## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC.,

                              Plaintiffs,

                    - against -

MUFG UNION BANK, N.A. and GLAS AMERICAS LLC,

                              Defendants.

19 Civ. No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Petróleos de Venezuela, S.A. ("PDVSA") (pronounced "PED-a-vesa"), PDVSA Petróleo, S.A. ("PDVSA Petróleo"), and PDV Holding, Inc. ("PDV Holding" and, collectively with PDVSA and PDVSA Petróleo, the "Plaintiffs"), through this complaint against MUFG Union Bank, N.A ("Union Bank") and GLAS Americas LLC ("GLAS Americas"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory and injunctive relief.  Plaintiffs seek a judgment declaring that certain notes issued by PDVSA, purportedly guaranteed by PDVSA Petróleo, and purportedly secured by a pledge of collateral from PDV Holding (as defined more fully below, the "2020 Notes"), as well as the related indenture and pledge agreement, are invalid, illegal, null and void *ab initio*, and thus unenforceable.  Plaintiffs also seek an injunction permanently enjoining any exercise of purported rights, remedies, or privileges with respect to the 2020 Notes or the purportedly pledged collateral—50.1% of PDV Holding's shares of CITGO Holdings, Inc. (the "CITGO Shares"), which owns 100% of CITGO Petroleum Company ("CITGO"), a major, U.S.-based oil refiner.

2.       PDVSA is a state-owned enterprise of the Bolivarian Republic of Venezuela ("Venezuela") which manages and oversees all of Venezuela's oil and gas operations.  PDVSA Petróleo and PDV Holding are wholly-owned subsidiaries of PDVSA.  PDV Holding, in turn, owns CITGO.  The oil industry has long been the primary driver of Venezuela's economy, which has completely collapsed due to the disastrous policies of Hugo Chávez and Nicolas Maduro, leading to a humanitarian crisis of epic proportions.  CITGO is critically important to any economic recovery and alleviation of human suffering in Venezuela.

3.      When the 2020 Notes were issued in 2016, PDVSA was controlled by Maduro, the Chávez protégé who became president of Venezuela after Chávez's death in 2013.  After a rigged election in 2018 in which Maduro illegitimately claimed victory, Venezuela's

democratically elected National Assembly declared the presidency vacant and, in accordance

with the Venezuelan Constitution, the president of the National Assembly, Juan Guaidó, became

the country's interim president.  Guaidó has since been recognized by the U.S. and over fifty

other nations as the rightful President of Venezuela.

4.      For more than a decade, the Chávez regime squandered much of Venezuela's oil

revenues on political patronage and other wasteful endeavors while underinvesting in PDVSA's

domestic production and refining capacities.  When chronic mismanagement and neglect met

with falling oil prices in 2014, oil revenues plummeted.  But the Maduro regime continued to

pursue the policies that led to PDVSA's financial undoing, including continued prioritization of

debt service over critical investments and operational expenditures, and issuance of

unsustainably expensive debt.  This odious borrowing included the issuance by PDVSA of

certain unsecured notes due in 2017 (as described more fully below, the "2017 Notes").

5.      By mid-2016, it was becoming clear that PDVSA did not have the money to repay

the 2017 Notes, and a default would have spelled political disaster for Maduro.  To stave off

default, the Maduro regime unilaterally and illegally orchestrated an exchange offer by which

PDVSA exchanged the 2017 Notes – which were unsecured and issued in local currency – for

the 2020 Notes, which were issued in U.S. dollars (as described more fully below, the "Exchange

Offer").  While PDV Holding is not a party to the indenture governing the 2020 Notes and has

no obligation to repay them, PDV Holding's principal asset—the CITGO Shares—were

purportedly pledged to secure PDVSA's debt.

6.      The holders who accepted this proposal provided the Maduro regime with a

financial and political lifeline.  Worse yet, these holders did so knowing that the Exchange Offer

was initiated without the required authorization of the National Assembly.  In fact, when the

transaction was announced, the National Assembly declared it illegal and called for an

immediate investigation – an investigation that was promptly quashed by the Maduro-controlled Constitutional Chamber of the Supreme Tribunal of Venezuela (the "Venezuelan Supreme Tribunal").

7.     Under the Venezuelan Constitution, the 2020 Notes, the indenture pursuant to which the notes were issued (as described more fully below, the "Indenture"), and the pledge and security agreement pursuant to which the notes were purportedly secured (as described more fully below, the "Pledge Agreement") are contracts in the national public interest and therefore required authorization by the National Assembly.  Because they were not authorized by the National Assembly, they are invalid, illegal, null and void *ab initio* under applicable Venezuelan law.  As set forth below, the lack of National Assembly authorization was widely reported at the time of the Exchange Offer.

8.     PDVSA is now governed by an ad-hoc administrative board (the "Ad-Hoc Board") appointed pursuant to a decree of Interim President Guaidó and recognized by the U.S. government and U.S. courts as the only legitimate corporate body with authority to govern its affairs.  The Ad-Hoc Board has, in turn, appointed new boards of its subsidiaries, including PDV Holding.  On account of the illegal Exchange Offer orchestrated by the Maduro regime, PDV Holding is now facing the loss of its controlling interest in CITGO.

9.     On October 28, 2019, PDVSA did not make a $913 million principal and interest payment purportedly due on the 2020 Notes, triggering an Event of Default.  Last week, in anticipation of this possibility, the U.S. issued General License 5A, forbidding Defendants from exercising default remedies until January 22, 2020.  Unless this Court grants the relief sought in this action by that time, CITGO will be lost and the Guaidó government's efforts to restore democracy and the rule of law, rebuild Venezuela's economy, and ameliorate the country's

ongoing humanitarian crisis will suffer a devastating blow.  Accordingly, Plaintiffs seek

declaratory and injunctive relief to avoid this cascade of irreparable harms.

## PARTIES

10.    Plaintiff PDVSA is a Venezuelan corporation with its principal place of business

in Caracas, Venezuela.  As mandated by Article 303 of the Venezuelan Constitution, Venezuela

retains all shares of PDVSA as the "body created to manage [Venezuela's] petroleum industry."[1]

11.    Plaintiff PDVSA Petróleo is a Venezuelan corporation with its principal place of

business in Caracas, Venezuela.

12.    Plaintiff PDV Holding is a Delaware corporation with its principal place of

business in Houston, Texas.

13.    Defendant Union Bank is a U.S. national banking association with its main office

in California and an office in New York City.  Union Bank is the Trustee under the Indenture

and the Pledge Agreement and, in that capacity, represents the interests of the holders and

beneficial holders of the 2020 Notes.

14.    Defendant GLAS Americas is a New York limited liability company that, upon

information and belief, has a single member that is organized under English law and has its

principal place of business in London, England.  GLAS Americas is the Collateral Agent under

the Indenture and the Pledge Agreement.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a)(3) because the amount in controversy exceeds $75,000, exclusive of interest and costs,

and it is an action between citizens of different States (PDV Holding as plaintiff and Union Bank

---

[1] Constitution of the Bolivarian Republic of Venezuela, art. 303 (translated), Ex. A.

as defendant) in which citizens or subjects of foreign states (PDVSA, PDVSA Petróleo, and GLAS Americas) are additional parties.

