

1(212) 318-6626
jamesbliss@paulhastings.com

February 5, 2020

**VIA ECF AND ELECTRONIC MAIL**

The Honorable Katherine Polk Failla
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:   *Petróleos de Venezuela, et al. v. MUFG Union Bank, N.A., et. al.*, Case No. 1:19-cv-10023-KPF (S.D.N.Y.)

Dear Judge Failla:

This letter address the issues raised in Mr. Clark's letter of January 31, 2020.

The defendants accuse Venezuela's Special Attorney General, Dr. Jose Ignacio Hernández, of witness intimidation—a very serious matter—based on a Guaidó administration press release about this case and a pair of one-line "tweets" calling attention to a news article entitled "New York trial to shed light on what Maduro covered [up] about the PDVSA 2020 bond."  (Exhibits 5-8 to Defendants' January 31, 2020 Letter to the Court).  These public statements come nowhere close to justifying the defendants' accusation.

This is a highly visible case with significant political implications.  The Guaidó administration—a non-party and a foreign sovereign—has every right to issue public statements explaining the nature of the case and expressing confidence in and support for the plaintiffs' legal position under Venezuelan law.  In relevant part, the press release (which Dr. Hernández was not involved in drafting) states that "[d]uring the argument phase, the Parties shall pose their interpretation of the Constitution before the Court and present supporting analyses from Venezuelan lawyers specialized in Constitutional Law."  (Exhibit 5 to Defendants' January 31, 2020 Letter to the Court).  The press release then states: "The legitimate Government's argument is solid. On the contrary, for a legal expert to justify the approval of the PDVSA 2020 bond issuance without authorization from the National Assembly, they would have to argue contrary to what is ordered by the Constitution of our Country."  *Id*.  Then, drawing a contrast with the secretive manner in which the Maduro regime orchestrated the 2016 exchange offer, the press release states that "in spite of the efforts made by the dictatorship, the Venezuelans will be able to witness the trial."  *Id*.  The obvious point is that the legality of the exchange offer will be determined in a public forum so that Venezuelans will know that the Maduro regime acted in violation of the Venezuelan Constitution.  The press release concludes by stating that "[t]he legitimate Government of Venezuela stands by its absolute decision to defend, at all costs and by all means, the property of our people of a strategic asset [CITGO] necessary for the national reconstruction and for overcoming the worst humanitarian crisis ever seen in the history of our region."  *Id*.  In context, the phrase "at all costs and by all means" has none of the threatening quality Mr. Clark reads into it.  Indeed, it is obvious that the Guaidó administration is simply reaffirming its commitment to protect CITGO through all legal and diplomatic means available, as it has been doing for almost a year while attempting to negotiate a resolution with the noteholders.  With regard to the alleged "coordination" of the press release and Dr. Hernandez's tweets about the news article, it was the appearance of the news article that prompted the Guaidó government to issue a statement of its own.



In characterizing these public statements as "attacks on [the defendants'] witnesses," Mr. Clark ignores the natural, common sense distinction between "attacking a witness" and attacking a legal position that "a legal expert [would have to take] to justify the approval of the PDVSA 2020 bond issuance without authorization from the National Assembly."

Mr. Clark is also wrong to suggest that the plaintiffs "could not explain" why the press release would reference "a legal expert" during the parties' January 31 meet-and-confer calls.  This presumes that this is something inherently nefarious that needs to be "explained."  At the heart of this case is a question of Venezuelan law—whether National Assembly authorization was constitutionally required.  That question can only be addressed by Venezuelan law experts.  The plaintiffs (and the legitimate government of Venezuela) believe that their position is right, that the defendants' position is wrong, and that this will be demonstrated in court.  Generic references to experts in public statements about a case that hinges on expert testimony regarding Venezuelan law do not require explanation.  In the same meet-and-confer calls, plaintiffs' counsel specifically asked whether the defendants had any other information the plaintiffs should consider regarding their accusation of witness intimidation, and defendants' counsel identified no information beyond the public statements referenced in Mr. Clark's letters.

