**EXHIBIT 5**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> MUFG UNION BANK, N.A. and GLAS AMERICAS LLC, <br><br> Defendants. | 19 Civ. No. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Petróleos de Venezuela, S.A. ("PDVSA") (pronounced "PED-a-vesa"), PDVSA Petróleo, S.A. ("PDVSA Petróleo"), and PDV Holding, Inc. ("PDV Holding" and, collectively with PDVSA and PDVSA Petróleo, the "Plaintiffs"), through this complaint against MUFG Union Bank, N.A ("Union Bank") and GLAS Americas LLC ("GLAS Americas"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory and injunctive relief.  Plaintiffs seek a judgment declaring that certain notes issued by PDVSA, purportedly guaranteed by PDVSA Petróleo, and purportedly secured by a pledge of collateral from PDV Holding (as defined more fully below, the "2020 Notes"), as well as the related indenture and pledge agreement, are invalid, illegal, null and void *ab initio*, and thus unenforceable.  Plaintiffs also seek an injunction permanently enjoining any exercise of purported rights, remedies, or privileges with respect to the 2020 Notes or the purportedly pledged collateral—50.1% of PDV Holding's shares of CITGO Holdings, Inc. (the "CITGO Shares"), which owns 100% of CITGO Petroleum Company ("CITGO"), a major, U.S.-based oil refiner.

2.       PDVSA is a state-owned enterprise of the Bolivarian Republic of Venezuela ("Venezuela") which manages and oversees all of Venezuela's oil and gas operations.  PDVSA Petróleo and PDV Holding are wholly-owned subsidiaries of PDVSA.  PDV Holding, in turn, owns CITGO.  The oil industry has long been the primary driver of Venezuela's economy, which has completely collapsed due to the disastrous policies of Hugo Chávez and Nicolas Maduro, leading to a humanitarian crisis of epic proportions.  CITGO is critically important to any economic recovery and alleviation of human suffering in Venezuela.

3.      When the 2020 Notes were issued in 2016, PDVSA was controlled by Maduro, the Chávez protégé who became president of Venezuela after Chávez's death in 2013.  After a rigged election in 2018 in which Maduro illegitimately claimed victory, Venezuela's

democratically elected National Assembly declared the presidency vacant and, in accordance

with the Venezuelan Constitution, the president of the National Assembly, Juan Guaidó, became

the country's interim president.  Guaidó has since been recognized by the U.S. and over fifty

other nations as the rightful President of Venezuela.

4.      For more than a decade, the Chávez regime squandered much of Venezuela's oil

revenues on political patronage and other wasteful endeavors while underinvesting in PDVSA's

domestic production and refining capacities.  When chronic mismanagement and neglect met

with falling oil prices in 2014, oil revenues plummeted.  But the Maduro regime continued to

pursue the policies that led to PDVSA's financial undoing, including continued prioritization of

debt service over critical investments and operational expenditures, and issuance of

unsustainably expensive debt.  This odious borrowing included the issuance by PDVSA of

certain unsecured notes due in 2017 (as described more fully below, the "2017 Notes").

5.      By mid-2016, it was becoming clear that PDVSA did not have the money to repay

the 2017 Notes, and a default would have spelled political disaster for Maduro.  To stave off

default, the Maduro regime unilaterally and illegally orchestrated an exchange offer by which

PDVSA exchanged the 2017 Notes – which were unsecured and issued in local currency – for

the 2020 Notes, which were issued in U.S. dollars (as described more fully below, the "Exchange

Offer").  While PDV Holding is not a party to the indenture governing the 2020 Notes and has

no obligation to repay them, PDV Holding's principal asset—the CITGO Shares—were

purportedly pledged to secure PDVSA's debt.

6.      The holders who accepted this proposal provided the Maduro regime with a

financial and political lifeline.  Worse yet, these holders did so knowing that the Exchange Offer

was initiated without the required authorization of the National Assembly.  In fact, when the

transaction was announced, the National Assembly declared it illegal and called for an

immediate investigation – an investigation that was promptly quashed by the Maduro-controlled
Constitutional Chamber of the Supreme Tribunal of Venezuela (the "Venezuelan Supreme
Tribunal").

7.      Under the Venezuelan Constitution, the 2020 Notes, the indenture pursuant to
which the notes were issued (as described more fully below, the "Indenture"), and the pledge and
security agreement pursuant to which the notes were purportedly secured (as described more
fully below, the "Pledge Agreement") are contracts in the national public interest and therefore
required authorization by the National Assembly.  Because they were not authorized by the
National Assembly, they are invalid, illegal, null and void *ab initio* under applicable Venezuelan
law.  As set forth below, the lack of National Assembly authorization was widely reported at the
time of the Exchange Offer.

8.      PDVSA is now governed by an ad-hoc administrative board (the "Ad-Hoc
Board") appointed pursuant to a decree of Interim President Guaidó and recognized by the U.S.
government and U.S. courts as the only legitimate corporate body with authority to govern its
affairs.  The Ad-Hoc Board has, in turn, appointed new boards of its subsidiaries, including PDV
Holding.  On account of the illegal Exchange Offer orchestrated by the Maduro regime, PDV
Holding is now facing the loss of its controlling interest in CITGO.

9.      On October 28, 2019, PDVSA did not make a $913 million principal and interest
payment purportedly due on the 2020 Notes, triggering an Event of Default.  Last week, in
anticipation of this possibility, the U.S. issued General License 5A, forbidding Defendants from
exercising default remedies until January 22, 2020.  Unless this Court grants the relief sought in
this action by that time, CITGO will be lost and the Guaidó government's efforts to restore
democracy and the rule of law, rebuild Venezuela's economy, and ameliorate the country's

ongoing humanitarian crisis will suffer a devastating blow.  Accordingly, Plaintiffs seek

declaratory and injunctive relief to avoid this cascade of irreparable harms.

## PARTIES

10.     Plaintiff PDVSA is a Venezuelan corporation with its principal place of business

in Caracas, Venezuela.  As mandated by Article 303 of the Venezuelan Constitution, Venezuela

retains all shares of PDVSA as the "body created to manage [Venezuela's] petroleum industry."[1]

11.     Plaintiff PDVSA Petróleo is a Venezuelan corporation with its principal place of

business in Caracas, Venezuela.

12.     Plaintiff PDV Holding is a Delaware corporation with its principal place of

business in Houston, Texas.

13.     Defendant Union Bank is a U.S. national banking association with its main office

in California and an office in New York City.  Union Bank is the Trustee under the Indenture

and the Pledge Agreement and, in that capacity, represents the interests of the holders and

beneficial holders of the 2020 Notes.

14.     Defendant GLAS Americas is a New York limited liability company that, upon

information and belief, has a single member that is organized under English law and has its

principal place of business in London, England.  GLAS Americas is the Collateral Agent under

the Indenture and the Pledge Agreement.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a)(3) because the amount in controversy exceeds $75,000, exclusive of interest and costs,

and it is an action between citizens of different States (PDV Holding as plaintiff and Union Bank

---

[1] Constitution of the Bolivarian Republic of Venezuela, art. 303 (translated), Ex. A.

as defendant) in which citizens or subjects of foreign states (PDVSA, PDVSA Petróleo, and GLAS Americas) are additional parties.

16.  This Court has personal jurisdiction over the defendants because they consented to the jurisdiction of this Court in the Indenture and the Pledge Agreement and because they maintain offices in this district.

17.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this complaint occurred here and because all parties to the Indenture and the Pledge Agreement waived any objection to the laying of venue in this Court.

## **BACKGROUND**

### I.   **The Bolivarian Republic of Venezuela**

18.  Venezuela is a sovereign state on the northern coast of South America.  Colonized by Spain in 1498, Venezuela gained full independence in 1830.  In 1958, Venezuela became a federal presidential republic with democratic elections.  Since the discovery of oil in Venezuela in the early 20th century, Venezuela's economy has become increasingly dependent on oil exports.  Venezuela has one of the largest known oil reserves in the world and has been one of the world's leading exporters of oil for many decades.

19.  In the 1980s and 1990s, oil-related economic crises led to political upheaval, including two coup attempts in 1992, and widespread disillusionment with the existing political parties.  1998 witnessed the election of Hugo Chávez and the beginning of the Bolivarian Revolution (named after nineteenth-century political leader Simon Bolivar), which sought to usher in socialism and a state-run economy.  In 1999, Venezuela ratified a new constitution, which changed the official name of the country to the *Bolivarian Republic of Venezuela* (in Spanish, the *República Bolivariana de Venezuela*).

20.     Chávez died in 2013, shortly after beginning his fourth term in office.  He was

succeeded by his Vice President, Nicolas Maduro, who won an election following Chávez's

death and later claimed victory in a 2018 election declared illegitimate by the National

Assembly.  As discussed more fully below, Venezuela now finds itself in the unique position of

having a legitimate government while an illegitimate one—the Maduro regime, which is

recognized only by Russia, China, Iran, Cuba, and Turkey—still controls parts of the State.

From the U.S. standpoint, however, the government led by President Guaidó and the National

Assembly is the only legitimate Government of Venezuela.

## II.     <u>Venezuela's Ongoing Political Crisis</u>

21.     In late 2015, a coalition of Maduro opponents, including Guaidó, won control of

Venezuela's National Assembly.  However, just before the new legislature was sworn in, the

Maduro-dominated National Assembly packed the Venezuelan Supreme Tribunal with judges

loyal to Maduro.  In March 2016, Maduro's tribunal declared the National Assembly in contempt

of the Venezuelan Constitution and ruled that all legislative powers vested in the National

Assembly would be transferred to the tribunal itself.  In light of these actions, in May 2017, the

U.S. Department of Treasury sanctioned the judges of the tribunal's Constitutional Chamber,

recognizing that the tribunal was "responsible for a number of judicial rulings . . . that have

usurped the authority of Venezuela's democratically-elected legislature."[2]

22.     Maduro's efforts to consolidate power culminated in the creation of the so-called

"Constituent National Assembly," a loyalist, parallel legislature, in July 2017.  The U.S. strongly

denounced Maduro's usurpation of power, recognizing the National Assembly as "the only

---

[2] Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice (May 18, 2017), *available at* https://www.treasury.gov/press-center/press-releases/Pages/sm0090.aspx.

legitimate legislature" in Venezuela and sanctioning the Maduro regime for the "establishment of an illegitimate National Constituent Assembly."[3]

23.    Not quite a year later, in May 2018, the Maduro-dominated Constituent National Assembly called for an election more than six months before the end of Maduro's term.  No major opposition party candidates participated because they had been jailed or were living in exile, and Maduro claimed victory over his lesser opponents.  By that time, Venezuela was "in the midst of a historic economic collapse marked by soaring prices, widespread hunger, rampant crime, a failing health system and a large-scale exodus of its citizens."[4]

24.    Maduro was sworn in as President of Venezuela on January 10, 2019 by the illegitimate National Constituent Assembly.  Five days later, the opposition-controlled National Assembly issued a legislative order reiterating that Maduro's election was illegitimate under the Venezuelan Constitution and that Guaidó, as president of the National Assembly, would assume the role of Interim President of Venezuela.  On January 23, 2019, the U.S. recognized the Guaidó-led National Assembly as Venezuela's only legitimate democratically elected government and Mr. Guaidó as Venezuela's legitimate interim president.[5]  A number of other countries soon followed suit in recognizing Guaidó as Venezuela's rightful Interim President.

25.    On February 5, 2019, the National Assembly approved and adopted a "Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic

---

[3] Exec. Order No. 13,808, 82 Fed. Reg. 41155 (Aug. 24, 2017).
[4] William Neuman and Nicholas Casey, *Venezuela Election Won by Maduro Amid Widespread Disillusionment*, N.Y. TIMES (May 20, 2018), *available at* https://www.nytimes.com/2018/05/20/world americas/venezuela-election.html; *see also* Ricardo Hausmann, *Understanding Venezuela's Collapse*, THE HARVARD GAZETTE (Feb. 12, 2019), *available at* https://news.harvard.edu/gazette/story/2019/02/harvard-expert-tries-to-makesense-of-venezuelas-collapse/ (describing Venezuela as going through "the biggest economic collapse in human history outside of war or state collapse"); *Venezuela's President Maduro Wins Election but Could Face Sanctions*, CNBC (May 20, 2018), *available at* https://www.cnbc.com/2018/05/20/venezuelas-president-maduro-wins-presidential-vote-electionboard-says.html (detailing Venezuela's five-year recession, hyperinflation, falling oil production, and mass emigration).
[5] "U.S. Relations with Venezuela – Bilateral Relations Fact Sheet", *available at* https://www.state.gov/u-s-relations-with-venezuela/.

of Venezuela" (the "<u>Transition Statute</u>").  The Transition Statute provided that, in opposition to

the dictatorial Maduro regime, Venezuela would establish a democratically-elected transitional

government.  The Transition Statute also specifically vested President Guaidó with the power to

reconstitute PDVSA through the creation of a new *ad hoc* PDVSA board having no relationship

whatsoever with the Maduro regime or the previous, Maduro-appointed directors.

## III.    Venezuela's Economic Collapse and Ongoing Humanitarian Crisis

26.    As Professor Ricardo Hausmann of Harvard has written, Venezuela is facing "the

biggest economic collapse in human history outside of war or state collapse."[6]  This

unprecedented economic collapse has its roots in the political turmoil that followed Hugo

Chávez's election as President in 1998.  In 2002, a nationwide strike was staged in an attempt to

force through a constitutional referendum by which Chávez could be removed from power.  The

strike failed, and Chávez fired over 20,000 oil industry workers, including most skilled

management and technical staff.

27.    In 2004, the Chávez regime began a surge of expropriations, including joint

ventures with foreign oil producers and most of the domestic companies that provided drilling,

transport, and other oil-related services to PDVSA.

28.    Meanwhile, from 2003 until 2013, high oil prices translated into the longest-

lasting oil boom in Venezuela's history.  But rather than invest sufficiently in PDVSA, the

Chávez administration spent much of Venezuela's oil revenues on maintaining itself through

political patronage and a host of wasteful endeavors, both nationally and regionally.  Although

oil production drifted downward over time, the regime's underinvestment in PDVSA was

---

[6]  Ricardo Hausmann, Director of the Center for International Development, Harvard University *Understanding Venezuela's collapse,* The Harvard Gazette (Feb. 12, 2019), *available at* https://news.harvard.edu/gazette/story/2019/02/harvard-expert-tries-to-make-sense-of-venezuelas-collapse/ ("<u>Hausmann Statement</u>").

masked by high oil prices and the production of joint ventures established by the prior administration that were coming online.

29.     As a result of chronic underinvestment and mismanagement, Venezuela's domestic production and refining capabilities have been decimated, with domestic refineries sometimes operating at less than 20% of capacity due to lack of maintenance and skilled technical staff.  It is estimated that Venezuelan oil production is the same in 2019 as it was in 1945 and has declined by 69% over the past two years.  As a result, Venezuela's gross domestic product has fallen a staggering 50% since 2013.  This dramatic decrease in oil production also led to a severe shortage of foreign currency as the economy was becoming more and more reliant on imports for goods that were no longer being produced in Venezuela due to the effects of expropriation and the predatory policies of Chávez and Maduro.  With foreign currency in short supply, Venezuela has been unable to pay for rigs, valves, compressors, and services to maintain domestic oil production, refining, and fuel supply.

