MUNGER, TOLLES & OLSON LLP

1155 F STREET N.W.
SEVENTH FLOOR
WASHINGTON, D.C. 20004-1361
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 683-3702

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

June 9, 2020

Writer's Direct Contact
(202) 220-1101
(213) 683-4007 FAX
Donald.Verrilli@mto.com

Hon. Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007

      Re:    *Petróleos de Venezuela, S.A. ("PDVSA"), et al. v. MUFG Union Bank, N.A., et. al.*, Case No. 1:19-cv-10023-KPF (S.D.N.Y.)

Dear Judge Failla:

      I represent the Bolivarian Republic of Venezuela. I am submitting the attached letter from Carlos Vecchio, Ambassador to the United States, setting forth the official views of the recognized government of Venezuela regarding the above-captioned matter. If this Court would prefer to receive this expression of views in the form of a brief amicus curiae or in some other form, we will promptly provide them.

      Thank you for your consideration.

                              Sincerely,

                              Donald B. Verrilli, Jr.



**EMBASSY OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**

UNITED STATES OF AMERICA

Washington D.C., June 9, 2020
EL/066

**Hon. Katherine Polk Failla**
United States District Court
Southern District of New York
40 Foley Square, Room 2103
New York, NY 10007

Re: *Petróleos de Venezuela ("PDVSA"), et al. v. MUFG Union Bank, N.A., et. al.*, Case No. 1:19-cv-10023-KPF (S.D.N.Y.)

Dear Judge Failla,

1.   I am writing in my capacity as Ambassador of the Bolivarian Republic of Venezuela ("Venezuela") to inform the Court of the views of Venezuela on the above-referenced case pending before this Court.  As you know, this case will determine whether Venezuela will lose a controlling interest in CITGO – the foreign "crown jewel" of the national oil industry – to the beneficial holders of the notes due in 2020 (the "2020 Notes") issued by Petróleos de Venezuela, S.A. ("PDVSA") in 2016 as part of a Maduro-orchestrated scheme to exchange the 2020 Notes for previously issued PDVSA notes that were coming due in 2017 (the "Exchange Offer").  Venezuela's Constitution prohibited national public interest contracts with foreign entities without the approval of the Venezuelan National Assembly.  The purported pledge of a controlling interest in CITGO via the Indenture and Pledge in connection with the Exchange Offer was a national public interest contract.  In defiance of Venezuela's Constitution and the resolutions of the National Assembly, PDVSA, while under the control of the Maduro regime, purported to pledge that crown jewel without National Assembly approval.  That purported pledge was invalid.  The loss of CITGO would deal a devastating blow to the U.S.-supported efforts of the Venezuelan National Assembly and the Government of the Interim President Juan Guaidó to oust the illegitimate and authoritarian Maduro regime and to restore democracy and the rule of law in Venezuela, and would aggravate the country's ongoing complex humanitarian emergency.

I.   THE INDENTURE AND PLEDGE WERE NATIONAL PUBLIC INTEREST CONTRACTS THAT REQUIRED AUTHORIZATION BY THE NATIONAL ASSEMBLY



**EMBASSY OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**

UNITED STATES OF AMERICA

2.     According to the Venezuelan Constitution, all national public interest contracts with companies not domiciled in Venezuela are subject to prior authorization of the National Assembly.  As provided in Article 150 of the Venezuelan Constitution:

> "Entering into contracts in the national public interest shall require the approval of the National Assembly in those cases in which such requirement is determined by law.  *No contract in the municipal, state or national public interest shall be entered into with foreign States or official entities, or with companies not domiciled in Venezuela, or transferred to any of the same, without the approval of the National Assembly.*  In contracts in the public interest, the law may demand certain conditions as to nationality, domicile or other matters, or require special guarantees" (emphasis added).[1]

3.     Since Venezuela's oil nationalization of 1975, the oil industry has been a statehood activity. PDVSA is not only a state-owned enterprise, but it was also created to fulfill a constitutional role of public interest within the framework of articles 12, 302 and 303 of the Constitution of the Bolivarian Republic of Venezuela. As the Venezuelan Supreme Tribunal decided in 2003 (before the 2015 court-packing of Maduro), PDVSA is a state-owned enterprise in charge of national public interest economic activities.[2]

