# Exhibit A

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC., <br><br>           Plaintiffs, <br><br>      - against - <br><br> MUFG UNION BANK, N.A. and GLAS AMERICAS LLC, <br><br>           Defendants. | Case No: 19-cv-10023-KPF |

# EXPERT REPORT OF ALLAN R. BREWER-CARÍAS

March 16, 2020

CONFIDENTIAL

# CONTENTS

I.     BACKGROUND AND QUALIFICATIONS ...................................................4

II.    SCOPE OF OPINION ..................................................................5

III.   SUMMARY OF CONCLUSIONS ...........................................................6

IV.    THE VENEZUELAN CONSTITUTION REQUIRES PRIOR
       NATIONAL ASSEMBLY AUTHORIZATION OF PUBLIC
       INTEREST CONTRACTS TO BE ENTERED INTO WITH
       FOREIGN/NON-DOMICILED COUNTERPARTIES .............................7

V.     LACK OF REQUIRED NATIONAL ASSEMBLY
       AUTHORIZATION PREVENTS CONTRACT FORMATION AND
       RENDERS ANY EXECUTED CONTRACT INVALID, ILLEGAL,
       AND NULL AND VOID *AB INITIO* ..........................................10

VI.    THE INDENTURE AND THE PLEDGE ARE NATIONAL PUBLIC
       INTEREST CONTRACTS THAT REQUIRED PRIOR NATIONAL
       ASSEMBLY AUTHORIZATION ...............................................11

       a.   PDVSA and PDVSA Petróleo Are Part of the National Public
            Administration of the Republic .........................................12

       b.   PDVSA and PDVSA Petróleo Were Parties to Both the
            Indenture and the Pledge, Which Affected Venezuela's Oil
            Industry and Most Important Foreign Asset in a Decisive Way .........14

       c.   The Indenture and the Pledge Were Entered Into With
            Companies Not Domiciled in Venezuela ...............................17

VII.   THE NATIONAL ASSEMBLY VIGOROUSLY AND PUBLICLY
       OPPOSED AND REJECTED THE EXCHANGE OFFER AND THE
       PLEDGE OF CITGO HOLDING SHARES ...................................17

       a.   The Structure of the Venezuelan Government and the Functions
            and Powers of the National Assembly .................................18

       b.   The National Assembly's Inability to Exercise Its
            Constitutional Powers Until After the 2015 Elections .....................21

       c.   The National Assembly's May 2016 Resolution ...............................27

       d.   The National Assembly's September 27, 2016 Resolution ...............29

       e.   The Contemporaneous 2016 Legal Opinion Requested by the
            National Assembly ....................................................31

f.       The National Assembly's October 15, 2019 Resolution.....................34

VIII.  THE SUPREME TRIBUNAL'S DECISIONS PURPORTING TO
       CURTAIL CONSTITUTIONAL POWERS OF THE NATIONAL
       ASSEMBLY ARE WHOLLY ILLEGITIMATE AND NOT
       ENTITLED TO RECOGNITION ................................................................35

IX.    HOGAN LOVELLS' OPINION REGARDING THE EXCHANGE
       OFFER WAS ███████████████████████████████████.......47

X.     VENEZUELAN LAW DOES NOT PERMIT THE LAW OF
       ANOTHER JURISDICTION TO GOVERN THE VALIDITY OF
       PUBLIC INTEREST CONTRACTS ...........................................................53

CONFIDENTIAL

## I.   BACKGROUND AND QUALIFICATIONS

**1.**     I have been a member in good standing of the Venezuelan Federal District Bar since 1963. Since 1974, I have been a partner of *Baumeister & Brewer*, a law firm located at Torre América, PH, Avenida Venezuela, Urbanización Bello Monte, Caracas 1050, Venezuela. I specialize in public law, particularly constitutional, administrative, and public economic law, which includes hydrocarbons law.

**2.**     I hold a law degree from the Central University of Venezuela (1962). I pursued postgraduate studies at the former University of Paris (1962-1963), and, in 1964, I earned a doctorate of law from the Central University of Venezuela. Since 1963, I have been a professor of administrative and constitutional law at the Central University of Venezuela, where I also served as Director of the Public Law Institute (1978-1987). Currently, I am an Emeritus Professor.

**3.**     Over the past six decades, I have participated in a large number of academic programs, including congresses, seminars, and colloquiums, and have delivered lectures at universities and public and private institutions in Europe, the United States, and Latin America on subjects relating to public law. I have held teaching appointments at Cambridge University (Trinity College) (1985-1986), University of Paris II (1989-1990), and Columbia Law School (2006-2008). I have served as the Vice President of the International Academy of Comparative Law (The Hague) (1982-2010) and as the President of the Venezuelan Academy of Political and Social Sciences (1997-1999).

**4.**     I am the author of over 220 books and 1,000 articles in Spanish, English, and French. My publications mainly address topics relating to public law and especially Venezuelan constitutional law, administrative law, municipal law, zoning law, environmental law, mining and hydrocarbons law, and matters of public administration and public comparative law. The content of many of my publications is available on my website: www.allanbrewercarias.com.

**5.**     Between 1969 and 1972, I was President of the Public Administration Commission of the Presidency of the Republic of Venezuela. In that capacity, I drafted the general Administrative Reform Plan for Venezuela, which included structural changes to the functioning of the ministries within the National Executive and the decentralized entities of the National Public Administration. In 1971, I drafted the Organic Law on Public Administration, enacted in 1976 and amended in 2001, 2008, and 2014, which, as stated in the Venezuelan Constitution and referenced in my opinion, serves as a normative framework for laws

CONFIDENTIAL

organizing all organs and entities comprising the Public Administration, including state-owned enterprises such as PDVSA.

**6.**   In 1993, I was appointed by the then-President of Venezuela, Ramón J. Velasquez, to be the country's Minister of State for Decentralization. In that capacity, I drafted all of the statutes and regulations designed to reinforce the federal organization of the State.

**7.**   In 1999, I was elected an independent member of the National Constituent Assembly. In that capacity, I was one of the drafters of the current Venezuelan Constitution, ratified in 1999. In particular, I proposed the constitutional provisions pertaining to "public interest contracts," including Articles 150 and 151, which govern the approval/authorization of such contracts by the National Assembly and matters of sovereign immunity regarding such contracts. All of my proposals, including for the drafting of Articles 150 and 151, and all of my votes, are compiled in Allan R. Brewer-Carías, *Debate Constituyente (Aportes a la Asamblea Nacional Constituyente)* [Constituent Debate: Contributions to the National Constituent Assembly], 3 Vols., Fundación de Derecho Público, Editorial Jurídica Venezolana, Caracas 1999.[1]

**8.**   A statement of my qualifications, testimony, and compensation is attached to this report as Exhibit A.

**9.**   I am currently a permanent resident of the United States residing in New York City.

## II.   SCOPE OF OPINION

**10.**   Paul Hastings LLP, as counsel to the Ad Hoc Boards of Directors of Petróleos de Venezuela, S.A. ("PDVSA") and PDVSA Petróleo, S.A. ("PDVSA Petróleo"), and Willkie Farr & Gallagher LLP, as counsel to PDV Holding, Inc., have requested my opinion regarding the following questions of Venezuelan law:

(i)   Whether the "8.50% Senior Secured Notes due 2020" (the "2020 Notes") issued by PDVSA, the Indenture dated October 28, 2016, pursuant to which the 2020 Notes were issued by PDVSA and purportedly guaranteed by PDVSA Petróleo, and the Pledge and Security Agreement of the same date (the "Pledge") pursuant to which the 2020 Notes were purportedly

---

[1]   2 ALLAN R. BREWER-CARÍAS, DEBATE CONSTITUYENTE (APORTES A LA ASAMBLEA NACIONAL CONSTITUYENTE) [CONSTITUENT DEBATE: CONTRIBUTIONS TO THE NATIONAL CONSTITUENT ASSEMBLY], (Editorial Jurídica Venezolana 1999).

CONFIDENTIAL

secured by a pledge of "50.1% of the outstanding Capital Stock of CITGO Holding, Inc." held by PDV Holding, Inc., are valid and enforceable contracts under the Venezuelan Constitution;

and

(ii)     Whether Venezuelan law permits Venezuelan state-owned enterprises such as PDVSA and PDVSA Petróleo to select the law of another jurisdiction to govern the formation and validity of their securities and contracts.

**11.**     I have also been asked for my assessment of a Hogan Lovells memorandum dated September 21, 2016, ███████████████████████ ███████████████████████████████.

## III.    SUMMARY OF CONCLUSIONS

**12.**     The Venezuelan Constitution is the supreme law of Venezuela. The current Venezuelan Constitution was drafted in 1999 by an elected Constituent Assembly, of which I was a member. The Venezuelan Constitution was adopted in December 1999, after its popular approval through a referendum.

**13.**     Under Articles 150 and 187.9 of the Venezuelan Constitution, which I proposed in my role as one of the constitutional drafters, a national public interest contract, meaning a public interest contract entered into by an entity that is part of the "National Public Administration," cannot be executed without prior authorization of the National Assembly if (1) a statute specifically requires such authorization, or (2) *the contract is to be entered into with* a foreign State or official entity or with *companies not domiciled in Venezuela*.

**14.**     PDVSA and PDVSA Petróleo are entirely state-owned commercial enterprises and are part of the National Public Administration, as defined in the Organic Law of Public Administration, which I drafted.

**15.**     Accordingly, the Indenture and the Pledge, both of which were entered into by PDVSA and PDVSA Petróleo with companies not domiciled in Venezuela, including the defendants, and which affected in a decisive way the most important foreign asset of Venezuela's most important industry, are unquestionably national public interest contracts within the meaning of Articles 150 and 187.9 of the Venezuelan Constitution. Therefore, in accordance with the Venezuelan Constitution, *prior National Assembly authorization of these contracts was required*.

**16.** Such authorization was not obtained. To the contrary, the National Assembly vigorously and publicly opposed and rejected the transaction, particularly the proposed pledge of a controlling interest in CITGO, both before and after the Indenture and the Pledge were executed.

**17.** Lack of required National Assembly authorization prevents valid consent and contract formation. Consequently, the Indenture, the 2020 Notes issued thereunder, and the Pledge are invalid, illegal (in the sense of having been executed/issued in violation of the Venezuelan Constitution), and null and void *ab initio—i.e., they never came into valid legal existence and are entirely unenforceable under Venezuelan law*.

**18.** As to the second question presented, under the principle of relative sovereign immunity embodied in Article 151 of the Constitution, which I proposed for inclusion in the Constitution, Venezuelan state-owned enterprises such as PDVSA and PDVSA Petróleo can agree that doubts and controversies arising from the performance of a contract of a commercial nature will be resolved in a foreign jurisdiction according to foreign law, *but in no case can such an agreement govern the validity of a public interest contract*. Validity is a matter of public order regulated by the provisions of Venezuelan public law, including the Venezuelan Constitution, which cannot be renounced or nullified through contractual stipulations.

**19.** 

## IV.  THE VENEZUELAN CONSTITUTION REQUIRES PRIOR NATIONAL ASSEMBLY AUTHORIZATION OF PUBLIC INTEREST CONTRACTS TO BE ENTERED INTO WITH FOREIGN/NON-DOMICILED COUNTERPARTIES

**20.** Article 150 of the Venezuelan Constitution requires the approval of "public interest contracts" by the National Assembly, as follows:

> "The execution of *national public interest contracts* shall require the approval of the National Assembly in those cases in which such requirement is determined by law.
>
> No *municipal, state or national public interest contract* shall be executed with foreign States or official entities, or with companies not

domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly.

In *public interest contracts*, the law may demand certain nationality and domicile conditions, or conditions of other nature, or require special guarantees."[2]

21.     The National Assembly exercises control over the Government and the National Public Administration (Article 187.3, Constitution), including through oversight of public interest contracts as addressed in Article 187.9 of the Constitution, which provides as follows:

"It is the role of the National Assembly to: […] 9. Authorize the National Executive to enter into *contracts of national interest*, in the cases established by law . . . [and] Authorize *contracts of municipal, state and national public interest*, with States or official foreign entities or with companies not domiciled in Venezuela."[3]

22.     In the context of Article 187.9, and according to Articles 225 and 242 of the Constitution and Article 119 of the Organic Law on Public Administration (explained further below), the term "National Executive" includes the Ministries to which public corporations and state-owned commercial enterprises such as PDVSA and PDVSA Petróleo are attached for the purpose of being controlled.[4] Due to this obligatory administrative attachment, national public interest contracts to be entered into by a public corporation or state-owned enterprise with foreign States, official foreign entities, or companies not domiciled in Venezuela can be presented for National Assembly authorization only by the Minister of the National Executive to which the entity is attached.

23.     Thus, Articles 150 and 187.9 of the Venezuelan Constitution require National Assembly approval/authorization of public interest contracts in two circumstances: (1) in the case of a national public interest contract, where such approval/authorization is required by law (i.e., by statute); or (2) where the public interest contract, whether national, state, or municipal, is to be entered into with foreign States or official foreign entities, or, as in this case, with companies not domiciled in Venezuela.

---

[2]     CONSTITUCIÓN DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA 1999 [1999 VENEZUELAN CONSTITUTION] art. 150.

[3]     1999 VENEZUELAN CONSTIUTION] art. 187.9.

[4]     *See Gaceta Oficial No. 6.147* (Nov. 17, 2014) at 24.

24.     The second circumstance is independent of the first. In other words, if a national public interest contract is to be entered into with foreign States or official foreign entities, or with companies not domiciled in Venezuela, National Assembly approval/authorization is required even if such approval/authorization is not required by any statute.

25.     In such cases, as ruled by the Constitutional Chamber of the Supreme Tribunal of Venezuela in decision No. 2241 of September 24, 2002, "the application of the system of prior control or authorization for procurement by the National Assembly is *inescapable*."[5]

26.     Thus, as I have previously written:

"aside from the cases of the National Assembly approval of national public interest contracts when established by a statute, the Constitution also imposes that in any case the 'national, state and municipal public interest contracts' to be entered into with 'foreign States, foreign official entities or companies not domiciled in Venezuela,' or when they are to be transferred to them, they must be submitted to the 'approval [authorization] of the National Assembly,' without the need, in such cases, that a statute provides for it."[6]

27.     In the first circumstance under Article 150—approval/authorization required by statute—the requirement is for approval *after* the contract has been executed as a condition of the contract becoming effective. However, as the Supreme Tribunal has held in accordance with scholarly opinion, in the second

[5]   In decision No. 2241 of September 24, 2002, the Constitutional Chamber of the Supreme Tribunal partially annulled article 80 of the Financial Management of the Public Sector Organic Law because this article did "not enshrin[e] the constitutional obligation of the National Executive to require the authorization of the National Assembly for the conclusion of contracts of national public interest, in the context of public credit transactions, when such contracts are concluded with States, foreign official entities or companies not domiciled in Venezuela." *See* El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 2241 Andrés Velásquez y otros, nulidad parcial artículo 80 de la Ley Orgánica de Administración Financiera del sector Público [Andrés Velásquez and others, the partial anullment of Article 80 of the Organic Law of the Financial Administration of the Public Sector, Sept. 24, 2002] (Venez.) (hereinafter Supreme Tribunal of Justice, No. 2241]

[6]   *See* Allan R. Brewer-Carías, *La mutación de la noción de contratos de interés público nacional hecha por la Sala Constitucional, para cercenarle a la Asamblea Nacional sus poderes de control político en relación con la actividad contractual de la administración pública y sus consecuencias* [*The mutation of the notion of national public interest contracts made by the Constitutional Chamber, to assure the National Assembly of its powers of political control in relation to the contractual activity of public administration and its consequences*], *in* 151–152 REVISTA DE DERECHO PÚBLICO 376–77 (Editorial Jurídica Venezolana ed. 2017).

CONFIDENTIAL

circumstance—contracts with foreign/non-domiciled counterparties—*prior* authorization is required as a condition of valid consent and contract formation.[7]

## V. LACK OF REQUIRED NATIONAL ASSEMBLY AUTHORIZATION PREVENTS CONTRACT FORMATION AND RENDERS ANY EXECUTED CONTRACT INVALID, ILLEGAL, AND NULL AND VOID *AB INITIO*

28.     If constitutionally required National Assembly authorization is not obtained, there can be no valid consent and thus no contract can be formed. Accordingly, a public interest contract executed without required National Assembly authorization is invalid and null and void *ab initio*.[8] Such a contract is illegal in the sense that it was executed in violation of the Venezuelan Constitution. Not only is such a contract entirely unenforceable, but it cannot be subsequently validated because it never came into existence in the first place due to a lack of valid consent.

29.     As the Office of the Venezuelan Attorney General has recognized since 1959:

---

[7]     In decision No. 2241 of September 24, 2002, *supra* note 5, the Constitutional Chamber of the Supreme Tribunal held that "by virtue of the expression 'no contract in the municipal, state or national public interest may be [executed] …' contained in the first of those constitutional provisions (Article 150), it must be concluded that this second control mechanism consists of *an authorization that must be granted prior to the conclusion of the contract* of national, state, or municipal public interest, in order for the contract to be entered into to be recognized as valid in accordance with the Constitution." In support of its decision, the Constitutional Chamber quoted Professor Jesús Caballero Ortíz, who explained as follows in 2001: "If the contract cannot be executed, obviously, it is about an authorization, a *conditio juris* for its validity, and the very text of the rule confirms that it is a prior act, well—we insist—the contract 'cannot be entered into.'" So, the provision in Article 187, numeral 9 is then the one that must prevail and appears correctly drafted: it is for the National Assembly to authorize the National Executive to [execute] contracts of national interest and to authorize contracts of municipal, state and national public interest with foreign official entities or with companies not domiciled in Venezuela." *See* Jesús Caballero Ortíz, *Los contratos administrativos, los contratos de interés público y los contratos de interés nacional en la Constitución de 1999* [*Administrative contracts, public interest contracts and contracts of national interest in the 1999 Constitution*], *in* 1 ESTUDIOS DE DERECHO ADMINISTRATIVO 139, 147 (Fernando Parra Aranguren & Armando Rodriguez García 2001); *see also* Rafael Badell Madrid, *Contratos de interés público nacional* [*Contracts of national public interest*], *in* 19 REVISTA DE DERECHO ADMINISTRATIVO 11 (2004) https://www.badellgrau.com/?pag=7&noti=132.

