# **Exhibit B**

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> MUFG UNION BANK, N.A. and GLAS AMERICAS LLC, <br><br> Defendants. | Case No: 19-cv-10023-KPF |

# EXPERT REPORT OF ALLAN R. BREWER-CARÍAS
## <u>REBUTTING THE REPORT OF</u> ███████████

May 1, 2020

# Table of Contents

I.     INTRODUCTION ............................................................................................. 1

II.    SUMMARY OF OPINIONS ........................................................................... 1

III.   ███████████████  IS WRONG THAT THE CONCEPT OF NATIONAL PUBLIC INTEREST CONTRACTS ONLY INCLUDES CONTRACTS TO WHICH THE REPUBLIC IS A PARTY ............................................................. 7

    A. Neither the Supreme Tribunal Nor Any Predecessor Court Has Established Any Such Interpretation, Much Less Any Binding Interpretation under Article 335 of the Venezuelan Constitution ........................................................................... 7

      i.   Decision No. 953 of April 29, 2003 (*EDELCA*) .................................... 7

      ii.   Decision No. 1460 of July 12, 2007 (*Attorney General of the Republic II*) ........... 8

      iii.   Decision of the Former Supreme Court in *Simón Muñoz Armas et al. Challenging Clauses of the Congress Resolution of July 4, 1995* .......................... 9

      iv.   Decisions of the Political-Administrative Chamber of the Supreme Tribunal ..... 10

    B. The Decisions Identified in ████████ Do Not Establish Any "Binding Judicial Precedent" That the Republic Must Be a Party to National Public Interest Contracts ........................................................................................... 10

      i.   Decision of November 26, 1937 (*Attorney General of the Republic I*) ............... 11

      ii.   Decision of March 15, 1962 (*Banco de Venezuela*) ............................... 12

      iii.   Decision No. 2241 of September 24, 2002 (*Andrés Velazquez et al.*) ................... 12

      iv.   Decision No. 1460 of July 12, 2007 *(Attorney General of the Republic II)* ......... 16

      v.   Decision No. 618 of July 20, 2016 (*Brigitte Acosta Isasis*) .................................. 17

    C. No Decision Has Established a Generally Applicable Interpretation of Binding Character with Respect to the Concept of National Public Interest Contracts .......... 21

    D. *Andrés Velazquez et al.* Did Not Establish Any Binding "Additional Criteria" for National Public Interest Contracts ................................................................. 28

    E. Plaintiffs' Allegations Are Not "At Odds" with Any "Official Interpretations" of the National Assembly or the Attorney General ....................................................... 30

      i.   The National Assembly Categorically Rejected the Pledge and Has Explicitly Declared that the Indenture is a National Public Interest Contract That Required Prior National Assembly Authorization .......................................................... 30

      ii.   The Attorney General's August 7, 2006 Opinion Does Not Support ███████ ███ Assertions ............................................................................... 34

    F. Articles 226 and 236 of the Venezuelan Constitution Do Not Restrict National Public Interest Contracts to Contracts Entered Into By the Republic Itself ............... 35

IV.   ████████████████  OPINION IS CONTRARY TO THE OVERWHELMING WEIGHT OF VENEZUELAN LEGAL SCHOLARSHIP ..... 35

CONFIDENTIAL

**V.** ██████████████ **"ADDITIONAL CONSIDERATIONS" DO NOT SUPPORT HIS ERRONEOUS AND OUTLIER CONCLUSION THAT ONLY THE REPUBLIC ITSELF CAN ENTER INTO NATIONAL PUBLIC INTEREST CONTRACTS** ............................................................ 39

    A. ████████████ Claim That PDVSA and PDVSA Petróleo Effectively Operate as Independent Corporations is Contrary to Venezuelan Law and the Facts at the Time of the Exchange Offer ........................................................ 39

    B. The Financial Administration of the Public Sector Organic Law Does Not Exempt from Prior National Assembly Authorization Public Debt Contracts Entered into With Foreign/Non-Domiciled Counterparties ........................................ 45

    C. The Indenture and the Pledge Are Unquestionably "Administrative Contracts" ....... 46

    D. The National Assembly's Historical Non-Assertion of Control Over Contracts Entered into by PDVSA or its Subsidiaries Does Not Support ███████████ Opinion ........................................................................ 49

**VI.** **THE PRESUMPTION OF LEGALITY AND THE PRINCIPLE OF LEGITIMATE EXPECTATIONS CAN NEVER APPLY TO ADMINISTRATIVE ACTS OR ANY STATE ACT AFFECTED BY ABSOLUTE NULLITY** ................................................................ 50

CONFIDENTIAL

## I.   INTRODUCTION

1.     At the request of Paul Hastings LLP, as counsel to the Ad Hoc Boards of Directors of PDVSA and PDVSA Petróleo, and Willkie Farr & Gallagher LLP, as counsel to PDV Holding, Inc., I submitted an expert report on March 16, 2020, concluding that the 2020 Notes, the Indenture, and the Pledge are invalid, illegal, null and void *ab initio*, and unenforceable under Venezuelan law because the Indenture and the Pledge were entered into without prior National Assembly authorization in violation of the Venezuelan Constitution. The same day, ████████ ██████████████████ submitted a report on behalf of the defendants ██████ ███████████ erroneously opining that the Indenture and the Pledge  are not "national public interest contracts" and thus did not require prior National Assembly authorization.

2.     In this report, I rebut the erroneous opinions offered by ███████████. Rather than address each and every error in ███████████, I have focused my rebuttal on the fundamental errors that I believe are relevant to the case.

## II.   SUMMARY OF OPINIONS

3.     Nothing in ███████████ alters my conclusion that the Indenture and the Pledge are national public interest contracts that required prior National Assembly authorization. My conclusion was and is based, in short, on the following:

   a.   Under Articles 150 and 187.9 of the Venezuelan Constitution, which I proposed in my role as one of the constitutional drafters, a national public interest contract cannot be executed without prior authorization of the National Assembly if *the contract is to be entered into with* a foreign State or official entity or with *companies not domiciled in Venezuela*.[1]

   b.   A "national" public interest contract is a public interest contract entered into by an entity that is part of the "National Public Administration." PDVSA and PDVSA Petróleo, which are entirely state-owned commercial enterprises, are unquestionably part of the National Public Administration, as defined in the Organic Law of Public Administration,[2] a Venezuelan statute that I drafted. PDVSA and

---

[1]   CONSTITUCIÓN DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA 1999 [1999 VENEZUELAN CONSTITUTION] art. 150; 187.9 (produced as Tab 1 to the First Report).

[2]   Organic Law of the Public Administration, GACETA OFICIAL *No. 6.147*, Nov. 17, 2014 (produced as Tab 9 to the First Report).

CONFIDENTIAL

PDVSA Petróleo are not like normal commercial entities, as they are subject to both public and private law.  Moreover, unlike other state-owned enterprises, which are generally created by Executive Order to engage in a particular business, PDVSA was created as part of the nationalization of the Venezuelan oil industry and is the only state-owned enterprise whose state ownership is enshrined in the Venezuelan Constitution "[f]or reasons of economic and political sovereignty and national strategy" (Art. 303).[3] In addition, PDVSA's President at the time of the Exchange Offer, Eulogio Del Pino, was simultaneously serving as Venezuela's Minister of Petroleum and Mining.

c.   In my opinion and in the opinion of many other Venezuelan legal experts, *any* contract entered into by an entity within the National Public Administration is a national public interest contract.  This was the intention of the proposal I made before the National Constituent Assembly with respect to the inclusion of Article 150 in the Constitution. This opinion is also consistent with the Supreme Tribunal's decision No. 953 of April 29, 2003 (Case: *EDELCA*), in which the Constitutional Chamber expressly recognized that contracts entered into by a state-owned enterprise, *Electrificación del Caroní S.A.*, with certain Brazilian entities were national public interest contracts.[4] The Indenture and the Pledge are also national public interest contracts under proposed standards that take into account the impact and magnitude of the contract, as these contracts affected in a decisive way the "crown jewel" of Venezuela's most economically and strategically important industry.

d.   Therefore, the Indenture and the Pledge, both of which were entered into by PDVSA and PDVSA Petróleo with companies not domiciled in Venezuela, required prior National Assembly authorization under Articles 150 and 187.9 of the Constitution. The lack of required National Assembly authorization prevented valid consent and contract formation, and thus the Indenture, the 2020 Notes issued thereunder, and the Pledge are invalid, illegal, and null and void *ab initio—i.e., they never came into valid legal existence and are entirely unenforceable.*

---

[3]   1999 VENEZUELAN CONSTITUTION, art. 303 (produced as Tab 1 to the First Report).

[4]   Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 953 EDELCA, Apr. 29, 2003 (Venez.) (hereinafter Supreme Tribunal of Justice Decision No. 953) (produced as Exhibit █ -72 to █████████████).

CONFIDENTIAL

4.     ███████████████ 's conclusion that the Indenture and the Pledge are not national public interest contracts is based primarily on the erroneous assertion, which is contrary to the vast majority of scholarly opinion, that only the Republic itself can enter into national public interest contracts. This erroneous assertion is based not on any fundamental legal analysis but on three incorrect presuppositions:

    a.  That "Venezuela's Highest Court has long held that contracts of national interest must include the Republic as a party";

    b.  That Articles 236 and 226 of the Venezuelan Constitution are consistent with this supposedly long-standing precedent; and

    c.  That this supposedly long-standing precedent is supported by the positions of the National Assembly and the Attorney General.

5.     These presuppositions are erroneous for the following reasons, which I explain in greater detail below:

    a.  First, neither the Constitutional Chamber of the Supreme Tribunal nor any predecessor court has ever ruled that the concept of national public interest contracts is restricted only to contracts that include the Republic as a party and cannot include contracts entered into by a public corporation or state-owned enterprise that is part of the National Public Administration. Indeed, the question of whether such contracts can qualify as national public interest contracts has not been a part of the *thema decidendum* of any case.

    b.  The decisions ███████████ relies on show only that the concept of national public interest contracts *includes* contracts entered into by the Republic, not that the concept *excludes* contracts entered into by public corporations and state-owned enterprises. To deduce such a proposition from these decisions defies logic and contravenes other decisions in which the Constitutional Chamber, other Chambers of the Supreme Tribunal, and the former Supreme Court of Justice have expressly accepted (without even a question being raised) that contracts entered into by such entities were national public interest contracts. Remarkably, ███████████ purports to rely on one of these decisions of the Constitutional Chamber (No. 1460 of July 12, 2007) (*Attorney General of the Republic II*) in reaching his erroneous conclusion.

    c.  In any event, none of the cases on which ███████████ relies established any "binding judicial precedent" with respect to the concept

CONFIDENTIAL

of national public interest contracts. In Venezuela's civil law system, there is no doctrine of *stare decisis* or binding precedent; decisions of the Supreme Tribunal are not a source of law; and except for Constitutional Chamber interpretations explicitly declared as having binding character pursuant to Article 335 of the Venezuelan Constitution, decisions of the Supreme Tribunal carry no more weight than the opinions of legal scholars and other branches of government.

d.   Regarding scholarly opinion, it is simply not true that the opinion expressed by ▮▮▮▮▮▮ regarding the concept of national public interest contracts has been "repeatedly reaffirmed by respected Venezuelan legal scholars." (par. 15). The reality is just the opposite. In addition to myself, those who have interpreted the concept of national public interest contracts to encompass contracts entered into by public corporations and state-owned enterprises within the National Public Administration include:

   i.   The National Assembly, which is the only Venezuelan government body recognized as legitimate by the U.S., in resolutions before and after the Exchange Offer;

   ii.   The Constitutional Chamber of the Supreme Tribunal in the *EDLECA* (2003) and *Attorney General of the Republic II* (2007) cases;

   iii.   The Political-Administrative Chamber of the Supreme Tribunal in the *Diques y Astilleros de Nacionales S.A. (DIANCA)* (2013), *Corporación Venezolana de Guayana (CVG)* (2011), and *Compañía Anónima Venezolana de Televisión (VTV)* (2006) cases;

   iv.   The former Supreme Court of Justice in the *Simón Muñoz Armas et al.* (1999) case;

   v.   Professor Juan Cristóbal Carmona Borjas, a distinguished member of the National Academy of Political and Social Sciences, who rendered an opinion on this matter to the National Assembly at the time of the Exchange Offer;

   vi.   Professor Luis Henrique Farías Mata;

   vii.   Professor José Araujo Juárez;

viii. Professor Margot Y. Huen Rivas;

ix. Professor Román José Duque Corredor;

x. Professor Isabel Boscán de Ruesta;

xi. Professor Luis Britto García;

xii. Professor Rafael Badell Madrid (who, contrary to ███████ ███████ mischaracterization of his writings on this matter, has been emphatic that national public interest contracts include contracts entered into by state-owned enterprises and public corporations); and

xiii. Professor Jesús Caballero Ortíz (who, contrary to ███████ ███████ assertions, has opined in his scholarly writings that contracts entered into by public corporations (autonomous institutes) can qualify as national public interest contracts).

e. Apart from Professor Eloy Lares Martínez, who affirmed that "national interest contracts are administrative contracts entered into by the National Public Administration,"[5] only to later take the contradictory position (without explanation) that the Republic must be a party, *I am not aware of any other Venezuelan public law scholar who holds the opinion expressed by* ███████████████ *in this case*. Contrary to ███████ erroneous assertions, his opinion does not find support in the writings he cites of Professor José Melich Orsini. The relative weight of authority on this issue is not even close.

f. Second, Articles 226 and 236 of the Venezuelan Constitution do not restrict national public interest contracts to contracts entered into by the Republic itself, as ███████████████ incorrectly claims. Rather, these articles simply empower the President, as the head of the National Executive branch of government, to enter into such contracts on behalf of the Republic.[6]

---

[5] Eloy Lares Martínez, *Contratos de Interés Nacional* [*Contracts of National Interest*], *in* 1 LIBRO HOMENAJE AL PROFESOR ANTONIO MOLES CAUBET 117, 137 (1981) (hereinafter *Contracts of National Interest*) (produced as Exhibit ███-65 to ███████████).

[6] 1999 VENEZUELAN CONSTITUTION, art. 226, 236 (produced as Exhibit ███-32 to ███████████).

CONFIDENTIAL

g. Finally, neither the National Assembly nor the Attorney General has taken the position that a national public interest contract must have the Republic as a party. In fact, the opposite is true. The National Assembly, in resolutions passed both before and after the 2020 Notes were issued, have declared that the Indenture and the Pledge, which were entered into by PDVSA and PDVSA Petróleo as state-owned entities within the National Public Administration, are national public interest contracts that required prior National Assembly authorization as a condition of their validity.[7]

h. If endorsed, ▮▮▮▮▮▮▮▮ outlier opinion would profoundly undermine the democratic principles at the foundation of Venezuela's system of government, as the National Executive (not to mention an illegitimate, authoritarian regime) could avoid National Assembly oversight simply by contracting through state-owned entities. As one of the drafters of the Venezuelan Constitution, I can say with certainty that such an illogical and destructive proposition is completely contrary to the intention behind and proper interpretation of Articles 150 and 187.9.

6. ▮▮▮▮▮▮▮▮ also opines that, even if a Venezuelan court were to conclude that the Indenture and the Pledge are national public interest contracts that required National Assembly authorization, the court would likely enforce them anyway based on Venezuela's "presumption of legality" (par. 179) and "principle of legitimate expectations." (par. 184). However, as the Constitutional Chamber and numerous legal scholars have opined, the "presumption of legality" and the "principle of legitimate expectations" can never apply to illegal acts of absolute nullity,[8] such as the execution of the Indenture and the Pledge without constitutionally required National Assembly authorization.

---

[7]    ▮▮▮▮▮▮▮ claims that several "additional considerations" also support his opinion. I address these "additional considerations" in detail below (par. 21, 156, 231).

[8]    *See e.g.* ALLAN RANDOLPH BREWER-CARÍAS, EL DERECHO ADMINISTRATIVO Y LA LEY ORGÁNICA DE PROCEDIMIENTOS ADMINISTRATIVOS 203 (8th ed. 2008) (produced as Exhibit ▮-103 to ▮▮▮▮▮ ▮▮▮).

III.    ████████████    IS WRONG THAT THE CONCEPT OF NATIONAL PUBLIC INTEREST CONTRACTS ONLY INCLUDES CONTRACTS TO WHICH THE REPUBLIC IS A PARTY

A.    Neither the Supreme Tribunal Nor Any Predecessor Court Has Established Any Such Interpretation, Much Less Any Binding Interpretation under Article 335 of the Venezuelan Constitution

7.    The main basis for ████████████ erroneous conclusion that the Indenture and the Pledge are not national public interest contracts is the claim that Venezuelan courts have "long held" that [national public interest contracts] must have the Republic as a party" (par. 87) and that, as of 2002, the Constitutional Chamber had issued "binding" rulings supposedly confirming this "long-standing judicial requirement." (par. 85, 99).

8.    In fact, there is no "binding interpretation" or "long-standing judicial requirement" from the Constitutional Chamber, or any other Venezuelan court, that national public interest contracts must have the Republic as a party. The Constitutional Chamber *has never* established such a general interpretation. To the contrary, the Constitutional Chamber, the former Supreme Court of Justice, and the Political-Administrative Chamber of the Supreme Tribunal have issued decisions accepting that the contracts in question *were* national public interest contracts even though they were not entered into by the Republic itself but by public corporations or state-owned enterprises that, like PDVSA and PDVSA Petróleo, are part of the decentralized National Public Administration.

i.    Decision No. 953 of April 29, 2003 (*EDELCA*)

9.    In the *EDELCA* case (decision No. 953 of April 29, 2003), which came just several months after the *Andrés Velazquez et al.* decision (No. 2241 of September 24, 2002) that is the centerpiece of ████████████, the Constitutional Chamber *expressly acknowledged that contracts entered into with Brazilian entities by a state-owned enterprise, Electrificación del Caroní S.A. (EDELCA), were national public interest contracts*.[9] This decision is acknowledged only in a footnote (137) to ████████████, in which ████████████ admits that "*a state corporation [EDELCA] entered into an agreement that the Court characterized as one of national interest*."

