# **Exhibit B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC.,<br><br>   Plaintiffs,<br><br>   -against-<br><br>MUFG UNION BANK N.A, and GLAS AMERICAS LLC,<br><br>   Defendants. | No. 19 Civ. 10023 (KPF) |

**EXPERT REBUTTAL REPORT OF DAVID C. HINMAN, CFA**

**APRIL 15, 2020**

# EXPERT REBUTTAL REPORT OF DAVID C. HINMAN

## Table of Contents

I. INTRODUCTION ................................................................................................................ 1

II. SUMMARY OF OPINIONS ............................................................................................... 2

III. THE DISTINCTIONS BETWEEN NEW YORK LAW BONDS AND OTHERWISE IDENTICAL LOCAL-LAW BONDS WOULD NOT HAVE BEEN A FACTOR IN AN INVESTOR'S EVALUATION OF THE OVERALL INVALIDITY RISK ASSOCIATED WITH PARTICIPATING IN THE EXCHANGE ................................................................................................................. 3

IV. THIS LITIGATION DOES NOT INVOLVE A RETROACTIVE CHANGE TO LOCAL LAW ...................................................................................................................... 6

V. IF PDVSA SUCCEEDS IN INVALIDATING THE 2020 NOTES, THE "LEGITIMATE EXPECTATIONS OF INVESTORS" WOULD NOT BE "DEFEATED" AND THE NEW YORK LAW BOND MARKET AS A WHOLE WOULD NOT SUFFER "LONG-LASTING DAMAGE" ............................................. 8

APPENDIX A: ADDITIONAL DOCUMENTS RELIED UPON ........................................... 17

# EXPERT REBUTTAL REPORT OF DAVID C. HINMAN

## I. INTRODUCTION

1. At the request of Paul Hastings LLP (PDVSA's and PDVSA Petróleo's counsel) and Willkie Farr & Gallagher LLP (PDV Holding's counsel) (collectively referred to as "Counsel"), I submitted an expert report on March 16, 2020.[1] The same day, Professor Arturo C. Porzecanski submitted a declaration on behalf of MUFG Union Bank, N.A. and GLAS Americas LLC, the Defendants and Counterclaim Plaintiffs.[2]

2. According to Professor Porzecanski:

   a. "New York law" bonds issued by sovereigns and state-owned enterprises ["SOEs"], such as the PDVSA 2020 Notes, offer investors certain legal protections that otherwise identical "local-law" bonds do not.[3]

      i. New York law bonds offer investors "greater predictability and certainty than the domestic law of these issuers," which reduces the risk that an issuer "will effect a change in the local law to diminish the rights of the bondholders."[4]

      ii. Therefore, investors pay a premium for New York law bonds compared to otherwise identical local-law bonds, especially when the "borrower is experiencing financial distress."[5]

      iii. "[I]f the 2020 Notes had been governed by Venezuelan law instead of New York law, the beneficial owners of the 2017 Notes would not have tendered into the

---

[1] I refer to my report dated March 16, 2020 (and its appendices and exhibits) as my "First Report." In that report, I defined all capitalized terms which I use in this report as well as provided my qualifications and compensation details.

[2] Declaration of Professor Arturo C. Porzecanski, March 16, 2020 ("Porzecanski Declaration" or "Declaration").

[3] Porzecanski Declaration at footnote 4 states: "In international debt markets, as explained below, many bonds, including the bonds at issue in this case, are governed by New York or English law, even when the issuers are not incorporated or headquartered in New York or England." For purposes of this rebuttal report, I refer to such bonds as "New York law bonds." The Porzecanski Declaration notes that such New York law bonds do not necessarily "apply to bonds placed by issuers who are themselves incorporated or headquartered in New York or England." Like Professor Porzecanski, I refer to "bonds governed by the law of the issuer's country" as "local-law" bonds. (Porzecanski Declaration at footnote 4).

[4] Porzecanski Declaration, ¶5(a). The Porzecanski Declaration Section IV discusses the relative benefits of New York Law bonds compared to otherwise identical local-law bonds in greater detail.

[5] Porzecanski Declaration, ¶23. See also, ¶5(b).

