UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC., <br><br> Plaintiffs and Counterclaim Defendants, <br><br> - against - <br><br> MUFG UNION BANK, N.A. and GLAS AMERICAS LLC, <br><br> Defendants and Counterclaim Plaintiffs. | No. 19 Civ. 10023 (KPF) |

### DECLARATION OF XIN XU

XIN XU declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I reside in London, England and am employed by Ashmore Group plc ("Ashmore"). Ashmore is an investment management company incorporated in England and Wales. Its corporate headquarters are located in London.

2. Funds managed by Ashmore are the beneficial owners of certain Petróleos de Venezuela, S.A. ("PDVSA") Notes due 2020 (the "2020 Notes"). Ashmore funds have been holders of 2020 Notes since 2016, when they received the Notes in exchange for certain PDVSA bonds due to mature in April 2017 and November 2017 (the "2017 Notes").

3. PDVSA has not made payments on the 2020 Notes since May 2019.

4. I have worked at Ashmore since October 2008, and I have been a portfolio manager since 2012. During my tenure at Ashmore, I have focused on emerging market debt, particularly sovereign debt and debt of state-owned entities such as PDVSA. Since 2012, my responsibilities have included covering Latin American external debt, including Venezuelan

CONFIDENTIAL

sovereign debt and PDVSA debt. As part of my responsibilities, I monitor relevant political and economic developments in Venezuela.

5. In early September 2016, as part of my responsibility to monitor developments in Venezuela, I visited Venezuela with individuals from two other investment management firms. The trip was arranged by Francisco Rodríguez, an analyst at Torino Capital, and Mr. Rodríguez accompanied us on the trip. Mr. Rodríguez is a Venezuelan economist who is and was, in my opinion, among the most knowledgeable and reliable analysts covering Venezuela. In the course of the trip, we met with senior Venezuelan political figures from both the governing party and the opposition, as well as legal scholars, economists, and others knowledgeable about Venezuelan politics, law, business, and economics.

6. At the time of the trip, Ashmore funds were beneficial holders of 2017 Notes. There had been no official announcements regarding PDVSA's intent to offer an exchange for its 2017 maturities, but I was aware of talk among market participants that an exchange offer was likely. Although the terms of any offer were unknown, I was aware of speculation that an exchange might involve new debt secured by a pledge of an interest in PDVSA's wholly owned indirect subsidiary CITGO Holding, Inc. ("CITGO Holding"), which in turn is the sole shareholder of CITGO Petroleum Corporation.

7. I attach as **Exhibit 1** relevant pages from my notes of meetings during my trip. I took these notes contemporaneously with the meetings they record, and with the intent that they reflect what was said as accurately as possible. To the best of my recollection, the notes, while not a verbatim transcript, accurately reflect the substance of what I and the other participants in the meetings were told.

CONFIDENTIAL

8. One of the Venezuelan political figures we met with during the trip was Rafael Guzmán, a lawyer, National Assembly deputy, and a senior figure in Primero Justicia, one of the principal opposition parties. (At the time, as now, the National Assembly, Venezuela's unicameral legislature, was controlled by a coalition of opposition parties, one of which was Primero Justicia.) At the time of our meeting, Mr. Guzmán was President of the National Assembly Subcommittee for Finance and Tax Policies. He later became President of the National Assembly Finance Committee.

9. As reflected in my notes, one of the subjects we discussed with Mr. Guzmán was a potential debt exchange offer by PDVSA. Mr. Guzmán stated that under Venezuelan law a PDVSA debt exchange would not need the approval of the National Assembly. Mr. Guzmán also stated that PDVSA could use its overseas assets, including its interest in CITGO Holding, as a guarantee for its debt without National Assembly approval. Mr. Guzmán stated that, while this was his personal opinion, he believed it was also the majority interpretation (which I understood to mean the majority interpretation within the National Assembly).

