**Exhibit 4 to the Xu Declaration**



Monday, October 3, 2016
Francisco Rodríguez, Chief Economist
franciscorodriguez@torinocap.com

# Venezuela this Week: October 3-9, 2016
# The Fine Print

*The National Assembly's resolution on the PDVSA bond swap did not question the operation's legality nor did it claim that it required legislative authorization. PDVSA is exempt from the requirement of National Assembly authorization by law, but other operations such as sovereign refinancing and new bilateral loans do need to be submitted before the Assembly.*

## Contents

What to watch this week ........................................................................................................ 2
A closer look .......................................................................................................................... 3
   The Debt Swap and Legislative Authorization ................................................................ 3
   Public interest contracts and public debt ........................................................................ 3
   Specific cases .................................................................................................................. 4
      Sovereign bond issuances ............................................................................................ 4
   Box 1: National Assembly Resolution on Debt Swap ...................................................... 5
      Sovereign bond refinancing ........................................................................................ 6
      PDVSA bond issuance and refinancing ..................................................................... 6
      Secured bond financing ............................................................................................. 7
      Mining concessions .................................................................................................... 7
      Bilateral loans, including China .................................................................................. 8

CONFIDENTIAL ASH_00006907



Monday, October 3, 2016
Francisco Rodríguez, Chief Economist
franciscorodriguez@torinocap.com

## What to watch this week

- Participants in the PDVSA bond swap must **submit their decision to participate** by Thursday, October 6 at 5 PM in order to qualify for the enhanced premium of 1.17 for PDVSA 2017 and 1.22 for PDVSA 2017N. Participants submitting after that date will be entitled to reduced premia of 1.12 and 1.17, respectively. We believe that the change in the terms of the exchange announced last week is likely to raise participation above the 50% minimum.
- The government may unveil greater details of the 2017 budget and confirm that it **does not intend to send the law project to the National Assembly for its approval**. Opposition leaders charge that failing to submit the budget before the Assembly is unconstitutional and may make contracts signed under that law – including future bond issuances – null and void.
- President Maduro appointed **five new members of his cabinet**: Carmen Meléndez (Chief of Staff), Aloha Nuñez (Indigenous Peoples), Ernesto Villegas (Information), Blanca Eekhout (Women) and Erika Farías (Communes). Eekhout and Farías form part of the more radical wing of *chavismo*, while Meléndez and Villegas are perceived as being more centrists.
- The **DICOM/SIMADI rate has started trending upwards again** and may continue doing so this week. The rate depreciated by 0.7% to 658.1 VEF/USD last week, the fastest observed rate of depreciation since mid-July.
- Watch for reactions to the **results of Colombia's peace referendum**, in which opponents of the peace deal prevailed by a razor-thin majority. Their victory may embolden hard-liners on the opposition side who have argued against the search for compromise with the government. Voluntad Popular leader Carlso Vecchio called the result "a defeat for Raúl Castro and his dictatorship."
- PDVSA will implement a **new plan for selling gasoline in dollars and Colombian pesos** to Colombians at its border service stations in the Táchira state. Prices would be similar to those charged at premium stations (232-290 VEF per liter). Authorities have been rationing access to regular stations in the state, shifting demand to the more expensive premium stations.
- National Assembly President Henry Ramos Allup stated on his Twitter account that **the government had been refused loans by China and other countries** because of its failure to comply with the Venezuelan constitution in submitting national interest contracts for National Assembly approval. In our view, National Assembly approval is necessary for new bilateral loans but not for the renewals of existing Chinese loan tranches nor for extensions such as the one granted earlier this year by China to Venezuela.

