FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEOS, S.A., and PDV HOLDING, INC.,

      Plaintiffs and Counterclaim Defendants,

- against -

MUFG UNION BANK N.A. and GLAS
AMERICAS LLC,

      Defendants and Counterclaim Plaintiffs.

No. 19 Civ. 10023 (KPF)

1.

FILED UNDER SEAL

██████████████████████████████████████████████

████████

2.      I have been retained by Latham & Watkins LLP, legal counsel for MUFG Union Bank, N.A. ("MUFG"), in its capacity as Trustee, and GLAS Americas LLC, in its capacity as Collateral Agent ("GLAS," and together with MUFG, the "Defendants") to provide my expert opinion in connection with judicial proceedings between Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA Petróleo, S.A., ("PDVSA Petróleo"), and PDV Holding, Inc. ("PDVH," and together with PDVSA and PDVSA Petróleo, the "PDVSA Parties") and the Defendants. ████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

3.      These proceedings involve the debt securities due 2020 that PDVSA issued in October 2016 (the "2020 Notes") as part of an exchange offer (the "Exchange Offer").  The 2020 Notes are secured by a pledge by PDVH (a Delaware Corporation) of 50.1% of the shares of its subsidiary, CITGO Holding, Inc. ("CITGO Holding"), which in turn owns CITGO Petroleum Corporation ("CITGO Petroleum"), an oil company organized under the laws of Delaware and headquartered in Houston, Texas.  The 2020 Notes and the related pledge of CITGO Holding shares are governed by the Indenture dated October 28, 2016 (the "Indenture") and the Pledge Agreement dated October 28, 2016 (the "Pledge Agreement").  The 2020 Notes were issued in the form of one or more fully registered notes without interest coupons in global form (the "Global Note," and together with the Indenture and the Pledge Agreement, the "Governing Documents").

FILED UNDER SEAL

4.      I understand that the PDVSA Parties contend that the Governing Documents are "invalid, illegal, null and void *ab initio*, and thus unenforceable."  The PDVSA Parties reason that the Governing Documents granting noteholders a security interest in CITGO Holding are considered Contracts of National Interest under Article 150 of the Venezuelan Constitution and, as a result, required the prior approval of the Venezuelan National Assembly (the Republic's legislature).[1]  Pursuant to Article 150, "[n]o contract of national . . . interest . . . may be executed with . . . companies not domiciled in Venezuela . . . without the approval of the National Assembly."[2]

5.      On March 16, 2020, I submitted an expert report (the "Expert Report") providing my opinions with regard to two discrete questions of Venezuelan law: (i) whether, under Venezuelan law, the Governing Documents are Contracts of National Interest that required the approval of the National Assembly of Venezuela; and (ii) whether, even assuming the Governing Documents were Contracts of National Interest, a Venezuelan court nevertheless would enforce the Governing Documents against PDVSA, PDVSA Petróleo, and PDVH after applying the presumption of validity and the principle of legitimate expectations to the aforementioned documents.  As explained in my Expert Report, I unequivocally concluded that the Governing Documents are *not* Contracts of National Interest requiring National Assembly approval.  I further opined that even if such contracts *were* considered Contracts of National Interest, a Venezuelan court would still enforce the Governing Documents.  A true and correct copy of my Expert Report is included herein as **Exhibit 2**.  I hereby incorporate by reference the contents of my Expert Report as my sworn testimony as if fully rewritten herein.

---

[1]   A true and correct copy of the 1999 Venezuelan Constitution in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 5**.

[2]   Ex. 5, art. 150.

FILED UNDER SEAL

6.      On May 1, 2020, I submitted a rebuttal report (the "Rebuttal Report") addressing certain arguments raised by the PDVSA Parties' Venezuelan law expert, Professor Brewer-Carías, who opined, without legal support, that the Governing Documents were, in fact, Contracts of National Interest requiring the approval of the National Assembly.  A true and correct copy of my Rebuttal Report is included herein as **Exhibit 3**.  I hereby incorporate by reference the contents of my Rebuttal Expert Report as my sworn testimony as if fully rewritten herein.

7.      I hereby certify that the statements and opinions made in my Expert Report and my Rebuttal Report are truthful and accurately reflect my knowledge at the time each report was signed and my opinions on the issues therein have not changed.  If called to testify regarding my opinions, I would testify consistent with those reports, which are summarized in this declaration.

8.      The information, sources, and data that form the factual predicate for my findings, conclusions and opinions in my Expert Report and Rebuttal Report include, among other things, the Venezuelan Constitution, Venezuelan statutes, decisions of various Venezuelan courts, regulatory filings, various scholarly sources, and various documents produced in this litigation.

9.      In this Declaration, I summarize for the Court's convenience my opinions, as expressed in my Expert Report and Rebuttal Report, and, where noted, respond to arguments first raised by Professor Brewer-Carías in his rebuttal report.  Additional support and discussion of the bases for my opinions are available in my reports.

FILED UNDER SEAL

## I.   INTRODUCTION TO FACTUAL BACKGROUND AND RELEVANT LEGAL CONCEPTS

### A.   PDVSA and PDVSA Petróleo's Corporate Status Under Venezuelan Law

10.    PDVSA is an oil and gas company that was established and incorporated in 1975, which is wholly owned by the Republic.[3]  Under Venezuelan law, PDVSA enjoys the corporate form and commercial status of a *sociedad anónima*, or a corporation with one shareholder.[4]  More specifically, PDVSA is a *sociedad anónima* known as a "state corporation," meaning that it is majority owned by the Republic, and is a legal entity created according to private law.[5]

11.    PDVSA's status as a *sociedad anónima* has several key implications.  *First and foremost*, PDVSA is not the same legal entity as its shareholder, the Republic, and cannot be conflated with the Republic for constitutional purposes, and in particular, when analyzing Article 150 of the Constitution.[6]  *Second*, PDVSA has its own assets, liabilities, and legal obligations separate and apart from its shareholder pursuant to Article 201 of Venezuela's Commercial Code.[7]  As such, the Republic is not personally liable for PDVSA's debts aside from its capital contributions.[8]  *Third*, PDVSA has its own employees separate and apart from the Republic, who are not civil servants.[9]  *Finally*, PDVSA, unlike the Republic, is generally governed by Venezuela's private, corporate laws, with the exceptions provided for in the Organic Law of the Public Administration and other applicable rules,[10] such as public laws concerning public

---

[3]   Ex. 2, ¶ 28.
[4]   *Id.* ¶ 32.
[5]   *Id.* ¶ 34.
[6]   *Id.* ¶¶ 32, 105.
[7]   *Id.* ¶ 33.
[8]   *Id.*
[9]   Ex. 3, ¶ 87.
[10]   Ex. 2, ¶ 42 n. 49.  Article 108 of the Organic Law of the Public Administration establishes an order of preference or priority in the sources applicable to State Companies (first, private, corporate laws; second, the Organic Law of Public Administration; and, third, other applicable Public Law laws and regulations).  Attached as **Exhibit 34** is a true and correct copy of the Organic Law of the Public Administration, in its original Spanish text, and a certified translation of the relevant portions thereof.

FILED UNDER SEAL

procurement, anti-corruption, and laws dealing with the exploitation of hydrocarbons, whose provisions are irrelevant to the instant matter given that they did not require the approval of the Governing Documents by the National Assembly.[11]   Consistent with my opinion, in a 1986 publication entitled *El Holding Público*, Professor Brewer-Carías acknowledged that PDVSA "has its own legal personality distinct from the Republic" such that it has "its own legal regime for the purpose of its patrimony, responsibility, taxes, contractual matters, etc., which is distinct from that of the Republic."[12]   A true and correct copy of the relevant portion of *El Holding Público* in its original Spanish text, and a certified translation of the same, are included as **Exhibit 4**.[13]

12.     PDVSA Petróleo is a wholly owned subsidiary of PDVSA, duly incorporated as a *sociedad anónima* as of November 16, 1978.[14]   PDVSA has additional subsidiaries in Venezuela and abroad, including PDV Holding ("PDVH"), a wholly owned subsidiary of PDVSA incorporated in Delaware as of April 21, 1997.[15]   PDVH owns 100% of the shares of CITGO Holding (a Delaware corporation), which in turn holds 100% of the shares of CITGO Petroleum, a U.S.-based refiner, transporter, and marketer of transportation fuels and other industrial products incorporated in Delaware.[16]   In 1986 and 1990, PDVSA, through subsidiaries, purchased the entirety of CITGO Petroleum.   PDVSA has confirmed that it did not seek or obtain National Assembly approval before purchasing CITGO Petroleum.[17]   Under Article 303 of the Venezuelan Constitution, shares of PDVSA's subsidiaries—unlike shares of PDVSA itself—may be encumbered and even sold.[18]

---

[11]   Ex. 2, ¶¶ 38, 40, 42.
[12]   Ex. 4, at 155.
[13]   *See* Ex. 2, ¶ 39 (citing Ex. 4).
[14]   *Id.* ¶ 29.
[15]   *Id.* ¶ 30.
[16]   *Id.*
[17]   *Id.*
[18]   *Id.* ¶ 31; Ex. 5, art. 303.

13.     Under Articles 15 and 29 of the Organic Law of Public Administration, Venezuela's Public Administration is comprised of: (i) the Centralized Administration, which is comprised of the "National Executive" (i.e., the Republic as represented through its President, Executive Vice President, and Ministers) and agencies and departments—lower in hierarchy—of the executive branch of government without legal personalities of their own; and (ii) the Decentralized Administration, which is comprised of entities with distinct legal personalities of their own separate from the Republic, such as state corporations, autonomous institutes, foundations, and civil association and partnerships.[19]

14.     PDVSA and PDVSA Petróleo are part of Venezuela's Public Administration.[20] Specifically, PDVSA and PDVSA Petróleo, as state corporations, are part of the Decentralized Administration, and are *not* part of the National Executive.  Professor Brewer-Carías does not dispute this.[21]  As state corporations, PDVSA and PDVSA Petróleo enjoy the freedom to conclude contracts and negotiate their terms unencumbered by the legal requirements that would otherwise restrict departments or agencies belonging to the Centralized Administration, including—in particular—the requirement of National Assembly approval established in Article 150 of the Constitution.[22]

### B.     The Organic Law for the Financial Administration of the Public Sector

15.     Contracts involving public debt in Venezuela (i.e., debt incurred by the Public Administration) are governed by the Financial Administration Law.[23]  A true and correct excerpted copy of the Financial Administration Law in its original Spanish text, and a certified translation of

---

[19]     Ex. 2, ¶¶ 36–37.
[20]     *Id.* ¶ 23; *see also* Ex. 48, arts. 29, 103.
[21]     *See* Clark Decl., Ex. 13, ¶¶ 32–33.
[22]     *See* Ex. 2, ¶ 40.
[23]     *See id.* ¶ 43.

