# Exhibit 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

*Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A. and PDV Holding, Inc.*
**Plaintiffs**

v.

*MUFG Union Bank, N.A. and GLAS Americas, LLC*
**Defendants**

**19 Civ. No. 10023-KPF**

**Expert Report**

████████████████

**March 16, 2020**

TABLE OF CONTENTS

ACADEMIC BACKGROUND .................................................................................................. 1

PURPOSE OF THIS REPORT .............................................................................................. 1

EXECUTIVE SUMMARY ...................................................................................................... 3

EXPERT REPORT ................................................................................................................ 7

FACTUAL BACKGROUND .................................................................................................. 7

    A.    PDVSA and PDVSA Petróleo As *Sociedades Anónimas* ............................ 7

    B.    The Organic Law for the Financial Administration of the Public
        Sector ............................................................................................................. 15

    C.    Contracts of National Interest Under the Venezuelan Constitution ....... 17

    D.    PDVSA's Prior Debt Issuances ................................................................... 19

    E.    The 2016 Exchange Offer .............................................................................. 20

    F.    Representations Within the Governing Documents ................................... 22

    G.    The Current Lawsuit .................................................................................... 30

I.    CONTRACTS OF NATIONAL INTEREST: AN INTRODUCTION .................. 30

    A.    Contracts of National Interest: Historical Usage and Other
        Considerations ............................................................................................... 30

        i.    The First Rule of Article 150: The Requirement of National
            Assembly Approval for Contracts of National Interest "in
            the cases determined by law" .............................................................. 31

        ii.    The Second Rule of Article 150: The Requirement of
            National Assembly Approval for Contracts of National
            Interest "with foreign official entities or States or with
            companies not domiciled in Venezuela" ............................................. 31

    B.    The Requirements of a Contract of National Interest as
        Recognized by Venezuela's Supreme Tribunal ......................................... 32

II.     THE GOVERNING DOCUMENTS CANNOT BE CHARACTERIZED AS
        CONTRACTS OF NATIONAL INTEREST BECAUSE THE REPUBLIC IS
        NOT A PARTY TO THE AGREEMENTS ................................................................. 34

        A.     It Is Well Settled that the Republic Must Be a Party to a Contract
               In Order for the Contract to Be Considered a Contract of National
               Interest ............................................................................................................ 34

               i.     Venezuela's Highest Court Has Long Held that Contracts
                      of National Interest Must Include the Republic as a Party .......... 35

               ii.    Consistency of the Requirement that the Republic Must Be
                      a Party with Articles 236 and 226 of the Constitution ................... 41

        B.     Plaintiffs' Allegations Concerning Contracts of National Interest
               Are Inconsistent with the Constitution and Interpretations of
               Article 150 by the National Assembly and the Venezuelan
               Attorney General ........................................................................................... 43

               i.     Plaintiffs Overlooked Article 236(14) of the Constitution ............ 43

               ii.    Plaintiffs' Allegations Are Inconsistent with Prior
                      Statements of the Legislature and Attorney General ..................... 44

III.    THE GOVERNING DOCUMENTS ARE NOT CONTRACTS OF
        NATIONAL INTEREST UNDER AT LEAST TWO OF THE REMAINING
        CRITERIA RECOGNIZED IN *ANDRÉS VELÁSQUEZ ET AL.* ............................. 47

        A.     Contracts of National Interest Must Satisfy the General Interests
               of the National Community ........................................................................... 47

        B.     Contracts of National Interest Must Involve the Assumption of
               Obligations Payable During Several Fiscal Years by the National
               Treasury ........................................................................................................... 51

IV.     ADDITIONAL CONSIDERATIONS SUPPORTING MY OPINION
        THAT THE GOVERNING DOCUMENTS ARE NOT CONTRACTS OF
        NATIONAL INTEREST ........................................................................................... 54

        A.     My Opinion Is Consistent with, and Plaintiffs' Arguments Are
               Inconsistent with, the Financial Administration Law and Other
               Constitutional Provisions Concerning Financing Agreements ............... 55

**B.**     My Opinion Is Further Supported by the Fact That the Governing Documents Do Not Qualify as Administrative Contracts, and Therefore Cannot Constitute Contracts of National Interest ................... 58

**V.**     **EVEN IF THE GOVERNING DOCUMENTS WERE FOUND TO BE CONTRACTS OF NATIONAL INTEREST, A VENEZUELAN COURT WOULD LIKELY ENFORCE THE CONTRACTS** .................................................... **62**

**A.**     Official Acts of the Public Administration, Such as the Indenture and the Pledge Agreement, Are Entitled to the Presumption of Legality Under Venezuelan Law ................................................... 62

**B.**     Under the Principle of Legitimate Expectations and the Rule of *Venire Contra Factum Proprium Non Valet*, the Governing Documents Are Valid ........................................................................ 65

    **i.**     The Principle of Legitimate Expectations ....................................... 65

**C.**     Plaintiffs' Current Lawsuit Violates the Principle of Legitimate Expectations ....................................................................................... 69

**D.**     The Lawsuit Is Inconsistent with the National Assembly's May 2016 Resolution, Thereby Violating the Principle of Legitimate Expectations ................................................................... 72

**E.**     The National Assembly's September 27, 2016 Resolution, On Which Plaintiffs Rely, Is Inconsistent with Supreme Tribunal Precedent ........................................................................................... 73

**F.**     The Plaintiffs' Lawsuit Is Inconsistent with Past Practice, Thereby Violating the Principle of Legitimate Expectations ................................... 75

**VI.**     **CONCLUSION** .......................................................................................... **79**

The undersigned, ████████████████, hereby declares that the following is true and correct:

### ACADEMIC BACKGROUND



§ 1. ████████████████████████████████████████
████████████████

§ 2. ████████████████████████████████████████
████████████████████

§ 3. ████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

§ 4. ████████████████████████████████████████
████████████████████████████████

### PURPOSE OF THIS REPORT

§ 5.   I have been asked by Latham & Watkins LLP, legal counsel for MUFG Union Bank, N.A. ("MUFG"), in its capacity as Trustee, and GLAS Americas LLC ("GLAS," and together with MUFG, collectively, the "Defendants"), in its capacity as Collateral Agent, to render an expert report (the "Expert Report") in connection with the judicial proceedings between Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA Petróleo, S.A., ("PDVSA Petróleo"), and PDV Holding, Inc. ("PDV Holding," and together, with PDVSA and PDVSA Petróleo, "Plaintiffs"), and the Defendants.

§ 6.   PDVSA is an oil and gas company wholly owned by the Bolivarian Republic of Venezuela (the "Republic"). Plaintiffs' lawsuit relates to certain agreements entered into by PDVSA and PDVSA Petróleo, among others, as part of a debt securities issuance by PDVSA in October 2016 (the "2020 Notes"). The 2020 Notes were issued in the form of one or more fully registered notes without interest coupons in global form (the "Global Security").[2] Pursuant to the indenture memorializing the terms of the 2020 Notes dated

---

[1] ████████████████████████████

[2] *See* Indenture Between Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., MUFG Union Bank, N.A., GLAS Americas LLC, Law Debenture Trust Company of New York, and Banque Internationale à Luxembourg, Société Anonyme Dated Oct. 27, 2016, § 2.3(a) (HL_002709) (the "Indenture") ("Notes issued in exchanges for Old Notes originally offered and sold to QIBs

October 28, 2016 (the "Indenture"), the 2020 Notes are secured by a pledge of 50.1% of the shares of a PDVSA subsidiary, CITGO Holding, Inc. ("CITGO Holding"), which in turn owns CITGO Petroleum Corporation ("CITGO"), an oil company organized under the laws of Delaware and headquartered in Houston, Texas. The terms of this pledge are memorialized in a pledge agreement dated October 28, 2016 (the "Pledge Agreement"),[3] the Indenture,[4] and the Global Security,[5] (collectively, the "Governing Documents").

§ 7.   According to the lawsuit filed by Plaintiffs (the "Lawsuit"), on October 28, 2019, PDVSA failed to make a required payment of principal and interest on the 2020 Notes.[6] The following day, Plaintiffs brought suit in the Southern District of New York seeking a declaratory judgement that the 2020 Notes issued by PDVSA were "invalid, illegal, null and void *ab initio*, and thus unenforceable."[7] Plaintiffs also sought an injunction enjoining the enforcement of any rights with respect to the collateral pledged as part of the transaction.[8]

§ 8.   Plaintiffs argue they are entitled to relief because PDVSA is a state enterprise and because CITGO is a critically important asset to the country. Plaintiffs contend that the Governing Documents granting noteholders a security interest in CITGO Holding are "Contracts of National Interest"[9] concluded with foreign corporations, and therefore purportedly require the prior approval of the Republic's legislature (referred to as the "National Assembly," "Legislature," or "Congress") under Article 150 of the Venezuelan Constitution currently in force (the "Constitution"). Plaintiffs argue that because the

---

pursuant to Rule 144A (such Notes, the 'Rule 144A Notes') and originally offered and sold in offshore transactions to No-U.S. Persons in reliance on Regulation S (such Notes, the 'Regulation S Note') shall be issued in the form of one or more fully registered notes without interest coupons in global form (the 'Global Notes')"), **Exhibit** ■-02, p. 21; *see also* PDVSA, Face of Note (Oct. 28, 2016) (HL_019590), **Exhibit** ■-03.

[3]     Pledge Agreement Between Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., MUFG Union Bank, N.A., GLAS Americas LLC, and Law Debenture Trust Company of New York Dated Oct. 28, 2016, (ASH_00009011) ("Pledge Agreement"), **Exhibit** ■-04, p. 3.

[4]     Indenture (HL_002709), **Exhibit** ■-02.

[5]     PDVSA, Face of Note (Oct. 28, 2016) (HL_019590), **Exhibit** ■-03.

[6]     Compl., ¶ 9, ECF No. 1 (Oct. 29, 2019) ("Lawsuit").

[7]     *Id.* ¶ 1.

[8]     *Id.*

[9]     Plaintiffs use the term "contracts in the national public interest" throughout their Lawsuit. In this report, I use the term "Contracts of National Interest" to refer to all such contracts.

2

Governing Documents and the 2020 Notes were not first approved by the National Assembly, they are invalid and void *ab initio* under applicable Venezuelan law.

§ 9.   I have been asked to opine on the following questions of Venezuelan law in the event that this Court does not hold the parties to the express application of New York law they selected in the Governing Documents and finds that Venezuelan law is relevant to the disputes in the Lawsuit:

- Whether, under Venezuelan law, the Governing Documents are Contracts of National Interest and, as such, whether they required the approval of the National Assembly; and

- Whether, even assuming the Governing Documents were Contracts of National Interest, a Venezuelan court nevertheless would enforce the Governing Documents against PDVSA, PDVSA Petróleo, and PDV Holding in light of the Venezuelan legal principle that serves to protect the legitimate expectations of parties contracting with state enterprises.

§ 10. Attached to this Expert Report is also a list of the documents on which I relied in preparing this Report.[10]

## EXECUTIVE SUMMARY

§ 11. As a State Corporation (defined *infra* § 32–§ 33), PDVSA maintains the corporate form and commercial status of a *sociedad anónima*, meaning it is a legally distinct entity from that of its shareholder: the Republic. Accordingly, PDVSA has its own bylaws, board members, officers, and budget, has the power to form its own subsidiaries, and can take actions consistent with its governing documents. Venezuelan constitutional law does not conflate PDVSA with its shareholder—the Republic. Indeed, it would be improper to conflate the two for constitutional law purposes and, in particular, for analyzing Contracts of National Interest, both under the Constitution and well-established legal precedent.

§ 12. Article 150 of the Constitution provides, in part, that "[t]he execution of [Contracts of National Interest] will require the approval of the National Assembly in the cases determined by law," and further states that "*no* [Contract of National Interest] . . . *may be*

---

[10]   List of Materials Relied On, **Exhibit ▮▮-05**.

*executed with. . . companies not domiciled in Venezuela . . . without the approval of the National Assembly."*[11]

§ 13. Pursuant to the Constitution, Venezuelan courts are obliged to look to the decisions of the Constitutional Chamber of the Supreme Tribunal of Justice (the "Constitutional Chamber") to determine whether the Governing Documents are Contracts of National Interest. According to Article 335 of the Constitution, the Constitutional Chamber is the ultimate arbiter with respect to the content or scope of constitutional norms and principles, and in such a role has established rules for determining whether an agreement is considered a Contract of National Interest.[12]

§ 14. With regard to the first question I have been asked to consider, after thoughtful examination of the Constitution, the Constitutional Chamber's precedent, and other relevant law, I have reached the conclusion that the Governing Documents entered into by PDVSA and PDVSA Petróleo are not Contracts of National Interest. I have two main bases for this opinion:

§ 15. ***First*, the Governing Documents are not Contracts of National Interest because the Republic is not a party to any of the Governing Documents.** The primary rule established by the Constitutional Chamber, and repeatedly affirmed by respected Venezuelan legal scholars, is that only contracts to which the Republic is a party qualify as Contracts of National Interest. This rule—which is consistent with the plain language of various articles of the Constitution—has been set forth unambiguously in a line of cases dating back to 1937. The rule was further affirmed by the Constitutional Chamber in the seminal 2002 case *Andrés Velásquez et al.,*[13] and was more recently reiterated in a 2016

---

[11]   Constitution of the Bolivarian Republic of Venezuela, art. 150, *Official Gazette* N° 5908 Extraordinary (1999), (emphasis added), **Exhibit ▪-32**, p. 25.

[12]   The Constitutional Chamber may review judicial decisions issued by any other courts, including of the Political-Administrative Chamber and other chambers of the Supreme Tribunal, if the decision being challenged (i) ignored a precedent issued by the Constitutional Court, (ii) made an improper application of a constitutional norm or principle, (iii) produced a serious error in its interpretation, or (iv) failed to apply constitutional principle or norms. *See* Organic Law of the Supreme Tribunal of Justice, art. 25, *Official Gazette* N° 39522, (Oct. 1, 2010), **Exhibit ▪-06**, pp. 397.866–67.

[13]   Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 2241, (Sept. 24, 2002) ("*Andrés Velásquez et al.*"), **Exhibit ▪-07**, p. 14.

4

decision of the Constitutional Chamber.[14] Under this well-established precedent, if the Republic is not a contracting party, that fact—considered by itself—suffices to disqualify the agreement from consideration as a Contract of National Interest.

§ 16. Under Venezuelan law, PDVSA and PDVSA Petróleo are State Corporations duly incorporated in accordance with the private laws of Venezuela, and are *not* the Republic for constitutional and contractual purposes. The Republic is not a party to the Governing Documents; nor is it a guarantor or signatory. Without the Republic being bound as a party, the Governing Documents cannot be considered Contracts of National Interest.

§ 17. This conclusion is consistent with both PDVSA's own actions and practices. Indeed, I am aware of no instance in which a PDVSA debt issuance was approved by the National Assembly. I am also unaware of a case holding that a debt instrument involving PDVSA is a Contract of National Interest. Nor am I aware of any case where a sale of assets owned by PDVSA was considered to be a Contract of National Interest. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████

§ 18. *Second*, **at least two of the Constitutional Chamber's additional criteria for Contracts of National Interest, as set out in *Andrés Velásquez et al.*, are not met here.** Assuming, contrary to fact, that the Republic was a party to the Governing Documents, the Constitutional Chamber requires three additional criteria be met for an agreement to be a Contract of National Interest: (i) the subject of the contract must be decisive or essential for the realization of the goals and missions of the Venezuelan State; (ii) the contract must have been concluded for the purpose of addressing—immediately and directly—requirements of general interest and, therefore, have to deal with assets of public domain; and (iii) the contract must imply the assumption of obligations payable by the Republic against the National Treasury during several fiscal years after the one in which the contract was concluded and, therefore, commit amounts of money and fiscal resources from the Republic's future budgets.

§ 19. The Governing Documents lack at least the second and third of these additional criteria. The subject of the contracts here is the exchange of the notes of a State Corporation—separate and apart from the Republic—and that State Corporation's pledge

---

[14] Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 618, (July 20, 2016) ("*Brigitte Acosta Isasis*"), **Exhibit** ██-08, pp. 19–21.

of a secured interest in a U.S.-based subsidiary's assets. The security interests at issue are shares of a Delaware corporation based in Houston, Texas, whose assets, under the Constitution and Venezuelan laws, are not assets of public domain. Moreover, PDVSA did not assume any liabilities payable by the Republic, on behalf of PDVSA, against the national budget.

§ 20. **My opinion that the Governing Documents are not Contracts of National Interest is reinforced by two additional considerations.**

§ 21. *First*, the National Assembly has established a statutory procedure for financing agreements ("Financing Agreements") involving the debt of the Republic and certain State entities and has defined those instances when approval by the National Assembly is required. In fact, PDVSA is specifically exempted by statute from seeking the approval of its Financing Agreements by the National Assembly.

§ 22. *Second*, under Venezuelan law, Contracts of National Interest are considered administrative contracts. Administrative contracts are governed—mainly or predominantly—by Venezuelan Public (*i.e.*, Administrative) Law, and involve sovereign powers that Plaintiffs do not possess, or even attempt to invoke with regard to the Governing Documents, such as the right to unilaterally interpret, modify, or terminate the contracts at issue. Here, the Governing Documents plainly lack these features of administrative contracts given that they contain express New York choice-of-law provisions and they do not purport to give PDVSA the unilateral right to interpret, modify, or terminate the contracts.

§ 23. **With regard to the second question I have been asked to consider, it is my opinion that even if it were found that the Governing Documents were Contracts of National Interest (and they are not), a Venezuelan court would still enforce these contracts under the principle of legitimate expectations.** Under the presumption of legality, unilateral decisions taken and contracts executed by the Public Administration (which includes PDVSA) are presumed to be valid and legitimate. Furthermore, Venezuelan courts affirm that parties may rely on the legitimate expectations created by prior conduct taken by the Public Administration as well as contracts entered into with the Public Administration. Given the principle of legitimate expectations, Venezuelan courts have not hesitated to ratify the obligations arising from a contract in which the Public Administration is a contracting party and honor the legitimate expectations of its counterparties, even in instances where required contracting procedures were not followed by the Public Administration.

§ 24. Here, the Lawsuit is inconsistent with the past conduct of the Plaintiffs and the Governing Documents. For decades, PDVSA and its subsidiaries have participated in a number of debt transactions. And they have continued entering into secured debt transactions through 2019. I have found no indication that the National Assembly's approval was ever sought or obtained by PDVSA or any of its subsidiaries for any of these transactions, and, prior to the current case, no suggestion by the National Assembly that such approval would be required. While Plaintiffs claim the Governing Documents differ from past transactions because they grant a security interest in CITGO, I am unaware of any precedent that supports this proposition. Further, this proposition is illogical because, even without the pledge of a security interest, a default by PDVSA would still place CITGO at risk from creditors.

### EXPERT REPORT

§ 25. I will address the two questions posed to me by first providing a brief statement of the relevant facts and law of this matter bearing on my analysis, which will comprise (i) the legal structure of PDVSA and PDVSA Petróleo, which are treated under Venezuelan law as corporations separate from the Republic, (ii) certain financing laws that serve to exempt PDVSA from seeking National Assembly approval, (iii) the articles of the Constitution bearing on Contracts of National Interest, and (iv) PDVSA's past debt issuances and the Governing Documents. I will then discuss my analysis and opinions, taking into consideration the Constitution, relevant Venezuelan court opinions, and the work of Venezuelan scholars.

§ 26. With that framework in mind, I will then analyze the Governing Documents for the purpose of determining whether the transactions constitute Contracts of National Interest under Venezuelan law.

§ 27. I will then examine the ways in which Plaintiffs' Lawsuit violates the principle of legitimate expectations. In so doing, I analyze the ways in which the Lawsuit is inconsistent with Plaintiffs' representations in the Indenture, the Pledge Agreement, and the interpretation of the law by Plaintiffs on which said representations were made.

### FACTUAL BACKGROUND

### A.    PDVSA and PDVSA Petróleo As *Sociedades Anónimas*

§ 28. PDVSA is an oil and gas company wholly owned by the Republic. It was established and incorporated in 1975 after the Republic nationalized the country's petroleum industry

through the publishing of the Organic Law that Reserved to the State the Industry and Trade of Hydrocarbons (the "Nationalization Law").[15] The Nationalization Law reserved to the Republic (or companies owned by the Republic) "the exploration of the national territory in search of oil, asphalt, and other hydrocarbons" as well as "the exploitation of [hydrocarbons] deposits."[16] Thus, PDVSA was created to manage the internal oil and gas assets of Venezuela.

§ 29.  Article 6 of the Nationalization Law empowered the Republic to "create, under the legal forms that it consider[ed] appropriate, the enterprises that it deem[ed] necessary for the regular and efficient development" of such oil exploitation,[17] and PDVSA was created shortly thereafter by Presidential Decree.[18] PDVSA was established as wholly owned by the Republic and continues to be so owned pursuant to Article 303 of the Constitution, which states that the Republic "shall own all the shares of [PDVSA] or of the entity created to manage the oil industry, except those of [PDVSA's] subsidiaries, strategic associations, companies, and any others that have been established or are established as a result of the business development of PDVSA." PDVSA Petróleo is a wholly owned subsidiary of PDVSA, duly incorporated as of November 16, 1978.[19]

---

[15]  Organic Law that Reserved to the State the Industry and Trade of Hydrocarbons, *Official Gazette* N° 1769 Extraordinary (Aug. 29, 1975) ("Nationalization Law"), **Exhibit** ■-09, p. 5.

[16]  *Id.* at art. 1 ("Everything related to the exploration of the national territory in search of oil, asphalt, and other hydrocarbons, the exploitation of deposits of the same, the manufacture or refinement, transport by special routes and warehousing; domestic and foreign trade of the substances exploited and refined, and all other works that may be required by their handling, under the terms indicated by this law, is reserved for the State, for reasons of national appropriateness."), **Exhibit** ■-09, p. 5

[17]  *Id.* at art. 6 ("First: [the National Executive] shall create, under the legal forms that it considers appropriate, the enterprises that it deems necessary for the regular and efficient development of such activities."), **Exhibit** ■-09, p. 5. Once established, such "companies" are to be governed by their own bylaws, pay national taxes, and make contributions for hydrocarbons concessions to the Republic. *Id.* at art. 7, **Exhibit** ■-09, pp. 5–6; *see also id.* at art. 8 (stating that any "directors, administrators, employees and workers of the companies" established pursuant to Article 6, "shall not be considered public officials or public employees"), **Exhibit** ■-09, p. 6.

