# Exhibit 3

CONFIDENTIAL

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

---

*Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc.,*
**Plaintiffs**

**v.**

*MUFG Union Bank, N.A. and GLAS Americas, LLC,*
**Defendants**

**19 Civ. No. 10023-KPF**

---

█████████████████████

**In Response to the Expert Report of Allan Randolph Brewer-Carías**

**May 1, 2020**

<u>TABLE OF CONTENTS</u>

Academic Background .................................................................................. 1

Purpose of This Report ............................................................................... 1

Executive Summary ..................................................................................... 1

Expert Report ............................................................................................... 5

I.   PROFESSOR BREWER-CARÍAS'S OPINION THAT THE GOVERNING
     DOCUMENTS ARE CONTRACTS OF NATIONAL INTEREST IS
     CONTRADICTED BY THE CONSTITUTIONAL CHAMBER'S BINDING
     PRECEDENT AND HIS OWN WRITINGS ..................................................... 6

     A.   *Andrés Velásquez et al.* Expressly Held That Contracts of National
          Interest Are Only Those to Which the Republic Is a Party ........................ 7

     B.   *Andrés Velásquez et al.* Constitutes Legally Binding Precedent ................... 13

     C.   *Brigitte Acosta Isasis* Follows *Andrés Velásquez et al.* and Is Binding
          Venezuelan Law ........................................................................... 16

     D.   ███████████████████████████████████████████
          ████████████████████████████ ..................... 20

II.  PROFESSOR BREWER-CARÍAS'S INTERPRETATION OF ARTICLE 150 OF
     THE CONSTITUTION CANNOT BE RECONCILED WITH THE PLAIN
     TEXT OF ARTICLES 187(9) AND 236(14) OF THE CONSTITUTION ................. 24

     A.   Professor Brewer-Carías's Role as Drafter of Articles 150 and 151 of
          the Constitution ............................................................................ 24

     B.   Article 187(3) of the Constitution Does Not Grant the National
          Assembly Power to Approve Contracts Concluded by PDVSA and Its
          Subsidiaries, Let Alone the Entirety of the National Public
          Administration ............................................................................. 26

     C.   The Administrative Attachment of PDVSA to the Ministry of
          Petroleum Reaffirms the Nature of PDVSA as an Entity Distinct and
          Separate from the Republic ............................................................. 28

III. PROFESSOR BREWER-CARÍAS'S CONCLUSION THAT ANY CONTRACT
     ENTERED INTO BY A DECENTRALIZED ENTITY WITHIN THE PUBLIC

i

ADMINISTRATION IS A PUBLIC INTEREST CONTRACT IS NOT
SHARED BY PROMINENT VENEZUELAN SCHOLARS AND IS
INCONSISTENT WITH PDVSA'S PRIOR DEBT PRACTICES .............................30

IV.   UNLIKE THE CONSTITUTIONAL CHAMBER'S DECISION IN *ANDRÉS
VELÁSQUEZ ET AL.*, THE NATIONAL ASSEMBLY RESOLUTIONS
INVOKED BY PROFESSOR BREWER-CARÍAS ARE NOT BINDING LAW ...... 32

   A.   National Assembly Resolutions Cannot Supersede the Constitutional
        Chamber's Interpretation of the Constitution and Venezuelan Law,
        and Do Not Have the Effect of Law .............................................................33

   B.   National Assembly Resolutions Are Not Laws and Are Insufficient
        Acts for the Purpose of Determining Whether a Contract Is a Contract
        of National Interest ..................................................................................34

   C.   The Resolutions on Which Professor Brewer-Carías Relies Do Not
        Support His Arguments ...........................................................................37

        1.   The May 2016 Resolution ....................................................................37

        2.   The September 2016 Resolution .........................................................38

        3.   The October 2019 Resolution..............................................................40

V.    THE CONTENTION THAT CONTRACTS OF NATIONAL INTEREST MAY
BE ENTERED INTO BY THE PUBLIC ADMINISTRATION, EVEN WHERE
THE REPUBLIC IS NOT A PARTY, UNDERMINES THE PUBLIC POLICY
OF THE EXEMPTION IN THE FINANCIAL ADMINISTRATION LAW ...........42

   A.   The Exemption of PDVSA's Public Credit Agreements from Prior
        National Assembly Approval .....................................................................42

   B.   The Prohibitions on Pledges of Public Assets Contained in Articles
        104 and 105 of the Financial Administration Law Do Not Apply to
        PDVSA and Its Subsidiaries .....................................................................43

VI.   THE MAGNITUDE OR IMPACT OF A TRANSACTION IS NOT A VALID
CRITERION OF CONTRACTS OF NATIONAL INTEREST ..................................46

VII.  UNDER THE PRINCIPLE OF CONGRUENT FORMS, PDVSA'S PAST
PRACTICE OF ACQUIRING LARGE ASSETS WITHOUT LEGISLATIVE

APPROVAL SHOWS NO APPROVAL WAS NECESSARY FOR THE
PLEDGE ........................................................................................................... 47

VIII.  THE GOVERNING DOCUMENTS CANNOT BE CHARACTERIZED AS
CONTRACTS OF NATIONAL INTEREST BECAUSE THEIR
OBLIGATIONS ARE TO BE FULFILLED OUTSIDE OF VENEZUELA ............... 50

IX.  PROFESSOR BREWER-CARÍAS ACKNOWLEDGES THAT CONTRACTS
OF NATIONAL INTEREST ARE ADMINISTRATIVE CONTRACTS, BUT
DOES NOT CONSIDER THE LEGAL CONSEQUENCES OF THAT
CIRCUMSTANCE ........................................................................................... 51

X.  PUBLIC ORDER AND THE PRINCIPLE OF LEGITIMATE EXPECTATIONS ..... 52

A.  Article 150 of the Constitution Contains a Rule of Public Order ................ 52

B.  The Interplay of Public Order Rules, the Principle of Legitimate
Expectations, and Presumption of Legality ..................................... 53

XI.  THE GOVERNING CONTRACTS ARE NOT NULL AND VOID *AB INITIO* ....... 54

A.  The Governing Documents Are Not Void *Ab Initio* Under Article 150
or Any Other Aspect of Venezuelan Law ...................................... 54

B.  ██████████████████████████████████████████
██████████████████████████████████████████
██████ ............................................................................................. 55

C.  The Indenture Is Not Void *Ab Initio* for the Reasons Advanced by
Professor Brewer-Carías and the Plaintiffs in Light of Its Severability
Clause ............................................................................................... 56

D.  The Pledge Agreement Is Not Void or Voidable ............................ 58

XII.  CONCLUSION ................................................................................................ 59

The undersigned, ███████████████, hereby declares that the following is true and correct:

## ACADEMIC BACKGROUND

§ 1.   ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

## PURPOSE OF THIS REPORT

§ 2.   I have been asked by Latham & Watkins LLP, legal counsel for MUFG Union Bank, N.A. (the "Trustee"), in its capacity as Trustee, and GLAS Americas LLC (the "Collateral Agent," and together with the Trustee, collectively, the "Defendants"), in its capacity as Collateral Agent, to render this new report (the "Rebuttal Report") for the purpose of analyzing in detail the expert report of Professor Allan Randolph Brewer-Carías, dated March 16, 2020 (the "Brewer-Carías Expert Report") submitted by Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA Petróleo, S.A., ("PDVSA Petróleo"), and PDV Holding, Inc. ("PDV Holding," and, together with PDVSA and PDVSA Petróleo, the "Plaintiffs"), in the existing judicial proceedings between Plaintiffs and the Defendants.[2]

## EXECUTIVE SUMMARY

§ 3.   Professor Brewer-Carías sets forth several opinions in his report regarding the interpretation of Venezuelan Law and its application to the Governing Documents. While I agree with some of the assertions within the Brewer-Carías Expert Report about certain aspects of Venezuelan Law, the principal opinions set forth in the Brewer-Carías Expert Report are unsupported by legal precedent and contrary to scholarly analysis, including Professor Brewer-Carías's own published works.

§ 4.   Professor Brewer-Carías argues that any contract entered into by an entity that is part of the "National Public Administration" with a company not domiciled in Venezuela

---

[1]   *Curriculum Vitae*, **Exhibit** ██-01. Included as an exhibit to this Rebuttal Report is a list of the materials I relied upon in preparing this report (**Exhibit** ██-R-37). I have also relied upon materials reviewed when drafting ███████████████ (*see* **Exhibit** ██-05).

[2]   Capitalized terms not otherwise defined within this Rebuttal Report shall have the meaning as set forth in ███████████.

*must* obtain prior authorization of the National Assembly.[3] According to him, because PDVSA and PDVSA Petróleo are part of the National Public Administration, and companies not domiciled in Venezuela were parties to the agreements, National Assembly authorization was required for the Governing Documents. This opinion is incorrect for several reasons.

§ 5.    *First*, Professor Brewer-Carías's opinion ignores nearly 80 years of Supreme Court precedent interpreting Article 150 of the Constitution and preceding constitutional rulings governing Contracts of National Interest, including the seminal 2002 decision in *Andrés Velásquez et al.* That decision—which is binding—confirmed that only contracts that include the Republic as a party can qualify as Contracts of National Interest.

§ 6.    Professor Brewer-Carías's attempts to minimize or call into question the conclusions or precedential effect of *Andrés Velásquez et al.* and its progeny run counter to the analyses of legal scholars who have considered this issue, *including, most notably*, Professor Brewer-Carías himself. In his published writings over many years, Professor Brewer-Carías has repeatedly acknowledged that *Andrés Velásquez et al.* is a binding precedent that requires that the Republic be party to any Contract of National Interest. To take just one example, in a book published in 2015, Professor Brewer-Carías wrote that *Andrés Velásquez et al.* "reduced the category of 'contracts of public interest' (art. 150 C.) to those signed by the Republic, the States, and the Municipalities accordingly, excluding from such classification public contracts signed by autonomous institutes or national public companies, such as PDVSA."[4] I cite and quote below other similar statements in Professor Brewer-Carías's publications, including publications cited in his expert report itself.

§ 7.    *Second*, the opinion that the category of Contracts of National Interest encompasses contracts with any State entities within the "National Public Administration" contradicts the express language of the Constitution. Indeed, the term "National Public Administration" does not appear anywhere in the text of Articles 150, 187(9), or 236(14) of the Constitution, as Professor Brewer-Carías's opinion would suggest. Rather, as explained in my Expert Report, Article 187(9) expressly refers to the "National Executive"

---

[3]    Brewer-Carías Expert Report, § 13.

[4]    Allan Randolph Brewer-Carías, *Contratos Administrativos, Contratos Públicos, Contratos del Estado* (2015) (emphasis added), **Exhibit ▓-R-01**, p. 316, n.16.

entering into Contracts of National Interest. "National Executive" and "National Public Administration" are very different terms that cannot be conflated or confused.

§ 8.    *Third*, Professor Brewer-Carías's expansive interpretation of the Constitution and Article 150 in particular leads to the unreasonable result that any contract—be it large or small—concluded by PDVSA or its subsidiaries, or any other state corporation, with a foreign company would qualify as a Contract of National Interest and demand approval by the Legislature. That is not—and has never been—the case. As I discussed in ███████ ████████████, PDVSA has frequently entered into debt agreements and other contracts with foreign companies without seeking or obtaining approval of the National Assembly. Professor Brewer-Carías's interpretation would significantly impair the ability of PDVSA, its subsidiaries, and any other State Corporation to enter into contracts involving non-Venezuelan entities or otherwise operate internationally. This interpretation is also contrary to the opinion of other scholars.

§ 9.    *Fourth*, Professor Brewer-Carías relies heavily on three National Assembly resolutions that he claims show that the National Assembly "vigorously and publicly opposed and categorically rejected the Exchange Offer."

§ 10.   The National Assembly resolutions on which Professor Brewer-Carías relies are irrelevant for several reasons. The resolutions *are not binding law*, as Professor Brewer-Carías acknowledges. They were not enacted in compliance with the procedures set forth in the Constitution for the enactment of laws. Rather, the resolutions are political interpretations and proclamations that lack the force of law. Moreover, the legislature lacks the authority to override the binding constitutional interpretation established in *Andrés Velásquez et al.* and other decisions of the Constitutional Chamber. Under Article 335 of the Constitution, the Constitutional Chamber is the "supreme and ultimate interpreter" of the Constitution, and Constitutional rulings of the Constitutional Chamber are "binding" on the other Chambers of the Supreme Tribunal of Justice and other courts of the Republic. Finally, only the Venezuelan courts, and not the National Assembly, are empowered to invalidate or nullify contracts.

§ 11.   Professor Brewer-Carías's description of these resolutions is also fundamentally inaccurate. The first of these resolutions, issued in May 2016, does not address the transactions in dispute in this case—namely, the 2020 Bond issuance. Moreover, that resolution expressly recognized—consistent with the opinions in ████████████████ and contrary to the opinions in the Brewer-Carías Expert Report—that the category of

3

Contracts of National Interest applies only to those concluded by the "National Executive," which does not include state-owned companies such as PDVSA. The second resolution Professor Brewer-Carías cites, adopted in September 2016, on its face did not assert that the Governing Documents were Contracts of National Interest or that the 2020 Bonds or the Pledge violated the Constitution. ███████████████████████

███████████████████████████████████████████████████████

█████████████ Finally, the National Assembly Resolution from October 2019 that Professor Brewer-Carías cites was issued approximately three years *after* the Exchange was concluded.

§ 12.   *Fifth*, Professor Brewer-Carías's arguments conflict with several other statutes and Venezuelan legal principles, including (i) Articles 101(4), 104, and 105 of Venezuela's Financial Administration Law, (ii) the principle of congruent forms or parallel forms (*paralelismo de las formas*), (iii) the principle (espoused by Professor Brewer-Carías himself in his published work) that Contracts of National Interest are characterized in part by satisfaction of all contractual obligations *within Venezuela*, and (iv) other aspects of the Venezuelan Public Law regime.

§ 13.   *Finally*, even if it were (incorrectly) found that the Governing Documents were Contracts of National Interest, a Venezuelan court of law would *still* enforce these contracts under the principle of legitimate expectations. Professor Brewer-Carías's report does not address why a court would not still enforce these agreements under the principle of legitimate expectations.

§ 14.   Professor Brewer-Carías's contention that the Governing Documents are "invalid, illegal, and null and void *ab initio*" is mistaken for several reasons. First, the Governing Documents are not Contracts of National Interest, and so cannot be considered void or voidable pursuant to Article 150. ████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████. As such, the Governing Documents cannot be considered contracts that are "void *ab initio*," for contracts void *ab initio* cannot be rectified.

---

[5]   Memorandum from Jose Ignacio Hernández (Aug. 28, 2019) ("Hernández Memorandum"), **Exhibit ██-87**, p. 52.

§ 15.    Moreover, the Governing Documents have express severability clauses that protect them from being invalidated in whole, so that void provisions may be severed, and the remaining provisions may be preserved. Here, both the Plaintiffs' and Professor Brewer-Carías's objections to the Indenture revolve around *the promise*—made by PDVSA in the Indenture—to pledge a controlling interest in CITGO Holding Inc.'s ("CITGO Holding") shares as collateral, and not the terms of the Exchange in general. As such, even assuming that the Pledge violates Venezuelan Law (it does not), the rest of the Indenture's provisions would still remain in force.

§ 16.    As for the Pledge Agreement, Professor Brewer-Carías's argument that this agreement was void *ab initio* without legislative approval is also incorrect. That is because, for the purpose of the Pledge Agreement, it was the consent of a foreign company—PDV Holding Inc.—and not PDVSA, *whose consent was essential* to pledge CITGO Holding's shares. ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████ Therefore, the Pledge cannot be considered void *ab initio* under Article 150 of the Constitution.

## EXPERT REPORT

§ 17.    In this Rebuttal Report, I will detail the opinions within the Brewer-Carías Expert Report that I share as well as those that are erroneous applications of Venezuelan Law to the Governing Documents. In doing so, I will present the reasons—based on Venezuelan Law—on which I ground my disagreement with the contents of the Brewer-Carías Expert Report.

§ 18.    My analysis will focus, in this precise order, on (i) the Constitutional Chamber's decision in the *Andrés Velásquez et al.*[6] case and the ensuing line of case law; (ii) the correct interpretation of Article 150 of the Constitution; (iii) the implications of the National Assembly's Resolutions invoked in the Brewer-Carías Expert Report; (iv) the purpose and scope of the exemption provided for in Article 101(4) of the Financial Administration Law;[7] (v) the magnitude or impact of a contract as an inadmissible criterion to identify a

---

[6]    Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 2241 (Sept. 24, 2002) ("*Andrés Velásquez et al.*"), **Exhibit** ██**-07**.

