**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

    Plaintiffs and Counterclaim Defendants,

    - against -

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

    Defendants and Counterclaim Plaintiffs

No. 19 Civ. 10023 (KPF)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS AND**
**COUNTERCLAIM PLAINTIFFS' MOTION TO EXCLUDE**
**THE EXPERT TESTIMONY OF DAVID C. HINMAN**

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
Walter Rieman
William A. Clareman
Jonathan Hurwitz
Shane D. Avidan
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile:  212-757-3990

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
Roberto J. Gonzalez (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300

*Attorneys for Defendants and*
*Counterclaim Plaintiffs*
*(as to New York law issues only)*

LATHAM & WATKINS LLP
Christopher J. Clark
Matthew S. Salerno
Sean H. McMahon
885 Third Avenue
New York, NY 10022
Telephone: 212-906-1200
Facsimile:  212-751-4864

*Attorneys for Defendants and*
*Counterclaim Plaintiffs*

**Table of Contents**

Page

Table of Authorities ............................................................................................... ii

Glossary and Citation Conventions ...................................................................... iv

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................ 4

ARGUMENT ............................................................................................................. 4

I.      Applicable Standard for Admissibility ...................................................... 4

II.     Mr. Hinman's Opinions Concerning "Invalidity Risk"
        Should be Excluded .................................................................................... 6

        A.      Mr. Hinman's Definition of Invalidity Risk Is
                Unreliable and Irrelevant Because It Conflates
                Different Types of Risk ................................................................... 7

        B.      Mr. Hinman's Review of Market Commentary
                Employs No Reliable Methodology ................................................. 8

        C.      Mr. Hinman Performs No Analysis to Attribute
                The Pricing Effects He Observes to Invalidity Risk ..................... 11

                i.      2020 Notes' Post-Default Pricing ...................................... 12

                ii.     Fitch Recovery Ratings ....................................................... 15

                iii.    Investors' Response to the Exchange Offer ........................ 16

III.    Mr. Hinman's Opinions that PDVSA Was Not "Enriched"
        by the Exchange Offer and that Exchanging Investors Suffered
        No Losses Are Inadmissible ...................................................................... 17

        A.      Mr. Hinman's Enrichment Opinion Should Be Excluded ............ 17

        B.      Mr. Hinman's Opinion that Exchanging Investors Have
                Not Lost Money Should Be Excluded ........................................... 19

CONCLUSION ....................................................................................................... 20

# Table of Authorities

**Page(s)**

**C**ASES

*523 IP LLC* v. *CureMD.Com*,
48 F. Supp. 3d 600 (S.D.N.Y. 2014) ...................................................................5

*Amorgianos* v. *Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .........................................................................5

*Campbell* v. *Metro. Prop. & Cas. Ins. Co.*,
239 F.3d 179 (2d Cir. 2001) .........................................................................5

*City of New York* v. *Coastal Oil New York Inc.*,
2000 WL 108816 (S.D.N.Y. Jan. 31, 2000) ...........................................7, 18

*Daubert* v. *Merrell Dow Pharms, Inc.*,
509 U.S. 579 (1993)..................................................................................1, 4, 5

*Deutsch* v. *Novartis Pharm. Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011) ..............................................................11

*In re Exec. Telecard, Ltd. Sec. Litig.*,
979 F. Supp. 1021 (S.D.N.Y. 1997) ............................................................14, 15

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) .................................................9

*Gen. Elec. Co.* v. *Joiner*,
522 U.S. 136 (1997)....................................................................................5

*Kumho Tire Co.* v. *Carmichael*,
526 U.S. 137 (1999)....................................................................................5

*In re Longtop Fin. Tech. Ltd. Sec. Litig.*,
32 F. Supp. 3d 453 (S.D.N.Y. 2014) ..............................................................9

*LVL XIII Brands* v. *Louis Vuitton Malleteir*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016) ..............................................................8

*Major League Baseball Props., Inc.* v. *Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ...........................................................11, 16, 17

*Malletier* v. *Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ..............................................................19, 20

*Marshall* v. *Hyundai Motor Am.*,
    51 F. Supp. 3d 451 (S.D.N.Y. 2014) .......................................................................18

*Nimely* v. *City of New York*,
    414 F.3d 381 (2d Cir. 2005) ...................................................................................12

*R.F.M.A.S., Inc.* v. *So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010) .......................................................7, 11, 14, 16

*Raskin* v. *Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997) .......................................................................................6

*In re Rezulin Prods. Liability Litig.*,
    369 F. Supp. 2d 398 (S.D.N.Y. 2005) ........................................................................9

*Riegel* v. *Medtronic, Inc.*,
    451 F.3d 104 (2d Cir. 2006) .....................................................................................5

*Scentsational Techs., LLC* v. *Pepsi, Inc.*,
    2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ...........................................................18

*Matter of Trs. Established Under Pooling And Servicing Agreements*,
    2020 WL 1304400 (S.D.N.Y. Mar. 19, 2020) ............................................................6

*United States* v. *Williams*,
    506 F.3d 151 (2d Cir. 2007) .....................................................................................5

## OTHER AUTHORITIES

Fed. R. Evid. 401 ....................................................................................................3, 5

Fed. R. Evid. 702 .......................................................................................................4

Fed. R. Evid. 403 .......................................................................................................4

**Glossary and Citation Conventions**

This brief uses the following defined terms:

"2017 Notes" means the 5.25% Senior Notes due 2017 and the 8.5% Senior Notes due 2017, both issued by PDVSA.

"2020 Notes" means the 8.5% Senior Secured Notes due 2020 issued by PDVSA pursuant to the Indenture.

