# Exhibit 1 to the Porzecanski Declaration

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO. 19 Civ. 10023 (KPF)

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

*Plaintiffs and Counterclaim Defendants*

-vs-

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

*Defendants and Counterclaim Plaintiffs.*

---

## DECLARATION OF PROFESSOR ARTURO C. PORZECANSKI

---

Pursuant to 28 U.S.C. § 1746, Arturo C. Porzecanski declares as follows:

1.     I, Arturo C. Porzecanski, have been retained by Paul, Weiss, Rifkind, Wharton & Garrison, LLP, counsel for MUFG Union Bank, N.A. (in its capacity as Trustee) and GLAS Americas LLC (in its capacity as Collateral Agent) (collectively, the "Defendants") in the above-captioned matter, to offer my opinion as an expert in the field of international finance on the economic implications of contractual choice-of-law provisions in the international bond market relating to sovereigns and state-owned enterprises.[1]

2.     The context for my opinion concerns a dispute arising from a debt securities issuance by Petróleos de Venezuela, S.A. ("PDVSA") in October 2016.  PDVSA is an oil and gas company

---

[1] Significant distinctions exist between a sovereign and a state-owned enterprise.  For example, sovereigns cannot declare bankruptcy.  (Buchheit et al. 2020, 329–30).  In contrast, a state-owned enterprise may have access to bankruptcy proceedings.  (World Bank 2014, 38.)  In fact, some commentators have specifically noted that PDVSA and its subsidiaries, unlike the Bolivarian Republic of Venezuela, can seek bankruptcy relief.  (Weidemaier and Gauthier 2017). The inability of a sovereign to declare bankruptcy—an inability that is not shared by many state-owned enterprises—has required the development of international norms and procedures for restructuring the debts of a sovereign.  (Buchheit et al. 2020, 333).  The reasons market participants prefer New York or English law, however, apply to both sovereigns and state-owned enterprises.  For that reason, this Declaration discusses the debt of sovereigns and state-owned enterprises together.

wholly owned by the Bolivarian Republic of Venezuela.  In 2016, PDVSA was in financial distress and struggling to meet its debt obligations, including payments on outstanding bonds due to mature in 2017 (the "2017 Notes").  To alleviate this near-term debt burden, PDVSA offered to exchange the 2017 Notes for new bonds due to mature in 2020 (the "2020 Notes").  The terms of this exchange were laid out in an Offering Circular.  The terms of the 2020 Notes were memorialized in and governed by an indenture ("Indenture"), a pledge and security agreement ("Pledge Agreement"), and a set of global notes ("Global Notes") (and, together with the Indenture and Pledge Agreement, the "2020 Notes").  The Offering Circular specified that the 2020 Notes would be governed by New York law,[2] and the Indenture, Pledge Agreement, and Global Notes each contains a choice-of-law provision specifying that each document is governed in all respects by New York law.[3]

3.    I understand that PDSVA has defaulted on the 2020 Notes by failing to make a required payment of principal and interest that was due on October 27, 2019.  (Compl. ¶¶ 73–83).  I further understand that Plaintiffs have taken the position that the 2020 Notes are unenforceable because they were not approved by the Bolivarian Republic of Venezuela's National Assembly, which Plaintiffs argue the Venezuelan Constitution requires.  (Compl. ¶¶ 73–83).  Defendants, on the other hand, take the position that the 2020 Notes are enforceable because, among other reasons, they are governed by New York law rather than Venezuelan law.  (Ans. ¶¶ 148–150, 175–187).

**I.    Assignment**

4.    I have been asked by counsel for Defendants to describe the economic function that New York choice-of-law provisions have performed in the development of international debt markets, the pricing of bonds in these markets, and outcomes for investors in times of distress.[4]  I

---

[2] Petróleos de Venezuela, S.A., Offering Circular, September 16, 2016, Offering Circular at 13, 17, 42, 156.
[3] Indenture § 10.03 (HL_002709); Pledge Agreement § 7.13 (ASH_00009011); Global Notes § 18 (HL_019590).
[4] In international debt markets, as explained below, many bonds, including the bonds at issue in this case, are governed by New York or English law, even when the issuers are not incorporated or headquartered in New York or England. Throughout this Declaration, when I refer to "New York and English law bonds," I am referring to such bonds.  My

refer to the contractual choice of governing law and the choice of the required judicial forum jointly as "choice-of-law" provisions because it is common for them to be symmetrical and to select laws of the forum in which disputes must be heard.  (Wood 1982, 11).  Specifically, I have been asked to respond to the following questions:

a.   Is it common for bonds issued by emerging-market sovereigns and state-owned enterprises to contain choice-of-law provisions requiring the application of New York law, and, if so, what factors contribute to reliance on such provisions in the market for such international bonds?

b.   Is there empirical evidence that cross-border investors pay a premium, and thus accept lower yields or spreads, in order to own sovereign and state-owned-enterprise bonds with New York choice-of-law provisions?

c.   Have New York and similar choice-of-law provisions benefitted international investors when sovereign and state-owned-enterprise bonds become distressed and default?

## II.    Summary of Opinions

5.    As described more fully below, my principal conclusions are as follows:

a.   Sovereigns and state-owned enterprises commonly issue bonds that are marketed internationally, and they feature choice-of-law provisions specifying that they are governed by the laws of New York or England.  The 2020 Notes contain choice-of-law provisions specifying that they are governed by New York law and, as such, are examples of such bonds.  Although many factors contributed historically to the development of the preference by international

---

opinions as to "New York or English law bonds" do not apply to bonds placed by issuers who are themselves incorporated or headquartered in New York or England.  I refer to bonds governed by the law of the issuer's country as "domestic law" or "local law" bonds.

investors for New York and English law bonds, a primary reason for their prominence is that the well-developed commercial law of these jurisdictions offers greater predictability and certainty than the domestic law of these issuers. Such New York or English law bonds reduce, in particular, the risk that the sovereign that issued or guaranteed them will effect a change in the local law to diminish the rights of the bondholders.

b.   Consistent with this well-established investor preference and reduced vulnerability to issuer abuse associated with bonds governed by New York or English law, empirical studies show that investors pay a premium to invest in bonds governed by New York or English law. Consequently, because investors will pay a premium for New York or English law-governed bonds, such provisions reduce borrowing costs and expand access to credit for sovereign and state-owned enterprise issuers seeking to raise capital in the international debt markets.

c.   Examples from sovereign defaults in Greece and Argentina illustrate why investors pay premiums to hold bonds governed by New York or English law. Even in circumstances in which these sovereigns and state-owned-enterprise issuers defaulted on local-law bonds, they have refrained from defaulting on comparable New York or English law bonds. Choice-of-law clauses are a significant reason for these examples of different treatment.

d.   If a foreign sovereign issuer could use its domestic law to diminish the rights of New York law bondholders, despite having agreed to New York law, the legitimate expectations of investors would be defeated, and the value of such choice-of-law provisions would be greatly impaired. The premium paid for

4

New York law bonds would potentially be reduced, if not eliminated entirely. Such a result would reduce access to credit and increase borrowing costs for sovereign and state-owned enterprise issuers in international capital markets. It would also adversely affect the reputation of, and thus international reliance on, New York law.

e.   The 2020 Notes are examples of state-owned-enterprise bonds governed by New York law, and thus my opinions regarding the economic implications of New York or English choice-of-law provisions in sovereign or state-owned-enterprise bonds apply to these notes.  It is therefore my opinion based on principles of international finance that, if the 2020 Notes had been governed by Venezuelan law instead of New York law, the beneficial owners of the 2017 Notes would not have tendered into the Exchange Offer, or would have tendered only on terms more favorable to tendering beneficial owners of the 2017 Notes.

f.   In my opinion, if PDVSA were to succeed in using local Venezuelan law to invalidate the 2020 Notes, the legitimate expectations of the investors would be defeated, the solemn obligations of the issuer would be broken, and the wider international bond market would take notice.  Indeed, the success of such a radical departure from conventional understandings and legal precedents would undermine the venerable role of choice-of-law provisions in international bond markets, causing potentially long-lasting damage to the market for sovereign or state-controlled-enterprise bonds with New York choice-of-law provisions.

6.   The remainder of my Declaration is organized as follows.  I begin by describing my

own professional background and qualifications.  I then explain why New York and English law are generally the most popular choices of law for international issuers of, and investors in, emerging-market sovereign and state-owned-enterprise bonds.  Next, I review the results of widely accepted and peer-reviewed empirical studies that have quantified how investors have valued, through the pricing of comparable bonds, the difference between sovereign or state-owned-enterprise bonds governed by local versus New York or English law.  After that, to illustrate the importance of different governing laws, I describe two recent examples in which investments in New York or English law bonds, rather than local-law bonds issued by sovereigns or state-owned enterprises, made a significant, favorable difference to investors in the New York or English law bonds, consistent with investor expectations.

### III.    Professional Background and Qualifications

7.      I am a full-time professor of international economic relations at American University in Washington, D.C., and I have held the title of Distinguished Economist in Residence since 2007. I previously served as an adjunct professor at other universities such as Columbia University and New York University, and as visiting professor at Williams College, during 2002–2006.

