# Exhibit 2 to the Porzecanski Declaration

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO. 19 Civ. 10023 (KPF)

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

*Plaintiffs and Counterclaim Defendants*

-vs-

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

*Defendants and Counterclaim Plaintiffs.*

_____

**REBUTTAL DECLARATION OF
PROFESSOR ARTURO C. PORZECANSKI
IN RESPONSE TO PORTIONS OF THE
EXPERT REPORT BY DAVID C. HINMAN**

_____

Pursuant to 28 U.S.C. § 1746, Arturo C. Porzecanski declares as follows:

1.      I, Arturo C. Porzecanski, have been retained by Paul, Weiss, Rifkind, Wharton &

Garrison LLP, counsel for MUFG Union Bank, N.A. (in its capacity as Trustee) and

GLAS Americas LLC (in its capacity as Collateral Agent) (collectively, the "Defendants") in the

above-captioned matter.  I submitted an initial report on March 16, 2020, in which I offered three

opinions related to the import of the New York choice-of-law clauses in the governing documents

for the bonds issued by Petróleos de Venezuela, S.A. ("PDVSA") and scheduled to mature in 2020

(the "2020 Notes"), including the accompanying indenture ("Indenture") and pledge of CITGO

Holding stock (the "Pledge" or "Pledge Agreement").  My professional background and

qualifications are described in my initial report.

2.      I have been asked by Defendants' counsel to submit this rebuttal report to respond to certain opinions offered by Mr. David C. Hinman in his report dated March 16, 2020 ("Hinman Report").  Specifically, I respond to the following opinions in the Hinman Report:

a.      "Starting from September 2016 when the Exchange Offer was announced, sophisticated investors knew (or at a minimum should have known) of the invalidity risk related to the purported pledge of CITGO Collateral associated with the 2020 Notes, notwithstanding any representations in the 2020 Notes Transaction Documents ('Representations') to the contrary."

(Hinman Report ¶ 19(a)).

b.      "My review of a host of contemporaneously available information that emerging market debt investors such as myself routinely review to evaluate the risk of a sovereign or SOE bond indicates that the invalidity risk associated with the 2020 Notes' collateral was the subject of considerable public discussion starting in September 2016 when the Exchange Offer was announced, and continuing thereafter, notwithstanding any Representations to the contrary."  (Hinman Report ¶ 19(a)(i)).

c.      "Hence, PDVSA noteholders would have been (or, at a minimum, should have been) aware of the invalidity risk associated with the 2020 Notes even before the Exchange was completed, notwithstanding any Representations to the contrary."

(Hinman Report ¶ 19(a)(ii)).

d.   "The terms of the Exchange Offer were unusually favorable for investors."

(Hinman Report ¶¶ 19(a)(iii)).

e.   "The Exchange Offer did not enrich PDVSA or PDV Holding."  (Hinman Report

¶ 19(b)).

3.   As described more fully below, my principal conclusions are as follows:

a.   Contrary to Hinman's opinion, during the period in which PDVSA's offer to

exchange 2017 notes for the 2020 Notes ("Exchange" or "Exchange Offer") was

pending, institutional[1] investors could reasonably have concluded that there was

no material risk that a court with jurisdiction would hold the Pledge to be invalid.

b.   Hinman's review of "contemporaneously available information" is fatally flawed

and unreliable because it: (a) relies upon arbitrary and inconsistent definitions of

"invalidity risk"; (b) ignores the choice-of-law clauses in the Indenture, Pledge,

and Offering Circular ("Transaction Documents"); and (c) cherry-picks sources

and misinterprets their contents, without considering the wide range of other

available information or assessing the weight an institutional investor could

reasonably have given to different sources.

c.   Hinman's opinions that the terms of the Exchange were "unusually favorable for

investors" and "did not enrich PDVSA or PDV Holding" are flawed because

they: (a) rely upon Hinman's incorrect opinion that investors perceived an

"invalidity risk"; (b) ignore the context of the Exchange; and (c) attribute

economically irrational perceptions to investors.

---

[1]   Hinman repeatedly refers to "sophisticated" investors, but since he does not define what he means by that term, I
deduce that it refers to institutional as opposed to individual investors, so "institutional" is the term that I shall use.

3

4.     I have not been asked by counsel to address the other opinions in the Hinman

Report, and consequently I do not do so.  The fact that I do not address the remaining opinions in

the Hinman Report should not be construed to mean that I agree with those opinions.

**I.     Institutional Investors Could Reasonably Have Concluded That There Was No Material Risk That a Court with Jurisdiction Would Hold the Pledge to Be Invalid.**

5.     Contrary to Hinman's opinion, during the period in which the Exchange Offer was

pending, institutional investors could reasonably have concluded that there was no material risk that

a court with jurisdiction would hold the Pledge to be invalid.[2]  Substantial information available at

that time, and of the types considered by institutional investors, would have supported that

conclusion.

6.     In my experience, institutional investors considering whether to participate in the

Exchange could have considered the following sources of information: (i) the Transaction

Documents; (ii) reports issued by the leading credit-rating agencies (Fitch, Moody's, and Standard

& Poor's); (iii) articles published in the leading English-language financial publications (*The Wall

Street Journal* and the *Financial Times*); (iv) reports by analysts from large, full-service investment

banks who regularly covered PDVSA; (v) PDVSA's past transaction history and practices;

(vi) declarations of Venezuela's National Assembly; and (vii) public and non-public statements

from Venezuelan analysts, lawyers, and politicians, and from PDVSA and its agents.  In preparing

this rebuttal, I have reviewed each of those sources of information.

7.     Investors, including institutional investors, could reasonably decide to review less

than all of these sources.  Indeed, not all investors choose to have access to all of these sources of

---

[2]     When I use the term "invalidity risk" throughout this rebuttal report, I am referring to this risk that a court with jurisdiction would hold the Pledge to be invalid.  Hinman uses a different definition, which I discuss in paragraphs 61–67.

information.  For example, most major analysts' reports are available only by purchasing high-priced subscriptions (or by paying an investment bank substantial amounts for other services).  Likewise, many investors do not have access to non-public statements by Venezuelan lawyers or politicians.  For instance, I would expect that few institutional investors would consult some of the materials cited in the Hinman Report, such as commentary by niche analysts like ACG Analytics (Hinman Report ¶ 39), or obscure Spanish-language press articles from Venezuela such as from *El Cooperante* and *El Nacional* (Hinman Report ¶¶ 47–48).  Reasonable investors may also consider only the views of particular analysts that they consider especially reliable or well-informed.  Indeed, I believe it is entirely common and appropriate for institutional investors to make investment decisions regarding securities offered in the United States based mostly upon the information in the offering circular.  Nevertheless, I address in this report a broad range of sources that an institutional investor might decide to review.

8.      Investors do not generally give all of these information sources similar weight.  On the contrary, I would expect reasonable investors to give the most weight to the Offering Circular and the other Transaction Documents and to the reports of rating agencies.  Offering circulars are very comprehensive, formal documents prepared, at great expense, for the benefit of investors and they contain historical and current information which is often not easily available elsewhere.  Institutional investors understand that a significant misstatement in an offering circular, or failure to identify a known material risk, can subject the issuer, and possibly the professionals involved, to potential liability, so such circulars are usually prepared with great attention to detail and with that liability much in mind.  In my experience, bond investors give second-most weight to the views of the leading credit-rating agencies, whose rankings convey the risk that a bond issuer may not meet

its contractual financial obligations and also provide an estimate of potential losses in the event of default.  These are crucial opinions because a default can wipe out most or all the value of an investment in a bond.  Reasonable investors also pay ongoing attention to rating-agency opinions in order to gauge the likelihood of impending rating actions, because rating changes, especially when unexpected, affect bond prices in the secondary market.

9.      After reviewing the sources of information an institutional investor might have reviewed, as well as the sources cited in the Hinman Report, I conclude that it would have been reasonable for institutional investors to conclude that there was no material risk that a court with jurisdiction would declare the Pledge to be legally invalid and unenforceable.  (A full list of documents relied upon for this Report is attached as Appendix I).

### A.      The Transaction Documents

10.     An investor considering whether to participate in the Exchange could reasonably have started with a review of the Transaction Documents, and in particular the Offering Circular. In reviewing the Transaction Documents, a reasonable investor would likely review and consider both the risks identified within the Transaction Documents and the affirmative representations of the parties regarding the validity of the transaction.

11.     Nothing in the Transaction Documents disclosed any risk that the Pledge could be deemed legally invalid, despite many pages of risk disclosures in the Offering Circular and a representation that the aspects of the transactions had been reviewed by highly reputable counsel in the United States and Venezuela.  On the contrary, the issuer and the pledgor expressly represented, among other things, that they had all authority necessary to enter into the transactions, and the pledgor expressly represented that the Pledge did not contravene any applicable laws.

6

12.     The representations and warranties by PDVSA, PDVSA Petróleo, and PDV Holding, Inc. in the Indenture, the Pledge Agreement, and the Offering Circular were clear, and are the types of representations and warranties that are commonly and routinely offered by debt issuers and relied upon by institutional investors.

13.     In the Indenture, PDVSA assured investors that (i) it was duly authorized to exchange the 2017 Notes for the 2020 Notes and to execute and deliver the Indenture; (ii) it had done all things necessary to make the Indenture a valid agreement as well as to make the Notes a valid obligation of PDVSA; and (iii) it had done all things necessary to make the Indenture a valid agreement of the Guarantor (PDVSA Petróleo, S.A.).  (2020 Notes Indenture 2016, 1).

14.     The Indenture further provided that the obligations of the Guarantor were unconditional and absolute and would not be "released, discharged or otherwise affected by . . . any invalidity or unenforceability relating to or against the Issuer for any reason of this Indenture or any Note, or any provision of applicable law or regulation purporting to prohibit the payment by the Issuer of the principal of or interest on any Note or any other amount payable by the Issuer under this Indenture."  (2020 Notes Indenture 2016, 52).

15.     In the Pledge Agreement, PDV Holding, Inc., as Pledgor, assured investors, among other things, that: (i) it had "full power and authority, and all governmental licenses, authorizations, consents and approvals, to execute and deliver" the Pledge Agreement "and to perform its obligations thereunder"; (ii) the execution and delivery of the Pledge Agreement "and its performance thereunder" had been duly authorized by all necessary actions; (iii) it "require[d] no additional action by . . . any governmental authority"; (iv) it would "not contravene any Applicable Law"; and (v) the Pledge Agreement had "been duly executed and delivered by it and constitutes its

7

legal, valid and binding obligation enforceable against it in accordance with its terms." (2020 Notes Pledge and Security Agreement 2016, 9–10).

16.     On their face, there was nothing to cause an investor to question these representations and warranties.  Representations and warranties as to due authorization and similar matters are commonly found in governing documents for debt transactions.  Institutional investors commonly and reasonably rely on such Transaction Documents and the representations therein without necessarily undertaking an independent investigation.  It makes no sense, for example, to expect each potential investor to independently examine the organizational documents of a corporation to determine which approvals are required or to verify from the books and records of the corporation that the necessary approvals have in fact been obtained.  This is particularly so in international debt transactions, where potential investors may not be familiar with the laws of the issuer and may not have regular access to local news sources, particularly sources of information in foreign languages, or may not be able to assess the reliability of such sources.

17.     The Offering Circular provided investors with additional reason to rely on these representations and warranties by disclosing that a highly reputable international law firm, Hogan Lovells, had reviewed the legal issues related to the issuance.  Specifically, the Offering Circular stated: "Certain legal aspects of U.S. law and New York law and the issuance of the New Notes offered hereby will be passed upon for [PDVSA] by Hogan Lovells US LLP as our U.S. legal counsel.  Certain legal matters with respect to Venezuelan law will be passed upon for us by Despacho de Abogados Hogan Lovells, S.C. as our Venezuelan legal counsel." (2020 Notes Offering Circular 2016, 176).

18.     Documents produced in discovery have confirmed that the New York and Caracas (Venezuela) offices of Hogan Lovells both produced favorable opinion letters, with the latter being the more relevant one to the assessment of any Venezuela-related invalidity risk.[3]  The Venezuelan legal opinion stated, among other things, that "No approval, authorization or consent of or registration or filing with, any governmental agency or governmental authority in Venezuela is required to be obtained or made by the Company or the Guarantor under Venezuelan Law in connection with, the execution, delivery and consummation by the Company or the Guarantor of Agreement or the making and consummation of the Offer."  (Despacho Hogan Lovells 2016, 4).

19.     While it is not a common practice to provide opinion letters to investors, and I understand that these opinion letters were not provided to investors, an institutional investor could reasonably have concluded that Hogan Lovells had not identified any material risk of illegality or invalidity.  In my experience, investors would understand that any material risk of illegality or validity, if identified by Hogan Lovells, would have been disclosed in the Offering Circular.

20.     Documents produced in discovery also indicate that Hogan Lovells attorneys also spoke directly to institutional investors, ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[3]     The letters were delivered to PDVSA, PDVSA Petróleo, Credit Suisse, the Trustee, the Collateral Agent, and the Paying Agent.  (HL_011091; HL_011111).

