UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

    Plaintiffs and Counterclaim Defendants,

    - against -

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

    Defendants and Counterclaim Plaintiffs.

No. 19 Civ. 10023 (KPF)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS AND COUNTERCLAIM PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Walter Rieman
William A. Clareman
Jonathan Hurwitz
Shane D. Avidan
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Roberto J. Gonzalez (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300

*Attorneys for Defendants and
Counterclaim Plaintiffs
(as to New York law issues only)*

LATHAM & WATKINS LLP
Christopher J. Clark
Matthew S. Salerno
Sean H. McMahon
885 Third Avenue
New York, NY 10022
Telephone: 212-906-1200
Facsimile: 212-751-4864

*Attorneys for Defendants and
Counterclaim Plaintiffs*

# Table of Contents

**Page**

Table of Authorities ................................................................................................. iii

Glossary and Citation Conventions ....................................................................... vii

Preliminary Statement ............................................................................................... 1

Statement of Undisputed Facts ................................................................................. 7

       A.     The Parties and Other Relevant Entities. ................................................. 7

       B.     The 2016 Exchange Offer. ....................................................................... 8

       C.     The PDVSA Parties' Boards of Directors and
              Corporate Officers Approved the Exchange Offer. ................................. 9

       D.     The PDVSA Parties Agreed to Broad New York Choice-of-Law Clauses. ......... 10

       E.     The Exchange Offer Was Centered in New York. ................................. 11

       F.     The PDVSA Parties Represented That the Governing Documents Were
              Valid, and Disclosed No Risk of Invalidity under Venezuelan Law. ................. 12

       G.     PDVSA's Counsel, Hogan Lovells, Determined That the
              Governing Documents Were Valid, and So Represented to
              the Trustee, the Collateral Agent, and Investors..................................... 13

       H.     For Its Entire 44-Year History, PDVSA Has Consistently
              Issued Debt and Engaged in Other Consequential
              Transactions Without National Assembly Approval. ........................... 16

       I.     While Some Venezuelan Politicians Criticized the Exchange
              Offer in 2016, the National Assembly Declined to Declare
              the Exchange Offer Illegal or Void.......................................................... 17

       J.     PDVSA Paid Principal and Interest on the 2020 Notes, and
               Acknowledged Them as a Valid Debt, until April 2019. .................... 18

       K.     In 2019, the Venezuelan Opposition Gained Recognition by the United
              States, Took Control of PDVSA's Assets in the United States, and, Nine
              Months Later, Filed This Suit Alleging That the 2020 Notes Are Void.............. 19

       L.     There Is No Evidence That Any Party to the Exchange Offer,
              or Any Noteholder, Believed That It Violated Venezuelan Law......................... 20

       M.     Over the Past Year, the National Assembly Has Attempted to Change
              Venezuelan Law to Help the PDVSA Parties Escape Their Obligations. ........... 21

Legal Standard Governing This Motion ................................................................. 22

Argument ................................................................................................................. 23

I.     The 2020 Notes and the Governing Documents Are
      Valid and Enforceable under New York Law.................................................... 23

A.      The PDVSA Parties' Claims Are Subject to New York Law under the Choice-of-Law Provisions to Which the PDVSA Parties Agreed. ............... 23

B.      N.Y. Gen. Oblig. Law § 5-1401 Precludes Consideration of Venezuelan Law in Determining the Validity of the Governing Documents. .......................... 24

C.      The Governing Documents Are Valid and Enforceable under New York Law. ................................................... 26

D.      The PDVSA Parties Had the Capacity to Contract. ............................................... 28

E.      The Parties' Choice of New York Law Is Enforceable under pre-*IRB* Case Law. ................................................. 32

F.      Article 150 of the Venezuelan Constitution Is Unenforceable under New York Public Policy Because It Is Discriminatory. ............................ 34

G.      This Case Highlights the Importance of Enforcing Choice-of-Law Provisions in Contracts Governing Sovereign and Quasi-Sovereign Debt. ......... 35

II.     PDVSA Petróleo Is Precluded, By Its Unconditional Guaranty, From Asserting a Defense of Illegality. ......................................... 36

III.    The Exchange Offer and Governing Documents Are Valid and Enforceable under Venezuelan Law. ....................................... 37

A.      The Governing Documents Are Valid under Venezuelan Law. ......................... 37

1.      No Provision of the Venezuelan Constitution or Other Law by Its Terms Required National Assembly Approval for the Governing Documents. ................................................... 37

2.      Under the Binding Decisions of the Constitutional Chamber, National Assembly Approval Was Not Required Because the Republic Was Not a Party to the Governing Documents. ....................... 39

3.      The Exchange Offer and Governing Documents Do Not Satisfy Other Criteria for Contracts of National Public Interest under *Andrés Velásquez*. .................................... 41

4.      The Opinion of the PDVSA Parties' Expert Is Contrary to PDVSA's Multi-Decade Practice of Issuing Debt Without National Assembly Approval. ................................................... 42

5.      The Opinion of the PDVSA Parties' Expert Would Lead to Absurd Results ................................................... 43

B.      The Governing Documents Are Enforceable under Venezuelan Law Doctrines Regarding Legality and Legitimate Expectations ............................... 44

Conclusion ................................................................................... 44

**Table of Authorities**

**Page(s)**

CASES

*ABB, Inc.* v. *Havtech, LLC*,
112 N.Y.S.3d 713 (1st Dep't 2019) ....................................................................25

*Access Telecomms., Inc.* v. *MCI Telecomms. Corp.*,
197 F.3d 694 (5th Cir. 1999) ...............................................................................4

*Allied Bank Int'l* v. *Banco Credito Agricola de Cartago*,
757 F.2d 516 (2d Cir. 1985)................................................................................34

*In re Ampal-Am. Israel Corp.*,
2015 WL 5176395 (Bankr. S.D.N.Y. Sept. 2, 2015)...........................................23

*Amusement Indus.* v. *Citigroup Glob. Mkts. Realty Corp.*,
421 B.R. 659 (Bankr. S.D.N.Y. 2009)..............................................................27–28

*Bank Leumi Tr. Co. of N.Y.* v. *Wulkan*,
735 F. Supp. 72 (S.D.N.Y. 1990) .................................................................31, 33

*Bank of N.Y. Mellon* v. *Omega Energy Int'l S.A.*,
2019 WL 4198676 (S.D.N.Y. Aug. 7, 2019)...................................................23, 37

*BDC Mgmt. Servs., LLP* v. *Singer*,
2016 WL 75603 (Sup. Ct. N.Y. Cty. Jan. 7, 2016)..............................................25

*Berkley Assur. Co.* v. *MacDonald-Miller Facility Sols., Inc.*,
2020 WL 1643866 (S.D.N.Y. Apr. 1, 2020)........................................................29

*Capstone Logistics Holdings, Inc.* v. *Navarrete*,
2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) ......................................................25

*Central Hanover Bank & Trust Co.* v. *Siemens Halske Aktiengesellschaft*,
15 F. Supp. 927 (S.D.N.Y. 1936), *aff'd*, 84 F.2d 993 (2d Cir. 1936)...............34, 35

*Citibank, N.A.* v. *Silverman*,
922 N.Y.S.2d 56 (1st Dep't 2011) .......................................................................27

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A.* v. *Navarro*,
36 N.E.3d 80 (N.Y. 2015)...................................................................................36

*Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019)................................................................................42

*Dresser-Rand Co.* v. *Petroleós de Venezuela, S.A.*,
2020 WL 635523 (S.D.N.Y. Feb. 11, 2020)....................................................22, 37

*DRFP L.L.C.* v. *República Bolivariana de Venezuela*,
  706 F. App'x 269 (6th Cir. 2017) ..........................................................39

*Duval* v. *Albano*,
  2017 WL 3053157 (S.D.N.Y. July 18, 2017) ...........................................37

*Ehrlich-Bober & Co.* v. *Univ. of Hous.*,
  404 N.E.2d 726 (N.Y. 1980)....................................................................35

*In re Futterman*,
  602 B.R. 465 (Bankr. S.D.N.Y. 2019)......................................................37

*Hamilton Capital VII, LLC, I* v. *Khorrami, LLP*,
  2015 WL 4920281 (Sup. Ct. N.Y. Cty. Aug. 17, 2015) ..........................25

*Hernandez* v. *City of N.Y.*,
  2015 WL 321830 (S.D.N.Y. Jan. 23, 2015) .............................................22

*Indosuez Int'l Fin. B.V.* v. *Nat'l Reserve Bank*,
  774 N.E.2d 696 (N.Y. 2002)..........................................................26, 29

*Int'l Minerals & Res., S.A.* v. *Pappas*,
  96 F.3d 586 (2d Cir. 1996).....................................................................29

*IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*,
  922 N.Y.S.2d 308 (1st Dep't 2011) ........................................................28

*IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*,
  982 N.E.2d 609 (N.Y. 2012)..........................................................*passim*

*J. Zeevi & Sons* v. *Grindlays Bank (Uganda)*,
  333 N.E.2d 168 (N.Y. 1975).....................................................30, 34, 35

*John Hancock Life Ins. Co. of N.Y.* v.
*Solomon Baum Irrevocable Family Life Ins. Tr.*,
  783 F. App'x 89 (2d Cir. 2019) ..............................................................27

*JPMorgan Chase Bank, N.A.* v.
*Controladora Comercial Mexicana S.A.B. De C.V.*,
  2010 WL 4868142 (Sup. Ct. N.Y. Cty. Mar. 16, 2010) ..........................32

*Klaxon Co.* v. *Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941)................................................................................23

*Korea Life Ins. Co.* v. *Morgan Guar. Tr. Co. of New York*,
  269 F. Supp. 2d 424 (S.D.N.Y. 2003)...............................................32, 33

*Lehman Bros. Comm. Corp.* v. *Minmetals Int'l Non-Ferrous Metals Trading Co.*,
179 F. Supp. 2d 118 (S.D.N.Y. 2000) .......................................................................... 32

*Maryland Cas. Co.* v. *Cont'l Cas. Co.*,
332 F.3d 145 (2d Cir. 2003) ......................................................................................... 30

*Ministers & Missionaries Benefit Bd.* v. *Snow*,
45 N.E.3d 917 (N.Y. 2015) .......................................................................................... 24

*Philips Credit Corp.* v. *Regent Health Grp.*,
953 F. Supp. 482 (S.D.N.Y. 1997) ............................................................................... 31

*Pravin Banker Assocs.* v. *Banco Popular Del Peru*,
109 F.3d 850 (2d Cir. 1997) ......................................................................................... 35

*Quartey* v. *AB Stars Prods., S.A.*,
697 N.Y.S.2d 280 (1st Dep't 1999) .............................................................................. 28

*Radioactive, J.V.* v. *Mason*,
153 F. Supp. 2d 462 (S.D.N.Y. 2001) ........................................................................... 29

*Reilly* v. *Natwest Mkts. Grp. Inc.*,
181 F.3d 253 (2d Cir. 1999) ......................................................................................... 21

*Republic of Argentina* v. *Weltover, Inc.*,
504 U.S. 607 (1992) ...................................................................................................... 30

*Rivera* v. *New York City Hous. Auth.*,
1998 WL 108032 (S.D.N.Y. Mar. 11, 1998) ............................................................... 21

*Ross Univ. Sch. of Med., Ltd.* v. *Brooklyn-Queens Health Care, Inc.*,
2012 WL 6091570 (E.D.N.Y. Dec. 7, 2012) ................................................................ 32

*Sun Forest Corp.* v. *Shvili*,
152 F. Supp. 2d 367 (S.D.N.Y. 2001) ........................................................................... 24

*Supply & Bldg. Co.* v. *Estee Lauder Int'l, Inc.*,
2000 WL 223838 (S.D.N.Y. Feb. 25, 2000) ................................................................ 25

*Torin Assocs.* v. *Perez*,
2016 WL 6662271 (S.D.N.Y. Nov. 10, 2016) .............................................................. 37

*UBS AG, Stamford Branch* v. *HealthSouth Corp.*,
645 F. Supp. 2d 135 (S.D.N.Y. 2008) ..................................................................... 26, 37

*Vera* v. *Saks & Co.*,
218 F. Supp. 2d 490 (S.D.N.Y. 2002) ........................................................................... 23

*Zurich Ins. Co.* v. *Shearson Lehman Hutton, Inc.*,
   642 N.E.2d 1065 (N.Y. 1994) ............................................................................30

**STATUTES**

N.Y. Bus. Corp. L. § 203 ...........................................................................................4, 31

N.Y. Gen. Oblig. Law § 5-1401.......................................................................... *passim*

**OTHER AUTHORITIES**

17A C.J.S. Contracts § 383 (Apr. 2020) ......................................................................28

Fed. R. Civ. P. 30(b)(6).........................................................................................16, 21

Fed. R. Civ. P. 56(a) ...................................................................................................22

Michael Gruson et al., *Legal Opinions in International Transactions*,
   Int'l Bar Ass'n (4th ed. 2003) ..................................................................................14

Restatement (Second) of the Conflict of Laws § 187 (1971) .......................................29

Restatement (Second) of the Conflict of Laws § 198 (1971) .......................................29

Restatement (Third) of Agency § 4.01 (2006)..............................................................29

TriBar Opinion Comm., *Supplemental Report: Opinions on Chosen-Law
   Provisions Under the Restatement of Conflict of Laws*,
   68 Bus. Lawyer 1161 (2013) ....................................................................................14

TriBar Opinion Comm., *Third-Party "Closing" Opinions: A Report of the Tribar
   Opinion Committee*,
   53 Bus. Lawyer 591 (1998) ......................................................................................14

## GLOSSARY AND CITATION CONVENTIONS

This brief uses the following defined terms:

"2017 Notes" means the 5.25% Senior Notes due 2017 and the 8.5% Senior Notes due 2017, both issued by PDVSA.

