# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC., <br><br>     Plaintiffs and Counterclaim Defendants, <br><br>     - against - <br><br> MUFG UNION BANK, N.A. and GLAS AMERICAS LLC, <br><br>     Defendants and Counterclaim Plaintiffs. | No. 19 Civ. 10023 (KPF) |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
Walter Rieman
William A. Clareman
Jonathan Hurwitz
Shane D. Avidan
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
Roberto J. Gonzalez (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300

*Attorneys for Defendants and
Counterclaim Plaintiffs
(as to New York law issues only)*

LATHAM & WATKINS LLP
Christopher J. Clark
Matthew S. Salerno
Sean H. McMahon
885 Third Avenue
New York, NY 10022
Telephone: 212-906-1200
Facsimile: 212-751-4864

*Attorneys for Defendants and
Counterclaim Plaintiffs*

# Table of Contents

Page

Preliminary Statement.................................................................................. 1

Argument .................................................................................................... 6

I.  The Act of State Doctrine Does Not Apply to the 2020 Notes......................... 6

  A.  The Act of State Doctrine Does Not Apply
      Because the Situs of the Debt Is the United States. ...............................7

  B.  The Act of State Doctrine Does Not Apply Because the National
      Assembly Resolutions Are Not "Official Acts" of Venezuela. ........................ 12

  C.  Applying the Act of State Doctrine Would Not Further Its Purposes. ............... 13

II.  The PDVSA Parties Cannot Avoid Their Agreement
     That New York Law Governs This Dispute. ......................................... 15

  A.  There Is No "Logical Flaw" in Enforcing the
      Parties' Agreement to Apply New York Law......................................... 15

  B.  The Local Law of a Corporation's Jurisdiction of Incorporation
      Need Not Govern Its Authority or Capacity to Contract. ...................... 16

  C.  The Uniform Commercial Code Does Not
      Require the Application of Venezuelan Law........................................ 19

III.  The Governing Documents Are Lawful and Enforceable under Venezuelan Law. ......... 27

  A.  The PDVSA Parties' Position Is Contrary to the Venezuela
      Constitution and the Constitutional Chamber's Decisions. ...................... 28

  B.  The PDVSA Parties' Definition of Contracts of National
      Interest Conflicts with the Views of Their Expert. .................................... 32

  C.  The PDVSA Parties' Reliance on National
      Assembly Resolutions Is Misplaced. ........................................................ 32

  D.  The PDVSA Parties' Definition of Contracts of National Interest
      Is Contrary to the Multi-Decade Practice of PDVSA and Its
      Subsidiaries of Issuing Debt Without National Assembly Approval. ................. 33

  E.  The PDVSA Parties Fail to Respond to Venezuelan
      Law Arguments that Undermine Their Approach. ................................ 34

  F.  The Views Expressed in Ambassador
      Vecchio's Letter Merit No Deference................................................ 34

  G.  The PDVSA Parties' Remarks Regarding *Lukoil* Should Be Disregarded.......... 40

IV.  The Trustee and Collateral Agent's Affirmative Defenses
     Bar Summary Judgment for the PDVSA Parties. ........................................ 40

V.  The Trustee and Collateral Agent's Counterclaims Should Not Be Dismissed. ............. 44

Conclusion ................................................................................................ 45

i

# Table of Authorities

**Page(s)**

CASES

*In re 136 Field Point Circle Holding Co., LLC*,
644 F. App'x 10 (2d Cir. 2016) .......................................26

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ....................13

*Allied Bank International* v. *Banco Credito Agricola de Cartago*,
757 F.2d 516 (2d Cir. 1985)...........................2, 6, 7, 14

*Anglo-Iberia Underwriting Mgmt. Co.* v. *PT Jamsostek*,
1998 WL 289711 (S.D.N.Y. June 4, 1998),
*aff'd in part and vacated in part*, 235 F. App'x 776 (2d Cir. 2007).......................18

*Animal Sci. Prod., Inc.* v. *Hebei Welcome Pharm. Co.*,
138 S. Ct. 1865 (2018)........................35, 36, 37, 39

*Banco Nacional de Cuba* v. *Sabbatino*,
376 U.S. 398 (1964)...................................7, 14

*In re Bd. of Directors of Telecom Arg., S.A.*,
528 F.3d 162 (2d Cir. 2008)...........................40

*United States* v. *Belmont*,
301 U.S. 324 (1937)..................................13

*Benjamin* v. *Koeppel*,
650 N.E.2d 829 (N.Y. 1995)...........................41

*Braka* v. *Bancomer*,
762 F.2d 222 (2d Cir. 1985)...........................10

*Bugliotti* v. *Rep. of Arg.*,
952 F.3d 410 (2d Cir. 2020).........................35, 37

*Chautauqua Cty. Fed'n of Sportsmens Club, Inc.* v. *Caflisch*,
222 N.Y.S.2d 835 (4th Dep't 1962).....................44

*Cornea* v. *U.S. Attorney General*,
771 F. App'x 944 (11th Cir. 2019) .....................40

*Crystallex Int'l Corp.* v. *Bolivarian Rep. of Venezuela*,
932 F.3d 126 (3d Cir. 2019),
*cert. denied*, 2020 WL 2515508 (U.S. May 18, 2020),
*on remand*, No. 1:17-MC-00151, ECF No. 175 (D. Del. May 26, 2020) .......................14, 34

*Daly* v. *Llanes*,
  2001 WL 1631419 (S.D.N.Y. Dec. 19, 2001) .............................................................9

*Dist. Att'y of N.Y.C.* v. *Rep. of the Philippines*,
  307 F. Supp. 3d 171 (S.D.N.Y. 2018) .....................................................................36

*Dornberger* v. *Metro. Life Ins. Co.*,
  961 F. Supp. 506 (S.D.N.Y. 1997) ..........................................................................41

*Drexel Burnham Lambert Group Inc.* v. *Galadari*,
  777 F.2d 877 (2d Cir. 1985) .....................................................................................8

*DRFP, LLC* v. *Republica Bolivariana de Venezuela*,
  945 F. Supp. 2d 890 (S.D. Ohio 2013) ......................................................................8

*Faison* v. *Lewis*,
  32 N.E.3d 400 (N.Y. 2015) ......................................................................................43

*Fed. Treasury Enter. Sojuzplodoimport* v. *Spirits Int'l B.V.*,
  809 F.3d 737 (2d Cir. 2016) ....................................................................................40

*Fir Tree Capital Opportunity Master Fund, LP* v. *Anglo Irish Bank Corp.*,
  2011 WL 6187077 (S.D.N.Y. Nov. 28, 2011) ............................................................9

*Goodman* v. *Deutsche-Atlantische Telegraphen Gesellschaft*,
  166 Misc. 509 (Sup. Ct. Kings Cty. 1938) ...............................................................18

*In re Grand Jury Subpoena*,
  912 F.3d 623 (D.C. Cir. 2019) .................................................................................38

*Gunnison Cty. Comm'rs* v. *Rollins*,
  173 U.S. 255 (1899) .................................................................................................44

*Hall & Co.* v. *Cont'l Cas. Co.*,
  310 N.Y.S.2d 950 (3d Dep't 1970) ..........................................................................26

*Hausler* v. *JP Morgan Chase Bank, N.A.*,
  127 F. Supp. 3d 17 (S.D.N.Y. 2015) ........................................................................10

*Herbert Constr. Co.* v. *Cont'l Ins. Co.*,
  931 F.2d 989 (2d Cir. 1991) ....................................................................................42

*Highland Capital Mgmt., L.P.* v. *Schneider*,
  533 F. Supp. 2d 345 (S.D.N.Y. 2008) ......................................................................23

*Hilton* v. *Guyot*,
  159 U.S. 113 (1895) .................................................................................................29

*Impact Fluid Solutions* v. *Bariven S.A.*,
  No. 4:19-cv-00652, ECF No. 55 (S.D. Tex. May 20, 2020) ......................................13

*IRB-Brasil Resseguros S.A.* v. *Inepar Invs. S.A.*,
   2009 WL 2421423 (Sup. Ct. N.Y. Cty. July 31, 2009),
   *aff'd*, 922 N.Y.S.2d 308 (1st Dep't 2011),
   *aff'd*, 982 N.E.2d 609 (N.Y. 2012) ...................................................................25

*IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*,
   922 N.Y.S.2d 308 (1st Dep't 2011), *aff'd*, 982 N.E.2d 609 (N.Y. 2012) ...............43

*Jimenez* v. *Palacios*,
   2019 WL 3526479 (Del. Ch. rev. Aug. 12, 2019) .........................................10, 13

*In re Kamerman*,
   278 F.2d 411 (2d Cir. 1960)...............................................................................45

*King Cty., Wash.* v. *IKB Deutsche Industriebank AG*,
   916 F. Supp. 2d 442 (S.D.N.Y. 2013)..................................................................42

*Konowaloff* v. *Metro. Museum of Art*,
   702 F.3d 140 (2d Cir. 2012)................................................................................13

*Korea Life Ins. Co.* v. *Morgan Guar. Tr. Co. of N.Y.*,
   269 F. Supp. 2d 424 (S.D.N.Y. 2003)..................................................................41

*Lehman Bros.* v. *Tutelar CIA Financiera, S.A.*,
   1997 WL 403463 (S.D.N.Y. July 17, 1997) .........................................................22

*Levison* v. *Ill. Sur. Co.*,
   118 N.E. 641 (N.Y. 1918).....................................................................................26

*Lightwater Corp.* v. *Rep. of Argentina*,
   2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003).........................................................9

*Lloyds Bank Plc* v. *Rep. of Ecuador*,
   1998 WL 118170 (S.D.N.Y. Mar. 16, 1998) ..........................................................9

*Marathon Enters.* v. *Schroter GmbH & Co. KG*,
   95 F. App'x 364 (2d Cir. 2004) ...........................................................................42

*Merrill Lynch* v. *Chipetine*,
   634 N.Y.S.2d 469 (1st Dep't 1995) .....................................................................45

*Miller* v. *Rodriguez*,
   2018 WL 6416928 (D.N.J. Dec. 6, 2018).............................................................40

*MMA Consultants 1, Inc.* v. *Rep. of Peru*,
   245 F. Supp. 3d 486 (S.D.N.Y. 2017).....................................................................8

*Motorola Credit Corp.* v. *Uzan*,
   388 F.3d 39 (2d Cir. 2004)...............................................................................3, 16

iv

*Oetjen* v. *Cent. Leather Co.*,
    246 U.S. 297 (1918) .............................................................................................13

*Optopics Labs. Corp.* v. *Savannah Bank of Nigeria, Ltd.*,
    816 F. Supp. 898 (S.D.N.Y. 1993) ........................................................................9

*Orix Credit All.* v. *Phillips-Mahnen, Inc.*,
    1993 WL 183766 (S.D.N.Y. May 26, 1993) .........................................................43

*PDVSA U.S. Litigation Trust* v. *Lukoil Pan Americas LLC*,
    372 F. Supp. 3d 1353 (S.D. Fla. 2019) .................................................................40

*Petersen Energia Inversora S.A.U.* v. *Rep. of Arg.*,
    895 F.3d 194 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) ......................35

*United States* v. *Pink*,
    315 U.S. 203 (1942) .......................................................................................13, 39

*Pravin Banker Assocs., Ltd.* v. *Banco Popular del Peru*,
    895 F. Supp. 660 (S.D.N.Y. 1995) ...................................................................9, 14

*Prudenti* v. *Cty. of Suffolk*,
    2014 WL 886887 (Sup. Ct. Suffolk Cty. Feb. 27, 2014),
    *aff'd* 38 N.Y.S.3d 238 (2d Dep't 2016) ................................................................43

*Ramirez de Arellano* v. *Weinberger*,
    745 F.2d 1500 (D.C. Cir. 1984),
    *vacated on other grounds*, 471 U.S. 1113 (1985) .................................................12

*In re Republic Airways Holdings Inc.*,
    598 B.R. 118 (Bankr. S.D.N.Y. 2019) ...........................................................25, 26

*Rep. of Benin* v. *Mezei*,
    2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010) .......................................................18

*Rep. of Panama* v. *Air Panama Int'l, S.A.*,
    745 F. Supp. 679 (S.D. Fla. 1988) .......................................................................10

*Saratoga City Chamber of Commerce* v. *Pataki*,
    798 N.E.2d 1047 (N.Y. 2003) ..............................................................................43

*Schnabel* v. *Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) .................................................................................15

*Schulz* v. *State*,
    615 N.E.2d 953 (N.Y. 1993) ................................................................................43

*Sharifi* v. *United States*,
    143 Fed. Cl. 806 (2019) .......................................................................................15

*Sharon* v. *Time, Inc.*,
   599 F. Supp. 538 (S.D.N.Y. 1984) ...................................................................12

