**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

Plaintiffs,

- against -

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

Defendants.

Case No: 19-cv-10023-KPF

## DECLARATION OF ALLAN R. BREWER-CARÍAS IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, ALLAN R. BREWER-CARÍAS, hereby declare pursuant to 28 U.S.C. § 1746 and

Local Rule 7.1 as follows:

1.     I have been provided with a declaration of the defendants' Venezuelan law expert,

███████████████████, dated June 10, 2020, which I understand was filed in

support of the defendants' summary judgment motion.

2.     I have prepared this relatively short declaration in response to some of the

erroneous opinions and assertions in █████████ declaration, which, in the course of its 45

pages, raises new arguments and makes reference to sources not previously referenced in this

case.

3.     I also discuss a new academic article by Professor Rafael Badell Madrid, a highly

respected Venezuelan administrative law scholar and member of the National Academy of Social

and Political Sciences on whom █████████ purports to rely in his reports (although only

because he mischaracterizes Badell's writings).  The article, which was just published in

Venezuela's *Journal of Public Law*, directly addresses the concept of national public interest

contracts, including the application of that concept to the 2020 Notes Transaction, which is a topic of considerable interest in the Venezuelan legal community.[1]

## I.    THE CONSTITUTIONAL CHAMBER DOES NOT ESTABLISH A "BINDING INTERPRETATION" UNDER ARTICLE 335 EVERY TIME IT INTERPRETS THE CONSTITUTION

4.      Referencing Supreme Tribunal decisions not referenced in his reports,  reiterates his erroneous view on the "binding interpretation" of constitutional norms or principles in accordance with Article 335 of the Venezuelan Constitution.  His assertion that "an unequivocal act of interpreting the Constitution . . . is all that is required for their binding nature" is absolutely wrong.  Declaration of ▮▮▮▮▮▮▮ dated June 10, 2020 ▮▮▮ ▮▮▮") at ¶ 50.

5.      It is important to understand that not all Constitutional Chamber interpretations of the Constitution are binding under Article 335, but only those where the Chamber, invoking Article 335, expressly announces the establishment of a binding interpretation and, even then, the interpretation must relate to the main *thema decidendum*.  This is not a mere "formality," as ▮▮▮▮▮▮ erroneously suggests. ▮▮▮▮▮ at ¶ 45.  On the contrary, it is the essence of "binding interpretations."

6.      This "rule of explicitness," which is derived from the Constitutional Chamber's own rulings, is recognized by all scholars who have written on the matter, including Professor Jesús María Casal, whose work I have not "mischaracterized." ▮▮▮▮▮ at ¶ 51.  Out of respect, and as a matter of principle, I must also state that I do not concur with ▮▮▮▮▮▮

---

[1] *See* Rafael Badell Madrid, *Contratos de interés público* [*Public Interest Contracts*], *in* 159-160 Revista de Derecho Público 9-42, Declaration of Allan R. Brewer-Carías in Opposition to Defendants' Motion for Summary Judgment ("<u>Brewer Opp. Decl.</u>") Ex. 1.

accusation of "plagiarism" in relation to the work of Francis Marval on this matter.  ███████ at ¶ 51.

7.    Regarding the "rule of publication," ██████████ gets it backwards.  When I refer to a decision ordering its own publication in the *Official Gazette* of the Republic, I am referring to publication that is ordered *on account of a binding interpretation in the decision*.  In other words, it is not the publication that makes the decision binding; rather, it is the binding character of the interpretation that warrants the publication.  Although the *Andrés Velásquez* and *Attorney General of the Republic II* decisions were published in the *Official Gazette*, this was not on account of any binding constitutional interpretation under Article 335, as those decisions contain no such interpretation.  The *Andrés Velásquez* decision was published in the *Official Gazette* because the decision annulled (in part) an article of a statute, and thus publication was required by the Organic Law of the Supreme Court of Justice (Articles 119 and 120) then in force, which provided that any decision annulling a law must be published in the *Official Gazette* due to its *erga omnes* effects.[2] The *Attorney General of the Republic II* decision was published in the *Official Gazette* at the Chamber's discretion.[3]  The rule that decisions containing binding interpretations under Article 335 are published in the *Official Gazette* does not mean that all published decisions contain binding interpretations.

