# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

    Plaintiffs and Counterclaim Defendants,

    - against -

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

    Defendants and Counterclaim Plaintiffs.

No. 19 Civ. 10023 (KPF)

---

**DEFENDANTS AND COUNTERCLAIM PLAINTIFFS' RESPONSE TO PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS AND RULE 56.1 COUNTERSTATEMENT OF ADDITIONAL MATERIAL UNDISPUTED FACTS**

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Walter Rieman
William A. Clareman
Jonathan Hurwitz
Shane D. Avidan
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile:  212-757-3990

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Roberto J. Gonzalez (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300

*Attorneys for Defendants and
Counterclaim Plaintiffs
(as to New York law issues only)*

LATHAM & WATKINS LLP
Christopher J. Clark
Matthew S. Salerno
Sean H. McMahon
885 Third Avenue
New York, NY 10022
Telephone: 212-906-1200
Facsimile:  212-751-4864

*Attorneys for Defendants and
Counterclaim  Plaintiffs*

## Glossary and Citation Conventions

This statement uses the following defined terms:

"2017 Notes" means the 5.25% Senior Notes due 2017 and the 8.5% Senior Notes due 2017, both issued by PDVSA.

"2020 Notes" means the 8.5% Senior Secured Notes due 2020, issued by PDVSA pursuant to the Indenture.  "April 2017 Notes" means the 5.25% senior unsecured notes due April 12, 2017, issued by PDVSA.

"Ashmore" means Ashmore Group plc and its affiliates.

"BlackRock" means BlackRock, Inc. and its affiliates.

"Bliss Ex. _" means an exhibit annexed to the declaration of James R. Bliss, dated June 10, 2020.

"CITGO Holding" means CITGO Holding Inc.

"CITGO Petroleum" means CITGO Petroleum Inc.

"Clark Ex. _" means an exhibit annexed to the declaration of Christopher J. Clark, dated June 10, 2020.

"Supp. Clark Decl." means the accompanying declaration of Christopher J. Clark, dated June 29, 2020.

"Supp. Clark Ex. _" means an exhibit annexed to the Supp. Clark Decl.

"Collateral" means PDVH's pledge of a 50.1% interest in CITGO Holding under the Pledge Agreement.

"Collateral Agent" means defendant and counterclaim plaintiff GLAS Americas LLC, the collateral agent of the 2020 Notes.

"Constitutional Chamber" means the Constitutional Chamber of the Supreme Tribunal of Justice of Venezuela.

"Contrarian" means Contrarian Capital Management, LLC.

"Defs. 56.1" means the Corrected Local Rule 56.1 Statement of Undisputed Material Facts in Support of Defendants and Counterclaim Plaintiffs' Motion for Summary Judgment, filed on June 19, 2020.

"Exchange Offer" means the tender offer announced by PDVSA on September 17, 2016, and closed on October 28, 2016, to exchange 2017 Notes for 2020 Notes.

"Governing Documents" means the Global Note, Indenture, and Pledge Agreement for the 2020 Notes.

"Indenture" means the Indenture dated October 27, 2016, between PDVSA as issuer, PDVSA Petróleo as guarantor, the Trustee, the Collateral Agent, the Law Debenture Trust Company of New York as registrar, transfer agent, and principal paying agent, and Banque Internationale à Luxembourg, Société Anonyme as Luxembourg paying agent.  A copy of the executed Indenture is annexed as Exhibit 2 to the Clark Decl. and Exhibit 2 to the Moreyra Decl.

"Moreyra Decl." means the declaration of Fernando Moreyra, a Vice President at MUFG Union Bank, N.A., in New York, New York.

"Moreyra Ex. _" means an exhibit annexed to the Moreyra Decl.

████████ means the declaration of ████████████████, expert for the Defendants and Counterclaim Plaintiffs.

████████ means an exhibit annexed to the ████████

████████████ means the accompanying declaration of ████████████████, expert for the Defendants and Counterclaim Plaintiffs, dated June 29, 2020.

████████████ means an exhibit annexed to the ████████

"National Assembly" means the National Assembly of the Bolivarian Republic of Venezuela.

"Offering Circular" means the Offering Circular for the 2020 Notes filed with the U.S. Securities and Exchange Commission.  A copy of the Offering Circular is annexed as Exhibit as Exhibit 1 to the Clark Decl. and Exhibit 1 to the Moreyra Decl.

"PDVH" means plaintiff PDV Holding, Inc.

"PDVH Board" means the Maduro-Controlled Board of Directors of PDVH.

"PDVSA" means plaintiff Petróleos de Venezuela, S.A.

"PDVSA Ad Hoc Board" means the Ad Hoc Administrative Board for PDVSA.

"PDVSA Petróleo" means plaintiff PDVSA Petróleo S.A.

"PDVSA Parties" means PDVSA, PDVSA Petróleo, and PDVH.

"PDVSA Parties' 56.1 Statement" means the Statement of Material Facts of Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding Inc., dated June 10, 2020.

"Pledge Agreement" means the Pledge and Security Agreement dated October 28, 2019, between PDVH as pledgor, PDVSA as issuer, PDVSA Petróleo as guarantor, the

Collateral Agent, and the Trustee.  A copy of the Pledge Agreement is annexed as Exhibit 3 to the Clark Decl. and Exhibit 3 to the Moreyra Decl.

"Porzecanski Rebuttal Decl." means the rebuttal expert declaration of Arturo Porzecanski, expert for the Defendants and Counterclaim Plaintiffs.

"Rosneft" means PJSC Rosneft Oil Company.

"S.A." means *sociedad anónima*.

"Supreme Tribunal" means the Supreme Tribunal of Justice of Venezuela.

"Torino Capital" means Torino Capital LLC.

"Trigo Paz Decl." means the accompanying declaration of Sergio Trigo Paz, Managing Director, Head of Emerging Markets Fixed Income at BlackRock Financial Management, Inc. in London, England.

"Trustee" means defendant MUFG Union Bank N.A., the trustee of the 2020 Notes.

"Venezuela" means the Bolivarian Republic of Venezuela.

"Weisser Decl." means the accompanying declaration of Joshua Weisser, Managing Director at Contrarian Capital Management, LLC, in Greenwich, Connecticut.

"Xu Decl." means the accompanying declaration of Xin Xu, a portfolio manager at Ashmore Group plc in London, England.

"Xu Decl. Ex. _" means an exhibit annexed to the Xu Decl.

Pursuant to Local Civil Rule 56.1(b), defendants and counterclaim plaintiffs MUFG Union Bank, N.A. and GLAS Americas LLC respectfully submit this response and supplemental counterstatement of additional undisputed facts to plaintiffs and counterclaim defendants Petróleos de Venezuela, S.A., PDVSA Petróleo, S.A., and PDV Holding Inc.'s Statement of Material Facts.  Defined terms used in Defendants and Counterclaim Plaintiffs' Response to Plaintiffs' Rule 56.1 Statement are listed in the Glossary and Citation Conventions at the beginning of this document.

## General Objections to the PDVSA Parties' Statement of Material Facts

The Trustee and Collateral Agent object to the PDVSA Parties' 56.1 Statement to the extent it relies on mere conclusions, hearsay, or unsupported inferences.  *See Giannullo* v. *City of New York*, 322 F.3d 139, 142–43 & n.5 (2d Cir. 2003) (vacating grant of summary judgment where statement of material fact in Rule 56.1 statement was unsupported by record); *Bridgeway Corp.* v. *Citibank*, 201 F.3d 134, 142 (2d Cir. 2000) ("Summary judgment cannot be granted on the basis of inadmissible evidence."); *Young* v. *Daughters of Jacob Nursing Home*, 2011 WL 2714208, at *1 n.1 (S.D.N.Y. July 12, 2011) (citing *Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008)) (noting that exhibits submitted in connection with summary judgment motion must be non-hearsay).

The Trustee and Collateral Agent further object to the PDVSA Parties' 56.1 Statement to the extent assertions are not "followed by citation to evidence which would be admissible."  *See* Local Civ. R. 56.1(d); *see also Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 74 & n.1 (2d Cir. 2001) ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently."); *Rodriguez* v. *City of New York*, 291 F. Supp. 3d 396, 408 (S.D.N.Y. 2018) (Failla, J.) (citing

Local Civ. R. 56.1(d) and *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241 (2004))

("Each statement must be supported by a citation to admissible evidence.  But a reviewing court

may not 'rely solely on the statement of undisputed fact[,] . . . [i]t must be satisfied that the

citation to evidence in the record supports the assertion.'").

The responses herein are based on information currently available to the Trustee, the

Collateral Agent, and their counsel. In light of the limited discovery to date, and the PDVSA

Parties' representation that they have no access to documents or witnesses in Venezuela, the

Trustee and Collateral Agent reserve the right to dispute the PDVSA Parties' assertions in their

56.1 Statement at a later stage of these proceedings.  In responding to the statements herein, the

Trustee and Collateral Agent do not concede that the matters stated are relevant or admissible,

and reserve the right to object to the offer of any evidence at trial on any appropriate ground.

*See, e.g.*, *Cortes* v. *City of New York*, 2019 WL 5592853, at *4 (E.D.N.Y. Oct. 30, 2019)

("[D]istrict courts in this circuit routinely remind litigants that their Local Rule 56.1 statements

may be deemed admitted for the purposes of a summary-judgment motion, but not

trial. Moreover, the argument advanced by Plaintiff here that Defendants' 56.1 statements

constitute judicial admissions has been squarely rejected. . . .") (citations omitted); *Ramgoolie* v.

*Ramgoolie*, 2018 WL 4266015, at *7 (S.D.N.Y. Sept. 6, 2018) ("[U]nder Rule 56.1(c), facts are

deemed admitted for *the purposes of the motion*. That these facts were deemed admitted at

summary judgment does not preclude Defendant from challenging Plaintiff's evidence at trial.")

(emphasis in original); *Marrero* v. *Air Brook Limousine*, 2014 WL 1623706, at *2 (S.D.N.Y.

Apr. 23, 2014) ("[A]ll statements of fact contained in defendants' Rule 56.1 Statement are

deemed admitted for the purposes of this motion (albeit not for trial).").  The statements herein

by the Trustee and the Collateral Agent should not be construed to imply that they have personal knowledge of the matters addressed.

### Responses to the PDVSA Parties'
### Statement of Material Facts

1.      Since the discovery of oil in what is now the Bolivarian Republic of Venezuela ("Venezuela" or the "Republic") in the early 20th century, Venezuela's economy has become increasingly dependent on oil exports.[1]

**Response**:  The assertions in this paragraph are not disputed, but the Trustee and Collateral Agent state that the assertions are not material to the issues in dispute.

2.      Venezuela has one of the largest known oil reserves in the world.[2]

**Response**:  The assertions in this paragraph are not disputed.

3.      Venezuela has been one of the world's leading exporters of oil for many decades.[3]

**Response**:  The assertions in this paragraph are not disputed.

4.      Hugo Chávez was elected president of Venezuela in 1998[4] and remained in office until his death in 2013.[5]

**Response**:  The assertions in this paragraph are not disputed, except to clarify that Chávez did not assume the presidency in 1998.  Chavéz was inaugurated on February 2, 1999. Clark Ex. 72.

---

[1] *See* Keith Johnson, *How Venezuela Struck It Poor*, FOREIGN POLICY (July 16, 2018), *available at* https://foreignpolicy.com/2018/07/16/how-venezuela-struck-it-poor-oil-energy-Chávez/.
[2] *See* Samuel Stebbin, *These 15 countries, as home to largest reserves, control the world's oil*, USA TODAY (May 22, 2019), *available at* https://www.usatoday.com/story/money/2019/05/22/largest-oil-reserves-in-world-15-countries-that-control-the-worlds-oil/39497945/.
[3] *Id*.
[4] Richard Lapper, *Venezuela and the Rise of Chávez: A Background Discussion Paper*, COUNCIL ON FOREIGN RELATIONS (Nov. 22, 2005), *available at* https://www.cfr.org/backgrounder/venezuela-and-rise-Chávez-background-discussion-paper.
[5] *Iconic Venezuelan president Hugo Chávez dies*, BBC (Mar. 6, 2013), *available at* https://www.bbc.com/news/world-latin-america-21679053.

5.      Chávez was succeeded by his Vice President, Nicolás Maduro.[6]

**Response**:  The assertions in this paragraph are not disputed.

6.      Plaintiff PDVSA is a Venezuelan corporation with its principal place of business in Caracas, Venezuela.[7]

**Response**:  The assertions in this paragraph are not disputed.

7.      PDVSA was formed in 1975 after the nationalization of the Venezuelan oil industry to coordinate, monitor, and control all Venezuelan oil and gas operations.[8]

**Response**:  The assertions in this paragraph are not disputed.

8.      PDVSA is wholly owned by Venezuela.

**Response**:  The assertions in this paragraph are not disputed.

9.      Venezuela's 100% ownership of PDVSA is mandated by Article 303 of the Venezuelan Constitution "[f]or reasons of economic and political sovereignty and national strategy."[9]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in Article 303, but state that Article 303 of the Venezuelan Constitution excepts "subsidiaries, strategic joint ventures, companies, and any other venture that is or has been established as a consequence of the business development of Petróleo de Venezuela, S.A." from the mandate that Republic "retain all shares" of PDVSA.  Bliss Ex. 4.  The Trustee and Collateral Agent respectfully refer the Court to Article 303 for its complete contents.

---

[6] Virginia Lopez, *Nicolás Maduro declared Venezuela election winner by thin margin*, THE GUARDIAN (Apr. 15, 2013), *available at* https://www.theguardian.com/world/2013/apr/15/nicolas-maduro-wins-venezuela-election.

[7] Offering Circular at 3, Ex. 5.  All citations to exhibits (Ex. _) in this Memorandum are exhibits to the Declaration of James R. Bliss in Support of Motion Plaintiffs' Motion for Summary Judgment.

[8] 1999 VENEZUELAN CONSTITUTION art. 303, Ex. 4

[9] Id.; Offering Circular at 3, Ex. 5.

10.     Plaintiff PDVSA Petróleo is a Venezuelan corporation based in Caracas and a wholly-owned PDVSA subsidiary responsible for oil production and exploration.[10]

**Response**:  The assertions in this paragraph are not disputed.

11.     Plaintiff PDV Holding, a Delaware corporation based in Houston, Texas, is also a wholly-owned PDVSA subsidiary.[11]

**Response**:  The assertions in this paragraph are not disputed.

12.     PDV Holding is a holding company that owns 100% of the shares of CITGO Holding, Inc. ("CITGO Holding").[12]

**Response**:  The assertions in this paragraph are not disputed.

13.     CITGO Holding owns 100% of the shares of CITGO Petroleum Company ("CITGO"), a major, U.S.-based oil refiner.[13]

**Response**:  The assertions in this paragraph are not disputed.

14.     PDVSA indirectly owns 100% of CITGO through PDV Holding and CITGO Holding.[14]

**Response**:  The assertions in this paragraph are not disputed.  PDVSA acquired a 50% ownership interest in CITGO Petroleum in 1986, and acquired the other 50% in 1990.  PDVSA & PDVSA Petróleo Answer ¶ 125; PDVH Answer ¶ 125.  ███████████████

████████████████████████████████████████████████

████████████████████████

---

[10] Id.  at 85.
[11] Id. at A-33.
[12] *Id*. at 87.
[13] *Id*.
[14] *Id*. at 84.