16.     This Court has personal jurisdiction over the defendants because they consented to the jurisdiction of this Court in the Indenture and the Pledge Agreement and because they maintain offices in this district.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this complaint occurred here and because all parties to the Indenture and the Pledge Agreement waived any objection to the laying of venue in this Court.

## BACKGROUND

### I.     The Bolivarian Republic of Venezuela

18.     Venezuela is a sovereign state on the northern coast of South America.  Colonized by Spain in 1498, Venezuela gained full independence in 1830.  In 1958, Venezuela became a federal presidential republic with democratic elections.  Since the discovery of oil in Venezuela in the early 20th century, Venezuela's economy has become increasingly dependent on oil exports.  Venezuela has one of the largest known oil reserves in the world and has been one of the world's leading exporters of oil for many decades.

19.     In the 1980s and 1990s, oil-related economic crises led to political upheaval, including two coup attempts in 1992, and widespread disillusionment with the existing political parties.  1998 witnessed the election of Hugo Chávez and the beginning of the Bolivarian Revolution (named after nineteenth-century political leader Simon Bolivar), which sought to usher in socialism and a state-run economy.  In 1999, Venezuela ratified a new constitution, which changed the official name of the country to the *Bolivarian Republic of Venezuela* (in Spanish, the *República Bolivariana de Venezuela*).

20.     Chávez died in 2013, shortly after beginning his fourth term in office.  He was
succeeded by his Vice President, Nicolas Maduro, who won an election following Chávez's
death and later claimed victory in a 2018 election declared illegitimate by the National
Assembly.  As discussed more fully below, Venezuela now finds itself in the unique position of
having a legitimate government while an illegitimate one—the Maduro regime, which is
recognized only by Russia, China, Iran, Cuba, and Turkey—still controls parts of the State.
From the U.S. standpoint, however, the government led by President Guaidó and the National
Assembly is the only legitimate Government of Venezuela.

## II.     Venezuela's Ongoing Political Crisis

21.     In late 2015, a coalition of Maduro opponents, including Guaidó, won control of
Venezuela's National Assembly.  However, just before the new legislature was sworn in, the
Maduro-dominated National Assembly packed the Venezuelan Supreme Tribunal with judges
loyal to Maduro.  In March 2016, Maduro's tribunal declared the National Assembly in contempt
of the Venezuelan Constitution and ruled that all legislative powers vested in the National
Assembly would be transferred to the tribunal itself.  In light of these actions, in May 2017, the
U.S. Department of Treasury sanctioned the judges of the tribunal's Constitutional Chamber,
recognizing that the tribunal was "responsible for a number of judicial rulings . . . that have
usurped the authority of Venezuela's democratically-elected legislature."[2]

22.     Maduro's efforts to consolidate power culminated in the creation of the so-called
"Constituent National Assembly," a loyalist, parallel legislature, in July 2017.  The U.S. strongly
denounced Maduro's usurpation of power, recognizing the National Assembly as "the only

---

[2] Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice (May 18, 2017), *available at* https://www.treasury.gov/press-center/press-releases/Pages/sm0090.aspx.

legitimate legislature" in Venezuela and sanctioning the Maduro regime for the "establishment of an illegitimate National Constituent Assembly."[3]

23.     Not quite a year later, in May 2018, the Maduro-dominated Constituent National Assembly called for an election more than six months before the end of Maduro's term.  No major opposition party candidates participated because they had been jailed or were living in exile, and Maduro claimed victory over his lesser opponents.  By that time, Venezuela was "in the midst of a historic economic collapse marked by soaring prices, widespread hunger, rampant crime, a failing health system and a large-scale exodus of its citizens."[4]

24.     Maduro was sworn in as President of Venezuela on January 10, 2019 by the illegitimate National Constituent Assembly.  Five days later, the opposition-controlled National Assembly issued a legislative order reiterating that Maduro's election was illegitimate under the Venezuelan Constitution and that Guaidó, as president of the National Assembly, would assume the role of Interim President of Venezuela.  On January 23, 2019, the U.S. recognized the Guaidó-led National Assembly as Venezuela's only legitimate democratically elected government and Mr. Guaidó as Venezuela's legitimate interim president.[5]  A number of other countries soon followed suit in recognizing Guaidó as Venezuela's rightful Interim President.

25.     On February 5, 2019, the National Assembly approved and adopted a "Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic

---

[3] Exec. Order No. 13,808, 82 Fed. Reg. 41155 (Aug. 24, 2017).

[4] William Neuman and Nicholas Casey, *Venezuela Election Won by Maduro Amid Widespread Disillusionment*, N.Y. TIMES (May 20, 2018), *available at* https://www.nytimes.com/2018/05/20/world americas/venezuela-election.html; *see also* Ricardo Hausmann, *Understanding Venezuela's Collapse*, THE HARVARD GAZETTE (Feb. 12, 2019), *available at* https://news.harvard.edu/gazette/story/2019/02/harvard-expert-tries-to-makesense-of-venezuelas-collapse/ (describing Venezuela as going through "the biggest economic collapse in human history outside of war or state collapse"); *Venezuela's President Maduro Wins Election but Could Face Sanctions*, CNBC (May 20, 2018), *available at* https://www.cnbc.com/2018/05/20/venezuelas-president-maduro-wins-presidential-vote-electionboard-says.html (detailing Venezuela's five-year recession, hyperinflation, falling oil production, and mass emigration).

[5] "U.S. Relations with Venezuela – Bilateral Relations Fact Sheet", *available at* https://www.state.gov/u-s-relations-with-venezuela/.

of Venezuela" (the "Transition Statute").  The Transition Statute provided that, in opposition to

the dictatorial Maduro regime, Venezuela would establish a democratically-elected transitional

government.  The Transition Statute also specifically vested President Guaidó with the power to

reconstitute PDVSA through the creation of a new *ad hoc* PDVSA board having no relationship

whatsoever with the Maduro regime or the previous, Maduro-appointed directors.

### III.   Venezuela's Economic Collapse and Ongoing Humanitarian Crisis

26.     As Professor Ricardo Hausmann of Harvard has written, Venezuela is facing "the

biggest economic collapse in human history outside of war or state collapse."[6]  This

unprecedented economic collapse has its roots in the political turmoil that followed Hugo

Chávez's election as President in 1998.  In 2002, a nationwide strike was staged in an attempt to

force through a constitutional referendum by which Chávez could be removed from power.  The

strike failed, and Chávez fired over 20,000 oil industry workers, including most skilled

management and technical staff.

27.     In 2004, the Chávez regime began a surge of expropriations, including joint

ventures with foreign oil producers and most of the domestic companies that provided drilling,

transport, and other oil-related services to PDVSA.

28.     Meanwhile, from 2003 until 2013, high oil prices translated into the longest-

lasting oil boom in Venezuela's history.  But rather than invest sufficiently in PDVSA, the

Chávez administration spent much of Venezuela's oil revenues on maintaining itself through

political patronage and a host of wasteful endeavors, both nationally and regionally.  Although

oil production drifted downward over time, the regime's underinvestment in PDVSA was

---

[6]  Ricardo Hausmann, Director of the Center for International Development, Harvard University *Understanding Venezuela's collapse,* The Harvard Gazette (Feb. 12, 2019), *available at* https://news.harvard.edu/gazette/story/ 2019/02/harvard-expert-tries-to-make-sense-of-venezuelas-collapse/ ("Hausmann Statement").

masked by high oil prices and the production of joint ventures established by the prior administration that were coming online.