The cases cited in Mr. Clark's letter only underscore how the public statements he characterizes as efforts at witness intimidation are nothing of the kind.  In *Harris v. SCA Restaurant Corp.*, the defendant "threatened two of his employees with termination if they testified against him in this case."  No. 09-CV-2212 JFB ETB, 2014 WL 996249, at *4 (E.D.N.Y. 2014).  In *Chahal v. Paine Webber Inc.*, an executive of the defendant brokerage firm allegedly called the plaintiffs' expert witness's new employer, also a brokerage firm, to complain that the firm was "violating an 'understanding' among brokerage firms that their employees do not testify against each other."  725 F.2d 20, 22 (1984).  In *Sewell v. Maryland Dept. of Transp.*, the plaintiff's lawyer initiated numerous *ex parte* communications with the defendants' psychiatric expert, who had examined the plaintiff as part of pretrial discovery, to dispute the expert's evaluation and threaten him with litigation.  206 F.R.D. 545, 546-47 (2002).  Finally, in *Massachusetts Institute of Technology v. Imclone Systems, Inc.*, in-house counsel for the defendant sent emails to an expert's employer that the court found "served no legitimate purpose" and were tantamount to a "demand that [the employer] rein [the expert] in."  490 F.Supp.2d 119, 126 (D. Mass. 2007).  Thus, each of these cases involved direct, unmistakable threats against particular witnesses or direct communications with a known expert's employer for the manifest purpose of interfering with the witness's role in the case.  The public statements referenced by Mr. Clark bear no resemblance to these types of improper communications.

Mr. Clark further states that "Plaintiffs did not deny seeking to communicate with defendants' potential experts, nor did they suggest that the communications were for an innocent purpose, such as retaining the experts themselves."  The plaintiffs did not deny seeking to communicate with Venezuelan legal scholars, any one of whom might (in theory) be a "potential expert" for the defendants, because there is nothing improper in doing so.

In advising the Guaidó administration, the Office of the Special Attorney General regularly solicits, on a strictly confidential basis due to personal safety concerns, the opinions of a broad array of Venezuelan legal scholars to ensure that the administration's legal positions on important issues, including the constitutional issue at the core this case, are well-founded and not vulnerable to legitimate criticism.  In the litigation context, this process (which is attorney work product) also serves to identify potential testifying and consulting experts.  Sometimes, as happened here, certain scholars will decline to offer an opinion, which could be for any number of reasons, including a conflict or potential conflict of interest.



Although this process thereby yields information about who might end up serving as the opposing side's expert, there were no efforts to continue communicating with any declining scholar. While criticizing the plaintiffs for not denying such communications, which are not improper in the first place, Mr. Clark's letter ignores the plaintiffs' straightforward denial of engaging in any communications with the purpose or effect of "chilling" or intimidating any witness.

With regard to the requested directions to the plaintiffs and "persons working in coordination with them," we can certainly confirm that the plaintiffs and their legal team, including the Office of the Special Attorney General, will not communicate with any potential expert believed to be working with the defendants (as of now, the plaintiffs do not know who the defendants' expert is, if they have an expert), although there will be ongoing communications with Venezuelan legal scholars on unrelated official matters and academic projects in which Dr. Hernández is involved. We can also confirm that the plaintiffs will not engage in any communications intended to intimidate or with the reasonably foreseeable effect of intimidating any witness, although, to be clear, the plaintiffs would not have foreseen, and do not see, the public statements at the center of this dispute as having such an effect. The plaintiffs and Dr. Hernández should not have to respond to the defendants' supplemental document requests, which, given the lack of any basis for the defendants' accusation of witness intimidation, are unwarranted and harassing.

Finally, in an effort to resolve the parties' disputes regarding the protective order, the plaintiffs proposed that Dr. Hernández and a designated colleague (i) only be permitted to review Attorneys'-Eyes-Only ("AEO") materials in our firm's offices, without taking possession of any such materials, and (ii) agree to be bound by the protective order and submit themselves to the jurisdiction of this Court with respect to its enforcement. Of course, like any other counsel with access to AEO materials, they would be prohibited from using such materials for any purpose other than the litigation of this case. To at least partially counterbalance the proposed restriction on Dr. Hernández and his designated colleague, the plaintiffs also proposed that the noteholders' AEO designations be limited to defined categories of materials identified by the noteholders' as particularly sensitive.

The defendants' concern over documents being "leaked" is misplaced, as Mr. Hernández and his designated colleague would never have possession of AEO materials under the plaintiff's proposed compromise. Furthermore, depriving them of any access to AEO materials, without any predefined limits on what can be designed AEO, would unjustifiably prevent the Office of the Special Attorney General from fulfilling its obligations under Venezuelan law to provide fully-informed legal advice to the *ad hoc* boards of PDVSA and PDVSA Petróleo. In any event, as the civil servant of a sovereign government, the Special Attorney General cannot agree to any restrictions that would impair the exercise of the office's public functions.

Respectfully,

*James R. Bliss*

James R. Bliss
of PAUL HASTINGS LLP


cc:     Counsel of record