30.     The collapse of Venezuela's economy has resulted in a humanitarian crisis of epic proportions.  Many Venezuelans lack access to the most basic of necessities, including food, safe drinking water, and critical healthcare.  According to the United Nations High Commissioner for Human Rights, "as a direct result of this far-reaching human rights crisis, more than 3 million people have fled Venezuela, in search of food, health care, work and protection."[7]  In a more recent statement, the United Nations Refugee Agency and United Nations High Commissioner for Refugees estimated that there are over 4 million Venezuelan refugees and migrants.[8]

---

[7]  Statement by United Nations High Commissioner for Human Rights Michelle Bachelet, *Oral Update on the Situation of Human Rights in the Bolivarian Republic of Venezuela* (Mar. 20, 2019), *available at* https://www. ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=24374 ("UNHCHR Oral Statement").
[8]  *See* Statement by Office of the United Nations High Commissioner for Refugees (UNHCR), *Refugees and migrants from Venezuela top 4 million: UNHCR and IOM* (June 7, 2019), *available at* https://www.unhcr.org/news/press/2019/6/5cfa2a4a4/refugees-migrants-venezuela-top-4-million-unhcr-iom.html.

31.     Rampant food shortages and hyperinflation have caused widespread malnutrition and starvation throughout the country.  Eight out of ten Venezuelan households lack a reliable source of food, and 87% report living in poverty.[9]  One out of five pregnant women in low-income communities suffers from moderate or acute malnutrition,[10] and 11.7% of all Venezuelans—approximately 3.7 million people—are undernourished, up from less than 5% between 2008 and 2013.[11]  In recent years, the average Venezuelan has lost more than twenty pounds due to deprivation and malnutrition.[12]

32.     Eighty percent of Venezuelans cannot afford basic healthcare,[13] and even those with the means to pay often cannot access the care they need.  Nearly 70% of Venezuela's hospitals report intermittent power outages and a lack of potable water.[14]  Intensive care and surgical units are operating at approximately 40% and 30% capacity, respectively, and Venezuelan hospitals lack approximately 50% of the medical supplies they need to provide life-saving emergency care.[15]  Nearly half of Venezuelan hospitals surveyed reported recent robberies of medical equipment, and one-third of all hospital beds are unavailable to patients.[16]  Hospitals have been asking patients' families to bring their own medical supplies, including syringes and scalpels.[17]

---

[9]  Human Rights Watch & Johns Hopkins Bloomberg School for Public Health, *Venezuela's Humanitarian Emergency* 26 (Apr. 2019), *available at* https://www.hrw.org/sites/default/files/report_pdf/venezuela0419_web.pdf. ("HRW Report").

[10]  *Id.* at 5.

[11]  *Id.* at 26.

[12]  R*emarks by Vice President Pence at the Washington Conference on the Americas* (May 7, 2019), *available at* https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-washington-conference-americas/.

[13]  United States Agency for International Development, *Venezuela Regional Crisis*, Fact Sheet #1, at 5 (March 1, 2019), *available at* https://www.usaid.gov/sites/default/files/documents/1866/venezuela_regional_crisis_fs01_03-01-2019.pdf.  ("USAID Fact Sheet #1").

[14]  *Id.*

[15]  United States Agency for International Development, *Venezuela Regional Crisis*, Fact Sheet #2 at 5 (April 10, 2019), *available at* https://www.usaid.gov/sites/default/files/documents/1866/04.10.19_-_USG_Venezuela_Regional_Crisis_Fact_Sheet_2.pdf.  ("USAID Fact Sheet #2").

[16]  USAID Fact Sheet #1 at 5.

[17]  HRW Report at 26.

33.     Venezuela's education system has also been devastated by the economic collapse,
with more than one million children no longer attending school.[18]  The public schools' food
programs have largely failed, there is a lack of affordable public transportation, and many
teachers and other education professionals have fled the country.[19]  The humanitarian crisis in
Venezuela has been further exacerbated by rolling blackouts, which have plagued the country
since March 2019.[20]

**IV.     Petróleos de Venezuela, S.A. (PDVSA)**

34.     Formed by Venezuela in 1975 after the nationalization of the oil industry,
PDVSA coordinates, monitors, and controls all Venezuelan oil and gas operations.  PDVSA is
wholly-owned by Venezuela and is the holding company for a group of oil and gas operating
companies.  PDVSA carries out exploration, development, and production operations in
Venezuela and sales, marketing, refining, transportation, infrastructure, storage, and shipping
operations in Venezuela, the Caribbean, North America, South America, Europe, and Asia.
Through PDV Holdings, a wholly-owned subsidiary, PDVSA indirectly owns 100% of CITGO,
a major, U.S.-based oil refiner.

35.     On February 8, 2019, pursuant to the authority granted him under the Transition
Statute, Interim President Guaidó appointed the Ad-Hoc Board of PDVSA, whose members live
in the U.S. and elsewhere due to the political turmoil in Venezuela, "for the purpose of carrying
out all necessary actions to appoint a Board of Directors" for PDV Holding.  On February 13,
2019, the National Assembly approved this action by resolution.[21]

---

[18] UNHCHR Oral Statement.
[19] *Id.*
[20] USAID Fact Sheet #2 at 5.
[21] Bolivarian Republic of Venezuela National Assembly, *Agreement Authorizing the Appointment to Hold Positions for an Intervention Entity, named "Ad-Hoc Administrative Board"*, dated February, 13, 2019 (translated), Ex. B.

36. The National Assembly's legitimate actions have been recognized as lawful by the U.S. and sustained by the courts. On August 2, 2019, in *Jimenez v. Palacios*, the Delaware Chancery Court held that under the political question and act of state doctrines, the Guaidó appointed Ad-Hoc Board is valid and lawful.[22] Notably, in rejecting a challenge by former Maduro-backed directors, the court concluded that the U.S.'s recognition of the National Assembly and Interim President Guaidó "effectively derecognized the Maduro regime."[23]

37. From a U.S. standpoint, the Ad-Hoc Board is the only legitimate board of PDVSA and the only corporate body with authority to govern its affairs. PDVSA has no available resources in bank accounts in the U.S., and, aside from whatever funds owing to PDVSA that remain "frozen" by the U.S. government in unknown, third-party accounts, PDVSA's only U.S. asset is PDV Holding.

38. In accordance with the Transition Statute and Presidential Decree N° 3 of April 10, 2019, the Ad-Hoc Board removed the Maduro-appointed directors at PDV Holding and appointed a new and autonomous board with the capacity to reorganize PDV Holding's subsidiaries. The Transition Statute and the Presidential Decree thus restored the autonomy of PDV Holding and its affiliates to protect CITGO as a key component of any economic recovery for Venezuela.

## V.    The Exchange Offer and the 2020 Notes

39. In April 2007, PDVSA issued U.S. $3,000,000,000 in aggregate principal amount of 5.25% senior unsecured notes due April 12, 2017 (the "April 2017 Notes"). In October 2010 and January 2011, PDVSA issued U.S. $6,150,000,000 in aggregate principal amount of 8.5% senior unsecured notes due November 2, 2017 (the "November 2017 Notes" and, together with

---

[22] No. CV 2019-0490-KSJM, 2019 WL 3526479, at *1 (Del. Ch. Aug. 2, 2019), *as revised* (Aug. 12, 2019).
[23] *Id.* at *41.

April 2017 Notes, the "2017 Notes").  The 2017 Notes, which were guaranteed by PDVSA Petróleo, were issued in local currency at a preferential rate.

40.     In a September 2016 Exchange Offer, PDVSA offered to exchange the 2017 Notes for the 2020 Notes.  Like the 2017 Notes, the 2020 Notes were issued with a purported guaranty from PDVSA Petróleo.  Unlike the 2017 Notes or any other notes issued by PDVSA, however, the 2020 Notes are also purportedly secured by a pledge of 50.1% of PDV Holding's CITGO Shares, even though PDV Holding is not a party to the Indenture nor responsible for PDVSA's debt obligations.

41.     The Exchange Offer was accepted by the holders of approximately U.S. $2,799,000,000 of 2017 Notes, which was approximately 52.57% of the maximum tender amount and approximately 39.43% of the aggregate principal amount outstanding.  For each U.S.$1,000 in outstanding principal amount of the April 2017 Notes validly tendered on or prior to the early tender deadline, PDVSA delivered U.S.$1,170 of 2020 Notes, and for each U.S.$1,000 in outstanding principal amount of the April 2017 Notes validly tendered after the early tender deadline but on or prior to the expiration of the Exchange Offer, PDVSA delivered U.S.$1,120 of 2020 Notes.   For each U.S.$1,000 in outstanding principal amount of the November 2017 Notes validly tendered on or prior to the early tender deadline, PDVSA delivered U.S.$1,220 of 2020 Notes, and for each U.S.$1,000 in outstanding principal amount of the November 2017 Notes validly tendered after the early tender deadline but on or prior to the expiration of the Exchange Offer, PDVSA delivered U.S.$1,170 of 2020 Notes.  In aggregate, PDVSA issued approximately U.S. $3,367,529,000 in principal amount of 2020 Notes.

42.     The 2020 Notes were issued pursuant to an Indenture dated as of October 28, 2016 and, as contemplated by the Indenture, purportedly secured by a pledge of 50.1% of PDV

Holding's CITGO Shares pursuant to a Pledge Agreement also dated as of October 28, 2016.[24] The 2020 Notes, the Indenture, and the Pledge Agreement comprise a set of interrelated "Transaction Documents" (as defined in the Indenture).[25]

43.     The Indenture was entered into among (i) PDVSA, as Issuer, (ii) PDVSA Petróleo, as Guarantor, (iii) MUFG Union Bank, N.A., as Trustee, (iv) GLAS Americas LLC, as Collateral Agent, (v) Law Debenture Trust Company of New York, as Registrar, Transfer Agent, and Principal Paying Agent, and (vi) Banque Internationale a Luxembourg, Societe Anonyme (as "Luxembourg Paying Agent").[26]  PDV Holding is not a party to the Indenture and is not an obligor on the 2020 Notes.  The Pledge Agreement was entered into among (i) PDV Holding, as Pledgor, (ii) PDVSA, as Issuer, (iii) PDVSA Petróleo, as Guarantor, (iv) GLAS Americas LLC, as Collateral Agent, and (v) MUFG Union Bank, N.A., as Trustee.[27]

## VI.     The Circumstances Surrounding the Exchange Offer

44.     According to the Offering Circular, the purpose of the Exchange Offer was to refinance the 2017 Notes because "external factors" had affected the price at which PDVSA could sell its products, making it "prudent to rearrange [PDVSA's] debt profile."[28]  In reality, and as many commentators noted at the time, the true cause of PDVSA's financial distress was the predatory policies of the Chávez and Maduro regimes.

45.     By the time of the Exchange Offer, clear signs of PDVSA's financial distress had appeared.  Among other things, Venezuela's decline in oil production[29] was accelerating, and quality was declining as well.  Financial statements revealed that PDVSA addressed the resulting

---

[24] Indenture, at p. 4; Pledge and Security Agreement, at pp. 3-4.
[25] Indenture, at p. 18.
[26] *Id*. at cover page & p. 18.
[27] Pledge Agreement, cover page & p. 18.
[28] Offering Circular for Petróleos de Venezuela, S.A. Offers to Exchange (the "Offering Circular"), at p. 7.
[29] Venezuela's oil production began to decline long before oil prices fell in 2014. By December 2013, Venezuelan production had fallen 27% to 2.684 mbpd from the 3,691 mbpd peak reached 17 years earlier in December 1997, according to the US Energy Information Administration (EIA).

loss of cash flow by, among other steps, (i) slashing investments by 38% ($6.8 billion) after a
26% contraction in 2015 ($6.5 billion), resulting in a cumulative investment reduction of 54% in
only two years; (ii) increasing arrears with suppliers and service providers by $19.3 billion; and
(iii) increasing liabilities to related parties (including the Central Bank) by $11.4 billion.  In
short, the operations and finances of PDVSA were in a death spiral.

46.     This led markets to anticipate that PDVSA would default on its debt.  As soon as
oil prices fell in late 2014, PDVSA's debt began trading at distressed prices, implying that a
default would occur in the short to medium term.  Bonds on the long end of PDVSA's yield
curve, such as the 5.5% 2037 bond, traded between 26% and 43% of face value until October
2016, the month of the Exchange Offer, yielding 14% to 22% to maturity.  These distressed
prices reflected the low expected recovery on the bonds in the event of a default.

47.     Unsurprisingly, the Exchange Offer was not well received by the market, and
PDVSA was forced to offer a premium to promote the exchange.[30]  PDVSA originally set a
minimum threshold of 50%—meaning, it sought at least 50% of the eligible bonds to participate
before it would effectuate the exchange.  But since the threshold was not met by the original
deadline, PDVSA extended the deadline twice and allowed all participating bondholders to
receive the same terms that were originally only offered to bondholders who tendered by the
original date.[31]

---

[30] For the exchange of the April 2017 Notes, PDVSA offered an exchange ratio of 1.12, and for the November 2017
an exchange ratio of 1.17. *See PDVSA Announces Changes to the Consideration Paid in connection with the
Exchange Offers, the Extension of the Early Tender Deadline and the Withdrawal Deadline of its Offers to
Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior
Secured Notes due 2020*, PR NEWSWIRE (Sept. 26, 2016), *available at* https://www.prnewswire.com/news-
releases/pdvsa-announces-changes-to-the-consideration-paid-in-connection-with-the-exchange-offers-the-extension-
of-the-early-tender-deadline-and-the-withdrawal-deadline-of-its-offers-to-exchange-its-outstanding-5250-senior-
notes-due-201-300334516.html..
[31] *PDVSA Announces Extension of the Early Tender Deadline and the Expiration Date for its Offers to Exchange its
Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes
due 2020,* PR NEWSWIRE (Oct. 17, 2016), *available at*  https://www.prnewswire.com/news-
releases/pdvsaannounces-extension-of-the-early-tender-deadlineand-the-expiration-date-for-its-offers-to-exchange-

48.     The lack of appetite for the Exchange Offer suggests that many holders of the
2017 Notes did not want to extend their exposure to PDVSA's credit risk for another four years
because they did not expect the 2020 Notes to be paid in full, and it also reflects widespread
concern about the legal and constitutional risks associated with the Exchange Offer, which were
widely reported at the time.  As discussed more fully below, the National Assembly adopted a
resolution contemporaneously with the Exchange Offer, denouncing it and calling for an
investigation.

49.     For PDVSA, the Exchange Offer only made its situation worse.  Although the
transaction provided PDVSA with $1.008 and $846 million in cash flow relief in 2016 and 2017,
respectively, this relief came at a very high price.  Debt service in 2018, 2019, and 2020
increased by $1,057, $985, and $914 million, respectively, accounting for the 2020 Notes'
extremely high 19% internal rate of return.  At the end of day, the Exchange Offer did nothing to
solve PDVSA's financial problems, while placing at risk PDV Holding's economic ownership
and control of CITGO.  From the perspective of the Maduro regime, the real objective – and
accomplishment – of the Exchange Offer was political, for it allowed Maduro to postpone for a
year the political trauma of a PDVSA default (which ultimately occurred in late 2017). [32] As

---

its-outstanding-5250-senior-notes-due-2017-and-850-senior-notes-due-2017-for-new-850-senior-secured-notes-due-
2020-300346322.html. In the end, only 39% of the eligible bondholders participated, and PDVSA decided to waive
its 50% threshold condition. *PDVSA Misses Tender Threshold as Investors Tender 39.43% of 2017 Notes,* Reorg
Research (Oct. 24, 2016) *available at* https://app.reorg.com/v3#/items/intel/1916?item_id=26700. And out of that
39%, "analysts estimate[d] that government-controlled entities [held] about 25 per cent of the affected bonds,"
meaning the number of unaffiliated bondholders who actually participated was much lower. *Venezuelan Oil Major's
Debt Swap: the Beginning of the End?*, FIN. TIMES (Sept. 26, 2016), at 2, *available at*
https://www.ft.com/content/aadf657c-7f4a-11e6-8e50-8ec15fb462f4.
[32]Robin Wigglesworth, *ISDA declares Venezuela, PDVSA in default on their debts*, FIN. TIMES (Nov. 16, 2019),
*available at* https://www.ft.com/content/3be4f10b-d639-3356-bd47-90b8031635d9; Myra Saefong, *Oil climbs in
electronic trade as ISDA rules that PDVSA and Venezuela defaulted on debts*, MARKETWATCH (Nov. 16, 2019),
*available at* https://www.marketwatch.com/story/oil-climbs-in-electronic-trade-as-isda-rules-that-pdvsa-and-
venezuela-defaulted-on-debts-2017-11-16; ; *Sweetened PDVSABond Swap Has Traders Ignoring Congress's
Threat*, Bloomberg, October 4, 2016 at 1,
*available at* https://www.bloomberg.com/news/articles/2016-10-04/sweetened-pdvsa-bond-swap-has-
tradersignoring-congress-s-threat

discussed below, however, Maduro only achieved this temporary – and crippling costly –
reprieve by violating the Venezuelan Constitution.