4.     Based on this, the National Assembly has determined that, before PDVSA can enter into a public national interest contract, authorization by the National Assembly is required under articles 150 and 187.9 of the Constitution. For instance, in 2006, the National Assembly invoked article 150 of the Constitution to authorize a joint venture agreement between an affiliate of PDVSA ("Corporación Venezolana de Petróleo") and foreign corporations.[3]

---

[1] Article 187 of the Constitution, which enumerates the functions of the National Assembly, provides in subsection 9 that one of the National Assembly's functions is: "To authorize the National Executive to enter into contracts of national interest, in the cases established by law.  *To authorize contracts of municipal, state and national public interest with States or official foreign entities or with companies not domiciled in Venezuela"*

[2] Justice Supreme Tribunal, Political-Administrative Chamber. Ruling number 416 dated May 4, 2004. See: http://historico.tsj.gob.ve/decisiones/spa/mayo/00416-040504-2003-0782.HTM

[3] Resolutions dated May 4, 2006, published in the Official Gazette number 38430, dated May 5, 2006.

Washington D.C.



**EMBASSY OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**

UNITED STATES OF AMERICA

5.    The acceleration of the Venezuelan collapse increased the authoritarian measures of Nicolás Maduro, who announced, in January of 2016, his intention to enter into national public interest contracts without the prior authorization of the National Assembly, as part of the measures aimed to circumvent the National Assembly's legislative powers.[4] In a Resolution dated May 26, 2016, the National Assembly rejected this authoritarian measure, reiterating that any national interest contract entered with foreign companies must be previously authorized by the National Assembly.

6.    On September 17, 2016, PDVSA announced its decision to exchange the 2017 Notes previously issued by PDVSA for new Notes due in 2020 (the "Exchange Offer"). Unlike any other debt transaction, PDVSA (together with PDVSA Petróleos) offered to pledge 50.1% of the shares of CITGO Holding, Inc., the exclusive shareholder of CITGO Petroleum Corporation. At the moment, PDVSA was facing a deep crisis, due to the collapse of oil production and its over-indebtedness. Rather than designing a comprehensive restructuring plan as the National Assembly had urged, Maduro offered the exchange of approximately 7 billion dollars of the 2017 Notes, creating a new and significant risk over CITGO, that was offered as collateral.[5]

7.    Considering the financial crisis of PDVSA, this offering posed a significant risk over CITGO, PDVSA's greatest strategic asset abroad. It was the first time that PDVSA purported to pledge strategic assets as collateral for a debt transaction, without requesting the prior authorization of the National Assembly.

8.     Because CITGO was - and currently is - an asset of national public interest, the Indenture and Pledge are national public interest contracts under any possible definition.[6]

---

[4] Decree 2184, published in the Official Gazette number 6214, dated January 14, 2016.

[5] On August 4, 2016, the National Assembly approved a Resolution that criticized PDVSA's indebtedness, proposing a comprehensive plan of debt refinancing.

[6] In particular, the Indenture and the Pledge qualify as national public interest contracts under any qualitative criteria, including (i) that the contract must implicate the collective interest of the national community and (ii) that the contract implies the assumption of obligations whose total or partial payment is stipulated over the course of several fiscal years subsequent to the one in which the object of the contract was caused. The Indenture and the Pledge certainly implicate the interests of the national community, as CITGO is indisputably a vital asset of Venezuela's most vital industry, which was nationalized precisely because of its

Washington D.C.



**EMBASSY OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**

UNITED STATES OF AMERICA

9. Shortly after PDVSA's announcement of the Exchange Offer, the National Assembly challenged the Exchange Offer, pursuant to article 187 numeral 9 of the Venezuelan Constitution that contemplates the parliamentary control over "public national interest contracts". For that purpose, the National Assembly enacted the Resolution dated September 27, 2016 (the "September 2016 Resolution"). Far from approving the Pledge and Indenture, the September 2016 Resolution rejected categorically the proposed pledge of 50.1% of CITGO as collateral in the Exchange Offer.[7]

10. The interpretation adopted by the National Assembly in the September 2016 Resolution was not an isolated one. The National Assembly has ratified this interpretation on several occasions. For instance, in 2018 the National Assembly declared null and void the "litigation trust agreement" subscribed by PDVSA.[8] Also, the National Assembly declared null and void the purported pledge of the remaining 49.9% of Citgo's shares in favor of Rosneft Trading.[9] Lastly, the National Assembly recently reiterated its position through a resolution condemning the Maduro regime's attempt to conduct a *de facto* privatization of PDVSA.[10] This doctrine of the National Assembly demonstrated that, in the Venezuelan Constitutional Law, PDVSA as a decentralized entity of the Public Administration can only subscribe to public national interest contracts with foreign counterparties

---

economic and strategic importance to the people of Venezuela as a whole. In addition, the 2020 Notes, which were issued in 2016 with a maturity date in 2020, certainly implied the assumption of obligations over the course of several fiscal years.