[8]     *See* Allan R. Brewer-Carías, *La formación de la voluntad de la Administración Pública Nacional en los contratos administrativos* [*The formation of the will of the National Public Administration in administrative contracts*], *in* 28 REVISTA DE LA FACULTAD DE DERECHO 61, 81–82 (Universidad Central de Venezuela ed., 1964).

"there is unanimity in the administrative doctrine regarding that the 'authorizations' that according to the Constitution or the statutes, public officials or agents of Public Administration require in order to adopt or issue certain legal acts, *are a constitutive element and necessary for the 'consent;' consequently, the omission of the authorization does not vitiate the consent, but prevents it, impeding its legitimate manifestation; and being that consent is an essential element of the existence of the act, once it has been omitted, also the act, legally speaking, is inexistent*."[9]

30.     In the same regard, professor Eloy Lares Martínez has explained that:

"When the Constitution or a Law requires an authorization for entering into a contract, such authorization is *necessary* for the validity of the contract. The authorization is a presupposition of legitimacy. If the contract is entered into without the authorization required by the Constitution or the law, it will be the product of a will that could not be expressed. Thus, the lack of authorization influences in the regularity of the formation of the act. That is why it is a condition of validity."[10]

## VI.  THE INDENTURE AND THE PLEDGE ARE NATIONAL PUBLIC INTEREST CONTRACTS THAT REQUIRED PRIOR NATIONAL ASSEMBLY AUTHORIZATION

31.     Without any doubt, the Indenture and the Pledge, which, along with the 2020 Notes issued under the Indenture, are integral parts of a single transaction, are national public interest contracts within the meaning of Articles 150 and 187.9 of the Venezuelan Constitution. Both contracts were entered into by PDVSA and

---

[9]  *See Informe de la Procuraduría de la Nación al Congreso Nacional 1959* [*Report of the Office of the Attorney General to the National Congress 1959*], 624–25 (1960) (Venez.).  *See also* Brewer-Carías, *The formation of the will of the National Public Administration in administrative contracts*, *supra* note 8 at 81–82. That is why, for instance, the National Assembly through its Resolution of September 25, 2018, regarding the public national interest contracts entered into by state-owned enterprises in the oil sector with private companies without the authorization of the National Assembly, declared the following: *"First:* To require the National Executive, in particular the Minister of the People's Power for Petroleum, in the exercise of the powers of this National Assembly, to report on service contracts with private companies in which primary activities relating to hydrocarbon deposits are allowed to be carried out, so that in a plenary session, in accordance with the provisions of the Constitution of the Republic and the Organic Law on Hydrocarbons, it can proceed to debate it and submit it for approval. *Second:* To declare null and void all service contracts involving private companies relating to the exploration, exploitation, recollection, transport and initial storage of hydrocarbon deposits not approved by this National Assembly."

[10]  *See* ELOY LARES MARTÍNEZ, MANUAL DE DERECHO ADMINISTRATIVO [ADMINISTRATIVE LAW MANUAL] 326 (10th ed., 1996).

CONFIDENTIAL

PDVSA Petróleo, both of which are part of the National Public Administration, with various companies that were not domiciled in Venezuela, affecting in a decisive way Venezuela's most economically and strategically important industry and the most economically and strategically important asset of that industry abroad—CITGO.

### a. PDVSA and PDVSA Petróleo Are Part of the National Public Administration of the Republic

**32.** To be a "public interest contract," a contract must be entered into by an entity that is part of the Public Administration at one of the three levels of government—national, state, or municipal. This is reflected in Articles 150 and 187.9 of the Venezuelan Constitution, which refer to "national," "state," and "municipal" public interest contracts.

**33.** The Public Administration is comprised of the "Central Public Administration" and the "Decentralized Public Administration." According to the Venezuelan Constitution (Article 242) and the Organic Law on Public Administration (Articles 59-61), the National Central Public Administration consists of the organs of the government itself, such as the various government ministries.[11] The National Decentralized Public Administration, on the other hand, consists of entities such as public corporations and state-owned commercial enterprises like PDVSA and PDVSA Petróleo that, while not directly part of the government itself, are closely related to the government, being attached to their corresponding government Ministries and subject to both public and private law.[12]

**34.** The basic constituents of the National Public Administration have been classified in the Public Administration Organic Law (Article 15), as "organs," which form the "Central Public Administration," and "entities," which form the "Decentralized Public Administration."[13] Regarding the latter, as the Constitutional Chamber of the Supreme Tribunal held in its decision No. 464 of March 3, 2002, the term "entities" in the Public Administration Organic Law encompasses:

> "State legal persons with the form of commercial companies, subjected to a mixed legal regime, of public and private law, although predominantly of private law, due to its form [of organization], but not

---

[11] *See* CONSTITUCIÓN DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA 1999 [1999 VENEZUELAN CONSTIUTION] arts. 160, 174, 236.20; *see also* ALLAN R. BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA 52 (Editorial Jurídica Venezolana, 2d ed. 2015).

[12] *See* 1999 VENEZ. CONST. arts. 142, 300.

[13] *See Gaceta Oficial No. 6.147* (Nov. 17, 2014) (Venez.), at 5.

CONFIDENTIAL

exclusively, because their close relation with the State subjects them to the mandatory rules of public law in order to secure the best organization, functioning and execution of control by the Public Administration, by its organs or by those that contribute to attain their objectives."[14]

**35.**     With regard to the rules of public law, state-owned commercial enterprises such as PDVSA and PDVSA Petróleo are subject, for instance, to the Public Contracting Law (Article 3)[15] and the Organic Law of the General Audit Office (Article 9).[16]

**36.**     Such entities are also part of the Public Sector as defined in Article 5 of the Financial Management of Public Sector Organic Law, which specifically encompasses:

> "8. Commercial companies in which the Republic or other persons referred to in this Article have a shareholding equal to or greater than fifty per cent of the share capital. This also includes the wholly state-owned companies, whose role, through the holding of shares of other companies, is to coordinate the public business management of a sector of the national economy [...]"[17]

**37.**     Thus, in accordance with the Venezuelan Constitution and relevant statutes, PDVSA, a Venezuelan corporation wholly owned by the Republic of Venezuela, and PDVSA Petróleo, a Venezuelan corporation wholly owned by PDVSA, are part of the National Public Administration. Indeed, in the aforementioned decision No. 464 of March 3, 2002, the Constitutional Chamber of the Supreme Tribunal was emphatic in observing that:

> "although [PDVSA] is a company incorporated and organized in the form of a public limited company, it is beyond doubt, and reaffirmed as such by the Constitution of the Bolivarian Republic of Venezuela, that it is

---

[14]    *See* El Tribunal de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice], No. 464 *Interpretación del Decreto de la Asamblea Nacional Constituyente de fecha 30 de enero de 2000, mediante el cual se suspende por 3 días la negociación de la Convención Colectiva del Trabajo)* [*Interpretation of the Decree of the National Constituent Assembly dated January 30, 2000, by which the negotiation of the Collective Labour Convention is suspended for 3 days*], Mar. 18, 2002 (Venez.). *in* 89–92 REVISTA DE DERECHO PÚBLICO 219 (Editorial Jurídica Venezolana 2002) [hereinafter Supreme Tribunal of Justice, No. 464].

[15]    *See Gaceta Oficial No. 6.154* (Nov. 19, 2014) (Venez.).

[16]    *See Gaceta Oficial No. 37.347* (Dec. 17, 2001) (Venez.).

[17]    *See Gaceta Oficial No. 6.210* (Dec. 30, 2015) (Venez.).

CONFIDENTIAL

framed within the general structure of the National Public Administration . . ."[18]

**38.**   In fact, since 2004 and continuing through the execution of the Indenture and the Pledge, PDVSA's relation with the government was so close that its President was simultaneously serving as the Minister of Petroleum and Mining, the organ of the National Executive responsible for exercising control over PDVSA.[19]

>    **b.    PDVSA and PDVSA Petróleo Were Parties to Both the Indenture and the Pledge, Which Affected Venezuela's Oil Industry and Most Important Foreign Asset in a Decisive Way**

**39.**   The notion that a public interest contract is a contract entered into by an organ or entity within the Public Administration is not otherwise restricted by the Constitution or any statute. Thus, in my opinion (which I have expressed since 1982)[20] and in the opinion of many other Venezuelan legal experts, among them José Araujo Juárez[21] and Rafael Badell,[22] *any* contract entered into by an organ or entity within the Public Administration is a public interest contract. This opinion is consistent with the Supreme Tribunal's decision No. 953 of April 29, 2003, in

---

[18]   The Supreme Tribunal explains that PDVSA and its subsidiaries are state owned enterprises with private law form. Supreme Tribunal of Justice, No. 464 *supra* note 14, at. 218–19. Regarding PDVSA being part of the National Public Administration, *see* Allan R. Brewer-Carías, *El carácter de Petróleos de Venezuela, S.A. como instrumento del Estado en la industria petrolera* [*The character of Petróleos de Venezuela, S.A. as an instrument of the state in the oil industry*], *in* 23 REVISTA DE DERECHO PÚBLICO, 77–86  (Editorial Jurídica Venezolana ed., 1985).

[19]   Mr. Rafael Ramírez, who was appointed Minister of Energy and Mines in July 2002 and reappointed as Minister of Petroleum and Mining in April 2013, was simultaneously President of PDVSA beginning in November 2004, and he occupied both positions until September 2014. Mr. Eulogio Del Pino, who was appointed Minister of Petroleum and Mining in August 2015 and reappointed as Minister of Petroleum in August 2017, was simultaneously President of PDVSA beginning in September 2014, and he occupied both positions until September 2017.

[20]   *See* Allan R. Brewer-Carías, *Los contratos de interés nacional y su aprobación legislative* [*Contracts of national interest and their legislative approval*], *in* 11 REVISTA DE DERECHO PÚBLICO   52 (Editorial Jurídica Venezolana ed., 1982).

[21]   José Araujo Juárez has opined that the state-owned enterprises "can enter into contracts that can be qualified as public interest contracts, and thus, subjected to the parliamentary regime control established in the Constitution. *See* José Araujo Juárez, *Régimen general de derecho público relativo a las empresas del Estado* [*General system of public law concerning State enterprises*], *in* 3 NACIONALIZACIÓN, LIBERTAD DE EMPRESA Y ASOCIACIONES MIXTAS 191, 229 (2008).

[22]   Rafael Badell has opined that public interest contracts are not only those entered into by the Republic, the States, and the Municipalities, but also those entered into by the "functional decentralized administration" if they affect the interest of the territorial entities, and, in particular, those "entered into by state-owned enterprises, when they affect in a direct way the national interest assigned to the Republic." *See* Rafael Badell Madrid, *supra* note 7, at 7, 9.

CONFIDENTIAL

which the Constitutional Chamber held that contracts entered into by a state-owned enterprise, *Electrificación del Caroní S.A. (Edelca)*, with certain Brazilian entities were national public interest contracts.[23]

    **40.**    As I explained in a 2006 paper:

"Contracts of the State or public contracts are all those in which one of the parties is a state legal person,[24] that means, that it is integrated in the organization of the State, whether a politico-territorial legal person (Republic, States, Municipalities), or public law persons (vg. autonomous institutes) or private law persons of the State (vg. commercial companies or state-owned enterprises).

These contracts in my opinion, have been qualified in the Constitution as public interest contracts (national, states or municipal)

In fact, in the 1999 Constitution, as supreme law and principal source of law, on matters of contracts of the State, in Section Four of Chapter I of Title IV on the 'Public Power,' it is provided for the 'public interest contracts,' a notion that in articles 150 and 151 was adopted to identify contracts entered into by public entities, that is, legal State persons, or those that integrate the public sector and that in general comprise the notion of 'State.' … This was the intention of the proposal I made[25] regarding such provision before the National Constituent Assembly during the drafting of the 1999 Constitution.

Given that Venezuela is organized as a federal state (Art. 4,) with three levels of autonomous governments (National, State, and Municipal) (Art. 136), the intention behind the regulation of the classification of public

---

[23]  *See* El Tribunal Supreme de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice], No. 953 (Apr. 29, 2003)(Venez.) at 11–12.

[24]  On the regulation of legal persons in the Constitution *see*: Allan R. Brewer-Carías, *Sobre las personas jurídicas en la Constitución de 1999* [*On legal persons in the 1999 Constitution*], *in* I DERECHO PÚBLICO CONTEMPORÁNEO: LIBRO HOMENAJE A JESÚS LEOPOLDO SÁNCHEZ 8, (Universidad Central de Venezuela ed., 2003) http://allanbrewercarias.com/wp-content/uploads/2007/08/473.-440.-SOBRE-LAS-PERSONAS-JUR%C3%8DDICAS-EN-LA-CONSTITUCION-DE-1999.pdf.

[25]  *See* Brewer-Carías, *Debate Constituyente (Aportes a la Asamblea Nacional Constituyente) Constituent Debate* [*Contributions to the National Constituent Assembly*], 173 Available at: http://allanbrewercarias.net/Content/449725d9-f1cb-474b-8ab2-41efb849fea5/Content/II,%201,%2086.%20APORTES%20AL%20DEBATE%20CONSTITUYENTE%20TOMO%20II.pdf.

interest contracts under Article 150 of the Constitution, as 'national public interest contracts,' 'state public interest contracts' and 'municipal public interest contracts' is to refer to the contracts entered into, respectively, by national public entities, state public entities or municipal public entities.[26] Consequently, the intention of the regulation [Article 150] was to consider as national public interest contracts, those concerning the national level of government (different from the state and municipal level of government), because it was entered into by a national public entity, that is to say, a national government agency (the Republic) or a national public corporation or a national state-owned enterprise."[27]

41.     Accordingly, the Indenture (under which the 2020 Notes were issued) and the Pledge are both national public interest contracts because they were both entered into by PDVSA and PDVSA Petróleo, which, as explained above, are both part of the National Public Administration of the Republic.

42.     The Indenture and the Pledge are also national public interest contracts under any standard that takes into account the magnitude or impact of the transaction, including the standard articulated by the National Assembly in its resolutions dated May 26, 2016[28] and September 27, 2016,[29] in which it expressed that "public interest contracts, that require the National Assembly's approval" as a "condition of the validity of the contract," are "a special category of administrative contracts, *inextricably related to an object that affects the collective interest of all citizens*." Venezuela's oil industry indisputably affects the collective interest of all citizens because it is the main driver of the country's crippled economy and the key to any hope of recovery, and CITGO is the "crown jewel" of Venezuela's oil industry and its most economically and strategically important asset abroad. Therefore, the Indenture and the Pledge, which were executed as part of a single,

---

[26]   *See* Caballero Ortiz, *supra* note 7 at 142.

[27]   *See* Allan R. Brewer-Carías, *Nuevas consideraciones sobre el régimen de los contratos del Estado en Venezuela* [*New considerations on the system of state contracts in Venezuela*], *in* 2 VIII JORNADAS INTERNACIONALES DE DERECHO ADMINISTRATIVO, 449–50 (2005).

[28]   *See* Asamblea Nacional, *Acuerdo sobre el respeto de las facultades propias e intransferibles de la Asamblea nacional sobre los contratos de interés público que suscriba el Ejecutivo Nacional con Estados o entidades oficiales extrajeras o con sociedades no domiciliadas en Venezuela* [*Resolution regarding the respect of its own and untransferable attributions regarding public interest contracts entered into by the National Executive with States or Official foreign entities or corporations not domiciled in Venezuela*], (May 26, 2016) (Venez.) (Hereinafter, *Resolution dated May 26, 2016*).

[29]   Asamblea Nacional, *Acuerdo sobre la situación financiera actual de Petróleos de Venezuela S.A.* [*National Assembly Resolution on the current Financial Situation of Petróleos de Venezuela S.A.*], (Sept. 27, 2016) (Venez.) (Hereinafter *Resolution dated Sep. 27, 2016*).

integrated transaction (the issuance of new, "secured" notes pursuant to the Exchange Offer),[30] are national public interest contracts under any such standard.

### c. The Indenture and the Pledge Were Entered Into With Companies Not Domiciled in Venezuela

43.     The Indenture was entered into with the following four counterparties: MUFG Union Bank N.A., as Trustee; GLAS Americas LLC, as Collateral Agent, Law Debenture Trust Company of New York, as Registrar, Transfer Agent, and Principal Paying Agent, and Banque Internationale à Luxembourg, Société Anonyme, as Luxemburg Paying Agent. The Pledge was entered into with two of these same counterparties—GLAS Americas LLC, as Collateral Agent, and MUFG Union Bank N.A., as Trustee.

44.     None of these four counterparties was domiciled in Venezuela when the Indenture and the Pledge were executed.

45.     Accordingly, as national public interest contracts entered into with entities not domiciled in Venezuela, the Indenture and the Pledge required prior National Assembly authorization under the plain text of Articles 150 and 187.9 of the Venezuelan Constitution. The National Assembly did not authorize the execution of these national public interest contracts, thus preventing them from coming into legal existence and rendering them and the 2020 Notes invalid and null and void *ab initio*.