---

[9]    Supreme Tribunal of Justice Decision No. 953, *supra* note 4 at 14-15.

ii. **Decision No. 1460 of July 12, 2007 (*Attorney General of the Republic II*)**

10. ███████████ asserts that, in this decision, the Constitutional Chamber "confirmed and reaffirmed the ruling in *Andrés Velásquez et al.* that a Public Debt transaction may qualify as a Contract of National Interest when executed 'by the Republic with [other] States, foreign official entities or commercial companies not domiciled in Venezuela'" (par. 103). As with other decisions referenced in ███████, it is immediately obvious upon reading the decision that ███████████ assertion is totally incorrect. Although the Constitutional Chamber referred to its prior non-binding *Andrés Velásquez* decision (discussed below), there is not a single word, line, or paragraph in decision No.1460 of July 12, 2007 (which is likewise non-binding), wherein the Constitutional Chamber "confirmed" or "reaffirmed" that national public interest contracts are *only* those entered into by the Republic. On the contrary, the ruling of the case presumes that ***public debt contracts entered into by decentralized entities of the National Public Administration are national public interest contracts***.[10]

11. The case involved the interpretation of Article 247 of the Venezuelan Constitution, which requires the Office of the Attorney General to be consulted on national public interest contracts prior to their approval. Specifically, the Constitutional Chamber was asked to clarify whether an Attorney General opinion issued pursuant to Article 247 is binding on the Public Administration entity seeking the opinion or merely consultative in nature.[11] That was the *thema decidendum*[12] of the case. There were no abstract requests for interpretation of a constitutional provision, but rather a specific request for interpretation regarding the nature of particular Attorney General opinions with respect to particular public debt contracts (promissory notes) of the *Banco de Desarrollo Agropecuario (Bandagro)*, which is a public corporation within the decentralized National Public Administration.[13] The Constitutional Chamber ruled in this non-binding decision that the Attorney General opinions, while required by Article 247 of the Constitution, were merely consultative in nature.[14] Contrary to what is suggested in ███████████ (par. 94), the Constitutional Chamber did not address, in any way, the notion of which entities

---

[10]  Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1460 [Attorney General of the Republic II], Jul. 12, 2007 (Venez.) (hereinafter Supreme Tribunal of Justice Decision No. 1460) at 22 (produced as Exhibit ██-71 to ███████).

[11]  *Id.* at 18.

[12]  *See* par. 30 below.

[13]  Supreme Tribunal of Justice Decision 1460, *supra* note 10 at 19, 21.

[14]  *Id.* at 19, 22, 23.

may enter into a national public interest contract, much less the supposed requirement that the Republic itself be a party.

12.   Thus, not only did the Constitutional Chamber not affirm in its decision No. 1460 of July 12, 2007 that public interest contracts are only those to which the Republic is a party, but, to the contrary, the Chamber expressly accepted in this decision that "public debt contracts" (promissory notes) issued by a public corporation as a decentralized entity of the National Public Administration (and not the Republic) had to be submitted to the General Attorney for approval in accordance with Article 247 of the Constitution, which applies only to "national public interest contracts."[15]

### iii.   Decision of the Former Supreme Court in *Simón Muñoz Armas et al. Challenging Clauses of the Congress Resolution of July 4, 1995*

13.   It is also important to mention the August 17, 1999 decision of the former Supreme Court of Justice in the case involving *Apertura Petrolera* (Case: *Simón Muñoz Armas et al. Challenging Clauses of the Congress Resolution of July 4, 1995*), which is referenced in ▮▮▮▮▮▮▮ (par. 172). In that case, administrative contracts entered into by decentralized oil industry entities, which were subsidiaries of PDVSA, were expressly qualified as "national public interest contracts."[16] That is why, for instance, Professor Eugenio Hernández Bretón has affirmed that the "Association Agreements" entered into by PDVSA and its subsidiaries are all "contracts of public interest."[17]

---

[15]   *Id*. at 18, 21, 22.

[16]   ALLAN RANDOLPH BREWER-CARÍAS, EL CASO DE LA APERTURA PETROLERA (DOCUMENTOS DEL A PETROLERA 1996-1999) [THE CASE OF THE OIL OPENING (DOCUMENTS OF THE NULLITY TRIAL AGAINST THE PARLIAMENTARY AUTHORIZATION FOR THE OIL ASSOCIATION AGREEMENTS 1996-1999)] 318-319 (2001) (hereinafter *The Case of the Oil Opening*) (produced as Exhibit ▮-101 to ▮▮▮▮▮).

[17]   *See* Margot Y. Huen Rivas, *El Arbitraje Internacional en los Contratos Administrativos* [*International Arbitration in Administrative Contracts*], *in* 1 VIII JORNADAS INTERNACIONALES DE DERECHO ADMINISTRATIVO 403, 435 fn. 58 (Fundación Estudios de Derecho Administrativo ed., 2005) (quoting Eugenio Hernández Bretón, *El Controversial Artículo 127* [*The Controversial Article 127*], *in* REVISTA GERENTE (1999)). I also considered the contracts entered into by PDVSA as "national public interest contracts" when expressing my opinion before the Venezuelan Senate in 1982. *See* LETTER FROM ALLAN R. BREWER-CARIAS TO GODOFREDO GONZALEZ, PRESIDENT OF THE VENEZUELAN SENATE (Aug. 11, 1982) at 2, 3, 6, 7.

### iv.  Decisions of the Political-Administrative Chamber of the Supreme Tribunal

14.  As acknowledged in footnote 144 of ███████████, the Political-Administrative Chamber of the Supreme Tribunal has also issued decisions relating to national public interest contracts, *generally accepting that such contracts can be entered into by decentralized entities of the National Public Administration* such as *Diques y Astilleros de Nacionales  S.A. (DIANCA)*, which is a national state-owned enterprise (Decision No 847 of July 16, 2013);[18] *Corporación Venezolana de Guayana (CVG)*, which is a national autonomous institution created by law (Decision No 1690 of December 7, 2011);[19] and *Compañía Anónima Venezolana de Televisión (VTV),* which is also a national state-owned enterprise (Decision No.  855 of April 5, 2006 -Case *VTV v. Eletronica Industriale*).[20]

### B.  The Decisions Identified in ████████████ Do Not Establish Any "Binding Judicial Precedent" That the Republic Must Be a Party to National Public Interest Contracts

15.  The Constitutional Chamber and predecessor court decisions on which ███████████ relies did not establish *any* judicial precedent—binding or non-binding—that national public interest contracts must include the Republic itself as a party. To the contrary, as mentioned above, two of these decisions (*EDELCA* and *Attorney General of the Republic II*)[21] supports the near-unanimous opinion among Venezuelan legal scholars that contracts entered into by entities within the National

---

[18]  Tribunal Supremo de Justicia Sala Político Administrativa [TSJ-SPA] [Supreme Tribunal of Justice, Political-Administrative Chamber] No. 847 Diques y Astilleros Nacionales (DIANCA), Jul. 16, 2013 (Venez.) (hereinafter Supreme Tribunal of Justice Decision No. 2241) (produced as Exhibit ██-75 to ████) at 23.

[19]  Tribunal Supremo de Justicia Sala Político Administrativa [TSJ-SPA] [Supreme Tribunal of Justice, Political-Administrative Chamber] No. 1690 Minera Las Cristinas (MINCA) Dec. 7, 2011 (Venez.) (hereinafter Supreme Tribunal of Justice Decision 1690) (produced as Exhibit ██-76 to ████) at 43 in the original Spanish, 47 in the translation. In this 2011 decision, the Political-Administrative Chamber of the Supreme Tribunal also referred to its previous decision No. 832 of July 14, 2004, in which it also recognized that mining concessions, in that case also entered into by autonomous institutes (public corporations) like  the *Corporación Venezolana de Guayana* and the same *Mineras Las Cristinas S.A.* were "national public interest contracts." *Id.* at 41, 72 in the original Spanish, 40, 53 in the translation.

[20]  Tribunal Supremo de Justicia Sala Político Administrativa [TSJ-SPA] [Supreme Tribunal of Justice, Political-Administrative Chamber] No. 855 Compañía Anónima Venezolana de Televisión (VTV), Apr. 5, 2006 (Venez.) (produced as Exhibit ██-126 to ████) at 78.

[21]  Supreme Tribunal of Justice Decision No. 953, *supra* note 4; Supreme Tribunal of Justice Decision No. 1460, *supra* note 10.

CONFIDENTIAL

Public Administration, such as PDVSA and PDVSA Petróleo, can qualify as national public interest contracts.

16.   I will first address the two referenced decisions of the former Venezuelan Federal and Cassation Court and the former Venezuelan Supreme Court, issued in 1937 and 1962, respectively, prior to the ratification of the 1999 Constitution. No "long-standing judicial requirement" that the Republic must be a party to a national public interest contract can possibly be deduced from these decades-old decisions. I will then turn to the more recent decisions ███ relies on, which likewise do not support the nonsensical notion that contracts entered into by public corporations and state-owned enterprises cannot qualify as national public interest contracts.

### i.   Decision of November 26, 1937 (*Attorney General of the Republic I*)

17.   According to ████████████, "the requirement that the Republic must be a party to a contract for it to qualify as a contract of national interest was first recognized by the Venezuela's highest court in 1937 in the *Attorney General of the Republic I* case" (par. 95).[22] Just reading the Court's decision is enough to realize the falsity of this assertion.[23]

18.   The *thema decidendum* of the case had nothing to do with the concept of national public interest contracts generally or with the specific question of which entities can enter into them. Rather, the case involved the judicial review of a "Special Law project" (draft statute) whereby Congress was to authorize the granting of a loan to the Municipality of the District Iribarren in the State of Lara. The Attorney General challenged the Special Law project on constitutional grounds, arguing that the Legislature did not have the power to initiate the granting of the loan.[24] The Court agreed, emphasizing that "the only branch of government with the initiative to enter into contracts is the National Executive," not the Legislature, which "does not have the power to contract."[25] Concluding that the challenged Special Law project ultimately "was not a project of law" or a "project of contract" but an "order" purportedly given by the Congress to the National Executive to enter

---

[22]   *See* Sala Politica y Administrativa de la Corte Federal y de Casación [Political-Administrative Chamber of the Federal Court and Court of Cassation] No. 62 [Attorney General of the Republic I] Nov. 26, 1937 (Venez.) (hereinafter Federal Court and Court of Cassation Decision No. 62) (produced as Exhibit ██ 64 to ████████).

[23]   It might appear that, in footnote 128 of his report, ████████ cites one of my works in support of his opinion. However, the cite is not to anything I have written but to the text of Venezuela's 1936 Constitution in my historical compilations of the country's constitutions.

[24]   Federal Court and Court of Cassation Decision No. 62, *supra* note 22 at 351.

[25]   *Id.* at 352.

CONFIDENTIAL

into a loan contract, the Court annulled the Special Law project as an unconstitutional violation of the separation of powers.[26]

19.   In concluding that the power to enter into contracts resided with the National Executive branch of government *and not the Legislature*, the Court referred to Article 100.21 of the 1936 Constitution, which empowered the National Executive to enter into national public interest contracts.[27] The Court did not rule that the National Executive was the *only* authority empowered to enter into national interest contracts *and that public corporations or state-owned enterprises could not* enter into contracts of national public interest. Indeed, that issue was not even raised, let alone decided. This could not have been otherwise, as in 1937 there were no public corporations or state-owned enterprises such as exist today, but only a few autonomous institutions (public corporations) like *Banco Obrero* and *Banco Agrícola y Pecuario*, which were created in 1928. Contrary to ███████████ assertions, this case does not stand in any way "for the principle that contracts of national interest are [limited to] contracts concluded by the Federal Executive" ████████ par. 97).

### ii.   Decision of March 15, 1962 (*Banco de Venezuela*)

20.   In this decision, the former Supreme Court of Justice annulled a "[l]aw through which a contract entered into between the National Executive and the *Banco de Venezuela* was approved."[28] The law was annulled on the grounds that the contract approved by the law exempted the *Banco de Venezuela* (a private commercial bank) from municipal taxes in violation of the municipal autonomy guaranteed in the Venezuelan Constitution.[29] In reaching its decision, the Court concluded that, although the content of the law was the approval of a public contract, the competence to exercise judicial review of legislation (including "special laws" approving public contracts and thus without general content) always belonged to the full Supreme Court (*Corte Plena*) and that the organs of the Administrative-Contentious Jurisdiction (including the Political-Administrative Chamber of the Court), which had jurisdiction over cases involving administrative contracts, was not competent to exercise judicial review of the law.[30]

---

[26]   *Id.* at 354.

[27]   *Id*. at 351.

[28]   Corte Suprema de Justicia [CSJ] Banco de Venezuela, Mar. 15, 1962, *in* OFFICIAL GAZETTE NO. 760 (Mar. 22, 1962) (Venez.) (produced as Exhibit ██-69 to ██████████) at 10.

[29]   *Id*. at 7-10.

[30]   *Id*. at 4-7.

21.   Although the case happened to involve a contract entered into by the National Executive, there is nothing in the decision to suggest that the Court was even dealing with the concept of national public interest contracts, much less interpreting the concept to include only contracts entered into by the National Executive on behalf of the Republic itself. Furthermore, there is nothing in the dissenting opinion to suggest that it "further clarifies that Contracts of National Interest are concluded [only] by the National Executive on behalf of the Republic" or that the dissenting justices "confirmed that contracts of national interest are [restricted to] contracts concluded by the Republic," as ███████████ erroneously asserts (par. 98). The dissenting justices merely disagreed that the Court had the power to exercise judicial review of the law given that its content was the approval of such a contract.[31] The *thema decidendum* of the case, in other words, was whether the constitutionality of a law approving a contract entered into by the National Executive on behalf of the Republic could be reviewed by the Supreme Court, not whether a contract must be entered into by the Republic to qualify as a national public interest contract. After finding itself competent to exercise judicial review, the Supreme Court proceeded to annul the law.[32]

### iii.   Decision No. 2241 of September 24, 2002 (*Andrés Velazquez et al.*)

22.   ███████████ erroneously asserts that in this decision the Constitutional Chamber expressly reaffirmed the supposed "long-standing judicial requirement" (which, as discussed above, did not exist) that "for a contract to qualify as a Contract of National Interest, the Republic has to be one of the contracting parties." (Par. 99).

23.   In fact, the *thema decidendum* of the case did not involve interpreting the Constitution with respect to the notion of public interest contracts at all. Rather, the Constitutional Chamber was adjudicating a general constitutional challenge brought by several citizens (Andrés Velázquez and others) against Article 80 of the Organic Law on Financial Administration of the Public Sector.[33] Article 80 provided, in relevant part, that "once sanctioned the annual indebtedness law, the National Executive will proceed to enter into contracts of public debt in the best attainable conditions possible and must inform periodically to the National Assembly."[34] The

---

[31]   *Id.* at 12.

[32]   *Id.* at 10.

[33]   Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 2241 Andrés Velásquez y otros, nulidad parcial artículo 80 de la Ley Orgánica de Administración Financiera del sector Público [Andrés Velásquez and others, the partial anullment of Article 80 of the Organic Law of the Financial Administration of the Public Sector], Sept. 24, 2002 (Venez.) (hereinafter Supreme Tribunal of Justice Decision No. 2241) (produced as Tab 23 to the Brewer report).

[34]   *Id.* at 11-12.

CONFIDENTIAL

plaintiff argued that, as written, this provision seemed to allow the National Executive to enter into public debt contracts of national interest with foreign states, official foreign entities, and companies not domiciled in Venezuela in violation of Article 150 of the Venezuelan Constitution — that is, without National Assembly authorization.[35] The *thema decidendum* of the case was thus the constitutionality of Article 80 of the Organic Law. Agreeing with the plaintiff that the relevant provision was unconstitutional, the Constitutional Chamber declared it null and void.[36]

24.    Bearing this context in mind, it cannot be deduced, as ██████ erroneously asserts, that "on the basis of that holding" the term "contracts of national public interest" only encompasses "contracts concluded by the Republic through the competent bodies of the National Executive" (par. 101). The Constitutional Chamber did not rule in any way whatsoever that decentralized entities within the National Public Administration such as public corporations and state-owned enterprises cannot enter into national public interest contracts. As ████ himself recognizes in his report (par. 100), the Constitutional Chamber noted in *Andrés Velazquez et al.* that national public interest contracts "is a contracting species which *includes* '. . . . contracts concluded by the Republic through the competent organs of the National Executive' (par. 100 (emphasis added)), implying that the National Executive is but one entity that may enter into such contracts, not the *only* entity.

25.    As I pointed out in my initial report, the reason the Constitutional Chamber focused on national public interest contracts entered into by the National Executive is that *those were the only contracts expressly mentioned in the challenged provision of Article 80 of the Organic Law.*[37]  Professor Román J. Duque Corredor has likewise observed that "the decision emphasizes public interest contracts of the Republic" because the decision "was in reference to the nullity of article 80 of the Financial Management of the Public Sector Organic Law, which governs the public debt operations of the Republic." That is, the Constitutional Chamber's analysis "was centered on public interest contracts of the Republic, concluding that article 80 was contrary to the constitutional obligation of the National Executive to request the National Assembly's authorization to enter into contracts of national public interest, in the framework of public debt operations, when such contracts are entered into with States, foreign official entities or foreign companies not domiciled in Venezuela."[38] Thus, in the words of Professor Duque Corredor, the interpretation of

---

[35]    *Id.* at 3.

[36]    *Id.* at 19.

[37]    Supreme Tribunal of Justice Decision No. 2241, *supra* note 33 at 11.

[38]    *See* ROMÁN J. DUQUE CORREDOR, OPINIÓN SOBRE LA INCONSTITUCIONALIDAD DEL BONO PDVSA 2020 [OPINION ON THE UNCONSTITUTIONALITY OF THE 2020 PDVSA NOTES] 2, 3 (2020).

the decision that "PDVSA is not subject to article 150 of the Constitution, because such provision only applies to the Republic and not to the state-owned enterprises like PDVSA" is no more than a "manipulation of the interpretation of the decision," which "does not establish that state-owned enterprises are excluded from article 150 of the Constitution."[39] The decision "equates the Republic to the National Executive, but does not do so with the intention of excluding the decentralized entities like state owned-enterprises from complying with article 150."[40]

26.   In any event, proof that the Constitutional Chamber did not intend to limit the concept of national public interest contracts came just months later in the *EDELCA* case (decision No. 953 of April 29, 2003), discussed in Paragraph 9 above, in which the Constitutional Chamber expressly recognized that contracts entered into by a state-owned enterprise *were national public interest contracts*.