   Exchange Offer, or would have tendered only on terms more favorable to tendering beneficial owners of the 2017 Notes."[6]

  b. If PDVSA succeeds in invalidating the 2020 Notes through this action, the purported "legitimate expectations of the investors would be defeated," allegedly causing "potentially long-lasting damage to the market for sovereign or state-controlled-enterprise bonds with New York choice-of-law provisions."[7]

3. Counsel has asked me to review and comment on Professor Porzecanski's opinions.

## II. SUMMARY OF OPINIONS

4. For reasons I explain in detail in this rebuttal report, in my opinion:

  a. The distinctions between New York law and local-law bonds that are the focus of Professor Porzecanski's opinions would not have been a factor in an investor's evaluation of the overall invalidity risk (*i.e.*, the invalidity of the 2020 Notes and the pledge of CITGO Collateral) associated with participating in the Exchange.

   i. It was widely understood by the relevant investor community at the time that the 2020 Notes' validity was subject to the requirements of the Venezuelan Constitution, notwithstanding the choice-of-law provisions in the 2020 Notes' governing documents.

   ii. While local-law bonds may entail the risk that "the sovereign that issued or guaranteed them will effect a change in the local law to diminish the rights of the bondholders,"[8] as Professor Porzecanski notes, such "issuer abuse"[9] is not relevant in this case because the 2020 Notes' validity is being litigated before a New York court which is independent of political interference by the foreign sovereign issuer. Further, the 2020 Notes that PDVSA actually issued (if valid issuance were assumed) would not be "governed by Venezuelan law instead of New York law," as Professor Porzecanski assumes in his hypothetical analysis.

  b. Professor Porzecanski's opinion that "New York or English law bonds reduce, in particular, the risk that the sovereign that issued or guaranteed them will effect a change in the local law to diminish the rights of the bondholders,"[10] does not address the actual factual circumstances presented in this case. I understand that the dispute at issue here does not constitute a *retroactive* attempt by Venezuela to change local law or contract provisions, but instead turns on the application of the Venezuelan Constitution's

---

[6] Porzecanski Declaration, ¶5(e).

[7] Porzecanski Declaration, ¶5(f) and ¶55.

[8] Porzecanski Declaration, ¶5(a).

[9] Porzecanski Declaration, ¶5(b).

[10] Porzecanski Declaration, ¶5(a).

requirements regarding the valid issuance of the 2020 Notes and the associated pledge of CITGO Collateral that were in force at the time of the Exchange.

c. Professor Porzecanski's claim that if PDVSA succeeds in invalidating the 2020 Notes through this action then "the legitimate expectations of investors would be defeated" and the market for New York law bonds would suffer long-lasting damage is fundamentally flawed. Given the considerable market and analyst commentary about the overall invalidity risk associated with the 2020 Notes both before and after the public circulation of the original Exchange Offering Circular, which contained the New York governing law clause, sophisticated investors would have factored the 2020 Notes' invalidity risk into their expectations about the 2020 Notes' future prospects, notwithstanding these Notes' New York governing law provision.

   i. This known invalidity risk was one reason that the ultimate terms of the Exchange Offer were unusually favorable for investors.

   ii. Even after the Exchange was completed, sophisticated investors would have continued to factor the 2020 Notes' invalidity risk into their expectations about the 2020 Notes' future prospects because market commentary, such as Professor Porzecanski's own blog post on Venezuela in 2018, continued to reiterate that "the validity of some debts could be challenged, especially by an eventual successor government, because not all received proper authorization (*e.g.,* from the National Assembly)."[11]

### III. THE DISTINCTIONS BETWEEN NEW YORK LAW BONDS AND OTHERWISE IDENTICAL LOCAL-LAW BONDS WOULD NOT HAVE BEEN A FACTOR IN AN INVESTOR'S EVALUATION OF THE OVERALL INVALIDITY RISK ASSOCIATED WITH PARTICIPATING IN THE EXCHANGE

5. The relative protections afforded to New York law bonds compared to local-law bonds would not have been a factor in an investor's evaluation of the invalidity risks associated with participating in the Exchange. Here, investors voluntarily exchanged existing New York law bonds (the PDVSA April 2017 and November 2017 Notes) for another New York law bond (the 2020 Notes),[12] in a transaction which was immediately and publicly

---

[11] Porzecanski, Arturo C. "Venezuela: Sliding into a Generalized Default," *AULA Blog*, January 9, 2018. (https://aulablog.net/2018/01/09/venezuela-sliding-into-a-generalized-default/).