10. At no time during our meetings in Venezuela did anyone suggest that an issuance of new debt by PDVSA or the pledge of CITGO Holding shares would be unlawful or invalid unless approved by the National Assembly.

11. Shortly after I returned to London, Mr. Rodríguez issued a report dated September 12, 2016, describing our trip. He wrote that "[o]pposition representatives also reassured us that they would not question the legality of the PDVSA bond swap, as they agreed with the interpretation of the law according to which a new PDVSA issuance (even if it was backed by CITGO) does not require National Assembly authorization." Ex. 2 at 7. A copy of Mr.

CONFIDENTIAL

Rodríguez's report is attached as **Exhibit 2**. To the best of my knowledge and recollection, the Report accurately reflects the substance of what we were told during the trip about a potential debt exchange.

12.   On September 16, 2016, PDVSA announced an exchange of debt (the "Exchange Offer"). The Exchange Offer involved the exchange of the 2017 Notes for newly issued 2020 Notes. The 2020 Notes were U.S. dollar-denominated and secured by a pledge of 50.1% of the shares in CITGO Holding (the "Pledge").

13.   In September 2016, I was aware of market concern about the possibility that PDVSA would default on its outstanding debt. Ashmore considered a default on the 2017 Notes unlikely. At the time, the 2017 Notes were current, and, to my knowledge, all prior payments due on them had been timely made. Thus, in considering whether to tender 2017 Notes in the Exchange Offer, Ashmore took into account its view that the 2017 Notes were likely to repaid.

14.   I was aware that, prior to the closing of the Exchange Offer on October 28, 2016, certain opposition legislators had expressed the view that the 2020 Notes should not be secured by the Pledge. I was also aware that some opposition legislators expressed the view that any debt issued by PDVSA required National Assembly approval.

15.   I understand that the National Assembly issued a resolution concerning the Exchange Offer dated September 27, 2016 (the "Resolution"). The Resolution called for the President of PDVSA to testify before the National Assembly; "[c]ategorically reject[ed]" the pledge of CITGO Holding stock; urged the Venezuelan Attorney General to investigate the transaction; and urged PDVSA to present a plan for its debt to the National Assembly. The Resolution did not, however, declare that the Exchange Offer or the Pledge was illegal or invalid.

16. The day after the Resolution was issued, I received a report by Mr. Rodríguez, attached as **Exhibit 3**, that was consistent with my understanding of the Resolution. Mr. Rodríguez explained that the Resolution "does not state that the operation is illegal nor does it criticize it on legal grounds." He noted that the Resolution was non-binding. He also stated that "[t]he operation is clearly legal in terms of Venezuela law" and that, although Article 105 of the Organic Law of the Financial Administration of the Public Sector requires National Assembly approval for bond issuances and forbids the use of state assets as collateral, Article 101 of the same law "expressly exempts PDVSA from those requirements." He stated that he had "spoke[n] to several opposition leaders" the day before and that most of those leaders, "including the most senior members," agreed that the operation was "legal and did not require National Assembly authorization." Mr. Rodríguez also expressed the view that it would not make sense for a hypothetical new government to attempt to repudiate the Exchange Offer, as it would be "legally binding in the US." Ex. 3 at ASH_00002449.

17. Mr. Rodríguez also stated in a separate email that, shortly after the Resolution was published, Julio Borges, another senior opposition legislator, confirmed his view that PDVSA debt issuances do not require approval of the National Assembly. **Ex. 4** at 3. Mr. Borges is a co-founder and coordinator of Primero Justicia. He served as President of the National Assembly in 2017 and currently serves as the Commissioner for Foreign Relations under Interim President Juan Guaidó.

18. The Resolution and the subsequent reports from Mr. Rodríguez thus reaffirmed Ashmore's previous assessment that the Exchange Offer was not subject to legitimate challenge under Venezuelan law. Based upon my conversation with other analysts at the time, I believe that this was a widely held view in the investment community.