CONFIDENTIAL　　　　ASH_00006908



Monday, October 3, 2016
Francisco Rodríguez, Chief Economist
franciscorodriguez@torinocap.com

# A closer look

## The Debt Swap and Legislative Authorization

Las Tuesday, September 27, the National Assembly approved a resolution rejecting the terms of PDVSA's proposed bond swap operation. The resolution summons PDVSA President and Oil Minister Eulogio Del Pino to explain the terms of the swap to the National Assembly, rejects the use of CITGO Holding stock as collateral in the bond swap operation, requests the Attorney General's office to investigate whether the operation generated economic damages to the nation that involve responsibility of the public officials involved, and requests PDVSA to present a plan to reprofile its debt and increase oil production (see Box 1).

Market concerns were stoked by an apparently apocryphal statement attributed to legislator Julio Borges – opposition whip and the highest-ranking figure in *Primero Justicia* - who was reported to have stated that the bond swap offer would not be valid in the event of a political transition. Borges denied making the statement, claiming that he was misquoted. According to Borges, his statement was made in reference to those national public interest contracts that require National Assembly approval, and not to the PDVSA swap operation, which does not. [1]

In fact, the National Assembly's resolution does not contain any allegation that the operation is illegal or contravened constitutional rules. This is in stark contrast with the way in which the National Assembly has handled other cases, such as that of the Mining Arc concessions, where it explicitly denied approval for the concessions and approved a law to restrict the government's authority to give them. In the case of the bond swap, the Assembly simply criticized the operation, but did not label it illegal. Furthermore, the legislative did not take the additional step of approving a law to restrict the operation, but rather decided to restrict itself to issuing a non-binding resolution.

## Public interest contracts and public debt

To understand the nuances distinguishing the contracts that Borges was talking about and the PDVSA bond swap, we need to delve somewhat more deeply into Venezuelan legal issues. Article 150 of Venezuela's Constitution states that

> "Signing of national public interest contracts will require the approval of the National Assembly in the cases determined by law. No public interest contract can be signed at the national, state or municipal level with states of official foreign entities or with associations not residing in Venezuela, nor be transferred to them, without the approval of the National Assembly."

Put simply, this article says two things. "National public interest contracts" have to be approved by the National Assembly, at least as long as the law says that they have to. In practice the provision builds in a lot of leeway

---

[1] See "Información errada tumbó precio de bonos de PDVSA," *El Nacional*, October 2, 2016. The original Bloomberg story was published on September 27, 2016 at 6:06 PM ("Venezuela's Congress Asks PDVSA to Present Debt Reprofiling Plan." We also communicated directly with legislator Julio Borges and confirmed that he denies making the claim as reported.

CONFIDENTIAL ASH_00006909



for legislators to establish exceptions to the general rule in the form of specific legal provisions. But if those contracts are signed with a foreign entity, then no exceptions can be made and they definitely need National Assembly approval.

But what are "public interest contracts" and do they include debt contracts? Quite obviously, the writers of the constitution did not intend that every single contract signed by the executive branch needed legislative approval – such an interpretation of the provision would bring public administration to a standstill. Ample Venezuelan jurisprudence and legal doctrine have demarcated what a "public interest contract" is and what type of contracts require legislative approval.

According to the text of a 2002 Supreme Court decision, a public interest contract is a contract "whose object is determinant and essential for the achievement of the ends and duties of the Venezuelan state in the search for satisfying the individual and coincident interest of the national community and not just of a particular sector of it…that implies the acceptance of obligations whose partial or total payment will be realized over several fiscal years after that in which the contract was signed."[2] This description implies several key elements:

(i) Its object is "determinant and essential" and not just incidental.
(ii) It must be relevant in terms of the interests of the whole national community and not just part of it.
(iii) It must involve a multi-year financing agreement.

## Specific cases

There is obviously a large degree of subjectivity in assessing some of these conditions. Fortunately, Article 150 allows the legislator to define the cases in which the National Assembly needs to approve these contracts – except when they involve contracts with foreign entities, in which case the National Assembly authorization is required. We now go on to discuss how several type of contracts have been dealt with by the law.