FILED UNDER SEAL

the relevant portions thereof, are included as **Exhibit 6**.  Generally, under this law, public debt is subject to prior legislative approval by means of a Special Annual Indebtedness Law, and specific public debt may be subject to additional approval by the National Assembly.[24]

16.     Article 101.4 of the Financial Administration Law exempts from the aforementioned requirements, including the requirement of National Assembly approval for the issuance of debt, corporations subject to the Organic Hydrocarbons Law, including PDVSA and PDVSA Petróleo.[25]  Thus, the Financial Administration Law permits PDVSA to issue debt or enter into other Financing Agreements without prior authorization by the National Assembly.[26] ■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■ ■     Even Professor Brewer-Carías, in his expert report, acknowledged that "PDVSA, as part of the state-owned enterprises of the Oil sector, [is] exempted of the need to be previously authorized by the National Assembly" for the purpose of entering into public credit transactions.[28]  The purpose of the exemption under Article 101 is to allow state corporations to operate autonomously, as designed by law, just like their commercial competitors, without the stringent legislative approval requirements otherwise required for Public Debt.[29]

17.     Under Article 104 of the Financial Administration Law, the Republic is prohibited from guaranteeing third-party obligations, with very limited exceptions for public works and national public services.[30]  Under Article 105 of the same law, the pledge or guarantee against "national, state, or municipal property or income" is prohibited for public debt unless an entity is

---

[24]     Ex. 2, ¶ 44; *see also* Ex. 6, arts. 5, 82–83, 97.
[25]     *Id.* ¶ 47.
[26]     *Id.* ¶¶ 47–48, 162–63.
[27]     *Id.* ¶ 163; *see also* Clark Decl., Ex. 28, at 2.
[28]     Clark Decl., Ex. 13, ¶ 77.
[29]     Ex. 3, ¶ 130.
[30]     *Id.* ¶¶ 133–34.

FILED UNDER SEAL

exempt from this prohibition.[31]  Pursuant to Article 101(4) of the Financial Administration Law,

PDVSA and its subsidiaries are exempted from the prohibitions of Articles 104 and 105 under

Article 101 of the same law.[32]

        **C.**      **Contracts of National Interest Under the Venezuelan Constitution**

       18.      Venezuela's Constitution requires certain contracts to be approved by the National

Assembly.  Said contracts, referred to within the Constitution as contracts "of public interest,"

include three types of contracts: (i) contracts of national public interest (referred to throughout my

reports as "Contracts of National Interest"); (ii) contracts of state public interest; and (iii) contracts

of municipal public interest.[33]  The Constitution references Contracts of National Interest in

Articles 150, 151, 187(9), 236(14), and 247 of the Constitution.[34]

       19.      Articles 150 and 151 contain the general parameters for public interest contracts,

including Contracts of National Interest.[35]  Under the former, legislative approval of such contracts

is necessary "when required by Law," or when foreign States, foreign official entities, or

companies not domiciled in Venezuela are parties to said contracts.[36]  Under the latter, Contracts

of National Interest shall include an express or implicit clause stating that doubts and disputes will

---

[31]  *Id.*

[32]  *Id.*  Although the PDVSA Parties have not pled a violation of the Financial Administration Law in their
Complaint, it should be noted that Professor Brewer-Carías's assertion that the Governing Documents violate the
prohibition against pledging national assets in Article 105 of the Financial Administration Law is plainly
erroneous as discussed above and in my Rebuttal Report.  *See* Clark Decl., Ex. 13, ¶ 46 n.31; Ex. 3, ¶¶ 132–38
(noting that Professor Carmona, whose writings Professor Brewer-Carías relies on, opined that "'with respect to
PDVSA, the provisions of [A]rticles 104 and 105 cannot be considered applicable'").  Even if Article 105 applied
to PDVSA (it does not), it does not apply to CITGO Petroleum, CITGO Holding, and PDVH because the latter
three are Delaware corporations, which are not subject to this Venezuelan law.  *See* Ex. 3, ¶ 135. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (quoting Clark Decl., Ex. 29, at 15).
Attached as Exhibit 48 is a true and correct copy of chart that summarizes the organizational structure of the
PDVSA Parties, which was prepared in connection with this declaration.

[33]  Ex. 2, ¶ 49.

[34]  Ex. 5, arts. 150–51, 187(9), 236(14), 247.

[35]  Ex. 2, ¶ 50 (citing Ex. 5, arts. 150–51).

[36]  Ex. 5, art. 187(9).

FILED UNDER SEAL

be decided by Venezuela's courts in accordance with the law of Venezuela, if compatible with the specific transaction at hand.[37]

20.     Articles 187(9), 236(14), and 247 concern the "consideration, execution, and enforcement of such public interest contracts."[38]   Article 187(9) of the Constitution expressly empowers the National Assembly to "authorize the National Executive to sign contracts of national interest"—and not state corporations such as PDVSA and PDVSA Petróleo.[39]   Likewise, Article 236(14) gives the President, who is head of the National Executive pursuant to Article 226, the sole power to "enter into contracts of national interest according to [the] Constitution and the law" in council with his Ministers.[40]   Finally, Article 247 requires that the Attorney General's Office be consulted on the approval of Contracts of National Interest.[41]

## II.   THE GOVERNING DOCUMENTS ARE NOT CONTRACTS OF NATIONAL INTEREST ACCORDING TO SEMINAL SUPREME TRIBUNAL PRECEDENT

### A.   The Governing Documents Are Not Contracts of National Interest Because the Republic Is Not a Party to the Agreements

21.     The Venezuelan Constitution does not define the term "Contract of National Interest."[42]   In the absence of clear guidance in the Constitution, the Constitutional Chamber of the Supreme Tribunal of Justice (the "Constitutional Chamber") has established rules and criteria for determining whether contracts such as the Governing Documents are Contracts of National Interest.[43]   According to Article 335 of the Constitution, the Supreme Tribunal of Justice is "the supreme and ultimate interpreter of the Constitution" and, as such, "shall see to the uniform

---

[37]   *Id.*, art. 151; Ex. 2, ¶ 53.
[38]   Ex. 2, ¶ 51 (citing Ex. 5, arts. 187(9), 236(14), 247).
[39]   *Id.*
[40]   *Id.* (citing Ex. 5, arts. 226, 236).
[41]   Ex. 2, ¶ 52.
[42]   *See generally* Ex. 5.
[43]   Ex. 2, ¶ 85.

interpretation and application thereof."[44]   Article 335 further states that "[i]nterpretations established by the Constitutional Chamber concerning the contents or scope of Constitutional rules and principles are binding on the other Chambers of the Supreme Tribunal of Justice and on any other courts of the Republic."[45]   Accordingly, interpretations by the Constitutional Chamber on the content or scope of constitutional provisions, such as Article 150, are final and have binding effects, and "the Constitutional Chamber is the ultimate arbiter with respect to the content or scope of constitutional norms and principles."[46]

22.     The primary rule established by the Constitutional Chamber, and repeatedly affirmed by respected Venezuelan legal scholars, is that *only contracts to which the Republic is a party can qualify as Contracts of National Interest necessitating National Assembly approval under Article 150.*[47]   This rule, which is consistent with the plain language of various articles of the Constitution, is consistent with a line of precedent dating from 1937 through to the present day.[48]

23.     The seminal Constitutional Chamber decision addressing this issue is *Andrés Velásquez et al.* (September 24, 2002), which "specified the meaning that must be given to the concept of *national public interest contracts* contained in articles 150 and 187, section 9, of the Constitution of the Bolivarian Republic of Venezuela . . . ."[49]   The Supreme Tribunal in *Andrés Velásquez et al.* stated that the control of Contracts of National Interest, by means of a case-by-case authorization, is "exercised by the [the National Assembly] prior to the conclusion of the contract . . . in all cases where *the Republic (as well as States and Municipalities) through the*

---

[44]   Ex. 5, art. 335.
[45]   *Id.*
[46]   Ex. 2, ¶¶ 13, 84–86.
[47]   *Id.* ¶¶ 91–94, 100–02; Ex. 3, ¶¶ 23–45, 92.
[48]   *Id.* ¶ 121.
[49]   Ex. 7, at 17 (emphasis in original).

*National Executive*, signs contracts with [other] States, foreign official entities and companies not domiciled in Venezuela."[50]  The Constitutional Chamber added that Contracts of National Interest are a distinct type of contract that is comprised of "contracts concluded by the Republic through the competent organs *of the National Executive* . . . ."[51]  And, furthermore, the Constitutional Chamber held that Contracts of National Interest are "*contracts in which the determining factor would be the participation of the Republic* . . . ." [52]  A true and correct copy of *Andrés Velásquez et al.*, in its original Spanish text, and a certified translation of the decision, are included as **Exhibit 7**.[53]  *Andrés Velásquez et al.* therefore reduced the concept of contracts of national interest only to those contracts to which the Republic is a party.

24.     Prominent Venezuelan scholars—including the PDVSA Parties' own Venezuelan law expert, Professor Brewer-Carías, prior to his engagement in this litigation—concur both that *Andrés Velásquez et al.* establishes binding precedent and that this decision reduced Contracts of National Interest to those to which the Republic is a party.[54]  Indeed, for over a decade, Professor Brewer-Carías, after having expressed his personal disagreement with the decision, has repeatedly interpreted *Andrés Velásquez et al.* in this manner and has acknowledged in particular that, under

---

[50]   *Id.* at 14 (emphasis added).

[51]   *Id.* at 16 (emphasis added).

[52]   *Id.* (emphasis added); *see also* Ex. 3, at ¶ 36.