[18]  According to Article 15 of the Organic Law of Administrative Proceedings, *Official Gazette* N° 2818 Extraordinary (July 1, 1981), **Exhibit** ■-10, p. 2, a Decree is an administrative act issued by the President of the Republic in exercise of sovereign authority (*ius imperium*). *See id.* ("The decrees are the decisions of greater hierarchy dictated by the President of the Republic. . . .").

[19]  *See* Articles of Incorporation and Bylaws of PDVSA Petróleo, S.A., Title I, PDVSA Form T-3 (Sept. 16, 2016), **Exhibit** ■-11, at Ex. T3B-2.

§ 30.   In addition to PDVSA Petróleo, PDVSA has several subsidiaries in Venezuela and abroad. Relevant to the present Lawsuit, PDVSA's subsidiary PDV Holding, a wholly owned subsidiary of PDVSA incorporated in Delaware as of April 21, 1997,[20] owns 100% of the shares of CITGO Holding,[21] which in turn holds 100% of the shares of CITGO, a U.S.-based refiner, transporter, and marketer of transportation fuels and other industrial products.[22] Through purchases in 1986 and 1990, PDVSA, through its subsidiaries, purchased the entirety of CITGO. CITGO Holding and CITGO are Delaware corporations.

███████████████████████████████████████████████████████████████████
███████████████████████[23]

§ 31. Pursuant to Article 303 of the Constitution, the Republic holds title to the shares representing the capital of PDVSA in perpetuity. Article 303 also states that the aforementioned rule *does not apply to* PDVSA's subsidiaries, recognizing that the shares of PDVSA's subsidiaries may be sold and even encumbered.[24]

§ 32. The Republic's petroleum industry is the main source of tax revenue for the country, and PDVSA has played an important role in the Venezuelan economy since its inception. Notwithstanding this importance, and the fact that PDVSA was established and is owned

---

[20]   Certificate of Incorporation of PDV Holding, Inc. (Apr. 21, 1997), **Exhibit** ██**-12**, at Ex. A, p. 1; Offering Circular, PDVSA Form T-3 (Sept. 16, 2016), **Exhibit** ██**-13**, at Ex. T3E, p. 3.

[21]   Offering Circular, *supra* note 20, **Exhibit** ██**-13**, at Ex. T3E, p. 3.

[22]   *Id.* at pp. 7, A-7.

[23]   ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████

[24]   PDVSA's own prospectuses confirm this point. For instance, the prospectus for PDVSA's 2017 Notes states: "Under the Venezuelan National Constitution, Venezuela must retain exclusive ownership of [PDVSA's] shares. However, the Venezuelan National Constitution does not require Venezuela to retain ownership of [PDVSA's] subsidiaries' shares. . . ." PDVSA Listing Prospectus For the Issuances of $3,000,000,000 5.25% Notes Due 2017, $3,000,000,000 5.375% Notes Due 2027, and $1,500,000,000 5.50% Notes Due 2037 (Dec. 4, 2007), **Exhibit** ██**-15**, p. 81; Offering Circular, *supra* note 20, **Exhibit** ██**-13**, at Ex. T3E, p. 129.

by the Republic, PDVSA is not the same legal entity as the Republic and cannot be conflated with the Republic.[25] Rather, PDVSA was established and is incorporated as a "*sociedad anónima*," or corporation, with one shareholder. Indeed, the first clause of Title I of the decree setting forth PDVSA's bylaws states, "[t]he company shall be named Petróleos de Venezuela, it shall operate in the form of a *sociedad anónima*, it shall have the city of Caracas as its domicile, and it shall have a duration of fifty (50) years counted from the date of registration of this document in the Commercial Registry. The company shall be able to establish subsidiaries, agencies or offices in other places of the Republic or abroad."[26]

§ 33. The designation and incorporation of PDVSA as a *sociedad anónima* has several implications. *First*, it means PDVSA is a legal person governed largely by and entitled to the benefits of Venezuela's corporate laws ("Private Laws"), meaning it can contract like other companies, pay taxes, and appoint directors and officers with specific corporate responsibilities as set forth in its bylaws. *Second*, under Article 201 of the Venezuelan Commercial Code ("Commercial Code"), PDVSA's legal obligations, like those of any other *sociedad anónima*, are guaranteed by its capital: the shareholders of a *sociedad anónima* are not liable for such debts.[27] In the case of PDVSA, this means that under Venezuelan law, while the Republic is the sole shareholder of PDVSA, the Republic is not liable for anything more than the capital contributed to PDVSA.[28] The Republic is not legally

---

[25]   Alfredo Morles Hernández, *Curso de Derecho Mercantil* (Las sociedades mercantiles) (2010), **Exhibit ▇-16**, p. 846. According to Morles Hernández, by granting legal personality to commercial companies, *sociedades anónimas* included, under Venezuelan law companies are considered legal persons (*sujetos de derecho*) and may acquire their own assets and liabilities. Moreover, companies have their own legal capacity, name, address, and nationality, in addition to the quality of merchant. José Luis Aguilar Gorrondona, *Derecho Civil. Personas* (25th ed. 2013), **Exhibit ▇-17**.

[26]   Presidential Decree N° 2184, *Official Gazette* N° 37588, (Dec. 10, 2002), **Exhibit ▇-18**, pp. 326.477–78.

[27]   According to Article 201 of the Commercial Code, "[c]ommercial companies are of the following types: . . . The corporation in which the obligations are secured up to a certain amount of capital and in which the liability of the shareholders is limited to the amount of their shares." *Official Gazette* N° 475 Extraordinary (Dec. 21, 1955), **Exhibit ▇-19**, pp. 20–21.

[28]   To this point, the Offering Circular for the 8.5% senior notes due 2020, offered by PDVSA and guaranteed by PDVSA Petróleo, recognizes: "Since [its] formation . . . [PDVSA] ha[s] been operated as a commercial entity, vested with commercial and financial autonomy. The Bolivarian Republic of Venezuela is not legally liable for [PDVSA's] obligations, including [PDVSA's] guarantees of indebtedness, or for the debt or obligations of [PDVSA's] subsidiaries." Offering Circular, *supra* note 20, **Exhibit ▇-13**, at Ex. T3E, p. 129.

10

responsible for PDVSA's debts and PDVSA is not legally responsible for the Republic's debts.

§ 34. PDVSA belongs to a category of *sociedades anónimas* known as "State Enterprises" or "State Corporations," because it is majority owned by the Republic.[29] State Corporations, like other *sociedades anónimas*, are "legal entities created according to the rules of private law,"[30] with their own legal personality, patrimony (*i.e.*, assets and liabilities), and representatives that are recognized and respected.[31] This is true even if all shares of the State Corporation are owned by the Republic. Indeed, as recognized by Venezuela's highest court in a December 12, 1963 decision discussing such entities:

> The fact that the [Republic] holds title to the shares [of a company] does not change the legal status of the company. The assets of the company, generated by its activities for the public it serves, belong to the company itself and not to the [Republic], as do the company's obligations, for which it would be difficult to hold the [Republic] responsible. If a company cannot and should not be confused with the [Republic] with respect to the company's obligations, then the same should be true for the company's activities and the revenue obtained therefrom . . . . [T]he

---

[29]  Organic Law of the Public Administration, art. 103, *Official Gazette* N° 6147 Extraordinary (Nov. 17, 2014), **Exhibit** ▉-20, p. 22. ("*State Enterprises are legal entities created according to the rules of private law* . . . in which the Republic, the States, the Metropolitan Districts and the Municipalities, or one entity formed by any of the former, alone or jointly, has a participation greater than fifty percent of the capital.") (emphasis added).

For the purposes of this report, I will refer to state enterprises, state companies, and state corporations as "State Corporations."

[30]  *Id.* at art. 103, **Exhibit** ▉-20, p. 22; ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; Juan Garrido Rovira, *Temas Sobre Administración Descentralizada en Venezuela* (1984) ("[T]he fundamental characteristic of the Decentralized Administration is the legal personality of each of the entities that compose it, unlike the Central Administration, which is composed by a group of organs whose legal activity is attributable to one single person: the Republic. . . ."), **Exhibit** ▉-22, p. 30.

[31]  Roman Duque Corredor, *El Derecho de la Nacionalización Petrolera* (1978) ("State Enterprises that comprise the National Petroleum Administration . . . are legal entities of private law, which are governed mainly by commercial law."), **Exhibit** ▉-23, pp. 187–88; *see also* Jesús Caballero Ortiz, *Las Empresas Públicas en el Derecho Venezolano* (1982) ("The general principle is, therefore, that business entities are considered commercial, and this principle stands regardless of whether the state or other public entity count among its shareholders."), **Exhibit** ▉-24, p. 329.

11

> [Republic] is simply the owner of the shares and, as such, exercises administrative control through assemblies to designate the company directors. . . .[32]

§ 35. The distinction between State Corporations, on the one hand, and governmental departments or agencies of the Republic, on the other, is set forth in the Organic Law of the Public Administration, which divides the Public Administration into two categories: The Centralized Administration and the Decentralized Administration.

§ 36. As set forth in Article 15 of the Organic Law of the Public Administration, at the National level, the Centralized Administration consists of "organs" or Government departments or agencies, which are described as not having their own legal personality distinct from the Republic. The Centralized Administration is comprised of (i) the National Executive (which includes, *inter alia*, the Presidency of the Republic, the Executive Vice Presidency of the Republic and the Ministers) as well as (ii) other departments or agencies—lower in administrative hierarchy and, hence, subordinate to the National Executive—pertaining to the Executive branch of government. Importantly, the term "National Executive" encompasses a group of administrative departments of the Republic without separate and distinct legal personalities of their own.[33] It does not include State Corporations which, as legal entities, have their own legal personalities. In general, the function of the National Executive is to implement laws, direct the domestic and foreign policy of the government, assume responsibility for the strategic direction of the government, formulate, approve, and evaluate public policies and ensure their implementation, and assess institutional performance and results.[34]

§ 37. By contrast, at the National level of government, the Decentralized Administration is comprised entirely of entities known as "Decentralized Entities," which have a legal

---

[32]  Decision of the Civil Cassation Chamber of the Supreme Court of Justice N° 125, (Dec. 12, 1963) ("*Compañía Anónima Teléfonos de Venezuela*"), **Exhibit** ■ **-25**, pp. 11–12.

[33]  Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 2724, (Dec. 18, 2001) ("*Jhonny García et al.*"), **Exhibit** ■ **-26**, pp. 6–7; Decision of the Full Chamber of the Supreme Court of Justice N° 142, (Nov. 28, 1988) ("*Estrella Sobeida et al.*"), **Exhibit** ■ **-27**, pp. 59–61; *see also* Allan Randolph Brewer-Carías, *Principios del Régimen Jurídico de la Organización Administrativa Venezolana* (1991), **Exhibit** ■ **-28**, pp. 15–16; Allan Randolph Brewer-Carías, *Régimen Jurídico de las Empresas Públicas en Venezuela* (1980), **Exhibit** ■ **-29**, p. 24. Said administrative bodies are also commonly known as the National Central Administration (*Administración Central de la República*).

[34]  Organic Law of the Public Administration, art. 45, **Exhibit** ■ **-20**, p. 14.

personality of their own, separate and distinct from that of the Republic.[35] The Decentralized Administration is composed of Autonomous Institutes (*Institutos Autónomos*) created by law, State Corporations, and foundations, as well as civil associations and partnerships.[36] The authority to create Decentralized Entities is contained in Article 29 of the Organic Law of the Public Administration.[37]

§ 38.  Article 29 of the Organic Law of the Public Administration permits the creation of state-owned companies with *a commercial purpose*, which are governed by *private law*. The Venezuelan government has created state-owned companies with commercial purposes to subject them to private law. The Republic's budget does not include the budget of state-owned Decentralized Entities with a commercial purpose.[38]

§ 39. Consistent with the distinction established between the Centralized and Decentralized Administrations, Professors Brewer-Carías and Viloria confirm that "the fact that [PDVSA] has its own legal personality distinct from the Republic and of the other territorial entities makes it an autonomous center of imputation of interests [*i.e.*, of rights and obligations], which gives rise to its own legal regime for the purpose of its patrimony, responsibility, taxes, contractual matters, etc., which is distinct from that of the Republic."[39]

---

[35]  *Id.* arts. 15, 29, **Exhibit** ■-20, pp. 10, 12.

[36]  Garrido Rovira, *supra* note 30 ("[T]he fundamental characteristic of the Decentralized Administration is the legal personality of each of the entities that compose it, unlike the Central Administration, which is composed by a group of organs whose legal activity is attributable to one single person: the Republic. . . ."), **Exhibit** ■-22, p. 30.

[37]  Pursuant to Article 29 of the Organic Law of the Public Administration, the Venezuelan state may create functionally decentralized entities either: (i) in the form of private law, in which entities are legal persons created according to private law rules which may or may not adopt the business form, depending on the purposes and objectives for which they were created and whether the fundamental source of their income derives from their own activity or from public contributions, respectively; or (ii) in the form of public law, in which a second type of decentralized entities are legal persons created and governed by public law norms and may exercise sovereign powers ("*potestades públicas*"). **Exhibit** ■-20, p. 12.

[38]  Organic Law of the Financial Administration of the Public Sector, art. 38, *Official Gazette* N° 6210 Extraordinary (Dec. 30, 2015) ("Financial Administration Law"), **Exhibit** ■-30, p. 76; *see also* ■ ████████████████████████████████████████████████ ████████

[39]  Allan Randolph Brewer-Carías & Enrique Viloria, *El Holding Público* (1986), **Exhibit** ■-31, p. 155.

13

§ 40.    As State Corporations, PDVSA and PDVSA Petróleo have freedom to conclude contracts and negotiate their terms unencumbered by requirements that would otherwise govern departments or agencies pertaining to the Central Administration of the Republic. This freedom derives from (i) the right to economic freedom enshrined in Article 112 of the Constitution, which sets out that "all persons may freely engage in the economic activity of their choice, without any limitations other than those provided for in [the] Constitution and those established by law,"[40] and, (ii) Article 103 of the Organic Law of the Public Administration, enacted to afford State Corporations the same legal regime afforded by law to private corporations.[41] By subjecting State Corporations to the same legal rules that govern private corporations, Article 103 places State Corporations and private corporations on equal footing to assure fair competition between the two.[42] As a consequence of the above, PDVSA has full legal capacity to negotiate, conclude, and obligate itself to contracts separate and apart from the obligations of the Republic.

§ 41.    In our legal system, corporations—including State Corporations—having such legal capacity "is the rule"; lack of legal capacity, "the exception."[43] Three fundamental consequences derive from this general premise. *First*, any limits to legal capacity must derive from an explicit legal rule establishing the same.[44] *Second*, in principle, rules limiting legal capacity must be subject to a restrictive interpretation (which is known in Venezuela as the principle of *favor libertatis*).[45] *Third*, whoever asserts the lack of legal capacity, proper or alien, has the burden of proving said incapacity.[46]

---

[40]    Constitution (1999), art. 112, **Exhibit** ▉**-32**, p. 23.

[41]    Organic Law of the Public Administration, art. 103, **Exhibit** ▉**-20**, p. 22.

[42]    Brewer-Carías, *Régimen Jurídico*, *supra* note 33, **Exhibit** ▉**-29**, p. 39.

[43]    Aguilar Gorrondona, *supra* note 25, **Exhibit** ▉**-17**, p. 205; René De Sola, *Capacidad de las personas jurídicas para intentar acciones penales*, (1946) (cited in *Código Civil de Venezuela. Artículos 19 a 40* (1969)), **Exhibit** ▉**-33**, p. 106.

[44]    Aguilar Gorrondona, *supra* note 25, **Exhibit** ▉**-17**, p. 205. *See*, *mutatis mutandis*, Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice N° 1108, (May 16, 2000) ("*Carlos Eduardo Oxford*"), **Exhibit** ▉**-34**, p. 4. According to the ruling invoked, freedom should be interpreted in the most extensive manner to guarantee its effectiveness.

[45]    Aguilar Gorrondona, *supra* note 25, **Exhibit** ▉**-17**, p. 205.

[46]    *Id.*

14

§ 42.   The contractual activity of State Corporations is governed by the principle of free will or the principle of freedom of choice.[47] Consequently, absent a legal rule limiting their capacity, State Corporations have full legal capacity to (i) conclude contracts and (ii) negotiate their contents.[48] As with any other *sociedad anónima*, the general rule is that State Corporations' businesses are subject to private law, not Venezuelan public law.[49]

### B.   The Organic Law for the Financial Administration of the Public Sector

§ 43.   Under Venezuelan law, contracts involving the debt of the Republic and State Corporations are subject to the requirements of the Financial Administration Law.[50]

§ 44.   According to the Financial Administration Law, the general rule is that public credit transactions are subject to approval by means of a Special Annual Indebtedness Law.[51] According to the Financial Administration Law, specific public credit transactions may be subject to an additional approval by the National Assembly.[52]

---

[47]   Massimo Severo Giannini, *Istituzioni di Diritto Amministrativo* (1981), **Exhibit** ▆▆-35, p. 461–62; ▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, **Exhibit** ▆▆-36, p. 1981.

[48]   Venezuelan courts have referred to the principle of free will in the following terms: (i) contractual freedom is a "right" and persons and legal entities have the power to exercise or not this legal power recognized by the laws enacted by the State; (ii) Contractual freedom is exercised through two kinds of liberties: liberty to enter into contracts and contractual freedom *stricto sensu*. Through the first, persons decide whether or not to contract, and on the basis of the second, contracting parties freely determine the content of their contracts. *See* Decision of the Second Court of the Municipalities of Maracaibo, Jesús Enrique Lossada and San Francisco of the Judicial District of the State of Zulia, (Dec. 7, 2009) ("*Elio Chacín Molero*"), **Exhibit** ▆▆-37, pp. 14–15.

As the freedom to (i) enter into contracts and (ii) negotiate its contents are an integral part of the constitutional freedom of enterprise, limitations to this freedom must be interpreted restrictively. José Ignacio Hernández González, *La Libertad de Empresa y sus Garantías Jurídicas. Estudio Comparado del Derecho Español y Venezolano* (2004), **Exhibit** ▆▆-38, p. 299.

[49]   Article 108 of the Organic Law of the Public Administration, **Exhibit** ▆▆-20, p. 22, establishes that *State Corporations are governed*—this is the general rule—*by civil and commercial Laws*, and not by Public Law; Allan Randolph Brewer-Carías, *Derecho Administrativo* (2006), **Exhibit** ▆▆-39, p. 439.

[50]   Financial Administration Law, art. 5, **Exhibit** ▆▆-30, pp. 72–73.

[51]   *Id.* at arts. 82–83, **Exhibit** ▆▆-30, p. 80.

[52]   *Id.* at art. 97, **Exhibit** ▆▆-30, p. 81.

§ 45.   Article 80 of the Financial Administration Law states that its requirements apply not only to the issuance of securities (Article 80(1)), but also the granting of guarantees (Article 80(4)).

§ 46.   Under Article 104 of the Financial Administration Law, the Republic of Venezuela is prohibited from entering into guarantee agreements to guarantee third-party obligations, with very limited exceptions for contracts for public works and national public services.[53]

§ 47.   However, pursuant to Article 101.4 of the Financial Administration Law, State Corporations subject to the Organic Hydrocarbons Law ("Hydrocarbons Law")[54] may issue public debt or enter into other Financing Agreements without prior authorization by the Legislature.[55] Because PDVSA and PDVSA Petróleo are subject to the Hydrocarbons Law,[56] both State Corporations are expressly exempted from the Legislative approval requirements of the Financial Administration Law.[57]

§ 48.   Pursuant to Article 101 of the Financial Administration Law, the only requirement for the issuance of debt or pledging of collateral by PDVSA is the certification of its payment capacity by means of an audited balance sheet published in a national newspaper.[58]

---

[53]   *Id.* at art. 104, **Exhibit** ▇-30, p. 82.

[54]   Articles 1, 27, and 28 of the Hydrocarbons Law, *Official Gazette* N° 38493 (Aug. 4, 2006), **Exhibit** ▇-40, pp. 348.077–78, provide, respectively, (i) that "[e]verything related to the exploration, exploitation, refining, industrialization, transportation, storage, marketing and preservation of hydrocarbons, as well as everything related to refined products and the works required by the aforementioned activities, will be governed by the provisions of this act"; (ii) that "[t]he [National Executive] may, by means of a Decree  in the Council of Ministers, create enterprises exclusively owned by the State in order to complete activities [associated with hydrocarbons]"; and, (iii) that the "enterprises referenced in [Article 27] may create other enterprises for the pursuit of their activities."

[55]   José Ignacio Hernández González, *Comentarios Sobre la Aprobación del Presupuesto 2017 y la Responsabilidad Patrimonial del Estado*, *in* 149–50 REVISTA DE DERECHO PÚBLICO (2017), **Exhibit** ▇-41, p. 209.

[56]   Hydrocarbons Law, arts. 1, 27–28, **Exhibit** ▇-40, pp. 348.078.

[57]   Financial Administration Law, art. 101, **Exhibit** ▇-30, p. 82.

[58]   *Id.*

16

### C.   Contracts of National Interest Under the Venezuelan Constitution

§ 49.  The Venezuelan Constitution reserves for the National Assembly approval of certain contracts, referred to within the Constitution as agreements or contracts "of public interest," which encompasses three different species of public interest contracts:[59] (i) contracts of national public interest; (ii) contracts of state public interest; and (iii) contracts of municipal public interest.[60] Contracts of National Interest are referenced in and regulated by Articles 150, 151, 187(9), 236(14) and 247 of the Constitution. A brief discussion of these articles is instructive.

§ 50. Under Section Four of Title IV of the Constitution (titled "Of Public Interest Contracts"), Articles 150 and 151 set forth general parameters for the conclusion of public interest contracts (including Contracts of National Interest) and provisions that such contracts must otherwise contain. Under Article 150, National Assembly approval of national public interest contracts is necessary "when required by Law," or when foreign States, foreign official entities, or companies not domiciled in Venezuela are parties to said contracts.

§ 51. Title V of the Constitution, in turn, sets out the vested powers for the National Assembly, the President of the Republic, and the Attorney General of the Republic, with Articles 187(9), 236(14), and 247 bearing on the consideration, execution, and enforcement of such public interest contracts. In particular, Article 187(9) states that the National Assembly has the responsibility to "authorize *the National Executive* to sign contracts of national interest, in the cases established by law [and to] authorize contracts of municipal, state or national public interest with foreign States or official foreign entities or with companies not domiciled in Venezuela."[61] As noted previously, the term "National Executive" does not include state-owned corporations such as PDVSA (*see supra* § 36). Under Article 226, the President is the head of the National Executive.[62] Article 236(14) in

---

[59]   *Andrés Velásquez et al.*, N° 2241, **Exhibit** ■■-07, p. 14; Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 1029, (June 13, 2001) ("*National Assembly*"), **Exhibit** ■■-42, p. 5.