[7]    Organic Law of the Financial Administration of the Public Sector, art. 101(4), *Official Gazette* N° 6210 Extraordinary (Dec. 30, 2015) ("Financial Administration Law"), **Exhibit** ██**-30**, p. 82.

5

Contract of National Interest; (vi) the interplay between the approval of Contracts of National Interest and the principle of congruent forms; (vii) the legal consequences that derive from characterizing a Contract of National Interest as an administrative contract; (viii) the legal relevance of the place in which the obligations arising from the Governing Documents are to be fulfilled; (ix) the validity under Venezuelan Law of the choice of law made in the Governing Documents; (x) the interplay between the principles of public order and legitimate expectations; and (xi) the validity of the Governing Documents.

§ 19.   I have prepared this Rebuttal Report in Caracas, Venezuela, where I live and work. Due to the quarantine decreed more than six weeks ago, as well as an acute shortage of gasoline and little if any public transportation, I have been unable to go to the office on a regular basis in order to have access to my legal library. My staff has similarly been unable to get to our office. In addition, during the last few weeks the website of the Supreme Tribunal of Justice has been down. These circumstances have greatly limited my ability to conduct the legal research needed to prepare this rebuttal report. Accordingly, I respectfully reserve the right to provide additional relevant authorities to which I may later gain access. In addition, I reserve the right to address any issues raised in Professor Brewer-Carías's rebuttal report and any other subsequent submissions in this litigation.

I.   **PROFESSOR BREWER-CARÍAS'S OPINION THAT THE GOVERNING DOCUMENTS ARE CONTRACTS OF NATIONAL INTEREST IS CONTRADICTED BY THE CONSTITUTIONAL CHAMBER'S BINDING PRECEDENT AND HIS OWN WRITINGS**

§ 20.   In this section, I will address the arguments contained in the Brewer-Carías Expert Report dealing with the Constitutional Chamber's decisions in the *Andrés Velásquez et al.* and *Brigitte Acosta Isasis*[8] cases.

§ 21. In his report, Professor Brewer-Carías (i) dismisses the holding of the Constitutional Chamber in *Andrés Velásquez et al.*, arguing that the Constitutional Chamber did not state that one of the key requirements for Contracts of National Interest is that the Republic be a party to it, and (ii) argues that *Andrés Velásquez et al.* is not binding law. Not only do I firmly disagree with these assertions, but they directly conflict with

---

[8]   Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 618 (July 20, 2016) ("*Brigitte Acosta Isasis*"), **Exhibit ▮-08**.

Professor Brewer-Carías's own conclusions in his prior published writings, and the interpretations of other prominent Public Law scholars in Venezuela.

§ 22.   Having concluded in his expert report that *Andrés Velásquez et al.* did not hold that Contracts of National Interest may only be entered into by the Republic, Professor Brewer-Carías opines █████████████████████████████████ ████████ ██████ ███████ ████████ ██ ███ ███████ ██ █████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████ .

### A.   *Andrés Velásquez et al.* Expressly Held That Contracts of National Interest Are Only Those to Which the Republic Is a Party

§ 23.   Professor Brewer-Carías puts forth an incorrect analysis in which he asserts that although *Andrés Velásquez et al.* is binding with regard to its holding partially nullifying Article 80 of the Financial Administration Law, it is not binding as to the definition of Contracts of National Interest.[9] He further concludes that the Constitutional Chamber in *Andrés Velásquez et al.* did not hold that *only* contracts to which the Republic is a party may qualify as Contracts of National Interest, notwithstanding the clear language of that decision.[10]

§ 24.   Respectfully, I disagree: *Andrés Velásquez et al.* is binding precedent as to both the definition of Contracts of National Interest and the anullment of Article 80 of the Financial Administration Law, and plainly holds that *only contracts to which the Republic is a party* may qualify as Contracts of National Interest.

§ 25.   As discussed in further detail below, Professor Brewer-Carías, while expressing disagreement with the holding of *Andrés Velásquez et al.*, has acknowledged that the decision is binding law and that it held the Republic *has to be a party* for a contract to qualify as a Contract of National Interest. Professor Brewer-Carías has also explicitly acknowledged in past writings that the implication of the *Andrés Velásquez et al.* decision

---

[9]   Brewer-Carías Expert Report, §§ 109–10. Plaintiffs use the term "contracts in the national public interest" throughout their Lawsuit. In this report, I use the term "Contracts of National Interest" to refer to all such contracts.

[10]   *Id.* §§ 105–06.

is that contracts entered into by PDVSA cannot be Contracts of National Interest. He has consistently said this in multiple publications over more than a decade, including as recently as 2017, and all of those publications came after the decision in the *Lucía Antillano* case.[11] I am not aware of any book or article by Professor Brewer-Carías that questions these conclusions.

§ 26.  Importantly, in his published works, Professor Brewer-Carías repeatedly interpreted *Andrés Velásquez et al.* in the same manner that I do. In Professor Brewer-Carías's own words:

> [In *Andrés Velásquez et al.,*] [t]he Constitutional Chamber of the Supreme Tribunal of Justice, as the highest and last interpreter of the Constitution . . . , *established a binding interpretation*, and reduced the category of "contracts of public interest" (art. 150 C.) to those signed or concluded by the Republic, the States, and the Municipalities, thus, *excluding from such a classification those contracts concluded by* autonomous institutes or *national public enterprises such as PDVSA.*

> The central argument of the Chamber's decision referred to the issue of prior parliamentary authorization in relation to the public debt contracts signed by the Republic, the States, and the Municipalities.[12]

---

[11]  As discussed below, while Professor Brewer-Carías argues in his report that the holding in *Andrés Velásquez et al.* was modified in the Constitutional Chamber's 2003 *Lucía Antillano* decision, most of Professor Brewer-Carías's prior works in which he interprets *Andrés Velásquez et al.* as binding precedent holding that the Republic is a necessary party to Contracts of National Interest were published *after* the 2003 *Lucía Antillano* decision.

[12]  Allan Randolph Brewer-Carías, *Nuevas Consideraciones Sobre el Régimen Jurídico de los Contratos del Estado en Venezuela*, *in* VIII JORNADAS INTERNACIONALES DE DERECHO ADMINISTRATIVO ALLAN RANDOLPH BREWER-CARÍAS (2006) (emphasis added), **Exhibit** ▇-R-02, p. 3, n.11.
Professor Brewer-Carías reaffirmed this criterion in four subsequent articles or books: (i) Allan Randolph Brewer-Carías, *Sobre los Contratos del Estado en Venezuela*, *in* 6 REVISTA MEXICANA STATUM REI ROMANAE DE DERECHO ADMINISTRATIVO (2011), **Exhibit** ▇-R-03, p. 4; (ii) Allan Randolph Brewer-Carías, *La Contratación Pública en Venezuela*, *in* TRATADO GENERAL DE LOS CONTRATOS PÚBLICOS (2013), **Exhibit** ▇-R-04, p. 4; (iii) Allan Randolph Brewer-Carías, *Administrative Law in Venezuela* (2015), **Exhibit** ▇-R-05, pp. 132–33; and, (iv) Allan Randolph Brewer-Carías, *Sobre las Nociones de Contratos Administrativos, Contratos De Interés Público, Servicio*

8

§ 27.   Further, according to a recent article by Professor Brewer-Carías published in 2017:

> Having reduced the notion of "public interest contracts" to only those signed by the Republic, States, and Municipalities, and consequently, *reduced the notion of "national public interest contracts" and to those signed only by the Republic*, the most notorious consequence of the decisions of [*Brigitte Acosta Isasis* and *Andrés Velásquez et al.*] is—that *articles 150, 151, 187.9, 236.14 and 247 of the Constitution do not apply to public contracts concluded by* these decentralized national public entities, for example, the Central Bank of Venezuela, autonomous institutes and state companies . . . .[13]

§ 28.   Notably, three of the works by Professor Brewer-Carías that he cites in his Expert Report actually reached that same conclusion. In the first work, originally published in 2013, and reedited in 2015, *Administrative Law in Venezuela*, Professor Brewer-Carías summarized the contents of the *Andrés Velásquez et al.* decision as follows: "Thus, *public contracts entered into by a national public corporation or a national public enterprise*, according to this Supreme Court interpretation, *cannot be considered 'national public interest contracts' pursuant to Article 150 of the Constitution.*"[14]

§ 29.   In the second work, published in 2015, *Contratos Administrativos, Contratos Públicos, Contratos del Estado* (translated as "Administrative Contracts, Public Contracts, State Contracts"), Professor Brewer-Carías affirmed—contrary to the conclusions in the Brewer-Carías Expert Report—that *Andrés Velásquez et al.* "established a binding interpretation and *reduced the category of 'contracts of public interest' (art. 150 C.) to those signed or agreed to by the Republic, the States, and the Municipalities accordingly, excluding from such classification public contracts signed by autonomous institutes or national public companies, such as PDVSA.*"[15]

---

*Público, Interés Público y Orden Público, y su Manipulación Legislativa y Jurisprudencial* (2019), **Exhibit ■-R-06**, p. 86.

[13]   Allan Randolph Brewer-Carías, *La Mutación de la Noción de Contratos de Interés Público Nacional Hecha Por la Sala Constitucional, para Cercenarle a la Asamblea Nacional sus Poderes de Control Político en Relación con la Actividad Contractual de la Administración Pública y sus Consecuencias*, *in* 151–52 REVISTA DE DERECHO PÚBLICO (2017) (emphasis added), **Exhibit ■-67**, p. 390.

[14]   Brewer-Carías, *Administrative Law*, *supra* note 12 (emphasis added), **Exhibit ■-R-05**, pp. 132–33.

[15]   Brewer-Carías, *Contratos Administrativos*, *supra* note 4, (emphasis added), **Exhibit ■-R-01**, p. 316, n.16.

§ 30.    In the third work, published in 2011, *Sobre los Contratos del Estado en Venezuela* (translated as "On State Contracts in Venezuela"), Professor Brewer-Carías wrote:

> [T]he Constitutional Chamber [in *Andrés Velásquez et al.*] inconveniently restricted this notion of 'public interest contract' of article 150 of the Constitution, [to include] only those contracts signed by the Republic, States and Municipalities in which a national, state and municipal public interest is involved; being excluded from the denomination of the public contracts signed by the autonomous institutes or companies of the State; [a] doctrine that we do not share.

> On the contrary, in our opinion, contracts signed for instance by national autonomous institutes or national State-owned companies should be deemed "national public interest contracts" pursuant to article 150 of the Constitution. The opposite does not make sense and would lead [one] to consider—in agreement with the doctrine of the Supreme Tribunal—that, for example, a contract concluded by Petróleos de Venezuela (PDVSA) could not be considered a national public interest contract; and this, we insist, makes no sense at all. Despite this mistaken doctrine, however, and without a doubt, such a contract is a public interest contract; in other words, a national public interest contract concluded by a state-owned public entity; concretely by a State-owned company or a state legal entity of private law.[16]

§ 31.    Although Professor Brewer-Carías does cite two of these works in his report,[17] he does not cite the aforementioned passages, with the sole exception of the final paragraph quoted above.[18] In light of his writings cited above, Professor Brewer-Carías has been one of the clearest and most unequivocal commentators in support of the key proposition made in my Expert Report: according to *Andrés Velásquez et al.*, the Republic must be a party for the contract to be a Contract of National Interest.

---

[16]   Brewer-Carías, *Sobre los Contratos*, *supra* note 12, **Exhibit ■-R-03**, p. 4 (emphasis added). As Professor Brewer-Carías correctly points out, state and municipal contracts can also be subject to legislative approval pursuant to Article 150.

[17]   Brewer-Carías Expert Report, §§ 33, 115, 119, 126 (citing Brewer-Carías, *Administrative Law*, *supra* note 12, **Exhibit ■-R-05**); *id.* § 114 (citing Brewer-Carías, *Sobre los Contratos*, *supra* note 12, **Exhibit ■-R-03**).

[18]   *Id.*

§ 32.   Professor Badell Madrid, a prominent Venezuelan Public Law scholar, is in accord:

> *The condition that the contract be entered into by the Republic is established by the . . . judgment* [in the *Andrés Velásquez et al.* case] *on more than one occasion . . . .*
>
> [Thus,] contracts of *national public interest . . . must be entered into by the Republic*, through the competent bodies of the National Executive . . . .[19]

§ 33.   Professor Brewer-Carías correctly identified in his 2017 article, *La Mutación de la Noción de Contratos de Interés Público Nacional hecha por la Sala Constitucional, para Cercenarle a la Asamblea Nacional sus Poderes de Control Político en Relación con la Actividad Contractual de la Administración Pública y sus Consecuencias* (translated as "The Alteration of the Notion of of National Public Interest Contracts Made By the Constitutional Chamber to Deprive the National Assembly of Its Political Oversight Powers in Relation to the Contractual Activity of the Public Administration and Its Consequences"), two critical legal consequences stemming from the *Andrés Velásquez et al.* holding that apply directly to contracts entered into by PDVSA and its subsidiaries:

a.   According to Professor Brewer-Carías, "the consequence of the indicated jurisprudential interpretation is that *public contracts signed by . . . state companies, like Petróleos de Venezuela S.A. and its subsidiary companies*, may be freely entered into with States or foreign official entities or with companies not domiciled in Venezuela, and even transfer to them *without being it necessary to obtain authorization from the National Assembly*."[20]

b.   Another legal consequence of *Andrés Velásquez et al.*, according to Professor Brewer-Carías, is that "[in] public contracts signed by public national entities . . . such as Petróleos de Venezuela S.A. and its subsidiary companies, [it] *can be freely established that the applicable law is some foreign law and that the applicable jurisdiction may be that of the courts of any other State* or that of arbitral tribunals."[21]

---

[19]   Rafael Badell Madrid, *Sobre la Inmunidad de Jurisdicción y la Procedencia de Cláusulas Arbitrales en los Contratos de Interés Público Nacional, in* 2 Congreso Internacional de Derecho Administrativo Homenaje al Prof. Luis H. Farías Mata (2006) (emphasis added), **Exhibit ██-70**, p. 159.

[20]   Brewer-Carías, *La Mutación*, *supra* note 13 (emphasis added), **Exhibit ██-67**, p. 390.

[21]   *Id.* at p. 391 (emphasis added).

§ 34.   These two legal consequences stem from the holding in *Andrés Velásquez et al.* and apply directly to contracts entered into by PDVSA and its subsidiaries.

§ 35.   The Brewer-Carías Expert Report does not address or acknowledge Professor Brewer-Carías's prior, opposing opinions, which are a more accurate representation of the holding in *Andrés Velásquez et al.* Nor does the Brewer-Carías Expert Report mention that the requirement that the Republic must be a party to a Contract of National Interest is only one of the four *concurring requisites* demanded by the *Andrés Velásquez et al.* decision.[22] The Brewer-Carías Expert Report does not contain arguments dealing—one by one—with the compliance or fulfillment of the other three requirements demanded by the *Andrés Velásquez et al.* decision. In the past, Professor Brewer-Carías has acknowledged that Contracts of National Interest must comply with the four concurring requisites specified in *Andrés Velásquez et al.*[23] Thus, Professor Brewer-Carías does not demonstrate that the legal standard for Contracts of National Interest, as set forth in *Andrés Velásquez et al.*, has been satisfied in the present case.

§ 36.   Even leaving aside Professor Brewer-Carías's numerous prior writings, it is readily apparent from the plain text of *Andrés Velásquez et al.* that only contracts to which the Republic is a party may qualify as Contracts of National Interest. That decision reads in relevant part:

> The doctrinal discussion existent during the effective period of the 1961 Constitution among the expressions [of] public interest and national interest contract has been . . . resolved by the Constitution of the Bolivarian Republic of Venezuela, as article 150 thereof *clearly established* the genus-species relationship that exists between the concept of public interest contract and the concept *of national . . . interest contracts in which the determining factor would be the participation of the Republic. . . .*[24]

---

[22]   ▮▮▮▮▮▮▮▮, §§ 88–89.

[23]   Brewer-Carías, *La Mutación, supra* note 13, **Exhibit** ▮-67, p. 387.