"56.1 ¶ __" means the Local Rule 56.1 Statement of Undisputed Material Facts in Support of the Trustee and Collateral Agent's Motion for Summary Judgment.

"Ashmore" means Ashmore Group plc and its affiliates.

"CITGO Collateral" means 50.1% of CITGO Holding's equity.

"CITGO Holding" means CITGO Holding Inc.

"Collateral Agent" means defendant and counterclaim plaintiff GLAS Americas LLC, the collateral agent of the 2020 Notes.

"Exchange Offer" means the tender offer announced by PDVSA on September 17, 2016, and closed on October 28, 2016, to exchange 2017 Notes for 2020 Notes.

"Fitch" means Fitch Ratings.

"Hinman Rep." means the initial report of the PDVSA Parties' expert, David C. Hinman.  This report is attached as Exhibit 1 to the accompanying Declaration of Matthew S. Salerno dated June 10, 2020.

"Hinman Rebuttal Rep." means the rebuttal report of David C. Hinman. This report is attached as Exhibit 2 to the accompanying Declaration of Matthew S. Salerno dated June 10, 2020.

"Indenture" means the Indenture dated October 27, 2016, between PDVSA as issuer, PDVSA Petróleo as guarantor, the Trustee, the Collateral Agent, the Law Debenture Trust Company of New York as registrar, transfer agent, and principal paying agent, and Banque Internationale à Luxembourg, Société Anonyme as Luxembourg paying agent.

"McKenna Rebuttal Rep." means the rebuttal expert report of the Trustee and Collateral Agent's expert, Timothy McKenna.  This report is attached as Exhibit 1 to the Declaration of Timothy McKenna in Support of the

Trustee and Collateral Agent's Motion for Summary Judgment dated May 29, 2020.

"PDVH" means plaintiff PDV Holding, Inc.

"PDVSA" means plaintiff Petróleos de Venezuela, S.A.

"PDVSA Petróleo" means plaintiff PDVSA Petróleo S.A.

The "PDVSA Parties" means PDVSA, PDVSA Petróleo, and PDVH.

"Pledge Agreement" means the Pledge Security Agreement dated October 28, 2016, between PDVH as pledgor, PDVSA as issuer, PDVSA Petróleo as guarantor, the Collateral Agent, and the Trustee.

"Porzecanski Rep." means the initial report of the Trustee and Collateral Agent's expert, Prof. Arturo C. Porzecanski.  This report is attached as Exhibit 1 to the Declaration of Arturo C. Porzecanski in Support of the Trustee and Collateral Agent's Motion for Summary Judgment dated May 30, 2020.

"Porzecanski Rebuttal Rep." means the rebuttal expert report of Prof. Porzecanski.  This report is attached as Exhibit 2 to the Declaration of Arturo C. Porzecanski in Support of the Trustee and Collateral Agent's Motion for Summary Judgment dated May 30, 2020.

"Ex.__" means the exhibits to the accompanying Declaration of Matthew S. Salerno dated June 10, 2020.

"Trustee" means defendant and counterclaim plaintiff MUFG Union Bank N.A., the trustee of the 2020 Notes.

"Venezuela" means the Bolivarian Republic of Venezuela.

"Xu Decl." means the declaration of Xin Xu, a portfolio manager at Ashmore Group plc in London, England.

The Trustee and Collateral Agent respectfully submit this memorandum of law in support of their motion to exclude the testimony of the PDVSA Parties' expert, David C. Hinman, CFA.

### PRELIMINARY STATEMENT

The PDVSA Parties' central claim in this case is that the 2020 Notes and pledge of the CITGO Collateral—transactions that are governed, respectively, by an Indenture and Pledge Agreement, each of which provides that it is subject exclusively to New York law—are nevertheless void under Venezuelan law, and thus unenforceable.  In support of this claim, the PDVSA Parties seek to proffer expert testimony by David Hinman, CFA, in an attempt to show that, both at the time of the Exchange Offer in late 2016 and thereafter, sophisticated investors knew or should have known of a purported "invalidity risk" associated with the CITGO Collateral.  Mr. Hinman's opinion, on its face, is irrelevant to the question of whether the 2020 Notes and pledge of CITGO Collateral are *in fact* enforceable under New York law (or, for that matter, Venezuelan law).  His opinion also suffers from numerous additional flaws which render it inadmissible under the Federal Rules of Evidence and *Daubert* v. *Merrell Dow Pharmaceuticals*.

Mr. Hinman's principal contention is that, beginning in September 2016, "sophisticated investors knew (or at a minimum should have known) of the invalidity risk related to the purported pledge of CITGO Collateral associated with the 2020 Notes."  He defines "invalidity risk" as the risk that the CITGO Collateral pledge would be "deemed invalid."  This opinion is fundamentally unreliable and speculative, and accordingly inadmissible.  His definition of the central term "invalidity risk," which he acknowledges was provided to him by the PDVSA Parties' counsel, improperly encompasses both alleged legal invalidity (as alleged

by the PDVSA Parties in this case) as well as other risks, including the political risk that a future Venezuelan government would repudiate the debt.  He identifies no threshold to evaluate the degree or magnitude of "risk" of which he contends investors should have been aware.  His opinion relies almost entirely on simply identifying scattershot statements in market commentary over a three-year period that he characterizes as reflecting "invalidity risk," but which in reality address disparate investment risks, the vast majority of which have nothing to do with legal validity under New York or Venezuelan law.  He does not assess what weight, if any, investors should have put on those statements, or even whether the statements are reliable or credible, and does not consider countervailing evidence contained in the vast array of press and analyst commentary he completely ignores.  He speculates that a "recovery rating" assigned by Fitch to the 2020 Notes is "consistent with" Fitch having downgraded the Notes due to alleged invalidity risk; but ignores Fitch's own explanation for its rating, which makes no mention of any such risk. Nor does he explain why investors in a debt issuance governed by New York law should have focused on purported risks that the debt would be deemed invalid under the law of Venezuela. His purported analysis of market prices to demonstrate the purported effect of alleged invalidity risk fails to consider, much less rule out, other potentially relevant factors that could account for the pricing effects he observes.  And his ultimate conclusion that the data he cites are "consistent with" investor awareness of invalidity risk means, at most, that they do not exclude the possibility of such awareness.  That conclusion expresses no actual causal relationship, and does not show that the data make the existence of such awareness more probable.