8.      I was born and raised in Uruguay, South America, came to the United States in 1968 at age 18, and am a naturalized citizen of the United States.

9.      I obtained B.A., M.A., and Ph.D. degrees in international economics, the latter two at the University of Pittsburgh, with a regional specialization in Latin America.

10.     Following two years of teaching and applied research on Latin American financial markets in Mexico City, I came to New York City and, in the 28 years from early 1977 until early 2005, I worked as an international financial economist on Wall Street.  I started out as a junior analyst at JP Morgan Bank, and over time was promoted to become a senior economic advisor on Latin America.  After a dozen years there, and then a stint as the chief economist of Republic National

Bank of New York, a commercial bank, I served as the chief economist for emerging markets at three large investment-banking institutions based in New York City, the last of which was the European banking group ABN AMRO.  In those positions, I advised multinational companies, and institutional stock, bond, and currency investors, on the risks and opportunities of investing in the emerging markets generally, and in countries like Venezuela, specifically.

11.     During my nearly three decades on Wall Street, I gained considerable first-hand experience in economic and financial analysis of sovereigns and their state-owned banks, corporations, and other entities, for the purpose of assessing their creditworthiness.  I routinely traveled to Latin American countries, including Venezuela, to conduct field research.  Through that work, I furthered my understanding of how international financial markets operate and the economic, financial, and political risks and opportunities that emerging-market economies present.

12.     Among the issues I have specifically considered in my academic research and teaching career, which began in 2005 after my departure from the financial industry, is the impact of different legal regimes on investors and sovereign and state-owned-enterprise issuers in international debt markets.  I have published numerous scholarly articles on sovereign and state-owned enterprise debt issues at the intersection of international finance and New York law, including in leading law journals and law books.  Examples of these include "From Rogue Creditors to Rogue Debtors: Implications of Argentina's Default" (2005); "When Bad Things Happen to Good Sovereign Debt Contracts: The Case of Ecuador" (2010); "Corporate Workouts in Mexico: The Good, the Bad and the Ugly" (2011); "Behind the 2012 Greek Default and Restructuring" (2013); "Borrowing and Debt: How Do Sovereigns Get Into Trouble?" (2014); "The Origins of Argentina's Litigation and Arbitration Saga, 2002–2016" (2016); "Sovereign Debt Restructuring After Argentina" (2016); and "Human Rights and Sovereign Debts in the Context of Property and Creditor Rights" (2018).  These articles address, among other things, ethical and legal standards and practices in the United States and elsewhere as

they relate to international debt markets.

13.     My *curriculum vitae* is attached as Appendix I.  I am being compensated for my time at a rate of $500 per hour.  My compensation is not contingent upon the nature or substance of my opinions or on the outcome of this matter.

14.     The materials I have relied upon in the preparation of this Declaration are cited herein, or listed in Appendix II.

## IV.     The Reasons That International Bond Market Participants Rely on New York and English Choice-of-Law Clauses

15.     New York and English law can be regarded as international public goods, in the sense that they are frequently used as the governing laws for international bond issues and associated documents, such as derivatives.  (Wood 2020, 3).  It is especially common for sovereign and state-owned-enterprise borrowers from less creditworthy nations, like the emerging markets and lower-income countries, to issue bonds with choice-of-law provisions selecting New York or English law as the law governing the bonds.  (Chamon et al. 2018, 165–67).

16.     An important reason for this is that investors, when considering advancing funds to a foreign sovereign or state-owned enterprise, are naturally concerned that, when the time comes, the sovereign or state-owned enterprise may not honor its obligations to pay principal and interest. (Chamon et al. 2018, 164).  In particular, unlike a corporate borrower, a foreign sovereign may draw upon the sovereign's powers, in a variety of ways, to avoid honoring its obligations or the obligations of its state-owned enterprises.  A choice-of-law clause selecting New York or English law is thus important to investors because it allows them to benefit from the protections of the chosen law.  It is also important to sovereign and state-owned-enterprise borrowers, and to the operation of international bond markets, because it allows sovereign and state-owned-enterprise borrowers to credibly eliminate the risk of confiscatory tactics under their local law.  This is so for several related

8

reasons.

17.     First, the selection of New York or English law insulates investors from a potential attempt by a sovereign, acting in its own interest or to benefit a state-owned enterprise, to use its own domestic law to escape its obligations.  (Wood 1982, 12; Wood 2020, 11–12).  A sovereign borrower may attempt to avoid its obligations by "unilaterally chang[ing] the terms of domestic law-governed debt," (Buchheit et al. 2020, 334), either by retroactively changing its law to its advantage or by purporting to interpret its law in a manner that has a like effect.  The sovereign may also be influenced by its state-owned enterprise in this regard.  For example, as discussed in more detail below, in 2012, Greece passed a law that retroactively inserted a clause into local-law bonds that made it significantly easier for the government to restructure both its sovereign and state-owned-enterprise debt at the expense of holders of the local-law bonds.  (Chamon et al. 2018, 164–65; Wood 2020, 11).  After all, sovereigns are sovereign: within their realm, one way or another, they can usually do whatever they wish.  Therefore, "[a] change in local law is a risk that investors take when they buy local law-governed debt instruments."  (Buchheit et al. 2020, 356).  But one "sovereign debtor cannot unilaterally change the terms of [New York or English law] bonds by legislative fiat" (Buchheit et al. 2020, 335); for example, the Bolivarian Republic of Venezuela cannot change New York law.  Thus, when sovereigns agree that their bonds will be governed by New York or English law, they knowingly surrender their ability to change or reinterpret their own laws in a manner such as to affect the rights of their creditors.  "For this reason, emerging market bonds targeted to foreign investors have generally been issued under [non-local] law, making the use of the local-law advantage moot in external debt restructurings."  (Buchheit et al. 2020, 356).

18.     Second, and apart from the risk of adverse changes in law, the law of the foreign sovereign may be unclear or unpredictable.  It may, for example, lack clear precedents interpreting

9

the relevant financial instrument.  The New York and English legal systems, on the other hand, have long handled complex commercial disputes, which means that "problems or disputes arising from loan agreements are more likely to have been already determined either by statute or case law," thereby providing much-desired predictability in contract interpretation.  (Orion Royal Bank 1982, 48).  Indeed, because international bond contracts are often drafted by American or English lawyers, the courts in those countries are perceived as more likely to "interpret the agreement in the manner in which the parties intended."  (Orion Royal Bank 1982, 47; Rich 1980, 514; Wood 2020, 7–8).

19.     Third, the selection of New York and English law protects investors from the court system of the foreign sovereign, which may be unwilling or unable to compel its own sovereign or state-owned enterprise to honor their financial obligations.  Unfortunately, many countries, including emerging markets, lack judiciaries with a reputation for resolving disputes fairly and quickly.  The concern for partiality can be most acute in cases where the sovereign, or a state-owned enterprise, is a party to a dispute, and also when the sovereign or state-owned enterprise is experiencing fiscal or hard-currency difficulties.  Without an established tradition of judicial independence, the pressure on a judge to rule in favor of a sovereign or state-owned-enterprise party, and against foreign creditors, may be overwhelming.  This is especially true in the wake of an economic depression or financial crisis.  In contrast, New York and English courts have a tradition of judicial independence and a reputation for fairly and quickly resolving legal disputes, including disputes between investors and foreign sovereign and state-owned-enterprise borrowers.  (Orion Royal Bank 1982, 47; Wood 2020, 4–5).

20.     Fourth, both the law and court systems of New York and England provide reliable methods to enforce judgments.  (Wood 1982, 12–13).  In this connection, the preference for New York and English law both contributed to, and was significantly aided by, the enactment of the U.S.

Foreign Sovereign Immunities Act ("FSIA") in 1976 and the U.K. State Immunity Act ("SIA") in 1978. The passage of these acts prompted market participants to include contractual waivers of immunity in their New York and English law bonds, which, in the United States and the United Kingdom, can potentially remove immunity from judgment and execution, subject to various exceptions.[5] (Rich 1980, 517; Weidemaier 2014, 86, 88; Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603–05; State Immunity Act, 1978, c. 33, §§ 1–3, 14 (Eng.)).

21.     For all these reasons, creditors prefer New York and English law when investing in the obligations of foreign sovereign or state-owned enterprise borrowers.[6] By agreeing to a choice-of-law clause designating New York or English law, a foreign sovereign or state-owned-enterprise borrower is able to address concerns that investors may have with its domestic law or court system. (Chamon et al. 2018, 178). And, as explained in the following sections, addressing these concerns benefits the foreign sovereign or state-owned-enterprise borrower by increasing its access to funding and/or to reducing its cost of credit.