██████████████████████████████████

████████████████████████████

21.     The section of the Offering Circular detailing investment risk factors went on for fifteen pages, totaling 10,376 words, and none of them referred to any risk of invalidity.  (2020 Notes Offering Circular 2016, 18–32).  In this context, an institutional investor could reasonably have concluded from the absence of such disclosure that no material invalidity risk existed. Investors generally and reasonably assume that offering circulars are materially complete and accurate.

22.     Given the weight appropriately placed upon the governing documents, investors could reasonably have relied upon the Transaction Documents to conclude that there was no material risk that the Pledge would be held legally invalid.  That would be so even if there had been substantial public information to the contrary.  As I next discuss, however, that was not the case. On the contrary, reliance upon the Transaction Documents would have been further supported by additional information available to investors from reputable independent sources.

**B.      Credit-Rating Agency Reports**

23.     Reports issued by the leading credit-rating agencies are a second component of the substantial public information available, at the relevant time, that could have led institutional investors reasonably to conclude that there was no material risk that the Pledge would be held to be legally invalid.  In my experience, investors expect such reports to identify what the rating agencies view as the most salient risk factors.

24.     I have reviewed all credit rating reports concerning PDVSA or CITGO issued in 2016 by the top credit-rating agencies: Fitch Ratings ("Fitch"), Moody's Investors Services

10

("Moody's"), and Standard & Poor's (now S&P Global Ratings).  None of the thirteen reports

issued by these agencies about PDVSA or CITGO that year made mention of any invalidity risk, or

of any risk relating to approval or disapproval by Venezuela's National Assembly.  Rather, they

identified other risks.  Investors could reasonably have found further comfort in the credit rating

agencies' failure to identify any risk of invalidity.

25.     Those reports, and whether or not they address either invalidity risk or National

Assembly approval, are summarized in the following table:

| *Leading Credit-Rating Agencies\** | | Mentions Invalidity Risk or National Assembly Opposition to 2020 Notes |
| --- | --- | --- |
| **Date** | **Report Title** | |
| 1/26/2016 | Moody's Credit Opinion: CITGO Holding, Inc. | No |
| 9/19/2016 | Moody's PDVSA's Bond Exchange Transaction Would Reduce Immediate Liquidity Risk, A Credit Positive | No |
| 9/19/2016 | Fitch Expects to Rate PDVSA's Proposed Notes 'CCC/RR4' | No |
| 9/19/2016 | Standard & Poor's Petroleos de Venezuela Downgraded to 'CC' from 'CCC' Following Exchange Offer Announcement; Outlook Remains Negative | No |
| 9/22/2016 | Fitch Places CITGO's Ratings on Negative Watch | No |
| 10/19/2016 | Fitch: CITGO Remains on Rating Watch following PDVSA Exchange Extension | No |
| 10/25/2016 | Fitch Downgrades PDVSA's IDRs to 'CC' | No |
| 10/25/2016 | Standard & Poor's Petroleos de Venezuela Downgraded to 'SD' on Distressed Exchange; Ratings On Senior Unsecured Notes Due 2017 Cut to 'D' | No |
| 10/27/2016 | Moody's PDVSA's Bond Exchange Transaction Would Reduce Immediate Liquidity Risk | No |
| 10/28/2016 | Fitch Affirms CITGO's Ratings Following PDVSA Exchange | No |
| 11/3/2016 | Standard & Poor's Petroleos de Venezuela Upgraded to 'CCC ' from 'SD' on Debt Exchange, Outlook Negative | No |
| 11/17/2016 | Fitch Petroleos de Venezuela, S.A. Full Rating Report | No |
| 11/18/2016 | Moody's Assigns Caa3 Rating to PDVSA's 2020 Notes | No |
| *\* From universe of 2016 reports making mention of PDVSA, CITGO Holding Inc., or CITGO Petroleum Corp.* | | |

26.     For example, in a report on PDVSA on the eve of the 2020 Notes transaction, Fitch

highlighted risks such as the oil company's links to the government of Venezuela, at a time when

the government's creditworthiness was adversely affected by "weakened external reserves, high

commodity dependence, rising macroeconomic distortions, limited reduced transparency in official

data, and continued policy and political uncertainty"; the government's heavy reliance on PDVSA's

earnings to the point where "transfers to the central government effectively renders PDVSA's cash flow from operations negative"; and flat-to-falling oil production levels combined with relatively low oil world prices also contributing to a "weak" and "uncertain" liquidity position.  (Fitch 2016a, 1–2).  The report does not mention any risk that the Pledge would be held to be legally invalid.

27.     In another report on PDVSA on the eve of the 2020 Notes transaction, Moody's highlighted similar risks to investors, such as "the government's fiscal demands" on PDVSA earnings, relatively low oil prices, and "difficulty in obtaining long-term financing," concluding as follows: "PDVSA's refinancing risk is high, which, combined with the lack of visibility regarding the company's investing and comprehensive refinancing plans, exacerbates its probability of default or debt restructuring in the next twelve to eighteen months."  (Moody's 2016c, 1–2).  For its part, a report by Standard & Poor's from around the same time took a very dim view of the transaction, stating that "we view the offer as distressed rather than purely opportunistic, given the currently difficult operating conditions and the significant upcoming debt maturities that PDVSA faces, which would very likely lead to a conventional default when the existing notes come due." (Standard & Poor's 2016b, 2).  Again, both the Moody's and Standard and Poor's reports make no mention of invalidity risk.

28.     The 2020 Notes received very low, "junk" ratings from all three agencies.  Fitch rated the 2020 Notes to be issued "CCC," suggesting "a real possibility of default" in reflection of major credit risks originating from the company's interdependence with the government of Venezuela, at the time likewise rated "CCC" because of its greatly deteriorated economic and financial condition.  (Fitch 2016a, 2).  Moody's categorized the forthcoming 2020 Notes "Caa3"— the scale equivalent of "CCC-"—even though it opined that a successful transaction would reduce

"the risk of an immediate payment default," because of underlying financial weaknesses at both the company and the sovereign, rated "Caa3" as well, to which it was closely linked.  (Moody's 2016d, 1).  Standard & Poor's rated the upcoming 2020 Notes even lower at "CC," reflecting "a downgrade potential if the company completes the exchange offer, which we classify as tantamount to a default."  (Standard & Poor's 2016a, 1).  At the time, the sovereign, which was meeting its foreign-currency obligations in full and was not planning a similar distressed-debt exchange, was rated at "CCC."  As previously indicated, none of the thirteen rating-agency reports issued during 2016 made any mention of invalidity risk; rather, the very low ratings awarded to PDVSA reflected its lack of creditworthiness and of access to new funding due to the company's greatly deteriorated financial condition.  Institutional investors would have been reasonable in relying on these rating-agency reports.

### C.    Newspaper Articles

29.    Articles published by leading financial newspapers are a third component of the substantial public information available in 2016 that could have led investors reasonably to conclude that there was no material risk that the Pledge would be deemed legally invalid.  I have reviewed all articles mentioning "CITGO" that were published in the two leading sources of financial news—*The Wall Street Journal* and the *Financial Times*—during 2016.[4]

30.    *The Wall Street Journal* published eight such articles during 2016.  None of the eight articles included any reference to invalidity risk for the Pledge.  Instead, the articles focused on other risks.  For example, an article from around the time of the debt-exchange offer mentioned that the deal was "likely to be a tough sell to debt markets," because default fears had mounted given

---

[4]    I have looked at articles mentioning CITGO, rather than PDVSA, in order not to miss any articles mentioning the pledge of CITGO Holding stock in the 2020 Notes.

that Venezuela's oil-dependent economy was grappling "with low crude prices and state finances that were left in shambles after more than a decade of profligate spending under the ruling Socialist Party," such that the country's financial situation continued "to deteriorate with international dollar reserves at less than $12 billion, a 13-year low."  (Vyas 2016, 1–2).

| The Wall Street Journal (www.wsj.com)* | | |
|---|---|---|
| Date | Article Title | Mentions Invalidity Risk or National Assembly Opposition to 2020 Notes |
| 2/24/2016 | In Decaying Venezuela, Debts Get Repaid | No |
| 9/13/2016 | Venezuela State Oil Company Looks to Swap $7 Billion In Upcoming Debt | No |
| 9/19/2016 | Venezuela's PdVSA Bonds Fall After Swap Proposal | No |
| 10/7/2016 | Venezuela's PdVSA Bonds Fall After Lack of Interest for Debt Maturity Extension | No |
| 10/18/2016 | Venezuela's PdVSA Says 'All Options Are Open' If Debt Exchange Fails | No |
| 10/24/2016 | Venezuela's PdVSA Restructures Debt | No |
| 10/27/2016 | Big Oil Companies Reap Windfall From Ethanol Rules | No |
| 12/16/2016 | Aramco Deals Face Uncertainty Under Trump Administration | No |

*From universe of 2016 articles making mention of CITGO Holding Inc. or CITGO Petroleum Corp.*

31. The *Financial Times* published ten such articles during 2016.  Only one of those ten articles made reference to a purported requirement that the 2020 Notes be approved by Venezuela's National Assembly.  That article reports that unnamed "senior members of the finance commission" were questioning the use of CITGO as collateral without prior approval by the National Assembly. The article does *not* refer to any action by the National Assembly as a whole or provide any independent assessment of whether Venezuelan law required National Assembly approval.  The focus of the article is on other issues, including what the author perceived as risks that the 2020 Notes transaction was "a curtain-raiser for an inevitable restructuring of Venezuela's national debts"; fears that "an array of foreign creditors are already in the process of suing CITGO for non-payment on various contracts, after the Venezuelan government sucked the company dry of cash"; and concerns that "the current administration will collapse … ushering in a period of even deeper economic, financial and political turmoil."  (Wigglesworth and Schipani, 2016, 1, 4–5).

14

32.     Notably, the *Financial Times* published five later articles before the closing of the exchange offer, and none of those articles mentioned National Assembly approval of the Pledge, political opposition, or potential invalidity.

| Date | The Financial Times (www.ft.com)* Article Title | Mentions Invalidity Risk or National Assembly Opposition to 2020 Notes |
|------|--------|--------|
| 1/22/2016 | Fears of Venezuela Debt Default Rise as Bond Prices Plunge | No |
| 6/9/2016 | Dutiful Venezuela Gives Unexpected Boost to Bond Investors | No |
| 9/13/2016 | Venezuela Oil Company to Launch $7bn Bond Swap | No |
| 9/23/2016 | How to Value (Worthless) Venezuelan Oil Bonds | No |
| 9/26/2016 | Venezuelan Oil Major's Debt Swap: The Beginning of the End? | Yes |
| 9/27/2016 | Oil Group PDVSA Sweetens Debt Swap Offer | No |
| 10/7/2016 | ConocoPhillips Cries Fraud Over PDVSA Bond Swap | No |
| 10/10/2016 | Venezuela's State Owned Oil Group Debt Swap Flounders | No |
| 10/13/2016 | Crunch Time for Venezuela's PDVSA? | No |
| 10/25/2016 | What Now for Venezuela's PDVSA After the Bond Swap? | No |

*\* From universe of 2016 articles making mention of CITGO Holding Inc. or CITGO Petroleum Corp.*

33.     In light of this coverage by *The Wall Street Journal* and the *Financial Times*, an institutional investor could reasonably have found further reason to rely upon the Representations and would not have been alerted to any material risk that a court with jurisdiction would declare the Pledge legally invalid or unenforceable.

**D.     Assessments by Financial Analysts**

34.     Analyst reports on PDVSA or CITGO distributed by the world's leading underwriters and broker-dealers are a fourth component of the information available to institutional investors in 2016 that could have led them reasonably to conclude that the 2020 Notes were legally valid.

35.     I have reviewed all analyst reports produced in this litigation that mention "PDVSA" or "CITGO" and that were published during the time period when the Exchange Offer was open. These include the analyst reports received and produced in discovery by three non-party investors

(Ashmore, Blackrock, and Contrarian) who participated in the Exchange.  I have also reviewed, as discussed in more detail below, all analyst reports cited by Hinman, even if not otherwise produced in this litigation.

36.     Not all analyst reports are created equal.  For example, analyst reports published by the largest full-service investment banks are often viewed by investors as more authoritative than those published by smaller institutions, and different investors may have different views about the reliability of particular analysts (including with respect to particular issuers or markets).[5]  The set of analyst reports produced in discovery that I reviewed included fifty-seven reports from large, full-service investment banks.

37.     The vast majority of the reports I reviewed included no mention—never mind warnings—of any potential legal invalidity risk.  Of the fifty-seven reports I reviewed from large, full-service investment banks, only six contained mention of information that could indicate a potential "invalidity risk," but only in the arbitrary and inconsistent manner that Hinman uses that term in the Hinman Report.  (As discussed further in paragraphs 75–82 below, however, these six reports, four of which are cited by Hinman, do not address the specific invalidity risk that is the subject of the litigation, namely, the risk that a court of competent jurisdiction would determine the Pledge to be invalid).