"2020 Notes" means the 8.5% Senior Secured Notes due 2020 issued by PDVSA pursuant to the Indenture.

"2024 Notes" means the $1.37 billion in notes issued by CITGO Holding in July 2019.

"56.1 ¶ __" means the Local Rule 56.1 Statement of Undisputed Material Facts in Support of the Trustee and Collateral Agent's Motion for Summary Judgment.

"Brewer Rep." means the initial report of the PDVSA Parties' expert, Prof. Allan R. Brewer-Carías.  This report is attached as Exhibit 13 to the accompanying Declaration of Christopher J. Clark dated June 10, 2020.

"Brewer Rebuttal Rep." means the rebuttal expert report of Prof. Brewer-Carías. This report is attached as Exhibit 27 to the accompanying Declaration of Christopher J. Clark dated June 10, 2020.

"CITGO Holding" means CITGO Holding, Inc.

"CITGO Petroleum" means CITGO Petroleum Corporation.

"Ex.__" means the exhibits to the accompanying Declaration of Christopher J. Clark dated June 10, 2020.

"Collateral Agent" means defendant GLAS Americas LLC, the collateral agent of the 2020 Notes.

"Constitutional Chamber" means the Constitutional Chamber of the Supreme Tribunal of Justice of Venezuela.

"Credit Suisse" means Credit Suisse Securities (USA) LLC.

"Directing Holders" means (i) funds and accounts managed by affiliates of Ashmore Group plc, (ii) funds and accounts managed by affiliates of BlackRock, Inc., and (iii) funds and accounts managed by Contrarian Capital Management, LLC.

"DTC" means the Depository Trust Company.

"Exchange Offer" means the tender offer announced by PDVSA on September 17, 2016, and closed on October 28, 2016, to exchange 2017 Notes for 2020 Notes.

"Global Note" means, collectively, the Global Notes to which the Indenture refers, and that evidence the obligations of PDVSA, as issuer, and PDVSA Petróleo, as guarantor, to Cede & Co., which is the registered holder of the 2020 Notes. The Global Notes are attached as Exhibit 6 to the accompanying Declaration of Christopher J. Clark dated June 10, 2020.

"Governing Documents" means the Global Note, Indenture, and Pledge Agreement for the 2020 Notes.

"Hogan Lovells" means Hogan Lovells US LLP and Despacho de Abogados Miembro de Hogan Lovells (Hogan Lovells's former office in Caracas, Venezuela).

"Indenture" means the Indenture dated October 27, 2016, between PDVSA as issuer, PDVSA Petróleo as guarantor, the Trustee, the Collateral Agent, the Law Debenture Trust Company of New York as registrar, transfer agent, and principal paying agent, and Banque Internationale à Luxembourg, Société Anonyme as Luxembourg paying agent. The Indenture is attached as Exhibit 2 to the accompanying Declaration of Christopher J. Clark dated June 10, 2020.

"Offering Circular" means the Offering Circular for the 2020 Notes filed with the U.S. Securities and Exchange Commission. The Offering Circular is attached as Exhibit 1 to the accompanying Declaration of Christopher J. Clark dated June 10, 2020.

███████████ means the exhibits to the accompanying Declaration of ████████ dated June 10, 2020.

███████████ means to the initial report of the Trustee and Collateral Agent's expert, ████████████████ This report is attached as Exhibit 2 to the accompanying Declaration of ████████████ dated June 10, 2020.

████████████ means the rebuttal expert report of ██████ This report is attached as Exhibit 3 to the accompanying Declaration of ████████ ████ dated June 10, 2020.

"PDVH" means plaintiff PDV Holding, Inc.

"PDVSA" means plaintiff Petróleos de Venezuela, S.A.

"PDVSA Petróleo" means plaintiff PDVSA Petróleo S.A.

"PDVSA Parties" means PDVSA, PDVSA Petróleo, and PDVH.

"Pledge Agreement" means the Pledge and Security Agreement dated October 28, 2019, between PDVH as pledgor, PDVSA as issuer, PDVSA Petróleo as guarantor, the Collateral Agent, and the Trustee.  The Pledge Agreement is attached as Exhibit 3 to the accompanying Declaration of Christopher J. Clark dated June 10, 2020.

"Porzecanski Rep." means the initial report of the Trustee and Collateral Agent's expert, Prof. Arturo C. Porzecanski.  This report is attached as Exhibit 1 to the accompanying Declaration of Arturo C. Porzecanski dated May 30, 2020.

"Trustee" means defendant MUFG Union Bank N.A., the trustee of the 2020 Notes.

"Venezuela" means the Bolivarian Republic of Venezuela.

The Trustee and Collateral Agent respectfully submit this memorandum of law in support of their motion for summary judgment. The Trustee and Collateral Agent seek the dismissal of the Complaint; a declaratory judgment on their first through fifth counterclaims; a money judgment on their sixth and seventh counterclaims equal to the accelerated outstanding principal on the 2020 Notes and all unpaid interest thereon; and a judgment as to liability on their eleventh and twelfth counterclaims.

## PRELIMINARY STATEMENT

The PDVSA Parties' effort to use Venezuelan law to relieve them of their obligation to repay over a billion dollars is wholly without merit. That is so for two independent reasons. First, as the parties agreed, this dispute is governed by New York law, not the law of Venezuela. And under New York law, the transaction is entirely valid and enforceable. Second, the PDVSA Parties' claim that the debt is invalid under the law of Venezuela is a recent concoction that has no basis in that country's law. It is contrary to, among other things, binding precedent by Venezuela's high court; over a decade of published statements by their own Venezuela law expert; the contemporaneous opinions of PDVSA's counsel, Hogan Lovells, provided to the Trustee and Collateral Agent; ███████████████████████████ ███████████████████████; and the consistent practice of PDVSA and its subsidiaries over decades, including as recently as last week.

This action arises from a debt exchange in 2016 by PDVSA, the Venezuelan state-owned oil company. At PDVSA's solicitation, holders of dollar-denominated PDVSA notes due in 2017 surrendered approximately $2.8 billion of those notes in exchange for newly issued notes of PDVSA due in 2020. The 2020 Notes were secured by a pledge of 50.1% of the equity in CITGO Holding. CITGO Holding is the U.S.-based parent of CITGO Petroleum, a U.S.-based oil refiner. It is undisputed that the Exchange Offer was authorized by the boards of

directors of the PDVSA Parties.  At the time of the exchange, Nicolás Maduro was internationally recognized as the legitimate president of Venezuela.

The 2020 Notes are governed by New York law.  The Governing Documents provide for the broad and unrestricted application of New York law to "[a]ll matters arising out of or relating in any way whatsoever" to the 2020 Notes and the related transactions "without regard to the conflict of laws provisions thereof."  The parties' choice of New York law is standard practice in capital markets, and particularly the market for bonds, such as those here, issued to international investors by sovereigns and state-owned enterprises such as PDVSA. Investors are understandably wary of being subject to the local law of the issuing sovereign rather than to the law of an international capital center such as New York or England.  Local-law notes, therefore, trade at a discount, because, among other reasons, holders face the risk that the sovereign will attempt to manipulate its own law to the detriment of investors.

In 2019, more than two years after PDVSA issued the 2020 Notes, the United States ceased to recognize the Maduro regime, and recognized instead a government led by Interim President Juan Guaidó.  The PDVSA Parties before this Court are now managed by ad hoc boards appointed by the Guaidó administration.  A coalition of parties opposed to the Maduro regime, including the party led by Interim President Guaidó, also controls the National Assembly (the country's legislature).  The Maduro regime, however, remains in effective control inside Venezuela, and consequently controls PDVSA's assets and operations within that country.

The PDVSA Parties, under the control of new boards and a new Venezuelan government, now ask the Court to hold that the 2020 Notes and the CITGO pledge are invalid as a matter of Venezuelan law.  They contend that the Court should disregard the New York law to which those entities agreed.  And they argue—squarely contradicting express representations

they made at the time of the 2016 exchange that the transaction was fully valid and authorized, and the formal written opinions of their counsel provided to the Trustee and Collateral Agent—that the transaction should be deemed invalid under the Venezuelan Constitution.  That is so, they contend, because the agreements governing the transaction were allegedly "contract[s] of national interest" that, under Article 150 of the Venezuelan Constitution, were required to be approved by the National Assembly.

   The PDVSA Parties' contentions are without merit and should be rejected.

   *First*, under governing New York law, made applicable by the broad governing law provisions to which the PDVSA Parties agreed, the 2020 Notes and the Governing Documents are valid and enforceable.  Section 5-1401 of the New York General Obligations Law requires that, where the parties agree to the application of New York law, that law, and the law of "no other state," shall apply.  *Ministers & Missionaries Benefit Bd*. v. *Snow*, 45 N.E.3d 917, 923–24 (N.Y. 2015).  In *IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*, 982 N.E.2d 609 (N.Y. 2012), the New York Court of Appeals squarely rejected a claim by a Brazilian corporation—identical in all relevant respects to the PDVSA Parties' central contention here—that a guarantee it gave was void because it was never authorized by the guarantor's board of directors as Brazilian law allegedly required.  The Court of Appeals held that the New York choice-of-law provision precluded any consideration of Brazilian law.

   Rigorous enforcement of agreements to apply New York law is critical to the international capital markets, and to New York's status as a center of those markets.  Accepting the PDVSA Parties' argument would increase the cost of capital for foreign sovereigns and state-owned companies.  Investors could not rely on New York choice-of-law provisions (no matter what assurances the debtors may give).  They would be required to investigate the often

uncertain requirements of local law.  And they would face the risk of belated claims by debtors that local law allows them to avoid their obligations.

Under New York law, the PDVSA Parties cannot avoid repaying their debts by arguing that they lacked capacity or authority to agree to the transactions or by invoking the doctrine of ultra vires.  PDVSA is a corporate entity with full capacity to issue debt.  It has done so dozens of times for decades.  The Boards of Directors of the PDVSA Parties had actual and apparent authority to act on their behalf.  As for ultra vires, New York has long since abolished that defense both by statute, N.Y. Bus. Corp. L. § 203, and under the common law, as to both domestic and foreign corporations.  A contention by the PDVSA Parties that the actions by their prior boards were illegal might give grounds for claims by those parties against their former directors.  It does not, however, entitle them to escape otherwise valid debt owed to third parties.

*Second*, PDVSA Petróleo unconditionally guaranteed the 2020 Notes, and New York law prohibits an unconditional guarantor, with inapplicable exceptions, from asserting *any* defense, including a defense of alleged illegality under foreign law.