*Themis Capital, LLC* v. *Dem. Rep. Congo*,
   881 F. Supp. 2d 508 (S.D.N.Y. 2012).........................................................18, 42

*U.S. E. Telecomm., Inc.* v. *U.S. W. Comm. Serv.*,
   38 F.3d 1289 (2d Cir. 1994)...........................................................................45

*Underhill* v. *Hernandez*,
   168 U.S. 250 (1897).........................................................................................13

*Ursa Minor Ltd.* v. *Aon Fin. Prods., Inc.*,
   2000 WL 1010278 (S.D.N.Y. July 21, 2000),
   *aff'd*, 7 F. App'x 129 (2d Cir. 2001)..............................................................25

*Von Saher* v. *Norton Simon Museum of Art at Pasadena*,
   897 F.3d 1141 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2616 (2019)....................12

*W.S. Kirkpatrick & Co., Inc.* v. *Envtl. Tectonics Corp., Int'l*,
   493 U.S. 400 (1990)...................................................................................12, 13

*Worthington* v. *JetSmarter, Inc.*,
   2019 WL 4933635 (S.D.N.Y. Oct. 7, 2019) ................................................15, 16

STATUTES

Fed. R. Civ. P. 44.1 .........................................................................................35

N.Y. Bus. Corp. Law § 203 ..........................................................................3, 19

N.Y. Gen. Oblig. Law § 5-1401.........................................................15, 19, 25, 26

N.Y. U.C.C. § 1-103 ........................................................................................23

N.Y. U.C.C. § 1-201 ........................................................................................25

N.Y. U.C.C. § 8-102 ........................................................................................24

N.Y. U.C.C. § 8-110 ......................................................................20, 22, 23, 24

OTHER AUTHORITIES

Albert A. Ehrenzweig, *Treatise on the Conflict of Laws* (1962) ...................................17

Brief for United States as Amicus Curiae,
   *Allied Bank International* v. *Banco Credito Agricola de Cartago*,
   No. 83-7714 (2d Cir. July 30, 1984)................................................................11

8 Moore's Federal Practice Civil § 38.31 (2020) .........................................................41

*Report of the TriBar Opinion Committee: The Remedies Opinion – Deciding
    When to Include Exceptions and Assumptions*, 59 Bus. Law. 1483 (2004)............................22

Restatement (Second) of Conflict of Laws § 187 (1971) ..............................................19

Restatement (Second) of Conflict of Laws § 198 ........................................................17

Restatement (Second) of Conflict of Laws § 301 ........................................................17

William D. Hawkland & James S. Rogers, 7A UCC Series (2019) .........................................4, 20

## PRELIMINARY STATEMENT

The PDVSA Parties' position, if accepted, would displace essential legal and financial foundations for the issuance of debt by sovereigns and state-owned enterprises. Their position is contrary to the law of both New York and (even if it were relevant) Venezuela. Their motion for summary judgment should be denied.[1]

The facts are these: The parties entered into a series of transactions in 2016 through which investors surrendered $2.8 billion in face amount of PDVSA's 2017 Notes—notes that were due to be repaid in less than a year. In return, they received secured 2020 Notes with a later maturity. The parties agreed that New York law governed the exchange and the 2020 Notes. The issuer, its subsidiaries, and their Venezuelan and New York counsel gave unqualified representations and opinions that the issuer had authority to enter into the transactions, and that the parties' agreement to apply New York law was valid and enforceable.

Now, more than three years later, the PDVSA Parties ask the Court to disregard what they did and said at the time, and to free them from any obligation to repay the 2020 Notes. They urge the Court to disregard the law of New York to which they agreed. They argue that the Court should instead rule the 2020 Notes invalid under the law of Venezuela. And they contend, citing a variety of inapposite legal doctrines, that the Court, in determining what the law of Venezuela is, must defer to the self-interested, after-the-fact statements and interpretations of that law by the Venezuelan government, their sole shareholder.

The PDVSA Parties' arguments are contrary to law and would upend the international markets for debt issued by foreign sovereigns and their wholly owned subsidiaries.

---

[1] Capitalized terms not defined in this brief have the meanings given to them in the Defendants and Counterclaim Plaintiffs' Response to Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts and Rule 56.1 Counterstatement of Material Undisputed Facts.

Under the standards the PDVSA Parties urge, investors would be unable to rely on representations by the issuer and choice-of-law provisions in transaction documents, opinions of the issuer's local counsel, or even their own independent assessment of foreign law.  Governments and government-owned issuers in nations with underdeveloped or potentially unreliable legal systems would be free to manipulate their own law, and U.S. courts would be obligated to shield their eyes from such manipulation.  Capital markets could not function under these conditions.  That is why investors regularly demand that such securities be governed by a law other than that of the issuer's jurisdiction, and why courts steadfastly enforce such choice-of-law agreements.  Not surprisingly, the PDVSA Parties cite no case in which a court has done what they ask this Court to do: invalidate bonds based on an after-the-fact claim of invalidity under foreign law that the parties agreed would *not* govern, and that is contrary to the issuer's representations and agreements when the bonds were issued.  The Trustee and Collateral Agent respectfully submit that this Court should not be the first.

*First*, the act of state doctrine does not—as the PDVSA Parties contend—require the Court to defer to any act by the Venezuelan government purporting to render the PDVSA Parties' obligations void.  The doctrine applies only to acts of a foreign sovereign within its own territory.  The Second Circuit definitively held in *Allied Bank International* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516, 521–22 (2d Cir. 1985), that the doctrine does not shield efforts by sovereigns to disavow debt obligations in the United States.  Under that case and more than 35 years of subsequent case law, the doctrine has no application when, as here, payments on the debt are required to be made in the United States, and the debtor consented to jurisdiction in the United States in actions to enforce the obligation.  That result is consistent with United States policy favoring enforcement of debt securities in accordance with their terms.

2

The PDVSA Parties' reliance on the act of state doctrine is misplaced for additional and independent reasons. The National Assembly resolutions that the PDVSA Parties cite do not have the force of law even within Venezuela, much less as applied to debt payable in New York. Moreover, at the time of the 2016 Exchange, the United States recognized the administration of Nicolás Maduro as the legitimate government of that country. And the Maduro administration expressly approved the Exchange. The 2019 action of the United States government recognizing the Guaidó administration (which did not even exist in 2016) did not retroactively turn the 2016 National Assembly into the only legitimate government of Venezuela at that time. *See infra*, Section I.

*Second*, New York law applies because the parties so agreed, and because this State is the center of gravity for the 2016 Exchange transaction and the 2020 Notes. Contrary to the PDVSA Parties' contention, there is nothing illogical about enforcing the parties' agreement to apply to New York law in assessing the enforceability of the relevant contracts. The PDVSA Parties, with the approval of their boards of directors, and by authorized officers, knowingly assented to the contracts, including the choice-of-law provisions. In these circumstances, courts, including the Second Circuit, have routinely held that "a choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract." *Motorola Credit Corp*. v. *Uzan*, 388 F.3d 39, 50 (2d Cir. 2004). Nor is there any requirement that only the law of Venezuela can determine the PDVSA Parties' authority to enter into contracts. Indeed, a core principle of New York law—reflected in, among other things, the statutory prohibition in section 203(a) of the Business Corporation Law against corporations seeking to avoid contractual obligations based upon alleged lack of capacity, and the doctrine of apparent authority—is that

the risk that a corporation's agents will enter into allegedly unauthorized contracts should be borne by the corporation, not its contractual counterparties.

The PDVSA Parties' contention that section 8-110 of the New York Uniform Commercial Code requires this Court look to Venezuela's laws to determine issues of "validity" misunderstands that term as used within the code. "Validity" in section 8-110 refers narrowly to "procedural or other requirements for the issuance of securities" not to laws of "general applicability" that might "render[ ] unenforceable a certain category of promises to pay money." William D. Hawkland & James S. Rogers, 7A UCC Series § 8-110:2 (2019). Section 8-110 does not govern questions, such as those at issue here, about the legality or enforceability of a securities issuance unrelated to whether approval of the issuance complied with required corporate formalities. The PDVSA Parties cite no cases supporting their over-broad interpretation of that statute. Venezuelan law permits a party to specify the law of another jurisdiction, such as New York. This is what PDVSA did here, as it has done in other debt transactions over many years. As the PDVSA Parties' expert has written about contracts signed by PDVSA and its subsidiaries, "it can be freely established that the applicable law is some foreign law." ███████ Ex. 5 at 391. *See infra*, Section II.

*Third*, the Governing Documents are enforceable under Venezuelan law. The PDVSA Parties contend that the Governing Documents are invalid under Article 150 of the Venezuelan Constitution because they are "contracts of national interest" that must be approved by the Venezuelan National Assembly. They rely for this purpose on an erroneous and gerrymandered definition of "contracts of national interest" as contracts that "relate[ ] to an object that affects the collective interest of all citizens" by virtue of their purported economic or strategic importance. *See* PDVSA Mem. 31.

4

This makeshift definition is contrary to Venezuelan law.  The Constitutional Chamber of Venezuela's high court held in the landmark *Andrés Velásquez* decision and other cases that only contracts to which the Bolivarian Republic of Venezuela is a party (among other requirements) can be deemed contracts of national interest.  The PDVSA Parties' expert, Professor Brewer-Carías, has stated repeatedly for over a decade that the Constitutional Chamber's rulings "exclud[e] from such a classification [as contracts of national interest] those contracts concluded by . . . national public enterprises *such as PDVSA*." ████ Ex. 9 at 3 n.11 (emphasis added).  Likewise, PDVSA's Venezuelan counsel, Hogan Lovells, concluded at the time of the Exchange transaction that the Governing Documents were not contracts of national interest and that no National Assembly approval was required.  The PDVSA Parties' position also disregards the primary Venezuelan statute governing public debt, which exempts PDVSA from any requirement of legislative approval for debt issuances.  And it is squarely at odds with their own and their subsidiaries' decades-long history of debt issuances, including secured debt issuances, without seeking or obtaining approval from the National Assembly.  These include issuances of billions of dollars of notes by CITGO Holding and by CITGO Petroleum in just the last year under the aegis of the current ad hoc boards, secured—like the 2020 Notes—by controlling interests in CITGO Petroleum and by its primary assets.

The PDVSA Parties' argument rests largely on nonbinding National Assembly resolutions criticizing the Exchange Offer, including resolutions adopted long after the Exchange transaction closed.  But (as the Guaidó administration's Special Attorney General has acknowledged) the only such resolution that was contemporaneous with the Exchange Offer "did not declare the [Indenture] to be a public interest contract" or state that the 2020 Notes were illegal or invalid.  Clark Ex. 29 ¶¶ 132, 160.  In any event, these resolutions are not laws and

cannot override decisions of the Constitutional Chamber, which under the Venezuelan

Constitution are binding on all Venezuelan courts.

The PDVSA Parties, citing the doctrine of comity, ask the Court to defer to the

views about Venezuelan law expressed in a letter from the Venezuelan Ambassador.  That letter

is entitled to no deference.  It is patently self-interested: the Republic is PDVSA's sole

shareholder, and the Guaidó administration has actively directed the prosecution of this

lawsuit.  And it is devoid of legal analysis, fails to address applicable Venezuelan law (including

the *Andrés Velásquez* decision), and conflicts with prior statements and conduct by the Republic

and PDVSA, as well as the opinions of the PDVSA Parties' expert.  *See infra*, Section III.

*Finally*, the PDVSA Parties are not entitled to summary judgment on the Trustee

and Collateral Agent's affirmative defenses and counterclaims.  *See infra*, Sections IV and V.

ARGUMENT

## I.     The Act of State Doctrine Does Not Apply to the 2020 Notes.

According to the PDVSA Parties, the act of state doctrine compels a finding that

the National Assembly's "refusal to authorize" the Governing Documents and adoption of the

September 2016 Resolution render the Governing Documents void and unenforceable.  That

argument, however, is contrary to the Second Circuit's decision in *Allied Bank*, 757 F.2d at 521–

22, and more than 35 years of case law following *Allied Bank*.  That case law holds that the act

of state doctrine does not apply to disputes regarding contractual debt obligations payable or

enforceable in the United States.  The act of state doctrine also does not apply here because the

2016 Resolution—the linchpin of the PDVSA Parties' argument—was a non-binding political

statement that did not purport to render, and did not render, the Governing Documents illegal or

unenforceable, and because in 2016 the National Assembly was in no way a sovereign.  Finally,

6

there is no basis for concluding that enforcement of the Governing Documents would be inconsistent with U.S. foreign policy.