8.    There is not a single case where the Constitutional Chamber is regarded as having established a binding interpretation of the content or scope of a constitutional norm or principle without expressly applying Article 335 of the Constitution and expressly announcing the

---

[2] *See* Organic Law of the Supreme Court of Justice, *Official Gazette* No. 1.893 (July 30, 1976), Brewer Opp. Decl. Ex. 2; Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 2241 Andrés Velásquez y otros, nulidad parcial artículo 80 de la Ley Orgánica de Administración Financiera del sector Público [Andrés Velásquez and others, the partial anullment of Article 80 of the Organic Law of the Financial Administration of the Public Sector], Sept. 24, 2002 (Venez.) (hereinafter Supreme Tribunal of Justice Decision No. 2241) at 23, ████████ Ex. 7.
[3] Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 1460 [Attorney General of the Republic II], Jul. 12, 2007 (Venez.) at 24, ████████ Ex. 18.

establishment of a binding interpretation in accordance with that provision, in which case Article 335 applies only to the matter expressly announced as binding.  The decisions referenced for the first time in footnote 116 of ███████ declaration did not involve the interpretation of "the content or scope of a constitutional norm or principle" under Article 335 but rather the interpretation of statutory provisions.  For example, in *Luis Duarte y Otros* (decision No. 2228 of September 20, 2002), the Constitutional Chamber, in deciding a specific case, interpreted the term "judicial means" in the Organic Law on Amparo (constitutional protection) not to include requests for administrative review pursuant to the Organic Law of Administrative Procedure that, if already filed, would prevent the filing of an *amparo* action.  This interpretation was considered in subsequent decisions as a binding interpretation of those statutes.[4]

9.      Ever since 2000, a few months after the current Constitution was ratified, I have expressed the opinion that a binding interpretation must be "an express interpretation" established by invoking Article 335 of the Constitution.[5]  I reaffirmed this criterion a few years later in 2004 when I wrote that the Constitutional Chamber must invoke Article 335 to "establish the interpretation of the [constitutional] norm," which "must be expressly pointed out"[6] in the sense of expressing, in one way or another, that a binding interpretation under Article 335 is being established.

10.     Addressing the matter in a 2019 book, I wrote:

[T]he [Constitutional] Chamber, in its judgment interpreting a constitutional norm must expressly indicate specifically that it is establishing the 'binding' doctrine.  That is, not all interpretation or usage of provisions made by the Constitutional Chamber can or

---

[4] Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice] No. 2228 [*Luis Duarte and others*], Sept. 20, 2002 (Venez.) at 3–5, ███████ Ex. 23.
[5] *See* Allan R. Brewer-Carías, *El Sistema de justicia constitucional en la Constitución de 1999* [*The Constitutional Justice System in the 1999 Constitution*]*,* 86, 87 (Editorial Jurídica Venezolana, 2000), Brewer Opp. Decl. Ex. 3.
[6] *See* ALLAN R. BREWER-CARÍAS, 2 LA CONSTITUCIÓN DE 1999. DERECHO CONSTITUCIONAL VENEZOLANA [THE CONSTITUION OF 1999],999 (Editorial Jurídica Venezolana, 2004), Pls. Ex. 38.

4

should be considered as a "binding interpretation" of the Constitution; and in the judgment in which the Constitutional Chamber effectively makes a binding interpretation of a constitutional norm or principle, it must necessarily make reference to the application of article 335 of the Constitution [*See* for instance, Rafael Laguna Navas, "*El recurso extraordinario de revisión y el carácter vinculante de las sentencias de la sala Constitucional del Tribunal Supremo de Justicia*," in Congreso Internacional de Derecho Administrativo en Homenaje al profesor Luis Henrique Farías Mata, Vol. II, 2006, pp. 91-101.]. That is, as I have expressed since 2000, "the reasoning or the 'motivating' part of the decisions cannot be consider as binding, but only the interpretation made, specifically, of the content or scope of a specific rule of the Constitution" [*See* Allan R. Brewer-Carías, *El sistema de justicia constitucional en la Constitución de 1999*, Editorial Jurídica Venezolana, Caracas 2000, p 87]. In other terms, "what can be binding in a decision, can only be its "resolutive" part [the Holding], in which the Constitutional Chamber determines the interpretation of a norm, and this must be expressly stated." [*See* Allan R. Brewer-Carías, *La Justicia constitucional. Procesos y procedimientos constitucionales*, Editorial Porrúa, México 2007, p. 415].[7]