15.     On February 5, 2019, the National Assembly enacted the "Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela" (the "Transition Statute").[15]

**Response**:  The assertions in this paragraph are not disputed.

16.     Pursuant to the Transition Statute, Interim President Guaidó appointed a new, *ad hoc* board of directors of PDVSA (the "Ad Hoc Board") "for the purpose of carrying out all necessary actions to appoint a Board of Directors" for PDV Holding.[16]

**Response**:  The assertions in this paragraph are not disputed.

17.     From a U.S. standpoint, the Ad Hoc Board is the only legitimate board of directors of PDVSA.[17]

**Response**:  The assertions in this paragraph are conclusions of law as to which a response is not required.  To the extent a response is required, the Trustee and Collateral Agent refer the Court to the decision of the Delaware Court of Chancery in *Jiménez* v. *Palacios*, 2019 WL 3526479, at *6 (Del. Ch. Aug. 2, 2019), currently on appeal, and state that for purposes of the present motion they do not dispute that the PDVSA Ad Hoc Board is the legitimate board of directors of PDVSA at this time.  The Trustee and Collateral Agent clarify, however, that in 2016, at the time of the Exchange Offer, the PDVSA Board appointed by the Maduro administration was the only legitimate board of directors of PDVSA.

---

[15] Asamblea Nacional, *Estatuto que rige la transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela [Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela]* (Feb. 5, 2019), Ex. 6.

[16] *Jimenez v. Palacios*, 2019 WL 3526479, at *6 (Del. Ch. Aug. 2, 2019) quoting Decree of Juan Guaidó (Feb. 8, 2019)).

[17] *See Jimenez*, 2019 WL 3526479, at *13 ("In this case, the act of state doctrine resolves the question of who constitutes the PDVSA board. The Guaidó government's reconstitution of the PDVSA board was the official act of a recognized sovereign taken wholly within its own territory. Under the act of state doctrine, this Court must accept that action as valid without further inquiry.").

18.     In accordance with the Transition Statute, the PDVSA Ad Hoc Board appointed new boards of PDV Holding, PDVSA Petróleo, and PDVSA's other wholly-owned subsidiaries.[18]

**Response**:  The assertions in this paragraph are not disputed, except to clarify that the PDVH Ad Hoc Board appointed the board of CITGO Holding, which in turn appointed the board of CITGO Petroleum.  Compl. ¶¶ 8, 35.  Article 13 of the Transition Statute states that "the National Assembly, the President of the National Assembly acting as in charge of the Office of the President of the Republic, and any body appointed thereby, including the ad-hoc administrative board, ***may not take any decision that impacts the day-to-day business of PDV Holding Inc. and its affiliated companies***, including Citgo Petroleum Corporation."  Bliss Ex. 7 at 19 (emphasis added).

19.     Defendant Union Bank is a U.S. national banking association with its main office in California and an office in New York City.[19]

**Response**:  The Trustee and the Collateral Agent do not dispute that Union Bank has an office in New York, New York, but dispute that its main office is in California.  Moreyra Decl. at ¶ 1; PDVSA & PDVSA Petróleo Answer ¶ 152; PDVH Answer ¶ 152.

20.     Union Bank is the Trustee under the Indenture (as defined below) and the Pledge (as defined below).[20]

**Response**:  The assertions in this paragraph are not disputed.

21.     As the Trustee under the Indenture and the Pledge, Union Bank represents the interests of the beneficial holders of the 2020 Notes (as defined below).[21]

---

[18] *See* Decree of Juan Guaidó (Apr. 10, 2019), Ex. 7.
[19] *Defendants' Answers and Counterclaims*, Case No. 1:19-cv-10023-KPF, Dkt. No. 40, at ¶ 13.
[20] *Id*.
[21] Indenture at 45-49, Ex. 10.

**Response**:  The assertions in this paragraph are disputed.  The Trustee's obligations under the Indenture are as set forth in that document.  The Trustee and Collateral Agent respectfully refer the Court to the Indenture for its complete contents.

22.  ████████████████████████████████████████████████
████████████████████████████████████████.[22]

**Response**:  The Trustee and Collateral Agent dispute that the beneficial holders include "hedge funds," but do not dispute that some beneficial holders are large and sophisticated investment funds.

23.  Most of the 2020 Notes are beneficially held by hedge funds managed by Ashmore PLC ("Ashmore"), Blackrock Financial Management Inc., and Contrarian Capital Management LLC.[23]

**Response**:  The assertions in this paragraph are disputed.  Ashmore Group, plc, Blackrock Financial Management, Inc., and Contrarian Capital Management LLC do not manage "hedge funds" that beneficially hold the 2020 Notes.  The Trustee and Collateral Agent clarify that the beneficial holders comprise investment funds and accounts managed by Ashmore Group, plc, Blackrock, Inc., and Contrarian Capital Management LLC.  *See* Trigo Paz Decl. ¶ 3; Xu Decl. ¶ 2; Weisser Decl. ¶ 3.  The Trustee and the Collateral Agent further note that the cited exhibit is not admissible to support the assertions in this paragraph.

---

[22] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

[23] Andrew Scurria, *Venezuelan Opposition Files Lawsuit Attacking Citgo-Backed Bonds*, WALL ST. J. (Oct. 29, 2019), *available at* https://www.wsj.com/articles/venezuelan-opposition-files-lawsuit-attacking-citgo-backed-bonds-11572391392.

24.     Ashmore PLC is a London-based asset manager with more than $98.4 billion under management as of December 31, 2019.[24]

**Response**: The Trustee and Collateral Agent dispute any suggestion that Ashmore is a "hedge fund," but otherwise do not dispute the assertions in this paragraph.  The Trustee and Collateral Agent respectfully refer the Court to the identified document for its complete contents.

25.     Blackrock Financial Management Inc. is a New York-based asset manager with more than $7.4 trillion under management as of December 31, 2019.[25]

**Response**:  The Trustee and Collateral Agent dispute any suggestion that Blackrock is a "hedge fund" and that BlackRock Financial Management Inc. had $7.43 trillion in assets under management as of December 31, 2019.

26.     Contrarian Capital Management LLC is a Greenwich, Connecticut-based asset manager with more than $6 billion under management through various hedge funds as of December 31, 2019.[26]

**Response**:  The Trustee and Collateral Agent dispute any suggestion that Contrarian is, or manages its portfolio through, a "hedge fund."  The Trustee and Collateral Agent further dispute that Contrarian had more than $6 billion in assets under management as of December 31, 2019, and state that Contrarian had approximately $5.2 billion in assets under management as of that date.  Otherwise the assertions in this paragraph are not disputed.  The Trustee and Collateral Agent respectfully refer the Court to the identified document for its complete contents.

---

[24] *See Third Quarter Assets Under Management Statement*, Ashmore Group, plc (Apr. 16, 2020), *available at* http://www.ashmoregroup.com/sites/default/files/reports/Ashmore%20Q3%20AuM%20statement%202019-20%20FINAL.pdf.

[25] *Annual Report 2019*, Blackrock, *available at*, https://s24.q4cdn.com/856760660/files/doc_financials/2019/ar/BlackRock-2019-Annual-Report.pdf.

[26] *See Form ADV*, Contrarian Capital Management, Ex. 8.

27.     Defendant GLAS Americas is a New York limited liability company with a single English member based in London, England.[27]

**Response**:  The assertions in this paragraph are not disputed.

28.     GLAS Americas is the Collateral Agent under the Indenture and the Pledge Agreement.[28]

**Response**:  The assertions in this paragraph are not disputed.

29.     Neither Union Bank nor GLAS Americas was ever domiciled in Venezuela.[29]

**Response**:  The assertions in this paragraph are not disputed.

30.     In a September 2016 exchange offer (the "Exchange Offer"), PDVSA offered to exchange its outstanding unsecured notes due in April and November 2017 (respectively, the "April 2017 Notes" and the "November 2017 Notes" and, collectively, the "2017 Notes") for new notes due in 2020 (the "2020 Notes").[30]

**Response**:  The assertions in this paragraph are not disputed.

31.     Like the 2017 Notes, the 2020 Notes were to be issued with a purported guaranty from PDVSA Petróleo.[31]

**Response**:  The assertions in this paragraph are not disputed, except to dispute that the guaranty was not "purported."  *See* Clark Ex. 87 at 12; *id.* Ex. 112.  PDVSA Petróleo also unconditionally and irrevocably guaranteed the 2017 Notes.  *See* Compl. ¶ 39.

32.     Unlike the 2017 Notes or any other notes or debts issued or incurred by PDVSA, the 2020 Notes were also to be purportedly secured by a pledge of 50.1% of PDV Holding's

---

[27] *Defendants' Answers and Counterclaims*, Case No. 1:19-cv-10023-KPF, Dkt. No. 40, at ¶ 114.
[28] *Id.*
[29] *See id.* ¶¶ 77 & 114; *Complaint for Declaratory and Injunctive Relief*, Case No. 1:19-cv-10023-KPF, Dkt. No. 1, at ¶ 77.
[30] Offering Circular at cover page, Ex. 5.
[31] *Id.* at cover page & 14.

shares of CITGO Holding (the "CITGO Shares") due to PDVSA's financial distress stemming

from mismanagement and the collapse of its oil production.[32]

**Response**: The Trustee and the Collateral Agent do not dispute that pursuant to the terms

of the Exchange Offer, the 2020 Notes were to be secured by a pledge of 50.1% of PDVH's

interest in CITGO Holding, nor that the 2017 Notes were unsecured. The assertions in this

paragraph, including that the 2020 Notes were to be "purportedly" secured, are otherwise

disputed. ███████████████████████████████          *See* Clark Ex. 36 at 1; ███████

███████████████; *id.* Ex. 87 at 12; *id.* Ex. 112 at 39. The stated rationale for the Exchange

Offer was to "extend the maturities of and refinance the Existing Notes" and "to rearrange [its]

debt profile." Clark Ex. 1 at 7; ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████          The PDVSA Parties cite no evidence in support of the claim

that they pledged PDVH's interest in CITGO Holding as a consequence of "mismanagement and

the collapse of its oil production." This claim has not been proven. The PDVSA Parties also

failed to provide any discovery relevant to this claim in response to the Trustee and Collateral

Agent's document requests, including a request for documents concerning "the purpose of the

Exchange, or any actual or anticipated financial benefit to Plaintiffs of the 2020 Notes or the

Exchange," ███████████████████████████████████████████

███████████████          *See* Clark Ex. 252 ¶¶ 6–7, 8, 13–14; *id.* Ex. 259 at 3, 8; Defs. 56.1 ¶¶ 521–

33, 536–52.

The Trustee and Collateral Agent further state that PDVSA and its subsidiaries engaged

in at least 95 financing transactions in the decades before the Exchange Offer. *See* Defs. 56.1

---

[32] *Id.* at 7.



¶¶ 376–82; *see also* Clark Ex. 1 at 70–83; ████ Ex. 2 §§ 55–58. ████████████

████████████████████████████████████

████████████  *See* Clark Ex. 1 at 79–82; ████████████

████████████████████████; *id.*

Ex. 42 at 11–12; *id.* Ex. 98 at 1, 7; *id.* Ex. 140 at 1; *id.* Ex. 205 at 26; *id.* Ex. 211 at 6–8; *id.* Ex.

217 at 1, 149; *id.* Ex. 219 at 1, 47, 194; ████████████; *see also* Defs. 56.1 ¶¶ 443, 449, 458,

465, 468, 469, 471, 475; ██████ Ex. 2 §§ 57–58.  During this time, CITGO Petroleum also

pledged as collateral various letters of credit, its accounts receivable and inventory, the accounts

receivable and inventory of its subsidiaries, its trade accounts receivable, and its property and the

property of its subsidiaries.  *See* Clark Ex. 1 at 79–80, F-44; *id.* Ex. 100 at 1, 4, 20, 22; *id.* Ex.

140 at 1; *id.* Ex. 172 at 1, 4, 19, 21; *id.* Ex. 174 at 1, 20, 22; *id.* Ex. 178 at 1, 4; *id.* Ex. 179 at 1,

4, 19, 23; *id.* Ex. 183 at 1, 4; *id.* Ex. 186 at 1, 23; *id.* Ex. 188 at 1, 22; *id.* Ex. 191 at 1, 4, 22; *id.*

Ex. 192 at 1, 4; *id.* Ex. 200 at 1–4; *id.* Ex. 207 at 1, 4; *id.* Ex. 210 at 1, 21; *id.* Ex. 211 at 1, 6–8,

131; *id.* Ex. 214 at 1, 29, 31; *id.* Ex. 221 at 1, 12, 18; *id.* Ex. 225 at 1, 20, 22, 26;  *id.* Ex. 240 at

1, B-1, B-2; *see also* Defs. 56.1 ¶¶ 396, 400, 401, 403, 405, 409, 411, 416, 417, 425, 431, 435,

436, 446, 449, 451, 452, 455, 456, 458, 465, 468.

33.    The Exchange Offer was accepted by the holders of approximately U.S.

$2,799,000,000 of 2017 Notes. [33]

**Response**:  The assertions in this paragraph are not disputed.

---

[33] *PDVSA Announces Expiration and Final Results for its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020*, PR NEWSWIRE (Oct. 24, 2016), *available at* https://www.prnewswire.com/news-releases/pdvsa-announces-expiration-and-final-results-for-its-offers-to-exchange-its-outstanding-5250-senior-notes-due-2017-and-850-senior-notes-due-2017-for-new-850-senior-secured-notes-due-2020-300349775.html.

34.     That amount was approximately 52.57% of the maximum tender amount and approximately 39.43% of the aggregate principal amount outstanding.[34]

**Response**:  The assertions in this paragraph are not disputed.

35.     For each U.S. $1,000 in outstanding principal amount of the 2017 Notes validly tendered, PDVSA delivered between U.S. $1,120 and U.S. $1,170 of 2020 Notes depending on the due date of the tendered notes and the timing of the tender.[35]

**Response**:  The Trustee and Collateral Agent do not dispute that for each $1,000 in outstanding principal amount of 2017 Notes validly tendered, PDVSA delivered different amounts of 2020 Notes depending on the due date of the tendered notes and the timing of tender. The Trustee and the Collateral Agent, however, dispute the range cited by the PDVSA Parties. For each $1,000 of April 2017 Notes exchanged, investors received $1,170 of 2020 Notes prior to the early tender deadline or $1,120 after the deadline.  For each $1,000 of November 2017 Notes exchanged, investors received $1,220 of 2020 Notes prior to the early tender deadline, or $1,170 after the deadline.  McKenna Ex. 1 ¶ 5.