29.     As a result of chronic underinvestment and mismanagement, Venezuela's domestic production and refining capabilities have been decimated, with domestic refineries sometimes operating at less than 20% of capacity due to lack of maintenance and skilled technical staff.  It is estimated that Venezuelan oil production is the same in 2019 as it was in 1945 and has declined by 69% over the past two years.  As a result, Venezuela's gross domestic product has fallen a staggering 50% since 2013.  This dramatic decrease in oil production also led to a severe shortage of foreign currency as the economy was becoming more and more reliant on imports for goods that were no longer being produced in Venezuela due to the effects of expropriation and the predatory policies of Chávez and Maduro.  With foreign currency in short supply, Venezuela has been unable to pay for rigs, valves, compressors, and services to maintain domestic oil production, refining, and fuel supply.

30.     The collapse of Venezuela's economy has resulted in a humanitarian crisis of epic proportions.  Many Venezuelans lack access to the most basic of necessities, including food, safe drinking water, and critical healthcare.  According to the United Nations High Commissioner for Human Rights, "as a direct result of this far-reaching human rights crisis, more than 3 million people have fled Venezuela, in search of food, health care, work and protection."[7]  In a more recent statement, the United Nations Refugee Agency and United Nations High Commissioner for Refugees estimated that there are over 4 million Venezuelan refugees and migrants.[8]

---

[7]  Statement by United Nations High Commissioner for Human Rights Michelle Bachelet, *Oral Update on the Situation of Human Rights in the Bolivarian Republic of Venezuela* (Mar. 20, 2019), *available at* https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=24374 ("UNHCHR Oral Statement").
[8]  *See* Statement by Office of the United Nations High Commissioner for Refugees (UNHCR), *Refugees and migrants from Venezuela top 4 million: UNHCR and IOM* (June 7, 2019), *available at* https://www.unhcr.org/news/press/2019/6/5cfa2a4a4/refugees-migrants-venezuela-top-4-million-unhcr-iom.html.

31.     Rampant food shortages and hyperinflation have caused widespread malnutrition and starvation throughout the country.  Eight out of ten Venezuelan households lack a reliable source of food, and 87% report living in poverty.[9]  One out of five pregnant women in low-income communities suffers from moderate or acute malnutrition,[10] and 11.7% of all Venezuelans—approximately 3.7 million people—are undernourished, up from less than 5% between 2008 and 2013.[11]  In recent years, the average Venezuelan has lost more than twenty pounds due to deprivation and malnutrition.[12]

32.     Eighty percent of Venezuelans cannot afford basic healthcare,[13] and even those with the means to pay often cannot access the care they need.  Nearly 70% of Venezuela's hospitals report intermittent power outages and a lack of potable water.[14]  Intensive care and surgical units are operating at approximately 40% and 30% capacity, respectively, and Venezuelan hospitals lack approximately 50% of the medical supplies they need to provide life-saving emergency care.[15]  Nearly half of Venezuelan hospitals surveyed reported recent robberies of medical equipment, and one-third of all hospital beds are unavailable to patients.[16]  Hospitals have been asking patients' families to bring their own medical supplies, including syringes and scalpels.[17]

---

[9]  Human Rights Watch & Johns Hopkins Bloomberg School for Public Health, *Venezuela's Humanitarian Emergency* 26 (Apr. 2019), *available a*t https://www.hrw.org/sites/default/files/report_pdf/venezuela0419_web.pdf. ("HRW Report").

[10]  *Id.* at 5.

[11]  *Id.* at 26.

[12]  R*emarks by Vice President Pence at the Washington Conference on the Americas* (May 7, 2019), *available at* https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-washington-conference-americas/.

[13]  United States Agency for International Development, *Venezuela Regional Crisis*, Fact Sheet #1, at 5 (March 1, 2019), *available at* https://www.usaid.gov/sites/default/files/documents/1866/venezuela_regional_crisis_fs01_03-01-2019.pdf.  ("USAID Fact Sheet #1").

[14]  *Id.*

[15]  United States Agency for International Development, *Venezuela Regional Crisis*, Fact Sheet #2 at 5 (April 10, 2019), *available at* https://www.usaid.gov/sites/default/files/documents/1866/04.10.19_-_USG_Venezuela_Regional_Crisis_Fact_Sheet_2.pdf.  ("USAID Fact Sheet #2").

[16]  USAID Fact Sheet #1 at 5.

[17]  HRW Report at 26.

33.     Venezuela's education system has also been devastated by the economic collapse, with more than one million children no longer attending school.[18]  The public schools' food programs have largely failed, there is a lack of affordable public transportation, and many teachers and other education professionals have fled the country.[19]  The humanitarian crisis in Venezuela has been further exacerbated by rolling blackouts, which have plagued the country since March 2019.[20]

**IV.     Petróleos de Venezuela, S.A. (PDVSA)**

34.     Formed by Venezuela in 1975 after the nationalization of the oil industry, PDVSA coordinates, monitors, and controls all Venezuelan oil and gas operations.  PDVSA is wholly-owned by Venezuela and is the holding company for a group of oil and gas operating companies.  PDVSA carries out exploration, development, and production operations in Venezuela and sales, marketing, refining, transportation, infrastructure, storage, and shipping operations in Venezuela, the Caribbean, North America, South America, Europe, and Asia. Through PDV Holdings, a wholly-owned subsidiary, PDVSA indirectly owns 100% of CITGO, a major, U.S.-based oil refiner.

35.     On February 8, 2019, pursuant to the authority granted him under the Transition Statute, Interim President Guaidó appointed the Ad-Hoc Board of PDVSA, whose members live in the U.S. and elsewhere due to the political turmoil in Venezuela, "for the purpose of carrying out all necessary actions to appoint a Board of Directors" for PDV Holding.  On February 13, 2019, the National Assembly approved this action by resolution.[21]

---

[18]  UNHCHR Oral Statement.
[19]  *Id.*
[20]  USAID Fact Sheet #2 at 5.
[21]  Bolivarian Republic of Venezuela National Assembly, *Agreement Authorizing the Appointment to Hold Positions for an Intervention Entity, named "Ad-Hoc Administrative Board"*, dated February, 13, 2019 (translated), Ex. B.

36.     The National Assembly's legitimate actions have been recognized as lawful by the U.S. and sustained by the courts.  On August 2, 2019, in *Jimenez v. Palacios*, the Delaware Chancery Court held that under the political question and act of state doctrines, the Guaidó appointed Ad-Hoc Board is valid and lawful.[22]  Notably, in rejecting a challenge by former Maduro-backed directors, the court concluded that the U.S.'s recognition of the National Assembly and Interim President Guaidó "effectively derecognized the Maduro regime."[23]

37.     From a U.S. standpoint, the Ad-Hoc Board is the only legitimate board of PDVSA and the only corporate body with authority to govern its affairs.  PDVSA has no available resources in bank accounts in the U.S., and, aside from whatever funds owing to PDVSA that remain "frozen" by the U.S. government in unknown, third-party accounts, PDVSA's only U.S. asset is PDV Holding.