**VII.**   **The National Assembly's Widely Reported Opposition to the Exchange Offer**

50.   On August 4, 2016, before the Exchange Offer was announced, the National
Assembly adopted a resolution decrying PDVSA's over-indebtedness and calling for a
comprehensive debt restructuring process.  On September 27, 2016, shortly after the
announcement of the Exchange Offer, the National Assembly adopted another resolution (the
"September Resolution") publicly denouncing the transaction and calling for an
investigation.[33]  As a part of the September Resolution, the National Assembly "reject[ed]
categorically" the pledge of 50.1% of the PDV Holding's CITGO Shares as collateral for the
2020 Notes.[34]  The September Resolution also condemned the irrationality of the transaction and
called for an immediate investigation of the Maduro regime's mismanagement of PDVSA and its
misuse of PDVSA for political purposes.[35]

51.   The National Assembly's fierce opposition to the Exchange Offer was widely
reported, with multiple articles noting that National Assembly authorization was constitutionally
required.  *See, e.g.*, Eyanir Chinea & Brian Ellsworth, *S&P says PDVSA bond swap offer
'tantamount to default,'*, REUTERS (Sept. 19, 2016) (noting that the National Assembly would
oppose the pledge of the CITGO Shares as collateral and that any such pledge would require
legislative oversight); Carolyn Cui, *Venezuela's PdVSA to Offer to Swap $7 Billion in Debt*,
WALL ST. J. (Sept. 14, 2016) ("Venezuela's constitution requires the National Assembly to
approve any new indebtedness of the republic.").  For example, it was reported at the time that:

---

[33] Bolivarian Republic of Venezuela National Assembly, *Resolutions on the Current Financial Situation of
Petróleos de Venezuela, S.A.*, dated September 27, 2016 (translated), Ex. C.
[34] *Id*.
[35] *Id*.

Many investors assert the 50.1% equity pledge on CITGO Holding Inc. is worth little given certain political risks and CITGO's substantial debt burden. Sources say that **Venezuela's congress is unlikely to approve the collateralization of CITGO before the tender closes, if at all, given that the lower house is controlled by opposition parties that are seeking to remove President Maduro from office**. PDVSA notes in its circular that the opposition coalition Mesa de la Unidad Democrática, or MUD, was elected to 112 seats in the National Assembly last year, leaving only 55 seats for Maduro's party, the Partido Socialista Unido de Venezuela, or PSUV. 'Such instability could have a material adverse effect on Venezuela's economic growth, our operations and as a result our ability to service our obligations under the New Notes,' the memorandum reads.[36]

52.     While the Exchange Offer was pending, articles and market reports warned that the lack of National Assembly approval would render the 2020 Notes subject to legal challenge.  *See, e.g.*, *Legal Risks Cloud Venezuela PdVSA Bond Swap – Market Talk*, DOW JONES INDUS. NEWS (Sept. 19, 2016) ("[T]he ruling Socialist Party has not consulted the opposition-controlled National Assembly regarding the bond exchange, which raises questions about how the debt would be viewed by authorities if there were to be a change in government.").  In a September 18, 2016 analysis of the Exchange Offer, Nomura Securities noted that "[t]he make or break of the exchange is the assessment of the equity valuation and the legal risks" and that "there have been opinions from local lawyers suggesting that all international transactions (such as…this PdVSA debt exchange) would require legislative approval or otherwise risk illegality."  *Legal Risks Cloud Venezuela PdVSA Bond Swap – Market Talk*, DOW JONES INDUS. NEWS (Sept. 19, 2016).  Torino Capital went as far as to warn that "there would be a strong legal argument for a future administration to state that debt contracted in 2017 would not be valid given the lack of an Annual Indebtedness Law approved by the

---

[36] *Investors Weigh Exchange Ratio, Value of Collateral Package in PDVSA Tender*, Reorg Research, September 21, 2016 (emphasis added), *available at* https://app.reorg.com/v3#/items/intel/1916?item_id=25705.

National Assembly."  Alexandra Ulmer, *Venezuela's Supreme Court lets Maduro bypass Congress in budget process*, REUTERS (Oct. 12, 2016).

53.     Investors' recognition of the risks was also reflected in the notes' ratings and the low participation threshold for the exchange. The proposed debt was "assigned an 'RR4' average Recovery Rating as the collateral provided may only marginally enhance recovery given default, which could still range between 31% and 50%."[37]  Both Standard & Poor's ("S&P") and Fitch Ratings downgraded PDVSA's credit rating soon after the exchange, with S&P referring to the PDVSA 2020 Bonds as a "distressed exchange" that would be "tantamount to default."[38]

54.     The Maduro regime and the Defendants ignored the National Assembly's September Resolution and proceeded with the Exchange Offer, the results of which were announced on October 24, 2016.  The very next day, in an effort to quell concern over the September Resolution, the Maduro-controlled Venezuelan Supreme Tribunal purported to suspend all National Assembly investigations of PDVSA, including the investigation of the Exchange Offer.  Three days later, at Maduro's direction, the Indenture and the Pledge Agreement were executed without National Assembly authorization.

55.     For months following the completion of the Exchange Offer, market analysts and journalists continued to comment on the illegality of the 2020 Notes.  *See, e.g.*, Mayela Armas & Kejal Vyas, *Venezuela Sells $5 Billion in New Bonds*, WALL ST. J. (Jan. 2, 2017) (commenting that the Exchange Offer was decried by Venezuelan lawmakers because it was not submitted to

---

[37] *Fitch Expects to Rate PDVSA's Proposed Notes 'CCR/RR4,'* Business Wire, September 19, 2016, at 2, *available at* https://www.businesswire.com/news/home/20160919006535/en/Fitch-Expects-Rate-PDVSAs-Proposed-Notes-CCCRR4.

[38] *Venezuela's Pdvsa Debt In Selective Default, S&P Says*, Barron's, October 25, 2017, *available at* https://www.barrons.com/articles/venezuelas-pdvsa-debt-in-selective-default-s-p-says-1477438907; *Fitch Downgrades PDVSA's IDRs to 'CC'*, FitchRatings, October 25, 2016, *available at* https://www.fitchratings.com/site/pr/1013724; *PDVSA Downgraded by S&P on 'Distressed' Bond Swap Proposal*, Bloomberg, September 19, 2016, *available at* https://www.bloomberg.com/news/articles/2016-09-19/pdvsadowngraded- by-s-p-on-distressed-bond-swap-proposal.

the National Assembly for required authorization, making the Exchange Offer "a totally illegal operation"); *Sovereign Risk*, ECONOMIST INTELLIGENCE UNIT LTD. (Aug. 14, 2017) ("New debt will carry repudiation risk for investors making them wary, as the opposition says that it will not recognise debt issued without the National Assembly's approval (as mandated by the constitution)."); Deutsche Bank Markets Research, *Emerging Markets Monthly*, at 133 (May 11, 2017) ("The lack of a legislative authorization, as stipulated in the constitution, is raising doubts about the legality of new financing transactions in 2017 and risks of selective debt repudiation by future administrations.  Last October, President Maduro opted out of the congressional route.  Instead he relied on extraordinary powers and a Supreme Court's decision to approve the 2017 budget law.").

56.     Thus, it is not simply that the Indenture and the Pledge Agreement were not authorized by the National Assembly, although that alone renders them invalid under Venezuelan law, as discussed further below.  Rather, Maduro used his political control over the Venezuelan Supreme Tribunal to prevent the National Assembly from exercising any of its rightful Constitutional powers with respect to the Exchange Offer.

**VIII.    U.S. Foreign Policy and Support for the Guaidó-Led National Assembly**

57.     On January 23, 2019, the President of the United States recognized "the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim President of Venezuela" and the National Assembly as "the *only* legitimate branch of government duly elected by the Venezuelan people."  In the same statement, the President referred to the Maduro regime as "illegitimate."[39]

---

[39] Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela (Jan. 23, 2019)

58.     On the same day the President of the United States officially recognized the Guaidó government, Secretary of State Michael Pompeo issued a statement declaring that the United States stands with interim President Juan Guaidó . . . . The United States does not recognize the Maduro regime as the government of Venezuela."[40]

59.     Two days later, on January 25, 2019, the President of the United States issued an Executive Order extending pre-existing sanctions to members of the Maduro regime and continuing to recognize the Guaidó government's legitimacy, while referring to the Maduro regime as "illegitimate."[41]

60.     In the days and weeks after U.S. recognition, the U.S. Department of State accepted Interim President Guaidó's designation of Carlos Alfredo Vecchio as the Chargé d'Affaires of the Government of Venezuela and allowed the Guaidó Government to take control of Venezuelan property in the U.S., including the Venezuelan Embassy.[42]

61.     Additionally, the State Department authorized Interim President Guaidó to receive and control otherwise sanctioned Venezuelan property held by U.S. Banks, acknowledging under U.S. law that Guaidó is the only leader "recognized by the Secretary of State as being the accredited representative of [Venezuela] to the Government of the United States[.]"[43]

62.     In support of these actions, the U.S. Secretary of State made clear that the U.S. no longer views the Maduro regime as the Government of Venezuela:

---

[40] Press Statement, U.S. Dep't of State, Continuing U.S. Diplomatic Presence in Venezuela (Jan. 23, 2019), *available at* https://www.state.gov/continuing-u-s-diplomatic-presence-in-venezuela/.

[41] Executive Order 13857.

[42] Michael R. Pompeo, Representative of the Government of Venezuela to the United States (Press Statement, Jan. 27, 2019), *available at* https://www.state.gov/representative-of-the-government-of-venezuela-to-the-united-states/); Gershon Peaks, *Venezuela opposition takes control of diplomatic properties in U.S.*, REUTERS, Mar. 18, 2019, at 2, *available at* https://www.reuters.com/article/us-venezuela-politics-vecchio/venezuela-opposition-takes-control-of-diplomatic-properties-in-us-idUSKCN1QZ2FH.

[43] 12 U.S.C. § 632; U.S. Dep't of State, Protecting Venezuela's Assets for Benefit of Venezuelan People (Press Statement, Jan. 29, 2019), available at https://www.state.gov/protecting-venezuelas-assets-for-benefit-of-venezuelan-people/.

> Today, the United States has taken necessary actions to prevent the
> *illegitimate former Maduro regime* from further plundering
> Venezuela's assets and natural resources. . . . The United States
> stands with interim President Juan Guaidó, the democratically
> elected National Assembly, and the people of Venezuela as they
> peacefully restore constitutional order to their country.[44]

63.     Since recognizing President Guaidó and the National Assembly as Venezuela's

only legitimate leaders, the U.S. executive branch has consistently reaffirmed its support for the

"efforts of Interim President Juan Guaidó to address the endemic corruption, human rights

abuses, and violent repression that has become the hallmark of the illegitimate Maduro

regime."[45]  For example, on May 1, 2019, President Trump issued a statement reaffirming that

"[t]he United States stands with Interim President Juan Guaidó, the democratically elected

National Assembly, and all Venezuelans who seek to restore democracy and the rule of law. . . .

The people of Venezuela are standing up against the illegitimate, brutal rule of Nicolas

Maduro."[46]

64.     The U.S. Congress has also voiced its support through members such as Nancy

Pelosi, Speaker of the House of Representatives, who issued a press release on February 8, 2019

stating: "I support the decision of the National Assembly, Venezuela's sole remaining

democratic institution, to recognize Juan Guaidó, President of the National Assembly, as the

Interim President until full, fair and free elections can be held. . . . Nicolas Maduro's regime of

---

[44] Michael R. Pompeo, *Sanctions Against PDVSA and Venezuela Oil Sector* (Press Statement, Jan. 28, 2019),
*available at* https://www.state.gov/sanctions-against-pdvsa-and-venezuela-oil-sector/ (emphasis added).
[45] U.S. Dep't of the Treasury, Press Release, Treasury Sanctions Governors of Venezuelan States Aligned with
Maduro (Feb. 25, 2019), *available at* https://home.treasury.gov/news/press releases /sm616; *see also* President
Donald J. Trump Stands for Democracy in Venezuela (May 1, 2019), *available at* https://www.whitehouse.gov/
briefingsstatements/president-donald-j-trump-stands-democracy-venezuela/.
[46] *President Donald J. Trump Stands for Democracy in Venezuela* (May 1, 2019), *available at* https://www.
whitehouse.gov/briefings-statements/president-donald-j-trump-stands-democracy-venezuela.

repression and impoverishment for his personal enrichment continues to gravely violate human rights."[47]

65.    Notably, consistent with the above, the U.S. government has taken a series of actions intended to sanction the Maduro regime by loosening its grip on CITGO.  On May 24, 2018, President Trump issued Executive Order 13835 (the "Executive Order"), which precludes U.S. persons from engaging in any transactions, provisions of financing, and other dealings related to "the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which [it] has a 50 percent or greater ownership interest."[48]  As defined in the Executive Order, the "Government of Venezuela" expressly includes PDVSA, and thus PDSVA's creditors are precluded from exercising remedies against PDVSA's shares of PDV Holding or the pledged CITGO Shares, precluding them by law from obtaining control of CITGO.[49]

66.    In July 2018, the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") issued General License 5 as a carve-out from the Executive Order.[50]  As explained by OFAC, General License 5 removed Executive Order 13835 as an obstacle to the holders of the 2020 Notes exercising default remedies with respect to the pledged CITGO Shares, with the intention of "prevent[ing] the Maduro regime from using [] [Executive Order 13835] to default on the [2020 Notes] without consequence.'"[51]

---

[47] *Pelosi Statement on the Situation in Venezuela* (Feb. 8. 2019), *available at:* https://www.speaker.gov/newsroom/2819-2/.
[48] Exec. Order No. 13,835, 83 Fed. Reg. 24,001 (May 24, 2018), *available at* https://www.treasury.gov/resourcecenter/ sanctions/Programs/Documents/venezuela_eo_13835.pdf.
[49] *Id.*
[50] *General License No. 5, Authorizing Certain Transactions Related to the Petróleos de Venezuela SA 2020 8.5 Percent Bond*, U.S. Dep't of the Treasury (July 19, 2018), available at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl5.pdf.
[51] *OFAC FAQs: Other Sanctions Programs, Venezuela Sanctions, FAQ 596*, U.S. Dep't of the Treasury (July 19, 2018), *available at* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#venezuela.