[7] See Asamblea Nacional Acuerdo sobre la situación financiera actual de Petróleos de Venezuela S.A.[Resolutions of the current financial situation of Petróleos de Venezuela S.A.] (Sept. 27, 2016)(Venez.).

[8] See Asamblea Nacional Acuerdo para denunciar la inconstitucionalidadde la constitución del fideicomiso "pdvsa us litigation trust", por parte de la sociedad anónimapetróleos de Venezuela [Resolution to denounce the unconstitutionality of the constitution of the trust "pdvsa us litigation trust", by the Venezuelan joint stock company] (April 24, 2018) (Venez.).

[9] This collateral pledge was purportedly given shortly after the pledge related to the PDVSA 2020 Notes. See Asamblea Nacional, Acuerdo que declara la invalidez y nulidad de los contratos por los cuales Petróleos de Venezuela s.a. y sus empresas filiales otorgaron en garantía el 49,9% de las acciones de citgo holding, inc. a favor de Rosneft Trading S.A [Resolutions that declares the invalidity and nullity of the contracts by which Petróleos de Venezuela S.A. and its subsidiary companies granted a guarantee of 49.9% of the shares of Citgo Holding, Inc. in favor of Rosneft Trading S.A.] (March 4, 2020) (Venez.).

[10] See Asamblea Nacional, Acuerdo de rechazo a los anuncios del régimen de Maduro de ceder activos de Petróleos de Venezuela, S.A. a terceros, incluyendo el centro de Refinación Paraguaná [Resolution rejecting the announcements of the Maduro regime to transfer assets from Petróleos de Venezuela, S.A. to third parties, including the Paraguaná Refining Center] (May 5, 2020) (Venez.).

Washington D.C.



subject to the control of the National Assembly.

11. It is not possible to compare the 2020 Notes with ordinary financial debt issued by PDVSA, because this was the first time an ownership interest in CITGO was purportedly pledged as collateral, and the required prior authorization of the National Assembly was refused based on the categorical rejection of the Pledge.

12. It is also not possible to compare the 2020 Notes with financial debt transactions of CITGO, because the Indenture and the Pledge were signed by PDVSA and PDVSA Petróleos, that are decentralized entities of the Public Administration, domiciled in Venezuela, to provide financial resources for oil activities of PDVSA in Venezuela. Accordingly, the contractual capacity of PDVSA and PDVSA Petróleos was ruled by the Venezuelan Law provisions applicable to the Public Administration's contracts, including article 150 of the Constitutional, related to the national public interest contract.
13.

II. THE 2020 NOTES WERE AN INVALID TRANSACTION, VOID *AB INITIO*, THROUGH WHICH PDVSA, UNDER THE CONTROL OF NICOLÁS MADURO, PURPORTED TO PLEDGE 50.1% OF CITGO'S SHARES AS COLLATERAL WITHOUT THE AUTHORIZATION OF THE NATIONAL ASSEMBLY

14. The 2020 Notes were issued by PDVSA on October 28, 2016, as a part of a fraudulent transaction in which Maduro's regime circumvented the authority of the National Assembly, through a political strategy that decimated the exercise of the Legislative Power of the National Assembly, legitimately elected in 2015.