## VII. THE NATIONAL ASSEMBLY VIGOROUSLY AND PUBLICLY OPPOSED AND REJECTED THE EXCHANGE OFFER AND THE PLEDGE OF CITGO HOLDING SHARES

46.     The National Assembly did not just fail to authorize the execution of the Indenture and the Pledge; rather, it vigorously opposed and *categorically rejected* the Exchange Offer, particularly objecting to the proposed pledge of a

---

[30]   The Indenture and the Pledge were executed as part of a single, integrated transaction involving the issuance of new, secured notes in exchange for unsecured notes previously issued by PDVSA and guaranteed by PDVSA Petróleo. Under Venezuelan law, the Indenture was a "complex contract" in that it contemplated two contractual engagements—a loan contract and a pledge contract. The loan contract was a public debt contract that would result from PDVSA's issuance of the 2020 Notes, which would be guaranteed by PDVSA Petróleo. The pledge contract was the contemplated pledge of "50.1% of the outstanding Capital Stock of CITGO Holding, Inc." held by PDV Holding, Inc. (a wholly-owned PDVSA subsidiary) to secure the 2020 Notes. As a direct consequence of the execution of the Indenture on October 28, 2016, the Pledge was executed as of the same date.

controlling interest in CITGO.[31] To fully understand the importance of the National Assembly resolutions bearing on this matter, it is necessary to understand the functions and powers of the National Assembly and its place within the Venezuelan government.

### a. The Structure of the Venezuelan Government and the Functions and Powers of the National Assembly

47.    As established in the Venezuelan Constitution, the Venezuelan government is organized according to the principle of the separation of powers, with the National Public Power divided into five branches of government—*Legislative, Executive, Judiciary, Citizen,* and *Electoral* (Article 136). Those branches correspond to the following organs: the National Assembly (*National Legislative Power*, Articles 186-224); the President of the Republic and the other

---

[31]    The text of the National Assembly's September 27, 2016 Resolution particularly objects to and rejects the illegitimacy of the purported pledge of CITGO. This pledge violated the Venezuelan legal system's traditional prohibition on securing public interest debt contracts  with pledges of or guaranties  based on national, state, or municipal assets, which prohibition is incorporated in Article 105 of the Financial Management of the Public Sector Organic Law. Although another provision of the Financial Management of the Public Sector Organic Law exempts PDVSA's debt contracts from the legislative authorization ordinarily required under this law for public debt contracts (an exemption which has no bearing on the authorization independently required under Article 150 for national public interest contracts entered into with foreign, non-domiciled counterparties), this exemption *does not* apply to the prohibition on pledges of national, state, or municipal assets. While the wording of the heading of the statutory exemption is somewhat confusing ("On the operations and entities exempt from the regime established in this Title **or of** the Legislative Authorization" (*De las Operaciones y Entes Exceptuados del Régimen Previsto en este Título **o de** la Autorización Legislativa* )), it is clear from the content of the Chapter that the exemptions listed therein, including the exemption for certain of PDVSA's debt contracts, are related exclusively to the *legislative authorization* regulated in the Title, that is, the regime established in the Title **on** Legislative authorization (*el regimen **sobre** Autorización Legislativa*), and not to the statute's prohibition on pledges of public assets. It is in the context of this traditional prohibition on pledges of Venezuelan public assets (*see e.g.*, LUIS CASADO HIDALGO, NOTAS PARA UN ESTUDIO DEL RÉGIMEN LEGAL DEL CRÉDITO PUBLICO EN EL DERECHO VENEZOLANO [NOTES FOR A STUDY OF THE LEGAL PUBLIC CREDIT SYSTEM IN VENEZUELAN LAW] 23, 42 (1975)) that the National Assembly's September 27, 2016 Resolution can be best understood. That is why, in the debate held at the National Assembly before the adoption of the Resolution, representative José Guerra argued regarding the pledge of the 50.1 % of Citgo shares, "that for the first time," a pledge was being offered as guaranty for a corporate bond issuance of PDVSA, and that such pledge was "questioned by the Venezuelan legal order." *See* Asamblea Nacional, *Sesión Ordinaria del día martes 27 de septiembre de 2016. Debates sobre los efectos del Canje de Bonos de PDVSA* [*Regular Session of Tuesday, September 27, 2016. Discussions on the effects of PDVSA Bond Redemption*], at 5. In the same debate, representative Freddy Guevara warned "the international creditors" that the National Assembly would not recognize any "public interest contract," such as the one that was discussed, without the intervention of the Assembly, alerting them that they "would not be able to request us to fulfill the commitments of irresponsible ones that destroyed PDVSA." *Id*. at 22).

bodies (particularly the Ministries) within the National Executive Power (*National Executive Power*, Articles 225-252); the Supreme Tribunal of the Republic and other courts (*Judicial Power*, Articles 253-272); the General Prosecutor of the Republic, the General Comptroller of the Republic, and the People's Defender (*Citizen Power*, Articles 273-291); and the National Electoral Council and other electoral bodies (*Electoral Power*, Articles 292-298).[32]

**48.**     The National Assembly is an elected body composed of members elected every five years through universal, direct, and secret suffrage (Article 186).

**49.**     As provided in Article 136 of the Venezuelan Constitution, "each of the branches of Public Power has its own functions, but the organs charged with exercising them shall cooperate with one another in achieving the purposes of the State,"[33] and, according to Article 137, "the Constitution and the law define the powers of the organs exercising the Public Power, to which the activities to be carried out must be subjected."[34] Consequently, as provided in Article 138, "any usurped authority is ineffective, and its acts are null and void." Usurpation occurs whenever an action is taken without legal authority.[35]

**50.**     In addition to its exclusive legislative power, the National Assembly also has the exclusive power, as provided in Article 187.3 of the Constitution, to "exercise functions of control over the Government and the National Public Administration." These "functions of control" are partially enumerated in Article 187, which gives the National Assembly exclusive authority to, for instance, discuss and approve budgetary matters (Article 187.6), authorize additional credits (Article 187.7), approve general lines of the Nation's development (Article 187.8), authorize entering into public interest contracts (Article 187.9), approve votes of censorship to high executive officials (Article 187.10), authorize the use of military missions (Article 187.11), authorize the sale of public goods (Article 187.12), authorize the appointment of certain high public officials (Article 187.14), authorize the President to travel abroad (Article 187.17), and approve International Treaties signed by the National Executive (Article 187.18).

---

[32]   *See* in relation to the organization of the Venezuelan Government, ALLAN R. BREWER-CARÍAS, LA CONSTITUCIÓN DE 1999: ESTADO DEMOCRÁTICO Y SOCIAL DE DERECHO [THE 1999 CONSTITUTION: DEMOCRATIC AND SOCIAL RULE OF LAW], 503–04 (Editorial Jurídica Venezolana ed., 2d ed., 2014).

[33]   1999 VENEZ. CONST. Art. 136.

[34]   1999 VENEZ. CONST. Art. 137.

[35]   *See* on this matter, ALLAN R. BREWER-CARÍAS, 4 LAS INSTITUCIONES FUNDAMENTALES DEL DERECHO ADMINISTRATIVO Y LA JURISPRUDENCIA VENEZOLANA [THE FUNDAMENTAL INSTITUTIONS OF VENEZUELAN ADMINISTRATIVE LAW AND JURISPRUDENCE] 59 (Universidad Central de Venezuela ed., 1964); Brewer-Carías, *The 1999 Constitution: Democratic and Social Rule of Law*, *supra* note 32, at 324.

CONFIDENTIAL

51.    In exercising such control functions, the National Assembly can adopt resolutions and issue political declarations (*Acuerdos*) that constitute "parliamentary acts without the form of law."[36] These legislative acts have the same rank as acts directly authorized by the Constitution, so long as they do not conflict with any other constitutional provision. For instance, the National Assembly can resolve that a certain authority has been usurped and that, according to the Constitution, such authority is ineffective and any related acts are to be deemed null and unconstitutional (Article 138).

52.    National Assembly resolutions need not be ratified by the President. A resolution can be repealed only by the National Assembly itself. No other government body can repeal, veto, or abrogate a National Assembly resolution, except the Constitutional Chamber of the Supreme Tribunal of Justice through a constitutionally-prescribed process of judicial review (Articles 266.1; 336.1; 336.4).

53.    Although the Constitution must be interpreted by all persons, officials, and organs of the government responsible for applying it, the National Assembly acts as the first-instance interpreter of the Constitution whenever it enacts laws, adopts resolutions, or performs other parliamentary acts in accordance with its Constitutional authority.[37] While no organ of the State, not even the Supreme Tribunal (Article 335), has a monopoly on constitutional interpretation,[38] the National Assembly, as the body representing popular sovereignty in the exercise of the legislative power of the State, not only speaks first as an interpreter of the Constitution, its voice is critical to constitutional interpretation and enforcement.[39]

---

[36]   *See* ALLAN R. BREWER-CARÍAS, LOS PRINCIPIOS FUNDAMENTALES DEL DERECHO PÚBLICO [THE FUNDAMENTAL PRINCIPLES OF PUBLIC LAW] 97–98 (Editorial Jurídica Venezolana ed., 2005)

[37]   *See* CLAUDIA NIKKEN, CONSIDERACIONES SOBRE LAS FUENTES DEL DERECHO CONSTITUCIONAL Y LA INTERPRETACIÓN DE LA CONSTITUCIÓN [CONSIDERATIONS ON THE SOURCES OF CONSTITUTIONAL LAW AND THE INTERPRETATION OF THE CONSTITUTION] 85 (Editorial Jurídica Venezolana ed., 2018).

[38]   *See* NÉSTOR PEDRO SAGUÉS, LA INTERPRETACIÓN JUDICIAL DE LA CONSTITUCIÓN [JUDICIAL INTERPRETATION OF THE CONSTITUTION] 2 (Lexis Nexis, 2d ed., 2006); *See* Elisur Arteaga Nava, *La interpretación constitucional* [*Constitutional interpretation*], *in* 1 INTERPRETACIÓN CONSTITUCIONAL 61, 108–09 (Editorial Porrúa ed., 2005).

[39]   As Joaquín Pérez Royo has stated: "the Constitution is a legal rule that refers at first instance to a political interpreter. Parliament is the political body that interprets the Constitution in the only way it knows how to do so: in a political sense. And furthermore, it is also a *privileged interpreter, insofar as it is the democratically elected representative of the citizens and, therefore, expresses the general will*. That is precisely why its interpretation in the form of a law is imposed on the whole of society." *See* Javier Pérez Royo, *La interpretación constitucional* [*Constitutional interpretation*], *in* 1 INTERPRETACIÓN CONSTITUCIONAL 889 (Editorial Porrúa ed., 2005),

CONFIDENTIAL

### b.    The National Assembly's Inability to Exercise Its Constitutional Powers Until After the 2015 Elections

**54.**    The system of checks and balances described in the previous section can only function in a democratic regime, where each branch of government acknowledges the independence and autonomy of the other branches of government. It is absolutely incompatible, however, with the authoritarian system of government that developed in Venezuela following the rise to power of Hugo Chávez shortly after the ratification of the current Constitution and continuing to the present day under Nicolás Maduro. Since the beginning of the Chávez regime in 2000, the Executive of Venezuela has devoted itself to neutralizing the National Assembly and subduing the Judiciary in blatant disregard of the Constitutional system of separation of powers.[40]

**55.**    The most important means used by the Executive to neutralize and prevent the National Assembly from exercising its functions has been to simply ignore its powers. Thus, numerous treaties and contracts of national public interest, which under the Constitution were required to be submitted to the National Assembly for authorization, were instead simply enacted by the Executive in complete disregard of the proper constitutional role of the National Assembly.

**56.**    For example, the following high-profile contracts were unquestionably national public interest contracts entered into with foreign non-domiciled counterparties that were required to be submitted to the National Assembly for authorization under Article 150 of the Constitution, yet were not:

(a)    A 2007 contract[41] for technological services relating to the transformation and modernization of Venezuelan citizen identification and

---

[40]    *See* on this process, the general comments in ALLAN R. BREWER-CARÍAS, DISMANTLING DEMOCRACY IN VENEZUELA. THE CHÁVEZ AUTHORITARIAN EXPERIMENT 1–6 (Cambridge Univ. Press, 2010). *See also* Allan R. Brewer-Carías, *The Principle of Separation of Powers and Authoritarian Government in Venezuela*, *in* 47 DUQUESNE LAW REVIEW 813–38 (2009).

[41]    *Convenio Integral de Cooperacion Cuba-Venezuela, Contrato para desarolo de solucion tecnologica integral* [*Cuba-Venezuela Comprehensive Cooperation Agreement, Comprehensive Technological Solution Development Contract*], https://infodio.com/docs/convenio-cedula-albet-onidex-pedro-carreno.pdf, at 4. *See Cuba: nueva cédula electrónica venezolana "un convenio secreto"* [*Cuba: Venezuela's new electronic cedula "a secret agreement"*], EL NUEVO HERALD (Nov. 28, 2011), 1, https://www.reportero24.com/2011/11/28/cuba-nueva-cedula-electronica-venezolana-un-convenio-secreto/ (commenting on the importance of the contract). I have highlighted the fact that this contract, being a national interest contract, entered into with foreign entities and companies not domiciled in Venezuela, was not submitted to National Assembly authorization as required by article 150 of the Constitution. *See* ALLAN R. BREWER-CARÍAS, CRÓNICA DE UNA DESTRUCCIÓN. CONCESIÓN, NACIONALIZACIÓN, APERTURA, CONSTITUCIONALIZACIÓN, DESNACIONALIZACIÓN,

CONFIDENTIAL

passport services entered into by the Republic of Venezuela and a Venezuelan state foundation, Fundación Misión Identidad, with Universidad de Ciencias Informáticas, a unit of the Republic of Cuba, and a Cuban corporation, Sociedad Mercantil ALBET Ingeniería y Sistemas (ALBET, S.A.);

(b)     The Framework Contract of the National Geological Prospection of Venezuela, entered into in 2012 by the Republic of Venezuela and the Venezuelan Geology and Mining Institute with a Chinese corporation, CITIC Construction;[42]

(c)     Various contracts of national public interest entered into on November 30, 2016 by PDVSA, PDVSA Petróleo, and PDV Holding, Inc. with Rosneft Trading S.A.;[43]

(d)     Various contracts of national public interest entered into by a number of Venezuelan state entities with a Chinese corporation, China CAMC Engineering Co. Ltd.;[44]

(e)     Other public interest contracts entered into by various Venezuelan public entities with the above-referenced CITIC Construction;[45] and

---

ESTATIZACIÓN, ENTREGA Y DEGRADACIÓN DE LA INDUSTRIA PETROLERA [CHRONICLE OF DESTRUCTION. CONCESSION, NATIONALIZATION, OPENING, CONSTITUTIONALIZATION, DENATIONALIZATION, STATIZATION, DELIVERY AND DEGRADATION OF THE OIL INDUSTRY] 289 (Editorial Jurídica Venezolana ed., 2018).

[42] See MÓNICA MARTIZ, SECTOR MINERO (LA SANGRIENTA FIEBRE DEL ORO) [MINING SECTOR (THE BLOODY GOLD RUSH)] 10, 12 (Manuel Sánchez ed., 2018). The National Academy of Physical Sciences and Mathematics in a Statement of September 9, 2012 questioned such public interest contract, as being against the national "policy to reach scientific sovereignty of the country" denouncing that "there is no known example of a sovereign Nation that has commissioned companies of another nation to complete [such activities.]" Academia de Ciencias Fisicas, Matematicas y Naturales, *Posicion de la Academia de Ciencias Físicas Matemáticas y Naturales Ante La Firma de Convenios Con Empresas Foraneas Para la Exploracion de Recursos Minerales*] [*Position of the Academy of Mathematical and Natural Physical Sciences Before The Signing of Covenants with Foreign Enterprises For the Exploration of Mineral Resources*] (Sept. 9, 2012).

[43] See *Venezuela's PDVSA uses 49.9 pct Citgo stake as loan collateral*, REUTERS (Dec. 23, 2016) https://www.reuters.com/article/venezuela-pdvsa-idUSL1N1EI1FO.

[44] *See* the references to such contracts in the web site of CAMCE: *Agricultural Projects*, CHINA CAMC ENGINEERING CO. LTD., http://www.camce.com.cn/en/enBA/enEC/enAP/ (last visited Feb. 25, 2020); *Industrial Projects*, CHINA CAMC ENGINEERING CO. LTD.) http://www.camce.com.cn/en/enBA/enEC/enIP/ (last visited Feb. 25, 2020); *Water Engineering Projects*, CHINA CAMC ENGINEERING CO. LTD., http://www.camce.com.cn/en/enBA/enEC/enWE/ (last visited Feb. 25, 2020); *Power Projects*, CHINA CAMC ENGINEERING CO. LTD., http://www.camce.com.cn/en/enBA/enEC/enPP/ (last visited Feb. 25, 2020).

CONFIDENTIAL

(f)   Contracts entered into by Venezuelan state-owned enterprises Siderúrgica del Orinoco (Sidor) and Venezolana de Aluminio (Venalum) with Chinese corporation Minmetals Engineering to promote Venezuela's aluminum production.[46]

**57.**   The second means used by the Executive to neutralize the National Assembly was to progressively appropriate its legislative functions through the enactment of sweeping, unconstitutional enabling laws. This process began in 2001, after the enactment of an enabling law pursuant to which the President enacted forty-eight decrees on the most important topics, purporting to replace regular legislation enacted by the National Assembly.[47]

**58.**   The Executive's assertion of total political control over the National Assembly, the subjugation of the Supreme Tribunal, and the Executive's control over the other branches of government were summarized in 2008 by the late Teodoro Petkoff, then director of one of the most important newspapers in the country (which was later censored by the government):

> "Chávez controls all the political powers. More than 90% of the Parliament obey his commands; the Venezuelan Supreme Court, whose number were raised from 20 to 32 by the parliament to ensure an overwhelming official's majority, has become an extension of the legal office of the Presidency… The Prosecutor General's Office, the Comptroller's Office and the Public Defender are all offices held by 'yes persons,' absolutely obedient to the orders of the autocrat. In the National Electoral Council, four of five members are identified with the government. The Venezuelan Armed Forces are tightly controlled by Chávez. Therefore, from a conceptual point of view, the Venezuelan political system is

---

[45]   *See* the references on the web site of CITIC Construction: CITIC CONSTRUCTION, , http://www.cici.citic.com/en/search/index.html?keyword=venezuela (last visited February 2, 2020).