27.   As mentioned in ███████████ (par. 101), I have been particularly critical of the *Andrés Velázquez* decision, not in relation to its annulment of the challenged provision of Article 80 of the Financial Administration of the Public Sector Organic Law, but because it inadvertently created the opportunity for confusion and politically motivated arguments by failing to include a reference to contracts entered into by decentralized entities within the National Public Administration when discussing national public interest contracts.[41] Time has

---

[39]   *See id.* At 2, 3.

[40]   *Id.*

[41]   Allan Randolph Brewer-Carías, *La Mutación de la Noción de Contratos de Interés Público Nacional Hecha Por la Sala Constitucional, para Cercenarle a la Asamblea Nacional sus Poderes de Control Político en Relación con la Actividad Contractual de la Administración Pública y sus Consecuencias* [*The Mutation of the Notion of Contracts of National Public Interest Made by the Constitutional Chamber, to Cut Off the National Assembly its Powers of Political Control in Relation to the Contractual Activity of the Public Administration and its Consequences*], *in* 151–52 Revista de Derecho Público 371, 379 (2017) (hereinafter *The Mutation of the Notion of Contracts of National Public Interest*). In 2005, I said that this decision could lead to the misimpression that a contract entered into by PDVSA was not a national public interest contract, and that such assertion "has no sense. Nonetheless, without doubt, it is a national public contract entered into by a State public entity, in particular, a state-owned enterprise or a State private law person." *See* Allan R. Brewer-Carías, *Nuevas consideraciones sobre el régimen jurídico de los contratos del estado en Venezuela* [*New Considerations on the Legal Regime of State Contracts in Venezuela*], *in* 2 VIII Jornadas Internacionales de Derecho Administrativo 449, 451 (Fundación Estudios de Derecho Administrativo ed., 2005). I have expressed this opinion since 1982, when, as a Senator for the Federal District, I prepared a memorandum to the President of the Venezuelan Senate on the notion of public national interest contracts and their legislative approval. Letter from Allan R. Brewer-Carias to Godofredo Gonzalez, President of the Venezuelan Senate, (Aug. 11, 1982) at 2, 6, 7.

CONFIDENTIAL

proved me right, as my concerns have now come to pass in the case of the PDVSA 2020 Notes.

28.   As I also wrote in 2017, "regrettably and without any need to resolve the *thema decidendum*, which was the nullity of the last paragraph of article 80 of the Organic Law on Financial Administration of the public sector, [the Chamber] began the inconvenient process of reduction over the notion of contracts of national interest." To counteract this process, I clarified that:

> "the determinant [factor] in the Constitution in order to identify public interest contracts is not the participation of the Republic, of the States or of the Municipalities, but the determinant [factor] is the participation of the state persons of public or private law in the three territorial levels, and that in addition of the Republic, the States and Municipalities, are for instance, the autonomous institutions [such as PDVSA or PDVSA Petróleo] or the state owned enterprises at the three territorial levels."[42]

29.   Regarding my 2017 article, I must also point out that I did not "expressly recognize [] [the decision] as binding law," as ▮▮▮▮▮▮▮▮ erroneously asserts (footnote 136). In that decision, the only content that can be considered "binding" is the partial annulment of Article 80 of the Organic Law (which was the *thema decidendum* of the case and has general *erga omnes* effects) and, along with it, the Constitutional Chamber's reaffirmation that, in the case of national public interest contracts entered into with official foreign entities or foreign companies not domiciled in Venezuela, prior National Assembly authorization is "inescapable."[43]

### iv.   Decision No. 1460 of July 12, 2007 *(Attorney General of the Republic II)*

30.   ▮▮▮▮▮▮▮▮ erroneously asserts that in this decision the Constitutional Chamber "confirmed and reaffirmed the ruling in *Andrés Velásquez et al.* that a Public Debt transaction may qualify as a [national public interest contract] when executed 'by the Republic with [other] States, foreign official entities or commercial companies not domiciled in Venezuela'" (par. 103). In fact, as discussed in Paragraphs 10-12 above, the decision in the *Attorney General of the Republic II* case actually presumes that public debt contracts entered into by

---

[42]   Brewer-Carías, *New Considerations on the Legal Regime of State Contracts in Venezuela*, *supra* note 41 at 379.
[43]   Decision No. 2241, *supra* note 33 at 18.

decentralized entities of the National Public Administration are national public interest contracts.[44]

### v.   Decision No. 618 of July 20, 2016 (*Brigitte Acosta Isasis*)

31.   This decision, along with others issued after the opposition won control of the National Assembly in December 2015, is wholly illegitimate and not entitled to recognition or deference.  As I explain at length in my initial report, since the 2015 elections, the Constitutional Chamber has acted in collusion with the Maduro regime to consistently attempt to neutralize, undermine, and, in some instances, usurp the National Assembly's powers, especially in relation to its political and administrative control over the National Public Administration.[45] As I wrote in my initial report:

> "the Supreme Tribunal was acting not as a court of justice, but rather as an agent of the Maduro regime; in other words, as an agent of authoritarianism to neutralize the democratically elected National Assembly, which has been internationally recognized since January 2019 (including by the United States) as the only legitimate, democratically elected body of the Republic. The actions of the Supreme Tribunal can only be understood in light of its lack of independence and autonomy, which is the product of almost two decades of political subjugation."[46]

32.   Specifically, the decision of the Constitutional Chamber No. 618 in the *Brigitte Acosta Isasis* case was issued without any respect for due process rights. Indeed, the Constitutional Chamber did not even notify the National Assembly of the case and did not hear argument from any interested parties. The decision was issued, as highlighted by Professor Román José Duque Corredor, "in the framework

---

[44]   Professor Rafael Badell has also pointed out that in this case the Constitutional Chamber reiterated the discussion in *Andrés Velázquez et al.* on the nature and characteristics of public interest contracts and then declared that public credit operations carried out by BANDAGRO, an entity within the decentralized Public Administration, constituted contracts of national public interest. In this sense, the Constitutional Chamber recognized that the decentralized Public Administration can enter into contracts of public interest, in that case through public credit operations, and that "for the corresponding issuance of the administrative act, in support of the formation of the will of the organ of the active administration consultation with the Office of the Attorney General of the Republic is constitutionally required, in accordance with Article 247 of the Constitution and Article 11 of the Organic Law of the Office of the Attorney General of the Republic." *See* Rafael Badell Madrid, Speech at the III Academic Conference on Public Contracting: CONTRATOS DE INTERÉS PÚBLICO [Public Interest Contracts] (Jun. 29, 2018) (transcript available at www.badellgrau.com) at 6.

[45]   [Initial Report, Section VIII].

[46]   [Initial Report, par. 91] (Internal citations omitted).

CONFIDENTIAL

of a permanent *coup d'Etat* against the National Assembly" […] "with the sole purpose of obstructing the National Assembly's controls."[47]

33.   Even so, as set forth in the text of the illegitimate decision, the *thema decidendum* or "the central point of the request for constitutional interpretation filed" was "*none other than to clarify if the potential loan contract to be entered into by the Central Bank of Venezuela with the Fondo Latinoamericano de Reservas (FLAR) could be considered as a national public interest contract* and therefore subject to the authorization of the National Assembly and in need of the legal opinion of the Attorney General."[48]

34.   It was in the context of this specific request, and not in an abstract way, that the Constitutional Chamber ruled that the contract to be entered into by the Central Bank was not a national public interest contract requiring National Assembly authorization. In other words, this ruling was not an abstract "binding interpretation" of general effect under Article 335 of the Constitution regarding the concept of national public interest contracts.

35.   The Constitutional Chamber's entire ruling was that:

"the potential loan contract to be entered into by Central Bank of Venezuela with the Fondo Latinoamericano de Reservas (FLAR), is carried out in execution of an International Agreement signed and ratified by the Bolivarian Republic of Venezuela (Law of Approval of the Agreement for the establishment of the Fondo Latinoamericano de Reservas, published in the Official Gazette of the Republic of Venezuela No. 34172 of March 61989) and consequently, must not be considered as a public national interest contract, and therefore, is not subject to the authorization of the National Assembly, nor does it require of the opinion of the Republic's Attorney General's Office, as advisor organ of the National Executive, as expressly provided in article 247 of the Constitution."[49]

36.   Contrary to what is stated in ▮▮▮▮▮▮▮▮, the decision contains no determination that "the financing agreement at issue was not a contract of national

---

[47]   *See* DUQUE CORREDOR, OPINION ON THE UNCONSTITUTIONALITY OF THE 2020 PDVSA NOTES, *supra* note 38 at 4.

[48]   Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 618 Brigitte Acosta Isasis, Jul. 20, 2016 (Venez.) (hereinafter Supreme Tribunal of Justice Decision No. 618) (produced as Tab 26 to the First Report) at 18.

[49]   *Id*. at 33.

interest because the Republic was not a party" (par. 104). Indeed, had such a determination been the basis of the ruling, it would have been a very simple matter.[50] But instead of simply ruling that the contract was not a national public interest contract because the Republic was not a party, the Constitutional Chamber spends numerous pages in its decision analyzing the "unique nature" and functions of the Central Bank and its relations to the different powers and branches of government, concluding (among other things) that it is:

> "a legal person of Public Law, of constitutional rank, endowed with autonomy for the exercise of the policies of its competence, which is not part of either the Central Administration or the functionally decentralized Administration, but, according to the provisions of the Constitution of the Bolivarian Republic of Venezuela that regulate it and that have been developed by the Special Law that governs it, is part of the so-called Administration with functional autonomy, which constitutes an element essential for the fulfillment of the purposes assigned by law; therefore, it requires a special arrangement and organization, proper and different from the common one applicable to other public or private entities."[51]

37.   It was "[b]ased on these factual and legal arguments" regarding the "unique nature" of the Central Bank, including that it is not part of either the centralized or the decentralized Public Administration, that the Constitutional Chamber ruled as it did on the "central point of the request for constitutional interpretation."[52] Thus, the decision does even not touch on the question of whether contracts entered into by entities such as PDSVA and PDVSA Petróleo, which are indisputably part of the decentralized Public Administration, can qualify as national public interest contracts. As Professor Román José Duque Corredor has argued, the Constitutional Chamber's statement that "the Public Administration is the one that can enter into contracts of national public interest" was made "with the purpose of pointing out that the Central Bank of Venezuela is not the National Public Administration, and thus, it is not subjected to the mentioned article 150." That is why, in the words of Professor Duque Corredor, it is possible to deduce from this decision that:

---

[50]   This is why, when discussing the *Brigitte Acosta Isasis* decision, Professor Rafael Badell Madrid referred to the criteria discussed in *Andrés Velázquez* that could "seem to exclude decentralized public administration from entering into public interest contracts" as "overruled criteria." *See* Badell Madrid, PUBLIC INTEREST CONTRACTS, *supra* note 44 at 7.

[51]   Supreme Tribunal of Justice Decision No. 618 *supra* note 48 at 29-30.

[52]   *Id*. at 18.

"entities that are part of the Administration with functional autonomy, are exempt of the requirement of authorization or approval of public interest contracts; and that, on the contrary, the legal persons with public law or private law form created by the holders of the organizational power of Central Administration are not [exempted], because such persons are part of the National Decentralized Public Administration, of which the commercial companies of the State are part."[53]

38.  I criticized this decision in my above-referenced 2017 article, pointing out that it was issued as part of a "judicial activism restrictive of the functions of the National Assembly" and with the specific purpose of "securing the exclusion of parliamentary control on specific loan contracts to be entered into by the Central Bank."[54] Given this purpose, it was convenient for the government to reduce the scope of national public interest contracts to only those entered into by the territorial public law entities, excluding contracts entered into by entities like the Central Bank of Venezuela, which "continues to be contrary to what is established in the Constitution."[55] Thus, as I wrote in my 2017 article, the Constitutional Chamber purported to "void of content" the concept of national public interest contracts,[56] completely distorting a concept "so fundamental and important to administrative law."[57]

39.  Fortunately for the principles of administrative law in Venezuela, this decision did not establish any "binding interpretation" under Article 335 of the Constitution, and thus the ruling applies only to *the specific loan agreement entered*

---

[53]  See DUQUE CORREDOR, OPINION ON THE UNCONSTITUTIONALITY OF THE 2020 PDVSA NOTES, *supra* note 38 at 4.

[54]  Brewer-Carías, *The Mutation of the Notion of Contracts of National Public Interest*, *supra* note 41 at 383. That is why, on April 28, 2020, the National Assembly issued a resolution "ratifying that none of the decisions issued by the Constitutional Chamber of the Supreme Court of Justice since December 23, 2015 can be considered a valid and effective ruling, much less binding in the terms of article 335 of the Constitution, as they are the result of the illegitimate composition of the Supreme Tribunal of Justice and, furthermore, are part of the political decisions aimed at dismantling the constitutional order in Venezuela" (First Article). This resolution was based in part on the fact that in those decisions "the Supreme Tribunal has contributed to disown the powers of the National Assembly" (Recital 4). *See* Asamblea Nacional, *Acuerdo de rechazo a la decisión de la ilegítima sala constitucional número 59 de 22 de Abril de 2020 Y de ratificación de la usurpación de la procuraduría General de la república por Reinaldo Muñoz Pedroza* [*Resolution rejecting the decision of the illegitimate Constitutional Chamber No. 59 of APRIL 22, 2020 and of ratification of the usurpation of the Office of the Attorney General of the Republic by Reinaldo Muñoz Pedroza*] (Apr. 28, 2020) (Venez.) (hereinafter Resolution dated April 28, 2020).

[55]  Brewer-Carías, *The Mutation of the Notion of Contracts of National Public Interest*, *supra* note 41 at 383.

[56]  *Id*. at 388.

[57]  *Id*. at 389.

*into by the Central Bank of Venezuela and the Fondo Latinoamericano de Reservas*. From a ruling so specific and limited in scope, even were it legitimate, it is impossible and erroneous to conclude that the Constitutional Chamber established any general interpretation, much less any "binding interpretation," regarding any matter.

### C.   No Decision Has Established a Generally Applicable Interpretation of Binding Character with Respect to the Concept of National Public Interest Contracts

40. ██████████████ erroneously asserts that "the Constitutional Chamber has established rules and criteria for determining whether an agreement is a Contract of National Interest[,] [and] [u]nder Venezuelan law, the Constitutional Chamber's rulings are final and *binding*" (par. 54). Contrary to ████████████ claim, the Constitutional Chamber of the Supreme Tribunal has *not* established any "final and binding" rules or criteria for determining whether an agreement is a national public interest contract. The Constitutional Chamber decisions cited in ██████████ that touch on the subject of national public interest contracts (No. 2241 of September 24, 2002 (Case: *Andrés Velásquez et al.*); No. 1460 of July 12, 2007 (Case: *Attorney General of the Republic II*); and No. 618 of July 20, 2016 (Case: *Brigitte Acosta Isasis*)),[58] *were not issued* as "binding interpretations" of the content or scope of any constitutional principle or provision pursuant to Article 335 of the Venezuelan Constitution. Thus, these decisions have no *binding* character under Venezuelan law with respect to the concept of national public interest contracts.

41.   In Venezuela, as in other countries that follow the Roman Law system, the doctrine of *stare decisis*, which "is peculiar to the common law systems of law and alien to the Roman law systems,"[59] has no general application. As explained by Professors M. Cappelletti and J.C. Adams:

> "Under the Anglo-American doctrine of *stare decisis*, a decision by the highest court in any jurisdiction is binding on all lower courts in the same jurisdiction, and thus as soon as the court has declared a law unconstitutional, no other court can apply it . . . *stare decisis*, however, is not normally part of

---

[58]   Supreme Tribunal of Justice Decision No. 2241, *supra* note 33; Supreme Tribunal of Justice Decision No. 1460, *supra* note 10; and Supreme Tribunal of Justice Decision No. 618, *supra* note 48.

[59]   As I expressed in 1989 in my book: ALLAN R. BREWER-CARÍAS, JUDICIAL REVIEW IN COMPARATIVE LAW 198 (Editorial Jurídica Venezolana ed., 2014).

the Roman law systems, and thus in these systems, the courts are not generally bound even by the decisions of the highest court."[60]

42.   Professor Cappelletti later developed the argument in his book *Judicial Review in the contemporary world*, when he wrote:

"Since the principle of *stare decisis* is foreign to civil law judges, a system which allowed each judge to decide on the constitutionality of statues could result in a law being disregarded as unconstitutional by some judges, while being held constitutional and applied by others. Furthermore, the same judicial organ, which had one day disregarded a given law, might uphold it the next day, having changed its mind about the law's constitutional legitimacy."[61]

43.   Therefore, as I argued many years ago in my book *Judicial Review in Comparative Law* (1989), in the:

"Venezuelan procedural system, the *stare decisis* doctrine has no application at all, the judges being sovereign in their decisions, only submitted to the constitution and the law. Therefore, decisions regarding the inapplicability of a law considered unconstitutional in a specific case do not have binding effects, neither regarding the same judge who may change his legal opinion in other cases, nor regarding other judges or courts."[62]

44.   The exception is when the Constitutional Chamber annuls a legislative act of general *erga omnes* effect, in which case the decision is universally binding. Except in such cases, Supreme Tribunal decisions (including those issued by the Constitutional Chamber) are not a source of law, and, unless a Constitutional Chamber interpretation of a constitutional rule or principle is explicitly declared as having binding character according to Article 335 of the Venezuelan Constitution, decisions of the Supreme Tribunal carry no more weight than the interpretations of legal scholars and other branches of government.

45.   Article 335 of the Constitution provides that the Supreme Tribunal, through all of its Chambers, "shall be the supreme and ultimate interpreter of the Constitution and shall see to the uniform interpretation and application of the same."

---

[60]   *See Id.* (quoting Mauro Cappelletti and J.C. Adams, *Judicial Review of Legislation: European Antecedents and Adaptations*, 79 HARVARD LAW REVIEW 1207, 1215 (1966)).