[12] The *Prospectuses for the April and November 2017* Notes stated: "The Indenture will provide that the Notes will be governed by, and construed in accordance with, the laws of the State of New York." (Petróleos de Venezuela, S.A. Prospectus dated December 4, 2007, p. 97 and Petróleos de Venezuela, S.A. Listing Particulars dated March 17, 2011, p. 102). The *September 16, 2016 Exchange Offering Circular* noted: "The Indenture will provide that the New Notes will be governed by, and construed in accordance with, the laws of the State of New York. The Security Documents

- 3 -

challenged by Venezuela's National Assembly as violating constraints placed by Venezuela's Constitution on PDVSA's authority to enter into certain contracts without National Assembly approval.

6. Under these circumstances, the 2020 Notes' choice-of-law provision would not have been a factor in an investor's evaluation of the overall invalidity risk associated with participating in the Exchange. The numerous contemporaneous news articles and analyst reports which assessed the invalidity risks associated with the 2020 Notes that I have reviewed also do not suggest that the 2020 Notes' anticipated choice-of-law provision was even relevant in assessing such invalidity risks, let alone viewed as a provision that would resolve the invalidity risk associated with the 2020 Notes.

7. Thus, Professor Porzecanski's opinion that investors pay a premium for New York law bonds relative to "equivalent bonds that are subject to local law," based on his review of certain academic studies,[13] does not shed light on the factors that investors would have considered in assessing the validity risks associated with the Exchange. The question facing the 2017 Noteholders at the time of the Exchange was not whether the 2020 Notes

---

will also be governed by, and construed in accordance with, the laws of the State of New York." (Petróleos de Venezuela, S.A. Offers to Exchange Offering Circular dated September 16, 2016, p. 156). This Exchange Offering Circular also stated: "Each Exchange Instruction submitted in a jurisdiction in which the Exchange Offers are being extended on the basis of this offering circular will be governed by and construed in accordance with the laws of the State of New York. By submitting an Exchange Instruction, you (and the Direct Participant on your behalf) irrevocably and unconditionally agree for the benefit of PDVSA, the Information Agent and the Exchange Agent that the New York state or U.S. federal courts sitting in the Borough of Manhattan, City of New York, are to have jurisdiction to settle any disputes which may arise out of or in connection with the Exchange Offers." (Petróleos de Venezuela, S.A. Offers to Exchange Offering Circular dated September 16, 2016, pp. 42-43. See also, pp. 13, 17, and 156.)

[13] The entirety of Professor Porzecanski's opinion in Section V of the Porzecanski Declaration is dedicated to the review of the results of certain academic studies that he claims provide "persuasive evidence that investors differentiate between, on the one hand, bonds issued by sovereigns and state-owned enterprises that are subject to New York or English law and, on the other, equivalent bonds that are subject to local law. Investors prize and thus pay a premium for the former class of obligations, and this effect is most pronounced when the sovereign or state-owned enterprise is experiencing financial distress." (Porzecanski Declaration, ¶38).

would be governed by New York law or Venezuelan law. There was never any question that the 2020 Notes were purportedly being issued as "New York law bonds." The question, rather, was whether the 2020 Notes could be validly issued in the first place, and the market correctly recognized that this was a question of Venezuelan constitutional law that could not be avoided through the inclusion of a New York governing law clause in the transaction documents.

8. Professor Porzecanski further opines that **"if the 2020 Notes had been governed by Venezuelan law instead of New York law,** the beneficial owners of the 2017 Notes would not have tendered into the Exchange Offer, or would have tendered only on terms more favorable to tendering beneficial owners of the 2017 Notes" (emphasis added).[14] This also is beside the point. In evaluating the Exchange Offer, holders of the 2017 Notes did not actually have to evaluate the "more favorable" terms they should have been offered "**if** the 2020 Notes offered in the Exchange had been governed by Venezuelan law" because the 2020 Notes that PDVSA actually issued – *if deemed valid* – are **not** "governed by Venezuelan law instead of New York law," as Professor Porzecanski assumes in his hypothetical analysis.

9. Further, to the extent that investors valued the protections associated with the selection of New York as providing the forum and procedure for resolution of any disputes, including disputes over the 2020 Notes' validity, they are receiving that value. The 2020 Notes' validity is being litigated before a New York court, not a court in Venezuela, and I understand that the New York court will apply New York procedures to resolve this

---

[14] Porzecanski Declaration, ¶5(e).

dispute.[15] A New York court's ruling in PDVSA's favor on the question of the 2020 Notes' validity will thus not violate sophisticated investors' expectations (at the time of the Exchange or later) that the 2020 Notes were to be governed by New York law, *assuming that they were validly issued*, a question that sophisticated investors understood related to Venezuelan constitutional requirements.