CONFIDENTIAL

19. I am aware that certain analysts made statements at or about the time of the Exchange Offer regarding a purported risk that the 2020 Notes would be deemed invalid. To my recollection, that was not a widely held view at the time of the Exchange Offer. The statements that I have seen to that effect are almost entirely conclusory, with no explanation of their purported basis. In light of the other information available to me, as described above, those statements would not have changed my conclusions.

20. On October 26, 2016, I communicated my understanding that PDVSA debt issuances do not require approval of the National Assembly to Ashmore's CEO and CIO, Mark Coombs, in an email attached as **Exhibit 5**.

21. I was aware at the time of the Exchange Offer that the 2020 Notes and the Pledge were to be governed by New York law, as stated in PDVSA's Offering Circular and the other governing agreements.

22. I was also aware from the Offering Circular that Hogan Lovells US LLP was to advise PDVSA on issues of New York law and that Despacho de Abogados Hogan Lovells, S.C. was to advise on issues of Venezuelan law. I was also aware that the Offering Circular did not identify any risk that the Exchange Offer would be deemed invalid under Venezuelan law, although it extensively disclosed other risks. In addition, I was aware that PDVSA, PDVSA Petróleo, S.A. and PDV Holding, Inc. represented in the transaction documents that they had authority to enter into the transactions that made up the Exchange Offer, including the issuance of the 2020 Notes and the associated pledge. I believed that, if Hogan Lovells had identified any legal risks with respect to the validity of the Exchange Offer, the PDVSA parties would not have made those representations, and the legal risks would have been disclosed.

23. As part of Ashmore's due diligence, Charlotte Henderson, an in-house lawyer at Ashmore, spoke to PDVSA's counsel at Hogan Lovells about the enforceability of the Pledge. Ms. Henderson did not investigate whether the 2020 Notes comply with Venezuelan law. I attach as **Exhibit 6**, an email from Oscar Stephens of Hogan Lovells to Ms. Henderson. Mr. Stephens stated that "THE PLEDGE AGREEMENT WILL BE GOVERNED UNDER NEW YORK LAW. HOGAN LOVELLS US LLP WILL BE PROVIDING THE RELEVANT ENFORCEABILITY, SECURITY INTEREST AND PERFECTION OPINIONS UNDER NEW YORK LAW." Mr. Stephens also stated that "THE COLLATERAL AGENT WILL HAVE ALL RIGHTS UNDER THE UCC (I.E. UNITES [SIC] STATES LAWS IN CONNECTION WITH GRANTING OF SECURITY INTERESTS) WITH RESPECT TO THE PLEDGE." Ex. 6 at ASH_00005640 (capitalization in original). Ms. Henderson contemporaneously reported the results of her investigation to me.

24. The selection of New York law in the bond indenture and pledge and security agreement, was an important factor in Ashmore's decision to participate in the Exchange Offer. That is because we believed the choice of New York law would insulate investors from the risk that the Venezuelan government would manipulate local law to the detriment of non-Venezuelan noteholders such as Ashmore. We also believed that PDVSA would be more likely to prioritize payments on the 2020 Notes and avoid default than if the Notes were not governed by New York law.

25. Ashmore ultimately participated in the Exchange Offer, which closed on October 28, 2016.

26. Ashmore also retained certain 2017 Notes that it did not tender in the Exchange Offer. Those 2017 Notes were fully repaid upon maturity.

CONFIDENTIAL

27. Neither I nor, to my knowledge, anyone at Ashmore believed at the time of the Exchange Offer that the transactions violated any provision of Venezuelan law. Nor did we believe that there was a material risk that the Notes or the Pledge were invalid. If we had been advised by PDVSA or its subsidiaries or by their counsel that there was a material risk that the Notes or the Pledge were invalid under Venezuelan law, I am confident that we would not have participated in the Exchange.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: London, England
June 8, 2020

                                                            _Xin Xu 徐欣_
                                                                Xin Xu