## Sovereign bond issuances

The 2002 Court decision specified that several public credit operations, including "issuance and placement of securities" could not be classified as national public interest contracts given that they were not aimed at achieving an objective in terms of the collective national interest but were rather carried out "with the objective of rapidly obtaining…resources that allow, for example, the functioning of Public Administration." However, it also said that other operations would give rise to national public interest contracts, such as "those that accord a loan of resources with the consequent indebtedness for the nation, or accord the refinancing of external public debt, among others."

---

[2] http://historico.tsj.gob.ve/decisiones/scon/Septiembre/2241-240902-00-2874%20.htm

CONFIDENTIAL
ASH_00006910



> **Box 1: National Assembly Resolution on Debt Swap**
>
> **AGREEMENT ON THE CURRENT FINANCIAL SITUATION OF PETRÓLEOS DE VENEZUELA S.A.**
>
> **CONSIDERING** That the Constitution of the Bolivarian Republic of Venezuela in its article 302 recognizes the strategic importance of the oil industry in Venezuela, and Petróleos de Venezuela, S.A. is the only Anonymous Company of public nature that our constitution expressly recognizes in its article 303;
>
> **CONSIDERING** That in the global context of falling oil prices, the Venezuelan State must seek to preserve its presence in world oil markets, striving to maintain or increase production levels. This failed objective was drawn up by the national government since 2005 in the "Plan de Siembra Petrolera" which states that by 2012 oil production should reach 6.0 million barrels per day of which 3.9 million barrels per day should be devoted to exports. In 2015, PDVSA's Annual Report indicates that domestic oil production, rather than increase, declined to 2.9 million barrels, below 50% of the production target for 2012;
>
> **CONSIDERING** That despite having generated more than 700 billion dollars in revenue from 1999 to 2015, the state has used PDVSA as a source of funding for partisan political purposes, thus hindering the company's investment in essential aspects in the industry such as exploration, extraction, refining and distribution. Consequently, current production is below the production levels of 1998;
>
> **CONSIDERING** That the financial situation of PDVSA is of a highly indebted company with a financial debt of US $ 43,716 million and US $ 19,052 with suppliers, significantly higher levels than owed in 1998;
>
> **CONSIDERING** That PDVSA has sold physical and financial assets below market prices. Thus, in 2016, PDVSA liquidated assets in Argentina, sold part of its equity in joint ventures with foreign oil companies, while in 2015 it negotiated the credit balances held with Jamaica and the Dominican Republic for less than their face value. In this sense, Venezuela traded accounts receivables with Jamaica of US $ 2,920 million for just US $ 1,500 million, representing a reduction of almost 50%, while the Dominican Republic ceded a creditor position of a debt of nearly US $ 4,000 million for just US $ 2,000 million;
>
> **CONSIDERING** That recently, the state oil company has announced it intends to make an exchange of bonds with maturities in the next fifteen months. Eligible titles for this operation total $ 7,100 million with an excessive focus on short-term debt service. In fact so far in 2016, more than 25.0% of revenues from oil exports will go to service the debt of PDVSA;
>
> **CONSIDERING** That it is an indication of the problems of credibility, that the national oil company with exclusive rights to exploit the largest oil reserves in the world has to offer as collateral for the payment of the bonds to be redeemed at 50.1% of its position in the subsidiary CITGO Holdings Inc.;
>
> **CONSIDERING** That the significant drop in the production of PDVSA, the need to place as collateral the company CITGO Holdings INC. and the opaque and improper handling of the finances of the company, will significantly compromise the liquidity of the company for the servicing of the financial and commercial debt and for increasing production;
>
> **CONSIDERING** That Article 187 of the Constitution empowers the National Assembly to exercise functions of control over the national government and public administration, granting it powers to be informed about the financial statements and the details of any transaction that compromises PDVSA when its assets are used as collateral.