[53]   More recently, the Constitutional Chamber confirmed the principles of *Andrés Velásquez et al.* in its 2016 decision, *Brigitte Acosta Isasis*.  *See* Ex. 2 ¶¶ 102, 104; Ex. 3, ¶ 48.  A true and correct copy of *Brigitte Acosta Isasis*, in its original Spanish text, and a certified translation of the decision, are included as **Exhibit 8**.  In *Brigitte Acosta Isasis*, the Constitutional Chamber explicitly stated that the "purpose" of the request for judicial interpretation it had received in that case was to "determine the scope and content of Articles 150, 187.9, 236.14 and 247 of the Constitution . . . ."  Ex. 8, at 16.  In relevant part, this decision reads:  "[T]his Constitutional [Chamber], in the often mentioned [*Andrés Velásquez et al.* decision], specified the essential elements that impart to contracts a national public interest nature, [including] . . . [t]hat they be executed by the Republic, through the bodies that compose the National Executive Branch that are competent in this matter . . . ."  *Id.* at 21.  The Court specifically considered whether the loan contract at issue meets "the elements to qualify it as [a] national public interest contract, in accordance with the criterion established by this Supreme Tribunal . . . [including] [t]hat they be executed by the Republic, through the bodies that compose the National Executive Branch that are competent in this subject matter . . . ."  *Id.* at 22.  The Constitutional Chamber determined that the Venezuelan Central Bank's financing agreement with a foreign entity, Fondo Latinoamericano de Reservas, was not a Contract of National Interest because the Republic was not a party to that agreement.  *See id.*, at 33; Ex. 2, ¶ 104.

[54]   Ex. 3, ¶¶ 25–33.

FILED UNDER SEAL

*Andrés Velasquez,* contracts by PDVSA cannot be Contracts of National Interest.  As early as 2006, Professor Brewer-Carías stated:

> [In *Andrés Velásquez et al.*,] [t]he Constitutional Chamber of the Supreme Tribunal of Justice, as the highest and last interpreter of the Constitution . . . established a binding interpretation, and reduced the category of "public interest contracts" (art. 150 C.) to those signed or concluded by the Republic, the States, and the Municipalities, thus, excluding from such a classification those contracts concluded by autonomous institutes or national public enterprises such as PDVSA.[55]

Professor Brewer-Carías reaffirmed this exact conclusion concerning *Andrés Velásquez*'s binding holding reducing Contracts of National Interest to those to which the Republic is a party in at least *four* subsequent articles or books, the last of which was published as recently as 2019.[56]

25.     In at least two additional writings published before this litigation, Professor Brewer-Carías unequivocally concluded that, according to *Andrés Velásquez et al.*, contracts by PDVSA and other state-owned companies do not qualify as having been concluded by the Republic, and therefore do not qualify as Contracts of National Interest.  As recently as 2015, he wrote that *Andrés Velásquez et al.* "established a binding interpretation and reduced the category of 'contracts of public interest' (art. 150 C.) to those signed or agreed to by the Republic, the States, and the Municipalities accordingly, excluding from such classification public contracts signed by autonomous institutes or national public companies, such as PDVSA" in an article entitled

---

[55]     Professor Brewer-Carías acknowledged this in an article entitled *Nuevas Consideraciones Sobre el Régimen Jurídico de los Contratos del Estado en Venezuela* in 2006.  A true and correct copy of this article in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 9**.  *See id.* at 3 n.11.

[56]     *See* Allan Randolph Brewer-Carías, *Sobre los Contratos del Estado en Venezuela,* in 6 REVISTA MEXICANA STATUM REI ROMANAE DE DERECHO ADMINISTRATIVO (2011) (attached as **Exhibit 10**); Allan Randolph Brewer-Carías, *La Contratación Pública en Venezuela,* in TRATADO GENERAL DE LOS CONTRATOS PÚBLICOS (2013) (attached as **Exhibit 11**); Allan Randolph Brewer-Carías, *Administrative Law in Venezuela* (2015) (attached as **Exhibit 12**); and Allan Randolph Brewer-Carías, *Sobre las Nociones de Contratos Administrativos, Contratos De Interés Público, Servicio Público, Interés Público y Orden Público, y su Manipulación Legislativa y Jurisprudencial* at 86, 239–40, 248–49 (2019) (attached as **Exhibit 13**).  Each of the preceding exhibits are true and correct copies of the aforementioned publications, excerpted in their original Spanish text with certified translations of the relevant portions thereof.

*Contratos Administrativos, Contratos Públicos, Contratos del Estado.*[57]   A true and correct copy

of this article in its original Spanish text, and a certified translation of the relevant portions thereof,

are included as **Exhibit 14**.

26.     Even more recently, in 2017, Professor Brewer-Carías noted in an article that

*Andrés Velásquez et al*. established precedent requiring that the Republic be a party for an

agreement to be considered a Contract of National Interest.[58]   A true and correct copy of this article

in its original Spanish text, and a certified translation of the relevant portions thereof, are included

as **Exhibit 15**.   Specifically, Professor Brewer-Carías stated that *Andrés Velásquez et al.* "reduced

[the definition of] Contracts of National Interest to only those concluded by the 'Republic,'

excluding from the category of Contracts of National Interest those that decentralized entities, such

as autonomous institutes and state enterprises, may enter into . . . ."[59]

27.     He continued in that same article:

> Having reduced the notion of "public interest contracts" to only those signed by the
> Republic, States, and Municipalities, and consequently, *reduced the notion of
> "national public interest contracts"* . . . *to those signed only by the Republic*,[60] the
> most notorious consequence of the decisions of [*Brigitte Acosta Isasis* and *Andrés
> Velásquez et al*.] is—that *articles 150, 151, 187.9, 236.14 and 247 of the
> Constitution do not apply to public contracts concluded by* these decentralized
> national public entities, for example, the Central Bank of Venezuela, autonomous
> institutes and state companies . . . .[61]

28.     In light of *Andrés Velásquez et al.* and the other cases cited above, as Professor

Brewer-Carías has acknowledged, only a contract to which the Republic is a party can be deemed

a Contract of National Interest.[62]   Considering the Republic was not a party to the Governing

---

[57]   Ex. 14, at 316.

[58]   *See* Ex. 15, at 380.

[59]   *Id.*

[60]   *Id.* at 390 (emphasis added)

[61]   *Id.* (emphasis in original).

[62]   In my Expert Report and Rebuttal Report, I also summarize the works of other concurring scholars.  Although
certain of these scholars, including Professor Brewer-Carías, disagree with the Constitutional Chamber's ruling
in *Andrés Velásquez et al.*, they have recognized *Andrés Velásquez et al.*'s binding weight, and its reduction of

FILED UNDER SEAL

Documents, and that PDVSA and PDVSA Petróleo are corporate entities legally distinct and separate from the Republic, the Governing Documents do not qualify as Contracts of National Interest requiring legislative approval under Article 150 of the Constitution.[63]

29.     My conclusion is consistent with the plain language of the Constitution.  Article 187(9) of the Constitution, which discusses the National Assembly's power to approve Contracts of National Interest, expressly refers to the "National Executive"—a term which denotes the Republic represented through its President, Executive Vice President, and Ministers and therefore does not include state corporations such as PDVSA and PDVSA Petróleo—entering into Contracts of National Interest.[64]

30.     █████████████████████████████████████████

██████████████████████████████  ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████  ██████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

---

contracts of national interest to only those to which the Republic itself is a party.  *See* Ex. 2, ¶¶ 93–109 ; Ex. 3, ¶¶ 23–35.

[63]  Ex. 2, ¶¶ 34–42.

[64]  *Id.* ¶ 51.  I discuss the relevant language of the Constitution that buttresses the Constitutional Chambers' precedent at paragraphs 49–51 of my Expert Report.

[65]  Clark Decl., Ex. 28, at 2.

[66]  *Id.* at 3–4.

[67]  *Id.* at 3.

FILED UNDER SEAL

**B.    Professor Brewer-Carías's Arguments Are Unpersuasive and the Cases He Cites Do Not Support His Opinions**

31.    Professor Brewer-Carías argues in his expert report and rebuttal report in this case that state corporations such as PDVSA may enter into Contracts of National Interest even if the Republic is not a party.  His arguments are unpersuasive.  The cases he cites do not support that opinion, and his argument is inconsistent with the opinions he has previously expressed, which postdate the cases on which he now relies.

32.    **_Lucía Antillano_**.  Professor Brewer-Carías cites _Lucía Antillano_[68] (April 29, 2003) to argue that my interpretation of _Andrés Velásquez et al._ is incorrect.  But this assertion is not persuasive when one considers that all of Professor Brewer-Carías's publications affirming that _Andrés Velásquez et al._ reduced Contracts of National Interest to those entered into by the Republic were published from 2006 to 2017—years _after_ the 2003 _Lucía Antillano_ decision.[69]

33.    In any event, and as explained in my Expert Report, _Lucía Antillano_ is wholly inapposite and did not purport to modify or overturn the rule set forth in _Andrés Velásquez et al._[70] As discussed in my expert reports, in _Lucía Antillano_, the Constitutional Chamber characterized the agreement of a state corporation, C.V.G Electrificación del Caroní, C.A. ("C.V.G."), as a Contract of National Interest because it had been executed to implement the Republic's international agreement with the Federal Republic of Brazil.[71]  A true and correct copy of _Lucía Antillano_ in its original Spanish text, and a certified translation of the decision, are included as **Exhibit 16**.