[60]   Constitution (1999) art. 150, **Exhibit** ■■-32, p. 25.

[61]   *Id.* at art. 187(9), **Exhibit** ■■-32, p. 28 (emphasis added).

[62]   Articles 187(9) and 236(14) of the 1999 Constitution, **Exhibit** ■■-32, pp. 28, 31, use the term "Contracts of National Interest." According to judicial decisions and legal scholars the term "Contracts of National Interest" is synonymous with "Contracts of National Public Interest." Jesús Caballero Ortiz, *Los contratos administrativos, los contratos de interés público y los contratos de interés nacional en la Constitución de 1999, in* I Estudios de Derecho Administrativo, Libro Homenaje a la Universidad Central de Venezuela (2001), **Exhibit** ■■-43, pp. 145–46.

turn establishes that the President of the Republic is vested with the power to "enter into contracts of national interest according to [the] Constitution and the law," and further notes that such power to enter into Contracts of National Interest must be exercised by the President in Council with his Ministers.[63] Read together, the Constitution requires that the National Executive conclude Contracts of National Interest, with the National Assembly having the responsibility to authorize such conclusion in certain cases.

§ 52. Article 247 states that the Attorney General's Office shall be consulted for the approval of Contracts of National Interest.[64]

§ 53. The Constitution sets forth that contracts of national public interest must provide that contractual disputes will be decided by Venezuelan courts under Venezuelan law. Specifically, Article 151 of the Constitution states that, if compatible with the specific transaction at hand, such agreements shall include an express or implicit clause stating that doubts and disputes will be decided by Venezuelan competent courts in accordance with Venezuelan law, without foreign or international recourse.[65]

§ 54. The Constitutional Chamber is the final arbiter on all questions regarding the interpretation of the Constitution pursuant to Article 335 of the Constitution, including questions regarding whether a contract is one of National Interest.[66] As discussed further below, the Constitutional Chamber has established rules and criteria for determining whether an agreement is a Contract of National Interest. Under Venezuelan law, the Constitutional Chamber's rulings are final and binding.

---

[63] Constitution (1999) art. 236, **Exhibit ▮-32**, p. 31 ("In Council of Ministers, the President of the Republic shall exercise the duties indicated in [Article 236(14)] and those assigned by the law to be exercised in the same way."). According to Article 52 of the Organic Law of the Public Administration, **Exhibit ▮-20**, p. 16, the President of the Republic, the Executive Vice President of the Republic, and the Ministers make up the Council of Ministers.

According to Article 30 of the Rules governing the Council of Ministers, *Official Gazette* N° 40580 (Jan. 14, 2015), **Exhibit ▮-44**, p. 418.088, decisions by the President in Council of Ministers are taken (i) by consensus or (ii) exceptionally, when consensus is not possible, by the majority of the members present in the Council.

[64] Constitution (1999) art. 247, **Exhibit ▮-32**, p. 31.

[65] *Id.* at art. 151, **Exhibit ▮-32**, p. 25.

[66] *Id.* at art. 335, **Exhibit ▮-32**, p. 37.

### D.     PDVSA's Prior Debt Issuances

§ 55. Counsel for the Defendants has informed me that since its incorporation in 1975, PDVSA and its subsidiaries, including PDVSA Petróleo, PDV Holding, and CITGO Holding have been involved in a number of debt issuances, term loans, or other credit facilities. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████

§ 56. For instance, I am told that PDVSA has taken out secured loans totaling $3.5 billion in February 2007,[67] and secured loans totaling $1.5 billion in June 2011.[68]

§ 57.



---

[67]   ████████████████, *supra* note 20, **Exhibit** ██**-13**, at Ex. T3E, pp. 72, F-42.

[68]   *Id.* at Ex. T3E, p. 73.

[69]   *Id.* at Ex. T3E, p. 81–82.

[70]   Bolivarian Republic of Venezuela, Form 18-K For the Fiscal Year Ended December 31, 2016, (Dec. 21, 2017); **Exhibit** ██**-45**, p. 10.

[71]   ████████████████████████████████████████████████████████
████████████████████████████ **Exhibit** ██**-46**, p. 4–5.

[72]   Press Release, CITGO Holding, Inc., CITGO Holding, Inc. Refinances Debt (Aug. 1, 2019), **Exhibit** ██**-47**; ████████████████████████████████████████, **Exhibit** ██**-48**, p. 1; ████████████████████████████████████████████████, **Exhibit** ██**-49**. ████████████████████████████████████████████████████████
██████████████████████████████; Pacheco Dep. Ex. 9 ████████████
████████████████████████████████ **Exhibit** ██**-50**.

same collateral.[73]

§ 58. 

.[74] And to the best of my knowledge, (i) these entities have not sought or obtained National Assembly approval prior to any other public debt issuances;[75] and (ii) neither PDVSA, its subsidiaries, nor the National Assembly ever stated that such approval was necessary or attempted to invalidate such financings on the basis of non-compliance with Article 150 of the Constitution at any time prior to the Lawsuit.[76] Consistent with the historical practice described above, I have found no evidence that PDVSA sought approval to issue the original notes that would have reached maturity in April and November 2017 that were exchanged for the 2020 Notes in 2016. In sum, the argument advanced in the Lawsuit is without precedent or support.

### E.    The 2016 Exchange Offer

§ 59. Between April 2007 and January 2011, PDVSA issued notes due in 2017 (the "2017

---



[73] ████, **Exhibit** ██-51, p. 46.

[74] Francisco Rodríguez & Adolfo De Lima, *Law & Order, PDVSA 20 Edition*, Venezuela Weekly, (Oct. 14, 2019), **Exhibit** ██-52, p. 3. ████

*See* ████ **Exhibit** ██-53, pp. 117:21–118:22.

[75] *Id.* at 7.

[76] ████

**Exhibit** ██-14, pp. 105:22–115:3. Bolivarian Republic of Venezuela, Form 18-K For the Fiscal Year Ended December 31, 2016, (Dec. 21, 2017); **Exhibit** ██-45, p. 10; Pledge and Security Agreement Between PDV Holding, Inc., PDVSA, PDVSA Petróleo, S.A., and Rosneft Trading S.A. Dated Nov. 30, 2016, § 2.01(a), **Exhibit** ██-46, p. 11.

20

Notes").[77] PDVSA Petróleo was a guarantor of all the 2017 Notes.[78] The 2017 Notes were payable in U.S. dollars, and had several provisions making clear that (i) New York law would govern the notes, and (ii) the notes would be enforceable in New York courts.[79] The offering circulars for the 2017 Notes state that PDVSA intended to use the proceeds to fund a business strategy that included oil and natural gas exploration, development, and production and the expansion of refinery capacity, other infrastructure, and marketing efforts.[80]

§ 60. On September 16, 2016, PDVSA announced it would seek to refinance the 2017 Notes, and offered to exchange all of the remaining 2017 Notes for new 2020 Notes (the "Exchange Offer").[81] The 2020 Notes, by their terms, were due to reach original maturity on October 27, 2020. The 2020 Notes were secured by a pledge by PDV Holding, a Delaware corporation, of 50.1% of the capital stock of CITGO Holding, a Delaware corporation with headquarters in Houston, Texas. The exchange offer was approved by the Executive Committee of PDVSA on September 7, 2016; and by the Extraordinary General Shareholder Assembly of PDVSA at a meeting held on September 8, 2016.[82] I understand that on October 24, 2016, PDVSA announced that holders with approximately

---

[77] *See generally* PDVSA Indenture for $3,000,000,000 5.25% Notes due 2017 Dated Apr. 12, 2007, **Exhibit ▮-54**; PDVSA Indenture for $3,000,000,000 8.5% Notes due 2017 Dated Oct. 29, 2010, **Exhibit▮-55**; and PDVSA Indenture for $3,150,000,000 8.5% Notes due 2017 Dated Jan. 18, 2011, **Exhibit▮-56**.

[78] *See generally* PDVSA Indenture for $3,000,000,000 5.25% Notes due 2017 Dated Apr. 12, 2007, **Exhibit ▮-54**; PDVSA Indenture for $3,000,000,000 8.5% Notes due 2017 Dated Oct. 29, 2010, **Exhibit▮-55**, and PDVSA Indenture for $3,150,000,000 8.5% Notes due 2017 Dated Jan. 18, 2011, **Exhibit▮-56**.

[79] PDVSA Indenture for $3,000,000,000 5.25% Notes due 2017 Dated Apr. 12, 2007, §§ 1.1, 2.10, 10.1(b), 10.3, 10.10, **Exhibit▮-54**; pp. 3, 11, 16, 49, 51; PDVSA Indenture for $3,000,000,000 8.5% Notes due 2017 Dated Oct. 29, 2010, §§ 1.01, 2.08, 7.01, 10.01, 10.03, 10.10, **Exhibit▮-55**, pp. 3, 13, 18, 41, 57, 58, 60; and PDVSA Indenture for $3,150,000,000 8.5% Notes due 2017 Dated Jan. 18, 2011, §§ 4.02, 4.04, **Exhibit ▮-56** pp. 4–5; Exhibit A to Indenture pp. 8–9.

[80] *See* PDVSA, Prospectus for $3,000,000,000 5.25% Notes due 2017 (Dec. 4, 2007), **Exhibit ▮-57**, pp. 2-3; PDVSA, Prospectus for $6,150,000,000 8.5% Notes due 2017 (Mar. 17, 2011), **Exhibit ▮-58**, pp. 1–3.

[81] Press Release, PDVSA, PDVSA Announces Offers to Exchange Any and All of its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020 (Sept. 16, 2016), **Exhibit ▮-59.**

[82] Indenture (HL_002709), **Exhibit▮02**, p. 1.

$2.8 billion of 2017 Notes (approximately 39.43%) had tendered in exchange for approximately $3.4 billion of 2020 Notes.[83]

§ 61. I understand that, in October 2016, PDVSA and PDVSA Petróleo, among others, entered into the Indenture and the Pledge Agreement in connection with the issuance of the 2020 Notes. The Indenture was entered into by and among: PDVSA, acting as issuer ("Issuer"); PDVSA Petróleo, acting as guarantor ("Guarantor"); MUFG, a national banking association organized under the laws of the United States of America, acting as trustee ("Trustee"); GLAS, a limited liability company organized under the laws of the State of New York, acting as collateral agent ("Collateral Agent"); Law Debenture Trust Company of New York, a limited purpose trust company chartered by the New York State Department of Financial Services, acting as registrar, transfer agent and principal paying agent ("Principal Paying Agent"); and Banque Internationale à Luxembourg, Société Anonyme, acting as Luxembourg listing agent and paying agent ("Luxembourg Paying Agent"). Since the Indenture was concluded for the purpose of issuing the 2020 Notes and exchanging them for the 2017 Notes, the Indenture was executed to refinance existing debts owed by PDVSA.

§ 62. In addition to the Indenture, the Pledge Agreement was also executed by and among PDV Holding, acting as pledger ("Pledgor"), the Issuer, the Guarantor, the Collateral Agent and the Trustee. The Pledge Agreement was concluded for the purpose of guaranteeing payment of the 2020 Notes issued pursuant to the Indenture. The Pledge Agreement was a necessary component of the deal to refinance debts owed by PDVSA and gave effect to the security provisions of the Indenture.

§ 63. Finally, the Global Security, concluded by PDVSA and authenticated by MUFG as trustee, sets out the explicit promises and obligations that PDVSA has assumed to each holder of 2020 Notes in connection with the secured debt issuance. The Republic was not a party, in any way, to the Governing Documents.

### F.    Representations Within the Governing Documents

§ 64. The parties entering into the Governing Documents included express choice of law provisions designating New York law as governing. For instance, the Indenture contains

---

[83]    Press Release, PDVSA, PDVSA Announces Offers to Exchange Any and All of its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020 (Sept. 16, 2016), **Exhibit ██-59**.

a choice of law provision specifying that all terms of the Indenture and the "Notes" shall be construed in accordance with New York law:

> THIS INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS INDENTURE AND THE NOTES AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).[84]

§ 65.  As with the Indenture, Section 7.13 of the Pledge Agreement unequivocally set forth that the Pledge Agreement would be governed by New York law:

> THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS AGREEMENT AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS AGREEMENT (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).[85]

§ 66. Pursuant to the Pledge Agreement, the 2020 Notes issued by the Issuer were (i) guaranteed by Guarantor and (ii) secured by a first-priority lien on 50.1% of the issued and outstanding common stock in CITGO.[86] The Global Security also contains a specific provision for governance under New York law:

> THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS NOTE AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS NOTE (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE

---

[84]   Indenture, §10.03, (HL_002709), **Exhibit** ▪▪-02, p. 72.

[85]   Pledge Agreement, § 7.13 (ASH_00009011), **Exhibit** ▪▪-04, p. 3.

[86]   *Id.* at § 2.01, **Exhibit** ▪▪-04, p. 3.

STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).[87]

§ 67. PDVSA, as Issuer, made several representations to the parties about the validity and legality of the Indenture. In particular, PDVSA stated that "all things necessary  to make the Indenture a valid agreement . . . have been done, and the Issuer has done all things necessary to make the Notes, when executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, valid obligations of the Issuer . . . ."[88]

§ 68. PDVSA also represented that:

> [P]ursuant to a resolution of the Executive Committee of the Issuer adopted on September 7, 2016, and a resolution adopted by the Shareholders' Meeting of the Issuer, the Issuer has duly authorized the exchange of the Old Notes for the Notes through the issuance of its 8.50% Senior Secured Notes due 2020 (the "Notes"); and to provide for the issuance thereof, the Issuer has duly authorized the execution and delivery of this Indenture . . . .[89]

§ 69. Furthermore, PDVSA Petróleo, as Guarantor, represented in relevant part:

> [T]he Guarantor has duly authorized the execution and delivery of this Indenture as guarantor of the Notes; and, all things necessary to make this Indenture a valid agreement of the Guarantor, in accordance with its terms, have been done.[90]

§ 70. The Pledge Agreement contains several representations concerning the validity and legality of its terms. In particular, PDV Holding declared in the Recitals to the Pledge Agreement that:

---

[87]   PDVSA, Face of Note (Oct. 28, 2016) (HL_019590), § 18, **Exhibit** ▮**-03,** pp. 9599–9600.

[88]   Indenture, Second "Whereas" Clause (HL_002709), **Exhibit** ▮**-02,** p. 1.

[89]   *Id.* at First "Whereas" Clause, **Exhibit** ▮**-02,** p. 1.

[90]   *Id.* at Third "Whereas" Clause, **Exhibit** ▮**-02,** p. 1.

> [PDV Holding] is the legal and beneficial owner of 100% of the issued and outstanding common stock in CITGO Holding.[91]

§ 71. In relevant part, PDV Holding further represented in Section 3.01 of the Pledge Agreement[92] that:

> (a) [I]t has been duly formed and has full power and authority, and all governmental licenses, authorizations, consents and approvals, to execute and deliver the Transaction Documents[93] to which it is a party and to perform its obligations thereunder, in each case. . . .
>
> (b) [T]he execution and delivery by it of the Transaction Documents to which it is a party, and its performance thereunder:
>
> > (i) has been duly authorized by all necessary action by [PDV Holding],
> >
> > (ii) requires no additional action by or in respect of, or filing with, any governmental authority, except such as have been taken or made on or before the date hereof and remain in full force and effect, [and]
> >
> > (iii) will not contravene any Applicable Law . . . .
>
> (c) [E]ach of the Transaction Documents to which [PDV Holding] is a party has been duly executed and delivered by it and constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms . . . .
>
> (d) [T]he choice of the laws of the State of New York as the governing law of this Agreement, the Indenture (and any Transaction Document) is a valid choice of law under the laws of Venezuela and any political

---

[91]   Pledge Agreement, Recitals, Second "Whereas" Clause (ASH_00009011), **Exhibit ■-04**, pp. 9–11.

[92]   *Id.* § 3.01, **Exhibit ■-04**, pp. 9–11.

[93]   According to the Indenture, Transactions Documents "shall mean, collectively, the following documents: (i) this Indenture, (ii) the Notes, (iii) the Security Documents and (iv) each other agreement or instrument designated a 'Transaction Document' by the Issuer or the Guarantor from time to time." Indenture, § 1.01 (HL_002709), **Exhibit ■-02**, p. 18.

subdivision thereof, and none of [PDVSA], [PDVSA Petróleo] or [PDV Holding] knows of any reason why the courts of Venezuela would not give effect to such choice of law . . . .

(g) [PDV Holding] has not taken, or knowingly permitted to be taken, any action that would terminate, or discharge or prejudice the validity or effectiveness of, this Agreement or [PDV Holding]'s organizational documents or the validity, effectiveness or priority of the Liens created hereby . . . .

(h) [PDV Holding] has good and valid title to the Collateral, free and clear of all Liens, other than Permitted Collateral Liens.

(i) [U]pon the delivery of any certificated securities representing the Pledged Shares and the effective filing of the UCC-1 financing statement in the appropriate filing office in the State of Delaware, United States of America, the security interest in favor of the Collateral Agent in all Collateral in which the security interest may be perfected by such delivery and by such filing in the United States or any other country pursuant to Applicable Law will constitute a valid and perfected first-priority security interest and charge in the Collateral securing the prompt and complete payment, performance and observance of the Secured Obligations; and

(j) [T]he Pledged Shares of CITGO Holding is a "certificated security" within the meaning of Section 8-102(a) of the New York UCC; and

(k) [I]mmediately prior to and at the time of the execution of this Agreement, [PDV Holding] owns 100% of the ownership interests in CITGO Holding.

§ 72. PDVSA's legal and financial advisors also opined on the validity of the Exchange. I understand that the Caracas office of Hogan Lovells acted as external Venezuelan counsel for PDVSA and the New York office of Hogan Lovells acted as external New York counsel for PDVSA and PDVSA Petróleo. I understand Hogan Lovells to be a well-respected international law firm experienced in cross-border transactions, including those involving companies incorporated in Venezuela.

§ 73. 

§ 74. Credit Suisse acted as financial advisor to PDVSA and PDVSA Petróleo in connection with the Exchange. On October 28, 2016, Hogan Lovells issued two opinion letters to Credit Suisse regarding the legality of the Indenture, the Pledge Agreement, and the 2020 Notes. As part of those opinions, Hogan Lovells Caracas opined, in relevant part, that:

> 1. [PDVSA] has been duly incorporated as of September 15 1975 . . . . Each of [PDVSA] and [PDVSA Petróleo] is validly existing under the laws of the jurisdiction of its incorporation and is duly qualified to transact business in such jurisdiction . . . .[97]

> 4. [PDVSA] and [PDVSA Petróleo] have the corporate power and authority to take all necessary corporate action to authorize the Exchange, the issuance of the Notes and to execute, deliver and perform the Transaction Documents [*i.e.*, the Indenture and Pledge Agreement] . . . .[98]

---

[94]  Memorandum from Hogan Lovells to PDVSA (HL_021479) (Sept. 21, 2016), ("Hogan Memorandum Dated Sept. 21, 2016"), **Exhibit ██-60**, p. 1.

[95]  *Id.* (emphasis in original).

[96]  *Id.* at pp. 2–3.

[97]  Opinion Letter from Hogan Lovells (Caracas) to PDVSA, et al., (Oct. 28, 2016) (HL_011111) ("Hogan (Caracas) Opinion Letter Dated Oct. 28, 2016"), **Exhibit ██-61,** p. 3.

[98]  *Id.* at p. 4.

5. [T]he issuance of the Notes and the execution, delivery and performance by [PDVSA] of the Transaction Documents are within [PDVSA's] corporate powers, and the execution and delivery of the Transaction Documents, and the performance by [PDVSA] of its obligations thereunder, have been duly authorized by all necessary corporate action of [PDVSA] . . . .[99]

6. [T]he issuance of the Notes and the execution, delivery and performance by [PDVSA Petróleo] of the Transaction Documents are within [PDVSA Petróleo's] corporate powers, and the execution and delivery of the Transaction Documents, and the performance by [PDVSA Petróleo] of its obligations thereunder, have been duly authorized by all necessary corporate action of [PDVSA Petróleo].[100]

§ 75. Hogan Lovells Caracas also attested to the legality of the transaction. Specifically, Hogan Lovells Caracas opined, in relevant part, that:

7. The Exchange, the issuance of the Notes, the execution and delivery by [PDVSA] and [PDVSA Petróleo] of the Transaction Documents and the performance of their respective obligations thereunder does not:

(i) violate Venezuelan law or the Articles of Incorporation and By-Laws of [PDVSA] or [PDVSA Petróleo], respectively, [nor]

(ii) conflict with or violate any Venezuelan law, rule, regulation, order, judgment or decree applicable to [PDVSA] or [PDVSA Petróleo] by which any property or asset of [PDVSA], [PDVSA Petróleo] or any of their subsidiaries is or may be bound . . . .[101]

8. No approval, authorization or consent of or registration or filing with, any governmental agency or governmental authority in Venezuela is required to be obtained or made by [PDVSA] or [PDVSA Petróleo] under Venezuelan law in connection with the execution, delivery and

---

[99] *Id.*

[100] *Id.*

[101] *Id.*

consummation by [PDVSA] or [PDVSA Petróleo] of the Transaction Documents . . . .[102]

12. The execution and delivery by [PDVSA] and [PDVSA Petróleo] and the performance of their obligations under the Transaction Documents and the performance of its obligations thereunder, constitute private and commercial acts (*iure gestionis*) rather than governmental or public acts (*iure imperi*) under Venezuelan law.[103]

§ 76. Hogan Lovells New York similarly concluded:

(d) [E]ach of the Indenture and the Pledge Agreement has been duly executed and delivered and is the legal, valid and binding obligation of the Relevant Parties, as applicable, under New York State Law, enforceable against the Relevant Parties in accordance with its terms . . . .[104]

(e) [T]he Notes have been duly executed by [PDVSA] under New York State Law and . . . the Notes will be the legally valid and binding obligations of [PDVSA] and [PDVSA Petróleo], enforceable against [PDVSA] and [PDVSA Petróleo] in accordance with their terms and entitled to the benefits of the Indenture . . . .[105]

(l) [PDV Holding] has the corporate power to execute, deliver and perform the Pledge Agreement. The execution, delivery and performance by [PDV Holding] of the Pledge Agreement have been duly authorized by all necessary corporation action of [PDVSA] . . . .[106]

(o) The Pledge Agreement is effective to create in favor of the Collateral Agent a security interest in the Collateral.[107]

---

[102]  *Id.*

[103]  *Id.* at p. 5.

[104]  Opinion Letter from Hogan Lovells (New York) to PDVSA, et al., (Oct. 28, 2016) (HL_011091) ("Hogan (NY) Opinion Letter Dated Oct. 28, 2016"), **Exhibit ███-62**, p. 5.