[24]   *Andrés Velásquez et al.*, N° 2241 (emphasis added), **Exhibit** ▮-07, p. 16. The *Andrés Velásquez et al.* decision has to be read and construed in light of Article 1166 of the Venezuelan Civil Code, *Official Gazette* N° 2990 Extraordinary (July 26, 1982), **Exhibit** ▮-107, p. 79. According to Article 1166, the general rule is that contracts *only* benefit the contracting parties ("Contracts have no effect but between the contracting parties: they do not harm or benefit third parties, except in the cases established by Law"). *Id.*

§ 37.   Because the decision unequivocally states that the "participation of" the Republic as the contracting party is a "determining factor," it is clear that the Republic *has to be a party* to Contracts of National Interest.[25] Indeed, the language of the decision makes clear that this issue is one of the key or "determining" factors in the analysis.[26]

§ 38.   This unavoidable conclusion, more fully discussed in my Expert Report, is not novel. Indeed, prior to the instant unprecedented attempt to invalidate PDVSA's 2020 Notes, prominent Venezuelan Public Law scholars that have analyzed the issue (including Professors Brewer-Carías and Badell Madrid, *see supra* §§ 26–§ 30,§ 32–§ 33) have read—and interpreted—the *Andrés Velásquez et al.* decision in the same way I have.

### B.   *Andrés Velásquez et al.* Constitutes Legally Binding Precedent

§ 39.   Having failed to address the plain text of the decision and the works of Venezuelan scholars—including, in particular, his own—that deal with the true import of *Andrés Velásquez et al.*, Professor Brewer-Carías argues that the decision is not binding under Venezuelan Law. According to the Brewer-Carías Expert Report, Article 335 of the Constitution "does not confer a 'binding' character on any phrase, argument or reasoning in Constitutional Chamber decisions."[27] Respectfully, I disagree with this assertion.

§ 40.   Article 335 of the Constitution expressly states that the Supreme Tribunal of Justice is "the supreme and ultimate interpreter of the Constitution" and that, as such, "shall see to the *uniform interpretation and application* thereof."[28] Article 335 further states that "*[i]nterpretations* established by the Constitutional Chamber *concerning the contents or scope of Constitutional rules and principles are binding* on the other Chambers of the Supreme [Tribunal] of Justice and on any other courts of the Republic."[29] Interpretations by the

---

[25]   *Andrés Velásquez et al.*, N° 2241, **Exhibit** ███**-07**, p. 16.

[26]   *Id.* As discussed in my Expert Report, the Political-Administrative Chamber has also issued decisions related to Contracts of National Interest. To the extent these decisions are inconsistent with the Constitutional Chamber's constitutional jurisprudence, they are not controlling given the Constitutional Chamber's role as the ultimate arbiter of the Constitution ███████████, § 86. Professor Brewer-Carías correctly does not rely on any such cases in his Expert Report.

[27]   Brewer-Carías Expert Report, § 110.

[28]   Constitution of the Bolivarian Republic of Venezuela, art. 335, Official Gazette N° 5908 Extraordinary (1999) ("Constitution") (emphasis added), **Exhibit** ██**-32**, p. 37.

[29]   *Id.* (emphasis added). According to Article 3 of the Organic Law of the Supreme Tribunal of Justice, the Supreme Tribunal of Justice is the highest court in the Republic and, hence, the general rule is

Constitutional Chamber on the content or scope of Constitutional rules and principles—including Article 150 of the Constitution—are binding and, therefore, impose limits or constraints to the interpretation powers granted to other judges.

§ 41.   Professor Brewer-Carías acknowledges that the Constitutional Chamber tends to (i) declare that a specific ruling has binding effect and (ii) order its publication in the Official Gazette.[30] However, Professor Brewer-Carías mistakenly asserts that *Andrés Velásquez et al.* is not binding in part because it was not published in the Official Gazette.[31] That is not so: The Constitutional Chamber ordered the publication of *Andrés Velásquez et al*. in the Official Gazette, and, accordingly, the decision was published in Official Gazette number 37549 on October 15, 2002.[32] Professor Brewer-Carías erred when he asserted the contrary to this Court.

§ 42.   But leaving aside that custom of publication, the binding effects of a ruling issued by the Constitutional Chamber are solely dependent—per Article 335 of the Constitution—on the contents of the decision. If a decision interprets the contents or scope of a Constitutional rule or principle—as the *Andrés Velásquez et al.* decision certainly does—the ruling produces binding effects *ope legis* (*i.e.*, by virtue of the law) since the plain text of Article 335 does not make the binding effects of the ruling conditional to any further declaration by the Constitutional Chamber. There is no constitutional rule that limits the binding effects solely to instances where the Constitutional Chamber affirmatively states that it is binding. And in fact, *Andrés Velásquez et al.* has been cited by scholars—including by Professor Brewer-Carías—as binding precedent even though it does not explicitly declare that its interpretation of Article 150 has binding effects.

---

that against its decisions no action or recourse will be heard, nor admitted. Organic Law of the Supreme Tribunal of Justice, art. 3, *Official Gazette* N° 39522 (Oct. 1, 2010), **Exhibit** ▮-06, p. 397.864.

[30]   Brewer-Carías Expert Report, § 111.

[31]   *Id.* (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮") (quoting the Hogan Memorandum (HL_021479) (Sept. 21, 2016), **Exhibit** ▮-60, p. 3).

[32]   *Official Gazette* N° 37549 (Oct. 15, 2002), **Exhibit** ▮-R-07, pp. 325.666–.74.

§ 43.    Indeed, Professor Brewer-Carías has opined in several past academic works that *Andrés Velásquez et al.* is binding precedent. In Professor Brewer-Carías's own words:

> [In *Andrés Velásquez et al.*], [t]he Constitutional Chamber of the Supreme Tribunal of Justice [acting] as the highest and last interpreter of the Constitution . . . *established a binding interpretation*, and reduced the category of "contracts of public interest" (art. 150 C.) to those signed or concluded by the Republic, the States, and the Municipalities, thus *excluding from such a classification those contracts concluded by* autonomous institutes or *national public enterprises such as PDVSA*. The central argument of the Chamber's decision referred to the issue of prior parliamentary authorization in relation to public debt contracts signed by the Republic, the States, and the Municipalities.[33]

§ 44.    ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████

---

[33]    Brewer-Carías, *Nuevas Consideraciones*, *supra* note 12 (emphasis added), **Exhibit █-R-02,** p. 3, n.11. Professor Brewer-Carías reaffirmed this criterion in four subsequent articles or books: (i) Brewer-Carías, *Sobre los Contratos*, *supra* note 12, **Exhibit █-R-03,** p. 4; (ii) Brewer-Carías, *La Contratación Pública en Venezuela*, *supra* note 12, **Exhibit █-R-04,** p. 4; (iii) Brewer-Carías, *Administrative Law*, *supra* note 12, **Exhibit █-R-05,** pp. 132–33; and (iv) Brewer-Carías, *Sobre las Nociones de Contratos Administrativos*, *supra* note 12, **Exhibit █-R-06,** p. 86.

[34]    Hernández Memorandum (emphasis added), **Exhibit █-87,** pp. 43–44.

§ 45.   ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████

    **C.**    *Brigitte Acosta Isasis* **Follows** *Andrés Velásquez et al.* **and Is Binding Venezuelan Law**

§ 46.   Professor Brewer-Carías argues that *Brigitte Acosta Isasis*[36] stands for the proposition that (i) the Central Bank is an entity with "functional autonomy" and "is *not* part of the Decentralized National Public Administration," and (ii) the Central Bank is not subject to National Assembly control pursuant to Article 150 of the Constitution.[37] I agree.

§ 47.   Professor Brewer-Carías goes on to argue that (i) the holding in *Brigitte Acosta Isasis* does not apply to entities that are part of the Decentralized Public Administration, such as PDVSA and PDVSA Petróleo,[38] and (ii) *Brigitte Acosta Isasis* should be disregarded entirely as "unconstitutional and illegitimate."[39] With these arguments, I respectfully disagree.

§ 48.   As a starting point, *Brigitte Acosta Isasis* is not focused on deciding the narrow issue of the legal status of the Central Bank. Instead, the Constitutional Chamber decided a *request for constitutional interpretation of the contents and scope of* Articles 150, 187(9), 236(14), and 247 of the Constitution. As stated in my Expert Report,[40] these articles regulate Contracts of National Interest. The conclusion reached by the Constitutional Chamber in *Brigitte Acosta Isasis* was that a financing agreement involving a foreign entity was not a Contract of National Interest because the Republic was not a party. While the facts of the case involved the Central Bank, the ruling did not decide a request for interpretation of Article 318 of the Constitution—and the "functional autonomy"—of the Central Bank. Instead, it decided a request for interpretation of the contents and scope of Articles 150, 187(9), and 236(14), and 247 of the Constitution and in doing so relied on the fact that the Republic was not a party to the contract *sub-iudice*. Thus, in opining on the scope and

---

[35]   *Id.* at pp. 19, 21 (citing *Andrés Velásquez et al.*, N° 2241, **Exhibit ██ 07**).

[36]   *Brigitte Acosta Isasis*, N° 618, **Exhibit ██-08**.

[37]   Brewer-Carías Expert Report, § 89.

[38]   *Id.* §§ 89–90.

[39]   Brewer-Carías Expert Report, § 101.

[40]   ██████████████████, §§ 49–52.

interpretation of these articles, the Constitutional Chamber reaffirmed *Andrés Velásquez et al.*'s interpretation of Article 150 of the Constitution, namely, that the Republic must be a party in order for a contract to be a Contract of National Interest. Whatever functional differences exist between PDVSA and the Central Bank, the *Brigitte Acosta Isasis* decision reaffirms that autonomous entities cannot be parties to a contract of National Public Interest unless the Republic is also a party.

§ 49.   As explained in my Expert Report,[41] the Constitutional Chamber's ruling in *Brigitte Acosta Isasis* is also fully consistent with an unbroken line of Constitutional Chamber decisions that include (i) *Andrés Velásquez et al.* in 2002[42] and (ii) *Attorney General of the Republic II* in 2007.[43] In the latter case, the Constitutional Chamber invoked and reaffirmed the ruling in *Andrés Velásquez et al.* that a Public Debt transaction may qualify as a Contract of National Interest when executed "by the Republic with [other] States, foreign official entities or commercial companies not domiciled in Venezuela."[44] These cases, in turn, rest on a long line of case law that dates back to 1937 (*Attorney General of the Republic I*).[45] As relevant here, *Brigitte Acosta Isasis* does not create new precedent. Rather, it simply affirms and is consistent with nearly 100 years of judicial precedent.

§ 50.   Professor Brewer-Carías also argues that the *Brigitte Acosta Isasis* decision should be disregarded entirely as "unconstitutional and illegitimate."[46] In support of that assertion, Professor Brewer-Carías cites (i) the irregular appointment of certain of the justices of the Constitutional Chamber by a lame-duck session of the National Assembly in December 2015, and (ii) what he asserts was a lack of "respect for due process rights" by the Chamber in not hearing arguments from the National Assembly or other interested parties before issuing the decision. While I believe the specific criticisms of the judicial appointments and the process by which the Chamber rendered its decision have force, I do not agree with Professor Brewer-Carías's conclusion that these criticisms mean that the decision can be disregarded as a matter of Venezuelan Law.

---

[41]   *Id.* § 94.

[42]   *Andrés Velásquez et al.*, N° 2241, **Exhibit** ▮▮-07.

[43]   Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 1460 (July 12, 2007) ("*Attorney General of the Republic II*"), **Exhibit** ▮▮-71, pp. 19–22.

[44]   *Id.*

[45]   ▮▮▮▮▮▮▮▮, §§ 94–98.

[46]   Brewer-Carías Expert Report, § 101.

§ 51.  The Constitutional Chamber is the final arbiter of the interpretation of the Venezuelan Constitution. Under Venezuelan Law, the justices appointed in December 2015 must be considered *de facto* officials and the *Brigitte Acosta Isasis* decision therefore has legal authority.[47] Likewise, the expedited process followed in *Brigitte Acosta Isasis* is one that the Supreme Tribunal has followed in the past on several occasions[48] once it has concluded that the plain text of the constitutional rules, existing precedent and scholarly works suffice to decide a certain request for interpretation, and notwithstanding the objections to said process, the Constitutional Chamber's decision remains binding in nature. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████.[49]

§ 52.  Professor Brewer-Carías cites a National Assembly resolution dated July 26, 2016 ("July 2016 Resolution") that purports to reject the *Brigitte Acosta Isasis* decision.[50] However, the rejection contained in the July 2016 Resolution does not deprive the *Brigitte Acosta Isasis* decision of its legally binding force. This is because a National Assembly

---

[47]  *See* Resolution by the National Assembly Dated June 15, 2004, *Official Gazette* N° 37961 (June 16, 2004) ("*Franklin Arrieche Gutiérrez*"), **Exhibit ██-R-08**, p. 333.604. According to that resolution by the National Assembly: (i) A Justice ceases to exercise public office only *after* his substitute has been appointed. Here, the *Brigitte Acosta Isasis* decision was issued on July 20, 2016, and the National Assembly did not appoint substitute justices until July 21, 2017; (ii) Despite the irregularity of their investiture, decisions issued by *de facto* officials produce legal effects as if they had been issued by *de iure* officials. Under Venezuelan law, *de facto* officials must be distinguished from authority usurpers. To be a usurper of authority, an official must either: (i) evict a *de iure* official from public office willfully or violently; or (ii) exercise authority without any kind of investiture. *See also* Allan Randolph Brewer-Carías, *Estado de Derecho y Control Judicial* (1987), **Exhibit ██-R-09**, pp. 143–44. Decisions issued by authority usurpers are null and do not produce any legal effects. *See* Constitution, art. 138, **Exhibit-██-32**, p. 24; and, Federal and Cassation Court (Nov. 12, 1947), *in* Allan Randolph Brewer-Carías, I Jurisprudencia de la Corte Suprema de Justicia y Estudios de Derecho Administrativo (1975), **Exhibit ██-R-10**, p. 577. According to the aforementioned judicial ruling, usurped authority means "illegitimate authority and, more specifically, authority based on *violence* or any other *fact* prohibited in the realm of the law."

[48]  *Brigitte Acosta Isasis*, N° 618, **Exhibit ██-08**, p. 17.

[49]  Hernández Memorandum, **Exhibit ██-87**, p. 25.

[50]  Brewer-Carías Expert Report, § 92 (citing Resolution Rejecting Decision No. 618 of the Constitutional Chamber of the Supreme Tribunal of Justice of July 20, 2016 (July 26, 2016) ("July 2016 Resolution"), **Exhibit ██-36).**

resolution purporting to reject a Supreme Tribunal's constitutional decision is not law.[51] It has no legal binding weight and does not impact the Constitutional Chamber decision's significance as a matter of Venezuelan Law.

§ 53.   On the other hand, it is notable that the July 2016 Resolution cited by Professor Brewer-Carías acknowledges the fundamental principle that the Republic is a necessary party to Contracts of National Interest:

> **FOURTH.** Ratify that any contract of national public interest, *signed by the Republic* with entities not domiciled in Venezuela without the approval of the National Assembly, is infected by absolute nullity.[52]

§ 54.   Further, the introductory paragraph to this resolution states that:

> A universal principle of democracy, is that the attribution of authorizing *loans and charges that commit the Republic* is the power of representatives of popular sovereignty . . . .[53]

§ 55.   Accordingly, despite the July 2016 Resolution's purported rejection of the *Brigitte Acosta Isasis* decision, the July 2016 Resolution *affirms* the proposition and main premise of my Expert Report, namely, that Contracts of National Interest must be contracts to which the Republic is a party.[54]

---

[51]   *See infra*, §§ 97–103.

[52]   July 2016 Resolution (emphasis added), **Exhibit ▪-36**, p. 3.

[53]   *Id.* at p. 1 (emphasis added).

[54]   The reference to the Republic made in the July 2016 Resolution is also consistent with two other Resolutions approved by the National Assembly, pursuant to Articles 50 and 187(9) of the Constitution, for the purpose of: (i) Approving "the contract between the . . . *Republic of Venezuela* and the China Great Wall Industry Corporation . . . domiciled in Beijing, People's Republic of China, for the design and commissioning of the Design Center and AITC Small Satellites Center in the Bolivarian Republic of Venezuela," (Resolution by the National Assembly Dated March 25, 2008, *Official Gazette* N° 38896 (Mar. 26, 2008) (emphasis added), **Exhibit ▪-R-11**, p. 360.167); and (ii) Authorizing "the National Executive to conclude the VRSS-1 Satellite Program Contract Project between the . . . *Republic of Venezuela*, by organ of the Ministry of People's Power for Science, Technology and Intermediate Industries, and the China Great Wall Industry Corporation, approving all its terms and conditions[,] for the design, construction, testing, launch and delivery of a Satellite System (VRSS-1 and GS satellite), including all resources, technical infrastructure and associated facilities, equipment, as well as the training of the human resources," (Resolution by the

§ 56.    In light of the above, any Venezuelan court considering issues related to Contracts of National Interest is bound by *Brigitte Acosta Isasis* and would view itself as required to apply the holding of that case to the extent applicable.[55]

§ 57.    As a final note, in my opinion, *Brigitte Acosta Isasis* is fully consistent with *Andrés Velásquez et al.*, which is a binding precedent in the Venezuelan legal system pursuant to Article 335 of the Constitution and Article 3 of the Organic Law of the Supreme Tribunal of Justice.