Mr. Hinman also opines that the Exchange Offer "did not enrich" the PDVSA Parties, and that exchanging investors that participated in the Exchange Offer "have not lost money."  These opinions fail *Daubert*'s "fit" requirement.  In offering both opinions,

Mr. Hinman appears to accept for purposes of this opinion the Trustee and Collateral Agent's position that the Indenture and Pledge Agreement are valid and enforceable.  His enrichment opinion rests on the conclusory assertion that the Exchange Offer benefitted PDVSA less than the exchanging investors under the terms of that transaction.  Yet, the question of the PDVSA Parties' "enrichment" would only be relevant, if at all, to quasi-contractual theories of unjust enrichment, and he does not consider whether or to what extent PDVSA would be enriched if the Indenture and Pledge Agreement were found to be unenforceable.  Mr. Hinman's opinion that exchanging investors have suffered no losses is also irrelevant as a matter of law.  Under the governing contracts, following PDVSA's default on October 28, 2019, holders of the 2020 Notes accelerated payment and seek to foreclose on the CITGO Collateral.  Mr. Hinman offers no opinion pertaining to these contractual remedies.  And, similar to his "enrichment" opinion, his calculation of losses would be equally irrelevant even if the 2020 Notes and Collateral Pledge were found, contrary to the available evidence, to be unenforceable.  The calculation on which his opinion hinges assumes that the 2020 Notes have the positive market value they had on the date of his report—value which would surely be destroyed if the 2020 Notes were unenforceable.  Thus, his opinions about PDVSA's enrichment and investor losses are irrelevant to any cognizable theory of damages any party could assert.

This is not proper expert testimony.  It does not assist the trier of fact in understanding the evidence or determining a fact at issue, it does not tend to make any disputed fact (if there are any) more or less probable, and it is not based on sufficient facts or data or reliable principles or methods.  It reflects only the PDVSA Parties' effort to put a sheen of expertise on the arguments of their counsel.  Mr. Hinman's opinions do not satisfy Rules 401,

403, and 702 of the Federal Rules of Evidence or the *Daubert* standard.  They should be excluded.

**BACKGROUND**

The PDVSA Parties propose to proffer Mr. Hinman as an expert on emerging market debt and financial restructuring.  Ex. 1, Hinman Rep. ¶¶ 1, 16.  Mr. Hinman offers three principal opinions in his opening report (the "Hinman Report"):

1. "[S]ophisticated investors knew (or at a minimum should have known) of the invalidity risk related to the purported pledge . . . associated with the 2020 Notes, notwithstanding any representations [by the PDVSA Parties] . . . to the contrary." *Id.* ¶ 19(a).

2. "The Exchange Offer did not enrich PDVSA or PDV Holding." *Id.* ¶ 19(b).

3. "Exchanging Investors have not lost money on their investment." *Id.* ¶ 19(c).

In addition, Mr. Hinman served a rebuttal report in response to a report by the Trustee and Collateral Agent's expert, Professor Arturo Porzecanski (the "Hinman Rebuttal Report"), who opined, based on a survey of finance literature, that investors in the international bond market value New York choice-of-law provisions and pay a premium for bonds containing them.  Porzecanski Rep. ¶ 5.  The Hinman Rebuttal Report opines that the New York choice-of-law provisions in the 2020 Notes would not have been a factor in investors' evaluation of invalidity risk in light of the market commentary that he identified in the Hinman Report.  Ex. 2, Hinman Rebuttal Rep. ¶ 4(c).

**ARGUMENT**

## I.      Applicable Standard for Admissibility

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert* v. *Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993).  The proponent of expert

4

testimony has the burden of establishing its admissibility by a preponderance of the evidence. *See United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Trial courts serve as gatekeepers of expert testimony and must exclude testimony if it: (1) lacks a "reliable foundation" or (2) is not "relevant to the case before the court." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 259 (2d Cir. 2002).

To be reliable, an expert opinion "requires some explanation as to how the expert came to his conclusions and what methodologies or evidence substantiate that conclusion." *Riegel* v. *Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). Expert opinions should be excluded if connected to existing data only by the *ipse dixit* of the expert, or if the court concludes "that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997). These standards apply not only to scientific methodologies, but also where an expert relies on skill- or experience-based observation. *See Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 151–52 (1999).

To be relevant, expert testimony must be "sufficiently tied to the facts of the case that it will aid the [factfinder] in resolving a factual dispute," a consideration described as one of "fit." *Daubert*, 509 U.S. at 591 (citation omitted). In particular, courts must analyze whether expert's opinion "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell* v. *Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 185 (2d Cir. 2001) (alteration omitted) (quoting Fed. R. Evid. 401). Moreover, courts should exclude expert testimony directed to matters the factfinder is capable of understanding without the expert's help. *523 IP LLC* v. *CureMD.Com*, 48 F. Supp. 3d 600, 644 (S.D.N.Y. 2014) (Failla, J.).