## V.     Evidence of the Market Value of New York and English Law

22.     The empirical evidence confirms that New York or English law provisions have the value that one would predict based on the aforementioned principles. Due to the greater investor demand for sovereign or state-owned-enterprise bonds governed by New York or English law, investors will typically pay more to acquire them. There is a substantial body of empirical evidence

---

[5] The restrictive theory of sovereign immunity that was eventually enshrined in the FSIA and SIA had its roots in the fact that, after the end of World War II, governments increasingly sought ways to minimize their being dragged into disputes involving cross-border business transactions, and also ways to start holding accountable the growing number of state-owned enterprises, including Soviet firms, whose legal immunity gave them an unfair advantage over private companies. (Feldman 1986, 303–04).

[6] These bonds are also frequently drafted in English, which "is the accepted language for international finance. An English language bond can be subject to a non-English governing law and sometimes is, but, as the courts are also chosen and as proceedings in those courts would be in a foreign language and also the applicable case law and the statutes would also be in a foreign language, the law would therefore be less accessible. This could be a disadvantage if there were a dispute or the issuer became insolvent." (Wood 2020, 5).

showing precisely this pricing effect. In this section, I discuss four widely cited studies that have examined this issue, using reliable data sourced from financial data providers such as Bloomberg, Reuters, and Dealogic, and applying widely accepted statistical analyses.

23.     In short, the evidence shows that, with respect to bonds issued by a sovereign or state-owned enterprise, investors pay a premium to invest in New York or English law bonds as opposed to otherwise identical local-law bonds, and this effect is most pronounced when the sovereign or state-owned enterprise borrower is experiencing financial distress. Issuers are able to capitalize and benefit from this phenomenon by raising more capital at lower interest rates and longer maturities by issuing New York or English law bonds, as opposed to local-law bonds.

24.     First, Chamon, Schumacher, and Trebesch explored "whether sovereign bonds that are governed by . . . English or New York law, trade at a premium compared to bonds issued under domestic law." The authors did so by examining whether a "legal safety premium" was priced into bond yields, which would provide evidence that bond-market participants value bonds that are governed by laws of New York or England more than those that are not similarly protected. (Chamon et al. 2018, 164). The study found that "a [New York or English] law premium exists," and that it becomes "sizable and relevant in times of debt distress." (Chamon et al. 2018, 165).

25.     The authors initially sought to estimate the premium on New York and English law and other non-local-law bonds by comparing, for many sovereigns and state-owned enterprises, two otherwise identical bonds that shared the same currency, maturity, coupon, and other features, except that one was issued under local law while the other under New York or English law. Unfortunately, such "twin bonds" are rare; the authors identified only one pair for Argentina and constructed another for Russia by interpolating two sovereign bonds. (Chamon et al. 2018, 165). Their statistical analysis spanned 2000 through 2013 and revealed that a New York or English law premium existed,

and while it was typically modest for Argentina and Russia during periods of market stability, it became very sizable during periods of debt distress, when domestic or international circumstances raised concerns about sovereign ability and/or willingness to pay.[7]  For example, in the case of Argentina, the New York law premium was highest after the outbreak of the 2008 global financial crisis, reaching approximately 600 basis points.  In Russia, the English law premium was highest in 2000 to mid-2001, in the aftermath of that country's 1998–99 defaults, when it ranged from a high of 800 to a low of 200 basis points.  (Chamon et al. 2018, 177–178).

26.     The authors next analyzed sovereign and state-owned-enterprise bonds issued by eurozone countries.  Their empirical study spanned 2006 to 2013 and covered substantially all actively traded New York, English, and other non-local-law and domestic-law bonds in the eurozone area—a robust dataset.[8]  Consistent with their findings for Argentina and Russia, they found that premiums investors paid on mainly New York or English law bonds in the eurozone countries were small or even negative when credit risks were low, but sizable in times of crisis within the eurozone, for example, in the wake of serious financial difficulties in Greece.  (Chamon et al. 2018, 166, 168).

27.     The authors concluded that their findings were consistent with the view that issuing New York or English law bonds enhanced investor confidence, especially in times of sovereign or state-owned-enterprise distress.  (Chamon et al. 2018, 178).  By issuing under New York, English, or other non-local law, "thereby making the debt harder to restructure, sovereigns send [investors] a signal that they are unlikely to default on such bonds."  (Chamon et al. 2018, 178).  Their statistical results are also consistent with the logical proposition that the larger the amount of harder-to-

---

[7] PDVSA and the Bolivarian Republic of Venezuela, in fact, were in such a period of distress at the time of the exchange at issue in this case, as many observers noted that PDVSA was struggling to meet its debt obligations.  (Graham 2016).
[8] The vast majority of non-local-law bonds were governed by New York or English law, and only a small minority was governed by the laws of other jurisdictions.  (Chamon et al. 2018, 166).

restructure debt (New York or English law bonds), the higher should be investors' expected losses on easier-to-restructure debt (local-law bonds).[9]  (Bolton and Jeanne 2009).

28.     A second recent academic study by Bradley, de Fontenay, de Lira Salvatierra, and Gulati, reached similar conclusions in a study examining sovereign bonds whose governing law, currency, and/or exchange listing were wholly local as compared to those whose corresponding features were wholly foreign.  (Bradley et al. 2018).  This study was broader than the study by Chamon, Schumacher, and Trebesch, and concluded that investors pay a premium for New York, English, or other non-local-law bonds, and that this premium is significant even during periods of relative stability, and "not merely in times of financial crisis or distress."  (Bradley et al. 2018, 294).

29.     The authors focused their analysis on when-issued pricing, not secondary market trading, which allowed them to measure how investors priced local- versus foreign-parameter bonds[10] at the time of issuance—prior to their changing hands in the secondary market, under the influence of subsequent market-moving news.  (Bradley et al. 2018, 263).  Beginning with a sample of 111 sovereigns who issued 22,605 bonds during 1990–2016, the authors identified all bonds for which at least one of the three key parameters—currency, law, or listing—was "foreign" relative to the issuer's country, and then matched each such foreign-parameter bond with any of the same sovereign's bonds for which all three parameters were local.  (Bradley et al. 2018, 264–65).

30.     The conclusion of this empirical analysis was that "for the many countries that do issue both types of debt, the foreign-parameter debt tends to be issued at lower spreads [relative to risk-free benchmarks] . . . [and] that investors price foreign- and local-parameter debt accordingly

---

[9] "In the absence of any seniority rule, sovereigns have an incentive to dilute outstanding debt that is relatively easy to restructure by issuing debt that is hard to restructure.  At the same time, if debt markets anticipate such dilution, sovereigns may also have an incentive to issue hard-to-restructure debt as a way of forestalling future dilution."  (Bolton and Jeanne 2009, 899).

[10] "Foreign-parameter" bonds, in this study, include New York and English law bonds.

from the outset—not merely in times of financial crisis or distress.  Investors thus consider foreign bonds to be safer than local bonds for a wide range of countries: effectively, creditors holding foreign-parameter debt expect to fare relatively better in the event of a sovereign's financial distress, making it akin to senior debt."  (Bradley et al. 2018, 294).

31.     In other words, investors paid more for foreign-parameter bonds than for local-parameter sovereign bonds, "suggesting that investors reward such sovereigns for the commitment not to expropriate their investments."  (Bradley et al. 2018, 266).  When the authors attempted to quantify this reward, their results suggested that "if low-quality sovereigns are willing to relinquish control of their debt to investors, they enjoy a lower cost of capital as reflected in the spread:  2.18% for local issues but only 1.83% for foreign issues."  (Bradley et al. 2018, 280).  Indeed, the authors noted that "many low-quality sovereigns issue bonds primarily with foreign parameters, suggesting that low-quality sovereigns must largely relinquish control of their debt in order to entice international investors to buy it, given the risk of expropriation."  (Bradley et al. 2018, 266).[11]

32.     These findings are consistent with the hypothesis that sovereigns and state-owned enterprises can and do grant some of their bond issues *de facto* seniority, by choosing features like New York or English law that make those bonds harder to default and restructure unilaterally, thereby attracting investors who are reassured and accept lower-than-otherwise yields.  (Bradley et al. 2018, 294).

33.     Finally, two additional empirical studies, performed years earlier, identified similar

---

[11] The authors note that the literature suggests that it remains useful for emerging-market sovereigns to develop local bond markets to protect themselves in times of crisis, because this debt may be more easily restructured.  The authors also surmise that investors' willingness to pay higher prices for New York, English and other non-local-law bonds may be dependent on the existence of local-law bonds: "if the sovereign experiences financial distress, investors holding [New York or English law] debt anticipate that the sovereign can and will impose greater losses on the holders of its local-law debt."  (Bradley et al. 2018, 280–81).  In Section VI, *infra*, I discuss examples of two restructurings where sovereigns did in fact impose losses on holders of local-law debt, while sparing holders of New York or English law debt.

pricing effects in European sovereign bond yields in connection with the sovereign debt crises in Greece and Cyprus.

34.     The first of these two studies attempted to gauge, during the period September 30, 2008 to December 31, 2012, the difference that choice-of-law made to yields in the secondary market of nearly 400 European sovereign bonds denominated in euros.  (Clare and Schmidlin 2014, 2, 17).  The sample included all euro-denominated sovereign bonds mainly under New York or English as well as local law,[12] and specifically all such sovereign bonds outstanding as of end-2012, including those issued by non-eurozone member countries.  (Clare and Schmidlin 2014, 15–17).