38.     Rather than invalidity, for the most part, these analyst reports concerned themselves with other risks, such as: PDVSA's allegedly exaggerated valuation of CITGO and the subordination of 2020 noteholders to creditors of CITGO Petroleum and CITGO Holding (Bank of

---

[5]     To be clear, in my opinion, investors could reasonably hold different views about the weight to give particular analyst reports.  A reasonable investor need not necessarily read every analyst report, or even every analyst report from the largest full-service investment banks.

America 2016a, 2); cash-flow savings generated by the exchange that could be used to increase needed imports rather than to strengthen PDVSA (Barclays 2016c, 193); the likelihood that even a successful bond exchange would not dispel the chances of a Venezuela credit event in 2017 (JP Morgan 2016a); and the risk of future political instability (Nomura 2016b, 1–2).

39.     The following table summarizes those analyst reports:

| | | Mentions Invalidity Risk or National Assembly Opposition to 2020 Notes |
|---|---|---|
| **Date** | **Report Title** | |
| *Bank of America Merrill Lynch* | | |
| 9/18/2016 | PDVSA: Debt Swap Formally Announced; Will Enough Investors Accept It? | No |
| 9/18/2016 | PDVSA Swap Value Not Obvious | No |
| 9/23/2016 | PDVSA Swap Could Buy Time | No |
| 9/27/2016 | PDVSA: New Pricing Premiums Make the 2017 Bond Exchange a Little Sweeter | No |
| 10/18/2016 | PDVSA Extends Bond Swap; "All Options On The Table" If Swap Fails | No |
| 10/24/2016 | PDVSA: Bond Swap Results Give Some Breathing Room in Short-Term | No |
| *Barclays Capital* | | |
| 9/15/2016 | Venezuela/PDVSA: Swap Marathon | No |
| 9/28/2016 | PDVSA Swap: Bondholder's Dilemma | No |
| 9/30/2016 | Venezuela: Buying Time | No |
| 10/13/2016 | Venezuela/PDVSA: Time for the Market to Vote | No |
| *Deutsche Bank Securities* | | |
| 9/14/2016 | On PDVSA Debt Swap | No |
| 9/15/2016 | PDVSA: Swap or Not? | No |
| 9/19/2016 | PDVSA: Swap or Not? Part II | No |
| 9/23/2016 | PDVSA: Swap or Not, Part II-A | No |
| 9/27/2016 | PDVSA: Swap or Not? Part III | No |
| 10/10/2016 | PDVSA Swap: Not a Lost Cause | No |
| 10/13/2016 | PDVSA: Swap Deadline Extended Again | No |
| 10/17/2016 | PDVSA Swap Update: Disappointing but Still May Not Be a Lost Cause | No |
| 10/25/2016 | PDVSA: As Good as It Gets | No |
| *Goldman Sachs* | | |
| 9/19/2016 | PDVSA Announces Swap of 2017 Bonds | No |
| 10/13/2016 | PDVSA Announces a New Extension of the Tender Deadline | Yes |
| 10/17/2016 | Decisive Day for PDVSA Bonds | No |
| 10/18/2016 | PDVSA Postpones the Tender Deadline Again | No |
| 10/25/2016 | PDVSA Accepts Low Participation in Bond Swap | No |
| 10/28/2016 | Venezuela: Political Risks Outweighs Fleeting Payment Relief | No |
| *HSBC* | | |
| 9/14/2016 | Minister Del Pino Announces PDVSA's Bond Swap | No |
| 9/19/2016 | HSBC LatAm Macro Snippets 19 Sept 2016 | Yes |
| 9/28/2016 | HSBC LatAm Macro Snippets 28 Sept 2016 | No |
| 9/29/2016 | HSBC LatAm Macro Snippets 29 Sept 2016 | Yes |
| 10/14/2016 | HSBC LatAm Macro Snippets 14 Oct 2016 | No |
| 10/21/2016 | HSBC LatAm Macro Snippets 21 Oct 2016 | No |
| 10/24/2016 | HSBC LatAm Macro Snippets 24 Oct 2016 | No |
| 10/25/2016 | HSBC LatAm Macro Snippets 25 Oct 2016 | No |
| 10/27/2016 | HSBC LatAm Macro Snippets 27 Oct 2016 | No |

*Analysts from Largest Full-Service Investment Banks\**

\* From available universe of September and October 2016 reports on PDVSA or CITGO.

**Analysts from Largest Full-Service Investment Banks\* (continued)**

| Date | Report Title | Mentions Invalidity Risk or National Assembly Opposition to 2020 Notes |
|---|---|---|
| *JP Morgan Securities* | | |
| 9/21/2016 | PDVSA: Waiting on the World to (Ex)change | No |
| 9/27/2016 | PDVSA: Marking the Swap to Market | No |
| 10/13/2016 | PDVSA: Swap Extended Again and the Clock is Ticking | Yes |
| 10/25/2016 | PDVSA: Done with the Exchange, But Challenges Persist in 2017 | No |
| 10/25/2016 | Emerging Markets Today | No |
| *Nomura Securities* | | |
| 9/14/2016 | Venezuela: Finally a Debt Offer | No |
| 9/15/2016 | Venezuela: Political Transition? | No |
| 9/18/2016 | Venezuela: PdVSA Exchange | Yes |
| 9/28/2016 | Venezuela: PdVSA Exchange Revisions | No |
| 10/3/2016 | Venezuela: Waiting For Debt Exchange Results | No |
| 10/4/2016 | Venezuela: What Political Transition? | No |
| 10/7/2016 | Venezuela: Blind Exchange | No |
| 10/11/2016 | Venezuela: PdVSA Exchange at Risk | No |
| 10/12/2016 | Venezuela: Strategy Inflection Point | No |
| 10/13/2016 | Venezuela: Third Delay on PDVSA Exchange | No |
| 10/17/2016 | Venezuela: Take It or Leave It | No |
| 10/18/2016 | Venezuela: Another Extension and Higher Stakes | No |
| 10/20/2016 | Venezuela: What is PDVSA Telling Us? | No |
| 10/21/2016 | Venezuela: Cross Currents | No |
| 10/24/2016 | Venezuela: Event Risk | No |
| 10/25/2016 | Venezuela: Finally Some Breathing Room | No |
| 10/27/2016 | Venezuela: Escalating the Conflict | No |
| *UBS Securities* | | |
| 9/19/2016 | Venezuela Bonds: Of Politics and Swaps | Yes |

*\* From available universe of September and October 2016 reports on PDVSA or CITGO.*

40.     In light of the content of these analyst reports, an institutional investor could reasonably have found further reason to conclude that there was no material risk that a court with jurisdiction would declare the Pledge legally invalid or unenforceable.

**E.     PDVSA's Past Debt Transaction History**

41.     There was another good reason for investors to conclude that the Pledge was valid and enforceable.  By late 2016, financial analysts and investors were well acquainted with PDVSA as a debtor, because the company and its subsidiaries had a long history of issuing debt in international markets, including on a secured basis.  Investors could reasonably have considered PDVSA's long history of debt transactions in crediting its Transaction Documents and in believing that the company had the authority to enter into the transaction.

18

42.     Details about the company's then-current indebtedness, including a partial history of prior debt issuances by PDVSA and its subsidiaries, were spelled out in fourteen pages of PDVSA's Offering Circular for the 2020 Notes.  The long list of such transactions described in the Offering Circular included: (i) a CITGO Senior Secured Credit Facility backed by its interest in refineries, trade accounts receivable, and inventories; (ii) a CITGO Secured Revolving Credit Facility; (iii) a CITGO Senior Secured Term Loan; (iv) CITGO Senior Secured Notes; and (v) CITGO Holding Senior Secured Notes and a CITGO Holding Senior Secured Term Loan B both backed by 100 percent of CITGO's capital stock and all of its interests in various subsidiaries. (2020 Notes Offering Circular 2016, 70–83).  PDVSA also listed these transactions in a Form T-3 filed with the SEC on September 16, 2016.  (PDVSA Form T-3, 2016, 70–83).

43.     Neither the Offering Circular nor the PDVSA Form T-3 indicated that any of these transactions was presented to the National Assembly for approval, ███████████████████ ████████████████████████████████████████████████████████████████████ ██████████████  Consequently, investors could reasonably have viewed a PDVSA debt exchange secured by a portion of CITGO shares as a transaction that would *not* come under the purview of the National Assembly, to which no prior PDVSA debt operation had been submitted for approval.

44.     Another reason why financial analysts and investors had good reason to dismiss invalidity risk as immaterial to the pending 2020 Notes transaction is that two years prior, in mid-2014, PDVSA had publicly put CITGO up for sale.  Based upon my review of contemporaneous documents, I have seen no indication that National Assembly approval was sought or obtained for such a sale.  On August 5, 2014, the then-president of PDVSA, Rafael Ramirez, told reporters that the company was open to receiving offers for CITGO Petroleum's assets, explaining that "we are

19

not a refining company, we're an oil-producing company." (Pitts and Kurmanaev 2014). A CITGO bond prospectus dated July 15, 2014, reportedly stated that PDVSA was "currently seeking to monetize its ownership interest in us." (Minaya et al. 2014). Investment bank Lazard was enlisted to solicit interest in CITGO and the company was put on the auction block in early December 2014, when several suitors reportedly submitted bids, though the auction was scrapped in January 2015. (Dezember and Sider 2015). The materials I have reviewed in connection with that frustrated asset sale do not reflect any claim, at that time, that the disposal of CITGO required approval by the National Assembly. Investors could reasonably conclude that if National Assembly approval was not required to sell CITGO outright, it would not be required to pledge stock in its corporate parent. Hence, investors would have had no reason to view a PDVSA debt exchange secured by a portion of CITGO shares as a transaction that would or should come under the purview of the National Assembly.

45.     Those who invested in 2020 Notes after their issuance had a further reason to believe that National Assembly approval was not required: ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

**F.     The National Assembly Declaration of September 27, 2016**

46.     Institutional investors also could reasonably have considered the actions taken by the Venezuelan National Assembly regarding the Exchange as supporting its legality. In particular, the National Assembly issued a resolution related to the Exchange on September 27, 2016. Based upon

my review of the resolution itself, market commentary about the resolution (or lack thereof), the

██████████████████████████████████████████████████████████████████

and other information from the discovery record, knowledgeable investors appear not to have

viewed the resolution as reflecting a significant risk that the Pledge was legally invalid.

47.     The September 2016 resolution, passed after the initial exchange offer was

announced but before it was amended and extended several times in subsequent weeks, criticized

the Exchange as bad politics and bad business.  While Hinman asserts that the resolution "explicitly

reject[ed] the Exchange and call[ed] for an investigation of the Maduro regime's mismanagement

of PDVSA and its misuse of PDVSA for political purposes" (Hinman Report ¶ 12), that is a

mischaracterization.  Contrary to Hinman's assertion, the resolution did not declare that the

Exchange or the Pledge of collateral was illegal or invalid, did not declare the 2020 Notes or the

Pledge of collateral were void, and did not assert that Venezuelan law required the transaction to be

approved by the National Assembly.

48.     An investor could have reasonably concluded that, absent any statement to that

effect in the resolution, it should have been regarded as a political statement and neither as a

statement of the National Assembly's legal views nor as a legally binding action precluding the

transaction from going forward.

49.     The National Assembly declaration featured the following four resolutions, as per

Plaintiffs' Spanish original text and English translation offered as Exhibit C of their Complaint:

### IT IS HEREBY RESOLVED

*First.  To summon citizen Eulogio del Pino, President of Petróleos de Venezuela SA,
to appear before this National Assembly to explain the terms of this bond swap
transaction, based on offering the majority of Citgo Holding Inc. shares as
collateral.*

21

*Second.  To reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of Citgo Holding Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation.*

*Third.  To urge the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with articles 187, section 9, 302 and 303 of the Constitution of the Bolivarian Republic of Venezuela.*

*Fourth.  To urge Petróleos de Venezuela S.A. to present the Country with a plan for the refinancing of its financial commitments and a recovery plan for the oil industry over the short- and medium-term.*

50.     The National Assembly's declaration, in short, summoned the then-head of PDVSA to explain the proposed bond exchange; expressed its opposition to the planned pledge of CITGO collateral; urged the Public Ministry (a figure akin to Attorney General) to investigate whether the transaction protected the nation's patrimony; and urged PDVSA to present a plan to refinance its liabilities and to boost oil production.  That is very different from declaring that the pledge of collateral about to be made to investors was legally invalid or required prior Assembly approval.