*Third*, the PDVSA Parties' Venezuelan law claim is contrary to New York public policy.  The PDVSA Parties' theory is that Article 150 of the Venezuelan Constitution required the 2020 Notes to be approved by the National Assembly solely because the contractual counterparties, the Trustee and Collateral Agent, were non-Venezuelan corporations.  New York courts do not enforce foreign laws that discriminate in this manner.

*Fourth*, although there is no need for this court to decide any Venezuelan legal issues, the record shows beyond serious question that the PDVSA Parties' claim is contrary to clear Venezuela law.  Among other things:

1.     Article 150, the provision of the Venezuelan Constitution on which the PDVSA Parties rely, makes no mention of any purported requirement for National Assembly approval of contracts involving state-owned companies such as PDVSA.  Nor does any Venezuelan statute impose such a requirement.  On the contrary, the primary Venezuelan statute governing public debt issuances expressly *exempts* PDVSA from any requirement of legislative approval.

2.     No Venezuelan court has ever held that Article 150 requires that transactions involving PDVSA must have National Assembly approval.  On the contrary, the Constitutional Chamber of the Venezuelan high court—under the Venezuelan Constitution, the ultimate arbiter of Venezuelan constitutional law—has repeatedly held that Article 150 applies *only* to contracts entered into by the Republic itself (and that satisfy other criteria).

3.     The PDVSA Parties' claim is contrary to the repeated statements in writing of their own Venezuela law expert prior to his expert report in this case.  In multiple academic publications over more than a decade, their expert has acknowledged that under the decisions of the Constitutional Chamber, Article 150 does not require legislative approval of contracts involving PDVSA.  In his own words, "The Constitutional Chamber of the Supreme Tribunal of Justice, as the highest and last interpreter of the Constitution . . . established a binding interpretation, and reduced the category of 'public interest contracts' (art. 150 C.) to those signed or concluded by the Republic, the States, and the Municipalities, thus ***excluding from such a classification those contracts concluded by autonomous institutes or national public enterprises such as PDVSA***."  *See infra*, p. 40.  The unexplained and unsupported 180-degree turnaround in his expert report in this case cannot be credited.

4.     PDVSA's Venezuelan counsel in the transaction, the Caracas office of the international law firm Hogan Lovells, provided opinion letters at the time of the transaction to

the Trustee and the Collateral Agent (among others) that all legal requirements for approval of

the transaction under Venezuela law had been satisfied.  *See infra*, pp. 13–14.

5.    ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████    *See infra*, p. 15.

6.    In the more than 40 years since PDVSA was first incorporated, ██████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████    Nor did PDVSA seek or obtain legislative approval for other major transactions,

including its purchase of CITGO Petroleum itself.

7.    According to the PDVSA Parties, ownership of CITGO Holding is of such critical

significance to Venezuela that any secured debt issuance placing that ownership at risk must be

approved by the legislature.  Recent actions by the PDVSA Parties squarely contradict this claim.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████.  Also without Assembly approval,

CITGO Petroleum announced just last week that it would offer more than $1 billion in secured

notes.

8.    Independently, a Venezuelan court would enforce the 2020 Notes and the

Governing Documents—even if Assembly approval was required, but not obtained—to protect

the Trustee and Collateral Agent's legitimate expectations, in light of the PDVSA Parties'

representations of validity and their multi-decade history of issuing debt without legislative approval.

* * *

The motion by the Trustee and Collateral Agent for summary judgment should be granted.

## Statement of Undisputed Facts

### A.    The Parties and Other Relevant Entities.

PDVSA is an oil and natural gas company that is wholly owned by the Bolivarian Republic of Venezuela.  56.1 ¶¶ 3, 5.  PDVSA is the issuer of the 2020 Notes.  *Id.* ¶ 165. PDVSA is legally separate from the Republic.  *Id.* ¶ 12.  It has its own assets and liabilities and more than 100,000 employees, who are not employed by the Republic.  *Id*. ¶¶ 10, 11.  PDVSA Petróleo is a wholly owned subsidiary of PDVSA, and the guarantor of the 2020 Notes.  *Id.* ¶¶ 13, 167.  PDVH, another wholly owned subsidiary of PDVSA, is incorporated in Delaware and has its principal place of business in Houston, Texas.  *Id.* ¶¶ 15–16.  PDVH is the pledgor of the collateral for the 2020 Notes.  *Id.* ¶ 168.  That collateral consists of 50.1% of the equity of CITGO Holding, which is the parent of CITGO Petroleum.  *Id.*  ¶ 115.

CITGO Holding and CITGO Petroleum are incorporated in Delaware and have their principal place of business in Houston, Texas.  *Id.* ¶¶ 21, 23.  CITGO Petroleum refines and markets petroleum products.  *Id.* ¶ 24.  ██████████████████████████ ██████████████████████  *Id.* ¶ 30.  CITGO Petroleum and its predecessors date back to 1910. *Id.* ¶ 27.  PDVSA acquired a 50% interest in CITGO Petroleum in 1986, and the remaining 50% in 1990.  *Id.* ¶ 26.  Prior to 1986, PDVSA had no direct or indirect ownership interest in CITGO Petroleum.  *Id*. ¶ 29.  The relationship between PDVSA, PDVSA Petróleo, PDVH, CITGO Holding, and CITGO Petroleum is depicted below.



MUFG Union Bank, N.A. is the Trustee under the Indenture and Pledge Agreement for the 2020 Notes. *Id.* ¶¶ 167–68. The Trustee is a federally chartered national banking association with offices in New York. *Id.* ¶ 31.

GLAS Americas LLC is the Collateral Agent under the Indenture and Pledge Agreement. *Id.* ¶¶ 167–68. The Collateral Agent is a New York limited liability company and, at the time of the Exchange Offer, its principal place of business was in New York. *Id.* ¶ 32. The Trustee and the Collateral Agent have served in those roles since the Indenture and Pledge Agreement were executed in 2016. *Id.* ¶ 33.

The Trustee and Collateral Agent are directed in this litigation by the Directing Holders, which are beneficial owners of a majority of outstanding 2020 Notes, and which are based in the United States and the United Kingdom. *Id.* ¶¶ 34–37. The Directing Holders are not parties to the litigation or to the Governing Documents. *Id.* ¶ 38.

**B.      The 2016 Exchange Offer.**

Between 2007 and 2011, PDVSA issued more than $9 billion in principal amount of unsecured 2017 Notes due in April and November 2017. 56.1 ¶¶ 39, 41. The 2017 Notes were denominated in U.S. dollars, governed by New York law, and administered by a trustee in

New York.  *Id.* ¶¶ 46–49.  PDVSA did not obtain approval from the National Assembly before

issuing the 2017 Notes, ███████████████████████████████████  *Id.* ¶¶ 44–45.

   Between the issuance of the 2017 Notes and the Exchange Offer, PDVSA's credit

ratings declined substantially.  *Id.* ¶¶ 54–57.  Among other factors, the credit rating agencies

cited the sustained decline in crude oil prices.  *Id.* ¶¶ 58–63.

   On September 17, 2016, PDVSA announced the Exchange Offer, by which

PDVSA offered to exchange 2017 Notes for 2020 Notes, in an Offering Circular filed with the

U.S. Securities and Exchange Commission.  *Id.* ¶ 113.  The Exchange Offer had the purpose and

the effect of extending the maturities of PDVSA's debt profile during a period of low crude oil

prices.  *Id.* ¶¶ 120–22.  Market analysts, citing the same factors, viewed the transaction as

beneficial to PDVSA.  *Id.* ¶¶ 123–31.  For example, Alejandro Grisanti and Luisa Palacios—two

financial analysts who were later appointed, in 2019, to the ad hoc boards of PDVSA and

CITGO Holding, respectively—both expressed support for the transaction.  *Id.* ¶ 129.

   By October 21, 2016, 39.43% of 2017 Notes, with a face amount of

approximately $2.8 billion, were tendered.  *Id.* ¶ 164.  Because less than 50% of the 2017 Notes

were tendered, PDVSA had no obligation to close.  *Id*. ¶ 119.  But PDVSA waived that

condition, completed the Exchange Offer with those holders who had tendered, and issued

approximately $3.4 billion in principal amount of 2020 Notes.  *Id.* ¶ 165.

  **C.** **The PDVSA Parties' Boards of Directors and**
    **Corporate Officers Approved the Exchange Offer.**

   PDVSA and PDVSA Petróleo are each incorporated in Venezuela as a *sociedad*

*anónima*.  56.1 ¶¶ 4, 14.  A *sociedad anónima* is a corporation.  *Id.* ¶ 6.  It is a legal person,

███████████████████████████████  with the capacity to enter into contracts,

and its shareholders are not liable for its debts.  *Id.* ¶¶ 8–9.  The Articles of Incorporation for

PDVSA and PDVSA Petróleo allow their boards of directors, among other things and without any relevant limitations, to "authorize the execution of contracts." *Id.* ¶¶ 76, 84.  In accordance with the companies' respective Articles, the boards of directors of PDVSA, PDVSA Petróleo, and PDVH (a Delaware corporation) authorized the execution of the Governing Documents to which each is a party, and the Governing Documents were executed by appropriate corporate officers.  *Id.* ¶ 74.  The PDVSA Parties delivered "Officer's Certificates" and "Incumbency Certificates" to the Trustee and Collateral Agent (among others) certifying that these individuals were duly appointed and authorized to sign.  *Id.* ¶¶ ██, 206, 209.

      **D.**     **The PDVSA Parties Agreed to Broad New York Choice-of-Law Clauses.**

Each of the Governing Documents for the 2020 Notes contained a broadly worded New York-choice-of-law clause.  The Global Note, for example, provided:

> This note shall be construed in accordance with, and ***this note and all matters arising out of or relating in any way whatsoever to this note*** (whether in contract, tort or otherwise) ***shall be governed by, the laws of the State of New York*** without regard to the conflicts of law provisions thereof (other than Section 5-1401 of the New York General Obligations Law).

Ex. 6 § 18 (emphasis added; capitalization altered).  Choice of law provisions in the Indenture and the Pledge Agreement are substantially identical. Ex. 2 § 10.03; Ex. 3 § 3.01(d).  These broad choice-of-law clauses contrast with narrower clauses found in certain of Venezuela's sovereign bonds, which expressly exclude from the application of New York law any issues "with respect to the authorization and execution of the global bonds, which will be governed by the laws of the Republic."  56.1 ¶ 508.

The PDVSA Parties acknowledged the validity and enforceability of the contractual choice of New York law in the Pledge Agreement.  They represented that the choice of New York law "is a valid choice of law under the laws of Venezuela . . . , and none of the

[PDVSA Parties] knows of any reason why the courts of Venezuela would not give effect to such choice of law." Ex. 3 § 7.13(d).

     **E.**    **The Exchange Offer Was Centered in New York.**

      As discussed below, under N.Y. General Obligations Law § 5–1401, the parties' agreement to apply New York law is enforceable without regard to the contract's relation to New York.  Nevertheless, New York was the geographic focus of the Exchange Offer.

      *The Trustee, Collateral Agent, and other parties involved in the Exchange Offer were located in New York*.  The New York offices of both the Trustee and Collateral Agent were involved in the issuance of the 2020 Notes.  56.1 ¶¶ 186–88.  New York is also the location of the principal offices of Law Debenture Trust Company of New York (the Registrar, Transfer Agent, and Principal Paying Agent) and DTC (the Depositary for the Notes).  *Id.* ¶¶ 161, 191.

      *The Exchange Offer was negotiated in New York*.  ████████████████

████████████████████████████████

███████████████████████████

████████████████████████████

██████████████████████████ ██ ████████

███████████████████████████████

██ ████ as did the principal personnel of the Trustee and Collateral Agent, and their lawyers.  *Id.* ¶¶ 186–87.  ███████████████████████

████████████████████████████

█████████████████

      *Significant holders of the 2017 Notes were located in New York*.  The tender offer was made to holders of the 2017 Notes.  ████████████████████

████████████████████ ██████████████████

█████████████████████████████████████████████████

████████   Among the New York holders solicited by the PDVSA Parties was BlackRock, one

of the Directing Holders.  *Id.* ¶ 35.