A.    **The Act of State Doctrine Does Not Apply Because the Situs of the Debt Is the United States.**

The act of state doctrine is a rule of federal common law, rooted in the separation of powers and "the preeminence of the political branches, and particularly the executive, in the conduct of foreign policy." *Allied Bank*, 757 F.2d at 520. Under the doctrine, the judicial branch "will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit." *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 428 (1964). By contrast, as the Second Circuit has observed, "[i]t has always been clear that the 'act of state doctrine does not . . . bar inquiry by the court into extraterritorial takings.'" *Allied Bank*, 757 F.2d at 520 (quoting *Banco Nacional de Cuba* v. *Chem. Bank of N.Y. Trust Co.*, 658 F.2d 903, 908 (2d Cir. 1981)). As applied to contractual debt obligations, the applicability of the doctrine "depends on the situs of the property at the time of the purported taking." *Id.* at 521. When, as here, the debt obligations are payable in the United States, or the debtor has consented to jurisdiction in U.S. courts, the situs of the debt is the United States and the act of state doctrine does not apply. *Id.*

*Allied Bank* is dispositive. In that case, Costa Rica's state-owned banks defaulted on notes payable to U.S.-based noteholders. Payments were due in U.S. dollars, and were required to be made in New York. *Id.* at 518–19. The banks defaulted after the Costa Rican Central Bank, pursuant to government decree, refused to authorize debt payments in U.S. dollars. *Id.* at 519. The banks argued that the act of state doctrine precluded claims by the noteholders because, they contended, those claims would call into question the Costa Rican government decree. *Id.* In ruling for the noteholders, the Second Circuit reasoned that, in view of the

7

limitation of the act of state doctrine to acts within the sovereign's territory, it applied "only if, when the decrees were promulgated, the situs of the debts was in Costa Rica." *Id.* at 521. Because the notes required payments to be made in New York, and because the notes could be enforced in U.S. courts, where the banks had conceded jurisdiction, the court concluded that the situs of the debt was New York, and "the [act of state] doctrine [was] not applicable." *Id.*

       *Allied Bank* precludes application of the act of state doctrine here. The PDVSA Parties do not and could not argue that the situs of the debt is Venezuela. *See* PDVSA Mem. 22. As in *Allied Bank*, the Indenture requires PDVSA to make payments in U.S. dollars "in the City of New York, New York." Clark Ex. 2 § 2.08. The Global Notes similarly specify that PDVSA must make all payments "in the City of New York, New York, . . . solely and exclusively in Dollars." Clark Ex. 6 ¶ 3. The 2020 Notes were registered to a New York holder of record, and deposited in New York, and the Collateral is held in a vault in New York. 56.1 ¶¶ 176, 189, 192, 194. The PDVSA Parties consented to jurisdiction in New York and filed their complaint in this Court. *Id.* ¶¶ 183–84. Accordingly, the act of state doctrine does not apply.

       The courts have repeatedly reached the same conclusion in the 35 years since *Allied Bank* was decided. In *Drexel Burnham Lambert Group Inc.* v. *Galadari*, 777 F.2d 877, 881 (2d Cir. 1985), for example, the Second Circuit reasoned that, where a note was payable in dollars at the lender's London office or other location the lender designated, "the situs of the debt is not in Dubai [where the borrower was located], and the act-of-state doctrine does not apply." Likewise, in *MMA Consultants 1, Inc.* v. *Rep. of Peru*, 245 F. Supp. 3d 486 (S.D.N.Y. 2017), the court held that the doctrine did not apply because the bondholder was located in the United States and "there has never been an indication that the Bonds are *only* payable in Peru." *Id.* at 520 (emphasis added); *see also, e.g.*, *DRFP, LLC* v. *Republica Bolivariana de Venezuela*, 945 F.

Supp. 2d 890, 914–15 (S.D. Ohio 2013) (rejecting act of state argument as to notes issued by the Republic but trading on international markets and payable at the location of the bearer's choice in U.S. dollars); *Fir Tree Capital Opportunity Master Fund, LP* v. *Anglo Irish Bank Corp.*, 2011 WL 6187077, at *14 n.10 (S.D.N.Y. Nov. 28, 2011) ("Where, as here, a debt instrument is payable in New York, courts have found that the act-of-state doctrine does not bar suit."); *Lightwater Corp.* v. *Rep. of Arg.*, 2003 WL 1878420, at *5 (S.D.N.Y. Apr. 14, 2003) ("[a]n act of a nation in failing to make payments on bonds held in other countries does not constitute an act of state dealing with property located within the nation"); *Daly* v. *Llanes*, 2001 WL 1631419, at *2 (S.D.N.Y. Dec. 19, 2001) (rejecting act of state argument because "the situs of the debt owed by BPIPR to plaintiff is Puerto Rico"); *Pravin Banker Assocs., Ltd.* v. *Banco Popular del Peru*, 895 F. Supp. 660, 664 n.4 (S.D.N.Y. 1995) (rejecting act of state doctrine as "clearly inapplicable" because "[t]he situs of the Banco Popular debt in question here is New York"); *Optopics Labs. Corp.* v. *Savannah Bank of Nigeria, Ltd.*, 816 F. Supp. 898, 907 (S.D.N.Y. 1993) (rejecting act of state defense because "[t]he 'taking' is plaintiff's right to receive the proceeds of the Letter of Credit in United States dollars at a bank in New York").

The PDVSA Parties' attempts to distinguish *Allied Bank* are unavailing. *First*, the PDVSA Parties argue that, unlike *Allied Bank*, this "is not a case of a government taking actions after the fact in an effort to avoid valid, preexisting obligations sited in the U.S." PDVSA Mem. 22. The premise of this argument is inaccurate: the PDVSA Parties are seeking to avoid obligations that they agreed were binding, and have been performing for years. *See* 56.1 ¶¶ 213–17, 233–45. In any event, the purported distinction is irrelevant. Nothing in *Allied Bank* suggests that its holding depends on the legal theory invoked to challenge the contractual debt obligation. The court in *Lloyds Bank Plc* v. *Rep. of Ecuador*, 1998 WL 118170, at *11–12

(S.D.N.Y. Mar. 16, 1998), rejected a similar effort to distinguish *Allied Bank* on grounds that "it did not pass a new law *ex post facto*, but rather devised its policy based on existing law."

*Second*, the cases cited by the PDVSA Parties do not support applying the act of state doctrine here. For example, in *Braka* v. *Bancomer*, 762 F.2d 222 (2d Cir. 1985) (cited in PDVSA Mem. 22), the court applied the same "situs test" adopted in *Allied Bank*, and determined that the act of state doctrine applied because the situs of the debt in that case was in Mexico. That was so, the court reasoned, because the certificates of deposit at issue "named Mexico City as the place of deposit and of payment of interest and principal." *Id.* at 224. *Braka* lends no support to applying the act of state doctrine in cases such as this one, in which the situs of the debt is in New York. The PDVSA Parties' reliance on *Jimenez* v. *Palacios*, 2019 WL 3526479, at *7 (Del. Ch. rev. Aug. 12, 2019), and *Rep. of Panama* v. *Air Panama Int'l, S.A.*, 745 F. Supp. 679, 772 n.4 (S.D. Fla. 1988), is equally misplaced. PDVSA Mem. 22 & n.72. These cases, concerning the appointment of directors to government-owned enterprises, have no bearing on the act of state doctrine as applied to international debt obligations. For such obligations, *Allied Bank* and the many decisions applying its rule firmly establish the situs test. And in *Hausler* v. *JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 54–57 (S.D.N.Y. 2015), the court applied the act of state doctrine to preclude a challenge to Cuba's nationalization of a Cuban foundation. That case has nothing to do with the facts here.

*Third*, the PDVSA Parties argue that the act of state doctrine should apply because voiding the 2020 Notes and Collateral Pledge would be consistent with "the U.S. foreign policy vis-à-vis Venezuela." PDVSA Mem. 22 n.71. *Allied Bank* rejected a similar argument. The Second Circuit explained that allowing foreign sovereigns "to repudiate private, commercial obligations is . . . contrary to the interests of the United States, a major source of private

international credit," and would undermine its interests "in maintaining New York's status as one of the foremost commercial centers in the world." *Id*. at 521–22. The court emphasized that the United States has an "interest in ensuring that creditors entitled to payment in the United States in United States dollars under contracts subject to the jurisdiction of United States courts" have their rights adjudicated "in accordance with recognized principles of contract law." *Id.*

The Second Circuit rendered its decision in *Allied Bank* on rehearing. In supporting rehearing, the United States explained that "denying lenders enforcement of their loan contracts according to their terms" would "introduce[ ] uncertainty in future contractual relations and make[ ] the adversarial context more attractive to the debtor than cooperation with all creditors and the IMF." Brief for United States as Amicus Curiae at 18, *Allied Bank Int'l*, No. 83-7714 (2d Cir. July 30, 1984) (Clark Supp. Ex. 385); *see also id.* at 6–7 ("The United States supports the cooperative and negotiated resolution of international debt problems within a context in which legal principles require enforcement of international loan agreements. Substantial alteration of these legal principles changes expectations in a way that renders contractual relations less certain, thereby discouraging needed further lending."). Long-established U.S. policy concerning international debt obligations thus supports judicial enforcement of the Governing Documents according to their terms.

Finally, the PDVSA Parties' assertions are at odds with their own prior representation to the Court that the U.S. government suspended the OFAC license permitting foreclosure on the Collateral "with the understanding that [the PDVSA Parties] would be seeking to litigate the validity issues" in this Court. Nov. 8, 2019 Tr. at 27:12–14. The PDVSA Parties should not be heard now to ask the Court *not* to consider the merits of this dispute.

### B.    The Act of State Doctrine Does Not Apply Because the National Assembly Resolutions Are Not "Official Acts" of Venezuela.

The act of state doctrine does not apply for the additional reason that a finding that the Governing Documents are enforceable does not require the Court to invalidate any official act by the recognized government of Venezuela.

The act of state doctrine requires an "***official act*** of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc.* v. *Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990) (emphasis added).  Acts by government officials that are "[a]dvisory" and thus "cannot bind the sovereign are not acts of state." *Von Saher* v. *Norton Simon Museum of Art at Pasadena*, 897 F.3d 1141, 1153 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2616 (2019); *see also Ramirez de Arellano* v. *Weinberger*, 745 F.2d 1500, 1534–35 (D.C. Cir. 1984) (nonbinding Honduran legislative resolutions regarding land expropriation were not acts of state), *vacated on other grounds*, 471 U.S. 1113 (1985); *Sharon* v. *Time, Inc.*, 599 F. Supp. 538, 545 (S.D.N.Y. 1984) (nonbinding findings and recommendations of a commission are not acts of state).

The September 2016 and 2019 National Assembly resolutions are not "official acts" because the resolutions were not binding in Venezuela.  It is undisputed that National Assembly resolutions do not carry the force of laws.  ▮▮▮▮▮▮▮▮▮▮ ¶¶ 105–08; Brewer Rep. ¶ 51.  Moreover, the National Assembly lacks the power under the Venezuelan constitution to invalidate contracts.  ▮▮▮▮▮▮▮▮▮ ¶¶ 96, 117.

The National Assembly actions at the time of the Exchange Offer also were not acts of a sovereign.  In 2016, the United States recognized the Maduro administration as the legitimate government of Venezuela, and that administration, as the government of the sole shareholder of PDVSA, approved the Exchange Offer.  56.1 ¶¶ 66–82.  There is no merit to the PDVSA Parties' argument that the National Assembly was retroactively transformed into

12

Venezuela's "only legitimate government" by the United States government's recognition of the Guaidó Administration more than two years later.  PDVSA Mem. 19.  The cases on which they rely concerned actions during a revolution or civil war by the party that ultimately prevailed, and that the United States subsequently recognized as the legitimate government.  *See Konowaloff* v. *Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012); *Oetjen* v. *Cent. Leather Co.*, 246 U.S. 297, 302–03 (1918); *United States* v. *Belmont*, 301 U.S. 324, 326 (1937); *United States* v. *Pink*, 315 U.S. 203, 233 (1942); *Underhill* v. *Hernandez*, 168 U.S. 250, 253 (1897).  Here, Venezuela had no revolution or civil war in 2016, and even the National Assembly did not claim that the Guaidó administration (which did not yet even exist) was the country's legitimate government. In contrast, *Jimenez*, 2019 WL 3526479, at *11, and *Impact Fluid Solutions* v. *Bariven S.A.*, No. 4:19-cv-00652, ECF No. 55, at 6 (S.D. Tex. May 20, 2020), even if rightly decided, involved decisions by the Guaidó administration made *after* it was recognized by the United States.