11.   Given my academic writings on this matter over the last two decades, it is obvious that the appearance of the word "binding" in reference to the Constitutional Chamber's *Andrés Velásquez* decision in a single footnote from 2006 that was reprinted verbatim numerous times, including in the above-quoted book, was entirely inadvertent. I have never elaborated any argument that the *Andrés Velásquez* decision established a "binding interpretation" under Article 335 of the Constitution, which is not even mentioned in the decision, and any such argument would be completely at odds with my own writings (and the writings of other scholars) on the concept of binding interpretation.

12.   Contrary to ▮▮▮▮▮▮ assertions,[8] I did not "recognize" the *Andrés Velásquez* decision as "binding law" in my 2017 article extensively discussing and criticizing the

[7] *See Allan R. Brewer-Carías, Sobre las Nociones de Contratos Administrativos, Contratos de Interés Público, Servicio Público, Interés Público y Orden Público, y su Manipulación Legislativa y Jurisprudencial, [On the Notions of Administrative Contracts, Public Interest Contracts, Public Service, Public Interest and Public Order, and their Legislative and Jurisprudential Manipulation],* 150–51 (Editorial Jurídica Venezolana, 2019) (emphasis added), Brewer Opp. Decl. Ex. 4.
[8] ▮▮▮▮, ▮▮▮▮ Ex. 3 at ¶ 58 n. 136.

5

decision.[9]  In fact, the Spanish word for "binding" does not even appear in the article.[10]  Nor did I refer to the decision as establishing a binding interpretation in my book on administrative law first published in 2013.[11]  I have been critical of the *Andrés Velásquez* decision because of the "restrictive interpretation" that could be placed on its discussion of public interest contracts given the lack of any reference to contracts entered into by state-owned entities within the decentralized Public Administration, but I have never argued that this was established by the Chamber as a binding interpretation under Article 335.

13.     To my knowledge, *no Venezuelan scholar* has ever argued that the *Andrés Velásquez* decision established a "binding interpretation" under Article 335 of the Constitution. On the contrary, in an academic article just published in Venezuela's *Journal of Public Law*, Professor Badell specifically addresses the absence of any binding interpretation in that decision, which was issued in response to a request for judicial review of the constitutionality of a statutory provision, not a request for interpretation of the concept of national public interest contracts.  He writes that:

> [Given] the content of the grounds for the ruling, the nature of the appeal decided and the text of the provision, it may be stated that the decision concerning Andrés Velásquez, Elías Mata *et al.* established criteria, which have been reiterated in subsequent rulings by the highest court, as shall be explained below, but that *under no circumstances may they be understood as binding criteria to exclude functionally decentralized administration entities as possible subjects of public interest contracts, thus subject to parliamentary authorization*. This explains how, in subsequent rulings, even after repeating statements from the Andrés Velásquez, Elías Mata *et al.* case, the highest court has admitted, expressly or implicitly, as shall be seen below, that a functionally decentralized entity may enter into contracts considered as being in the public interest, if the other

---

[9] *See* Allan R Brewer-Carías, *La mutación de la noción de contratos de interés público nacional hecha por la Sala Constitucional, para cercenarle a la Asamblea Nacional sus poderes de control político en relación con la actividad contractual de la Administración Pública y sus consecuencias*, [*The mutation of the notion of national public interest contracts made by the Constitutional Chamber, to assure the National Assembly of its powers of political control in relation to the contractual activity of public administration and its consequences*], *in* 151–152 REVISTA DE DERECHO PÚBLICO 379 (Editorial Jurídica Venezolana, 2017), Pls. Ex. 40.