36.     In aggregate, PDVSA issued approximately U.S. $3,367,529,000 in principal amount of 2020 Notes.[36]

**Response**:  The assertions in this paragraph are not disputed.

37.     The 2020 Notes were issued on October 28, 2016.

**Response**:  The assertions in this paragraph are not disputed.

38.     The 2020 Notes were issued pursuant to an indenture dated as of October 28, 2016 (the "Indenture").[37]

---

[34] *Id*.
[35] Offering Circular Supplement, at 2, Ex. 9.
[36] Indenture, cover page, Ex. 10.
[37] *Id*. at 1.

**Response**:  The assertions in this paragraph are not disputed.

39.     As contemplated by the Indenture, the 2020 Notes were purportedly secured by a pledge of 50.1% of PDV Holding's CITGO Holding shares (the "CITGO Shares") pursuant to a pledge and security agreement (the "Pledge") also dated as of October 28, 2016.[38]

**Response**:  The assertions in this paragraph that the 2020 Notes are secured by the Collateral pursuant to the Pledge Agreement and as contemplated by the Indenture are not disputed, but the Trustee and Collateral Agent respectfully refer the Court to those documents for their complete contents and dispute any summary inconsistent therewith.  The assertion that the 2020 Notes are "purportedly" secured is disputed.  ██████████████████  *See* Clark Ex. 2 at 1; *id.* Ex. 3 § 3.01; *id.* Ex. 36 at 1; *id.* ████████████████; *id.* Ex. 87 at 12; *id.* Ex. 112 at 39.

40.     The 2020 Notes, the Indenture, and the Pledge comprise a set of interrelated "Transaction Documents" (as defined in the Indenture) executed as part of a single, integrated transaction.[39]

**Response**:  The assertions in this paragraph are disputed.  The Governing Documents are separate agreements and separately enforceable.  *See* Clark Ex. 2 § 10.05; *id.* Ex. 3 § 7.12; *id.* Ex. 6.

41.     The Indenture was entered into among (i) PDVSA, as Issuer, (ii) PDVSA Petróleo, as Guarantor, (iii) Union Bank, as Trustee, (iv) GLAS Americas, as Collateral Agent, (v) Law Debenture Trust Company of New York, as Registrar, Transfer Agent, and Principal

---

[38] *Id*. at 4; Pledge and Security Agreement, at 3-4, Ex. 11.
[39] Indenture at 18, Ex. 10.

Paying Agent, and (vi) Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Paying Agent.[40]

**Response**:  The assertions in this paragraph are not disputed.

42.    The Pledge was entered into among (i) PDV Holding, as Pledgor, (ii) PDVSA, as Issuer, (iii) PDVSA Petróleo, as Guarantor, (iv) GLAS Americas, as Collateral Agent, and (v) Union Bank, as Trustee.[41]

**Response**:  The assertions in this paragraph are not disputed.

43.    The stated purpose of the Exchange Offer was to refinance the 2017 Notes because "external factors" had affected the price at which PDVSA could sell its products, making it "prudent to rearrange [PDVSA's] debt profile."[42]

**Response**:  The Trustee and Collateral Agent do not dispute that the above words are attributed to PDVSA in the Offering Circular.  The Trustee and Collateral Agent, however, state that the PDVSA Parties failed to provide discovery on "the purpose of the Exchange, or any actual or anticipated financial benefit to Plaintiffs of the 2020 Notes or the Exchange," and their

█████████████████████████████████████████████████████

*See* Clark Ex. 252 ¶¶ 6–7; *id.* Ex. 259 at 3, 8; Defs. 56.1 ¶¶ 521–33, 536–52.

44.    However, the Exchange Offer did not alleviate the causes of PDVSA's cash flow crisis and overall financial distress.

**Response**:  The assertions in this paragraph are disputed.  The PDVSA Parties fail to cite admissible evidence in support of the assertions in this paragraph as required by Local Rule 56.1(d).  Contrary to the PDVSA Parties' assertions, the Exchange Offer provided PDVSA with

---

[40] *Id*. at cover page.
[41] Pledge and Security Agreement, at cover page, Ex. 11.
[42] Offering Circular at 7, Ex. 5.

deferred loan payments and allowed PDVSA to pay off the remaining amounts due on the outstanding 2017 Notes.  *See* Clark Ex. 303; *id.* Ex. 304 at BLA_00001571; *id.* Ex. 309; *id.* Ex. 375.  Because the PDVSA Parties did not provide discovery about this matter in response to the Trustee and Collateral Agent's discovery requests, Clark Ex. 252 ¶¶ 6–7; *id.* Ex. 259 at 3, 8; Hr'g Tr. 7:12–19, 31:11–13, Nov. 8, 2019, ECF No. 31, based upon their representation that such information was not available to them, the PDVSA Parties should not be permitted to offer evidence (let alone rely on inadmissible hearsay) concerning the alleged impact of the Exchange Offer on PDVSA's cash flow and financial condition.

45.     Instead of pursuing a comprehensive restructuring of PDVSA's debt, the Maduro regime chose to refinance just the 2017 Notes, increasing PDVSA's debt burden and placing CITGO at risk.

**Response**:  The assertions in this paragraph are disputed.  The PDVSA Parties fail to cite admissible evidence in support of the assertions in this paragraph as required by Local Rule 56.1(d).  The Trustee and Collateral Agent have no knowledge as to what other debt the Maduro administration sought to refinance.  Because the PDVSA Parties did not provide discovery about this matter in response to the Trustee and Collateral Agent's discovery requests, Hr'g Tr. 7:12–19, 31:11–13, Nov. 8, 2019, ECF No. 31; Clark Ex. 17 at 138:13–139:4, 250:17–252:3; *id.* Ex. 252 ¶¶ 6–7, 16, 32–33; *id.* Ex. 259 at 3, 8, based upon their representation that such information was not available to them, the PDVSA Parties should not be permitted to offer evidence (let alone rely on inadmissible hearsay) concerning the alleged impact of the Exchange Offer on PDVSA's cash flow and financial condition.

46.     Just one year after the Exchange Offer, PDVSA defaulted on all of its debt except the 2020 Notes.[43]

**Response**:  The Trustee and Collateral Agent dispute the assertions made in this paragraph as they are not supported by admissible evidence or the identified document.  ████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████; Xu Decl. ¶ 26.

47.     Rather than accept a principal reduction (a face value "haircut"),[44] noteholders that accepted the Exchange Offer received more in 2020 Notes than remained due on their 2017 Notes (a face value "premium").[45]

**Response**:  The Trustee and Collateral Agent dispute that the noteholders received "more" in 2020 Notes than remained due on their 2017 Notes.  The PDVSA Parties fail to provide any source or calculation that supports this assertion.  Investors who participated in the Exchange Offer received reduced cash flows on their new 2020 Notes compared to the cash flows that would have been due on of the 2017 notes they exchanged.  McKenna Decl. ¶¶ 84–85.  For the reasons stated in the Trustee and Collateral Agent's Motion to Exclude the Expert Testimony of David C. Hinman, ECF No. 102, Hinman's calculation that investors did not lose money is flawed and unreliable, *id.* at 19.  His calculation, among other flaws, ignored the time

---

[43] *Venezuela Suffers Another Blow as PDVSA Declared in Default*, FIN. TRIBUNE (Nov. 17 2017), *available at* https://financialtribune.com/articles/world-economy/76346/venezuela-suffers-another-blow-as-pdvsa-declared-in-default.

[44] *See* Expert Report of David C. Hinman, dated March 16, 2020 ("Hinman Report"), at ¶ 74, n.126, attached as Exhibit A to Declaration of David C. Hinman (citing Chuck Fang, Julian Schumacher, and Christoph Trebesch, "Restructuring sovereign bonds: holdouts, haircuts and the effectiveness of CACs," *European Central Bank Working Paper Series No 2366*, January 2020, pp. 15 and 43, *available at* https://www.ecb.europa.eu/pub/pdf/scpwps/ecb.wp2366~5317a382b3.en.pdf).

[45] *PDVSA Announces Expiration and Final Results for its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020*, PR Newswire (Oct. 24, 2016), *available at* https://www.prnewswire.com/news-releases/pdvsa-announces-expiration-and-final-results-for-its-offers-to-exchange-its-outstanding-5250-senior-notes-due-2017-and-850-senior-notes-due-2017-for-new-850-senior-secured-notes-due-2020-300349775.html.

value of money and mistakenly credited investors with the current market value of the 2020

Notes.  McKenna Decl. ¶¶ 79–85.  It should therefore be excluded.

48.     The exchanging holders of April 2017 Notes also received a 3.25% higher interest

rate.[46]

**Response**:  The assertion in this paragraph that the exchanging holders "received" a

higher interest rate is disputed, because PDVSA defaulted on its obligations under the Governing

Documents.  *See* Defs. 56.1 ¶¶ 259–66.  The Trustee and Collateral Agent further clarify that the

interest rate of the 2020 Notes is the same as the interest rate of the November 2017 Notes.  *See*

Clark Ex. 1 at Cover Page; *id.* Ex. 2 at 1, 24.  Otherwise, the assertions in this paragraph are not

disputed.

49.     Meanwhile, PDVSA obtained a (weighted average) maturity extension of only

1.67 years for its purported obligations on the 2017 Notes.[47]

**Response**:  The assertions in this paragraph are not disputed.

50.     The Exchange Offer allowed PDVSA to avoid paying U.S. $2.982 billion in

interest and principal through November 2017 on 2017 Notes.[48]

**Response**:  The assertions in this paragraph are not disputed.

51.     However, the Exchange Offer also committed PDVSA to paying 40% more (U.S.

$4.163 billion) in interest and principal on the 2020 Notes through October 2020.[49]

**Response**:  The assertions in this paragraph are not disputed.

---

[46] Offering Circular at cover page, Ex. 5.
[47] Hinman Report at ¶ 76 n. 130.
[48] See *id*. at ¶ 77 n. 131, Exhibit 2A, and Exhibit 2B (calculating avoided interest and principal as $0.967 billion for the exchanged April 2017 Notes *plus* $2.015 billion for the exchanged November 2017 Notes).
[49] See *id*. at ¶ 77 n. 132, Exhibit 2A, and Exhibit 2B (calculating commitments to pay interest and principal as the sum of $1.339 billion for the exchanged April 2017 Notes and $2.824 billion for the exchanged November 2017 Notes).

52.    One analyst report described the economics of the Exchange Offer from PDVSA's perspective as follows: "The swap in and of itself does nothing to improve PDVSA's creditworthiness.  If anything, it worsens it . . . The swap provides some cash flow relief as the late October/early November amortization hump becomes less humpy.  But this cash flow relief is at the expense of a buildup of a new amortization hump not that far into the future."[50]

**Response**: The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited source, but dispute that the assertions in this paragraph are true.  Credit rating agencies and credit analysts, including a future member of the PDVSA Ad Hoc Board, described the Exchange Offer at the time as credit positive because it reduced the risk of an immediate payment default and postponed payment of debts maturing in 2016 and 2017.  *See, e.g.*, Clark Ex. 101 at 2; *id.* Ex. 102 at 1; *id.* Ex. 127 at 2; *id.* Ex. 135; *id.* Ex. 291 at BLA_00004826; *id.* Ex. 303 at ASH_00001323; *id.* Ex. 304 at BLA_00001571; *id.* Ex. 375.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████; *id.*
Ex. 252 ¶¶1, 3, 7, 14, 22; *id.* Ex. 259 at 3, 8; Hr'g Tr. 7:12–19, 31:11–13, Nov. 8, 2019, ECF No. 31.

53.    Regardless of when a noteholder purchased 2017 Notes exchanged for 2020 Notes, the total interest and principal payments received, plus the market value of the 2020 Notes as of March 13, 2020, exceeds the 2017 Notes' purchase cost.[51]

---

[50] Email from Javier Kulesz to Jan Dehn, "Jefferies LatAm Sovns – PDVSA's swap and Argentina's Euro bond deal," dated October 5, 2016.  (ASH_00004270 – 274 at 271), Ex. 12.
[51] Hinman Report at ¶¶ 84-85.

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph.  Among other things, these assertions are hypothetical, rely on unstated and unsubstantiated assumptions, and use an undefined term—"purchase cost"—that differs from the term used in the Hinman report—"investment cost."  The Trustee and Collateral Agent further state that Hinman's calculation applied only to hypothetical noteholders who held 2017 Notes, exchanged them for 2020 Notes, then held the 2020 Notes continuously through March 13, 2020.  Hinman Rep. ¶¶ 84, 88, 90, 93, 95, n.140–41.  In addition, for the reasons stated in the Trustee and Collateral Agent's Motion to Exclude the Expert Testimony of David C. Hinman, ECF No. 102, among other reasons, Hinman's calculation that investors did not lose money is flawed and unreliable, *id.* at 19.  It should be excluded.

54.     Counting only interest and principal payments, the value received for exchanged 2017 Notes equals 153% and 192% of the purchase cost at issuance of the April 2017 Notes and the November 2017 Notes, respectively.[52]

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph for the same reasons stated in their response to paragraph 53.  The Trustee and Collateral Agent further dispute the assertions in this paragraph because, among other things, Hinman's figures include amounts received on the 2017 Notes prior to the Exchange Offer. Such amounts were not part of the "value received" as a result of the Exchange Offer.

55.     For 2017 Notes purchased during the Exchange Offer window, the value received equals no less than 96% of the purchase cost.[53]

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph for the same reasons stated in their responses to paragraphs 53 and 54.

---

[52] *Id*. at ¶¶ 87, 89, Exhibit 4A, & Exhibit 4B.
[53] *Id*. at ¶ 95, Figure 1B.

56.     The Constitution of the Bolivarian Republic of Venezuela (the "<u>Venezuelan</u> <u>Constitution</u>" or the "<u>Constitution</u>") was drafted by an elected Constituent Assembly that included the PDVSA Parties' Venezuelan law expert, Professor Allan R. Brewer-Carías.[54]

**Response**:  The assertions in this paragraph are not disputed, except to clarify that the Constituent Assembly comprised 161 elected members, of which Professor Brewer-Carías was one.  Clark Ex. 13 ¶ 12; Supp. Clark Ex. 389 at 5.

57.     Professor Brewer proposed the inclusion of Article 150 in the Venezuelan Constitution.[55]

**Response**:  The assertions in this paragraph are disputed.  The Trustee and Collateral Agent state that the term "Contract of National Interest," as found in Article 150, was first used in the Venezuelan Constitution enacted in 1854 and then included in subsequent Venezuelan constitutions.  ██████████ Ex. 2 § 84.  Furthermore, to the extent that Professor Brewer-Carías was involved in the Constituent Assembly, the preparatory work of the Constituent Assembly and the opinions expressed in the discussions of the Venezuelan Constitution can never be considered an authentic interpretation of the Venezuelan Constitution.  ██████████ Ex. 3 §§ 72–74.

58.     Article 150 provides that "***[n]o contract in the . . . national public interest shall be entered into with . . . companies not domiciled in Venezuela . . . without the approval of the National Assembly.***"[56]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in Article 150, but the Trustee and Collateral Agent respectfully refer the Court to

---

[54] *Id*. at ¶¶ 12-13.
[55] *Id*. at ¶ 7.
[56] 1999 Venezuelan Constitution art. 150, Ex. 4.

Article 150 for its complete contents and dispute any summary or interpretation inconsistent therewith.