38.     In accordance with the Transition Statute and Presidential Decree N° 3 of April 10, 2019, the Ad-Hoc Board removed the Maduro-appointed directors at PDV Holding and appointed a new and autonomous board with the capacity to reorganize PDV Holding's subsidiaries.  The Transition Statute and the Presidential Decree thus restored the autonomy of PDV Holding and its affiliates to protect CITGO as a key component of any economic recovery for Venezuela.

## V.     The Exchange Offer and the 2020 Notes

39.     In April 2007, PDVSA issued U.S. $3,000,000,000 in aggregate principal amount of 5.25% senior unsecured notes due April 12, 2017 (the "April 2017 Notes").  In October 2010 and January 2011, PDVSA issued U.S. $6,150,000,000 in aggregate principal amount of 8.5% senior unsecured notes due November 2, 2017 (the "November 2017 Notes" and, together with

---

[22] No. CV 2019-0490-KSJM, 2019 WL 3526479, at *1 (Del. Ch. Aug. 2, 2019), *as revised* (Aug. 12, 2019).
[23] *Id.* at *41.

April 2017 Notes, the "2017 Notes"). The 2017 Notes, which were guaranteed by PDVSA Petróleo, were issued in local currency at a preferential rate.

40.     In a September 2016 Exchange Offer, PDVSA offered to exchange the 2017 Notes for the 2020 Notes. Like the 2017 Notes, the 2020 Notes were issued with a purported guaranty from PDVSA Petróleo. Unlike the 2017 Notes or any other notes issued by PDVSA, however, the 2020 Notes are also purportedly secured by a pledge of 50.1% of PDV Holding's CITGO Shares, even though PDV Holding is not a party to the Indenture nor responsible for PDVSA's debt obligations.

41.     The Exchange Offer was accepted by the holders of approximately U.S. $2,799,000,000 of 2017 Notes, which was approximately 52.57% of the maximum tender amount and approximately 39.43% of the aggregate principal amount outstanding. For each U.S.$1,000 in outstanding principal amount of the April 2017 Notes validly tendered on or prior to the early tender deadline, PDVSA delivered U.S.$1,170 of 2020 Notes, and for each U.S.$1,000 in outstanding principal amount of the April 2017 Notes validly tendered after the early tender deadline but on or prior to the expiration of the Exchange Offer, PDVSA delivered U.S.$1,120 of 2020 Notes.   For each U.S.$1,000 in outstanding principal amount of the November 2017 Notes validly tendered on or prior to the early tender deadline, PDVSA delivered U.S.$1,220 of 2020 Notes, and for each U.S.$1,000 in outstanding principal amount of the November 2017 Notes validly tendered after the early tender deadline but on or prior to the expiration of the Exchange Offer, PDVSA delivered U.S.$1,170 of 2020 Notes. In aggregate, PDVSA issued approximately U.S. $3,367,529,000 in principal amount of 2020 Notes.

42.     The 2020 Notes were issued pursuant to an Indenture dated as of October 28, 2016 and, as contemplated by the Indenture, purportedly secured by a pledge of 50.1% of PDV

Holding's CITGO Shares pursuant to a Pledge Agreement also dated as of October 28, 2016.[24]
The 2020 Notes, the Indenture, and the Pledge Agreement comprise a set of interrelated
"Transaction Documents" (as defined in the Indenture).[25]

43.    The Indenture was entered into among (i) PDVSA, as Issuer, (ii) PDVSA
Petróleo, as Guarantor, (iii) MUFG Union Bank, N.A., as Trustee, (iv) GLAS Americas LLC, as
Collateral Agent, (v) Law Debenture Trust Company of New York, as Registrar, Transfer Agent,
and Principal Paying Agent, and (vi) Banque Internationale a Luxembourg, Societe Anonyme (as
"Luxembourg Paying Agent").[26]  PDV Holding is not a party to the Indenture and is not an
obligor on the 2020 Notes.  The Pledge Agreement was entered into among (i) PDV Holding, as
Pledgor, (ii) PDVSA, as Issuer, (iii) PDVSA Petróleo, as Guarantor, (iv) GLAS Americas LLC,
as Collateral Agent, and (v) MUFG Union Bank, N.A., as Trustee.[27]

## VI.    The Circumstances Surrounding the Exchange Offer

44.    According to the Offering Circular, the purpose of the Exchange Offer was to
refinance the 2017 Notes because "external factors" had affected the price at which PDVSA
could sell its products, making it "prudent to rearrange [PDVSA's] debt profile."[28]  In reality,
and as many commentators noted at the time, the true cause of PDVSA's financial distress was
the predatory policies of the Chávez and Maduro regimes.

45.    By the time of the Exchange Offer, clear signs of PDVSA's financial distress had
appeared.  Among other things, Venezuela's decline in oil production[29] was accelerating, and
quality was declining as well.  Financial statements revealed that PDVSA addressed the resulting

---

[24] Indenture, at p. 4; Pledge and Security Agreement, at pp. 3-4.
[25] Indenture, at p. 18.
[26] *Id*. at cover page & p. 18.
[27] Pledge Agreement, cover page & p. 18.
[28] Offering Circular for Petróleos de Venezuela, S.A. Offers to Exchange (the "Offering Circular"), at p. 7.
[29] Venezuela's oil production began to decline long before oil prices fell in 2014. By December 2013, Venezuelan production had fallen 27% to 2.684 mbpd from the 3,691 mbpd peak reached 17 years earlier in December 1997, according to the US Energy Information Administration (EIA).

loss of cash flow by, among other steps, (i) slashing investments by 38% ($6.8 billion) after a

26% contraction in 2015 ($6.5 billion), resulting in a cumulative investment reduction of 54% in

only two years; (ii) increasing arrears with suppliers and service providers by $19.3 billion; and

(iii) increasing liabilities to related parties (including the Central Bank) by $11.4 billion.  In

short, the operations and finances of PDVSA were in a death spiral.

46.    This led markets to anticipate that PDVSA would default on its debt.  As soon as

oil prices fell in late 2014, PDVSA's debt began trading at distressed prices, implying that a

default would occur in the short to medium term.  Bonds on the long end of PDVSA's yield

curve, such as the 5.5% 2037 bond, traded between 26% and 43% of face value until October

2016, the month of the Exchange Offer, yielding 14% to 22% to maturity.  These distressed

prices reflected the low expected recovery on the bonds in the event of a default.