67. On February 8, 2019, the same day that Guaidó reconstituted PDVSA's board, OFAC specifically licensed transactions with the Guaidó appointed directors despite broad sanctions against PDVSA.[52] In explaining its actions taken against PDVSA, the Treasury Department explained that its goal was to transfer control to Interim President Guaidó and away from "former President Nicolas Maduro."[53]

68. After the U.S. President put in place additional sanctions against the Maduro regime in an Executive Order dated August 5, 2019, the Treasury Department issued another license exempting from sanctions certain transactions with the Venezuelan National Assembly and Interim President Guaidó, and making clear that sanctions remained in place for any transaction with a member of the Maduro regime.[54]

69. On October 24, 2019, OFAC replaced General License 5 with General License 5A, which reinstated the Executive Order with respect to the 2020 Notes until January 22, 2020, thereby barring any exercise in the interim of default remedies with respect to the pledged CITGO Shares.[55]

---

[52] Exec. Order No. 13,835, 83 Fed. Reg. 24,001 (May 24, 2018), *available at* https://www.treasury.gov/resourcecenter/ sanctions/Programs/Documents/venezuela_eo_13835.pdf; *General License No. 2, Authorizing Certain Transactions and Activities to Wind Down Operations for the Hotel Operating at Millennium Plaza, Panama*, U.S. Dep't of the Treasury (May 5, 2016), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/kingpin_gl2.pdf; *General License No. 7B, Authorizing Certain Activities Involving PDV Holding, Inc. and CITGO Holding, Inc.*, U.S. Dep't of the Treasury (June 6, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl7b.pdf.

[53] *OFAC FAQs: Other Sanctions Programs, Venezuela Sanctions, FAQ 660*, U.S. Dep't of the Treasury (Jan. 31, 2019), *available at* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#venezuela.

[54] *General License No. 31, Certain Transactions Involving the Venezuelan National Assembly, the Interim President of Venezuela, and Certain Other Persons Authorized*, U.S. Dep't of the Treasury (Aug. 5, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl31.pdf.

[55] *General License No. 5A, Authorizing Certain Transactions Related to the Petróleos de Venezuela SA 2020 8.5 Percent Bond on or After January 22, 2020*, U.S. Dep't of Treasury (Oct. 24, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_gl5a.pdf.

## IX.   Events of Default Under the Indenture and Default Remedies With Respect to the Pledged CITGO Shares

70.     The Indenture defines a number of "Events of Default," including the failure of PDVSA and PDVSA Petróleo to pay interest or principal when due.[56]  Under the terms of the Indenture, if an Event of Default (other than an Event of Default related to any bankruptcy, reorganization or insolvency proceeding, which automatically results in an acceleration of the 2020 Notes) occurs and continues without a waiver, the holders of at least 25% in principal amount of outstanding 2020 Notes may declare the notes to be due and payable by notice in writing to PDVSA and the Trustee specifying the Event of Default and that it is a notice of acceleration.[57]  Upon the issuance of an acceleration notice, the 2020 Notes become immediately due and payable in full.[58]

71.     In addition, if an Event of Default has occurred and is continuing, the Trustee (and the Collateral Agent at the direction of the Trustee) may, at the written direction of holders of at least 25% in aggregate principal amount of the then outstanding 2020 Notes voting as a single class, exercise rights and/or powers with respect to security interests (including with respect to the CITGO Shares) purportedly granted pursuant to the Pledge Agreement.

## X.   The Purported Payment Default

72.     Under the terms of the Indenture, approximately $913,000,000 in principal and interest was purportedly due by 10:00 a.m. (EST) on October 28, 2019.[59] This payment was not made, and thus an Event of Default has purportedly occurred and, but for General License 5A, the Trustee could direct the Collateral Agent to exercise default remedies with respect to the

---

[56] Indenture, § 5.01(a)(1)-(2).
[57] Id. at 5.01(b).
[58] Id.
[59] Id. at 2.08(b).  Though an interest payment is technically due on October 28, 2019, interest payments are subject to a 30-day grace period under the Indenture and the failure to pay interest when it is due does not constitute an Event of Default until that 30-day grace period expires.  Id. at 5.01(a)(2).

pledged CITGO Shares. Upon the expiration of General License 5A on January 22, 2020, the Trustee could direct the Collateral Agent to exercise default remedies at any moment.

## FIRST CAUSE OF ACTION

**(On Behalf of PDVSA and PDVSA Petróleo, a Declaration that the 2020 Notes and the Indenture are Invalid, Illegal, Null and Void *Ab Initio*, and Unenforceable)**

73. Paragraphs 1-72 are incorporated by reference as if fully set forth herein.

74. Under Articles 150 and 187.9 of Venezuelan Constitution, contracts in the national public interest entered into by the National Public Administration with companies not domiciled in Venezuela must be authorized in advance by the National Assembly.[60]

75. PDVSA and PDVSA Petróleo are national, state-owned enterprises that are part of Venezuela's National Public Administration and the public sector of the Venezuelan State.

76. At the time of the Exchange Offer, the Indenture was a national public interest contract because (i) PDVSA and PDVSA Petróleo were parties to the Indenture and (ii) the Indenture implicated in a significant way Venezuela's most important industry and placed the CITGO Shares at risk.

77. In addition, the Indenture was entered into with companies not domiciled in Venezuela, including the Trustee and the Collateral Agent.

78. The Indenture was not authorized by the National Assembly and thus was entered into in violation of the Venezuelan Constitution.

79. As set forth above, in its September Resolution, the National Assembly challenged the Exchange Offer. In a resolution adopted on October 15, 2019, the National Assembly reiterated that the Indenture was not authorized as required by the Venezuelan

---

[60] *See* Constitution of the Bolivarian Republic of Venezuela, articles 150 & 187.9 (translated), Ex. A.

Constitution and that the National Assembly's investigations were thwarted by the Venezuelan Supreme Tribunal, which was acting under Maduro's political control.[61]

80.    The Executive Branch of the U.S. government recognizes the Guaidó government, including the National Assembly, as the only legitimate branch of government in Venezuela and considers the Maduro regime illegitimate.

81.    28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

82.    An actual controversy exists because PDVSA and PDVSA Petróleo are in default of their purported payment obligations under the Indenture.

83.    Accordingly, PDVSA and PDVSA Petróleo are entitled to a declaratory judgment that the 2020 Notes and the Indenture are invalid, illegal, null and void *ab initio*, and thus unenforceable.

## SECOND CAUSE OF ACTION

### (On Behalf of All Plaintiffs, a Declaration that the Pledge Agreement Is Invalid, Illegal, Null and Void *Ab Initio*, and Unenforceable)

84.    Paragraphs 1-83 are incorporated by reference as if fully set forth herein.

85.    Under Articles 150 and 187.9 of Venezuelan Constitution, contracts in the national public interest entered into by the National Public Administration with companies not domiciled in Venezuela must be authorized in advance by the National Assembly.

86.    PDVSA and PDVSA Petróleo are national, state-owned enterprises that are part of Venezuela's National Public Administration and the public sector of the Venezuelan State.

---

[61] Bolivarian Republic of Venezuela National Assembly, *Resolutions that Reiterates the Invalidity of PDVSA's 2020 Bonds*, dated October 15, 2019 (translated), Ex. D.

87.     At the time of the Exchange Offer, the Pledge Agreement was a national public interest contract because (i) PDVSA and PDVSA Petróleo were parties to the Pledge Agreement and (ii) the Pledge Agreement implicated in a significant way Venezuela's most important industry and placed the CITGO Shares at risk.

88.     In addition, the Pledge Agreement was entered into with companies not domiciled in Venezuela, including the Trustee and the Collateral Agent.

89.     The Pledge Agreement was not authorized by the National Assembly and thus was entered into in violation of the Venezuelan Constitution.

90.     As set forth above, in its September Resolution, the National Assembly challenged the Exchange Offer and the pledge of the CITGO Shares as collateral for the 2020 Notes.  In a resolution adopted on October 15, 2019, the National Assembly reiterated that the Pledge Agreement was not authorized as required by the Venezuelan Constitution and that the National Assembly's investigations were thwarted by the Venezuelan Supreme Tribunal, which was acting under Maduro's political control.[62]

91.     The Executive Branch of the U.S. government recognizes the Guaidó government, including the National Assembly, as the only legitimate branch of government in Venezuela and considers the Maduro regime illegitimate.

92.     28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

---

[62] Bolivarian Republic of Venezuela National Assembly, *Resolutions that Reiterates the Invalidity of PDVSA's 2020 Bonds*, dated October 15, 2019 (translated), Ex. D.

93.     An actual controversy exists because PDVSA and PDVSA Petróleo are in default of their purported payment obligations under the Indenture.

94.     Accordingly, Plaintiffs are entitled to a declaratory judgment that the Pledge Agreement is invalid, illegal, null and void *ab initio*, and thus unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief as follows:

a.   A judgment declaring that the 2020 Notes, the Indenture, and the Pledge Agreement are invalid, illegal, null and void *ab initio*, and thus unenforceable;

b.   An injunction permanently enjoining the defendants, any owners or holders of the 2020 Notes or beneficial interests therein, and any other parties claiming an interest in the 2020 Notes or a security interest in the pledged CITGO Shares, from attempting to enforce the 2020 Notes, the Indenture, or the Pledge Agreement or from otherwise attempting to exercise any rights, remedies, or privileges purportedly arising from a default or Event of Default under the Indenture or the Pledge Agreement; and

c.   Such other and further relief as the Court deems just and proper.

[SIGNATURES ON FOLLOWING PAGE]

Dated:  October 29, 2019          Respectfully submitted,

/s/ Kurt W. Hansson
Kurt W. Hansson
James R. Bliss
James B. Worthington

PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
kurthansson@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com

*Attorneys for Plaintiffs*
*Petróleos de Venezuela, S.A. and PDVSA Petróleo,*
*S.A.*

/s/ Tariq Mundiya
Tariq Mundiya
Jeffrey B. Korn

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone:     (212) 728-8000
Facsimile:     (212) 728-8111
tmundiya@willkie.com
jkorn@willkie.com

Michael J. Gottlieb
1875 K Street NW
Washington, DC  20006-1238
Telephone:     (202) 303-1442
Facsimile:     (202) 303 2442
mgottlieb@willkie.com

*Attorneys for Plaintiff PDV Holding, Inc.*

# EXHIBIT A

# CONSTITUCIÓN
## DE LA REPÚBLICA
# BOLIVARIANA
## DE VENEZUELA
## 1999



INCLUYE:
Exposición de Motivos
Enmienda Nº 1 (15/02/2009)

# PREÁMBULO

El pueblo de Venezuela, en ejercicio de sus poderes creadores e invocando la protección de Dios, el ejemplo histórico de nuestro Libertador Simón Bolívar y el heroísmo y sacrificio de nuestros antepasados aborígenes y de los precursores y forjadores de una patria libre y soberana; con el fin supremo de refundar la República para establecer una sociedad democrática, participativa y protagónica, multiétnica y pluricultural en un Estado de justicia, federal y descentralizado, que consolide los valores de la libertad, la independencia, la paz, la solidaridad, el bien común, la integridad territorial, la convivencia y el imperio de la ley para esta y las futuras generaciones; asegure el derecho a la vida, al trabajo, a la cultura, a la educación, a la justicia social y a la igualdad sin discriminación ni subordinación alguna; promueva la cooperación pacífica entre las naciones e impulse y consolide la integración latinoamericana de acuerdo con el principio de no intervención y autodeterminación de los pueblos, la garantía universal e indivisible de los derechos humanos, la democratización de la sociedad internacional, el desarme nuclear, el equilibrio ecológico y los bienes jurídicos ambientales como patrimonio común e irrenunciable de la humanidad; en ejercicio de su poder originario representado por la Asamblea Nacional Constituyente mediante el voto libre y en referendo democrático, decreta la siguiente:

151

## Sección cuarta: de los contratos de interés público

**Artículo 150.** La celebración de los contratos de interés público nacional requerirá la aprobación de la Asamblea Nacional en los casos que determine la ley.

No podrá celebrarse contrato alguno de interés público municipal, estadal o nacional con Estados o entidades oficiales extranjeras o con sociedades no domiciliadas en Venezuela, ni traspasarse a ellos sin la aprobación de la Asamblea Nacional.

La ley podrá exigir en los contratos de interés público determinadas condiciones de nacionalidad, domicilio o de otro orden, o requerir especiales garantías.

**Artículo 151.** En los contratos de interés público, si no fuere improcedente de acuerdo con la naturaleza de los mismos, se considerará incorporada, aun cuando no estuviere expresa, una cláusula según la cual las dudas y controversias que puedan suscitarse sobre dichos contratos y que no llegaren a ser resueltas amigablemente por las partes contratantes, serán decididas por los tribunales competentes de la República, de conformidad con sus leyes, sin que por ningún motivo ni causa puedan dar origen a reclamaciones extranjeras.

## Sección quinta: de las relaciones internacionales

**Artículo 152.** Las relaciones internacionales de la República responden a los fines del Estado en función del ejercicio de la soberanía y de los intereses del pueblo; ellas se rigen por los principios de independencia, igualdad entre los Estados, libre determinación y no intervención en sus asuntos internos, solución pacífica de los conflictos internacionales, cooperación, respeto a los derechos humanos y solidaridad entre los pueblos en la lucha por su emancipación y el bienestar de la humanidad. La República mantendrá la más firme y decidida defensa de estos principios y de la práctica democrática en todos los organismos e instituciones internacionales.

**Artículo 153.** La República promoverá y favorecerá la integración latinoamericana y caribeña, en aras de avanzar hacia la creación de una comunidad de naciones, defendiendo los intereses económicos, sociales, culturales, políticos y ambientales de la región. La República podrá suscribir tratados internacionales que conjuguen y coordinen esfuerzos para promover el desarrollo común de nuestras naciones, y que garanticen el bienestar de los pueblos y la seguridad colectiva de sus habitantes. Para estos fines, la República podrá atribuir a organizaciones supranacionales, mediante tratados, el ejercicio de las competencias necesarias para llevar a cabo estos procesos de integración. Dentro de las políticas

**Artículo 187.** Corresponde a la Asamblea Nacional:

1. Legislar en las materias de la competencia nacional y sobre el funcionamiento de las distintas ramas del Poder Nacional.

2. Proponer enmiendas y reformas a esta Constitución, en los términos establecidos en ésta.

3. Ejercer funciones de control sobre el Gobierno y la Administración Pública Nacional, en los términos consagrados en esta Constitución y en la ley. Los elementos comprobatorios obtenidos en el ejercicio de esta función, tendrán valor probatorio, en las condiciones que la ley establezca.

4. Organizar y promover la participación ciudadana en los asuntos de su competencia.

5. Decretar amnistías.

6. Discutir y aprobar el presupuesto nacional y todo proyecto de ley concerniente al régimen tributario y al crédito público.

7. Autorizar los créditos adicionales al presupuesto.

8. Aprobar las líneas generales del plan de desarrollo económico y social de la Nación, que serán presentadas por el Ejecutivo Nacional en el transcurso del tercer trimestre del primer año de cada período constitucional.

254

9. Autorizar al Ejecutivo Nacional para celebrar contratos de interés nacional, en los casos establecidos en la ley. Autorizar los contratos de interés público municipal, estadal o nacional con Estados o entidades oficiales extranjeros o con sociedades no domiciliadas en Venezuela.

10. Dar voto de censura al Vicepresidente Ejecutivo o Vicepresidenta Ejecutiva y a los Ministros o Ministras. La moción de censura sólo podrá ser discutida dos días después de presentada a la Asamblea, la cual podrá decidir, por las tres quintas partes de los diputados o diputadas, que el voto de censura implica la destitución del Vicepresidente Ejecutivo o Vicepresidenta Ejecutiva o del Ministro o Ministra.

11. Autorizar el empleo de misiones militares venezolanas en el exterior o extranjeras en el país.

12. Autorizar al Ejecutivo Nacional para enajenar bienes inmuebles del dominio privado de la Nación, con las excepciones que establezca la ley.

13. Autorizar a los funcionarios públicos o funcionarias públicas para aceptar cargos, honores o recompensas de gobiernos extranjeros.

14. Autorizar el nombramiento del Procurador o Procuradora General de la República y de los Jefes o Jefas de Misiones Diplomáticas Permanentes.