15. In a functioning rule of law system, the September 2016 Resolution should have prevented PDVSA from advancing the Exchange Offer and issuing the 2020 Notes. However, PDVSA and the 2017 Noteholders decided to ignore the September 2016 Resolution and proceeded with the exchange. On October 24, PDVSA announced the closing of the Exchange Offer, and issued the 2020 Notes on October 28, 2016, with an insignificant result of only 40% of the 2017 Notes participating in the exchange. The 40% who participated in the exchange received a pledge of the entire 50.1% interest in CITGO that had been offered in exchange for all of the 2017 Notes. To achieve this poor result, PDVSA offered a premium exchange *and* the



**EMBASSY OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**

UNITED STATES OF AMERICA

collateral over CITGO. Despite its economic collapse, PDVSA increased its debt by approximately 1 billion dollars with the 2020 Notes.[11]

16.     In addition to categorically rejecting the pledge of CITGO, the September 2016 Resolution called for an investigation of the transaction, and summoned Eulogio del Pino, President of PDVSA (who was also Maduro's Oil Minister) before the National Assembly.  Since the holders of the 2017 Notes were aware of the invalidity challenge by the National Assembly, Maduro's regime decided to use the illegitimate Supreme Tribunal -that was packed in December 2015- to stop the investigation ordered in the September 2016 Resolution. For that purpose, the Constitutional Chamber of the Supreme Tribunal enacted the ruling number 893, dated October 25, 2016, that prohibited all investigations ordered by the National Assembly. Three days later, PDVSA executed the Indenture and the Pledge, ignoring once again the September 2016 Resolution.

17.     In a resolution adopted on October 15, 2019 (the "<u>October 2019 Resolution</u>"), the National Assembly reiterated the September 2016 Resolution, by clarifying, once again, that the Indenture and Pledge entered by PDVSA and PDVSA Petróleos were national public interest contracts, that should have not been signed with foreign corporations without the prior authorization of the National Assembly.

18.     In conclusion, the 2020 Notes were issued as a result of an illegal and unconstitutional transaction aimed to circumvent the political control of the National Assembly over the public national interest contract. The 2020 Notes, including the Pledge and Indenture, were therefore void *ab initio*.  The holders of the 2017 Notes were aware of the fraudulent and void nature of this transaction because the political debates of the National Assembly were broadcasted and informed in several media reports, in Venezuela and abroad, due to the unique nature of this transaction.[12] Despite the public information, the economic collapse of Venezuela

---

[11] PDVSA Announces Expiration and Final Results for its Offers to Exchange its  Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50%  Senior Secured Notes due 2020. See: http://www.pdvsa.com/templates/pdvsa/img/bonos/bonopdvsa2017/Final%20announcements%20(PDF).PDF

[12] Some examples: Carolyn Cui, *Venezuela's PdVSA to Offer to Swap $7 Billion in Debt*, via Wall St. Journal on September 14 2016: https://www.wsj.com/articles/venezuelas-pdvsa-to-offer-to-swap-7-billion-in-debt-1473878226 and LA PATILLA, *Freddy Guevara on PDVSA: We will not recognize any bond swap that has not*

Washington D.C.



and the corrupted oil industry, the holders of the 2017 Notes decided to finance Maduro's PDVSA, purportedly acquiring rights over the CITGO's collateral.[13]

19.     PDVSA and the noteholders who elected to participate in the Exchange Offer could not avoid the requirement of National Assembly approval by writing into the Exchange Offer documents a provision for the application of the law of another state. The power of PDVSA to enter into a national public interest contract is limited by the provisions of the Venezuelan Constitution discussed in this letter.  Without compliance with the requirement of approval by the National Assembly, no contract could be formed – and, therefore, no agreement to apply some other state's law could exist.

III.    THE STRATEGIC RELEVANCE OF CITGO IN THE DEMOCRATIC TRANSITION IN VENEZUELA

20.     Since January 10, 2019, the Speaker of the National Assembly, deputy Juan Guaidó, is acting as Interim President of Venezuelan pursuant article 233 of the Constitutional. The United States Government recognized Interim President Guaidó on January 23, 2019, and since then, has developed a foreign policy aimed to promote the democratic transition in Venezuela.[14]

21.     One of the components of the Venezuelan transition is the economic recovery of Venezuelan and the renegotiation of the Venezuelan debt, that could be estimated in approximately 140 billion dollars.[15] However, the priority is to address the Venezuelan complex humanitarian emergency caused by the predatory policies of Hugo Chávez. Among the many policy reforms that should be implemented, it is

---

*been authorized by the NA (translated)* on September 27 2016: https://www.lapatilla.com/2016/09/27/freddy-guevara-sobre-pdvsa-no-reconoceremos-ningun-canje-de-bonos-que-no-haya-sido-autorizado-por-la-an/