[46]   *See Venezuela y China firmaron acuerdos para impulsar industrias siderurgicas* [*Venezuela and China signed agreements to boost steel industries*], TELESUR (April 16, 2014), https://www.telesurtv.net/news/Venezuela-y-China-firmaron-acuerdos-para-impulsar-industrias-siderurgicas-20140416-0031.html.

[47]   *See* Allan R, Brewer-Carías, *Apreciación general sobre los vicios de inconstitucionalidad que afectan los Decretos Leyes Habilitados* [*General appreciation of the vices of unconstitutionality affecting the Enabling Laws Decrees*] *in* LEY HABILITANTE DEL 13-11-2000 Y SUS DECRETOS LEYES 65–66 (Irene de Valera ed., 2002)

CONFIDENTIAL

autocratic. All political power is concentrated in the hands of the President. There is no real separation of Powers."[48]

59.     In 2009, the President of the Supreme Tribunal exclaimed in a press conference that "the separation of powers weakens the State" and that this principle "has to be reformed."[49] Perhaps this assertion was made to support President Chávez's August 2008 statement "*I am the Law ... I am the State*," (*Yo soy la Ley... Yo soy el Estado*) when he announced that, despite the general opposition to his abusive use of delegate legislation, he was going to enforce forty new statutes through blatantly unconstitutional Decree Laws, threatening to persecute all those who might oppose him.[50] And this was not the first time he used such an expression. In 2001, when he approved the first forty-eight executive Decree Laws, he declared "*La Ley soy yo... El Estado soy yo.*" ("The law is me. The state is me.").[51]

60.     Given this state of affairs, and particularly after 2006, when the National Assembly became completely controlled by the Chávez regime (and later the Maduro regime) due to the decision of the opposition parties not to participate in the December 2005 parliamentary elections,[52] it is not surprising that prior to

---

[48]  *See* Teodoro Petkoff, *Election and Political Power. Challenges for the Opposition*, *in* REVISTA: HARVARD REVIEW OF LATIN AMERICA 2 (2008).  *See* Allan R, Brewer-Carías, *The Principle of separation of Powers and the Authoritarian Government in Venezuela*, *in* 47 DUQUESNE LAW REVIEW 813, 838 (2009).

[49]  *See* Juan Francisco Alonso, *La división de poderes debilita al estado. La presidenta del TSJ [Luisa Estela Morales] afirma que la Constitución hay que reformarla* [*The division of power weakens state, President of TSJ [Luisa Estela Morales] states that the Constitution must be reformed*], EL UNIVERSAL (Dec. 5, 2009), http://www.eluniversal.com/2009/12/05/pol_art_mo-ra-les:-la-divisio_1683109.shtml.

[50]  These were the words of president Chavez in a political rally challenging his opponents held on August 28, 2008; "I warn you, group of Stateless, putrid opposition. Whatever you do, the 26 Laws will go ahead! And the other 16 Laws... also. And if you go out in the streets, like on April 11 (2002) we will sweep you in the streets, in the barracks, in the universities. I will close the *golpista* media. I will have no compassion whatsoever ... This Revolution came to stay, forever! You can continue talking stupidity ... I am going to intervene all communications and I will close all the enterprises I consider to be of public usefulness or of social interest! Out [of the country], contractors and corrupt people of the Fourth Republic! I am the Law ... I am the State!!" *See* Brewer-Carías, *The Principle of separation of Powers and the Authoritarian Government in Venezuela*, *supra* note 40, at 837-38 (citing Yo soy la Ley . . . Yo Soy el Estado. [I am the Law . . . I am the State.], http://lasarmasdecoronel.blogspot.com/2008/10/yo-soy-la-leyyo-soy-el-estado.html (Oct. 15, 2008)).

[51]  *See* Brewer-Carías, *The Principle of separation of Powers and the Authoritarian Government in Venezuela*, *supra* note 40, at 838 (citing La ley soy yo. El Estado soy yo. [The Law Is Me. The State Is Me.], EL UNIVERSAL (Venez.), Dec. 4, 2001, at 1,1 & 2,1)).

[52]  The main opposition parties decided not to participate in the 2005 parliamentary elections due to the lack of transparency to guaranty free elections, denouncing the government's control over the National Electoral Council, the inconsistencies of the National Electoral Registrar, and the lack of

CONFIDENTIAL

2016, the National Assembly never bothered to review and authorize national public interest contracts.

61. This political domination of the National Assembly even predated 2006. For example, in 2004, the National Assembly, already decisively controlled by Chávez, approved the appointment of forty-nine new Justices and Deputy Justices of the Supreme Tribunal, every one of whom was associated with the Chávez regime. Not a single one was associated with the opposition.[53] As a consequence, substantially all of the Justices were dependent on and loyal to Chávez.

62. After the announcement of Chávez's death in 2013, his protégé Nicolás Maduro came to power and used many of the same brutal and unconstitutional tactics to neutralize and usurp the National Assembly's power and install a judiciary that would do his bidding, all in disregard of the Constitution and all conventional notions of proper judicial review and due process. As has been widely reported, Maduro employed brutality, torture, and political persecution against his rivals to maintain his authoritarian hold on the Venezuelan people and government.[54] In recent years, his regime has developed a third means of

---

guaranteed vote secrecy. *See e.g.*Francesc Relea, *La oposición se retira de los comicios legislativos en Venezuela. Los adversarios de Chávez denuncian la falta de transparencia* [*The opposition withdraws from the legislative elections in Venezuela. Chávez's adversaries denounce lack of transparency*],EL PAÍS (Nov. 30, 2005)(Venez.), *Chávez controlará por completo la Asamblea tras el boicot de los principales partidos opositores* [*Chávez will completely control the Assembly after the boycott of the main opposition parties*], EL MUNDO.ES, (Dec. 5, 2005. 12:51)(Venez.), https://www.elmundo.es/elmundo/2005/12/05/internacional/1133745658.html.

[53] Regarding such appointments, Representative Pedro Carreño in the name of the ruling official party publicly expressed that "While we members of parliament have the power to make this choice, the President of the Republic was consulted and his opinion was very much taken into account. […] Let us be clear, we aren't going to score goals against ourselves. In the list, there were people from the opposition who meet all the requirements. The opposition could have used them to come to an agreement in the meetings, but they did not want to. So we are not going to do so for them. In the group of candidates, there is no one who is going to act against us." *See* Javier Pereira, *Chavismo designará hoy 49 nuevos magistrados* [*Chavismo to appoint 49 new judges today*], EL NACIONAL, Dec. 13, 2004 (Venez), at A.2.

[54] *See e.g. Venezuelan president is to blame for humanitarian crisis, OAS chief says*, THE GUARDIAN, (Jun. 23, 2016), https://www.theguardian.com/world/2016/jun/23/organization-american-states-venezuela-nicolas-maduro; HUMAN RIGHTS WATCH, CRACKDOWN ON DISSENT: BRUTALITY, TORTURE, AND POLITICAL PERSECUTION IN VENEZUELA (2017), https://www.hrw.org/report/2017/11/29/crackdown-dissent/brutality-torture-and-political-persecution-venezuela.

CONFIDENTIAL

neutralizing the National Assembly—the direct persecution of its members, many of whom have been incarcerated or forced into exile.[55]

63.     It was not until the opposition took control of the National Assembly in the December 2015 parliamentary elections that it ceased to be entirely politically subjugated by the Executive and began to attempt to exercise its functions. For the first time in almost fifteen years, the National Assembly began acting as an independent branch of government attempting to exercise its powers to oversee and regulate the government and the Public Administration.

64.     Thus, any assertion that national public interest contracts such as the Indenture and Pledge do not require National Assembly authorization because, from 1999 (shortly before Chávez rose to power) through 2016, the National Assembly did not always exercise its Constitutional powers, ignores the two decades of brutal subjugation, threats, acts of violence, and humanitarian abuses carried out against anyone who dared attempt to stand up to the country's authoritarian rulers, Chávez and Maduro.

65.     Since beginning to exercise its control functions in 2016, the National Assembly has adopted many resolutions declaring contracts to be national public interest contracts or rejecting contracts entered into without National Assembly authorization. Examples of such resolutions include the following:

(a)     "Resolution on the Decree of creation of the national strategic development zone Mining Arc of the Orinoco" of June 14, 2016;[56]

(b)     "Resolution rejecting the decision No 618 of the Constitutional Chamber of the Supreme Tribunal of Justice of June 20, 2016" of July 2,2016;[57]

---

[55]   See Florantonia Singer, *Casi 70 diputados venezolanos han sido víctimas de persecución. El régimen de Maduro ha bloqueado sistemáticamente a la Asamblea Nacional, donde la oposición logró mayoría en 2015* [*Almost 70 Venezuelan deputies have been victims of persecution. The Maduro regime has systematically blocked the National Assembly, where the opposition won a majority in 2015*], EL PAÍS (Venez.), (May 9, 2019), https://elpais.com/internacional/2019/05/09/america/1557361186_073215.html

[56]   Asamblea Nacional, *Acuerdo Sobre el Decreto de Creaciónde la Zona de Desarrollo Estratégiconacional 'Arco Minero del Orinoco'* [*Resolution on the Decree of creation of the national strategic development zone Mining Arc of the Orinoco*], (June 14, 2016) (Venez.).

[57]   Asamblea Nacional, *Acuerdo de rechazo de la sentencia N. 618 de la sala constitucional del tribunal supremo de justicia del 20 de julio de 2016* [*Resolution rejecting the decision No 618 of the Constitutional Chamber of the Supreme Tribunal of Justice of June 20, 2016*], (July 2, 2016) (Venez.).

CONFIDENTIAL

(c)     "Resolution to denounce the unconstitutionality of the constitution of a "PDVSA Litigation Trust, by PDVSA" of April 24, 2018;[58]

(d)     "Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities" of September 25, 2018;[59]

(e)     "Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities" of January 8, 2019;[60] and

(f)     "Resolution Declaring the Invalidity and Nullity of the Contracts by which Petróleos de Venezuela S.A. and its Subsidiary Companies granted 49.9% of the shares of Citgo Holding, Inc. in Favor of Rosneft Trading S.A."[61]

### c.     The National Assembly's May 2016 Resolution

**66.**     As mentioned above, the first National Assembly resolution relevant to this matter was adopted on May 26, 2016 (before the announcement of the exchange offer) with the title "*Resolution on the respect of the inherent and nontransferable powers of the National Assembly on contracts of public interest signed by and between the National Executive and Foreign States or Official entities or with companies not domiciled in Venezuela.*"[62]

---

[58]   Asamblea Nacional, *Acuerdo para denunciar la inconstitucionalidad de la constitución el fideicomiso 'Pdvsa US Litigation Trust,' por parte de la sociedad anónima petróleos de Venezuela* [*Resolution to denounce the unconstitutionality of the constitution of a "PDVSA Litigation Trust, by PDVSA*], (Apr. 24, 2018) (Venez.).

[59]   Asamblea Nacional, *Acuerdo en rechazo a los contratos de servicios suscritos por PDVSA que permiten que empresas privadas actuen en actividades primarias de hidrocarburos* [*Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities*], (Sep. 25, 2018) (Venez.).

[60]   Asamblea Nacional, *Acuerdo en rechazo a los contratos de servicios suscritos por PDVSA que permiten que empresas privadas actuen en actividades primarias de hidrocarburos* [*Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities*], (Jan. 8, 2019) (Venez.).

[61]   Asamblea Nacional, *Acuerdo que declara la invalidez y nulidad de los contratos por los cuales Petróleos de Venezuela S.A. y sus empresas filiales otorgaron en garantía el 49.9% de las acciones de Citgo Holding, Inc. A favor de Rosneft Trading S.A.* [*Resolution Declaring the Invalidity and Nullity of Contracts by which Petróleos de Venezuela S.A. and its Subsidiary Companies granted 49.9% of the shares of Citgo Holding, Inc. in Favor of Rosneft Trading S.A*] (Mar. 4, 2020) (Venez.).

[62]   Asamblea Nacional*, Resolution dated May 26, 2016*, *supra* note 26.

CONFIDENTIAL

67.     After the Maduro regime lost absolute political control over the National Assembly in the December 2015 parliamentary elections, the regime embarked on a campaign to further curtail the National Assembly's constitutional powers to legislate and to control the activities of the government and the Public Administration. In this context, the National Assembly reaffirmed through its May 26, 2016 resolution that "the Constitution imposes in a categorical way, without exception, the approval of the National Assembly" of national public interest contracts (Article 150), which the National Assembly interpreted to include:

> "those related to *large contracts (grandes contrataciones) that could seriously compromise the assets of the Republic or expose it to serious losses or international claims eventually injurious to the sovereignty and integrity of the country, as well as the contracts that, due to their purpose, deserve such qualification*, all of which justify the intervention and control of the National Assembly."[63]

68.     The National Assembly elaborated in the May 2016 Resolution that such "public interest contracts, that require the National Assembly's approval" as a "*condition of the validity of the contract*" are "a special category of administrative contracts, *inextricably related to an object that affects the collective interest of all citizens*." Based on this interpretation, the National Assembly declared in the resolution that it rejected what was established in article 2.5 of [Maduro's] Decree No. 2323 of May 13, 2016, that declared a State of Exception and Economic Emergency, purporting in an unconstitutional way to allow the National Executive to enter into public interest contracts without National Assembly approval.[64] In the May 2016 Resolution, the National Assembly further declared that:

> "any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void and shall be considered

---

[63]   *Id.*

[64]   Asamblea Nacional*, Resolution dated May 26, 2016*, *supra* note 28; *see also Gaceta Oficial No. 6.227*, Art. 2 (May 13, 2016) at 2. *See also* Allan R. Brewer-Carías, *Nuevo golpe a la Asamblea Nacional: Estado de Emergencia, Usurpación definitiva de la function de legislar y eliminación del control político* [*New blow to the National Assembly: State of Emergency definitive usurpation of the function of legislating and elimination of political control*], (May 18, 2016), at 1-2, http://allanbrewercarias.com/wp-content/uploads/2016/05/136.-Brewer.-Golpe-final-a-la-democracia.-Edo-excepci%C3%B3n-19-mayo-2016.pdf (criticizing this Decree for the same reason that it purports to allow the President to enter into national public interest contracts without the authorization of the National Assembly).

non-existent and those who issue or sign the respective acts will be liable under the law."[65]

### d.    The National Assembly's September 27, 2016 Resolution

**69.**    On September 27, 2016, eleven days after PDVSA announced its "Offer to Exchange" the 2017 Notes for the 2020 Notes, the National Assembly, citing Article 187 of the Venezuelan Constitution, resolved that "*the State has used PDVSA as a source of financing for political partisan purposes, thus hindering the company from investing in essential aspects within the industry such as exploration, extraction, refining and distribution*" and "that the financial situation of PDVSA is that *of a highly indebted entity*."[66]

**70.**    Regarding PDVSA's "intention to make a *bond swap*" and to offer "as a *guaranty of payments of the Notes 50.1 % of the shares of its subsidiary CITGO Holding, Inc*.," the National Assembly further resolved "that the *opaque and inappropriate management of the company's finances will significantly* compromise *its liquidity for debt service*." Based on its constitutional power to "exercise control functions over the National Government and the Public Administration, with the power to have knowledge about the financial statements and details of any operation that commits PDVSA when its assets are used as collateral," the National Assembly summoned PDVSA's President (Mr. Eulogio del Pino, who was also Maduro's Minister of Petroleum and Mining) to explain the transaction before the assembled members, and further resolved:

> "*To **reject categorically** that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO Holding, Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation.*"[67]

**71.**    Thus, prior to the execution of the Indenture and the Pledge, the National Assembly *insisted on the need for the transaction contracts, which were to be entered into with companies not domiciled in Venezuela, to be submitted to the authorization of the National Assembly, and **categorically rejected** the pledging of the CITGO Holding shares*.

**72.**    By invoking Article 187.9 of the Constitution, the National Assembly recognized that the transaction contracts were contracts in the national public

---

[65]   Asamblea Nacional*, Resolution dated May 26, 2016*, *supra* note 28.
[66]   Asamblea Nacional, *Resolution dated Sep. 27, 2016*, *supra* note 29.
[67]   *Id.*

CONFIDENTIAL

interest, as Article 187.9 is addressed only to the authorization of such contracts by the National Assembly and addresses, in particular, national public interest contracts entered into with States, official foreign entities, or companies not domiciled in Venezuela.[68] In the debates leading up to the adoption of the resolution, National Assembly member Freddy Guevara stated emphatically that "this National Assembly . . . will not recognize any *contract of national interest* that does not pass through this National Assembly."[69]

**73.** This resolution was a binding declaration of the National Assembly, the only legitimate governing body of Venezuela, that has never been annulled by any subsequent action of the National Assembly or any purported action of the Supreme Tribunal. As explained above, a National Assembly resolution is a legislative act of the same legal rank as a statute.

**74.** Not surprisingly, however, this resolution was completely disregarded by the Maduro regime, including the Supreme Tribunal, which had recently been packed with Maduro loyalists who had been doing his bidding in blatant and complete disregard of the Venezuelan Constitution.[70] On October 25, 2016, three

---

[68] Article 187.9 provides that "It is the role of the National Assembly to: […] 9. Authorize the National Executive to enter into contracts of national interest, in the cases established by law . . . [and] Authorize contracts of municipal, state and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela." 1999 VENEZ. CONST. art. 187.9.

[69] *See* Asamblea Nacional, *Regular Session of Tuesday, September 27, 2016. Discussions on the effects of PDVSA Bond Redemption*, *supra* note 29, at 5, 22. In that National Assembly session, representative Freddy Guevara, President of the Comptroller's Commission, stated that "Parliament will not recognize any national interest contract that is not considered and authorized by the Legislative Power according to the Constitution. *Freddy Guevara sobre PDVSA: No reconoceremos ningún canje de bonos que no haya sido autorizado por la AN* [*Freddy Guevara on PDVSA: We will not recognize any bond swap that has not been authorized by the NA*], LA PATILLA (Sept. 27, 2016) https://www.lapatilla.com/2016/09/27/freddy-guevara-sobre-pdvsa-no-reconoceremos-ningun-canje-de-bonos-que-no-haya-sido-autorizado-por-la-an/.