[61]   *See Id.* (quoting MAURO CAPPELLETTI, JUDICIAL REVIEW IN THE CONTEMPORARY WORLD 58 (1971)).

[62]   *See Id.* at 374.

CONFIDENTIAL

In addition, the same provision adds that the Constitutional Chamber can establish interpretations regarding the content and scope of constitutional rules or principles with binding character, for which purpose the Constitutional Chamber has developed at least two very important procedural rules for identifying which of its interpretations are intended to be binding pursuant to Article 355 of the Constitution: (i) that the binding character of the interpretation is expressly indicated in the text of the decision (known as the "rule of explicitness"); and (ii) that the decision includes an order for its publication in the *Official Gazette* of the Republic (known as the "rule of publication").[63]

46.  Thus, the Constitutional Chamber engages in two distinct types of constitutional interpretation — (1) "binding interpretation" pursuant to Article 335 of the Constitution (referred to as *jurisdatio*), and (2) non-binding interpretation that applies only to the particular facts at issue in the particular case before the court (referred to as *jurisdictio*).[64]

---

[63]  Ruben J. Laguna N. describes these two rules as "complementary conditions," writing that "to be binding, in addition, [the Constitutional Chamber decisions] must fulfill certain complementary conditions: 1. That the binding character of the decision be expressly signaled;" and "2. The need for the decision to be published in the *Official Gazette*." Francis Marval, *La jurisprudencia vinculante de la Sala Constitucional y el principio iura novit curia* [*The binding jurisprudence of the Constitutional Chamber and the iura novit curia principle*], *in* 1 MAGISTRA 179, 183 (2008) (citing Ruben J. Laguna Navas, LA SALA CONSTITUCIONAL DEL TRIBUNAL SUPREMO DE JUSTICIA: SU ROL COMO MÁXIMA Y ÚLTIMA INTÉRPRETE DE LA CONSTITUCIÓN [THE CONSTITUTIONAL CHAMBER OF THE SUPREME COURT OF JUSTICE: ITS ROLE AS THE MAXIMUM AND LAST INTERPRETER OF THE CONSTITUTION] 233 (Universidad Central de Venezuela ed., 2005)).  Professor Jesús María Casal has also explained that when a binding interpretation is established pursuant to Article 335 of the Constitution, "the Constitutional Chamber has expressly established the binding nature of the *ratio decidendi*, and has ordered the publication of the corresponding sentence in the *Official Gazette*."  Jesús M. Casal Hernández, *Cosa juzgada y efecto vinculante en la justicia constitucional* [*Res Judicata and binding effect on constitutional justice*], *in* 8 REVISTA DE VENEZOLANA DERECHO CONSTITUCIONAL 193, 215 (2003). Likewise, I have explained that when the Constitutional Chamber issues a binding interpretation, this must be "expressly pointed out." *See* Allan R. Brewer-Carías, *Los efectos de las sentencias constitucionales en Venezuela* [*The effects of constitutional sentences in Venezuela*], *in* 22 ANUARIO INTERNACIONAL SOBRE JUSTICIA CONSTITUCIONAL 19, 64 (2008).

[64]  *See e.g.* Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 276 Gerardo Sanchez Chacón, Apr. 24, 2014 (Venez.) (hereinafter Supreme Tribunal of Justice Decision No. 276) at 7. [The Constitution] sets forth two sorts of constitutional interpretations, that is, the individualized interpretation that is contained in the ruling as individualized norm [*jurisdictio*], and the general or  bstract interpretation established in article 335, which is a true *jurisdatio*, in the sense that it declares *erga omnes* and *pro futuro* (*ex nunc*), the content and scope of the constitutional principles and norms whose interpretation is requested through the corresponding extraordinary action. The difference between both sorts of interpretation is patent and produces decisive juridical consequences in the exercise of the constitutional jurisdiction by this Chamber […] [T]he efficacy of an individualized norm is limited to the case decided, while the general norm produced by the abstract interpretation has

47. From its creation in 2000, the Constitutional Chamber has been conscious of the two sorts of constitutional interpretation.[65] That is why the Constitutional Chamber has been emphatic in affirming over and over again since 2001 that "it is clear that in our legal order, except the doctrine of constitutional interpretation established by this Chamber, *the jurisprudence is not a direct source of law*."[66]

48. In one of its first decisions interpreting the 1999 Constitution, the Constitutional Chamber explained that:

> "when ruling on a recourse for interpretation of the Constitution, this Chamber will specify, if applicable, *the core of the constitutional precepts*, values or principles, in response to reasonable doubts regarding its meaning and scope, originating in an alleged antinomy or obscurity in the terms whose intelligence is pertinent to clarify in order to satisfy the need for legal certainty. It consists primarily of a *mere statement, with binding effects, on the minimum core of the norm studied, its purpose or extension*, which would affect the features or properties that are predicated of the terms that form the precept and the set of objects or dimensions of reality covered by it, when they are doubtful or obscure."[67]

---

*erga omnes* value and constitutes a real *jurisdatio*… which expresses the declared constitutional content of the fundamental text.

[65] *See e.g.*, Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1347 [On the scope of the recourse of constitutional interpretation ] Nov. 11, 2000 (Venez.) *in* 84 REVISTA DE DERECHO PÚBLICO 269 (Editorial Jurídica Venezolana ed., 2000) in which the Chamber explained that: "The statements that, without referring to the central nucleus of the debate object of the decision, affect a collateral issue relevant to it, normally linked to the legal reasoning outlined to settle the solution to the case, *will not logically be binding*, nor in this nor in any other sense."

[66] *See* Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 31 Alejandro Humberto Sosa vs. Decisión Sala de Casación Civil del Tribunal Supremo de Justicia [Alejandro Humberto Sosa vs. Decision of the Civil Cassation Chamber of the Supreme Court of Justice] Jan. 30, 2009, *in* 117 REVISTA DE DERECHO PÚBLICO. 135 (Editorial Jurídica Venezolana ed., 2009) (citing Supreme Tribunal Decision No. 856 of June 1, 2001).

[67] *See* Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1415, Nov. 22, 2000 (Venez.) at 7; *see also* Allan R. Brewer-Carías, *La potestad la Jurisdicción Constitucional de interpretar la Constitución con efectos vinculantes* [*The power of Constitutional Jurisdiction to interpret the Constitution with binding effects*], *in* EL PRECEDENTE CONSTITUCIONAL VINACULANTE EN EL PERÚ (ANÁLISIS, COMENTARIOS Y DOCTRINA COMPRADA) 10 (ADRUS Editorial ed., 2009) (produced as Tab 74 to the First Report); Ramón Escovar León, *Límites a la interpretación constitucional* [*Limits of Constitutional Interpretation*], *in* 157-158 REVISTA DE DERECHO PÚBLICO 48, 55, 60 (Editorial Jurídica Venezolana ed., 2019); Hernando Diaz Candia, *El principio Stare Decisis y el concepto de precedente vinculante a efectos del artículo 335 de la Constitución de la República Bolivariana de Venezuela de 1999* [*The principal of Stare Decisis and*

49.  In its decision No. 276 of April 24, 2014, the Constitutional Chamber recognized that, based on these principles:

> "The Constitutional Chamber has been always very careful in not usurping with its interpretation, attributions of the other Chambers (for instance, the recourse of interpretation of legal text); and to avoid that this action is intended to substitute pre-existing procedural resources; or an attempt is made to surreptitiously obtain quasi-jurisdictional results that go beyond the clarifying purpose of this type of action, that is, that what is proposed rather seeks to resolve a specific conflict between individuals or between these and public bodies, or between the latter among themselves; or that there is a veiled intention to obtain a prior opinion on the unconstitutionality of a law."[68]

50.  The "rule of explicitness" has been followed by the Constitutional Chamber from the outset of its interpretation of the 1999 Constitution. Whenever the Constitutional Chamber has adopted or established a binding interpretation of the content or scope of a constitutional principle or provision, it has *explicitly declared the binding character of the interpretation in the text of the decision*. Consequently, an interpretation can be considered binding *only when* the decision itself explicitly establishes its binding character.[69]

---

the concept of binding precedent for the purposes of Article 335 of the Constitution of the Bolivarian Republic of Venezuela]," *in* 8 REVISTA DE DERECHO CONSTITUCIONAL 219, 228 (Sherwood ed., 2003).

[68]  Supreme Tribunal of Justice Decision No. 276, *supra* note 64 at 9.

[69]  The following cases are illustrative: Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1 Emery Mata Millán vs. varios [Emery Mata Millán vs. various], Jan. 20, 2000 (Venez.) *in* 81 REVISTA DE DERECHO PÚBLICO 229-230 (Editorial Jurídica Venezolana ed., 2000)(explicitly establishing the binding character of an interpretation regarding procedural rules for amparo proceedings); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 2, Domingo G. Ramírez M vs. Varios [Domingo G. Ramírez M vs. Varioius], Jan. 20, 2000 (Venez.) *in* 81 REVISTA DE DERECHO PÚBLICO 238 (Editorial Jurídica Venezolana ed., 2000) (explicitly establishing the binding character of an interpretation regarding jurisdictional rules for amparo proceedings against High Officials); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1555, Yoslena Chanchamire B. v. Instituto Universitario Politécnico Santiago Mariño [Yoslena Chanchamire B. vs. Santiago Mariño Poly-technical University Institute], Dec. 8, 2000 (Venez.) *in* 84 REVISTA DE DERECHO PÚBLICO 304, 310 (Editorial Jurídica Venezolana ed., 2000) (explicitly establishing the binding character of an interpretation regarding rules of judicial procedure and jurisdiction for amparo proceedings); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1013 Elías Santana y Asociación Civil Queremos Elegir vs. Presidente de la República e Instituto Autónomo Radio Nacional de Venezuela [Elias Santana and Queremos Elegir Civil Association vs. President of the Republic and Autonomous Institute National Radio of Venezuela], Jun. 12, 2001 (Venez.) *in* 85-88 REVISTA DE DERECHO PÚBLICO 117 (Editorial Jurídica Venezolana ed., 2001) (explicitly establishing the binding doctrine of an interpretation regarding Articles 57 and 58 of the Constitution); Tribunal Supremo de Justicia Sala Constitucional

51.   Regarding the "rule of publicity," the Constitutional Chamber requires publication of its decisions with binding interpretations in the *Official Gazette* of the Republic, ordering such publication in the text of the decision itself.[70]

---

[TSJ] [Supreme Tribunal of Justice] No. 833, Instituto Autónomo Policía Municipal de Chacao vs. Corte Primera de lo Contencioso Administrativo [Autonomous Institute of Municipal Police of Chacao vs. First Court of Administrative Litigation] Mar. 5, 2001, (Venez.) *in* 85-88 REVISTA DE DERECHO PÚBLICO 369 (Editorial Jurídica Venezolana ed., 2001) (explicitly establishing the binding character of an interpretation of Article 334 of the Constitution regarding the two methods of judicial review that exist in Venezuela—the concentrated judicial review method attributed to the Constitutional Chamber and the diffuse judicial review powers attributed to all courts); Allan R. Brewer-Carías, *Judicial Review in Venezuela*, 45 DUQUESNE LAW REVIEW 5-6 (2007) (on the two methods of judicial review in Venezuela); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 2353, Impugnación de la Ordenanza de Impuestos sobre Juegos y Apuestas del Municipio Iribarren del Estado Lara [Challenging of the Tax Ordinance on Games and Betting of the Iribarren Municipality of the State of Lara], Nov. 23, 2001 (Venez.) in 85-88 REVISTA DE DERECHO PÚBLICO 374, 387 (Editorial Jurídica Venezolana ed., 2001) (explicitly establishing the binding effect for all courts of an interpretation regarding Constitutional Jurisdiction and Contentious Administrative Jurisdiction with respect to matter of judicial review); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 488, Parque Turístico Desarrollos Río Chico, C.A. vs. Guardia Nacional [Tourist Park Desarrollos Rio Chico, C.A. vs. National Guard], Apr. 6, 2001 (Venez.) *in* 85-88 REVISTA DE DERECHO PÚBLICO 470, 472 (Editorial Jurídica Venezolana ed., 2001) (explicitly establishing the binding character of an interpretation regarding appellate rules for amparo proceedings); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 332, INSACA vs. Ministerio de Sanidad y Asistencia Social (Director de Drogas y Cosméticos) [INSACA vs. Ministry of Health and Social Welfare (Director of Drugs and Cosmetics)], Mar. 14, 2001 *in* 85-88 REVISTA DE DERECHO PÚBLICO 483, 492 (Editorial Jurídica Venezolana ed., 2001) (explicitly establishing the binding character of an interpretation of Article 28 of the Constitution in order for the Chamber to assume the exclusive power to decide matters relating to habeas data actions); and Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1126 Solicitud de revisión constitucional de la sentencia Nº 303 dictada, el 12 de julio de 2011, por la Sala de Casación Civil (Iberia, Líneas Aé-reas de España, S.A.) [Request for constitutional review of judgment No. 303 issued, on July 12 of 2011, by the Civil Appellate Chamber (Iberia, Lineas Aereas de España, S.A.)], Aug. 3, 2012 *in* 131 REVISTA DE DERECHO PÚBLICO 203 (Editorial Jurídica Venezolana ed., 2012) (expressly stating that it interpreted with binding character the scope of civil extra-contractual liability of Airlines).

[70]   Examples of the Constitutional Chamber ordering binding interpretations to be published include: Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1318 Nicolás J. Alcalá R., Aug. 2, 2001 *in* 85-88 REVISTA DE DERECHO PÚBLICO 265 (Editorial Jurídica Venezolana ed., 2001) (ordering that "the Labor Courts, when they hear from now on situations such as the one raised in this case, must abide by the doctrine contained in this ruling for the effective administration of justice, therefore, *this ruling will have ex tunc effects as of its publication, since the interpretations established by the Constitutional Chamber on the content or scope of the constitutional norms and principles are binding* for the other Chambers of the Supreme Court of Justice and other courts of the Republic"); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 2817, Impugnación de varias disposiciones de la Ley Orgánica del Poder Electoral [Challenging of various provisions of the Organic Law of the Electoral Authority], Nov. 18, 2002 *in* 89-92 REVISTA DE DERECHO PÚBLICO 174, 175 (Editorial Jurídica Venezolana ed., 2002) (stating that

the Constitutional Chamber "interpreted, with binding character the application of article 214 of the Constitution, so that order is given for the publication of this decision in the Official Gazette of the Republic"); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1573 Carbonell Thielsen, C.A. v. Revision de Sentencia de la Sala de Casacion Civil del Tribunal Supremo de Justicia [Carbonell Thielsen, C.A. vs. Revision of Judgement of the Civil Appellate Court of the Supreme Court of Justice], July 12, 2005 *in* 103 REVISTA DE DERECHO PÚBLICO 109, 114 (Editorial Jurídica Venezolana ed., 2005) (establishing a binding interpretation regarding the quantum for filing cassation appeals (*recurso de casación*) and ordering *publication of the ruling in the Official Gazette of the Republic due to the binding character of the ruling for all Venezuelan* courts); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1682 Interpretación del artículo 77 de la Constitución [Interpretation of Article 77 of the Constitution], July 2005 *in* 103 REVISTA DE DERECHO PÚBLICO 124 (Editorial Jurídica Venezolana ed., 2005) (interpreting Article 77 of the Constitution on matters relating to marriage and stating that "*due to its binding character, according to article 335 of the Constitution, [the Chamber] orders the publication of this ruling in the Official Gazette of the Republic*"); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1379 Gerardo Gil Peña y otro [Gerardo Gil Peña and another], Oct. 29, 2009 *in* 120 REVISTA DE DERECHO PÚBLICO 107-108 (Editorial Jurídica Venezolana ed., 2009) (deciding not to apply Article 177 of the Organic Law on Labor Procedure, explicitly declaring that the interpretation is *binding on all Venezuelan courts,* and *ordering the publication of the ruling in the Official Gazette of the Republic*); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 650, Irwin Oscar Fernández Arrieche (Revisión de sentencia), [Irwin Oscar Fernandez Arrieche (Revision of Judgment)], May 23, 2012 in 130 REVISTA DE DERECHO PÚBLICO 475, 485 (Editorial Jurídica Venezolana ed., 2012) (interpreting the Constitution with respect to the applicability of Article 104 of the Labor Organic Law, explicitly declaring the *binding character* of the interpretation*,* and *ordering the publication of the ruling in the Official Gazette of the* Republic); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1005, Ninfa Denis Gavidia vs. Juzgado Superior en lo Civil, Mercantil, del Tránsito y de Protección de Niños, Niñas y Adolescentes de la Circunscripción Judicial del Estado Bolivariano de Miranda [Ninfa Denis Gavidia vs. Higher Court for Civil, Commercial, Transportation Matters and Protection of Children and Adolescents of the Judicial District of the Bolivarian State of Miranda], July 26, 2013 *in* 135 REVISTA DE DERECHO PÚBLICO 89, 90 (Editorial Jurídica Venezolana ed., 2013) (interpreting the term to issue judicial decisions, explicitly declaring the binding character of the interpretation for all Venezuelan courts, and ordering the publication of the ruling in the Official Gazette of the Republic); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1063 Alcaldía Del Municipio Autónomo Acevedo Del Estado Miranda [City Council of the Autonomous Municipality of Acevedo of the State of Miranda], Aug. 5, 2014 *in* 139 REVISTA DE DERECHO PÚBLICO 86, 88 (Editorial Jurídica Venezolana ed.,2014) (explicitly establishing binding criteria for all Venezuelan courts regarding access to justice in labor judicial procedures according to Articles 26 and 257 of the Constitution and *ordering the publication of the ruling in the Official Gazette of the Republic*); Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 97 Pedro Alba Linares vs. actuaciones realizadas por el Tribunal Superior Segundo del Circuito Judicial de Protección de Niños, Niñas y Adolescentes de la Circunscripción Judicial del Área Metropolitana de Caracas y Nacional de Adopción Internacional [Pedro Alba Linares vs. actions carried out by the Second High Court of the Judicial Circuit for the Protection of Children and Adolescents of the Judicial District of the Metropolitan Area of Caracas and National for International Adoption.], May 14, 2019 *in* 157-158 REVISTA DE DERECHO PÚBLICO 323, 325 (Editorial Jurídica Venezolana ed., 2019) (interpreting Article 76 of the Constitution, explicitly establishing the *binding character of the interpretation,* with *ex tunc* and *ex nunc* effects, and *ordering the publication of the ruling in the Official Gazette of the Republic*).