### IV. THIS LITIGATION DOES NOT INVOLVE A RETROACTIVE CHANGE TO LOCAL LAW

10. I understand that the issue in dispute in this case is whether Venezuela's constitutional requirements were met for the 2020 Notes to come validly into existence in the first place. Sophisticated investors recognize that a bond must be validly issued under the law of the jurisdiction governing the issuer, regardless of which jurisdiction's law would eventually govern the bond, *if it is valid*.

11. The Porzecanski Declaration fails to explain why the 2020 Notes' New York governing law provision is relevant in this dispute. In my view, sophisticated investors would consider the protections afforded to investors under New York law irrelevant if the 2020 Notes (and relatedly, the CITGO Collateral pledge) were not validly issued in accordance with the issuer's local constitutional requirements at the time of their issuance.

12. Professor Porzecanski states that "New York or English law bonds reduce, in particular, the risk that the sovereign that issued or guaranteed them will effect a change in the local

---

[15] I further understand that PDVSA has not argued that the 2020 Notes – *if valid* – should be governed by Venezuelan law. Rather, it is my understanding that PDVSA is arguing only that the transaction violated fundamental limits imposed by the Venezuelan Constitution and that the 2020 Notes and pledge of the CITGO Collateral are therefore void *ab initio* as they were never validly issued in the first place. In my opinion, sophisticated market participants understood before the close of the Exchange that the 2020 Notes and CITGO Collateral pledge faced the risk of such an invalidity challenge.

law to diminish the rights of the bondholders."[16] To bolster his opinion, Professor Porzecanski notes that sovereign issuers, such as Greece and Argentina, retroactively changed the clauses of their sovereign *local-law* bonds to the detriment of the bondholders,[17] but holders of Greek and Argentine sovereign bonds subject to English and other non-local law received preferential treatment.[18] However, the question in dispute in this case is different. I understand that this case does not involve an attempt by Venezuela to change *retroactively* the terms or governing law of the transaction, which appears to be the focus of Professor Porzecanski's opinion.[19] Rather, I understand the dispute at issue concerns the invalidity of the 2020 Notes and the purported pledge of CITGO Collateral under the Venezuelan Constitution *in effect at the time of the 2020 Notes' issuance.* Sophisticated investors would have incorporated into their expectations this invalidity risk despite the New York governing law provision.

---

[16] Porzecanski Declaration, ¶5(a).

[17] The Porzecanski Declaration notes that:

> "[T]he Greek parliament hastily passed a law retroactively introducing collective-action clauses ("CACs") with a class voting mechanism into the €177 billion of targeted bonds governed by Greek law, specifying that by tendering into the exchange, every bondholder was automatically voting to make the terms of the exchange applicable to all other bonds." (Porzecanski Declaration, ¶44).

> "In August and December 2019, and again in January and February 2020, the government of Argentina defaulted on a sizeable amount of local-law debt obligations, denominated in both the local currency and U.S. dollars. These actions were accomplished primarily by changes to Argentine law that unilaterally changed the terms of the debt." (Porzecanski Declaration, ¶49).

[18] Porzecanski Declaration, ¶¶47 – 48.

[19] Professor Porzecanski states: "In my opinion, if PDVSA were to succeed in using local Venezuelan law to invalidate these bonds, the legitimate expectations of the investors would be defeated." (Porzecanski Declaration, ¶55).

V. **IF PDVSA SUCCEEDS IN INVALIDATING THE 2020 NOTES, THE "LEGITIMATE EXPECTATIONS OF INVESTORS" WOULD NOT BE "DEFEATED" AND THE NEW YORK LAW BOND MARKET AS A WHOLE WOULD NOT SUFFER "LONG-LASTING DAMAGE"**

13. The Porzecanski Declaration neither explains *how* investors would have formed "legitimate expectations," (*i.e.,* the grounds on which investors would have formed expectations about the dispute at issue) nor *why* such expectations would be defeated if the court in this case finds that the 2020 Notes were invalidly issued.

14. As discussed in my First Report, investors form expectations about a bond's merits (*i.e.,* future cash flows and associated investment risks, including the ultimate outcome of any ongoing legal disputes) based on contemporaneously available information such as market commentary and analyst reports by independent third-parties and do not simply take at face value the issuer's representations.[20] This is particularly the case when the issuer may have a propensity to "escape its obligations,"[21] as the Porzecanski Declaration suggests is true of PDVSA.