CONFIDENTIAL ASH_00006911



Monday, October 3, 2016
Francisco Rodríguez, Chief Economist
franciscorodriguez@torinocap.com

> **AGREES TO:**
> **First.** Summon citizen Eulogio del Pino, president of the firm Petróleos de Venezuela SA, to appear before the National Assembly to explain the terms of the swap of the bonds, based on the granting of most of the shares of CITGO HOLDING INC as collateral.
> **Second.** Categorically reject that within the swap operation a 50.1% of CITGO Holding Inc shares are used as collateral or that any other assets of the nation be used to constitute collateral.
> **Third.** Urge the Public Ministry to open an investigation to determine whether the current operation protects the patrimony of the nation, in view of Articles 187, paragraph 9, 302 and 303 of the Constitution of the Bolivarian Republic of Venezuela.
> **Fourth.** Urge Petróleos de Venezuela S.A, to present to the country a reprofiling plan of its financial commitments and a recovery plan for the oil industry in the short and medium term.
> **Fifth.** Advertise this Agreement.

The decision gave blanket authorization to the central government to carry out bond issuances, as long as they were within the ceilings set by the annual budget and indebtedness laws. Loan agreements and debt refinancing would be subject to legislative approval when they took the form of contracts with foreign entities such as a multilateral bank. If they took the form of local contracts, then they simply needed to be within the limits set by the annual budget and indebtedness laws.

## Sovereign bond refinancing

The 2002 Court decision also set apart the case of refinancing of external public debt, for which National Assembly approval is required. Therefore, the case of an external bond issuance would be treated differently from that of a sovereign debt refinancing, with the latter requiring National Assembly approval. This leaves a potential grey area for the case, for example, of a sovereign debt swap which is somewhat of a combination between both types of operation (issuance and refinancing). One important element is that the Constitution requires National Assembly approval for contracts subscribed "with states or official foreign entities or associations not residing in Venezuela." An untested but potentially valid argument is that bearer bonds, even if subject to international law, are not in essence contracts with external entities as they may be owned by Venezuelans or foreigners.

## PDVSA bond issuance and refinancing

The Organic Law of Financial Administration of the Public Sector (henceforth OLFAPS for short) establishes in its Article 101 a blanket exception for all public credit operations carried out by several independent public entities: (i) The central bank, (ii) The National Development Bank BANDES, (iii) public sector banks and insurance companies (iv) State-owned national oil companies such as PDVSA.

In principle, these exceptions could be challenged on constitutional grounds. One could of course argue that a PDVSA debt refinancing has the same potential to generate wide-ranging effects on all Venezuelans as a

CONFIDENTIAL ASH_00006912



sovereign refinancing, so that it should be considered a national public interest contract on the same grounds. Yet the fact that this exception has been present in the law since 2000 and survived unchallenged implies that there is little doubt as to the legality of a PDVSA bond issuance or debt refinancing without National Assembly approval under current legislation.

Recently, on July 20, the Supreme Court ratified the constitutionality of this exception when it stated that Venezuela's Central Bank did not require National Assembly authorization in order to contract a loan with the Latin American Reserve Fund. This point is relevant because the central bank is covered by the same blanket exception as PDVSA in Article 1010 of the OLFAPS. The opposition rejected this decision, alleging that it was unconstitutional, and Finance Commission President Alfonso Marquina claimed that this loan would not be recognized by the National Assembly.[3]

In contrast to the Latin American Reserve Fund loan, in the case of the bond swap the opposition did not question the legality of the operation (see our discussion below). This likely reflects the fact that numerous PDVSA issuances have been made in the past without requiring National Assembly authorization, making the legal precedent much clearer.

### Secured bond financing

One difference between the current swap offering and PDVSA bond issuances is that this operation involves borrowing using a state-owned asset as collateral. In principle, it would seem as if this could run afoul of another legal provision, Article 105 of the OLFAPS, which forbids the use of publicly owned goods as collateral in public credit operations. However, PDVSA is exempt from this provision. The same article (101) of the OLFAPS that exempts it from National Assembly approval also exempts it – together with the central bank, state-owned banks and BANDES – of the restriction in using publicly owned gods as collateral.[4] This is the reason, for example, that the central bank has been able to use the gold in its international reserves for swap operations.