---

[68]    Professor Brewer-Carías refers to this decision as the "_Edelca_" decision.  *See* Clark Decl., Ex. 13, ¶ 39.
[69]    Ex. 3, ¶ 67.
[70]    *See* Ex. 2, ¶ 102, n.139; Ex. 3, ¶¶ 63–67.
[71]    *Id.*

34.     Here, *Lucía Antillano* is inapposite for two reasons.[72]   *First*, the Governing Documents, unlike the C.V.G contract, do not derive from an international agreement between the Republic and a foreign country.[73]   The C.V.G. contract was concluded "in execution" of an international agreement between the Republic and Brazil.[74]   *Second*, unlike the Governing Documents, a default on the contract in *Lucía Antillano* could have created a liability for the Republic because of its international agreement with Brazil.[75]   Here, the Governing Documents do not impose any obligations or liabilities on the Republic, as the result of a treaty with a foreign government or otherwise.   The Collateral at issue affects only assets of a U.S. subsidiary of PDVSA.[76]

35.     ***Simón Muñoz Armas***.   Moreover, Professor Brewer-Carías's assertion that the *Simón Muñoz Armas* decision supports his opinion is misplaced. A true and correct copy of this decision, in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 17**.[77]   Although it is true that *Simón Muñoz Armas et al*. affirms that the model clauses of certain joint venture agreements by PDVSA for the exploration and production of hydrocarbons in Venezuela were Contracts of National Interest, Professor Brewer-Carías fails to acknowledge that this case predates *Andrés Velasquez et al.*   Moreover, *Simón Muñoz Armas* is entirely distinguishable because it concerned legislative approval for joint venture agreements entered into by PDVSA pursuant to a since-repealed section of the Nationalization Law, which governed contracts for the exploitation of hydrocarbons and explicitly demanded prior approval by the Legislature.[78]   This statute "is wholly inapplicable to financing agreements or agreements

---

[72]   Ex. 3, ¶¶ 65–66.
[73]   *Id.*
[74]   Ex. 16, at 14.
[75]   Ex. 3, ¶¶ 65–66.
[76]   *Id.*; *see also* Ex. 2, ¶ 19.
[77]   Clark Decl., Ex. 13, ¶ 13.
[78]   Ex. 2, ¶¶ 172, 176.

for the issuance of debt."[79]  *Simón Muñoz Armas* is also distinguishable because there the parties to the contract had to explicitly agree to be governed by Venezuelan public law, as explained in my Expert Report.[80]

36.    **_Attorney General of the Republic II_**.[81]  In my previous reports, I cited *Attorney General of the Republic II* in support of my view of that a contract does not qualify as a Contract of National Interest unless the Republic is a party.[82]  Professor Brewer disagrees with my reliance on that decision.  According to Professor Brewer-Carías,[83] the *Attorney General of the Republic II* case, which was decided in 2007,

> involved the interpretation of Article 247 of the Venezuelan Constitution, which requires the Office of the Attorney General to be consulted on national public interest contracts prior to their approval.  Specifically, the Constitutional Chamber was asked to clarify whether an Attorney General opinion issued pursuant to Article 247 is binding on the Public Administration entity seeking the opinion or merely consultative in nature.[84]

37.    That much is true.  However, Professor Brewer-Carías is simply wrong when he asserts that this case did not concern a binding interpretation of the Constitutional Chamber regarding Article 150 simply because the interpretation of Article 247 was the "*thema decidendum*" of the case.[85]  When rendering this decision, the Constitutional Chamber understood that it had to rely on the prior interpretation of Article 150 made in *Andrés Velásquez et al.*, and further, a constitutional provision cannot be read and interpreted in isolation.[86]  The Supreme Tribunal's citation of the *Andrés Velásquez et al.* decision—and its two-and-a-half-page discussion of the requirement that the Republic be a party to Contracts of National Interest—served a purpose,

---

[79]    *Id.* ¶ 176.
[80]    *Id.*
[81]    A true and correct copy of *Attorney General of the Republic II* in its original Spanish text, and a certified translation of the decision, are included as **Exhibit 18**.
[82]    *See* Ex. 2, ¶¶ 93–94, 102–103; Ex. 3, ¶¶ 49, 58, 112.
[83]    Clark Decl., Ex. 27, ¶ 11.
[84]    *Id.*
[85]    *Id.*
[86]    Ex. 2, ¶ 120.

namely, to affirm that *Andrés Velásquez et al.* was—and still is—good law; and to confirm the

ruling in *Andrés Velásquez et al.* that a Public Debt transaction may qualify as a Contract of

National Interest when executed "by the Republic with [other] States, foreign official entities or

commercial companies not domiciled in Venezuela."[87]

38.     Professor Brewer-Carías is also wrong in asserting—for the first time in his rebuttal

report—that the *Attorney General of the Republic II* "presumes that public debt contracts entered

into by decentralized entities of the National Public Administration are national public interest

contracts."[88]  In *Attorney General of the Republic II*, the Constitutional Chamber decided a case

related to notes issued by Banco de Desarrollo Agropecuario (BANDAGRO), a state corporation.

Since the payment of the notes had allegedly been guaranteed by the Republic, a default by the

State Corporation could have resulted in liability for the Republic.[89]  Attached as **Exhibit 19** is a

true and correct copy of the Promissory Note at issue in *Attorney General of the Republic II* issued

on December 7, 1981.  As such, this case is distinguishable from contracts entered into generally

by state corporations such as PDVSA.  Here, there is no guarantee by the Republic, alleged or

otherwise, that could directly impose liabilities for the Governing Documents on the Republic.

39.     Professor Brewer-Carías raised certain Political-Administrative Chamber cases for

the first time in his rebuttal report.[90]  As discussed in my Expert Report, most of these cases arose

in the unique procedural context of determining the jurisdiction of Venezuelan courts in disputes

where the contracts at issue provided for the resolution of disputes by arbitration, rather than before

Venezuela's courts.[91]   None of these cases address the issue of those contracts' validity in

---

[87]   Ex. 18, at 21; Ex. 2, ¶ 103.
[88]   *See* Clark Decl., Ex. 27, ¶ 10 (emphasis removed).
[89]   Ex. 18, at 19–22; *see also DRFP L.L.C.* v. *República Bolivariana De Venezuela, et al.*, No. 2:04-cv-0793, 2016 WL 3996719, at *10 (S.D. Oh. July 22, 2016).
[90]   *See* Clark Decl., Ex. 27, ¶ 14.
[91]   *See* Ex. 2, ¶ 104, n.144.

connection with the National Assembly approval requirement of Article 150 of the Constitution, nor were any of those contracts approved by the National Assembly.[92]  To the extent these cases are inconsistent with the Constitutional Chamber's binding decision in *Andrés Velásquez et al.*, they should be disregarded, and Professor Brewer-Carías offers no argument to the contrary.[93]  As explained in my Expert Report, "[t]o the extent these decisions are inconsistent with the Constitutional Chamber's constitutional jurisprudence, they are not controlling" because the Constitutional Chamber is the "ultimate arbiter with respect to the content or scope of constitutional norms and principles."[94]  As the ultimate arbiter of interpretations of the Constitution, the Constitutional Chamber may review judicial decisions by any other court in Venezuela, including other chambers of the Supreme Tribunal, pursuant to Article 25 of the Organic Law of the Supreme Tribunal of Justice, of which a true and correct copy, and a certified translation of the relevant portions thereof, is attached to this declaration as **Exhibit 20**.[95]

40.    As explained in my Expert Report, no Venezuelan court has ever held that a PDVSA debt transaction, including secured debt, should be approved by the National Assembly, and Professor Brewer-Carías cites none.[96]  I am also unaware of any case holding that a debt instrument or sale of assets involving PDVSA was a Contract of National Interest, and again, Professor Brewer-Carías cannot identify any such case.

41.    Professor Brewer-Carías's expansive position on Contracts of National Interest would also lead to unreasonable results that contravene past practices of PDVSA.  As stated in my Rebuttal Report,[97] under the theory advanced by Professor Brewer-Carías, not only would all

---

[92]  *Id.*
[93]  *Id.*
[94]  *Id.* ¶ 13.
[95]  *See id.* ¶ 13 n.12; Ex. 22, at 397.866–67.
[96]  *Id.* ¶¶ 210–17.
[97]  *Id.* ¶¶ 90–91.

FILED UNDER SEAL

PDVSA financing agreements be subject to approval by the National Assembly, but also any other contracts between PDVSA or its subsidiaries and a foreign company (including minor or trivial contracts and vendor agreements) would similarly be subject to this requirement.  Such a requirement would vastly inhibit the ability of PDVSA or its subsidiaries (or any state corporation, for that matter) to enter into contracts with foreign entities and generally compete in an international market.[98]

42.    Professor Brewer-Carías cites resolutions passed by the National Assembly that he contends support his expansive interpretation of Contracts of National Interest.  As explained in my Rebuttal Report, such resolutions are not binding law and do not—and cannot—supersede the Constitutional Chamber's precedent.[99]  Further, Professor Brewer-Carías is incorrect as a matter of fact that the resolution dated September 27, 2016 concluded the Governing Documents violated Article 150.[100]  This resolution on its face did not conclude that the Governing Documents were Contracts of National Interest or that the 2020 Bonds or the Pledge violated the Constitution.[101]

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████[102]  Had the National Assembly intended to conclude that the Governing Documents violated Article 150, it would have done so expressly in this resolution, and surely would have cited to Article 150, rather than calling for an investigation into the 2020 Notes.[103]

---

[98]  *Id.*
[99]  Ex. 3, ¶¶ 94–127.
[100]  *Id.* ¶¶ 113–21.
[101]  *Id.* ¶ 11.
[102]  Clark Decl., Ex. 29, at 52.
[103]  *See* Ex. 3, ¶¶ 113–21.

### C.     Contrary to Professor Brewer-Carías's Rebuttal Report, the Decisions of the Constitutional Chamber Are Binding

43.     In his expert report, Professor Brewer-Carías attempts to dismiss the binding holding in *Andrés Velásquez et al.* and other Constitutional Chamber decisions cited in my expert reports by arguing that the Constitutional Chamber has developed two "procedural rules for identifying which of its interpretations are intended to be binding pursuant to Article 335 of the Constitution."[104] He asserts that: (i) a Constitutional Chamber decision is not binding law if the Constitutional Chamber did not "expressly indicate" the binding nature of the decision (violating a so-called "rule of explicitness"); and (ii) a decision must include an order for its publication in the Official Gazette of the Republic (the purported "rule of publication").[105]  His opinion on these so-called "rules" is ungrounded in fact or law, and contradicts his own writings prior to his engagement in this litigation, as well as his opening report in this litigation.[106]

44.     As to the first proffered "rule," Professor Brewer-Carías argues—contrary to all of his prior published works—that the *Andrés Velásquez et al.* decision is not binding law because the Constitutional Chamber did not "expressly indicate" the binding nature of the decision.[107]  As explained in my Rebuttal Report, this argument is wholly unsupported by law.[108]  No provision of the Constitution, nor any other Venezuelan law, imposes such a condition.  Indeed, this purported "rule" would contradict Article 335, which plainly states that the Constitutional Chamber's interpretations of the Constitution are "binding."[109]  The scholarly works Professor Brewer-Carías cites as support for this assertion do not alter the plain text of Article 335; rather, they simply recognize that a custom of publication exists.  Upon reviewing the decisions of the Constitutional

---

[104]   *See* Clark Decl., Ex. 27, ¶ 45.
[105]   *Id.*
[106]   *See* Ex. 3, ¶¶ 41–43.
[107]   *See* Clark Decl., Ex. 27, ¶¶ 45–53.
[108]   *See* Ex. 3, ¶¶ 41–43.
[109]   *See* Ex. 5, art. 335; *see also* Ex. 2, ¶ 86.