[105]  *Id.*

[106]  *Id.* at p. 6.

[107]  *Id.*

### G. The Current Lawsuit

§ 77. Plaintiffs now contend that both the Indenture and the Pledge Agreement are Contracts of National Interest that were entered into by the Venezuelan National Public Administration with companies not domiciled in Venezuela and therefore were required to have been authorized in advance by the National Assembly.[108] Specifically, Plaintiffs allege that:

   a. PDVSA and PDVSA Petróleos are national, state-owned enterprises that are part of Venezuela's National Public Administration;[109]

   b. At the time of the exchange of PDVSA's Senior Notes due 2017 for new Senior Secured Notes due 2020, both the Indenture and the Pledge Agreement were Contracts of National Interest because (i) PDVSA and PDVSA Petróleo were parties to the Indenture and the Pledge Agreement and (ii) the Indenture and the Pledge Agreement implicated in a significant way Venezuela's most important industry and placed CITGO Holding, Inc.'s shares at risk;[110] and

   c. The Indenture and the Pledge Agreement were entered into with companies not domiciled in Venezuela, including MUFG as trustee and GLAS as collateral agent.[111]

§ 78. According to the Lawsuit, the Indenture, the 2020 Notes, and the Pledge Agreement are null and void *ab initio*, because they were not authorized by the National Assembly and were concluded, therefore, in violation of Article 150 of the Venezuelan Constitution.[112]

## I. CONTRACTS OF NATIONAL INTEREST: AN INTRODUCTION

### A. Contracts of National Interest: Historical Usage and Other Considerations

§ 79. As noted earlier, the concept of Contracts of National Interest appears in Article 150 of the Constitution.

---

[108]   Lawsuit, §§ 74, 85.

[109]   *Id.* §§ 75, 86.

[110]   *Id.* §§ 76, 87.

[111]   *Id.* §§ 77, 88.

[112]   *Id.* §§ 78, 83, 89, 94.

§ 80. Article 150 contains three different rules. The first two rules are pertinent to the instant discussion.

> **i.      The First Rule of Article 150: The Requirement of National Assembly Approval for Contracts of National Interest "in the cases determined by law"**

§ 81. According to the first rule of Article 150, National Assembly approval is required for Contracts of National Interest so designated by law. Such a law must be enacted prospectively (constitutional principle of non-retroactivity);[113] a new law would not apply retroactively to contracts already concluded. No one alleges such a law applies here.

§ 82. Both now and at the time the Governing Documents were concluded, there was no statute requiring Legislative approval for the issuance of bonds or debt by PDVSA pursuant to Article 150. Although there have been some statutes that have required or still require PDVSA to seek Legislative approval for certain contracts, those provisions are wholly inapplicable because they do not apply to the issuance of bonds or financing agreements.

> **ii.     The Second Rule of Article 150: The Requirement of National Assembly Approval for Contracts of National Interest "with foreign official entities or States or with companies not domiciled in Venezuela"**

§ 83. According to the second rule of Article 150, Contracts of National Interest concluded with foreign States, foreign official entities, or companies not domiciled in Venezuela require the approval of the Legislature.

§ 84. The Constitution does not define the term "Contract of National Interest." The term was used for the first time in the Venezuelan Constitution enacted in 1854, in which the term was synonymous with national public works contracts.[114] Subsequent Venezuelan Constitutions—no longer in force—characterized as Contracts of National Interest contracts dealing with: (i) titles and concessions of mines; (ii) sales of vacant lands or real

---

[113]   Pursuant to Article 24 of the Constitution (1999), **Exhibit ■-32**, p. 23, "[n]o legislative provision will have retroactive effect. . . ."

[114]   Gonzalo Pérez Luciani, *Contratos de Interés Nacional, Contratos de Interés Público y Contratos de Empréstito Público*, *in* 1 LIBRO HOMENAJE AL DOCTOR ELOY LARES MARTÍNEZ (1984), **Exhibit ■-63,** p. 92.

estate belonging to the Republic; (iii) concession agreements to build transportation routes, including railroad tracks and aerial traction cables; (iv) establishment of telegraphic or wireless communications; (v) immigration and colonization; as well as (vi) any other Contracts of National Interest authorized by the Constitution or the laws.[115]

§ 85. In the absence of more specific guidance in the Constitution, the Constitutional Chamber has established rules and criteria for determining whether an agreement is a Contract of National Interest. Said rules are binding under Venezuelan law.

§ 86. Specifically, interpretations of the Constitution by the Constitutional Chamber are binding pursuant to Article 335 of the Constitution. Article 335 states that the Supreme Tribunal of Justice is "the supreme and ultimate interpreter of the Constitution" and, as such, "shall see to the uniform interpretation and application thereof."[116] In light of said constitutional provision, the general rule is that any person or authority interpreting the Constitution shall consider the legal interpretations that the Supreme Tribunal of Justice may have established on a certain constitutional issue or matter, and apply the same to the case at hand. Article 335 further states that: "Interpretations established by the Constitutional Chamber concerning the contents or scope of Constitutional rules and principles are binding on the other Chambers of the Supreme Tribunal of Justice and on any other courts of the Republic." [117] According to this second provision, interpretations by the Constitutional Chamber on the content or scope of, *e.g.*, Article 150 of the Constitution, are binding and, hence, impose limits or constraints to the interpretation powers granted to other judges. This includes judges of the other chambers of the Supreme Tribunal, such as the Political-Administrative Chamber of the Supreme Tribunal.

### B.   The Requirements of a Contract of National Interest as Recognized by Venezuela's Supreme Tribunal

§ 87. Venezuelan courts have been dealing with the definition of Contracts of National Interest for decades. In the process, courts have established that Contracts of National Interest must have the Republic as a party. However, any supplementary criteria for such

---

[115]   *Id.* at pp. 92–96.

[116]   Constitution (1999), art. 335, **Exhibit ■-32**, p. 37.

[117]   *Id.*

contracts had remained elusive until the Venezuelan Supreme Tribunal's 2002 decision in the *Andrés Velásquez et al.* case.

§ 88.  In *Andrés Velásquez et al.*, the Constitutional Chamber ruled that a contract must meet four requirements to be a Contract of National Interest:

    a. The Republic must be one of the contracting parties; [118]

    b. The subject of the contract must be decisive or essential for the realization of the goals and missions of the Venezuelan State; [119]

    c. The contract must satisfy the interests of the national community; [120] and

    d. The contract must imply the assumption of obligations payable by the Republic "against the National Treasury" during several fiscal years after the one in which the contract was concluded and, therefore, commits amounts of money and fiscal resources from Venezuela's future budgets. [121]

§ 89.  In the absence of any one of the four requisites listed above, a contract cannot be characterized as a Contract of National Interest.

§ 90.  As explained further below, considering the criteria employed by Venezuelan courts to identify a Contract of National Interest, it is evident that the Governing Documents do not qualify as Contracts of National Interest because the Republic was not a party to the Governing Documents. The Governing Documents cannot qualify as Contracts of National Interest for the additional reasons that they (i) do not satisfy the interests of the national community, and (ii) do not imply the assumption of obligations payable by the Republic against the National Treasury such that they commit amounts of money and fiscal resources from Venezuela's future budgets. Therefore, the Governing Documents were not subject to prior authorization by the Legislature, and lack of approval by the Legislature does not affect the validity and effectiveness of the Governing Documents.

---

[118]  *Andrés Velásquez et al.*, N° 2241, **Exhibit ▮-07**, pp. 14, 16.

[119]  *Id.* at pp. 16–17.

[120]  *Id.*

[121]  Decision of the Political and Administrative Chamber of the Federal and Cassation Court Decision N° 62, (Nov. 26, 1937) ("*Attorney General of the Republic I*"), **Exhibit ▮-64**, p. 351; *Andrés Velásquez et al.*, N° 2241, **Exhibit ▮-07**, p. 17.

## II.   THE GOVERNING DOCUMENTS CANNOT BE CHARACTERIZED AS CONTRACTS OF NATIONAL INTEREST BECAUSE THE REPUBLIC IS NOT A PARTY TO THE AGREEMENTS

§ 91.  The Governing Documents cannot be characterized as Contracts of National Interest because *the Republic* is not a party to these agreements.

§ 92.  The Constitutional Chamber has established that this is a requirement of Contracts of National Interest. This requirement is consistent with Articles 226 and 236 of the Constitution, under which the President of the Republic, as Head of the National Executive, is the sole authority empowered by the Constitution to conclude Contracts of National Interest.

### A.   It Is Well Settled that the Republic Must Be a Party to a Contract In Order for the Contract to Be Considered a Contract of National Interest

§ 93.  As Professor Lares Martínez explains, for a contract to be considered of national interest, one of the contractual parties "has to be the *Republic of Venezuela*."[122] In other words, it is of the *essence* of any Contract of National Interest that the Republic be a party to it. This is further supported by Professor Caballero Ortiz, who argues that when it

---

[122]  Eloy Lares Martínez, *Contratos de Interés Nacional*, *in* 1 LIBRO HOMENAJE AL PROFESOR ANTONIO MOLES CAUBET (1981) (emphasis added), **Exhibit ▇-65**, p. 137. With regards to this particular requirement, the Constitutional Chamber invokes the teachings of Professor Lares Martínez in *Andrés Velásquez et al.* It is also worth noting that Professor Lares Martínez also wrote: "it is a recognized fact, both abroad and in our country, that in the decision of the disputes related to the public administration . . . the courts usually accept the teachings of the most prestigious jurisconsult. If the names of the authors are not mentioned, their opinions are studied and frequently accepted. That is why the doctrine is considered as an *indirect source of administrative law*." Eloy Lares Martínez, *Manual de Derecho Administrativo* (13th ed. 2008) (emphasis added), **Exhibit ▇-66**, p. 115.

Professor Brewer-Carías thinks the court should have decided differently in the *Andrés Velásquez et al.* (2002) case, but he acknowledges that the aforementioned decision affirms that the Republic has to be a party to Contracts of National Interest. In his view, the purpose of the constitutional regulation is to submit for the Legislature's approval contracts concluded (i) by the Republic; and (ii) other national entities, including state corporations. Allan Randolph Brewer-Carías, *La Mutación de la Noción de Contratos de Interés Público Nacional Hecha Por la Sala Constitucional, para Cercenarle a la Asamblea Nacional sus Poderes de Control Político en Relación con la Actividad Contractual de la Administración Pública y sus Consecuencias*, *in* 151–52 REVISTA DE DERECHO PÚBLICO (2017), **Exhibit ▇-67**, pp. 373–74.

comes to contracts concluded with foreign states, foreign official entities or companies not domiciled in Venezuela, it is the interests "of the Republic, which must primarily be subject to protection . . . ."[123]

§ 94. Venezuela's highest court has long held that this is a requirement of Contracts of National Interest. This requirement is well-established, having first been discussed in the Federal and Cassation Court's 1937 decision in the *Attorney General of the Republic I* case.[124] The requirement was further affirmed by the Constitutional Chamber in several cases, including the *Andrés Velásquez et al.* (2002), *Attorney General of the Republic II* (2007), and *Brigitte Acosta Isasis* (2016) cases. Therefore, if the Republic is *not* a contracting party, that circumstance—on its own—suffices to exclude the contract from the definition of Contracts of National Interest.

### i.   Venezuela's Highest Court Has Long Held that Contracts of National Interest Must Include the Republic as a Party

§ 95. The requirement that the Republic must be a party to a contract for it to qualify as a Contract of National Interest was first recognized by Venezuela's highest court in 1937 in the *Attorney General of the Republic I* case.[125] There, the Court considered a request for judicial review of a law enacted by the Legislature approving a loan by the Republic to a Venezuelan municipality (*Municipalidad del Distrito Iribarren del Estado Lara*). Said loan was to be granted with funds allocated to the Republic for that specific purpose in the National Budget. In its complaint, the Attorney General of the Republic argued that the loan agreement approved by the Legislature had been defined by the Legislature, and not by the Executive branch of government, as required for Contracts of National Interest. The Court held that the Legislature does "not have the power to contract, but [does have] the power to approve or deny contracts *concluded by the Federal Executive* . . . ."[126]

§ 96. The Court further held that:

> [T]he *Federal Executive* is the only branch of Government to whom the initiative of contracts of national interest corresponds, an initiative that has been suppressed by the Legislature, by presenting the latter, already

---

[123]   Caballero Ortiz, *Los contratos administrativos*, *supra* note 62, **Exhibit ▆-43**, p. 154.

[124]   *Attorney General of the Republic I*, N° 62, **Exhibit ▆-64**, p. 351.

[125]   *Id.*

[126]   *Id.* (emphasis added), **Exhibit ▆-64**, p. 351–52.

approved, a basis of contract in which the Executive cannot introduce any modification . . . .[127]

§ 97. This decision stands for the principle that Contracts of National Interest are "contracts *concluded by the Federal Executive*"[128]—that is, contracts concluded *solely by the Republic*. It is clear that the phrase "contracts *concluded by the Federal Executive*" used by the court alludes to contracts concluded solely by the Republic because the term Federal Executive (*Ejecutivo Federal*) as used in the 1936 Constitution is equivalent to the term National Executive (*Ejecutivo Nacional*) employed, *inter alia*, by Article 226 of the current Constitution. As noted previously, the term "National Executive"[129] does not include State Corporations, which have legal personalities of their own and are part of the National Decentralized Administration. As such, Contracts of National Interest must be concluded by the Republic.

§ 98. The opinion of the dissenting justices in the 1962 *Banco de Venezuela* case further clarifies that Contracts of National Interest are concluded by the National Executive on behalf of the Republic.[130] *Banco de Venezuela* concerned the unrelated issue of the constitutionality of a provision of a law enacted by the Legislature to approve a contract concluded by the Federal Executive and Banco de Venezuela, a Venezuelan banking institution, for the purpose of authorizing the latter to act as tax collection agent.[131] The majority of the Justices of the Full Chamber of the Supreme Court determined that it had jurisdiction to hear the case because the act subject to judicial review was not a Contract of National Interest, but rather a law enacted by the Legislature that could be reviewed by that Chamber. The dissenting justices concluded, instead, that a Contract of National Interest executed by the Republic did not lose its contractual nature due to its approval

---

[127]   *Id.* (emphasis added).

[128]   *Id.* (emphasis added); Allan Randolph Brewer-Carías, *Las Constituciones de Venezuela, Estudio Preliminar de Allan R. Brewer-Carías* (1985), **Exhibit ▇-68**, pp. 816–17, 819–20.

[129]   *Estrella Sobeida et al.*, N° 142, **Exhibit ▇-27**, pp. 59–61; *Jhonny García et al.*, N° 2724, **Exhibit ▇-26**, pp. 6–7; *see also* Brewer-Carías, *Régimen, supra* note 33, **Exhibit ▇-29**, p. 24; Brewer-Carías, *Principios del Régimen Jurídico*, *supra* note 33, **Exhibit ▇-28**, pp. 15–16. Said administrative bodies are also commonly known as the National Central Administration (*Administración Central de la República*).

[130]   Decision of the Full Chamber of the Supreme Court of Justice, (Mar. 15, 1962) (*"Banco de Venezuela"*), *Official Gazette* N° 760 Extraordinary (Mar. 22, 1962), **Exhibit ▇-69**, p. 12.

[131]   Plaintiffs had argued said contract was null and void because it exempted the collection agent from municipal taxation and, by doing so, violated the power granted by the Constitution to the Municipalities to organize and manage their income.

by means of a law enacted by Congress and, as such, should be reviewed by another Chamber of the Supreme Court. But more importantly, and apart from the strictly jurisdictional issue that gave rise to the dissenting opinion, the dissenting Justices confirmed—in line with what had been decided in the *Attorney General of the Republic I* case—that Contracts of National Interest are contracts concluded *by the Republic*:

> [T]he legislative approval given to *contracts of national interest concluded by the President of the Republic through the respective Ministry*, perfects and completes the administrative will involved in the creation of the contractual relationship.[132]

§ 99. In the 2002 *Andrés Velásquez et al.* case, the Constitutional Chamber expressly reaffirmed the long-standing judicial requirement that, for a contract to qualify as a Contract of National Interest, the Republic has to be one of the contracting parties.

§ 100. In *Andrés Velásquez et al.*, the Constitutional Chamber considered a constitutional challenge to a provision of the Financial Administration Law that purported to allow the National Executive to enter into financing agreements where the financing had been approved in the annual debt law without obtaining additional National Assembly approval on a case-by-case basis, as set forth in Article 150 of the Constitution. Plaintiffs argued that the blanket approval for total indebtedness in the annual debt law could not be construed as a substitute for the requirement of authorization by Article 150. The Constitutional Chamber held that the control of Contracts of National Interest by means of a case-by-case authorization "is exercised by the national legislative body prior to the conclusion of the contract . . . . in all cases in which *the Republic* (as well as States and Municipalities) through the *National Executive*, executes contracts with foreign States, foreign official entities or companies not domiciled in Venezuela."[133] The Constitutional Chamber added that Contracts of National Interest is a contracting species which includes ". . . . *contracts concluded by the Republic* through the competent organs of the National Executive . . . ."[134]

---

[132] *Id.* at p. 11 (emphasis added).

[133] *Andrés Velásquez et al.*, N° 2241 (emphases added), **Exhibit ▪-07**, p. 14. It should be noted that the Constitutional Chamber, citing a number of factors including "preventing an imbalance in the structure and operation of the public administration and the preservation of the general interest," decided to apply the ruling prospectively so that the "validity of national public interest contracts" that were not approved by the National Assembly "is left harmless." *Id.* at p. 23.

[134] *Id.* at p. 16 (emphasis added).

§ 101.  On the basis of that holding by the Constitutional Chamber, the term "Contracts of National Public Interest" only encompasses "contracts *concluded by the Republic*, through the competent bodies of the *National Executive*."[135] In the words of Professor Brewer-Carías, the ruling in the *Andrés Velásquez et al.* case "*reduced* [the definition of] Contracts of National Interest to *only* those concluded by the '*Republic*,' excluding from the category of Contracts of National Public Interest those that decentralized entities, such as autonomous institutes and state enterprises, may enter into . . . ."[136] Similarly, Professor Badell Madrid affirms that for a contract to qualify as a Contract of National Interest, the entity which assumes the obligations derived from the contract has to be the Republic.[137]

§ 102.  The Constitutional Chamber has confirmed on additional occasions that *Andrés Velásquez* is good law. *See Attorney General of the Republic II* (2007)[138] and *Brigitte Acosta Isasis* (2016).[139]

§ 103.  In the *Attorney General of the Republic II* (2007) case, the Constitutional Chamber decided a request for interpretation of Article 247 of the Constitution. The judicial request sought clarification on whether the legal opinion issued by the Attorney General's Office on the approval procedures for Contracts of National Interest were binding. After declaring that the legal opinion of the Attorney General of the Republic serves as a control

---

[135]  *Id.* (emphasis added). The meaning of the term National Executive has been discussed previously (*see supra* § 36).

[136]  Brewer-Carías, *La Mutación*, *supra* note 122, **Exhibit** ■-67, p. 380. Although Professor Brewer-Carías does not agree that this should be a requirement for a Contract of National Interest as a matter of scholarly debate, he expressly recognizes it as binding law. In his view, the purpose of the constitutional regulation is to submit to the Legislature's approval contracts concluded (i) by the Republic as well as (ii) other national entities, including State corporations. *Id.* at pp. 373–74.

[137]  Rafael Badell Madrid, *Sobre la Inmunidad de Jurisdicción y la Procedencia de Cláusulas Arbitrales en los Contratos de Interés Público Nacional*, *in* 2 Congreso Internacional de Derecho Administrativo Homenaje al Prof. Luis Henrique Farías Mata (2006), **Exhibit** ■-70, p. 161.

[138]  Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 1460, (July 12, 2007) ("*Attorney General of the Republic II*"), **Exhibit** ■-71, pp. 19–22.

[139]  *Brigitte Acosta Isasis*, N° 618, **Exhibit** ■-08, pp. 20–22. In *Lucía Antillano*, the Constitutional Chamber addressed a case where the Republic had entered into an international agreement with the Federal Republic of Brazil concerning the supply of electricity. Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 953, (Apr. 29, 2003) ("*Lucía Antillano*"), **Exhibit** ■-72, p. 1. In furtherance of that agreement, a state corporation entered into an agreement that the Court characterized as one of national interest. Here, no such international obligations of the Republic are implicated by the Governing Documents.

mechanism for the validity of Contracts of National Interest, the Court invoked and, by doing so, confirmed and reaffirmed the ruling in *Andrés Velásquez et al.* that a Public Debt transaction may qualify as a Contract of National Interest when executed "by the Republic with [other] States, foreign official entities or commercial companies not domiciled in Venezuela."[140]

§ 104.   In *Brigitte Acosta Isasis*, the Constitutional Chamber considered whether a financing agreement between the Venezuelan Central Bank and a foreign entity, Fondo Latinoamericano de Reservas,[141] could be characterized as a Contract of National Interest and, as such, required prior authorization by the Legislature.[142] The Constitutional Chamber invoked—and, by doing so, once again reaffirmed—the four requirements of a Contract of National Interest listed in the *Andrés Velásquez* case.[143] The Constitutional Chamber determined that the financing agreement at issue was not a Contract of National Interest because the Republic was not a party. In relevant part, the *Brigitte Acosta Isasis* decision reads:

> [T]his Constitutional Chamber, in the many times mentioned Judgment No. 2241 of 24 September 2002 [i.e., *Andrés Velásquez et al.*], *specified the essential elements that make contracts a contract of national public interest*, as follows:
>
> > 1. *That they be concluded by the Republic, through the organs that make up the National Executive* competent in this matter . . . .[144]

---

[140]   *Attorney General of the Republic II*, N° 1460, **Exhibit ▉-71**, pp. 19–21.

[141]   Fondo Latinoamericano de Reservas was created by virtue of a treaty. Convenio para el Establecimiento del Fondo Latinoamericano de Reservas, *Official Gazette* N° 34172, (Mar. 6, 1989), **Exhibit ▉-73**, pp. 1–2.

[142]   *Brigitte Acosta Isasis*, N° 618, **Exhibit ▉-08**, pp. 20–21.

[143]   *Id.* at p. 22.