§ 58.    Thus, I wish to make clear that even if *Brigitte Acosta Isasis* were not viewed as valid authority, my ultimate opinion would remain unchanged. This is because my view that the Governing Documents are not Contracts of National Interest is based principally on the plain text of the applicable constitutional provisions, as well as the Constitutional Chamber's decisions in *Andrés Velásquez et al.*, *Attorney General of the Republic II*, and *Brigitte Acosta Isasis*.

D.    ███████████████████████████████████
███████████████████████████████████████████

§ 59.    As I addressed in my expert report,[56] PDVSA and PDVSA Petróleo retained Hogan Lovells to advise them regarding the 2016 Exchange. ████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████

---

National Assembly Dated May 3, 2011, *Official Gazette* N° 39666 (May 4, 2011) (emphasis added), **Exhibit** ██**-R-12**, p. 358.095).

[55]    Professor Brewer-Carías's Report discusses and criticizes a wide range of decisions by the Supreme Tribunal of Justice, including the Constitutional Chambers, since the parliamentary elections of December 2015. Brewer-Carías Expert Report, §§ 86-87, 91–101. My opinion that the Constitutional Chamber's decision in *Brigitte Acosta Isasis* is binding as a matter of Venezuelan Law should not be interpreted to imply that I approve the other decisions that Professor Brewer-Carías cites.

[56]    ███████████████████, §§ 72–76.

[57]    *See* Hogan Memorandum (Sept. 21, 2016), **Exhibit** ██**-60**, p. 1; Opinion Letter from Hogan Lovells (Caracas) to PDVSA, et al. (Oct. 28, 2016), **Exhibit** ██**-61**, p. 3; Opinion Letter from Hogan Lovells (New York) to PDVSA, et al. (Oct. 28, 2016), **Exhibit** ██**-62**, p. 5.

██████████████████████████████████████████████████████
████████████████████████████████████████.[58]

§ 60.    Professor Brewer-Carías argues in his report that ████████████████
████████████████████████████████████████ of *Andrés Velásquez et al.*[59] I respectfully disagree with each of Professor Brewer-Carías's arguments ████████████████████.

§ 61.    *First*, Professor Brewer-Carías argues that "the Constitutional Chamber did not state [in *Andrés Velásquez et al.*] that public contracts entered into by decentralized public entities such as PDVSA are *not* public interest contracts, and this cannot be deduced from the text of the decision . . . ."[60] Professor Brewer-Carías also argues that "the decision did not establish any general interpretation . . . of the term 'public interest contract . . . .'"[61] For the reasons set forth in Part I.A of this report, these statements are contrary to the express language within *Andrés Velásquez et al.*, and also conflict with legal scholars' analyses of the case, including the past analyses of Professor Brewer-Carías in at least six of his prior published works.

§ 62.    *Second*, Professor Brewer-Carías argues that even if *Andrés Velásquez et al.* did establish that Contracts of National Interest must include the Republic as a party, the Constitutional Chamber's decision is not binding law because (i) the Constitutional Chamber did not explicitly state the decision was binding, and (ii) it was not published in the Official Gazette.[62] For the reasons set forth in Part I.B of this report, these statements are incorrect. Moreover, they directly contradict Professor Brewer-Carías's published works regarding this very case and its legally binding effects.

§ 63.    *Third*, Professor Brewer-Carías claims that ███████████████████
██████████ ██ ██ ██████████ ████████ ██████████ ██ ██████ ████████.
Specifically, Professor Brewer-Carías argues that in *Lucía Antillano*, the Constitutional Chamber held that a contract entered into by a State Corporation—in the case, *C.V.G*

---

[58]    ████████████████, § 73; Hogan Memorandum (Sept. 21, 2016), **Exhibit ██-60**, pp. 1–4.

[59]    Brewer-Carías Expert Report, § 105.

[60]    *Id.* at § 106.

[61]    *Id.* at § 109.

[62]    *Id.* at §§ 110–11.

*Electrificación del Caroní, C.A. (Edelca)*—may qualify as a Contract of National Interest.[63] I disagree.

§ 64.    In *Lucía Antillano*, the Constitutional Chamber addressed a case where *the Republic* had entered into an international agreement with the Federal Republic of Brazil concerning the supply of electricity.[64] In furtherance of that international agreement, a State Corporation entered into a commercial agreement that the Court characterized as a Contract of National Interest.

§ 65.    That judicial holding is inapposite to the present case for two reasons, namely:

a.    The *C.V.G Electrificación del Caroní, C.A. (Edelca)* contract *derived from an international agreement* between the Republic of Venezuela and the Federal Republic of Brazil concerning the "international relations [between both States] . . . for the supply of Electric Power."[65] In other words, the *C.V.G Electrificación del Caroní, C.A. (Edelca)* contract was concluded to execute that international agreement between two States: the *Republic* and Brazil.

Indeed, in the *Lucía Antillano* decision, the Constitutional Chamber concluded that the contract *sub iudice* had been concluded "*in execution of* the Friendship and Cooperation Agreement between the Republic of Venezuela and the Federative Republic of Brazil of November 17, 1977, as well as the Additional Protocol to said Agreement, signed by the Presidents of both countries on March 4, 1994, and in compliance with the Memorandum of Understanding for the Supply of Electric Power Venezuela-Brazil . . ." and, furthermore, that "*the Supply Contract* between CVG ELECTRIFICACIÓN DEL CARONÍ . . . and CENTRAIS ELÉTRICAS BRASILEIRAS S/A ELETROBRAS and CENTRAIS ELÉTRICAS DO NORTE DO BRAZIL S/A ELETRONORTE, *whereby both countries*, by the body of the

---

[63]  *Id.* at § 112.

[64]  Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 953 (Apr. 29, 2003) ("*Lucía Antillano*"), **Exhibit ■ - 72**, p. 1.

[65]  The international agreements I refer to are (i) the Additional Protocol to the Agreement of Friendship and Cooperation between the Republic of Venezuela and the Federative Republic of Brazil (*Protocolo Adicional al Convenio de Amistad y Cooperación entre la República de Venezuela y la República Federativa del Brasil*), dated March 4, 1994, and (ii) the Memorandum of Understanding for the Supply of Electric Power Venezuela-Brazil (*Memorándum de Entendimiento para el Suministro de Energía Eléctrica Venezuela-Brasil*), dated January 29, 1997. *See id.* at pp. 1, 14–15.

subscribing companies, *agreed to execute in their respective territories the construction of a power line in order for the Venezuelan State to supply electricity* from the Macagua II hydroelectric plant, to . . . the aforementioned Brazilian city [of Boa Vista]." [66]

In the present case (i) there is no such international agreement; and (ii) the international relationship between Venezuela and another State is not at stake.

b. Because of the existing international agreement between the Republic and Brazil, a default on the contract for the supply of electricity could have created a liability for the Republic in the international forum.

§ 66.    In the present case, a default by PDVSA and PDVSA Petróleo on the commercial obligations pursuant to the Governing Documents cannot create liabilities to the Republic. Indeed, the Governing Documents do not create obligations attributable to the Republic.

§ 67.    While Professor Brewer-Carías references one of his own publications from 2011 to bolster his argument that *Lucía Antillano* contradicts and supersedes *Andrés Velásquez et al.*, ███████████████████████████████████████████████████ y, that "[t]he Constitutional Chamber . . . as the highest and final interpreter of the Constitution in [*Andrés Velásquez et al.*] established a binding interpretation, and *reduced the category of 'public interest contracts' (art. 150 C.) to those signed or concluded by the Republic*, States and Municipalities, consequently, *excluding from such classification public contracts subscribed by autonomous institutes or national public companies such as PDVSA . . . .*"[67] It is worthwhile emphasizing further that, in scholarly work produced *years after Lucía Antillano* was decided in 2003, Professors Badell Madrid and Brewer-Carías still concluded that the Constitutional Chamber had decided that Contracts of National Interest are contracts concluded by the Republic only.[68]

§ 68.    █████████████████████████████████████████████████████████ ███████████ each of the other criteria of *Andrés Velásquez et al.* As support for his argument, Professor Brewer-Carías states that PDVSA "incurred a huge indebtedness well beyond its ordinary commercial needs" and that, in accordance with the National Assembly's May 26, 2016, Resolution, the Governing Documents could "compromise the assets of the

---

[66]   *Id.* at p. 14 (emphasis added).

[67]   Brewer-Carías, *Sobre los Contratos*, *supra* note 12 (emphasis added), **Exhibit** ██**-R-03**, p. 4.

[68]   Badell Madrid, *Sobre la Inmunidad*, *supra* note 19, **Exhibit** ██**-70**, p. 159; Brewer-Carías, *La Mutación*, *supra* note 13, **Exhibit** ██**-67**, p. 390.

23

Republic or expose it to serious losses or international claims."[69] Again, I disagree with these statements. As a factual matter, Professor Brewer-Carías provides no support for his assertions regarding PDVSA's debt. But even if such statements were factually supported, as explained in my Expert Report, PDVSA's default does not expose *the Republic* to losses or international claims because the Republic is not a party to either of the Governing Documents.[70]

§ 69. ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

## II. PROFESSOR BREWER-CARÍAS'S INTERPRETATION OF ARTICLE 150 OF THE CONSTITUTION CANNOT BE RECONCILED WITH THE PLAIN TEXT OF ARTICLES 187(9) AND 236(14) OF THE CONSTITUTION

§ 70.  In this section, I will review (i) the significance of Professor Brewer-Carías's role as drafter of Articles 150 and 151 of the Constitution; (ii) the true meaning of Article 187(3) of the Constitution granting the National Assembly's powers to control the National Public Administration; (iii) the legal consequences stemming from the administrative attachment of PDVSA to the Ministry of Petroleum and the simultaneous exercise of the Ministry of Petroleum and the Presidency of PDVSA by the same person; and (iv) the practical consequences of Professor Brewer-Carías's reading of Article 150 of the Constitution.

### A. Professor Brewer-Carías's Role as Drafter of Articles 150 and 151 of the Constitution

§ 71.  Professor Brewer-Carías affirms that the Venezuelan Constitution is the supreme law of Venezuela.[71] I fully agree.

---

[69]   Brewer-Carías Expert Report, § 116.
[70]   ████████████████████, §§ 105–10.
[71]   Brewer-Carías Expert Report, § 12.

§ 72.    However, Professor Brewer-Carías's conclusion that a Contract of National Interest is a contract that may be entered into by any entity that is part of the National Public Administration,[72] including PDVSA and PDVSA Petróleo, is contrary to the plain language of Articles 187(9) and 236(14) of the Constitution.

§ 73.    Professor Brewer-Carías's role in the Constitution's drafting process of Articles 150 and 151 cannot alter the plain language of Articles 187(9) and 236(14). This is because the opinion of the single drafter of a constitutional rule—in the case at hand, Articles 150 and 151 of the Constitution—does not necessarily coincide with the understanding that more than 100 members of the Constitutional Assembly in charge of drafting the Constitution may have had of those same two provisions, other relevant constitutional rules (including Articles 187(9) and 236(14)), and the interplay of all those constitutional provisions. The Brewer-Carías Expert Report does not prove that Professor Brewer-Carías's opinion and the understanding of the rules proposed by him and the ones held by the rest of the members of the National Assembly are one and the same.

§ 74.    This is why, under Venezuelan Law, (i) the preparatory work on two Articles of the Constitution cannot not be read literally (*ad pedem litterae*) when interpreting the final text of the Constitution;[73] and (ii) the opinions expressed throughout the discussion of the Constitution can never be considered as an authentic interpretation of the Constitution.[74]

§ 75.    As I stated in my Expert Report,[75] the Constitutional Chamber has affirmed that constitutional rules cannot be read and interpreted "isolated from its normative context" and that the meaning of a constitutional rule, in fact, can only be determined bearing in mind that the Constitution constitutes a "harmonic and systematized" set of rules. Therefore, the true meaning of Article 150 can only be determined taking into account Articles 187(9) and 236(14).

---

[72]    *Id.* at §§ 13, 22, 32–41.

[73]    *See*, *mutatis mutandis*, Edgar Sanabria, *Interpretación de la ley*, and Carlos Morín Loreto, *La interpretación de la ley*, *in* CÓDIGO CIVIL DE VENEZUELA ARTÍCULOS 1O. A 18, **Exhibit ▮-R-13**, p. 225.

[74]    *Id.*

[75]    ▮▮▮▮▮▮▮, § 120.

**B.    Article 187(3) of the Constitution Does Not Grant the National Assembly Power to Approve Contracts Concluded by PDVSA and Its Subsidiaries, Let Alone the Entirety of the National Public Administration**

§ 76.    It is true that Article 187(3) of the Constitution grants the National Assembly power to "[e]xercise control functions over the Government and National Public Administration."[76] But that same provision adds that such control may only be exercised "*on the terms enshrined in [the] Constitution and in the law.*"[77] In the case at hand, the phrase "on the terms enshrined in [the] Constitution" makes specific reference to Article 187(9), which circumscribes the power granted to the National Assembly to approve Contracts of National Interest to contracts concluded by the "National Executive," and the "National Executive" *only*.[78]

§ 77.    The term "National Public Administration" does not appear anywhere in the text of Article 187(9), which is the specific constitutional rule that authorizes the National Assembly to approve Contracts of National Interest in exercise of its control functions, nor in Articles 150 or 236(14).[79] To the contrary, Article 187(9) expressly refers to the "National Executive" entering into Contracts of National Interest.[80] Hence, the term "National Public Administration" should not be read into these articles of the Constitution, as Professor Brewer-Carías proposes in his expert report.

§ 78.    As I explained in my Expert Report, "National Executive" and "National Public Administration" are *very different terms*.

§ 79.    The term "National Public Administration" is a broad term which encompasses two different groups of "organs"—*i.e.*, bodies or departments—and entities:

a. On the one hand, the *Centralized Administration*, which in turn comprises two sub-groups of organs, namely, (i) the *National Executive*, which includes, among others, the President of the Republic, the Executive Vice President of the

---

[76]    Constitution, art. 187(3), **Exhibit ▇-32**, p. 28.

[77]    *Id.* (emphasis added).

[78]    *Id.*

[79]    *Id.* at arts. 150, 187(9), 236(14), **Exhibit ▇-32**, pp. 25, 28, 31.

[80]    *Id.* at art. 187(9), **Exhibit ▇-32**, p. 28.

Republic, and the Ministers, and (ii) other administrative organs, lower in administrative hierarchy.

The Republic of Venezuela, as an entity, acts through its organs, including the President in Council of Ministers. The organs of the Republic are bodies or departments without separate and distinct legal personality of their own. As such, actions taken by said organs are attributable to the Republic—and the Republic only.[81]

b. On the other hand, the *Decentralized Administration*[82] is composed in its entirety by legal entities with distinct legal personalities, separate and apart from that of the Republic. The Decentralized Administration comprises all State Corporations—including PDVSA and its subsidiaries.

§ 80.   Therefore, the terms "National Executive" and "National Public Administration" cannot be conflated or in any way confused.

§ 81.   In the present case, the term National Executive refers to the President and the Council of Ministers only, per Article 236(14) of the Constitution. Article 236(14) *reserves the power* to enter into Contracts of National Interest to the President and Council of Ministers *only*. Put in other words, the Constitution does not grant the power to conclude Contracts of National Interest to any other authority. The Brewer-Carías Expert Report should have considered—and it does not—the plain text of Article 236(14) of the Constitution. In failing to do so, the analysis of the Constitution contained in the Brewer-Carías Expert Report is incomplete and reaches a conclusion that cannot be reconciled with the Constitution *considered as a whole*.[83]

§ 82.   The assertion made in the Brewer-Carías Expert Report is contrary to how the National Assembly delineated these groups or organs and entities, including at the time of the 2016 Exchange. Indeed, the National Assembly in its Resolution dated May 26, 2016, (the "May 2016 Resolution")[84] discusses its authority to approve Contracts of National

---

[81]   ███████████████, §§ 36–37.

[82]   Brewer-Carías, *Administrative Law*, *supra* note 12, **Exhibit ██-R-05,** pp. 79–80.

[83]   ███████████████, § 120.