"The principles governing admissibility of evidence do not change on a motion for summary judgment." *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). These principles likewise also apply where issues not resolved on summary judgment would be tried to the court instead of a jury. *See Matter of Trs. Established Under Pooling And Servicing Agreements*, 2020 WL 1304400, at *45, 53 & n.18 (S.D.N.Y. Mar. 19, 2020) (Failla, J.).

## II.   Mr. Hinman's Opinions Concerning "Invalidity Risk" Should be Excluded

Central to Mr. Hinman's reports is his opinion that "sophisticated investors knew (or at a minimum should have known)" of "invalidity risk" associated with the pledge of CITGO Collateral, and that it would not have been reasonable for sophisticated investors to assume that the pledge of the CITGO Collateral was "valid or to rely upon any Representation to that effect." Hinman Rep. ¶ 22. Mr. Hinman defines "invalidity risk" as "the risk that the purported pledge of 50.1% of CITGO Holding's equity as collateral for the 2020 Notes in the Exchange [Offer] . . . would be deemed invalid." *Id*. ¶ 16(a). The "Representations" to which Mr. Hinman refers include affirmative representations in the Indenture and Pledge Agreement that the PDVSA Parties have done all things necessary to make the 2020 Notes "valid obligations," that the Pledge Agreement required no further approvals by any governmental authority, and that the transaction did "not contravene" Venezuelan law, among other things. Answer ¶¶ 143–44. In addition to the representations in the transaction documents, PDVSA's outside counsel at Hogan Lovells also provided an unqualified legal opinion that the Exchange Offer complied with both New York and Venezuelan law.

The claimed basis for Mr. Hinman's opinion that sophisticated investors knew or should have known of invalidity risk is two-fold. First, he claims to have reviewed "extensive market commentary" that supports his contention regarding invalidity risk. Hinman Rep. ¶¶ 19, 36. Second, he argues that pricing of, and market reaction to, the 2020 Notes is "consistent

6

with" the presence of "invalidity risk." *Id.* ¶ 19.  None of his purported opinions regarding

invalidity risk constitutes relevant or reliable expert testimony.  They should be excluded.

### A. Mr. Hinman's Definition of Invalidity Risk Is Unreliable and Irrelevant Because It Conflates Different Types of Risk

Mr. Hinman's definition of "invalidity risk" cannot form the basis of any relevant

or reliable opinion because it conflates several different risks.  As Prof. Porzecanski points out,

the invalidity risk that Mr. Hinman purports to analyze "does not clarify *who* would deem the

Pledge [Agreement] invalid or under *what law*."  Porzecanski Rebuttal Rep. ¶ 62 (emphasis in

original).  Mr. Hinman's definition of invalidity risk includes both the legal risk that a court of

competent jurisdiction will declare the 2020 Notes legally invalid and thus unenforceable—the

PDVSA Parties' theory in this case—and the political risk that a Venezuelan governmental entity

would deem the pledge invalid by repudiating the debt for political reasons—a risk that is

contrary to the PDVSA Parties' theory.  Porzecanski Rebuttal Rep. ¶¶ 64–65; McKenna Rebuttal

Rep. ¶ 18.  This vague and unhelpful definition of "invalidity risk" does not come from finance

literature, common usage in the bond market, or Mr. Hinman's experience, but instead was

supplied to Mr. Hinman by counsel solely for use in this case.  Hinman Rep. ¶ 16(a).  *See*

*R.F.M.A.S., Inc.* v. *So*, F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (excluding testimony where experts

"simply [did] not draw on their areas of actual expertise" and instead adopted assumptions from

counsel).

This definition also fails to satisfy *Daubert*'s "fit" requirement, as it does not

allow Mr. Hinman to reliably assess any risk factor of relevance to this case.  *See City of New*

*York* v. *Coastal Oil New York Inc.*, 2000 WL 108816, at *2 (S.D.N.Y. Jan. 31, 2000) (excluding

plaintiff's expert's opinion where expert's definition of a key term was "not relevant to

plaintiff's claim").  As a result, his opinions that incorporate the term "invalidity risk" are

unhelpful in assessing whether investors knew or should have known of the specific legal risk

alleged by the PDVSA Parties as a ground to invalidate the 2020 Notes and Pledge Agreement—

which is a legal, not political risk.  *See LVL XIII Brands* v. *Louis Vuitton Malleteir*, 209 F. Supp.

3d 612, 642 & n.31 (S.D.N.Y. 2016) (precluding plaintiffs' expert's testimony on Rule 403 and

702 grounds where the expert defined the relevant product market in a manner that was

inconsistent with the plaintiffs' legal theory).  Because Mr. Hinman collapses these different

risks into his definition of "invalidity risk," his opinion can be of no help to the Court, and

should therefore be excluded.

### B.  Mr. Hinman's Review of Market Commentary Employs No Reliable Methodology

Mr. Hinman's opinion concerning investor knowledge of invalidity risk should be

excluded for the additional reason that it is not supported by any reliable methodology capable of

producing reliable results.

To support his opinion, Mr. Hinman quotes ten news articles and eleven analyst

reports over a three-year period as evidence of purported widespread knowledge of "invalidity

risk."  Hinman Rep. ¶¶ 34–56.  His review of public information contained in his report,

however, represents only a small fraction of the commentary to which investors would have had

access.  Porzecanski Rebuttal Rep. ¶¶ 29–33.  For example, Prof. Porzecanski reviewed 57

analyst reports published by full service investment banks during the 44-day period in which the

Exchange Offer was open—between September 14, 2016 and October 28, 2016—that were

produced in party discovery in this case, and found that only six of them said anything that could

be construed as meeting Mr. Hinman's definition of "invalidity risk."  Porzecanski Rebuttal Rep.