35.     The results of this study suggested that before the sovereign debt crisis in Greece, market participants did not price-in the safety advantages of euro-denominated bonds governed by New York, English, or other non-local law.  However, once alarming news started to come out of Greece, and then fear of contagion effects spread around the European periphery, traders and investors quickly bid local-law bonds down relative to their New York or English law equivalents.  The authors noted that "[t]he premium paid for [mainly New York or English] law bonds, as compared to bonds governed by local law, peaked at 262 [basis points] in terms of yield during the height of the crisis, . . . [and] [t]his [New York or English] law effect was especially distinct for lower-rated issuers."  (Clare and Schmidlin 2014, 32).  After Greece unilaterally restructured its local-law sovereign debt and debt issued by state-owned enterprises, investors understandably repriced the new local-law obligations to reflect a lower risk of a second restructuring, such that by the end of 2012 the premium commanded by mainly New York or English law bonds had narrowed to less than 60 basis points.  (Clare and Schmidlin 2014, 32).

---

[12] 89.1 percent of the bonds in this study were governed by English law, with the remainder split between New York law and Swiss law.  (Clare and Schmidlin 2014, 16, 24).

36.     The second of these studies examined, from 2008–2014, issuers from Greece, Ireland, Portugal, Spain, Italy, and France, since these eurozone countries were the ones most likely to be affected by solvency and liquidity concerns reflected in their bond markets.  (Nordvig 2015).  In this study, the author found "evidence of a rising premium especially in late 2011 and mid-2012 on bonds with [mainly New York or English] governing law relative to those with local governing law (and otherwise similar characteristics) . . . [and] that this governing law premium can be linked to both credit risk (expected haircuts) and redenomination risk (expected currency depreciation)."  (Nordvig 2015, 1).  In sum, this study confirmed the importance of legal parameters for asset pricing, including the variability of such effects over time, particularly in stressed and uncertain markets, with market participants regarding New York, English, and other non-local-law bonds as significantly safer than local-law instruments.  (Nordvig 2015, 39–40).

37.     The authors of each of the four empirical studies discussed above used common statistical methods to isolate the effect of choice-of-law from other factors that influence pricing. For instance, differences between domestic and foreign capital markets in terms of tax treatment, issuance procedures, flotation costs, listing practices, market liquidity, and others could all play an explanatory role in pricing discrepancies.  Yet, as one would expect as a result of greater demand for New York or English law bonds, all four of these empirical studies show pricing differences between local-law bonds and their New York or English law equivalents that are statistically significant after controlling for bond characteristics highlighted as important by the finance literature (*e.g.*, term-structure effects) and after accounting for unobserved time-varying, country-specific factors and differences across issuers.

38.     In sum, there is persuasive evidence that investors differentiate between, on the one hand, bonds issued by sovereigns and state-owned enterprises that are subject to New York or

17

English law and, on the other, equivalent bonds that are subject to local law.  Investors prize and thus pay a premium for the former class of obligations, and this effect is most pronounced when the sovereign or state-owned enterprise is experiencing financial distress.  By issuing New York or English law bonds and not just local-law bonds, sovereigns and state-owned-enterprises reap a benefit from a *de facto* seniority structure that enables them to access more funding on better terms than otherwise.

## VI.    Examples of Differential Investor Treatment Depending on Choice of Law

39.    Experience in the international bond market over the past decade has highlighted the value that investors receive from investing in sovereign or state-owned-enterprise bonds governed by New York, English, or other non-local law, as opposed to bonds governed by the domestic law of the issuer.  While some sovereigns and state-owned enterprises have, in times of distress, defaulted on their debt obligations across the board irrespective of their choice of law, many sovereigns and state-owned enterprises will instead default selectively, *i.e.*, by prioritizing some obligations over others.[13]

40.    Sovereign and state-owned-enterprise debtors may prioritize bonded debts for a variety of reasons, such as the currency denomination of the bonds, nature of the investor base holding the bonds, potential harm to their domestic banking and pension systems, and/or other

---

[13] I use the word "default" as applied to a sovereign or state-owned enterprise as the leading credit-rating agencies do, and specifically by following the four relevant criteria from Moody's Investors Service: "a. a missed or delayed disbursement of a contractually-obligated interest or principal payment (excluding missed payments cured within a contractually allowed grace period), as defined in credit agreements and indentures; b. a bankruptcy filing or legal receivership by the debt issuer or obligor that will likely cause a miss or delay in future contractually-obligated debt service payments; c. a distressed exchange whereby 1) an issuer offers creditors a new or restructured debt, or a new package of securities, cash or assets, that amount to a diminished value relative to the debt obligation's original promise and 2) the exchange has the effect of allowing the issuer to avoid a likely eventual default; d. a change in the payment terms of a credit agreement or indenture imposed by the sovereign that results in a diminished financial obligation, such as a forced currency re-denomination (imposed by the debtor, or the debtor's sovereign) or a forced change in some other aspect of the original promise, such as indexation or maturity."  (Moody's 2020, 32).

political-economy considerations. But one important factor in selective defaults on bonds, and the one relevant here, is the choice-of-law provision governing the bonds. Indeed, in the past decade, there are at least two examples of sovereigns or state-owned entities that issued both local-law and New York or English law bonds selectively restructuring or defaulting on the local-law bonds, while continuing to make payments on the New York or English law bonds. In effect, the sovereign and state-owned-enterprise borrowers treated their New York or English law bonds as having *de facto* seniority.

41.     The cases of sovereign debt crises in Greece in 2012 and Argentina in 2019–2020 (ongoing as of the date of this report) illustrate the benefits to investors of New York or English law bonds in cases of selective defaults. They also illustrate the benefits to sovereigns and state-owned enterprises of having issued both local-law and either New York or English law bonds. I next discuss these two examples.

### A.     Greece

42.     The Greek sovereign debt crisis provides an example of a situation where the sovereign and state-owned enterprises were willing to jeopardize their access to the international financial markets, but they were still unable to force all holders of English law government bonds to accept losses, demonstrating the value of New York, English, or other non-local-law bonds to investors. While the Greek government was able to unilaterally and retroactively change the terms of its local-law bonds through legislation, it was unable to change English, Italian, Japanese, or Swiss law, and thus unable to change the terms of its non-local-law bonds.

43.     In March 2012, the government of Greece offered a distressed-debt exchange in accordance with its commitments under an economic rescue program agreed with the European Commission, the European Central Bank ("ECB"), and the International Monetary Fund ("IMF").

(Zettelmayer et al. 2013a, 524–26).   The exchange attempted to restructure all privately held sovereign and state-owned-enterprise bonds issued prior to 2012, amounting to more than €200 billion of both local- and English law instruments.  (Zettelmayer et al. 2013a, 524).  The English law bonds accounted for approximately 10 percent of the targeted securities, and they were largely denominated in euros.  (Zettelmayer et al. 2013a, 525).  Bonds issued by the sovereign included 81 titles representing 95 percent of the debt obligations eligible to be exchanged, while the remainder were 36 instruments issued by three state-owned enterprises.  (Zettelmayer et al. 2013b, 51).[14] Treated as senior and thus left out of the restructuring were Greek treasury bills and, far more significantly, all obligations to the ECB, Europe's national central banks, the European Investment Bank, and multilateral lending organizations—principally the IMF.  (Zettelmayer et al. 2013a, 524).

44.     The exchange was billed as a "voluntary transaction" but was coercive in three main ways.  First, most of the bonds were held by Greek banks, or else by dozens of European banks and insurers, all of whom operated under the thumb of their respective government regulators—and most of whom had by that point become dependent for funding on the ECB.  Realistically, they had no choice but to participate.  Second, the Greek parliament hastily passed a law retroactively introducing collective-action clauses ("CACs") with a class voting mechanism into the €177 billion of targeted bonds governed by Greek law, specifying that by tendering into the exchange, every bondholder was automatically voting to make the terms of the exchange applicable to all other bonds.  The new payment terms were thus imposed on holdouts once the agreement of two-thirds of face-value-weighted votes was obtained.  Third, the Greek authorities made it plain that non-participants into

---

[14] The entities were the Hellenic Railway Company, the Hellenic Defense Systems, and the Athens Urban Transport Organization.  Most bonds were subject to English law, and some bonds were subject to Japanese, Italian, and Swiss law, but none were under New York law; besides euros, they were denominated in yen, dollars, and Swiss francs.  (Zettelmeyer et al. 2013b, 53).

the exchange should not expect any payments.  (Porzecanski 2013, 41).