**G.      Public and Non-Public Information Considered by Institutional Investors**

51.     █████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████



54.     Documents produced in discovery also illuminate the type of advice that investors were also receiving from knowledgeable analysts in the wake of the National Assembly's September 27 declaration.  The October 3–9, 2016 issue of "Venezuela This Week," circulated by boutique investment-banking firm Torino Capital, devoted more than 2,000 words to the topic of "The Debt Swap and Legislative Authorization."  It explained that "the National Assembly's resolution does not contain any allegation that the operation is illegal or contravened constitutional

rules.  This is in stark contrast with the way in which the National Assembly has handled other cases, such as that of the Mining Arc concessions, where it explicitly denied approval for the concessions and approved a law to restrict the government's authority to give them.  In the case of the bond swap, the Assembly simply criticized the operation, but did not label it illegal. Furthermore, the legislative [sic] did not take the additional step of approving a law to restrict the operation, but rather decided to restrict itself to issuing a non-binding resolution."  (Torino Capital 2016a).

55.    The author of this Torino Capital Report, Francisco Rodriguez, also briefed investors on his conversations with lawyers and politicians in Venezuela.

56.    Indeed, Xu heard directly from one such Assembly legislator, Rafael Guzman, a leading attorney who would go on to become the chair of the Assembly's Commission of Finance and Economic Development.  (RTTNews 2018, 1–2).

Attorney's Eyes Only



\*     \*     \*

59.     In my considered opinion, PDVSA's Transaction Documents were plausible on their face and further supported by the information available from top credit-rating agencies, reputable financial news sources, authoritative financial analyst reports, PDVSA's track record of debt transactions and the attempted sale of CITGO, and ████████████████████ from additional due diligence involving travel and communications with yet more sources of facts and opinions. Thus, it would have been reasonable for institutional investors to conclude that there was no material risk that a court with jurisdiction would hold the Pledge invalid.

---

7     ████████████████████████████████████████

8     Hogan Lovells, Draft Question & Answer dated Sept. 20, 2016 (HL_023889).

## II.    Hinman's Review of "Contemporaneously Available Information" Is Fatally Flawed and Unreliable.

60.     Hinman purports to reach the opposite conclusion based on his own review of "contemporaneously available information."  (Hinman Report ¶ 19(a)(i)).  Hinman's conclusion is fatally flawed and unreliable, however, because it (a) relies upon arbitrary and inconsistent definitions of "invalidity risk"; (b) ignores the New York choice-of-law clause; and (c) cherry-picks and misinterprets sources.

### A.    Hinman's Definitions of "Invalidity Risk" Are Arbitrary and Inconsistent.

61.     Hinman's analysis of contemporaneously available information is undermined at the outset by his use of arbitrary and internally inconsistent definitions of "invalidity risk."  Hinman writes that he was asked by counsel for Plaintiffs to determine whether investors who participated in the Exchange would and should have been cognizant of an "invalidity risk," which Hinman defines as "the risk that the purported pledge of 50.1 percent of CITGO Holding's equity as collateral for the 2020 Notes in the Exchange ('CITGO Collateral') would be deemed invalid."  (Hinman Report ¶ 16(a)).

62.     Hinman's definition does not clearly specify the nature of the risk of which he claims investors should have been aware.  It does not clarify *who* would deem the Pledge invalid or under *what law*.  Thus, although the governing documents are, by their terms, governed by New York law (as discussed in my initial expert report), Hinman purports to find evidence of "invalidity risk" in sources that do not even consider what a New York court applying New York law would decide.

63.     Further, Hinman does not attempt to quantify the *amount or degree* of "invalidity risk" that he believes investors should have recognized, or to demonstrate that it was *material*.  In

other words, Hinman does not distinguish between a small or large risk.  Without quantifying the degree of risk, Hinman's conclusion—that "it would not have been reasonable for sophisticated investors to assume that the purported pledge of CITGO Collateral was valid or to rely upon any Representations to that effect" (Hinman Report ¶ 22)—does not follow.  It would be entirely reasonable for an investor to disregard a known but immaterial risk.

64.     Hinman's lack of clarity is worsened by his changing the definition of "invalidity risk" later in his report.  In the body of his report, Hinman states that invalidity risk "would materialize only if: (a) the 2020 Notes defaulted at maturity, or before they matured; *and* (b) there was a power transition in Venezuela from the Maduro administration to the opposition before such a default had occurred;[] *and* (c) the successor government refused to honor the purported pledge of the CITGO Collateral."  (Hinman Report ¶ 36, emphasis in the original).

65.     This second definition defines invalidity as a later political act of repudiation, rather than a legal determination of initial invalidity.  There is a difference between the risk that a debt obligation will eventually be found to be invalid under its governing law by a court with jurisdiction, and the risk that a legally valid obligation will eventually be repudiated for political reasons.  Indeed, throughout his report, as described below, Hinman improperly conflates these two risks, purporting to cite sources that describe the risk that a subsequent government would cause PDVSA to repudiate the 2020 Notes or the Pledge—a *political* risk—as evidence of a *legal* risk that a court would hold the Pledge unenforceable.

**B. Hinman's Definition of "Invalidity Risk" Arbitrarily Ignores the New York Choice-of-Law Clauses.**

66.     Hinman's approach to "invalidity risk" is also flawed because it focuses exclusively on alleged Venezuelan legal and political risks, while ignoring the New York choice-of-law clauses

27

in each of the governing documents.[9]  As I explained in my initial report, investors in sovereign and state-owned-entity bonds value New York choice-of-law provisions because, among other reasons, they "insulate[] investors from a potential attempt by a sovereign, acting in its own interest or to benefit a state-owned enterprise, to use its own domestic law to escape its obligations," and also because "the law of the foreign sovereign may be unclear or unpredictable."  (Porzecanski Declaration ¶¶ 17–20).

67.    Hinman offers no evidence that investors would or should have concluded that the New York choice-of-law clauses would fail to be enforced, or that the Pledge would be deemed invalid under New York law.  Instead, Hinman appears to assume that if the Pledge is "deemed invalid" under Venezuelan law, it will not be enforceable.  (Hinman Report ¶ 16(a)).  This unsupported assumption renders Hinman's opinion unreliable.

### C.  Hinman Cherry-Picks and Mischaracterizes Sources, Ignores Other Available Information, and Fails to Account for the Weights That Investors Could Reasonably Have Given to Different Sources.

68.    Hinman's analysis of the information available to investors is also rendered unreliable by his cherry-picking and mischaracterization of sources; his failure to consider other relevant sources; and his failure to allow consideration of the appropriate weight that investors should give to different sources.

### i.  Newspaper Articles

69.    Hinman takes a different approach to surveying news articles than I have taken above.  He does not identify the publications on which investors are most likely to rely, much less explain why any reasonable investor would have to read the publications he chooses to cite; he does

---

[9]    Indenture § 10.03 (HL_002709); Pledge Agreement § 7.13 (ASH_00009011); Global Notes § 18 (HL_019590).

not systematically review the universe of relevant articles from those publications; and he does not limit his review to articles published during the time period in which investors were considering whether to tender their 2017 Notes.  Rather, he collects all the articles, from any publication, at any time, with purported references to matters that he deems to constitute "invalidity risk," and strings them together in an attempt to make it appear as though there was "extensive market commentary on the invalidity risk associated with the 2020 Notes in the financial press and in research reports issued by Wall Street analysts."  (Hinman Report ¶ 36).  This sampling method is biased and thus not reliable.

70.     In addition to cherry-picking, Hinman also mischaracterizes his sources.  Many of the news articles he cites do not discuss legal invalidity, but only political risks, including potential default and repudiation.  For example, as evidence of "extensive market commentary on the invalidity risk associated with the 2020 Notes," (Hinman Report ¶ 36), the first newspaper report he cites from after the announcement of the Exchange is a *Reuters* article dated September 13, 2016, reporting, among other things, that some investors were "concerned about potential political opposition to using CITGO shares."  (Hinman Report ¶ 38 (citing Martinez and Pons (2016, 3)). The second news article Hinman cites is another *Reuters* piece from September 19, 2016, stating that "Venezuela's opposition, which controls parliament, has said it will oppose the use of CITGO as collateral."  (Hinman Report ¶ 43, emphasis removed from original (citing Chinea and Ellsworth 2016, 3)).  Hinman's unsupported assumption that political opposition to the transaction created "invalidity risk" conflates distinct risks and renders his conclusions unreliable. In reality, as explained previously, these quotations reflect discussion of political risk, not evidence that a court with jurisdiction would declare the Pledge legally invalid or unenforceable.

29

71.    To the contrary, actual discussion of legal issues is noticeably absent from Hinman's sample.  The only article Hinman cites that even quotes a Venezuelan attorney appeared in a local Venezuelan newspaper, and it had to be translated into English by Plaintiffs. (Hinman Report ¶ 48 (citing *El Nacional* 2016)).  But then, Hinman did not focus on legal issues because when he searched for instances of "invalidity risk," he was by definition not concerned with legal invalidity considerations.

72.    Hinman's use of sources published years after the tender offer closed is also an unreliable method for ascertaining what investors would or should have known in September–October 2016.  One such after-the-fact source that Hinman cites is an op-ed that I published in the *Financial Times* on November 18, 2019.  (Hinman Report ¶ 53).[10]  It is cited as evidence that "commentators and analysts continued to discuss [the] invalidity risk of the 2020 Notes until October 28, 2019, when PDVSA failed to make a principal and interest payment of $913 million." (Hinman Report ¶ 53).  The fact is, I did not discuss the invalidity risk of the 2020 Notes: the word "invalidity" appears nowhere in my piece.  Rather, I wrote that Plaintiffs' Complaint, seeking a judgment that the 2020 Notes' Indenture should be annulled and declared unenforceable, thereby barring any exercise rights on the CITGO collateral, was a "Hail Mary pass" for four reasons, the last one being that in May 2019 the National Assembly had voted unanimously to make the coupon payment due on the 2020 Notes, "thereby legitimizing the obligation the Assembly had denounced in 2016."  (Porzecanski 2019).

---

[10]    See Hinman Report footnote 85.  That same op-ed is also cited by Hinman in footnotes 12 and 59.

*Articles Cited in Hinman Report\**

| Location in Hinman Report | Date | Publication and Article Title | Problem(s) with Using Article as Evidence of Invalidity Risk |
|---|---|---|---|
| ¶ 34 | 9/26/2016 | *Financial Times*, Venezuelan Oil Major's Debt Swap: The Beginning of the End? | • Legality only briefly mentioned.<br>• Does not name anonymous legislator(s).<br>• Does not conduct independent analysis. |
| ¶ 38 | 9/13/2016 | *Reuters*, Venezuela's PDVSA Offers $7 Billion Bond Swap To Ease Debt Burden | • Refers to political opposition, rather than legal invalidity.<br>• Opposition only briefly mentioned.<br>• Does not name anonymous legislator(s).<br>• Does not conduct independent analysis. |
| ¶ 43 | 9/19/2016 | *Reuters*, S&P Says PDVSA Bond Swap Offer 'Tantamount To Default' | • Refers to political opposition, rather than legal invalidity.<br>• Opposition only briefly mentioned.<br>• Does not name anonymous legislator(s).<br>• Does not conduct independent analysis. |
| n. 77 | 9/27/2016 | *Petróleo América*, Del Pino Must Explain Terms of the PDVSA Bond Exchange to the AN | • Spanish-language source.<br>• Not leading financial newspaper or analyst.<br>• Quotes personal opinions of only two legislators.<br>• Does not conduct independent analysis.<br>• Contains information contradicting Hinman's hypothesis: "Moreover, the pro-government Parliamentarian, Hugbel Roa emphasized that the debate is 'an attack on a normal monetary transaction.'" |
| ¶ 47 | 9/28/2016 | *El Cooperante*, Freddy Guevara: Government Has Shown to Be Negligent and Destructive of the Economy | • Spanish-language source.<br>• Not leading financial newspaper or analyst.<br>• Quotes personal opinion of only one legislator.<br>• Does not conduct independent analysis. |
| ¶ 48 | 9/17/2016 | *El Nacional*, Debt Issue Under New Decree Will Be Void | • Spanish-language source.<br>• Does not conduct independent analysis.<br>• Quotes personal opinions of only one legislator and one non-legislator. |
| ¶ 53 | 11/18/2019 | *Financial Times*, The PDVSA 2020 Bond: Time For a Solution | • Published 3 years after Exchange.<br>• Discusses this lawsuit.<br>• Contains information contradicting Hinman's hypothesis: Refers to the lawsuit as a "Hail Mary pass" and compares the attempts to invalidate the bonds as an attempt to invoke the doctrine of odious debt, which has "gained zero traction"; provides several other reasons the bonds are valid including the fact that they are governed by New York law. |
| ¶ 54 | 10/10/2019 | *Nasdaq*, Major PDVSA 2020 Holder Anticipates Default on Bond | • Published 3 years after Exchange.<br>• Not leading financial newspaper or analyst.<br>• Does not conduct independent analysis.<br>• Contains information contradicting Hinman's hypothesis: "Even so, some perceive this argument as a weak defense that would fail to hold up in court. Not only is the bond governed by New York law, but PDVSA bonds do not require the approval of the National Assembly, say detractors." |
| ¶ 56 | 11/1/2019 | *Petroleum Economist*, Bondholders Close in on CITGO | • Published 3 years after Exchange.<br>• Discusses this lawsuit.<br>• Does not conduct independent analysis.<br>• Not leading financial newspaper or analyst.<br>• Mischaracterizes facts: Erroneously suggests the National Assembly has "always" claimed the bonds were invalid |

*\* From articles cited in Hinman Report as evidence of discussion of invalidity risk.*

### ii.  *Analyst reports*

73.     As with news articles, Hinman takes a biased-sample approach to showcase what financial analysts were writing in 2016 around the time of the Exchange.  He does not identify the analysts on which investors would be most likely to rely, much less explain why investors would be expected to consider or rely on the analysts he cites.  Nor does he review all the relevant reports from those analysts (or even the portion produced in this litigation).  Instead, as with news articles, Hinman engages in cherry-picking.  He identifies only four analyst reports from full-service investment banks that, according to him, support his hypothesis.  (Hinman Report ¶¶ 40–41, 50–51).  He then adds to these a few other reports from marginal firms and obscure consultants.[11]

74.     None of these reports contains any information that would have led a reasonable investor to conclude that there was a material risk that a court with jurisdiction would declare the Pledge to be legally invalid and unenforceable.  The vast majority of these reports that Hinman cites (with the exceptions noted below) focus on political or repudiation risks rather than the risk that a court with jurisdiction would declare the Pledge legally invalid and unenforceable.