       ***The 2017 Notes were tendered in New York***.  Exchanging holders were required

to communicate instructions to tender their 2017 Notes to DTC in New York (or else to one of

two European clearing banks).  *Id.* ¶ 192.

       ***The Global Notes were registered to a New York holder of record and deposited***

***in New York***.  The Global Notes for the 2020 Notes were deposited in New York with the Law

Debenture Trust Company, as custodian for DTC.  *Id.* ¶ 189.  The Global Notes were registered

in the name of Cede & Co., which is a partnership organized under New York law, with its

headquarters located in New York.  *Id.* ¶ 194.  Cede & Co. is the sole holder of record for the

Global Notes.  *Id.*

       ***The collateral is held in New York***.  The shares representing 50.1% of the stock

of CITGO Holding are held by the Collateral Agent in a vault in New York.  *Id.* ¶ 176.

       ***All payments under the 2020 Notes are required to be made in New York***.  The

Indenture provides that all payments of principal and interest due on the Notes are to be made to

the Principal Paying Agent "in New York, New York."  *Id.* ¶ 173.

    **F.**    **The PDVSA Parties Represented That the Governing Documents Were**
            **Valid, and Disclosed No Risk of Invalidity under Venezuelan Law.**

       In the Indenture and Pledge Agreement, the PDVSA Parties represented and

warranted that the Governing Documents were duly authorized, valid, and enforceable.  PDVSA

represented that it "has duly authorized the exchange" of 2017 Notes for the 2020 Notes and

"duly authorized the execution and delivery of this Indenture."  *Id.* ¶ 196.  PDVSA further

represented that it had done "all things necessary to make this Indenture a valid agreement" and

"all things necessary to make the [2020] Notes" its "valid obligations." *Id.* ¶ 199.  PDVSA

Petróleo and PDVH made similar representations.  *Id.* ¶¶ 200–05.  PDVH represented that the

Pledge Agreement "require[d] no additional action by or in respect of, or filing with, any

governmental authority, except such as have been taken or made on or before the date hereof and

remain in full force and effect" and would "not contravene any Applicable Law," which was

defined to include Venezuelan law.  *Id.* ¶ 202.  The PDVSA Parties made similar representations

in "Officer's Certificates" delivered to, among others, the Trustee and Collateral Agent.  *Id.*

¶¶ ███, 206.

       The PDVSA Parties made no disclosure to the Trustee, the Collateral Agent, or

potential investors in the 2020 Notes of any risk that the Governing Documents might be deemed

invalid under the law of Venezuela or any other jurisdiction.  The Offering Circular contained

twenty-eight pages of detailed risk disclosures.  But none called into question the PDVSA

Parties' representations or warranties that the 2020 Notes and the Governing Documents were

lawful, valid, and enforceable, or identify any risk that the 2020 Notes might be invalid because

they were not approved by the National Assembly.  *Id.* ¶¶ 338–40.

      **G.**    **PDVSA's Counsel, Hogan Lovells, Determined That the**
             **Governing Documents Were Valid, and So Represented**
             **to the Trustee, the Collateral Agent, and Investors.**

       PDVSA's New York and Venezuelan legal counsel, the New York and Caracas

offices of Hogan Lovells, concluded that the transaction was lawful under both New York and

Venezuelan law.  On October 28, 2016, they delivered unqualified opinion letters to that effect

to, among others, the Trustee and Collateral Agent.  *Id.* ¶ 339.  The letter from Hogan Lovells's

New York office said that the Governing Documents constituted a "legal, valid and binding

obligation, as applicable, under New York State Law" of the PDVSA Parties.  *Id.* ¶ 341.  The

letter from Hogan Lovells's Caracas office said that the Exchange Offer and Governing

Documents "do[] not violate Venezuelan Law . . . [or] conflict with or violate any Venezuelan law, rule, regulation, order, judgment or decree" and that "[n]o approval, authorization or consent of . . . any governmental agency or governmental authority in Venezuela is required to be obtained." *Id*. ¶¶ 344–45.  Hogan Lovells's opinion letters did not identify any risk that the 2020 Notes might be subject to challenge under Venezuelan law.  The Officer's Certificates delivered to the Trustee and Collateral Agent, among others, certified that the PDVSA Parties "kn[e]w of no facts, circumstances or events that are contrary or inconsistent with any of the statements or opinions contained in the [Hogan Lovells] Opinions." *Id*. ¶ 206.  The Offering Circular assured investors that Hogan Lovells had "passed upon" New York and Venezuelan legal matters. *Id*. ¶ 335.

The Trustee and the Collateral Agent were not alerted by Hogan Lovells or anyone else that the issuance of the 2020 Notes or the execution and delivery of the Indenture and Pledge Agreement violated Venezuelan law, or that there was any question whether the Governing Documents were enforceable. *Id*. ¶¶ 332–33.  The Directing Holders likewise relied upon the identification of Hogan Lovells in the Offering Circular and believed that Hogan Lovells would not have allowed the Offering Circular to omit a material legal risk. *Id*. ¶¶ 334–36.  These beliefs were reasonable under applicable professional standards governing "closing" opinions such as these. *See, e.g.*, TriBar Opinion Comm., *Third-Party "Closing" Opinions: A Report of the Tribar Opinion Committee*, 53 Bus. Lawyer 591, 602–03 (1998); TriBar Opinion Comm., *Supplemental Report: Opinions on Chosen-Law Provisions Under the Restatement of Conflict of Laws*, 68 Bus. Lawyer 1161, 1166–68 (2013); Michael Gruson et al., *Legal Opinions in International Transactions*, Int'l Bar Ass'n, 14, 16–17, 48–49, 152–53, 243–46 (4th ed. 2003).

Hogan Lovells also represented to holders of the 2017 Notes that the transaction was lawful. *Id.* ¶¶ 341–48. Hogan Lovells told Directing Holder Ashmore that "[t]he Pledge Agreement will be governed under New York law. . . .  The Collateral Agent will have all rights under the UCC (i.e., Unite[d] States laws in connection with granting of security interests) with respect to the Pledge." *Id.* ¶ 361. ████████████████████████

██████████████████████████████████████

████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

*Id.* ¶¶ 362–64 (emphasis added).

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
██████████████████████████
████████████████████████████
████████████████████████████
████████████████

**H.      For Its Entire 44-Year History, PDVSA Has Consistently Issued Debt and Engaged in Other Consequential Transactions Without National Assembly Approval.**

The PDVSA Parties' representations ████████████████████████████ ████████████████████████████████████████████████████, were

consistent with PDVSA's unchanging practice since its founding in 1976.  PDVSA and its

subsidiaries, including CITGO Holding and CITGO Petroleum, have issued billions of dollars of

secured and unsecured debt in dozens of transactions, and also engaged in other major business

transactions, ████████████████████████████. *Id.* ¶¶ 376–77.

That history stretches back decades before the present political crisis, before the Presidency of

Nicolás Maduro (2013 to 2019), and before that of his predecessor Hugo Chávez (1999 to 2013).

*Id.* ¶¶ 28, 473–99.  Among other things, ████████████████████████

████████████████████████████████████████████

████████████████████████████ *Id.* ¶¶ 475, 497.

That history also includes the purchase and sale of major assets, ████████████████

██████████████ *Id.* ¶¶ 473–99.

████████████████████████. *Id.* ¶ 477.

That practice continued after the Exchange Offer and the U.S. recognition of

Interim President Guaidó. ████████████████████████████████

████████████████████████████████. *Id.*

¶ 474. ████████████████████████████████

████████████████████████████████

████████████ *Id.* ¶ 475. ████████████████████

████████████████████████████████

████████████████████ *Id.* ¶¶ 478–82.  Yet this transaction has the same

16

practical effect and poses the same ownership risk to Venezuela as the CITGO Pledge, which the

PDVSA Parties claim is invalid. ███████████████████████████

███████████████████ *Id.* ¶ 498. ██████████████████

████████████████ *Id.* ¶¶ 473–99. ████████████████

████████████████████████████ *Id.* ¶ 477.



### I.   While Some Venezuelan Politicians Criticized the Exchange Offer in 2016, the National Assembly Declined to Declare the Exchange Offer Illegal or Void.

In September and October 2016, while the Exchange Offer was open, Maduro

was the President of Venezuela, and the United States recognized his administration as the

country's legitimate government.  *Id*. ¶ 66.  In the December 2015 legislative elections, an

opposition coalition took control of Venezuela's National Assembly.  *Id.* ¶¶ 72–73.

In 2016 and 2017, the opposition-led National Assembly condemned as

unconstitutional other contracts, not related to the 2020 Notes, that it contended should have

been, but were not, submitted to the National Assembly for approval.  *Id.* ¶¶ 284–305.  For

example, on June 15, 2016, the National Assembly passed a resolution condemning certain

mining concessions as "illegally granted" by Venezuela without "authorization of the National

Assembly, in accordance with the provisions of articles 150."  *Id*. ¶ 304.  In another example, on

April 18, 2017, the National Assembly condemned the government's use of gold swaps to

guarantee bank loans, and other transactions, as an "absolute nullity, for contravening the

provisions of article[ ] 150 . . . of the Constitution."  *Id*. ¶ 305.

The National Assembly issued no such declaration here.  ████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████    Another senior Justice First deputy, Julio Borges, was reported to

have said the same.  *Id.* ¶ 289.

        In a resolution passed on September 27, 2016, the National Assembly criticized

PDVSA for agreeing to the Exchange Offer, *id.* ¶ 292, but did not assert that the Exchange Offer

required National Assembly approval, or claim that it was illegal.  ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████    *Id.* ¶ 301.

        The market noted that the National Assembly resolution did not declare the

Exchange Offer illegal.  One firm, Torino Capital, advised investors (including Ashmore and

BlackRock) that the resolution "does not state that the operation is illegal nor does it criticize it

on legal grounds," and investors credited that analysis.  *Id.* ¶¶ 295–99.

**J.     PDVSA Paid Principal and Interest on the 2020 Notes, and Acknowledged Them as a Valid Debt, until April 2019.**

        Between October 2016 and April 2019, the PDVSA Parties accepted the benefit

of the Exchange—the surrender of the exchanged 2017 Notes—and performed their obligations

under the Governing Documents without incident.  *Id.* ¶¶ 211–17.  PDVH deposited the

collateral with the Collateral Agent in New York.  *Id.* ¶ 176.  PDVSA paid interest and principal

five times on the 2020 Notes as they came due.  *Id.* ¶¶ 213–17.  The PDVSA Parties publicly

acknowledged the 2020 Notes as a valid, secured debt, for example, in their Consolidated

Financial Statements for 2016.  *Id.* ¶¶ 233–44.  The National Assembly did not criticize these

actions or attempt to block them.  *See id.* ¶¶ 211–17.

18

The 2020 Notes traded in the secondary market, in which New York plays a central role. *Id.* ¶ 258. For example, they were held by exchange-traded funds (ETFs). *Id.*

### K.    In 2019, the Venezuelan Opposition Gained Recognition by the United States, Took Control of PDVSA's Assets in the United States, and, Nine Months Later, Filed This Suit Alleging That the 2020 Notes Are Void.

In January 2019, the National Assembly declared Maduro illegitimate and elected Juan Guaidó, the Speaker of the National Assembly, as Interim President. *Id.* ¶¶ 306–07. Shortly thereafter, the United States government recognized Guaidó as the legitimate Interim President of Venezuela. *Id.* ¶ 308. The Maduro regime maintains territorial control in Venezuela (*id.* ¶¶ 510, 517, 553), but the ad hoc board appointed by the Guaidó administration has taken control of the PDVSA Parties' assets and litigation in the United States. *Id.* ¶¶ 18–19.

The PDVSA ad hoc board, as well as the National Assembly, voted to approve a payment of interest due on the 2020 Notes in April 2019. *Id.* ¶¶ 218–19. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

*Id.* ¶¶ 220–23, 228, 232. In October 2019, three days after obtaining a U.S. government order ████████████ to temporarily suspend the rights of the Trustee and Collateral Agent (which acts at the written direction of the Trustee) to enforce the Pledge Agreement, PDVSA failed to make payments of principal and interest due on October 27, 2019, and filed this suit seeking to have the 2020 Notes declared invalid. *Id.* ¶¶ 229, 259.