C.     **Applying the Act of State Doctrine Would Not Further Its Purposes.**

Even if the act of state doctrine were available here as a technical matter—which it is not—courts will decline to apply the doctrine unless doing so is justified by additional prudential factors described by the Supreme Court in *Sabbatino*.  *Kirkpatrick*, 493 U.S. at 409. Those factors are: "(1) the degree of international consensus regarding the challenged act; (2) how sharply the court's ruling would tread on national nerves, that is, its potential impact on foreign relations; and (3) whether the government that performed the challenged act still exists." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 10947344, at *29 (E.D.N.Y. Sept. 22, 2010) (citing *Sabbatino*, 376 U.S. at 428).

These factors do not support applying the act of state doctrine here.  The first factor addresses the consequences for U.S. foreign relations of the courts enforcing international law.  *See Sabbatino*, 376 U.S. at 431–32.  Here, there is no issue of international law.

13

The second factor likewise does not support applying the act of state doctrine. The U.S. government is already managing the United States' foreign-relations interest through a sanctions regime that includes a license—whose effective date has been temporarily suspended—that permits foreclosure on the Collateral in the event of a default. *See* 56.1 ¶¶ 226–32. And, as discussed above, the United States has an important interest in ensuring that creditors under international debt agreements can turn to U.S. courts to resolve their contractual disputes under principles of contract law. *Allied Bank*, 757 F.2d at 522; *Pravin Banker Assocs.*, 109 F.3d at 855 (recognizing "strong interest" of United States in "in ensuring the enforceability of valid debts under the principles of contract law").

The PDVSA Parties' assertion that their ownership of CITGO Holding "hang[s] in the balance" (PDVSA Mem. 23) ignores the reality that their ownership of CITGO is at risk in multiple pending litigations. In the *Crystallex* case, for example, the plaintiff, which is not a secured creditor, has already obtained a writ attaching PDVSA's shares in PDVH for the purpose of satisfying the plaintiff's $1.2 billion judgment against the Republic. If the plaintiff obtains an order authorizing sale of the attached shares, PDVSA may lose beneficial ownership of CITGO Holding in whole or in part. *See Crystallex Int'l Corp.* v. *Bolivarian Rep. of Venezuela*, 932 F.3d 126 (3d Cir. 2019), *cert. denied,* 2020 WL 2515508 (U.S. May 18, 2020), *on remand*, No. 1:17-MC-00151, ECF No. 175 (D. Del. May 26, 2020) (scheduling order).

Finally, the third *Sabbatino* factor—whether the government that performed the challenged act still exists—does not justify applying the act of state doctrine. As noted, the Guaidó administration was not in office at the time of the Exchange Offer in 2016. And the mere fact that the Venezuelan National Assembly still exists does not, by itself, justify applying the doctrine and disregarding the parties' agreement. *Sharifi* v. *United States*, 143 Fed. Cl. 806,

816 (2019) ("[W]hile the government of Afghanistan is still in existence, this alone does not warrant applying the act of state doctrine.").

## II.  The PDVSA Parties Cannot Avoid Their Agreement That New York Law Governs This Dispute.

The Governing Documents and New York General Obligations Law § 5-1401 mandate the application of New York law, not Venezuelan law.  Mem. 24–26.  The PDVSA Parties do not dispute that, under substantive New York law, the Governing Documents are enforceable.  *Id.* at 26–28.  Instead, they seek to avoid their agreement that New York law would govern.  PDVSA Mem. 23–28.  The PDVSA Parties' arguments are unavailing.

### A.  There Is No "Logical Flaw" in Enforcing the Parties' Agreement to Apply New York Law.

The PDVSA Parties argue that under *Worthington* v. *JetSmarter, Inc.*, 2019 WL 4933635, at *4 (S.D.N.Y. Oct. 7, 2019), and *Schnabel* v. *Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012), there is a "logical flaw" in considering a choice-of-law clause when the validity of a contract is in dispute.  PDVSA Mem. 24.

There is no such logical flaw, and those cases have no bearing here.  The issue in both cases, involving consumer "clickwrap" agreements, was whether the consumer had been given notice of and assented to the relevant terms of a form contract prepared by the other party. *Schnabel*, 697 F.3d at 119–21; *JetSmarter*, 2019 WL 4933635, at *4–5.  In *Schnabel*, the court held that that a consumer was not obligated to arbitrate because it was not given notice of an alleged arbitration provision and thus could not have assented to it.  697 F.3d at 112.  In *JetSmarter*, this Court held a contractual arbitration provision was enforceable because the consumer seeking to avoid arbitration had been given notice of the provision and assented to it. 2019 WL 4933635, at *5.  The Court further held that the consumer's challenges to the validity and enforceability of the contract as a whole should be decided by an arbitrator.  *Id*. at *8.

Here, notice and assent are not in dispute.  The Governing Documents were executed by authorized officers of the PDVSA Parties and approved by their respective boards of directors.  Mem. 9–10.  The transaction was also approved by the Venezuelan Government as PDVSA's sole shareholder.  56.1 ¶ 82.  The Governing Documents provide unequivocally that New York law applies to "[a]ll matters arising out of or relating in any way whatsoever" to the 2020 Notes issuance.  *Id.* ¶¶ 180–82.

Thus, there is no impediment to applying New York law to determine whether the Governing Documents are valid and enforceable.  On the contrary, New York law requires that "a choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract."  *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 50 (2d Cir. 2004); *see also* Mem. 24, 29 (citing cases and the Restatement); *id*. at 31 (citing N.Y. Bus. Corp. L. § 203(a)).  That issue should be adjudicated under New York law for the independent reason that New York was the center of gravity of the transaction.  Mem. 30–31.

### B.     The Local Law of a Corporation's Jurisdiction of Incorporation Need Not Govern Its Authority or Capacity to Contract.

The PDVSA Parties argue that "only Venezuelan law . . . can supply the rule of decision" regarding "the authority of Venezuelan state-owned enterprises" to enter into contracts.  PDVSA Mem. 27.  But under New York law, a contracting party's capacity to contract is determined by the law chosen in the contract, or, absent any such choice, by the law selected by the "grouping of contacts" or "center of gravity" test.  Mem. 28–29.  That law governs all aspects of the contract, including "whether the parties had legal capacity to enter into the particular contract."  Restatement (Second) of Conflict of Laws § 198 & cmt. a (1971).  As one scholar has explained, the proposition that each party's "personal law" must govern its capacity to contract is rooted in a "distant feudal past" and is now "unjustifiable" in "this commercial and mobile age";

such a rule benefits only those that "conveniently claim an incapacity" at the expense of "those dealing with them in reliance on the law of the transaction."  Albert A. Ehrenzweig, *Treatise on the Conflict of Laws* § 178, at 476–77, 479 (1962).

The PDVSA Parties' argument also ignores other core principles of New York law.  New York law does not permit a corporation to assert an alleged lack of capacity, or ultra vires, to avoid a contractual obligation to a third party.  Mem. 31 (citing N.Y. Bus. Corp. L. § 203(a)).  The rule reflects a policy choice that the risk of alleged incapacity should be borne by the corporation and its representatives, not third parties.  That choice applies to foreign corporations, including—and especially—foreign corporations such as the PDVSA Parties that come into New York to issue tradeable notes governed by New York law.  Restatement (Second) of Conflict of Laws § 301 cmt. c (1971).  *See also* Mem. 24–26, 28–32.  Likewise, a party can be bound by agreements entered into on its behalf by agents with apparent authority.  *Id*. at 26–27.

None of the cases cited by the PDVSA Parties holds that a party's authority to enter into a contract must invariably be governed by the law of that party's jurisdiction, even where the parties agree to the application of substantive New York law.  PDVSA Mem. 26–27 (citing *Themis Capital, LLC* v. *Dem. Rep. Congo*, 881 F. Supp. 2d 508 (S.D.N.Y. 2012); *Rep. of Benin* v. *Mezei*, 2010 WL 3564270, at *6 (S.D.N.Y. Sept. 9, 2010); *Anglo-Iberia Underwriting Mgmt. Co*. v. *PT Jamsostek*, 1998 WL 289711, at *3 (S.D.N.Y. June 4, 1998), *aff'd in part and vacated in part*, 235 F. App'x 776, 782 (2d Cir. 2007)).  Nor did any of these cases hold that— for contracts entered into in New York or subject to New York law—New York law regarding the defense of ultra vires and apparent authority should not apply.  On the contrary, all of those cases applied the substantive law of New York in determining whether a foreign entity had apparent authority to enter into the contract in dispute.  *See Themis Capital*, 881 F. Supp. 2d at

521–26 (applying New York law to issue of agent's apparent authority to bind foreign sovereign despite finding that the foreign sovereign's jurisdiction had "the most significant relationship with the transaction at issue"); *Rep. of Benin*, 2010 WL 3564270, at 6–7 (applying New York law to determine apparent authority of agent to bind foreign sovereign to agreement conveying real estate in New York); *Jamsostek*, 1998 WL 289711, at 3 & n.2 (applying New York law to determine apparent authority of agent to bind foreign sovereign and state-owned entity to agreement with New York corporation).

The secondary sources cited by the PDVSA Parties, PDVSA Mem. 24–25 & nn.73–75, are contrary to New York law.  The assertion that "the capacity or authority of a corporate . . . entity to contract loans and issue bonds is governed by its personal law, i.e., by the law of the borrower itself," *id.* at 24 (quoting G. Delaume, *Legal Aspects of International Lending and Economic Development Financing* 130 (1967)), is directly contrary to settled New York law cited above.  The sole New York case cited in that source, *Goodman* v. *Deutsche-Atlantische Telegraphen Gesellschaft*, 166 Misc. 509 (Sup. Ct. Kings Cty. 1938) (Delaume 131), held only that the authority of a German borrower was governed by German law because the agreement so provided.  *Id.* at 510.  The other sources upon which the PDVSA Parties rely cite no New York law at all.  The PDVSA Parties' contention that contracts executed without sufficient authority "are ultra vires and therefore void," PDVSA Mem. 25 (quoting Thomas W. Wälde & George Ndi, *Stabilizing International Investment Commitments: International Law Versus Contract Interpretation*, 31 Tex. Int'l L.J. 215 (Spring 1996)), is contrary to section 203(a) of the New York Business Corporation Law and New York common law.  *See* Mem. 31.

Contrary to the PDVSA Parties' contention, there is nothing "nonsensical" about this conclusion, and it does not mean that New York law can "nullify" Venezuelan

"constitutional limitations."  PDVSA Mem. 27.  Any choice-of-law rule permitting the parties to select governing law could be characterized pejoratively as allowing the parties to "escape prohibitions" of the law not chosen.  Restatement (Second) of Conflict of Laws § 187 cmt. e (1971).  (For example, by the PDVSA Parties' specious logic, applying Venezuela law here would allow Venezuela to "nullify" the law of New York.)  But, given the benefits of "certainty, predictability and convenience," the choice to enforce the parties' agreement to New York law, as reflected in N.Y. Gen. Oblig. Law § 5-1401, was a logical and legitimate one for New York to make.  *Id*.  What would be nonsensical—and unjust—would be to allow PDVSA to rely on what it contends is Venezuelan law to retain the benefits of the Exchange Offer after agreeing that the transaction would be governed by the law of New York.

C.     **The Uniform Commercial Code Does Not Require the Application of Venezuelan Law.**

The PDVSA Parties argue that section 8-110 of the Uniform Commercial Code prohibits an agreement to apply any law other than the "local law of the issuer's jurisdiction" to the "validity of a security."  PDVSA Mem. 25–26 (quoting N.Y. U.C.C. § 8-110(a)(1), (d)).  Section 8-110 does not override the parties' choice of New York law for multiple reasons.  *First*, the PDVSA Parties' argument that the Governing Documents violated the Venezuelan Constitution does not bear on the "validity of a security" within the meaning of that provision. *Second*, section 8-110 does not preclude the Court from applying New York law to issues of apparent authority, the effect of an alleged ultra vires act, or ratification.  *Third*, the parties' choice of law would be enforced under section 8-110 because it is permitted under Venezuelan law.  And *finally*, section 8-110 does not prevent New York law from governing PDVSA Petróleo's guarantee or PDVH's pledge.  And, because the PDVSA Parties' theory that the 2020

Notes are unenforceable solely because of the alleged invalidity of the pledge, section 8-110

likewise does not prevent New York law from applying to the Notes.

> ***The PDVSA Parties' contention that the Notes and the Pledge are illegal or
> unenforceable does not raise an issue of "validity."***  As used in N.Y. U.C.C. § 8-110(a)(1), the
> phrase "validity of a security" refers only to whether the security was duly authorized under
> corporate law, such as whether it was approved by a corporation's board of directors.  The New
> York legislature understood the term "validity of a security" to "refer[ ] to validity in the sense of
> corporate or other authority to issue securities," i.e., to whether the security was "issued pursuant
> to appropriate corporate or other similar action."  N.Y. Bill Jacket, 1997 A.B. 6619, Ch. 566.