[10] *Id.*

[11] *See* ALLAN R BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA 119 (Editorial Jurídica Venezolana, 2013), Pls. Ex. 41.

6

aforementioned quantitative characteristics are fulfilled, in which case application of the constitutional regime for parliamentary authorization shall be in order."[12]

14.     In the same article, Professor Badell specifically addresses the 2020 Notes, writing that:

> One additional *example* of this type of public interest contract is the contract for the issuance of the PDVSA 2020 Bond, as well as the contract guaranteeing that bond backed by 50.1% of the shares of Citgo Holding, Inc. This contract has the nature of a national public interest contract, in addition to the fact that it was entered into by two state-owned enterprises, which PDVSA and PDVSA Petróleos S.A. are; and the criteria of the importance of the contracting and its link to fulfillment of the State's objectives and missions.

> Hence, in our view, the issuance of the PDVSA 2020 Bond, as well as its respective guarantee, is a national public interest contract that should have been subjected to the procedure of review and authorization by the National Assembly, pursuant to Article 150 of the Constitution, and to acquisition of the prior opinion of the Office of the Attorney General of the Republic, as required by Article 247 of the Constitution.[13]

15.     I must say that I find it impossible to believe that ███████████████ ███████████████████████████████████████████████████████, and who has read my works on public law, actually thinks that the reference to a "binding" interpretation in the 2006 footnote reflects my true opinion.  Anyone familiar with my writings on the matter of binding interpretation—especially my insistence that a binding interpretation under Article 335 must be expressly announced and relate to the *thema decidendum* rather than a peripheral question—would know that this is inconceivable.

16.     The Court can be sure that I have not "mischaracterized" or "misrepresented" the views of Professors Luis Henrique Farías Mata, Isabel Boscán de Ruesta, José Araujo Juárez, Huen Rivas, José Melich Orsini, or Jesús Caballero Ortiz (██████ at ¶¶ 52-60), or the views of Professor Badell, who ██████████ ignores in his declaration.  None of these scholars have

---

[12] Brewer Opp. Decl. Ex. 1 at 14.
[13] *Id.* at 19.

ever written that only the Republic can be a party to a national public interest contract.  On the contrary, in the writings referenced in my reports, they have each expressly recognized that public interest contracts can be entered into by state-owned entities within the Public Administration.[14]

17.      I would also note that, even before the opposition parties won control of the National Assembly in December 2015, the Chávez-dominated National Assembly passed numerous resolutions authorizing as national public interest contracts under Article 150 various joint venture agreements (referred to in Venezuela as "mixed companies" or "mixed enterprises") entered into by PDVSA and certain of its subsidiaries relating to oil industry activities (exploration and extraction) in Venezuela.[15]  These agreements were submitted to the National Assembly because their authorization as national public interest contracts under Article 150 was expressly required by the Hydrocarbon Law, and thus the counterparties insisted on National Assembly authorization (which, given the National Assembly's lack of independence, was sure to be granted).

---

[14] Professor Badell makes the same observation in his new article.  *Id.* at 11–13.

[15] For example, the National Assembly approved, through a resolution dated March 31, 2006, the "Terms and conditions for the incorporation and functioning of Mixed Companies, as well as the model of the corresponding public contract to be signed between Corporación Venezolana del Petróleo and private corporations which between 1992 and 1997 had entered into Operational contracts" (*Official Gazette* No. 38.410, March 31, 2006), Brewer Opp. Decl. Ex. 5.  Based on this legislative authorization by the National Assembly in accordance with Article 150 of the Constitution and Article 33 of the Hydrocarbon Law, the National Assembly subsequently approved at the request of the National Executive the following resolutions:  Resolution of May 5, 2006 establishing the terms and conditions for Corporación Venezolana del Petróleo to enter into national public interest contracts for the incorporation and functioning of certain mixed enterprises (*Official Gazette* No. 38.43,0, May 5, 2006), Brewer Opp. Decl. Ex. 6; Resolution of July 6, 2016 establishing the terms and conditions for Corporación Venezolana del Petróleo to enter into national public interest contracts for the incorporation and functioning of certain mixed enterprises (*Official Gazette* No. 38.473, July 6, 2006), Brewer Opp. Decl. Ex. 7; and Resolution of September 25, 2006 establishing the terms and conditions for Corporación Venezolana del Petróleo to enter into national public interest contracts for the incorporation and functioning of a certain mixed enterprise (*Official Gazette* No. 38.529, September 25, 2006), Brewer Opp. Decl. Ex. 8.