59.     The authorization of public interest contracts is enumerated in Article 187.9 of the Venezuelan Constitution as one of the National Assembly's core functions.[57]

**Response**:  The assertions in this paragraph are disputed.  Article 187(9) of the Venezuelan Constitution states:

> The National Assembly is responsible to . . . authorize the National Executive to sign contract of national interest, in the cases established by law [and to] authorize contract of municipal, state or national public interest with States or official foreign entities or with companies not domiciled in Venezuela.

▮▮▮▮▮▮  Ex. 5 Art. 187(9).  The Venezuelan Constitution does not identify the provisions of Article 187(9) as one of the National Assembly's "core functions."  *Id*.  The Trustee and Collateral Agent further clarify that the term "National Executive" does not include state-owned corporations such as PDVSA.  *Id.* Ex. 2 § 51.

60.     On May 26, 2016 (before the announcement of the Exchange Offer), the National Assembly passed a resolution (the "May 2016 Resolution").[58]

**Response**:  The assertions in this paragraph are not disputed, except to clarify that the Resolution cited is not binding law in Venezuela and the Resolution cited preceded the announcement of the Exchange Offer by nearly four months.  Clark Ex. 13 § 51; ▮▮▮▮▮ Ex. 3 §§ 10, 105–08.  The Resolution cited also did not mention the Exchange Offer, the 2020 Notes, or the Collateral.

61.     The May 2016 Resolution recited, *inter alia*, that:

---

[57] 1999 VENEZUELAN CONSTITUTION art. 187, Ex. 4.
[58] *Resolution on the Respect of the Inherent and Nontransferable Powers of the National Assembly on Contracts of Public Interest Signed by and between the National Executive and Foreign States or Official Entities or with Companies Not Domiciled in Venezuela*, dated May 26, 2016 (translated), Ex. 13.

In relation to contracts of national, state or municipal public interest concluded by and between the National Executive and . . . companies not domiciled in Venezuela, the Constitution categorically mandates, without exception, the approval of the National Assembly (art 150) . . .

The control mechanisms of the National Assembly on the contracts of public interest concluded by the National Executive include its approval, as a condition of the validity of the contract . . . [and]

The responsibility of the National Assembly concerning the approval of contracts of national, state or municipal public interest concluded by and between the National Executive and foreign States or official entities or with companies not domiciled in Venezuela cannot be waived, transferred, extended and it cannot be relaxed by conventions, decrees or other legal acts . . . .[59]

**Response**: The Trustee and Collateral Agent do not dispute that the quoted language appears in the Resolution cited, but respectfully refer the Court to the cited Resolution for its complete contents and dispute any summary or interpretation inconsistent therewith. The Trustee and Collateral Agent note that the Resolution cited did not mention the Exchange Offer, the 2020 Notes, or the Collateral. The Trustee and Collateral Agent further note that PDVSA does not qualify as part of the National Executive and that the Exchange Offer did not involve the "national, state or municipal public interest." *See* ████ Ex. 2 §§ 123–25; *id.* Ex. 3 §§ 111–12.

62.     Following these and other recitals, the National Assembly resolved, *inter alia*:

To warn that any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void and shall be considered non-existent . . . [and]

To remind that the contracts of national, state or municipal public interest concluded by and between the National Executive and . . . companies not domiciled in Venezuela, without the approval of the National Assembly; as well as other contracts of national public interest that it signs without this approval outside of the cases excepted by law, shall be null and void in their entirety.[60]

---

[59] *Id.*
[60] *Id.*

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the Resolution cited, but respectfully refer the Court to the cited Resolution for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent, however, clarify that the Resolution cited is not binding law in Venezuela and the National Assembly resolution dated May 26, 2016, preceded the announcement of the Exchange Offer by nearly four months.  Clark Ex. 13 § 51; ███████ Ex. 3 §§ 10, 105–08.  The Trustee and Collateral Agent further note that the Resolution cited did not mention the Exchange Offer, the 2020 Notes, or the Collateral.  The Trustee and Collateral Agent further note that PDVSA does not qualify as part of the National Executive and that the Exchange Offer did not involve the "national, state or municipal public interest."  *See* ███████ Ex. 2 §§ 123–25; *id.* Ex. 3 §§ 111–12.

63.     On September 27, 2016, the National Assembly passed a resolution specifically regarding the Exchange Offer (the "September 2016 Resolution").[61]

**Response**:  The assertions in this paragraph are not disputed, except to clarify that the Resolution cited is not binding law in Venezuela.  Clark Ex. 13 § 51; ███████ Ex. 3 §§ 10, 105–08.

64.     The September 2016 Resolution recited, *inter alia*:

That recently, the state oil company [PDVSA] has announced that it intends to execute a bond swap with a maturity date in the next 15 months. Eligible securities for this transaction reach US$ 7.1 billion with an excessive concentration in the short-term for debt service. In fact, so far in 2016, more than 25.0% of revenues from oil exports will be used to serve PDVSA's debt . . .

That, indicative of the credibility problems, the national oil company, having exclusive exploitation rights over the largest oil reserves in the world, must offer

---

[61] *Resolutions on the Current Financial Situation of Petróleos de Venezuela S.A.*, dated September 27, 2016 (translated), Ex. C to Complaint.

50.1% of its position in the subsidiary company Citgo Holdings Inc. as collateral for the payment of the bond swap . . . [and]

That Article 187 of the Constitution empowers the National Assembly to exercise control functions over the National Government and the Public Administration, with the power to obtain information about the financial statements and details of any transaction that commits PDVSA's assets as collateral.[62]

**Response**: The Trustee and Collateral Agent do not dispute that the quoted language appears in the Resolution cited, but respectfully refer the Court to the cited Resolution for its complete contents and dispute any summary or interpretation inconsistent therewith. The Trustee and Collateral Agent state, however, that the Resolution did not assert that the Exchange Offer or the Governing Documents constituted a Contract of National Interest, nor did it invoke Article 150.

65.     Following these and other recitals, the National Assembly resolved, *inter alia*:

To summon citizen Eulogio del Pino, President of Petróleos de Venezuela SA, to appear before this National Assembly to explain the terms of this bond swap transaction, based on offering the majority of Citgo Holding Inc. shares as collateral . . .

To reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO Holding, Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation . . . [and]

To urge the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with article[] 187, section 9. . . of the Constitution . . . .[63]

**Response**: The Trustee and Collateral Agent do not dispute that the quoted language appears in the Resolution cited, but respectfully refer the Court to the cited Resolution for its complete contents and dispute any summary or interpretation inconsistent therewith. The Trustee and Collateral Agent state, however, that the Resolution did not declare that the

---

[62] *Id.*
[63] *Id.*

25

Exchange Offer or the Governing documents were void *ab initio* or unconstitutional.  The Trustee and Collateral Agent further state that the Resolution did not declare that the National Assembly would or could refuse to authorize the Exchange Offer (for which authorization was not required), nor did it purport to prohibit the Exchange Offer or payment of principal and interest on the 2020 Notes.

66.     During the National Assembly debate over the September 2016 Resolution, representative Guevara, President of the Comptroller's Commission, stated with respect to the Exchange Offer that "we will not acknowledge any national interest contract that does not come before this National Assembly; let me make this very clear to our international creditors: you know that this Party [of Maduro] is on its way out and that the people will enter Miraflores [presidential palace] very soon and you will not be able to ask us to honor the commitments of the irresponsible individuals who destroyed PDVSA."[64]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the National Assembly debate cited, but the Trustee and Collateral Agent respectfully refer the Court to the debate cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent state that during the debate, Representative Guevara did not mention Article 150 or opine on the constitutionality of the Exchange Offer.  *See* Bliss Ex. 14.  The Trustee and Collateral Agent further state that the resolution resulting from this debate, dated September 27, 2016, did not declare that the Exchange Offer or the Governing Documents were void *ab initio* or unconstitutional, did not invoke Article 150, and did not incorporate Representative Guevara's statement.

---

[64] Asamblea Nacional, *Regular Session of Tuesday, September 27, 2016. Discussions on the effects of PDVSA Bond Redemption* (translated), Ex. 14, at 22.

67.     In the same National Assembly session, representative Guerra stated that "[h]ere for the first time collateral is being put up, in the issuance of a PDVSA corporate bond, 50.1% of the shares of Citgo, that is questioned by the Venezuelan legal order."[65]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the National Assembly debate cited, but the Trustee and Collateral Agent respectfully refer the Court to the debate for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent clarify that Representative Guerra's objections to the Exchange Offer were not legal objections but objections to the level of debt incurred by PDVSA.  Representative Guerra has publicly stated that "PDVSA does not require authorization from the [National Assembly] to issue debt."  Clark Ex. 162.

The assertion that shares of CITGO Petroleum or CITGO Holding had never before been used as collateral is disputed.  ███████████████████████████████████



███████████████████████████████████████████████████████

███████████████████████████████████████████ Clark Ex. 1 at 79–81; █████

███████████████████████████████████ ; *id.* Ex. 98 at 1, 7; *id.* Ex. 140 at 1; *id.* Ex. 205 at 26; *id.* Ex. 211 at 6–8; *id.* Ex. 217 at 1, 149; *id.* Ex. 219 at 1, 47, 194; ███████████ █ ; *see also* Defs. 56.1 ¶¶ 443, 449, 458, 465, 468, 469, 471, 475.  During this time, CITGO Petroleum also pledged as collateral various letters of credit, its accounts receivable and inventory, the accounts receivable and inventory of its subsidiaries, its trade accounts receivable, and its property and the property of its subsidiaries.  *See* Clark Ex. 1 at 79–80, F-44; *id.* Ex. 100 at 1, 4, 20, 22; *id.* Ex. 140 at 1; *id.* Ex. 172 at 1, 4, 19, 21; *id.* Ex. 174 at 1, 20, 22; *id.* Ex. 178 at 1, 4; *id.* Ex. 179 at 1, 4, 19, 23; *id.* Ex. 183 at 1, 4; *id.* Ex. 186 at 1, 23; *id.* Ex. 188 at 1, 22; *id.*

---

[65] *Id*. at 5.

Ex. 191 at 1, 4, 22; *id.* Ex. 192 at 1, 4; *id.* Ex. 200 at 1–4; *id.* Ex. 207 at 1, 4; *id.* Ex. 210 at 1, 21; *id.* Ex. 211 at 1, 6–8, 131; *id.* Ex. 214 at 1, 29, 31; *id.* Ex. 221 at 1, 12, 18; *id.* Ex. 225 at 1, 20, 22, 26;  *id.* Ex. 240 at 1, B-1, B-2; *see also* Defs. 56.1 ¶¶ 396, 400, 401, 403, 405, 409, 411, 416, 417, 425, 431, 435, 436, 446, 449, 451, 452, 455, 456, 458, 465, 468.

68.     On October 25, 2016, three days before the issuance of the 2020 Notes, the Maduro-controlled Constitutional Chamber of the Supreme Tribunal issued a decision purporting to suspend the National Assembly's investigations of PDVSA.[66]

**Response**:  The assertion that the Constitutional Chamber issued a decision on October 25, 2016, is not disputed, but the Trustee and Collateral Agent respectfully refer the Court to the decision for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent further clarify that the decision does not discuss the Exchange Offer, the 2020 Notes, or the Collateral.  *See* Bliss Ex. 50.  The Trustee and Collateral Agent further state that the cited document does not support the assertion that the Constitutional Chamber was "Maduro-controlled."

69.     On October 15, 2019, the National Assembly passed a resolution (the "October 2019 Resolution").[67]

**Response**:  The assertions in this paragraph are not disputed, except to clarify that the Resolution cited is not binding law in Venezuela.  Clark Ex. 13 § 51; ▮▮▮▮▮▮ Ex. 3 §§ 10, 105–08.

70.     The October 2019 Resolution recited, *inter alia*:

That on September 27, 2016, this Assembly approved a Resolution in which it questioned the irresponsible over-indebtedness of PDVSA, initiated an investigation into the bond swap offer, rejected the collateral of 50.1% of the

---

[66] El Tribunal Supremo de Justicia Sala Constitucional [TSJ] [Supreme Tribunal of Justice], No. 893, (Venez) (Oct. 25, 2016), Ex. 50.
[67] *Resolutions that Reiterates the Invalidity of PDVSA's 2020 Bonds* (translated), Ex. D to Complaint.

shares in Citgo Holding, Inc., and ordered the initiation of investigations for alleged crimes to the public patrimony derived from this transaction . . .

That PDVSA decided to ignore the Resolution of this National Assembly, and proceeded with the bond swap transaction, despite the market not reacting favorably, due to the economic collapse of PDVSA and the public complaints presented by this Assembly in its Resolution dated September 27, 2016 . . .

That the swap increased PDVSA's obligations during 2016-2020 by US$1,102 million, that is, US$569 million in additional capital payments and US$533 million in additional interest payments.  Consequently, the total financing of the bond swap has an internal rate of return of almost 19.8% in dollars, plus the 50.1% of the Citgo Holding, Inc. shares offered as collateral . . .

That the day following the announcement of the bond swap results, the Constitutional Court issued its ruling No. 893, in which it illegitimately prevented this National Assembly from investigating PDVSA, thereby allowing that the latter to complete the bond swap transaction through the issue of bond indentures and guarantees executed on 28 October, even though the nullity of the Resolution dated September 27, 2016 was not declared . . .

That following the investigations conducted in coordination with the Office of the Special Prosecutor, it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution . . . [and]

That in addition to the foregoing, the financial conditions of the 2020 Bond indenture were irrational, damaging PDVSA's equity due to the unjustified increase in its debt.[68]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the Resolution cited, but respectfully refer the Court to the Resolution cited for its complete contents and dispute any summary or interpretation inconsistent therewith.

71.     Following these and other recitals, the National Assembly resolved, *inter alia*:

To ratify that the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national interest public contract, executed with foreign companies, which was not authorized by the National Assembly . . . [and]

To ratify that the 2020 Bond indenture violated Articles 311 and 312 of the Constitution of the Bolivarian Republic of Venezuela, since its financial

---

[68] *Id.*

29

conditions were detrimental given the irrationality under which PDVSA structured the bond swap and subsequent issuance . . . .[69]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the Resolution cited, but respectfully refer the Court to the Resolution cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent, however, dispute use of the word "ratify" to the extent it implies that the National Assembly declared the 2020 Notes invalid, void *ab initio*, or unconstitutional prior to the October 2019 Resolution.

72.    The May 2016 Resolution, the September 2016 Resolution, and the October 2019 Resolution were each made public upon their passage.[70]

**Response**:  The assertions in this paragraph are disputed.  The cited sources do not establish the date of publication of each resolution.  The Trustee and Collateral Agent have no knowledge of the date on which the National Assembly made its resolutions public.

73.    The Exchange Offer was announced on September 13, 2016.[71]

**Response**:  The assertions in this paragraph are disputed.  PDVSA announced the terms of the Exchange Offer by press release and through publication of the Exchange Offer on September 16, 2016.  Clark Ex. 147; *id.* Ex. 1 at 2.