47.    Unsurprisingly, the Exchange Offer was not well received by the market, and

PDVSA was forced to offer a premium to promote the exchange.[30]  PDVSA originally set a

minimum threshold of 50%—meaning, it sought at least 50% of the eligible bonds to participate

before it would effectuate the exchange.  But since the threshold was not met by the original

deadline, PDVSA extended the deadline twice and allowed all participating bondholders to

receive the same terms that were originally only offered to bondholders who tendered by the

original date.[31]

---

[30] For the exchange of the April 2017 Notes, PDVSA offered an exchange ratio of 1.12, and for the November 2017 an exchange ratio of 1.17. *See PDVSA Announces Changes to the Consideration Paid in connection with the Exchange Offers, the Extension of the Early Tender Deadline and the Withdrawal Deadline of its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020*, PR NEWSWIRE (Sept. 26, 2016), *available at* https://www.prnewswire.com/news-releases/pdvsa-announces-changes-to-the-consideration-paid-in-connection-with-the-exchange-offers-the-extension-of-the-early-tender-deadline-and-the-withdrawal-deadline-of-its-offers-to-exchange-its-outstanding-5250-senior-notes-due-201-300334516.html..
[31] *PDVSA Announces Extension of the Early Tender Deadline and the Expiration Date for its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020,* PR NEWSWIRE (Oct. 17, 2016), *available at*  https://www.prnewswire.com/news-releases/pdvsaannounces-extension-of-the-early-tender-deadlineand-the-expiration-date-for-its-offers-to-exchange-

48.     The lack of appetite for the Exchange Offer suggests that many holders of the 2017 Notes did not want to extend their exposure to PDVSA's credit risk for another four years because they did not expect the 2020 Notes to be paid in full, and it also reflects widespread concern about the legal and constitutional risks associated with the Exchange Offer, which were widely reported at the time.  As discussed more fully below, the National Assembly adopted a resolution contemporaneously with the Exchange Offer, denouncing it and calling for an investigation.

49.     For PDVSA, the Exchange Offer only made its situation worse.  Although the transaction provided PDVSA with $1.008 and $846 million in cash flow relief in 2016 and 2017, respectively, this relief came at a very high price.  Debt service in 2018, 2019, and 2020 increased by $1,057, $985, and $914 million, respectively, accounting for the 2020 Notes' extremely high 19% internal rate of return.  At the end of day, the Exchange Offer did nothing to solve PDVSA's financial problems, while placing at risk PDV Holding's economic ownership and control of CITGO.  From the perspective of the Maduro regime, the real objective – and accomplishment – of the Exchange Offer was political, for it allowed Maduro to postpone for a year the political trauma of a PDVSA default (which ultimately occurred in late 2017). [32] As

---

its-outstanding-5250-senior-notes-due-2017-and-850-senior-notes-due-2017-for-new-850-senior-secured-notes-due-2020-300346322.html. In the end, only 39% of the eligible bondholders participated, and PDVSA decided to waive its 50% threshold condition. *PDVSA Misses Tender Threshold as Investors Tender 39.43% of 2017 Notes,* Reorg Research (Oct. 24, 2016) *available at* https://app.reorg.com/v3#/items/intel/1916?item_id=26700. And out of that 39%, "analysts estimate[d] that government-controlled entities [held] about 25 per cent of the affected bonds," meaning the number of unaffiliated bondholders who actually participated was much lower. *Venezuelan Oil Major's Debt Swap: the Beginning of the End?*, FIN. TIMES (Sept. 26, 2016), at 2, *available at* https://www.ft.com/content/aadf657c-7f4a-11e6-8e50-8ec15fb462f4.

[32] Robin Wigglesworth, *ISDA declares Venezuela, PDVSA in default on their debts*, FIN. TIMES (Nov. 16, 2019), *available at* https://www.ft.com/content/3be4f10b-d639-3356-bd47-90b8031635d9; Myra Saefong, *Oil climbs in electronic trade as ISDA rules that PDVSA and Venezuela defaulted on debts*, MARKETWATCH (Nov. 16, 2019), *available at* https://www.marketwatch.com/story/oil-climbs-in-electronic-trade-as-isda-rules-that-pdvsa-and-venezuela-defaulted-on-debts-2017-11-16; ; *Sweetened PDVSABond Swap Has Traders Ignoring Congress's Threat*, Bloomberg, October 4, 2016 at 1, *available at* https://www.bloomberg.com/news/articles/2016-10-04/sweetened-pdvsa-bond-swap-has-tradersignoring-congress-s-threat

discussed below, however, Maduro only achieved this temporary – and crippling costly –
reprieve by violating the Venezuelan Constitution.

**VII.**     **The National Assembly's Widely Reported Opposition to the Exchange Offer**

50.     On August 4, 2016, before the Exchange Offer was announced, the National
Assembly adopted a resolution decrying PDVSA's over-indebtedness and calling for a
comprehensive debt restructuring process.  On September 27, 2016, shortly after the
announcement of the Exchange Offer, the National Assembly adopted another resolution (the
"September Resolution") publicly denouncing the transaction and calling for an
investigation.[33]  As a part of the September Resolution, the National Assembly "reject[ed]
categorically" the pledge of 50.1% of the PDV Holding's CITGO Shares as collateral for the
2020 Notes.[34]  The September Resolution also condemned the irrationality of the transaction and
called for an immediate investigation of the Maduro regime's mismanagement of PDVSA and its
misuse of PDVSA for political purposes.[35]

51.     The National Assembly's fierce opposition to the Exchange Offer was widely
reported, with multiple articles noting that National Assembly authorization was constitutionally
required.  *See, e.g.*, Eyanir Chinea & Brian Ellsworth, *S&P says PDVSA bond swap offer
'tantamount to default*,*',* REUTERS (Sept. 19, 2016) (noting that the National Assembly would
oppose the pledge of the CITGO Shares as collateral and that any such pledge would require
legislative oversight); Carolyn Cui, *Venezuela's PdVSA to Offer to Swap $7 Billion in Debt*,
WALL ST. J. (Sept. 14, 2016) ("Venezuela's constitution requires the National Assembly to
approve any new indebtedness of the republic.")  For example, it was reported at the time that:

---

[33] Bolivarian Republic of Venezuela National Assembly, *Resolutions on the Current Financial Situation of
Petróleos de Venezuela, S.A.*, dated September 27, 2016 (translated), Ex. C.
[34] *Id.*
[35] *Id.*

Many investors assert the 50.1% equity pledge on CITGO Holding Inc. is worth little given certain political risks and CITGO's substantial debt burden. Sources say that **Venezuela's congress is unlikely to approve the collateralization of CITGO before the tender closes, if at all, given that the lower house is controlled by opposition parties that are seeking to remove President Maduro from office**. PDVSA notes in its circular that the opposition coalition Mesa de la Unidad Democrática, or MUD, was elected to 112 seats in the National Assembly last year, leaving only 55 seats for Maduro's party, the Partido Socialista Unido de Venezuela, or PSUV. 'Such instability could have a material adverse effect on Venezuela's economic growth, our operations and as a result our ability to service our obligations under the New Notes,' the memorandum reads.[36]

52.     While the Exchange Offer was pending, articles and market reports warned that the lack of National Assembly approval would render the 2020 Notes subject to legal challenge.  *See, e.g.*, *Legal Risks Cloud Venezuela PdVSA Bond Swap – Market Talk*, DOW JONES INDUS. NEWS (Sept. 19, 2016) ("[T]he ruling Socialist Party has not consulted the opposition-controlled National Assembly regarding the bond exchange, which raises questions about how the debt would be viewed by authorities if there were to be a change in government.").  In a September 18, 2016 analysis of the Exchange Offer, Nomura Securities noted that "[t]he make or break of the exchange is the assessment of the equity valuation and the legal risks" and that "there have been opinions from local lawyers suggesting that all international transactions (such as…this PdVSA debt exchange) would require legislative approval or otherwise risk illegality."  *Legal Risks Cloud Venezuela PdVSA Bond Swap – Market Talk*, DOW JONES INDUS. NEWS (Sept. 19, 2016).  Torino Capital went as far as to warn that "there would be a strong legal argument for a future administration to state that debt contracted in 2017 would not be valid given the lack of an Annual Indebtedness Law approved by the

---

[36] *Investors Weigh Exchange Ratio, Value of Collateral Package in PDVSA Tender*, Reorg Research, September 21, 2016 (emphasis added), *available at* https://app.reorg.com/v3#/items/intel/1916?item_id=25705.