255

una justa distribución de la riqueza mediante una planificación estratégica democrática, participativa y de consulta abierta.

**Artículo 300.** La ley nacional establecerá las condiciones para la creación de entidades funcionalmente descentralizadas para la realización de actividades sociales o empresariales, con el objeto de asegurar la razonable productividad económica y social de los recursos públicos que en ellas se inviertan.

**Artículo 301.** El Estado se reserva el uso de la política comercial para defender las actividades económicas de las empresas nacionales públicas y privadas. No se podrá otorgar a personas, empresas u organismos extranjeros regímenes más beneficiosos que los establecidos para los nacionales. La inversión extranjera está sujeta a las mismas condiciones que la inversión nacional.

**Artículo 302.** El Estado se reserva, mediante la ley orgánica respectiva, y por razones de conveniencia nacional, la actividad petrolera y otras industrias, explotaciones, servicios y bienes de interés público y de carácter estratégico. El Estado promoverá la manufactura nacional de materias primas provenientes de la explotación de los recursos naturales no renovables, con el fin de asimilar, crear e innovar tecnologías, generar empleo y crecimiento económico, y crear riqueza y bienestar para el pueblo.

316

**Artículo 303.** Por razones de soberanía económica, política y de estrategia nacional, el Estado conservará la totalidad de las acciones de Petróleos de Venezuela, S.A., o del ente creado para el manejo de la industria petrolera, exceptuando las de las filiales, asociaciones estratégicas, empresas y cualquier otra que se haya constituido o se constituya como consecuencia del desarrollo de negocios de Petróleos de Venezuela, S.A.

**Artículo 304.** Todas las aguas son bienes de dominio público de la Nación, insustituibles para la vida y el desarrollo. La ley establecerá las disposiciones necesarias a fin de garantizar su protección, aprovechamiento y recuperación, respetando las fases del ciclo hidrológico y los criterios de ordenación del territorio.

**Artículo 305.** El Estado promoverá la agricultura sustentable como base estratégica del desarrollo rural integral a fin de garantizar la seguridad alimentaria de la población; entendida como la disponibilidad suficiente y estable de alimentos en el ámbito nacional y el acceso oportuno y permanente a éstos por parte del público consumidor. La seguridad alimentaria se alcanzará desarrollando y privilegiando la producción agropecuaria interna, entendiéndose como tal la proveniente de las actividades agrícola, pecuaria, pesquera y acuícola. La producción de alimentos es de interés nacional y fundamental para el desarrollo económico y social de

317



**TRANSPERFECT**

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

### CERTIFICATION

I, Aurora Landman, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided Spanish into English translation(s) of the source document(s) listed below are true and accurate:

- *1999 Venezuelan Constitution*

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty-five years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

Aurora Landman, Project Assistant

Sworn to before me this
Friday, October 25, 2019

Authorized Signature

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
STATE PUBLIC OF NEW YORK

## Preamble

The people of Venezuela, exercising their powers of creation and invoking the protection of God, the historic example of our Liberator Simón Bolívar, and the heroism and sacrifice of our aboriginal ancestors as well as of the forerunners and founders of a free and sovereign nation; with the supreme purpose to reshape the Republic to establish a democratic, participatory and self-reliant, multiethnic and multicultural society in a just, federal and decentralized State that embodies the values of freedom, independence, peace, solidarity, the common good, the nation's territorial integrity, comity and the rule of law for this and future generations; guarantees the right to life, work, learning, education, social justice and equality, without discrimination or subordination of any kind; promotes peaceful cooperation among nations and furthers and strengthens Latin American integration in accordance with the principle of non-intervention and national self-determination of the peoples, the universal and indivisible guarantee of human rights, the democratization of the international society, nuclear disarmament, ecological balance and environmental legally protected resources as the common and inalienable heritage of humanity; exercising their innate power through their representatives comprising the National Constituent Assembly, by their freely cast vote and in a democratic referendum, hereby ordain and establish the following:

[....]

## Article 150

The execution of national public interest contracts shall require the approval of the National Assembly in those cases in which such requirement is determined by law.

No municipal, state or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly.

In public interest contracts, the law may demand certain nationality and domicile conditions, or conditions of other nature, or require special guarantees.

[....]

## Article 187

It is the role of the National Assembly to:

[....]

9.       Authorize the National Executive to enter into contracts of national interest, in the cases established by law. Authorize contracts of municipal, state and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela.

[....]

## Article 303

For reasons of economic and political sovereignty and national strategy, the State shall retain all shares of Petroleos de Venezuela, S.A. or the body created to manage the petroleum industry, with the exception of subsidiaries, strategic joint ventures, companies, and any other venture that is or has been established as a consequence of the business development of Petroleos de Venezuela, S.A.

# EXHIBIT B

Ir arriba

- [Inicio](#)
- [La Asamblea](#)
  - [Junta Directiva](#)
  - [Sedes Legislativas](#)
- [Noticias](#)
- [Diputados](#) [Diputados](#)
  - [Todos](#)
  - [Principales](#)
  - [Suplentes](#)
- [Comisiones](#)
- [Agenda Legislativa](#)
  - [Toda la agenda](#)
  - [Agenda de la Junta Directiva](#)
- [Leyes](#) [Leyes](#)
  - [Sancionadas](#)
  - [Proyectos](#)
- [Actos Legislativos](#)
- [Transparencia](#)
- [Sala de prensa](#)
- [Galerías](#)

Menu

- 

- 

- 



- 

- 

-

Caracas - Venezuela
17 de Junio 2019 / 01:06 pm

6/17/2019    ACUERDO QUE AUTORIZA EL NOMBRAMIENTO PARA EJERCER LOS CARGOS DEL ÓRGANO DE INTERVENCIÓN, LLAMADO "J…

Case 1:19-cv-10023-KBF   Document 59-5   Filed 02/12/20   Page 44 of 75
Case 1:19-cv-10023   Document 1-2   Filed 10/29/19   Page 3 of 10



- Inicio
- La Asamblea
  - Junta Directiva
  - Sedes Legislativas
- Noticias
- Diputados  Diputados
  - Todos
  - Principales
  - Suplentes
- Comisiones
- Agenda Legislativa
  - Toda la agenda
  - Agenda de la Junta Directiva
- Leyes  Leyes
  - Sancionadas
  - Proyectos
- Actos Legislativos
- Transparencia
- Sala de prensa
- Gacetas Legislativas
- Galerías



ACUERDO QUE AUTORIZA EL NOMBRAMIENTO PARA EJERCER LOS CARGOS DEL ÓRGANO DE INTERVENCIÓN, LLAMADO "JUNTA ADMINISTRADORA AD-HOC", QUE ASUMA LAS FUNCIONES DE LA ASAMBLEA DE ACCI

Fecha: 13/02/2019

### ASAMBLEA NACIONAL

### DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA

En defensa de la Constitución, la Democracia y el Estado de Derecho

**ACUERDO QUE AUTORIZA EL NOMBRAMIENTO PARA EJERCER LOS CARGOS DEL ÓRGANO DE INTERVENCIÓN, LLAMADO "JUNTA ADMINISTRADORA AD-HOC", QUE ASUMA LAS FUNCIONES DE LA ASAMBLEA DE ACCIONISTA Y JUNTA DIRECTIVA DE PETRÓLEOS DE VENEZUELA S.A., PARA ACTUAR EN SU NOMBRE Y, COMO ÚNICO ACCIONISTA DE PDV HOLDING, INC., PROCEDER A DESIGNAR A SU JUNTA DIRECTIVA, Y EN CONSECUENCIA NOMBRAR LA JUNTA DIRECTIVA CITGO HOLDING, INC., Y DE LA EMPRESA CITGO PETROLEUM CORPORATION.**

### CONSIDERANDO

Que el 20 de mayo de 2018 el régimen de facto pretendió simular un proceso comicial en el que los venezolanos no pudieron ejercer su derecho al voto en libertad, sentando las bases para que Nicolás Maduro y su régimen propiciaran el escenario de usurpación de la Presidencia de la República para un nuevo período presidencial;

### CONSIDERANDO

Que el pasado 22 de mayo de 2018 la soberana Asamblea Nacional aprobó un Acuerdo Reiterando el Desconocimiento de la Farsa Realizada el 20 de mayo de 2018 para la supuesta elección del Presidente de la República, en consideración a que la farsa realizada el 20 de mayo incumplió todas las garantías electorales reconocidas en Tratados y Acuerdos de Derechos Humanos, así como en la Constitución de la República Bolivariana de Venezuela y la Ley Orgánica de Procesos Electorales, tomando en cuenta la ausencia efectiva del Estado de Derecho; la parcialidad del árbitro electoral; la violación de las garantías efectivas para el ejercicio del derecho al sufragio y para el ejercicio del derecho a optar a cargos de elección popular; la inexistencia de controles efectivos en contra de los actos de corrupción electoral perpetrados por el Gobierno; la sistemática violación a la libertad de expresión, aunada a la parcialidad de los medios de comunicación social controlados por el Gobierno, y la ausencia de mecanismos efectivos y transparentes de observación electoral;

**CONSIDERANDO**

Que Nicolás Maduro usurpa el cargo de Presidente de la República, lo que constituye una autoridad ineficaz y, en consecuencia, todos los actos que emanan de esa usurpación son nulos, a tenor de lo dispuesto en el artículo 138 de la Constitución de la República Bolivariana de Venezuela;

**CONSIDERANDO**

Que el pueblo venezolano sufre por las malas políticas públicas implementadas en los últimos años por el Ejecutivo Nacional y apoyada por los demás poderes públicos afectos al régimen de Nicolás Maduro;

**CONSIDERANDO**

Que parte de las políticas de este Gobierno usurpador es desviar los recursos presupuestarios de la República para mantener su régimen oprobioso, en detrimento del pueblo venezolano que sufre por la inseguridad, la falta de hospitales y medicinas, la falta de alimentos, de transporte y de servicios públicos que mejoren su calidad de vida;

**CONSIDERANDO**

Que como consecuencia de esta desafortunada situación jurídica de usurpación generada por el ciudadano Nicolás Maduro y su régimen, y en apego a la disposición establecida en el artículo 333 de la Constitución de la República Bolivariana de Venezuela, la Asamblea Nacional, ha tenido que asumir las competencias constitucionales, tal como se establece en el primer aparte del artículo 233 de la Constitución de la República, y en ese sentido, el legítimo Presidente encargado de la República Bolivariana de Venezuela es el Presidente de la Asamblea Nacional.

**CONSIDERANDO**

Que en cumplimiento del artículo 333 y del artículo 187 numeral 1 de la Constitución de la República Bolivariana de Venezuela, la Asamblea Nacional aprobó el pasado 5 de febrero de 2019, la Ley denominada "Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela", como un pacto de convivencia para la vida cívica de los venezolanos y como camino seguro a la transición democrática, que tiene como principal fundamento volver a la reinstitucionalización de la Constitución de la República que ha sido intencionadamente extraviada por el Ejecutivo Nacional;

**CONSIDERANDO**

Que es deber patrio de todos los venezolanos, donde quiera que estos se encuentren, en el territorio nacional o en el extranjero, asumir la defensa de los intereses de la República y el patrimonio de todos los venezolanos;

**CONSIDERANDO**

Que en la actualidad la Empresa CITGO Petroleum Corporation, filial de Petróleos de Venezuela S.A., está afrontando una serie de dificultades operativas, financieras y gerenciales, por los constantes desórdenes administrativos del régimen implementado por Gobierno Nacional, motivo por el cual, sobre esta empresa venezolana en los Estados Unidos pesan tres importantes contingencias legales: (i) la garantía otorgada a los acreedores de los Bonos Soberanos 2020; (ii) la garantía otorgada por el régimen a la empresa rusa Rosneft como consecuencia de un préstamo, y (iii) la orden de embargo de las acciones propiedad de PDV Holding, Inc., a favor de Crystallex, con motivo de haber ganado un juicio por expropiación de un contrato de concesión minera otorgada en Venezuela a esa empresa minera canadiense;

**CONSIDERANDO**

Que actualmente la operación de la Empresa CITGO recae en una gerencia integrada por personal estadounidense con importantes limitaciones legales, por la ausencia de los miembros de la Junta Directiva venezolana debido a su relación con el

Gobierno usurpador de Maduro, motivo por el cual las operaciones de la empresa se han visto afectadas;

## CONSIDERANDO

Que debido a la usurpación de la Presidencia de la República que ilegalmente ejerce Nicolás Maduro, no es posible lograr que la Junta Directiva de PDVSA y, en consecuencia, no es posible que su asamblea de accionista cumplan todas las formalidades para designar a la nueva Junta Directiva de PDV Holding, Inc., de la Empresa CITGO Holding, Inc y de la Empresa CITGO Petroleum Corporation, motivo por el cual en el artículo 34 del Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela, aprobado por la Asamblea Nacional el pasado 5 de febrero de 2019, se establece un régimen legal especial y temporal de intervención de empresas del Estado, que permite designar a un órgano de intervención, llamado "Junta Administradora Ad-hoc", designado por el Presidente encargado de la República, que asuma las funciones de la Asamblea de Accionista y Junta Directiva de PDVSA, para actuar en su nombre como único accionista, y proceder a designar a la Junta Directiva de PDV Holding, Inc., y en consecuencia, la Junta Directiva de la Empresa CITGO Petroleum Corporation;

## CONSIDERANDO

Que los actos del Presidente encargado deben ser sometidos al control parlamentario de la Asamblea Nacional, en el ejercicio de sus funciones constitucionales, de conformidad con el artículo 187 de la Constitución de la República Bolivariana de Venezuela y de los artículos 13, 15 y 16 del Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela.

## ACUERDA

**PRIMERO:** Autorizar al ciudadano Juan Gerardo Guaidó Márquez, Presidente encargado de la República Bolivariana de Venezuela, para que en uso de sus atribuciones legales, designe a los ciudadanos que a continuación se mencionan como miembros de la Junta de Administración Ad-hoc de Petróleos de Venezuela S.A., en consideración a las disposiciones expresamente establecidas en los artículos 236 numerales 1, 2 y 11, así como del artículo 333 de la Constitución de la República Bolivariana de Venezuela, y de los artículos 15 literal a. y 34 del Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela:

## JUNTA DE ADMINISTRACIÓN AD-HOC DE PETRÓLEOS DE VENEZUELA S.A.

☐ Simón Antunes;

☐ Gustavo J. Velásquez;

☐ Carlos José Balza;

☐ Ricardo Alfredo Prada, y

☐ David Smolansky.

**SEGUNDO:** Los miembros principales de la Junta Administradora Ad-hoc de la sociedad mercantil Petróleos de Venezuela, S.A., se regirán por las siguientes disposiciones:

1. La Junta Administradora Ad-hoc tendrá las atribuciones correspondientes a la Asamblea de Accionista y a la Junta Directiva de Petróleos de Venezuela S.A., a los fines de realizar todas las actuaciones necesarias para designar a la Junta Directiva de PDV Holding, Inc.
2. La Junta Administradora Ad-hoc, directamente o a través de la persona por esta designada, representará a Petróleos de Venezuela S.A. como accionista de PDV Holding, Inc., solo para suscribir el consentimiento escrito del único accionista necesario para designar a la Junta Directiva de PDV Holding, Inc.
3. Queda revocada y sin efecto cualquier otra autorización o designación que en el pasado haya formulado Petróleos de Venezuela S.A., para la representación de Petróleos de Venezuela S.A. como accionista de PDV Holding, Inc., incluyendo sin limitación para la suscripción de consentimientos escritos como único accionista de PDV Holding, Inc.