[13] Santos, Miguel Ángel Santos and Muci, Frank, *Country for sale with sea view* (translated). Via Prodavinci on October 5th 2016 : http://historico.prodavinci.com/blogs/se-vende-pais-con-vista-al-mar-por-miguel-angel-santos-y-frank-muci/

[14] January 23, 2019 statement from the White House. See: https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/

[15] Hausmann, Ricardo; Grisanti, Alejandro and Hernandez, José Ignacio, *What to do about Venezuela's overwhelming debt burden (Translated)*. Via Project Syndicate on July 10, 2019: https://www.project-syndicate.org/commentary/how-to-address-venezuela-debt-burden-by-ricardo-hausmann-et-al/spanish?barrier=accesspaylog





necessary to promote the recovery of the Venezuela oil industry. CITGO will have a strategic role in that policy reforms.[16]

22.     One of the priorities of the Interim Government is to protect CITGO. As the Ambassador of Venezuela in the United States, I have actively been working for this purpose. This are the main actions adopted by the Interim Government to protect CITGO, with the support of the United States Government:

a) In February 2019, pursuant to the Statute that Governs the Transition to Democracy to Restore the Enforcement of the Constitution of the Bolivarian Republic of Venezuela (the "Democracy Transition Statute")[17], Interim President Guaidó appointed the ad hoc Board of PDVSA, and PDVSA removed Maduro's directors at PDV Holding, Inc., the shareholder of CITGO.[18]

b) President Guaidó reinforced the rights of the ad hoc board of PDVSA under article 34 of the Democracy Transition Statute through Executive Order No. 3 ("Decree No. 3") that modified the composition of the ad hoc board and established governance rules to reinforce the autonomy of PDVSA and PDV Holding, Inc.[19]

c) After unsuccessful negotiations with the 2020 Noteholders, the ad hoc Board of PDVSA requested the authorization of the National Assembly to pay, with reservation of rights, the April Coupon of the Notes. In 2018 the United States Government issued General License 5, that authorized the 2020 Notes holders to foreclose CITGO's share. Because any invalidity claim by PDVSA will

---

[16] Pacheco, Luis. The Road Ahead for the Venezuelan Oil Industry – Time for New Ideas, May 5th, 2020.
[17] *Legislative Gazette No. 1 Ext of February 6, 2019. See:*
http://www.asambleanacional.gob.ve//storage/documentos/gaceta/gaceta_1570546878.pdf
[18] On February 8, 2019, Interim President Guaidó appointed the members of the ad hoc board, and those appointments were later approved by the Resolution of the National Assembly dated February 13, 2019.
[19] According to Decree No. 3, "the creation of this ad hoc administrative board revealed the need to adopt new actions to protect the State of Venezuela's foreign assets, directly or indirectly controlled by PDVSA, in order to comply with the provisions established in the Statute governing the transition to democracy in order to establish the validity of the Constitution of the Bolivarian Republic of Venezuela." See: Legislative Gazette No. 8 of June 5 2019. See:
http://www.asambleanacional.gob.ve//storage/documentos/gaceta/gaceta_1569936245.pdf

Washington D.C.





trigger an event of default and therefore, the foreclosure of CITGO, PDVSA was not able to exercise any remedy.[20]

d) Since April, the Guaidó Administration requested the revocation of General License 5, especially after Executive Order was issued on August 5, 2019. As was explained in the guidelines for the Venezuelan debt renegotiation published by the Office of the Special Attorney General on July 1, 2019,[21] the Interim Government required a "breathing space" to address the legacy private claims against Venezuela in an orderly and consensual process. For this purpose, it was necessary to have temporary relief, including the revocation of General License 5. On October 24, 2019, and after another failed negotiation attempt with the 2020 Notes holders, the Office of Foreign Asset Control (OFAC) of the Department of Treasury, issued General License 5A, that differed the effect of License 5 until January 22, 2020. This was a clear demonstration that, to support the Venezuelan Transition, the United States Government must grant temporary protective measures of CITGO. Consequently, the United States Government has enacted several modifications of License 5, to maintain the suspension of its effects.[22]

e) Considering the risks over CITGO derived from several litigations in process in Delaware, the Interim Government has also requested the support of the State Department and the United States Congress.[23]

---

[20] Press Statement: PDVSA ad hoc board announces payment of 2020 bond coupon. Via Prodavinci on may 16 2019 : https://prodavinci.com/comunicado-junta-ad-hoc-de-pdvsa-anuncia-pago-del-cupon-del-bono-2020/

[21] General Guidelines for the Venezuela public debt restructuration. Via twitter on July 7, 2019: https://twitter.com/ignandez/status/1147866824446529537?s=20

[22] See Issuance of Venezuela-related General License 5C https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20200410.aspx.