[70] *See* Jimenez v. Palacios, No. CV 2019-0490-KSJM, 2019 WL 3526479, at *2–3 (Del. Ch. Aug. 2, 2019), *as revised* (Aug. 12, 2019) for a recounting of the recent actions by the Venezuelan Judicial and Executive branches seeking to usurp and subjugate the legislative branch:

"The opposition coalition nevertheless swore in the three legislators, claiming the Supreme Tribunal's ruling was designed to strip the opposition of its supermajority in the National Assembly. In response, the Supreme Tribunal declared null and void decisions taken by the National Assembly while the three legislators held their seats. In March 2017, the Supreme Tribunal took over legislative powers from the National Assembly. The United States and other members of the international community condemned this action, prompting the Supreme Tribunal to reverse course in April 2017.

On May 1, 2017, the Maduro regime took a new approach, calling for a National Constituent Assembly (the "Constituent Assembly") under Article 347 of the *Constitución de la República*

---

days before the issuance of the 2020 Notes, the Constitutional Chamber of the Supreme Tribunal issued an unconstitutional and illegitimate decision (No. 893) purporting to suspend the National Assembly's investigations of PDVSA for the stated purpose of quashing any doubts of the investors *"in all the countries that the Republic can access for the exchange of credit."*[71] Importantly, this decision, although illegitimate for the reasons discussed above, did **not** purport to invalidate or abrogate the portion of the resolution in which the National Assembly "reject[ed] categorically" the Pledge.

75.     On October 28, 2016, the Indenture and the Pledge were executed without being authorized by the National Assembly, in violation of Articles 150 and 187.9 of the Constitution.

### e.     The Contemporaneous 2016 Legal Opinion Requested by the National Assembly

76.     In connection with its deliberations over the September 27, 2016 Resolution, the National Assembly requested the opinion of a distinguished Venezuelan law professor and member of the National Academy of Political and Social Sciences, Juan Cristóbal Carmona Borjas, regarding the legality of the 2020 Notes, the Indenture, and the Pledge. Professor Carmona sent his opinion to the President of the National Assembly on October 7, 2016, shortly after the National Assembly's resolution condemning the exchange transaction. In this opinion, Professor Carmona corroborated the conclusion that, according to Article 150 of the Constitution, national public interest contracts of public debts entered into with sovereign States, official foreign entities, or *companies not domiciled in Venezuela*, must be approved by the National Assembly. He also noted, with respect to Article

---

*Bolivariana de Venezuela* (the "Venezuelan Constitution"). Members of the international community denounced the move as an unconstitutional effort to concentrate political power, and the opposition coalition boycotted the July elections for the Constituent Assembly. The United States vowed "to take strong and swift actions" against the members of the Maduro regime, whom the U.S. Department of State referred to as the "architects of authoritarianism." Protests and violence ushered in election results, according to some accounts.

In its first month of existence, the Constituent Assembly reportedly expressed support for Maduro, gave itself the power to legislate, and voted to put opposition leaders on trial for treason. The National Assembly refused to subordinate itself to the Constituent Assembly, resulting in two legislative bodies purporting to govern Venezuela."

[71]   El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice], No. 893, (Venez.), Oct. 25, 2016. *See also* Allan R. Brewer-Carías, *El intento fallido de la Asamblea Nacional de ejercer el control político sobre la Administración Pública investigando la actuación de PDVSA, y su anulación por la Sala Constitucional* [*The failed attempt by the National Assembly to exercise political control over the Public Administration by investigating PDVSA's action, and its annulment by the Constitutional Chamber*], *in* 147 - 148 REVISTA DE DERECHO PÚBLICO 358–59 (2016).

CONFIDENTIAL

105 of the Organic Law of Financial Management of the Public Sector, that there were "valid doubts" regarding the ability of PDVSA or its subsidiaries to pledge the shares of Citgo Holding as collateral for the 2020 Notes, even with National Assembly approval.

**77.** The general content of Professor Carmona's opinion was published later in 2016 in his book on *Oil Activity and Public Finances in Venezuela*,[72] in which he states as follows:

> First, that according to the Financial Management of the Public Sector Organic Law and its regulations, the swap bond operation announced and made by PDVSA was without doubt a public debt operation, and a national public interest contract.

> Second, that according to article 101.3 of the same Organic Law, public debt contracts entered into by PDVSA, as part of the state-owned enterprises of the Oil sector, are exempted of the need to be previously authorized by the National Assembly.[73] This does not exempt PDVSA of the need to certify its capacity of payments in the way is provided in the same norm,[74] and to be authorized by the Council of Ministers, with the technical opinion issued by the National Office of Public Credit.[75]

> Third, notwithstanding the provisions of the Organic Law, according to articles 150, 187.9 and 312 of the Constitution, the legal regime applicable to national public interest contracts is different "when they are concluded with States or official foreign entities, or with companies not domiciled in Venezuela. The difference seems to be that in these cases, there is no room for the exception of the law referred to in the heading of the article, in other words, this type of contract will always require the authorization of the National Assembly."[76]

**78.** Professor Carmona went further, affirming that according to Article 150, "when the contract is of national interest but it is also [entered into with] a sovereign State, an official foreign entity or with a company not domiciled in Venezuela, the approval of the National Assembly will always be required."[77]

---

[72] *See* JUAN CRISTÓBAL CARMONA BORJAS, 2 ACTIVIDAD PETROLERA Y FINANZAS PÚBLICAS EN VENEZUELA [ACTIVITY AND PUBLIC FINANCE IN VENEZUELA] 425 (2016).
[73] *Id.*
[74] *Id.* at 426.
[75] *Id.* at 427.
[76] *Id.* at 429.
[77] *Id.* at 431.

CONFIDENTIAL

Quoting a decision of the Supreme Tribunal, he affirmed that such authorization must be given prior to the signing of the contract "so that the contract to be entered into can be recognized as valid in accordance with the Constitution."[78]

**79.**    Regarding the specific case of the Indenture and the Pledge for the 2020 Notes, Professor Carmona opined as follows:

> "Accordingly, we consider that public credit operations conducted by PDVSA, notwithstanding the fact that they are contracts of national interest, are not subject to their prior authorization by the National Assembly. A different situation would arise, however, when such transactions would be concluded with another State, foreign official entity or company not domiciled in the country, as in such cases, regardless of what entity of the National Public Administration [signs] them, the legal exception to congressional authorization is not possible."[79]

**80.**    Such required authorization aside, Professor Carmona considered the Pledge "the greatest controversy in recent times,"[80] observing that "the fact that the object of the guarantee that PDVSA intends to offer are shares of a company constituted abroad and indirectly held by it, does not exclude them from the notion of public patrimony subject to controls intended to ensure its sound administration that allow or justify the extraterritorial application of the law."[81]

**81.**    Professor Carmona concluded as follows:

> "In view of the foregoing, it can be noted that: i) since the Legislator has not distinguished regarding the location of national assets (Art. 105 [of the Organic Law of Financial Administration of the Public Sector]); ii) their character depending on its owner and not its location; iii) be the object of the guarantee a national asset and; iv) the laws aimed at preserving the correct administration of public patrimony are applicable extraterritorially, valid doubts arise as to PDVSA's ability to pledge the shares held by CITGO Holding, Inc. in order to guarantee public debt operations."[82]

---

[78]    *Id*. at. 432.
[79]    *Id*. at 436–37.
[80]    *Id*. at. 437.
[81]    *Id*. at 440.
[82]    *Id*.

CONFIDENTIAL

### f.   The National Assembly's October 15, 2019 Resolution

**82.**   Following a rigged presidential election in 2018, in which Maduro disqualified the opposition parties from participating in the election and jailed or exiled many of his political rivals, Maduro claimed victory and, on January 10, 2019, purported to swear himself in before the Supreme Tribunal, not before the National Assembly as provided in the Constitution. The National Assembly declared Maduro's presidency illegitimate on January 15, 2019. On January 23, 2019, the National Assembly's president, Juan Guaidó, publicly assumed his duty as Interim President of Venezuela in accordance with Article 233 of the Venezuelan Constitution. That same day, the United States (along with a number of other countries) recognized Guaidó as the Interim President of Venezuela and the National Assembly as the "only legitimate branch of government elected by the Venezuelan people."[83]

**83.**   On October 15, 2019, the National Assembly issued a resolution "reiterating the invalidity of the 2020 Notes."[84] After reiterating its resolutions of May 26 and September 27, 2016, including its prior rejection of the Pledge, the National Assembly declared that "the financial conditions of the 2020 Bond issue contract were irrational, damaging PDVSA's patrimony due to the unjustified increase in its debt," adding that:

> "following the investigations conducted in coordination with the Office of the Special Attorney General, it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution."[85]

**84.**   Based on this conclusion, the National Assembly resolved as follows:

---

[83]   *See* Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela, WHITEHOUSE.GOV (Jan. 23, 2019); *see also* Allan R. Brewer-Carías, Emeritus Professor, Central University of Venezuela, Some Constitutional and Legal Challenges posed by the Process of Transition Towards Democracy Decreed by the National Assembly of Venezuela, Since January 2019 (Address before the New York Chapter of the Inter-American Bar Association) (Jul. 17, 2019), http://www.iaba.org/some-constitutional-and-legal-challenges-posed-by-the-process-of-transition-towards-democracy-decreed-by-the-national-assembly-of-venezuela-since-january-2019%EF%80%AAallan-r-brewer-carias-emeritus/.

[84]   Asamblea Nacional, *Acuerdo que reitera la invalidez del bono PDVSA 2020* [*Resolution ratifying the invalidity of the PDVSA 2020 Notes*], (Oct. 15, 2019).

[85]   *Id.*

34

CONFIDENTIAL

"*FIRST*. To ratify that the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national public contract, signed with foreign companies, which was not authorized by the National Assembly.

*SECOND*. To ratify that the 2020 Bond indenture violated Articles 311 and 312 of the Constitution of the Bolivarian Republic of Venezuela, since its financial conditions were detrimental given the irrationality under which PDVSA structured the bond swap and subsequent issuance.

*THIRD*. To reiterate all the objections that this National Assembly has been formulating since 2016 regarding the irresponsible indebtedness of PDVSA and the execution of national public contracts not previously authorized, all of which are undergoing an investigation that includes, among other items, the agreement executed with Rosneft Trading, SA."[86]

**85.**   Like the National Assembly's prior resolutions condemning the exchange transaction and rejecting the Pledge, this resolution was a binding declaration of the same rank as a statute adopted in the exercise of the National Assembly's legislative power, which resolution has never been annulled by any subsequent action of the National Assembly or purportedly annulled by any decision of the Supreme Tribunal.

## VIII. THE SUPREME TRIBUNAL'S DECISIONS PURPORTING TO CURTAIL CONSTITUTIONAL POWERS OF THE NATIONAL ASSEMBLY ARE WHOLLY ILLEGITIMATE AND NOT ENTITLED TO RECOGNITION

**86.**   As discussed above, in the parliamentary elections of December 2015, the opposition won control of the National Assembly, which had previously been completely controlled and subjugated by the Chávez and Maduro regimes. Since the 2015 elections, the Constitutional Chamber of the Supreme Tribunal has consistently attempted to neutralize, undermine, and, in some instances, usurp the National Assembly's powers, especially in relation to its political and administrative control over the Public Administration.

**87.**   I summarized the situation in a lecture I gave at Boston College in 2018, saying:

---

[86] *Id.*

CONFIDENTIAL

"[A]fter sixteen years of authoritarian rule and after the failure of the erroneous economic and social policies that were imposed, the destruction of all the productive forces of the country was achieved through indiscriminate confiscations and expropriations of private land, industries and property. The consequence was that the political, economic and social destruction of the country by 2016 was already completed, provoking a sort of popular rebellion which was expressed through voting in the parliamentary election held in December 2015. In it, the government lost control of the majority in the National Assembly, the opposition obtaining a qualified majority of representatives, being that fact, without doubt, after the failure of the 2007 constitutional reform, the most important political setback of the authoritarian regime since 1999.

But the regime was already used to exercise absolute control of power, and therefore, an autonomous Legislature could not be tolerated. The Government then, soon after such election, began to obstruct the opposition from developing its legislative agenda, and gradually striped the Legislative body of all its powers and functions – yes, all of them - and all that, thanks to an all evil and depraved collusion between the Executive Branch and the Supreme Tribunal of Justice.

That happened even before the new elected National Assembly could have its first session on January 5th 2016, when the former National Assembly enacted in just two days (December 29th and 30th) more than 30 statutes striping off the new Assembly of all its legal powers; proceeding then to appoint new Supreme Tribunal justices, packing it entirely with members of the governing party.

Once the Tribunal was completely controlled, it immediately began to prevent the *Assembly* from exercising its functions, issuing during the following years more than 100 rulings that have transformed the political system into what I called, a 'Judicial Dictatorship or Judicial Tyranny,'[87]

---

[87]   *See* ALLAN R. BREWER-CARÍAS, DICTADURA JUDICIAL Y PERVERSIÓN DEL ESTADO DE DERECHO. LA SALA CONSTITUCIONAL Y LA DESTRUCCIÓN DE LA DEMOCRACIA EN VENEZUELA [JUDICIAL DICTATORSHIP AND PERVERSION OF THE RULE OF LAW. THE CONSTITUTIONAL CHAMBER AND THE DESTRUCTION OF DEMOCRACY IN VENEZUELA] 9–10 (Editorial Jurídica Venezolana Int'l. ed., 2d ed., 2016); ALLAN R. BREWER-CARÍAS, LA CONSOLIDACIÓN DE LA TIRANÍA JUDICIAL. EL JUEZ CONSTITUCIONAL CONTROLADO POR EL PODER EJECUTIVO, ASUMIENDO EL PODER ABSOLUTO, COLECCIÓN ESTUDIOS POLÍTICOS [THE CONSOLIDATION OF JUDICIAL TYRANNY. THE CONSTITUTIONAL JUDGE CONTROLLED BY THE EXECUTIVE BRANCH ASSUMING ABSOLUTE POWER] 9-10 (Editorial Jurídica Venezolana Int'l. ed., 2017).

characterized by the fact that the Executive has used, at his will, the subjugated Supreme Tribunal as its main instrument to neutralize the National Assembly, absolutely eliminating all its functions.

The result has been that the Constitutional Chamber of the Supreme Tribunal, acting as constitutional judge, declared the unconstitutionality of practically all – yes, all – the statutes that have been sanctioned by the National Assembly elected on December 2015;[88] reformed the *interna copris* of the Assembly in order to subject the exercise of its legislative functions to the prior approval by the Executive Branch, something never seen in any State;[89] eliminated the Assembly's political power of controlling the government and the Public Administration;[90] imposed the prior approval by the Executive Vice-President for a Minister to be questioned by the Assembly; eliminated the possibility for the Assembly to oppose and disapprove the states of emergency that the Executive has successively decreed;[91] eliminated the possibility for the National Assembly to approve votes of non-confidence against the Ministers;[92] canceled the constitutional obligation of the President to submit its Annual State of the Nation before the National Assembly, deciding instead that it was to be submitted before the same Supreme Tribunal;[93] eliminated the legislative approval of the

---

[88]   *See* Allan R. Brewer-Carías, *El desconocimiento judicial del poder de la Asamblea Nacional para legislar* [*The Judicial Ignorance of the Power of the National Assembly to Legislate*], *in* REVISTA DE DERECHO PÚBLICO 377–78 (2016).

[89]   *See* Allan R. Brewer-Carías, *El fin del Poder Legislativo: la regulación por el Juez Constitucional del régimen interior y de debates de la Asamblea Nacional, y la sujeción de la función legislativa de la Asamblea a la aprobación previa por parte del Poder Ejecutivo* [*The End of Legislative Power; The Regulation by the Constitutional Judge of the Internal Regime and Debates of the National Assembly, and the subjection of the legislative function of the Assembly to prior approval by the Executive Branch*], *in* REVISTA DE DERECHO PÚBLICO 428–30, (2016).

[90]   *See e.g.*, Brewer-Carías, *The failed attempt by the National Assembly to exercise political control over the Public Administration, supra* note 71, at 358–59.

[91]   *See* Allan R. Brewer-Carías, *El control político de la Asamblea Nacional respecto de los decretos de excepción y su desconocimiento judicial y Ejecutivo con ocasión de la emergencia económica decretada en enero de 2016* [*The political control of the National Assembly with regard to the decrees of exception and their judicial and executive ignorance on the occasion of the economic emergency decreed in January 2016*], *in* VI CONGRESO DE DERECHO PROCESAL CONSTITUCIONAL Y IV DE DERECHO ADMINISTRATIVO 291, 291–300 (2017).

[92]   *See* Allan R. Brewer-Carías, *El desconocimiento judicial de los poderes de control político de la Asamblea Nacional* [*The judicial ignorance of the powers of politicals control of the National Assembly*], *in* 145-146 REVISTA DE DERECHO PÚBLICO 348, (2016).

[93]   *See* Allan R. Brewer-Carías, *Comentarios a la sentencia de la Sala Constitucional N° 3 de 11 de enero de 2017, declarando la omisión de la Asamblea Nacional, disponiendo que el mensaje anual de Presidente de la República no podía presentarse ante la Asamblea Nacional* [*Comments to the judgment of Constitutional Chamber No. 3 of 11 January 2017, declaring the omission of the*

CONFIDENTIAL

national budget law, transforming the Budget Law into a mere executive decree to be approved by the Tribunal;[94] eliminated the Assembly's power to review its own decisions and repeal them, as was the case regarding the unconstitutional appointment of the justices of the Supreme Tribunal made in December 2015;[95] eliminated the power of the National Assembly even to express political opinion as a result of its debates, having annulled all the major political Resolutions and Declarations that it has adopted;[96] and in a few decisions issued last year, based on an alleged contempt of court regarding a ruling by the Electoral Chamber of the same Supreme Tribunal, the Constitutional Chamber declared null and void all – yes all present and future decisions of the National Assembly, threatening to revoke the popular mandate of its members and to imprison them.[97]

---

[94] *National Assembly, stating that the annual message of the President of the Republic could not be presented to the National Assembly*], *in* 149-50 REVISTA DE DERECHO PÚBLICO 271 (2017).