52.   Likewise, even within a decision in which the Constitutional Chamber issues a binding interpretation, the binding interpretation is limited to the *thema decidendum* of the decision and not "to the *dictum* that refers to marginal, peripheral, circumstantial or superabundant motivations, which *are not binding with erga omnes effects*, since the latter are only persuasive."[71]

53.   According to these rules, and contrary to ▮▮▮▮▮▮▮ baseless assertions, it is readily apparent that none of the judicial decisions referenced in ▮ ▮▮▮▮▮▮ — most notably, the Constitutional Chamber decisions No. 2241 of September 20, 2002 (Case: *Andrés Velazquez et al.*), No. 1406 of July 12, 2007 (Case: *Attorney General of the Republic*), and No. 618 of July 20, 2016 (Case: *Brigitte Acosta Isasis*) — contain any "binding interpretation" of any constitutional principle or provision relating to national public interest contracts, let alone any requirement that, to qualify as a national public interest contract, a contract must be entered into by the Republic itself.

54.   There is no mention in these decisions of any such interpretation having "binding character," and none of these decisions contains an order for its publication in the *Official Gazette* on account of any "binding interpretation" of a constitutional principle or provision.[72] Given the lack of any such "binding interpretation" in these decisions, it follows that there are no necessary or required "elements" of a national public interest contract like the ones erroneously "quoted" in ▮▮▮▮▮▮▮ (par. 88, 130), as discussed more fully below.

### D.   *Andrés Velazquez et al.* Did Not Establish Any "Additional Required Criteria" for National Public Interest Contracts

55.   ▮▮▮▮▮▮▮ asserts that the Indenture and the Pledge also fail to satisfy at least two "additional required criteria" for national public interest contracts supposedly established by the Constitutional Chamber in *Andres Velazquez, et al.*;

---

[71]   *See* Escovar León, *Limits of constitutional interpretation*, *supra* note 67 at 48; *see also* Diaz Candia, *The principal of Stare Decisis and the concept of binding precedent*, *supra* note 67 at 220-221, 227-229 ("the binding interpretation established by the Constitutional Chamber can only refer to the legal principles derived from the main *thema decidemdum*," and cannot refer "to simple assertions made by the Chamber or incidental questions, even referring to the content or scope of constitutional norms and principles").

[72]   Decision No. 2241 of September 24, 2002 ordered its publication in the *Official Gazette*, but not because it contained any "binding" constitutional interpretation. Rather, by mandate of Articles 119 and 120 of the then in-force Organic Law of the Supreme Court of Justice, all decisions annulling statutory provisions of statutes had to be published in the *Official Gazette* due to their general effects. Supreme Tribunal of Justice Decision No. 2241, *supra* note 33 at 19. This mandate now resides in Article 32 of the Supreme Tribunal Organic Law currently in force. Organic Law of the Supreme Court of Justice, art. 32, *Gaceta Oficial No. 39.522* (Oct. 1, 2010)

CONFIDENTIAL

specifically, (i) that "the contract must satisfy the interest of the national community" and (ii) that "the contract must imply the assumption of obligations payable by the Republic—against the National Treasury—during several fiscal years after the one in which the contract was concluded and, therefore, commit amounts of money and fiscal resources from Venezuela's future budgets."

56.   There are, however, no such "required criteria" because, as discussed above, the Constitutional Chamber has not established any generally applicable, binding interpretations under Article 335 of the Constitution regarding the concept of national public interest contracts.  As also set forth above, in two cases decided after *Andres Velazquez, et al.* (*EDELCA* and *Attorney General of the Republic II*), the Constitutional Chamber expressly recognized that the contracts at issue were national public interest contracts *even though they were not entered into by the Republic*,[73] from which it follows that the assumption of obligations by the Republic payable from the National Treasury or the satisfaction of the interest of the national community are also not "requirements" as ▮▮▮▮▮▮▮ claims. Indeed, the contracts at issue in the *Attorney General of the Republic II* case – unsecured promissory notes issued by a public corporation in the banking-agricultural industry – could not have implicated the national interest more than the issuance of the 2020 Notes by Venezuela's state-owned oil company with a purported pledge of a controlling interest in CITGO, one of the most vital assets of the country's most vital industry.

57.   It also bears noting that the *Andres Velazquez, et al.* decision says nothing about the assumption of obligations over several fiscal years "by the Republic," payable "against [funds in] the National Treasury," and committing financial resources from "Venezuela's future budgets," as stated in ▮▮▮▮▮▮ (par. 88). Rather, the decision simply refers to contracts that "imply the assumption of obligations whose total or partial payment is stipulated over the course of several fiscal years subsequent to the one in which the object of the contract was caused." The 2020 Notes, which were issued in 2016 with a maturity date in 2020, certainly implied the assumption of obligations over the course of several fiscal years.

---

[73]   As Professor Rafael Badell has pointed out, "from the judgments of the *EDELCA* case and the *BANDAGRO* case, it appears that the decentralized public administration entities can enter into administrative contracts and may even enter into public interest contracts in the event that the contracting commits interests of the Republic, states or municipalities, such as political-territorial entities." *See* BADELL MADRID, PUBLIC INTEREST CONTRACTS, *supra* note 44 at 6.

CONFIDENTIAL

### E. Plaintiffs' Allegations Are Not "At Odds" with Any "Official Interpretations" of the National Assembly or the Attorney General

58.  According to ▮▮▮▮▮▮▮, "Plaintiffs' allegations that the Governing Documents are Contracts of National Interest are also at odds with "official interpretations" of the term Contracts of National Interest by the National Assembly and the Venezuelan Attorney General prior to the execution of the agreements" (▮▮▮▮▮, par. 122 ff). This is simply wrong. Neither the National Assembly nor the Office of the Attorney General has interpreted, never mind "officially interpreted," the concept of national public interest contracts to require that the Republic itself be a party.

#### i.   The National Assembly Categorically Rejected the Pledge and Has Explicitly Declared that the Indenture is a National Public Interest Contract That Required Prior National Assembly Authorization

59.  As set out in my initial report, the National Assembly has issued at least three recent resolutions pertaining to national public interest contracts generally, and on two occasions, both before and after the 2020 Notes were issued, specifically as to the Indenture and the Pledge.[74]

60.  The first National Assembly resolution relevant to this matter was adopted on May 26, 2016 (before the announcement of the exchange offer).[75] The resolution was passed in reaction to Maduro's campaign following the 2015 parliamentary elections to further curtail the National Assembly's constitutional powers to legislate and to control the activities of the government and the Public Administration. In it, the National Assembly defined national public interest contracts to include "those related to *large contracts (grandes contrataciones) that could seriously compromise the assets of the Republic or expose it to serious losses or international claims eventually injurious to the sovereignty and integrity of the*

---

[74]  That is why Professor Rafael Badell has said that: "one more argument to recognize that the decentralized public administration can enter into administrative contracts that are considered as contracts of public interest, are the declarations of contracts of public interest of the National Assembly regarding contracts made by a state company (in this case, PDVSA)." *See Id.* at 7-8.

[75]  *See* Asamblea Nacional, *Acuerdo sobre el respeto de las facultades propias e intransferibles de la Asamblea nacional sobre los contratos de interés público que suscriba el Ejecutivo Nacional con Estados o entidades oficiales extranjeras o con sociedades no domiciliadas en Venezuela* [*Resolution regarding the respect of its own and untransferable attributions regarding public interest contracts entered into by the National Executive with States or Official foreign entities or companies not domiciled in Venezuela*], (May 26, 2016) (Venez.) (hereinafter *May 2016 Resolution*) (produced as Tab 11 to the First Report).

*country, as well as the contracts that, due to their purpose, deserve such qualification.*"[76]

61.    Based on this interpretation, the National Assembly declared in the resolution that it rejected what was established in article 2.5 of [Maduro's] Decree No. 2323 of May 13, 2016, that declared a State of Exception and Economic Emergency, purporting in an unconstitutional way to allow the National Executive to enter into public interest contracts without National Assembly approval.[77]

62.    ██████████████   characterizes   the   May   2016   Resolution   as "confirm(ing) that contracts of national interest must be entered into by the Republic" (par. 123). When read in context, however, it is clear that this Resolution confirms nothing of the sort.

63.    As stated previously, the May 2016 Resolution was adopted in reaction to a specific provision of Decree No. 2323 of May 13, 2016, whereby Maduro declared a state of exception and economic emergency and "authorized" himself (unconstitutionally) to "approve and enter into public interest contracts … without being subject to authorizations or approvals from the other branches of government."[78] Recognizing that "the state of exception never could mean to suspend the rule of law, nor interrupt the functioning of the organs of the public power or the exercise of its control functions," the National Assembly rejected the decree's purported attempt to authorize the National Executive itself to enter into public interest contracts without National Assembly authorization.[79] The National Assembly further resolved to "remember that any national, state and municipal public interest contracts entered into by the National Executive with States, official foreign entities and companies not domiciled in Venezuela without the approval from the National Assembly, will be absolutely null."[80]

64.    The National Assembly further declared that:

---

[76]   *Id.* at 2.
[77]   *Id.*
[78]   *Id*.
[79]   *Id.*
[80]   *Id.* at 3.  In the same regard, Professor Román José Duque Corredor has opined that "the contracts on the 2020 Notes issuance and the Pledge of 50.1% on Citgo, being national public interest contracts entered into without authorization of the National Assembly, are *null and void according to Venezuelan Constitutional Law.*" *See.* DUQUE CORREDOR, OPINION ON THE UNCONSTITUTIONALITY OF THE 2020 PDVSA NOTES, *supra* note 38 at 2.

"any activity carried out by *an organ* that usurps the constitutional functions of another public authority is null and void and shall be considered non-existent and those who issue or sign the respective acts will be liable under the law."[81]

65.   This language clearly does not confine itself to the notion that only the Republic itself (i.e. Maduro) could enter into such contracts. It is impossible to deduce from this Resolution any "official interpretation" of the National Assembly supposedly "confirming" that national public interest contracts "must be entered into by the Republic." There is no reference anywhere in the Resolution to contracts entered into "by the Republic," and the reference to contracts entered into "by the National Executive" was meant in the widest possible sense, relating not only to "national" public interest contracts but to all "national, state, or municipal public interest contracts entered into by the National Executive with States, foreign entities and corporations non domiciled in Venezuela."[82] As explained in my initial report, all such public interest contracts—national, state, and municipal—including all such contracts entered into by public corporations and state-owned enterprises, must be presented for National Assembly authorization by the appropriate organ of the National Executive, even if the Republic itself is not party.

66.   The National Assembly's resolution of September 27, 2016, which was issued after the 2020 Notes were announced, erases any possibility of doubt that the National Assembly took the position that entities other than the Republic itself, such as state-owned enterprises, could enter national public interest contracts.[83]  In this resolution, the National Assembly specifically invoked Article 187, section 9, in calling for an investigation into the proposed transactions and specifically and categorically rejecting the Pledge.[84]  As I wrote in my initial report:

"By invoking Article 187.9 of the Constitution, the National Assembly recognized that the transaction contracts were contracts in the national public interest, as Article 187.9 is addressed only to the authorization of such contracts by the National Assembly and addresses, in particular, national public interest contracts entered into with States, official foreign entities, or

---

[81]   *May 2016 Resolution*, *supra* note 75 at 3.

[82]   *Id.* at 2.

[83]   Asamblea Nacional, *Acuerdo sobre la situación financiera actual de Petróleos de Venezuela S.A.* [*National Assembly Resolution on the current Financial Situation of Petróleos de Venezuela S.A.*], (Sept. 27, 2016) (Venez.) (Hereinafter *September 2016 Resolution*) (produced as Tab 15 to the First Report).

[84]   *Id.* at 2.

CONFIDENTIAL

companies not domiciled in Venezuela. In the debates leading up to the adoption of the resolution, National Assembly member Freddy Guevara stated emphatically that "this National Assembly . . . will not recognize any *contract of national interest* that does not pass through this National Assembly."[85]

67.   As mentioned in my initial report (par. 65), the National Assembly issued a "Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities" on January 8, 2019[86] and a "Resolution to denounce the unconstitutionality of the incorporation of the trust 'PDVSA US Litigation Trust' by PDVSA" on April 24, 2018,[87] declaring that such contracts affected the public interest and, according to Articles 150 and 187.9 of the Constitution, required prior National Assembly authorization, thereby expressly recognizing that decentralized Public Administration entities like PDVSA can enter into national public interest contracts.[88]

68.   A few months later, on October 15, 2019, prior to PDVSA's default on the 2020 Notes, the National Assembly issued a resolution "reiterating the invalidity of the 2020 Notes."[89]   After reiterating its resolutions of May 26 and September 27, 2016, including its prior rejection of the Pledge, the National Assembly declared that:

"following the investigations conducted in coordination with the Office of the Special Attorney General, it was concluded that the 2020 Bond indenture is a

---

[85]   [Initial Report, par. 72].

[86]   Asamblea Nacional, *Acuerdo en rechazo a los contratos de servicios suscritos por PDVSA que permiten que empresas privadas actuen en actividades primarias de hidrocarburos* [*Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities*], (Jan. 8, 2019) (Venez.) (produced as Tab 17 to the First Report).

[87]   Asamblea Nacional, *Acuerdo para denunciar la inconstitucionalidad de la constitución el fideicomiso 'Pdvsa US* Litigation *Trust,' por parte de la sociedad anónima petróleos de Venezuela* [*Resolution to denounce the unconstitutionality of the constitution of a "PDVSA Litigation Trust, by PDVSA*], (Apr. 24, 2018) (Venez.) (produced as Tab 14 to the First Report).

[88]   As Professor Rafael Badell has highlighted: "The legislative body itself, constitutionally responsible for authorizing the conclusion of contracts of national public interest (Articles 150 and 187.9 of the Constitution), has recognized the nature of public interest contracts for operations carried out by Petróleos de Venezuela Sociedad Anónima (PDVSA), a State company (decentralized entity of the national public administration), for being decisive for the realization of the State's purposes and compromising the patrimonial interests of the Republic." See BADELL MADRID, PUBLIC INTEREST CONTRACTS, *supra* note 44 at 8.

[89]   Asamblea Nacional, *Acuerdo que reitera la invalidez del bono PDVSA 2020* [*Resolution ratifying the invalidity of the PDVSA 2020 Notes*], (Oct. 15, 2019) (produced as Tab 18 to the First Report).

national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution."[90]

69.   More recently, on April 7, 2020, the National Assembly issued a "Resolution by which it Ordered the Opening of an Investigation on the Alleged Sale of the Shareholding Participation of the Company Rosneft in Venezuelan Mixed Companies," declaring that:

> "any contract concluded between the *Corporación Venezolana del Petróleo S.A.* (CVP), as a subsidiary of *Petróleos de Venezuela*, and companies domiciled abroad and that constitute contracts of national public interest, must be previously authorized by the National Assembly within the framework of article 150 of the Constitution of the Bolivarian Republic of Venezuela, including those contracts for the incorporation of mixed companies provided in the Organic Hydrocarbons Law."[91]

70.   Based on all of the aforementioned resolutions, and contrary to what is expressed in ████████████, there is a long tradition of the National Assembly recognizing contracts entered into by PDVSA and its subsidiaries as national public interest contracts that, when entered into with foreign companies not domiciled in Venezuela, must be authorized by the National Assembly in accordance with Articles 150 and 187.9 of the Constitution. This interpretation by the National Assembly has even been recognized as the "original and authentic interpretation."[92] In addition, the National Assembly, the only legitimate and recognized government of Venezuela, "categorically rejected" the Pledge while invoking Article 187.9 of the Constitution, and has expressly declared that the Indenture, which contemplates the Pledge and the issuance of the 2020 Notes, is invalid.

ii.   **The Attorney General's August 7, 2006 Opinion Does Not Support ██████████ Assertions**

71.   ██████████ cites an opinion dated August 7, 2006 (par. 126) in which a particular commercial contract was analyzed based on supposed "elements"

---

[90]   *Idem.*

[91]   *See* Asamblea Nacional, Acuerdo que contiene el pliego nacional de conflict que unifica la lucha por el restablecimiento de la democracia y el rescate de la lucha por el restablecimiento de la democracia y el rescate de todos los derecho humanos, civiles, politicos y economicos del pueblo venezolano [*Resolution containing the national list of conflicts that unifies the fight for the restoration of democracy and the rescue of the fight for the restoration of democracy and the rescue of all the human, civil, political and economic rights of the Venezuelan people*] (Apr. 7, 2020) *in* GACETA OFICIAL *No. 20*, April 22, 2020 (Venez.).

[92]   *See* BADELL MADRID, PUBLIC INTEREST CONTRACTS, *supra* note 44 at 4, 15.

of a national public interest contract referenced in the Constitutional Chamber's *Andres Velazquez, et al.* decision, which were considered only "as orientations to establish their nature" (p. 76). This opinion, which was purely consultative in nature and not binding in any respect, cannot be characterized as any sort of "official interpretation" of the concept of a national public interest contract. The Attorney General's Office in Venezuela has no power to issue "official interpretations" or "binding interpretations" on matters of law, but only consultative opinions, as the Constitutional Chamber ruled in decision No, 1460 of July 12, 2007,[93] cited in ████ ████ (par. 103).

### F. Articles 226 and 236 of the Venezuelan Constitution Do Not Restrict National Public Interest Contracts to Contracts Entered Into By the Republic Itself

72.   ████████ asserts that his erroneous interpretation of Supreme Tribunal precedent is consistent with Articles 226 and 236 of the Venezuelan Constitution, claiming that "under [these Articles] the President of the Republic, as Head of the National Executive, is the sole authority empowered by the Constitution to conclude Contracts of National Interest" (████████, par. 91, 92, 112, 114, 118, 120, 121).

73.   Article 226 of the Constitution simply declares that the President of the Republic is the head of State and of the National Executive, and Article 236.14 simply assigns to the President certain powers, including: "To enter into national interest contracts *according to this Constitution and to the law*."[94]  In other words, one of the powers granted to the President is the power to enter into national public interest contracts on behalf of the Republic *when the Constitution and the law permit*. Articles 226 and 236 nowhere provide, as ████████ erroneously asserts, that the President is "the sole authority empowered by the Constitution to conclude contracts of national interest" (par. 114).