15. My review of such contemporaneously available market commentary and analyst reports indicates that investors would have known that the 2020 Notes, were they validly issued under the Venezuelan Constitution, would be governed by New York law, according to the

---

[20] First Report, ¶¶20-22. My First Report discussed the information that was contemporaneously available to investors concerning the invalidity risk associated with the 2020 Notes prior to their issuance through October 2019. (First Report, Section III.B.)

[21] Porzecanski Declaration, ¶17. Professor Porzecanski further states: "[M]any countries, including emerging markets, lack judiciaries with a reputation for resolving disputes fairly and quickly. The concern for partiality can be most acute in cases where the sovereign, or a state-owned enterprise, is a party to a dispute, and also when the sovereign or state-owned enterprise is experiencing fiscal or hard-currency difficulties." (Porzecanski Declaration, ¶19). Of course, as noted above, the validity of the PDVSA 2020 Notes and associated Pledge is being litigated in a New York court, not a Venezuelan one, so Professor Porzecanski's concerns on this count are moot.

Exchange Offering Circular that was released on September 16, 2016.[22] But, widely available market and analyst commentary beginning immediately upon the release of the Exchange Offering Circular (and continuing through the closing of the Exchange) discussed the possible legal risks associated with the proposed 2020 Notes' issuance under Venezuelan law, notwithstanding the 2020 Notes' New York governing law provision disclosed in the Exchange Offering Circular.[23]

16. For instance, on September 18, 2016, Siobhan Morden, Managing Director and Head of Latin America Fixed Income Strategy at Nomura Securities International, noted in an email to institutional investors that "[t]he make or break of the exchange is the assessment of the equity valuation and the legal risks."[24] Ms. Morden noted that opinions from local lawyers had suggested that "all international transactions (such as … this PdVSA debt exchange) would require legislative approval or otherwise risk illegality."[25] Ms. Morden highlighted this invalidity risk, even after the Exchange Offering Circular released two days earlier had announced that the 2020 Notes, Indenture, and Pledge would be governed by New York law upon issuance.

---

[22] By September 16, 2016 investors would have known through the Exchange Offer Circular issued that day that the new 2020 Notes "will be governed by, and construed in accordance with, the laws of the State of New York." (Petróleos de Venezuela, S.A. Offers to Exchange Offering Circular dated September 16, 2016, p. 156).

[23] Section III.B of my First Report, provides examples of the information available to investors regarding the invalidity risk associated with the 2020 Notes prior to and after the Exchange through 2019. In this report, I summarize some of that discussion for the pre-issuance period (*i.e.,* through October 28, 2016) in particular.

[24] Email from Siobhan Morden to Patrick Haller, Michel Aubenas, Pablo Goldberg and 27 others, "Venezuela | PdVSA exchange," *Nomura*, September 18, 2016. (ASH_00000743 – 746 at 743); Email from Siobhan Morden to Patrick Haller, Michel Aubenas, Pablo Goldberg and 27 others, "Venezuela | PdVSA exchange," *Nomura*, September 18, 2016. (BLA_00004810 – 811 at 810; BLA_00000556 – 558 at 557).

[25] Email from Siobhan Morden to Patrick Haller, Michel Aubenas, Pablo Goldberg and 27 others, "Venezuela | PdVSA exchange," *Nomura*, September 18, 2016. (ASH_00000743 – 746 at 743); Email from Siobhan Morden to Patrick Haller, Michel Aubenas, Pablo Goldberg and 27 others, "Venezuela | PdVSA exchange," *Nomura*, September 18, 2016. (BLA_00004810 – 811 at 810; BLA_00000556 – 558 at 557).

17. Likewise, on September 19, 2016, a UBS analyst report



18. On September 27, 2016, the Venezuela's National Assembly passed a resolution regarding the "Current Financial Situation of Petróleos de Venezuela, S.A."[27] The resolution was publicly declared and widely discussed in the relevant analyst and investor community. The National Assembly resolved:[28]

> To reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of Citgo Holding Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation.

It is my understanding that this resolution was issued pursuant to provisions of the Venezuelan Constitution that have not subsequently been changed, retroactively or otherwise.

19. The National Assembly's September 27, 2016 resolution also called for "an investigation to determine if the current transaction protects the National Property, in accordance with

---

[26] Alejo Czerwonko, "Venezuela bonds: Of politics and swaps," *UBS,* September 19, 2016, p. 3. (UBS-PDV000001 – 009 at 003).