### Mining concessions

Concessions for the extraction and sale of natural resources are a different type of contract, as there is no jurisprudence excepting them from National Assembly approval. As such, there is a case-by-case judgment that is made in every instance of whether the contract in question is relevant enough in terms of its magnitude to affect the welfare of the collective community of Venezuelans and thus qualify as a national public interest contract. This makes such contracts inherently more questionable under Venezuelan law. For this reason, the National Assembly tried to restrict the concessions given by the Maduro administration under the Mining Arc Decree of February 14 of this year. It did so through two separate decisions: (i) Explicitly denying such authorization in a June 9 resolution (ii) approving a reform of the mining law explicitly requiring National Assembly authorization for the granting of mining concessions on August 9.

---

[3] See http://elestimulo.com/elinteres/marquina-tsj-le-da-al-gobierno-y-al-bcv-licencia-para-delinquir/.
[4] Article 101 creates an exception for all the articles in that section of the law, including that which requires National Assembly authorization for public credit operations (97) and that which forbids the use of state goods as collateral (105)

7

CONFIDENTIAL



Monday, October 3, 2016
Francisco Rodríguez, Chief Economist
franciscorodriguez@torinocap.com

The Supreme Court ruled the National Assembly's law reform unconstitutional on September 2, as it had been taken after the incorporation of three legislators from Amazonas whose swearing-in had been suspended by the Electoral Court. Despite the fact that this renders Mining Arc concessions legal from the standpoint of current Venezuelan law, there is obviously a larger degree of uncertainty regarding the potential that they may be repudiated in a future administration given the opposition's explicit attempts to block it and its disavowal of Supreme Court decisions taken during the period of conflict between branches of government.

## Bilateral loans, including China

Loans with other governments and official entities are covered by the second clause of Article 150 of the Constitution and therefore require National Assembly Authorization. The National Assembly has in fact approved all loan agreements and amendments with China in the form of bilateral treaties between China and Venezuela.[5] Formally, these treaties have the same standing as a law.

These loan agreements take the form of three renewable loan tranches, each of which is intended to be repaid in three years, with the treaty providing for their automatic renewal at expiration as long as both parts agree with renewing.[6] Whether a loan extension such as the one granted by China to Venezuela earlier this year requires National Assembly authorization is unclear. The loans are specified in the treaty are three-year loans, suggesting that any change in the maturity of the loans requires a change in the treaty. On the other hand, the treaties provide for renewal once the loan is repaid, suggesting that the parts understood at signing that repayment could occur over periods different from three years.

What can definitely not occur is the granting of new loans - other than automatic renewal of tranches - without National Assembly authorization. Since the treaties specify that loans cannot be renewed until repaid, the fact that there is currently an extension on the amortizations also implies that Venezuela cannot receive new tranche loans without National Assembly approval until it completes amortization of existing tranches.

**Francisco Rodríguez**
Chief Economist
franciscorodriguez@torinocap.com
Phone: 212-339-0021 (O), 646-630-4883 (M)

---

[5] See the latest reform of this treaty, dating from June 30, 2015, in Official Gazette 40.692.
[6] A separate agreement covers a 10-year, $20bn loan.

8

CONFIDENTIAL ASH_00006914



Monday, October 3, 2016
Francisco Rodríguez, Chief Economist
franciscorodriguez@torinocap.com

Disclosure: Although the statements of fact and data in this presentation have been obtained from, and are based upon, sources that Torino Capital LLC believes to be reliable, we do not guarantee their accuracy, and any such information may be incomplete or condensed. All opinions included in this material constitute Torino Capital LLC's judgment as of the date of this material and are subject to change without notice. This material is provided for informational purposes only and is not intended as an offer or solicitation with respect to the purchase or sale of any security. This is a product of the sales and trading desk and should not be considered research. It is intended for institutional, professional and accredited investors only.

CONFIDENTIAL ASH_00006915