Chamber, it is apparent that the Constitutional Chamber from time to time notes in certain decisions that they are binding, but this practice does not compel the conclusion that failing to do so renders the decisions non-binding.

45.     The Constitutional Chamber's decision in *Emery Mata Millán* (Jan. 20, 2000) makes this plain.  A true and correct copy of *Emery Mata Millán* in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 21**.  In *Emery Mata*, issued shortly after the approval of the 1999 Constitution, the Constitutional Chamber invoked Article 335 of the Constitution for the purpose of determining the rules governing the jurisdiction of Venezuelan courts deciding injunctions for constitutional relief.[110]  There, the Supreme Tribunal acknowledged that, "by [the] imperative of [A]rticle 335" the interpretations made by the Constitutional Chamber are "binding for the other Chambers of this highest jurisdictional body, as well as for the other courts of the Republic . . . ."[111]  In other words, *Emery Mata Millán* declares that the binding effects of the Constitutional Chamber's interpretations are the result of a constitutional "imperative" and not the result of a formality—here, Professor Brewer-Carías's proffered formality of "explicitness" and "publication."[112]

46.     The Constitutional Chamber expressed the same sentiment one year later in 2001 in the *Corpoturismo* case.[113]  A true and correct copy of *Corpoturismo* in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 22**. There, the Constitutional Chamber decided an injunction for constitutional relief (*amparo constitucional*) filed against a decision which had been previously issued by the Political-Administrative Chamber

---

[110]  *See* Ex. 21, at 1.
[111]  *Id.*
[112]  *Id.*; *see also* Clark Decl., Ex. 27, ¶ 45.
[113]  Ex. 22, at 1.

of the Venezuelan Supreme Court.[114]   In doing so, the Constitutional Chamber interpreted Article 335 of the Constitution as follows:

> According to [Article 335] there is no doubt that this Chamber has the maximum power of interpretation of the Constitution and that its decisions are binding on the other courts of the Republic.  Thus, the other Chambers of the Supreme Court of Justice and the other courts and tribunals of the Republic are obliged to decide based on the interpretive criteria that this Chamber has of the constitutional norms.[115]

47.    That Professor Brewer-Carías's "rule of explicitness" is unsupported is further borne out by the fact that the Constitutional Chamber has issued decisions without any explicit language to this effect and that said decisions have later been described as binding by subsequent decisions of that same court.[116]

48.    Likewise, Professor Brewer-Carías argues that *Andrés Velásquez et al.* is not binding law because it was not published in the Official Gazette.[117]  This is incorrect as a matter of law, and also as a matter of fact.  As noted in my Rebuttal Report, the Constitutional Chamber ordered the publication of *Andrés Velásquez et al.* in the Official Gazette, and the decision was so published in Official Gazette No. 37549 on October 15, 2002.[118]  A true and correct copy of Official Gazette No. 37549, in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 27**.

---

[114]  *See id*.

[115]  *Id.*

[116]  For example, the *Luis Duarte et al.* decision, which contains a constitutional interpretation related to the procedural lapses of administrative appeals, did not explicitly state that its interpretation was binding.  A true and correct copy of *Luis Duarte et al.* in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 23**.  *See* Ex. 23, at 2–5.  Nonetheless, in a subsequent ruling—the *Julio César Torrealba* decision (Apr. 14, 2005)—the Constitutional Chamber described the constitutional interpretation contained in *Luis Duarte et al.* as binding.  A true and correct copy of *Julio César Torrealba* in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 24**.  *See* Ex. 24, at 112–14.  Likewise, the *Servicios La Puerta* decision (Mar. 19, 2004) contains a constitutional interpretation associated with the right to be heard and due process, and, though it does not state its interpretation is binding, it was later described as binding in the Constitutional Chamber's decision, *Cristina Vispo* (Dec. 4, 2011).  A true and correct copy of the 2004 *Servicios La Puerta* decision in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 25**.  A true and correct copy of the 2011 *Cristina Vispo* decision in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 26**.

[117]  *See* Clark Decl., Ex. 27, ¶ 111.

[118]  *See* Ex. 3, ¶ 41.

49.     Moreover, publication of judicial decisions in Official Gazettes serves only as a means to disseminate these decisions and is not an additional prerequisite for the rulings to be binding.[119]  No provision of the Venezuelan Constitution nor any of its laws imposed a publication requirement on the *Andrés Velásquez et al.* decision.   Indeed, publication is sporadic and sometimes on the Supreme Tribunal's official website.[120]    Professor Brewer-Carías's characterization of publication as a "rule" in his rebuttal report contradicts even his own opinion in his opening report, in which he conceded that "the Constitutional Chamber *commonly orders* the publication in the Official Gazette of its decisions establishing a binding interpretation of the content or scope of a constitutional principle or provision."[121]

50.     Likewise, Professor Brewer-Carías's arguments that the following cases are not binding because their *thema decidendum* also involved the interpretations of additional articles of the Venezuelan Constitution in addition to Article 150 are plainly of no moment in light of Article 335: *Andrés Velásquez et al.*, *Attorney General of the Republic II*, and *Brigitte Acosta Isasis*.[122] Each of these decisions involves an unequivocal act of interpreting the Constitution, which is all that is required for their binding nature, as discussed in my Expert Report.[123]  Professor Brewer-

---

[119]   *See* Ex. 3, ¶¶ 41–42.  This indisputable fact is confirmed in the *José Amando Mejía* decision (Feb. 1, 2000), which stated on page 11 of the decision: "Due to the binding nature of this ruling, and despite the fact that such character is acquired by the previous doctrine [herein] from the date [in which this judgment by the Chamber is published] [i.e., from the date in which it is added to the judicial file], [it is hereby ordered that it] be published in the Official Gazette."  A true and correct copy of the *José Amando Mejía* decision in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 28**.  Similarly, in the case of *Adriana Vigilanza et al.* (June 17, 2005), the Constitutional Chamber affirmed on page 340.115 of that decision that: "[t]he publication of the interpretative ruling in the Official Gazette has a purpose other than that of setting the beginning of the applicability of the constitutional norms: it is the means of publicizing the ruling so that it reaches the largest number of people."  A true and correct copy of the *Adriana Vigilanza et al.* decision in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 29**.

[120]   For example, the Constitutional Chamber's 2014 decision, *N.D.G.*, was published on its website.  A true and correct copy of that decision in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 30**.  Likewise, the Chamber's 2014 decision, *Gerardo Sanchez Chacon*, was also published online.  A true and correct copy of that decision in its original Spanish text, and a certified translation, are included as **Exhibit 31**.

[121]   Clark Decl., Ex. 27, ¶ 111.

[122]   *Id.* ¶¶ 17–39.

[123]   Ex. 2, ¶¶ 95–104.

FILED UNDER SEAL

Carías's argument that these cases have no weight because Venezuela does not follow the concept of *stare decisis* is a classic straw man argument, for I do not argue that such a concept applies in Venezuela.[124]  Rather, the Constitutional Chamber's decisions interpreting the Constitution are a binding source of law pursuant to the express text of Article 335 of the Constitution, as discussed earlier.

51.     In his rebuttal report, Professor Brewer-Carías mischaracterizes the writings of scholars who purportedly state otherwise.  There, he provides an incomplete quote by Professor Jesús María Casal, who, in his own words, affirmed in an article that "*[s]ometimes* the Constitutional Chamber has expressly established the binding nature of the ratio decidendi [or the 'the rationale for the decision'] and has ordered the publication of the respective judgment in the Official Gazette."[125]  A true and correct copy of that article, entitled *Cosa Juzgada y Efecto Vinculante en la Justicia Constitucional* [*Res Judicata and binding effect on constitutional justice*], in its original Spanish text, and a certified translation of the relevant portions thereof, are included herein as **Exhibit 32**.  In his rebuttal report, Professor Brewer-Carías omitted the word "sometimes" from the beginning of the aforementioned quote.[126]  Professor Brewer-Carías also relies on the work of Francis Marval, who appears to have plagiarized Professor Casal, rendering the former's writing on the subject unworthy of consideration.[127]

---

124  Clark Decl., Ex. 27, ¶¶ 41–44.
125  *Id.* ¶ 45, n.63 (emphasis added); Ex. 32, at 215.
126  *Id.*
127  A true and correct copy of Francis's Marval's article entitled *La jurisprudencia vinculante de la Sala Constitucional y el principio iura novit curia* [*The binding jurisprudence of the Constitutional Chamber and the iura novit curia principle*], in its original Spanish text, and a certified translation of the relevant portions thereof, are included herein as **Exhibit 45**. I have included an analysis of key provisions of Marval's "analysis" of this issue, juxtaposed against Professor Casal's work, as **Exhibit 33**.  The excerpts show that Marval's purported work is identical to that of Professor Casal.

FILED UNDER SEAL

**D.**   **Contrary to Professor Brewer-Carías's Rebuttal Report, the Venezuelan Scholarly Community Does Not Share His Opinion that State Corporations May Enter into Contracts of National Interest**

52.     Professor Brewer-Carías also attempts to undermine the binding holding in *Andrés Velásquez et al.*, which requires Contracts of National Interest to have the Republic as a party, by invoking several scholars that supposedly share his opinion that such contracts may also be entered into by state companies, and other organs of the National Public Administration.[128]   Having reviewed these scholarly works, it is readily apparent that Professor Brewer-Carías mischaracterized these writings, often taking them out of context.

53.     For example, many of the scholarly works invoked by Professor Brewer-Carías in his rebuttal report analyzed are inapposite, for they predate the Constitutional Chamber's decision in *Andrés Velásquez et al.*[129]   Taking into account this circumstance, it is an error to invoke these outdated scholarly writings that do not analyze *Andrés Velásquez et al.* to argue that Contracts of National Interest are those entered into by the National Public Administration.

54.     For instance, Professor Brewer-Carías contends that Professor Luis Henrique Farías Mata "has always been emphatic that national public interest contracts include contracts entered into by decentralized public entities of the Administration,"[130] and cites as support a 1981 article by Farías Mata.  But Professor Mata's 1981 article predates *Andrés Velásquez et al.*, so cannot be relied upon as evidence of this scholar's opinion on *Andrés Velásquez et al.*'s binding interpretation of Article 150.