[144]   *Id.* (emphasis added). The Political-Administrative Chamber has also issued decisions related to Contracts of National Interest. *See* Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice Decision N° 1198, (Nov. 2, 2017 ) ("*Fondo de Desarrollo Nacional Fonden*"), **Exhibit ▉-74**, pp. 19, 25–27; Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice Decision N° 847, (July 16, 2013) ("*Diques y Astilleros Nacionales (DIANCA)*"), **Exhibit ▉-75**, pp. 16-17, 23–24; Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice N° 1690 (Dec. 7, 2011) ("*Minera Las Cristinas (MINCA)*"), **Exhibit ▉-76**, pp. 23, 51, 54; Decision of the Political-Administrative Chamber of the Venezuelan Supreme Tribunal N° 855, (Apr. 5, 2006) ("*Compañía Anónima Venezolana de Televisión (VTV)*"), **Exhibit ▉-126,** pp. 71–79. Most of these decisions arose in the distinct procedural context of determining the

§ 105.  Here, the Governing Documents cannot qualify as such contracts pursuant to the first requirement of *Andrés Velásquez* because the Republic was not a party to these contracts. A simple review of the Governing Documents reveals that the Republic was not a party (*see supra* §§ 61–§ 63). Rather, the Governing Documents were entered into by corporations with distinct legal personalities separate from the Republic.

§ 106.  The instant matter is analogous to *Brigitte Acosta Isasis*. Like PDVSA and PDVSA Petróleo, the Venezuelan Central Bank is a separate and distinct legal entity that cannot be confounded with the Republic for the purpose of determining whether the Governing Documents are Contracts of National Interest. Corporations cannot be conflated with their shareholders for constitutional purposes, both in general and with regard to the Republic in particular.[145]

§ 107.  To emphasize: The Republic and each of the Plaintiffs are different legal entities. As such, each of the Plaintiffs and the Republic have their own (i) legal personality;[146] and therefore, (ii) separate patrimony (*i.e.*, assets and liabilities); and (iii) separate legal representatives. Indeed, under Venezuelan law, the President of the Republic is not the legal representative of State Corporations. Articles 242 and 275 of the Commercial Code—applicable to PDVSA and PDVSA Petróleo—provide, respectively, that (i) corporations (*sociedades anónimas*) are managed by one or more administrators, and (ii) said administrators are appointed by the shareholders of the corporation in a shareholders meeting.[147]

§ 108.  Given the President of the Republic's legal power to obligate the Republic, on the one hand, and the President's lack of legal power to obligate State Corporations such as

---

jurisdiction of Venezuelan courts in cases where the contracts at issue provided for the resolution of disputes in arbitration, rather than before Venezuela's courts. None of these decisions addresses the issue of the contracts' validity in relation to the legislative approval requirements of Article 150 of the Constitution, nor were the contracts at issue approved by the National Assembly. To the extent these decisions are inconsistent with the Constitutional Chamber's constitutional jurisprudence, they are not controlling. *See supra* § 13 (explaining that, pursuant to Article 335 of the Constitution, the Constitutional Chamber is the ultimate arbiter of the Constitution).

[145]  Brewer-Carías & Viloria, *supra* note 39, **Exhibit ■-31,** p. 155.

[146]  Regarding the legal personality of the Republic, *see* Allan Randolph Brewer-Carías, *El Estado, la República y la Nación. Precisión Sobre las Personas Jurídicas Estatales en la Constitución de 1999 y sobre el Error en el que Incurrió la Sala Constitucional al Confundir la 'Nación' con la 'República'*, *in* 134 REVISTA DE DERECHO PÚBLICO (2013), **Exhibit ■-77**, pp. 209–11.

[147]  Commercial Code at arts. 242, 275, **Exhibit ■-19**, pp. 24, 26.

PDVSA or PDVSA Petróleo, on the other, the term Contracts of National Interest, used in Article 236(14) of the Venezuelan Constitution, must be understood as a type of contract in which the Republic is a contracting party, *i.e.*, in which the Republic *has to be* a contracting party.

§ 109.  Moreover, the Governing Documents did not create any direct obligations by or liabilities of the Republic. Professor Badell Madrid affirms that for a contract to qualify as a Contract of National Interest, the entity that assumes the obligations derived from the contract has to be the Republic.[148] The obligations derived from the Governing Documents are, all of them, incumbent upon corporations with their own legal personality, assets, and liabilities.

§ 110.  Accordingly, the Republic must have been a party to the Governing Documents for these contracts to qualify as Contracts of National Interest. Because it was not, the Governing Documents do not qualify, and are not subject to approval by the National Assembly pursuant to Article 150 of the Constitution.

§ 111.  Moreover, my conclusion is consistent with Articles 236(14) and 226 of the Constitution, as discussed below.

### ii.   Consistency of the Requirement that the Republic Must Be a Party with Articles 236 and 226 of the Constitution

§ 112.  The requirement that only contracts to which the Republic is a party may qualify as Contracts of National Interest is also consistent with Articles 236(14) and 226 of the Constitution.

§ 113.  Pursuant to Article 236(14), the President of the Republic is vested with the power to conclude Contracts of National Interest. This Article states that: "The powers and duties of the President of the Republic are as follows: . . . [to] enter into contracts of national interest according to this Constitution and the law."

§ 114.  It is essential to point out that the President of the Republic is the sole authority empowered by the Constitution to conclude Contracts of National Interest pursuant to Article 236(14). This is significant, as the Republic, as well as other public entities, are

---

[148]   Badell Madrid, *Sobre la Inmunidad de Jurisdicción*, *supra* note 137, **Exhibit ███-70**, p. 161.

subject to the Rule of Law (*principio de legalidad*)[149] the constitutional principle under which state bodies and entities may only act when an express law provision allows them to do so (*principio de competencia*).[150]

§ 115.  The President's role in approving such contracts is further discussed in the final paragraph of Article 236, which states that the power granted to the President of the Republic to conclude Contracts of National Interest must be exercised by the President in Council with his Ministers.[151]

§ 116.  As explained by Professors Lares Martínez, Melich-Orsini and Caballero Ortiz, Article 236(14)'s grant of sole authority to the President to conclude Contracts of National Interest is consistent with the President's role as the Head of the National Executive, pursuant to which the President is enabled to conclude contracts on the Republic's behalf (*see supra* § 51). This power derives from Article 226, according to which the President of the Republic is the Head of State and of the National Executive, and in said capacity directs the actions of the government.

§ 117.  In exercise of the powers granted to the President of the Republic by Articles 226 and 236(14) of the Constitution, the President sanctioned regulations for the review of drafts of Contracts of National Interest to be concluded by the Republic, establishing the internal procedure to be followed by the National Executive prior to the conclusion of

---

[149]  Articles 2, 137, and 141 of the Constitution (1999), *supra* note 40, **Exhibit ■-32**, pp. 17, 24, state, respectively, that (i) Venezuela has "a democratic and social State of Law. . ."; (ii) the Constitution and the laws define the powers of the bodies entrusted with the exercise the Public Power, and the activities carried out by them must conform to the Constitution and the laws; and, (iii) the Public Administration must act "with full submission to the law. . . ."

[150]  According to Article 4 of the Organic Law of the Public Administration, the Public Administration is organized and acts in accordance with the principle of legality, whereby the attribution, distribution, and exercise of its powers is subject to the provisions of the Constitution, laws, and regulations, in guarantee and protection of public liberties. **Exhibit ■-20**, p. 8. Article 26 of the Organic Law of the Public Administration, **Exhibit ■-20**, p. 12, states that all powers attributed to the organs and entities of the Public Administration is mandatory and shall be exercised under the conditions, limits and procedures established, and that any activity by an organ or entity which manifestly lacks power is void and its effects will be deemed non-existent.

*See* Lares Martínez, *Contratos de Interés Nacional*, *supra* note 122, **Exhibit ■-65**, p. 123.

[151]  Constitution (1999) art. 236, *supra* note 39, **Exhibit ■-32**, p. 31.

Contracts of National Interest inclusive of arbitration clauses.[152] All of these powers and acts of the President are consistent with the requirement that, for a contract to qualify as a Contract of National Interest, the Republic must be party.

**B.**   **Plaintiffs' Allegations Concerning Contracts of National Interest Are Inconsistent with the Constitution and Interpretations of Article 150 by the National Assembly and the Venezuelan Attorney General**

§ 118.  It would be contrary to the Constitution for the Governing Documents to have been Contracts of National Interest, because the President of the Republic is the sole authority empowered by the Constitution to conclude such contracts pursuant to Article 226 and 236(14). Article 236(14) of the Constitution states as follows: "The powers and duties of the President of the Republic are as follows: . . . [to] enter into contracts of national interest in accordance with this Constitution and the law."

§ 119.  Plaintiffs completely overlooked Article 236(14) in their Lawsuit when alleging that the Governing Documents are Contracts of National Interest. Plaintiffs' allegations are also inconsistent with prior statements about such contracts by the National Assembly and Venezuela's Attorney General.

**i.**   **Plaintiffs Overlooked Article 236(14) of the Constitution**

§ 120. In overlooking Article 236(14), Plaintiffs erred in two regards. They ignored the identity of the sole Venezuelan official empowered by the Constitution to conclude Contracts of National Interest—the President of the Republic in Council of Ministers. Moreover, Plaintiffs failed to consider that the Constitution, as any legal text, must be read and interpreted as a whole.[153] Accordingly, Plaintiffs conducted what scholars, both in Venezuela and abroad, have called a "dis-integrated" reading or interpretation of the Constitution.[154] A "dis-integrated" reading of the Constitution is based on some (*e.g.*,

---

[152]  Instruction for the Review of Drafts of National Public Interest Contracts That Will Be Entered into by the Republic, *Official Gazette* N° 37158 (Mar. 14, 2001), **Exhibit** ▆-78, pp. 317.684-85.

[153]  Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 24, (Jan. 22, 2003) ("*Elba Paredes Yéspica*"), **Exhibit** ▆-79, p. 8; 
, p. 327.

[154]  Lawrence Tribe & Michael Tribe, *On Reading the Constitution* (1991), **Exhibit** ▆81, p. 23. In Venezuela, ▆▆▆▆

Articles 150 and 187(9)), but not all of the applicable constitutional rules, and results in an erroneous interpretation of the Constitution. Venezuelan courts have affirmed that when it comes to ascertaining the meaning of a constitutional rule, the rule cannot be read and interpreted "isolated from its normative context"; its meaning, on the contrary, can only be determined bearing in mind that the Constitution constitutes a "harmonic and systematized" set of rules.[155]

§ 121. Plaintiffs erroneously read Articles 150 and 187(9) of the Constitution as allowing Contracts of National Interest to be entered into by the National Public Administration.[156] But the term "National Public Administration" does not appear anywhere in the text of these Articles. Instead, Article 187(9) expressly refers to the "National Executive" entering into Contracts of National Interest. This is significant. Unlike the term "National Executive," the term "National Public Administration" encompasses State Corporations such as PDVSA and PDVSA Petróleo. Instead, and contrary to the Plaintiffs' arguments, Contracts of National Interest are concluded solely on behalf of the Republic by the President of the Republic in Council of Ministers (Article 236(14) of the Constitution). Given the case law prior to 1999, if the framers of the Constitution had wanted to make sure that the definition of Contracts of National Interest encompassed certain contracts concluded by State Corporations, they would have reviewed—and modified—the Constitutional rules dealing with Contracts of National Interest, bearing in mind the way in which said rules had been interpreted by Venezuelan courts since 1937. Instead, they opted to leave the Constitutional rules as they were.

### ii. Plaintiffs' Allegations Are Inconsistent with Prior Statements of the Legislature and Attorney General

§ 122. Plaintiffs' allegations that the Governing Documents are Contracts of National Interest are also at odds with official interpretations of the term Contracts of National Interest by the National Assembly and the Venezuelan Attorney General prior to the execution of the agreements.

§ 123. A May 26, 2016 National Assembly Resolution (the "May 2016 Resolution")[157] confirms that Contracts of National Interest must be entered into by the Republic. In the

---

[155] *Elba Paredes Yéspica*, N° 24, **Exhibit** ▪-79, p. 8; ▰▰▰▰▰▰▰▰▰▰▰▰▰

[156] Lawsuit, §§ 74, 85.

[157] The May 2016 Resolution is entitled "Resolution on the respect of the legal and non-transferable authority of the National Assembly on contracts of public interest *signed by the National Executive*

44

May 2016 Resolution, the National Assembly reasserted its power to approve contracts of public interest concluded by the *National Executive* with foreign states, foreign official entities or companies not domiciled in Venezuela.[158] The May 2016 Resolution also provided that "contracts of national public interest executed by the *National Executive* with foreign states or foreign official entities or with companies not domiciled in Venezuela will be absolutely null [when executed] without the approval of the National Assembly" (Decision #3.)[159]

§ 124.  The text of the May 2016 Resolution, which is based on Article 150, demonstrates the National Assembly's awareness of the requirement that a Contract of National Interest include the Republic—and its National Executive—as a party. It resolves:

- That the Constitution "categorically requires, without exception, the approval of the National Assembly of all contracts of national . . . public interest executed by the *National Executive* with [foreign] states or foreign official entities or with companies not domiciled in Venezuela" (First "Whereas" Clause);[160]

- That the conclusion of "large contracts that could seriously compromise the assets of *the Republic* or could expose it to serious losses or to international claims that could damage the sovereignty or integrity of the country . . . justify the intervention and control of the National Assembly" (Fourth "Whereas" Clause);[161]

- That "[a]pproval, as a condition of validity of the contracts is one of the control mechanisms [that may be exercised by] the National Assembly on public interest contracts executed by the *National Executive* . . . ." (Sixth "Whereas" Clause);[162]

- That the power bestowed to "the National Assembly regarding the approval of national . . . public interest contracts executed by the *National Executive* with [foreign] States or foreign official entities or with companies not domiciled in

---

with States or foreign official entities or with companies not domiciled in Venezuela." (May 26, 2016) (emphasis added), **Exhibit ▉-82**, p. 1.

[158]  *Id.* at pp. 1–3.

[159]  *Id.* at p. 3 (emphasis added).

[160]  *Id.* at p. 1 (emphasis added).

[161]  *Id.* at p. 2 (emphasis added).

[162]  *Id.* (emphasis added).

Venezuela is inalienable . . . and cannot be ignored by means of conventions, decrees or other legal acts" (Seventh "Whereas" Clause).[163]

§ 125.  As discussed previously, the term National Executive, as employed, *inter alia*, by Article 226 of the Venezuelan Constitution, encompasses a group of administrative bodies of the Republic, which includes the Presidency of the Republic, the Executive Vice Presidency of the Republic and the Ministers (*see supra* § 36). This term does not include State Corporations, which are distinct legal entities and as such have their own legal personalities, assets, liabilities, and representatives (*see supra* § 37). In summary, the May 2016 Resolution is consistent with the judicial precedents previously invoked holding that the Republic must be a party for a contract to be considered a Contract of National Interest.

§ 126.  Plaintiffs' conclusion is also inconsistent with a legal opinion dated August 7, 2006 by the Attorney General's Office (the "Legal Opinion") which concluded that, for contracts to be considered Contracts of National Interest, it was necessary that "they are concluded *by the Republic*, through the bodies that compose the *National Executive* . . . ."[164] Notably, this Legal Opinion invoked—and by doing so, shared—the conclusions of the court in *Andrés Velásquez et al.* (*see supra* § 88).[165]

§ 127.  To conclude, the Republic was not a party to the Governing Documents and the Governing Documents did not create any direct obligations by or liabilities to the Republic. Accordingly, the Governing Documents cannot be characterized as Contracts of National Interest. Plaintiffs' conclusions to the contrary are premised on a misreading of the Constitution—in addition to being contrary to *Andrés Velásquez et al.* and other binding judicial precedent—and are inconsistent with statements by the National Assembly and the Attorney General prior to the execution of these agreements. Therefore, the Governing Documents were not subject to approval by the Legislature, and lack of authorization by the Legislature does not affect the validity of the Governing Documents.

§ 128.  ██████████████████████████████████████████████████████████
██████████████████████████████████

---

[163]  *Id.* (emphasis added).

[164]  Oficio N° G.G.A.J./C.D.E. 493, *Doctrina de la Procuraduría General de la República 2006-2007*, (Aug. 7, 2006) (emphasis added), **Exhibit ██ 83**, pp. 75–76.

[165]  *Id.* at p. 76.

46



## III.   THE GOVERNING DOCUMENTS ARE NOT CONTRACTS OF NATIONAL INTEREST UNDER AT LEAST TWO OF THE REMAINING CRITERIA RECOGNIZED IN *ANDRÉS VELÁSQUEZ ET AL.*

§ 129.  The Governing Documents are not Contracts of National Interest for the additional reasons that they do not meet at least two of the remaining three requisites for such contracts enumerated in *Andrés Velásquez et al.*

§ 130.  For Contracts of National Interest, the Republic must be a contracting party (*see supra* §§ 93–§ 128), but that sole requisite does not suffice by itself. The remaining three requisites enumerated in *Andrés Velásquez et al.* must also be met, namely: (i) the subject of the contract must be decisive or essential for the realization of the goals and missions of the Venezuelan State; (ii) the contract must satisfy the interests of the national community; and (iii) the contract must imply the assumption of obligations payable by the Republic—against the National Treasury—during several fiscal years after the one in which the contract was concluded and, therefore, commit amounts of money and fiscal resources from Venezuela's future budgets.[167] As discussed below, at least two of these requirements are not met with regard to the Governing Documents.

### A.   Contracts of National Interest Must Satisfy the General Interests of the National Community

§ 131.  The Court in *Andres Velasquez et al.* stated that a contract must satisfy the general interest of the national community—*i.e.*, the individual and matching interests of the inhabitants of the country, considered as a whole—to qualify as a Contract of National Interest. Plaintiffs' Complaint does not provide an explanation as to why the Governing

---

[166]   Hogan Memorandum Dated Sept. 21, 2016 (HL_021479), *supra* note 94, **Exhibit** ▉**-60**, p. 3 (emphasis added).

[167]   *Andrés Velásquez et al.*, N° 2241, **Exhibit** ▉**-07**, pp. 16–17.

Documents meet the standard of being able to satisfy the individual and matching interests of the national community.

§ 132. Here, the Governing Documents cannot be considered Contracts of National Interest because they were not concluded for the purpose of satisfying—immediately and directly—the individual and matching interests of the national community. Indeed, the Governing Documents were not concluded for the purpose of rendering any public service to the community or its citizens. The relationship between the Governing Documents and the general interest is—at best—indirect and, as such, does not meet the criteria set forth by *Andrés Velásquez et al*.

§ 133. Plaintiffs' central argument for why the Governing Documents and Exchange required National Assembly approval appears to be that the pledge of collateral associated with the Exchange converts these agreements to Contracts of National Interest because of the significance of the collateral pledged. However, the pledge of collateral does not transform the Governing Documents into Contracts of National Interest. There is no legal authority that posits that the mere existence of a pledge transforms debt instruments such as the Governing Documents into Contracts of National Interest.

§ 134. Treating these agreements as Contracts of National Interest simply because they contemplate the pledge of shares of a PDVSA subsidiary would be illogical. PDVSA regularly risks collection of the shares of CITGO Holding and other assets by undertaking unsecured debt; as a result, PDVSA's assets are subject to collection upon default.[168] Thus, even without the pledge of a security interest, a default by PDVSA would still place CITGO at risk from creditors. Because entering into unsecured debt transactions would expose Plaintiffs to the risk of collection of the collateral involved in the Exchange here, the Pledge alone does not give these agreements greater significance under Article 150 of the Constitution. The only notable difference between the Pledge in this matter and prior debt transactions by Plaintiffs is the process and timing of collection for the creditor in the instant matter; in either scenario, the result to the debtor is the same—the collateral may be collected upon default. █████████████████████████████

---

[168] *See, e.g.*, Offering Circular, *supra* note 20 (listing various loans taken by PDVSA and its subsidiaries), **Exhibit █-13**, Ex. T3E, pp. 70–72.

§ 135.  A prominent Venezuelan scholar who has been cited by the Constitutional Chamber,[169] Professor Lares Martínez, has argued that contracts pertaining to assets of the private domain do not tend to address the general interest or, to be more specific, the interests of the national community. Professor Lares Martínez explains that Contracts of National Interest must be concluded for the purpose of "addressing requirements of general interest [both] *immediately and directly*" and, therefore, "contracts related to the management and sale of assets belonging to the private domain of the Republic are excluded from the category of Contracts of National Interest."[170]

§ 136.  The assets involved in the Governing Documents—shares issued by a subsidiary of PDVSA—are assets pertaining to the private domain of PDVSA. Therefore, even under this scholarly criterion, the Governing Documents do not concern the types of assets typically associated with Contracts of National Interest.

§ 137.  National assets belonging to the Republic and State Corporations may be (i) assets of the public domain or, alternatively, (ii) assets of the private domain.[171] Under Venezuelan law, the assets pertaining to the *public domain* include, for example, assets destined for public use such as public parks or roads; lacustrine and river spaces; and hydrocarbon deposits existing in the national territory, under the bed of the territorial sea, in the exclusive economic zone and in the continental shelf. As discussed *infra* § 139, the list of assets of the public domain does not include CITGO's shares—CITGO being a US-based company that does not own the foregoing hydrocarbon deposits.[172]

§ 138.  Under Venezuelan law, the assets of the public domain cannot be attached, sold or acquired by third parties by means of adverse possession.[173] In contrast, assets or property of the Republic or a State Corporation not included in the foregoing list and not intended for public use or affected to any public service, such as monies and/or shares, pertain to the private domain.

---

[169]  The Supreme Tribunal invokes the teachings of Professor Lares Martínez in *Andrés Velásquez et al.*, N° 2241, **Exhibit** ■-07, p. 15.

[170]  Lares Martínez, *Manual de Derecho Administrativo*, *supra* note 122 (emphasis added) **Exhibit** ■-66, p. 297.

[171]  Organic Law of Public Assets arts. 5 and 6, *Official Gazette* N° 6155 Extraordinary (Nov. 19, 2014) **Exhibit** ■-84, pp. 27–28.

[172]  *Id.* at art. 6, **Exhibit** ■-84, p. 28.

[173]  *Id.* at art. 9, **Exhibit** ■-84, pp. 28–29.

§ 139.  Article 303 of the Constitution recognizes that shares issued by PDVSA are assets of the Republic and cannot be sold, *i.e.*, that they are assets of the public domain. Article 303 also expressly recognizes that shares of its subsidiaries are not. By implication, shares of PDV Holding, a Delaware corporation and an indirect, wholly-owned subsidiary of PDVSA, are not assets of the public domain:

> ***Article 303***. For reasons of economic and political sovereignty and national strategy, the State shall own all the shares of Petróleos de Venezuela, S.A., or of the entity created to manage the oil industry, except those of the subsidiaries, strategic associations, companies and any others that have been established or are established as a result of the business development of Petróleos de Venezuela, S.A.[174]

§ 140. Here, the Governing Agreements concern the assets of the private domain of PDVSA, PDV Holding, and CITGO, each of which is a U.S.-based company incorporated in Delaware with headquarters in Houston, Texas.[175] Both PDV Holding and CITGO Holding are subsidiaries of PDVSA. Because these entities are subsidiaries of PDVSA incorporated outside of Venezuela, and considering the fact that the shares of subsidiaries of PDVSA are excluded from the public domain pursuant to Article 303 of the Constitution and Article 6 of the Organic Law of Public Assets, said shares cannot be considered assets of the public domain. Therefore, they do not involve assets typical of Contracts of National Interest, as recognized by Professor Lares Martínez, nor do they satisfy indirectly or immediately the general interest, *i.e.*, the interest of the national community.