[84]   Resolution on the Respect of the Legal and Non-Transferable Authority of the National Assembly on Contracts of Public Interest *Signed by the National Executive* with States or Foreign Official

Interest. In doing so, the National Assembly does not refer to the "National Public Administration" when discussing the parties to such contracts, but instead uses the term "National Executive."[85]

C. **The Administrative Attachment of PDVSA to the Ministry of Petroleum Reaffirms the Nature of PDVSA as an Entity Distinct and Separate from the Republic**

§ 83.   In arguing that PDVSA and PDVSA Petróleo are part of the National Public Administration (a point with which I agree), Professor Brewer-Carías notes, among other facts, that PDVSA is attached to the Ministry of Petroleum for the purpose of the supervision and control of the former by the latter.[86] But, as Professor Brewer-Carías acknowledges, this relationship does not transform PDVSA or PDVSA Petróleo into organs of the National Executive and the Republic.[87] And that attachment does not repudiate the legal personality of PDVSA or PDVSA Petróleo; on the contrary, it reaffirms it.

§ 84.   Indeed, Article 15(2) of the Law on Attachment of Autonomous Institutes, State Corporations, Foundations, Associations and Civil Societies of the State to the Bodies of the Public Administration ("Law on Attachment")[88] states that as a consequence of the attachment provided for in the Law on Attachment, control over State Corporations shall be exercised by the Republic acting as a shareholder in the State Corporation's shareholders meetings.[89] Given the nature of the control—shareholders' control—of the Republic through the Ministry of Petroleum over PDVSA, Article 15(2) of the Law on

---

Entities or with Companies Not Domiciled in Venezuela (May 26, 2016) ("May 2016 Resolution"), **Exhibit** █-82.

[85]   *Id.* at pp. 1–3.

[86]   *See* Organic Law of the Public Administration, art. 120, *Official Gazette* N° 6147 Extraordinary (Nov. 17, 2014), **Exhibit** █-20, p. 24.

[87]   Brewer-Carías Expert Report, § 22; *see also* ████████████, §§ 36, 51.

[88]   Law on Attachment of Autonomous Institutes, State Corporations, Foundations, Associations and Civil Societies of the State to the Bodies of the Public Administration, art. 15(2), *Official Gazette* N° 5556 Extraordinary (Nov. 13, 2001) ("Law on Attachment"), **Exhibit** █-R-14, p. 9.

[89]   Pursuant to Article 201 of the Commercial Code, a corporation and its shareholders are different legal persons. *Official Gazette* N° 475 Extraordinary (Dec. 21, 1955), **Exhibit** █-19, pp. 20–21; *see also* ████████████████████████████████████████ ████), **Exhibit** █-21, pp. 23–25.

Attachment *reaffirms the autonomy granted to PDVSA* by the Constitution and the Organic Law of the Public Administration to manage the oil business as a decentralized and specialized legal entity.

§ 85.   It is also true, as Professor Brewer-Carías observes, that PDVSA's President has also served as Minister of Petroleum. But again, that circumstance does not transform PDVSA—an entity with legal personality separate and distinct from the Republic—into an organ of the *National Executive* and the Republic. Nor does it transform PDVSA's contracts into contracts entered into by the Republic through the organs of its National Executive. Professor Brewer-Carías does not cite precedent or law that would lead a court to any different conclusion.

§ 86.   Indeed, Professor Brewer-Carías, in a publication co-authored by Enrique Viloria, acknowledged that

> the fact that Petróleos de Venezuela, S.A. has its own legal personality distinct from the Republic and of the other territorial entities [states, municipalities], makes it an autonomous center of imputation of interests, which gives rise to its own legal regime for the purpose of its patrimony, responsibility, taxes, contractual matters, etc., which is distinct from that of the Republic.[90]

§ 87.   Further, PDVSA's employees are paid by PDVSA, not the Republic, and they are not civil servants under Venezuelan Law.[91] PDVSA is responsible for its own finances and is not funded by the Republic.[92] Overlap in a State Corporation's governance with

---

[90]   Allan Randolph Brewer-Carías & Enrique Viloria, *El Holding Público* (1986), **Exhibit ▆-31,** p. 155.

[91]   Organic Law of the Public Administration, art. 108 ("State enterprises shall be governed by [Private laws], by what is established in this Decree with Rank, Value and Force of Organic Law and other applicable norms; and their workers will be governed by [Private] labor legislation."), **Exhibit ▆-20**, p. 22.

[92]   Financial Administration Law, art. 101(4) ("The following [entities] are excepted from the [limits and prohibitions on public credit transactions set forth in] this Title: . . . 4. Business companies created or to be created in accordance with the Organic Hydrocarbons Law . . . ."), **Exhibit ▆-30**, p. 82; Organic Law of the Public Administration, art. 29(1) ("There will be two types of operational decentralized entities: 1. Operational decentralized entities in the form of private law: these will be made up of legal entities constituted in accordance with the rules of private law and may . . . adopt the corporate structure in accordance with the purposes and objectives for which

individuals that have roles within the Republic, *even an organ of the National Executive*, does not transform a State Corporation into part of the National Executive.

§ 88.   In light of the above, that PDVSA's President has served as the Minister of Petroleum is of no moment.

**III.   PROFESSOR BREWER-CARÍAS'S CONCLUSION THAT ANY CONTRACT ENTERED INTO BY A DECENTRALIZED ENTITY WITHIN THE PUBLIC ADMINISTRATION IS A PUBLIC INTEREST CONTRACT IS NOT SHARED BY PROMINENT VENEZUELAN SCHOLARS AND IS INCONSISTENT WITH PDVSA'S PRIOR DEBT PRACTICES**

§ 89.   Professor Brewer-Carías concludes in his report that "*any* contract entered into by an organ or entity of the Public Administration is a public interest contract."[93] Respectfully, I disagree. Not only is this opinion contrary to established Venezuelan Law, but it would have unwieldy and illogical consequences.

§ 90.   According to Professor Brewer-Carías's expansive reading of Article 150 of the Constitution, any contract—be it large or small—concluded by PDVSA or its subsidiaries would qualify as a public interest contract. Moreover, when concluded with a corporation not domiciled in Venezuela, any contract to which PDVSA or its subsidiaries are parties would then be subject to the approval of the National Assembly. Thus, under the theory advanced in the Brewer-Carías Expert Report, not only would large and small financing agreements be subject to approval by the National Assembly, but also *any other* contracts between PDVSA or its subsidiaries and a foreign company. This would require prior approval by the National Assembly of (i) contracts related to the day-to-day commercial operations of PDVSA and its subsidiaries, such as contracts for the sale of Venezuelan oil in the international markets or the lease of an oil tanker, and even (ii) contracts for

---

they were created and in consideration of whether the fundamental source of their funds comes from their own activity . . . ."), **Exhibit ▓-20**, p. 12.

[93]   Brewer-Carías Expert Report, § 39 (emphasis in original).

electrical energy supply or cleaning services to be provided to PDVSA's offices in the cities of New York, London, or The Hague.[94] That is not—and has never been—the case.

§ 91.   Indeed, such a broad interpretation of Contracts of National Interest would effectively grind to a halt the ability of PDVSA or its subsidiaries to enter into contracts involving non-Venezuelan entities or otherwise operate internationally.

§ 92.   Moreover, Professor Brewer-Carías's conclusion is contrary to the opinion of other scholars (including Professors Lares Martínez and Caballero Ortiz) who have opined that in Contracts of National Interest, the Republic must be a contracting party, as discussed in my Expert Report.[95]

§ 93.   Notably, Professor Brewer-Carías's position is broader than, and inconsistent with, the arguments made by Plaintiffs in this litigation about why the Indenture and Pledge Agreement are Contracts of National Interest. In both their Complaint and in representations to the Court, Plaintiffs have asserted that the Governing Documents are Contracts of National Interest not merely because they were entered into by PDVSA and PDVSA Petróleo with corporations not domiciled in Venezuela, but also because of their impact on Venezuela's oil industry and, specifically, the pledge of CITGO Holding's shares. In the Complaint, Plaintiffs asserted that the Indenture and Pledge Agreement were Contracts of National Interest "because (i) PDVSA and PDVSA Petróleo were parties to the Indenture [and Pledge Agreement] and (ii) the Indenture [and Pledge Agreement] implicated in a significant way Venezuela's most important industry and placed the CITGO Shares at risk."[96] During a conference on November 8, 2019, Plaintiffs argued that what differentiates the Governing Documents is that they "involved a pledge of a controlling interest in Citgo" and clarified that "[their] contention is not that every contract PDVSA enters into requires prior National Assembly authorization."[97]

---

[94]   A list of PDVSA's commercial offices can be found here under the "Business Offices" tab: *PDVSA in the World*, PDVSA, http://www.pdvsa.com/index.php?option=com_content&view=article&id=6581&Itemid=898&lang=en (last visted Apr. 30, 2020).

[95]   ███████████████, § 93.

[96]   Compl., §§ 76, 87, ECF No. 1 (Oct. 29, 2019).

[97]   H'rg Tr., Nov. 8, 2019, ECF No. 31, **Exhibit** ██**-125**, p. 14.

## IV. UNLIKE THE CONSTITUTIONAL CHAMBER'S DECISION IN *ANDRÉS VELÁSQUEZ ET AL.*, THE NATIONAL ASSEMBLY RESOLUTIONS INVOKED BY PROFESSOR BREWER-CARÍAS ARE NOT BINDING LAW

§ 94.   In his report, Professor Brewer-Carías relies mainly on three National Assembly resolutions (i) the May 2016 Resolution, (ii) a resolution dated September 27, 2016 (the "September 2016 Resolution"),[98] and (iii) a resolution dated October 15, 2019 (the "October 2019 Resolution") (collectively, the "Resolutions").[99] As discussed below, reliance on these Resolutions is misplaced for several reasons.

§ 95.   *First and foremost*, the Resolutions carry no legally binding effect when it comes to determining *whether* a contract is a Contract of National Interest, and cannot serve to invalidate the Governing Documents. Nor should they be given any legal deference for interpretations of the Constitution to the extent they conflict with the Constitutional Chamber's guidance on the requirements of Contracts of National Interest.

§ 96.   *Second*, it is well settled that the National Assembly has no power to invalidate contracts through its resolutions. No provision of the Constitution grants the National Assembly the power to declare the nullity of contracts. Rather, the power to invalidate contracts is reserved to Venezuelan courts.[100]

§ 97.   *Third*, Professor Brewer-Carías misreads each of the three Resolutions, and therefore the conclusions he draws from these resolutions are unsubstantiated by the text of those documents.

---

[98]   Resolution on the Current Financial Situation of Petróleos de Venezuela, S.A. (Sept. 27, 2016) ("September 2016 Resolution"), **Exhibit ▮-124**.

[99]   Resolution That Reiterates the Invalidity of PDVSA's 2020 Bonds (Oct. 15, 2019) ("October 2019 Resolution"), **Exhibit ▮-R-15**.

[100]   According to Article 253 of the Constitution, the power to administer justice is granted to the Judiciary. Constitution. art. 253, **Exhibit ▮-32**, p. 32.

A. **National Assembly Resolutions Cannot Supersede the Constitutional Chamber's Interpretation of the Constitution and Venezuelan Law, and Do Not Have the Effect of Law**

§ 98.   Before addressing each of the Resolutions on which Professor Brewer-Carías relies, it is first necessary to explain the weight and nature of National Assembly resolutions in the context of Constitutional Law.

§ 99.   As Professor Brewer-Carías concedes, the Constitutional Chamber enjoys precedence over the National Assembly in matters of constitutional interpretation. Professor Brewer-Carías has even noted, for instance, that "the Constitutional Chamber . . . through a constitutionally-prescribed process of judicial review" can repeal National Assembly resolutions.[101] I agree. Professor Brewer-Carías also argues that the National Assembly is empowered to interpret the Constitution in the exercise of its legislative powers through its resolutions.[102] I agree with this assertion as well.

§ 100.  But, to the extent the Brewer-Carías's Expert Report could be read to imply that the National Assembly is empowered to overrule constitutional determinations made by the Constitutional Chamber on the requirements of Contracts of National Interest, be it by resolution or otherwise, that is simply incorrect.

§ 101.  Article 335 of the Constitution entrusts the Supreme Tribunal of Justice with the role of "supreme and ultimate interpreter" of the Constitution. Article 335 also states that the interpretations made by the Constitutional Chamber concerning the contents or scope of Constitutional rules and principles "are binding" on the other Chambers of the Supreme Tribunal of Justice and on any other courts of the Republic, just as it is binding on any other national authority, including the National Assembly.[103]

---

[101] Brewer-Carías Expert Report, § 52. Pursuant to Article 336(1) of the Constitution, the Constitutional Chamber is empowered to declare the nullity of "national laws *and any other* acts . . . *with force of law*" issued by the National Assembly. Constitution, art. 336(1) (emphasis added), **Exhibit ■-32**, p. 37.

[102] Brewer-Carías Expert Report, §§ 50–51.

[103] Constitution, art. 335, **Exhibit ■-32**, p. 37.

§ 102.  Under Venezuelan Law, the National Assembly must respect and abide by the Constitution[104] as well as the decisions—binding in nature—made by the Constitutional Chamber for the purpose of interpreting the contents of the Constitution (*supra* § 40). While the National Assembly is entitled to pass resolutions to express concern over debt transactions entered into by PDVSA and its affiliates, these resolutions are *political* in nature, and not legally binding. Thus, they *cannot contradict or supersede* the Constitutional Chamber's binding interpretation of Article 150 of the Constitution made in the *Andrés Velásquez et al.* decision and its ensuing case law.

§ 103.  I note that based on Article 138 of the Constitution, Professor Brewer-Carías argues that "the National Assembly can resolve that a certain authority has been usurped and that, according to the Constitution, such authority is ineffective and any related acts are to be deemed null and unconstitutional . . . ."[105] Respectfully, I disagree.

§ 104.  Usurpation of authority is a legal defect that can only be declared by Venezuelan courts[106] following judicial due process. As a legal defect, usurpation of authority presupposes the exercise of *authority* by someone who lacks such authority. In the present case, PDVSA and PDVSA Petróleo did not act as an authority. They need not. On the contrary, the conclusion of the Governing Documents was the result of the exercise by PDVSA and PDVSA Petróleo of their *right to contract*.

B.   **National Assembly Resolutions Are Not Laws and Are Insufficient Acts for the Purpose of Determining Whether a Contract Is a Contract of National Interest**

§ 105.  Along similar lines, Professor Brewer-Carías states in his report that resolutions approved by the National Assembly are not laws.[107] I agree. For that reason as well, the

---

[104]  *See id.* at art. 7, **Exhibit** ■**-32**, p. 17 ("The Constitution is the supreme law and the foundation of the legal system. All persons and bodies that exercise Public Power are subject to this Constitution.").

[105]  Brewer-Carías Expert Report, § 51.

[106]  *See* Allan Randolph Brewer-Carías, *VI Instituciones Políticas y Constitucionales (Justicia Constitucional)* (1996), **Exhibit** ■**-R-16**, pp. 260–61. Professor Brewer-Carías concludes that *usurpation of authority* serves as *grounds for a judicial claim* for reasons of unconstitutionality. *See id.*

[107]  Brewer-Carías Expert Report, § 51.

34

resolutions are insufficient to determine whether the Governing Documents are Contracts of National Interest.