¶¶ 35–39.  The Hinman Report, by contrast, does not systematically review any particular

universe of information available to investors.  Rather, Mr. Hinman simply collects articles from

"any publication, at any time, with purported references to matters that he deems to constitute 'invalidity risk,' and strings them together in an attempt to make it appear as though there was 'extensive market commentary,'" and ignores completely the vast majority of the commentary that he concedes does not support his thesis.  Porzecanski Rebuttal Rep. ¶ 69.

This is not a reliable methodology under *Daubert*, and amounts to nothing more than marshalling evidence that the Court can review without the assistance of an expert.  *See In re Longtop Fin. Tech. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 457 (S.D.N.Y. 2014) (excluding expert report that "summarize[d] various third party audits and reports" and concluded it was reasonable for a party to rely on them, on the ground that an expert may not construct "a factual narrative based on record evidence").  Indeed, Mr. Hinman's failure to discuss, or even mention, the considerable majority of analyst reports that do not support his opinion amounts to impermissible cherry-picking of evidence, which courts routinely exclude.  *See In re Rezulin Prods. Liability Litig.*, 369 F. Supp. 2d 398, 426 (S.D.N.Y. 2005) (excluding opinions where experts "discussed only the evidence that they believed would advance the plaintiffs' position"); *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *8 (S.D.N.Y. Sept. 30, 2009) (excluding expert opinion that "overlook[ed]" evidence in record contradicting his opinion, and noting that "[f]ailure to discuss the import of, or even mention, these material facts . . . amounts to cherry-picking the facts") (citation omitted)).

Moreover, even a passing review of the sources cited in the Hinman Report shows that a reader of the information would likely not reach any conclusion that the investment posed "invalidity risk."  The disparate sources in the Hinman Report discuss different subjects, and almost none of them discuss the species of "invalidity risk" actually at issue in this case— namely, that a court of competent jurisdiction may conclude that the CITGO Collateral pledge

9

was unenforceable under applicable law.  Indeed, none of the sources he cites purports to address

whether the pledge is invalid under New York law, or whether a New York court, construing a

pledge governed by its terms by New York law, would consider Venezuelan law at all.  To the

contrary, the majority of the reports Mr. Hinman cites concern political repudiation risk.  *See*

Porzecanski Rebuttal Rep. ¶ 74.  For example, Mr. Hinman cites a September 19, 2016 UBS

Securities analyst report ██████████████████████████████████████████

█████████████████████████████████████████████ Hinman Rep.

¶ 41. ████████████████████████████████████████████

██████████████████████████████████████████ Porzecanski

Rebuttal Rep. ¶ 75; Ex. 3, Alejo Czerwonko, "Venezuela Bonds: Of Politics and Swaps," UBS

(Sept. 19, 2016).  Similarly, a Torino Capital report Mr. Hinman relies upon stated that while

some investors may be "concerned about the legal risks, . . . given the perceived possibility of

non-recognition by a future [opposition party] government as well as the current legal actions

against Citgo," the report goes on to conclude—in language Mr. Hinman completely ignores—

that "***there is little doubt as to the legality*** of a PDVSA bond issuance or debt refinancing

without National Assembly approval."  Porzecanski Rebuttal Rep. ¶ 81 (emphasis added); Xu

Decl. Ex. 3, Francisco Rodriguez, "The Fine Print," TORINO CAPITAL (Oct. 3, 2016).  Mr.

Hinman does not explain how a report which considers there to be "little doubt" concerning the

lawfulness of the transaction could possibly support a claim that investors who read it should

have known of a material risk that the notes were "invalid" under Venezuelan or New York law.

Other examples cited by Mr. Hinman are similar.  None of the information

supplied in his report is capable of supporting reliable opinion testimony that sophisticated

investors knew or should have known of a material risk that CITGO Collateral would be

declared invalid by a court with jurisdiction over the issue.  His opinion is not reliable or helpful to the Court and should be excluded.

## C.  Mr. Hinman Performs No Analysis to Attribute The Pricing Effects He Observes to Invalidity Risk

In addition to relying on press and analyst commentary, the Hinman Report also opines that (i) the pricing of the 2020 Notes after PDVSA's default on October 28, 2019, (ii) the recovery rating assigned by Fitch to the 2020 Notes on October 25, 2016, and (iii) the allegedly "muted" investor response to the Exchange Offer, are "consistent with" the presence of "invalidity risk."  Hinman Rep. ¶ 19(a)(iii)-(v).  None of these opinions is reliable or admissible.

In addition to specific deficiencies discussed below, each of these opinions share two basic flaws.  First, the Hinman Report does not consider, much less rule out, alternative explanations for the phenomena he observes.  Where an expert seeks to prove that a particular risk caused an observed effect on pricing, the expert "must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant."  *Deutsch* v. *Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 474 (E.D.N.Y. 2011) (internal quotation marks and citation omitted).  Indeed, "[i]t is plain that one cannot determine whether something caused an observed effect without controlling for other equally plausible causes of that effect."  *R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 273.  Mr. Hinman's opinions fail this basic test.

Second, none of his opinions actually attribute causation to "invalidity risk." Rather, he only concludes that the data are "consistent with" invalidity risk.  This testimony does not make any fact of consequence to this case more or less probable, and it therefore does not meet the standard for relevance under Rule 401.  *See Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 311, 319 (2d Cir. 2008) (holding that an expert opinion was

irrelevant and inadmissible where it opined that a specific variable "would appear to be more consistent with" the plaintiffs' theory, on the grounds that the testimony amounted to "conjecture[] and speculation"); *Nimely* v. *City of New York*, 414 F.3d 381, 399 (2d Cir. 2005) (excluding testimony where expert conceded that the data he analyzed was "susceptible of numerous interpretations," but nevertheless elevated his own conclusion "from possibility to probability" based on his own *ipse dixit* assessment of the evidence).