45.     The key economic terms of the bond offer were extremely harsh to investors, imposing losses estimated to have averaged 76 percent, intended to achieve a write-off of almost 30% (over €105 billion) of Greece's total sovereign debt and debt issued by state-owned enterprises.  (Moody's 2013, 7–9, 23).  Investors were to exchange their bonds for new ones with a face value equal to a fraction (31.5 percent) of the face amount of the debt exchanged; staggered bullet maturities equivalent to a synthetic bond with a 30-year maturity and 10-year grace period; and step-up coupons starting at a mere 2 percent up to 2015 rising to a maximum of 4.3 percent after 2021.  However, the new bonds they would be given were made subject to English law and jurisdiction "and thus not subject to the fiat of the Greek parliament," a concession to the fact that the credibility of Greek-law bond indentures had been ruined by the retroactive rewriting of the existing stock of indentures.  (Zettelmeyer et al. 2013b, 8–12; Buchheit et al. 2020, 351).

46.     Investors in English and other non-local-law bonds fared better in the restructuring.  (Zettelmeyer et al. 2013b, 51).  While an exchange offer and consent solicitation were made to the holders of English law bonds, only the exchange offer was made to holders of Japanese and Italian law bonds, and only the consent solicitation was sent to holders of the single Swiss law bond.  Unlike the local law bonds, the Greek government made no attempt to amend the terms of these bonds.  For example, the English law bonds were governed by CACs with thresholds that applied bond-by-bond, rather than across bonds as in the Greek law that introduced CACs retroactively.  As a consequence, 44 percent (by face value) of the English law bonds refused the Greek government's restructuring offer.  (Zettelmeyer et al. 2013b, 51).[15]  The Greek authorities decided to keep servicing—and in

---

[15] The final participation rate among English and other non-local-law bondholders was 71 percent, whereas the overall share of holdouts was only 3.1 percent of the total eligible debt.  (Zettelmeyer et al. 2013a, 527).

fact they have since repaid—the holdouts in full, thereby opting not to pursue the confrontational path that rogue-debtor Argentina followed from 2005 until 2016, when it finally settled with its own holdouts.  (Porzecanski 2016).

47.     As a result, holders of Greek sovereign or state-owned-enterprise bonds subject to English and other non-local law fared far better than holders of local-law bonds.

### B.     Argentina

48.     Likewise, Argentina's recent defaults on local-law government debt provide a timely example of how holders of New York law debt receive preferential treatment from sovereigns in times of financial distress.

49.     In August and December 2019, and again in January and February 2020, the government of Argentina defaulted on a sizeable amount of local-law debt obligations, denominated in both the local currency and U.S. dollars.  These actions were accomplished primarily by changes to Argentine law that unilaterally changed the terms of the debt.  The first action involved the unilateral extension, effective August 30, 2019, of repayments on the whole stock of dual-currency treasury bills (known as "Letes," "Lecaps," "Lelinks," and "Lecers"), such that they would be paid mostly in arrears.  (Fitch 2019a).  The second decision entailed the government's unilateral deferral, on December 19, 2019, of all repayments coming due of short-term, local-law, dollar-denominated treasury bills ("Letes") until August 31, 2020.  (Fitch 2019b).  The third action implicated the launch and conclusion, on January 20, 2020, of a distressed-debt exchange of short-term, local-law, local-currency government obligations ("Lecaps") maturing between February and April 2020, whereby investors exchanged their holdings for new instruments maturing in September or December 2020, such that participants received new obligations involving longer maturities, lower coupons, and a lesser par value than their original securities.  (S&P Global Ratings 2020, 2).  And the fourth policy

decision was the unilateral deferment until September 30, 2020, via a resolution by the Ministry of Economy dated February 11, 2020, of the redemption of a local-currency, local-law government bond indexed to the price of the U.S. dollar known as the AF20, that was due to be amortized on February 13, 2020.  (Raszewski and Bronstein 2020a).

50.     During the same period, and to date, Argentina remained current on its New York law obligations, including on all new issues placed during 2016–2018 subject to New York law.[16] (Binetti 2020).  Although the previous administration of President Mauricio Macri had signaled in late August 2019 that it would ask bondholders for a deferral of scheduled redemptions on the sovereign debt, Argentina ultimately acted only with respect to local-law debt.  (Wigglesworth and Stott 2020).  The successor administration of President Alberto Fernández instead confirmed its intention to seek a consensual restructuring of the sovereign debt by the end of March 2020.  In early February, it obtained congressional approval to negotiate on the country's behalf a restructuring of its foreign-currency, New York law debt.  (Raszewski and Garrison 2020b).

51.     In mid-January, 2020, Axel Kicillof, Governor of the Province of Buenos Aires (the country's largest province) proposed to creditors a delay in a looming payment of principal on a dollar-denominated New York law bond.  (Squires and Do Rosario 2020, 1–2 ).  Under the relevant CAC, at least 75 percent (by face value) of holders would have had to approve the proposal.  That hurdle was not cleared, leaving the province with the choice of either making the payment before

---

[16] These include the following issues, all subject to New York law: $2,750,000,000 6.250% Bonds due 2019, $4,500,000,000 6.875% Bonds due 2021, $6,500,000,000 7.500% Bonds due 2026, and $2,750,000,000 7.625% Bonds due 2046 (5/4/2016); $1,000,000,000 6.625% Bonds due 2028, and $1,750,000,000 7.125% Bonds due 2036 (7/6/2016); €1,250,000,000 3.875% Bonds due 2022, and €1,250,000,000 5.000% Bonds due 2027 (10/5/2016); $3,250,000,000 5.625% Bonds due 2022, and $3,750,000,000 6.875% Bonds due 2027 (1/26/2017); $2,732,991,000 6.250% Bonds due 2019, $4,469,318,000 6.875% Bonds due 2021, $6,468,120,000 7.500% Bonds due 2026, $2,743,906,000 7.625% Bonds due 2046, $988,413,000 6.625% Bonds due 2028, $1,710,730,000 7.125% Bonds due 2036, $3,245,605,000 5.625% Bonds due 2022, and 3,744,556,000 6.875% Bonds due 2027 (4/28/2017); $2,750,000,000 7.125% Bonds due 2117 (6/28/2017); €1,000,000,000 3.375% Bonds due 2023, €1,000,000,000 5.250% Bonds due 2028, and €750,000,000 6.250% Bonds due 2047 (11/2/2017); and $1,750,000,000 4.625% Bonds due 2023, $4,250,000,000 5.875% Bonds due 2028, and $3,000,000,000 6.875% Bonds due 2048 (1/4/2018).

the grace period ended or else defaulting.  The principal payment was finally made in early February, at the end of the grace period.  (Squires and Do Rosario 2020, 1–2).

52.     Argentina's current debt-servicing crisis thus demonstrates the importance of New York law provisions in sovereign bonds.

### VII.     Conclusion

53.     In conclusion, the New York choice-of-law provisions in the governing documents at issue in this case are the same type of New York or English law provisions that are commonly included in sovereign debt and debt issued by state-owned enterprises placed internationally. Sovereigns and state-owned enterprises, especially those from less creditworthy nations, typically pledge to be governed by New York or English law to address investor concerns that the sovereign, as the issuer or as the holder of a substantial financial interest in the issuer, may abuse its powers to the detriment of bondholders.  In turn, sovereigns and state-owned enterprises often benefit from New York or English law provisions through lower borrowing costs, longer maturities, and/or increased access to credit.  The empirical evidence supports the conclusion that investors usually pay a premium—whether in the form of lower coupons or yields, longer maturities, or the granting of other favorable terms—to invest in sovereign or state-owned-enterprise bonds governed by New York or English choice-of-law provisions relative to comparable obligations governed by local law.

54.     The role that New York or English law provisions play in preventing or alleviating investor-unfriendly sovereign or state-owned-enterprise behavior is not hypothetical.  The examples of Greece in 2012 and Argentina in 2019–2020 illustrate how sovereigns and state-owned enterprises can and often do grant *de facto* seniority to New York or English law creditors.

55.     The 2020 Notes are an example of a state-owned-enterprise bond subject to New York or English law, given that PDVSA is a Venezuelan state-owned issuer and the bonds are

24

governed, in fact, by New York law.  In my opinion, if PDVSA were to succeed in using local Venezuelan law to invalidate these bonds, the legitimate expectations of the investors would be defeated, the solemn obligations of the issuer would be broken, and the wider international bond market would take notice.  Indeed, the success of such a radical departure from conventional understandings and legal precedents would undermine the venerable role of choice-of-law provisions in international bond markets, causing potentially long-lasting damage to the market for sovereign or state-controlled-enterprise bonds with New York choice-of-law provisions.

_____

Arturo C. Porzecanski, Ph.D.