75.     For example, Hinman cites a UBS Securities analyst who noted, in a report dated September 19, 2016, that "if the opposition comes to power down the road, there is a non-negligible probability it could repudiate bonds stemming from this swap."  Contrary to Hinman's characterization, that report does not offer evidence that the pledge would be deemed legally

---

[11]  Specifically, Hinman cites four analyst reports from full-service investment banks: one Nomura Securities report dated September 18, 2016; one UBS Securities report dated September 19, 2016; one JP Morgan report dated October 13, 2016; and one Goldman Sachs report dated October 13, 2016.  (Hinman Report ¶¶ 40–41, 50–51).  Hinman cites seven analyst reports from marginal firms and consultants: four Jefferies reports dated September 19, September 27, October 26, 2016, and October 27, 2016; two Torino Capital reports dated October 3 and October 11, 2016; and one ACG Analytics reports dated September 13, 2016.  (Hinman Report ¶¶ 39, 42, 46, 49, 52).

invalid.  Rather, the report offers the analyst's prediction of how a future opposition government might act.  (Hinman Report ¶ 41) (UBS 2016a, 3).

76.    Likewise, the JP Morgan Securities report dated October 13, 2016 provides little reliable information that would reasonably lead an investor to conclude that there was a material risk that the pledge would be determined by a court to be invalid.  The report states that "jailed [opposition] leader Leopoldo Lopez has warned markets that the [2020 Notes] deal could be 'illegal' and reneged upon by a future opposition government."  But the report provides no independent assessment of the credibility or reliability of the assertion that the notes could properly be deemed illegal, or any analysis of the relevant legal issues.  Nor does the report provide any information from which an investor could determine even the political significance of opposition to the transaction by Mr. Lopez—much less any information about the reliability of his claim that the notes could be illegal.  Indeed, the report goes on to predict that a future opposition government would likely *not* seek to invalidate the notes.  It states instead that, in the analyst's view, "any future opposition government is likely to try to leverage market confidence rather than immediately fight a battle over onerous debt, but the warning shot has been fired nonetheless."  (Hinman Report ¶ 51) (JP Morgan 2016c, 1).

77.    Finally, the Goldman Sachs report dated October 13, 2016, included one sentence at the end of its section on Venezuela, noting only that "the National Assembly has questioned the legitimacy of offering a 50% participation of CITGO as collateral."  (Hinman Report ¶ 50) (Goldman Sachs 2016b).  This statement reports on potential political or repudiation risk, rather than a risk of legal invalidity.  And, like the other reports Hinman cites, it provides no independent analysis or assessment of the relevant legal issues.

33

78.    The Nomura report dated September 18, 2016, devoted only one sentence to suggesting that some unnamed local lawyers opined that the exchange would require legislative approval.  Again, however, the report does not independently assess the reliability of the opinion or provide any analysis of the relevant issues.  (Nomura 2016c, 1).  And the same analyst never discussed this issue again in thirteen subsequent reports published before the Exchange closed on October 28, 2016.  If this were a material risk to investors, one would expect this analyst to include a longer discussion and to bring up the matter again in subsequent reports.

79.    The ACG Analytics Report Hinman cites only briefly mentions invalidity and does not conduct an independent analysis of the legal arguments.  Rather, it cites one unnamed legislator's view that the Pledge would constitute a privatization requiring National Assembly authorization under Article 312 of Venezuela's Constitution—a different legal argument than that Plaintiffs advance in their Complaint.  (ACG Analytics 2016, 1–2).  ACG Analytics does not mention Article 150 of the Venezuelan Constitution or national public-interest contracts.  Moreover, ACG Analytics is neither a full-service investment bank nor one of the leading analysts on Venezuelan issues.

80.    While Hinman repeatedly cites reports published by Jefferies, based on the discovery in this case, there is no evidence that any substantial holder placed any weight on Jefferies' reports.  █████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████  Moreover, Jefferies, like ACG Analytics, characterizes the legal issue as one over privatizations; it makes no

mention of Article 150 of the Venezuelan Constitution or of national public interest

contracts.  (Jefferies 2016a) (ASH_00004192).

81.     Hinman cites a report by Torino Capital expressing the view that some investors

"may be concerned about the legal risks associated with the new bond, given the perceived

possibility of non-recognition by a future [opposition party] government as well as the current legal

actions against Citgo."  (Hinman Report ¶ 49).  But Hinman fails to mention or quote Torino

Capital's conclusion in the very same report that "there is little doubt as to the legality of a PDVSA

bond issuance or debt refinancing without National Assembly approval under current legislation."

(Torino Capital 2016a, 7.)[12]

### III.     There Are No Grounds to Conclude that the Terms of the 2016 Bond Exchange Were Unusually Favorable to Exchanging 2017 Noteholders or that the Exchange Did Not Enrich PDVSA or PDV Holding.

82.     Hinman alleges that the 2016 bond exchange that led to the issuance of the 2020

Notes was "unusually favorable for investors" because tendering holders of 2017 bonds received, in

exchange for a deferment of imminent maturities, new notes with a higher principal value and a

better coupon.  "In my experience in debt restructurings of this kind," Hinman wrote, "the new

notes that investors typically receive in exchange for their existing notes typically offer

significantly worse terms," and his experience in this regard "is consistent with academic research

on restructuring of 'sovereign' debt," including that of state-owned enterprises (Hinman Report

¶¶ 19(a)(iii), 70).

---

[12]    Finally, although Hinman does not cite them, two HSBC reports refer to "rumours" and "speculation" as to legal issues in Venezuelan press reports.  The HSBC reports provide no independent analysis on the subject.  (HSBC 2016d; HSBC 2016e).

83.     Hinman similarly asserts that the Exchange "did not enrich PDVSA or PDV Holding" because it "provided PDVSA only a relatively short maturity extension" while "in exchange [PDVSA] had to commit to significantly greater principal and interest payments through 2020."  (Hinman Report ¶¶ 19(b), 77–78).  Hinman does not define what he means by "enriched." For purposes of this report, I interpret "enriched" to mean benefited.

84.     These opinions are flawed and unreliable for three reasons.  First, they rely upon Hinman's incorrect opinion that investors perceived an "invalidity risk," as discussed in the prior section.  Second, they ignore the context of the Exchange, and thus draw inapt comparisons.  And, third, they attribute economically irrational decisions to investors.

### A.     Hinman's Other Opinions Are Based on His Flawed Opinions Regarding "Invalidity Risk."

85.     The best measure of whether a new bond placement is "unusually favorable" to investors is the extent to which investors choose to bid for the new bonds.  Whenever a bond issue is *over*subscribed, because investor demand exceeds issuer supply, then it is evident that the issue was underpriced, namely, the terms for investors were *too favorable* relative to the perceived risk of the bonds.  Whenever a bond issue is *under*subscribed, as the 2020 Notes were, because issuer supply exceeded investor demand, then it is evident that the issue was overpriced, namely, the terms for investors were *insufficiently favorable* relative to the perceived risk of the bonds.

86.     The Exchange fails this test of favorability to investors.  As Hinman acknowledges, the investor response to the exchange offer was "muted" and "tepid."  (Hinman Report ¶¶ 19(a)(iii), 83).  A more accurate characterization would be to say that the transaction was woefully undersubscribed and thus greatly disappointing to PDVSA, since holders of the 2017 notes only

tendered $2.8 billion of their notes, equivalent to just 39.43 percent of the aggregate principal amount outstanding that PDVSA was hoping to attract into the exchange.  (D.F. King & Co., 2016).

87.    Hinman attempts to explain away the very low participation rate by citing "investor awareness of and concern about the invalidity risk associated with the 2020 Notes." (Hinman ¶ 19(a)(iii)).[13]  But, as discussed above, the evidence does not support the view that institutional investors perceived a substantial risk that a court would deem the Pledge invalid.  Because Hinman's analysis of invalidity risk is flawed, this argument is also flawed.  Hinman's unsupported speculation that investors perceived a material risk of invalidity cannot explain the low participation rate.  Rather, the low participation rate should be interpreted as evidence that many investors concluded that the terms of the exchange were not as attractive as the alternative of keeping their 2017 Notes.

**B.    Hinman Ignores the Context of the Exchange.**

88.    Hinman is led further astray because his narrative is missing essential context.  The documents I have reviewed indicate that during the second half of 2016, the government of Venezuela and PDVSA's management were doing their utmost to avoid defaulting on their obligations to bondholders.  The maturity extension sought by PDVSA in September–October of 2016 was thus a liability-management reprofiling, and *not* a debt restructuring, that was consistent with the then-official policy to remain current on coupon and principal payments on all obligations subject to New York law.  The 2020 Notes transaction was not intended to be the beginning of a comprehensive or even partial attempt to obtain debt relief by defaulting, or by threatening to default, in order to extract coupon concessions and principal forgiveness from Venezuela's

---

[13]    In turn, Hinman cites the allegedly favorable terms of the Exchange as evidence of the existence of invalidity risk.  This reasoning is, of course, circular.

creditors—the objective of the headline-grabbing, coercive sovereign debt-restructurings with which Hinman is familiar and to which his sources refer.  (Hinman Report ¶¶ 70–76).

89.     This context explains why PDVSA was willing to offer enhancements during October 2016 in order to obtain the maturity extension lifeline that was then its top priority. According to press accounts at the time (Boyd 2016, 1; Schipani and Platt 2016, 2), PDVSA wanted to buy itself time for world oil prices to rally, because they had dropped from over $100/barrel in early 2014 to below $40/barrel by early 2016, lingering under $50/barrel during the months of the debt exchange.[14]  As it turned out, oil prices rose only marginally in 2017, averaging close to $50/barrel throughout that year, and meantime Venezuela's oil production and thus export volumes began to drop precipitously.  (Verrastro and Stanley 2018, 1).  This is the reason why, at the end of October 2017, PDVSA and the government of Venezuela capitulated to grim reality and soon after began to default on New York-law debt obligations across the board, with a view to eventually negotiating a restructuring that would deliver substantial debt relief for the company and the sovereign.[15]

90.     Analyst commentary acknowledged this benefit to PDVSA from the Exchange. For example, a Bank of America report noted that "a successful swap would allow Venezuela to kick the can down the road a little further, allowing time for a possible rebound in oil prices."  (Bank of

---

[14]   West Texas Intermediate (WTI) spot prices from the U.S. Energy Information Administration, available at https://www.eia.gov/dnav/pet/xls/PET_PRI_SPT_S1_D.xls  Venezuela's heavier crude oil typically fetches $7-8/barrel less than WTI crude.

[15]   In early November 2017, Venezuelan President Maduro announced his intention to obtain debt relief from creditors.  On November 2, 2017, PDVSA failed to make a principal payment on a bond that had no grace period, and on November 12 and 20 sovereign bonds due in 2019 and 2024, respectively, also went into default.  (Moody's 2018, 6).  The 2020 Notes, however, continued to be honored and thus were serviced normally for two additional years.  As of April 15, 2020, Venezuela has yet to engage in debt-restructuring negotiations with its New York-law creditors.

America 2016c).  Similarly, a JP Morgan analyst report from 2015 concluded that PDVSA could

generate sufficient EBITDA "to service both its own debt and the sovereign's debt" if crude oil

prices were to increase to approximately $70/barrel.  (JP Morgan 2015).  Hinman himself

acknowledges that the Exchange allowed PDVSA to benefit from a potential increase in oil prices.

(*See* Hinman Report ¶¶ 9, 34).