Under the terms of the Indenture, PDVSA's failure to make the payments due in October 2019 and its filing of this suit constitute four "Events of Default." *Id.* ¶¶ 260–66. On December 18, 2019, holders of a sufficient percentage of the outstanding 2020 Notes sent an acceleration notice to PDVSA and the Trustee. *Id.* ¶ 271. The acceleration notice rendered all

unpaid principal and interest immediately due and payable. *Id*. The outstanding unpaid principal is $1,683,764,500. *Id*. ¶ 273. Interest continues to accrue. *Id*. ¶ 274. PDVSA and PDVSA Petróleo are also liable for fees and expenses. *Id*. ¶¶ 277–78. If the Court grants this motion, the Trustee will submit an affidavit detailing the proper calculation of the judgment amount.

## L.     There Is No Evidence That Any Party to the Exchange Offer, or Any Noteholder, Believed That It Violated Venezuelan Law.

The PDVSA Parties opened their Complaint with the accusation that investors who participated in the Exchange Offer "provided the Maduro regime with a financial and political lifeline . . . *knowing* that the Exchange Offer was initiated without the required authorization of the National Assembly." Compl. ¶ 6 (emphasis added). The facts developed in discovery refute any claim that the exchanging holders believed that National Assembly approval was required, that the Governing Documents were invalid, or that the Exchange Offer violated Venezuelan law. The PDVSA Parties' allegation is inconsistent with the undisputed testimony of representatives of the Directing Holders (56.1 ¶¶ 334–37); the contemporaneous documents (*id*. ¶¶ 357–75); ████████████████████████████████████████

████████████    ████████████████████████████████████████

████████████████████████ (*id*. ¶¶ 339–56); the PDVSA Parties' contractual recitals and representations and warranties; and the PDVSA Parties' consistent historical practice. *See supra*, 14–20. The Trustee and the Collateral Agent likewise were not alerted to any question about the legality of the transaction, and, in executing the Indenture and the Pledge Agreement, did not intend to violate Venezuelan law. 56.1 ¶¶ 332–33.[1]

---

[1]    According to the expert report from David C. Hinman, CFA, submitted on behalf of the PDVSA Parties, market prices of the 2020 Notes were "consistent with" investors' alleged perception of invalidity risk. That opinion, however, is unreliable and inadmissible for the reasons explained in the rebuttal reports of Prof. Arturo Porzecanski and Timothy McKenna, Ph.D and the Trustee and Collateral Agent's separate motion to exclude Mr. Hinman's testimony.

Nor have the PDVSA Parties proffered any evidence that *they* intended to violate Venezuelan law. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *Id.* ¶¶ 521, 541.  In any event, for the reasons discussed below (pp. 23–34), any such intent would be irrelevant in light of the parties' agreement to apply New York law.

PDVSA and PDVSA Petróleo have claimed that the ad hoc board lacks access to personnel or documents in Venezuela, which, they have said, include any contemporaneous PDVSA emails (other than those of the ad hoc board itself, which was created in 2019), and accordingly they produced no such documents.  *Id.* ¶¶ 384, 510–11, 517–19.  In light of the PDVSA Parties' claimed lack of access to information during discovery relevant to their state of mind at the time of the Exchange Offer, they should not be permitted to offer any such evidence now.  *See, e.g.*, *Reilly* v. *Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 268–69 (2d Cir. 1999) (preclusion is proper when a party breaches its "affirmative duty" to produce a Rule 30(b)(6) witness "to give complete, knowledgeable, and binding answers on its behalf"); *Rivera* v. *New York City Hous. Auth.*, 1998 WL 108032, at *1 (S.D.N.Y. Mar. 11, 1998) ("[A] party who fails to produce requested information should not benefit from the resulting gaps in the evidentiary record"), *adopted by* 1998 WL 193230 (S.D.N.Y. Apr. 21, 1998).

**M.    Over the Past Year, the National Assembly Has Attempted to Change Venezuelan Law to Help the PDVSA Parties Escape Their Obligations.**

In a transparent effort to influence the outcome of this lawsuit, the National Assembly (which, as discussed above, was aligned with the Guaidó administration) has passed no fewer than four after-the-fact resolutions purporting to interpret Venezuela's Constitution. *First*, on October 15, 2019—on the eve of PDVSA's payment default and the commencement of this lawsuit—the National Assembly passed a resolution purporting to declare that the 2020

Notes violated Article 150 of the Constitution.  56.1 ¶ 311.  While the October 2019 resolution purported to "reiterate" the September 2016 resolution, *id.*, as discussed above, the September 2016 resolution did not declare the 2020 Notes illegal or invalid.  *Second*, on March 4, 2020, shortly after the Trustee and Collateral Agent had noticed a deposition of PDVSA about, among other topics, the 2016 pledge of a 49.9% interest in CITGO Holding to Rosneft (*see* p. 16, above), and just days before the scheduled deposition, the National Assembly passed a resolution purporting to condemn that transaction under Article 150 as null and void.  *Id.* ¶¶ 314–15.  *Third*, on April 28, 2020, after the Trustee and Collateral Agent had served an expert report that cited a 2016 decision of the Constitutional Chamber, and days before the deadline for rebuttal reports, the National Assembly passed another resolution purporting to declare that *all* cases decided by the Constitutional Chamber since December 23, 2015 were null and void.  *Id.* ¶ 316.  *Fourth*, only a month ago, on May 5, 2020, the National Assembly passed yet another resolution purporting to declare the 2020 Notes null and void.  *Id.* ¶ 322.

### LEGAL STANDARD GOVERNING THIS MOTION

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The party opposing summary judgment "may not rely upon the pleadings alone but must instead cite to 'particular parts of materials in the record' or show that 'the materials cited [by the movant] do not establish the absence . . . of a genuine dispute' as to any material fact."  *Hernandez* v. *City of N.Y.*, 2015 WL 321830, at *13 (S.D.N.Y. Jan. 23, 2015) (Failla, J.) (quoting Fed. R. Civ. P. 56(c)(1)).

"A prima facie case for recovery on a promissory note requires only proof of a note and failure to make payment."  *Dresser-Rand Co.* v. *Petroleós de Venezuela, S.A.*, 2020 WL 635523, at *2 (S.D.N.Y. Feb. 11, 2020).  "Once the plaintiff establishes a prima facie case, the

burden shifts to the [issuer] to prove the existence of a triable issue of fact relating to a bona fide defense against payment of the note." *In re Ampal-Am. Israel Corp.*, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015), *aff'd*, 2016 WL 859352 (S.D.N.Y. Feb. 28, 2016), *aff'd*, 677 F. App'x 5 (2d Cir. 2017).  To make a prima facie case for recovery on a guaranty, plaintiff "need only prove 'an absolute and unconditional guarantee, the underlying debt, and the guarantor's failure to perform under the guarantee.'" *Bank of N.Y. Mellon* v. *Omega Energy Int'l S.A.*, 2019 WL 4198676, at *3 (S.D.N.Y. Aug. 7, 2019).

A federal court in New York should apply New York conflict-of-law rules when, as here (56.1 ¶¶ 1–2), its jurisdiction is based on diversity of citizenship.  *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

## Argument

### I.     The 2020 Notes and the Governing Documents Are Valid and Enforceable under New York Law.

#### A.     The PDVSA Parties' Claims Are Subject to New York Law under the Choice-of-Law Provisions to Which the PDVSA Parties Agreed.

In each of the Governing Documents, the PDVSA Parties agreed to broad New York choice-of-law clauses that cover "*[a]ll matters arising out of or relating in any way whatsoever*" to the 2020 Notes, the Indenture, or the Pledge Agreement.  Ex. 6 at -599; Ex. 2 at 72; Ex. 3 at 22 (quoted in full *supra*, p. 10).  The PDVSA Parties' claim that the Governing Documents are "invalid, illegal, null and void *ab initio*, and thus unenforceable" (Compl. ¶¶ 83, 94) arises out of and relates to the Governing Documents, and is therefore covered by their agreement to submit to New York law.  *See, e.g.*, *Vera* v. *Saks & Co.*, 218 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) (claim that contract is illegal "arises out of" and "relates to" contract), *aff'd*, 335 F.3d 109 (2d Cir. 2003).

**B.     N.Y. Gen. Oblig. Law § 5-1401 Precludes Consideration of Venezuelan Law in Determining the Validity of the Governing Documents.**

Section 5-1401 of New York's General Obligations Law provides that where, as here, a transaction involves at least $250,000, "the parties to any contract . . . may agree that the law of [New York] shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state."

Section 5-1401 was enacted because the New York Legislature "feared" that, despite the parties' agreement to be governed by New York law, a court might "conduct a conflicts analysis" that might point to some other jurisdiction as having the "most significant relationship" and thus apply some other law. *IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*, 982 N.E.2d 609, 611 (N.Y. 2012), *cert. denied*, 569 U.S. 994 (2013). "[T]he Legislature was concerned about how that would affect the standing of New York as a commercial and financial center," and enacted the statute "to promote and preserve" that standing. *Id.* at 611–12. To engage in any "conflict-of-laws analysis," when § 5-1401(1) applies, would "frustrate the Legislature's purpose." *Id.* at 612.

Section 5-1401(1) requires a court to apply the substantive law of New York to any action that falls under the statute. *Ministers & Missionaries Benefit Bd.* v. *Snow*, 45 N.E.3d 917, 922–23 (N.Y. 2015). "[L]ogic dictates that, by including a choice-of-law provision in their contracts, the parties intended for *only* New York substantive law to apply"—and the law of "*no other state*." *Id.* at 923–24 (emphasis added); *Sun Forest Corp.* v. *Shvili*, 152 F. Supp. 2d 367, 388 (S.D.N.Y. 2001) ("Section 5–1401 does not provide for any exceptions that would permit a court to decline to enforce a choice-of-law clause . . . "). A party cannot escape a choice-of-law clause by claiming that the contract is invalid, but must show that the clause *itself* was the product of fraud or overreaching. *Sun Forest*, 152 F. Supp. 2d at 388–89.

24

Under these cases, Section 5-1401 precludes the PDVSA Parties' reliance on alleged requirements of Venezuelan law to escape their agreement that the Governing Documents are subject to the law of New York.  As courts have made clear, "[s]ince *Ministers* was handed down, . . . the courts of New York have refused to consider the public policy of *foreign states . . .* to overturn an otherwise valid contractual choice of law provision."  *Capstone Logistics Holdings, Inc.* v. *Navarrete*, 2018 WL 6786338, at *22 (S.D.N.Y. Oct. 25, 2018). "This is particularly evident because a requirement that New York courts consider the fundamental public policy of a *foreign law* would swallow whole the *Ministers* holding that courts need not engage in conflicts analysis."  *Id.; see also ABB, Inc.* v. *Havtech, LLC*, 112 N.Y.S.3d 713, 714 (1st Dep't 2019) (declining to give effect to public policy of Maryland, even with respect to dealer contract performed in Maryland); *BDC Mgmt. Servs., LLP* v. *Singer*, 2016 WL 75603, at *7 (Sup. Ct. N.Y. Cty. Jan. 7, 2016) (declining to give effect to public policy of New Jersey law regulating dental offices located in New Jersey); *Hamilton Capital VII, LLC, I* v. *Khorrami, LLP*, 2015 WL 4920281, at *6 (Sup. Ct. N.Y. Cty. Aug. 17, 2015) (declining to give effect to California Constitution provisions concerning usury, even with respect to California borrower); *Supply & Bldg. Co.* v. *Estee Lauder Int'l, Inc.*, 2000 WL 223838, at *3 (S.D.N.Y. Feb. 25, 2000) (declining to give effect to public policy of Kuwait, even with respect to contract performed there, because "the clear provisions of section 5–1401 make no exception for a foreign state's public policy").

The New York Court of Appeals' decision in *IRB* is on point.  There, a Brazilian corporation guaranteed notes issued by Uruguayan company, and the notes and guaranty were governed by New York law.  982 N.E.2d at 610.  In defense of an action on the guaranty, the Brazilian guarantor argued that the guaranty was "void under Brazilian law because it was never

authorized by [the guarantor's] board of directors," as Brazilian corporate law allegedly required. *Id*.  The Court of Appeals squarely rejected that argument; the Court held that Section 5-1401 forbade any consideration of Brazilian law.  *Id*. at 612.  Here too, the PDVSA Parties cannot avoid their obligations under the 2020 Notes on the ground that foreign law purportedly required additional approvals.