As one leading commentator explains, the statutory term "validity" refers

narrowly to "procedural or other requirements for issuance of securities by municipalities or

corporations," not to laws of "general applicability" that might "render[ ] unenforceable a certain

category of promises to pay money."  William D. Hawkland & James S. Rogers, 7A UCC Series

§ 8-110:2 (2019).  The commentator explains:

> This limited meaning of the word "valid" should also be the basis for
> interpretation of the choice of law provisions.  Suppose that Issuer, organized
> under the laws of State A, is issuing debt securities pursuant to an indenture under
> which the indenture trustee will be a bank located in State B.  The indenture
> provides that it, and the terms of the debt obligation itself, are to be governed by
> the laws of State B.  Suppose further that the general contract or other civil
> obligation law of State A includes a somewhat unusual statute or law (Law X)
> that renders unenforceable a certain category of promises to pay money. . . . .
> Section 8-110 would have no bearing on the question whether a court in State A
> would give effect to the provision in the indenture stating that the security was to
> be governed by the law of State B. Although it would be possible to describe the
> question of the enforceability of the promise to pay as an issue about the
> "validity" of the issuer's obligation, this is not the type of issue to which
> subsection 8-110(a) refers in using the word "validity."

*Id*.  Thus, section 8-110(a) does *not* govern whether the security is "enforceable" or "legal, valid,

and binding."  *Id.* § 8-202:6.  If it did, it would have the anomalous and unintended "effect of

carving out an enormous and ill-defined exception to the general principles of choice of law recognized both by the U.C.C. and general law." *Id.* § 8-110:2.

The limited scope of section 8-110 is consistent with the narrow purposes of U.C.C. Article 8 (of which section 8-110(a) is a part). Article 8 "deals with how interests in securities are evidenced and how they are transferred." Prefatory Note to Article 8 at III.B (1994). Put differently, Article 8 merely "play[s] the role for the securities markets that real estate recording acts play for the real estate markets." *Id.* ("Article 8 does not regulate the conduct of parties to securities transactions."). As the drafters of the U.C.C. emphasized, Article 8 is "in no sense a comprehensive codification of the law governing securities or transactions in securities." *Id.* Rather, "most of [the] relationship [between securities holders and issuers] is governed not by Article 8, but by corporation, securities, and contract law." *Id.* Article 8's stated goal is irrelevant here. The PDVSA Parties cite no cases or other authority supporting their broad contrary interpretation of section 8-110.

Under the correct reading of section 8-110, there is no dispute about the "validity" of the 2020 Notes or the Pledge. The 2020 Notes were authorized by PDVSA's board of directors consistent with its charter. Mem. 9–10, 38. Article 150 of the Venezuelan Constitution is not part of Venezuelan corporate law or a provision specific to the issuance of securities, but a principle of contract law that, according to the PDVSA Parties, renders the substantive provisions of the Governing Documents illegal and unenforceable. The PDVSA Parties' contentions concerning Article 150 of the Venezuelan Constitution therefore do not bear on the "validity" of the Notes within the meaning of section 8-110.

The PDVSA Parties' argument that the *enforceability* of a security issued by a foreign corporation *must* be governed by the local law of the issuer—even when the issuer agrees

21

to a New York choice-of-law clause—is also contrary to standard practice in New York's securities markets.  Issuers' New York counsel routinely opine, as Hogan Lovells did here, that securities are "legally valid and binding obligations" so long as they are "duly executed" and delivered under the local law of the issuer.  Clark Ex. 33 at 5.  "For a corporation, due authorization is a function of corporation law and due execution a function of corporation and agency law." *Special Report of the TriBar Opinion Committee: The Remedies Opinion – Deciding When to Include Exceptions and Assumptions*, 59 Bus. Law. 1483, 1486–87 n.22 (2004) (citing Restatement (Second) of Conflict of Laws §§ 198-202 (1971)).  None of the professional standards governing closing opinions in cross-border transactions (cited Mem. 14) requires New York counsel to obtain an opinion from foreign counsel that the choice of New York law is "permitted" under the issuer's local law (*see* N.Y. U.C.C. § 8-110(d)) before opining that securities with New York choice-of-law clauses are valid, binding, and enforceable.  If section 8-110 had the significance that the PDVSA Parties ascribe, it would feature prominently in closing opinions and the standards governing them.  It does not.

**Section 8-110 does not apply to apparent authority, the effect of an alleged ultra vires act, or ratification.**  Section 8-110 does not establish any choice-of-law rule applicable to other issues separate from the validity of a security, such as apparent authority, the effect of an alleged ultra vires act, or ratification.  Mem. 26–27, 31–32; *see also Lehman Bros.* v. *Tutelar CIA Financiera, S.A.*, 1997 WL 403463, at *3 n.4 (S.D.N.Y. July 17, 1997) (The "issue of apparent authority is governed," not by the internal affairs doctrine, but "by the law where [plaintiff] 'relied upon such apparent authority.'").

The doctrines of apparent authority, the effect of an alleged ultra vires act, and ratification are not displaced by, but rather supplement, the rules established in the U.C.C.  *See*

22

N.Y. U.C.C. § 1-103(b) ("Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions."); *Highland Capital Mgmt., L.P.* v. *Schneider*, 533 F. Supp. 2d 345, 352 (S.D.N.Y. 2008) ("[T]he U.C.C. does not displace the common law of agency."); Mem. 26–28, 31–32; *infra*, p. 42.

### Section 8-110 and Venezuelan law permitted the parties to agree to the application of New York law to the validity of the 2020 Notes.

Section 8-110(a) provides that the "validity" of a security is governed by "[t]he local law of the issuer's jurisdiction, as specified in subsection [8-110](d) . . . ."  Section 8-110(d), in turn, defines "issuer's jurisdiction" to mean either the law of the jurisdiction in which the issuer is organized, "or, if permitted by the law of that jurisdiction, the law of another jurisdiction specified by the issuer."  N.Y. U.C.C. § 8-110(d).  (The second sentence of subsection (d) applies only to issuers organized under the law of "this State," that is, New York, and thus has no bearing here.)

Venezuelan law permitted PDVSA to elect New York law as it did here. Venezuelan law broadly permits choice-of-law agreements, absent an express proscription by law. ▮▮▮▮▮▮ ¶¶ 40–42; ▮▮▮▮▮▮▮▮▮▮ ¶¶ 43–45.  The PDVSA Parties argue that the choice of foreign law for public interest contracts is prohibited by Article 151 of the Venezuelan Constitution.  *See* PDVSA Mem. 26 & n.77 (citing Clark Ex. 13 at pp. 53–59).  The Governing Documents are not public interest contracts.  *Infra*, pp. 32–34.  In any event, Article 151 by its terms permits the parties to choose foreign law if application of Venezuelan law would be incompatible with the contract's "nature." ▮▮▮ Ex. 5 art. 151; ▮▮▮▮▮▮▮▮ ¶¶ 29–30.  The application of Venezuelan law to the Governing Documents would have been inconsistent with

the nature of transaction, which was centered in New York, and which refinanced existing notes governed by New York law at a time when PDVSA was distressed; with the expectations of international investors in external debt issued by a state-owned enterprise in a developing nation; and with PDVSA's own interest in access to international capital markets without paying a premium to compensate investors for all of the unpredictability potentially associated with Venezuelan law.  *See* ███████████ ¶¶ 33–34; Porzecanski Decl. ¶¶ 23–38.  Applying Venezuelan law to the Governing Documents would also have been inconsistent with many prior debt issuances by PDVSA in which PDVSA agreed to apply New York law.  *See* ███████ ¶¶ 64–66, 71, 176, 199; ████████████ ¶¶ 156, 160; ████████████ ¶¶ 28–31.  As the PDVSA Parties' own Venezuelan law expert, Professor Brewer-Carías, has written, it follows from the holding of *Andrés Velásquez* that, in contracts signed by PDVSA and its subsidiaries, it "can be freely established that the applicable law is some foreign law."  ████████ Ex. 5 at 391.

### *Section 8-110 does not apply to the guarantee or pledge*.  Section 8-110(a)(1)

cannot override the parties' agreement to apply New York law to PDVSA Petróleo's guarantee or PDVH's pledge of collateral, because that section by its terms applies only to "the validity of a security."  *See* N.Y. U.C.C. § 8-110(a)(1).  The guarantee and the pledge of collateral—and the Indenture and Pledge Agreement that document them—are not "securities" under the UCC's definition.  *See* N.Y. U.C.C. § 8-102(15) (defining "security" with a three-part test: registrability of transfer, divisibility, and investment function).  The guarantee is not a "security" because it is not registrable or divisible and does not serve as a medium for investment.  *See IRB-Brasil Resseguros S.A.* v. *Inepar Invs. S.A.,* 2009 WL 2421423, at *3, 8 (Sup. Ct. N.Y. Cty. July 31, 2009) (referring to global notes issued by Uruguayan corporation as "securities," but applying N.Y. Gen. Oblig. Law section 5-1401 to enforce the choice of law provision in note guarantee),

*aff'd*, 922 N.Y.S.2d 308 (1st Dep't 2011), *aff'd*, 982 N.E.2d 609 (N.Y. 2012).  The same is true of the pledge of collateral, which is instead a "security interest" under the U.C.C.  *See* N.Y. U.C.C. § 1-201(35) (defining "security interest"); Moreya Ex. 3 at § 2.01 (PDVH "hereby pledges . . . a first-priority security interest").

The parties' choice of New York law as to the guarantee and the pledge is enforceable under N.Y. Gen. Oblig. Law section 5-1401.  *First*, the Indenture and Pledge contain severability clauses expressly providing that any invalidity in one term of the respective documents does not invalidate the other provisions of that document.  Moreya Ex. 2 at § 10.05, Ex. 3 at § 7.12.  *Second*, an unconditional guarantee such as that given by PDVSA Petróleo is enforceable even where there is a valid defense to the underlying obligation.  *See* Mem. 36–37; *Ursa Minor Ltd*. v. *Aon Fin. Prods., Inc*., 2000 WL 1010278, at *6 (S.D.N.Y. July 21, 2000) (holding that unconditional guaranty barred guarantor from arguing that the underlying agreement was a nullity, illegal, and void for lack of authorization), *aff'd*, 7 F. App'x 129 (2d Cir. 2001); *see also* Restatement (Third) of Suretyship & Guaranty § 34(1)(b) (1996) (obligor's incapacity is not a defense to a guarantee).  *Third*, the Pledge by its terms supports all obligations "payable by the Issuer *or the Guarantor*."  Moreyra Ex. 3 at -506 (emphasis added).

The cases cited by the PDVSA Parties are inapposite.  *See* PDVSA Mem. 27–28. The court in *In re Republic Airways Holdings Inc.* declined to enforce a guarantee on the ground that the guarantee violated New York public policy due to the presence of a liquidated damages clause.  598 B.R. 118, 147–48 (Bankr. S.D.N.Y. 2019).  It is far from clear that the court's view of New York public policy was correct.  *See In re 136 Field Point Circle Holding Co., LLC*, 644 F. App'x 10, 12–13 (2d Cir. 2016) (upholding guarantee with respect to liability under unenforceable liquidated damages clause).  In any event, the PDVSA Parties cite no cases

refusing to enforce a guarantee on grounds of alleged public policy of another jurisdiction, and

N.Y. Gen. Oblig. Law section 5-1401 forbids consideration of another jurisdiction's public

policy.  *See* Mem. 24–25.  Neither of the other cases cited by the PDVSA Parties involved an

unconditional guarantee, in contrast to the guarantee provided by PDVSA Petróleo here.  *See*

*Levison* v. *Ill. Sur. Co.*, 118 N.E. 641, 643 (N.Y. 1918) (guarantee by its terms covered only "an

act of larceny or embezzlement"); *Hall & Co.* v. *Cont'l Cas. Co.*, 310 N.Y.S.2d 950, 952–53 (3d

Dep't 1970) (surety bond not described as unconditional guarantee).

   The fact that the Pledge Agreement is not a security, and that section 8-110

therefore does not apply to the "validity" of the Pledge Agreement, further demonstrates why the

PDVSA Parties' entire theory of section 8-110 is incorrect.  According to the PDVSA Parties,

the critical feature of the Governing Documents that triggered the application of Article 150 was

the pledge of collateral—even though the pledgor was a Delaware corporation and, according to

the PDVSA Parties, Article 150 does not apply to Delaware corporations.  PDVSA Mem. 31.

The PDVSA Parties' explanation seems to be that the Pledge somehow caused *PDVSA's*

participation in the transaction to violate Article 150.  And that is supposedly so even though, on

the theory of the PDVSA Parties, the independent promises made by PDVSA in the Governing

Documents, such as its promises to pay principal and interest, did not themselves trigger

application of Article 150.