## II.   THE REFERENCE TO THE "NATIONAL EXECUTIVE" IN THE FIRST PART OF ARTICLE 187.9 OF THE CONSTITUTION DOES NOT REFER TO CONTRACTS WITH FOREIGN/NON-DOMICILED COUNTERPARTIES REFERRED TO IN THE SECOND PART

18.   ████████████ claims that the reference to the "National Executive" in Article 187.9 of the Constitution supports his erroneous opinion that the concept of national public interest contracts is restricted to contracts entered into by the Republic itself. ████████ at ¶¶ 20, 29.  He declares:  "My conclusion is consistent with the plain language of the Constitution. Article 187(9) of the Constitution, which discusses the National Assembly's power to approve Contracts of National Interest, expressly refers to the 'National Executive'—a term which denotes the Republic represented through its President, Executive Vice President, and Ministers and therefore does not include state corporations such as PDVSA and PDVSA Petróleo— entering into Contracts of National Interest." ████████ at ¶ 29.

19.   ████████████ ignores the fact that Article 187.9 has *two* parts.  The first part addresses the National Assembly's power to "authorize the National Executive to enter into national interest contracts, in the cases provided in the law [*i.e.*, by statute]."[16]  The second part, which is the part relevant to this case, addresses the National Assembly's power to "authorize municipal, state and national public interest contracts with States or foreign official entities or with companies not domiciled in Venezuela."[17]  In contrast to the first part of Article 187.9, the second part does not speak of the National Assembly authorizing a particular organ or entity to enter into a national public interest contract.  Rather, it speaks of the National Assembly authorizing national public interest contracts with foreign/non-domiciled counterparties, without regard to which organ or entity is entering into the contract.[18]

---

[16] 1999 VENEZUELAN CONSTITUTION, art. 187.9, Pls. Ex. 4.
[17] *Id.*
[18] *Id.*

20.     Thus, the **relevant part** of Article 187.9 supports **my conclusion** (and the conclusion of the overwhelming majority of Venezuelan public law scholars) that national public interest contracts can be entered into, not just by the Republic itself, but by public corporations and state-owned enterprises within the National Public Administration.

## III.    THE REQUIREMENT OF NATIONAL ASSEMBLY AUTHORIZATION FOR CONTRACTS WITH FOREIGN/NON-DOMICILED COUNTERPARTIES IS INESCAPABLE

21.     ███████████ asserts that my opinion on the requirement of National Assembly authorization for contracts with foreign/non-domiciled counterparties would "significantly impair" the public policy behind the exemption of PDVSA debt transactions from the requirement for National Assembly authorization of public debt transactions in the Organic Law on the Financial Administration of the Public Sector. ███████ at ¶ 72.  He describes the public policy as "allow[ing] state corporations to operate autonomously without the stringent legislative approval requirements for public debt."  *Id*. at ¶ 72.

22.     However, it is not that "my opinion" would have this allegedly impairing effect. It is clear from the text of Article 150 of the Constitution, and not a subject of any disagreement, that National Assembly authorization of national public interest contracts is required in two *separate and independent* circumstances: (i) when such authorization is required by statute, and (ii) when the contract is with foreign/non-domiciled counterparties.[19]  Thus, the exemption from required authorization under the Organic Law on the Financial Administration of the Public Sector in no way exempts PDVSA debt transactions from the independent constitutional requirement of authorization for national public interest contracts entered into with "States, official foreign entities, or foreign companies not domiciled in Venezuela."[20]