74.    That same day, Reuters reported that "[s]ome are concerned about potential political opposition to using CITGO shares [as collateral]" and that "*[c]ritics in the opposition,*

---

[69] *Id*.

[70] *See* May 2016 Resolution (ordering publication), Ex. 13; September 2016 Resolution, Ex. C to Complaint; and October 2019 Resolution (same), Ex. D to Complaint.

[71] Sebastian Boyd, *PDVSA Bonds Surge as Company Says It Will Announce Debt Swap*, Bloomberg (Sept. 13, 2016), *available at* https://www.bloomberg.com/news/articles/2016-09-13/pdvsa-bonds-surge-amid-speculation-bond-swap-announcement-near.

*which now controls the National Assembly, argue involving CITGO would constitute a de facto privatization of a state asset that requires parliamentary approval*."[72]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited *Reuters* article, but respectfully refer the Court to the article for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent clarify that the article states:

> Analysts said it was still too early to evaluate the offer given that PDVSA had not provided the full details.
>
> Some are concerned about potential political opposition to using Citgo shares. Critics in the opposition, which now controls the National Assembly, argue involving Citgo would constitute a de facto privatization of a state asset that requires parliamentary approval.

*See supra* n.72.  The Trustee and Collateral Agent clarify that the article did not discuss legal invalidity, but instead it discussed the risk of "potential political opposition to using CITGO shares."  *See supra* n.72; *see also* Porzecanski Rebuttal Decl. ¶ 70.  The Trustee and Collateral Agent further clarify that the article only briefly mentioned any potential opposition to the Exchange Offer, did not identify "critics in the opposition," and did not purport to conduct an independent analysis of legality.  *See* Porzecanski Rebuttal Decl. at 31.  It also reported that "[a]nalysts said it was still too early to evaluate the offer," because "PDVSA had not yet provided the full details" of the Exchange Offer.  *See supra* n.72.  Finally, the Trustee and Collateral Agent dispute that "privatization," as used in the quoted language, refers to Article 150.

---

[72] Ana Isabel Martinez and Corina Pons, *Venezuela's PDVSA offers $7 billion bond swap to ease debt burden*, REUTERS (Sept. 13, 2016), *available at* https://www.reuters.com/article/us-venezuela-pdvsa-idUSKCN11J2E2) (emphasis added).

75.     The next day, a *Wall Street Journal* article noted that "Venezuela's constitution requires the National Assembly to approve any new indebtedness of the republic."[73]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited *Wall Street Journal* article, but respectfully refer the Court to the article for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent, however, state that the article was published on September 14, 2016, which was two days prior to publication of the Exchange Offer.  At that time, the role, if any, that the Republic would play in the Exchange Offer was still unknown.  The Trustee and Collateral Agent further state that the quoted language explicitly states that the approval requirement applies to debt of the "Republic," not PDVSA, and did not say that National Assembly approval is necessary only if the issuance is backed by the pledge of an asset.  Finally, the Trustee and Collateral Agent note that the Republic was not a party to any of the Governing Documents.  Clark Ex. 2 at cover page; *id.* Ex. 3 at cover page.

76.     On September 17, 2016, an article in *El Nacional*, a leading Venezuelan news outlet, quoted a Venezuelan constitutional lawyer as saying that ***the decree purportedly allowing PDVSA to use CITGO as collateral was unconstitutional*** and that "***any contract it signs is invalid***."[74]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited *El Nacional* article, but respectfully refer the Court to the article for its complete contents and dispute any summary or interpretation inconsistent therewith.  The

---

[73] Carolyn Cui, *Venezuela's PdVSA to Offer to Swap $7 Billion in Debt*, WALL ST. J. (Sept. 14, 2016), available at https://www.wsj.com/articles/venezuelas-pdvsa-to-offer-to-swap-7-billion-in-debt-1473878226.
[74] *Debt Issue Under New Decree Will be Void*, EL NACIONAL (VENEZUELA) (Sept. 27, 2016) (translated), Ex. 15.

Trustee and the Collateral Agent dispute that the statement of the Venezuelan lawyer is admissible hearsay.

77.     On September 18, 2016, a Nomura analyst stated in an email to market participants that "[t]he make or break of the exchange is the assessment of the equity valuation and the **legal risks**" and that "opinions from local lawyers suggest[ed] that ***all international transactions (such as the recent deal with Gold Reserve and this PdVSA debt exchange) would require legislative approval or otherwise risk illegality*** . . . ."[75]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited Nomura analyst report, but respectfully refer the Court to the analyst report for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent state, however, that the "opinions" from an unidentified "local lawyer" are inadmissible hearsay.  The Trustee and Collateral Agent further state that the majority of analyst reports published during the time period when the Exchange Offer was open did not mention any risk that the 2020 Notes were invalid or illegal.  Porzecanski Rebuttal Decl. ¶¶ 37–39; *see also* Clark Ex. 290; *id.* Ex. 299; Xu Decl. Ex. 3 at 1; *id*. Ex. 4 at 3.

78.     On September 19, 2016, UBS published an analyst report



"[76]

---

[75] Email from Siobhan Morden to Patrick Haller, Michel Aubenas, Pablo Goldberg and 27 others, "Venezuela | PdVSA exchange," *Nomura*, September 18, 2016. (ASH_00000743 – 746 at 743) (emphasis added), Ex. 16; Email from Dan Gelfand to Michel Aubenas, Pablo Goldberg and 27 others, "FW: Venezuela | PdVSA exchange," dated September 18, 2016, forwarding an email from Siobhan Morden, "Venezuela | PdVSA exchange," *Nomura*, dated September 18, 2016. (BLA_00000556 – 558 at 557) (emphasis added), Ex. 17.
[76] Alejo Czerwonko, "Venezuela bonds: Of politics and swaps," *UBS*, September 19, 2016, p. 3. (UBS-PDVSA000001 – 009 at 003) (emphasis added), Ex. 18.

**Response**: ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

79.     Also on September 19, 2016, a Jeffries analyst sent an email to Jan Dehn, Head of Research at Ashmore, noting that the Venezuelan opposition had "***already challenged the use of Citgo equity to back this deal on legal grounds***."[77]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited Jefferies analyst report, but respectfully refer the Court to the analyst report for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent note that the analyst report stated: "Third, the opposition has already challenged the use of Citgo equity to back this deal on legal grounds.  If privatizations require congressional approval, as they do, they may have a point." (Emphasis added.)  The Trustee and Collateral Agent note that the PDVSA Parties have never alleged that the Exchange Offer constituted a "privatization."

In addition, the Trustee and Collateral Agent state that the analyst report preceded the September 27, 2016 Resolution and that the cited views of the opposition did not materialize in the content of that Resolution.  The Trustee and Collateral Agent further state that the majority of

---

[77] Email from Javier Kulesz to Jan Dehn, Herbert Saller, and Xin Xu, "Jeffries LatAm Sovns – The PDVSA swap," dated September 19, 2016. (ASH_00004192 – 194 at 192, Ex. 51; ASH_00005982 – 984 at 982 – 983, Ex. 52; ASH_00006721 – 723 at 721 – 722, Ex. 53) (emphasis added); Email from Dan Gelfand to Pablo Goldberg, Sergio Trigo Paz and 27 others, "FW: Jeffries LatAm Sovns – The PDVSA swap," dated September 19, 2016, forwarding email from Javier Kulesz to Dan Gelfand, "Jeffries LatAm Sovns – The PDVSA swap," dated September 19, 2016. (BLA_00000643 – 645 at 643 – 644), Ex. 54 (emphasis added).

analyst reports published during the time period when the Exchange Offer was open did not

mention any risk that the 2020 Notes were invalid or illegal.  Porzecanski Rebuttal Decl. ¶¶ 37–

39; *see e.g.*, Clark Ex. 290 at ASH_00006835; *id.* Ex. 299 at BLA_00004841; Xu Decl. Ex. 3 at

1; *id*. Ex. 4 at 3.  ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

80.     Also on September 19, 2016, Reuters reported that "doubts about the legal

underpinning of the CITGO guarantee weakened investor confidence.  Venezuela's opposition,

which controls parliament, has said it will oppose the use of CITGO as collateral."[78]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language

appears in the *Reuters* article cited, but respectfully refer the Court to the article cited for its

complete contents and dispute any summary or interpretation inconsistent therewith.  The

Trustee and Collateral Agent state, however, that (1) opposition is not the same as legal

invalidation, (2) the *Reuters* article preceded the September 27, 2016 Resolution, and (3) the

cited views of the opposition did not materialize in the content of the September 27, 2016

Resolution.  The Trustee and Collateral Agent further note that the majority of analyst reports

published during the time period when the Exchange Offer was open did not mention any risk

that the 2020 Notes were invalid or illegal.  Porzecanski Rebuttal Decl. ¶¶ 37–39; *see e.g.*, Clark

Ex. 290 at ASH_00006835; *id.* Ex. 299 at BLA_00004841; Xu Decl. Ex. 3 at 1; *id*. Ex. 4 at 3.

████████████████████████████████████████████████████████

---

[78] Eyanir Chinea and Brian Ellsworth, *S&P says PDVSA bond swap offer 'tantamount to default'*, REUTERS (Sept. 19, 2016) (emphasis added), *available at* https://www.reuters.com/article/us-venezuela-pdvsa-debt-idUSKCN11Q05F.



81.     On September 21, 2016, in an interview with CNN, National Assembly member José Guerra stated that his party would demand that "PDVSA [] come to Congress [and] explain the swap" and that "*[Congress] will discuss whether it is legal to put the refinery up as collateral*. . . because . . . National assets are being affected there."[79]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the *CNN* interview cited, but respectfully refer the Court to the interview cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent further state that the full quotation states:

> What we want is for PDVSA to come to Congress, explain the swap, and we will discuss whether it is legal to put the refinery up as collateral, as a guarantee—the 3 CITGO refineries, the 8,000 CITGO gas stations, because in case they do not pay that back, this comp… these Venezuelan companies will go to the creditors. That is [] an international contract.  National assets are being affected there.  And, I think that the very least a parliament must do is to discuss this issue.

The Trustee and Collateral Agent additionally state that Guerra said in the same interview that "we are not opposing the swap, from the legal point of view, as long as there is no collateral, because PDVSA is a corporate entity and, and is not subject to the financial administration law, which obliges the government to consult with Congress on indebtedness."  Bliss Ex. 55.  Guerra

---

[79] Congressman Jose Guerra Interview with CNN, September 21, 2016, at 3 (translated), Ex. 55.

also tweeted in 2019, contemporaneous with PDVSA's April 2019 payment, that "PDVSA does not require authorization from the [National Assembly] to issue debt."  Clark Ex. 162.

82.     On September 27, 2016, a Venezuelan media outlet published a press release entitled "*Freddy Guevara on PDVSA: We will not recognize any bond sale that has not been authorized by the NA*," which quoted Mr. Guevara as saying: "We will not pay for the broken crockery of a small group of crooks that destroyed Venezuela.  ***Not only do we not recognize these transactions, we will also investigate everyone involved in the sale because it would be implying an embezzlement of the Nation***."[80]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the press release cited, but respectfully refer the Court to the press release cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent note, however, that Guevara was criticizing PDVSA's level of debt, not the legality of the Exchange Offer:

> "How can they try to put the country further into debt without the knowledge or the authorization of the National Assembly?  The government has the obligation to explain to the people how State funds are allocate and how we will perform our constitutional duty to supervise the use of public funds.  The Executive Branch has shown itself more and more to be highly inefficient, negligent and destructive of the economy and we will not be co-responsible for the embezzlement of the nation", he emphasized.

Nowhere in this press release did Guevara suggest that the Exchange Offer was illegal or that it violated the Venezuelan Constitution.  ████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████  Clark Ex.

44; *see also id.* Ex. 29 ¶ 160; ████████████

---

[80] *Freddy Guevara on PDVSA: We will not recognize any bond swap that has not been authorized by the NA*, LA PATILLA (Sept. 27, 2016) (translated), Ex. 20.

83.     The next day, another Venezuelan media outlet published an article entitled

"*Freddy Guevara: Government has proven negligent and destructive of the economy*," which

quoted Mr. Guevara as saying with respect to the Exchange Offer that the National Assembly

"***will not recognize any public contract that is not considered or authorized by the Legislative***

***Branch in accordance with the Constitution***."[81]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language

appears in the article cited, but respectfully refer the Court to the article cited for its complete

contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and

Collateral Agent clarify, however, that Guevara focused his criticism on PDVSA's level of debt:

> "How can they try to put the country further into debt without the knowledge or
> the authorization of the National Assembly?  The government has the obligation
> to explain to the people how State funds are allocate and how we will perform our
> constitutional duty to supervise the use of public funds.  The Executive Branch
> has shown itself more and more to be highly inefficient, negligent and destructive
> of the economy and we will not be co-responsible for the embezzlement of the
> nation", he emphasized.

Nowhere in the article cited was it stated that the Exchange Offer was illegal or that it violated

the Venezuelan Constitution. ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Clark

Ex. 44; *see also id.* Ex. 29 ¶ 160; ███████████

84.     On October 11, 2016, a report from analyst firm Torino Capital noted that the

tender deadline had been extended twice because of "concern[s] about the ***legal risks associated***

***with the new bond***" and that noteholders "may expect that the market will not only discount the

---

[81] Lysaura Fuentes, *Freddy Guevara: Government has proven negligent and destructive of the economy*,  *El
Cooperante* (Sept. 28, 2016) (translated), Ex. 19.

collateral on the 2020 but perhaps also force it to trade at an additional discount given ***concerns about the legality of the issuance***."[82]

      **Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the analyst report cited, but respectfully refer the Court to the analyst report cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent clarify, however, that the full quotation discusses the risk of political repudiation of the Exchange Offer, not its purported unconstitutionality:

> Other investors may be concerned about the legal risks associated with the new bond, given the perceived possibility of non-recognition by a future MUD [opposition] government as well as the current legal actions against CITGO.  They thus may expect the market will not only discount the collateral on the 2020 but perhaps also force it to trade at an additional discount given concerns about the legality of the issuance.

The Trustee and Collateral Agent further note that the cited report discussed other reasons for the lack of investor participation, including that "[s]ome investors believe it is better to stay on their current bond and hold it until maturity as they believe that the probability of payment is high," and that "[o]ther investors (particularly larger ones) may be engaged in an explicit or implicit process of bargaining with PDVSA."  Bliss Ex. 21 at 6.  The report stated that PDVSA's extension was mainly in reaction to this last group of investors.  *Id.*  The Trustee and Collateral Agent further note that Torino Capital informed investors on multiple occasions that the Exchange Offer did not pose any legal problems.  *See, e.g.*, Clark Ex. 290; Xu Decl. Ex. 2 at 6; *id*. Ex. 3 at ASH_00002449; *id*. Ex. 4 at 3.  For example, on September 28, 2016, the day after the non-binding National Assembly Resolution was passed, the Chief Economist at Torino Capital, Francisco Rodríguez, sent an email to a group of investors, including Ashmore and

---

[82] Francisco Rodríguez, "Venezuela this Week: October 11-16, 2016 Of Laws and Bonds," *Torino Capital LLC*, (ASH_00006934 – 941 at 939 – 940) (emphasis added), Ex. 21.