National Assembly."  Alexandra Ulmer, *Venezuela's Supreme Court lets Maduro bypass Congress in budget process*, Reuters (Oct. 12, 2016).

53.     Investors' recognition of the risks was also reflected in the notes' ratings and the low participation threshold for the exchange. The proposed debt was "assigned an 'RR4' average Recovery Rating as the collateral provided may only marginally enhance recovery given default, which could still range between 31% and 50%."[37]  Both Standard & Poor's ("S&P") and Fitch Ratings downgraded PDVSA's credit rating soon after the exchange, with S&P referring to the PDVSA 2020 Bonds as a "distressed exchange" that would be "tantamount to default."[38]

54.     The Maduro regime and the Defendants ignored the National Assembly's September Resolution and proceeded with the Exchange Offer, the results of which were announced on October 24, 2016.  The very next day, in an effort to quell concern over the September Resolution, the Maduro-controlled Venezuelan Supreme Tribunal purported to suspend all National Assembly investigations of PDVSA, including the investigation of the Exchange Offer.  Three days later, at Maduro's direction, the Indenture and the Pledge Agreement were executed without National Assembly authorization.

55.     For months following the completion of the Exchange Offer, market analysts and journalists continued to comment on the illegality of the 2020 Notes.  *See, e.g.*, Mayela Armas & Kejal Vyas, *Venezuela Sells $5 Billion in New Bonds*, Wall St. J. (Jan. 2, 2017) (commenting that the Exchange Offer was decried by Venezuelan lawmakers because it was not submitted to

---

[37] *Fitch Expects to Rate PDVSA's Proposed Notes 'CCR/RR4,'* Business Wire, September 19, 2016, at 2, *available at* https://www.businesswire.com/news/home/20160919006535/en/Fitch-Expects-Rate-PDVSAs-Proposed-Notes-CCCRR4.

[38] *Venezuela's Pdvsa Debt In Selective Default, S&P Says*, Barron's, October 25, 2017, *available at* https://www.barrons.com/articles/venezuelas-pdvsa-debt-in-selective-default-s-p-says-1477438907; *Fitch Downgrades PDVSA's IDRs to 'CC'*, FitchRatings, October 25, 2016, *available at* https://www.fitchratings.com/site/pr/1013724; *PDVSA Downgraded by S&P on 'Distressed' Bond Swap Proposal*, Bloomberg, September 19, 2016, *available at* https://www.bloomberg.com/news/articles/2016-09-19/pdvsadowngraded- by-s-p-on-distressed-bond-swap-proposal.

the National Assembly for required authorization, making the Exchange Offer "a totally illegal operation"); *Sovereign Risk*, ECONOMIST INTELLIGENCE UNIT LTD. (Aug. 14, 2017) ("New debt will carry repudiation risk for investors making them wary, as the opposition says that it will not recognise debt issued without the National Assembly's approval (as mandated by the constitution)."); Deutsche Bank Markets Research, *Emerging Markets Monthly*, at 133 (May 11, 2017) ("The lack of a legislative authorization, as stipulated in the constitution, is raising doubts about the legality of new financing transactions in 2017 and risks of selective debt repudiation by future administrations.  Last October, President Maduro opted out of the congressional route.  Instead he relied on extraordinary powers and a Supreme Court's decision to approve the 2017 budget law.").

56.     Thus, it is not simply that the Indenture and the Pledge Agreement were not authorized by the National Assembly, although that alone renders them invalid under Venezuelan law, as discussed further below.  Rather, Maduro used his political control over the Venezuelan Supreme Tribunal to prevent the National Assembly from exercising any of its rightful Constitutional powers with respect to the Exchange Offer.

**VIII.   U.S. Foreign Policy and Support for the Guaidó-Led National Assembly**

57.     On January 23, 2019, the President of the United States recognized "the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim President of Venezuela" and the National Assembly as "the *only* legitimate branch of government duly elected by the Venezuelan people."  In the same statement, the President referred to the Maduro regime as "illegitimate."[39]

---

[39] Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela (Jan. 23, 2019)

58.     On the same day the President of the United States officially recognized the Guaidó government, Secretary of State Michael Pompeo issued a statement declaring that the United States stands with interim President Juan Guaidó . . . . The United States does not recognize the Maduro regime as the government of Venezuela."[40]

59.     Two days later, on January 25, 2019, the President of the United States issued an Executive Order extending pre-existing sanctions to members of the Maduro regime and continuing to recognize the Guaidó government's legitimacy, while referring to the Maduro regime as "illegitimate."[41]

60.     In the days and weeks after U.S. recognition, the U.S. Department of State accepted Interim President Guaidó's designation of Carlos Alfredo Vecchio as the Chargé d'Affaires of the Government of Venezuela and allowed the Guaidó Government to take control of Venezuelan property in the U.S., including the Venezuelan Embassy.[42]

61.     Additionally, the State Department authorized Interim President Guaidó to receive and control otherwise sanctioned Venezuelan property held by U.S. Banks, acknowledging under U.S. law that Guaidó is the only leader "recognized by the Secretary of State as being the accredited representative of [Venezuela] to the Government of the United States[.]"[43]

62.     In support of these actions, the U.S. Secretary of State made clear that the U.S. no longer views the Maduro regime as the Government of Venezuela:

---

[40] Press Statement, U.S. Dep't of State, Continuing U.S. Diplomatic Presence in Venezuela (Jan. 23, 2019), *available at* https://www.state.gov/continuing-u-s-diplomatic-presence-in-venezuela/.

[41] Executive Order 13857.

[42] Michael R. Pompeo, Representative of the Government of Venezuela to the United States (Press Statement, Jan. 27, 2019), *available at* https://www.state.gov/representative-of-the-government-of-venezuela-to-the-united-states/); Gershon Peaks, *Venezuela opposition takes control of diplomatic properties in U.S.*, REUTERS, Mar. 18, 2019, at 2, *available at* https://www.reuters.com/article/us-venezuela-politics-vecchio/venezuela-opposition-takes-control-of-diplomatic-properties-in-us-idUSKCN1QZ2FH.

[43] 12 U.S.C. § 632; U.S. Dep't of State, Protecting Venezuela's Assets for Benefit of Venezuelan People (Press Statement, Jan. 29, 2019), available at https://www.state.gov/protecting-venezuelas-assets-for-benefit-of-venezuelan-people/.