**TERCERO:** La Junta de Administración Ad-hoc de Petróleos de Venezuela S.A., procederán a realizar todas las actuaciones necesarias a los fines de designar las nuevas juntas directivas de las filiales de PDV Holding, Inc., de CITGO Holding, Inc. y de la Empresa CITGO Petroleum Corporation, las cuales estarán integradas por las siguientes personas:

## PDV Holding, Inc.:

☐ Luisa Palacios;

☐ Edgar Rincón;

☐ Oswaldo Nuñez;

☐ Fernando Vera;

☐ Elio Tortolero, y

☐ Andrés Padilla.

**Citgo Holding, Inc.:**

☐ Luisa Palacios;

☐ Edgar Rincón;

☐ Ángel Olmeta;

☐ Oswaldo Núñez;

☐ Javier Troconis, y

☐ Rick Esser.

**Citgo Petroleum Corporation:**

☐ Luisa Palacios;

☐ Edgar Rincón;

☐ Luis Urdaneta;

☐ Ángel Olmetta;

☐ Andrés Padilla, y

☐ Rick Esser.

**CUARTO:** La Junta de Administración Ad-hoc de Petróleos de Venezuela S.A., así como los nuevos directores de PDV Holding, Inc., y las juntas directivas de las filiales nombradas, deberán proceder inmediatamente a implementar un plan orientado por las siguientes premisas:

1. Obtener la protección de activos de la Empresa CITGO. Para ello, deberá lograrse la exclusión de la Empresa CITGO del régimen de sanciones y promover su inclusión en un régimen de protección de activos.
2. Realizar las gestiones que permitan buscar fuentes de suministro de petróleo pesado alternativo a PDVSA al menor costo posible, hasta que cese la usurpación y se restablezca el suministro de crudo a los Estados Unidos por parte de Petróleos de Venezuela S.A.
3. Efectuar las auditorías necesarias que permitan determinar el estado del patrimonio de la Empresa CITGO y en especial, establecer los hechos que permitan investigar las posibles irregularidades que se pudieran haber cometido, y que hayan afectado los intereses de la República, con la finalidad de realizar las denuncias antes los organismos competentes.
4. Cualquier otra orden o instrucción que sea emanada de la autoridad del Presidente Encargado de la República.

**QUINTO:** Dar publicidad al presente Acuerdo en la Gaceta Legislativa y a través de los medios de comunicación.

Dado, firmado y sellado en el Palacio Federal Legislativo, sede de la Asamblea Nacional de la República Bolivariana de Venezuela, en Caracas, a los trece días del mes de febrero de dos mil diecinueve. Años 209° de la Independencia y 159° de la Federación.

**JUAN GERARDO GUAIDÓ MÁRQUEZ**

Presidente

**ÉDGAR JOSÉ ZAMBRANO RAMÍREZ**

Primer Vicepresidente

**IVÁN STALIN GONZÁLEZ MONTAÑO** Segundo Vicepresidente

**EDINSON DANIEL FERRER ARTEAGA**
Secretario

**JOSÉ LUIS CARTAYA PIÑANGO**

Subsecretario

Buscador

| Buscar... |

Buscar

La Asamblea

- Junta Directiva
- Sedes Legislativas

Diputados

- Principales
- Suplentes

Agenda Legislativa

- Sesiones AN
- Eventos
- Ruedas de Prensa

Comisiones

- Permanentes
- Ordinarias
- Especiales

Leyes

- Proyectos

Sala de Prensa

- Noticias
- Convocatorias
- Comunicados
- Notas de Prensa

6/17/2019          ACUERDO QUE AUTORIZA EL NOMBRAMIENTO PARA EJERCER LOS CARGOS DEL ÓRGANO DE INTERVENCIÓN, LLAMADO "J…

Case 1:19-cv-10023-KBF   Document 52-5   Filed 02/12/20   Page 49 of 75
Case 1:19-cv-10023   Document 1-2   Filed 10/29/19   Page 4 of 10

[Gacetas Legislativas](#)

- 

- 

- 

Palacio Federal Legislativo, Caracas - Venezuela / Teléfono: +58 212 7783322
X



## TRANSLATION CERTIFICATION

I, Gabriela Vasallo, president and owner of Lexico LLC., certify that my company has translated from Spanish to English the document named "Exhibit Q Acuerdo de la Asamblea Nacional Autorizando el Nombramiento de la Junta Directiva Ad-hoc de PDVSA" to the best of our professional translators' ability and knowledge, and we have determined it is a correct and true translation of the original.

Gabriela Vasallo, President
Lexico LLC.

June 24, 2019

Date

6/17/2019 AGREEMENT AUTHORIZING THE APPOINTMENT OF THE POSITIONS OF THE INTERVENTION BODY CALLED THE BOARD OF ADMINISTRATION AD-HOC TO NAMED...

Case 1:19-cv-10023-KPF Document 59-5 Filed 03/18/20 Page 51 of 75

Case 1:19-cv-10023 Document 1-2 Filed 10/29/19 Page 46 of 46

Back to top

- [Home](#)
- [The Assembly](#)
  - [Board of Directors](#)
  - [Legislative headquarters](#)
- [News](#)
- [Deputies Deputies](#)
  - [All](#)
  - [Main](#)
  - [Substitute](#)
- [Commissions](#)
- [Legislative agenda](#)
  - [The whole agenda](#)
  - [Agenda of the Board of Directors](#)
- [Laws Laws](#)
  - [Enacted](#)
  - [Projects](#)
- [Legislative acts](#)
- [Transparency](#)
- [Press room](#)
- [Galleries](#)

Menu

- 
- 
- 
- 
- 
- 

Caracas - Venezuela
June 17, 2019 / 01:06 pm

6/17/2019    AGREEMENT AUTHORIZING THE APPOINTMENT TO HOLD THE POSITIONS OF THE INTERVENTION BODY, NAMED...
Case 1:19-cv-10023-KPF   Document 59-5   Filed 02/18/20   Page 52 of 75
Case 1:19-cv-10023   Document 1-2   Filed 10/29/19   Page 41 of 16



**REPÚBLICA BOLIVARIANA DE VENEZUELA**

# ASAMBLEA NACIONAL

- Home
- The Assembly
  - Board of Directors
  - Legislative headquarters
- News
- Deputies Deputies
  - All
  - Main
  - Substitute
- Commissions
- Legislative agenda
  - The whole agenda
  - Agenda of the Board of Directors
- Laws Laws
  - Enacted
  - Projects
- Legislative acts
- Transparency
- Press room
- Legislative gazette
- Galleries

AGREEMENT AUTHORIZING THE APPOINTMENT TO HOLD THE POSITIONS OF THE INTERVENTION BODY, NAMED "AD-HOC ADMINISTRATIVE BOARD", TO ASSUME THE FUNCTIONS OF THE SHAREHOLDERS MEETING
Date: 13/02/2019

**NATIONAL ASSEMBLY**

**OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**

In defense of the Constitution, Democracy and the Rule of Law

**AGREEMENT AUTHORIZING THE APPOINTMENT TO HOLD THE POSITIONS FOR AN INTERVENTION ENTITY, NAMED "AD-HOC ADMINISTRATIVE BOARD", TO ASSUME THE FUNCTIONS OF THE SHAREHOLDERS MEETING AND BOARD OF DIRECTORS OF PETRÓLEOS DE VENEZUELA S.A., TO ACT ON THEIR BEHALF AND AS SOLE SHAREHOLDER OF PDV HOLDING, INC., TO APPOINT ITS BOARD OF DIRECTORS AND CONSEQUENTLY APPOINT THE BOARD OF DIRECTORS OF CITGO HOLDING, INC. AND CITGO PETROLEUM CORPORATION.**

**WHEREAS**

On May 20, 2018, the regime de facto tried to simulate an electoral process where Venezuelans could not exercise their right to vote in freedom, laying the groundwork for Nicolás Maduro and his regime to propitiate the scenario of usurpation of the Presidency of the Republic for a new presidential term;

**WHEREAS**

On May 22, 2018, the sovereign National Assembly approved an Agreement Reiterating the Lack of Knowledge of the Farce That Took Place on May 20, 2018, for the alleged election of the President of the Republic, considering that the farce carried out on May 20 failed to comply with all the electoral guarantees recognized in Human Rights

Case 1:19-cv-10023-KPF   Document 59-5   Filed 03/18/20   Page 53 of 75
Case 1:19-cv-10023   Document 11-29   Filed 02/29/19   Page 92 of 96

Treaties and Agreements, as well as in the Constitution of the Bolivarian Republic of Venezuela and the Organic Law of Electoral Processes, taking into account the effective absence of the Rule of Law; the bias of the electoral arbitrate, the violation of the guarantees to exercise the right to suffrage and to exercise the right to be elected for public office; the absence of effective controls against acts of electoral corruption perpetrated by the Government; the systematic violation of freedom of expression, coupled with the bias of the social communication media controlled by the Government, and the absence of effective and transparent observation mechanisms during the elections;

## WHEREAS

Nicolás Maduro usurps the office of President of the Republic, which constitutes an ineffective authority; therefore, all acts emanating from this usurpation are null and void, in accordance with the provisions of Article 138 of the Constitution of the Bolivarian Republic from Venezuela;

## WHEREAS

The Venezuelan people suffer from the bad public policies implemented in recent years by the National Executive and supported by the rest of public powers akin to the regime of Nicolás Maduro;

## WHEREAS

Part of the policies of this usurping Government are to divert the budgetary resources of the Republic to maintain its contemptuous regime, to the detriment of the Venezuelan people who suffer from insecurity, lack of hospitals and medicines, lack of food, lack of transportation, and lack of public services that could improve their quality of life;

## WHEREAS

As a consequence of this unfortunate legal situation of usurpation perpetrated by citizen Nicolás Maduro and his regime, and in accordance with the provision established in Article 333 of the Constitution of the Bolivarian Republic of Venezuela, the National Assembly has had to assume its constitutional competencies, as established in the first part of Article 233 of the Constitution of the Republic and, in this regard, the legitimate President in charge of the Bolivarian Republic of Venezuela is the President of the National Assembly.

## WHEREAS

In compliance with Article 333 and Article 187 numeral 1 of the Constitution of the Bolivarian Republic of Venezuela, the National Assembly approved on February 5, 2019, the Law called "Statute that Governs the Transition to Democracy to Restore the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela," as a pact of coexistence for the civic life of Venezuelans and as a safe path to democratic transition, which has as main foundation the return to the re-institutionalization of the Constitution of the Republic that has been intentionally lost by the National Executive;

## WHEREAS

It is the national duty of all Venezuelans, wherever they may be, in the national territory or abroad, to assume the defense of the interests of the Republic and the heritage of all Venezuelans;

## WHEREAS

At present the company CITGO Petroleum Corporation, a subsidiary of Petróleos de Venezuela SA, is facing a series of operational, financial and managerial difficulties, due to the constant administrative disorders of the regime implemented by the National Government, reason why there are three important legal contingencies weighing on this Venezuelan company in the United States: (i) the guarantee granted to the creditors of the Sovereign Bonds 2020; (ii) the guarantee granted by the regime to the Russian company Rosneft as consequence of a loan, and (iii) the order to seize the shares owned by PDV Holding, Inc., in favor of Crystallex on the grounds of having won a trial for expropriation of a mining concession contract granted in Venezuela to said Canadian mining company;

## WHEREAS

Currently, the operation of the Company CITGO relies on a management team comprised by US staff who face important legal limitations due to the absence of the members of the Venezuelan Board of Directors because of their relationship with the usurper Government of Maduro, reason why the operations of the company have been affected;

## WHEREAS

6/17/2019 AGREEMENT THAT AUTHORIZES THE APPOINTMENT TO EXERCISE THE POSITIONS OF THE INTERVENTION BODY NAMED...

Case 1:19-cv-10023-KPF Document 1-59 Filed 03/18/20 Page 54 of 75
Case 1:19-cv-10023 Document 1-2 Filed 10/23/19 Page 43 of 46

Due to the usurpation of the Presidency of the Republic illegally exercised by Nicolás Maduro, it is not possible for the Board of Directors of PDVSA and, consequently, for the shareholders meeting to fulfill all the formalities to designate a new Board of Directors of PDV Holding, Inc., of the Company CITGO Holding, Inc. and of the Company CITGO Petroleum Corporation, which is why Article 34 of the Statute Governing the Transition to Democracy to Restore the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela, approved by the National Assembly on February 5, 2019, establishes a special and temporary legal regime for intervention of State companies, which allows the appointment of an intervention body, called the "Ad-hoc Administrative Board," appointed by the President in charge of the Republic, to assume the functions of the Shareholders Meeting and the Board of Directors of PDVSA, to act on their behalf as sole shareholder, and to proceed to appoint the Board of Directors of PDV Holding, Inc. and, subsequently, appoint the Board of Directors of the company CITGO Petroleum Corporation;

## WHEREAS

The acts of the President in charge must be submitted to parliamentary control by the National Assembly, in the exercise of its constitutional functions, in conformity with Article 187 of the Constitution of the Bolivarian Republic of Venezuela and Articles 13, 15 and 16 of the Statute that Governs the Transition to Democracy to Restore the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela.

## IT AGREES:

**FIRST:** Authorize citizen Juan Gerardo Guaidó Márquez, President in charge of the Bolivarian Republic of Venezuela, by means of its legal attributions, to appoint the citizens that are mentioned below as members of the Ad-hoc Administrative Board of Petróleos de Venezuela S.A., in consideration of the provisions expressly established in Articles 236 numerals 1, 2 and 11, as well as Article 333 of the Constitution of the Bolivarian Republic of Venezuela, and Articles 15 literal a. and 34 of the Statute Governing the Transition to Democracy to Restore the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela:

## AD HOC ADMINISTRATIVE BOARD OF PETRÓLEOS DE VENEZUELA S.A.

D Simón Antunes;

D Gustavo J. Velásquez;

D Carlos José Balza;

D Ricardo Alfredo Prada, and

D David Smolansky.

**SECOND**: the following provisions will govern the principal members of the Ad-hoc Administrative Board of the commercial company Petróleos de Venezuela, S.A.:

1. The Ad-hoc Administrative Board will have the appropriate attributions to the Shareholders Meeting and the Board of Directors of Petróleos de Venezuela S.A., for the purpose of carrying out all the necessary actions to appoint a Board of Directors of PDV Holding, Inc.
2. The Ad-hoc Administrative Board, directly or through the person they designate, will represent Petróleos de Venezuela S.A. as a shareholder of PDV Holding, Inc., for the only purpose of subscribing the written consent of the sole shareholder required to appoint the Board of Directors of PDV Holding, Inc.
3. Any other authorization or appointment that Petróleos de Venezuela S.A. has formulated in the past for representing Petróleos de Venezuela SA as shareholder of PDV Holding is revoked and without effect, including any limitations to subscribe written consents as sole shareholder of PDV Holding, Inc.

**THIRD:** The Ad-hoc Administrative Board of Petróleos de Venezuela S.A. will proceed to carry out all the necessary actions for the purpose of designating the new boards of directors of the subsidiaries of PDV Holding, Inc., of CITGO Holding, Inc. and of CITGO Petroleum Corporation, which will be comprised of the following persons:

## PDV Holding, Inc.:

6/17/2019    AGREEMENT THAT AUTHORIZES THE APPOINTMENT TO EXERCISE THE POSITIONS OF THE INTERVENTION BODY, NAMED...

Case 1:19-cv-10023-KPF   Document 29-5   Filed 10/29/19   Page 55 of 75
Case 1:19-cv-10023   Document 1-2   Filed 10/29/19   Page 94 of 16

D Luisa Palacios;

D Edgar Rincón;

D Oswaldo Nuñez;

D Fernando Vera;

D Elio Tortolero, and

D Andrés Padilla.

**Citgo Holding, Inc.:**

D Luisa Palacios;

D  Edgar  Rincón;

D Ángel Olmeta;

D Oswaldo Núñez;

D Javier Troconis, and

D Rick Esser.