[23] Letter to the Special Envoy Elliot Abrams dated September 05, 2019.  Letters to Hon. Michael Pompeo Secretary of State, Hon. Steve Mnuchin Secretary of the Treasury and Hon. Noel Francisco Solicitor General, dated November 19, 2029.  On December 9, 2019, the US Treasury Office of Foreign Asset Control issued FAQ 809: "I hold a writ of attachment on shares of a Government of Venezuela entity whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations. Am I authorized to prepare for and hold an auction or other sale of the shares, contingent upon the winning bidder obtaining a license from OFAC?

"No. Parties who have attached shares of an entity whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591) must obtain a specific license from OFAC prior to conducting an auction or other sale, including a contingent auction or other sale, or taking other



**EMBASSY OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**

UNITED STATES OF AMERICA

23. The October 2019 Resolution adopted by the National Assembly, precisely, has the purpose of protecting CITGO against the unconstitutional collateral pledged by PDVSA regarding the 2020 Notes. This Resolution declared the Indenture and the Pledge null and void, based on the September 2016 resolution, because PDVSA (and PDVSA Petróleos) did not have the contractual capacity to pledge CITGO as collateral of the 2020 Notes to foreign corporations, without the prior authorization of the National Assembly.

24. The Interim Government of President Guaidó recognizes the September 2016 and October 2019 Resolutions, as well as the absence of the National Assembly's authorization of the CITGO pledge, as official acts of the only legitimate branch of Venezuela's government at the time, carrying the full force of the law in accordance with the Venezuelan Constitution, that vitiate the consent necessary for the Indenture and the Pledge to have come into valid legal existence in the first instance and therefore render these contracts and the 2020 Notes invalid, illegal, and null and void *ab initio*.

*25.* I request that the United States Courts accord respectful deference to those official acts taken wholly within Venezuela by the National Assembly, which has been the only legitimate branch of government in Venezuela since the opposition took control of that legislative body in the 2015 parliamentary elections. The act of state doctrine requires a finding that the Indenture, the Pledge, and the 2020 Notes issued thereunder are invalid, illegal, and null and void *ab initio*. According to the October 2019 Resolution, the Interim Government is willing to reconcile any legitimate claims that may arise from the Exchange Offer, but, following the Resolutions adopted by the National Assembly, it cannot recognize the 2020 Notes and the CITGO collateral as valid and binding agreements.

---

concrete steps in furtherance of an auction or sale. More generally, OFAC urges caution in proceeding with any step in furtherance of measures which might alter or affect blocked property or interests in blocked property. OFAC would consider license applications seeking to authorize such activities on a case-by-case basis. For additional information, see 31 C.F.R. §§ 591.309, 591.310, 591.407 and 591.506. [12-09-2019]" See: https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_other.aspx#venezuela



Washington D.C.



26.     The Court's decision in the case of the 2020 Notes could have enormous implications for the future of Venezuela. As noted above, if the Indenture, the Pledge, and the 2020 Notes are enforced and CITGO is lost to the noteholders, the legitimate Venezuelan Government's efforts, supported by the US, to peacefully remove the illegitimate Maduro regime from power in Caracas would be severely undermined.  This, in turn, would severely undermine the United States' foreign policy aimed at restoring democracy in Venezuela and bringing much needed relief to the Venezuelan people.

27.     Finally, any foreclosure of Citgo would impair the implementation of the July 1, 2019 guidelines for the renegotiation of the Venezuelan public debt. The amicable and orderly renegotiation of all the legacy claims against Venezuela will require proper conditions. If Venezuela is not able to implement this amicable renegotiation, the economic recovery of Venezuela will be imperiled.

Very truly yours,

Carlos Vecchio
Ambassador of the Bolivarian Republic of Venezuela to the United States of America
2409 California St NW
Washington, DC 20008
U.S.A

Washington D.C.