[94] *See* Allan R. Brewer-Carías, *La cremación de la Asamblea Nacional y la usurpación de sus funciones presupuestarias por parte del Juez Constitucional* [*The Cremation of the National Assembly and the usurpation of its budgetary functions by the Constitutional Judge*], *in* REVISTA DE DERECHO PÚBLICO 334 (2016).

[95] *See* Allan R. Brewer-Carías, *El desconocimiento judicial de la potestad de la Asamblea Nacional para revisar y revocar sus propios actos cuando sean inconstitucionales: El caso de la revocación de los actos de designación de los magistrados del Tribunal Supremo* [*Judicial ignorance of the power of the National Assembly to review and revoke its own acts when unconstitutional: The case of revocation of acts of appointment of Supreme Court judges*], *in* REVISTA DE DERECHO PÚBLICO 369 (2016); Allan R. Brewer-Carías, *La ratificación por la Sala Constitucional del Tribunal Supremo de su decisión de desconocimiento de la potestad de la Asamblea Nacional para revisar y revocar sus propios actos* [*The ratification by the Constitutional Chamber of the Supreme Court of its decision to reject the power of the National Assembly to review and revoke its own acts*], *in* REVISTA DE DERECHO PÚBLICO 305.

[96] *See* Allan R. Brewer-Carías, *El desconocimiento judicial del poder de la Asamblea Nacional para expresar opiniones políticas sobre asuntos de interés nacional* [*The judicial ignore of the power of the National Assembly to express political opinions about matters of national interest*], *in* REVISTA DE DERECHO PÚBLICO 469 (2016).

[97] *See* Carlos M. Ayala Corao and Rafael J. Chavero Gazdik EL LIBRO NEGRO DEL TSJ DE VENEZUELA: DEL SECUESTRO DE LA DEMOCRACIA Y LA USURPACIÓN DE LA SOBERANÍA POPULAR A LA RUPTURA DEL ORDEN CONSTITUCIONAL (2015-2017) [THE BLACK BOOK OF THE TSJ OF VENEZUELA: FROM THE KIDNAPPING OF DEMOCRACY AND THE USURPATION OF POPULAR SOVEREIGNTY TO THE BREAKING OF CONSTITUTIONAL ORDER (2015-2017)] 1–23 (Editorial Jurídica Venezolana ed., 2017); *Memorial de agravios 2016 del Poder Judicial. Una recopilación de más de 100 sentencias del TSJ* [*Memorial of grievances of the Judiciary 2016. A compilation of more than 100 TJ judgments*], TRANSPARENCIA VENEZUELA (Sept. 12, 2016); José Vicente Haro, *Las 111 decisiones inconstitucionales del TSJ ilegítimo desde el 6D-2015 contra la Asamblea Nacional, los partidos políticos, la soberanía popular y los DDHH* [*The 111 illegitimate TSJ decisions since 6D-2015 against the National Assembly, political parties, popular sovereignty and HRDs*], BUSCANDO EL NORTE 1 (Jul. 10, 2017), http://josevicenteharogarcia.blogspot.com/2017/; RAMÓN GUILLERMO AVELEDO (COORDINADOR), CONTRA LA REPRESENTACIÓN POPULAR. SENTENCIAS

But that was not the end. In one of the most notorious and shameful decisions of the Constitutional Chamber, issued in March 2017 (No. 155 of March 27, 2017, and No. 156 of March 29, 2017), it simply decreed in an unconstitutional way a state of emergency; eliminated the parliamentary immunity of the representatives; assumed in an arbitrary way all – yes, all - the parliamentary powers of the National Assembly;[98] and even the Tribunal delegated legislative powers upon the President of the Republic, ordering him to reform laws and Codes at his discretion, among them, the Criminal Code and the Organic Code of Criminal Procedure."[99]

**88.**    It was in this political and constitutional context that the Constitutional Chamber of the Supreme Tribunal issued an erroneous and unconstitutional decision—No. 618 of July 20, 2016. This decision, the purpose of which was supposedly to "interpret" Articles 150, 187.9, 236.14, and 247 of the Venezuelan Constitution for the sole purpose of determining if a contract to be entered into by the Central Bank of Venezuela was a national public interest contract,[100] was issued without any respect for due process rights. Indeed, the Constitutional Chamber did not even notify the National Assembly of the case and did not hear argument from any interested parties.[101] Through this sham, erroneous

---

[footnotes]

INCONSTITUCIONALES DEL TSJ DE VENEZUELA [AGAINST POPULAR REPRESENTATION, UNCONSTITUTIONAL RULINGS OF THE TSJ OF VENEZUELA] 1-4 (1st ed., 2019). *See also* Brewer-Carías, JUDICIAL DICTATORSHIP AND PERVERSION OF THE RULE OF LAW, *supra* note 87 at 1–8. Brewer-Carías, THE CONSOLIDATION OF JUDICIAL TYRANNY, *supra* note 87 at 1–8.

[98] *See* Allan R. Brewer-Carías, *El reparto de despojos: La usurpación definitiva de las funciones de la Asamblea Nacional por la Sala Constitucional del Tribunal Supremo de Justicia al asumir el poder absoluto del Estado (Sentencia No. 156 de la Sala Constitucional)* [*The Distribution of Remainders: The Definitive Usurpation of the Functions of the National Assembly by the Constitutional Chamber of the Supreme Court of Justice by assuming the absolute power of the State (Judgment No. 156 of the Constitutional Chamber)*], *in* REVISTA DE DERECHO PÚBLICO 292–93 (Editorial Jurídica Venezolana ed., 2017).

[99] *See* Allan R. Brewer-Carías, Emeritus Professor, Central University of Venezuela, Transition from Democracy to Tyranny through the Fraudulent Use of Democratic Institutions: The Case of Venezuela (1999-2018) (Sep. 25, 2018).

[100] *See* El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice], No. 618, Jul. 20, 2016 (Venez).

[101] The Chamber employed a "process for constitutional interpretation" which consists only of consultation with its own past decisions, purporting to rule as a "mere law matter" and denying interested parties (such as the National Assembly) any opportunity to be heard. This procedure has been criticized as violating the most elemental rules of due process. *See* ALLAN R. BREWER-CARÍAS, LA PATOLOGÍA DE LA JUSTICIAR CONSTITUCIONAL [THE PATHOLOGY OF CONSTITUTIONAL JUSTICE] 177 (Editorial Jurídica Venezolana ed., 3d ed., 2014); Luis Alfonso Herrera Orellana, *El 'recurso' de interpretación de la Constitución: reflexiones críticas de la argumentación jurídica y la teoría del discurso* [*The 'resource' of interpretation of the Constitution: critical reflections of legal argumentation and discourse theory*], *in* REVISTA DE DERECHO PÚBLICO 26 – 27 ( Editorial Jurídica Venezolana ed., 2008).

decision, the Constitutional Chamber attempted to prevent the newly elected National Assembly from exercising control over public interest contracts entered into by the Central Bank of Venezuela, in blatant disregard of the Constitution.[102]

89.      After acknowledging a prior decision holding that the Central Bank "belong[s] to the National Public Administration, with functional autonomy" and is "integrated within the structure of the State" (No. 259 of March 31, 2016), the Constitutional Chamber declared that the Central Bank is *not* part of the Central or Decentralized National Public Administration[103] for purposes of the articles in question, in an obvious attempt to help prop up the Maduro regime. For this purpose, the Constitutional Chamber used the term "*national*" in the phrase "national public interest contracts" to refer only to public contracts *entered into by the Republic itself*, which makes no sense and is contrary to Venezuelan constitutional law, all for the purpose of excluding from the category of national public interest contracts the contracts entered into by the Central Bank of Venezuela with a foreign entity (*Fondo Latinoamericano de Reservas*) pursuant to an international agreement previously approved by a statute of the National Assembly. The Constitutional Chamber did not, however, conclude that contracts entered into by other entities, which *are* part of the Decentralized Public Administration, are not subject to Article 150 of the Constitution. On the contrary, this ruling could be interpreted as implying that such other entities can enter into public national interest contracts.

90.      Although, when issuing this unconstitutional decision, the Constitutional Chamber did not establish any binding interpretation of the content or scope of any constitutional provision, its restrictive holding was undoubtedly designed only to sustain that because the Central Bank has a special status under

---

[102]   *See* Brewer-Carías, *The mutation of the notion of national public interest contracts*, *supra* note 6 at 383–84 (criticizing this decision).

[103]   On the contrary, the Central Bank of Venezuela is and has been always considered part of the decentralized entities of the National Public Administration. *See* ALLAN R. BREWER-CARÍAS, *Introducción general al régimen jurídico de la Administración Pública* [*General Introduction to the Legal System of Public Administration*], *in* LEY ORGÁNICA DE LA ADMINISTRACION PÚBLICA 68 (4th ed. 2009); ALLAN R. BREWER-CARÍAS, DERECHO ADMINISTRATIVO [ADMINISTRATIVE LAW], 390, 398-400, 433-434 (2005). ALLAN R. BREWER-CARÍAS, TRATADO DE DERECHO ADMINISTRATIVO VOL. II [ADMINISTRATIVE LAW TREATY VOL. II] 353–56, 367 (2013) [hereinafter ADMINISTRATIVE LAW TREATY VOL. II].   See also, about the Central Bank of Venezuela, as part of the Decestralized National Public Administration, in INFORME SOBRE LA REFORMA DE LA ADMINISTRACIÓN PÚBLICA NACIONAL TOMO I [REPORT ON THE REFORM OF THE NATIONAL PUBLIC ADMINISTRATION VOL. I] 298, 300, 310, 311, 611, 613–15 (1972).

CONFIDENTIAL

the Constitution, it is not a decentralized entity of the State,[104] having constitutional autonomy regarding the National Executive power, not being subject to National Assembly control pursuant to Article 150.[105] Thus, the Constitutional Chamber's holding, which was not issued as a binding interpretation of the content or scope of any constitutional principle or provision, cannot in any event be applied to national public interest contracts entered into by entities that are explicitly part of the National Public Administration, such as state-owned enterprises like PDVSA and PDVSA Petróleo, which do not enjoy the constitutional autonomy of the Central Bank and which are subject to Article 150.

91.    In this illegitimate and erroneous decision, like all of the aforementioned decisions attempting to curtail the powers of the National Assembly, the Supreme Tribunal was acting not as a court of justice, but rather as an agent of the Maduro regime; in other words, as an agent of authoritarianism[106] to neutralize the democratically elected National Assembly, which has been

---

[104]    As I mentioned when criticizing the Constitutional Chamber decision, it was issued "with the specific purpose of assuring the exclusion of the parliamentary control regarding specific credit contracts entered into by the Central Bank of Venezuela." For such purpose "it was necessary to reduce again the scope of the public interest contracts to those only concluded by the territorial public law persons (Republic, States, Municipalities), excluding from the notion contracts concluded by decentralized entities, like state owned companies, which in our opinion remained contrary to what is regulated in the Constitution." *See* Brewer-Carías, *The mutation of the notion of national public interest contracts*, *supra* note 6, at 383.

[105]    It must be pointed out that *Petróleos de Venezuela S.A.* is also referred to in article 303 of the Constitution but, in a different way from the Central Bank of Venezuela, only for the purpose of providing that the State will retain all its shares, but not those of the "subsidiaries, strategic joint ventures, companies, and any other venture that is or has been established as a consequence of the business development of *Petróleos de Venezuela, S.A.*" 1999 VENEZ. CONST. art. 303.

[106]    See specifically on this matter: Allan R. Brewer-Carías, *El juez constitucional al servicio del autoritarismo y la ilegítima mutación de la Constitución: el caso de la Sala Constitucional del Tribunal Supremo de Justicia de Venezuela (1999-2009)* [*The Constitutional Judge in the Service of Authoritarianism and the Illegitimate Mutation of the Constitution: The Case of the Constitutional Chamber of the Supreme Court of Justice of Venezuela (1999-2009)*], *in* 180 REVISTA DE ADMINISTRACIÓN PÚBLICA 387–88 (2009); Allan R. Brewer-Carías, *El rol del Tribunal Supremo de Justicia en Venezuela, en el marco de la ausencia de separación de poderes, producto del régimen autoritario* [*The role of the Supreme Court of Justice in Venezuela, in the context of the absence of separation of powers, as a result of authoritarian rule*], SEGUNDO CONGRESO COLOMBIANO DE DERECHO PROCESAL CONSTITUCIONAL 1, (2011); Allan R. Brewer-Carías, *La ilegítima mutación de la Constitución por el juez constitucional y la demolición del Estado de derecho en Venezuela* [*The illegitimate mutation of the Constitution by the constitutional judge and the demolition of the rule of law in Venezuela*], *in* 75-76 REVISTA DE DERECHO POLÍTICO 1 (Universidad Nacional de Educación a Distancia ed., 2009), http://allanbrewercarias.com/wp-content/uploads/2009/10/619.-613-ILEGITIMA-MUTACION-CONSTITUCIONAL-Y-DEMOLICI%C3%93N-DEL-ESTADO-DE-DERECHO-HOMENAJE-A-GARC%C3%8DA-PELAYO.doc.pdf.

internationally recognized since January 2019 (including by the United States)[107] as the only legitimate, democratically elected body of the Republic. The actions of the Supreme Tribunal can only be understood in light of its lack of independence and autonomy, which is the product of almost two decades of political subjugation.[108] As I pointed out several years ago in my scholarly writings, this decision was issued with the "specific purpose of reducing the powers of control of the National Assembly over the government and Public Administration, particularly when from 2016, this became a State policy, after the Assembly began to be controlled by the opposition."[109]

92.    Indeed, the Supreme Tribunal's lack of autonomy has been widely denounced, making it impossible for its decisions to be recognized as legitimate by foreign courts in the democratic world. The National Assembly itself adopted a resolution on July 26, 2016, six days after the issuance of the Constitutional Chamber's decision, rejecting it on the basis that the Tribunal had "ignored the mandate of Articles 150 and 187, numerals 3, 7, and 9 of the Constitution and 97 of the Organic Law of Financial Administration of the Public Sector, and misrepresented its own criteria expressed in decision No. 2241 of September 23 (sic), 2002,[110] which established that the credit operations with entities not

---

[107] On January 23, 2019, the United States Government declared that: "[It] recognizes Juan Guaidó as the new interim President of Venezuela and strongly supports his courageous decision to assume that role under article 233 of the Venezuelan Constitution and with the support of the National Assembly, to restore democracy in the country [...]. We will work closely with the legitimately elected National Assembly to facilitate Venezuela's transition to the restoration of democracy and the Rule of Law, in line with the Inter-American Democratic Charter [...]. The new Venezuelan government carries the flame of democracy on behalf of Venezuela. The United States expresses its continued support for President Guaidó, the National Assembly, and the Venezuelan people." *Reconocimiento de Juan Guaidó como Presidente interino de Venezuela* [*Recognition of Juan Guaidó as Interim President of Venezuela*], EMBAJADA DE ESTADOS UNIDOS EN PERÚ, (Jan. 23, 2019), https://pe.usembassy.gov/es/reconocimiento-de-juan-guaido-como-presidente-interino-de-venezuela/. *See also* Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela, WHITEHOUSE.GOV (Jan. 23, 2019), https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/.

[108] *See* Allan R. Brewer-Carías, *La progresiva y sistemática demolición institucional de la autonomía e independencia del Poder Judicial en Venezuela 1999-2004* [*The progressive and systematic institutional demolition of the autonomy and independence of the Judiciary in Venezuela 1999-2004*], *in* XXX JORNADAS J.M DOMÍNGUEZ ESCOVAR, ESTADO DE DERECHO, ADMINISTRACIÓN DE JUSTICIA Y DERECHOS HUMANOS 35 (Jose Santana E. ed., 2005); Allan R. Brewer-Carías, *La justicia sometida al poder y la interminable emergencia del poder judicial (1999-2006)* [*Justice subjected to power and the endless emergency of the judiciary (1999-2006)*], DERECHO Y DEMOCRACIA, CUADERNOS UNIMENTANOS 122–23 (Universidad Metropolitana ed., 2007).

[109] *See* Brewer Carías, *The mutation of the notion of national public interest contracts*, *supra* note 6, at 382–83.

[110] Supreme Tribunal of Justice, No. 2241, *supra* note 5.

domiciled in Venezuela are of public interest, and, therefore, are subject to prior control by the National Assembly." In the resolution, the National Assembly reaffirmed its power "to authorize contracts of national public interest according to article 150 of the National Constitution" and "categorically reject[ed] Decision No. 618 [of July 20, 2016] of the Constitutional Chamber of the Supreme Tribunal of Justice, since it ignores the Constitution of the Bolivarian Republic of Venezuela, making it devoid of content by authorizing indebtedness without control of popular sovereignty."[111]

93.    On February 5, 2019, in the midst of the struggle between the Supreme Tribunal and the National Assembly, and following the fraudulent presidential election in 2018, the Assembly approved and adopted a Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela (the "Transition Statute"). The Transition Statute was adopted to end "the dictatorial regime" of Maduro and set up a "provisional national unity Government" to ensure the "reestablishment of the democratic system" and "free elections."[112]

94.    In the Transition Statute, the National Assembly expressly rejected the legitimacy of the Supreme Tribunal, providing in Article 18 that the Assembly was to enact statutes promoting the political transition according to Article 333 of the Constitution and ensuring that public officials, civil and military, act according to the Constitution and "not obey orders from the one who usurps the Presidency of the Republic" or from "the other *unconstitutionally integrated organs such as the Supreme Tribunal of Justice*," the Justices of which appointed before July 21, 2017 were declared illegitimate in Article 22 of the Transition Statute.[113]

95.    For its part, the U.S. Government has declared the Supreme Tribunal illegitimate because it "usurped the authority of Venezuela's democratically-elected legislature, the National Assembly, including by allowing the Executive Branch to rule through emergency decree, thereby restricting the rights and thwarting the will of the Venezuelan people."[114] The U.S. Government has also

---

[111]   *See* Asamblea Nacional, *Acuerdo de Rechazo de la Sentencia No. 618 de la Sala Constitucional del Tribunal Supremo de Justicia del 20 de Julio 2016* [*Resolution rejecting the decision No. 618 of the Constitutional Chamber of the Supreme Tribunal of Justice of July 20, 2016*], (July 26, 2016).