### IV. ████████ ████████ OPINION IS CONTRARY TO THE OVERWHELMING WEIGHT OF VENEZUELAN LEGAL SCHOLARSHIP

74.   It is simply not true that the main opinion expressed in ████████ — that national public interest contracts must have the Republic itself as a party—has been "repeatedly reaffirmed by respected Venezuelan legal scholars" (par. 15). The reality is demonstrably the opposite. As stated in my initial report, *the overwhelming*

---

[93]   Supreme Tribunal of Justice Decision No. 1460, *supra* note 10.

[94]   1999 VENEZUELAN CONSTITUTION, arts. 226, 236 (produced as Exhibit ██-32 to ████████)

CONFIDENTIAL

*majority of Venezuelan public law scholars agree that national public national interest contracts include, not just those entered into by the Republic, but also contracts entered into by national public corporations and national state-owned enterprises* (par. 50 ff.). The Constitutional Chamber of the Supreme Tribunal has recognized this in many cases (including the *EDELCA* case, the *Attorney General of the Republic II (BANDAGRO)* case, and the other above-mentioned examples), bearing in mind that, as discussed above, the Constitutional Chamber has not established any "binding interpretation" on the matter.

75.   Professor Luis Henrique Farías Mata, who is cited in ████████ (par. 168), has always been emphatic that national public interest contracts include contracts entered into by decentralized public entities of the Public Administration, arguing that:

> "the Constitution does not establish distinctions regarding the organ that enters into the contract: if it is a contract of national interest, regardless of which organ of the Venezuelan Public Administration appears in it as a party, it must, in all cases, meet the requirements set forth therein."[95]

76.   Likewise, Professor José Araujo Juárez has opined that state-owned enterprises "can enter into contracts that can be qualified as public interest contracts, and thus, subjected to the parliamentary regime control established in the Constitution."[96] In the same regard, Professor Román José Duque Corredor has considered that state-owned enterprises, as entities within the Public Administration, can enter into public interest contracts."[97] Professor Margot Y. Huen Rivas also agrees that one of the characteristics of public interest contracts is "at least a *public entity* is one of the parties."[98] Regarding *national* public interest contracts in particular, Professor Isabel Boscán de Ruesta agrees that such contracts "are those

---

[95]   Luis Henrique Farías Mata, *La Teoría del Contrato Administrativo en la Doctrina, Legislación y Jurisprudencia Venezolanas* [*The Theory of the Administrative Contracting in the Venezuelan Doctrine, Legislation and Jurisprudence*], *in* 2 LIBRO HOMENAJE AL PROFESOR ANTONIO MOLES CAUBET 935, 974. I must mention that in the translation of this paragraph of Farías Mata's article in exhibit █-94 of ████████, the expression "does not establish a distinction" (*no establece distinciones*) is mistranslated to the opposite meaning as "draws a distinction." *Id.* at 974.

[96]   *See* José Araujo Juárez, *Régimen general de derecho público relativo a las empresas del Estado* [*General system of public law concerning State* enterprises], *in* NACIONALIZACIÓN, LIBERTAD DE EMPRESA Y ASOCIACIONES MIXTAS 191, 229 (2008) (produced as Tab 35 in the First Report). Professor Araujo Juárez also expressed his same opinion in his book:

[97]   *See* DUQUE CORREDOR, OPINION ON THE UNCONSTITUTIONALITY OF THE 2020 PDVSA NOTES, *supra* note 38 at 4.

[98]   *See* Huen Rivas, *International Arbitration in Administrative Contracts*, *supra* note 17 at 404.

entered into by the National Public Administration."[99] In addition, Luis Britto García has opined that "administrative contracts or public interest contracts, are ones in which the *[Public] Administration*, acting as such, that is pursuing purposes of public policy which it is in charge of comply, enter into a contract whose object tend to fulfill a purpose of public interest."[100]

77.    Contrary to the erroneous assertions in ▮▮▮▮▮▮▮▮ (par. 147), Professor José Melich Orsini has not affirmed that the Republic must be a party in order for a contract to be considered a "Contract of National interest." What Professor Melich said, in fact, is that "what typifies a 'contract of public interest' is that it is a great contract entered into by the *national Public Administration*,"[101] without mentioning any specific public entity within the centralized or decentralized Public Administration at the national level.

78.    In the case of Professor Jesús Caballero Ortíz, it is completely illegitimate to try and deduce from a marginal argument related to the "Calvo clause" — affirming that in public contracts the Republic cannot be considered as a private party —[102] that he would have "supported" the argument that a national public interest contract must have the Republic as a party (▮▮▮▮▮▮▮, par. 93). A careful reading of Caballero's cited article from 2001 reveals that in no part of his public interest contracts analysis does he address which specific organs or entities can or cannot enter into such contracts. He simply analyzes public interest contracts from a substantive point of view with respect to the regime of authorization and/or approval of such contracts by the National Assembly, and in no way whatsoever

---

[99]    *See* Isabel Boscán de Ruesta, *La Inmunidad de Jurisdicción en los Contratos de Interés Público* [*The Immunity of Jurisdiction in Contracts of Public Interest*], *in* 14 REVISTA DE DERECHO PÚBLICO 23, 38 (Editorial Jurídica Venezolana ed., 1983).

[100]   *See* Juan Carlos Balzán Perez, *El Arbitraje en los Contratos de Interés Público a la Luz de la Cláusula de Inmunidad de Jurisdicción Prevista en el Artículo 151 de la Constitución de 1999* [*Arbitration in Public Interest Contracts in Light of the Immunity Clause of Jurisdiction provided for in Article 151 of the 1999 Constitution*], *in* 2 VIII JORNADAS INTERNACIONALES DE DERECHO ADMINISTRATIVO 293, 308 (Fundación Estudios de Derecho Administrativo ed., 2005) (quoting Luis Britto García, *Régimen Constitucional de los Contratos de Interés Públic* [*Constitutional Regime of Public Interest Contracts*], *in* 50 REVISTA DE CONTROL FISCAL Y TECNIFICACIÓN ADMINISTRATIVA 89-90 (1968).

[101]   *See* José Melich Orsini, *La Noción de Contrato de Interés Público* [*The Notion of Public Interest Contracts*], *in* 7 REVISTA DE DERECHO PÚBLICO 62 (Editorial Jurídica Venezolana ed., 1981) (produced as Exhibit ▮▮▮ 85 to ▮▮▮▮▮▮ ).

[102]   Jesús Caballero Ortiz, *Los Contratos Administrativos, los Contratos de Interés Público y los Contratos de Interés Nacional en la Constitución de 1999* [*Administrative Contracts, Public Interest Contracts and Contracts of National Interest in the 1999 Constitution*], *in* I ESTUDIOS DE DERECHO ADMINISTRATIVO, LIBRO HOMENAJE A LA UNIVERSIDAD CENTRAL DE VENEZUELA 154 (2001) (produced as Tab 110 to the First Report).

restricts the concept of national public interest contracts to contracts entered into by the Republic, as ▓▓▓▓▓▓▓ erroneously asserts. On the contrary, Professor Caballero has opined since 1982 that national public interest contracts include not only contracts to which the Republic is a party, but also contracts entered into by decentralized entities of the Public Administration, specifically referring to "public enterprises, public law persons" (autonomous institutions or public corporations).[103]

79.    Regarding Professor Rafael Badell, he does not "affirm[] that for contracts to qualify as a Contract of National Interest, the entity which assumes the obligation derived from the contract has to be the Republic," as asserted in ▓▓▓▓▓ (par 101). Indeed, in the very same article of 2004 to which ▓▓▓▓▓ refers,[104] Professor Badell expressly acknowledges that contracts of public interest can be entered into by entities of the decentralized Public Administration "if they affect directly the interest of the Republic as territorial entity, or of the States or Municipalities" (pp. 159-160), and thus that "contracts signed by public companies may be considered as national public interest contracts, when the national interests that correspond to the Republic are directly affected." [105] In support of this proposition, Professor Badell cites the *EDECLA* case[106] discussed above, in which the Constitutional Chamber *expressly acknowledged that contracts entered into by a public corporation were national public interest contracts*. More recently, Professor Badell has been emphatic in affirming that national public interest contracts are "contracts entered into by the State, through its territorial entities (Republic, States or Municipalities), and even its functionally decentralized administration (state companies, autonomous institutes, civil associations,

---

[103]   *See* JESÚS CABALLERO ORTIZ, LAS EMPRESAS PÚBLICAS EN EL DERECHO VENEZOLANA [PUBLIC ENTERPRISES IN VENEZUELAN LAW] 333-334 (Editorial Jurídica Venezolana ed., 1982); *see also* JESÚS CABALLERO ORTÍZ, INSTITUTOS AUTÓNOMOS [AUTONOMOUS INSTITUTES] 206-207 (Editorial Jurídica Venezolana ed., 1995).

[104]   Rafael Badell Madrid, *Sobre la Inmunidad de Jurisdicción y la Procedencia de Cláusulas Arbitrales en los Contratos de Interés Público Nacional* [*On the Immunity of Jurisdiction and the Origin of Arbitration Clauses in Contracts of National Public Interest*], *in* 2 CONGRESO INTERNACIONAL DE DERECHO ADMINISTRATIVO HOMENAJE AL PROF. LUIS HENRIQUE FARÍAS MATA 159-60 (2006) (produced as Exhibit ▓-70 to ▓▓▓▓▓).

[105]   (emphasis added). Professor Rafael Badell has opined in other of his works, in the same sense that public interest contracts are not only those entered into by the Republic, the States, and the Municipalities, but also those entered into by the "functional decentralized administration" if they affect the interest of the territorial entities, and, in particular, those "entered into by state-owned enterprises, when they affect in a direct way the national interest assigned to the Republic." *See* Rafael Badell Madrid, *Contratos de interés público nacional* [*Contracts of national public interest*], *in* 19 REVISTA DE DERECHO ADMINISTRATIVO 7, 9 (Editorial Sherwood ed., 2005) (produced as Tab 102 to the First Report).

[106]   Supreme Tribunal of Justice Decision No. 953, *supra* note 4 at 14.

foundations),"[107] and that "public interest contracts include those concluded by the public administration, centralized as well as territorially or functionally decentralized; which means that this category includes those contracts of public interest that have been entered into by autonomous institutes, ***state-owned companies***, foundations, and other state entities of public or private law."[108]

80.   Apart from Eloy Lares Martínez, cited in ▮▮▮▮▮▮▮▮▮▮ (par. 93), who affirmed that "national interest contracts are administrative contracts *entered into by the National Public Administration*" but then took a contradictory position without explanation,[109] I am not aware of *any other Venezuelan public law scholar who holds the opinion expressed in* ▮▮▮▮▮▮▮▮ *on this matter*.

**V.   ▮▮▮▮▮▮▮▮▮▮▮▮  "ADDITIONAL CONSIDERATIONS" DO NOT SUPPORT HIS ERRONEOUS AND OUTLIER CONCLUSION THAT ONLY THE REPUBLIC ITSELF CAN ENTER INTO NATIONAL PUBLIC INTEREST CONTRACTS**

**A.   ▮▮▮▮▮▮▮▮▮▮  Claim That PDVSA and PDVSA Petróleo Effectively Operate as Independent Corporations is Contrary to Venezuelan Law and the Facts at the Time of the Exchange Offer**

81.   To bolster his outlier and erroneous claim that only the Republic itself can enter into a national public interest contract, ▮▮▮▮▮▮▮▮ attempts to create the illusion that PDVSA and PDVSA Petróleo operated effectively as private corporations and, as such, would naturally fall outside the definition of the "Republic" (par. 28-42). After misquoting Article 103 of the Public Administration Organic Law,[110] and also after misquoting one of my books,[111]  he then concludes

---

[107]   *See* BADELL MADRID, PUBLIC INTEREST CONTRACTS, *supra* note 44 at 3, 4.

[108]   *Idem*, p. 5.

[109]   Eloy Lares Martínez, *Contratos de Interés Nacional* [*Contracts of National Interest*], *in* 1 LIBRO HOMENAJE AL PROFESOR ANTONIO MOLES CAUBET 117, 137 (1981) (produced as Exhibit ▮▮-65 to ▮▮▮▮▮▮▮).

[110]   Article 103 of the Public Administration Organic Law provides that: "The State-owned enterprises are legal persons of public law constituted according to the rules of private law, in which the Republic, the states, the metropolitan districts and the municipalities, or one of the functionally decentralized entities referred to in this Decree with Rank, Value and Force of Organic Law, alone or jointly, have a participation greater than fifty percent of the share capital." Public Administration Organic Law, art. 103, *Gaceta Oficial No. 6.147* (Nov. 17, 2014) (produced as Tab 9 to the First Report). There is no reference to "State Corporations and private corporations on equal footing to assume fair competition between the two," as stated in ▮▮▮▮▮▮▮▮ (par. 40).

[111]   In my book Allan R. Brewer-Carías, RÉGIMEN JURÍDICO DE LAS EMPRESAS PÚBLICAS EN VENEZUELA [LEGAL REGIME OF PUBLIC ENTERPRISES IN VENEZUELA] (1980) (produced as Exhibit ▮▮-29 to the

CONFIDENTIAL

that, as a result of its status as a "State Corporation" (a state-owned enterprise, which he claims is on equal footing with private corporations), "any limits to legal capacity must derive from an explicit legal rule establishing the same" (par. 41). Misquoting Article 108 of the Public Administration Organic Law[112] and other of my books,[113] he also erroneously asserts that "the general rule is that State Corporations' businesses are subject to private law, not to Venezuelan public law" (par. 42). On the contrary, the essence of state-owned enterprises is that they are subject to a mixed legal regime, always combining public law and private law.[114]

---

[ █████████ ), in a way very different from the one suggested in █████████ (par. 40), I expressed on the same page that, due to the application to such state-owned enterprises of public law, such as statutes referring to budget and public debt matters, state-owned enterprises "are subject to a regime very similar to the one established in such law for the autonomous [state] institutions" (p. 39).

[112] Article 108 of the Public Administration Organic Law provides that: "State-owned enterprises will be governed by ordinary legislation, by the provisions of this Decree with Rank, Value and Force of Organic Law and other applicable regulations; and its workers will be governed by ordinary labor legislation." Public Administration Organic Law, art. 108, *Gaceta Oficial No. 6.147* (Nov. 17, 2014) (produced as Exhibit ██ -20 to █████ ). There is no phrase expressing that "As with any other *sociedad anónima*, the general rule is that State Corporations' businesses are subject to private law, not Venezuelan public law," as expressed in █████████ (par. 42). On the contrary the provision makes clear that such state-own enterprises are subject to private law (ordinary legislation) *and to public (administrative) law* as established in the same Organic Law and other applicable legislation.

[113] In no part of my book, Allan R. Brewer-Carías, ADMINISTRATIVE LAW, quoted in █████████ (par. 42) (██ -39), have I expressed that "the general rule is that State Corporations' businesses are subjected to private law, *not to Venezuelan public law*." On the contrary, and in a way very different to the one suggested in █████████ (par. 42), in the page quoted (p. 439), I wrote that: "being legal persons of private law, state companies are governed by ordinary legislation, particularly that established in the Commercial Code, except what is established in the Organic Law of Public Administration. In the case of state companies created by national law, they must also be governed by ordinary legislation, except as provided by the law (art. 106). In addition, evidently, the consequence that a corporate legal entity of private law is legally considered as a State-owned enterprise, regardless of the economic activity it carries out, is that it, in addition to being governed by the regime established in the Organic Law of the Public Administration and in the Commercial Code with respect to the regime of corporations, is subject to the legal regime of government agencies or the public sector. Therefore, these companies, in principle, are subject to the regulations on the budgetary regime, on public credit and, in general, on Financial Administration contained in the Organic Law of Financial Administration, such as those relating to the safeguarding of public property contained in the Law against Corruption, and those related to the management and administration of the public sector, such as the rules on fiscal control, and the rules on administrative contracting, both on the selection of contractors and on general conditions clauses." ALLAN R. BREWER-CARÍAS, DERECHO ADMINISTRATIVO [ADMINISTRATIVE LAW] (2005) 439 (produced as Exhibit ██ -39 to █████████ ). (p. 439).

[114] Since 1968, I have referred to this trend of a mixed regime of private and public law for state-owned enterprises as a general trend in comparative law resulting from the presence of the State as a shareholder in a formally commercial company. *See* ALLAN RANDOLPH BREWER-CARÍAS, LES ENTERPRISES PUBLICQUE EN DROIT COMPARE [PUBLIC COMPANIES IN COMPARATIVE LAW] 77 (1968).