[27] Complaint, Exhibit C, "Resolutions on the Current Financial Situation of Petróleos de Venezuela, S.A.," The National Assembly of the Bolivarian Republic of Venezuela, September 27, 2016. Translated by TransPerfect.

[28] Complaint, Exhibit C, "Resolutions on the Current Financial Situation of Petróleos de Venezuela, S.A.," The National Assembly of the Bolivarian Republic of Venezuela, September 27, 2016. Translated by TransPerfect.

articles 187, section 9, 302 and 303 of the Constitution of the Bolivarian Republic of Venezuela."[29]

20. Further, the same day (September 27, 2016), news articles reported that during the National Assembly's debate on the subject, Freddy Guevara, the deputy to the National Assembly, had stated that allowing the 2020 Noteholders to become owners of CITGO (should the 2020 Notes default) would be a "flagrant breach of national sovereignty."[30]  Mr. Guevara also questioned the validity of the Exchange transaction (*i.e.,* the issuance of the 2020 Notes).  For instance, a September 28, 2016 *El Cooperante* article noted that in the National Assembly debate, Mr. Guevara affirmed that the National Assembly "will not recognize any public contract that is not considered or authorized by the Legislative Branch in accordance with the Constitution."[31]

21. Analysts at Torino Capital, Goldman Sachs, J.P. Morgan, and Jefferies continued to comment on the invalidity risk associated with the 2020 Notes (despite the September 16, 2016 announcement in the Exchange Offering Circular that the Notes would be governed by New York law upon issuance) through the completion of the Exchange on October 28,

---

[29] Complaint Exhibit C, "Resolutions on the Current Financial Situation of Petróleos de Venezuela, S.A.," The National Assembly of the Bolivarian Republic of Venezuela, September 27, 2016.  Translated by TransPerfect.

[30] Lysaura Fuentes, "Freddy Guevara: Government has proven negligent and destructive of the economy," *El Cooperante*, September 28, 2016.  Translated by TransPerfect.  (See also, "Del Pino must explain terms of the PDVSA Bond Exchange to the AN," *Petróleo América*, September 27, 2016.  Translated by TransPerfect.)

[31] Lysaura Fuentes, "Freddy Guevara: Government has proven negligent and destructive of the economy," *El Cooperante*, September 28, 2016.  Translated by TransPerfect.  (See also, "Del Pino must explain terms of the PDVSA Bond Exchange to the AN," *Petróleo América*, September 27, 2016.  Translated by TransPerfect.)

2016.[32]  For instance, on October 13, 2016, a J.P. Morgan analyst report highlighted the risk surrounding the legality of the Exchange.  The report noted:[33]

> [The Venezuelan National] Assembly has gone on record with [a] resolution rejecting the use of Citgo as collateral and calling del Pino to testify (which he has not).  Moreover, from a more political perspective, jailed leader Leopoldo Lopez has warned markets that the deal could be "illegal" and reneged upon by a future opposition government.

22. The citations above are just selected examples.  My First Report discusses at greater length the many other instances where analysts and news articles discussed the invalidity risk under the Venezuelan Constitution associated with the 2020 Notes' issuance and the purported pledge of the CITGO Collateral.  All of this commentary was issued notwithstanding the 2020 Notes' New York governing law provision.

23. As noted in my First Report, "the terms offered by PDVSA to induce 2017 Noteholders to tender their notes in the Exchange were unusually favorable for investors in my experience. […]  For example, PDVSA offered investors who tendered their 2017 Notes more in face value on the 2020 Notes than the remaining face value of the exchanged 2017 Notes (a face value "premium") rather than requiring them to accept a face value haircut as in the typical restructuring in my experience." [34]  Nevertheless, "only 39% of the 2017 Notes' outstanding principal was ultimately tendered in the Exchange.  Investors' tepid response to the Exchange Offer, despite the favorable terms, is consistent with the finding that

---

[32] Francisco Rodríguez, "Venezuela this Week: October 11-16, 2016 Of Laws and Bonds," *Torino Capital LLC*, October 11, 2016, pp. 6 – 7; see also (same) (ASH_00006934 – 941 at 939 – 940).  For a discussion of such analyst commentary by Goldman Sachs, J.P. Morgan and Jefferies, *see* First Report, ¶¶50 – 52.

[33] Email from Dan Gelfand to Blackrock employees, "FW: PDVSA : Swap extended again and the clock is ticking," dated October 13, 2016 attaching email from Javier Zorrilla, Ben Ramsey, and Trang Nguyen, "PDVSA Swap Extended Again and the Clock is Ticking," *J.P. Morgan*, October 13, 2016.  (BLA_00001171 – 175 at 172).