55.     Similarly, Professor Brewer-Carías misrepresented that Isabel Boscán de Ruesta "agrees that [Contracts of National Interest] 'are those entered into by the National Public

---

[128]   Clark Decl., Ex. 27, ¶¶ 74–80.
[129]   *See generally* Ex. 07.
[130]   Clark Decl., Ex. 27, ¶ 75.

FILED UNDER SEAL

Administration'" in her 1983 article, *La Inmunidad de Jurisdicción en los Contratos de Interés Público* [*The Immunity of Jurisdiction in Contracts of Public Interest*].[131]  A true and correct copy of Professor Boscán de Ruesta's article, in its original Spanish text, and a certified translation of relevant excerpts thereof, are included herein as **Exhibit 47**.  Professor Boscán de Ruesta writes in her article that "*[a] majority sector* of Venezuelan doctrine considers that when the constituent uses the expression 'Contract of National Interest' it refers to a group of contracts that the Public Administration enters into, and when it uses the expression 'Contract of Public Interest' it is with the purpose of encompassing Contracts of National, State or Municipal Interest."[132]  She does not, as Professor Brewer-Carías asserts, commit herself to this view, but instead neutrally represents one interpretation of Contracts of National Interest in the scholarly community in the early 1980s (her reference to "doctrine" is a reference to scholarly writings).  In any event, Professor Boscán de Ruesta's characterization of the opinion of the scholarly community in the early 1980s is not instructive here because it predates the Constitutional Chamber's decision, *Andrés Velásquez et al*.

56.     In addition to these outdated citations, Professor Brewer-Carías overstates the opinions of several other scholars, including Professors José Araujo Juárez, Margot Y. Huen Rivas, José Melich Orsini, and Jesús Caballero Ortiz.

57.     As to Professor José Araujo Juárez, Professor Brewer-Carías asserts that Professor Juárez "has opined that state-owned enterprises 'can enter into contracts that can be qualified as public interest contracts, and thus, subjected to the parliamentary regime control established by the Constitution.'"[133]  The aforementioned quote is incomplete and misrepresents Professor Araujo

---

[131]   *Id.* ¶ 76.
[132]   Ex. 47 at 38 (emphasis added).
[133]   Clark Decl., Ex. 27, ¶ 76.

FILED UNDER SEAL

Juárez' true opinion in his 2008 article, *Régimen general de derecho público relativo a las empresas del Estado* [*General system of public law concerning State* enterprises], of which a true and correct copy, in its original Spanish and with a certified translation of the relevant portions thereof, are included as **Exhibit 35**.  As is readily apparent when one reads the rest of his article, Professor Juárez interprets Article 150 in the same manner that I do, while recognizing that a *sector* of the scholarly community (i.e., of the legal "literature")[134] embraces a contrary interpretation:

> Now, in relation to the *subjects whose presence is a necessary condition for the conclusion of contracts of national interest, it is required first of all that it be a political-territorial entity, that is, the Republic*, the States and the Municipalities. However, *a sector of the literature* has considered that this category also applies to those contracts signed by the decentralized National Public Administration, that is, autonomous institutes and State companies, *when they directly affect the national interests that correspond to the Republic*.[135]

58.     Professor Brewer-Carías also claims that Professor Margot Y. Huen Rivas "also agrees that one of the characteristics of public interest contracts is 'at least a public entity is one of the parties.'"[136]  But prior to making this statement, Professor Huen Rivas equates Contracts of National Interest (or "public interest contracts") with administrative contracts.[137]  As explained below, the Governing Documents are not administrative contracts and therefore cannot be characterized as Contracts of National Interest.[138]   Professor Huen Rivas also expressly acknowledges that the four requirements in *Andrés Velásquez et al.* are applicable to Contracts of National Interest.

59.     Along similar lines, Professor Brewer-Carías contends that Professor José Melich Orsini "has not affirmed that the Republic must be a party in order for a contract to be considered

---

[134]  Ex. 35, at 228–29.
[135]  *Id.* (emphasis added).
[136]  Clark Decl., Ex. 27, ¶ 76.  A true and correct copy of Professor Huen Rivas's publication, *El Arbitraje Internacional en los Contratos Administrativos* [*International Arbitration in Administrative Contracts*], in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 36**.
[137]  Ex 37, at 405, 420, 426.
[138]  Ex. 2, ¶¶ 166–77.

a 'Contract of National Interest'" and instead believes that "what typifies a 'contract of public interest' is that it is a great contract entered into by the national Public Administration. . . ."[139]  In actuality, Professor Melich Orsini states in his article that only contracts that could "'seriously compromise the economic assets *of the Republic*'" are Contracts of National Interest.[140]  A true and correct copy of this publication, *La Noción de Contrato de Interés Público* [*The Notion of Public Interest Contracts*], in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 37**.  Here, the Governing Documents do not create a liability for the Republic, which is a significant factor for Professor Melich Orsini in determining whether a contract is one of national interest.[141]

60.    Additionally, Professor Brewer-Carías misrepresents the opinion of Professor Jesús Caballero Ortiz.  Professor Brewer-Carías alleges that "Professor Caballero has opined since 1982 that national public interest contracts include not only contracts to which the Republic is a party, but also contracts entered into by decentralized entities of the Public Administration, specifically referring to 'public enterprises, public law persons' (autonomous institutions or public corporations)."[142]  However, Professor Caballero Ortiz clarified in his 1982 publication titled *Las Empresas Pùblicas en el Derecho Venezolana* [*Public Enterprises in Venezuelan Law*] that Contracts of National Interest cannot be made extensive with the "term 'public administration' to which the legislator refers to, [and] cannot be applied to companies with public participation."[143]  A true and correct copy of the excerpted publication by Jesús Caballero Ortiz, in its original

---

[139]    Clark Decl., Ex. 27, ¶ 77.
[140]    Ex. 2, ¶ 151 (quoting Ex. 37, at 61 (emphasis added)).
[141]    *Id.*
[142]    Clark Decl., Ex. 27, ¶ 78.
[143]    *See* Ex. 38, at 333–34.

Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 38**.

61.     Professor Brewer-Carías's heavy reliance in his rebuttal report on the newly minted opinion of Román J. Duque Corredor, a former Justice of the Political-Administrative Chamber, on the legality of the 2020 Notes merits little attention.[144]  This opinion, dated April 19, 2020, was written *less than two weeks* before expert rebuttal reports were due, on May 1, 2020, in this matter.[145]  ███████████████████████████████████████████████████

██████████████████████████████████████████████ ███ The Duque Corredor opinion does no more than repeat Professor Brewer-Carías's erroneous conclusions in his expert report as to the Governing Documents.  Such after-the-fact statements, prepared in the midst of litigation, should not be viewed as reliable evidence of Venezuelan law.

62.     Moreover, the opinion espoused by Professor Brewer-Carías in his expert report— that *any* contract entered into by an entity that is part of the "National Public Administration" of the Republic (including state corporations such as PDVSA) with a company not domiciled in Venezuela must obtain prior authorization from the National Assembly—is not supported by binding case law and contradicts his own published works from at least 2006 through 2019 interpreting that case law, as discussed above and in my Rebuttal Report.[147]

63.     Indeed, Professor Brewer-Carías's position goes farther even than the PDVSA Parties' litigation position, as conveyed during a conference on November 8, 2019, in which counsel for the PDVSA Parties represented that what differentiates the Governing Documents is

---

[144]   *See* Clark Decl., Ex. 27, ¶¶ 5, 25, 32, 37, 63 n.80, 68, 76 n.97.
[145]   *See id.*, Ex. 340.
[146]   *See id.*, available at https://www.acienpol.org.ve/wp-content/uploads/2020/04/Nulidad-de-la-Bonos-2020-de-PDVSA.pdf.
[147]   *See* Ex. 3, 26 n.12 (listing publications from 2006 through 2019); *see also* Ex. 10–13.

FILED UNDER SEAL

that they "involved a pledge of a controlling interest in Citgo" and represented that "[their] contention is not that every contract PDVSA enters into requires prior National Assembly authorization."[148]   Professor Brewer-Carías's expert reports do not advocate a legal theory whereby the pledge would be deemed a contract of national interest, but not all other PDVSA debt.[149]

64.     Professor Brewer-Carías's sweeping theory would lead to absurd and impractical results, including grinding PDVSA's international operations to a halt, as discussed in my rebuttal report.[150]

**E.     The Governing Documents Do Not Satisfy Other Criteria for Contracts of National Interest**

65.     In addition to the requirement that the Republic be a party to the Governing Documents, the Constitutional Chamber under *Andrés Velásquez et al.* requires that three additional criteria be met in order for an agreement to qualify as a Contract of National Interest: (i) "the subject of the contract must be decisive or essential for the realization of the goals and missions of the Venezuelan State"; (ii) "the contract must satisfy the interests of the national community"; and (iii) "the contract must imply the assumption of obligations payable by the Republic—against the National Treasury—during several fiscal years after the one in which the contract was concluded and, therefore, commit amounts of money and fiscal resources from Venezuela's future budgets."[151]   The absence of any of one of these criteria disqualifies a contract from being considered a Contract of National Interest under Article 150.[152]

---

[148] *See id.* ¶ 93.
[149] *Id.*
[150] *Id.* ¶¶ 89–91 (explaining that Professor Brewer-Carías's opinion would invalidate "(i) contracts related to the day-to-day commercial operations of PDVSA and its subsidiaries . . . and even (ii) contracts for electrical energy supply or cleaning services to be provided to PDVSA's offices in the cities of New York, London, or The Hague.").
[151] *See* Ex. 2, ¶¶ 129–30.
[152] *Id.* ¶ 89.