§ 141. In light of the foregoing, the Governing Documents cannot be characterized as Contracts of National Interest.

---

[174]  Constitution (1999) art. 303, **Exhibit ▪-32**, p. 35.

[175] 

**B.      Contracts of National Interest Must Involve the Assumption of Obligations Payable During Several Fiscal Years by the National Treasury**

§ 142.  The Governing Documents did not imply the assumption of monetary obligations by the Republic payable by the National Treasury over several fiscal years.

§ 143.  As the Court explained in the *Andrés Velásquez et al.* case (*see supra* § 88), the fourth (and last) criteria of a Contract of National Interest is that such contracts concluded by the Republic must:

> [(i.)] imply the assumption of obligations whose total or partial payment is stipulated over the course of several fiscal years subsequent to the one in which the object of the contract was caused, [(ii.)] in view of the implications that the adoption of such commitments may cause to the economic and social life of the Nation.[176]

§ 144.  This requirement may be broken down into two factors, each of which must be met for a contract to qualify as a Contract of National Interest. *First*, the contract must involve obligations assumed by the Republic with expenditures to be made against the National Treasury over several fiscal years.[177] *Second*, the obligation must consider the "implications the adoption of such commitments may cause to the economic and social life of the Nation."[178]

§ 145.  It is apparent from context that the first factor means that Contracts of National Interest must involve expenditures by the Republic against the National Treasury. In *Andrés Velásquez et al.*, the court stated that Contracts of National Interest involve "the assumption of obligations whose total or partial payment is stipulated over the course of several fiscal years"[179] when reviewing the constitutionality of Article 80 of the Financial Administration Law in force at the time. Pursuant to Article 80, the National Executive had to simultaneously submit to the Legislature drafts of (i) the national budget law, as well as (ii) the annual indebtedness law for the corresponding fiscal year. The draft of the annual indebtedness law had to specify, *inter alia*, (i) the maximum amount of Public Debt

---

[176]  *Andrés Velásquez et al.*, N° 2241, **Exhibit** ■-07, pp. 16–17.

[177]  *Attorney General of the Republic I*, N° 62, **Exhibit** ■-64, pp. 351–52.

[178]  *Andrés Velásquez et al.*, N° 2241, **Exhibit** ■-07, p.17.

[179]  *Id.* at p. 17.

to be contracted during the Republic's fiscal year, and (ii) the maximum amount of outstanding treasury bills payable by the Republic at the close of the respective fiscal year. The amounts specified in the draft annual indebtedness law had to be consistent with the multi-annual budget law and consider, *inter alia*, (i) the requirements for an orderly development of the national economy; (ii) the Republic's foreseeable tax revenues; and (iii) the country's gross domestic product.[180] Given that context, Contracts of National Interest must involve obligations assumed by the Republic.

§ 146. This is consistent with the 1937 *Attorney General of the Republic I* case, in which Venezuela's highest Court had ruled that the contract at issue could be characterized as a Contract of National Interest because the contract obligated the Republic to make "an expenditure against *the National Treasury* . . . ."[181]

§ 147. This conclusion is consistent with the writings of several Venezuelan scholars who have affirmed that, in addition to the Republic being a contracting party, a contract may only be characterized as a Contract of National Interest if it is likely to seriously compromise the economic *assets of the Republic*.[182] For a contract to seriously compromise the economic assets of the Republic, said contract (i) must imply the assumption of obligations by the Republic itself, and, hence, (ii) said obligations are those that need to be included in the national budget and payable from the National Treasury.[183]

§ 148. Based on this first factor alone, it is patent that the Governing Documents are not Contracts of National Interest, as neither involve expenditures to be made against Venezuela's National Treasury. Although these agreements involved obligations on the part of the PDVSA and PDVSA Petróleos over several fiscal years, the Republic did not assume any obligations by means of these agreements. The obligations derived from said contracts were payable from PDVSA's patrimony (*i.e.*, its assets)—not from the National Treasury. As such, the Governing Documents could not have met the fourth requirement enumerated in *Andrés Velásquez et al.*[184]

---

[180] *Id.* at pp. 21–22.

[181] *Attorney General of the Republic I*, N° 62 (emphasis added), **Exhibit ▮-64**, pp. 351–52.

[182] José Melich-Orsini, *La Noción de Contrato de Interés Público*, *in* 7 REVISTA DE DERECHO PÚBLICO (1981), **Exhibit ▮-85**, p. 61.

[183] *Attorney General of the Republic I*, N° 62, **Exhibit ▮-64**, pp. 351–52.

[184] *Andrés Velásquez et al.*, N° 2241, **Exhibit ▮07**, p. 17.

§ 149. As to the second factor, which involves "implications that the adoption of such commitments may cause to the economic and social life of the Nation,"[185] it is unclear what kind of "implications" turn a contract into a Contract of National Interest. This matter still is open to scholarly debate.

§ 150. Some scholars, including Professors Pérez Luciani and Melich-Orsini, affirm that Contracts of National Interest must be determined based on their economic implications, *i.e.*, on their *quantum*. Their theory is problematic for several reasons.

§ 151. Professor Pérez Luciani argues that the inclusion of Contracts of National Interest in Venezuelan Constitutions reveals a concern about the economic and financial consequences derived from contracts concluded by governments. He argues that: "if all those contracts had been of little economic significance or had been planned to be paid in a single year and within the limits of the Public Expenditure Budget, the aforementioned Contracts of National Interest would not have existed."[186] Professor Pérez Luciani is seconded by Professor Melich-Orsini. According to the latter, "the expression 'contract of national interest' . . . was introduced and has been retained by the Venezuelan subsequent Constitutions to refer to those 'large contracts' likely to seriously compromise the economic *assets of the Republic*."[187]

§ 152. The thesis advanced by Professors Pérez Luciani and Melich-Orsini is problematic because of the doubts it casts and the uncertainties it causes. What qualifies as a contract of little significance? What is the meaning of the term "large contracts"? What is the threshold that separates (i) a contract of little economic significance from one of "great economic significance" or (ii) a "large contract" from a "small contract"? Lacking an objective (quantitative) standard or threshold, the thesis poses many questions but provides few answers.

§ 153. Accordingly, and paraphrasing Professor Brewer-Carías, the "quantitative interpretation criterion on what is to be understood as a contract of national interest is inadmissible by itself to draw the boundary between contracts that are of national interest and those that are not."[188] Professor Brewer-Carías goes on to say that the quantitative

---

[185]  *Id.*

[186]  Pérez Luciani, *Contratos de Interés Nacional*, *supra* note 114, **Exhibit** ■-63, p. 155; Caballero Ortiz, *Los contratos administrativos*, *supra* note 62, **Exhibit** ■-43, p. 144.

[187]  Melich-Orsini, *supra* note 182, (emphasis added), **Exhibit** ■-85, p. 61.

[188]  3 Allan Randolph Brewer-Carías, *Tratado de Derecho Administrativo* (2013), **Exhibit** ■-86, p. 638.

criterion cannot be admitted "unless a law [enacted by the Legislature] establishes that contracts of certain amounts, importance or nature are [Contracts of National Interest], for the purpose of being subject to the approval of Congress . . . ."[189]

§ 154.  Because there is no clear interpretive criterion on how to determine the quantitative value of economic implications, this criterion should not be applied to determine whether the Governing Documents involve Contracts of National Interest. But even if this criteria were admissible, the Governing Documents cannot be considered contracts with large economic implications for the Republic because they do not impose any obligations on the Republic. More saliently, and notwithstanding the quantum of the Governing Documents, these agreements cannot be characterized as Contracts of National Interest because they do not involve expenditures from the National Treasury over a period of several fiscal years.

§ 155.



## IV.  ADDITIONAL CONSIDERATIONS SUPPORTING MY OPINION THAT THE GOVERNING DOCUMENTS ARE NOT CONTRACTS OF NATIONAL INTEREST

§ 156.   Two additional considerations support my opinion that the Governing Documents are not Contracts of National Interest.

§ 157. *First*, financing agreements by PDVSA are excluded from the requirement of authorization by the National Assembly pursuant to an explicit provision of the Financial Administration Law. This statute fits into a separate set of constitutional requirements applicable to Financing Agreements. No Venezuelan court has held that this provision of

---

[189]   *Id.*

[190]   Hogan Memorandum Dated Sept. 21, 2016 (HL_021479), *supra* note 94 (emphasis added), **Exhibit** ███**-60**, p. 3.

the Financial Administration law is unconstitutional. Yet the logic of Plaintiffs' arguments would call into question the constitutionality of this law.

§ 158. *Second*, Contracts of National Interest are administrative contracts, which are characterized by the additional criteria of being subject mainly or predominantly to Venezuelan Public Law and involving sovereign powers (*ius imperium*). The Governing Documents are not subject to Venezuelan Public Law and do not involve sovereign powers, which, indeed, Plaintiffs do not possess. Because the Governing Documents do not qualify as administrative contracts, they cannot be considered Contracts of National Interest.

### A.    My Opinion Is Consistent with, and Plaintiffs' Arguments Are Inconsistent with, the Financial Administration Law and Other Constitutional Provisions Concerning Financing Agreements

§ 159. My view that PDVSA's debt, whether unsecured or secured, is not subject to National Assembly approval requirements under Article 150 of the Constitution is further supported by the existence of Venezuelan statutory law exempting PDVSA's financing agreements from National Assembly approval. Under the Financial Administration Law, Public Debt incurred by corporations created pursuant to the Hydrocarbons Law, such as PDVSA and PDVSA Petróleos, are expressly excluded from the requirement of legislative approval.[191] Moreover, Financing Agreements for Public Debt are subject to a separate set of constitutional rules.

§ 160. Contracts involving Public Debt were first regulated in the Venezuelan Constitution enacted in 1830,[192] *i.e.*, more than 30 years before the term Contract of National Interest first appeared in the 1864 Venezuelan Constitution. And the lists of types of contracts recognized as Contracts of National Interest listed in prior Constitutions, as discussed previously, did not include Financing Agreements.

§ 161. Rather, under Venezuelan law, Public Debt has traditionally been subject to a separate set of constitutional provisions set forth in Articles 187(6), 187(7), 236(12) and 312.[193] Pursuant to these provisions, the President of the Republic is empowered to negotiate certain Public Debt Agreements (Article 236(12)), and the National Assembly is

---

[191]   Financial Administration Law, art. 101, § 4, **Exhibit ▉-30**, p. 82.

[192]   Pérez Luciani, *Contratos de Interés Nacional*, *supra* note 114, **Exhibit ▉-63**, pp. 120–24.

[193]   In contrast, the Constitution regulates Contracts of National Interest in Articles 150, 151, 187(9), 236(14) and 247, as discussed *supra* §§ 49–§ 53.

empowered to discuss and approve the national budget and any bill concerning public credit, as well as additional credits to the national budget (Articles 187(6) and 187(7)). For their validity, Public Debt transactions shall require a special law that authorizes them, with the sole exclusions to be established by law (Article 312), and the laws enacted by the National Assembly shall set limits on public indebtedness. These constitutional provisions are implemented in a statutory regime pursuant to the Financial Administration Law.

§ 162.  Pursuant to Article 101(4) of the Financial Administration Law, State Corporations created in accordance with the Hydrocarbons Law,[194] such as PDVSA and PDVSA Petróleo, may issue Public Debt without any prior authorization by the Legislature.[195] The Republic created PDVSA based on the Nationalization Law.[196] The exemption in Article 101(4) of the Financial Administration Law was enacted as a means to guarantee flexibility when conducting businesses in face of competition by other corporations. Pursuant to the Financial Administration Law, the issuance of Public Debt by PDVSA and PDVSA Petróleo is only subject to a certification of the State Corporations' ability to pay by means of a balance duly signed by a public accountant, to be published in a national newspaper within 15 business days of the end of their fiscal year.[197]

---

[194]  Articles 27 and 28 of the Hydrocarbons Law provide, respectively, (i) that the National Executive, by means of a Decree approved in Council of Ministers, may create corporations wholly owned by the State for the purpose of conducting activities associated with hydrocarbons (Article 27); and, (ii) that the aforementioned corporations may create other corporations for the purpose of conducting their activities (Article 28). *See* arts. 27–28, **Exhibit** ▉-40, p. 348.078

[195]  Hernández González, *Comentarios*, *supra* note 55, **Exhibit** ▉-41, p. 209; *see also* Memorandum from José Ignacio Hernández González (Aug. 28, 2019), **Exhibit** ▉-87, pp. 26–27 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

[196]  *See generally*, Nationalization Law, **Exhibit** ▉-09.

[197]  Financial Administration Law, art. 101, **Exhibit** ▉-30, p. 82; *see also* PDVSA Extracto del Balance de la Deuda Financiera Consolidada, Diario VEA/Caracas (Jan. 23, 2016), **Exhibit** ▉-88; PDVSA Extracto del Balance de la Deuda Financiera Consolidada, Panorama (Jan. 22, 2016), panorama.com.ve, **Exhibit** ▉-89. PDVSA's balance sheet is also publicly published on its website. *See* PDVSA, Balance de la Deuda Financiera Consolidada 31 de diciembre de 2015, **Exhibit** ▉-90, http://www.pdvsa.com/images/pdf/RELACION%20CON%20INVERSIONISTAS/Deuda/Balance%20de%20la%20Deuda/2015/Balance%20de%20la%20Deuda%20Financiera%20Consolidada%20al%2031%20de%20diciembre%20de%202015.pdf.

§ 163. The exemption recognized in Article 101(4) has existed since the law was first enacted in 2000.[198] Indeed, PDVSA and PDVSA Petróleo have been exempted from these Legislative approval requirements for Public Debt for decades, since the predecessor to this law, the 1983 Public Financing Organic Law (*Ley Orgánica de Crédito Público*), also exempted Public Debt by PDVSA and PDVSA Petróleo from Legislative approval requirements.[199]

§ 164. The Constitutional Chamber in *Andrés Velásquez et al.* held that certain Public Debt, issued by the Republic could in rare cases entail the conclusion of a Contract of National Interest. But Plaintiffs' overbroad definition of a Contract of National Interest would, as a practical matter, render this long-standing statutory exemption ineffective or even unconstitutional.

§ 165. A decision holding Article 101 of the Financial Administration Law unconstitutional would be unprecedented under Venezuelan law. To the contrary, the exemption under Article 101 of the Financial Administration Law was upheld in *Brigitte Acosta Isasis*. There, the Constitutional Chamber affirmed that Article 101 "exempts" the public entities to which it applies "from the [general] authorization regime provided for" in said law. The Court further held that said entities, which include State Corporations created in accordance with the Hydrocarbons Law, do not require prior legislative "authorization to carry out public credit operations."[200] The legal exemption is justified because the aforementioned State Corporations: (i) have limited liability;[201] and (ii) produce revenue of their own and, hence, are not dependent upon the National Treasury.[202] Further, said State Corporations are not dependent on the National Budget for economic resources and do not compromise assets of the Republic.

---

[198] Organic Law of the Financial Administration of the Public Sector, art. 89, *Official Gazette* N° 37029 (Sept. 5, 2000) ("Financial Administration Law of 2000"), **Exhibit** ■-91, p. 315.265.

[199] Organic Law of the Public Financing, art. 49, *Official Gazette* N° 3253 Extraordinary (Sept. 14, 1983), **Exhibit** ■-92, p. 7.

[200] *Brigitte Acosta Isasis*, N° 618, **Exhibit** ■-08, p. 33.

[201] Articles 301(3) and 334 of the Commercial Code, **Exhibit** ■-19, pp. 28, 31, provide, respectively, that (i) the obligations of a corporation (*sociedad anónima*) are guaranteed by its capital and that the liability of the shareholders is limited to the amount of their contribution (shares); and, (ii) that the bankruptcy of the corporation does not entail the bankruptcy of its shareholders.

[202] Organic Law of the Public Administration, art. 29 § 1, **Exhibit** ■-20, p. 12.

**B.**     **My Opinion Is Further Supported by the Fact That the Governing Documents Do Not Qualify as Administrative Contracts, and Therefore Cannot Constitute Contracts of National Interest**

§ 166. Additionally, the Governing Documents cannot be considered Contracts of National Interest because these agreements are not administrative contracts.

§ 167.  Under Venezuelan law, Contracts of National Interest are administrative contracts. This aspect of Venezuelan law was acknowledged by the Full Chamber of the Supreme Tribunal of Justice in the *Banco de Venezuela* case (*see supra* § 98). There, the majority found that a contract concluded by the Republic "is a *public law and national interest contract*, which involves a *public service* to be provided by a private banking institution, acting as an Auxiliary Bank of the Treasury."[203] By affirming that the contract (i) was subject to *Public Law* and (ii) dealt with an activity considered of *public service*, the majority affirmed that the contract at issue was, indeed, an administrative contract. The Dissenting Opinion in that case acknowledged that the Contract of National Interest "between the *National Executive* and the Bank of Venezuela . . .undoubtedly belongs to the category of *administrative or public law contracts*  . . . ."[204]

§ 168. Additionally, Professors Badell Madrid, Brewer-Carías, Farías Mata, and Lares Martínez have affirmed that Contracts of National Interest are administrative contracts.[205]

§ 169. Different legal bodies of the Venezuelan Public Administration, including the Attorney General's Office, have also acknowledged that Contracts of National Interest are

---

[203] *Banco de Venezuela*, N° 760 (emphasis added), **Exhibit** ■**-69**, p. 5.

[204] *Id.*

[205] Allan Randolph Brewer-Carías, *Las Instituciones Fundamentales del Derecho Administrativo y la Jurisprudencia Venezolana* (1964), **Exhibit** ■**-93**, pp. 162–63, 171–72; Luis Henrique Farías Mata, *La Teoría del Contrato Administrativo en la Doctrina, Legislación y Jurisprudencia Venezolanas*, *in* 2 Libro Homenaje al Doctor Eloy Lares Martínez (1981), **Exhibit** ■**-94**, p. 941; Eloy Lares Martínez, *Contratos de Interés Nacional*, *in* 1 Libro Homenaje al Doctor Eloy Lares Martínez (1981), **Exhibit** ■**-65**, p. 117; and Rafael Badell Madrid, *Contratos de Interés Público Nacional*, *in* 19 Revista de Derecho Administrativo (2004), **Exhibit** ■**-95**, p. 67.

On the other hand, Professors Pérez Luciani and Melich-Orsini have opined that Contracts of National Interest are not Administrative Contracts. *See* Pérez Luciani, *Contratos de Interés Nacional*, *supra* note 114, **Exhibit** ■**-63**, p. 152; and Melich-Orsini, *supra* note 182, **Exhibit** ■**-85**, pp. 42–44.

indeed administrative contracts.[206] The National Assembly has itself stated in the May 2016 Resolution that "contracts of public interest that require approval of the National Assembly are a special category of *administrative contracts* . . . ."[207]

§ 170. Considering that Contracts of National Interest are a species of administrative contracts, it must be the case that any Contract of National Interest satisfies the definitional requirements of an administrative contract. If a contract does not meet the requirements of an administrative contract, it therefore cannot qualify as a Contract of National Interest.

§ 171.  Under Venezuelan law, contracts may be characterized as administrative contracts when the Public Administration[208] is a party to the agreement and one of two additional requisites is met: (i) the purpose of the contract must be an activity of "public service" or of "general interest"[209] or (ii) the Public Administration is granted exorbitant decision-making powers derived from the State's sovereign authority (*ius imperium*).[210]  In administrative contracts, the State's sovereign powers grant the Public Administration the authority to, *inter alia*, unilaterally (i) interpret, (ii) modify and even (iii) terminate the

---

[206]  Oficio N° G.G.A.J./C.D.E. 493, *Doctrina de la Procuraduría General de las Repúblicas 2006-2007* (Aug. 7, 2006), **Exhibit** ■-83, pp. 75–76; Farías Mata, *supra* note 205, **Exhibit** ■-94, pp. 941–42; Pérez Luciani, *Contratos de Interés Nacional, supra* note 114, **Exhibit** ■-63, p. 147.

[207]  May 2016 Resolution, Fifth "Whereas" Clause (emphasis added), **Exhibit** ■-82, p. 2.[208] "Public Administration" is a term that, at the National level, encompasses (i) administrative bodies of the Republic (*i.e.*, organs of the Republic without legal personality), (ii) Autonomous Institutes (*i.e.*, entities with legal personality of their own created by law enacted by the Legislature), and (iii) State foundations and corporations owned or controlled, directly or indirectly, by the Republic.

[208]  "Public Administration" is a term that, at the National level, encompasses (i) administrative bodies of the Republic (*i.e.*, organs of the Republic without legal personality), (ii) Autonomous Institutes (*i.e.*, entities with legal personality of their own created by law enacted by the Legislature), and (iii) State foundations and corporations owned or controlled, directly or indirectly, by the Republic.

[209]  Decisions of the Federal Court, (Nov. 12, 1954) ("*Alberto Machado-Conejos Mestizos*"), and of the Political-Administrative Chamber of the Supreme Court of Justice, (June 14, 1983) ("*Acción Comercial*"), *in* Luis Ortiz-Álvarez & Giovanna Mascetti, *Jurisprudencia de Contratos Administrativos (1980-1999)* (1999), **Exhibit** ■-96, pp. 77, 81.