§ 106. Laws are enacted by the National Assembly acting as a legislative body and must follow the legislative procedure for the enactment of laws set forth in Articles 203 *et seq.* of the Constitution.[108] This process is far more complex and contains far more steps in order for a law to be enacted, in comparison to the much simpler process of issuing National Assembly resolutions. When approving a resolution, the National Assembly does not act as a legislative body and does not follow the legislative procedure for the

---

[108] The legislative procedure for the enactment of laws is regulated by the Constitution (arts. 204, 208–09, 214–16, **Exhibit ▆-32**, pp. 29–30), and the Procedural and Internal Rules of the National Assembly (the "Procedural Rules") (arts. 103–06, 111 (Dec. 17, 2019), **Exhibit ▆-R-17**, pp. 38–40, 42). Briefly, this can be described as a five-step process. First, a draft bill is submitted pursuant to Articles 204 of the Constitution and 103 of the Procedural Rules. A draft bill may be submitted before the National Assembly by the authorities or persons with power to do so (including, among others, (i) the National Executive, (ii) National Assembly committees, (iii) at least three Lawmakers acting jointly, and (iv) a certain number of registered voters). Second, a first discussion is held on the draft bill pursuant to Articles 208 of the Constitution and 104 of the Procedural Rules. During this step, the National Assembly discusses the general aspects and convenience of the bill. If the majority approves the draft after the first discussion, it is sent to the parliamentary committee with competence in the subject-matter related to the draft for its detailed analysis. Third, a report is prepared by the parliamentary committee, pursuant to Articles 208 of the Constitution and 105 of the Procedural Rules, on the convenience of the bill. Fourth, a second discussion of the draft bill is held by lawmakers to discuss the report prepared by the parliamentary committee, pursuant to Articles 209 of the Constitution and 106 of the Procedural Rules. During the second discussion, lawmakers discuss the specifics of the draft "article by article" and vote on whether to approve the draft. If the draft is approved, the President of the Assembly declares the draft as law and sends it to the President of the Republic for its enactment. The last step is the President of the Republic's consideration of the enactment of the law (*promulgación de la ley*) pursuant to Articles 214 through 216 of the Constitution. After receiving the law, the President of the Republic may (i) suggest amendments thereto, (ii) request a decision by the Constitutional Chamber on the constitutionality of the law or articles thereof, or (iii) approve its enactment. After receiving the National Assembly's implementation of the President's suggestions or the Constitutional Chamber's decision confirming the constitutionality of the law, respectively, the President must approve the enactment of the law.

enactment of laws set forth in the Constitution.[109] Resolutions cannot contradict laws nor replace the lack of them when a certain matter is reserved to the law.[110]

§ 107.   Venezuelan legal scholars concur. Professor Badell Madrid has argued that the regulation of Contracts of National Interest—and the ensuing limitation to the freedom to enter into contracts and negotiate their contents—is a matter reserved to the *laws* enacted by the Legislature,[111] as "the legislature is responsible for establishing the scenarios in which legislative approval shall be required for these contracts."[112] Professor Badell Madrid adds that the matter reserved to laws enacted by the Legislature:

> is broad and *includes* not only *the classification of the contract (as a "public national interest" contract)* but also the setting of special conditions for entering into said contract in relation to the nationality of the co-contracting parties, their domicile, the need for special or other guarantees, such as experience and financial conditions, among others.[113]

§ 108. Not being laws enacted by the Legislature, the resolutions invoked in Professor Brewer-Carías's report were *unsuitable* for the purpose of declaring—with legally binding

---

[109]  Resolutions are drafted and first discussed within the board (President and two Vice Presidents) of the National Assembly, and only then submitted for the approval of the rest of the lawmakers. Procedural Rules, art. 111, **Exhibit ▪-R-17**, p. 42.

[110]  Article 218 of the Constitution provides that laws can only be repealed by other laws. Constitution, art. 218 ("Laws are repealed by other laws and abrogated by referendum, except for the exceptions established in this Constitution."), **Exhibit ▪-32**, p. 30.

[111]  Rafael Badell Madrid, *Contratos de Interés Público Nacional*, *in* 19 Revista de Derecho Administrativo (2004), **Exhibit ▪-95**, p. 50; *see also* Decision of the Constitutional Chamber of the Supreme Tribunal of Justice N° 1029 (June 1, 2001), **Exhibit ▪-42**, pp. 5–6. The judicial decision reads as follows: "the determination of contracts of national interest is reserved to the law, as provided in Article 150 and Article 187(9) of the Constitution." It should be emphasized that, when exercising its ability to pass laws regulating Contracts of National Interest, the Legislature must adhere to the Constitutional Chamber's binding precedent on the requirements of such contracts as set forth in *Andrés Velásquez et al.*, N° 2241, **Exhibit ▪-07**.

[112]  Badell Madrid, *Contratos de Interés*, *supra* note 111, **Exhibit ▪-95**, p. 50. In this same sense, Professor Brewer-Carías affirms that "first of all, a contract will be of 'national interest' when determined by the legislator." Allan Randolph Brewer-Carías, *Los contratos de interés nacional y su aprobación legislativa*, *in* 11 Revista de Derecho Público (1982), **Exhibit ▪-R-18**, p. 49; Allan Randolph Brewer-Carías, *III Tratado de Derecho Administrativo* (2013), **Exhibit ▪-86**, p. 637.

[113]  Badell Madrid, *Contratos de Interés*, *supra* note 111 (emphasis added), **Exhibit ▪-95**, p. 50.

effects—that a contract is a Contract of National Interest or articulating a binding interpretation of the requirements of such contracts.

### C.   The Resolutions on Which Professor Brewer-Carías Relies Do Not Support His Arguments

#### 1.   The May 2016 Resolution

§ 109.  While Professor Brewer-Carías first relies on the National Assembly's May 2016 Resolution, that Resolution on its face does not address the transactions at issue in this case. Professor Brewer-Carías opines, however, that the May 2016 Resolution articulated a standard for Contracts of National Interest that "takes into account the magnitude or impact of the transaction."[114] Based on that erroneous conclusion, he further opines that the Indenture and Pledge are Contracts of National Interest because of CITGO's importance to Venezuela's oil industry.[115] Specifically, he argues that, through this resolution, the National Assembly interpreted Contracts of National Interest to include

> [l]arge contracts (*grandes contrataciones*) that could seriously compromise the assets of the Republic or expose it to serious losses or international claims eventually injurious to the sovereignty and integrity of the country, as well as the contracts that, due to their purpose, deserve such qualification . . . .[116]

§ 110.  Although Professor Brewer-Carías is correct that the May 2016 Resolution states the foregoing, as explained above, National Assembly resolutions are not legally binding interpretations of the Constitution. Accordingly, the May 2016 Resolution cannot create any new Constitutional "standard" that bears upon the validity or legality of the Pledge or Indenture. At most, the resolution confirms the National Assembly's political interpretation of the Constitution—an interpretation that is not legally binding and is contrary to the rulings of the Constitutional Chamber discussed above.

§ 111.  Further, because Professor Brewer-Carías's purported standard would turn in part on the size of the contracts, it is unworkable, as discussed in my Expert Report[117] and

---

[114]  Brewer-Carías Expert Report, § 42.

[115]  *Id.*

[116]  *Id.* § 67.

[117]  ████████████████, §§ 150–54.

37

*infra* § 142. That is because there is no clear *legal guidance* on how to identify a Contract of National Interest based on quantitative value or economic implications. Professor Brewer-Carías himself has argued that the size of a contract "is inadmissible by itself to draw the boundary between contracts that are of national interest and those that are not."[118] Professor Brewer-Carías's proposed standard would also turn on whether the contracts would compromise the assets of *the Republic*. The shares of PDVSA's subsidiaries, including CITGO Holding's shares, are not "assets" of the Republic. Accordingly, even under this proposed standard, neither the Pledge nor the Governing Documents would qualify as Contracts of National Interest.

§ 112.  Rather than support Professor Brewer-Carías's position, the May 2016 Resolution actually recognizes and reaffirms that the National Assembly's power to approve Contracts of National Interest refers to those concluded by the "*National Executive*" with foreign States, foreign official entities, or companies not domiciled in Venezuela.[119] By using the term "National Executive" in this resolution, the National Assembly acknowledged that contracts between State-owned companies such as PDVSA, which are not the "National Executive," and foreign entities are not Contracts of National Interest, as affirmed by the Constitutional Chamber in several cases, including *Andrés Velásquez et al.* (2002), *Attorney General of the Republic II* (2007), and *Brigitte Acosta Isasis* (2016).[120]

### 2.    The September 2016 Resolution

§ 113.  Turning to the September 2016 Resolution, Professor Brewer-Carías correctly notes that the September 2016 Resolution[121] invokes Article 187(9) of the Constitution, which grants the National Assembly power to approve Contracts of National Interest.[122] However, the fact that the September 2016 Resolution cited in passing Article 187(9) of the Constitution does not, as Professor Brewer-Carías suggests, mean that the National Assembly "recognized that the transaction contracts were contracts in the national public interest" through this resolution.[123]

---

[118]   Brewer-Carías, *supra* note 112 (emphasis added), **Exhibit ▮▮-86**, p. 638.

[119]   May 2016 Resolution (emphasis added), **Exhibit ▮▮-82**, pp. 1–3.

[120]   ▮▮▮▮▮▮▮▮▮▮▮▮▮, §§ 95–106.

[121]   September 2016 Resolution, **Exhibit ▮▮-124**.

[122]   Brewer-Carías Expert Report, § 69.

[123]   *Id.* § 72.

§ 114. It is apparent from the face of the September 2016 Resolution that the National Assembly did not affirm nor conclude that the Governing Documents were Contracts of National Interest in this resolution. If the National Assembly had that intention, it could have expressly said so, and it surely would have cited to Article 150.

§ 115. Instead, the September 2016 Resolution provides that it was issued, first of all, for the purpose of summoning the President of PDVSA to appear before the National Assembly "to explain the terms" of the Exchange Offer and the pledge of the majority of the shares of CITGO Holding as collateral.[124] That first determination clearly shows that the National Assembly indicated it desired more information about the terms of the Exchange Offer and, lacking that information, could not—*ex rerum natura* (stemming from the nature of things)—arrive at a reasoned conclusion as to the nature of the contract.

§ 116. The September 2016 Resolution identifies three additional purposes, none of which are determinative as to whether the Governing Documents are Contracts of National Interest.

§ 117. *First*, the September 2016 Resolution purports to "reject" the pledge of the majority of the shares of CITGO Holding as collateral.[125] As discussed above, however, this declaration represents solely *political intent* with no legally binding effects as to the legal meaning of the Constitution. The Resolution does not declare that the Pledge is unlawful or violates Article 150 of the Constitution. Notably, the portion of the resolution "reject[ing]" the Pledge makes no mention of Articles 187(9) or 150.[126] Moreover, again as discussed above (*supra* § 96), the National Assembly does not have the power to invalidate contracts; that power is reserved to Venezuelan courts of law.

§ 118. *Second*, the September 2016 Resolution urges the Prosecutor General to initiate an investigation in order to determine if the Exchange Offer safeguarded the assets of the Nation.[127] Again, considering the core functions of the Prosecutor General,[128] that request for the launching of *a criminal investigation* was not aimed at determining the nature of the Exchange Offer, and is ultimately irrelevant. Indeed, the *only* reference to Article 187(9)

---

[124] September 2016 Resolution, **Exhibit ▮-124**, p. 4.

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] Organic Law of the Prosecutor General's Office, art. 16(2)(3), *Official Gazette* N° 38647 (Mar. 19 2007), **Exhibit ▮-R-19**, p. 353.336.

in the September 2016 Resolution is in the context of this *investigation*, and not in connection with any determination or conclusion as to the nature of the Governing Documents.

§ 119. 

§ 120. *Finally*, the September 2016 Resolution urges PDVSA to renegotiate its financial debts. This request, too, is unrelated to any determination of whether the Governing Documents are, in fact, Contracts of National Interest.[130]

§ 121. In summary, the September 2016 Resolution by its terms did not assert that the Governing Documents were Contracts of National Interest. This resolution did not purport to *invalidate* the Governing Documents or the Pledge due to lack of National Assembly approval. Nor could it do so, for that is the sole responsibility of the courts, and is not a power possessed by the National Assembly.

### 3.     The October 2019 Resolution

§ 122. The Brewer-Carías Expert Report also invokes the October 2019 Resolution.[131] According to the National Assembly, this resolution was purportedly issued in order to:

a.    "ratify that the 2020 Bond indenture violated Article 150 of the Constitution . . . since it . . . was not authorized by the National Assembly;"[132] and

---

[129]   Hernández Memorandum, **Exhibit ██-87**, pp. 43, 52.
[130]   September 2016 Resolution, **Exhibit ██-124**, p. 4.
[131]   Brewer-Carías Expert Report, §§ 83–85.
[132]   October 2019 Resolution, **Exhibit ██-R-15-T**, p. 8.

b. "ratify that the 2020 Bond indenture violated Articles 311 and 312 of the Constitution . . . since its financial conditions were detrimental given the irrationality under which PDVSA structured the bond swap . . . ."[133]

§ 123. Professor Brewer-Carías argues that, "[l]ike the National Assembly's prior resolutions condemning the exchange transaction and rejecting the Pledge, this resolution was a binding declaration of the same rank as a statute adopted in the exercise of the National Assembly's legislative power."[134] Respectfully, I disagree.

§ 124. As explained above, there is no "prior resolution" whose contents could be "ratified" on this particular subject matter, and the September 2016 Resolution did not declare that the Governing Documents or the 2016 Exchange were illegal or invalid. Of course, had the National Assembly actually concluded in its September Resolution that the Governing Documents were Contracts of National Interest (it did not), there would be no need to issue the October 2019 Resolution, as it would be a superfluous announcement of the National Assembly's position. Rather, the October 2019 Resolution, issued more than three years after the September 2016 Resolution, and days before the filing of the Plaintiffs' Complaint, is the first act in which the National Assembly actually takes the position—political in nature—that the Exchange Offer violated the Constitution.

§ 125. But even so, as explained earlier (*supra* Part IV.A), the National Assembly does not have the power to declare that the Governing Documents violated Articles 150, 311, or 312 of the Constitution. That power is reserved to Venezuelan courts and can only be exercised with the due process of law.

§ 126. Moreover, the September 2016 Resolution was not issued in exercise of the "legislative power" granted to the National Assembly. Instead, the resolution was issued

---

[133] *Id.* Neither Professor Brewer-Carías nor the Plaintiffs claim that Articles 311 and 312 were violated by the Exchange or the Governing Documents. Articles 311 and 312 of the Constitution provide, in relevant part, that (i) the management of the National Treasury will be governed and executed based on principles of efficiency, solvency, transparency, responsibility, and fiscal balance, and (ii) the National Assembly will not authorize measures that lead to a decrease in public revenue or expenses that exceed the amount of revenue estimates in the draft Budget Law. Constitution, arts. 311–12, **Exhibit ▪-32**, pp. 35–36. Articles 311 and 312 relate to the principles governing the National Treasury and the Budget Laws to be enacted by the Republic. *Id.*

[134] Brewer-Carías Expert Report, § 85.

41

in exercise of the "oversight"—or political control—powers granted by the Constitution to the National Assembly.[135]

§ 127. Hence, the declarations contained in the October 2019 Resolution are—at best—political declarations with no legally binding effects.

## V. THE CONTENTION THAT CONTRACTS OF NATIONAL INTEREST MAY BE ENTERED INTO BY THE PUBLIC ADMINISTRATION, EVEN WHERE THE REPUBLIC IS NOT A PARTY, UNDERMINES THE PUBLIC POLICY OF THE EXEMPTION IN THE FINANCIAL ADMINISTRATION LAW

### A. The Exemption of PDVSA's Public Credit Agreements from Prior National Assembly Approval

§ 128. Professor Brewer-Carías acknowledges that the Financial Administration Law exempts Public Debt transactions by PDVSA and its subsidiaries from National Assembly approval.[136] I agree.

§ 129. However, if it were true that any and all contracts entered into by the National Administration—including by PDVSA and its subsidiaries—with corporations not domiciled in Venezuela are Contracts of National Interest,[137] PDVSA and its subsidiaries would end up being unable to resort to the international financial markets for loans big and small, without seeking and obtaining in each case the approval of the National Assembly.

§ 130. That impediment alone would significantly impair the public policy behind Article 101(4) of the Financial Administration Law,[138] which was enacted for the purpose of exempting PDVSA and its subsidiaries from the stringent legislative approval requirements for Public Debts. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

---

[135] *Id.* §§ 21, 50–51; *see also* Allan Randolph Brewer-Carías, 1 *Derecho Administrativo* (2005), **Exhibit ██-R-20**, pp. 81–82.

[136] Brewer-Carías Expert Report, § 108.

[137] *Id.* §§ 39, 42.

[138] Financial Administration Law, art. 101(4), **Exhibit ██ 30**, p. 82.

███████████[139]██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

§ 131. As such, requiring legislative approval every time PDVSA contracted with a foreign entity, and controlling whether or not PDVSA enters into such contracts, would thus impinge upon the public policy—autonomy to manage the State Corporation—behind Article 101(4). It would also defeat the public policy behind Article 303 of the Constitution, which recognizes PDVSA's *ability to manage* the oil industry on its own, rather than with the ceaseless involvement of the Republic, through its National Assembly.

**B.**    **The Prohibitions on Pledges of Public Assets Contained in Articles 104 and 105 of the Financial Administration Law Do Not Apply to PDVSA and Its Subsidiaries**

§ 132. In his expert report, Professor Brewer-Carías argues that the prohibition on pledging national assets as collateral contained in Article 105 of the Financial Administration Law applies to PDVSA.[141] I do not understand this to be a claim made in the Complaint in this case, but I will nevertheless address the argument and explain my disagreement.

§ 133. It is true that Article 105 provides that "[p]ublic credit operations with guarantee or privileges over national, state or municipal property or income may not be contracted." It is also true that Article 104 of the Financial Administration Law provides: "The Republic and [State] companies whose purpose is not financial activity are prohibited from granting guarantees to support third party obligations . . . ."[142] However, neither Article 104 nor Article 105 of the Financial Administration Law apply to the Pledge or the Governing Documents. This is clear for several reasons.