Each of these purported analyses is discussed in greater detail below.

### i. 2020 Notes' Post-Default Pricing

The Hinman Report argues that "the 2020 Notes traded in a manner that is consistent with investors incorporating the invalidity risk associated with the CITGO Collateral into their valuation of the 2020 Notes."  Hinman Rep. ¶ 58.  The purported basis for this opinion is that the aggregate market price for the 2020 Notes on October 28, 2019—the day PDVSA defaulted on payments of $913 million—was 41% of the value the CITGO Collateral as estimated by Fitch in July 2019.  *Id.* ¶ 60.  The Hinman Report asserts that "absent any invalidity risk, if the CITGO Collateral was unencumbered, then the Notes' Value would equal the CITGO Collateral's estimated value once the 2020 Notes had missed payments."  *Id.* ¶ 59.  The Hinman Report argues that the alleged discounted value of the notes is "consistent with investors factoring in significant invalidity risk related to the CITGO Collateral."  *Id.* ¶ 60.

In reaching this conclusion, the Hinman Report considers (and dismisses) only one other potential explanation for the pricing effect he observes—that U.S. sanctions policy against Venezuela may have depressed the value of the 2020 Notes.  *Id.* ¶ 61.  On May 21, 2018, the United States imposed broad sanctions on Venezuela which would have precluded any U.S. person from foreclosing on the CITGO Collateral following an event of default by PDVSA.  56.1 ¶ 226.  On July 19, 2018, the U.S. Office of Foreign Assets Control ("OFAC") issued General

License 5 ("GL5"), which altered U.S. policy and restored the 2020 Noteholders' ability to claim CITGO Holding's equity as collateral if the 2020 Notes defaulted.  *Id.* ¶ 226.  Although not mentioned in the Hinman Report, five days before PDVSA's default, GL5 was amended by GL5A, which delayed implementation of GL5 for a period of months.  *Id.* ¶ 229.  Nevertheless, Mr. Hinman concludes, based on his review of the market reaction to GL5 in the three-day period after its announcement in July 2018—a period in which he concludes the price of the 2020 Notes remained "stable"—that the "discount in the post-default 2020 Notes' Value . . . is consistent with the invalidity risk associated with the CITGO Collateral rather than the imposition (or removal) of U.S. sanctions specifically related to 2020 Noteholders' ability to claim CITGO equity as collateral."  Hinman Rep. ¶ 62.

This opinion is unreliable for several reasons.  As an initial matter, it rests on an unreliable premise:  the Hinman Report provides no basis to conclude that the purported "discount" of 41% against the value of the CITGO Collateral is calculated in an accurate or reliable manner.  The CITGO Collateral consists of equity in a closely held corporation that is not publicly traded, and subject to a wide range of uncertain valuations.  *See* McKenna Rep. ¶ 60.  As the Hinman Report elsewhere notes, at the time of the initial Exchange Offer in 2016, public valuations of CITGO ranged from $1.80 billion to $4.16 billion.  Hinman Rep. ¶¶ 67– 68.  In the absence of reliable up-to-date information at the time of the default, he calculates the CITGO Collateral's "value" based on an estimated valuation reflected in a Fitch report published months earlier.  *Id.* ¶ 68.  The Hinman Report does not explain why the Fitch valuation was used, or why it should be considered a reliable comparator for purposes of calculating a post-default "discount."

Even if the Hinman Report's calculated discount were reliable, it does not consider, much less reject, numerous alternative explanations for the post-default price of the 2020 Notes.  For example, he fails to consider that the market price of the 2020 Notes relative to the Fitch estimated value of the CITGO Collateral could result from (i) uncertainty concerning the value of the CITGO Collateral, (ii) uncertainty concerning how to foreclose on the CITGO Collateral and monetize it, (iii) political risks related to CITGO, and (iv) well-known volatility in CITGO's value due to oil price fluctuations.  Any of these factors, alone or in combination, could have caused the 2020 Notes to be valued at a discount to the CITGO Collateral's value.

Moreover, as the Trustee and Collateral Agent's rebuttal expert, Timothy McKenna, observes, the value of a secured bond is *not* necessarily equal to the value of its collateral.  McKenna Rebuttal Rep. ¶ 27.  Rather, it is common to apply a "haircut" to collateral value based on the factors and uncertainties described above.  *Id.* ¶¶ 28–29.  In other words, discounts are the norm, for reasons having nothing to do with "invalidity risk."  The Hinman Report's failure to account for these alternative explanations renders Hinman's opinion unreliable.  *See R.F.M.A.S.*, 748 F. Supp. 2d at 271–74 (excluding testimony that failed to consider "obvious possibility" that decline in sales was attributable to conscious decision); *see also In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025–26 (S.D.N.Y. 1997) (excluding opinion that failed to distinguish between fraudulent and non-fraudulent influences on stock price).

Finally, the one potential alternative cause for the allegedly discounted price considered in the Hinman Report—U.S. sanctions policy—is improperly rejected as negatively impacting the price of the 2020 Notes.  As Mr. McKenna points out, Mr. Hinman's analysis of price movements around the GL5 Announcement does not purport to constitute a proper or

reliable price impact analysis, which would typically involve an event study. *See* McKenna Rebuttal Rep. ¶ 68. Indeed, without employing an event study or a similar analysis, an expert's results "cannot be evaluated by standard measures of statistical significance" and "the reliability of the magnitude and direction of [an expert's] value estimates are incapable of verification." *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. at 1026 (quoting *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993)). This principle is particularly apt here. At the time of PDVSA's default, U.S. government policy prohibited the enforcement of rights against the CITGO Collateral, yet Mr. Hinman conducts no reliable price impact analysis to assess the impact of sanctions policy on the price of PDVSA's bonds. 56.1 ¶¶ 226–29. Mr. Hinman's opinion that U.S. sanctions policy had no material impact on the price of the 2020 Notes—but "invalidity risk" did—is not supported by any competent analysis.