Dated: March 16, 2020

Appendix I

# ARTURO C. PORZECANSKI, Ph.D.

**Office:** 4400 Massachusetts Ave., NW, Washington, DC 20016-8071
**Phones:** 202-885-1602 and 917-526-3607
**E-mail:** _aporzeca@american.edu_

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| _Aug 2007-now_ | _Distinguished Economist in Residence, American University_ |
| _Aug 2019-now_ | _Chair, International Economic Relations Program_ |
| _Jun 2012-2018_ | _Director, International Economic Relations Program_ |
| _Jun 2013-2018_ | _Co-Director, International Economics Program_ |
| _2005-2007_ | _Scholar in Residence_ |

I directed two Master's degree programs in the School of International Service, and developed and taught six different courses ("Economic Globalization: Pros & Cons," "International Economics," "International Economic Organizations," "International Finance and the Emerging Markets," "Financial Issues in Latin America," and "Populism: Lessons from Latin America"), mostly to graduate and undergraduate students enrolled in the School of International Service or the Department of Economics.  I also developed and taught an online course ("Understanding Global Economics and Markets") as part of two graduate programs, the M.S. in International Relations and Business and the Master of International Service for Experienced Professionals.  I carry out publishable research in international finance and provide consulting services to financial, law and public-relations firms, as well as to U.S. government agencies and multilateral institutions, such as the Inter-American Development Bank and the United Nations.  In addition, I serve as a Dispute Resolution Arbitrator for the Financial Industry Regulatory Authority (FINRA); taught international economics at the Inter-American Defense College (2006-2012); and was a Senior Associate (Non-Resident) in the Americas Program of the Center for Strategic and International Studies (2006-2013).

_Jan 2002-Dec 2006 Adjunct Professor of International Affairs, Columbia University_

I developed and taught every Fall term a very popular graduate-level course on "Financial Issues in Latin America" at the School of International and Public Affairs, and previously taught a seminar on "Globalization: Causes and Consequences."

_Jan 2004-May 2005 Adjunct Professor of Economics, New York University_

I taught each spring term a course in international business to undergraduate students in the Stern School of Business, "Global Business Environment" and its follow-on course

2

"International Study Project," and also the class on "Financial Issues in Latin America" to graduate students in the Economics Department of the Faculty of Arts and Science.

*Jan-May 2005*          *Visiting Professor of Economics, Williams College*

I taught two Oxford-style tutorials in international finance and economic development to mid-career graduate students from developing countries at the Center for Development Economics.

*Jul 2000-Feb 2005  Managing Director and Head of Emerging Markets Sovereign
                    Research, ABN AMRO Inc.*

Advised the Bank, its bond and equity investor clients, as well as corporate, bank and government treasurers, on financial market and credit risks and opportunities, especially in the emerging markets of Asia, Emerging Europe and Latin America; published economic research reports on a regular basis; conducted seminars and spoke out publicly in numerous venues; visited clients around the globe to advise them personally; granted interviews to the media on virtually a daily basis; advised U.S. government and international agencies located in Washington and beyond; and managed a team of nearly 20 applied-research economists scattered around the globe.

*1994-Jun 2000          Managing Director and Chief Economist for the Americas, ING
                        Barings (previously ING Capital)*

Founded and managed the firm's top-ranked economics and corporate-debt research effort in the Americas, and helped to set it up in Europe and Asia; advised the firm and its fixed-income and equity clients on global economic and political prospects with special concentration on Latin America and the region's trade and financial interactions with the U.S.; was the managing editor of (and regular contributor to) the firm's flagship fixed-income publication; and was often ranked by investor surveys as one of the top economic advisors, receiving an award for accuracy in economic forecasting.

*1992-1993              Senior Vice President and Chief Emerging Markets Economist,
                        Kidder Peabody & Co. Inc.*

Advised the trading desk and institutional clients on market risks and opportunities mostly in Latin America but also in other emerging markets; visited the countries covered, producing a variety of written research reports; made presentations to clients and handled relations with the media; was a member of the firm's Investment Policy Committee; and managed a small team of economic analysts.

3

| 1989-1992 | *Senior Vice President and Chief Economist, Republic National Bank of New York* |

Advised management and clients on financial-market developments, government policies, and economic and political trends in the New York area, the U.S. and abroad; produced a biweekly research report on current national and international issues, a quarterly international country risk report and numerous other topical memoranda as circumstances warranted; and was a member of the firm's International Credit Policy Committee.

| 1977-1989 | *Vice President and Senior Economist (initially Assistant Economist, then Associate Economist), JP Morgan (previously Morgan Guaranty Trust Co.), New York* |

Advised management and clients on lending and investment risks and opportunities in emerging markets, primarily Latin America; after the onset of the 1982 LDC debt crisis, helped to represent Morgan in country debt negotiations; and wrote numerous research papers appearing in the Bank's flagship publication and in various other country and currency reports.

| 1981 | *Adjunct Assistant Professor of Economics, Barnard College* |

Taught an honors undergraduate course in international finance.

| 1975-1976 | *Research Economist, Center for Latin American Monetary Studies, Mexico City* |

Taught Master's-level courses in macroeconomics to Latin American central bank officials and carried out empirical research on monetary policy problems in Latin America, later published in refereed journals or in books on fiscal and monetary affairs.

| 1976 | *Adjunct Assistant Professor of Economics, Instituto Tecnológico Autónomo de México (ITAM), Mexico City* |

Taught an undergraduate course on theories of economic growth.

| 1973 | *Visiting Economist, International Monetary Fund* |

4

Developed and completed a research project, later published in a refereed journal, on the feasibility of using general indirect taxes as instruments of anti-inflation policy.

**EDUCATIONAL BACKGROUND**

*1975*            Ph.D. in Economics, University of Pittsburgh, with specialization in international, development and Latin American economics, and Graduate Certificate in Latin American Studies; doctoral dissertation chair: Prof. Marina von N. Whitman.

*1974*            M.A. in Economics, University of Pittsburgh, with specialization in international and development economics.

*1971*            B.A. in Economics and Certificate in Latin American Studies, Whittier College, CA.

                 Elementary and secondary education in Montevideo, Uruguay.


**PROFESSIONAL MEMBERSHIPS**

                 Council on Foreign Relations (Life Member since 1991)
                 American Economic Association


**BOARD DIRECTORSHIPS**

*2007-now*        Tinker Foundation, New York, NY
*2005-2007*       Washington Office for Latin America, Washington DC


**LANGUAGES**

                 Fluent in Spanish, Italian and Portuguese.

5

## PUBLICATIONS

**While in Graduate School:**
*Articles:*

"Price-Level and Income-Redistributing Effects of Devaluation in LDCs," in *Rivista Int. Di Sc. Economiche,* September 1972.

"Uruguay's Continuing Dilemma," in *Current History*, January 1974.

"The 'Natural' Trade Balance," in *Rivista Int. Di Sc. Economiche*, March 1974.

"General Indirect Taxation as a Macroeconomic Policy Instrument," in *National Tax Journal*, December 1974.

"The Inflationary Impact of Repetitive Devaluation," in *Journal of Development Studies*, July 1975.

*Book:*

*Uruguay's Tupamaros: The Urban Guerrilla* (New York: Praeger Publishers, 1973).

**Soon After Graduate School:**
*Articles:*

"Authoritarian Uruguay," in *Current History*, February 1977.

"An Analysis of the Economic Determinants of Legal and Illegal Mexican Migration to the US," with Mario I. Blejer and Harry G. Johnson, in *Research in Population Economics*, ed. by Julian L. Simon (Greenwich, CT: JAI Press, 1978). Translated into Spanish and republished in *Demografía y Economía*, No. 3, 1977.

"A Comparative Study of Exchange Rate Policy under Inflation," in *Journal of Developing Areas*, January 1978.

"The Case of Uruguay," in *Social Security in Latin America*, ed. by Carmelo Mesa-Lago (Pittsburgh: Univ. of Pittsburgh Press, 1978).

"Patterns of Monetary Policy in Latin America," in *Journal of Money, Credit and Banking*, November 1979.

"The assessment of country risk: Lessons from the Latin American experience," in *Financing Development in Latin America*, ed. by Juan C. Garcia-Zamor and Stewart E. Sutin (New York: Praeger Publishers, 1980).

6

"The International Financial Role of US Commercial Banks," in *Journal of Banking and Finance*, March 1981.

"The Monetary Approach to the Balance of Payments as Applied To Uruguay (In Spanish)," in *Central Bank of Uruguay 1980 Prize* (Montevideo: BCU, 1981).

"Some Thoughts on Risk in International Bank Lending," in *Crises in the Economic and Financial Structure*, ed. by Paul Wachtel (Lexington, MA: DC Heath, 1982).

"Profitability of International Banking," in *International Banking: Principles and Practices*, ed. by Emmanuel N. Roussakis (New York: Praeger Publishers, 1983).

"The Limited Role of the IMF," with Rimmer de Vries, in *IMF Conditionality*, ed. by John Williamson (Washington: IIE, 1983).

*Books:*

*Fiscal Policy in Latin America (in Spanish)*, an edited book of essays (Mexico City: CEMLA, 1977).

*Monetary Economics (in Spanish)*, a book of essays co-edited with Mario I. Blejer (Mexico City: CEMLA, 1977).

**While on Wall Street:**
*Articles:*

"Achieving Stability in Latin American Financial Markets: A Comment," in *Volatile Capital Flows*, ed. by Ricardo Hausmann and Liliana Rojas-Suárez (Washington, DC: IADB, 1996).

"Confronting Fiscal Imbalances Via Intertemporal Economics: A Comment," in *Sustainable Public Sector Finance in Latin America* (Atlanta: Federal Reserve Bank of Atlanta, 1999).

"Killing the Golden Goose," in *Emerging Markets Investor*, November 1999.