91.     PDVSA's 2020 Notes transaction of 2016 was thus similar in nature to the liability-

management operations that Mexico's PEMEX, a fellow state-owned oil company likewise under

financial stress, has undertaken during the last eight months.  In both instances, and as is frequently

the case with distressed sovereign or corporate debtors, voluntary debt swaps in which investors

agree to extended maturities are usually accompanied by the incentive of more advantageous

economic terms to participating investors, such as increased principal, higher coupons or additional

collateral.  Since 2009, PEMEX has registered a steadily deteriorating balance sheet with a

significant increase in debt and negative equity, as a result of a crushing tax burden, massive

unfunded pension liabilities, high leverage—over $100 billion in financial debt, making PEMEX

the world's most indebted oil company—plus rising lifting costs for crude and gaping investment

needs to counter a steady decline in oil production during the past 15 years.  (Harrup and Whelan

2019, 1; Eschenbacher 2020a, 1).  The company's financial vulnerability has been aggravated by

the recent collapse in world oil prices, such that Fitch Ratings, which until early 2019 had classified

PEMEX as an investment-grade, BBB+ credit, has since cut that foreign-currency debt rating four

notches to a speculative-grade BB.[16]  (Eschenbacher 2020b, 1).  Faced with the prospect of having

to repay $44 billion in bonded debt during the next four years, PEMEX has recently staged two

---

[16]    Moody's and S&P, which had rated PEMEX as high as A3/BBB+, still rate it Baa3/BBB as of April 15, 2020.

sizeable debt-reprofiling operations.  In September 2019, the company paid higher coupons to place $7.5 billion in longer-dated paper in order to retire bonds coming due, and this past January it issued a further $5 billion in longer-term bonds to repurchase foreign debt maturing this year. (Martin 2019, 1–2;, Webber and Smith 2019, 1; Gonzalez 2020, 1).  It would be a gross mischaracterization to say that these PEMEX transactions were debt restructurings that should have imposed worse terms on bondholders—just as it is a gross mischaracterization by Hinman to conclude that the 2020 Notes transaction was a debt restructuring that should have featured worse terms for bondholders (Hinman Report ¶19(a)(iii)).

> **C.**  **Hinman's Argument that "Favorable" Terms Can Compensate for a Substantial Risk of Invalidity Is Economically Irrational.**

92.     Hinman argues that exchanging holders accepted a substantial risk that the 2020 Notes were invalid and unenforceable because they were compensated by the allegedly "favorable" terms of the 2020 Notes.  (Hinman Report ¶ 19(a)(iii)).  This purported reasoning is economically irrational.  There is a logical limit on the degree to which "favorable" terms can compensate for a risk of invalidity.  This is so because a determination that the bonds are invalid would mean that investors will not receive those purportedly favorable terms; in fact, they will suffer a loss of principal.  As a result, in the case of the 2020 Notes, a rational investor would not have accepted *any* material risk of invalidity.  Instead, an investor who perceived a material risk of invalidity would have kept the 2017 Notes.

93.     The main financial risk that bondholders routinely face is the potential loss of principal on their bonds.  If investors are concerned about a likely total loss of principal within two or three years, then there is no single-digit or even double-digit coupon rate that can compensate them for that principal loss in such a short time span.  Here, the interest rate on the 2020 Notes was

set at 8.5 percent, which was equal to the interest rate of the November 2017 Notes and only 3.25 percentage points higher than the interest rate of the March 2017 Notes (5.25 percent).  As an economic matter, it would be irrational for an investor to accept more than a small risk of a loss of principal in exchange for the opportunity to slightly increase the principal balance and (in the case of the March 2017 Notes only) to earn a somewhat higher interest rate.

94.     Thus, if they believed that the 2020 Notes carried a meaningful risk of a total loss by reason of invalidity, then it would have been economically irrational for the 39.43 percent of the eligible bondholders who accepted the 2020 Notes to have participated in the Exchange.  If they believed that risk was substantial, they would simply have retained their 2017 Notes, which Plaintiffs do not contend were subject to any "invalidity risk."

*          *          *

95.     In sum, there are no grounds to conclude that the terms of the 2016 bond exchange were unusually favorable to exchanging 2017 Noteholders.  The noteholders were asked to postpone the return of their principal in exchange for several enticements, which is only reasonable, and there was nothing unusual about the 2020 Notes transaction relative to other market-driven refinancings, such as those recently undertaken by PEMEX.  The 2016 debt exchange was decidedly *not* a coercive debt restructuring aimed at obtaining interest and principal forgiveness. Moreover, the fact that the transaction was undersubscribed is indicative of it having been insufficiently generous and reassuring to the 2017 Noteholders.

41

Arturo C. Porzecanski, Ph.D.

Dated: April 15, 2020

42

Appendix I

## MATERIALS CONSIDERED

### I.  SOURCES CITED IN THE REBUTTAL

#### A.  ANALYST REPORTS

a.  ACG ANALYTICS

ACG Analytics (2016), "PDVSA Swap in the Works – Questions Remain on Legislature's Role," September 13 (ASH_00002364).

b.  BANK OF AMERICA MERRILL LYNCH

Bank of America (2016a), "PDVSA: Debt Swap Formally Announced; Will Enough Investors Accept It?," September 18 (ASH_00009562).

Bank of America (2016b), "PDVSA Swap Value Not Obvious," September 18 (ASH_00009506).

Bank of America (2016c), "PDVSA Swap Could Buy Time," September 23, 2016 (ASH_00009003).

Bank of America (2016d), "PDVSA: New Pricing Premiums Make the 2017 Bond Exchange a Little Sweeter," September 27 (BLA_00000897).

Bank of America (2016e), "PDVSA Extends Bond Swap; 'All Options on the Table' if Swap Fails," October 18 (ASH_00000342).

Bank of America (2016f), "Bond Swap Results Give Some Breathing Room in Short-Term," October 24 (ASH_00001323).

c.  BARCLAYS CAPITAL

Barclays Capital (2016a), "Venezuela/PDVSA: Swap Marathon," September 15 (ASH_00009512).

Barclays Capital (2016b), "PDVSA Swap:" Bondholder's Dilemma," September 28 (ASH_00001266).

Barclays Capital (2016c), "Venezuela: Buying Time," September 30 (BLA_00001302).

Barclays Capital (2016d), "Venezuela/PDVSA: Time for the Market to Vote," October 13 (ASH_00001296).

d.  DEUTSCHE BANK SECURITIES

Deutsche Bank (2016a), "On PDVSA Debt Swap," September 14 (BLA_00004790).

Deutsche Bank (2016b), "PDVSA: Swap or Not?," September 15 (ASH_00009494).

Deutsche Bank (2016c), "PDVSA: Swap or Not – Part II," September 19 (BLA_00003230).

Deutsche Bank (2016d), "PDVSA: Swap or Not, Part II-A," September 23 (ASH_00004239).

Deutsche Bank (2016e), "PDVSA: Swap or Not? Part III," September 27 (BLA_00000808).

Deutsche Bank (2016f), "PDVSA Swap: Not a Lost Cause," October 10 (BLA_00001131).

Deutsche Bank (2016g), "PDVSA Swap Deadline Extended Again," October 13 (BLA_00001178).

Deutsche Bank (2016h), "PDVSA Swap Update: Disappointing, But Still May Not be a Lost Cause," October 17 (BLA_00001204).

Deutsche Bank (2016i), "PDVSA: As Good as it Gets," October 25 (BLA_00001552).

e.   GOLDMAN SACHS

Goldman Sachs (2016a), "PDVSA Announces Swap of 2017 Bonds," September 19 (BLA_00000625).

Goldman Sachs (2016b), "PDVSA Announces a New Extension of the Tender Deadline," October 13 (BLA_00001162; ASH_00000275; ASH_00001588; ASH_00002573).

Goldman Sachs (2016c), "Decisive Day for PDVSA Bonds," October 17 (BLA_00001193).

Goldman Sachs (2016d), "PDVSA Postpones the Tender Deadline Again," October 18 (BLA_00001263).

Goldman Sachs (2016e), "PDVSA Accepts Low Participation in Bond Swap," October 25 (BLA_00001564).

Goldman Sachs (2016f), "Venezuela: Political Risk Outweighs Fleeting Payment Relief," October 28 (BLA_00001653).

f.   HSBC

HSBC (2016a), "Minister Del Pino Announces PDVSA's Bond Swap," September 14 (ASH_00002367).

HSBC (2016b), "HSBC LatAm Macro Snippets 28 Sept 2016," September 28 (BLA_00001007).

HSBC (2016c), "HSBC LatAm Macro Snippets 14 Oct 2016," October 14 (BLA_00001182).

HSBC (2016d), "HSBC LatAm Macro Snippets 19 Sept 2016," September 19 (BLA_00000657).

HSBC (2016e), "HSBC LatAm Macro Snippets 29 Sept 2016," September 29 (ASH_00010334).

HSBC (2016f), "HSBC LatAm Macro Snippets 21 Oct 2016," October 21 (ASH_00006086).

HSBC (2016g), "HSBC LatAm Macro Snippets 24 Oct 2016," October 24 (ASH_00000397).

HSBC (2016h), "HSBC LatAm Macro Snippets 25 Oct 2016," October 25 (BLA_00004916).

HSBC (2016i), "HSBC LatAm Macro Snippets 27 Oct 2016," October 27 (ASH_00004428).

g.   JEFFERIES

Jefferies (2016a), "Jefferies LatAm Sovns – The PDVSA Swap," September 19 (ASH_00004192; ASH_00005982; ASH_00006721).

h.   JP MORGAN SECURITIES

JP Morgan (2015), "Venezuela and PDVSA Debt: A Guide," March 30.

JP Morgan (2016a), "PDVSA: Waiting on the World to (Ex)change," September 21 (ASH_00000173).

JP Morgan (2016b), "PDVSA: Marking the Swap to Market," September 27 (BLA_00004826).

JP Morgan (2016c), "PDVSA: Swap Extended Again and the Clock is Ticking," October 13 (BLA_00004841; BLA_00001171).

JP Morgan (2016d), "PDVSA: Done with the Exchange, But Challenges Persist in 2017," October 25 (BLA_00003880).

JP Morgan (2016e), "Emerging Markets Today," October 25 (ASH_00006119).

i.   <u>NOMURA SECURITIES</u>

Nomura (2016a), "Venezuela: Finally a Debt Offer," September 14 (BLA_00000506).

Nomura (2016b), "Venezuela: Political Transition?," September 15 (BLA_00000526).

Nomura (2016c), "Venezuela: PDVSA Exchange," September 18 (ASH_00000743; BLA_00004810; BLA_00000556).

Nomura (2016d), "Venezuela: PDVSA Exchange Revisions," September 28 (BLA_00000935).

Nomura (2016e), "Venezuela: Waiting for Debt Exchange Results," October 3 (BLA_00001032).

Nomura (2016f), "Venezuela: What Political Transition?," October 4 (BLA_00001070).

Nomura (2016g), "Venezuela: Blind Exchange," October 7 (BLA_00001106).

Nomura (2016h), "Venezuela: PDVSA Exchange at Risk," October 11 (BLA_00001137).

Nomura (2016i), "Venezuela Strategy Inflection Point," October 12 (ASH_00005045).

Nomura (2016j), "Venezuela: Third Delay on PDVSA Exchange," October 13 (BLA_00001157).

Nomura (2016k), "Venezuela: Take It or Leave It," October 17 (BLA_00001190).

Nomura (2016l), "Venezuela: Another Extension and Higher Stakes," October 18 (BLA_00001260).

Nomura (2016m), "Venezuela: What is PDVSA Telling Us?," October 20 (BLA_00001279).

Nomura (2016n), "Venezuela: Cross Currents," October 21 (BLA_00001517).

Nomura (2016o), "Venezuela: Event Risk," October 24 (BLA_00001523).

Nomura (2016p), "Venezuela: Finally Some Breathing Room," October 25 (BLA_00001557).

Nomura (2016q), "Venezuela: Escalating the Conflict," October 27 (BLA_00001621).

j.   SCOTIABANK

██████████████████████████████████████

k.   TORINO CAPITAL

Torino Capital (2016a), "The Fine Print," October 3–9 (ASH_00006907).

Torino Capital (2016b), "Venezuela This Week: Of Laws and Bonds," October 11-16 (ASH_00006934).

l.   UBS SECURITIES

UBS (2016a), "Venezuela Bonds: Of Politics and Swaps," September 19 (UBS-PDVSA000001).

## B.  CREDIT RATING REPORTS

Fitch Ratings (2016a), "Fitch Expects to Rate PDVSA's Proposed Notes 'CCC/RR4'," September 19.

Fitch Ratings (2016b), "Fitch Places CITGO's Ratings on Negative Watch," September 22.

Fitch Ratings (2016c), "Fitch: CITGO Remains on Rating Watch Following PDVSA Exchange Extension," October 19.

Fitch Ratings (2016d), "Fitch Downgrades PDVSA's IDRs to 'CC,'" October 25.

Fitch Ratings (2016e), "Fitch Affirms CITGO's Ratings Following PDVSA Exchange," October 28.