### C.   The Governing Documents Are Valid and Enforceable under New York Law.

Consistent with *IRB* and other governing case law, the Governing Documents are valid and enforceable contracts because the PDVSA Parties' officers executed them with both actual and apparent authority, and because the PDVSA Parties ratified them.

***The PDVSA Parties Had Actual Authority***.  Under New York law, there is no question that the approvals of the PDVSA Parties' Boards of Directors and the signatures of their corporate officers (*supra*, pp. 9–10) were sufficient to bind the PDVSA Parties to the Governing Documents.  *See, e.g.*, *UBS AG, Stamford Branch* v. *HealthSouth Corp.*, 645 F. Supp. 2d 135, 144–45 (S.D.N.Y. 2008) (holding that there was "no question" that board of directors resolution "conferred express actual authority").

***The PDVSA Parties Had Apparent Authority***.  The PDVSA Parties' Boards of Directors and signatories also had apparent authority, particularly in light █████████████  ███████████████████████ (*supra*, pp. 16–17), their delivery of Incumbency Certificates and Officer's Certificates and making of representations and warranties (*supra*, pp. 10, 13–14), ████████████████████████████████████████████████ ████████ (*supra*, pp. 16–18).  *See, e.g., Indosuez Int'l Fin. B.V.* v. *Nat'l Reserve Bank*, 774 N.E.2d 696, 699–701 (N.Y. 2002) (director of Russian bank had apparent authority to sign currency

26

swap contracts governed by New York law, despite purported Russian law requiring corporation's "accountant general" to approve such transactions).

*The PDVSA Parties Ratified the 2020 Notes, the Indenture, and the Pledge Agreement*. The PDVSA Parties ratified the Governing Documents when they accepted the benefit of the Exchange Offer—namely, the surrender by investors of $2.8 billion of 2017 Notes and the consequent three-year extension of PDVSA's repayment obligations. *See supra*, p. 9; *IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*, 922 N.Y.S.2d 308, 311 (1st Dep't 2011) (finding that guaranty was ratified by "acceptance of benefits flowing from [the loan] agreement"), *aff'd*, 982 N.E.2d 609 (N.Y. 2012); *see also John Hancock Life Ins. Co. of N.Y.* v. *Solomon Baum Irrevocable Family Life Ins. Tr.*, 783 F. App'x 89, 90 (2d Cir. 2019). The PDVSA Parties continued to ratify the contracts by making five principal and interest payments, and by publicly acknowledging the 2020 Notes as a valid secured debt. *See supra*, pp. 19–20; *Citibank, N.A.* v. *Silverman*, 922 N.Y.S.2d 56, 57 (1st Dep't 2011) (defendant ratified debt by "listing it on a net worth statement and making interest payments on the debt").

The PDVSA Parties' contention that the interest payment in April 2019 was made "under protest" is irrelevant. For more than two years before that payment, all of PDVSA's payments on the Notes were made following approval by board members appointed by the then-recognized, legitimate government of Venezuela, without any challenge or objection from the National Assembly regarding the legality of the 2020 Notes. 56.1 ¶¶ 66, 167–70. Even as to the April 2019 payment, with the new PDVSA board in place, ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ *See supra*, pp. 19–20. That amounts to a ratification. *See Amusement Indus.*

v. *Citigroup Glob. Mkts. Realty Corp.*, 421 B.R. 659, 684 (Bankr. S.D.N.Y. 2009) (a party "cannot have its cake and eat it too" by purporting to preserve its rights while seeking "to reap its perceived benefits" by not promptly asserting those rights).  Moreover, since the PDVSA Parties have at all times retained the benefits of the Exchange Offer, the Trustee and Collateral Agent, at the direction of the Directing Holders, elect to treat the PDVSA Parties' conduct as ratification notwithstanding the PDVSA Parties' purported repudiation.  *See* Restatement (Third) of Agency § 4.01 (2006).

        The PDVSA Parties cannot defeat this showing of ratification on the ground that the Governing Documents are allegedly illegal.  There can be no claim that the Governing Documents were illegal in New York, the jurisdiction of performance.  And contracts merely lacking government licensure or authorization can be ratified because, standing alone, the mere absence of government approval is not *malum in se* (evil in and of itself).  17A C.J.S. Contracts § 383 (Apr. 2020); *Quartey* v. *AB Stars Prods., S.A.*, 697 N.Y.S.2d 280, 283 (1st Dep't 1999) (where the defendant lacked government license to promote a boxing match, the promotion agreement was "merely *malum prohibitum*," not "illegal per se").

### D.    The PDVSA Parties Had the Capacity to Contract.

        In recent public statements, the PDVSA Parties have attempted to recharacterize their claim as a question of their "capacity" to contract.  56.1 ¶ 310.  That maneuver is flawed because, as Gen. Oblig. Law § 5-1401 requires, New York law governs the issue of a contracting party's capacity.  And, under New York law, the PDVSA Parties had capacity to agree to the Governing Documents, and, in any event, may not avoid their obligations to third parties based upon alleged lack of capacity.

        ***New York law governs the PDVSA Parties' capacity.***  Under New York's conflict-of-law rules, questions such as capacity to contract are decided under the law chosen in

the contract (or, if there is no choice-of-law clause, by the law chosen by the "grouping of

contacts" test). *See, e.g.*, *Int'l Minerals & Res., S.A.* v. *Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)

(under New York conflict of law rules, a choice-of-law clause governs "contract formation

issue[s]"); *Berkley Assur. Co.* v. *MacDonald-Miller Facility Sols., Inc.*, 2020 WL 1643866, at

*1–2 (S.D.N.Y. Apr. 1, 2020); *see also IRB*, 982 N.E.2d at 610, 612 (holding that New York

choice-of-law clause governed question of proper corporate authorization); *Indosuez*, 774 N.E.2d

at 635 (same). Gen. Oblig. Law § 5-1401 requires this result. *See supra*, pp. 24–26.

New York law is consistent with part of the Restatement approach, which also

provides that the law chosen by the parties should govern questions such as capacity.

Restatement (Second) of the Conflict of Laws §§ 187(2) & cmt. d, 198(1) & cmt. a (1971). But

New York law diverges from the Restatement in an important respect. Under the Restatement,

there are two circumstances in which capacity could be governed by some other law:

> (a) the chosen state has *no substantial relationship* to the parties or the transaction
> and there is *no other reasonable basis* for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a *fundamental
> policy* of a state which has a *materially greater interest* than the chosen state in
> the determination of the particular issue and which . . . *would be the state of the
> applicable law* in the absence of an effective choice of law by the parties.

*Id.* § 187(2)(a)–(b) (emphasis added). These exceptions call for a conflicts-of-law analysis of the

type prohibited by General Obligation Law § 5-1401, and thus are of no import here.

Neither exception would apply here anyway. New York has a "substantial

relationship" to the parties and to the transaction, and there was a "reasonable basis" for the

choice of New York law. As shown above (pp. 11–12), the Exchange was centered in New

York. *See, e.g.*, *Radioactive, J.V.* v. *Mason*, 153 F. Supp. 2d 462, 471 (S.D.N.Y. 2001) (holding

New York had a substantial relationship to the transaction where "[a]t least some" of the

negotiations took place in New York, and "some" performance took place in New York).

29

Nor does Venezuela have a "materially greater interest" than New York.  "New York has an *overriding and paramount* interest" in maintaining its status as "a financial capital of the world," which demands that the "justified expectations of the parties" to contracts governed by New York law be protected.  *J. Zeevi & Sons* v. *Grindlays Bank (Uganda)*, 333 N.E.2d 168, 172–73 (N.Y. 1975) (emphasis added).  Any contrary alleged interest of Venezuela is necessarily lessened by the fact that these transactions were centered in New York, and by the substantial Venezuelan law authority contrary to the PDVSA Parties' position (*see infra* Part III).  It is also undermined by the long history of debt issuances by PDVSA and its subsidiaries—

███████████████████████████████████████████████████████████

███████████████████, as well as unsecured debt issued to U.S. investors that, if unpaid, likewise threaten PDVSA's control of CITGO Holding and CITGO Petroleum.

Finally, New York law would apply absent the choice-of-law clauses.  In such cases, New York law considers the "'center of gravity' or 'grouping of contacts.'"  *Zurich Ins. Co.* v. *Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994) (quoting *Auten* v. *Auten*, 124 N.E.2d 99, 101 (N.Y. 1954) and Restatement (Second) of Conflict of Laws § 188 (1971)).  The relevant contacts are: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile or place of business of the contracting parties."  *Maryland Cas. Co.* v. *Cont'l Cas. Co.*, 332 F.3d 145, 151–52 (2d Cir. 2003).

Here, all five factors point to New York law.  ███████████████████

███████████████████████████████████████████████████  New York is designated in the agreements as the place of performance.  *Id.* ¶ 173; *see Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 608 (1992) (New York was the "place of

performance" because bonds designated "accounts in New York as the place of payment" "and

Argentina made some interest payments into those accounts" before defaulting).  The "subject

matters" of the Exchange Offer—i.e., the 2020 Notes and their Collateral—are located in New

York.  56.1 ¶¶ 176, 189; *see Philips Credit Corp.* v. *Regent Health Grp.*, 953 F. Supp. 482, 504

(S.D.N.Y. 1997) ("Regarding the location of the subject matter of the contract, the location of the

collateral that secures a contract for the repayment of money typically determines the location of

the subject matter of the contract.").  And nearly all parties to the Governing Documents, other

than the PDVSA Parties, are organized or headquartered in New York.  56.1 ¶¶ 31, 32, 188.

These overwhelming New York contacts outweigh the only Venezuelan contact:

the bare fact that PDVSA and PDVSA Petróleo—neither of which is the pledgor here—are

Venezuelan companies.  *See, e.g.*, *Bank Leumi Tr. Co. of N.Y.* v. *Wulkan*, 735 F. Supp. 72, 76

(S.D.N.Y. 1990) (noting that New York, rather than Israeli, law applied, with or without a

choice-of-law clause, to claims arising from a guaranty where the "drafting, negotiation and

execution of the [g]uaranty and the obligations guaranteed took place in New York" even though

the plaintiff bank is wholly-owned by an Israeli parent and employs Israelis).

***The PDVSA Parties have capacity under New York law, and may not avoid***

***their obligations to third parties by claiming lack of capacity***.  The PDVSA Parties plainly have

the capacity to incur debt and to pledge their assets.  ████████████████.  *See* pp. 16–

17, above.  Moreover, New York law does not permit a corporation to avoid obligations to third

parties on the ground of alleged incapacity.  *See* N.Y. Bus. Corp. Law § 203(a) ("No act of a

corporation . . . , otherwise lawful, shall be invalid by reason of the fact that the corporation was

without capacity or power to do such act"); *see also* McKinney's Bus. Corp. Law § 203, Legis.

Studies and Rep. Cmt. (2019) (§ 203 "largely codifies New York case law").  New York law also

precludes *any* party from "rescind[ing] or repudiat[ing] a contract on the basis of . . . ultra vires [or] lack of authority" while it has "retained the benefit under the contract."  *Ross Univ. Sch. of Med., Ltd.* v. *Brooklyn-Queens Health Care, Inc.*, 2012 WL 6091570, at *15 (E.D.N.Y. Dec. 7, 2012).

> **E.   The Parties' Choice of New York Law Is**
> **Enforceable under pre-*IRB* Case Law.**

While some cases prior to *IRB* and *Ministers & Missionaries* purporting to apply New York law suggested that, in some circumstances, New York courts might refuse enforcement of a contract governed by New York law on the ground that the contract was allegedly illegal in a foreign jurisdiction, no such circumstances exist here.  Before *IRB* and *Ministers & Missionaries*, one district court had held that a court applying New York law could in some circumstances decline to enforce a contract on grounds of alleged illegality in another jurisdiction.  *Lehman Bros. Comm. Corp.* v. *Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 135–43 (S.D.N.Y. 2000).  To the extent the court's reasoning in *Minmetals* conflicts with the decisions of the Court of Appeals in *IRB* and *Ministers & Missionaries*, it is no longer good law in New York.