   This contorted theory does not implicate the validity of a "security" within the

meaning of section 8-110.  The theory is fundamentally an attack on the Pledge, which is not a

security.  The PDVSA Parties apparently contend that, as a matter of Venezuelan law, the

objectionable Pledge infects the promises by PDVSA, as issuer, that constitute the "security."

But whether or not that is correct as a matter of Venezuelan law (and it is not), it is incorrect

under section 8-110.  The theory does not rely on characteristics of the "security" itself, and it cannot reasonably be deemed an argument respecting the validity of the "security"—as distinct from the pledge—for purposes of section 8-110.

### III.    The Governing Documents Are Lawful and Enforceable under Venezuelan Law.

For the reasons discussed above, the Governing Documents are lawful and enforceable under New York law, and there is no occasion to consider the law of Venezuela. But under Venezuelan law, too, those agreements are lawful and enforceable.

The PDVSA Parties argue that the Governing Documents are invalid because those documents are contracts of national interest under Article 150 of the Venezuelan Constitution, and therefore must be approved by the National Assembly.  PDVSA Mem. 29–31. Their position is contrary to binding rulings of Venezuela's Constitutional Chamber that contracts to which the Republic is not a party are not contracts of national interest, Mem. 39–41; the consistent practice of PDVSA and its subsidiaries, *id.* 16–17; and a decade of the academic writings of the PDVSA Parties' expert, *id.* 40.

Plaintiffs contend that contracts of national interest are those "relat[ing] to an object that affects the collective interest of all citizens" due to its economic or strategic importance.  PDVSA Mem. 30.  They argue that this definition is satisfied here "on account" of the pledge of CITGO shares, because the Venezuelan oil industry affects the collective interest of all Venezuelan citizens and CITGO is supposedly the "crown jewel and the most economically and strategically important foreign asset of national public interest."  *See id.* at 31. But that definition is unsupported by any decision of the Venezuelan Constitutional Chamber. And it departs from the theory put forward in the reports of the PDVSA Parties' expert, who argues instead that *all* contracts between PDVSA and non-Venezuelan entities are contracts of national interest.  Clark Ex. 13 ¶¶ 32–45.  Their expert has previously criticized the definition the

27

PDVSA Parties now urge as "inadmissible" because it is too vague. ██████████ ¶ 111. Finally, the PDVSA Parties' argument is contrary to their history of secured debt transactions, including recent secured debt issuances by both CITGO Holding and CITGO Petroleum approved by their current ad hoc boards, which—like the Pledge here—allow creditors to seize control of CITGO Petroleum or its principal assets in the event of default. ████████ ¶¶ 24, 134.

### A.  The PDVSA Parties' Position Is Contrary to the Venezuela Constitution and the Constitutional Chamber's Decisions.

The PDVSA Parties' definition of contracts of national interest finds no support in the Venezuelan Constitution or in the Constitutional Chambers' decisions.  While Article 150 of the Venezuelan Constitution does not define contracts of national interest, that article must be read in conjunction with Article 187(9), which "authorize[s] the *National Executive* to sign contracts of national interest."  Mem. 38.  It is undisputed that "National Executive" refers to the *Republic* acting through its President, Executive Vice President, and Ministers and does not include state-owned companies such as PDVSA.  *Id*.

The PDVSA Parties' argument conflicts with the Constitutional Chamber's authoritative decision, *Andrés Velásquez*, which established four mandatory criteria for contracts of national interest.  One of those criteria is the "long-standing" requirement that the Republic must be a party.  Mem. 39–41.  The Governing Documents do not satisfy that criterion or any of the other requirements.  *Id.* at 41–42.  PDVSA's counsel, Hogan Lovells, likewise opined at the time of the transaction that the Governing Documents did not meet the authoritative criteria in *Andrés Velásquez.*  56.1 ¶¶ 349–56.  The PDVSA Parties do not dispute that the Governing Documents fail these criteria.  Instead, they argue that *Andrés Velásquez* should be disregarded. They are mistaken.

*First,* the PDVSA Parties assert that the relevant passages of *Andrés Velásquez* are merely "*dicta*" and that the Constitutional Chamber does not state that "*only*" contracts entered into by the Republic can be contracts of national interest.  PDVSA Mem. 34.  As ▇▇▇▇▇▇▇▇▇▇▇ explains, in setting forth the four criteria, the Constitutional Chamber intended to demarcate the essential elements of a contract of national interest.  ▇▇▇▇▇▇ ¶¶ 88, 99–101; ▇▇▇▇▇▇▇▇▇ ¶¶ 23–24, 36–38.  This interpretation of *Andrés Velásquez*, which is consistent with the Constitutional Chamber's later holding in the *Brigitte Acosta* decision, is endorsed in multiple articles published by Professor Brewer-Carías over a decade.  Mem. 40.  It is also consistent with Hogan Lovells's legal opinions.  56.1 ¶¶ 352–354; Clark Ex. 28 at 3.

*Second*, the PDVSA Parties assert that, except in specific circumstances, Constitutional Chamber decisions "carry no more weight than the interpretations of legal scholars and other branches of government."  PDVSA Mem. 35 n.100.  The Court should decline the PDVSA Parties' invitation to credit their expert over the decisions of the Constitutional Chamber.  To do so would be to ignore Venezuela's Constitution, which unequivocally provides in Article 335 that the Supreme Tribunal of Justice is "the supreme and ultimate interpreter of the Constitution" and that the Constitutional Chamber's decisions "concerning the contents or scope of Constitutional rules and principles are binding."  ▇▇▇▇ Ex. 5, art. 335; ▇▇▇▇▇▇ ¶ 86; ▇▇▇▇▇▇▇▇▇ ¶ 40; *see also* Mem. 39 (citing *DRFP L.L.C.* v. *Republica Bolivariana de Venezuela*, 706 F. App'x 269, 277 (6th Cir. 2017)); *Hilton* v. *Guyot*, 159 U.S. 113, 194 (1895) ("We receive the construction given by the courts of the [foreign] nation as the true sense of the law, and feel ourselves no more at liberty to depart from that construction than to depart from the words of the statute.").  As Special Attorney General Hernández acknowledged in a legal memorandum dated August 28, 2019, to Interim President Guaidó: "the constitutional concept of

a public interest contract does not depend on its prior classification by the National Assembly, but on compliance with the requirements established in jurisprudence." Clark Ex. 29 at 19, 21, 43 (citing *Andrés Velásquez* as a key example of the "jurisprudence" defining the requirements of contracts of national interest); ██████████████ ¶¶ 44–45.

Professor Brewer-Carías has written repeatedly that the Constitutional Chamber, "as the highest and last interpreter of the Constitution," established a "binding interpretation" in *Andrés Velásquez* reducing contracts of national interest to those signed by the Republic. ████ Ex. 9, at 3 n.11. Neither Professor Brewer-Carías nor the PDVSA Parties offer a credible justification for how or why Professor Brewer-Carías—whom they characterize as "world's foremost scholar of Venezuelan public law," PDVSA Mem. 3, 33, 38—now proffers an opinion that contradicts over a decade of his own published works. The PDVSA Parties claim the contradiction is explained by a latent, decades-long printing error, where a footnote from a 2006 publication "inadvertently" referred to *Andrés Velásquez* as a "binding interpretation" and was republished verbatim "in numerous other publications." *See* ████████████ ¶¶ 46–50. Professor Brewer-Carías, on the other hand, contends that he criticized *Andrés Velásquez* only because "it inadvertently created the opportunity for confusion and politically motivated arguments." Clark Ex. 27 ¶ 27. Neither excuse is credible.

*Third,* the PDVSA Parties assert that later decisions by the Constitutional Chamber and another chamber of the Supreme Tribunal undermine this interpretation of *Andrés Velásquez*. PDVSA Mem. 35–36. They are incorrect. Indeed, most of Professor Brewer-Carías's articles in which he laments that *Andrés Velásquez* "reduced" contracts of national interest to those involving the Republic were published *after* these decisions. Had he believed that later cases undermined that decision, he would have said so. ████████████ ¶¶ 25–30.

As discussed in ██████████ Rebuttal Report, the Constitutional Chamber cases on which Professor Brewer-Carías relies involved contracts that directly imposed liabilities on the Republic, and do not call into question the holding of *Andrés Velásquez*.  In *Lucia Antillano (Edelca)*, the court addressed a contract by a Venezuelan state-owned corporation "in execution" of an international agreement between the Republic and Brazil, which created a direct liability for the Republic.  *See id.* ¶¶ 63–65.  In *Attorney General of the Republic II*, the Constitutional Chamber addressed debt of a state-owned bank that was allegedly guaranteed by the Republic.  The Chamber there unequivocally reaffirmed the ruling in *Andrés Velásquez* that a public debt transaction may qualify as a contract of national interest when executed "by the Republic with [other] States, foreign official entities or commercial companies not domiciled in Venezuela." ██████████ ¶ 103; ██████████ ¶ 38.

The PDVSA Parties also cite decisions by the Political-Administrative Chamber of the Supreme Tribunal.  PDVSA Mem. 35–36.  These cases (which their expert did not even mention in his opening expert report) do not involve Article 150.  And the Constitutional Chamber's decisions control because that Chamber is the "ultimate arbiter" of the Constitution. ██████████ ¶ 13; ██████████ ¶ 37 n.26.

*Fourth*, although the Constitutional Chamber reaffirmed *Andrés Velásquez* in *Brigitte Acosta*, the PDVSA Parties contend that the decision in the latter case is illegitimate. PDVSA Mem. 34.  But this decision remains a precedent of the Constitutional Chamber. ██████████ ██████████ ¶¶ 46–57.  The Special Attorney General of the Guaidó Administration cited *Brigitte Acosta* without qualification in analyzing the issues presented in this case.  Clark Ex. 29 ¶ 63; ██████████ ¶ 51.  The PDVSA Parties do not dispute that the decision is consistent with a long line of high court decisions including *Andrés Velásquez*. ██████████ ¶ 49.

*Fifth,* the PDVSA Parties assert that the majority of Venezuelan scholars agree with Professor Brewer-Carías's erroneous opinion in his expert reports that the Republic need not be a party to contracts of national interest.  PDVSA Mem. 37–38.  Not so.  As ███████ ████ explains, Professor Brewer-Carías misrepresents and takes out of context the writings of scholars he cites in support of that claim.  *See* ████████ ¶¶ 52–61.  Many of the works that Professor Brewer-Carías cites are inapposite because they were written before *Andrés Velásquez*.

**B.     The PDVSA Parties' Definition of Contracts of National Interest Conflicts with the Views of Their Expert.**

The PDVSA Parties' proposed definition of contracts of national interest, which turns on the argument that CITGO is Venezuela's foreign "crown jewel," is contradicted by the previous writings of their expert, who opined prior to this litigation that the economic significance of a transaction is an "inadmissible" and unworkable criterion for defining contract of national interest.  ████ Ex. 39 at 638; ████████ ¶ 153.  Even now, Professor Brewer-Carías has declined to opine that he accepts this standard or that is it recognized as a matter of Venezuelan law.  *See* Clark Ex. 13 ¶  42; *see generally* Clark Ex. 27; ████████████ ¶¶ 139–43.  Notably, the PDVSA Parties relegate to a footnote Professor Brewer-Carías's central opinion in his expert reports that *any* contract between PDVSA and a foreign entity constitutes a contract of national interest, likely in recognition of the fact that this opinion would produce absurd results.  PDVSA Mem. 30 n.84; Mem. 43; ████████████ ¶¶ 89–91.

**C.     The PDVSA Parties' Reliance on National Assembly Resolutions Is Misplaced.**

The principal purported support for the PDVSA Parties' erroneous definition of contracts of national interest appears be the resolution of the National Assembly dated May 26, 2016, which they assert defines contracts of national interest as "administrative contracts, inextricably related to an object that affects the collective interest of all citizens" that could

"seriously compromise the assets of the Republic or expose them to serious losses or international claims that might be detrimental to the sovereignty or integrity of the country." PDVSA Mem. 30 (quoting ████ Ex. 46).  But that resolution recognizes that contracts of national interest are those entered into by the "National Executive"—not state-owned companies such as PDVSA.  ████Rebuttal Rep. ¶¶ 36, 76–77, 79.  The May 2016 Resolution thus is at odds with the PDVSA Parties' position.  In any event, National Assembly resolutions are not law, because they are not enacted pursuant to the procedures required for statutes.  ████ ████ ¶ 99; 56.1 ¶ 297.  Nor does the National Assembly have authority to overrule a decision of the Constitutional Chamber interpreting the Venezuelan Constitution.  ████████ ¶ 99

### D. The PDVSA Parties' Definition of Contracts of National Interest Is Contrary to the Multi-Decade Practice of PDVSA and Its Subsidiaries of Issuing Debt Without National Assembly Approval.