---

[19] 1999 VENEZUELAN CONSTITUTION, art. 150, Pls. Ex 4.
[20] *Id.*

23.     Indeed, as discussed in my reports, the holding of the *Andrés Velásquez* decision (the decision on which ███████ so heavily relies), the holding of which had nothing to do with interpreting the concept of national public interest contracts, was that Article 80 of the same Organic Law was partially unconstitutional insofar as it would allow public debt transactions to be entered into with foreign/non domiciled counterparties without prior National Assembly authorization in accordance with Article 150.[21]  In the words of the Constitutional Chamber, the constitutional requirement of authorization for such contracts is "inescapable."[22]

24.     It is ███████ erroneous opinion, not my opinion, that would lead to "absurd results," as nearly all public contracts affecting important national interests are entered into by public corporations and state-owned enterprises that, like PDVSA, are "attached" to and controlled by one of the ministries of the Republic but are not technically part of the Republic itself.

## IV.   PDVSA'S ACQUISITION OF A GERMAN OIL REFINER ALMOST 40 YEARS AGO HAS NO BEARING ON THE 2020 NOTES TRANSACTION

25.     ███████ references an opinion I issued in 1983, almost 40 years ago, when I was acting Senator for the Federal District of Venezuela. ███████ ¶ 89.  The opinion, which was issued at the request of the Senate's Commission on Energy and Mines, addressed whether Article 126 of the 1961 Constitution (predecessor of the current Article 150, but requiring only post-signing approval) required National Assembly approval of a contract entered into by

---

[21] In the decision (No. 2241 of September 24, 2002), the Constitutional Chamber partially annulled article 80 of the Financial Management of the Public Sector Organic Law because this article did "not enshrin[e] the constitutional obligation of the National Executive to require the authorization of the National Assembly for the conclusion of contracts of national public interest, in the context of public credit transactions, when such contracts are concluded with States, foreign official entities or companies not domiciled in Venezuela." *See* ███████ Ex. 7 at 21.

[22] The Spanish word used by the Chamber is "*ineludible*." *Id*. at 19.

PDVSA with a German company, Veba Oel AG, for the acquisition of shares in Ruhr Oel GmbH, an oil refiner operating in Germany.[23]

26.     In the opinion, I reaffirmed that national public interest contracts are not only those entered into by the Republic itself but include contracts entered into by decentralized entities within the National Public Administration such as PDVSA.[24]  Accordingly, I concluded that the contract between PDVSA and Veba Oel AG was, without any doubt, a national public interest contract.[25]

27.     I further concluded, however, that since the contract did not refer to activities reserved to the Venezuelan State and its purpose and object was "the cooperation between two oil companies regarding the Federal Republic of Germany oil and petrochemical industry[] and the acquisition of shares of a foreign company in order to refine Venezuelan crude, not taking place its execution in the national territory, the requirement of the second part of article 126 of the Constitution was not to be applied, and the contract needed not to be approved by Congress."[26]  In other words, I concluded that National Assembly approval was not required because, among other things, the purpose and object of the contract had no direct relation to PDVSA's oil industry activities in Venezuela.  By contrast, the financing of PDVSA's oil industry activities in Venezuela was the direct purpose and object of the 2020 Notes Transaction.

---

[23] *See* the text of my 1983 opinion in Allan R. Brewer-Carías, *La aprobación Legislativa de los contratos de interés nacional y el contrato PDVSA-Veba Oel*, [*Legislative approval of contracts of national interest and the PDVSA-Veba Oel contract*], in *Estudios de Derecho Público (Labor en el Senado 1983), Tomo II,* Ediciones del Congreso de la República, 65-82 [Caracas 1984], ▮▮▮▮▮▮ Ex. 44.
[24] *Id*. at 68–70.
[25] *Id*. at 78–79.
[26] *Id.* at 81.