BlackRock, explaining that the resolution "does not state that the operation is illegal nor does it criticize it on legal grounds."  Clark Ex. 293; *see also* Xu Decl. Ex. 3 at ASH_00002449.  In the same email, Rodríguez also stated that "[Torino Capital] spoke to several opposition leaders yesterday.  Most, including the most senior members, agreed that the [Exchange Offer] was legal and did not require National Assembly authorization."  *Id.*

85.     On October 13, 2016, Goldman Sachs published a research report noting that "the National Assembly has questioned the legitimacy of offering a 50% participation of CITGO as collateral."[83]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the research report cited, but respectfully refer the Court to the research report cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  ████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████  Clark Ex. 44; *see also*

*id.* Ex. 29 ¶ 160; ██████████

86.     Also on October 13, 2016, J.P. Morgan published a report noting that "***the deal could be 'illegal' and reneged upon by a future opposition government***."[84]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the J.P. Morgan report cited, but respectfully refer the Court to the J.P. Morgan report

---

[83] Email from GS Macro Economics Research to Jan Dehn, Herbert Saller, Xin Xu, and Pablo Goldberg, "LATAM Today: October 13, 2016," dated October 13, 2016. (ASH_00000275 – 280, Ex. 22; ASH_00001588 – 593, Ex. 23; ASH_00002573 – 578, Ex. 24; BLA_00001162 – 167, Ex. 25) (emphasis added)
[84] Email from Dan Gelfand to Blackrock employees, "FW: PDVSA : Swap extended again and the clock is ticking," dated October 13, 2016 forwarding email from Javier Zorrilla, Ben Ramsey, and Trang Nguyen, "PDVSA Swap Extended Again and the Clock is Ticking," *J.P. Morgan*, October 13, 2016. (BLA_00001171 – 175 at 172). (emphasis added), Ex. 26.

cited for its complete contents and dispute any summary or interpretation inconsistent therewith.

The Trustee and Collateral Agent note that the analyst report stated:

> On the first, we do not believe the National Assembly has explicit purview of PDVSA's finance operations, but the Assembly has gone on the record with a resolution rejecting the use of Citgo as collateral and calling del Pino to testify (which he has not).  Moreover, from a more political perspective, jailed leader Leopoldo López has warned markets that the deal could be "illegal" and reneged upon by a future opposition government.  In our view, any future opposition government is likely to try to leverage market confidence rather than fight a battle over onerous debt, but the warning shot has been fired nonetheless.

Bliss Ex. 26 at BLA_00001172.

87.    On October 27, 2016, a Jefferies analyst stated in an email to market participants that "even though [the] market [was] pricing it between 15 and 17 at the moment," the CITGO Shares "should not be worth much" as collateral because the National Assembly had not "blessed" the transaction and thus the pledge of the CITGO Shares was potentially illegal.[85]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the analyst report cited, but respectfully refer the Court to the analyst report cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent state, however, that the majority of analyst reports published during the time period when the Exchange Offer was open did not mention any risk that the 2020 Notes were invalid or illegal.  Porzecanski Rebuttal Decl. ¶¶ 37–39.

---

[85] Email from John Salvesen to John Salvesen and Pablo Goldberg, "Opening Salvo - EM - METALS, VENZ/PDVSA, ARGENT, ODBR, JBSSBZ," dated October 27, 2016. (BLA_00001623 – 628 at 624), Ex. 56; Email from Zoe Piper to Xin Xu "FW: Opening Salvo - EM - METALS, VENZ/PDVSA, ARGENT, ODBR, JBSSBZ," dated October 27, 2016. (ASH_00003174 – 180 at 175), Ex. 57.  *See also* Email from Javier Kulesz to Jan Dehn, Xin Xu, Herbert Saller, "Jefferies LatAm Sovns - Venezuela and Argentina commentary," dated October 26, 2016. (ASH_00004413 – 417 at 413 – 414, Ex. 58; ASH_00007140 – 144 at 140 – 141, Ex. 59; ASH_00006137 – 141 at 137 – 138, Ex. 60); Email from Dan Gelfand to Pablo Goldberg, Sergio Trigo Paz and 25 others, "FW: Jefferies LatAm Sovns - Venezuela and Argentina commentary," dated October 26, 2016, forwarding email from Javier Kulesz to Dan Gelfand, "Jefferies LatAm Sovns - Venezuela and Argentina commentary," dated October 26, 2016. (BLA_00001612 – 1616 at 612 – 614), Ex. 61.

88.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[86]

**Response**: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

89.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[87]

**Response**: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮   The Trustee and Collateral Agent note, however, that the majority of analyst reports published during the time period when the Exchange Offer was open did not mention any risk that the 2020 Notes were invalid or illegal.  Porzecanski Rebuttal Decl. ¶¶ 37–39.  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[86] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[87] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Hinman Report ¶ 36–57 (detailing the extensive market commentary on the risk that the 2020 Notes were invalid and noting that this commentary "highlighted the fact that the Venezuelan National Assembly had publicly rejected the purported pledge of CITGO Collateral for the 2020 Notes issued by PDVSA.").

██████████████████████████████████████████████████

████████████████    In late September, Ashmore was again assured by the Chief Economist at

Torino Capital, Francisco Rodríguez, that they spoke to opposition leaders, and most senior

members of the opposition agreed that the Exchange Offer was legal.  Clark Ex. 293; *see also* Xu

Decl. Ex. 3.  ████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

90.     On October 28, 2016, after the illegitimate, Maduro-controlled Supreme Tribunal

quashed the National Assembly's investigation into PDVSA and the Exchange Offer, the 2020

Notes Transaction was completed despite the National Assembly's strenuous opposition and

"categorical rejection" of the offered pledge.[88]

**Response**:  The assertion that the Exchange Offer closed on October 28, 2016, is not

disputed, but the Trustee and Collateral Agent note that the exhibit cited does not support this

fact.  Additionally, the Trustee and Collateral Agent do not dispute that the quoted language

appears in Resolution cited, but respectfully refer the Court to Resolution cited for its complete

contents and dispute any summary or interpretation inconsistent therewith.  Otherwise, the

assertions in this paragraph are disputed as unsupported by the Resolution cited, which pre-dated

the issuance of the 2020 Notes by a month.

---

[88] *Resolutions on the Current Financial Situation of Petróleos de Venezuela S.A.*, dated September 27, 2016
(translated), Ex. C to Complaint.

91.     The Maduro regime's disregard of the National Assembly's public opposition to the Exchange Offer was emblematic of a longstanding disregard of the separation of powers embodied in the Venezuelan Constitution.[89]

**Response**:  The Trustee and Collateral Agent do not dispute that the Maduro regime has taken actions that are anti-democratic and that have been criticized by the U.S. government.  The Trustee and Collateral Agent state, however, that these assertions are beyond the scope of Professor Brewer-Carías's disclosed opinions and his report is not admissible to prove these points.  *See* Brewer-Carías Report ¶¶ 10–11.  The Trustee and Collateral Agent further state that the PDVSA Parties failed to provide discovery on the assertions in this paragraph in response to the Trustee and Collateral Agent's discovery requests.  *See* Supp. Clark Ex. 397 ¶¶ 34, 36, 38–40; Clark Ex. 259.  The Trustee and Collateral Agent further state that the assertions in this paragraph are not material to the issues in dispute.  Finally, the Trustee and Collateral Agent state that since at least 1983 and until recently, the National Assembly has discussed whether contracts involving PDVSA are contracts of national interest and has declined to declare those contracts as such.  *See* ████████ Ex. 3 §§ 148–150.

92.     Since the beginning of the Chávez regime in 1999, the National Executive branch of the Venezuelan government has devoted itself to neutralizing the National Assembly and subduing the judiciary.[90]

**Response**:  The Trustee and Collateral Agent do not dispute that since 1999 the National Executive branch has taken actions that are anti-democratic and that have been criticized by the U.S. government.  The Trustee and Collateral Agent dispute the remaining assertions in this

---

[89] Brewer Report at ¶¶ 54-65.
[90] Brewer Report at ¶ 54, (citing ALLAN R. BREWER-CARÍAS, DISMANTLING DEMOCRACY IN VENEZUELA. THE CHÁVEZ AUTHORITARIAN EXPERIMENT 1–6 (Cambridge Univ. Press, 2010), Ex. 63.

paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and therefore not admissible.  *See* Brewer-Carías Report ¶¶ 10–11.  The Trustee and Collateral Agent further state that the PDVSA Parties failed to provide discovery on the assertions in this paragraph in response to the Trustee and Collateral Agent's discovery requests.  *See* Supp. Clark Ex. 397 ¶¶ 34–36, 38–40; Clark Ex. 259.  The Trustee and Collateral Agent further state that the assertions in this paragraph are not material to the issues in dispute.

93.     The primary means of neutralizing the National Assembly has been simply to ignore its constitutional powers.[91]

**Response**:  The Trustee and Collateral Agent do not dispute that the Maduro regime has taken actions that are anti-democratic and that have been criticized by the U.S. government.  The Trustee and Collateral Agent dispute, however, that the approval of the 2016 Exchange Offer ignored the constitutional powers of the National Assembly.  The Trustee and Collateral Agent dispute the remaining assertions in this paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and therefore not admissible.  *See* Brewer-Carías Report ¶¶ 10–11.  The Trustee and Collateral Agent further state that the PDVSA Parties failed to provide discovery on the assertions in this paragraph in response to the Trustee and Collateral Agent's discovery requests.  *See* Supp. Clark Ex. 397 ¶¶ 34–36, 38–40; Clark Ex. 259.  Finally, the Trustee and Collateral state that the assertions in this paragraph are not material to the issues in dispute.

94.     Numerous treaties and contracts of national public interest have been enacted by the National Executive without constitutionally required National Assembly authorization.[92]

---

[91] Brewer Report, at ¶ 55.
[92] *Id*. at ¶ 56 (collecting examples).

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph as

the assertions are beyond the scope of Professor Brewer-Carías's disclosed opinions and

therefore not admissible.  *See* Brewer-Carías Report ¶¶ 10–11.  The Trustee and Collateral Agent

further state that the PDVSA Parties failed to provide discovery on the assertions in this

paragraph in response to the Trustee and Collateral Agent's discovery requests.  *See* Supp. Clark

Ex. 397 ¶¶ 34, 36, 38–40; Clark Ex. 259.  Moreover, the assertion that the contracts cited at

paragraph 56 of Professor Brewer-Carías's report are contracts of national interest is disputed to

the extent that the Republic is not a party to the contracts, and to the extent that the contracts are

inconsistent with the requirements set out in *Andrés Velásquez*.  *See* ███████ Ex. 2 §§ 91–

110, 129–155.  The Trustee and Collateral Agent further state that the National Assembly only

passed a non-binding resolution purporting to reject the contract between Rosneft and CITGO

Holding after this litigation was filed, and only one day before PDVSA's Rule 30(b)(6)

deposition was scheduled.  Clark Ex. 14 at 8–9; *id.* Ex. 51 at 2–3.

95.     Other means have included the appropriation of the National Assembly's

legislative functions through executive decrees and the direct persecution of opposition party

members, many of whom have been jailed or forced into exile.[93]

**Response**:  The Trustee and Collateral Agent do not dispute that members of parties

opposed to the Maduro regime have been jailed or forced into exile.  The Trustee and Collateral

Agent dispute, however, that the Exchange Offer required National Assembly approval, as its

legal validity is consistent with decades of Venezuelan Supreme Tribunal precedent.  The

Trustee and Collateral Agent further state that the assertions in this paragraph are not material to

---

[93]*See* Andriena Aponte and Leon Wietfield, *Factbox: Venezuela's jailed, exiled or barred opposition politicians*, REUTERS (Feb. 19, 2018), *available at* https://www.reuters.com/article/us-venezuela-politics-factbox/factbox-venezuelas-jailed-exiled-or-barred-opposition-politicians-idUSKCN1G31WU.

the issues in dispute and that the *Reuters* article cited for the assertions in this paragraph is inadmissible hearsay.

96.    Announcing his first forty-eight executive decrees in 2001, Chávez proclaimed: "*La Ley soy yo . . . El Estado soy yo*" ("The law is me . . . The state is me.").[94]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in Professor Brewer-Carías's report and the lecture cited therein, but respectfully refer the Court to the report cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent state, however, that the statement attributed to Chávez is not material to the issues in dispute.

97.    Chávez approved another forty decrees in 2008, threatening to persecute anyone opposing him and similarly proclaiming "Yo soy la Ley . . . Yo soy el Estado" ("I am the Law . . . I am the State").[95]

**Response**:  The Trustee and Collateral Agent, however, do not dispute that the quoted language appears in Professor Brewer-Carías's report and the lecture cited therein, but respectfully refer the Court to the report cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent state, however, that the statement attributed to Chávez is not material to the issues in dispute.

98.    In 2004, the National Assembly, which was already decisively controlled by Chávez, approved the appointment of forty-nine new justices and deputy justices of the Supreme Tribunal, each of whom was associated with the Chávez regime.[96]

---

[94] Allan R. Brewer-Carías, *The Principle of Separation of Powers and Authoritarian Government in Venezuela*, *in* 47 DUQ. L.  REV. 837-38 (2009).
[95] *Id*. at 838.
[96] Brewer Report at ¶ 61 (citing Javier Pereira, *Chavismo to appoint 49 new judges today*, EL NACIONAL, Dec. 13, 2004)) (translated), at A.2, Ex. 64.

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and his report is, therefore, not admissible evidence to prove these assertions.  *See* Brewer-Carías Report ¶¶ 10–11. The Trustee and Collateral Agent further state that the Supreme Tribunal decided *Andrés Velásquez* in 2002—two years before the Chávez regime appointed new justices to the Supreme Tribunal.

99.     The opposition parties did not participate in the December 2005 parliamentary elections because they believed the elections would be rigged.[97]

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and his report is, therefore, not admissible evidence to prove these assertions.  *See* Brewer-Carías Report ¶¶ 10–11.  The Trustee and Collateral Agent further state that the assertions in this paragraph are not material to the issues in dispute.

100.     As a consequence, the National Assembly became completely dominated by Chávez.[98]

**Response**:  The assertion that pro-Chávez representatives held a majority of seats in the National Assembly after the December 2005 National Assembly elections is not disputed, but the Trustee and Collateral Agent state that the assertions in this paragraph are not material to the issues in dispute.

---

[97] Brewer Report at ¶ 60 (citing *The opposition withdraws from the legislative elections in Venezuela. Chávez's adversaries denounce lack of transparency*, EL PAIS (Nov. 30, 2005)) (translated), Ex. 65.

[98] Brewer Report at ¶ 60 (citing *Chávez will completely control the Assembly after the boycott of the main opposition parties*], EL MUNDO.ES. (Dec. 5, 2005)) (translated), Ex. 66.