> Today, the United States has taken necessary actions to prevent the *illegitimate former Maduro regime* from further plundering Venezuela's assets and natural resources. . . . The United States stands with interim President Juan Guaidó, the democratically elected National Assembly, and the people of Venezuela as they peacefully restore constitutional order to their country.[44]

63.    Since recognizing President Guaidó and the National Assembly as Venezuela's only legitimate leaders, the U.S. executive branch has consistently reaffirmed its support for the "efforts of Interim President Juan Guaidó to address the endemic corruption, human rights abuses, and violent repression that has become the hallmark of the illegitimate Maduro regime."[45]  For example, on May 1, 2019, President Trump issued a statement reaffirming that "[t]he United States stands with Interim President Juan Guaidó, the democratically elected National Assembly, and all Venezuelans who seek to restore democracy and the rule of law. . . . The people of Venezuela are standing up against the illegitimate, brutal rule of Nicolas Maduro."[46]

64.    The U.S. Congress has also voiced its support through members such as Nancy Pelosi, Speaker of the House of Representatives, who issued a press release on February 8, 2019 stating: "I support the decision of the National Assembly, Venezuela's sole remaining democratic institution, to recognize Juan Guaidó, President of the National Assembly, as the Interim President until full, fair and free elections can be held. . . . Nicolas Maduro's regime of

---

[44] Michael R. Pompeo, *Sanctions Against PDVSA and Venezuela Oil Sector* (Press Statement, Jan. 28, 2019), *available at* https://www.state.gov/sanctions-against-pdvsa-and-venezuela-oil-sector/ (emphasis added).
[45] U.S. Dep't of the Treasury, Press Release, Treasury Sanctions Governors of Venezuelan States Aligned with Maduro (Feb. 25, 2019), *available at* https://home.treasury.gov/news/press releases /sm616; *see also* President Donald J. Trump Stands for Democracy in Venezuela (May 1, 2019), *available at* https://www.whitehouse.gov/ briefingsstatements/president-donald-j-trump-stands-democracy-venezuela/.
[46] *President Donald J. Trump Stands for Democracy in Venezuela* (May 1, 2019), *available at* https://www. whitehouse.gov/briefings-statements/president-donald-j-trump-stands-democracy-venezuela.

repression and impoverishment for his personal enrichment continues to gravely violate human rights."[47]

65.     Notably, consistent with the above, the U.S. government has taken a series of actions intended to sanction the Maduro regime by loosening its grip on CITGO.  On May 24, 2018, President Trump issued Executive Order 13835 (the "Executive Order"), which precludes U.S. persons from engaging in any transactions, provisions of financing, and other dealings related to "the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which [it] has a 50 percent or greater ownership interest."[48]  As defined in the Executive Order, the "Government of Venezuela" expressly includes PDVSA, and thus PDSVA's creditors are precluded from exercising remedies against PDVSA's shares of PDV Holding or the pledged CITGO Shares, precluding them by law from obtaining control of CITGO.[49]

66.     In July 2018, the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") issued General License 5 as a carve-out from the Executive Order.[50]  As explained by OFAC, General License 5 removed Executive Order 13835 as an obstacle to the holders of the 2020 Notes exercising default remedies with respect to the pledged CITGO Shares, with the intention of "prevent[ing] the Maduro regime from using [] [Executive Order 13835] to default on the [2020 Notes] without consequence."[51]

---

[47] *Pelosi Statement on the Situation in Venezuela* (Feb. 8. 2019), *available at:* https://www.speaker.gov/newsroom/2819-2/.
[48] Exec. Order No. 13,835, 83 Fed. Reg. 24,001 (May 24, 2018), *available at* https://www.treasury.gov/resourcecenter/ sanctions/Programs/Documents/venezuela_eo_13835.pdf.
[49] *Id*.
[50] *General License No. 5, Authorizing Certain Transactions Related to the Petróleos de Venezuela SA 2020 8.5 Percent Bond*, U.S. Dep't of the Treasury (July 19, 2018), available at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl5.pdf.
[51] *OFAC FAQs: Other Sanctions Programs, Venezuela Sanctions, FAQ 596*, U.S. Dep't of the Treasury (July 19, 2018), *available at* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#venezuela.

67.     On February 8, 2019, the same day that Guaidó reconstituted PDVSA's board, OFAC specifically licensed transactions with the Guaidó appointed directors despite broad sanctions against PDVSA.[52]  In explaining its actions taken against PDVSA, the Treasury Department explained that its goal was to transfer control to Interim President Guaidó and away from "former President Nicolas Maduro."[53]

68.     After the U.S. President put in place additional sanctions against the Maduro regime in an Executive Order dated August 5, 2019, the Treasury Department issued another license exempting from sanctions certain transactions with the Venezuelan National Assembly and Interim President Guaidó, and making clear that sanctions remained in place for any transaction with a member of the Maduro regime.[54]

69.     On October 24, 2019, OFAC replaced General License 5 with General License 5A, which reinstated the Executive Order with respect to the 2020 Notes until January 22, 2020, thereby barring any exercise in the interim of default remedies with respect to the pledged CITGO Shares.[55]

---

[52] Exec. Order No. 13,835, 83 Fed. Reg. 24,001 (May 24, 2018), *available at* https://www.treasury.gov/resourcecenter/ sanctions/Programs/Documents/venezuela_eo_13835.pdf; *General License No. 2, Authorizing Certain Transactions and Activities to Wind Down Operations for the Hotel Operating at Millennium Plaza, Panama*, U.S. Dep't of the Treasury (May 5, 2016), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/kingpin_gl2.pdf; *General License No. 7B, Authorizing Certain Activities Involving PDV Holding, Inc. and CITGO Holding, Inc.*, U.S. Dep't of the Treasury (June 6, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl7b.pdf.

[53] *OFAC FAQs: Other Sanctions Programs, Venezuela Sanctions, FAQ 660*, U.S. Dep't of the Treasury (Jan. 31, 2019), *available at* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#venezuela.

[54] *General License No. 31, Certain Transactions Involving the Venezuelan National Assembly, the Interim President of Venezuela, and Certain Other Persons Authorized*, U.S. Dep't of the Treasury (Aug. 5, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl31.pdf.

[55] *General License No. 5A, Authorizing Certain Transactions Related to the Petróleos de Venezuela SA 2020 8.5 Percent Bond on or After January 22, 2020*, U.S. Dep't of Treasury (Oct. 24, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl5a.pdf.

## IX.    Events of Default Under the Indenture and Default Remedies With Respect to the Pledged CITGO Shares

70.    The Indenture defines a number of "Events of Default," including the failure of PDVSA and PDVSA Petróleo to pay interest or principal when due.[56]  Under the terms of the Indenture, if an Event of Default (other than an Event of Default related to any bankruptcy, reorganization or insolvency proceeding, which automatically results in an acceleration of the 2020 Notes) occurs and continues without a waiver, the holders of at least 25% in principal amount of outstanding 2020 Notes may declare the notes to be due and payable by notice in writing to PDVSA and the Trustee specifying the Event of Default and that it is a notice of acceleration.[57]  Upon the issuance of an acceleration notice, the 2020 Notes become immediately due and payable in full.[58]

71.    In addition, if an Event of Default has occurred and is continuing, the Trustee (and the Collateral Agent at the direction of the Trustee) may, at the written direction of holders of at least 25% in aggregate principal amount of the then outstanding 2020 Notes voting as a single class, exercise rights and/or powers with respect to security interests (including with respect to the CITGO Shares) purportedly granted pursuant to the Pledge Agreement.