**Citgo Petroleum Corporation:**

D  Luisa Palacios;

D  Edgar  Rincón;

D  Luis  Urdaneta;

D Ángel Olmetta;

D Andrés Padilla, and

D Rick Esser.

**FOURTH:** The Ad-hoc Administrative Board of Petróleos de Venezuela S.A., and the new directors of PDV Holding, Inc. and the boards of the subsidiaries listed above will proceed immediately to implement a plan based on the following premises:

1.  Secure the protection of assets of CITGO Company. For this purpose, the exclusion of the CITGO Company from the sanctions regime and promotion of its inclusion in a regime for protection of assets must be achieved.
2.  Implement measures that permit seeking alternative sources to PDVSA for supply of heavy oil at the lowest possible cost, until the usurpation ceases and Petróleos de Venezuela S.A restores the supply of crude oil to the United States.
3.  Carry out the necessary audits to determine the status of the assets of CITGO Company, particularly to establish evidence of possible irregularities committed, which could have affected the interests of the Republic, and proceed to file complaints before the competent authorities.
4.  Any other order or instruction issued from the authority of the President in Charge of the Republic.

**FIFTH:** Disseminate the present Agreement publicly in the Judicial Gazette and the communication media.

Signed, sealed and delivered in the Federal Legislative Palace, venue of the National Assembly of the Bolivarian Republic of Venezuela, in Caracas, on the thirteenth day of the month of February, 2019. 209th year of Independence and 159th year of Federation.

6/17/2019 AGRE... Case 1:19-cv-10023-KPF Document 59-5 Filed 09/18/20 Page 56 of 75 ...ION BODY, NAMED...

Case 1:19-cv-10023 Document 1-2 Filed 10/29/19 Page 13 of 16

**JUAN GERARDO GUAIDÓ MÁRQUEZ**

President

**ÉDGAR JOSÉ ZAMBRANO RAMÍREZ**
First Vice-President

**IVÁN STALIN GONZÁLEZ MONTAÑO**
Second Vice-President

**EDINSON DANIEL FERRER ARTEAGA**
Secretary

**JOSÉ LUIS CARTAYA PIÑANGO**
Undersecretary

Browser

Search...

Search

The Assembly

- Board of Directors
- Legislative headquarters

Deputies

- Main
- Substitute

Legislative agenda

- Sessions of the National Assembly
- Events
- Press conferences

Commissions

- Permanent
- Ordinary
- Special

Laws

- Projects

Press room

- News
- Calls
- Releases
- Press releases

6/17/2019     AGREEMENT... Case 1:19-cv-10023-KPF   Document 59-5   Filed 09/18/20   Page 57 of 75 ...ON BODY, NAMED...

Case 1:19-cv-10023   Document 1-2   Filed 10/23/19   Page 98 of 16

Legislative gazette

- 

- 

- 

Federal Legislative Palace, Caracas - Venezuela / Telephone: +58 212 7783322 X

# EXHIBIT C





## Acuerdos aprobados en la plenaria en las distintas áreas de interés nacional

## ACUERDO SOBRE LA SITUACIÓN FINANCIERA ACTUAL DE PETRÓLEOS DE VENEZUELA S.A.

### LA ASAMBLEA NACIONAL

### DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA

### ACUERDO SOBRE LA SITUACIÓN FINANCIERA ACTUAL DE PETRÓLEOS DE VENEZUELA S.A.

### CONSIDERANDO

Que la Constitución de la República Bolivariana de Venezuela en su artículo 302 reconoce la importancia estratégica de la actividad petrolera en Venezuela y es Petróleos de Venezuela, S.A., la única sociedad anónima de carácter público que reconoce expresamente nuestra Constitución en su artículo 303;

### CONSIDERANDO

Que en el contexto mundial de baja de precios del crudo, el Estado venezolano debe buscar preservar su presencia en los mercados mundiales de hidrocarburos, procurando mantener o incrementar los niveles de producción. Este objetivo fallido fue trazado por el Gobierno Nacional desde el año 2005 en el Plan de Siembra Petrolera que señala que para el 2012 la producción petrolera debió alcanzar los 6.0 millones de barriles diarios de los cuales 3.9 millones de barriles diarios se deberían destinar para la exportación. El informe de gestión de PDVSA del año 2015 señala que la producción petrolera nacional lejos de incrementar disminuyó a 2.9 millones de barriles de petróleo, por debajo del 50 % de la meta de producción para el 2012;

### CONSIDERANDO

Que pese a haber generado más de 700 millardos de dólares en ingresos desde el año 1999 hasta el 2015, el Estado ha usado a PDVSA como fuente de financiamiento para fines político-partidistas, obstaculizando así que la empresa invirtiera en aspectos esenciales dentro de la industria como son la exploración, extracción, refinación y distribución. En consecuencia, la

producción actual está por debajo de los niveles de producción del año por 10/29/19    Page 8 of 9

**CONSIDERANDO**

Que la situación financiera de PDVSA es la de una entidad altamente endeudada con una deuda financiera de US$ 43.716 millones y de US$ 19.052 millones con proveedores, niveles estos significativamente mayores que lo adeudado en 1998;

**CONSIDERANDO**

Que PDVSA ha vendido activos físicos y financieros a precios inferiores al mercado. Así, en 2016, PDVSA liquidó sus activos en Argentina, vendió parte de su capital accionario en las empresas mixtas a petroleras extranjeras y en el año 2015 negoció las acreencias que mantenía con Jamaica y República Dominicana por un precio inferior a su valor nominal. En ese sentido, Venezuela transó sus cuentas por cobrar con Jamaica de US$ 2.920 millones de dólares por apenas US$ 1.500 millones, lo que representa una rebaja cercana al 50%, mientras que a República Dominicana cedió una posición de acreedor de una deuda cercana a los US$ 4.000 millones por apenas US$ 2.000 millones;

**CONSIDERANDO**

Que recientemente, la estatal petrolera ha dado a conocer que pretende realizar un canje de bonos con fecha de maduración en los próximos quince meses. Los títulos elegibles para esta operación alcanzan a US$ 7.100 millones con una concentración excesiva en el corto plazo del servicio de la deuda. De hecho en lo que va de 2016, más del 25,0 % de los ingresos por exportaciones petroleras se destinarán a servir la deuda de PDVSA;

**CONSIDERANDO**

Que es un indicio de los problemas de credibilidad que la empresa petrolera nacional con derechos exclusivos de explotación sobre las mayores reservas petroleras del mundo tenga que ofrecer como garantía real del pago de los bonos a ser canjeados el 50,1% de su posición en la empresa subsidiaria Citgo Holdings INC;

**CONSIDERANDO**

Que tanto la sensible caída en la producción de PDVSA, la necesidad de colocar como colateral a la empresa Citgo Holdings INC y el manejo opaco e inadecuado de las finanzas de la empresa, comprometerán significativamente la liquidez de esta para el servicio de la deuda financiera y comercial y aumentar la producción;

**CONSIDERANDO**

Que el artículo 187 de la Carta Magna faculta a la Asamblea Nacional para ejercer funciones de control sobre el Gobierno Nacional y sobre la Administración Pública, con potestad para conocer sobre los estados financieros y los detalles de cualquier operación que comprometa a PDVSA al usarse como garantía sus activos.

**ACUERDA**

**Primero.** Citar al ciudadano Eulogio del Pino, Presidente de la Empresa Petróleos de Venezuela S.A, a que comparezca a esta Asamblea Nacional para que explique los términos de esta operación de canje de bonos, fundamentada en el otorgamiento de la mayoría de las acciones de Citgo Holding INC como garantía.

**Segundo.** Rechazar categóricamente que el Ejecutivo Nacional pretenda ofrezca como garantía con prioridad por el 50.1% de las acciones que conforman el capital social de Citgo Holding INC, o que se constituya garantía sobre cualquier otro bien de la Nación.

**Tercero.** Exhortar al Ministerio Público a que abra una investigación para determinar si la operación en curso resguarda el Patrimonio de la Nación, en atención a los artículos 187 numeral 9, 302 y 303 de la Constitución de la República Bolivariana de Venezuela.

**Cuarto.** Exhortar a Petróleos de Venezuela S.A, a que presente al país un plan de reperfilamiento de sus compromisos financieros y un plan de recuperación de la industria petrolera para el corto y mediano plazo.

**Quinto.** Dar publicidad al presente Proyecto de Acuerdo**.**

Dado, firmado y sellado en el Palacio Federal Legislativo, Sede de la Asamblea Nacional de la República Bolivariana de Venezuela, en la ciudad de Caracas, a los veintisiete días del mes de septiembre del año dos mil dieciséis. Año 206° de la Independencia y 156° de la Federación.

**HENRY RAMOS ALLUP**

Presidente de la Asamblea Nacional

**ENRIQUE MÁRQUEZ**              **SIMÓN CALZADILLA**

Primer Vicepresidente              Segundo Vicepresidente

**ROBERTO EUGENIO MARRERO BORJAS**        **JOSÉ LUIS CARTAYA**

Secretario              Subsecretario

# Buscador

Buscar...

BUSCAR

Asamblea

Historia
Bases Legales
Junta Directiva

Noticias

Todas
Nacional
Internacional
Legislativa

Diputados

Todos
Principales
Suplentes

Comisiones

Todas
Comisiones Ordinarias
Comisiones Permanentes
Comisiones Consultivas

Actos Legislativos

Todos
Acuerdos aprobados e...
Autorización...
Autorizaciones de co...
Comisiones Especiale...
Comisiones Mixtas
Discursos de Orden
Embajadores / Autori...
Informes presentados...
Informes
Informes de gesti&oa...

Transparencia

Documentos

Gaceta Legislativa

Contáctanos

Palacio Federal Legislativo, Caracas - Venezuela /
Teléfono: +58 212 7783322





**TRANSPERFECT**

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

### CERTIFICATION

I, Aurora Landman, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided Spanish into English translation(s) of the source document(s) listed below are true and accurate:

- *National Assembly Resolutions on the Current Financial Situation of Petróleos de Venezuela, S.A.*

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty-five years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

_____
Aurora Landman, Project Assistant

Sworn to before me this
Friday, October 25, 2019

_____
Authorized Signature

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 6TH FLOOR, NEW YORK, NY 10001 | T 212.400.8840 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

09/27/2016

## THE NATIONAL ASSEMBLY

## OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

### RESOLUTIONS ON THE CURRENT FINANCIAL SITUATION OF PETRÓLEOS DE VENEZUELA S.A.

#### WHEREAS

That the Constitution of the Bolivarian Republic of Venezuela, in Article 302 thereof, recognizes the strategic importance of the oil activity in Venezuela, with Petróleos de Venezuela, S.A. being the only public company that expressly recognizes our Constitution in Article 303 thereof;

**WHEREAS** That in the global context of low oil prices, the Venezuelan State must seek to preserve its presence in the global hydrocarbon markets in an attempt to maintain or increase production levels. This failed objective was set by the National Government since 2005 in the "*Plan de Siembra de Petroleo*" (Oil Sowing Plan) that states that, by 2012, oil production should have reached 6.0 million barrels per day, of which 3.9 million barrels per day should be destined for export. PDVSA's 2015 management report indicates that national oil production, far from increasing, actually decreased to 2.9 million barrels of oil, below 50% of the production target for 2012;

 **WHEREAS** That despite having generated more than US$700 billion in revenue from 1999 to 2015, the State has used PDVSA as a source of financing for political-partisan purposes, thus hindering the company from investing in essential aspects within the industry such as exploration, extraction, refining and distribution. Consequently, current production is below the 1998 production levels;

#### WHEREAS

That PDVSA's financial situation is that of a highly indebted entity with a financial debt of US$43,716 million and US$19,052 million with suppliers, levels that are significantly higher than what was owed in 1998;

**WHEREAS** That PDVSA has sold physical and financial assets at prices below the market. Thus, in 2016, PDVSA liquidated its assets in Argentina, sold part of its share capital in joint ventures to foreign oil companies, and in 2015 negotiated the claims it held with Jamaica and the Dominican Republic for a price below nominal value. Accordingly, Venezuela negotiated its accounts receivable of US$ 2,920 million with Jamaica for just US$ 1,500 million, which represents a reduction close to 50%, while the Dominican Republic relinquished a creditor position for a debt of almost US$ 4,000 million for just US$ 2,000 million;

**WHEREAS** That recently, the state oil company has announced that it intends to execute a bond swap with a maturity date in the next 15 months. Eligible securities for this transaction reach US$ 7.1 billion with an excessive concentration in the short-term for debt service. In fact, so far in 2016, more than 25.0% of revenues from oil exports will be used to serve PDVSA's debt;

**WHEREAS** That, indicative of the credibility problems, the national oil company, having exclusive exploitation rights over the largest oil reserves in the world, must offer 50.1% of its position in the subsidiary company Citgo Holdings Inc. as collateral for the payment of the bond swap;

## WHEREAS

That the considerable drop in the production of PDVSA, the need to offer the company Citgo Holdings Inc. as collateral, and the opaque and inadequate management of the company's finances will significantly compromise its liquidity for the service of financial and commercial debt and for the increase in production;

## WHEREAS

That Article 187 of the Constitution empowers the National Assembly to exercise control functions over the National Government and the Public Administration, with the power to obtain information about the financial statements and details of any transaction that commits PDVSA's assets as collateral.

## IT IS HEREBY RESOLVED

**First**. To summon citizen Eulogio del Pino, President of Petróleos de Venezuela SA, to appear before this National Assembly to explain the terms of this bond swap transaction, based on offering the majority of Citgo Holding Inc. shares as collateral.

**Second**. To reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of Citgo Holding Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation.

**Third**. To urge the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with articles 187, section 9, 302 and 303 of the Constitution of the Bolivarian Republic of Venezuela.

**Fourth**. To urge Petróleos de Venezuela S.A. to present the Country with a plan for the refinancing of its financial commitments and a recovery plan for the oil industry over the short- and medium-term.

**Fifth**. To publicize these Draft Resolutions.

Issued, signed and sealed in the Federal Legislative Palace, Headquarters of the National Assembly of the Bolivarian Republic of Venezuela, in the city of Caracas, on the twenty-seventh day of the

month of September of the year two thousand and sixteen. Year 206 of Independence and 156 of the Federation.