[112]   National Assembly, Estatuto que rige la transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela [Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela], Feb. 5, 2019.

[113]   *Id.*

[114]   *See Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice*, U.S. DEP'T OF THE TREASURY    (May    18,    2017),    https://www.treasury.gov/press-center/press-releases/Pages/sm0090.aspx.

CONFIDENTIAL

sanctioned the President of the Supreme Court of Justice and seven principal members of the Constitutional Chamber because they prevented "the democratically-elected National Assembly [from] perform[ing] its constitutional functions."[115]

96.     This lack of autonomy and judicial independence has also been denounced by the Secretary General of the Organization of American States, Luis Almagro, in two reports produced in 2016 requesting that the Permanent Council of the Organization apply Article 20 of the Inter American Democratic Charter[116] considering that "*with regards to the current situation in Venezuela*" the country is "*facing serious disruptions of the democratic order.*"[117] He observed, in brief, that "*there is currently no clear separation and independence of the branches of government in Venezuela, with the co-opting of the Judicial branch by the Executive Branch being one of the clearest cases of this.*"[118] He also noted "the continued violations of the Constitution, particularly with regard to the *balance between the branches of government, functioning, and integration of the Judicial Branch*, [and] human rights violations [...]"[119]

97.     The Secretary General also requested "a new composition of the Supreme Tribunal of Justice [...] given that the current composition is completely flawed, both in the appointment process as well as in the political bias of virtually all its members."[120]

98.     Speaking before the Permanent Council of the Organization of American States on June 23, 2016, Dr. Almagro summarized his report of May 30, 2016, stating:

---

[115] *See id.*; *see also Office of Foreign Assets Control*, *Specially Designated Nationals List Update*, U.S. DEP'T OF THE TREASURY (May 18, 2017) https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20170518.aspx.

[116] The first Report dated June 23, 2016, was called the *Report on the situation in Venezuela in relation to compliance with the Inter-American Democratic Charter* of May 30, 2016. *See* Org. of Am. States, *Luis Almagro to Mr. Juan Jose Arcuri*, at 1–3, OSG/243-16 (May 26, 2016), http://www.oas.org/documents/eng/press/OSG-243.en.pdf. The second Report, dated March 14, 2017, was called *Follow-up Report on Venezuela. See* Org. of Am. States, *Luis Almagro to Patrick Andrews*, at 1–4 (Mar. 14, 2017), http://www.oas.org/documents/eng/press/Informe-VZ-II-English-Final-Signed.pdf.

[117] Org. of Am. States, *Luis Almagro to Mr. Juan Jose Arcuri*, at 109, OSG/243-16 (May 26, 2016), http://www.oas.org/documents/eng/press/OSG-243.en.pdf.

[118] *Id.* at 65.

[119] *Id.* at 112.

[120] *Id.* at 111.

"In Venezuela there is a consistent *effort by the executive and judiciary to impede and even nullify the normal workings of the National Assembly. The Executive has repeatedly used unconstitutional interventions against the Legislative, with the collusion of the Constitutional Chamber of the Supreme Court of the Court.* [...] These examples clearly demonstrate the *lack of independence of the judiciary.* The tripartite system of democracy has failed, with the *judicial branch now co-opted by the Executive* [...]"[121]

99.    Even more explicit and tragic was what Dr. Almagro stated in an open letter dated August 22, 2016, to a Venezuelan opposition leader on the occasion of his conviction of what he called a "political horror," reaffirming:

"*the lamentable end of democracy in Venezuela.* Paragraph by paragraph it is, it also signals the *end of the Rule of Law.*"[122]

In Venezuela, "a threshold has been crossed, marking *the end of democracy itself.*"[123]

"*today, there is no democracy and there is no rule of law in Venezuela.*"[124]

100.    This dire situation was confirmed in July 2019 in the "Report of the United Nations High Commissioner for Human Rights Michelle Bachelet, on the situation of Human rights in the Bolivarian Republic of Venezuela," in which she stated that:

"Over at least a decade, the *Government and government-controlled institutions enforced laws and policies that have accelerated the erosion of the rule of law and the dismantlement of democratic institutions*, including the National Assembly. These measures are aimed at neutralizing, repressing and criminalizing political opponents and people critical of the Government. This trend has accelerated since 2016, after the opposition won the majority of National Assembly seats, resulting in increased repression targeting the

---

[121]   Luis Almagro, Presentation of the Secretary General of the OAS to the Permanent Council on the Application of the Democratic Charter (June 23, 2016), http://www.oas.org/en/about/speech_secretary_general.asp?sCodigo=16-0051.

[122]   Org. of Am. States, *Open letter to Leopoldo López*, at 2, OSG/441-16 (Aug. 22, 2016), http://www.oas.org/fpdb/press/OSG-441en.pdf.

[123]   *Id.* at 3.

[124]   *Id.* at 2.

political opposition, and steadily reducing the already limited democratic space [...]"[125]

**101.**   Accordingly, Supreme Tribunal decisions purporting to restrict or strip the National Assembly of its constitutional powers are blatantly unconstitutional and illegitimate, and are wholly unworthy of recognition by the courts of the United States.[126] The Constitutional Chamber's aforementioned decision No. 618 of July 20, 2016, aside from being addressed only to contracts entered into by the Central Bank of Venezuela pursuant to a certain international agreement approved by the National Assembly, is particularly unworthy of recognition because, in violation of the due process principles set out in Article 49 of the Constitution, the decision was issued without hearing the National Assembly or any other interested parties and therefore must be considered null and void in accordance with Article 25 of the Venezuelan Constitution.[127]

---

[125]   Mme. Bachelet also expressed that the actions of the government in Venezuela "*have restricted the democratic space, weakened public institutions, and affected the independence of the judiciary*" (par. 76). U.N. High Commissioner, *Human rights in the Bolivarian Republic of Venezuela: Report of the United Nations on the situation of Human rights in the Bolivarian Republic of Venezuela*, ¶ 76 U.N. Doc. A/HRC/41/18 (July 5, 2019); *See* Allan R. Brewer-Carías, *Informe Bachelet: Desahucio al régimen* [*Bachelet Report: Eviction from the regime*], CONSTITUTIONAL JOURNAL 1 (2019). https://www.diarioconstitucional.cl/noticias/actualidad-internacional/2019/07/10/publican-el-informe-bachelet-desahucio-al-regimen-por-allan-r-brewercarias/?utm_source=General+2&utm_campaign=e66498c4b2-EMAIL_CAMPAIGN_2019_07_10_07_58&utm_medium=email&utm_term=0_b01d5feada-e66498c4b2-127880117.

[126]   In the United States, for instance, the doctrine that foreign judicial decisions are not automatically recognized is well known, as the United States Supreme Court held many years ago (1895), establishing that such recognition can only be made when the judicial decision was issued "under a system of jurisprudence likely to secure an *impartial administration of justice*," and the issuance of a foreign judicial decision: "appears to have been rendered by a *competent court, having jurisdiction of the cause and of the parties*, and *upon due allegations and proofs and opportunity to defend against them*, and its *proceedings are according to the course of a civilized jurisprudence*, and are stated in a clear and formal record." *See* Hilton v. Guyot, 159 U.S. 113 (1895). In addition, for instance, the *Restatement (Third) of Foreign Relations Law*, regarding the recognition of foreign judgments, sets forth that the respective court "must satisfy itself of the essential fairness of the judicial system under which the judgment was rendered," concluding that if there is "evidence that the judiciary was dominated by the political branches of government" that "would support a conclusion that the legal system was one whose judgments were not entitled to recognition." That is, the corresponding Judiciary "must satisfy itself of the essential fairness of the judicial system under which the judgment was rendered." *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 482 cmt. b (1987). In my opinion, none of these conditions is satisfied by the current judicial system in Venezuela.

[127]   Article 25 set forth that: "Any act laid down in the exercise of the Public Power that violates or impairs the rights guaranteed by this Constitution and the Law is null and void..." 1999 VENEZ. CONST. art. 25.

CONFIDENTIAL

## IX.   HOGAN LOVELLS' OPINION REGARDING THE EXCHANGE OFFER WAS ██████████████

**102.**   As I understand, the Hogan Lovells firm acted as external Venezuelan counsel to PDVSA and PDVSA Petróleo (then under the control of the Maduro regime) in connection with the Exchange Offer and, in that capacity, issued opinion letters with respect to the transaction.  Hogan Lovells' Caracas office issued an opinion letter dated September 16, 2016 to Credit Suisse Securities (USA) LLC,[128] which was acting as PDVSA and PDVSA Petróleo's financial advisor, in which the firm opined in relevant part that:

> "7.   The execution, delivery and consummation by the Relevant Parties of the [Financial Advisor Agreement with Credit Suisse] does not, and the making and consummation of the [Exchange] Offer by [PDVSA] will not (i) violate Venezuelan Law . . . [or] (ii) conflict with or violate any Venezuelan law, rule, regulation, order, judgment or decree applicable to [PDVSA] or [PDVSA Petróleo] . . . ."[129]

> "8.   No approval, authorization or consent of or registration or filing with, any governmental agency or governmental authority in Venezuela is required to be obtained or made by [PDVSA] or [PDVSA Petróleo] under Venezuelan Law in connection with, the execution, delivery and consummation by [PDVSA] or [PDVSA Petróleo] of the [Financial Advisor Agreement with Credit Suisse] or the making and consummation of the [Exchange] Offer."[130]

**103.**   Hogan Lovells' Caracas office issued a second opinion letter, dated October 28, 2016 and addressed to PDVSA, PDVSA Petróleo, and the defendants as well as to Credit Suisse,[131] in which the firm offered the same opinions but with respect to the "Transaction Documents" (which include the Indenture, the 2020 Notes, and the Pledge).  Neither letter included any analysis, and the aforementioned opinions are wrong for the reasons set forth above.  Although the second opinion letter was issued after the National Assembly's resolution

---

[128] Letter from Despacho de Abogados Miembro de Hogan Lovells to Credit Suisse Securities (USA) LLC (Sept. 16, 2016).

[129] *Id.*

[130] *Id.*

[131] Letter from Despacho de Abogados Miembro de Hogan Lovells to Petróleos de Venezuela, S.A. PDVSA Petróleo, S.A., Credit Suisse Securities (USA) LLC, MUFG Union Bank, N.A., Law Debenture Trust Company of New York, and GLAS Americas LLC (Oct. 28, 2016).

condemning the Exchange Offer, which, as explained above, has the same rank as a statute, the letter does not even mention the resolution.



**104.**

**105.** The issue in decision No. 2241 was whether Article 80 of the Organic Law on Financial Administration of Public Sector was unconstitutional because it purported to allow public entities to enter into public debt contracts with foreign entities not domiciled in Venezuela without National Assembly authorization, contrary to Article 150 of the Constitution. The complaint did not refer to any particular public entity or any particular contract, whether national, state, or municipal, or to the central administration or decentralized administration of the State.

**106.** In discussing Article 150 of the Constitution, the Constitutional Chamber of the Supreme Tribunal observed that public contracts entered into "by the Republic, the States and the Municipalities" are "public interest contracts" (p. 16), but this does not entail, and the Constitutional Chamber did not state, that those are the *only* public entities that can enter into public interest contracts—that is to say, the Constitutional Chamber did not state that public contracts entered into by decentralized public entities such as PDVSA are *not* public interest contracts, and this cannot be deduced from the text of the decision unless it is assumed that the decision was issued for the illegitimate purpose of curtailing the powers of the National Assembly. While the decision refers to contracts entered into by the "National Executive" as an organ of the Republic, this is because such contracts are the ones expressly mentioned in the challenged Article 80 of the Organic Law.

---

[132] Internal Memorandum of Despacho de Abogados Miembro de Hogan Lovells. The Exchange Offer and the requisite of approval set forth in article 150 of the Venezuelan Constitution (Sept. 21, 2016).
[133] Supreme Tribunal of Justice, No. 2241 *supra* note 5.

48

CONFIDENTIAL



107.   I note that in discussing Article 80 of the Organic Law in decision No. 2241, the Constitutional Chamber affirmed that if a public debt contract is entered into with a foreign corporation not domiciled in Venezuela, the need for prior National Assembly authorization is "inescapable" (decision p. 19).

108.   Furthermore, while the Organic Law on the Financial Administration of the Public Sector excludes PDVSA from the requirement of seeking National Assembly authorization for entering into public credit agreements, it does not exclude PDVSA from the same law's prohibition on pledging national assets as collateral (see my discussion of this point in footnote 31 above). Here, the purported pledge of the CITGO Holding shares, which was prohibited by the Organic Law, was an integral part of the Exchange Offer expressly contemplated by the Indenture.

109.

As already mentioned, the decision refers to national public interest contracts signed by the National Executive for the Republic, because those were the ones referred to in Article 80 of the Organic Law, but the decision did not establish any general interpretation, much less any "binding interpretation," of the term "public interest contract" as used in the Constitution. Rather, the decision is binding only with respect to that specific case relating to the partial nullity of Article 80 of the Organic Law on the Financial Administration of the Public Sector.

---

[134] Internal Memorandum of Despacho de Abogados Miembro de Hogan Lovells. The Exchange Offer and the requisite of approval set forth in article 150 of the Venezuelan Constitution (Sept. 21, 2016).
[135] *Id.*

CONFIDENTIAL

**110.**

███████████████████████████████████████

Article 335 does not confer a "binding" character on any phrase, argument, or reasoning in Constitutional Chamber decisions. On the contrary, Article 335 applies only when the Constitutional Chamber expressly states in the text of a decision that it is establishing a "binding interpretation." As I wrote in 2009 in relation to this very matter:

> "Article 335 of the Constitution, […] establishes that 'the interpretations' that are established by the Constitutional Chamber 'concerning the content or scope of the constitutional norms are binding,' which require the Chamber to determine exactly and precisely in its generally extensive judgments, which is exactly the part of them that contain the binding interpretation; an operation that cannot be in any case left up to the reader of the rulings. In other words, the 'binding' nature of a constitutional interpretation on the content or scope of the constitutional regulations that is made in a Constitutional Chamber judgment, cannot fall on any phrase or interpretative reasoning it contains. On the contrary, the judgment must expressly be derived from the interpretation of the Chamber 'on the content or scope of the constitutional regulations and constitutional principles,' which is the part that has [such character], which does not extend to any argument or sentence used in the judgment for the normative interpretation."[136]

**111.** In other words, when the Constitutional Chamber establishes a "binding interpretation" of the content or scope of a constitutional provision, it always and necessarily manifests this intention in a formal and explicit way in the text of the decision, thereby qualifying the interpretation as binding.[137] In addition,

---

[136] *See* Allan R. Brewer-Carías, *La potestad la Jurisdicción Constitucional de interpretar la Constitución con efectos vinculantes* [*The power of Constitutional Jurisdiction to interpret the Constitution with binding effects*], *in* El Precedente Constitucional Vinaculante en el Perú (Análisis, Comentarios y Doctrina Comprada) 10 (ADRUS Editorial ed., 2009).

[137] For example, in its decision No. 565 of April 15, 2009 interpreting Article 164.10 of the Constitution with respect to the distribution of powers between the Republic and the States on matters relating to the maintenance, administration, and exploitation of national roads and highways, the Constitutional Chamber expressly stated that it was establishing a "binding interpretation." See El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice], No. 565, 114 Revista de Derecho Público 166–67 (2008) (Venez).

CONFIDENTIAL

although according to the Organic Law of the Supreme Tribunal of Justice, only decisions annulling statutes or other State acts are required to be published in the *Official Gazette* (Article 32), the Constitutional Chamber commonly orders the publication in the *Official Gazette* of its decisions establishing a binding interpretation of the content or scope of a constitutional principle or provision. ██████████████████████████████████████████████ the Constitutional Chamber did not establish any "binding interpretation" in the text of decision No. 2241 and did not order its publication in the *Official Gazette*.

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**112.** ████████████████████████████████████████████████ ███████████████████ the Supreme Tribunal's decision No. 953 of April 29, 2003, which declared a contract entered into by a national state-owned enterprise, *C.V.G Electrificación del Caroní, C.A. (Edelca)*, with two foreign corporations, *Centrais Elétricas Brasileiras S/A (Eletrobras)* and *Centrais Elétricas Do Norte Do Brasil S/A (Eletronorte),* to be a national public interest contract, holding as follows:

> "Regarding the legal figure concluded, which is based on the international commitments signed by the National Executive, it is noteworthy that although it is the product of the aforementioned acts of government, it turns out to be a stipulation of a contractual nature, which constitutes a public interest contract, since a high interest of the Republic has been committed in the framework of its international relations with the Federative Republic of Brazil for the supply of electricity. Regarding this, the agreement concluded is subsumed within the limits defined by this Chamber, on public interest contracts."[138]

**113.** This decision of the Constitutional Chamber, issued only seven months later, makes it impossible to deduce from decision No. 2241 any interpretation, never mind a "binding interpretation," that public interest contracts are, ████████████████████████████████████, only those ██████████████ ████████████████████████████████████████████████████████ and therefore that contracts entered into with foreign corporations by state-owned enterprises such as EDELCA or PDVSA are not public interest contracts.

---

[138] El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice], No. 953, Apr. 29, 2003, 11–12 (Venez).