CONFIDENTIAL

82.   Therefore, the notion that state-owned enterprises, such as PDVSA and PDVSA Petróleo, operate on equal footing with private corporations is nonsense. It entirely ignores the fact that "State-owned enterprises," unlike private corporations, are also subject to public law. As I explained in my initial report:

> "The Public Administration is comprised of the 'Central Public Administration' and the 'Decentralized Public Administration.' According to the Venezuelan Constitution (Article 242) and the Organic Law on Public Administration (Articles 59-61), the National Central Public Administration consists of the organs of the government itself, such as the various government ministries. The National Decentralized Public Administration, on the other hand, consists of entities such as public corporations and state-owned commercial enterprises like PDVSA and PDVSA Petróleo that, while not directly part of the government itself, are closely related to the government, being attached to their corresponding government Ministries and subject to both public and private law."[115]

83.   In the case of PDVSA in particular, it must be remembered that this state-owned enterprise was not created, as other state entities generally are, by decision of the Executive to form a corporation according to the Commercial Code for the purpose of engaging in some particular business. Rather, PDVSA was created as a result of the nationalization of the Venezuelan oil industry in 1975 in accordance with the *Organic Law Reserving to the State the Industry and Commerce of Hydrocarbons*.[116] In that Organic Law, the Legislature "reserved" such economic sectors "to the State" providing in Article 5 that "the State" was to perform "the reserved activities, directly by the National Executive or through entities of its own property."[117] For this purpose, Article 6 of the Organic Law ordered the National Executive to create "with the legal form it considered convenient, the enterprises it deemed necessary to perform regular and efficiently" the reserved activities.[118] The provision also authorized the National Executive to "assign one of the enterprises the functions of coordination, supervision and control of the activities of the others, assigning the ownership of the shares of any of such enterprises."[119] According to Article 7 of the same Organic Law, such enterprises "will be governed by the

---

[115]   Initial Report, par. 33.
[116]   GACETA OFICIAL No. 1769 (Aug. 29, 1975) (produced as Exhibit ██-09 to ████████).
[117]   *Id.*
[118]   *Id.*
[119]   *Id.*

Organic Law and its Regulations, by its own by-laws, by the disposition enacted by the National Executive and by the ordinary law that could be applied."[120]

84.  This was the origin of PDVSA, which was then created by the National Executive pursuant to Decree No. 1123 of August 30, 1975[121] as "a state enterprise, with the form of commercial corporation (*Sociedad anónima*), that will fulfill and execute the polity dictated by the National Executive, through the Ministry of Mines and Hydrocarbons on matters of hydrocarbons" (Art. 1). As a consequence, as I expressed in 1985, there is no doubt that the "intention of the Legislature was to organize the Nationalized Oil Administration, through state-owned enterprises (entities or State persons), with the form of commercial corporations and therefore with a mixed regime of public law and private Law."[122] Therefore, as I also wrote in 1985:

> "PDVSA is a State enterprise, wholly owned by it and responding to the policies that it dictates, and as such, is integrated within the general organization of the State Administration, as a decentralized administration entity, but with the form of a commercial corporation, that is, of a person of private law."[123]

85.  In the same regard, the Constitutional Chamber of the Supreme Tribunal, in decision No. 464 of March 18, 2002, explained that:

> "Petróleos de Venezuela S.A. and its subsidiary companies have a legal regime that allows them to be clearly differentiated, not only from the centralized Public Administration and autonomous institutes, but also from other state owned enterprises. Therefore, this Chamber must conclude that the identification of the legal nature of said companies as state persons with the legal form of private law, undoubtedly, as a consequence, raises that the legal regime applicable to them is a mixed regime, both of public law as well as private law, even when it is predominantly private law, due to its form, but not exclusively, since their intimate relationship with the State, subjects them

---

[120]  *Id.*

[121]  Allan R. Brewer-Carías, *Consideraciones sobre el régimen jurídico-administrativo de Petróleos de Venezuela S.A.* [*Considerations on the legal-administrative regime of Petróleos de Venezuela S.A.*], *in* 67 REVISTA DE HACIENDA 79, 83 (1977) (citing *Official Gazette* No. 1770 of August 30, 1975).

[122]  *See* Allan R. Brewer-Carías, *El carácter de Petróleos de Venezuela, S.A. como instrumento del Estado en la industria petrolera* [*The character of Petróleos de Venezuela, S.A. as an instrument of the state in the oil industry*], *in* 23 REVISTA DE DERECHO PÚBLICO 77, 80 (Editorial Jurídica Venezolana ed., 1985) (produced as Tab 54 to the First Report).

[123]  *Idem.* at 81.

to the mandatory rules of public law dictated for the best organization, operation and control of execution of the Public Administration, by the organs that are integrated to it or contribute to the achievement of its tasks."[124]

86.   Therefore, PDVSA is a state-owned enterprise that, contrary to what is asserted in ▮▮▮▮▮▮▮ (par. 33 ff.), is different from all other state-owned enterprises, not only because it is the only state-owned enterprise that has been constitutionalized in Article 303 of the 1999 Constitution, having directly assigned to it "the management of the oil industry," but also, as I also pointed out in 1985, because:

> "very few state owned enterprises are subject, unrestrictedly 'to the provisions issued by the National Executive, as it is PDVSA, which opens a wide margin to the application of public law rules to the company, through unilateral administrative acts, without the need to go to corporate formulas, such as the Shareholders Meeting, for example, as well as the possibility that the National Executive will issue the necessary instructions."[125]

87.   PDVSA is thus an instrument of the Venezuelan State created to manage the nationalized oil industry,[126] which is why in the second clause of its by-laws, it has been established since 1975 that:

> "The fulfillment of the corporate purpose must be carried out by the company *under the guidelines and policies that the National Executive through the Ministry of Energy and Mines establishes or set down* in accordance with the powers conferred by the Law.
>
> The activities carried out by the company for this purpose *will be subject to the control rules established by said Ministry in the exercise of the competence*

---

[124]   Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 464 Interpretación del Decreto de la Asamblea Nacional Constituyente de fecha 30 de enero de 2000, mediante el cual se suspende por 3 días la negociación de la Convención Colectiva del Trabajo [Interpretation of the Decree of the National Constituent Assembly dated January 30, 2000, by which the negotiation of the Collective Labour Convention is suspended for 3 days], *in* 89-92 REVISTA DE DERECHO PÚBLICO 219 (Editorial Jurídica Venezolana ed., 2002) (produced as Tab 22 to the First Report).

[125]   *See* Brewer-carías, *The character of Petróleos de Venezuela S.A. as instrument of the State in the Oil Industry*, *supra* note 122 at 82.

[126]   That is why, as Professor Román J. Duque Corredor has written, PDVSA is "a State owned enterprise that fulfills functions of national public interest according to article 303 of the Constitution." *See* DUQUE CORREDOR, OPINION ON THE UNCONSTITUTIONALITY OF THE 2020 PDVSA NOTES, *supra* note 38 at 3.

conferred on it by article 7 of the Organic Law that Reserves to the State the Industry and Commerce of Hydrocarbons."[127]

88.    Consequently, PDVSA is not a regular state-owned enterprise and, contrary to the assertions in ▮▮▮▮▮▮▮▮▮▮, is not "governed largely" by private law (par. 33). On the contrary, it is governed largely by public law, being, as qualified by the Political-Administrative Chamber of the Supreme Tribunal, the "main state owned enterprise of the Venezuelan State, dedicated to oil activity at the national level, whose shares are one hundred percent (100%) owned by it."[128] As instruments of the Venezuelan State for managing the oil industry, PDVSA and PDVSA Petróleo can not only enter into administrative contracts, but also national public interest contracts that, if entered into with foreign companies not domiciled in Venezuela, must be authorized by the National Assembly according to Articles 150 and 187.9 of the Constitution, and especially if such contracts affect the shares of a subsidiary like CITGO, which is a critical strategic asset of the Venezuelan oil industry.

89.    In addition to PDVSA being the main instrument of the State for the management of the oil industry and an integral part of the National Public Administration, at the time of the Exchange Offer, the President of PDVSA, Eulogio Del Pino, simultaneously served as the Minister of Petroleum and Mining, the organ of the National Executive responsible for exercising control over PDVSA (as set out in the Organic Law of Public Administration and in Article 2, Clause 3 of PDVSA's by-laws). Thus, there is no reliable way to differentiate the actions at the time of the organ of the National Executive in charge of directing PDVSA from the actions of PDVSA itself, particularly with respect to the decision to enter into the Indenture and the Pledge,[129] which are undoubtedly national public interest contracts, without prior authorization of the National Assembly.

---

[127]    *See* for instance the By-Laws of PDVSA, reformed by Decree No. 2184, GACETA OFICIAL *No. 37.588* (Dec. 10, 2002).

[128]    Tribunal Supremo de Justicia Sala Político Administrativa [TSJ-SPA] [Supreme Tribunal of Justice, Political-Administrative Chamber] No. 416 PDVSA Petróleo y Gas, S.A. y Sindical Unión de Trabajadores Petroleros, Petroquímicos, de los Hidrocarburos y sus Derivados UNAPETROL - v. Dirección de Inspectoría Nacional y Otros Asuntos Colectivos del Trabajo del Sector Privado [PDVSA Petróleo y Gas, S.A. and the Union of Petroleum Workers, Petrochemicals, Hydrocarbons and their Derivatives UNAPETROL v. Directorate of National Inspection and Other Collective Labor Matters of the Private Sector] May 4, 2004 (Venez.) (hereinafter Supreme Tribunal of Justice Decision No. 416) at 22.

[129]    As Professor Román José Duque Corredor has opined, the Indenture and the Pledge "have all the elements to be considered as national public interest contracts. In fact: they were entered into by two state owned corporations, that is PDVSA and PDVSA Petróleo; those contracts gave as a guarantee the

CONFIDENTIAL

**B.**  **The Financial Administration of the Public Sector Organic Law Does Not Exempt from Prior National Assembly Authorization Public Debt Contracts Entered into With Foreign/Non-Domiciled Counterparties**

90.  ▓▓▓▓▓▓▓▓ also claims that his erroneous opinion that the Indenture and the Pledge are not national public interest contracts is supported by the additional consideration that, according to him, the Indenture and the Pledge, being "financial agreements," are exempted from National Assembly authorization by the Organic Law on the Financial Administration of the Public Sector (▓▓▓▓▓▓, par. 159 ff.). This assertion is entirely incorrect.

91.  There is no doubt that Article 101.4 of this Organic Law exempts the public debt contracts of PDVSA and other state-owned enterprises in the hydrocarbon sector from the Organic Law's requirement of National Assembly authorization for their public interest contracts (par. 159, 162, 163).  However, such public debt contracts are still subject to National Assembly authorization under Articles 150 and 187.9 of the Venezuelan Constitution if they are to be entered into with foreign states, official foreign entities, or foreign companies not domiciled in Venezuela.  In the already referenced decision No. 2441 of September 24, 2002 (case *Andrés Velazquez et al.*), the Constitutional Chamber partially annulled Article 80 of the Organic Law precisely because, as originally written, it could be read to allow the National Executive to enter into contracts with foreign states, official foreign entities, or foreign companies not domiciled in Venezuela without the National Assembly's authorization, which is constitutionally prohibited. Although this was the very core of the Constitutional Chamber's decision, it is completely ignored in ▓▓▓▓▓▓▓▓. Furthermore, even though public debt contracts to be entered into by PDVSA are exempted from the requirement of National Assembly authorization imposed by the Organic Law on the Financial Administration of the Public Sector, this exception could never be extended to contract provisions purporting to establish guarantees or pledges over national assets, which not only is prohibited in the same Organic Law (Article 105)[130], but is also not exempted from legislative control under the Constitution.

---

participation of control over the most important asset of the Venezuela State abroad, as it is Citgo, that are not contracts on the ordinary course of business of PDVSA; and those contracts were entered into with corporations domiciled abroad, that is, the Trust agent and the Collateral agent." *See* DUQUE CORREDOR, OPINION ON THE UNCONSTITUTIONALITY OF THE 2020 PDVSA NOTES, *supra* note 38 at 1.

[130]  Financial Administration of the Public Sector Organic Law, art 105, *Gaceta Oficial No. 6.154* (Nov. 19, 2014) (produced as Tab 4 to the First Report).

92.   Finally, I note that Article 101 of the Organic Law, which contains the public debt exemption, was not "upheld" in the Constitutional Chamber's 2016 *Bridgitte Acosta* decision, as ████████████ erroneously asserts (par. 165). That case did not involve a challenge to any provision of the Organic Law, and no provision of any law was either annulled or "upheld."

### C.   The   Indenture   and   the   Pledge   Are   Unquestionably "Administrative Contracts"

93.   An additional consideration in ████████████ erroneous opinion is that the Indenture and the Pledge do not qualify as "administrative contracts" and therefore cannot be national public interest contracts (████████, par. 166 ff). This is totally incorrect and serves only to introduce needless confusion.

94.   Like many Venezuelan scholars, I have studied the subject of administrative contracts for many years, beginning with my first writings on administrative law in 1964.[131] I concur with the view expressed by all leading scholars of Venezuelan administrative law, as highlighted in ████████████ (par. 168), that the concept of a "national public interest contract" in constitutional law is equivalent to the concept of an "administrative contract" as developed over the past decades in administrative law, where the question was one of jurisdiction — whether a certain contract was subject to the jurisdiction of the administrative law courts or the regular civil courts. This has also been the opinion of Venezuela's highest court, as declared by the former Supreme Court of Justice in its decision of August 17, 1999 (Case: *Apertura Petrolera: Simón Muñoz Armas et al. Challenging Clauses of the Congress Resolution of July 4, 1995*), referenced in ████████████ (par. 172), in which public interest contracts were identified with administrative contracts.[132]

95.   Ignoring the evolution of Venezuelan administrative law and citing outdated judicial decisions, ████████████ claims that, "[u]nder Venezuelan law, contracts may be characterized as administrative contracts when the Public Administration is a party to the agreement and one of two additional requisites is met: (i) the purpose of the contract must be an activity of 'public service' or of 'general interest' or (ii) the Public Administration is granted exorbitant decision-

---

[131]   ALLAN RANDOLPH BREWER-CARÍAS, LAS INSTITUCIONES FUNDAMENTALES DEL DERECHO ADMINISTRATIVO Y LA JURISPRUDENCIA VENEZOLANA [THE FUNDAMENTAL INSTITUTIONS OF ADMINISTRATIVE LAW AND VENEZUELAN JURISPRUDENCE] 162-163, 171-172 (1964) (produced as Exhibit ██ 93 to ████████████); Allan R. Brewer-Carías, *La Evolución del Concepto de Contrato Administrativo* [*The Evolution of the Concept of Administrative Contract*], *in* 1 LIBRO HOMENAJE AL PROFESOR ANTONIO MOLES CAUBET 63 (1981) (produced as Exhibit 100 to ████████)

[132]   Brewer-Carias, *The Case of the Oil Opening*, *supra* note 16 at 319.

making powers derived from the State's sovereign authority (*ius imperium*)," in particular, "the authority to, *inter alia*, unilaterally (i) interpret, (ii) modify and even (iii) terminate the contract." (par. 171). According to ▮▮▮▮▮▮▮▮▮, the Indenture and the Pledge are not "administrative contracts" (and thus are not national public interest contracts) because they neither relate to an activity of "public service" or "general interest" nor grant PDVSA and PDVSA Petróleo "exorbitant powers."

96.      ▮▮▮▮▮▮▮▮      assertion that the purpose of the Indenture and the Pledge is not of "general interest" is so obviously wrong that it is not worth discussing at length. Indeed, all public debt contracts of entities within the Public Administration are of "general interest," and this is especially true of the Indenture and the Pledge, which affect in a decisive way the most important foreign asset of Venezuela's state-owned oil industry — an industry that is indisputably vital to the nation's economic survival. Regarding the importance of the oil industry in Venezuela and PDVSA in particular, it is enough to highlight the observation of the Political-Administrative Chamber of the Supreme Tribunal that the oil industry "has a direct impact on the socioeconomic regime of the Venezuelan State as expressly provided for in articles 299, 302 and 303 of the Constitution" and that PDVSA is:

> "the main company of the Venezuelan State dedicated to the activities of exploration, exploitation, distribution, transport, industrialization, commercialization, refining and sale of hydrocarbons nationwide; which shows the public and social interest that the activities of the aforementioned company have for the entire Nation, and the repercussions that this conflict generated, consequently transcending the interests of the appellants affected by the aforementioned administrative acts, and influencing in the normal development and development of the economic and social life of the Bolivarian Republic of Venezuela."[133]

97.   With regard to exorbitant powers, while it is true that when the doctrine of administrative contracts was being developed, exorbitant powers were considered one of its main elements, they are no longer considered inherent to public contracts.[134] In fact, all leading scholars agree that, while the ability of a public contracting party to exercise exorbitant powers is a common feature of contracts entered into by public entities, it is not an indispensable requirement of an "administrative contract." The logic is simple. It is a fundamental principle of administrative law that a public entity can only have the powers granted to it by

---

[133] Supreme Tribunal of Justice Decision No. 416, *supra* note 128 at 13.

[134] *See* Brewer-Carías, *The Evolution of the Concept of Administrative Contract supra* note 131 at 61-63.

CONFIDENTIAL

law,[135] and thus, if not provided for in the contract by agreement of the parties, any exorbitant powers must be provided by statute.[136] After many years of doctrinal and jurisprudential development, this recognition led to the conclusion, shared by all leading scholars, that the concept of an administrative contract does not include exorbitant powers as a necessary element. An entity within the Public Administration, while subject to both public and private law can choose to enter into a contract in which private law predominates (the formation and validity of the contract being necessarily governed by Venezuelan public law, as explained in my initial report), and this does not change or affect in any way its status as an "administrative contract."[137]

98.    The Indenture and the Pledge, which were entered into by state-owned enterprises within the National Public Administration, which have as their purpose an activity of "general interest," and which are governed by both Venezuelan public

---

[135]   That is why Article 4 of the Organic Law of Public Administration provides that: "Public Administration is organized and acts in conformity with the *principle of legality*, so the *assignment, distribution and exercise of its attributions is subject to the Constitution, the statutes and administrative acts of general effects* previously enacted in a formal way according to the law as a guaranty and protection of public freedoms established in the protagonist democratic and participative regime." *See* GACETA OFICIAL No. 6.147 (Nov. 17, 2014) (produced as Exhibit ██-20 to ████████); *see also* ALLAN R. BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA 33-34 (Editorial Jurídica Venezolana ed., 2015).

[136]   *See* BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA, *supra* note 135 at 141; *see also* José Ignacio Hernández, *El Contrato Administrativo en la Ley de Contrataciones Públicas Venezolana* [*The Administrative Contract in the Venezuelan Public Procurement Law*], *in* LEY DE CONTRATACIONES PÚBLICAS 363, 377-379 (Editorial Jurídica venezolana ed., 2008).



        And it is well known in Venezuelan Administrative Law that according to Article 4 of the Organic Law of Public Administration (see above footnote 124), administrative acts can only be enacted by an administrative entity when a statute assigns it expressly the corresponding attribution.

[137]   Brewer-Carías, *The Evolution of the Concept of Administrative Contract supra* note 131 at 61-63.

CONFIDENTIAL

law (as to formation and validity) and the private law of New York (as to performance), are, without any doubt, "administrative contracts" under Venezuelan law. No knowledgeable scholar of Venezuelan administrative law would accept ▮▮▮▮▮▮▮▮▮▮▮▮ erroneous assertions to the contrary.