[34] First Report, ¶¶70 – 71.

- 12 -

investors had factored in invalidity risk associated with the CITGO Collateral."[35]  Further, this tepid response suggests that the existence of a New York governing law clause in the 2020 Notes failed to incentivize a majority of 2017 Note holders to participate in the Exchange because investors remained concerned about the validity of the 2020 Notes.

24. Commentary about the invalidity risk related to the 2020 Notes continued even after the Notes were issued.  For instance, Professor Porzecanski himself noted in a 2018 blog post that restructuring Venezuela's debt could be complicated by the fact that "the validity of some debts could be challenged, especially by an eventual successor government, because not all received proper authorization (*e.g.,* from the National Assembly)."[36]  Such ongoing commentary would have reinforced investors' expectations regarding the 2020 Notes' invalidity risk, despite the 2020 Notes' governing New York law provision.

25. Therefore, Professor Porzecanski's claim that a finding by the court that the 2020 Notes and the associated CITGO Collateral pledge were invalid at issuance would defeat investors' "legitimate expectations" is flawed and unsupported by the facts.

26. Professor Porzecanski's related claim that such a finding by the court would cause "long-lasting damage" to the New York law bond market[37] is speculative and incorrect.  Professor Porzecanski has discussed examples of sovereign issuers such as Greece that may have abused their powers to the detriment of their debtholders by introducing additional *post-issuance* clauses for some of their local-law bonds through new legislation.[38]  However, he fails to recognize that the present dispute is *not* a retroactive attempt by Venezuela to

---

[35] First Report, ¶83.

[36] Porzecanski, Arturo C. "Venezuela: Sliding into a Generalized Default," *AULA Blog*, January 9, 2018. (https://aulablog.net/2018/01/09/venezuela-sliding-into-a-generalized-default/).

[37] Porzecanski Declaration, ¶55.

[38] Porzecanski Declaration, ¶¶44 – 45.

change the terms of an existing bond by enacting new legislation. The challenge here is to the validity of the 2020 Notes in the first place, a risk that sophisticated investors would have already been aware of prior to the 2020 Notes' issuance.

27. Indeed, the New York law bond market has survived instances in the past where the investor community was taken by surprise by a sovereign issuer's actions, including a sovereign entity's (Ecuador's) decision to default on its existing New York law bonds based on validity challenges that arose several years *after* the bonds had been issued. In contrast, in this case, sophisticated investors would not be surprised if the New York court finds the 2020 Notes are invalid because investors were well aware of the challenges to the validity of the 2020 Notes and the purported pledge of CITGO Collateral *before* the 2020 Notes were issued.

28. In 2006, Rafael Correa was elected Ecuador's president. In his January 15, 2007 inauguration speech, President Correa "presaged his get-tough attitude toward foreign bondholders" and noted "that part of Ecuador's foreign debt was illegitimate, had been acquired under dubious circumstances, [and] was not used for its intended purposes."[39] In December 2008, the Correa administration defaulted on certain of its sovereign New York

---

[39] Porzecanski, Arturo C. "When Bad things Happen to Good Sovereign Debt Contracts: The Case of Ecuador," *Law and Contemporary Problems*, vol. 73, no. 4, 2010, pp. 251 – 272 ("Porzecanski (2010)"), at pp. 260 – 261. Porzecanski notes that "In July of 2000, with the IMF's backing, the government sought and obtained a second round of principal forgiveness from its creditors, estimated at around forty percent of face value. Bondholders were presented with a take-it or-leave-it exchange offer whereby they would get new, uncollateralized obligations due in 2030 that paid very little interest, at least in the initial years, in exchange for their long-dated Brady bonds, to which a heavy discount was applied, and for their short-dated Eurobonds, to which no discount was applied. If creditors had opted instead for a bond paying a high interest rate and maturing in 2012, they would have had to concede an additional thirty-five percent 'haircut' on the principal owed by Ecuador." (Porzecanski (2010) at p. 254.) Ecuador ultimately issued $3.95 billion of sovereign debt, governed by New York Law, that were due to mature in 2012 and 2030 (henceforth, Ecuador's "2012 Notes" and "2030 Notes," respectively). (Republic of Ecuador Listing Particulars Document dated August 23, 2000).