FILED UNDER SEAL

66.    The Governing Documents fail to meet *at least* the second and third additional *Andrés Velásquez et al.* criteria.  As set forth in my Expert Report, the Governing Documents do not satisfy the general interests of the Venezuelan national community because the purpose of the Governing Documents is the refinancing of notes and the pledge of shares of a U.S.-based subsidiary incorporated in Delaware and headquartered in Houston, Texas, not any interest of the individual and matching interests of the inhabitants of the Venezuela considered as a whole.[153]

67.    Treating these agreements as satisfying the general interest requirement simply because the Governing Documents contemplate the pledge of shares of a PDVSA subsidiary is illogical.[154]   PDVSA and its subsidiaries: (i) ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████[155]

68.    Professor Brewer-Carías's opinion is also inconsistent with CITGO Petroleum's recent debt issuances.  Just recently, on June 2, 2020, during the pendency of this litigation, CITGO Petroleum announced the issuance of $750 million in senior secured notes, due 2025 (the "2025 Notes"), which would be secured by all of CITGO Petroleum's assets.[156]   Later that same day, CITGO Petroleum announced that the principal amount of this offering increased to $1.125 billion from the previously announced offering size of $750 million.   A true and correct copy of that announcement is included as **Exhibit 41**.  The day after these announcements, the Special Attorney

---

[153]   *Id.* ¶¶ 132, 136–41.
[154]   *Id.* ¶ 134.
[155]   Ex. 2, ¶ 134
[156]   *See* Clark Decl., Ex. 42, at 1; *id.* Ex. 325.

FILED UNDER SEAL

General's office issued a press release, published in Spanish and English, confirming that neither PDVSA nor any of its subsidiaries had sought or obtained National Assembly approval for the 2025 Notes—*and that such approval was not required by Venezuelan law*.[157]  I discuss this press release in further detail below.

69.     Moreover, the Governing Documents do not involve the assumption of obligations payable by the Republic against the National Treasury because the PDVSA Parties did not assume any liabilities payable *by the Republic*, on behalf of the PDVSA Parties or otherwise, against the National Treasury.[158]  Professor Brewer-Carías's argument to the contrary erroneously conflates PDVSA with the Republic for constitutional purposes, and is belied by PDVSA's debt practices and ████████████████████████████████████████████████████████████████

███[159]

70.     Professor Brewer-Carías's assertion that, "under any standard that takes into account the magnitude or impact of the transaction" the Governing Documents are also Contracts of National Interest, has no foundation in the law and is fundamentally unworkable and so does not change my opinion.[160]  In fact, I do not read Professor Brewer-Carías's expert reports as in fact advocating such a position.[161]  Instead, I understand him to be arguing that, if such a standard were operative, the contracts in this case would qualify.[162]  Indeed, he has previously argued in a 2013 publication entitled, *Tratado de Derecho Administrativo*, that the "quantitative interpretation criterion on what is to be understood as a contract of national interest is inadmissible by itself to draw the boundary between contracts that are of national interest and those that are not."[163]  A true

---

[157]  *See id.*, Ex. 277.
[158]  Ex. 2, ¶¶ 142–48.
[159]  *Id*. ¶¶ 107, 134, 154.
[160]  Ex. 3, ¶¶ 139–45 (emphasis omitted).
[161]  *Id.* ¶ 140.
[162]  *See* Ex. 2. ¶¶ 133–34.
[163]  Ex. 39, at 638.

FILED UNDER SEAL

and correct copy of this excerpted publication, in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 39**.

71.     In light of the above, the Governing Documents are not Contracts of National Interest, and Professor Brewer-Carías's opinion to the contrary should not be relied upon.

## II.     PROFESSOR BREWER-CARÍAS'S OPINION WOULD FRUSTRATE THE PURPOSE OF PDVSA AND PDVSA PETRÓLEO'S EXEMPTION FROM LEGISLATIVE APPROVAL UNDER THE FINANCIAL ADMINISTRATION LAW AND RENDER THIS EXEMPTION UNCONSTITUTIONAL

72.     Professor Brewer-Carías opines in his expert report that all contracts entered into by the National Administration (including state corporations such as PDVSA) with corporations not domiciled in Venezuela are Contracts of National Interest requiring National Assembly approval.[164] As discussed *supra*, Part I.B, PDVSA and PDVSA Petróleo are specifically exempted from seeking the approval of their financing agreements by the National Assembly under Article 101 of the Financial Administration Law.  Professor Brewer-Carías's opinion, if adopted, would significantly impair the public policy behind this exemption, which was enacted to allow state corporations to operate autonomously without the stringent legislative approval requirements for Public Debt.[165]

73.     Moreover, Professor Brewer-Carías's opinion's overbroad reading of what contracts qualify as Contracts of National Interest implies that the exemption under the Financial Administration Law is unconstitutional.[166]  A decision so holding would be unprecedented under Venezuelan law, and would contradict the *Brigitte Acosta Isasis* decision, in which the Constitutional Chamber reaffirmed that Article 101 "exempts" the public entities to which it applies "from the [general] authorization regime provided for" in the Financial Administration

---

[164]   Clark Decl., Ex. 13, ¶ 13.
[165]   *See* Ex. 3, ¶ 130.
[166]   *See* Ex. 2, ¶¶ 164–65.

Law.[167]  Professor Brewer-Carías's argument that the Constitutional Chamber did not recognize this exemption in *Brigitte Acosta Isasis* is not borne out by the plain text of that decision.[168]

## III.    THE GOVERNING DOCUMENTS DO NOT QUALIFY AS ADMINISTRATIVE CONTRACTS

74.     Under Venezuelan law, Contracts of National Interest are considered administrative contracts.  In fact, Professor Brewer-Carías refers to an article by Juan Carlos Balzán in which Balzán affirms that "there is no difference between the constitutional expression '*contracts of public interest*' and the doctrinal term '*administrative contract of the Administration*.'"[169]  This was also recognized by the National Assembly in a resolution dated May 26, 2016, of which a true and correct copy, in its original Spanish text, and a certified translation thereof, are included as **Exhibit 46**.  In this resolution, the National Assembly asserted that "contracts of public interest that require approval of the National Assembly are a special category of administrative contracts. . . ."[170]  Administrative contracts are governed predominantly by Venezuelan public (*i.e.*, administrative) law and necessarily involve sovereign powers that PDVSA and PDVSA Petróleo do not possess with respect to the Governing Documents, such as the right to unilaterally interpret, modify, or terminate the contracts.[171]

75.     Here, the Governing Documents lack the defining features of administrative contracts because they contain express New York choice-of-law provisions and do not purport to

---

[167]   *See id.*

[168]   *See id.*

[169]   *See* Ex. 40, at 308.  A true and correct copy of this article, *El Arbitraje en los Contratos de Interés Público a la Luz de la Cláusula de Inmunidad de Jurisdicción Prevista en el Artículo 151 de la Constitución de 1999* [*Arbitration in Contracts of Public Interest in the Light of the Clause of Immunity of Jurisdiction Provided for in Article 151 of the 1999 Constitution*], in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 40**; *see also* Clark Decl., Ex. 27, ¶ 76, n.100 (citing Ex. 40).

[170]   Ex. 46, Fifth "Whereas" Clause.  As further examined in paragraph 155 of my Rebuttal Report, Professor Brewer-Carías invokes the May 2016 Resolution in his opening report, but does not acknowledge that the Governing Documents do not satisfy the core requirements of administrative contracts.

[171]   Ex. 2, ¶ 22.

FILED UNDER SEAL

give PDVSA or PDVSA Petróleo the unilateral right to interpret, modify, or terminate the contracts.  These concepts are more fully articulated in my Expert Report.[172]

## IV. EVEN IF THE GOVERNING DOCUMENTS WERE FOUND TO BE CONTRACTS OF NATIONAL INTEREST, A VENEZUELAN COURT WOULD STILL ENFORCE THESE AGREEMENTS

76.     Even assuming for the sake of argument that National Assembly approval was required for the Governing Documents, Venezuelan courts reviewing these documents would still enforce these agreements after applying the presumption of legality and the principle of legitimate expectations.

77.     Under the presumption of legality, contracts executed by entities of Venezuela's Public Administration—including PDVSA and PDVSA Petróleo—are presumed to be valid and legitimate.[173]  Furthermore, Venezuelan courts affirm on a consistent basis that parties may rely on the legitimate expectations arising from actions—contracts included—by Venezuela's Public Administration.[174]  Indeed, in the 2007 *UCV* case, the Constitutional Chamber ruled in favor of the Public Administration's counterparty based on the principle of legitimate expectations despite the fact that UCV had violated public order contracting regulations governing its contracts.[175]  A true and correct copy of *UCV* in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 42**.  Professor Brewer-Carías fails to address the *UCV* case entirely.[176]

78.     Professor Brewer-Carías is also wrong to suggest that the presumption of legality is inapplicable because the Governing Documents are absolutely null and void for lack of National

---

[172] *Id.* ¶¶ 169–77.
[173] *Id.* ¶ 179.
[174] *See id.* ¶¶ 184–89.
[175] Ex. 2, ¶ 189; Ex. 3, ¶ 162.
[176] *See generally* Clark Decl., Ex. 13.

Assembly approval.  As discussed above, no such approval was required for the validity of these contracts.  In any event, as explained in my Rebuttal Report, a lack of National Assembly approval is not the type of defect that would render a contract null and void, ████████████████

████████████████████████████████ [177]

79.     Professor Brewer-Carías's main argument in his rebuttal report against the application of the presumption of legality is that "when *administrative acts* are null and void in an absolute sense (for instance, according to Article 19 of the Organic Law on Administrative Procedure), such acts do not benefit from any presumption of validity."[178]  But the Governing Documents are not *administrative* acts; they are debt finance contracts.  As such, they are not governed by the Organic Law of Administrative Proceedings, which solely regulates administrative procedures and administrative acts.  Accordingly, Professor Brewer-Carías's arguments on this issue, as well as on the applicability of the principle of legitimate expectations, are entirely inapplicable to the Governing Documents.

80.     His only other argument in his rebuttal report against the applicability of this principle is a quotation of a single scholar, Hildegard Rondón de Sansó, whose article, *El Principio de Confianza Legítima en el Derecho Venezolano* ("The Principle of Legitimate Expectation in Venezuelan Law"), Professor Brewer-Carías also takes out of context.  A true and correct copy of this article in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 43**.  Specifically, Professor Brewer-Carías asserts that this scholar stated that legitimate expectations cannot be based on "a promise that does not comply with the rules, or even, is contrary to the rules."[179]  Upon reviewing this publication by Rondón de Sansó, it is

---

[177]  Ex. 3, ¶¶ 171–72.
[178]  Clark Decl., Ex. 27, ¶ 104 (emphasis added).
[179]  *Id.* ¶ 110 (emphasis omitted) (citing Ex. 43).