[210]  Decisions of the Political-Administrative Chamber of the Supreme Tribunal of Justice N° 1002, (Aug. 5, 2004) ("*DHL, Zoom, Domesa*"), **Exhibit** ■-97, pp. 27–28, and Decision N° 500, (May 19, 2004) ("*Inversiones y Desarrollo P&R*"), **Exhibit** ■-98, p. 5; Henrique Iribarren Monteverde, *El Equilibrio Económico en los Contratos Administrativos y la Teoría de la Imprevisión, in* 1 Congreso Internacional de Derecho Administrativo en Homenaje al Profesor Luis H. Farías Mata (2006), **Exhibit** ■-99, p. 148.

contract, in order to safeguard the "public service" or the "general interest" entrusted to the Public Administration by law.[211]

§ 172.  Administrative contracts concluded by the Venezuelan Public Administration are subject—mainly or predominantly—to Public Law with regards to their (i) conclusion, (ii) performance and/or (iii) termination, due to their close connection with the general interest or a "public service."[212] This was affirmed in the *Simón Muñoz Armas, et al.* case, in which it was expressly recognized that, for a contract to qualify as an administrative contract: "*it is indispensable that the contracting parties had wanted to submit themselves to a Public Law regime . . . .*"[213] In *Simón Muñoz Armas, et al.*, plaintiffs asked for the judicial review of a Resolution taken by the National Assembly for the purpose of authorizing the model clauses of certain joint venture agreements by PDVSA for the exploration and production of hydrocarbons, arguing that the aforementioned clauses were unconstitutional. These agreements did not concern the issuance of notes, nor were these financing agreements. The Court rejected the judicial claim and added that in the contract authorized by the National Assembly and reviewed by the Court, the parties' conscious and willing decision to submit to a Public Law regime served as the basis for the "binding force" of the provisions of the contract.[214] In this case, a model agreement was approved by the National Assembly after being submitted for review based on Article 5 of the

---

[211]  Citing Eduardo García de Enterría, a well-known and respected Spanish Administrative Law professor and scholar, often mentioned or invoked by Venezuelan courts and authors, Professor Brewer-Carías has called these exorbitant powers "extra-contractual clauses" or provisions outside the Contract, because they derive directly from (general) legal authority granted to the Public Administration as manager of the "public interest." Allan Randolph Brewer-Carías, *La Evolución del Concepto de Contrato Administrativo*, *in* 1 LIBRO HOMENAJE AL PROFESOR ANTONIO MOLES CAUBET (1981), **Exhibit** ■**-100**, p. 63. For example, a work contract entered into by the Republic for the purpose of building a dam designed to generate electricity in Venezuela might qualify as an administrative contract because of the underlying general interest. By contrast, considered by itself a credit agreement would not qualify as an administrative contract, because its purpose is not an activity of general interest.

[212]  Decisions of the Federal Court, (Nov. 12, 1954) ("*Alberto Machado-Conejos Mestizos*"), and of the Political-Administrative Chamber of the Supreme Court of Justice, (June 14, 1983) ("*Acción Comercial*"), *supra* note 209, **Exhibit** ■**-96**, pp. 77, 81.

[213]  Allan Randolph Brewer-Carías, *El Caso de la Apertura Petrolera (Documentos del Juicio de Nulidad Contra la Autorización Parlamentaria para los Convenios de Asociación Petrolera 1996-1999)* ("*Simón Muñoz Armas, et al.*") (2001) (emphasis added), **Exhibit** ■**-101**, p. 314.

[214]  *Id.*

Nationalization Law, which demanded legislative approval of certain joint-venture agreements involving the exploitation of hydrocarbons.

§ 173. The Governing Documents do not satisfy several of the core requirements of administrative contracts, and therefore cannot constitute Contracts of National Interest.

§ 174. *First*, although the agreements were entered into by entities of the Public Administration, namely PDVSA and PDVSA Petróleo, the purpose of these agreements was not an activity of "public service" or "general interest." Rather, the Governing Documents' purpose concerned the exchange of the 2017 Notes for new notes due 2020 secured by an interest in the shares of CITGO Holding, as U.S.-based company.

§ 175. *Second*, PDVSA and PDVSA Petróleo have no sovereign decision-making powers with regard to these agreements.[215] Unlike, for example, the Republic's sovereign power to unilaterally rescind a mining contract to which it is party,[216] PDVSA and PDVSA Petróleo have no power to unilaterally cancel or rescind the Governing Documents, nor is there any such provision in these agreements that would allow PDVSA and PDVSA Petróleo to do so. This fact is apparent from the Plaintiffs' attempt to seek a judicial decision declaring these agreements null and void. Were they administrative contracts, PDVSA and PDVSA Petróleo would possess that power on their own.

§ 176. *Third*, the Governing Documents contain governing law provisions that state that the laws of the State of New York govern the agreements. This choice of law reveals that the Governing Documents are not administrative contracts not only because Administrative Contracts are *ex rerum natura* (from the nature of things) subject—mainly or predominantly—to Venezuelan Public Law (*see supra* § 22), but because of the parties' conscious and explicit will to submit to a completely different legal regime: New York law (*see Simón Muñoz Armas et al.*, *supra* § 172). The Governing Documents are thus wholly distinguishable from PDVSA's joint venture agreements discussed in the *Simón Muñoz*

---

[215]   Typically, decentralized entities in the form of public law—namely, Autonomous Institutes (*Institutos Autónomos*)—are created and governed by public law norms and may exercise sovereign authority (*ius imperium*); on the contrary, State Corporations are created according to the norms of private law and lack the possibility of exercising sovereign authority. Organic Law of the Public Administration, art. 29, **Exhibit ■-20**, p. 12; *see also DHL, Zoom, Domesa*, N° 1002, **Exhibit ■-97**, pp. 27–28; *Inversiones y Desarrollo P&R*, N° 500, **Exhibit ■-98**, p. 5; Henrique Iribarren Monteverde, *supra* note 210, **Exhibit ■-99**, p. 148.

[216]   *Crystallex International Corporation* v. *Venezuela*, ICSID Case N° ARB(AF)/11/2, Award (Apr. 4, 2016), **Exhibit ■-102**, pp. 120–21.

*Armas* case, which required legislative approval prior to contracting. The joint venture agreements in that matter clearly subjected the parties to Venezuelan Public Law. *Simón Muñoz Armas* is also distinguishable because it involved a law requiring legislative approval of certain joint-venture contracts entered into by PDVSA involving the use of hydrocarbons, namely, the Nationalization Law. This law, which was repealed in 2006, is wholly inapplicable to financing agreements or agreements for the issuance of debt.

§ 177. Considering that Contracts of National Interest are a species of administrative contracts, and having concluded that the Governing Documents are not administrative contracts, the consequence is obvious: the Governing Documents (i) cannot be considered to be Contracts of National Interest and (ii) are not subject to the authorization required by Article 150 of the Constitution.

## V.   EVEN IF THE GOVERNING DOCUMENTS WERE FOUND TO BE CONTRACTS OF NATIONAL INTEREST, A VENEZUELAN COURT WOULD LIKELY ENFORCE THE CONTRACTS

§ 178.  As set forth above, it is my opinion that the Indenture and the Pledge Agreement are not Contracts of National Interest, and therefore they did not require National Assembly approval when they were concluded. However, even if a Venezuelan court determined such contracts to be Contracts of National Interest, it is my opinion that a Venezuelan court deciding in accordance with Venezuelan laws would still hold such agreements to be binding and enforceable on PDVSA and PDVSA Petróleo because of an important principle of Venezuelan law: the principle of legitimate expectations. Said principle serves to protect the expectations of counterparties against unfair prejudice in matters dealing with the Public Administration, specifically, and contracts more generally.

### A.   Official Acts of the Public Administration, such as the Indenture and the Pledge Agreement, Are Entitled to the Presumption of Legality Under Venezuelan Law

§ 179. Under Venezuelan law, unilateral decisions taken by the Public Administration acting as an authority—*i.e.*, administrative acts—are presumed to be valid and legitimate.[217] This is known as the presumption of legality. Scholars, both in Venezuela

---

[217]  Decision of the First Contentious-Administrative Court, (June 16, 1983), *in* 15 REVISTA DE DERECHO PÚBLICO (1983), **Exhibit ▪-127,** p. 148; *see also* Allan Randolph Brewer-Carías, *El Derecho*

and abroad, affirm that contracts concluded by the Public Administration—as well as decisions and acts of the Public Administration—are also presumed to be valid and legitimate.[218]

§ 180. The presumption of legality with respect to contracts entered into by the Public Administration stems from the need to avoid legal and administrative uncertainty. Thus, the presumption of legality is applicable to contracts (i) not only because in principle there is no reason to doubt the legality of contracts concluded, but also (ii) because the Venezuelan judicial system would be non-viable if the legality of all acts, such as the entry into a contract, had to be reviewed and certified by a court of justice prior to its execution or performance.[219] In this way, the presumption of legality allows parties to rely upon acts of Public Administrations and make interaction with the Public Administration predictable.

§ 181. Whoever questions the legality of an act issued or of a contract concluded by the Public Administration bears the burden of proof when it comes to demonstrating its illegality before a court of law.[220] Under Venezuelan law, courts may only declare the illegality of an act issued or of a contract concluded by the Public Administration when the evidence provided proves categorically—*i.e.,* creates certainty—that the act or contract being challenged is in fact illegal.[221] Unless and until a party meets this high burden to

---

*Administrativo y la Ley Orgánica de Procedimientos Administrativos*, *in* 16 Colección Estudios Jurídicos (8th ed. 2008), **Exhibit** ▮**-103**, p. 203.

[218] *See, mutatis mutandis,* José Ramón Parada Vásquez, *cited by* Javier Barcelona Llop, *Ejecutividad, Ejecutoriedad y Ejecución Forzosa de los Actos Administrativos* (1995), **Exhibit** ▮**-104**, p. 101. Teachings by both Spanish authors have been invoked in the past by Venezuelan courts. ▮▮

[219] *See, mutatis mutandis,* Parada Vásquez, *supra* note 218, **Exhibit** ▮**-104**, p. 101. Teachings by both Spanish authors have been invoked in the past by Venezuelan courts. ▮▮

[220] Lares Martínez, *Manual de Derecho Administrativo, supra* note 122, **Exhibit** ▮**-66**, pp. 169–71.

[221] Decision of the Civil Cassation Chamber of the Supreme Tribunal of Justice, N° RC.00643 (Oct. 11, 2005), https://vlexvenezuela.com/vid/beatriz-p-rez-mart-nez-villarroel-283387191, **Exhibit** ▮**-105**; Decision of the First Contentious-Administrative Court (June 16, 1983), *in* 15 Revista de Derecho Público (1983), **Exhibit** ▮**-127**, p. 148; Decision of the Political-Administrative Chamber of the Supreme Court of Justice, (Mar. 22, 1982), *in* 10 Revista de Derecho Público (1982), **Exhibit** ▮**-106**, pp. 145–46. According to the first decision, "every administrative act has the formal appearance of full validity and effectiveness; consequently, there is a presumption of legitimacy, a presumption that admits evidence to the contrary, so whoever intends to obtain a

invalidate such contracts (*i.e.*, proves to a court with *certainty* that such contracts are invalid) and a Venezuelan court of law declares the contract concluded by the Public Administration is therefore invalid, said contract must remain in full force and the contracting parties are obliged to perform their obligations in good faith.[222]

§ 182. As discussed above (*see supra* §§ 35–§ 40), PDVSA is a member of the Public Administration, and therefore the acts and contracts concluded by PDVSA are entitled to the presumption of legality. This includes contracts entered into by PDVSA, including the Indenture and the Pledge Agreement. Thus, as a matter of Venezuelan law, given the presumption of legality of the acts of the Public Administration, (i) the Indenture and the Pledge Agreement, as contracts concluded by PDVSA (a member of the Public Administration), must be considered valid and legal, and (ii) the corporate decisions taken by PDVSA and PDVSA Petróleo for the purpose of concluding the Indenture and the Pledge Agreement, must also be considered both (i) true and correct and (ii) valid and legal. This is particularly true given the requirements of Article 150 of the Constitution, upon which PDVSA now relies in order to invalidate the Indenture and the Pledge Agreement, ████████████████████████████████████████████████████████ ████████████████████████.[223]

§ 183. Therefore, if PDVSA were to attempt to invalidate the Indenture and the Pledge Agreement in Venezuelan court, the parties to those agreements seeking enforcement would have the benefit of the presumption of legality, both with respect to the agreements themselves and the representations made therein, and each of PDVSA's acts in furtherance of concluding those agreements. PDVSA would have the burden of proving, not simply with likelihood, but with *certainty*, that the Indenture and Pledge Agreement

---

declaration of nullity in this contentious-administrative jurisdiction, must properly prove the existence of the vices on which his complaint is based." According to the second, "the presumption of legality that protects administrative acts obliges those who intend to enervate their effects, because they consider their rights injured, to produce evidence to the contrary, destroying that presumption."

[222] According to Articles 1159 and 1160 of the Civil Code: (i) "contracts have the force of law between the parties. They cannot be revoked except by mutual consent or for the causes authorized by the Law"; and, (ii) "contracts must be executed in good faith and oblige to comply not only with what is expressed in them, but to all the consequences that derive from the same contracts, according to equity, use or the Law." *Official Gazette* N° 2990 Extraordinary (July 26, 1982), **Exhibit** ██-107, p. 78.

[223] Hogan Memorandum Dated Sept. 21, 2016 (HL_021479), *supra* note 94, **Exhibit** ██-60, pp. 2–3.

were illegitimate. Without exceeding this high bar, a Venezuelan court applying the presumption of legality would find the Indenture and Pledge Agreement enforceable.

### B. Under the Principle of Legitimate Expectations and the Rule of *Venire Contra Factum Proprium Non Valet*, the Governing Documents Are Valid

#### i. The Principle of Legitimate Expectations

§ 184. The Venezuelan legal system protects the legitimate expectations of both individuals and private corporations that may have arisen from their dealings with the Venezuelan Public Administration.[224] Venezuelan courts affirm that as a general principle of Administrative Law, legitimate expectations condition and govern all acts and conduct by the Public Administration, and that parties may rely on reasonable expectations of the Public Administration when engaging with it.[225]

§ 185. The protection of legitimate expectations derives from the principles of legal certainty[226] and good faith.[227] The principle of legitimate expectations finds its foundation in the legal aphorisms *venire contra factum proprium non valet* ("prohibition against going against one's own acts") and *nemo auditur sua turpitudinem allegans*[228] ("no one can be heard to invoke his own turpitude"). Thus, one's legitimate expectations have been violated when actions taken by the Public Administration contradict its previous behavior

---

[224] Hildegard Rondón de Sansó, *El Principio de Confianza Legítima en el Derecho Venezolano*, *in* IV JORNADAS INTERNACIONALES DE DERECHO ADMINISTRATIVO ALLAN RANDOLPH BREWER-CARÍAS (1998), **Exhibit ■-108**, pp. 295–351; Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice N° 514, (Apr. 3, 2001) ("*Coca-Cola*"), **Exhibit ■-109**, pp. 10–11.

[225] Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice N° 1181, (Sept. 28, 2011) ("*Ingenería Pecha*"), **Exhibit ■-110**, p. 27.

[226] In Venezuela, the principle of legal certainty is embedded in the Constitution. Decision of the Political-Administrative Chamber of the Supreme Court N° 686, (Oct. 30, 1997) ("*Luis Enrique Pages*"), **Exhibit ■-111**, pp. 6–7.

[227] Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice N° 1171, (July 3, 2007) ("*Universidad Central de Venezuela*"), **Exhibit ■-112**, p. 23; Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice N° 213, (Feb. 18, 2009) ("*La Oriental de Seguros*"), **Exhibit ■-113**, p. 11.

[228] Decision of the Electoral Chamber of the Supreme Tribunal of Justice N° 98, (Aug. 1, 2001) ("*Club Campestre Paracotos*"), **Exhibit ■-114**, p. 30 ("[N]o one can claim their own clumsiness.")

or statements[229] in a manner that prejudices that party because the Public Administration has the duty to act coherently, *i.e.*, without ambiguity. Indeed, actions taken by the Public Administration should give individuals and private corporations the ability to predict or foresee the future behavior of the former and, consequently, be able to act on the confidence derived from the Public Administration's previous conduct.[230]

§ 186.  Under Venezuelan law, the principle of legitimate expectations may arise from acts or conduct of the Public Administration and, therefore, applies to contracts entered into by the Public Administration. Indeed, Venezuela's Supreme Tribunal of Justice has affirmed that:

> [R]egarding the scope of application of the principle of legitimate expectations in Administrative Law, said principle is not limited to formal actions, rather it applies to a wide range of the Public Administration's behaviors, such as: formal unilateral or contractual agreements; promises, administrative doctrine; information and interpretations; factual behaviors that make one expect an action from the Public Administration in a specific case; usage, customs or unwritten rules . . . .[231]

§ 187. In other words, legitimate expectations are protected whenever the Public Administration (i) acts as an authority and issues an administrative act; or (ii) enters into a contractual relationship.[232]

§ 188.  Significantly, the principle of legitimate expectations has been used by Venezuelan courts to dismiss arguments made by a party when said arguments are in contradiction with the party's previous conduct. For example, in the *Coca-Cola Company* ("*Coca-Cola*") case, Coca-Cola asked the Supreme Tribunal of Justice to declare null and void an

---

[229] Caterina Balasso Tejera, *El Principio de Protección de la Confianza Legítima y su Aplicabilidad Respecto de los Ámbitos de Actuación del Poder Público*, *in* 100 REVISTA DE DERECHO PÚBLICO (2006), **Exhibit ▮-115**, p. 745.

[230] *See, mutatis mutandis*, Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 1252 (June 30, 2004) ("*José Andrés Romero*"), **Exhibit ▮-116**, p. 6.

[231] *Club Campestre Paracotos*, N° 98, **Exhibit ▮-114**, p. 31.

[232] *Id.*; José Ignacio Hernández González, *Contratos de la Administración y Contencioso Administrativo*, *in* VIII JORNADAS INTERNACIONALES DE DERECHO ADMINISTRATIVO ALLAN RANDOLPH BREWER-CARÍAS (2005), **Exhibit ▮-117**, p. 500; 4 Allan Randolph Brewer-Carías, *Tratado de Derecho Administrativo* (2013), **Exhibit ▮-129**, pp. 239–41.

66

administrative decision by virtue of which the Ministry for Development had denied a request for registration of Coca-Cola's trademark.[233] Coca-Cola argued that in precedent cases the Ministry had applied specific criteria in order to approve similar requests and that a sudden change of said criteria would violate Coca-Cola's legitimate expectations. The Supreme Tribunal of Justice found that the Ministry's decision had violated Coca-Cola's legitimate expectations because it had departed from the criteria used in similar cases and, consequently, declared the decision null and void.

§ 189.  Similarly, in the *Universidad Central de Venezuela* ("*UCV*") case, a commercial firm, Repro Sportny, filed a complaint against UCV, a public university (and, as such, part of the Venezuelan Public Administration).[234] Repro Sportny demanded payment due under a contract where UCV had placed an urgent order to buy sport uniforms, Repro Sportny had fulfilled its obligations and delivered the uniforms under said order, and the uniforms were then used by UCV's athletes. After receiving the uniforms, UCV refused to pay, arguing that procedures for the conclusion of its contracts had not been followed. The Supreme Tribunal of Justice ruled that UCV had to make the payment demanded because, despite the lack of compliance with the internal rules invoked by UCV, Repro Sportny had a legitimate expectation to receive said payment.

§ 190.  Legitimate expectations may arise from the previous interpretation of Venezuelan laws made by the contracting parties (in the case at hand, the reading and interpretation that the contracting parties had made of Article 150 of the Constitution[235] based on or relying on, among other legal authorities, *Andrés Velásquez et al.* (2002), *Attorney General of*

---

[233]  *Coca-Cola*, N° 514, **Exhibit ▆-109**, pp. 10–11.

[234]  *Universidad Central de Venezuela*, N° 1171, **Exhibit ▆-112**, pp. 20–23.

[235]  *Club Campestre Paracotos*, N° 98, **Exhibit ▆-114**, p. 31.

the Republic II (2007), *Brigitte Acosta Isasis* (2016),[236] and the May 2016 Resolution,[237] as well as the ▮▮▮▮▮▮▮▮▮).

§ 191.  As I have previously stated, PDVSA and PDVSA Petróleo are State Corporation (*see supra* §§ 34–§ 42). As such, they are part of the National Public Administration. Being part of the National Public Administration, their conduct is governed by the principle of legitimate expectations.

§ 192.  Furthermore, authorizations and approvals of Contracts of National Interest by the National Assembly are considered administrative in nature.[238] Because of this, Venezuelan scholars have affirmed that the principle of legitimate expectations governs the conduct of the Legislature when it authorizes or approves Contracts of National Interest.[239]

---

[236]  *Andrés Velásquez et al.* (2002), *Attorney General of the Republic II* (2007), and *Brigitte Acosta Isasis* (2016), and the cases before them, represent a stable and coherent line of jurisprudence. An unforeseen and unjustified change of the criteria set by those cases would violate the principle of legitimate expectations of the Defendants who had relied in good faith: (i) directly, on the representations made in said documents; and (ii) indirectly, on the legal interpretation of Article 150 of the Constitution by the Constitutional Chamber on which the aforementioned representations relied. Regarding legitimate expectations and judicial activity. *See, mutatis mutandis*, Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 1490, (July 13, 2007) ("*Telcel*"), **Exhibit** ▮-118, pp. 23–24.

[237]  Quoting Lee C. Buchheit and Mitu Gulati, Professor Hernández González has affirmed that, if confronted with a claim of nullity, creditors "may claim that they acted in good faith, protected by rulings and decisions of legitimate authorities, even when there are doubts as to the violation of the Constitution. Finally, in Venezuela it has been admitted, for some time now, that in case of debts and illegal contracts," the Republic must honor the debt in order "to avoid enrichment without cause, which it would prevent ignoring all the debt issued in violation of the Constitution." José Ignacio Hernández González, *¿Es Legítima la Deuda Pública Venezolana?*, Prodavinci (Aug. 28, 2017), **Exhibit** ▮-119, p. 4.

[238]  *Banco de Venezuela*, N° 760 (Dissenting Opinion by Justices Padilla, Duque Sánchez, Monsalve Casado, Rosales, Urbaneja Achelpohl, Toro and Lares Martínez), **Exhibit** ▮-69, p. 12; *see also, mutatis mutandis*, Brewer-Carías, *Derecho Administrativo*, *supra* note 49, **Exhibit** ▮-39, pp. 84, 92; 3 Brewer-Carías, *supra* note 188, **Exhibit** ▮-86, p. 636.

[239]  Hildegard Rondón de Sansó, *Visión General del Principio de Expectativa Plausible*, *in* 141 Boletín de la Academia de Ciencias Políticas y Sociales (2003), **Exhibit** ▮-120, p. 337; Brewer-Carías, *Derecho Administrativo*, *supra* note 49, **Exhibit** ▮-39, p. 84.