§ 134. First and foremost, PDVSA and its subsidiaries are expressly exempted from the requirements of Articles 104 and 105 of the Financial Administration Law by Article 101

---

[139]   Hernández Memorandum, **Exhibit** ██**-87**, p. 27.

[140]   *Id.*

[141]   Brewer-Carías Expert Report, §§ 46, n. 31, 108.

[142]   Financial Administration Law, art. 104, **Exhibit** ██**-30**, p. 82.

of that very same law. Professor Brewer-Carías reads Article 105 in isolation, but this article—and the same goes for Article 104—must be interpreted in conjunction with Article 101 *eiusdem* which excludes PDVSA and its subsidiaries from all the provisions of the Title, (*i.e.*, the section) of the Financial Administration Law of which Articles 104 and 105 are a part of. This broad, umbrella-type exemption in Article 101 exempts certain entities from the requirements of *all other provisions* of the Title of the Financial Administration Law of which Articles 104 and 105 belong.[143] Therefore, Professor Brewer-Carías errs in affirming that the prohibition of Article 105—and Article 104—apply to PDVSA and its subsidiaries.

§ 135. Second, even if the prohibition of Article 105 applied here (it does not), it would not be violated by the Governing Documents or the 2016 Exchange because CITGO, CITGO Holding, and PDV Holding are Delaware companies.

---

[143]  Professor Brewer-Carías cites Professor Juan Cristóbal Carmona Borjas as stating that, while PDVSA is exempted under the Financial Administration Law from National Assembly approval of Contracts of National Interest involving Venezuelan persons or entities, PDVSA is not exempted from the prohibition on pledging public property or goods under Article 105. *See* Brewer-Carías Expert Report, §§ 76–77, 80–81 (quoting Juan Cristóbal Carmona Borjas, *Actividad Petrolera y Finanzas Públicas en Venezuela*, *in* 2 COLECCIÓN DERECHO Y FINANZAS: HIDROCARBUROS Y MINERALES (2016) (emphasis added), **Exhibit ▇-R-21**). PDVSA is not subject to Article 105 for several reasons, as discussed above.

[144]  Hernández Memorandum, **Exhibit ▇-87**, p. 16.

[145]  *Id.* at p. 15.

44

████████████████████████████████████████████████████████

██████████████████████████████

§ 136.  In the present case, the thesis on the applicability of the prohibition on pledging national assets as collateral advanced by Professor Brewer-Carías is also contradicted by Professor Carmona, who Professor Brewer-Carías cites as an authority in his Expert Report. Professor Carmona states:

> Regarding PDVSA's possibility to pledge its shares in CITGO as guarantee, we must make the following considerations.
>
> The granting of guarantees qualifies as a public credit operation according to article 80 of the Financial Administration Law. This type of transaction, regulated in that law, receives, like any other, exceptional treatment when it is carried out by PDVSA. It should be remembered that *article 101 of the Financial Administration Law not only exempts the state oil company from obtaining the authorization of the public credit operation by the National Assembly, but that exempts it from everything provided in Title V* (Public Credit System), which is why, *with respect to PDVSA, the provisions of articles 104 and 105 cannot be considered applicable.*[147]

§ 137.  ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████

§ 138.  Professor Brewer-Carías's thesis is also contradicted by the fact that PDVSA, through its subsidiaries, has been pledging its assets since the 1990s, and continues to do so today.[149] CITGO Holding has also pledged its assets on numerous occasions, and, to

---

[146]  *Id.* (emphasis added). ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████

[147]  *See* Carmona Borjas, *supra* note 143 (emphasis added), **Exhibit██-R-21,** p. 437.

[148]  Hernández Memorandum, **Exhibit██-87,** p. 42.

[149]  *See* ██████████████, §§ 57, 212, 217; *see, e.g.,* PDVSA Finance Ltd., Offering Memorandum for $400,000,000 6.45% Notes Due 2004, $300,000,000 6.65% Notes Due 2006, $300,000,000 6.80% Notes Due 2008, $400,000,000 7.40% Notes Due 2016, and $400,000,000 7.50% Notes due 2028 (Nov. 16, 1998), **Exhibit██-R-22,** p. 47.

the best of my knowledge, PDVSA has not challenged these pledges as invalid for the alleged reason that they constitute national assets of Venezuela.[150]

## VI.   THE MAGNITUDE OR IMPACT OF A TRANSACTION IS NOT A VALID CRITERION OF CONTRACTS OF NATIONAL INTEREST

§ 139.  According to the Brewer-Carías Expert Report, the Governing Documents are also Contracts of National Interest "*under any standard that takes into account the magnitude or impact of the transaction,*" including the standard articulated by the National Assembly in the May 2016 Resolution and September 2016 Resolution.[151]

§ 140.  As an initial matter, I do not interpret Professor Brewer-Carías to be opining that the magnitude of a transaction is a valid criterion for qualifying a contract as a national interest contract. He does not cite judicial precedent in support of such an opinion, and absent a law determining the magnitude that serves as threshold for the approval requirement, Professor Brewer-Carías has rejected this criterion in his prior published writings. Instead, I take him to be arguing that, *if* such a standard were operative, the contracts in this case would qualify.

§ 141.  The position that the size of a transaction can qualify it as a Contract of National Interest has no basis in law and, in any event, is unworkable because there is no clear guidance on how to identify a Contract of National Interest based on the quantitative value or economic implications. Therefore, this scholarly theory should not be applied to determine whether the Governing Documents are Contracts of National Interest.[152]

§ 142.  It is true that some scholars have affirmed that Contracts of National Interest must be determined based on their economic implications—*i.e.*, on their *quantum*.[153] Nevertheless, in his scholarly work Professor Brewer-Carías has argued—justly, I must add—that the "*quantitative interpretation criterion on what is to be understood as a contract of national interest is inadmissible by itself to draw the boundary between contracts that are of national interest and those that are not.*"[154]

---

[150]  ████████████, §§ 57–58.

[151]  Brewer-Carías Expert Report, § 42 (emphasis added).

[152]  ████████████, §§ 150–54.

[153]  *Id.*

[154]  Brewer-Carías, *Tratado de Derecho, supra* note 112, **Exhibit** ██-86, p. 638 (emphasis added).

§ 143.  In that same book, Professor Brewer-Carías added that the quantitative criterion cannot be admitted "*unless a law* [enacted by the Legislature] establishes that contracts of certain amounts, importance or nature are [Contracts of National Interest], for the purpose of being subject to the approval of Congress."[155]

§ 144.  As I have already explained before, the resolutions invoked in the Brewer-Carías Expert Report are not laws (*supra* Part IV.B). Therefore, they cannot establish or articulate legal standards for the purpose of determining whether the Governing Documents are Contracts of National Interest (*supra* Part IV.B). As discussed in my Expert Report,[156] the four requirements of such contracts are:

a.  The Republic must be one of the contracting parties;

b.  The subject of the contract must be decisive or essential for the realization of the goals and missions of the Venezuelan State;

c.  The contract must satisfy the interests of the national community; and

d.  The contract must imply the assumption of obligations payable by the Republic "against the National Treasury" during several fiscal years after the one in which the contract was concluded and, therefore, commits amounts of money and fiscal resources from Venezuela's future budgets.

§ 145.  In the absence of any one of the four requisites listed above, a contract cannot be characterized as a Contract of National Interest. Professor Brewer-Carías does not address—one by one—why three of four of these concurring requirements (*supra* § 144) are satisfied with regard to the Governing Documents.

## VII.  UNDER THE PRINCIPLE OF CONGRUENT FORMS, PDVSA'S PAST PRACTICE OF ACQUIRING LARGE ASSETS WITHOUT LEGISLATIVE APPROVAL SHOWS NO APPROVAL WAS NECESSARY FOR THE PLEDGE

§ 146. In his Expert Report, Professor Brewer-Carías argues that the Governing Documents are Contracts of National Interest and, as such, should have been authorized by the National Assembly pursuant to Article 150 of the Constitution. In addition to the reasons discussed *supra* Parts I to VI, and in my Expert Report, I disagree with this

---

[155]  *Id.* (emphasis added).

[156]  ███████████████, § 88.

47

conclusion because it violates the principle of congruent forms or parallel forms (*paralelismo de las formas*).[157]

§ 147. According to the principle of congruent forms, acts or decisions *must be undone the same way they were made*, or modified or revoked *following the same procedure followed when they were made*.[158] Pursuant to this legal principle:

a. If a legislative approval *is needed* for the conclusion of a contract for the acquisition by PDVSA of a large and important asset—in the present case, CITGO—that same legislative approval is *necessary* for the sale or disposition of that same asset.

b. Conversely, if a legislative approval *was not needed* for the conclusion of a contract for the acquisition of such a large and important asset, that same legislative approval is *unnecessary* when it comes to the sale or disposition of that same asset.

§ 148. Pursuant to this legal principle, PDVSA's prior history of acquisitions shows that legislative approval is not needed for PDVSA's purchase of large assets such as a controlling interest in CITGO Holding's shares. For example, before acquiring CITGO, PDVSA entered into a contract with Veba Oel A.G. for the purpose of acquiring 50% of the capital shares of RuhR Oel Gmbh (the "Veba Oel Contract").[159] By entering into this

---

[157] Organic Law of the Public Administration, art. 10, **Exhibit ▮ 20**, p. 10 ("The activity of the Public Administration will be conducted based on the principles of . . . congruent forms . . . ."); *see also*, *mutatis mutandis*, Decision of the Constitutional Chamber of the Supreme Tribunal of Justice Decision N° 34 (Jan. 26, 2004) ("*Vestalia Sanpedro*"), **Exhibit ▮-R-23**, pp. 15–17; Decision of the Constitutional Chamber of the Supreme Tribunal of Justice Decision N° 489 (Mar. 30, 2004) ("*Ciudadano C.T.*"), **Exhibit ▮-R-24**, pp. 8–9; Decision of the Constitutional Chamber of the Supreme Tribunal of Justice Decision N° 1562 (Dec. 4, 2012) ("*Windsurfer's Oasis*"), **Exhibit ▮-R-25**, pp. 5, 12.

[158] *See*, *mutatis mutandis*, Decision of the Constitutional Chamber of the Supreme Tribunal of Justice Decision N° 34 (Jan. 26, 2004) ("*Vestalia Sanpedro*"), **Exhibit ▮-R-23**, pp. 15–17; and, Decision of the Constitutional Chamber of the Supreme Tribunal of Justice Decision N° 489 (Mar. 30, 2004) ("*Ciudadano C.T.*"), **Exhibit ▮ R-24**, pp. 8–9.

[159] Allan Randolph Brewer-Carías, *La Aprobación Legislativa de los Contratos de Interés Nacional y el Contrato PDVSA-VEBA OEL*, in ESTUDIOS DE DERECHO PÚBLICO (1985), **Exhibit ▮-R-26**, p. 78. In Professor Brewer-Carías's own words, "[t]he purpose of the contract signed by PDVSA with the Veba Oel A.G. company was to acquire the shares of a company domiciled in the German Republic, that deals with the refining of crude oil."

contract, PDVSA sought to enter the oil market of the Federal Republic of Germany to ensure the long-term placement of its crude and pre-oil products.[160]

§ 149. In 1983, the Venezuelan Congress discussed—at length—whether (i) the Veba Oel Contract was a Contract of National Interest and, therefore, (ii) had to be approved by the Legislature. The discussion took place after the Minister of Energy had informed Congress of the scope of the negotiations between PDVSA and Veba Oel A.G.[161] Only one Representative of Congress proposed that the Veba Oel Contract should be declared a Contract of National Interest, but this proposal was subsequently considered and rejected by the Venezuelan Congress.[162] In other words, according to Congress, no legislative approval was required for PDVSA's entry into this contract.

§ 150. Years later—in 1986 and 1990—PDVSA decided to purchase the entirety of CITGO.[163] In so doing, PDVSA did not seek or otherwise obtain the Legislature's approval for the purchase of CITGO.[164] This lack of legislative approval must be construed in light of the precedent created by the Veba Oel Contract, under which no legislative approval is needed for PDVSA's acquisitions of large assets.

§ 151. Taking into account (i) the precedent created by the Veba Oel Contract, and (ii) that PDVSA has not argued or proved that it sought legislative approval for the purchase of CITGO, Plaintiffs' disposition of a controlling interest in CITGO Holding through the

---

[160] *Id.*

[161] Diario de Debates de la Cámara de Diputados, XIII Vol I (Jan. July 1983), **Exhibit ▮-R-27**, pp. 386, 389.

[162] *Id.* at p. 425.

[163] ▮▮▮▮▮▮▮▮▮▮▮▮▮, § 30.

[164] 

Pledge Agreement was not subject to prior legislative approval under the principle of congruent forms and in light of PDVSA's—and the Legislature's—prior conduct.

## VIII.   THE GOVERNING DOCUMENTS CANNOT BE CHARACTERIZED AS CONTRACTS OF NATIONAL INTEREST BECAUSE THEIR OBLIGATIONS ARE TO BE FULFILLED OUTSIDE OF VENEZUELA

§ 152.  In prior writings, Professor Brewer-Carías analyzed the Veba-Oel Contract (*supra* § 148) in the context of the rule contained in the 1961 Constitution equivalent to Article 150, and, in so doing, concluded that Contracts of National Interest are characterized—in part—by the fact that obligations under such contracts must be fully executed or fulfilled *within Venezuela*.[165] Notably, this criterion is not discussed in Professor Brewer-Carías's report, but under this scholarly theory, the Governing Documents do not qualify as Contracts of National Interest.

§ 153.  In 1985, the Venezuelan Congress edited and compiled a book collecting opinions by Professor Brewer-Carías including, among others, an article on the Veba Oel contract. Professor Brewer-Carías's article had been sent—as an opinion—to the Permanent Commissions for Energy and Mines of the Venezuelan Congress per the request of the Venezuelan Congress. In that article, Professor Brewer-Carías argued that, due to the origin and evolution of the constitutional rule that is now recognized as Article 150 of the Constitution, Contracts of National Interest are characterized by the fact that the obligations thereof are to be fulfilled or executed *within Venezuela*:

> [W]e consider that it is the State contracts *to be executed in Venezuelan territory*, concluded with companies not domiciled in Venezuela, which require the approval of Congress. Therefore, a public interest contract concluded with a company not domiciled in Venezuela, to be executed abroad, does not require the approval of Congress in accordance with the second section of Article 126 of the Constitution.[166]

§ 154.  Although it is not law, it is notable that even under this criterion proffered in past writings by Plaintiffs' own expert, the Governing Documents do not qualify as Contracts of National Interest because these agreements were *to be fulfilled and executed outside of Venezuela*. Among other circumstances, the place of payment, the choice of currency, the

---

[165]  Brewer-Carías, *La Aprobación Legislativa*, *supra* note 159, **Exhibit ▮-R-26**, pp. 78–79, 81.
[166]  *Id.* at p. 81 (emphasis added).

language of the Governing Documents, and the location of the Trustee, Collateral Agent, and Paying Agent, all indicate that the Governing Documents were designed to be performed outside of Venezuela and have been performed outside of Venezuela. Plaintiffs have not argued otherwise.

## IX. PROFESSOR BREWER-CARÍAS ACKNOWLEDGES THAT CONTRACTS OF NATIONAL INTEREST ARE ADMINISTRATIVE CONTRACTS, BUT DOES NOT CONSIDER THE LEGAL CONSEQUENCES OF THAT CIRCUMSTANCE

§ 155. Professor Brewer-Carías invokes the National Assembly's May 2016 Resolution and—in doing so—acknowledges that Contracts of National Interest are "a special category of administrative contracts."[167] However, Professor Brewer-Carías does not acknowledge that the Governing Documents do not satisfy the core requirements of administrative contracts, and as such, fails to consider the legal consequences of this aspect of Venezuelan Law.

§ 156. Indeed, it is evident that the Governing Documents do not qualify as administrative contracts because:

a. The parties to the Governing Documents did not submit—willingly and consciously—to a Venezuelan Public Law regime, as parties *must* do in administrative contracts;[168]

b. Instead, the Governing Documents are governed by New York law and, therefore, are not subject—mainly or primarily—to Venezuelan Public Law, as administrative contracts must be;[169] and

c. In the present case, (i) the purpose of these agreements was not an activity of "public service" or "general interest," and (ii) PDVSA and PDVSA Petróleo do not have exorbitant decision-making powers derived from the State's sovereign authority (*ius imperium*) granted to the Public Administration in administrative contracts.

---

[167]  Brewer-Carías Expert Report, § 68.

[168]  ██████████████, § 172.

[169]  *Id.* §§ 171–72.

§ 157. In light of the above, and for the reasons discussed in my Expert Report, the consequence is obvious: The Governing Document cannot constitute Contracts of National Interest.