Thus, the Hinman Report's opinion that post-default pricing of the 2020 Notes is "consistent with" invalidity risk should be excluded.

### ii. Fitch Recovery Ratings

On October 25, 2016, Fitch downgraded both the 2020 Notes and PDVSA's senior unsecured debt, and assigned both types of debt a recovery rating of 4, which corresponds to an estimated recovery rate range of 31% to 50%. Hinman Rep. ¶ 65. Fitch estimated that the unsecured debt would recover "closer to the lower end of the range," and that the collateral for the 2020 Notes "may only marginally enhance recovery given default, which could still range between 31% and 50%." *Id.* The Hinman Report speculates that this recovery rating was "consistent with Fitch factoring into its assessment that the 2020 Notes' recovery of CITGO Collateral would be limited due to invalidity risk." *Id.* ¶ 67.

Hinman's speculation that Fitch based its opinion on perceived invalidity risk is contradicted by its source, which, while providing a narrative explanation for its ratings, makes

no mention of "invalidity risk." *See* Ex. 4, "Fitch Downgrades PDVSA's IDRs to 'CC'," FITCH RATINGS (Oct. 25, 2016).  Moreover, as the McKenna Report notes, none of the nineteen company-specific Fitch reports about PDVSA or CITGO from the time of the Exchange Offer to the present so much as mention invalidity risk.  McKenna Rebuttal Rep. ¶ 77.  Instead, the Fitch report identifies several other explanations for its ratings, such as that "PDVSA's liquidity position is expected to continue to weaken as a result of the unsuccessful exchange offer and recent and near-term debt service payments, current low oil price environment and transfers to the central government."  Ex. 4 at 2.  As a result, Mr. Hinman's opinion is entirely speculative, *Major League Baseball Props., Inc.*, 542 F.3d at 311, and, as in his analysis of post-default pricing, it fails to consider or rule out other factors which may have impacted the recovery rating assigned by Fitch.  *See R.F.M.A.S.*, 748 F. Supp. 2d at 273 (excluding expert testimony for failure to investigate any other possible causes).  This opinion should also be excluded.

### iii.  Investors' Response to the Exchange Offer

Lastly, Mr. Hinman's opinion that investors' "response to the Exchange Offer . . . is consistent with the finding that investors had factored in invalidity risk associated with the CITGO Collateral" is also speculative, unreliable, and inadmissible.  Hinman Rep. ¶ 83.  The Hinman Report asserts that "participation rates in sovereign restructurings typically range from 72% to 100%," but that "only 39% of the 2017 Notes' outstanding principal" was tendered in the Exchange Offer.  *Id.*  He concludes that this "tepid response" is "consistent with" concerns on the part of non-tendering holders about invalidity risk.  *Id.*

Mr. Hinman's opinion that "invalidity risk" accounts for the participation rate in the Exchange Offer is speculative.  As the discovery record in this case shows, there are numerous reasons why investors might decline to participate that have nothing to do with invalidity risk, all of which the Hinman Report ignores.  ████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████  Indeed, there are any

number of reasons a holder of 2017 Notes might have declined to tender into the Exchange

Offer, but none are given any consideration in the Hinman Report.  This speculative opinion

likewise should be excluded.  *See Major League Baseball Props., Inc.*, 542 F.3d at 311.

**III.    Mr. Hinman's Opinions that PDVSA Was Not "Enriched" by the Exchange Offer and that Exchanging Investors Suffered No Losses Are Inadmissible**

Separate from his opinions regarding invalidity risk, Mr. Hinman also opines that

PDVSA was "not enriched" by the Exchange Offer and that investors have suffered no losses.

Hinman Rep. ¶¶ 77, 85.  Neither opinion is admissible.

**A.  Mr. Hinman's Enrichment Opinion Should Be Excluded**

The Hinman Report concludes that the Exchange Offer did not "enrich" PDVSA

because, in Mr. Hinman's opinion, the terms of the exchange gave PDVSA only "modest, short-

term debt relief" in exchange for "significantly greater principal and interest payments through

2020." *Id.* ¶¶ 77–78.  Although the Hinman Report concedes that the maturity relief benefited

PDVSA by allowing it "to avoid making payments totaling $2.982 billion through November

2017 on 2017 Notes," (*id.* ¶ 77), it nevertheless argues that the Exchange Offer, relative to other

debt restructurings, offered terms that were "unusually favorable" to investors, and thus PDVSA

was not enriched thereby.  *Id.* ¶¶ 70–77.  This opinion is inadmissible for two separate reasons.

First, Mr. Hinman's opinion is based entirely on his say-so and employs no

methodology to objectively evaluate or quantify the relative benefits and costs to PDVSA under

the Exchange Offer.  *See Scentsational Techs., LLC* v. *Pepsi, Inc.*, 2018 WL 18889763, at *11

(S.D.N.Y. 2018) (excluding expert testimony as *ipse dixit* where the opinion was based on the expert's perception of the "alignment" among companies without "describ[ing] any method whereby one is able to assess a degree of 'alignment'"); *Coastal Oil*, 2000 WL 108816, at *2 (excluding opinion where expert did "not offer a basis upon which his conclusion can be tested").  Mr. Hinman's opinion amounts to little more than an *ipse dixit* assertion that the terms of the Exchange Offer were somehow "unfair" to PDVSA, and overly generous to investors. This is not admissible expert testimony under the *Daubert* standard.