"Argentina y la Nueva Arquitectura del Sistema Financiero Internacional," in Banco Central del Uruguay *Revista de Economía*, May 2001.

"The Past and Future of Domestic Financial Markets in Latin America: A Comment," in *Domestic Finance and Global Capital in Latin America* (Atlanta: Federal Reserve Bank of Atlanta, 2001).

"Bankruptcy Lite," in *The International Economy*, Summer 2002.

7

"A Critique of Sovereign Bankruptcy Initiatives," in *Business Economics*, January 2003.
"The Constructive Role of Private Creditors" in *Ethics & International Affairs*, September 2003.

**While in Academia:**
*Articles:*

"From Rogue Creditors to Rogue Debtors: Implications of Argentina's Default," *Chicago Journal of International Law*, Summer 2005.

"Dealing with Sovereign Debt: Trends and Implications," in *Sovereign Debt at the Crossroads*, ed. by Chris Jochnick and Fraser Preston (New York: Oxford Univ. Press, 2006).

"El Mercado de Renta Fija en Uruguay," in Banco Central del Uruguay *Revista de Economía*, May 2007.

"Debt Relief by Private and Official Creditors: The Record Speaks," *International Finance*, Summer 2007.

"The Constructive Role of Private Creditors," expanded and updated version, in *Dealing Fairly with Developing Country Debt*, ed. by Christian Barry, Barry Herman and Lydia Tomitova (Malden, MA: Blackwell, 2007).

"The Fixed-Income Market in Uruguay," with Julio De Brun, Néstor Gandelman and Herman Kamil, in *Bond Markets in Latin America*, ed. by Eduardo Borensztein, Kevin Cowan, Barry Eichengreen and Ugo Panizza (Cambridge, MA: MIT Press, 2008).

"U.S.-Latin America Relations: A New Direction for a New Reality," *Council on Foreign Relations Independent Task Force Report*, No. 60, Brookings Institution Press, May 2008, contributor.

"Latin America: The Missing Financial Crisis," *ECLAC Washington Office Studies and Perspectives Series #6* (Santiago, Chile and Washington, DC: United Nations ECLAC, October 2009).

"Should Argentina Be Welcomed Back by the Capital Markets?," University of Miami Center for Hemispheric Policy *Perspectives on the Americas*, December 2010.

"When Bad Things Happen to Good Sovereign Debt Contracts: The Case of Ecuador," *Law & Contemporary Problems*, Duke Law School, Fall 2010.

8

"Corporate Workouts in Mexico: The Good, the Bad and the Ugly," Center for Strategic and International Studies *Issues in International Political Economy*, April 2011; reprinted in *North American Free Trade & Investment Report*, April 15, 2011.

"Should Argentina be Welcomed Back by Investors?," *World Economics*, September-December 2011.

"Mexico's Retrogression: Implications of a Bankruptcy Reorganization Gone Wrong," Center for Strategic and International Studies *Americas Program Hemisphere Focus*, November 2011.

"Buenos Aires to Athens: The Road to Perdition," *CSIS Americas Program Hemisphere Focus*, April 2012.

"Recommendations for a New Administration: Prosperity through Rule of Law and Sound Economics," Center for Strategic and International Studies *Americas Program Hemisphere Focus*, December 11, 2012; reprinted in *Latin American Law & Business Report*, December 2012.

"Behind the 2012 Greek Default and Restructuring," in *Sovereign Debt Restructuring: Legal, Financial and Regulatory Aspects*, ed. by Eugenio A. Bruno (London: Globe Law and Business, 2013).

"Brazil's Place in the Global Economy," University of Miami Center for Hemispheric Policy *Perspectives on the Americas*, December 2013.

"Borrowing and Debt: How Do Sovereigns Get Into Trouble?," in *Sovereign Debt Management*, ed. by Rosa Lastra and Lee Buchheit (Oxford and New York: Oxford Univ. Press, 2014).

"Brazil's Place in the Global Economy," in *Brazil on the Global Stage: Power, Ideas, and the Liberal International Order,* ed. by Matthew Taylor and Oliver Stuenkel (London and New York: Palgrave Macmillan, 2015).

"Sovereign Debt Restructuring After Argentina," *Development*, June 2016.

"The Origins of Argentina's Litigation and Arbitration Saga, 2002-2016," *Fordham Journal of International Law*, November 2016.

"Debunking the Relevance of the Debt-to-GDP Ratio," *World Economics*, January-March 2018.

9

"Human Rights and Sovereign Debts in the Context of Property and Creditor Rights," in *Sovereign Debt and Human Rights*, ed. by Ilias Bantekas and Cephas Lumina (Oxford and New York: Oxford Univ. Press, 2018).

## EXPERT TESTIMONY

Expert testimony in United States District Court, Southern District of New York, Case No. 10 Civ. 4300 (TPG) Silvia Seijas et al., Plaintiffs, v. The Republic of Argentina and Banco de la Nación Argentina, Defendants, February 2011.

Expert testimony in International Centre for the Settlement of Investment Disputes, Case No. ARB/07/5, Abaclat and Others, Claimants v. The Argentine Republic, Respondent, November 2013.

Expert testimony in Circuit Court, Fairfax County, Virginia, Case No. CL 2016-9386, Jorge Rafael Vazquez Saldana v. Karen Villar-Moncada, September 2018.

# Appendix II

## MATERIALS CONSIDERED

**A.  SOURCES CITED IN THE DECLARATION**

**I.  BOOKS AND ARTICLES**

Binetti, Bruno (2020), "Argentina Stares Down Yet Another Default," *Foreign Affairs*, March 9.

Bolton, Patrick and Olivier Jeanne (2009), "Structuring and Restructuring Sovereign Debt: The Role of Seniority," *Review of Economic Studies*, 76 (3), July, 879–902.

Bradley, Michael, Elisabeth de Fontenay, Irving Arturo de Lira Salvatierra, and Mitu Gulati (2018), "Pricing Sovereign Debt: Foreign versus Local Parameters," *European Financial Management*, 24 (2), March, 261–97.

Buchheit, Lee, Guillaume Chabert, Chanda DeLong, and Jeromin Zettelmeyer (2020), "The Restructuring Process," in *Sovereign Debt.*, ed. by S. Ali Abbas, Alex Pienkowski, and Kenneth Rogoff, Oxford Univ. Press, 328–64.

Chamon, Marcos, Julian Schumacher and Christoph Trebesch (2018), "Foreign-Law Bonds: Can They Reduce Sovereign Borrowing Costs?," *Journal of International Economics*, 114, September, 164–79.

Clare, Andrew and Nicolas Schmidlin (2014), "The Impact of Foreign Governing Law on European Government Bond Yields," The Sir John Cass Business School, City University, London, March.

Feldman, Mark B. (1986), "The United States Foreign Sovereign Immunities Act of 1976 in Perspective: A Founder's View," *International and Comparative Law Quarterly*, 35 (2), April, 302–319.

Fitch Ratings (2019a), *Fitch Downgrades Argentina to "Restricted Default,"* August 30.

Fitch Ratings (2019b), *Fitch Downgrades Argentina to "RD" on Local Maturity Extensions*, December 20.

Graham, Luke (2016), "Venezuela's State Oil Company Is Struggling Under Bond Obligations," CNBC, October 21.

Moody's Investors Service (2013), *Sovereign Defaults Series Compendium*, October.

Moody's Investors Service (2020), *Rating Symbols and Definitions*, January.

Nordvig, Jens (2015), "Legal Risk Premia During the Euro-Crisis: The Role of Credit and Redenomination Risk," *Discussion Papers on Business and Economics*

*No. 10/2015*, University of Southern Denmark, May 18.

Orion Royal Bank (1982), "Why English or New York Law?," *International Financial Law Review*, 1 (4), 47–48.

Porzecanski, Arturo C. (2013), "Behind the 2012 Greek Default and Restructuring," in *Sovereign Debt and Debt Restructuring: Legal, Financial and Regulatory Aspects*, ed. by Eugenio A. Bruno, Globe Business Publishing, 33–49.

Porzecanski, Arturo C. (2016), "The Origins of Argentina's Litigation and Arbitration Saga, 2002-2016," *Fordham International Law Journal*, 40 (1), 41–77.

Raszewski, Eliana and Hugh Bronstein (2020a), "Argentina to Delay $1.47 Billion Bond Payment Amid Debt Crisis," Reuters, February 11.

Raszewski, Eliana and Cassandra Garrison (2020b), "Argentina's Senate Unanimously Passes Debt Restructuring Bill," Reuters, February 5.

Rich, Frederic C. (1980), "Eurobond Practice: Sources of Law and the Threat of Unilateral National Regulation," *Virginia Journal of International Law*, 20 (2), 505–46.

S&P Global Ratings (2020), *Argentina Local Currency Ratings Lowered To "SD" On Distressed Debt Exchange*, January 21.

Squires, Scott and Jorgelina Do Rosario (2020), "Fidelity Calls Bluff on Buenos Aires Bond Payment and Wins Big," *Bloomberg News*, February 4.