Fitch Ratings (2016f), "Petroleos de Venezuela, S.A. Full Rating Report," November 17.

Moody's (2016a), "Credit Opinion: CITGO Holding, Inc.," January 26.

Moody's (2016b), "PDVSA's Bond Exchange Transaction Would Reduce Immediate Liquidity Risk, A Credit Positive," September 19.

Moody's (2016c), "PDVSA's Bond Exchange Transaction Would Reduce Immediate Liquidity Risk," October 27.

Moody's (2016d), "Moody's Assigns Caa3 Rating to PDVSA's 2020 Notes," November 18.

Moody's (2018), "Venezuela's Debt Default," February.

Standard & Poor's (2016a), "Petroleos de Venezuela Downgraded To 'CC' From 'CCC' Following Exchange Offer Announcement; Outlook Remains Negative," September 19.

Standard & Poor's (2016b), "Petroleos de Venezuela Downgraded to 'SD' on Distressed Exchange; Ratings on Senior Unsecured Notes Due 2017 Cut to 'D,'" October 25.

Standard & Poor's (2016c), "Petroleos de Venezuela Upgraded to 'CCC-' from 'SD' on Debt Exchange, Outlook Negative," November 3.


## C. ARTICLES

### a. BLOOMBERG NEWS

Boyd, Sebastian (2016), "PDVSA Seeks to Buy Time for Oil Rally with $7 Billion Debt Swap," *Bloomberg News*, September 14.

[REDACTED]

Gonzalez, Pablo Rosendo (2020), "Pemex Sells $5 Billion of Bonds, Tapping Ravenous Yield Demand," *Bloomberg News*, January 21.

Martin, Eric (2019), "Pemex Bonds Won't Have Mexico Formal Backing Despite Big Premium," *Bloomberg News*, September 12.

Pitts, Pietro and Kurmanaev, Anatoly (2014), "Venezuela Says Citgo Assets Worth More than 10 Billion," *Bloomberg News*, August 6.

### b. THE FINANCIAL TIMES

Dizard, John (2016), "How to Value (Worthless) Venezuelan Oil Bonds," *The Financial Times*, September 23.

Dye, Jessica (2016a), "ConocoPhillips Cries Fraud Over PDVSA Bond Swap," *The Financial Times*, October 7.

Dye, Jessica (2016b), "Crunch Time for Venezuela's PDVSA?," *The Financial Times*, October 13.

Platt, Eric (2016), "Oil Group PDVSA Sweetens Debt Swap Offer," *The Financial Times*, September 27.

Platt, Eric and Dye, Jessica (2016), "Venezuela's State-Owned Oil Group Debt Swap Flounders," *The Financial Times*, October 10.

Porzecanski, Arturo (2019), "The PDVSA 2020 Bond: Time for a Solution," *The Financial Times*, November 18.

Schipani, Andres and Moore, Elaine (2016a), "Fears of Venezuela Debt Default Rise as Bond Prices Plunge," *The Financial Times*, January 22.

Schipani, Andres and Moore, Elaine (2016b), "Dutiful Venezuela Gives Unexpected Boost to Bond Investors," *The Financial Times*, June 9.

Schipani, Andres and Platt, Eric (2016), "Venezuela Oil Company to Launch $7bn Bond Swap," *The Financial Times*, September 13.

Webber, Jude and Smith, Colby (2019), "Pemex Pays Up to Secure $7.5bn Bond Issue," *The Financial Times*, September 12.

Wheatley, Jonathan and Platt, Eric (2016), "What Now for Venezuela's PDVSA After the Bond Swap?," *The Financial Times*, October 25.

Wigglesworth, Robin and Andres Schipani (2016), "Venezuelan Oil Major's Debt Swap the Beginning of the End?," *The Financial Times*, September 26.

    c.   REUTERS

Chinea, Eyanir and Ellsworth, Brian (2016), "S&P Says PDVSA Bond Swap Offer 'Tantamount to Default,'" *Reuters*, September 19.

Eschenbacher, Stephanie (2020a), "'Unsustainable': Mexico's Pemex Buckling Under Crushing Pension Debt," *Reuters*, March 6.

Eschenbacher, Stephanie (2020b), "Mexico's Pemex Slides Deeper Into 'Junk'," Stefanie, *Reuters*, April 3.

Martinez, Ana Isabel and Pons, Corina (2016), "Venezuela's PDVSA Offers $7 Billion Bond Swap to Ease Debt Burden," *Reuters*, September 13.

    d.   THE WALL STREET JOURNAL

Cui, Carolyn (2016a), "Venezuela's PDVSA Bonds Fall After Swap Proposal," *The Wall Street Journal*, September 19.

Cui, Carolyn (2016b), "Venezuela's PDVSA Bonds Fall After Lack of Interest for Debt-Maturity Extension," *The Wall Street Journal*, October 7.

Cui, Carolyn and Muñoz, Sara Schaefer (2016), "In Decaying Venezuela, Debts Get Repaid," *The Wall Street Journal*, February 24.

Dezember, Ryan and Alison Sider (2015), "Plug Pulled on Venezuela's Sale of Citgo," *The Wall Street Journal*, January 20.

Gold, Russell (2016), "Aramco Deals Face Uncertainty Under Trump Administration," *The Wall Street Journal*, December 16.

Harrup, Anthony and Robbie Whelan (2019), "Pemex Seeks to Reverse 15-Year Decline in Oil Output," *The Wall Street Journal*, July 16.

Kurmanaev, Anatoly and Cui, Carolyn (2016a), "Venezuela's PDVSA Says 'All Options are Open' if Debt Exchange Fails,'" *The Wall Street Journal*, October 18.

Kurmanaev, Anatoly and Cui, Carolyn (2016b), "Venezuela's PDVSA Restructures Debt," *The Wall Street Journal*, October 24.

Minaya, Ezequiel, Alison Sider and Dana Cimilluca (2014), "Cash-Poor Venezuela Weighs Sale of Citgo," *The Wall Street Journal*, July 30.

Olson, Bradley (2016), "Big Oil Companies Reap Windfall from Ethanol Rules," *The Wall Street Journal*, October 27.

Vyas, Kejal (2016), "Venezuela State Oil Company Looks to Swap $7 Billion In Upcoming Debt," *The Wall Street Journal*, September 13.

e.   OTHER PUBLICATIONS

*Petróleo America* (2016), "Del Pino Must Explain Terms of the PDVSA Bond Exchange to the AN," September 27.

Fuentes, Lysaura (2016), "Freddy Guevara: Government has Shown to be Negligent and Destructive of the Economy," *El Cooperante*, September 28.

El Nacional (2016), "Debt Issue Made Under New Decree Will be Void," September 17.

Berrospi, Miluska (2019), "Major PDVSA 2020 Holder Anticipates Default on Bond," *Nasdaq*, October 10.

Waine, Charles (2019), "Bondholders Close in on Citgo," *Petroleum Economist*, November 1.

Verrastro, Frank and Andrew Stanley (2018), "How Low Can Venezuelan Oil Production Go? Venezuela's Oil Industry in Dire Straits," *Center for Strategic & International Studies(CSIS)*, June 18.

RTTNews (2018), "Venezuela's Opposition-Controlled National Assembly Declares Petro Illegal," March 7.

## D. COMPLAINTS AND OTHER LEGAL DOCUMENTS

Complaint, Dkt. 1, *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc.,* v. *MUFG Union Bank, N.A. and GLAS Americas LLC*, No. 1:19-cv-10023.

National Assembly Resolution, dated September 27, 2016 (Exhibit C to the Complaint, Dkt. 1).

Decl. of Arturo C. Porzecanski, dated March 16, 2020.

Expert Report of David C. Hinman, dated March 16, 2020.

Transcript of Luis Pacheco Deposition (2020), *Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding, Inc.,* v. *MUFG Union Bank, N.A. and GLAS Americas LLC*, No. 1:19-cv-10023.

## E. PRODUCED DOCUMENTS

Global Notes, October 28, 2016 (HL_019590).

Indenture, October 27, 2016 (HL_002709).

Pledge and Security Agreement, October 28, 2016 (ASH_00009011).

Despacho de Abogados Miembro de Hogan Lovells, Letter RE: Petroleos de Venezuela, S.A. Offering, October 28, 2016 (HL_011111).

Hogan Lovells US LLP, Letter RE: Petroleos de Venezuela, S.A. Offering, October 28, 2016 (HL_011091).

Hogan Lovells, Draft Question & Answer dated Sept. 20, 2016 (HL_023889).



### F. Public Documents

D.F. King & Co., Inc. (2016), "Announcement," October 26.

Petróleos de Venezuela, S.A., Offering Circular, September 16, 2016
https://www.sec.gov/Archives/edgar/data/906424/000119312516712239/d171369
dex99t3e.htm.

Petróleos de Venezuela, S.A., Form T-3 Sept. 16, 2016,
https://www.sec.gov/Archives/edgar/data/906424/000119312516712239/d171369
dt3.htm.

West Texas Intermediate Spot Prices from the U.S. Energy Information
Administration, available at
https://www.eia.gov/dnav/pet/xls/PET_PRI_SPT_S1_D.xls.

## II. Consulted Sources Not Cited in the Rebuttal

### A. Analyst Reports

#### a. ACG Analytics

Wong, Meilee (2016a), "Venezuela: S&P Downgrades PDVSA," *ACG Analytics*,
September 19 (ASH_00010252).

Wong, Meilee (2016b), "Venezuela This Week: PDVSA Bond Swap," *ACG
Analytics*, September 21 (ASH_00010289).

Wong, Meilee (2016c), "Venezuela: First Deadline for PDVSA Swap Thursday,"
*ACG Analytics*, October 5 (ASH_00002517).

Wong, Meilee (2016d), "Venezuela: PDVSA Extends SWAP Deadline to Meet
Goals/ConocoPhillips Sues Over Exchange Offer," *ACG Analytics*, October 7
(ASH_00006931).

Wong, Meilee (2016e), "Venezuela Today: Turkey's Erdogan Inspires President
Maduro as Swap Extension Extended," *ACG Analytics*, October 13
(ASH_00006963).

Wong, Meilee (2016f), "Venezuela Alert: Swap Participation Breaks 40%,
Opposition Responds to Chavista Actions," *ACG Analytics*, October 22
(ASH_00007059).

#### b. BancTrust

BancTrust (2016a), "Venezuela Flash Note – PDVSA's Swap is Here,"
September 19 (ASH_00010226).

BancTrust (2016b), "Venezuela Flash Note – Sweetening the Swap," September 27 (ASH_00002442).

BancTrust (2016c), "Venezuela Flash Note – PDVSA Extends the Swap Early Deadline," October 7 (ASH_00002523).

BancTrust (2016d), "PDVSA Flash Note – Del Pino's Options," October 14 (ASH_00006991).

c. BANK OF AMERICA MERRILL LYNCH

Bank of America (2016g), "LATAM End of Day Commentary," September 19 (ASH_00001496).

d. BARCLAYS CAPITAL

Barclays Capital (2016e), "Barclays EM Credit Opening Comment – 10th Oct 2016," October 10 (ASH_00001280).

Barclays Capital (2016f), "Global Macro Daily," October 27 (ASH_00004436).

Barclays Capital (2016g), "Global Macro Daily," October 28 (ASH_00004445).

e. CITI

Citi (2016), "PDVSA: Kicking the Can Down the Road," October 24 (BLA_00003878).

f. CREDIT AGRICOLE

Crédit Agricole (2016), "U.S. Liability Management Update," September (PDVHCITGO0001308).

g. CREDIT SUISSE

Credit Suisse (2016a), "PDVSA Looks at Bond Exchange," September 15 (CSSU_0009478).

Credit Suisse (2016b), "PDVSA Offer Falls Flat," September 27 (CSSU_0012732).

Credit Suisse (2016c), "Telecom Personal Gets IFC Financing," October 7 (CSSU_0013885).

Credit Suisse (2016d), "PDVSA Extends Bond Swap Deadline for Third Time," October 19 (CSSU_0014990).

Credit Suisse (2016e), "Fitch Downgrades PDVSA," October 26 (CSSU_0018877).

h. DEUTSCHE BANK SECURITIES

Deutsche Bank (2016j), "EM Macro and Strategy Focus," September 16 (BLA_00000538).

Deutsche Bank (2016k), "EM Macro and Strategy Focus," September 18 (BLA_00000546).

Deutsche Bank (2016l), "Deutsche Bank EM Update Sept 19, 2016," September 19 (BLA_00000670).

Deutsche Bank (2016m), "Venezuela: PDVSA Awards New Contracts to Arrest Production Decline," September 22 (ASH_00004212).

Deutsche Bank (2016n), "EM Macro and Strategy Focus," October 2 (BLA_00001030).

Deutsche Bank (2016o), "EM Macro and Strategy Focus," October 23 (BLA_00001521).

Deutsche Bank (2016p), "Deutsche Bank EM Update Oct 24th, 2016," October 24 (BLA_00001549).