But even under the *Minmetals* approach, the Governing Documents should be enforced, because the circumstances in which a court would not enforce a contract on grounds of alleged illegality in another jurisdiction do not exist here.  *See JPMorgan Chase Bank, N.A.* v. *Controladora Comercial Mexicana S.A.B. De C.V.*, 2010 WL 4868142, at *12–15 (Sup. Ct. N.Y. Cty. Mar. 16, 2010) (rejecting defense of illegality under Mexican law where contract was not *malum in se*, was not executory, and party raising defense was *in pari delicto*) (citing *Korea Life Ins. Co.* v. *Morgan Guar. Tr. Co. of New York*, 269 F. Supp. 2d 424, 441–42 (S.D.N.Y. 2003)).

*New York, not Venezuela, is the place of performance*. New York courts have long enforced promises to pay money in New York despite a debtor's argument that payment would violate foreign law. *See, e.g.*, *Central Hanover Bank & Trust Co.* v. *Siemens Halske Aktiengesellschaft*, 15 F. Supp. 927, 929 (S.D.N.Y. 1936) ("[A] contract made here by a German corporation to pay money here is not touched by a law of Germany . . . . [T]he contracts were made here and were to be performed here, the German law relative to performance is of no legal significance in the courts of this country."), *aff'd*, 84 F.2d 993 (2d Cir. 1936) (per curiam); *Bank Leumi Tr. Co.*, 735 F. Supp. at 76–77 (holding that Israeli guarantor's promise to pay money in New York was enforceable despite illegality under Israeli law).

*The contracts are not* **malum in se**, for the reasons discussed at p. 28, above.

*The contracts are not executory*. Before bringing suit, the PDVSA Parties enjoyed the full benefit of their bargain and had made five principal and interest payments. *See supra*, p. 19. Accordingly, the contracts are not executory, and cannot be invalidated. *See Controladora*, 2010 WL 4868142, at *14; *Korea Life Ins.*, 269 F. Supp. 2d at 441.

*The PDVSA Parties are* **in pari delicto**. If Article 150 of the Venezuelan Constitution was violated, the PDVSA Parties are the only party that could be at fault, as the only Venezuelan parties to the transaction. *See Controladora*, 2010 WL 4868142, at *14–15; *Korea Life Ins.*, 269 F. Supp. 2d at 442. The PDVSA Parties represented and warranted the content of Venezuelan law in the Governing Documents and supported those representations with an opinion letter from their Venezuelan counsel at Hogan Lovells. *Supra*, pp. 14–16. (No such facts were present in *Minmetals*.) *See Controladora*, 2010 WL 4868142, at *14; *Korea Life Ins.*, 269 F. Supp. 2d at 441.

*The Venezuelan law purportedly violated was not clearly established in 2016.*

As detailed *infra* Part III and in the accompanying declarations of ████████, Article 150 of the Venezuelan Constitution did not require National Assembly approval of these contracts.  For the same reasons, there was no such clearly established requirement at the time of the Exchange Offer.  *See Access Telecomms., Inc.* v. *MCI Telecomms. Corp.*, 197 F.3d 694, 708 (5th Cir. 1999) ("[I]f foreign law is sufficiently unclear as to the legality of certain actions, then it is unreasonable to say the parties entered the contract with a view to violate anything.").  Indeed, just months before the PDVSA Parties filed this action, Venezuela's Special Attorney General acknowledged that Venezuelan law lacked "clarity . . . as to when a contract is in the public interest" and must be approved by the National Assembly.  56.1 ¶ 250.

F.    **Article 150 of the Venezuelan Constitution Is Unenforceable under New York Public Policy Because It Is Discriminatory.**

This Court should not enforce Article 150 of the Venezuelan Constitution for the additional reason that it discriminates against foreigners by requiring National Assembly approval only when the contractual counterparty is a non-Venezuelan company.  The "well-known policy" of New York is not to enforce "confiscatory or discriminatory" foreign laws.  *J. Zeevi & Sons*, 333 N.E.2d at 172.

Article 150 is discriminatory.  A necessary element of the PDVSA Parties' claim that the Governing Documents required National Assembly approval is that the Trustee and Collateral Agent are "foreign" companies "not domiciled in Venezuela."  *See* Brewer Rep. ¶¶ 13, 20–24, 43–45.  If the Trustee and Collateral Agent were Venezuelan companies, then, under the PDVSA Parties' theory, National Assembly approval would not have been required.  New York courts do not enforce foreign laws that discriminate against individuals and entities domiciled in New York or disfavored foreign jurisdictions in this way.  *Allied Bank Int'l* v. *Banco Credito*

34

*Agricola de Cartago*, 757 F.2d 516, 522 (2d Cir. 1985) (declining to enforce, on public policy grounds, Costa Rican law that blocked payments to foreign creditors without Central Bank approval); *J. Zeevi & Sons*, 333 N.E.2d at 173 (declining to enforce, on public policy grounds, Ugandan law that blocked payments to Israeli companies); *Siemens*, 15 F. Supp. at 930 (declining to enforce German currency law that "discriminates against nonresident creditors").

Article 150 is also confiscatory, at least as the PDVSA Parties seek to apply it in this case, which is to declare null and void approximately $1.68 billion in current principal of secured notes. *See* Compl. ¶¶ 83, 94. The United States and New York have a "strong interest in ensuring the enforceability of valid debts under the principles of contract law, and in particular, the continuing enforceability of foreign debts owed to United States lenders." *Pravin Banker Assocs.* v. *Banco Popular Del Peru*, 109 F.3d 850, 855 (2d Cir. 1997); *see also Ehrlich-Bober & Co.* v. *Univ. of Hous.*, 404 N.E.2d 726, 730–31 (N.Y. 1980) (declining to apply Texas law restricting where University of Houston could be sued because it conflicted with New York's public policy of preserving its status as a financial center).

**G.     This Case Highlights the Importance of Enforcing Choice-of-Law Provisions in Contracts Governing Sovereign and Quasi-Sovereign Debt.**

The broad enforceability of New York choice-of-law clauses furthers the goals of stability and predictability in commercial transactions, and protects investors from risk such as the uncertainty of foreign law and the potential for sovereign manipulation of foreign law. Porzecanski Rep. ¶¶ 15–20. New York's legislature enacted General Obligations Law § 5–1401 to shield parties from this same uncertainty. *See IRB*, 982 N.E.2d at 612. The circumstances of this case illustrates these risks. For foreign investors to have concluded that the Exchange Offer was unlawful, they would have had to disagree with, among others, Venezuela's Constitutional Chamber, the Caracas office of Hogan Lovells, and the pre-litigation scholarly writings of the

PDVSA Parties' own Venezuela law expert.  In 2019, Venezuela's Special Attorney General acknowledged that there not "any clarity in Venezuelan law" of whether the 2020 Notes were contracts of national interest under the Venezuelan Constitution, and described the claim PDVSA Parties are urging in this case as a "last strategy" to avoid payments.  56.1 ¶¶ 249–50.

This case also involves a sovereign's manipulation of its law, such as in the examples detailed in Professor Porzecanksi's report (¶¶ 17, 41–52).  As noted, the National Assembly has passed four resolutions on the eve of and during this litigation that, given their timing and content, are unmistakably intended to influence the outcome of this case.  *Supra*, pp. 22–23.  The PDVSA Parties' expert relied heavily upon these resolutions.  56.1 ¶ 321.  New York choice-of-law provisions are designed to protect investors from precisely this type of uncertainty and sovereign misbehavior.

## II.   PDVSA Petróleo Is Precluded, By Its Unconditional Guaranty, From Asserting a Defense of Illegality.

Separate and apart from the choice-of-law issues, PDVSA Petróleo should be precluded from asserting its Venezuelan law arguments because of its unconditional guaranty. PDVSA Petróleo "irrevocably and unconditionally" guaranteed the 2020 Notes, specifically agreeing that its obligations would "not be released, discharged or otherwise affected by," among other potential defenses, "any invalidity or unenforceability relating to or against the Issuer for any reason."  Ex. 2 at § 7.02.  This type of language is more than sufficient to create an unconditional guarantee.  *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A.* v. *Navarro*, 36 N.E.3d 80, 82 (N.Y. 2015) (guarantee was unconditional where agreement stated it would be "absolute and unconditional irrespective of any lack of validity or enforceability of any such agreement, note or other instrument").

36

"Under New York law, the only affirmative defenses that are not waived by an absolute and unconditional Guaranty are payment and lack of consideration for the Guaranty." *Duval* v. *Albano*, 2017 WL 3053157, at *13 (S.D.N.Y. July 18, 2017) (Failla, J.); *see also Dresser-Rand*, 2020 WL 635523, at *3 (finding that PDVSA Petróleo "waived all defenses except for complete payment."). The defenses waived include illegality and lack of capacity. *See, e.g., Omega Energy*, 2019 WL 4198676, at *4 (illegality under Colombian law); *HealthSouth*, 645 F. Supp. 2d at 143–44 (lack of authority); *Torin Assocs.* v. *Perez,* 2016 WL 6662271, at *4–6 (S.D.N.Y. Nov. 10, 2016) (note never signed). This rule too is essential for the proper functioning of securities markets. "The whole point of including waivers of defenses in guarantees is to permit the quick and certain enforcement of guarantees without expensive and drawn-out litigations." *In re Futterman*, 602 B.R. 465, 480 (Bankr. S.D.N.Y. 2019).

## III. The Exchange Offer and Governing Documents Are Valid and Enforceable under Venezuelan Law.

The Trustee and Collateral Agent are entitled to summary judgment for the independent reason that the 2020 Notes and the Pledge are valid under the law of Venezuela.

### A. The Governing Documents Are Valid under Venezuelan Law.

The indisputable evidence of Venezuelan law shows the Governing Documents are valid. Contrary to the PDVSA Parties' claim, there is no requirement that debt issued by PDVSA or its subsidiaries (secured or unsecured) must be approved by the National Assembly.

#### 1. No Provision of the Venezuelan Constitution or Other Law by Its Terms Required National Assembly Approval for the Governing Documents.

Neither Venezuela's Constitution, nor any other Venezuelan law, by its terms requires National Assembly approval for debt agreements between PDVSA and non-Venezuelan counterparties. ▆▆▆▆▆▆ ¶¶ 47–48, 82, 159–65; ▆▆▆▆▆▆▆▆ ¶¶ 128–31. Article 150 of the Constitution, on which the PDVSA Parties rely, requires that "contracts of national public

interest" with foreign parties be approved by the National Assembly. ███ Ex. 5, art. 150; ███ ███ ¶¶ 49–50, 81–83.  Although Article 150 does not define the term "contracts of national public interest," the related Article 187(9) expressly "authorize[s] the *National Executive* to sign contracts of national interest" (i.e., the Republic through its President, Executive Vice President, and Ministers)—not state-owned companies such as PDVSA. ███ Ex. 5, art. 187(9) (emphasis added); ███████ ¶ 36, 76–77, 79.

The PDVSA Parties' Venezuela law expert, Professor Brewer-Carías, does not dispute that PDVSA is not part of the National Executive, nor that PDVSA is a distinct legal entity separate and apart from the Republic.  *See* Brewer Rebuttal Rep. ¶¶ 19, 112; ███████ ¶ 11 (explaining that "Venezuelan constitutional law does not conflate PDVSA with its shareholder—the Republic").  To the contrary, Professor Brewer-Carías concedes that PDVSA is part of the Decentralized Administration of Venezuela, which consists of public corporations and state-owned commercial corporations that are "not directly part of the government itself." Brewer Rebuttal Rep. ¶¶ 19, 112; ██████ ¶ 37.

It is also undisputed that no Venezuelan statute requires that the PDVSA Parties submit proposed debt issuances (whether secured or unsecured) for National Assembly approval. To the contrary, Venezuela's Organic Law of the Financial Administration of the Public Sector has long expressly exempted PDVSA's debt from any such requirement.  56.1 ¶ 251; *see also* ███████ ¶¶ 47–48, 159–65; ██████████ ¶¶ 128–31.  Moreover, the PDVSA Parties have not identified *any* decision by a Venezuelan court (and we know of none) requiring National Assembly approval for debt (secured or unsecured) issued by PDVSA or its subsidiaries.  *See supra*, pp. 16–17; ██████ ¶ 17.