The PDVSA Parties' definition of contracts of national interest contradicts the PDVSA Parties' multi-decade practice of issuing debt, including secured debt, without National Assembly approval, including recently under the approval of the PDVSA Parties' ad hoc boards. 56.1 ¶¶ 473–99; ████████ ¶¶ 30, 57, 215–19; ████████ ¶¶ 146–51.  The PDVSA Parties suggest that these prior transactions are distinguishable because the Governing Documents involve a pledge of CITGO Holding's shares.  PDVSA Mem. 31.  But the PDVSA Parties cite no Venezuelan law indicating that a pledge makes a constitutional difference, and there is none.  ████████ ¶ 134.  In fact, PDVSA subsidiaries have repeatedly pledged the stock issued by both CITGO Holding and CITGO Petroleum.  56.1 ¶¶ 473–99.

In other words—and as the *Crystallex* case vividly demonstrates--an unsecured debt owed by PDVSA, if unpaid, could result in the attachment and sale of its shares in PDVH and the loss of PDVSA's beneficial ownership of CITGO Holding.  *See supra* p. 14.  The

Pledge—the primary effect of which is to improve the 2020 Noteholders' standing vis-à-vis other creditors—thus has no constitutional significance. ███████ ¶¶ 133–34.

### E. The PDVSA Parties Fail to Respond to Venezuelan Law Arguments that Undermine Their Approach.

The PDVSA Parties do not respond to key aspects of Venezuelan law that are fundamentally incompatible with their proffered interpretation of Article 150 and their conclusion that the Governing Documents are contracts of national interest. They do not address the long-standing exemption of PDVSA's debt from the requirement of National Assembly approval under the Organic Law of the Financial Administration of the Public Sector. 56.1 ¶ 251; *see also* ███████ ¶¶ 47–48, 159–65; ███████ ¶¶ 89–91, 128–31, 135. Nor have they identified any decision by a Venezuelan court requiring National Assembly approval for debt of PDVSA or its subsidiaries. *See supra*, pp. 16–17; ███████ ¶ 17.

The PDVSA Parties also fail to address the Venezuelan principles of legitimate expectations and presumption of legality. Under these principles, a Venezuelan court would enforce the obligations of the PDVSA Parties—even if National Assembly approval had been required—to protect the legitimate expectations of the Trustee, Collateral Agent, and the holders of the 2020 Notes. *See* ███████ ¶¶ 199–200, 203. These principles alone would require denial of the PDVSA Parties' motion for summary judgment.

### F. The Views Expressed in Ambassador Vecchio's Letter Merit No Deference.

Citing principles of comity, the PDVSA Parties ask this Court to defer to a letter filed by Ambassador Carlos Vecchio a day before the parties' dipositive motions were due (the "Letter"). The Letter asserts that the Governing Documents are invalid because they are contracts of national interest. Mem. 20–21, 29, 41–42; Vecchio Letter, ECF No. 80. This self-interested submission on behalf of a company wholly owned by the Republic should be given no

deference.  It lacks any meaningful legal analysis, fails to address applicable Venezuelan law, and conflicts with prior statements by officials of the National Assembly, the Republic, and PDVSA, and with the views of PDVSA's expert.

When reviewing a foreign government's characterization of its own laws, federal courts are "neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials."  *Animal Sci. Prod., Inc.* v. *Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018).  Rather, courts assess a foreign government's interpretation of its laws as but one "relevant material or source" under Rule 44.1 of the Federal Rules of Civil Procedure. *Bugliotti* v. *Rep. of Arg.*, 952 F.3d 410, 414 n.3 (2d Cir. 2020) (vacating a district court decision deferring to a declaration by the Attorney General of Argentina and remanding for the determination of the appropriate weight to be given considering other evidence under Rule 44.1); *Petersen Energia Inversora S.A.U.* v. *Rep. of Arg.*, 895 F.3d 194, 208–09 (2d Cir. 2018) (rejecting the erroneous views of Argentina and its expert on Argentine law, "even [after] according respectful consideration to Argentina's views"), *cert. denied*, 139 S. Ct. 2741 (2019).

In *Animal Science,* the Supreme Court held that the weight to be given to a foreign government's statement on its own laws will depend on several "relevant considerations" including "the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." 138 S. Ct. at 1869; *see also Dist. Att'y of N.Y.C..* v. *Rep. of the Philippines*, 307 F. Supp. 3d 171, 220 (S.D.N.Y. 2018) (Failla, J.) (characterizing comity as "a discretionary rule of 'practice, convenience, and expediency'") (quoting *Pravin Banker Assocs.*, 109 F.3d at 854).  Here, these considerations weigh decisively against affording any deference to the Letter.

***The Letter's "clarity, thoroughness, and support."***  The Letter's "clarity, thoroughness, and support" are severely lacking; the Letter relies on *ipse dixit* and contains no meaningful legal reasoning.  The Letter does not even mention the Constitutional Chamber's decision in *Andrés Velásquez* or any of its other decisions on contracts of national interest, although, under Article 335 of the Venezuelan Constitution, the Constitutional Chamber is the "ultimate arbiter" of the Constitution's meaning.  ██████ ¶ 13.  (For the reasons stated in the Trustee and Collateral Agent's motion to strike (ECF No. 147) the Letter—in addition to being unreliable as a source of Venezuelan law—should be stricken.)

The Letter claims in a footnote that the Governing Documents are contracts of national interest "under any qualitative criteria, including i) that the contract must implicate the collective interest of the national community and ii) that the contract implies the assumption of obligations whose total or partial payment is stipulated over the course of several fiscal years." Vecchio Letter, ECF No. 80 ¶ 8 n.6.  But the Letter provides no citation or justification for these criteria.  They appear to coincide generally with two of the criteria in *Andrés Velásquez*, but the Letter fails to mention the two other mandatory criteria, including that the Republic be a party to the contract.  *Id.*  And, as ██████████ explains, *Andrés Velásquez* was referring to expenditures from the Republic's *Treasury* over multiple fiscal years, a condition not satisfied here.  ████████ ¶¶ 142–48.  Moreover, the Letter's theory conflicts with the theory espoused in Professor Brewer-Carías's expert reports, and, as discussed, urges a standard that Professor Brewer-Carías has rejected as unworkable.  ██████████ ¶ 111.

The Letter cites National Assembly resolutions, but fails to address the fact that, under Venezuelan law, such resolutions lack the force of law.  *Id.* ¶¶ 98–108.  And in stating that the October 2019 Resolution "reiterated the September 2016 Resolution by clarifying, once

again, that the Indenture and Pledge . . . were national public interest contracts," the Letter repeats the erroneous assertion that the September 2016 Resolution declared the Governing Documents to be contracts of national interest.  Vecchio Letter, ECF No. 80 ¶ 17.  As Special Attorney General Hernández has acknowledged, and as is clear from the face of the resolution, the September 2016 Resolution did no such thing.  Clark Ex. 29 ¶¶ 132, 160; 56.1 ¶ 301.

The Letter suggests that its position that the Governing Documents are contracts of national interest rests solely on the fact that the Governing Documents involved a pledge of shares of CITGO Holding.  *See* Vecchio Letter, ECF No. 80 ¶¶ 1, 6–8.  But the Letter provides no reason why the criteria it cites would *not* apply to unsecured debt transactions.  As noted, even unsecured debt transactions put the issuer's assets at risk in the event of a default.

***The Letter's "context and purpose."***  The "context and purpose" of the Letter reinforce the conclusion that the Letter deserves no weight.  The fact that the Letter was prepared in furtherance of the Republic's significant economic interest in this litigation as PDVSA's sole shareholder is particular "cause for caution in evaluating the foreign government's submission." *Animal Sci. Prod.*, 138 S. Ct. at 1874 (cautioning that, "[w]hen a foreign government makes conflicting statements" or "offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission"); *see also Bugliotti*, 952 F.3d at 414, n.13 (remanding for determination of the weight to be given to the views of the Argentine Attorney General submitted in litigation with bondholders and prescribing caution in keeping with the Supreme Court's admonition in *Animal Science*).

The Letter is the result of patent coordination between the PDVSA Parties and the Republic's Special Attorney General, who has directed this litigation on their behalf.  *See* ECF No. 66, Feb. 6, 2020 Hr'g Tr. 61:11-13 ("THE COURT: [Mr. Hernández presents] [s]ome

strange counsel relationship, almost your co-counsel.  MR. BLISS: I think that's a fair way to

describe it."); ECF No. 76 (seeking a modification of the case schedule on the ground that

Dr. Hernández was unable to review plaintiffs' summary judgment filings); *see also* Clark Ex.

392 ¶ 8 (the Special Attorney General's office developed a strategy to protect PVSA's interest in

CITGO "in coordination with the Embassy of Venezuela in the United States.").

   This coordination is further evidenced by the heavy reliance on the Letter in the

PDVSA Parties' motion papers, although the Letter was filed just a day before the motion.

Mem. 20–21, 29, 41–42.  That the Republic's Letter "was clearly prepared in response to this

litigation and at a very late hour[,]" makes it even less likely that "the statement accurately

reflects how [Venezuela's] courts would interpret the relevant provision."  *In re Grand Jury*

*Subpoena*, 912 F.3d 623, 634 (D.C. Cir. 2019) (declining to defer to a belated statement by a

foreign government's agency, referred to as "Country A," on its laws in an action against its

state-owned company following the court's criticism of a declaration by the company's counsel

that failed to include "citations to authority or Country A's case law").

   ***The "transparency of the foreign legal system" and the "role and authority" of***

***the official offering the statement.***  There is no need to defer to the Letter for the additional

reason that the Court already has adequate materials on which to interpret the Venezuelan law

question at issue including, *inter alia,* decisions by Venezuela's Constitutional Chamber, the

ultimate arbiter of the Venezuelan Constitution, in *Andrés Velásquez* and other cases; Professor

Brewer-Carías's academic writings over a decade before this case; and opinions from Hogan

Lovells, which analyzed the issue before the Court at the time of the transaction.

   ***The Letter's consistency with past positions.***  The Letter's views are contradicted

by multiple past statements of the National Assembly, officials appointed by Interim President

Guaidó, and PDVSA, as well as the Venezuelan high court cases previously cited.  These include (i) the PDVSA Parties' express representations, and the opinions of PDVSA's counsel, that they were fully authorized to enter into the Governing Documents and to issue the 2020 Notes and make the Pledge, Exs. 28, 30–33, 282–83, 298; (ii) statements by senior opposition legislators that the Exchange Offer did not require legislative approval, 56.1 ¶¶ 287–91; (iii) the National Assembly's Resolution in May 2016 referring to contracts of national interest as those entered into by the "National Executive" (a term that does not include PDVSA), Mem. 38; (iv) an opinion by the Republic's Attorney General's Office dated August 7, 2006, opining that, under *Andrés Velásquez*, a commercial contract was not a contract of national interest because, among other reasons, such contracts "are concluded by the National Executive."  Supp. Clark Ex. 393; ███████ ¶¶ 126, 169; Clark Ex. 27 ¶ 71.

Finally, the cases cited by the PDVSA Parties do not support their request for deference.  In *United States* v. *Pink*, 315 U.S. 203 (1942)—unlike in this case—"[t]here was no indication that the declaration  was inconsistent with the Soviet Union's past statements; and the declaration was consistent with expert evidence in point."  *Animal Sci. Prods.*, 138 S. Ct. at 1875 (citing *Pink*, 315 U.S. at 218).  Similarly, in *Cornea* v. *U.S. Attorney General*, 771 F. App'x 944 (11th Cir. 2019), the Greek government's views of its own laws were "consistent with the Greek authorities' past positions expressed in this case," "well-supported by the Greek Code of Criminal Procedure," provided "by the [Greek] agency tasked with interpreting Greek laws," and requested by the United States "through diplomatic channels."  *Id*. at 948.  The other cases cited by the PDVSA Parties are inapposite because they do not involve a foreign government's submission of its views.  *See Fed. Treasury Enter. Sojuzplodoimport* v. *Spirits Int'l B.V.*, 809 F.3d 737 (2d Cir. 2016) (deferring to a decision of a Russian court and a subsequent decree by

Russia formally transferring trademark rights); *In re Bd. of Directors of Telecom Arg., S.A.*, 528 F.3d 162 (2d Cir. 2008) (granting comity to a foreign bankruptcy proceeding pursuant to a provision in the Bankruptcy Code).