## V.   THE GUAIDÓ ADMINISTRATION PRESS RELEASE REGARDING RECENT CITGO DEBT TRANSACTIONS IS NOT BASED ON AN "INVENTED THEORY"

28.   ▌▌▌▌▌▌ refers to the Guaidó Administration's June 3, 2020 press release stating that certain CITGO debt transactions did not require National Assembly authorization because the National Assembly's control powers "cannot be exercised extraterritorially concerning PDVSA subsidiaries incorporated abroad, [or] concerning contracts executed abroad not related to the transfer or traffic [course of business] of PDVSA."[27] ▌▌▌▌▌ at ¶ 87.  This is not, as the defendants and ▌▌▌▌▌ claim, any sort of newly invented theory.  *Id.*; Defendants' Motion for Summary Judgment at 42.  By definition, a national public interest contract is a contract that, at a minimum, has as a party an entity within the National Public Administration (the dispute in this case being whether that entity must be the Republic itself).[28]  No one has ever argued that a contract entered into only by a non-Venezuelan entity such as CITGO, which is not part of the centralized or decentralized National Public Administration, could qualify as a national public interest contract.

## VI.   ▌▌▌▌▌▌ IS MISAPPLYING THE "PRINCIPLE OF CONGRUENT (OR PARALLEL) FORMS"

29.   ▌▌▌▌▌ asserts that, under the "principle of congruent (or parallel) forms," if the acquisition of CITGO was not subject to National Assembly approval, the purported pledge of CITGO Holding shares to secure to the 2020 Notes was also not subject to National Assembly approval.  ▌▌▌▌▌ at ¶ 88.  This is not a proper application of the principle, even assuming that the CITGO acquisition was not approved by the National Assembly.

---

[27] Defs. Ex. 277.
[28] Brewer Report ¶ 32.

30.     Most fundamentally, as █████████ recognizes in his rebuttal report (¶ 147),
the "principle of congruent (or parallel) forms," was developed in Venezuelan administrative law
to ensure that administrative acts or decisions "must be undone the same way they were made, or
modified or revoked following the same procedure followed when they were made."[29]  The
purported pledge of CITGO Holding shares did not "undo," or modify or revoke in any way, the
acquisition of CITGO Petroleum, which is still wholly owned by CITGO Holding (and, through
PDV Holding, PDVSA).  Furthermore, at the time of the CITGO Petroleum acquisition (1986
and 1990), the 1961 Constitution was in force rather than the 1999 Constitution that was in force
at the time of the purported pledge (and that is still in force today).  The former required only
post-signing National Assembly approval while the latter requires prior National Assembly
authorization as a pre-condition of valid contract formation, and so the constitutional procedures
for National Assembly oversight of national public interest contracts are not even the same.
Moreover, the purported pledge of CITGO Holding shares was part of a transaction which had
the purpose and object of financing PDVSA's oil industry activities in Venezuela, not the
undoing, modification, or revocation of the CITGO Petroleum acquisition.

## VII.   THE "PRINCIPLE OF LEGITIMATE EXPECTATIONS" CANNOT BE APPLIED TO ENFORCE AN ILLEGAL CONTRACT

31.     █████████ highlights a 2007 decision of the Political-Administrative
Chamber of the Supreme Tribunal (not the Constitutional Chamber, as he erroneously states) in a
case involving the Universidad Central de Venezuela (UCV).  █████████ at ¶ 77.  According to
█████████, the Chamber "ruled in favor of the Public Administration's counterparty based



---

[29] *See* in Allan R. Brewer-Carías, *Los principios de legalidad y eficacia en las leyes de Procedimientos
Administrativos en América Latina* [*The principles of legality and effectiveness in the laws of Administrative
Procedures in Latin America*], in *IV Jornadas Internacionales de Derecho Administrativo Allan Randolph Brewer
Carías,* Caracas 9-12 noviembre de 1998, FUNEDA, 47, 49 (Caracas 1998), Brewer Opp. Decl. Ex. 9.

on the principle of legitimate expectation, despite the fact that UCV had violated public order contracting regulations governing its contracts." ████████ at ¶ 77. ████████ fails to mention that the "ruling in favor of the Public Administration's counterparty" was not to enforce the counterparty's alleged contract but to fashion a remedy for "enrichment without cause."