101.    In 2009, the president of the Supreme Tribunal exclaimed in a press conference that "the separation of powers weakens the State" and that this system "has to be reformed."[99]

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and his report is, therefore, not admissible evidence to prove these assertions.  *See* Brewer-Carías Report ¶¶ 10–11.  The Trustee and Collateral Agent further state that the assertions in this paragraph are not material to the issues in dispute.  The Trustee and Collateral Agent, however, do not dispute that the quoted language appears in Professor Brewer-Carías's report and the television interview cited therein.  To the extent admissible, the Trustee and Collateral Agent respectfully refer the Court to the television interview cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The television interview cited by the PDVSA Parties further states:

> "The existence of institutions such as that of the Council of State or the principle of collaboration between powers are very healthy and allow the State, which is one, and the power, which is one, to be divided into competencies, to coordinate, in one way or another, as the separation of powers is one thing and the division thereof is another," said the officer, who clarified that when exercising their powers, each instance of Public Power should act independently and none of the others could interfere with it.
>
> "For example, the jurisdiction of the Judiciary is to judge, that is our core, judging, and there should be complete autonomy for such purpose—that is, judges should judge freely, in accordance with the legal elements, techniques and what has been verified in the dockets.  Then it is true, and it is absolute, that there cannot be any type of intervention and there is none," she explained.

Supp. Clark Ex. 396.

102.    In 2008, Teodoro Petkoff, then editor of the Venezuelan newspaper *Tal Cual*, observed: "From a conceptual point of view, the Venezuelan political system is autocratic.  All

---

[99] Brewer Report at ¶ 59 (citing *The division of power weakens state, President of TSJ [Luisa Estela Morales] states that the Constitution must be reformed*], EL UNIVERSAL (Dec. 5, 2009)) (translated), Ex. 28.

political power is concentrated in the hands of the President.  There is no real separation of Powers."[100]

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and his report is, therefore, not admissible evidence to prove these assertions.  *See* Brewer-Carías Report ¶¶ 10– 11.  The Trustee and Collateral Agent further state that the assertions in this paragraph are not material to the issues in dispute.  To the extent admissible or material, however, the Trustee and Collateral Agent do not dispute that the quoted language appears in the Petkoff essay cited, and respectfully refer the Court to the Petkoff essay for its complete contents and dispute any summary or interpretation inconsistent therewith.

103.    It was not until the opposition parties won control in the December 2015 parliamentary elections that the National Assembly could begin asserting its constitutional powers as an independent branch of government, overseeing the government and the Public Administration.[101]

**Response**:  The Trustee and Collateral Agent do not dispute that the opposition won control of the National Assembly in the December 2015 parliamentary elections.  The Trustee and Collateral Agent dispute the remaining assertions in this paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and his report is, therefore, not admissible evidence to prove these assertions.  *See* Brewer-Carías Report ¶¶ 10–11.  Moreover, the Trustee and Collateral Agent note that the cited portion of Professor Brewer-Carías's report does not

---

[100] Brewer Report at ¶ 60 (citing Teodoro Petkoff, *Election and Political Power. Challenges for the Opposition*, *in* REVISTA: HARVARD REVIEW OF LATIN AMERICA 2 (2008), Ex. 27.
[101] Brewer Report at ¶ 101; Brian Walker and Tiffany Ap, *Venezuela's opposition party wins parliament in a blow to Maduro*, CNN (Dec. 7, 2015), *available at* https://www.cnn.com/2015/12/07/americas/venezuela-oelections/index.html.

support these assertions.  The Trustee and Collateral Agent further state that the assertions in this paragraph are not material to the issues in dispute.  Finally, the Trustee and Collateral Agent state that the PDVSA Parties failed to provide discovery on the assertions in this paragraph in response to the Trustee and Collateral Agent's discovery requests.  *See* Supp. Clark Ex. 397 ¶¶ 34, 36, 38–40; Clark Ex. 259.

104.    Since beginning to independently exercise its control functions in 2016, the National Assembly has passed numerous resolutions declaring contracts to be national public interest contracts or rejecting contracts entered into without legislative authorization,[102] including the following:

- "Resolution on the Decree of creation of the national strategic development zone Mining Arc of the Orinoco" of June 14, 2016;[103]

- "Resolution rejecting the decision No 618 of the Constitutional Chamber of the Supreme Tribunal of Justice of July 20, 2016" of July 26, 2016;[104]

- "Resolution to denounce the unconstitutionality of the constitution of a "PDVSA Litigation Trust, by PDVSA" of April 24, 2018;[105]

- "Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities" of September 25, 2018;[106]

- "Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities" of January 8, 2019;[107] and

---

[102] Brewer Report at ¶ 65 (collecting examples of resolutions).

[103] Asamblea Nacional, *Resolution on the Decree of creation of the national strategic development zone Mining Arc of the Orinoco*, (June 14, 2016) (translated), Ex. 67.

[104] Asamblea Nacional, *Resolution rejecting the decision No 618 of the Constitutional Chamber of the Supreme Tribunal of Justice of Julu 20, 2016*, (July 26, 2016) (translated), Ex. 68.

[105] Asamblea Nacional, *Resolution to denounce the unconstitutionality of the constitution of a "PDVSA Litigation Trust, by PDVSA,* (Apr. 24, 2018) (translated), Ex. 69.

[106] *Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities*, (Sept. 25, 2018) (translated), Ex. 70.

[107] Asamblea Nacional, *Resolution rejecting the services contracts entered into by PDVSA that allow private corporations to develop hydrocarbon primary activities*, (Jan. 8, 2019) (translated), Ex. 71.

- "Resolution Declaring the Invalidity and Nullity of the Contracts by which Petróleos de Venezuela S.A. and its Subsidiary Companies granted 49.9% of the shares of Citgo Holding, Inc. in Favor of Rosneft Trading S.A."[108]

**Response**:  The Trustee and Collateral Agent do not dispute that the above resolutions were passed on the referenced dates, but clarify that four of the six listed resolutions post-date the Exchange Offer.  The Trustee and Collateral Agent respectfully refer the Court to each of the resolutions for their complete contents.

105.    The National Assembly has authorized numerous joint venture agreements entered into by PDVSA or certain of its subsidiaries, which did not include the Republic itself as a party, as national public interest contracts under Article 150 of the Venezuelan Constitution.[109]

**Response**:  The assertions in this paragraph are disputed.  First, the referenced National Assembly resolutions cannot supersede the binding interpretation of Article 150 in *Andrés Velásquez* and its progeny.  Therefore, the referenced joint venture agreements are not contracts of national interest insofar as they fail to fulfill the requirements in those cases.  Second, the joint venture agreements require National Assembly approval under Article 33 of the Organic Hydrocarbons Law, not under Article 150.  Third, each joint venture agreement directly affects the assets of the Venezuela, which some scholars have argued may exceptionally qualify a contract as a contract of national interest.  Finally, the nature of the joint venture agreements required National Assembly approval, because the geographic zones in which the joint ventures were to operate had to be delimited by decree, authorized by the President of the Venezuela, and officially published.  Supp. ▮▮▮▮▮ § 16.

---

[108] Asamblea Nacional, *Resolution Declaring the Invalidity and Nullity of Contracts by which Petróleos de Venezuela S.A. and its Subsidiary Companies granted 49.9% of the shares of Citgo Holding, Inc. in Favor of Rosneft Trading S.A*, (Mar. 4, 2020) (translated), Ex. 72.

[109] *See, e.g.*, Resolutions dated May 4, 2006, published in the Official Gazette No. 38.430, dated May 5, 2006 (translated), Ex. 47; Resolution dated Sept. 24, 2009, published in the Official Gazette No. 39.273, dated Sept. 28, 2009 (translated), Ex. 48.

106.    On December 23, 2015, just before the new legislature was sworn in, the outgoing legislature made a host of judicial appointments to stack the Venezuelan Supreme Tribunal with Maduro loyalists.[110]

**Response**:  The Trustee and Collateral Agent do not dispute that the National Assembly made certain irregular judicial appointments in December 2015.  *See* ███████ Ex. 3 ¶ 50.  The Trustee and Collateral Agent state, however, that the cited *Reuters* article is inadmissible hearsay to prove the truth of the assertions in this paragraph.  The Trustee and Collateral Agent further note that *Andrés Velásquez* was decided in 2002—over a decade prior the judicial appointments made in December 2015.

107.    From that point on, the Maduro-controlled Supreme Tribunal issued more than a hundred decisions that transformed Venezuela's government into what has been called a "judicial dictatorship" or "judicial tyranny."[111]

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and his report is, therefore, not admissible evidence to prove these assertions.  *See* Brewer-Carías Report ¶¶ 10–11.  Professor Brewer-Carías's report, moreover, is not admissible evidence to prove the content of "more than a hundred decisions" not listed in his report.  *See* Brewer-Carías Report.  To the extent admissible, however, the Trustee and Collateral Agent do not dispute that the quoted language appears in Professor Brewer-Carías's report and his own lecture cited therein, but respectfully refer the Court to the report and lecture cited for their complete contents and dispute

---

[110] Diego Ore, *Venezuela's outgoing Congress names 13 Supreme Court justices*, REUTERS (Dec. 23, 2016), *available at* https://www.reuters.com/article/us-venezuela-politics/venezuelas-outgoing-congress-names-13-supreme-court-justices-idUSKBN0U626820151223.

[111] Brewer Report at ¶ 87 (quoting Allan R. Brewer-Carías, Emeritus Professor, Central University of Venezuela, *Transition from Democracy to Tyranny through the Fraudulent Use of Democratic Institutions: The Case of Venezuela* (Sept. 25, 2018), *available at* https://allanbrewercarias.com/wp-content/uploads/2018/09/1218.-Brewer.-conf.-Transictiion-Democracy-to-Tyranny.-B.C.-2018.pdf).

any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent further note that *Andrés Velásquez* was decided in 2002.

108.    In 2016, the Secretary General of the Organization of American States reported that Venezuela was "facing serious disruptions of the democratic order" and that "there is currently no clear separation and independence of the branches of government in Venezuela, with the co-opting of the Judicial branch by the Executive Branch being one of the clearest cases of this."[112]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the Secretary General's report, but respectfully refer the Court to the report cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent clarify, however, that the Secretary General's report does not discuss the *Brigitte Acosta* decision as an example of "co-opting of the Judicial branch by the Executive branch."  *See supra* n.112 at 65.  The Secretary General's report only discusses decisions dating from December 12, 2015, to May 19, 2016.  *Id.* at 36–40.  The Trustee and Collateral Agent further note that *Andrés Velásquez* was decided in 2002.

109.    The Secretary General also reported "the continued violations of the Constitution, particularly with regard to the balance between the branches of government," and called for "a new composition of the Supreme Tribunal of Justice . . . given that the current composition is completely flawed, both in the appointment process as well as in the political bias of virtually all its members."[113]

---

[112] Org. of Am. States, *Luis Almagro to Mr. Juan Jose Arcuri*, at 65, 109, OSG/243-16 (May 26, 2016), *available at* http://www.oas.org/documents/eng/press/OSG-243.en.pdf.
[113] *Id.* at 111 & 112.

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the Secretary General's report, but respectfully refer the Court to the report cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent clarify, however, that the Secretary General did not recommend that the decisions of the Supreme Tribunal be overturned, nor did he describe them as illegitimate or non-binding.  *See supra* n.112 at 111–12.

110.    In a March 2017 decision, the Supreme Tribunal eliminated the parliamentary immunity of National Assembly members, arrogated to itself all of the legislative powers of the National Assembly, and delegated legislative powers to Maduro, permitting him to reform laws and codes at his discretion.[114]

**Response**:  The Trustee and Collateral Agent dispute the assertions in this paragraph as they are beyond the scope of Professor Brewer-Carías's disclosed opinions and his report is, therefore, not admissible evidence to prove these assertions.  *See* Brewer-Carías Report ¶¶ 10–11.  Professor Brewer-Carías's report, moreover, does not rely on the Supreme Tribunal decision for its opinion, but instead cites a lecture given by Professor Brewer-Carías.  *See supra* n.114.  It is, accordingly, not admissible evidence to prove the contents of the Supreme Tribunal decision.  The Trustee and Collateral Agent further state that the PDVSA Parties failed to provide discovery on the assertions in this paragraph in response to the Trustee and Collateral Agent's discovery requests.  *See* Supp. Clark Ex. 397 ¶ 40; Clark Ex. 259.  Finally, the Trustee and Collateral Agent further state that the assertions in this paragraph are not material to the issues in dispute.

---

[114] Brewer Report at ¶ 87 (quoting Allan R. Brewer-Carías, Emeritus Professor, Central University of Venezuela, *Transition from Democracy to Tyranny through the Fraudulent Use of Democratic Institutions: The Case of Venezuela* (Sept. 25, 2018)), *available at* https://allanbrewercarias.com/wp-content/uploads/2018/09/1218.-Brewer.-conf.-Transictiion-Democracy-to-Tyranny.-B.C.-2018.pdf.

111.    Thus, in the 2019 Transition Statute, the National Assembly called for legislation prohibiting public officials from "obey[ing] orders from the one who usurps the Presidency of the Republic [Maduro]" or from "the other unconstitutionally integrated organs such as the Supreme Tribunal of Justice," declaring illegitimate all justices appointed before July 21, 2017.[115]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the Transition Statute cited, but respectfully refer the Court to the Transition Statute cited for its complete contents and dispute any summary or interpretation inconsistent therewith. The Trustee and Collateral Agent clarify, however, that the Transition Statute does not prohibit public officials from obeying orders from the Maduro regime or the Supreme Tribunal, but rather aims to incentivize public officials to defect from the Maduro regime:

> The National Assembly shall dictate Laws promoting the political transition pursuant to article 333 of the Constitution.  These Laws shall serve the following objectives:
>
> 1.    Create the legal incentives and guarantees so that civil and military officials act according to the Constitution and do not obey orders from one who usurps the Presidency of the Republic since January 10, 2019, or from other unconstitutionally integrated organs such as the Supreme Tribunal of Justice, the National Electoral Board, the Prosecution Authorities, the Defense of the People and the General Comptroller of the Republic, so that they collaborate and participate in the process of transition and reestablishment of the constitutional order.

Bliss Ex. 6, Art. 18.

112.    The U.S. Government has also declared the Supreme Tribunal illegitimate, stating that it "usurped the authority of Venezuela's democratically-elected legislature, the National

---

[115] Asamblea Nacional, *Estatuto que rige la transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela [Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela]* (Feb. 5, 2019), Ex. 6.

Assembly, including by allowing the Executive Branch to rule through emergency decree, thereby restricting the rights and thwarting the will of the Venezuelan people."[116]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the Treasury Department press release cited, but respectfully refer the Court to the press release cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent note, however, that the specific press release cited does not declare the Supreme Tribunal "illegitimate."

113.    The U.S. Government has even sanctioned the President of the Supreme Tribunal and seven principal members of the Constitutional Chamber for preventing "the democratically-elected National Assembly [from] perform[ing] its constitutional functions."[117]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the Treasury Department press release cited, but respectfully refer the Court to the press release cited for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent also do not dispute that the Treasury Department designated eight members of Venezuela's Supreme Tribunal, including its President, for sanctions pursuant to Executive Order 13692.  The Trustee and Collateral Agent add that the cited source does not mention the *Brigitte Acosta* decision, although it specifically criticizes other decisions by the Supreme Tribunal.  The Trustee and Collateral Agent further clarify that these designations post-dated the Exchange Offer.