## X.    The Purported Payment Default

72.    Under the terms of the Indenture, approximately $913,000,000 in principal and interest was purportedly due by 10:00 a.m. (EST) on October 28, 2019.[59] This payment was not made, and thus an Event of Default has purportedly occurred and, but for General License 5A, the Trustee could direct the Collateral Agent to exercise default remedies with respect to the

---

[56] Indenture, § 5.01(a)(1)-(2).
[57] *Id*. at 5.01(b).
[58] *Id*.
[59] *Id*. at 2.08(b).  Though an interest payment is technically due on October 28, 2019, interest payments are subject to a 30-day grace period under the Indenture and the failure to pay interest when it is due does not constitute an Event of Default until that 30-day grace period expires.  *Id*. at 5.01(a)(2).

pledged CITGO Shares.  Upon the expiration of General License 5A on January 22, 2020, the

Trustee could direct the Collateral Agent to exercise default remedies at any moment.

## FIRST CAUSE OF ACTION

**(On Behalf of PDVSA and PDVSA Petróleo, a Declaration that the 2020 Notes and the Indenture are Invalid, Illegal, Null and Void *Ab Initio*, and Unenforceable)**

73.     Paragraphs 1-72 are incorporated by reference as if fully set forth herein.

74.     Under Articles 150 and 187.9 of Venezuelan Constitution, contracts in the

national public interest entered into by the National Public Administration with companies not

domiciled in Venezuela must be authorized in advance by the National Assembly.[60]

75.     PDVSA and PDVSA Petróleo are national, state-owned enterprises that are part

of Venezuela's National Public Administration and the public sector of the Venezuelan State.

76.     At the time of the Exchange Offer, the Indenture was a national public interest

contract because (i) PDVSA and PDVSA Petróleo were parties to the Indenture and (ii) the

Indenture implicated in a significant way Venezuela's most important industry and placed the

CITGO Shares at risk.

77.     In addition, the Indenture was entered into with companies not domiciled in

Venezuela, including the Trustee and the Collateral Agent.

78.     The Indenture was not authorized by the National Assembly and thus was entered

into in violation of the Venezuelan Constitution.

79.     As set forth above, in its September Resolution, the National Assembly

challenged the Exchange Offer.  In a resolution adopted on October 15, 2019, the National

Assembly reiterated that the Indenture was not authorized as required by the Venezuelan

---

[60] *See* Constitution of the Bolivarian Republic of Venezuela, articles 150 & 187.9 (translated), Ex. A.

Constitution and that the National Assembly's investigations were thwarted by the Venezuelan Supreme Tribunal, which was acting under Maduro's political control.[61]

80.     The Executive Branch of the U.S. government recognizes the Guaidó government, including the National Assembly, as the only legitimate branch of government in Venezuela and considers the Maduro regime illegitimate.

81.     28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

82.     An actual controversy exists because PDVSA and PDVSA Petróleo are in default of their purported payment obligations under the Indenture.

83.     Accordingly, PDVSA and PDVSA Petróleo are entitled to a declaratory judgment that the 2020 Notes and the Indenture are invalid, illegal, null and void *ab initio*, and thus unenforceable.

## SECOND CAUSE OF ACTION

**(On Behalf of All Plaintiffs, a Declaration that the Pledge Agreement Is Invalid, Illegal, Null and Void *Ab Initio*, and Unenforceable)**

84.     Paragraphs 1-83 are incorporated by reference as if fully set forth herein.

85.     Under Articles 150 and 187.9 of Venezuelan Constitution, contracts in the national public interest entered into by the National Public Administration with companies not domiciled in Venezuela must be authorized in advance by the National Assembly.

86.     PDVSA and PDVSA Petróleo are national, state-owned enterprises that are part of Venezuela's National Public Administration and the public sector of the Venezuelan State.

---

[61] Bolivarian Republic of Venezuela National Assembly, *Resolutions that Reiterates the Invalidity of PDVSA's 2020 Bonds*, dated October 15, 2019 (translated), Ex. D.

87.     At the time of the Exchange Offer, the Pledge Agreement was a national public interest contract because (i) PDVSA and PDVSA Petróleo were parties to the Pledge Agreement and (ii) the Pledge Agreement implicated in a significant way Venezuela's most important industry and placed the CITGO Shares at risk.

88.     In addition, the Pledge Agreement was entered into with companies not domiciled in Venezuela, including the Trustee and the Collateral Agent.

89.     The Pledge Agreement was not authorized by the National Assembly and thus was entered into in violation of the Venezuelan Constitution.

90.     As set forth above, in its September Resolution, the National Assembly challenged the Exchange Offer and the pledge of the CITGO Shares as collateral for the 2020 Notes.  In a resolution adopted on October 15, 2019, the National Assembly reiterated that the Pledge Agreement was not authorized as required by the Venezuelan Constitution and that the National Assembly's investigations were thwarted by the Venezuelan Supreme Tribunal, which was acting under Maduro's political control.[62]

91.     The Executive Branch of the U.S. government recognizes the Guaidó government, including the National Assembly, as the only legitimate branch of government in Venezuela and considers the Maduro regime illegitimate.

92.     28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

---

[62] Bolivarian Republic of Venezuela National Assembly, *Resolutions that Reiterates the Invalidity of PDVSA's 2020 Bonds*, dated October 15, 2019 (translated), Ex. D.

93.     An actual controversy exists because PDVSA and PDVSA Petróleo are in default of their purported payment obligations under the Indenture.

94.     Accordingly, Plaintiffs are entitled to a declaratory judgment that the Pledge Agreement is invalid, illegal, null and void *ab initio*, and thus unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief as follows:

a.  A judgment declaring that the 2020 Notes, the Indenture, and the Pledge Agreement are invalid, illegal, null and void *ab initio*, and thus unenforceable;

b.  An injunction permanently enjoining the defendants, any owners or holders of the 2020 Notes or beneficial interests therein, and any other parties claiming an interest in the 2020 Notes or a security interest in the pledged CITGO Shares, from attempting to enforce the 2020 Notes, the Indenture, or the Pledge Agreement or from otherwise attempting to exercise any rights, remedies, or privileges purportedly arising from a default or Event of Default under the Indenture or the Pledge Agreement; and

c.  Such other and further relief as the Court deems just and proper.

[SIGNATURES ON FOLLOWING PAGE]

Dated:  October 29, 2019         Respectfully submitted,

/s/ Kurt W. Hansson
Kurt W. Hansson
James R. Bliss
James B. Worthington

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
kurthansson@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com

*Attorneys for Plaintiffs*
*Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.*

/s/ Tariq Mundiya
Tariq Mundiya
Jeffrey B. Korn

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone:     (212) 728-8000
Facsimile:      (212) 728-8111
tmundiya@willkie.com
jkorn@willkie.com

Michael J. Gottlieb
1875 K Street NW
Washington, DC  20006-1238
Telephone:     (202) 303-1442
Facsimile:      (202) 303 2442
mgottlieb@willkie.com

*Attorneys for Plaintiff PDV Holding, Inc.*