HENRY RAMOS ALLUP

**President of the National Assembly**

ENRIQUE MÁRQUEZ                                 SIMÓN CALZADILLA

**First Vice President**                              **Second Vice President**

ROBERTO EUGENIO MARRERO BORJAS              JOSÉ LUIS CARTAYA

**Secretary**                                       **Undersecretary**

# EXHIBIT D





REPÚBLICA BOLIVARIANA DE VENEZUELA
**ASAMBLEA NACIONAL**

**Acuerdos aprobados en la plenaria en las distintas áreas de interés nacional**

## ACUERDO QUE REITERA LA INVALIDEZ DEL BONO PDVSA 2020

DESCARGAR

**LA ASAMBLEA NACIONAL**
**DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**

Como vocera del pueblo libre, soberano y democrático,

**ACUERDO QUE REITERA LA INVALIDEZ DEL BONO PDVSA 2020**

**CONSIDERANDO**

Que en Acuerdo aprobado en fecha 26 de mayo de 2016, esta Asamblea Nacional ratificó que: "serán absolutamente nulos los contratos de interés público nacional, estadal o municipal que celebre el Ejecutivo Nacional con Estados o entidades oficiales extranjeras o con sociedades no domiciliadas en Venezuela sin la aprobación de la Asamblea Nacional; así como otros contratos de interés público nacional que suscriba sin esta aprobación fuera de los casos exceptuados por la ley";

**CONSIDERANDO**

Que el 4 de agosto de 2016 esta Asamblea Nacional aprobó el Acuerdo de emplazamiento al Ejecutivo Nacional sobre la situación de la compañía estatal Petróleos de Venezuela S.A. (PDVSA), en el cual se acordó, entre otras decisiones, exhortar "al Ejecutivo Nacional y a la directiva de la Estatal PDVSA a mantener una sana política de endeudamiento, tanto financiera como comercial que no afecte a largo plazo los intereses del país y de la propia industria petrolera";

**CONSIDERANDO**

Que el 16 de septiembre de 2016 PDVSA ofreció el canje de bonos con vencimiento en 2017 por un nuevo bono con vencimiento en 2020, con garantía sobre el 50,1% de la acciones de Citgo Holding, Inc.;

**CONSIDERANDO**

Que el 27 de septiembre de 2016 esta Asamblea aprobó un Acuerdo en el cual cuestionó el sobre-endeudamiento irresponsable de PDVSA, inició una investigación sobre la oferta de canje, rechazó la garantía sobre el 50,1% de la acciones de Citgo Holding, Inc., y ordenó el inicio de investigaciones por presuntos delitos al patrimonio público derivados de esta operación;

**CONSIDERANDO**

Que PDVSA decidió ignorar el Acuerdo de esta Asamblea Nacional, y avanzó en el canje, a pesar de que el mercado no reaccionó favorablemente, como resultado del colapso económico de PDVSA y las objeciones públicamente realizadas por esta Asamblea en su Acuerdo de fecha 27 de septiembre de 2016;

**CONSIDERANDO**

Que tras cambiar las condiciones del canje para reconocer una prima a quienes decidiesen participar en tal operación, PDVSA anunció el 24 de octubre de 2016 los resultados de la operación, en la cual apenas se logró canjear cerca del 40% de los bonos con vencimiento en 2017;

**CONSIDERANDO**

Que el canje aumentó las obligaciones de PDVSA durante 2016-2020 por 1.102 millones de dólares, dividido en 569 millones en pagos de capital adicional y 533 millones en pagos de intereses adicionales. Como resultado de lo anterior, el financiamiento total del canje tiene una tasa interna de retorno de cerca del 19,8% en dólares, más el colateral sobre el 50,1% de las acciones de Citgo Holding, Inc;

**CONSIDERANDO**

Que al día siguiente del anuncio de este acuerdo de reestructuración, el 28 de septiembre de 2016, fue posible a la Asamblea Nacional a investigar a PDVSA, todo lo cual facilitó que esa empresa cerrara la operación de canje, mediante contratos de emisión y de garantías suscritos el 28 de octubre, a pesar de lo cual, no se declaró la nulidad del Acuerdo del 27 de septiembre del año 2016;

**CONSIDERANDO**

Que el 30 de noviembre de 2016 PDVSA, firmó un acuerdo de financiamiento con Rosneft Trading, S.A., a resultas del cual PDV Holding, Inc. entregó en prenda el 49,9% de acciones de Citgo Holding, Inc., en una operación que tampoco fue autorizada por la Asamblea Nacional de conformidad con lo previsto en los artículos 150 y 187 numeral 3 de la Constitución;

**CONSIDERANDO**

Que desde febrero de 2019, la Asamblea Nacional y el Presidente (E) Juan Gerardo Guaidó Márquez adoptaron todas las decisiones necesarias para cambiar a los administradores de PDV Holding, Inc., Citgo Holding, Inc. y Citgo Petroleum Corporation, de conformidad con el Estatuto que rige la transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela, todo lo cual permitió resguardar a Citgo de la grave crisis en la cual estaba sumergida como resultado de las políticas predatorias de los regímenes de Hugo Chávez y Nicolás Maduro;

**CONSIDERANDO**

Que el 24 de abril de 2019 la Sub-Comisión de Crédito Público y la Comisión Permanente de Finanzas y Desarrollo Económico recomendaron a la Asamblea Nacional, tal y como esta acordó, pagar por una vez los intereses del Bono 2020 por parte de la Junta Ad-Hoc de PDVSA designada por el Presidente (E) Juan Gerardo Guaidó Márquez, pero reservando expresamente los derechos de PDVSA derivados de las dudas en torno a la validez de ese Bono, para lo cual acordó iniciar la correspondiente investigación;

**CONSIDERANDO**

Que a pesar de los esfuerzos de la Oficina del Procurador Especial, el Embajador de Venezuela en Estados Unidos de América y la Junta Administradora Ad-Hoc de PDVSA, el Departamento del Tesoro no ha reconocido la revocatoria de la licencia general número 5, que autoriza a los tenedores del Bono 2020 a tomar control de las acciones de Citgo Holding, Inc., aun cuando esas acciones se encuentran bloqueadas como resultado de las decisiones adoptadas por el Gobierno de Estados Unidos, en especial, la Orden Ejecutiva de 5 de agosto;

**CONSIDERANDO**

Que luego de las investigaciones adelantadas en coordinación con la Oficina del Procurador Especial, se concluyó que el contrato de emisión del Bono 2020 es un contrato de interés público nacional que ha debido ser autorizado por la Asamblea Nacional, de conformidad con el artículo 150 de la Constitución;

**CONSIDERANDO**

Que además de lo anterior, las condiciones financieras del contrato de emisión del Bono 2020 fueron irracionales, lesionando el patrimonio de PDVSA por el incremento injustificado de su deuda.

**ACUERDA**

**PRIMERO**. Ratificar que el contrato de emisión del Bono 2020 violó el artículo 150 de la Constitución de la República Bolivariana de Venezuela, pues se trató de un contrato de interés público nacional, suscrito con sociedades mercantiles extranjeras, el cual no fue autorizado por la Asamblea Nacional.

**SEGUNDO**. Ratificar que el contrato de emisión del Bono 2020 violó los artículos 311 y 312 de la Constitución de la República Bolivariana de Venezuela, pues sus condiciones financieras fueron lesivas debido a la irracionalidad bajo la cual PDVSA estructuró el canje y posterior emisión.

**TERCERO**. Reiterar todos los cuestionamientos que esta Asamblea Nacional ha venido formulando desde el año 2016 en torno al endeudamiento irresponsable de PDVSA y la celebración de contratos de interés público nacional no autorizados previamente, todo lo cual está siendo objeto de una investigación que incluye, entre otros, el acuerdo suscrito con Rosneft Trading, S.A.

**CUARTO**. Emplazar al Gobierno del Presidente (E) Juan Gerardo Guaidó Márquez a los fines de adoptar todas las acciones orientadas a la defensa de los activos de PDVSA en Estados Unidos, procurando el arreglo ordenado y consensuado de cualquier reclamación que pudiera plantearse.

**QUINTO**. Dar publicidad al presente Acuerdo.

Dado, firmado y sellado en el Palacio Federal Legislativo, sede de la Asamblea Nacional de la República Bolivariana de Venezuela, en Caracas a los quince días del mes de octubre 2019. Año 209° de la Independencia y 160° de la Federación.

**JUAN GERARDO GUAIDÓ MÁRQUEZ**

Presidente de la Asamblea Nacional

**ÉDGAR JOSÉ ZAMBRANO RAMÍREZ**

Primer Vicepresidente

**IVÁN STALIN GONZÁLEZ MONTAÑO**

Segundo Vicepresidente

**EDINSON DANIEL FERRER ARTEAGA** Secretario

**JOSÉ LUIS CARTAYA PIÑANGO**

Subsecretario

## Buscador

Buscar...

BUSCAR

| Asamblea | Noticias | Diputados | Comisiones | Actos Legislativos | Transparencia | Gaceta Legislativa |
|---|---|---|---|---|---|---|
| Historia | Todas | Todos | Todas | Todos | Documentos | Contáctanos |
| Bases Legales | Nacional | Principales | Comisiones Ordinarias | Acuerdos aprobados e... | | |
| Junta Directiva | Internacional | Suplentes | Comisiones Permanentes | Autorización... | | |
| | Legislativa | | Comisiones Consultivas | Autorizaciones de co... | | |
| | | | | Comisiones Especiale... | | |
| | | | | Comisiones Mixtas | | |
| | | | | Discursos de Orden | | |
| | | | | Embajadores / Autori... | | |
| | | | | Informes presentados... | | |
| | | | | Informes | | |
| | | | | Informes de gesti&oa... | | |

Palacio Federal Legislativo, Caracas - Venezuela /
Teléfono: +58 212 7783322



**TRANSPERFECT**

STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATION

I, Aurora Landman, as an employee of TransPerfect Translations, Inc., do hereby certify, to the best of my knowledge and belief, that the provided Spanish into English translation(s) of the source document(s) listed below are true and accurate:

▪ National Assembly Resolution Dated October 15, 2019

TransPerfect Translations, Inc., a translation organization with over 90 offices on six continents, is a leader in professional translations. TransPerfect Translations, Inc. has over twenty years experience translating into the above language pair, its work being accepted by business organizations, governmental authorities and courts throughout the United States and internationally.

TransPerfect Translations, Inc. affirms that the provided translation was produced in according to our ISO 9001:2015 and ISO 17100:2015 certified quality management system, and also that the agents responsible for said translation(s) are qualified to translate and review documents for the above language pair, and are not a relation to any of the parties named in the source document(s).

Aurora Landman, Project Assistant

Sworn to before me this
Friday, October 25, 2019

Authorized Signature

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM EXP
04-03-2021
PUBLIC
STATE OF NEW YORK

_____

**NATIONAL ASSEMBLY OF BOLIVARIAN REPUBLIC OF VENEZUELA**

_____

RESOLUTION THAT REITERATES THE INVALIDITY OF PDVSA'S 2020 BONDS

**NATIONAL ASSEMBLY OF
BOLIVARIAN REPUBLIC OF VENEZUELA**

As voice for the free, sovereign and democratic people.

**RESOLUTION THAT REITERATES THE INVALIDITY OF PDVSA'S 2020 BONDS**

**WHEREAS**

That in a Resolution approved on May 26, 2016, this National Assembly ratified that: "any national, state or municipal public contract entered into by the National Executive Power with foreign States or foreign official entities or with companies not domiciled in Venezuela without the approval of the National Assembly shall be absolutely null and void; as well as other national public contracts that are executed without such approval except where exempt by law ";

**WHEREAS**

That on August 4, 2016, the National Assembly approved the Summons Resolution for the National Executive Power on the situation of the state-owned company Petróleos de Venezuela S.A. (PDVSA), in which it was resolved, among other decisions, to urge "the National Executive Power and the board of the State-owned PDVSA to maintain a healthy debt policy, both financially and commercially, that does not affect the long-term interests of the country and the oil industry itself ";

**WHEREAS**

That on September 16, 2016, PDVSA offered a bond swap transaction, whereby a bond with a maturity date in 2017 would be swapped for a new bond with a maturity date in 2020, with 50.1% of the shares in Citgo Holding, Inc. offered as collateral;

**WHEREAS**

That on September 27, 2016, this Assembly approved a Resolution in which it questioned the irresponsible over-indebtedness of PDVSA, initiated an investigation into the bond swap offer, rejected the collateral of 50.1% of the shares in Citgo Holding, Inc., and ordered the initiation of investigations for alleged crimes to the public patrimony derived from this transaction;

**WHEREAS**

That PDVSA decided to ignore the Resolution of this National Assembly, and proceeded with the bond swap transaction, despite the market not reacting favorably, due to the economic collapse of PDVSA and the public complaints presented by this Assembly in its Resolution dated September 27, 2016;

**WHEREAS**

That after modifying the bond swap conditions to recognize a premium for those who decided to participate in such a transaction, PDVSA announced the results of the transaction on October 24, 2016, where barely 40% of the bonds maturing in 2017 were swapped;

**WHEREAS**

That the swap increased PDVSA's obligations during 2016-2020 by US$1,102 million, that is, US$569 million in additional capital payments and US$533 million in additional interest payments. Consequently, the total financing of the bond swap has an internal rate of return of almost 19.8% in dollars, plus the 50.1% of the Citgo Holding, Inc shares offered as collateral;

**WHEREAS**

That the day following the announcement of the bond swap results, the Constitutional Court issued its ruling No. 893, in which it illegitimately prevented this National Assembly from investigating PDVSA, thereby allowing that the latter to complete the bond swap transaction through the issue of bond indentures and guarantees executed on 28 October, even though the nullity of the Resolution dated September 27, 2016 was not declared;

**WHEREAS**

That on November 30, 2016, PDVSA signed a financing agreement with Rosneft Trading, S.A., resulting in PDV Holding, Inc. pledging 49.9% of shares in Citgo Holding, Inc., through a transaction that was not authorized by the National Assembly in accordance with the provisions of Articles 150 and 187, section 3 of the Constitution;

**WHEREAS**

That since February 2019, the National Assembly and the President (E), Juan Gerardo Guaidó Márquez, adopted all the necessary decisions to change the board of PDV Holding, Inc., Citgo Holding, Inc. and Citgo Petroleum Corporation, in accordance with the Statute governing the transition to democracy to restore the validity of the Constitution of the Bolivarian Republic of Venezuela, all of which allowed Citgo to protect itself from the serious crisis in which it was submerged as a result of the predatory policies of the regimes of Hugo Chávez and Nicolás Maduro;

**WHEREAS**

That on April 24, 2019, the Public Credit Subcommittee and the Permanent Committee on Finance and Economic Development recommended to the National Assembly, as resolved by the latter, that the Ad-Hoc Board of PDVSA appointed by the President (E), Juan Gerardo Guaidó Márquez, pay the interest of the 2020 Bond in a single payment, but expressly reserving PDVSA's rights of PDVSA derived from the doubts concerning the validity of that Bond, for which it was resolved to initiate the corresponding investigation:

**WHEREAS**

That despite the efforts of the Office of the Special Prosecutor, the Venezuelan Ambassador of to the United States of America and the Ad-Hoc Administrative Board of PDVSA, The Department of Treasury has not recognize the revocation of general license number 5, which authorizes the holders of the 2020 Bond to take control of shares in Citgo Holding, Inc., even when such shares are frozen as a result of the decisions taken by the United States Government, in particular, the Executive Order of 5 August;

### WHEREAS

That following the investigations conducted in coordination with the Office of the Special Prosecutor, it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution;

### WHEREAS

That in addition to the foregoing, the financial conditions of the 2020 Bond indenture were irrational, damaging PDVSA's equity due to the unjustified increase in its debt.

### IT IS HEREBY RESOLVED

**FIRST.** To ratify that the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national public contract, executed with foreign companies, which was not authorized by the National Assembly

**SECOND**. To ratify that the 2020 Bond indenture violated Articles 311 and 312 of the Constitution of the Bolivarian Republic of Venezuela, since its financial conditions were detrimental given the irrationality under which PDVSA structured the bond swap and subsequent issuance.

**THIRD**. To reiterate all the questions that this National Assembly has been formulating since 2016 regarding the irresponsible indebtedness of PDVSA and the execution of national public contracts not previously authorized, all of which are undergoing an investigation that includes, among other items, the agreement executed with Rosneft Trading, S.A.

**FORTH.** To summon the Government of the President (E), Juan Gerardo Guaidó Márquez, to adopt all actions aimed at defending PDVSA's assets in the United States, seeking the orderly and consensual settlement of any claim that may arise.

**FITH.** To publicize this Resolution.

Issued, signed and sealed in the Federal Legislative Palace, Headquarters of the National Assembly of the Bolivarian Republic of Venezuela, in the city of Caracas, on the fifteenth day of the month of October 2019.

Year 209of Independence and 160 of the Federation.

JUAN GERARDO GUAIDÓ MÁRQUEZ

President of the National Assembly

ÉDGAR JOSÉ ZAMBRANO RAMÍREZ          IVÁN STALIN GONZÁLEZ MONTAÑO

First Vice president                          Second Vice President


EDINSON DANIEL FERRER ARTEAGA          JOSÉ LUIS CARTAYA PIÑANGO

Secretary                              Undersecretary