CONFIDENTIAL

**114.** As I wrote in 2011 regarding any such restrictive and unjustified interpretation that could possibly be deduced from decision No. 2241:

"On the contrary, in my opinion, the contracts entered into for example, by national public corporations and state-owned enterprises, have to be considered as 'national public interest contracts' according to article 150 of the Constitution. The contrary has no sense, and could lead to consider that according to the doctrine of the Supreme Tribunal, for instance, a contract entered into by Petróleos de Venezuela (PDVSA) could not be considered as a national public interest contract, which I insist, has no sense at all. Nevertheless, and in spite this erroneous doctrine, without doubt, such contract is a national public contract entered into by a state public entity, in particular, a state-owned enterprise or state person of private law."[139]

**115.** ████████████████████████████████████████████ decision No. 2241 of the Constitutional Chamber of the Supreme Tribunal, I expressed in 2015 that pursuant to the 1999 Constitution, a contract entered by a national public enterprise must be considered a "national public interest contract" because it is executed by a public entity.[140]

**116.** ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ Regarding these supposed criteria, it must be said that: (i) PDVSA not only incurred a huge indebtedness well beyond its ordinary commercial needs, directly involving the economy of the Nation and imperiling the capacity of the State to accomplish its constitutional ends and purposes, but in accordance with the National Assembly's above-mentioned resolution of May 26, 2016, the Indenture and Pledge were contracts that "*could seriously compromise the assets of the Republic or expose it to serious losses or international claims that might be detrimental to the sovereignty or integrity of the*

---

[139] *See* Allan R. Brewer-Carías, *Sobre los contratos del Estado en Venezuela* [*On State Contracts in Venezuela*], *in* 6 REVISTA MEXICANA STATUM REI ROMANAE DE DERECHO ADMINISTRATIVO 1, 4 (2011).

[140] *See* BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA, *supra* note 11, at 133; *See also* my comments on the unnecessary and unjustified confusion generated by decision 2241. Brewer-Carías, *The mutation of the notion of national public interest contracts*, *supra* note 6, at 379–82.

*country,"*[141] thereby justifying the intervention and control of the National Assembly; and (ii) as "assets owned by PDVSA and/or its affiliates," the pledged CITGO Holding shares are not only "national assets" under Venezuelan law but perhaps the most important national assets of Venezuela's state-owned oil industry abroad.

## X.   VENEZUELAN LAW DOES NOT PERMIT THE LAW OF ANOTHER JURISDICTION TO GOVERN THE VALIDITY OF PUBLIC INTEREST CONTRACTS

**117.**   I have also been asked to address the question of whether Venezuelan law permits PDVSA and PDVSA Petróleo to select the law of another jurisdiction to govern the formation and validity of their securities or contracts they enter into. The answer is that *it unequivocally does not*.

**118.**   The relative sovereign immunity clause in Article 151 of the Constitution, which allows public contracts of a commercial nature to provide that doubts and controversies that may arise on such contracts can be resolved by foreign jurisdictions and according to foreign law, refers only to doubts and controversies arising from the conduct or performance of the contracts. It does *not* permit a public contracting party to select foreign law to govern the validity of the contract itself. In accordance with Article 151 of the Venezuelan Constitution, such validity is a matter of public order regulated *only* by Venezuelan law.

**119.**   Among the contractual clauses that, according to the Constitution, all public interest contracts must contain are those related to the relative foreign sovereign immunity clause of the State and to international claims related to public contracts (known as a *Calvo* clause).[142] These clauses are referred to in Article 151, which provides that:

> "In public interest contracts, unless inapplicable by reason of the nature of such contracts, a clause shall be deemed included even if not expressed, whereby any doubts and controversies which may arise concerning such contracts and which cannot be resolved amicably by the contracting parties, shall be decided by the competent courts of the Republic, in accordance with its laws, and shall not, on any grounds, or for any reason, give rise to foreign claims."[143]

---

[141]   Asamblea Nacional, *Resolution dated May 26, 2016, supra* note 28.

[142]   BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA, *supra* note 11, at 369–70.

[143]   1999 VENEZ. CONST. Art. 151.

**120.**   Article 151 (which basically reproduces Article 127 of the 1961 Constitution), includes not only the *Calvo* Clause, but also the relative sovereign immunity jurisdiction clause. Both of these clauses apply to contracts entered into by the Republic, the States, and the Municipalities, as well as to all public entities of the State such as public corporations and state-owned enterprises like PDVSA and PDVSA Petróleo.[144]

**121.**   Regarding the relative sovereign immunity jurisdiction clause, Article 151 of the Constitution establishes that doubts and controversies that may arise concerning such public interest contracts that cannot be resolved amicably by the contracting parties shall be decided by the competent courts of the Republic, in accordance with Venezuelan law.

**122.**   Article 151 sets forth one exception to this general principle: when consistent with the nature of the contract (for example, in a public interest contract of a commercial nature), the public contracting parties may include in its text a clause stipulating that doubts and controversies arising with respect to such contract may be decided by a foreign court or by arbitral tribunals applying a foreign law and not Venezuelan Law.[145] However, this exception applies only to doubts and controversies arising from the *conduct or performance of the contract*.[146] The exception does not apply to matters that arise prior to the signing

---

[144]   As I wrote in 1992, seven years before the 1999 Constitution was approved, according to the 1961 Constitution, then in force: "The notion of "contracts of public interest" was fixed in the same Constitution (Article 126) as comprising "contracts of national, states and municipal public interest." That is, contracts of public interest not only entered by the Republic, but also by the States and by the Municipalities, as well as by public national, states and municipal entities (public corporations and state-owned enterprises. *See* ALLAN R. BREWER-CARÍAS, CONTRATOS ADMINISTRATIVOS [ADMINISTRATIVE CONTRACTS] 28–30 (Editorial Jurídica Venezolana ed., 1992) (hereinafter ADMINISTRATIVE CONTRACTS) *republished in* 3 TRATADO DE DERECHO ADMINISTRATIVO [ADMINISTRATIVE LAW TREATY] 635-641 (Editorial Jurídica Venezolana ed., 2013).

[145]   *See* Allan R. Brewer-Carías, *Comentarios sobre la doctrina del acto de gobierno, del acto político, del acto de Estado y de las cuestiones políticas como motivo de inmunidad jurisdiccional de los Estados en sus Tribunales nacionales* [*Commentary on the doctrine of the act of government, the political act, the act of state and political issues as grounds for judicial immunity of States in their national courts*], *in* 26 REVISTA DE DERECHO PÚBLICO 65, 65–68 (Editorial Jurídica Venezolana ed., 1986).

[146]   As I mentioned in 1992, regarding public debt contracts, they can be subjected "in their performance that occur abroad" to a foreign law and jurisdiction. *See* BREWER-CARÍAS, ADMINISTRATIVE CONTRACTS, *supra* note 144, at 136–37. It was based on this provision of article 151 of the Constitution, that many statutes provided for the relative sovereign immunity jurisdiction clause, like for instance, was the case of the Decree Law Nº 1.510 of November 2, 2001, through which was issued the Organic Hydrocarbons Law.   *Hydrocarbons Organic Law, Gaceta Oficial* No. *37.323*, (Nov. 13, 2001). The Law was reformed in 2006, in which it was provided that contracts establishing mixed companies for the exploitation of hydrocarbons, "shall be deemed incorporated", even if "they

of the contract, such as whether the contract is legal and valid in the first instance.[147]

**123.** This is particularly true with respect to matters of public order, such as a public contracting party's power of consent. That is to say, the freedom of the parties, including public entities such as PDVSA and PDVSA Petróleo, to choose the law applicable to a contract extends only to the "personal and property matters of the parties" and cannot affect the "imperative provisions and general clauses tending to protect consent," the "imperative provisions of public nature" or "public order,"[148] or, in the case of public contracts, public law governing the process of formation of the contract or the expression of consent by the public contracting party.[149]

**124.** This means that Venezuelan law, not foreign law, must govern the conditions of validity of national public interest contracts subject to National Assembly authorization. Article 1141 of the Civil Code, which is applicable to all contracts, including those entered into by public entities, establishes the general principles regarding the validity of contracts as follows:

---

do not expressly appear," a clause establishing that "the questions and disputes of any nature that may arise in connection with the conduct of activities and that cannot be resolved amicably by the parties, *including arbitration* …." will be resolved by the courts. LEY ORGÁNICA DE HIDROCARBUROS [ORGANIC HYDROCARBONS LAW] art. 34.3.b (Venez.). This provision expressly recognized in the Law the possibility to submit to arbitration the solution of disputes resulting from activities in the hydrocarbon sector when mixed companies were constituted with private investors.

[147] As for instance has been observed by Haydee Barrios de Acosta, when the parties select a foreign law to be applied to the contract, it is in order to be applied to the "contractual obligations," or as pointed out by the former Supreme Court of Justice in a decision of April 27, 1971, that the author quotes, the intention of the legislator is to allow the parties to determine the law applicable to the performance of the contracts. *See* Haydee Acosta de Barrios, *La interpretación del contrato por el juez en el derecho interno y en el derecho internacional privado* [*The interpretation of the contract by the judge in domestic law and private international law*]" *in* I LIBRO HOMENAJE A JOSÉ MELICH ORSINI 155, 171 (1982).

[148] *See* NURIA BOUZA VIDAL, ASPECTOS ACTUALES DE LA AUTONOMÍA DE LA VOLUNTAD EN LA ELECCIÓN DE LA JURISDICCIÓN Y DE LA LEY APLICABLE A LOS CONTRATOS INTERNACIONALES [CURRENT ASPECTS OF THE AUTONOMY OF THE WILL IN THE CHOICE OF JURISDICTION AND THE LAW APPLICABLE TO INTERNATIONAL CONTRACTS] 4, 6 (Universidad del Pais Vasco ed., 2005).

[149] That is why, for instance, Roberto Ruiz Díaz Labrano observes that the parties to a contract can submit "their contractual relations" or "their contractual obligations," which have "*inter partes* effects," to a foreign law, but always "with the limitations resulting from imperative or public order provisions to which the applicability of the foreign law is subjected." *See* Roberto Ruiz Díaz Labrano, *El principio de la autonomía de la voluntad y las relaciones contractuales* [*The principle of the autonomy of will and contractual relations*]," *in* 1 LIBRO HOMENAJE AL PROFESOR EUGENIO HERNÁNDEZ BRETÓN 735–40 (Editorial Jurídica Venezolana ed., 2019).

"Article 1141. The conditions required for the existence of the contract are: 1st Consent of the parties; 2nd Object that may be a matter of contract; and 3rd Lawful cause."[150]

**125.** The first condition of validity set forth in this provision, that the parties must mutually consent, which is a condition for the validity of any contract, provides not only that the parties must express a deliberate approval for the proposed clauses to be included in an agreement, but also that they must have the legal capacity, power, or competency to give such consent in accordance with the law governing their actions.

**126.** In the case of contracts entered into by Venezuelan public entities, such legal competency is a matter of public order governed by Venezuelan public law, including the Venezuelan Constitution. Thus, as I explained in 1992, "apart from the clauses themselves of the agreement (which have force of law between the parties), and the complementary Civil Code provisions, all public contracts are subject in one way or another to public (administrative) law regulations, at least when referring to the competency or attributions of the public entity to sign them."[151]

**127.** The competency of a public contracting party to enter into a public contract must always be justified and must be exercised within applicable legal constraints.[152] As I observed in 1964:

"The public contracting party needs to have legal competency, by the subject matter of the contract, the territory, the timing, the hierarchy, and the legal powers conferred on to it in order to enter into the contract. It is because of such principle that the Constitution says that the State shall not recognize obligations other than those entered into by legitimate bodies of the Public Power, in accordance with the law."[153]

---

[150] The conditions required for the existence of the contract are: 1st Consent of the parties; 2nd Object that may be a matter of contract; and 3rd Lawful cause. CODIGO CIVIL [C. CIV.] [CIVIL CODE] art. 1.141 (Venez.).

[151] *See* Allan R. Brewer-Carías, 3 TRATADO DE DERECHO ADMINISTRATIVO [ADMINISTRATIVE LAW TREATY] 846 (Editorial Jurídica Venezolana ed., 2013). [hereinafter ADMINISTRATIVE LAW TREATY VOL. III]. *See* in BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA, *supra* note 11, at 144.

[152] *See* BREWER-CARÍAS, ADMINISTRATIVE LAW TREATY VOL. II *supra* note 103, at 431.

[153] CONSTITUCÍON DE LA REPÚBLICA DE VENEZUELA DE 1961 [CONSTITUTION], art. 232. *See* ALLAN R. BREWER-CARÍAS, 4 LAS INSTITUCIONES FUNDAMENTALES DEL DERECHO ADMINISTRATIVO Y LA JURISPRUDENCIA VENEZOLANA 166 (1964).

**128.**   A public entity seeking to enter into a public contract must have the express competency to do so and must comply, among other things, with all mandatory conditions of validity required prior to entering into the contract, such as the prior National Assembly authorization required by the Constitution for public interest contracts to be entered into with foreign states, foreign entities, or corporations not domiciled in Venezuela.[154] Conditions and requirements having the character of public order cannot be relinquished in any way (much less in the contract itself) by the public contracting party.[155]

**129.**   In fact, Venezuelan law recognizes a general exception to the principle of freedom of contract for statutory provisions regulating the public order (*orden público*). As expressed in Article 6 of the Venezuelan Civil Code, "[l]aws in which public order or good morals are involved cannot be renounced or relaxed by private agreements."

**130.**   The concept of public order as an exception to the contractual freedom of the parties must be interpreted strictly, and in the Venezuelan legal system refers to legal provisions relating to the legal order that is general and essential for the existence of the community itself and thus cannot be relaxed according to the wishes of the parties.[156]

---

[154]   I addressed this matter many years ago in a 1964 article entitled "The formation of the will of the Public Administration in administrative contracts." *See* Brewer-Carías, *The formation of the will of the National Public Administration in administrative contracts*, *supra* note 8, at 79–82.

[155]   As Joaquín Sánchez-Covisa explains: "In establishing a standard of public policy, the State determines the mandatory and imperative "duty to be" -that is required at that time by the legal awareness of the group. As a result, those rules cannot be waived or relaxed by contracts between private parties. In this sense the duty to fidelity between spouses, compensation for professional accidents or the payment of taxes cannot be relaxed by the will of the private parties. These are provisions of public policy, and therefore represent the idea of what is the purpose in that legal community of our days." *See* Joaquín Sánchez-Covisa, *La vigencia temporal de la Ley en el ordenamiento jurídico venezolano* [*The Temporary Validity of the Law in the Venezuelan Legal Order*] ACADEMIA DE CIENCIAS POLÍTICAS Y SOCIALES 179 (2007). In this same sense, Francisco López Herrera, quoting Henri De Page (*Traité Élementaire de Droit Civil Belge*, Bruilant, Bruxelles, 1941-1949, Vol. I, p. 102), stated that "public policy laws and provisions are those that refers to the essential interest of the State or that affect the Collectivity, or that fix in private law the legal fundamental basis on which is based the economic and moral order of a determined society. In order to determine the public policy provision, it is needed to analyse in each case, the spirit of the Institution and to examine what and why it has relation with essential demands of the Collectivity or the fundamental basis of private law." *See* FRANCISCO LÓPEZ HERRERA, LA NULIDAD DE LOS CONTRATOS EN LA LEGISLACIÓN CIVIL DE VENEZUELA [THE TEMPORARY VALIDITY OF THE LAW IN THE VENEZUELAN LEGAL ORDER] 96 (1952).

[156]   For instance in Decision No 276 of the Cassation Chamber of the Supreme Tribunal of 31 May 2002, based on the opinion of the Italian author Emilio Betti, ruled that "the concept of public order represents a notion that crystallizes all those rules of public interest that demand unconditional

57

CONFIDENTIAL

**131.**   The Public Administration Organic Law expressly establishes that the legal provisions regulating the competency or powers of public entities comprising the Public Administration are provisions governing public order[157] and therefore must be governed by Venezuela law. For instance, Article 26 of the Organic Law of the Public Administration provides that:

> "All powers attributed to Public Administration organs and entities shall be mandatory and binding and exercised under the conditions, limits and procedures established; they shall be not subject to waiver, nor delegated, nor extended and cannot be relaxed by any contract, except for the cases that are expressly set forth in the laws and other regulatory acts.

> Any activity carried out by an organ or entity that is manifestly incompetent, or usurped by those without public authority, is null and void and its effects shall be non-existent. Those who undertake such acts shall be liable under the law, without the claim that they followed higher orders serving as any form of excuse."[158]

**132.**   Thus, even in cases where the exception to the relative sovereign immunity clause is applied and the public contracting party agrees to accept the application of foreign law for the resolution of doubts and controversies arising from the performance or conduct of the contract, public entities are nonetheless *always required to comply with all of the conditions of validity of public interest contracts established in Venezuelan public law, as it is not possible for those conditions of validity to be waived or governed in any way whatsoever by any foreign law*. This includes the requirement that the National Assembly authorize public interest contracts to be entered into with a foreign State, a foreign entity, or a corporation not domiciled in Venezuela, which must be fulfilled before the contract can be executed.

---

observance, and that cannot be repealed by means of a private agreement. The indication of these characteristic signs of the concept of public order, that is, the need for the unconditional observance of its rules, which the parties cannot renounce, makes it possible to discover with reasonable margin of confidence, when somebody is or is not in a case of a violation of a rule of public order." El Tribunal Supremo de Justicia Sala de Casación Civil [TSJ] [Supreme Tribunal of Justice], No. 276, May 31, 2002 (Venez).

[157]   I wrote in 2005 that "the laws governing competition are those called public policy, which implies that they cannot be relaxed or repealed by agreements between individuals (article 6 C.C.) nor at the will of the public official that is called to exercise the competency." *See* BREWER-CARÍAS, ADMINISTRATIVE LAW TREATY VOL. II, *supra* note 103, at 432.

[158]   *See Gaceta Oficial No. 6.147* (Nov. 17, 2014), art. 26.

CONFIDENTIAL

**133.** Consequently, Venezuelan law does not permit entities such as PDVSA and PDVSA Petróleo to select the law of another jurisdiction to govern the validity of public interest contracts such as the Indenture, the 2020 Notes issued thereunder, and the Pledge.

Allan R. Brewer-Carias