### D. The National Assembly's Historical Non-Assertion of Control Over Contracts Entered into by PDVSA or its Subsidiaries Does Not Support ▮▮▮▮▮▮▮▮▮▮ Opinion

99.  The fact that the National Assembly has not always acted to authorize contracts with PDVSA or its subsidiaries as a party is only indicative of the authoritarian regime's blatant disregard for the Venezuelan Constitution, including the separation of powers between the Executive and Legislative branches, since Chavez first came to power shortly after the Constitution was ratified until the opposition won control of the National Assembly in December 2015.

100. As I noted in my initial report:

"Since the beginning of the Chávez regime in 2000, the Executive of Venezuela has devoted itself to neutralizing the National Assembly and subduing the Judiciary in blatant disregard of the Constitutional system of separation of powers.

The most important means used by the Executive to neutralize and prevent the National Assembly from exercising its functions has been to simply ignore its powers. Thus, numerous treaties and contracts of national public interest, which under the Constitution were required to be submitted to the National Assembly for authorization, were instead simply enacted by the Executive in complete disregard of the proper constitutional role of the National Assembly.

The second means used by the Executive to neutralize the National Assembly was to progressively appropriate its legislative functions through the enactment of sweeping, unconstitutional enabling laws. This process began in 2001, after the enactment of an enabling law pursuant to which the President enacted forty-eight decrees on the most important topics, purporting to replace regular legislation enacted by the National Assembly.[138]

---

[138]  Initial Report, par. 54-62.

CONFIDENTIAL

In recent years, his regime has developed a third means of neutralizing the National Assembly—the direct persecution of its members, many of whom have been incarcerated or forced into exile."

101. Thus, any assertion that national public interest contracts such as the Indenture and Pledge do not require National Assembly authorization because, from 1999 (when Chávez rose to power) through 2016, the National Assembly did not always exercise its Constitutional powers, ignores the two decades of brutal subjugation, threats, acts of violence, and humanitarian abuses carried out against anyone who dared attempt to stand up to the country's authoritarian rulers, Chávez and Maduro.

102. I provided in my initial report six examples of contracts that obviously met the definition of national public interest contracts (some of which even met ███████████████ erroneously narrow definition), but were entered into by the Maduro and Chavez regimes without being first authorized by the National Assembly.[139]

## VI.   THE PRESUMPTION OF LEGALITY AND THE PRINCIPLE OF LEGITIMATE EXPECTATIONS CAN NEVER APPLY TO ADMINISTRATIVE ACTS OR ANY STATE ACT AFFECTED BY ABSOLUTE NULLITY

103. In the final sections of his report, ███████████ claims that if a Venezuelan court were to find the Indenture and Pledge to be national public interest contracts, the court "deciding in accordance with Venezuelan laws would still hold such agreements to be binding and enforceable on PDVSA and PDVSA Petróleo because of an important principle of Venezuelan law: the principle of legitimate expectations," which "serves to protect the expectations of counterparties against unfair prejudice in matters dealing with the Public Administration, specifically, and contracts more generally" (par. 178).  These claims have no basis under Venezuelan law.

104. As noted in ████████████ (par. 179), which cites one of my works addressing administrative acts,[140] it can be said that, as a matter of principle, acts of the Public Administration (including state-owned enterprises such as PDVSA and

---

[139]   *See* Initial Report, par. 56.

[140]   Allan Randolph Brewer-Carías, *El Derecho Administrativo y la Ley Orgánica de Procedimientos Administrativos*, *in* 16 COLECCIÓN ESTUDIOS JURÍDICOS 203 (8th ed. 2008) (produced as Exhibit ███-103 to ██████████).

PDVSA Petróleo) are presumed to be valid and legitimate and thus enforceable until annulled by a competent administrative or judicial authority. However, as I also mention in the same work, the "enforceability presumption has an exception for when the act is affected of absolute nullity."[141] As I wrote many years earlier when commenting on a decision of the Political Administrative Chamber of the former Supreme Court of Justice (case *Arnaldo Lovera*),[142] when administrative acts are null and void in an absolute sense (for instance, according to Article 19 of the Organic Law on Administrative Procedure), such acts do not benefit from any presumption of validity, and the Public Administration can revoke and declare such acts null and void at any time. In other words, "*the presumption of legitimacy of administrative acts does not exist when the acts are vitiated of absolute nullity, in which case they could not be enforced.*"[143] As I put it more recently, "an administrative act vitiated of absolute nullity cannot be presumed legitimate, and the Administration cannot order its compliance."[144]

105. An administrative act with a vice of absolute nullity is unenforceable because such an act can have no effect whatsoever and cannot form the basis of any vested rights. In the words of the Political Administrative Chamber of the former Supreme Court of Justice, in cases of absolute nullity, "the presumption of legitimacy that produces the administrative act cannot prevail against logic."[145] That is why the same Chamber of the former Supreme Court, in its decision of April 6, 1993 (case *Eduardo Contramaestre*), ruled that "absolute nullity is the most grave consequence derived from the vices of the administrative act, and means that *the act cannot produce an effect in any way whatsoever,* due to the fact that the act of

---

[141] *Id.*

[142] *See* La Corte Suprema de Justicia Sala Político Administrativa [Supreme Court of Justice Political-Administrative Chamber] [CSJ] No. 332 Arnaldo Lovera v. Inquilinato, Nov. 21, 1989, *in* 40 REVISTA DE DERECHO PÚBLICO 76-77 (Editorial Jurídica Venezolana ed., 1989).

[143] *See* Allan R. Brewer-Carías, *Consideraciones sobre la ejecución de los actos administrativos (a propósito de los actos administrativos que ordenan el desalojo de viviendas)* [*Considerations about the execution of the administrative acts (regarding the administrative acts that order the eviction of homes)*], *in* 41 REVISTA DE DERECHO PÚBLICO 163, 165 (Editorial Jurídica Venezolana ed., 1990).

[144] *See* Allan R. Brewer-Carías, *Presentación a la Segunda Edición, Sobre Algunos Principios de la Invalidez de los actos administrativos en la legislación de América Latina* [*Presentation to the Second Edition, On some principles of the invalidity of administrative acts in Latin American legislation*]," *in* TOMÁS RAMÓN FERNÁNDEZ, LA NULIDAD DE LOS ACTOS ADMINISTRATIVOS 13, 29 (2019).

[145] *See* La Corte Suprema de Justicia Sala Político Administrativa [Supreme Court of Justice Political-Administrative Chamber] [CSJ] No. 411 Banco del Caribe vs. República (Ministerio de Hacienda), Aug. 13, 1991 *in* 47 REVISTA DE DERECHO PÚBLICO 111 (Editorial Jurídica Venezolana ed., 1991).

absolute nullity has to be considered as never enacted; consequently, it could not and cannot produce effects."[146]

106. Furthermore, as Professor Tomás Ramón Fernández has written, it is not just that an absolutely null administrative act "cannot produce effects and its author cannot impose it," its author has "an obligation to declare it null and void from the moment in which he realizes by himself or is warned by an interested party of the existence of a nullity cause, due to the fact that it is not allowed to anybody, due to the most elemental requirements of justice, to obtain benefits from his own clumsiness (*allegans propriam turpitudinem non auditur*)."[147] As the former Political-Administrative Chamber of the Supreme Court expressed in a decision of on July 26, 1984 (Case: *Despachos Los Teques*), "the Administration can and ought to declare the absolute nullity, by its own initiative, at any time, of those acts that are against the law and are affected of absolute nullity."[148]

107. Moreover, in the words of Professor Eloy Lares Martínez, "the principle of auto-control of the Administration upon its own acts is not limited by vested rights of individuals, because no rights whatsoever can be based on administrative acts vitiated of absolute nullity."[149] In the same regard, Professor Carlos Luis Carrillo, who also affirms that the Public Administration has a "duty" to declare null and void administrative acts of absolute nullity, has observed that the inclusion of Article 19 in the Organic Law on Administrative Procedure "implies that such an act [null and void] could never produce expectations of rights, personal, direct and legitimate interests and much less subjective rights for its addressee, because as we have said, nobody could claim to be the beneficiary of effects emanating from a will expressed upon a basis that is null and against the law."[150] Article 19 provides that acts of the

---

[146] *See* La Corte Suprema de Justicia Sala Político Administrativa [Supreme Court of Justice Political-Administrative Chamber] [CSJ] Eduardo Contramaestre vs. República (Ministerio de Sanidad y Asistencia Social, Apr. 6, 1993 *in* 55-56 REVISTA DE DERECHO PÚBLICO 198 (Editorial Jurídica Venezolana ed., Caracas 1993); *See* JOSÉ ARAUJO JUÁREZ, 2 DERECHO ADMINISTRATIVO GENERAL [GENERAL ADMINISTRATIVE LAW] 174 (Ediciones Paredes ed., 2011).

[147] *See* TOMÁS RAMÓN FERNÁNDEZ, LA NULIDAD DE LOS ACTOS ADMINISTRATIVOS [The Revocation of Administrative Acts] 53 (Ediciones Olejnik ed., Santiago, 2019).

[148] *See* La Corte Suprema de Justicia Sala Político Administrativa [Supreme Court of Justice Political-Administrative Chamber] [CSJ] No. 210 Despachos los Teques, Jul. 26, 1984 *in* 19 REVISTA DE DERECHO PÚBLICO 130-131 (Editorial Jurídica Venezolana ed., 1984).

[149] *See* ELOY LARES MARTÍNEZ, MANUAL DE DERECHO ADMINISTRATIVO [ADMINISTRATIVE LAW MANUAL] 246 (14th ed. 2013).

[150] *See* Carlos Luis Carrillo Artiles, *La imbricación de la noción y contenido de la potestad de autotutel de la Administración en Venezuela* [*The imbrication of the notion and content of the authority of auto-control of the Administration in Venezuela*], *in* DERECHO ADMINISTRATIVO IBEROAMERICANO 26 (2007); *see also* HENRIQUE MEIER E., TEORÍA DE LAS NULIDADES EN EL DERECHO

Administration are absolutely null in five circumstances, including, as relevant here, when they are issued by manifestly incompetent authorities or with total and absolute disregard of the legally established procedure [e.g., prior National Assembly authorization]."[151] As I have explained some years ago: an "act affected by absolute nullity, it is not capable of creating or declaring rights,"[152] or in other words absolute nullity prevents acts "from having any effects of any kind, as the act, deemed absolutely null, cannot be understood as ever issued."[153]

108. In short, as Professor Gustavo Linares Benzo has succinctly explained: "Absolute nullity is referred to as an intrinsic vice of the act, to its constitutive elements. Thus, the vitiated act never produces effects, from the beginning. Due to the general character of the vice, absolute nullity can be alleged against anybody, *erga omnes*."[154] This is precisely the situation with the Indenture and the Pledge, which, as explained in my initial report, are null and void *ab initio* because the lack of constitutionally-required National Assembly authorization precluded (on the part of PDVSA and PDVSA Petróleo) any valid expression of consent, which is an essential element of contract formation. Contrary to ████████ assertions, it is impossible under Venezuelan law to construct any presumption of legality or legitimacy in the face of such absolute nullity. Consequently, no court in Venezuela could or would enforce the Indenture and the Pledge based on such a presumption.

109. The principle of legitimate expectations is also wholly inapplicable to the Indenture and the Pledge. This principle was developed to protect relations between the State and individuals in cases of reiterative actions of the Public Administration by preventing the latter from changing the course of its actions irrationally, abruptly, suddenly, and without warning, taking into account the effects that such changes could cause.[155] As the Electoral Chamber of the Supreme Tribunal of Justice ruled in its decision No. 98 of August 1, 2001, cited in ████████ (par. 185), for this

---

ADMINISTRATIVO [THEORY OF NULLITIES IN ADMINISTRATIVE LAW] 77 (Editorial Jurídica Alba ed., 1991).

[151] *See* on the five cases of absolute nullity of administrative acts in BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA, *supra* note 135 at 124-125.

[152] *Idem*, at 112.

[153] *Idem*, at 123-124.

[154] *See* Gustavo Linares Benzo, *Notas sobre los actos administrativos* [*Notes on Administrative Acts*], *in* EL DERECHO PÚBLICO A LOS 100 NÚMEROS DE LA REVISTA DE DERECHO PÚBLICO 1980-2005 755, 783 (Editorial Jurídica Venezolana ed., 2005).

[155] *See* BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA, *supra* note 135 at 36-37.

CONFIDENTIAL

principle to apply, the actions of the Public Administration "must *follow the legal framework* and be oriented to the protection of the general interest."[156]

110. In the words of Hildegard Rondon de Sansó, also cited in ███████ ███,[157] legitimate expectations cannot be based on "a *promise that does not comply with the rules, or even, is contrary to the rules*."[158] That is, the principle applies only when the expectation is "legitimate" in the sense of being subject to "all the requirements of the legal order"[159] and "not contrary to an express rule."[160] As the same author also wrote regarding the subjective element of the expectation: "The legitimacy of the claim could not be a decisive factor because it could lead to a plausible expectation or confidence when deriving from a fact that has not evidence of legality. For instance, it could happen that a matter considered illegal is going to be placed in the field of legality,"[161] which is obviously unacceptable. This is why the same author, in another work cited in ███████████ (par. 192), emphasizes that "it is necessary for the *expectation to be established in accordance with the legal order*, in a way that there is no provision that could be opposed to the satisfaction of the claim."[162]  For this same reason, Professor Caterina Balasso, also cited in ███ ███████ (par. 185), has expressed that a legitimate expectation must be "justified"—that is, the act on which the expectation is based "*must be subject to the legal order* and oriented toward the protection of the general interest."[163]

111. Therefore, no "legitimate expectation" could possibly arise from the execution of the Indenture and the Pledge, which was not authorized by the National Assembly pursuant to Articles 150 and 187.9 of the Venezuelan Constitution.

---

[156] *See* Tribunal Supremo de Justicia Sala Electoral [TSJ] [Electoral Chamber of the Supreme Tribunal of Justice] No. 98 Asociación Civil "Club Campestre Paracotos, Aug. 1, 2001, *in* 85-88 REVISTA DE DERECHO PÚBLICO 232-238 (Editorial Jurídica Venezolana ed., 2001) (produced as Exhibit ██-114 to ███████).

[157] Hildegard Rondón de Sansó, El Principio de Confianza Legítima en el Derecho Venezolano [The Principle of Legitimate Expectation in Venezuelan Law], *in* IV JORNADAS INTERNACIONALES DE DERECHO ADMINISTRATIVO 295 (1998) (produced as Exhibit ██-108 to ███████).

[158] *Id*. at 300.

[159] *Id*. at 301.

[160] *Id*. at 328.

[161] *Id*. at 349.

[162] Hildegard Rondón de Sansó, *Visión General del Principio de Expectativa Plausible* [*Overview of the Principle of Plausible Expectation*], *in* 141 BOLETÍN DE LA ACADEMIA DE CIENCIAS POLÍTICAS Y SOCIALES 341 (2003).

[163] Caterina Balasso Tejera, *El Principio de Protección de la Confianza Legítima y su Aplicabilidad Respecto de los Ámbitos de Actuación del Poder Público* [*The Principal of Protection of Legitimate Expectations and its Applicability to policy areas of the Public Power*], *in* 100 REVISTA DE DERECHO PÚBLICO 745-746 (2006).

CONFIDENTIAL

Moreover, it is bad faith to pretend otherwise given that, in the same May 2016 Resolution of the National Assembly from which ███████████ purports to deduce an "official interpretation" of national public interest contracts that would exclude the Indenture and the Pledge, the National Assembly expressly warned that any national public interest contract entered into without required legislative authorization would be absolutely null and void[164] (par. 123 ff; 201ff).

112. The May 2016 Resolution was not adopted to "define" or establish any specific notion of public interest contracts, as ███████████ incorrectly asserts (par. 201). Rather, the evident purpose of the Resolution was to declare in a general way the National Assembly's "own and untransferable" power to authorize, as a condition of validity, all public interest contracts entered into with foreign states, official foreign entities, or corporations non domiciled in Venezuela, referring to the "National Executive" because it is the National Executive (i.e., the National Executive branch of government) that must present such a contract to the National Assembly for authorization even when the public contracting party is a state-owned enterprise such as PDVSA or PDVSA Petróleo.[165] The Resolution was sent to all foreign embassies in Venezuela to ensure that potential foreign counterparties would be warned "about the nullity of contracts to be entered against the provision of article 150 of the Constitution and about the liability derived therein."[166] (Article 4).

113. There is simply no plausible way to deduce from the text of the May 2016 Resolution that the National Assembly's purpose was to "define" the notion of national public interest contracts in such a way as to "welcome" foreign companies not domiciled in Venezuela to enter into such contracts without legislative authorization, much less that the National Assembly created a "legitimate expectation" that public interest contracts entered into without authorization would be accepted.

114. Finally, the National Assembly's September 2016 Resolution,[167] passed when the Exchange Offer was announced but prior to the execution of the Indenture and the Pledge, did not "contradict" the May 2016 Resolution. On the contrary, consistent with the May 2016 Resolution, the National Assembly invoked its powers under Article 187 of the Constitution, which include, as relevant to the situation, the power enumerated in subpart 187.9 to authorize the national public interest

---

[164] *May 2016 Resolution*, supra note 75.
[165] *Id.* at 1.
[166] *Id.* at 3.
[167] *September 2016 Resolution*, *supra* note 83.

CONFIDENTIAL

contracts entered into with foreign companies not domiciled in Venezuela.[168] Specifically, the Resolution "exhort[ed] the Public Prosecutor to open an inquiry to establish whether the operation in process [the Exchange Offer] protected the Nation's patrimony, in consideration of what is stated in articles 187, number 9, 302 and 303 of the Constitution."[169] Additionally, the resolution categorically rejected the Pledge. ███████████████ emphasis on the lack of any specific reference to Article 150 (par. 205) is highly misleading, as the power granted in Article 187.9 with respect to national public interest contracts corresponds to the same power granted in Article 150. The reference to Article 187.9 was therefore perfectly sufficient for the intended purpose, which was to assert the National Assembly's legislative control over national public interest contracts. Even without a specific reference to Article 150, which would have been superfluous, its co-applicability with Article 187.9 would have been well understood.

Allan R. Brewer-Carias

---

[168] *Id*. at 2.
[169] *Id*.