- 14 -

law bonds, due in 2012 and 2030, on the grounds that those bonds were immoral and not legally valid under Ecuadorian law.[40]

29. Unlike the validity challenge at issue in this litigation, which was widely analyzed prior to the 2016 Exchange transaction, I am not aware of any legal challenges to the validity of Ecuador's 2012 and 2030 Notes when those notes were issued in 2000.  Yet, as Professor Porzecanski himself noted in an article he published in 2010, "no leading government or any official multilateral agency based in Washington or Latin America" objected to Ecuador's actions.[41]  For instance, in December 2008, shortly after Ecuador's selective default, "when a reporter asked the IMF about its attitude towards Ecuador's default," Porzecanski (2010) noted an IMF spokesperson stated:[42]

> We understand that Ecuador's decision to default on these bonds is based on a dispute about [their] legal validity rather than [on] debt sustainability [grounds], and of course we don't take sides on the merits.

30. In my opinion, as an institutional investor who managed and traded emerging market sovereign debt at the time, even though Ecuador's repudiation of its 2012 Notes and 2030 Notes in 2008 may have been considered by some investors to be a retroactive maneuver by a sovereign issuer to unilaterally change its bonds' terms, the New York law bond market did not suffer any long-lasting damage as a result.[43]

---

[40] "Ecuador's winning strategy," *The Economist*, June 17, 2009.  (https://www.economist.com/news/2009/06/17/ecuadors-winning-strategy).

[41] For example, Porzecanski (2010) noted: "The deplorable fact is that no leading government or any official multilateral agency based in Washington or Latin America went on record to express any dismay at Ecuador's latest default and alleged bond-market manipulation. On the contrary, the local representatives of the regional development banks uttered words of moral support, and their headquarters provided an indirect blessing to the default and debt buyback by ramping up their lending to the government…   All things considered, the official community's tacit approval of Ecuador's default is deeply troubling."  (Porzecanski (2010), pp. 268 – 269).

[42] Porzecanski (2010), p. 269.

[43] Ecuador, in particular, has not suffered any permanent loss of access to the capital markets as a result of its default, and the country has since raised capital by issuing several New York law bonds.  For instance, Ecuador issued $750

31. As the New York law bond market has survived surprises such as Ecuador's repudiation of its New York law bonds in 2008, there is no reason to believe that a successful validity challenge here—which was the subject of widespread *pre-issuance* analysis and commentary—will have systemic market consequences, as Professor Porzecanski asserts.

_____
David C. Hinman

---

million bonds governed by New York law in 2015. The $750 million bonds issued in 2015 carried a 10.5% interest rate and matured in 2020. The offering circular noted that "The Notes will be governed by the laws of the State of New York, except for the terms concerning submissions to arbitration which will be governed by English law." (Republic of Ecuador Offering Circular dated March 24, 2015, pp. 19 and 23.) Ecuador has subsequently issued additional New York law bonds including, among others: $1 billion 10.75% notes issued 2016 and maturing in 2022 (Republic of Ecuador Offering Circular Supplement dated September 30, 2016, p. 16); $3.0 billion 7.875% notes issued in January 2018 and maturing in 2028 (Republic of Ecuador Offering Circular dated January 23, 2018, p. 30); and $2.125 billion 10.75% notes issued in 2019 and maturing in 2029 (Republic of Ecuador Offering Circular dated June 10, 2019, p. 25).

# APPENDIX A: ADDITIONAL DOCUMENTS RELIED UPON

1. Declaration of Professor Arturo C. Porzecanski, March 16, 2020.

2. Porzecanski, Arturo C. "When Bad things Happen to Good Sovereign Debt Contracts: The Case of Ecuador," *Law and Contemporary Problems*, vol. 73, no. 4, 2010, pp. 251 – 272.

3. Porzecanski, Arturo C. "Venezuela: Sliding into a Generalized Default," AULA Blog, January 9, 2018.  (https://aulablog.net/2018/01/09/venezuela-sliding-into-a-generalized-default/).

4. "Ecuador's winning strategy," *The Economist,* June 17, 2009. (https://www.economist.com/news/2009/06/17/ecuadors-winning-strategy).

5. Republic of Ecuador Listing Particulars Document dated August 23, 2000.

6. Republic of Ecuador Offering Circular dated March 24, 2015.

7. Republic of Ecuador Offering Circular Supplement dated September 30, 2016.

8. Republic of Ecuador Offering Circular dated January 23, 2018.

9. Republic of Ecuador Offering Circular dated June 10, 2019.