FILED UNDER SEAL

apparent that this quote is part of a larger section entitled "Regarding the name used," in which Rondón de Sansó argues that this principle, which is called the principle of "legitimate" expectations, would more accurately be named the principle of "plausible" expectations because "the former [term, i.e. "legitimate"] requires the expectation to adhere to all the requirements of existing legislation, *which is not essential* in the situation forming the subject matter of this analysis, which may well be created even outside [the terms] of some express provision. . ."[180] In light of the above, there is no barrier to the applicability of the principle of legitimate expectations to the Governing Documents.

81.     Applying this principle here, it is clear the PDVSA Parties' lawsuit violates the principle of legitimate expectations because it is inconsistent with the text of the Indenture and the Pledge Agreement, according to which PDVSA and PDVSA Petróleo repeatedly represented that all legal requirements established by Venezuelan law for the validity of those agreements were duly met.[181] ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████ ██ These statements also contradict the dual opinions issued by the Caracas and New York offices of Hogan Lovells to Credit Suisse, financial advisor to PDVSA, regarding the legality of the Indenture, the Pledge Agreement, and the 2020 Notes, two of which were provided to the Trustee and Collateral Agent.[183]

---

180   Ex. 43, at 300–01 (emphasis added).
181   Ex. 2, ¶¶ 193–97.
182   Clark Decl., Ex. 28, at 4.
183   *See id.* Ex. 30; *id.* Ex. 31.

FILED UNDER SEAL

82.     Professor Brewer-Carías' reliance on a National Assembly Resolution, issued on October 15, 2019, purportedly to "ratify that the 2020 Bond indenture violated Article 150 of the Constitution" since it was not approved by the National Assembly, does not alter my opinion.[184] As explained above and in my Rebuttal Report,[185] National Assembly resolutions are not legally binding with respect to whether a contract is a Contract of National Interest and cannot serve to invalidate or nullify contracts such as the Governing Documents.  Further, the National Assembly is not empowered to overrule determinations made by the Constitutional Chamber in matters of constitutional interpretation.

83.     Regarding the actual language of the October 2019 Resolution, as stated in my Rebuttal Report,[186] there is no prior National Assembly Resolution whose contents could be "ratified" on this particular subject matter, since the National Assembly's resolution dated September 27, 2016 did not declare that the Governing Documents or the 2016 Exchange Offer were illegal or invalid.[187]  The October 2019 Resolution, issued more than three years after the September 2016 Resolution and just days before the filing of the PDVSA Parties' Complaint, was the first time the National Assembly took this position.  In any event, the National Assembly does not have the authority to declare that the Governing Documents violated any provision of the Constitution, as that power is reserved to the courts of Venezuela and can only be exercised with due process of law.[188]  Therefore, both the September 2016 Resolution and October 2019 Resolution are, at best, political declarations with no legally binding effects.

---

[184]   *Id.* Ex. 50, at 8.
[185]   Ex. 3, ¶¶ 95–100.
[186]   *Id.* ¶¶ 124–27.
[187]   *See* Clark Decl., Ex. 44.
[188]   *See* Ex. 3, ¶¶ 95–96.

FILED UNDER SEAL

84.     This lawsuit is also inconsistent with the past conduct of PDVSA and PDVSA

Petróleo.   For decades, PDVSA and its subsidiaries have participated in numerous debt

transactions.[189] ███████████████████████████████████████████████████

███████████████████████ ██ █████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ ██ Prior to this lawsuit, there was no declaration by the National Assembly that

such authorization was required for any other PDVSA debt issuance.

85.     This lawsuit is also inconsistent with CITGO Petroleum's current conduct.   As

mentioned above, on June 2, 2020, CITGO Petroleum announced plans to issue the 2025 Notes,

constituting $1.125 billion in debt secured by all of CITGO's assets.[192]   Yet, no National Assembly

approval was ever sought or obtained for the transaction.[193]

86.     In its press release dated June 3, 2020, the Special Attorney General's Office

attempted to distinguish the recent issuance of the 2025 Notes from the 2020 Notes.   According to

the Special Attorney General, no National Assembly approval for the former was necessary

because the National Assembly's "control powers cannot be exercised extraterritorially concerning

PDVSA subsidiaries incorporated abroad, nor concerning contracts executed abroad not related to

the transfer or traffic of PDVSA."[194]   In this quotation, the phrase "transfer or traffic" is a

---

[189]   *See* Ex. 2, ¶¶ 210–14.
[190]   *Id.*
[191]   *See id*. ¶ 58, n.76.
[192]   *See* Ex. 50.
[193]   *See* Clark Decl., Ex. 277, at 1.
[194]   *Id.*

41

translation of the phrase "giro o tráfico," which is more accurately translated as "course of business."

87.     The Special Attorney General's attempt to distinguish the 2020 Notes is logically flawed, as it would allow PDVSA to engage in an almost identical transaction as the 2020 Notes without seeking National Assembly approval, so long as the Governing Documents were entered into by PDVSA's non-Venezuelan subsidiaries instead.  Moreover, the theory proffered by the Special Attorney General's Office, that a contract must involve PDVSA's ordinary "course of business" [195] in order to qualify as a Contract of National Interest, has no basis in Venezuelan law. No court has ever recognized this theory, nor is such a theory contemplated by any provision of Venezuela's Constitution or laws.  Professor Brewer-Carías' expert reports did not cite the theory described in the press release, much less provide any support for it.

88.     Furthermore, pursuant to the principle of congruent (or parallel) forms, PDVSA's prior history of acquisitions demonstrates that National Assembly approval is not needed for PDVSA's purchase of large assets, such as a controlling interest in CITGO Holding's shares.  As stated in my Rebuttal Report,[196] before acquiring CITGO Petroleum, PDVSA entered into a contract with Veba Oel A.G. for the purpose of acquiring 50% of the capital shares of RuhR Oel Gmbh (the "Veba Oel Contract").  The National Assembly decided that no legislative approval was required for PDVSA to acquire this asset.[197]  Thereafter, PDVSA did not seek or otherwise obtain National Assembly approval for the purchase of CITGO Petroleum in 1986, or in 1990.[198]

---

[195]  *See id.*
[196]  Ex. 3, ¶¶ 148–50.
[197]  *Id.* ¶ 149.
[198]  *Id.* ¶ 150.

FILED UNDER SEAL

Therefore, congruently, the PDVSA Parties' pledge of CITGO Holding shares in the Governing Documents was not subject to approval by the National Assembly.[199]

89.     On the subject of the Veba Oel Contract, it should be noted that Professor Brewer-Carías has written in the past that Contracts of National Interest are characterized, in part, by the fact that the obligations under such contracts must be fully executed or fulfilled *within Venezuela*.[200]   Specifically, he wrote, based on the article of the 1961 Constitution that is the predecessor to Article 150 in the current Constitution:

> [W]e consider that it is the State contracts *to be executed in Venezuelan territory*, concluded with companies not domiciled in Venezuela, which require the approval of Congress. Therefore, a public interest contract concluded with a company not domiciled in Venezuela, to be executed abroad, does not require the approval of Congress in accordance with the second section of Article 126 of the Constitution.[201]

90.     Professor Brewer-Carías omits any discussion of this scholarly theory in his reports in this matter.   Although this scholarly theory is not law, even under this theory defended by the PDVSA Parties' expert, the Governing Documents would not be considered Contracts of National Interest.[202]   Here, the governing Documents were performed outside of Venezuela, as the place of payment, choice of currency, the language of the Governing Documents, and location of the Trustee, Collateral Agent, and Paying Agent, all indicating that these contracts were performed outside of Venezuela, and the PDVSA Parties have not argued otherwise.[203]

---

[199]   *Id.* ¶¶ 150–51.
[200]   I refer specifically to an article by Professor Brewer-Carías entitled *La Aprobación Legislativa de los Contratos de Interés Nacional y el Contrato PDVSA-VEBA OEL*, published in 1985.  A true and correct excepted copy of this publication in its original Spanish text, and a certified translation of the relevant portions thereof, are included as **Exhibit 44**.
[201]   *Id.* at 81 (emphasis added); *see also* Ex. 3, ¶ 153.
[202]   Ex. 3, ¶¶ 152–54.
[203]   *Id.* ¶ 154.

FILED UNDER SEAL

## V.     THE GOVERNING DOCUMENTS ARE NOT NULL AND VOID *AB INITIO*

91.     Professor Brewer-Carías opines that the Governing Documents are invalid, illegal, and null and void *ab initio* because they lacked National Assembly approval.  This opinion has no merit for several reasons articulated in my Rebuttal Report.

92.     *First*, the Governing Documents are not Contracts of National Interest for the reasons discussed above.  Thus, no National Assembly approval was required for the Governing Documents to be executed, and the agreements are neither void nor void *ab initio* under Article 150.[204]  To the contrary, PDVSA and PDVSA Petróleo, as *sociedades anónimas*, have full legal capacity to negotiate and execute contracts.

93.     *Second*, lack of National Assembly approval is not the type of alleged defect that would render the Governing Documents void *ab initio* under Venezuelan law.[205]  While Professor Brewer-Carías argues that lack of National Assembly approval is a legal defect amounting to a lack of valid consent to contract, this would at most be considered a legal defect affecting PDVSA's legal capacity to contract, which renders a contract merely voidable, not void.

94.     *Third*, the Indenture as a whole is not void *ab initio* by virtue of the pledged collateral pursuant to Section 10.05, the severability provision.[206]  If the Indenture were a Contract of National Interest—and it is not—because of the pledge of CITGO Holding shares, that part of the Indenture would be at most considered voidable; the rest would continue to be binding and enforceable.  Of course, even if the Governing Documents were voidable at one time, they no longer are, as a Venezuelan court would still enforce the obligations in these contracts pursuant to

---

[204]   *Id.* ¶¶ 165–67.
[205]   *Id.* ¶¶ 168–69.
[206]   *Id.* ¶¶ 175–77.

FILED UNDER SEAL

the principle of legitimate expectations and in light of the presumption of validity, as discussed above.

95.    *Finally*, with respect to the Pledge Agreement, PDVH, the contracting party whose consent was essential for the pledged collateral, was not—and still is not—subject to Venezuelan law because it is a foreign corporation.[207]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.



Executed on June 10, 2020

---

[207]  *Id.* ¶¶ 179–80.