### C.  Plaintiffs' Current Lawsuit Violates the Principle of Legitimate Expectations

§ 193.  As discussed above (*see supra* §§ 7–§ 8), according to the Lawsuit, the Indenture, the Pledge Agreement, and the 2020 Notes are null and void *ab initio*, because they were not authorized by the National Assembly and were concluded, therefore, in violation of the Venezuelan Constitution.[240]

§ 194.  The aforementioned allegations openly contradict (i) the letter of the Indenture and the Pledge Agreement and the representations made by PDVSA and PDVSA Petróleo therein, as well as ███████████████████████████████████████████████ ████████████████████████████████████████████████

§ 195.  Indeed, according to the text of the Indenture and the Pledge Agreement, PDVSA and PDVSA Petróleo represented that all legal requirements established by Venezuelan law for the validity of those agreements were duly met (*see supra* §§ 67–§ 69). For instance, within the Indenture and Pledge Agreement:

   a.  PDVSA represented that "all things necessary [(i)] to make this Indenture a valid agreement of [PDVSA]" and (ii) to "make the [2020] Notes . . . valid obligations of [PDVSA] as hereinafter provided" had been done;[241]

   b.  PDV Holding represented, among other things, that it "ha[d] full power and authority, and all governmental licenses, authorizations, consents and approvals, to execute and deliver [the Pledge Agreement] . . . and perform its obligations thereunder;"[242] and

   c.  All parties represented that they intended the Indenture and Pledge Agreement to be governed by and subject to New York law (*see supra* §§ 64–66).

§ 196.  ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████

---

[240]  Lawsuit, §§ 74, 83, 85, 94.

[241]  Indenture, Second "Whereas" Clause (HL_002709), **Exhibit ██-02**, p. 1.

[242]  Pledge Agreement, § 3.01(b), (ASH_00009011), **Exhibit ██-04**, p. 9.



§ 197. Moreover, these statements contradict the dual opinions issued by PDVSA's lawyers advising on the Indenture and the Pledge Agreement in the Caracas and New York offices of Hogan Lovells. Hogan Lovells concluded that:

a. PDVSA and PDVSA Petróleo had the corporate power and authority to take all necessary corporate action to authorize the Exchange, the issuance of the Notes and to execute, deliver, and perform the transaction;[246]

b. The issuance of the 2020 Notes and the execution, delivery, and performance of the Indenture and Pledge Agreement were within PDVSA and PDVSA Petróleo's respective corporate powers and were authorized by all necessary corporate action;[247] and

c. The Indenture and Pledge Agreement had been duly executed and delivered and were legal, valid, and binding obligations on all parties, as applicable, under New York State law, enforceable against PDVSA and PDVSA Petróleo in accordance with their terms.[248]

§ 198. The Lawsuit alleges that the Indenture and the Pledge Agreement are Contracts of National Interest, and as such, required approval in advance by the National Assembly. These allegations directly contradict the previous and express representations made by Plaintiffs PDVSA (acting as Issuer), PDVSA Petróleo (acting as Guarantor), PDV Holding,

---

[243]   Hogan Memorandum Dated Sept. 21, 2016 (HL_021479), *supra* note 94 (emphasis added), **Exhibit** ▇**-60**, p. 4.

[244]   *Id.* at p. 2.

[245]   *Id.* at p. 3.

[246]   Hogan (Caracas) Opinion Letter Dated Oct. 28, 2016 (HL_011111), **Exhibit** ▇**-61**, p. 4.

[247]   *Id.*

[248]   Hogan (NY) Opinion Letter Dated Oct. 28, 2016 (HL_011091), **Exhibit** ▇ **62**, p. 5.

Inc. (acting as Pledgor), and PDVSA's New York and Venezuelan legal counsel, that the parties had obtained all necessary approvals for the transaction, and that the transaction was otherwise legal and valid. Plaintiffs allegations to the contrary violate the well-established principle of legitimate expectations.

§ 199.  The allegations in the Lawsuit also violate the legitimate expectations of the parties because all parties, including PDVSA and PDVSA Petróleo, agreed that the Indenture and Pledge Agreement would be governed exclusively by New York law. By arguing that the Indenture and Pledge Agreements are Contracts of National Interest, PDVSA and PDVSA Petróleo must implicitly argue that these agreements are also subject mainly or predominantly to Venezuelan Public Law (a requirement of every Contract of National Interest, *see supra* §§ 167,§ 176), and not New York law as previously agreed.[249] This reversal on the clear terms of the Indenture and Pledge Agreement also represents a violation of the principle of legitimate expectations of the parties.

§ 200.  Under Venezuelan law, the general rule is that laws are considered to be known by all parties on the date they are published in the Official Gazette of the Republic (Article 1° of the Venezuelan Civil Code) ("Civil Code"). As such, the laws are applicable to all, including the State, individuals, and private corporations, starting on the date of publication.[250] Accordingly, when PDVSA declared in the Indenture that "all things necessary [(i)] to make the Indenture a valid agreement" and (ii) "to make the [2020] Notes, when executed by the Issuer and authenticated and delivered by the Trustee and duly issued by the Issuer, valid obligations of the Issuer" have been done, ███████████

████████████████████████████████████████[251] Under Venezuelan law, no one may claim ignorance of the law in order to excuse compliance with it (Article 2° of the Civil Code).[252] Our highest court has established that:

---

[249] This observation is also significant because the choice of law provision agreed to by Plaintiffs at the time of the Indenture and the Pledge Agreement indicates they did not intend at the time to be entering into a Contract of National Interest.

[250] Civil Code, art. 1, **Exhibit ██-107**, p. 17; *see also* Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 1358, (Aug. 13, 2008) ("*Defensor del Pueblo*"), **Exhibit ██-121**, p. 9; Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 1674, (July 18, 2002) ("*Jesús Salvador Rendón Carrillo*"), **Exhibit ██-122**, pp. 6–7.

[251] Indenture, Second "Whereas" Clause (HL_002709), **Exhibit ██-02**, p. 1; Hogan Memorandum Dated Sept. 21, 2016 (HL_021479), *supra* note 94, **Exhibit ██60**, pp. 2–3.

[252] Civil Code, art. 2, **Exhibit ██-107**, p. 17.

[N]o one can allege in his defense his own ignorance [of the laws], as determined by the Latin principle "*Ignorantia Iuris Neminem Excusat*" or "*Ignorantia Legis Non Excusat*" . . . .[253]

### D. The Lawsuit Is Inconsistent with the National Assembly's May 2016 Resolution, Thereby Violating the Principle of Legitimate Expectations

§ 201.  The definition of Contracts of National Interest used by the National Assembly in its May 2016 Resolution further gainsays the allegations set out in the Lawsuit (*see supra* §§ 7–§ 8). The wording used by the May 2016 Resolution—and, therefore, its scope—is undoubtedly clear and simple: according to the National Assembly, Contracts of National Interest are those entered into by the National Executive—*i.e.*, by the competent administrative bodies of a specific legal entity: the Republic (*see supra* §§ 93–§ 128). By circumscribing Contracts of National Interest to contracts concluded by the Republic through the National Executive, the National Assembly recognized that the Republic has to be a party to Contracts of National Interest.[254]

§ 202.  Contradicting the terms of the May 2016 Resolution, the Lawsuit has attempted to widen the definition of Contracts of National Interest to encompass contracts entered into by State Corporations. Certainly, by substituting the term *National Executive*—employed in the May 2016 Resolution and meaning administrative bodies of the highest hierarchy of the Republic (*inter alia*, the Presidency of the Republic, Executive Vice Presidency of the Republic, and Ministries)—with the term *National Public Administration*, which encompasses a variety of public entities other than the Republic, the Lawsuit departs from the letter and intent of the May 2016 Resolution.

§ 203.  According to this new and expanded definition proffered within the Lawsuit, contracts entered into by the National Public Administration, including State Corporations, should have been authorized in advance by the National Assembly.[255] The aforementioned contradiction between the explicit terms of the May 2016 Resolution, where no authorization is required, and the allegations in the Lawsuit, where such

---

[253]  Decision of the Civil Cassation Chamber of the Supreme Tribunal of Justice N° 25, (Feb. 10, 2009) ("*Materiales Salerno*"), **Exhibit** ▮**-123**, p. 5.

[254]  *See* Resolution on the Current Financial Situation of Petróleos de Venezuela, S.A. (Sept. 27, 2016) ("New Resolution"), **Exhibit** ▮**-124**.

[255]  Lawsuit, §§74, 85.

authorization is purportedly required, is incompatible with the principle of legitimate expectations.

### E. The National Assembly's September 27, 2016 Resolution, On Which Plaintiffs Rely, Is Inconsistent with Supreme Tribunal Precedent

§ 204. On September 27, 2016, after the announcement of the Indenture and Pledge Agreement, but before conclusion of those agreements, the National Assembly issued a resolution (the "New Resolution"),[256] wherein it:

a. Expressed concern over the amount of debt in which PDVSA had incurred over the years (Fourth "Whereas" Clause);[257]

b. Rejected PDVSA's offering as collateral "50.1% of the shares that make up the capital stock of CITGO Holding Inc." in the exchange offer that PDVSA was extending to its bondholders (Second "Decision"). As seen, the rejection in question revolves around CITGO Holding Inc.'s shares being offered as collateral;[258] and

c. Urged the Public Prosecutor to open an inquiry to determine if the exchange offer protected the assets of the Nation in accordance with, *inter alia*, Article 187(9) of the Constitution (Third "Decision").[259]

§ 205. At most, this New Resolution registered disagreement with the Exchange Offer. The New Resolution notably did not declare that the Exchange Offer or the Governing Documents were unconstitutional or would be void *ab initio*; or even cite Article 150 of the Constitution. In any event, the National Assembly does not have the authority to declare the nullity of a contract on those constitutional grounds; such a decision could only be taken by a court of law.

§ 206. Even assuming that the New Resolution *did* declare that the Exchange Offer was illegal (which it plainly does not), the National Assembly disregarded several key legal precedents in its New Resolution, each of which would violate the principle of legitimate expectations. For instance, the New Resolution cites as justification for its objection to the Pledge Agreement that PDVSA "is a highly indebted entity" and that its prior dealings

---

[256] New Resolution, **Exhibit ▉-124**, p. 3.

[257] *Id.* at 3.

[258] *Id.* at p. 4.

[259] *Id.*

have "significantly compromise[d] the liquidity of the company." The resolution also cites the fact that security was pledged for the transaction, and that, in particular, shares of CITGO Holding were pledged.

§ 207.  To the extent the New Resolution set forth a theory that the prior indebtedness of an entity relates to whether a certain contract is a Contract of National Interest, it was novel and, in any event, had not been formally included in a law at the time the Pledge and the Indenture were concluded.

§ 208.  Likewise, Venezuelan Courts have never ruled that having collateral transforms a regular financing arrangement into a Contract of National Interest.[260] In the case of CITGO Holding shares, in particular, this argument is of little weight, as creditors would still have had the right to pursue the CITGO Holding shares in the event PDVSA defaulted on the 2020 Notes, even if the 2020 Notes were not secured by a pledge of CITGO Holding's shares. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Creditors of CITGO Holding would have the right to pursue these assets and interests in CITGO in the event of default.

§ 209.  Given that the New Resolution contradicts the May 2016 Resolution and was not founded on *reasonable legal grounds*—was not founded, *i.e.*, *on rational legal terms*[261]—the New Resolution is contrary to the principles of legitimate expectations, and a Venezuelan Court would likely consider these inconsistencies and find that PDVSA and PDVSA Petróleo cannot escape their obligations to contracting parties under Venezuelan law.

---

[260]  The collateral being offered in a specific transaction would only make a difference if it (i) belongs to the Republic itself and, therefore, (ii) may have a direct adverse impact on the Republic's patrimony.

[261]  4 Brewer-Carías, *supra* note 232, **Exhibit ██-129**, pp. 239–41.

F.      **The Plaintiffs' Lawsuit Is Inconsistent with Past Practice, Thereby Violating the Principle of Legitimate Expectations**

§ 210.  The Lawsuit is also inconsistent with (i) the way in which PDVSA had conducted itself in the past when entering into financial transactions; and (ii) the Legislature's prior and historic stances on PDVSA's Public Debt.

§ 211.  I understand that in the past, PDVSA has issued Public Debt without prior authorization by the National Assembly. The undisputed fact that: (i) authorizations and approvals of Contracts of National Interest by the National Assembly are considered administrative in nature, and (ii) the National Assembly had not approved prior Public Debt by PDVSA under Article 150 must be construed in light of the principle of legitimate expectations.

§ 212.  As set forth in sections § 55–§ 58, *supra*, prior to 2017, PDVSA had issued Public Debt on several occasions. In each issuance, neither the issuer nor the National Executive ever asked the National Assembly to authorize the Public Debt being issued by PDVSA.[262]

§ 213.  As discussed above, counsel for the Defendants has informed me that PDVSA and its subsidiaries have incurred debt and sold or encumbered assets on numerous occasions. Counsel informs me that PDVSA's subsidiaries, including PDV Holding, PDVSA Petróleo, and entities owned by those subsidiaries, including CITGO Holding, have similarly participated in debt issuances, ███████████████████.

§ 214.  In each such sale or transaction, I am aware of no suggestion by the Legislature that National Assembly approval was ever required, and I have found no indication that the National Assembly's approval was sought or obtained by PDVSA or any of its subsidiaries.

---

[262] The National Assembly has addressed certain transactions involving PDVSA. From my review, these transactions were ones in which PDVSA was participating in joint ventures, profit-sharing projects, joint operating agreements, association agreements or mixed company agreements (*empresas mixtas*) involving exploration or, exploitation of hydrocarbons in Venezuela pursuant to Article 5 of the Nationalization Agreement and Article 33 of the Hydrocarbons Law, **Exhibit ██-40**. Under Venezuelan law, hydrocarbon reservoirs are owned by the Republic and exploration and exploitation activities are reserved to the Venezuelan state, directly or through State Corporations. In contrast, in the instruments reviewed I did not find language showing that such an approval was requested and/or granted to debt instruments issued by PDVSA.

75

§ 215.  Secondary sources reporting on PDVSA's past debt practices have noted that:

> [I]t is not unusual for PDVSA bonds to be issued without legislative approval. On the contrary, what would have been highly unusual would have been for the [2020] bond to have been sent to the National Assembly for its approval. No PDVSA bond has ever been sent to the National Assembly for its approval.[263]

§ 216.  I concur with this conclusion. I, along with an associate of mine under my direct supervision, have reviewed several securities filings by PDVSA and certain key subsidiaries and have found no evidence of any of PDVSA's past debt transactions receiving National Assembly approval.[264]

§ 217.  I have found the same is true regardless of whether PDVSA's past debt involved a pledge or sale of its assets.[265] For example, in 2013, PDVSA signed several financing agreements under which foreign partners would lend funds for joint ventures with PDVSA if the loan could be repaid with the joint venture's production, *i.e.*, "effectively guaranteeing the loan on the country's export revenues."[266]

§ 218.  PDVSA also secured its loans against future oil productions, including with Rosneft, to the best of my knowledge without prior approval by the National Assembly.[267]

§ 219.  The only example I am aware of in which PDVSA's agreements underwent some form of Legislative approval is an agreement with the National Development Bank BANDES, but that was approved only through a *bilateral treaty* between the Venezuelan and Chinese governments, which served only as a framework for the loans, and included

---

[263]  Rodríguez & De Lima, *Law & Order*, *supra* note 74, **Exhibit ▉-52**, p. 3, *accord The Invention of History-Truth and Fiction in Accounts of the PDVSA Exchange Discussion*, Venezuela Weekly (Nov. 4, 2019), **Exhibit ▉-128**, p. 6.

[264]   . *See* Dep. Tr. of Mr. Luis Pacheco (Mar. 5, 2020), **Exhibit ▉-14**, pp. 94:21–96:6; ▉▉▉▉▉▉▉

[265]  Rodríguez & De Lima, *Law & Order*, *supra* note 74, **Exhibit ▉-52**, pp. 7–8.

[266]  *Id.* at p. 7.

[267]  *Id.*

direct commitments from the Republic.[268] The loan agreements themselves were never submitted for review and approval by the National Assembly.[269] Consistent with this historical practice, I found no evidence that PDVSA sought approval to issue the original notes that would have reached maturity in April and November 2017 that were exchanged for the 2020 Notes in 2016.

§ 220. Likewise, I am aware of no instance in which CITGO Holding or CITGO have issued debt with National Assembly approval.



§ 221. These transactions show that: (i) the way in which the Indenture and the Pledge Agreement were concluded was consistent with PDVSA and its affiliates' prior conduct; and (ii) that said prior conduct gave rise to legitimate expectations because it was premised on an interpretation of Article 150 of the Constitution, according to which secured and unsecured debt by PDVSA and its affiliates did not require prior authorization by the Legislature.

§ 222. I, along with an associate of mine under my direct supervision, have also reviewed the Official Gazettes of the Republic from 1975 to present and have found no evidence of PDVSA's debt transactions having received National Assembly approval in the past. It has been common practice for the Legislature to publish relevant resolutions approving transactions in the Official Gazette of the Republic, although there is no requirement to

---

[268] The approval of international treaties is regulated by Article 187(18) of the Constitution, **Exhibit** ▮**-32**, p. 28. According to said constitutional provision, the National Assembly has the power to "approve by law the treaties and international agreements concluded by the National Executive. . . ." *Id.*

[269] Rodríguez & De Lima, *Law & Order*, *supra* note 73, **Exhibit** ▮**-52**, pp. 7–8.

[270] *Id.* at p. 8.

[271] *Id.*

[272] *Id.*

do so. I view the lack of any resolutions in the Official Gazette of the Republic as additional evidence that it is unlikely that PDVSA's past debt transactions were approved by the National Assembly. Additionally, I have reviewed a transcript of a hearing in this matter where counsel for Plaintiffs admitted that the National Executive had not asked the National Assembly to authorize prior public debt issued by PDVSA in the past,[273] ■

§ 223.  In light of the above, a Venezuelan Court would likely consider the past practices of PDVSA and PDVSA Petróleo when determining the legitimate expectations of these parties when entering into the Indenture and Pledge Agreement.

§ 224.  I am aware that Plaintiffs have attempted to broadly differentiate PDVSA's prior transactions from the instant analysis by claiming that this case involves a pledge of CITGO Holding's share of CITGO, thereby placing PDVSA's ownership of CITGO at risk. That contention, however, is unavailing for several reasons.

§ 225.  *First*, as raised above, other transactions have involved a pledge of CITGO's ownership, including transactions undertaken with the current *Ad Hoc* Board of PDVSA. None of these transactions has, to my knowledge, required or involved National Assembly approval.

§ 226.  *Second*, Venezuelan Courts have never ruled that having collateral transforms a regular financing arrangement into a Contract of National Interest, and, hence, demands prior authorization by the Legislature. I am similarly unaware of any precedent that suggests that PDVSA would be required to seek National Assembly approval simply because it has pledged a "significant" asset. There is no authority to that effect. The collateral being offered in a specific transaction would only make a difference if it (i) belongs to the Republic itself and, therefore, (ii) may have a direct adverse impact on the Republic's assets and liabilities. Instead, the Republic must first and foremost be a party to the transaction and the additional criteria of *Andrés Velásquez et al.* must be satisfied.

---

[273] Hr'g Tr., Nov. 8, 2019, ECF No. 31, **Exhibit** ■**-125**, pp. 13–14.

[274] ■

■ **Exhibit** ■**-53**, pp. 193:16–22; 194:23–195:23; 196:11–14; 198:5–23; *id.* 167:7–25; 170:11–16; 173:11-22.

§ 227.  *Finally*, the premise that the 2016 Exchange is characteristically different from other historical PDVSA transactions because this transaction was secured by shares of CITGO (and therefore places the ownership of CITGO at risk) is fundamentally flawed. As discussed above, CITGO Holding is a wholly owned subsidiary of PDV Holding, which in turn is a wholly owned subsidiary of PDVSA. Under Venezuelan law, PDVSA's assets—all of them—are part of the common pledge, *i.e.*, the common guarantee, available to all creditors.[275] Absent the existing pledge over the shares of PDV Holding Inc., PDVSA's creditors, including the holders of the 2020 Notes, would have had the right to seize and acquire said shares had PDVSA defaulted on its obligations, because, as stated, PDVSA's assets are part of the common pledge available to all of its creditors. The pledge of CITGO Holding shares, therefore, does not impact the risk of loss of control of CITGO. Rather, it addresses the rights of priority of PDVSA's creditors with respect to that asset.

§ 228.  Thus, a Venezuelan court taking each of these factors into account when evaluating Plaintiffs' arguments would likely enforce the Indenture and the Pledge Agreement, consistent with the legitimate expectations of the parties.

## VI.  CONCLUSION

§ 229.  In summary, it is my conclusion that the Governing Documents are not Contracts of National Interest.

§ 230.  I have come to this conclusion after a thoughtful examination of the Constitution, the Constitutional Chamber's precedent, and other relevant law. I base this conclusion on two main considerations: (i) the Governing Documents are not Contracts of National Interest because the Republic is not a party to any of the Governing Documents; and (ii) at least two of the Constitutional Chamber's additional criteria for Contracts of National Interest, as set out in *Andrés Velásquez et al.*, are not met with regard to the Governing Documents.

§ 231.  My opinion that the Governing Documents are not Contracts of National Interest is further reinforced by two additional considerations: (i) the National Assembly has established a statutory procedure for Financing Agreements for Public Debt, and PDVSA

---

[275]  Article 1864 of the Civil Code, **Exhibit ■-107**, p. 112, states: "The debtor's assets are the common pledge of his creditors, who have in them an equal right, if there are no legitimate causes of preference. Legitimate causes of preference are privileges and mortgages." According to the legal rule, creditors may enforce their credit right on the debtor's assets. The "privileges" to which Article 1864 refers include pledges (*see* Article 1871 of the Civil Code, **Exhibit ■-107**, p. 113).

is specifically exempted from National Assembly approval generally required by statute for Public Debt; and (ii) under Venezuelan law, Contracts of National Interest are considered administrative contracts, which are governed—mainly or predominantly—by Venezuelan Public Law, but the parties willingly submitted the Governing Documents to New York laws and not to Venezuelan Public Law, and, furthermore, the Plaintiffs do not possess, or even attempt to invoke with regards to the Governing Documents, the sovereign powers associated with administrative contracts.

§ 232. I further conclude that, even if it were found that the Governing Documents were Contracts of National Interest—they are not—Venezuelan courts deciding in accordance with Venezuelan laws would still enforce these contracts under the principle of legitimate expectations. Pursuant to this principle, Venezuelan courts have not hesitated to ratify the obligations arising from a contract in which the Public Administration is a contracting party and honor the legitimate expectations of its counterparties, even in instances where required contracting procedures were not followed by the Public Administration. Here, the Lawsuit is inconsistent with the Governing Documents and the past conduct of the Plaintiffs of entering into debt transactions without the approval by the National Assembly. I have found no indication that the National Assembly's approval was ever sought or obtained by PDVSA or any of its subsidiaries for debt transactions (and PDVSA has admitted as much), and, prior to the current case, no suggestion by the National Assembly that such approval would be required.