## X.   PUBLIC ORDER AND THE PRINCIPLE OF LEGITIMATE EXPECTATIONS

### A.   Article 150 of the Constitution Contains a Rule of Public Order

§ 158. According to the Brewer-Carías Expert Report,[170] Venezuelan Law recognizes a general exception to the principle of freedom to contract for statutory provisions regulating the public order (*orden público*).[171]

§ 159. Professor Brewer-Carías goes on to say that PDVSA and PDVSA Petróleo were required to comply with all the conditions of validity of a Contract of National Interest demanded by Venezuelan Public Law, as it is not possible for those conditions of validity to be waived or governed in any way whatsoever by any foreign law, including the requirement that the National Assembly approves Contracts of National Interest. With that assertion, Professor Brewer-Carías implies that the parties to the Governing Documents could not choose to disregard Article 150 of the Constitution because this Constitutional provision is of public order.

§ 160. However, because the Governing Documents are not Contracts of National Interest, the Governing Documents are not subject to the approval requirement of Article 150 of the Constitution. Nor would requiring such approval be consistent with PDVSA's past history of contracting, as PDVSA's contracts routinely contain governing law clauses stating that the contracts are governed by the law of New York.[172] There is no impediment

---

[170]   Brewer-Carías Expert Report, §§ 129, 132.

[171]   Civil Code, art. 6, **Exhibit** ▮**-107**, p. 17. According to Article 6, contracts cannot infringe rules enacted to protect public order.

[172]   *See, e.g.*, PDVSA Finance Ltd., Offering Memorandum for $400,000,000 6.45% Notes Due 2004, $300,000,000 6.65% Notes Due 2006, $300,000,000 6.80% Notes Due 2008, $400,000,000 7.40% Notes Due 2016, and $400,000,000 7.50% Notes due 2028 (Nov. 16, 1998), **Exhibit** ▮**-R-22**, p. 20; PDVSA, Third Supplemental Indenture for $500,000,000 8.50% Notes Due November 16, 2012 (Nov. 16, 2001), **Exhibit** ▮**-R-28**, p. 12; PDVSA, Prospectus for $3,000,000,000 5.25% Notes Due 2017, $3,000,000,000 5.375% Notes Due 2027, and $1,500,000,000 5.50% Notes Due 2037 (Dec. 4, 2007), **Exhibit** ▮**-R-29**, p. 97; PDVSA, Offering Circular for $3,000,000,000 9.75% Senior Notes Due 2035 (May 11, 2012), **Exhibit** ▮**-R-30**, p. 108; PDVSA, Listing Particulars for $4,500,000,000 6.00% Senior Notes Due 2026 (Apr. 4, 2014), **Exhibit** ▮**-R-31**, p. 119.

to honoring the parties' choice of New York law to govern the validity of the Governing Documents under Venezuelan Law.

### B. The Interplay of Public Order Rules, the Principle of Legitimate Expectations, and Presumption of Legality

§ 161.  Even if it were found that the Governing Documents were Contracts of National Interest (they are not), a Venezuelan court of law would still enforce these contracts under the principle of legitimate expectations.[173]

§ 162.  Indeed, legal rules governing public procurement procedures are considered to be rules of public order.[174] The *Universidad Central de Venezuela* ("*UCV*") case invoked in my Expert Report[175] dealt with the violation of legal rules of public order for the adjudication of a contract with the Public Administration. In spite of the violation of the aforementioned rules, the Supreme Tribunal of Justice decided that the principle of legitimate expectations demanded that the obligations derived from the contract concluded and executed in violation of rules of public order be respected by the National Administration.

§ 163. The Brewer-Carías Expert Report does not contain any consideration of the presumption of legality of the Governing Documents or the principle of legitimate expectations.

---

[173]  ███████████████, §§ 184–92.

[174]  *Mutatis mutandis*, Decision of the Second Court of First Instance in Civil and Commercial Law of the Judicial District of the State of Zulia (Mar. 17, 1961), *in* CÓDIGO CIVIL DE VENEZUELA ARTÍCULOS 1O. AL 18 ("Procedural forms directly concern public order . . . ."), **Exhibit ██-R-32**, p. 318; Decision of the Cassation Chamber of the Federal and Cassation Court (Dec. 20, 1940), *in* CÓDIGO CIVIL DE VENEZUELA ARTÍCULOS 1O. AL 18 ("It is not optional for the parties, not even to the courts, to subvert the rules with which the lawmaker has implemented the proceedings, since this is a matter of public order, which must be strictly observed."), **Exhibit ██-R-32**, p. 317; *see also* ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████), **Exhibit ██-80**, p. 404.

[175]  Decision of the Political-Administrative Chamber of the Supreme Tribunal of Justice N° 1171 (July 3, 2007) ("*Universidad Central de Venezuela*"), **Exhibit ██-112**, p. 7.

## XI.    THE GOVERNING CONTRACTS ARE NOT NULL AND VOID *AB INITIO*

§ 164.  Professor Brewer-Carías opines that the Governing Documents are "invalid, illegal (in the sense of having been executed/issued in violation of the Venezuelan Constitution), and null and void ab initio—*i.e.*, they never came into valid legal existence and are entirely unenforceable under Venezuelan Law,"[176] because they lacked National Assembly approval. Respectfully, this is incorrect for the reasons discussed below.

### A.    The Governing Documents Are Not Void *Ab Initio* Under Article 150 or Any Other Aspect of Venezuelan Law

§ 165. First and foremost, the Governing Documents are not Contracts of National Interest for the reasons discussed in my Expert Report, including that these agreements do not satisfy the primary criterion for such contracts—having the Republic as a party. Accordingly, no National Assembly approval was required for Plaintiffs to enter into these agreements, and the Governing Documents are neither void or void *ab initio* under Article 150. To the contrary, PDVSA has full legal capacity to negotiate, conclude, and obligate itself to contracts.[177] As discussed in my Expert Report, under Venezuelan Law, capacity to contract is the general rule for *sociedades anónimas* such as the Plaintiffs, and lack of legal capacity is the exception, such that anyone claiming lack of capacity has the burden of proving said incapacity.[178]

§ 166.  Indeed, Professor Brewer-Carías acknowledges that "PDVSA, as part of the state-owned enterprises of the Oil sector, [is] exempted of the need to be previously authorized by the National Assembly" for the purpose of entering into public credit transactions.[179] Given that explicit legal exemption, PDVSA had the capacity to (i) negotiate the exchange of the 2017 Notes for the 2020 Notes and, in doing so, (ii) extend the term for payment of the capital owed and/or (iii) revise the interest due. Article 101 of the Financial Administration Law empowered PDVSA to contract on these issues.[180]

---

[176]  Brewer-Carías Expert Report, § 17.
[177]  ███████████████, §§ 40–41.
[178]  *Id.* § 41.
[179]  Brewer-Carías Expert Report, § 77.
[180]  ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

§ 167. Further, as discussed below, even if Article 150 applied to the Governing Documents—it does not—a lack of National Assembly approval would not render these contracts void *ab initio*.

**B.** 

§ 168. ███████████████████████████████████████████, even if one were to assume that National Assembly approval was needed for the Governing Documents (it was not), lacking the National Assembly's approval is not the type of alleged defect that would render the Governing Documents void *ab initio* under Venezuelan law.

§ 169.  Professor Brewer-Carías argues in his report that a lack of approval is a legal defect amounting to a lack of *consent* to contract.[181] However, a lack of National Assembly approval would at most be considered a legal defect affecting an entity's *legal capacity* to contract, which renders a contract merely voidable, not void.[182]

§ 170. 

[183]

---

[181]  Brewer-Carías Expert Report, § 28.

[182]  Article 1142 of the Civil Code provides that "[t]he contract *may be* anulled: 1º Due to the legal incapacity of the parties or one of them; and 2º By vices of consent." **Exhibit** ██-107, p. 78 (emphasis added). Venezuelan courts have concluded that Article 1142 of the Venezuelan Code "refers to the voidability of contracts (*lack of legal capacity of the parties* and vices of consent)," which entails the "relative nullity" of the contract. Decision of the Civil Cassation Chamber of the Supreme Tribunal of Justice Nº 357 (Jun. 14, 2016) ("*V.E.V.B.*"), **Exhibit** ██-R-33, p. 8 (emphasis added).

[183]  Hernández Memorandum (emphasis added), **Exhibit** ██-87, p. 53.

55



§ 171. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████  ██████████████████████████
█████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████  █  ██████████  ████████  ███████  █████  ██
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████[5]

§ 172. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████

**C.     The Indenture Is Not Void *Ab Initio* for the Reasons Advanced by Professor Brewer-Carías and the Plaintiffs in Light of Its Severability Clause**

§ 173.  One of Professor Brewer-Carías's main objections to the Indenture revolves around *the promise*—made by PDVSA in the Indenture—to pledge a controlling interest in CITGO Holding's shares as collateral. Indeed, Professor Brewer-Carías invokes the September

---

[184]  *Id.*

[185]  *Id.* at pp. 52–53 (emphasis added).

[186]  *Id.* at p. 53.

[187]  Francisco López Herrera, *La Nulidad de los Contratos en la Legislación Civil Venezolana* (1952), **Exhibit ██-R-34**, p. 97.

2016 Resolution, rejecting "that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO Holding, Inc. *are offered* as a guarantee with priority . . . ."[188] Professor Brewer-Carías also affirms that (i) "[t]he Indenture [is a] . . . national public interest [contract] under any standard that takes into account the magnitude or impact of the transaction . . ." and (ii) "*CITGO is the 'crown jewel' of Venezuela's oil industry and its most economically and strategically important asset abroad . . . .*"[189]

§ 174. 

§ 175.  That the Indenture as a whole is not void *ab initio* by virtue of the promise to pledge collateral is clear from a plain reading of its terms, including Section 10.05 (Severability). Section 10.05 of the Indenture provides that:

> Any provision of this Indenture or any Note that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability, without invalidating the remaining provisions hereof or thereof, and any such prohibition or

---

[188]   Brewer-Carías Expert Report, § 70 (emphasis added).

[189]   *Id.* § 42 (emphasis added).

[190]   Hernández Memorandum ████████████████████████████████████ ████████████████████████████████████ ████████████████ (emphasis added), **Exhibit** ██-87, pp. 17, 54.

unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.[191]

§ 176. In other words, if the "promise" to pledge were to be considered illegal, the rest of the Indenture would continue to validly exist without PDVSA's "promise" to pledge.

§ 177. If the Indenture were a Contract of National Interest—and it is not—because of PDVSA's offer to pledge a controlling interest in the shares of CITGO Holding, part of the Indenture—the part dealing with the promise to pledge only—would be voidable; the rest of the Indenture would continue to be binding and enforceable. Given that the legal objections raised center on one part—and *one part only*—of the Indenture, and the severability clause, Venezuelan Law would not treat the Indenture—*considered as a whole*—as a contract void *ab initio* (*nulo de nulidad absoluta*).

§ 178. And since *the promise*—made by PDVSA in the Indenture—to pledge the CITGO Holding shares materialized by means of the Pledge Agreement, under Venezuelan Law, the Plaintiffs would be unable to file a complaint requesting the courts to declare that the Indenture is voidable. Indeed, from a Venezuelan Law perspective, the Plaintiffs would lack legal standing (*interés jurídico actual*)[192] to ask that the Indenture be declared illegal and voidable, because Plaintiffs would not reap any advantage or benefit from a judicial ruling declaring that the promise—executed thereafter—was illegal: The pledge, already created, would continue to exist even after the promise contained in the Indenture was declared illegal and voidable.

### D.  The Pledge Agreement Is Not Void or Voidable

§ 179. Turning to the Pledge Agreement, from a Venezuelan Law perspective, it must be highlighted that it was PDV Holding—and not PDVSA—that was *the contracting party*,

---

[191]  Indenture Between Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., MUFG Union Bank, N.A., GLAS Americas LLC, Law Debenture Trust Company of New York, and Banque Internationale à Luxembourg, Société Anonyme Dated Oct. 27, 2016, § 10.05 (HL_002709), **Exhibit ▮-02**, p. 72.

[192]  Civil Procedural Code, art. 16, *Official Gazette* N° 4209 Extraordinary (Sept. 18, 1990), **Exhibit ▮-R-35**, p. 3. Article 16 provides that "[t]o propose a claim, the plaintiff must have a *present legal interest*. In addition to the cases provided for in the Law, the interest may be limited to the mere declaration of the existence or non-existence of a right or of a legal relationship. The mere declaration request is not admissible when the plaintiff can obtain the complete satisfaction of his interest through a different legal action" *Id.* (emphasis added).

*and whose consent was essential for the purpose of pledging the CITGO Holding shares*, on the one hand, and, on the other hand, that *PDV Holding Inc. was not—and still is not—subject to Venezuelan Law.* ████████████████████████████████████████
██████████████



§ 180.  Given the fact that *the consent needed for the purpose of creating the pledge* over CITGO Holding's shares was given (i) abroad and (ii) by a foreign corporation—PDV Holding— to which Venezuelan Law does not apply, PDV Holding's consent cannot be declared illegal and the Pledge cannot be considered void *ab initio*.

## XII.   CONCLUSION

§ 181. In summary, it is my conclusion that *Andrés Velásquez et al.* clearly and unambiguously requires the Republic to be a party for a contract to be considered a Contract of National Interest. Therefore, *Andrés Velásquez et al.* cannot be interpreted as

---

[193]   Hernández Memorandum (emphasis added), **Exhibit** ██-87, p. 15.

[194]   *Id.* at p. 16 (emphasis in original).

[195]   *Id.*

Professor Brewer-Carías does in his Expert Report. Furthermore, as Professor Brewer-Carías has repeatedly recognized in past writings, *Andrés Velásquez et al.* is binding precedent when it comes to the requirements needed to determine whether a contract is a Contract of National Interest or not. Under *Andrés Velásquez et al.*, the Governing Documents are not Contracts of National Interest because the Republic is not a party.

§ 182. Contrary to what the Brewer-Carías Expert Report affirms, *Brigitte Acosta Isasis* unequivocally reaffirmed the *Andrés Velásquez et al.* interpretation of Article 150 of the Constitution, ████████████████████████████████████████
████████████████████████████████████

§ 183. It is also my opinion that the Brewer-Carías Expert Report errs when it conflates the term "National Public Administration" with the term "National Executive" to conclude that the contracts entered into by State Corporations pertaining to the National Public Administration are Contracts of National Interest. The plain text of the Constitution is clear and unambiguous: The National Executive—*i.e.*, the President in Council of Ministers—is the only authority capable of concluding Contracts of National Interest.

§ 184. It is further my conclusion that the National Assembly resolutions discussed in the Brewer-Carías Expert Report and the political interpretations in those resolutions cannot contradict and supersede the Constitutional Chamber's binding interpretation of Article 150 of the Constitution made in the *Andrés Velásquez et al.*

§ 185. I further conclude, that neither Article 104 nor Article 105 of the Financial Administration Law apply to the Governing Documents. PDVSA and its subsidiaries are expressly exempted from the requirements of Articles 104 and 105 of the Financial Administration Law by Article 101 of that very same law.

§ 186. The conclusion reached by Professor Brewer-Carías, according to which the Governing Documents should have been authorized by the National Assembly pursuant to Article 150 of the Constitution, cannot be reconciled with the principle of congruent forms or parallel forms (*paralelismo de las formas*). PDVSA's prior history of acquisitions shows that legislative approval is not needed for PDVSA's purchase of large assets, such as a controlling interest in CITGO Holding's shares, or the sale or disposition of those same assets.

§ 187. Since, contrary to what Professor Brewer-Carías asserts, the Governing Documents do not satisfy the core requirements of administrative contracts, I also conclude that they are not administrative contracts and, therefore, they are not Contracts of National Interest.

§ 188. The Governing Documents do not qualify as Contracts of National Interest because—among many other reasons detailed above—these agreements were to be fulfilled and executed outside of Venezuela.

§ 189. Not being Contracts of National Interest, the Governing Documents are not invalid, illegal, or null and void *ab initio* because they lacked National Assembly approval, as stated in the Brewer-Carías Expert Report. Furthermore, even if Article 150 applied to the Governing Documents—it does not—a lack of National Assembly approval would not render these contracts void *ab initio*. Further, according to Section 10.05 (Severability) of the Indenture, if the "promise" to pledge were to be considered illegal, the rest of the Indenture would continue to validly exist without PDVSA's "promise" to pledge.

§ 190. Considering that the consent needed for the purpose of creating the pledge over CITGO Holding's shares was given abroad and by a foreign corporation—PDV Holding—to which Venezuelan Law does not apply, under Venezuelan Law, PDV Holding's consent cannot be declared illegal and the Pledge cannot be considered void *ab initio*.