Second, this opinion is inadmissible because it fails *Daubert*'s "fit" requirement. In this action, the PDVSA Parties seek a declaration that the 2020 Notes are unenforceable and that the Exchange Offer is void *ab initio*.  Compl. ¶ 1.  The Trustee and Collateral Agent seek a declaration that the 2020 Notes are binding obligations, and seek the return of principal and interest under a breach-of-contract theory.  Answer ¶¶ 204–20.  Only if the Court finds that the 2020 Notes are unenforceable will the Trustee and Collateral Agent seek disgorgement, restitution, and other quasi-contract remedies through unjust enrichment and quantum meruit counterclaims.  *Id.* ¶¶ 224–25, 254(a–e).  In that scenario, PDVSA will avoid its final payments of principal and interest, and it will certainly have been "enriched," yet the Hinman Report does not address this circumstance.  *Marshall* v. *Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014) (holding unjust enrichment is an alternative theory to breach of contract that applies where no valid contract exists).  On the other hand, if the 2020 Notes are enforced, the question of enrichment is irrelevant, because remedies will be dictated by the relevant contracts. In either case, the enrichment opinion in the Hinman Report is irrelevant and inadmissible.  *See Malletier* v. *Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 572–73 (S.D.N.Y. 2007) (excluding

testimony of plaintiff's expert due to "a lack of fit between the basic premise of the study" and plaintiff's "oft-expressed position in this litigation").

### B.  Mr. Hinman's Opinion that Exchanging Investors Have Not Lost Money Should Be Excluded

Mr. Hinman's opinion that "Exchanging Investors"—defined to mean "investors who exchanged [2017 Notes] for 2020 Notes and held those 2020 Notes through [March 16, 2020]"—"have not lost money on their investment," is similarly irrelevant.  Hinman Rep. ¶¶19(c), 84.  He supports his opinion by calculating the "total value that Exchanging Investors received from their investment," and comparing that to the amount they paid to purchase the 2017 Notes.  *Id.* ¶ 84.  To calculate "total value," Mr. Hinman includes (1) all principal and interest payments that investors would have received from the date they purchased the 2017 Notes through March 16, 2020, and (2) the market value of the 2020 Notes as of March 16, 2020. *Id.*  He does this analysis under two scenarios:  in one scenario, the Exchanging Investors purchased 2017 Notes when they were issued; in the other, the Exchanging Investors purchased the 2017 Notes during the window to tender into the Exchange Offer.  *Id.* ¶ 85.  He concludes that neither set of investors "lost any money through the Exchange Offer."  *Id.*

Like the enrichment opinion, Mr. Hinman's calculation is irrelevant to any legal theory of damages at issue in this case.  The Trustee and Collateral Agent are seeking contractual remedies, as to which the Hinman Report offers no opinion.  Alternatively, if the 2020 Notes were deemed unenforceable, Mr. Hinman's calculation would still be irrelevant because he includes in his arithmetic the market value of the 2020 Notes as of the date of his report.  *See* Hinman Rep. ¶ 84.  However, if the Court were to declare the 2020 Notes invalid and unenforceable, as Mr. McKenna observes, "the market value of the 2020 Notes may decline [and] [i]n fact, if the value of the 2020 Notes were to go to zero, then, under Mr. Hinman's

flawed methodology, investors would lose money from participating in the Exchange [Offer]." McKenna Rebuttal Rep. ¶ 83.  Accordingly, Mr. Hinman's analysis lacks the requisite "fit" and is therefore inadmissible.  *See Malletier*, 525 F. Supp. 2d at 572–73.

### CONCLUSION

Mr. Hinman's testimony should be excluded in its entirety.

Dated: New York, New York
       June 10, 2020

Respectfully submitted,

| | |
|---|---|
| PAUL, WEISS, RIFKIND,<br>   WHARTON & GARRISON LLP<br>Walter Rieman<br>William A. Clareman<br>Jonathan Hurwitz<br>Shane D. Avidan<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>Telephone: 212-373-3000<br>Facsimile:  212-757-3990<br>wrieman@paulweiss.com<br>wclareman@paulweiss.com<br>jhurwitz@paulweiss.com<br>savidan@paulweiss.com | LATHAM & WATKINS LLP<br><br>By:  <u>s/ Matthew S. Salerno</u><br>     Christopher J. Clark<br>     Matthew S. Salerno<br>     Sean H. McMahon<br>885 Third Avenue<br>New York, New York 10022<br>Telephone: 212-906-1200<br>Facsimile:  212-751-4864<br>chris.clark@lw.com<br>matthew.salerno@lw.com<br>sean.mcmahon@lw.com |

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
Roberto J. Gonzalez (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300
rgonzalez@paulweiss.com

*Attorneys for Defendants and Counterclaim Plaintiffs MUFG Union Bank, N.A. and GLAS Americas LLC, in their respective capacities as Trustee and Collateral Agent, under the Indenture dated October 27, 2016, and the Pledge and Security Agreement dated October 28, 2016, governing PDVSA's Senior Secured Notes due 2020 (as to New York law issues only)*

*Attorneys for Defendants and Counterclaim Plaintiffs MUFG Union Bank, N.A. and GLAS Americas LLC, in their respective capacities as Trustee and Collateral Agent, under the Indenture dated October 27, 2016, and the Pledge and Security Agreement dated October 28, 2016, governing PDVSA's Senior Secured Notes due 2020*