Weidemaier, W. Mark C. (2014), "Sovereign Immunity and Sovereign Debt," *University of Illinois Law Review*, 2014 (1), 67–114.

Weidemaier, W. Mark C. and Matt Gauthier (2017), "Venezuela As A Case Study in Limited (Sovereign) Liability," *Capital Markets Law Journal*, 12 (2), April, 215–23.

Wigglesworth, Robin and Michael Stott (2019), "Argentina Seeks to Restructure $101bn of Debt," *Financial Times*, August 29.

Wood, Philip R. (1982), "External Governing Law—Either a Fortress or a Paper-House," *International Financial Law Review*, 1 (3), July, 11–14.

Wood, Philip R. (2020), "Choice of Governing Law for Bonds," *Capital Markets Law Journal*, 15 (1), January, 3–17.

World Bank (2014), *Corporate Governance of State-Owned Enterprises: A Toolkit*.

Zettelmeyer, Jeromin, Christoph Trebesch, Mitu Gulati, Tommaso Monacelli and Karl Whelan (2013a), "The Greek Debt Restructuring: An Autopsy," *Economic*

*Policy*, July, 28 (75), 515–63.

Zettelmeyer, Jeromin, Christoph Trebesch, Mitu Gulati (2013b), "The Greek Debt Restructuring: An Autopsy, Appendix," draft, July.

II. **DOCUMENTS**

Complaint, Dkt. 1, *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc.,* v. *MUFG Union Bank, N.A. and GLAS Americas LLC*, No. 1:19-cv-10023.

Answer and Counterclaims, and Exs. A–E, Dkts. 40–40.5, *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc.,* v. *MUFG Union Bank, N.A. and GLAS Americas LLC*, No. 1:19-cv-10023.

Global Notes, October 28, 2016 (HL_019590).

Indenture, October 27, 2016 (HL_002709).

Pledge and Security Agreement, October 28, 2016 (ASH_00009011).

Petróleos de Venezuela, S.A., Offering Circular, September 16, 2016 https://www.sec.gov/Archives/edgar/data/906424/000119312516712239/d171369 dex99t3e.htm.

The Republic of Argentina, Offering Memorandum for the Issuance of $2,750,000,000 6.250% Bonds due 2019, $4,500,000,000 6.875% Bonds due 2021, $6,500,000,000 7.500% Bonds due 2026, and $2,750,000,000 7.625% Bonds due 2046 (May 4, 2016).

The Republic of Argentina, Offering Memorandum for the Issuance of $1,000,000,000 6.625% Bonds due 2028 and $1,750,000,000 7.125% Bonds due 2036 (July 6, 2016).

The Republic of Argentina, Offering Memorandum for the Issuance of €1,250,000,000 3.875% Bonds due 2022 and €1,250,000,000 5.000% Bonds due 2027 (Oct. 5, 2016).

The Republic of Argentina, Offering Memorandum for the Issuance of $3,250,000,000 5.625% Bonds due 2022 and $3,750,000,000 6.875% Bonds due 2027 (Jan. 26, 2017).

The Republic of Argentina, Luxembourg Listing Memorandum for the Issuance of $2,732,991,000 6.250% Bonds due 2019, $4,469,318,000 6.875% Bonds due 2021, $6,468,120,000 7.500% Bonds due 2026, $2,743,906,000 7.625% Bonds due 2046, $988,413,000 6.625% Bonds due 2028, $1,710,730,000 7.125% Bonds due 2036, $3,245,605,000 5.625% Bonds due 2022, and 3,744,556,000 6.875% Bonds due 2027 (Apr. 28, 2017).

The Republic of Argentina, Offering Memorandum for the Issuance of $2,750,000,000 7.125% Bonds due 2117 (June 19, 2017).

The Republic of Argentina, Prospectus Supplement for the Issuance of €1,000,000,000 3.375% Bonds due 2023, €1,000,000,000 5.250% Bonds due 2028, and €750,000,000 6.250% Bonds due 2047 (Nov. 2, 2017).

The Republic of Argentina, Prospectus Supplement for the Issuance of $1,750,000,000 4.625% Bonds due 2023, $4,250,000,000 5.875% Bonds due 2028, and $3,000,000,000 6.875% Bonds due 2048 (Jan. 4, 2018).

### III.  STATUTES

Foreign Sovereign Immunities Act, 28 U.S.C. § 1603–05.

State Immunity Act, 1978, c. 33, §§ 1–3, 14 (Eng.).

## B.  CONSULTED SOURCES NOT CITED IN THE DECLARATION

### I.  DOCUMENTS

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,000 3.70% Bonds due 2015 (Feb. 21, 2005).

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,000 4.5% Bonds due 2037 (Mar. 4, 2005).

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,000 3.10% Bonds due 2010 (Apr. 18, 2005).

The Republic of Greece, Prospectus for the Issuance of CHF 650,000,000 2 1/8% Bonds due 2013 (June 29, 2005).

The Republic of Greece, Offering Circular for the Issuance of €400,000,000 Fixed to CMS Spread Linked Notes due 2025 (July 4, 2005).

The Republic of Greece, Offering Circular for the Issuance of €250,000,000 Fixed to Floating Rate Capped Government Bonds due 2024 (July 5, 2005).

The Republic of Greece, Offering Circular for the Issuance of €250,000,000 CMS - Linked Notes with Global Floor due 2020 (July 12, 2005).

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,000 3.60% Bonds due 2016 (Jan. 17, 2006).

The Republic of Greece, Offering Circular for the Issuance of €250,000,000 CMS – Linked Notes with Coupon Floor due 2021 (Apr. 18, 2006).

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,000 3.90% Bonds due 2011 (May 22, 2006).

The Republic of Greece, Offering Circular for the Issuance of €100,000,000 Fixed to Floating Rate Capped Government Bonds due 2021 (May 30, 2006).

The Republic of Greece, Offering Circular for the Issuance of €150,000,000 Fixed to CMS Spread Linked Notes due 2021 (with option to switch to floating rate) (June 8, 2006).

The Republic of Greece, Offering Circular for the Issuance of €2,100,000,000 Floating Rate Notes due 2018 (July 4, 2006).

The Republic of Greece, Offering Circular for the Issuance of €130,000,000 Fixed to CMS Spread Linked Notes due 2026 (July 7, 2006).

Hellenic Railways, Temporary Global Note representing €225,000,000 4.215 % Guaranteed Notes due 2019 guaranteed by the Republic of Greece (Dec. 15, 2006).

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,000 4.30% Bonds due 2017 (Jan. 15, 2007).

The Republic of Greece, Offering Circular for the Issuance of €4,000,000,000 4.60% Notes due 2040 (Feb. 2, 2007).

The Republic of Greece, Offering Circular for the Issuance of €1,000,000,000 2.085% Inflation Linked Notes due 2057 (Mar. 29, 2007).

The Republic of Greece, Offering Circular for the Issuance of €3,500,000,000 2.30% Inflation Linked Bonds due 2030 (Apr. 12, 2007).

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,000 4.70% Bonds due 2024 (May 29, 2007).

The Republic of Greece, Offering Circular for the Issuance of €4,000,000,000 2.30% Inflation Linked Bonds due 2030 (Jan. 28, 2008).

The Republic of Greece, Offering Circular for the Issuance of €600,000,000 2.085% Inflation Linked Notes due 2057 (Mar. 28, 2008).

The Republic of Greece, Offering Circular for the Issuance of €3,550,000,000 Floating Rates Notes due 2016 (Apr. 9, 2008).

The Republic of Greece, Offering Circular for the Issuance of €4,000,000,000 4.60% Bonds due 2018 (May 9, 2008).

The Republic of Greece, Offering Circular for the Issuance of €1,500,000,000 4.625% Bonds due 2013 (June 24, 2008).

The Republic of Greece, Offering Circular for the Issuance of €500,000,000 Floating Rate Notes due 2016 (July 17, 2008).

The Republic of Greece, Offering Circular for the Issuance of €1,000,000,000 Floating Rate Notes due 2016 (Aug. 8, 2008).

The Republic of Greece, Offering Circular for the Issuance of €5,500,000,000 5.50% Bond due 2014 (Jan. 26, 2009).

The Republic of Greece, Offering Circular for the Issuance of €7,000,000,000 4.30% Bonds due 2012 (Feb. 16, 2009).

The Republic of Greece, Offering Circular for the Issuance of €150,000,000 Floating Rate Notes due 2012 (Mar. 23, 2009).

The Republic of Greece, Offering Circular for the Issuance of €7,000,000,000 5.50% Bonds due 2014 (April 6, 2009).

The Republic of Greece, Offering Circular for the Issuance of €7,000,000,000 5.30% Bonds due 2026 (Nov. 9, 2009).

The Republic of Greece, Offering Circular for the Issuance of €8,000,000,000 6.10% Bonds due 2015 (Jan. 29, 2010).

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,0000 6.25% Bonds due 2020 (Mar. 10, 2010).

The Republic of Greece, Offering Circular for the Issuance of €5,000,000,000 5.90% Bonds due 2017 (April 1, 2010).