Deutsche Bank (2016q), "EM Macro and Strategy Focus," October 28 (BLA_00001697).

i. EURASIA GROUP

Eurasia Group (2016a), "Successful Bond Swap Would Not Change Political Outlook," September 14 (BLA_00002775).

Eurasia Group (2016b), "Weekly Watch: 19 September," September 19 (BLA_00000663).

Eurasia Group (2016c), "Opposition Will Successfully Overcome New Hurdles to Recall," September 22 (BLA_00004465).

Eurasia Group (2016d), "Bond Swap Will Have Limited Impact on Economic and Political Outlook," September 30 (BLA_00001025).

Eurasia Group (2016e), "Weekly Watch: 3 October," October 3 (BLA_00003267).

Eurasia Group (2016f), "Weekly Watch: 10 October," October 10 (BLA_00001125).

Eurasia Group (2016g), "Weekly Watch: 17 October," October 17 (BLA_00004500).

Eurasia Group (2016h), "Government Will Avoid 2016 Default Regardless of Swap Outcome," October 18 (BLA_00001276).

Eurasia Group (2016i), "Maduro Will Likely Hang Onto Power," October 26 (BLA_00003310).

j.   EXOTIX

Exotix (2016a), "Exotix … 14/9/16," September 14 (ASH_00000695).

Exotix (2016b), "Swap Offer Will Not Remove Default Concerns," September 20 (ASH_00004197).

Exotix (2016c), "Weekly Credit Risk Monitor – In This Week's Edition," September 23 (ASH_00004241).

Exotix (2016d), "Exotix … 10/10/16," October 10 (ASH_00005010).

Exotix (2016e), "Exotix .. 17/10/16," October 17 (ASH_00005212).

Exotix (2016f), "Exotix … 19/10/16," October 19 (ASH_00005221).

Exotix (2016g), "Swap Offer Garners 39.4% Participation," October 25 (ASH_00000422).

Exotix (2016h), "Exotix … 27/10/16," October 27 (ASH_00001353).

Exotix (2016i), "Exotix .. 28/10/16," October 28 (ASH_00005525).

Exotix (2016j), "Credit in Focus: PDVSA – Swap Offer Garners 39.4% Participation," October 28 (ASH_00000476).

k.   GOLDMAN SACHS

Goldman Sachs (2016g), "Suspension of Recall Referendum Leads to Escalation of Institutional Confrontation," October 24 (ASH_00001624).

l.   IGM

Merl, Lewis (2016a), "LatAm Ahead: October Outlook," *IGM*, September 30 (CSSU_0012931).

Merl, Lewis (2016b), "LatAm Close: Week in Review," *IGM*, October 7 (CSSU_0014012).

Merl, Lewis (2016c), "LatAm Close: Week in Review," *IGM*, October 14 (CSSU_0014289).

Merl, Lewis (2016d), "LatAm Close: 2 Prints Emerge – 2 Potential Issuers for

Tomorrow," *IGM*, October 19 (CSSU_0015199).

Merl, Lewis (2016e), "LatAm Close: Week in Review," *IGM*, October 28 (CSSU_0019332).

m. ITAÚ

Itaú (2016a), "Investors Mixed on PDVSA Swap," September 20 (ASH_00000157).

Itaú (2016b), "PDVSA Revises Debt Exchange," September 28 (ASH_00000244).

Itaú (2016c), "PDVSA Extends Bond Swap Deadline Again," October 14 (ASH_00000289).

Itaú (2016d), "PDVSA Extends Bond Swap Deadline for Third Time," October 19 (ASH_00000348).

n. JEFFERIES

Jefferies (2016b), "Venezuela," August 25 (BLA_00000012).

Jefferies (2016c), "Venezuela," August 29 (BLA_00002598).

Jefferies (2016d), "Venezuela: The Tide is Turning," September 6 (BLA_00000436).

Jefferies (2016e), Jefferies LatAm Sovns – Venezuela Commentary," September 9 (BLA_00000860; BLA_00000863).

Jefferies (2016f), "LatAm Corporate Trading Note: ANDRGI, ODBR, September 20 (ASH_00006756).

Jefferies (2016g), "Opening Salvo – EM – PDVSA, FED, CSNABZ, PETBRA, FX," September 20 (ASH_00006724).

Jefferies (2016h), "Jefferies LatAm Sovns – Venezuela Commentary," *Jefferies*, September 27 (ASH_00006823; ASH_00000224; ASH_00001519).

Jefferies (2016i), "Jefferies LatAm Sovns – PDVSA's Swap and Argentina's Euro Bond Deal," October 5 (ASH_00004270; ASH_00006035; ASH_00006922; BLA_00003275; BLA_00001075).

Jefferies (2016j), "Opening Salvo – EM – VENZ, MINING, ANDRGI, CSNABZ, ELSAV," October 11 (ASH_00002529).

Jefferies (2016k), "LatAm Corp Trading: Daily News & Views," October 18 (ASH_00001619).

14

Jefferies (2016l), "Opening Salvo – EM – PDVSA, ARGENT, FED, EM, ECELIP," October 25 (ASH_00002674).

Jefferies (2016m), "Jefferies LatAm Sovns – Venezuela and Argentina Commentary," October 26 (ASH_00006137; ASH_00004413; ASH_00007140; BLA_00001608; BLA_00001612).

Jefferies (2016n), "Opening Salvo – Jefferies EM – 10/27/2016," October 27 (BLA_00001623; ASH_00002461).

o.   JP MORGAN SECURITIES

JP Morgan (2016f), "Emerging Markets Today," September 14 (ASH_00006535).

JP Morgan (2016g), "JPM EM Corporate Cross-Product Daily," September 22 (ASH_00004216).

JP Morgan (2016h), "Emerging Markets Today," September 22 (ASH_00006776).

JP Morgan (2016i), "EMBI September 2016 Month-End Estimated Composition," September 26 (ASH_00010319; ASH_00001504).

JP Morgan (2016j), "Emerging Markets Today," October 13 (ASH_00004312).

JP Morgan (2016k), "Emerging Markets Today," October 14 (ASH_00006975).

JP Morgan (2016l), "EMBI October 2016 Month-End Estimated Composition," October 25 (ASH_00002717).

JP Morgan (2016m), "PDVSA: Done with the Exchange, But Challenges Persist in 2017," October 25 (BLA_00003880).

JP Morgan (2016n), "JPM EM Corporate Cross-Product Daily," October 27 (ASH_00004418).

p.   MACROSTRATEGY

MacroStrategy (2016a), "Morning Headlines," September 14 (ASH_00001458).

MacroStrategy (2016b), "Morning Headlines," October 7 (ASH_00004290).

MacroStrategy (2016c), "Morning Headlines," October 25 (ASH_00000415).

q.   NOMURA

Nomura (2016r), "Venezuela: It's All About Politics," August 10 (ASH_00000666).

r.   OPPENHEIMER

Oppenheimer (2016), "Latam Credit Commentary," September 19 (ASH_00001206).

s.   ROYAL BANK OF SCOTLAND

Royal Bank of Scotland (2016), "PDVSA Signs $1.2 Billion Financing Agreement with Repsol," October 10 (ASH_00004297).

t.   RUSS DALLEN

Dallen, Russ (2016a), "Top Ten Things to Know About the PDVSA Exchange Deal," September 17 (BLA_00000540).

Dallen, Russ (2016b), "PDVSA Swap Update and Citgo Valuations," September 22 (BLA_00000734).

Dallen, Russ (2016c), "Delaware Federal Court Allows Crystallex $2.8 Billion Fraudulent Conveyance Lawsuit Against PDVSA to Continue, Though Dismisses Citgo Holding," October 6 (BLA_00001080).

u.   SCOTIABANK

Scotiabank (2016b), "PDVSA's New Exchange Offer has Value," September 28 (BLA_00001000).

Scotiabank (2016c), "PDVSA's New Exchange Offer has Value," (Email Version), September 28 (BLA_00000990).

v.   STIFEL NICOLAUS & CO.

Fu, Victor (2016a), "PDVSA: Debt Swap Deal Unattractive, Hold 17 News," *Stifel Nicolaus & Co.*, September 19 (BLA_00000646).

Fu, Victor (2016b), "PDVSA: Revised Debt Swap Terms Attractive," *Stifel Nicolaus & Co.*, September 27 (BLA_00000894).

Fu, Victor (2016c), "PDVSA: Thoughts on the Tender Deadline Extension," *Stifel Nicolaus & Co.*, October 13 (BLA_00001168).

Fu, Victor (2016d), "PDVSA: How Many Extensions Can We Have?," *Stifel Nicolaus & Co.*, October 18 (BLA_00001267).

Fu, Victor (2016e), "PDVSA: Cautious on the Front-End Rally on a Costly Deal," *Stifel Nicolaus & Co.*, October 24 (BLA_00001546).

w.   TORINO CAPITAL

Torino Capital (2016c), "Mulling the Swap," September 19-25 (BLA_00000650).

Torino Capital (2016d), "Back and Forth," September 26 – October 2 (BLA_00000769).

Torino Capital (2016e), "The Finish Line," October 17-23 (ASH_00002589).

Torino Capital (2016f), "Face-Off," October 24-30 (ASH_00002635).

Torino Capital (2016g), "Expensive Talk," October 31 – November 6 (ASH_00003218).

x.   TPCG VALORES

TPCG Valores (2016a), "Venezuela: PDVSA Improves Bond Swap Terms," September 28 (ASH_00000254).

TPCG Valores (2016b), "Venezuela: PDVSA Swaps 39.4% of 2017 Bonds," October 25 (ASH_00000424).

y.   UBS SECURITIES

UBS (2016b), "Investors Weigh Exchange Ratio, Value of Collateral Package in PDVSA Tender," September 21 (ASH_00010292).


**B.  ARTICLES**

Harrup, Anthony (2019), "Mexico's Pemex Sells Bonds for $7.5 Billion in Refinancing," *The Wall Street Journal*, September 12.


**C.  SOURCES CITED IN THE HINMAN REPORT**

Dehn, Jan and Medeiros (2016), "Latin America: The Best Investment Proposition in the World Today," *Ashmore*, July.

Goldberg, Pablo (2016), "Venezuela Opposition Reaches Political, Economic Accords w/ Govt," *BlackRock*, November 13 (BLA_00003918).

Email from J. Kulesz to R. Xavier and X. Xu, dated September 27, 2016 (ASH_00002433; ASH_00006820).

Congressman Jose Guerra Interview with CNN, September 21, 2016. Transcript by TransPerfect.

Email from M. Coombs to X. Xu, "Re:," dated October 26, 2016 (ASH_00003732).

"About Torino," *Torino Capital*, https://torinocap.com/about-torino/.

"Products," *Torino Capital*, https://torinocap.com/products/.

"Tail Risk," *PIMCO*, https://www.pimco.com/en-us/resources/education/understanding-tail-risk.

Das, Udaibir, et al. (2012), "Sovereign Debt Restructurings 1950-2010; Literature Survey, Data, and Stylized Facts," IMF Working Paper, Monetary and Capital Markets Departmnet, WP12/203.

*Reuters* (2019), "JPMorgan Stays with Venezuela in Emerging Bond Indexes – Fund Managers," February 28, https://www.reuters.com/article/venezuela-pdvsa-index/jpmorgan-stays-with-venezuela-in-emerging-bond-indexes-fund-managers-idUSL3N20O0RQ.

"The Case for Venezuela Frequently Asked Questions (FAQS)," *Ashmore* (ASH_00003951).

Walker, Mark and Cooper, Richard (2017), "Venezuela's Restructuring: A Realistic Framework," September 19 (CON_00002380).

Petróleos de Venezuela, S.A., Press Release, "PDVSA Announces Expiration and Final Results for its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020," dated October 24, 2016.

Petróleos de Venezuela, S.A., Press, Press Release, "PDVSA Announces Extension of the Early Tender Deadline and the Expiration Date for its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020," dated October 17, 2016.

Petróleos de Venezuela, S.A., Supplement to Offering Circular, dated September 26, 2016.

Cruces, Juan and Trebesch, "2014 Update Building on AEJ Macro 2013 Paper 'Sovereign Defaults: The Price of Haircuts,'" https://sites.google.com/site/christophrebesch/data.

Roy, Sudip (2009), "Ukraine: Naftogaz Set for Success on Restructing," *Euromoney*, October 6.

Medeiros, Gustavo (2020), "Quantifying EM Sovereign Fair Value," *Ashmore*, February.

Schumacher, Julian and Trebesch, Christoph (2020), "Restructuring Sovereign Bonds: Holdouts, Haircuts and the Effectiveness of CACs," *European Central Bank Working Paper Series No. 2366*, January.

Mihalachie, Gabriel (2019), "Sovereign Default Resolution Through Maturity Extension," *Stony Brook University Working Paper*, January 30.

International Monetary Fund (2011), "United Arab Emires: 2011 Article IV Consultation—Staff Report; Staff Supplement; Public Information Notice on the Executive Board Discussion," May.

19