38

2.     **Under the Binding Decisions of the Constitutional Chamber, National Assembly Approval Was Not Required Because the Republic Was Not a Party to the Governing Documents.**

The Constitutional Chamber has repeatedly held that only contracts entered into by the Republic—and not by state-owned companies such as PDVSA—qualify as contracts of national interest. *See* ███████ ¶¶ 15, 94, 101–02. This requirement is "long standing," having first been recognized by Venezuela's highest court in 1937. ███████ ¶¶ 15, 99. Under Article 335 of the Venezuelan Constitution, decisions of the Constitutional Chamber interpreting the Constitution "are binding on the other Chambers of the Supreme [Tribunal] of Justice and on any other courts of the Republic." ███████, art. 335; ███████ ¶¶ 10, 13, 40, 101. As the Sixth Circuit has recognized, "the decisions of the Constitutional Chamber of the Supreme Court of Justice of Venezuela are the highest and most final statements of Venezuelan law." *DRFP L.L.C.* v. *República Bolivariana de Venezuela*, 706 F. App'x 269, 277 (6th Cir. 2017) (noting that the "weight of authority suggests the district court would have erred" if it had credited the opinion of an expert witness that was contrary to a Venezuelan Supreme Court decision).

In the 2002 decision *Andrés Velásquez*, the Constitutional Chamber set forth the criteria for contracts of national interest under Article 150 of the Venezuela Constitution. *See* ███████ ¶¶ 15, 87–88, 94, 99–101, 104. As the Court held, one of these criteria is that only contracts to which the Republic is a party qualify as contracts of national interest. *See id*. ████████████████████████████████████████████████████████ ████████████████████████████████████████ 56.1 ¶ 354. *Andrés Velasquez* was most recently reaffirmed by the Constitutional Chamber in *Brigitte Acosta*, which held that a contract between the Venezuelan Central Bank and a foreign entity did not qualify as a contract of national interest because the Republic was not a party. *See* ███████. ¶ 104.

39

Before being engaged as an expert in this case, Professor Brewer-Carías (the PDVSA Parties' Venezuela law expert) consistently interpreted *Andrés Velásquez* in just the same way.  In multiple academic publications over more than a decade, Professor Brewer-Carías, while criticizing the holding of that case, expressly acknowledged that it was a binding precedent that exempted PDVSA from any requirement under Article 150 for obtaining National Assembly approval.  ▮▮▮▮▮▮▮▮▮▮ ¶¶ 25–31, 43 (listing publications from 2006 to 2017).  For example, Professor Brewer-Carías stated in 2006:

> The Constitutional Chamber of the Supreme Tribunal of Justice, as the highest and last interpreter of the Constitution . . . established a binding interpretation, and reduced the category of "contracts of public interest" (art. 150 C.) to those signed or concluded by the Republic, the States, and the Municipalities, thus, ***excluding from such a classification those contracts concluded by autonomous institutes or national public enterprises such as PDVSA***.

▮▮▮ Ex. 9 at 3 & n.11 (emphasis added).

Ten years later, in 2016, he again stated that the *Andrés Velásquez* decision "reduced the category of 'contracts of public interest' (art. 150 C.) to those signed or agreed to ***by the Republic . . . excluding from such*** classification ***public contracts signed by . . . PDVSA***." ▮▮▮ Ex. 14 at 316 n.16 (emphasis added); *see also, e.g.,* ▮▮▮ Ex. 15 at 390 ("[T]he most notorious consequence of the decisions of [*Brigitte Acosta* and *Andrés Velásquez*] is—that articles 150, 151, 187.9, 236.14 and 247 of the Constitution do not apply to public contracts concluded by . . . state companies.").  Professor Brewer-Carías's litigation-driven adoption in his expert reports of a position squarely opposite to views he consistently expressed over many years—without offering any explanation for reversing his opinion or even acknowledging that he did so—cannot be credited.

Here, on the face of the Governing Documents, the Republic was not a contracting party.  Accordingly, they do not qualify as contracts of national interest and no National Assembly approval was required.  *See* ██████ ¶¶ 91–92, 105.

### 3. The Exchange Offer and Governing Documents Do Not Satisfy Other Criteria for Contracts of National Public Interest under *Andrés Velásquez.*

In *Andrés Velásquez*, the Constitutional Chamber set forth three additional criteria for contracts of national interest besides the requirement that the Republic is a party: (i) the subject of the contract must be decisive or essential for the realization of the goals and missions of the Venezuelan State; (ii) the contract must satisfy the general interests of the national community; and (iii) the contract must imply the assumption of obligations payable by the Republic "against the National Treasury" during multiple fiscal years after the one in which the contract was concluded.  *See* ██████ ¶¶ 88–89; ████████████ ¶ 144.  The failure to meet any of one of these criteria is fatal.  ██████ ¶ 89.  Here, the Governing Documents fail to satisfy at least the second and third criteria.  *Id.* ¶¶ 19, 90.

As ██████ explains, the Governing Documents cannot fairly be characterized as satisfying the general interests of the Venezuelan national community as a whole.  *Id.* ¶¶ 18–19, 131–41.  These contracts served to extend the maturity of PDVSA's debt, not to "render[] any public service to the community or its citizens."  *Id.* ¶¶ 19, 132.  Professor Brewer-Carías's contrary opinion is illogical.  ████████████████████ ████████████████████  ████ *See supra*, pp. 16–17; ██████ ¶ 134.  As ██████████: "The only notable difference between the Pledge in this matter and prior [unsecured] debt transactions . . . is the process and timing of collection for the creditor in the instant matter; in either scenario, the result to the debtor is the same—the collateral may be collected upon default."  ██████ ¶ 134.

41

It is also beyond dispute that even PDVSA's transactions not involving a pledge of CITGO Holding shares can put PDVSA's control of that company at risk.  *See Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, 932 F.3d 126, 152 (3d Cir. 2019) (authorizing the attachment of PDVSA's shares in PDVH to satisfy the plaintiff's $1.2 billion judgment against Venezuela), *cert. denied Venezuela* v. *Crystallex Int'l Corp.*, 2020 WL 2515508 (U.S. May 18, 2020).

Nor do the Governing Documents involve the assumption of obligations of the Republic "against the National Treasury." ███████ ¶¶ 90, 142–55.  The 2020 Notes do not involve the assumption of debt by the Republic *at all*.  Obligations thereunder are payable by the PDVSA Parties' own, separate assets.  *Id.* ¶¶ 3–12. ████████████████████

████████████████████████████████████████

██████████████████████ 56.1 ¶ 256.

**4.    The Opinion of the PDVSA Parties' Expert Is Contrary to PDVSA's Multi-Decade Practice of Issuing Debt Without National Assembly Approval.**

████████████████████████████████████████

████████████████████████████████████████

██████████████████████. 56.1 ¶¶ 473–99; ██████ ¶¶ 30, 57, 215–19;

████████████ ¶¶ 146–51.  As noted (pp. 16–17), ████████████████

████████████████████████████████████████

██████

In an attempt to distinguish these recent transactions from the 2020 Notes, the Guaidó administration has invented yet another gerrymandered theory.  In a press release issued last week, the Guaidó Administration's Special Attorney General asserted that the recent CITGO Holding and CITGO Petroleum secured notes are not subject to Article 150 because they involve a foreign subsidiary of PDVSA and were "executed abroad [and are] not related to the transfer or

traffic" of PDVSA.  56.1 ¶ 325.  This theory is unsupported by anything in the reports of the PDVSA Parties' Venezuela law expert, and has no basis in Venezuelan law.  ███████ ¶ 87.  Moreover, this theory—under which PDVSA can easily put control of CITGO Petroleum at risk without National Assembly approval by the simple expedient of doing so through a wholly owned foreign subsidiary—discards any pretense that Article 150 reflects a fundamental public policy of Venezuela of ensuring continued control of CITGO Petroleum.  Cf. Brewer Rep. ¶ 42.  This theory is a particularly weak reed for the PDVSA Parties in this case because the pledgor, PDVH, is itself a foreign subsidiary of PDVSA, incorporated in Delaware and with a principal place of business in Texas.

     5.     **The Opinion of the PDVSA Parties' Expert Would Lead to Absurd Results.**

In any event, Professor Brewer-Carías's sweeping opinion that National Assembly approval is required for any contract by PDVSA with a foreign corporation would have the absurd result that all of PDVSA's contracts with non-Venezuelan entities would be deemed void and unenforceable.  *See* ███████████ ¶¶ 89–91.  The consequence of that opinion would be effectively to halt the PDVSA Parties' ability to operate internationally.  *Id.* ¶¶ 89–91, 135.  During the initial conference in this case on November 8, 2019, PDVSA's counsel told the Court that their illegality theory does *not* challenge all of PDVSA's debt, but is based instead on the pledge of CITGO Holding's shares to secure the 2020 Notes.  ECF No. 31 Hearing Tr. at 14:2–12 (Nov. 8, 2019); ██████ ¶ 93.  But Professor Brewer-Carías does not limit his opinion in that way, and the PDVSA Parties have offered no other evidence in support of the theory they urged.

    **B.**    **The Governing Documents Are Enforceable under Venezuelan Law Doctrines Regarding Legality and Legitimate Expectations.**

Even if, contrary to Venezuelan law, National Assembly approval were required for the Governing Documents, a Venezuelan court would still enforce these contracts pursuant to the doctrine regarding presumption of legality and the principle of legitimate expectations. ██ ¶¶ 179–92; ████████████ ¶¶ 161–63.  Under the former concept, the Governing Documents are presumptively valid. █████ ¶¶ 179–83.  Under the latter, a Venezuelan court would enforce the Governing Documents—even if no National Assembly approval was obtained—to protect the legitimate expectations of the holders of the 2020 Notes, Trustee, and Collateral Agent in light of the PDVSA Parties' representations of validity (*see supra*, pp. 14–16) and their multi-decade history of issuing debt without legislative approval.  *See* █████ ¶¶ 199–200, 203; *supra*, pp. 16–17.  Professor Brewer-Carías's opinion that these principles are inapplicable because the Governing Documents are supposedly void *ab initio* is erroneous and ████████████████████████████████████ ████████ ██ ¶¶ 168–72. ████████████████████████ ████████████████████ *Id.*

CONCLUSION

The Court should grant summary judgment dismissing with prejudice and in their entirety the claims asserted by the PDVSA Parties, and granting the affirmative relief to the Trustee and the Collateral Agent that is set forth in their accompanying Notice of Motion.

Dated: New York, New York
     June 10, 2020

Respectfully submitted,

PAUL, WEISS, RIFKIND,
     WHARTON & GARRISON LLP
Walter Rieman
William A. Clareman
Jonathan Hurwitz
Shane D. Avidan
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
wrieman@paulweiss.com
wclareman@paulweiss.com
jhurwitz@paulweiss.com
savidan@paulweiss.com

PAUL, WEISS, RIFKIND,
     WHARTON & GARRISON LLP
Roberto J. Gonzalez (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300
rgonzalez@paulweiss.com

*Attorneys for Defendants and Counterclaim*
*Plaintiffs MUFG Union Bank, N.A. and*
*GLAS Americas LLC, in their respective*
*capacities as Trustee and Collateral Agent,*
*under the Indenture dated October 27,*
*2016, and the Pledge and Security*
*Agreement dated October 28, 2016,*
*governing PDVSA's Senior Secured Notes*
*due 2020 (as to New York law issues only)*

LATHAM & WATKINS LLP

By: *Christopher J. Clark*
     Christopher J. Clark
     Matthew S. Salerno
     Sean H. McMahon
885 Third Avenue
New York, New York 10022
Telephone: 212-906-1200
Facsimile: 212-751-4864
chris.clark@lw.com
matthew.salerno@lw.com
sean.mcmahon@lw.com

*Attorneys for Defendants and Counterclaim*
*Plaintiffs MUFG Union Bank, N.A. and*
*GLAS Americas LLC, in their respective*
*capacities as Trustee and Collateral Agent,*
*under the Indenture dated October 27, 2016,*
*and the Pledge and Security Agreement*
*dated October 28, 2016, governing*
*PDVSA's Senior Secured Notes due 2020*