      **G.**    **The PDVSA Parties' Remarks Regarding *Lukoil* Should Be Disregarded.**

      The PDVSA Parties mischaracterize the district court's decision in a separate litigation, *PDVSA U.S. Litigation Trust* v. *Lukoil Pan Americas LLC*, 372 F. Supp. 3d 1353 (S.D. Fla. 2019).  Contrary to the PDVSA Parties' assertions, the district court in *Lukoil* did *not* adopt the PDVSA Parties' views on Venezuelan law.  It expressly "decline[d] to make a formal ruling on Venezuelan law."  *Id.* at 1361.  The court also "decline[d] to apply the Act of State doctrine." *Id.* at 1357, 1362.  The decision does not support the PDVSA Parties' position.

      It is of no moment that one of the dozen defendants in *Lukoil* was represented by Paul, Weiss.  It would be absurd and unjustified for the result here to be influenced by the fact that Paul, Weiss is one of the firms representing the Trustee and Collateral Agent in this distinct matter.  *See Miller* v. *Rodriguez*, 2018 WL 6416928, at *5 n.3 (D.N.J. Dec. 6, 2018) ("The Court . . . is unaware of any rule, statute or jurisprudence holding that counsel's position in one case and one set of facts is binding on that same counsel in a separate matter, a different set of facts and while representing a different client.").

**IV.**    **The Trustee and Collateral Agent's Affirmative Defenses**
         **Bar Summary Judgment for the PDVSA Parties.**

      The Court should enforce the Governing Documents according to their terms, in which case it need not reach the Trustee and Collateral Agent's affirmative defenses.  But, if the Court reaches the defenses, it should sustain them, or, at a minimum, hold that they raise fact questions precluding summary judgment for the PDVSA Parties.

*Equitable defenses*.  The PDVSA Parties first assert that all equitable defenses are unavailable when a contract is void or illegal.  PDVSA Mem. 39.  That is not the case where, as here, the contracts are not *malum in se* or executory; the PDVSA Parties are more at fault; and the illegality was not clearly established at the time of contracting.  Mem. 32–34.  *See also Benjamin* v. *Koeppel*, 650 N.E.2d 829, 830 (N.Y. 1995) ("[T]he violation of a statute that is merely *malum prohibitum* will not necessarily render a contract illegal and unenforceable.").  Equitable defenses also are available because the PDVSA Parties seek cancellation of the Governing Documents, a traditionally equitable remedy.  8 Moore's Federal Practice Civil § 38.31 (2020) ("An action for rescission or cancellation of a contract or other instrument is traditionally equitable.").  At the very least, the Court should condition any relief to the PDVSA Parties on equitable relief restoring the parties to the position they would have occupied but for the Exchange Offer.  *See, e.g.*, *Korea Life Ins. Co.* v. *Morgan Guar. Tr. Co. of N.Y.*, 269 F. Supp. 2d 424, 440–42 (S.D.N.Y. 2003); *Dornberger* v. *Metro. Life Ins. Co.*, 961 F. Supp. 506, 537–40 (S.D.N.Y. 1997) (rescission should be only be granted "where it is reasonably feasible to unwind the transaction and return the parties to their pre-contract status").

*Apparent authority*.  The PDVSA Parties had apparent authority as a result of (among other things) their history of debt transactions, their representations, and the Hogan Lovells opinions.  Mem. 26–27.  *See King Cty., Wash.* v. *IKB Deutsche Industriebank AG*, 916 F. Supp. 2d 442, 451 (S.D.N.Y. 2013) (party's "testimony [that it relied] is alone sufficient to create a disputed issue of fact on reliance").

The PDVSA Parties assert that the exchanging holders "should have known" about a "risk" of invalidity (PDVSA Mem. 39–40), but they cite no case holding that constructive notice of a "risk" is sufficient to negate apparent authority.  Because the Exchange

Offer was neither "novel" nor "extraordinary," no party was under a duty to inquire.  *See Marathon Enters.* v. *Schroter GmbH & Co. KG*, 95 F. App'x 364, 367 (2d Cir. 2004); *Herbert Constr. Co.* v. *Cont'l Ins. Co.*, 931 F.2d 989, 996 (2d Cir. 1991); *Themis*, 35 F. Supp. 3d at 481.  The PDVSA Parties also do not and cannot show that the Trustee, the Collateral Agent, and the exchanging noteholders could not have reasonably relied on the information available to them.  At most, reasonable reliance is an issue for trial.

The PDVSA Parties' assertion that only the Republic could have "created the appearance of authority," PDVSA Mem. 40, ignores the PDVSA Parties' status under Venezuelan law as independent legal persons.  56.1 ¶¶ 3–16.  They cite no authority for the proposition that those dealing with a corporation must look to the words or conduct of its shareholder(s) to determine its authority.  And the Republic—through what the United States recognized at the time as its legitimate government—approved the Exchange Offer through a shareholder vote and otherwise.  56.1 ¶ 82; 56.1 Counterstatement ¶¶ 135–36.

*Ratification*.  The PDVSA Parties ratified the 2020 Notes and the Governing Documents by accepting their benefits, publicly acknowledging the debt, and making five principal and interest payments.  Mem. 26–28.  The PDVSA Parties respond that they did not have the "right . . . to ratify" without National Assembly approval.  PDVSA Mem. 40.  But ratification is a matter of New York law, not Venezuelan law, and ratification can be based upon the retention of a benefit.  *See IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*, 922 N.Y.S.2d 308, 311 (1st Dep't 2011) (despite lack of approval by board of directors required by Brazilian law, corporation ratified guaranty by accepting benefits), *aff'd*, 982 N.E.2d 609 (N.Y. 2012); *Prudenti* v. *Cty. of Suffolk*, 2014 WL 886887, at *6 (Sup. Ct. Suffolk Cty. Feb. 27, 2014) (county ratified agreement, even though legislative approval was lacking, because it retained the

agreement's benefits and a county employee provided a letter stating that the agreement did not

need to "undergo Legislative approval"), *aff'd* 38 N.Y.S.3d 238 (2d Dep't 2016); *Orix Credit*

*All.* v. *Phillips-Mahnen, Inc.*, 1993 WL 183766, at *5 (S.D.N.Y. May 26, 1993) ("Acceptance of

the benefits of a transaction is . . . an alternative test for ratification, not the exclusive one.").

      *Laches*.  The PDVSA Parties delayed asserting their claims in April 2019 in order

to lobby for changes to the U.S. sanctions regime that have prejudiced the holders of the 2020

Notes.  Mem. 27–28.  That delay and the resulting prejudice are sufficient for laches.  *See Schulz*

v. *State*, 615 N.E.2d 953, 956–58 (N.Y. 1993) (delay of less than one year sufficient for laches

because "[d]uring that time . . . bonds were issued and sold to investors").  *Saratoga City*

*Chamber of Commerce* v. *Pataki*, 798 N.E.2d 1047 (N.Y. 2003), cited by the PDVSA Parties (at

41), distinguished between the mere loss of "expected profits," which it held was insufficient for

prejudice, and the invalidation of bonds, the issue presented here and in *Schulz*.  *Id.* at 1056–57.

At a minimum, these are fact-specific issues for trial.  The PDVSA Parties also cite *Faison* v.

*Lewis*, 32 N.E.3d 400 (N.Y. 2015), but that case involved a forged deed, which the court noted

"holds a unique position in the law."  *Id.* at 403.  The court also noted that claims seeking to

invalidate a deed "are subject to a laches defense."  *Id*. at 407 n.5.

      *Estoppel*.  The PDVSA Parties incorrectly argue that the defense of equitable

estoppel must be dismissed because they made no "misrepresentation of fact."  PDVSA Mem.

40.  However, by reciting that they obtained all necessary approvals for the Exchange Offer, they

represented that several factual predicates for invalidity had not occurred, including that the

"purpose" of the transaction was not to satisfy the Venezuelan public, and that the CITGO

Pledge was not "decisive" for Venezuela's national goals.  ████ ¶ 88.  In September 2016,

the National Assembly acknowledged the need to rely on PDVSA's factual representations to

determine the validity of the Exchange Offer by calling for the President of PDVSA to "explain the terms" of the Exchange Offer.  ▓▓▓▓▓▓▓ ¶ 115.  Under New York law, "a party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed." *Chautauqua Cty. Fed'n of Sportsmens Club, Inc.* v. *Caflisch*, 222 N.Y.S.2d 835, 839–40 (4th Dep't 1962); *Gunnison Cty. Comm'rs* v. *Rollins*, 173 U.S. 255, 275 (1899) (borrower estopped to deny validity of bond where it unambiguously recited that the bond complied with state law).

## V.    The Trustee and Collateral Agent's Counterclaims Should Not Be Dismissed.

Because the Governing Documents are valid, the Court should grant the Trustee and Collateral Agent summary judgment on their first through seventh counterclaims.  There is no need to reach the Trustee and Collateral Agent's alternative claims for unjust enrichment and *quantum meruit* if the 2020 Notes and the Governing Documents are enforced.  But, if they are not, then these claims should not be dismissed.

*Unjust Enrichment*.  The exchanging holders exchanged $2.8 billion face amount of valid 2017 Notes for the 2020 Notes.  If the PDVSA Parties succeed in their effort to have the Notes held invalid—or rendered unsecured, in which case they may become substantially valueless—they will be unjustly enriched.  The PDVSA Parties assert that the only benefit of the exchange to PDVSA was "a relatively short maturity extension."  PDVSA Mem. 43.  But that is not true: as a result of the Exchange Offer, they did not have to repay the 2017 Notes, and, if the 2020 Notes are invalidated, they never will.  The PDVSA Parties' assertion that PDVSA *would have* defaulted on the 2017 Notes but for the Exchange Offer is pure speculation, unsupported by evidence, and contrary to the fact that the 2017 Notes that were not exchanged were fully repaid. In any event, that they could have been enriched *more* does not mean they were not enriched. *See U.S. E. Telecomm., Inc.* v. *U.S. W. Comm. Serv.*, 38 F.3d 1289, 1299 n.2 (2d Cir. 1994) ("[A]

person may be liable in unjust enrichment even though the benefit received as a result of the unjust enrichment did not allow that person to turn a profit."). Lastly, equity forbids the PDVSA Parties from retaining the benefits of their own illegal acts. *Merrill Lynch* v. *Chipetine*, 634 N.Y.S.2d 469, 471 (1st Dep't 1995) ("equity does not favor allowing defendant to escape restitution."). The PDVSA Parties rehash their assertions about what the holders purportedly should have known about legal risks. But, as shown above, exchanging holders were justified in believing the representations of PDVSA and its counsel. 56.1 ¶¶ 332–37. And, in any event, PDVSA is far more responsible for any illegality under Venezuelan law than any of the holders.

*Quantum meruit.* The Trustee and Collateral Agent are also entitled to their costs, fees, and expenses under the theory of *quantum meruit. In re Kamerman*, 278 F.2d 411, 414 (2d Cir. 1960) (permitting *quantum meruit* where the contract was illegal). The PDVSA Parties' cases concerning "illegal or invalid contracts" (PDVSA Mem. 42) are inapposite because they involve government contracts, not corporate contracts.

## CONCLUSION

The PDVSA Parties' motion for summary judgment should be denied.

Dated: New York, New York
          June 29, 2020

Respectfully submitted,

PAUL, WEISS, RIFKIND,
     WHARTON & GARRISON LLP
Walter Rieman
William A. Clareman
Jonathan Hurwitz
Shane D. Avidan
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
wrieman@paulweiss.com
wclareman@paulweiss.com
jhurwitz@paulweiss.com
savidan@paulweiss.com


PAUL, WEISS, RIFKIND,
     WHARTON & GARRISON LLP
Roberto J. Gonzalez (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300
rgonzalez@paulweiss.com

*Attorneys for Defendants and Counterclaim
Plaintiffs MUFG Union Bank, N.A. and
GLAS Americas LLC, in their respective
capacities as Trustee and Collateral Agent,
under the Indenture dated October 27,
2016, and the Pledge and Security
Agreement dated October 28, 2016,
governing PDVSA's Senior Secured Notes
due 2020 (as to New York law issues only)*

LATHAM & WATKINS LLP

By:  s/ Christopher J. Clark
         Christopher J. Clark
         Matthew S. Salerno
         Sean H. McMahon
885 Third Avenue
New York, New York 10022
Telephone: 212-906-1200
Facsimile: 212-751-4864
chris.clark@lw.com
matthew.salerno@lw.com
sean.mcmahon@lw.com

*Attorneys for Defendants and Counterclaim
Plaintiffs MUFG Union Bank, N.A. and
GLAS Americas LLC, in their respective
capacities as Trustee and Collateral Agent,
under the Indenture dated October 27, 2016,
and the Pledge and Security Agreement
dated October 28, 2016, governing
PDVSA's Senior Secured Notes due 2020*