32.     In that case, a private company, Repro Sportny, manufactured and delivered sports uniforms to UCV, which did not pay for them because the alleged contract had not been duly authorized by the University Council in accordance with applicable bidding rules.[30]  Repro Sportny sought to compel UCV to pay the agreed-upon price for the uniforms, which had already been used by UCV students.[31]

33.     The Chamber refused to enforce the alleged contract, finding that the lack of required authorization meant "the non-existence of the manifestation of the will by the University in order to be liable" on a contract.[32]  Thus, the Chamber ruled that "Universidad Central de Venezuela is compelled to compensate *only to the extent of its enrichment, compensation that cannot be greater than the impoverishment suffered by the personal firm Repro Sportny*."[33]

34.     The Political-Administrative Chamber has been absolutely clear in other decisions that a contract infected by illegality cannot be the enforced based on the principle of legitimate expectations.  Most recently, in its decision of November 20, 2019 in the *Propatrimonio* case, the Chamber ruled that "legitimate expectations or plausible expectations are not principles or values that can be invoked or predicated in a situation of illegality or outside the law, since this would imply reinforcing and perpetuating conducts contrary to law instead of contributing to the

---

[30] *See* decision of the Supreme Tribunal of Justice of July 3, 2007 at 20, ████████. Ex. 42.
[31] *Id.* at 23.
[32] *Id.* at 20.
[33] *Id.* at 24.

consolidation of legal security and stability of the legal system Venezuelan[,] [and thus] the plaintiff cannot claim to enjoy the principle of legitimate expectations or to have a plausible expectation born from illegitimate action . . . ."[34]

35.      Previously, in its decision of March 24, 2015 in the *Cámara Venezolana de la Construcción et al* case, the Chamber ruled that "the legitimate confidence or plausible expectation are not principles or values that can be invoked or predicated in a situation of illegality or outside the law."[35]  Likewise, in its decision of May 5, 2010 in the *Seguros Carabobo* case, the Chamber ruled that "a justified expectation . . . could not exist based on an interpretation that does not conform to what is prescribed in the Law."[36]

36.      In her 2019 book on the principle of legitimate expectations, Professor Karla Velazco Silva refers to the *Cámara Venezolana de la Construcción et al* and *Seguros Carabobo* decisions, concluding that they "make it clear that the principle of legitimate confidence [expectations] cannot be invoked when it was born from an illegal action that damages the legal sphere of the community."[37]

37.      In any event, no "legitimate expectations" could possibly have arisen in this case given the National Assembly's public warnings and opposition to the Exchange Offer.

---

[34] *See* decision of the Political-Administrative Chamber of the Supreme Tribunal of November 20, 2019 at 35, Brewer Opp. Decl. Ex. 10.

[35] *See* decision of the Political Administrative Chamber of the Supreme Tribunal of March 24, 2015 (case *Cámara Venezolana de la Construcción et al*) at 20, Brewer Opp. Decl. Ex. 11.

[36] *See* decision of the Political Administrative Chamber of the Supreme Tribunal of May 5, 2010 (case *Seguros Carabobo*) at 27, Brewer Opp. Decl. Ex. 12.

[37] *See* Karla Vealzco Silva, *La confianza legítima ante actuaciones de funcionarios de hecho* [*Legitimate expectations in the face of the actions of de facto officials*]*,* 66 (Universidad del Zulia, 2019), Brewer Opp. Decl. Ex. 13.

## VIII.   PUBLIC ADMINISTRATION CONTRACTS ENTERED INTO WITHOUT REQUIRED AUTHORIZATION ARE VOID *AB INITIO* (NOT JUST VOIDABLE) BECAUSE NO VALID CONTRACT IS EVER FORMED

38.      The *UCV* case referred to by ███████████ and discussed above is a very important case because the Political-Administrative Chamber explains very clearly that, contrary to ███████████ erroneous opinion (███████ at ¶ 93), a public contract entered into without required prior authorization never comes into valid legal existence, which corresponds exactly to the concept in U.S. law of void *ab initio*.  In the words of the Constitutional Chamber already quoted above, the lack of required authorization results in "the non-existence of the manifestation of the will by the [Public Administration entity] in order to be liable" on a contract.  Under Venezuelan law, "manifestation of the will" is an essential element of contract formation.

39.      If called to testify at trial, I would testify under oath as set forth herein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of June, 2020                    Allan R. Brewer-Carías

17