---

[116] *See Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice*, U.S. DEP'T OF THE TREASURY (May 18, 2017), *available at* https://www.treasury.gov/press-center/pressreleases/Pages/sm0090.aspx.
[117] *Id.*

114.    More recently, the U.S. Government has placed visa restrictions on "members of the illegitimate [Venezuelan] Supreme Court[] for undermining Venezuela's democracy."[118]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited State Department press release, but respectfully refer the Court to the press release for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent clarify, however, that the announced visa restrictions do not mention the *Brigitte Acosta* decision and that these visa restrictions post-date the Exchange Offer.

115.    Additionally, the U.S. Government has issued an indictment against the Supreme Tribunal's president for alleged crimes, including accepting bribes to fix civil and criminal cases.[119]

**Response**:  The assertions in this paragraph are not disputed.  The Trustee and Collateral Agent, however, clarify that the indictment was issued on March 12, 2020, and that the indicted president, Maikel José Moreno Pérez, was not on the panel that decided *Brigitte Acosta*.  *See* ▮▮▮▮ Ex. 8.

116.    After a rigged election in November 2018, Maduro claimed victory over the opponents that remained after the major opposition party candidates had been jailed or exiled.[120]

**Response**:  The Trustee and Collateral Agent do not dispute that after an election in May 2018, Maduro claimed victory over his remaining opponents.  The Trustee and Collateral Agent

---

[118] U.S. Department of State, *U.S. Sanctions on Venezuelan Individuals and Entities* (Press Statement, Feb. 15, 2019), *available at* https://www.state.gov/u-s-sanctions-on-venezuelan-individuals-and-entities/.

[119] *U.S. v. Maikel Jose Moreno Perez*, Case No. 1:20-mj-02407-JJO (S.D. Fl. Mar. 12, 2020).

[120] *See* Andriena Aponte and Leon Wietfield, *Factbox: Venezuela's jailed, exiled or barred opposition politicians*, REUTERS (Feb. 19, 2018), *available at* https://www.reuters.com/article/us-venezuela-politics-factbox/factbox-venezuelas-jailed-exiled-or-barred-opposition-politicians-idUSKCN1G31WU.

note that the presidential election occurred in May 2018, and that the U.S. government described it as "not free, fair or credible."  Supp. Clark Ex. 388.

117.    On January 23, 2019, the National Assembly invoked Article 233 of the Venezuelan Constitution to declare Maduro's presidency illegitimate and name National Assembly President Juan Guaidó as the Interim President of Venezuela.[121]

**Response**:  The assertions in this paragraph are not disputed, except to clarify that the National Assembly issued a legislative order on January 15, 2019, naming Juan Guaidó as the Interim President of Venezuela.  Compl. ¶ 24.

118.    That same day, the U.S. President declared that the Maduro regime was "illegitimate" and officially recognized "the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim President of Venezuela" and the National Assembly as the "only legitimate branch of government duly elected by the Venezuelan people."[122]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited press statement, but respectfully refer the Court to the press statement for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent clarify, however, that President Trump officially recognized Interim President Juan Guaidó eight days after the National Assembly issued a legislative order stating that Guaidó would assume the role of Interim President, not the same day.  Compl. ¶ 24.

---

[121] Doug Stanglin, *U.S. recognizes Venezuela opposition leader Juan Guaido as president; Russia backs Maduro*, USA TODAY (Jan. 23, 2019), *available at* https://www.usatoday.com/story/news/world/2019/01/23/venezuela-juan-guaido-declares-himself-president-amid-protests/2658642002/.

[122] Press Statement, Secretary of State Michael R. Pompeo, Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela (Jan. 23, 2019), *available at* https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/.

119.    Soon thereafter, a number of other countries also recognized Mr. Guaidó as Venezuela's legitimate Interim President and the National Assembly as Venezuela's only legitimate, democratically elected government body.[123]

**Response**:  The assertions in this paragraph are not disputed.

120.    The Maduro regime is recognized only by Russia, China, Iran, Cuba, and Turkey.[124]

**Response**:  The Trustee and Collateral Agent do not dispute that Russia, China, Iran, Cuba, and Turkey recognize the Maduro regime.

121.    On January 25, 2019, the U.S. President issued an executive order imposing sanctions in light of the efforts of the "illegitimate Maduro regime" to "prevent the Interim President and the National Assembly from exercising legitimate authority in Venezuela."[125]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited Executive Order, but respectfully refer the Court to the Order for its complete contents and dispute any summary or interpretation inconsistent therewith.

122.    On August 5, 2019, the U.S. President issued another executive order blocking all property of the Maduro regime in the U.S. in light of Maduro's "usurpation of power."[126]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited Executive Order, but respectfully refer the Court to the Order for its complete contents and dispute any summary or interpretation inconsistent therewith.

---

[123] Press Statement, Secretary of State Michael R. Pompeo, Recognition Of Juan Guaidó As Venezuela's Interim President By Several European Countries (Feb. 4, 2019), *available at* https://eg.usembassy.gov/secretary-pompeo-on-recognition-of-juan-Guaidó-as-venezuelas-interim-president-by-several-european-countries/.

[124] Natalia Vasilyeva, *Venezuela crisis: Familiar geopolitical sides take shape*, AP NEWS (Jan. 24, 2019), *available at* https://apnews.com/6b7fa7cc566f486cb974362168f1d90d.

[125] *See* Executive Order 13857 (Jan. 25, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/13857.pdf.

[126] *See* Executive Order 13884 (August 5, 2019), *available at* https://www.treasury.gov/resource-center/sanctions/programs/documents/13884.pdf.

123.    The U.S. Treasury Department has likewise issued orders blocking transactions with the Maduro regime (describing Maduro in accompanying guidance as the "former President") and permitting transactions with the National Assembly and Interim President Guaidó.[127]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited sources, but respectfully refer the Court to the sources for their complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent clarify, however, that the sanctions were issued by Executive Order, not by the Treasury Department who designated the entities and individuals subject to sanctions, and that the Treasury Department has authorized certain transactions only.

124.    The U.S. State Department has issued statements reiterating that "the United States does not recognize the Maduro regime as the government of Venezuela" and considers Maduro the "former President."[128]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited press release, but respectfully refer the Court to the press release for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent state, however, that the United States recognized the Maduro administration at the time of the Exchange Offer and continued to recognize it until January 2019.  Clark Ex. 58; *id.* Ex. 59; *id.* Ex. 365; Compl. ¶ 24.

125.    Even before formal recognition, the U.S. had declared the National Assembly to be Venezuela's only "legitimately elected" legislative body and had vowed "to take strong and

---

[127] *See* OFAC General Licenses 7 & 31; OFAC FAQ 660, *available at* https://www.treasury.gov/resource-center/faqs/sanctions/pages/faq_other.aspx.
[128] Press Statement, U.S. Dep't of State, *Continuing U.S. Diplomatic Presence in Venezuela* (Jan. 23, 2019), *available at* https://www.state.gov/continuing-u-s-diplomatic-presence-in-venezuela/.

swift actions against the architects of authoritarianism in Venezuela, including those who participate in the 'Constituent National Assembly'" illegitimately constituted by Maduro in July 2017.[129]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language appears in the cited State Department press release, but respectfully refer the Court to the press release for its complete contents and dispute any summary or interpretation inconsistent therewith.  The Trustee and Collateral Agent state, however, that the United States recognized the Maduro administration as Venezuela's government at the time of the Exchange Offer and continued to recognize it until January 2019.  Clark Ex. 58; *id.* Ex. 59; *id.* Ex. 365; Compl. ¶ 24.

126.  ██████████████████████████████████████████████.[130]

**Response**:  The assertions in this paragraph are disputed.  Ashmore was a subscriber to Torino Capital's analyst reports.  Clark Ex. 293; Xu Decl. Exs. 2–4.

127.  ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████[131]

**Response**:  ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  ████████████████

███████████████████████████████████

---

[129] State Dep't, Assumption of Legislative Powers in Venezuela (Aug. 18, 2017) ("[T]he democratically-elected National Assembly is the only legitimate legislative body . . . As long as the Maduro regime continues to conduct itself as an authoritarian dictatorship, we are prepared to bring the full weight of American economic and diplomatic power to bear in support of the Venezuelan people as they seek to restore their democracy."), *available at* https://www.state.gov/assumption-of-legislative-powers-in-venezuela/.
[130] ██████████████████████████████████████████████████
[131] *Id.*

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ ██████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████ *Id*.

128.   ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████ [132]

**Response**:   ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ █████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████   Further, this view was informed by a conversation with Rafael

Guzmán, a National Assembly deputy and principal leader of the opposition party Justice First.

*Id.*; Clark Ex. 362.  The Trustee and Collateral Agent respectfully refer the Court to their

response to paragraph 127 above for further context.

---

[132] *Id.*

129. 

[133]

**Response**:

130.    In July 2016, approximately two months before the Exchange Offer, Ashmore's

Head of Research, Jan Dehn, stated that Venezuela was "one of the most miserable,

mismanaged, hopeless countries on the planet.  But that doesn't mean you can't make

money."[134]

**Response**:  The Trustee and Collateral Agent do not dispute that the quoted language

appears in the *Bloomberg* article cited, but the Trustee and Collateral Agent respectfully refer the

Court to the *Bloomberg* article cited for its complete content and dispute any summary

inconsistent therewith.

### The Trustee and Collateral Agent's Statement of Additional Material Undisputed Facts

Pursuant to Local Civil Rule 56.1(b), the Trustee and Collateral Agent respectfully

submit additional undisputed facts in response to the PDVSA Parties' Rule 56.1 Statement.  The

Trustee and Collateral Agent hereby incorporate by reference in its entirety the Statements of

Material Undisputed Facts made in their Rule 56.1 Statement filed with the Court on June 10,

2020.

---

[133] *Id*.

[134] Sebastian Boyd, *Venezuela Refuses to Default. Few People Seem to Understand Why*, BLOOMBERG (July 5, 2016), Ex. 49.  *See also* Quote from Jan Dehn (ASH_00006371), Ex. 1;

131.    On August 7, 2006, the Venezuela Attorney General's Office issued an advisory legal opinion on the elements necessary for a contract to be considered a contract of national interest.  *See* Supp. Clark Ex. 393.

132.    In the opinion, the Attorney General's Office applied the *Andrés Velásquez* factors and concluded that contracts of national interest must involve "the National Executive." Supp. Clark Ex. 393 at 76.

133.    On June 17, 2020, President of the PDVSA Ad Hoc Board Luis Pacheco submitted a declaration in support of the Republic's motion for equitable relief under Federal Rule of Civil Procedure 60(b) in *Crystallex International Corp.* v. *Bolivarian Republic of Venezuela*.  In his declaration, Pacheco emphasized the separateness of PDVSA and the Venezuelan government, stating that the Maduro regime "does not exercise any control over the ad hoc administrative board" and that "the ad hoc administrative board has acted to ensure separation from the Guaidó government."  Supp. Clark Ex. 390 ¶¶ 10–13.

134.    In support of the same motion, Professor Brewer-Carías submitted a declaration also emphasizing PDVSA's "clear corporate separation" from the Venezuelan government and its status as "an independent instrumentality of the Republic."  Supp. Clark Ex. 391 ¶¶ 18, 35–36, 40.

135.    On October 12, 2016, Eulogio del Pino, then President of PDVSA and Venezuela's Oil Minister, responded to critiques of the Exchange Offer by opposition politicians, stating that:

> We are going to be taking legal action against some politicians in Venezuela who have been going to the banks and asking them not to go for the exchange, and that is something that is damaging the value of the company . . . Those guys should be responsible for what they are doing, attacking not just the company, but the people and the country. . . . [U]nfortunately the opposition in Venezuela is crazy, they have been going against that exchange, which is really good because it

> allows us to restructure our debt instead of the next two years, to extend it for [the] next four years.  When time are so bad with the price of oil, it would allow us to take a breather in our finances and our cash flow.  Restructuring debt is the kind of deal that some other companies around the world are doing, but in Venezuela it has come under attack from the opposition and has become a political issue.

Supp. Clark Ex. 386.

136.    Del Pino, the President of PDVSA and Minister of Oil during the Exchange Offer, made multiple statements endorsing and encouraging participation in the Exchange Offer.  Supp. Clark Ex. 394; *id.* Ex. 395.

137.    On September 30, 2016, the Republic filed a form 18-K with the U.S. Securities and Exchange Commission in which the Republic described the Exchange Offer without mention of National Assembly approval or other potential legal issues.  The 18-K stated as follows:

> In February 2015, CITGO Holding Inc. issued U.S.$1.5 billion in bonds secured by a 100% equity stake in CITGO. The bond proceeds funded a U.S.$2.8 billion dividend to PDVSA.  On September 16, 2016, PDVSA launched an exchange offer for its 5.250% senior notes due April 2017 and 8.50% senior notes due November 2017.  The new exchange notes mature in 2020 and bear interest at a rate of 8.50% per annum.  The new exchange notes will be secured by a 50.1% equity stake in CITGO and will be guaranteed by a subsidiary, PDVSA Petróleo, S.A. ("PDVSA Petróleo").  The consummation of the offer is contingent upon the tender of at least 50% in aggregate principal amount of the existing notes.

Supp. Clark Ex. 387 at 67–68.

138.

Hr'g Tr. 61:11–13, Feb. 6, 2020, ECF No. 66; Joint Letter for Extension of Time, June 3, 2020, ECF No. 76; ;

Supp. Clark Ex. 392 ¶ 8.

Dated: New York, New York
      June 29, 2020

Respectfully submitted,

PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
Walter Rieman
William A. Clareman
Jonathan Hurwitz
Shane D. Avidan
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990
wrieman@paulweiss.com
wclareman@paulweiss.com
jhurwitz@paulweiss.com
savidan@paulweiss.com

PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
Roberto J. Gonzalez (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: 202-223-7300
rgonzalez@paulweiss.com

*Attorneys for Defendants and Counterclaim
Plaintiffs MUFG Union Bank, N.A. and GLAS
Americas LLC, in their respective capacities
as Trustee and Collateral Agent, under the
Indenture dated October 27, 2016, and the
Pledge and Security Agreement dated
October 28, 2016, governing PDVSA's Senior
Secured Notes due 2020 (as to New York law
issues only)*

LATHAM & WATKINS LLP

By:   s/ Christopher J. Clark
        Christopher J. Clark
        Matthew S. Salerno
        Sean H. McMahon
885 Third Avenue
New York, New York 10022
Telephone: 212-906-1200
Facsimile: 212-751-4864
chris.clark@lw.com
matthew.salerno@lw.com
sean.mcmahon@lw.com

*Attorneys for Defendants and Counterclaim
Plaintiffs MUFG Union Bank, N.A. and GLAS
Americas LLC, in their respective capacities
as Trustee and Collateral Agent, under the
Indenture dated October 27, 2016, and the
Pledge and Security Agreement dated October
28, 2016, governing PDVSA's Senior Secured
Notes due 2020*