**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

                Plaintiffs,

           - against -

MUFG UNION BANK, N.A. and GLAS AMERICAS
LLC,

                Defendants.

Case No: 19-cv-10023-KPF


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

I.  THE ACT OF STATE DOCTRINE AND PRINCIPLES OF COMITY TAKE
    PRECEDENCE OVER STATE LAW AND POLICY ............................................ 4

II.  DEFENDANTS' CHOICE-OF-LAW ARGUMENTS ARE FATALLY
     FLAWED ........................................................................................................... 10

    A.  The Transaction Documents' New York Choice-of-Law Provisions
        Cannot Govern the Threshold Validity Question ................................. 10

    B.  New York Law Itself Requires the Application of Venezuelan Law to the
        Threshold Validity Question................................................................. 11

    C.  The Analysis Is No Different for PDVSA Petróleo's Invalid Guaranty.............. 17

III.  THE TRANSACTION DOCUMENTS ARE INVALID AND
      UNENFORCEABLE UNDER GOVERNING VENEZUELAN LAW ......................... 19

    A.  The Transaction Documents Are Invalid and Unenforceable Because Prior
        National Assembly Authorization Was Constitutionally Required.................... 19

        1.  National Assembly Authorization Was Required Under Articles
            150 and 187.9 of the Constitution............................................... 19

        2.  The Constitutional Chamber Has Not Established Any "Binding
            Interpretation" That National Public Interest Contracts Must
            Include the Republic Itself as a Party ...................................... 21

            a)  The Constitutional Chamber Has Not Established Any
                "Binding Interpretation" Regarding National Public Interest
                Contracts ......................................................................... 22

            b)  The Decisions Referenced by ▮▮▮▮▮▮▮ Contain No
                Interpretation That Contracts Entered Into by State-Owned
                Entities Within the National Public Administration Cannot
                Qualify as National Public Interest Contracts............................ 27

        3.  The Transaction Documents Satisfy the "Other Criteria" for
            National Public Interest Contracts Discussed in *Andrés Velásquez* ........ 33

        4.  The Historical Issuance of PDVSA Debt Without National
            Assembly Authorization Is Not Contrary to Professor Brewer's
            Opinion and Certainly Does Not Support the Opinion Offered by
            ▮▮▮▮▮▮▮ .................................................................... 34

        5.  The Transaction Documents Are National Public Interest Contracts
            Under Any Potentially Applicable Qualitative Criteria......................... 36

    B.  The Transaction Documents Are Not Enforceable Under Venezuela's
        "Presumption of Legality" or "Principle of Legitimate Expectations"
        Because These Doctrines Do Not Apply to Illegal Acts...................... 37

# TABLE OF CONTENTS

**Page**

IV.    DEFENDANTS' ACTUAL AUTHORITY, APPARENT AUTHORITY, AND
       RATIFICATION DEFENSES FAIL OR, AT A MINIMUM, RAISE GENUINE
       FACT ISSUES ................................................................................................ 40

CONCLUSION ................................................................................................................ 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Solar Power, Inc.*,
2018 WL 1626162 (S.D.N.Y. Mar. 30, 2018) ........................................................42

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964) ................................................................................4, 5, 6, 10

*Bank of N.Y. Mellon v. Omega Energy Int'l S.A.*,
2019 WL 4198676 (S.D.N.Y. Aug. 7, 2019) ...........................................................18

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*,
25 N.Y.3d 485 (2015) ............................................................................................18

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
323 F. Supp.3d 393 (S.D.N.Y. 2018) ......................................................................41

*Draper v. Georgia Props., Inc.*,
230 A.D.2d 455 (1st Dep't 1997), *aff'd*, 94 N.Y.2d 809 (1999) .............................42

*In re Dreier LLP*,
421 B.R. 60 (Bankr. S.D.N.Y. 2009) ......................................................................18

*Dresser-Rand v. Petroleos de Venezuela*,
2020 WL 635523 (S.D.N.Y. Feb. 11, 2020) ...........................................................18

*Duval v. Albano*,
2017 WL 3053157 (S.D.N.Y. July 18, 2017) ..........................................................18

*Federal Treasury Enters. Sojuzplodoimport OAO v. Spirits Int'l B.V.*,
809 F.3d 737 (2d Cir. 2016) .....................................................................................8

*In re Futterman*,
602 B.R. 465 (Bankr. S.D.N.Y. 2019) ....................................................................18

*Hausler v. JP Morgan Chase Bank, N.A.*,
127 F. Supp. 3d 17 (S.D.N.Y. 2015) .......................................................................10

*Highland Capital Mgmt. LP v. Schneider*,
607 F.3d 322 (2d Cir. 2010) ...................................................................................42

*Impact Fluid Solutions et al v. Bariven S.A. et al*,
Civ No. 4:19-cv-00652, Dkt. No. 43-1 (S.D. Tex. Jan. 31, 2020) .............................9

*IRB-Brasil Resseguros, S.A. v. Inepar Invs., S.A.*,
20 N.Y.3d 310 (2012) ............................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

*IRB-Brasil Resseguros S.A. v. Inepar Invs. S.A.*,
  2009 WL 2421423 (N.Y. Sup. Ct. July 31, 2009) .................................................................11

*Jimenez v. Palacios*,
  2019 WL 3526479 (Del. Ch. Aug. 2, 2019) ...........................................................................7

*John E. Rosasco Creameries v. Cohen*,
  276 N.Y. 274 (1937) .............................................................................................................16

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
  412 F.3d 418 (2d Cir. 2005).....................................................................................................5

*Konowaloff v. Metro. Museum of Art*,
  702 F.3d 140 (2d Cir. 2012)......................................................................................................5

*Korea Life Ins. Co. v. Morgan Guar. Tr. Co. of N.Y.*,
  269 F. Supp. 2d 424 (S.D.N.Y. 2003)....................................................................................17

*Loeser v. Gabae Dev. ULC*,
  2013 U.S. Dist. LEXIS 114521 (S.D.N.Y. March 25, 2013) ................................................14

*Mackinder v. Schawk, Inc.*,
  2005 U.S. Dist. LEXIS 15880 (S.D.N.Y. Aug. 2, 2005)......................................................14

*In re MG Re. & Mktg Inc. Litig.*,
  1997 WL 23177 (S.D.N.Y. Jan. 22, 1997) ...........................................................................18

*Michael R. Gianatasio, PE, P.C. v. City of N.Y.*,
  53 Misc.3d 757 (N.Y. Sup. Ct. 2016)....................................................................................43

*Missionaries & Ministers Benefit Bd. v. Snow*, 45 N.E.3d 917 (N.Y. 2015)...............................12

*Oetjen v. Central Leather Co.*,
  246 U.S. 297 (1918).........................................................................................................2, 4, 6

*Parsa v. New York*,
  64 N.Y.2d 143 (1984) ...........................................................................................................42

*PDVSA U.S. Litig. Tr. v. Lukoil Pan Ams. LLC*,
  372 F. Supp. 3d 1353 (S.D. Fla. 2019) ...................................................................................5

*Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A.*,
  2012 WL 967301 (S.D.N.Y. Mar. 20, 2012)........................................................................42

*People v. Davin*,
  1 A.D.2d 811 (1st Dep't 1956) ..............................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

*In re Republic Airways Holdings Inc.*,
    598 B.R. 118 (Bankr. S.D.N.Y. 2019) ..........................................................................18, 19

*Republic of Benin v. Mezei*,
    2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010) ......................................................................11

*Republic of Iraq v. First Nat'l City Bank*,
    353 F.2d 47 (2d Cir. 1965) ...........................................................................................4, 5, 6

*Ricaud v. Am. Metal Co.*,
    246 U.S. 304 (1918) ..............................................................................................................5

*Royal Palm Senior Inv'rs, LLC v. Carbon Capital II, Inc.*,
    2009 U.S. Dist. LEXIS 57452 (S.D.N.Y. July 7, 2009) ....................................................17

*Sardanis v. Sumitomo Corp.*,
    282 A.D.2d 322 (1st Dep't 2001) .......................................................................................41

*Schlessinger v. Valspar Corp.*,
    686 F.3d 81, 85 (2d Cir. 2012 ......................................................................................15, 16

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012) ...............................................................................................11

*SG Cowen Sec. Corp. v. Messih*,
    2000 U.S. Dist. LEXIS 6697 (S.D.N.Y. May 17, 2000) ....................................................13

*In re Singh*,
    2007 WL 2917235 ...............................................................................................................14

*Stone v. Freeman*,
    298 N.Y. 268 (1948) ...........................................................................................................15

*Strauss Linotyping Co. v. Schwalbe*,
    159 A.D. 347 (1st Dep't 1913) ...........................................................................................41

*Themis Capital, LLC v. Democratic Republic of Congo*,
    881 F. Supp. 2d 508 (S.D.N.Y. 2012) .....................................................................11, 15, 42

*Torin Assocs.inc. v. Perez*,
    2016 WL 6662271 (S.D.N.Y. Nov. 10, 2016) ...................................................................18

*UBS A.G. v. HealthSouth Corp.*,
    645 F. Supp. 2d at 137, 142-43 .........................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Belmont,*
   301 U.S. 324 (1937).............................................................................................4

*United States v. Pink*,
   315 U.S. 203 (1942).............................................................................................5

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
   493 U.S. 400 (1990).........................................................................................3, 6

*Walentas v. N.Y.C. Dep't of Ports*,
   167 A.D.2d 211 (1st Dept. 1990).......................................................................44

*Worthington v. JetSmarter, Inc*.,
   2019 WL 4933635 (S.D.N.Y. Oct. 7, 2019) (J. Failla)......................................11

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015)..................................................................................................4

**Statutes**

Anderson U.C.C. § 8-110:6 ..........................................................................................13

New York General Obligations Law Section 5-1401 ....................................................12

Organic Law Article 80 ...........................................................................................29, 33

UCC 8-110.....................................................................................................................14

Uniform Commercial Code...............................................................................12, 13, 17

**Other Authorities**

63 N.Y. Jur. 2d Guaranty and Suretyship § 159 ..........................................................19

Asemblea Nacional, Resolution Dated May 26,
   2016.......................................................................................................... *passim*

Asemblea Nacional, Resolution Dated September 27,
   2016.......................................................................................................... *passim*

Asemblea Nacional, Resolution Dated October 15,
   2019.......................................................................................................... *passim*

*Statement from National Security Advisor Ambassador John Bolton on Venezuela*
   (Jan. 11, 2019)......................................................................................................9

# TABLE OF AUTHORITIES

**Page(s)**

U.S. Department of the Treasury, Press Release, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (January 28, 2019) ........................10

VENEZUELAN CONSTITUTION ...........................................................................20, 22, 23

White House, *United States Stands with Interim President Juan Guaidó and Venezuela's President* (Feb. 4, 2020) ......................................................................9

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants'
motion for summary judgment.  Capitalized terms have the same meanings as in Plaintiffs'
opening memorandum of law in support of their summary judgment motion.

## PRELIMINARY STATEMENT

On May 26, 2016, the National Assembly passed a resolution warning that any national
public interest contracts executed without its prior authorization "shall be null and void in their
entirety."  Four months later, on September 27, 2016, just days after the Exchange Offer was
formally announced and well before the Transaction Documents were executed, the National
Assembly passed a resolution publicly denouncing the Exchange Offer, "categorically rejecting"
its central feature—the purported pledge of CITGO Shares as collateral for the 2020 Notes—and
initiating an investigation of the Exchange Offer and PDVSA's finances pursuant to (among
other constitutional provisions) Article 187.9 of the Venezuelan Constitution, which enumerates
the authorization of national public interest contracts as of one of the National Assembly's core
oversight functions.  The Maduro-controlled Supreme Tribunal promptly (and illegally) quashed
the National Assembly's investigation, and the 2020 Notes Transaction was executed
notwithstanding the National Assembly's refusal to authorize the Transaction Documents.

The National Assembly's public opposition to the Exchange Offer and the risk that the
2020 Notes Transaction could be challenged as invalid were contemporaneously reported in the
media and addressed in research reports issued by Goldman Sachs, Nomura, JP Morgan, and
UBS (among others).  Even Defendants' own economics expert, Professor Porzecanski,
recognized in a blog post after the Exchange Offer that "the validity of some
[Venezuela/PDVSA] debts could be challenged, especially by an eventual successor government,

***because not all received proper authorization (e.g., from the National Assembly)***."[1]

The potential developments foreseen by numerous observers, including Defendants' expert, have come to pass.  On October 15, 2019, the National Assembly—consistent with the law and policy of the U.S. Government to "remain[] steadfast in its support of" the "only legitimate" arm of government in Venezuela—passed a resolution reiterating that the 2020 Notes Transaction was executed without constitutionally required authorization and declared the transaction invalid in accordance with its May and September 2016 resolutions.  By the time PDVSA stopped paying on the 2020 Notes, however, the noteholders had already realized (under almost any scenario) a significant positive return on their investments.

Defendants, who represent the noteholders' interests in this case, would have this Court enforce the 2020 Notes Transaction by disregarding (i) the National Assembly's official acts opposing the transaction and declaring it invalid under the Venezuelan Constitution, (ii) the Republic's interpretation of its own laws as conveyed in its letter to the Court, and (iii) the overwhelming weight of Venezuelan legal authority.

The act of state doctrine and principles of comity, which Defendants do not even address, are dispositive here because this Court cannot enforce the Transaction Documents without effectively overruling the National Assembly's resolutions and undermining its legitimate authority, which the U.S. Executive Branch has continuously reaffirmed.  "To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations."  *Oetjen v. Central Leather Co.*, 246 U.S. 297, 304 (1918).  Accordingly, the act of state doctrine is "a principle of decision binding on federal and state courts alike," and "the act within its own boundaries of one sovereign State" becomes "a rule of decision for the courts

---

[1] Hinman Rebuttal Report at ¶ 24 (emphasis added).

of this country." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 406 (1990) (citations and internal quotation marks omitted).

Even aside from the National Assembly's conclusive acts of state, Defendants are not entitled to summary judgment because their choice-of-law arguments are fatally flawed, relying on New York choice-of-law provisions that cannot be applied to determine whether the Transaction Documents containing those provisions were validly formed in the first place.  The question of whether the Transaction Documents, executed by Venezuelan state-owned enterprises, were validly formed is one for which only Venezuelan law can supply the rule of decision.  Consistent with this inescapable logic, New York law itself requires the application of Venezuelan law to the threshold validity question.

Under applicable Venezuelan law, the Transaction Documents are invalid and unenforceable because they were illegally executed without National Assembly authorization in violation of Articles 150 and 187.9 of the Venezuelan Constitution.  Defendants' principal argument on Venezuelan law—that national public interest contracts must include the Republic itself as a party based on a supposedly "binding interpretation" to that effect in the Constitutional Chamber's *Andrés Velásquez* decision—is contrary to numerous National Assembly resolutions, the Republic's interpretation of its own laws, subsequent decisions of the Constitutional Chamber and other Chambers of the Supreme Tribunal, the writings of nearly every Venezuelan public law scholar, and the opinion of Venezuela's Office of the Special Attorney General. Defendants' argument is also contrary to the position taken by their own counsel (Paul Weiss) that the contract at issue in the *PDVSA Litigation Trust* case (to which the Republic is also not a party and which also contains a New York choice-of-law provision) is a national public interest contract that required National Assembly authorization, otherwise it was "null and void."

3

Defendants' motion must be denied.

## ARGUMENT

## I.   THE ACT OF STATE DOCTRINE AND PRINCIPLES OF COMITY TAKE PRECEDENCE OVER STATE LAW AND POLICY

The act of state doctrine "arises out of the basic relationships between branches of government in a system of separation of powers" and "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964). The doctrine provides that "[t]he conduct of the foreign relations . . . is committed by the Constitution to the [political] departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen*, 246 U.S. at 302 (citation and quotation marks omitted). In determining who to recognize as acting on a foreign sovereign's behalf, "[t]he Nation must speak with one voice" and that one voice is "the Executive." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015) (citation and quotation marks omitted).

Even where domestic state law issues are relevant to a particular dispute, the act of state inquiry is antecedent to questions of state law. In other words, the question of whether an "act" constitutes an act of state "***must be treated exclusively as an aspect of federal law***." *Sabbatino*, 376 U.S. at 425 (emphasis added). As the Second Circuit has explained:

> It is fundamental to our constitutional scheme that in dealing with other nations the country must speak with a united voice. It would be baffling if a foreign act of state intended to affect property in the United States were ignored on one side of the Hudson but respected on the other. . . The required uniformity can be secured only by recognizing the expansive reach of the principle, announced by Mr. Justice Harlan in *Sabbatino*, that all questions relating to an act of state are questions of federal law[.]

*Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 50-51 (2d Cir. 1965) (citing *United States v. Belmont*, 301 U.S. 324, 331 (1937)); *United States v. Pink*, 315 U.S. 203, 233-234 (1942)). Indeed, the Second Circuit has squarely held that "New York could not, by application of its choice of law rules, give a foreign act of state an effect, whether less or greater, differing from that dictated by federal law." *Id*. at 53.

Accordingly, this Court must apply federal law to determine the effect of the National Assembly's official acts condemning the Exchange Offer, "categorically rejecting" the offered pledge of CITGO Shares, and refusing to authorize the Transaction Documents, regardless of their choice-of-law provisions and Section 5-1401 of the New York General Obligations Law (the "<u>NYGOL</u>"). *See PDVSA U.S. Litig. Tr. v. Lukoil Pan Ams. LLC*, 372 F. Supp. 3d 1353, 1362 (S.D. Fla. 2019) (holding in the alternative that the act of state doctrine precluded any ruling contrary to a National Assembly resolution declaring unconstitutional a Trust Agreemen—which contained a New York choice-of-law provision—entered into by PDVSA). Otherwise, "the purposes behind the doctrine [would be] as effectively undermined as if there had been no federal pronouncement on the subject." *Sabbatino*, 376 U.S. at 424.

Once applied, federal law dictates that the National Assembly's official acts in Venezuela to prevent the Transaction Documents from coming into valid legal existence "cannot be questioned but must be accepted by our courts as a rule for their decision." *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) (quoting *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 309 (1918)). For similar reasons, the Transaction Documents' choice-of-law provisions are irrelevant to this Court's application of comity principles, which require deference to the Republic's interpretation of its own laws in this case. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 429 (2d Cir. 2005) (deferring to a foreign

proceeding on comity grounds despite choice of New York law).

Defendants' actual authority, apparent authority, and ratification defenses under New York law fail because any declaration that the Transaction Documents are valid and enforceable would require this Court to effectively overrule the official sovereign acts of the legitimate Venezuelan Government.  The act of state doctrine prohibits that result.  *See Oetjen*, 246 U.S. at 304 (1918); *W.S. Kirkpatrick*, 493 U.S. at 406 (1990).

The act of state doctrine also precludes Defendants' assertion that New York's policy against "confiscatory or discriminatory" foreign laws somehow supersedes Venezuela's constitutional requirement that the National Assembly must authorize national public interest contracts entered into with foreign/non-domiciled counterparties.  The Supreme Court and the Second Circuit have long held that state law or public policy may not be applied to invalidate acts of a recognized foreign sovereign.  *See Sabbatino*, 376 U.S. at 424; *First Nat'l City Bank*, 353 F.2d at 53.  Accepting Defendants' argument would lead to a "baffling" result where the interpretation of the laws of a recognized foreign sovereign could, and surely would, differ throughout the U.S. based upon the vagaries of state law.  *First Nat'l City Bank*, 353 F.2d at 50-51.  Furthermore, Article 150 of the Venezuelan Constitution cannot be considered "confiscatory" given that a lack of National Assembly authorization precludes the creation of any valid contract rights in the first instance.

Defendants' attempt to isolate PDVSA Petróleo's guaranty of the 2020 Notes (which Defendants concede was granted at PDVSA's direction, *see* Defs. Rule 56.1 Statement ¶ 79) likewise fails because this Court cannot enforce the guaranty without effectively overruling numerous acts of the National Assembly, including its September 2016 Resolution "categorically rejecting" the offered pledge of CITGO Shares and calling for an investigation of PDVSA and

6

the entire Exchange Offer, its refusal to authorize the Indenture, which contains the guaranty, and its October 2019 Resolution explicitly declaring the Indenture invalid.  A similar situation was presented in *Jimenez v. Palacios*, where the Delaware Chancery Court held that the act of state doctrine prevented the Judicial Branch from second-guessing the Executive Branch's recognition of the National Assembly and Interim President Guaidó, even though the National Assembly's official act of appointing the PDVSA Ad Hoc Board resulted in the reconstitution of the boards of PDV Holding, CITGO Holding, and CITGO—all U.S. companies subject to Delaware law.  2019 WL 3526479, at *13 (Del. Ch. Aug. 2, 2019).

Nor should this Court entertain Defendants' erroneous assertion that the National Assembly has "changed" Venezuelan law.  The relevant constitutional provisions are exactly the same today as they were in 2016, and the National Assembly's October 2019 Resolution declaring the 2020 Notes Transaction invalid is perfectly consistent with its May 2016 Resolution warning that any national public interest contracts executed without National Assembly authorization "shall be null and void in their entirety" and its September 2016 Resolution denouncing the Exchange Offer and invoking its power under Article 187.9 of the Venezuelan Constitution to authorize national public interest contracts. Exs. C & D to the Complaint; Pls. Ex. 13.[2]

These acts of state are conclusive under Second Circuit precedent.  For example, in *Federal Treasury Enters. Sojuzplodoimport OAO v. Spirits Int'l B.V.*, 809 F.3d 737, 742–43 (2d Cir. 2016), the Second Circuit held that any "declaration of a United States court that the executive branch of the Russian government violated its own law by transferring its own rights to its own quasi-governmental entity . . . would be an affront to the government of a foreign

---

[2] All references to "Pls. Ex __" refer to exhibits attached to the *Declaration of James R. Bliss in Support of Plaintiffs' Motion for Summary Judgment*, dated June 10, 2020.

sovereign." *Id.* at 742–43.  The court explained that "[s]o long as the act is the act of the foreign sovereign, it matters not how grossly the sovereign has transgressed its own laws." *Id.* (citation and quotation marks omitted).  As Defendants' counsel correctly argued in the *PDVSA Litigation Trust* case: "A decision that [the Trust Agreement between PDVSA and a foreign/non-domiciled entity] is valid, notwithstanding the National Assembly's clear pronouncement to the contrary, risks undermining the Executive Branch's recognition of that body as the 'only legitimate legislature' in Venezuela."[3]

Notably, the Republic itself has rejected Defendants' portrayal of the facts.  As expressed in the Venezuelan Government's letter to the Court, the Republic views the National Assembly's September 2016 Resolution condemning the Exchange Offer and rejecting the offered pledge, as well as its refusal to authorize the Transaction Documents, as the "official acts of the only legitimate branch of Venezuela's government at the time, carrying the full force of the law in accordance with the Venezuelan Constitution, that vitiate[d] the consent necessary for the Indenture and the Pledge to have come into valid legal existence in the first instance and therefore render these contracts and the 2020 Notes invalid, illegal, and null and void *ab initio*."[4]

Finally, recognition of the National Assembly's denunciation of the Exchange Offer and declaration of the 2020 Notes' invalidity is consistent with U.S. law and policy.  As Defendants' counsel argued in the *PDVSA Litigation Trust* case, any judicial decision "directly contravening the National Assembly's express declaration that [a national public interest contract] is illegal" would "no doubt undermine U.S. foreign policy by strengthening Maduro's hand in his power struggle with the National Assembly."[5]  Here, the foreign policy implications are even more

---

[3] Pls. Ex 3.
[4] Letter to the Honorable Katherine Polk Failla from Carlos Vecchio, Dkt. 80, at ¶ 24 (June 9, 2020) ("<u>Republic's Letter to the Court</u>").
[5] Pls. Ex 3.

pronounced.  The Republic has informed this Court that "[t]he loss of CITGO would deal a devastating blow to the U.S.-supported efforts of the Venezuelan National Assembly and the Government of the Interim President Juan Guaidó to oust the illegitimate and authoritarian Maduro regime and to restore democracy and the rule of law in Venezuela, and would aggravate the country's ongoing complex humanitarian emergency."[6]  The U.S. Government has continually affirmed its official recognition of and support for the National Assembly and Interim President Guaidó through executive orders, licenses, guidance, acceptance of diplomats, and public statements.[7]  As the U.S. Government made clear in another court in January of this year (after the National Assembly had passed its October 2019 Resolution), "[t]he United States remains steadfast in its support of Guaidó as the interim president and in its support of his government."  *Impact Fluid Solutions et al v. Bariven S.A. et al*, Civ No. 4:19-cv-00652, Dkt. No. 43-1, at 1 (S.D. Tex. Jan. 31, 2020), Bliss Opp. Decl. Ex. 24.[8]  The U.S. Government has also continued its sanctions regime, which is designed to "prevent further diverting of Venezuela's assets by Maduro and preserve these assets for the people of Venezuela," as well as to facilitate "the expeditious transfer of control to the Interim President or a subsequent,

---

[6] Republic's Letter to the Court at ¶ 1.
[7] For example, the U.S. President has issued numerous executive orders imposing strict sanctions in light of Maduro's "usurpation of power" and the "illegitimate Maduro regime['s]" efforts to "prevent the Interim President and the National Assembly from exercising legitimate authority in Venezuela."  *See* Executive Orders 13857 (Jan. 25, 2019), Bliss Opp. Decl. Ex. 20 and 13884 (Aug. 5, 2019), Bliss Opp. Decl. Ex. 21; *see also* White House, Press Release, *Statement from National Security Advisor Ambassador John Bolton on Venezuela* (Jan. 11, 2019) ("The Trump Administration resolutely supports the Venezuelan National Assembly, the only legitimate branch of government duly elected by the Venezuelan people."), Bliss Opp. Decl. Ex. 22; White House, *United States Stands with Interim President Juan Guaidó and Venezuela's President* (Feb. 4, 2020) ("The United States is leading a 59-nation diplomatic coalition against the socialist dictator of Venezuela, Nicolás Maduro. (Applause.) Maduro is an illegitimate ruler, a tyrant who brutalizes his people.  But Maduro's grip on tyranny will be smashed and broken. . . Joining us in the gallery is the true and legitimate president of Venezuela, Juan Guaidó . . . [A]ll Americans are united with the Venezuelan people in their righteous struggle for freedom."), Bliss Opp. Decl. Ex. 23.
[8] All references to "Bliss Opp. Decl. Ex. __" refer to exhibits attached to the *Declaration of James R. Bliss in Opposition to Defendants' Motion for Summary Judgment*, dated June 29, 2020.

democratically elected government."[9]   A decision effectively nullifying the National Assembly's

legitimate authority, as expressed in its October 2019 Resolution (as well as its earlier actions),

would only serve to "hinder rather than further this country's pursuit of goals."  S*abbatino*, 376

U.S. at 423; *see also Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 57 (S.D.N.Y.

2015) (applying the act of state doctrine to give extraterritorial effect to Cuba's taking of assets

in the U.S. because doing so was consistent with U.S. law and policy).

## II.    DEFENDANTS' CHOICE-OF-LAW ARGUMENTS ARE FATALLY FLAWED

Defendants' choice-of-law arguments are fatally flawed for at least two independent

reasons.  First, as a matter of law and logic, the Transaction Documents' choice-of-law

provisions cannot govern the threshold question of validity.  The validity question must be

governed by Venezuelan law, as New York law can have nothing to say about requirements for

National Assembly authorization of contracts entered into by Venezuelan state-owned

enterprises.  Second, New York law itself requires the application of Venezuelan law to the

question of validity.

### A.    The Transaction Documents' New York Choice-of-Law Provisions Cannot Govern the Threshold Validity Question

As Your Honor has observed, and as discussed in Plaintiffs' opening summary judgment

memorandum (pp. 23-28), "there is a logical flaw inherent in following a contractual choice-of-

law provision before determining whether the parties have actually formed the contract in which

the choice-of-law clause appears."  *Worthington v. JetSmarter, Inc*., 2019 WL 4933635, at *4

(S.D.N.Y. Oct. 7, 2019) (J. Failla) (citing *Schnabel v. Trilegiant Corp*., 697 F.3d 110, 119 (2d

Cir. 2012)).  Here, the validity of the Transaction Documents is a question for which only

Venezuelan law can supply the rule of decision.  *See, e.g., Themis Capital, LLC v. Democratic*

---

[9] U.S. Department of the Treasury, Press Release, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019), Bliss Opp. Decl. Ex. 25.

*Republic of Congo*, 881 F. Supp. 2d 508, 520–21 (S.D.N.Y. 2012) (applying DRC law to determine whether the DRC had authority to sign the credit agreement at issue); *Republic of Benin v. Mezei*, 2010 WL 3564270, at *6 (S.D.N.Y. Sept. 9, 2010) ("Even if New York law applies, New York must look to the law of Benin to determine the actual authority of an agent of the Benin government.").  Otherwise, constitutional limitations on a state-owned entity's authority could be nullified, nonsensically, through the selection of another jurisdiction's law in a contract into which the entity had no authority to enter *ex ante*.

**B.      New York Law Itself Requires the Application of Venezuelan Law to the Threshold Validity Question**

The centerpiece of Defendants' choice-of-law argument is the New York Court of Appeals' decision in *IRB-Brasil Resseguros, S.A. v. Inepar Invs., S.A.*, 20 N.Y.3d 310 (2012), which enforced a New York choice-of-law provision pursuant to NYGOL 5-1401, which generally provides that parties to significant commercial contract can select New York as the governing law even if the transaction bears no relation to the state.  However, as the trial court acknowledged in the order that was ultimately affirmed, the fact that "none of the statutory exceptions appl[ied]" in that case was a necessary predicate to the application of New York law pursuant to NYGOL 5-1401.  *IRB-Brasil Resseguros S.A. v. Inepar Invs. S.A.*, 2009 WL 2421423, at *8 (N.Y. Sup. Ct. July 31, 2009).  Here, by contrast, a statutory exception not only applies, it provides a statutory rule *requiring* the application of Venezuelan law to the threshold validity question.

Defendants devote pages of discussion to NYGOL 5-1401, which the Transaction Documents' choice-of-law provisions expressly incorporate,[10] without ever fully quoting it.  In relevant part, including the critical provision Defendants omit, NYGOL 5-1401 provides that:

---

[10] Thus, unlike in *Missionaries & Ministers Benefit Bd. v. Snow*, 45 N.E.3d 917 (N.Y. 2015), there can be no doubt as to the Transaction Documents' adoption of NYGOL 5-1401's choice-of-law rules.

The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection (a) of section 1-301 of the uniform commercial code, may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state. ***This section shall not apply to any contract, agreement or undertaking*** (a) for labor or personal services, (b) relating to any transaction for personal, family or household services, or ***(c) to the extent provided to the contrary in subsection (c) of section 1-301 of the uniform commercial code***.

NYGOL § 5-1401 (emphasis added).  Thus, under NYGOL 5-4101, if Section 1-301(c) of the

Uniform Commercial Code (as adopted in New York, the "UCC") provides a contrary choice-of-

law rule, UCC 1-301 controls the choice-of-law question pursuant to the Transaction Documents

and New York law.  Here, UCC 1-301 *does* provide a contrary choice-of-law rule.  Section 1-

301 provides in subsection "(c)" that "***[i]f one of the following provisions of [this Act] specifies***

***the applicable law, that provision governs and a contrary agreement is effective only to the***

***extent permitted by the law so specified*** . . . ."  (emphasis added).  One of the "following

provisions of this Act" listed in subsection "(c)" is "Section 8-110" of the UCC.

Section 8-110, which deals with investment securities such as the 2020 Notes, provides

that "***[t]he local law of the <u>issuer's jurisdiction</u> . . . governs . . . the validity of a security*** [and

other specified issues]."  UCC § 8-110(a)(1) (emphasis added).  The "issuer's jurisdiction" is

defined as "the jurisdiction under which the issuer of the security is organized or, if permitted by

the law of that jurisdiction, the law of another jurisdiction specified by the issuer."  UCC § 8-

110(d).  Accordingly, "[t]he issuer ***cannot specify*** that the law of another jurisdiction should

determine the validity of a security."  8 Anderson U.C.C. § 8-110:6 [Rev] (3d ed.) (emphasis

12

added).[11]  This is because "[t]he question whether an issuer can assert the defense of invalidity

may implicate significant policies of the issuer's jurisdiction of incorporation."[12]

As Professor Brewer explains at length in his initial expert report,[13] Venezuelan law does

not permit state-owned entities to select foreign law to govern questions of contractual validity,

as contracts entered into by such entities implicate important public policies of the Republic.  On

the contrary, "[i]n accordance with Article 151 of the Venezuelan Constitution, such validity is a

matter of public order regulated *only* by Venezuelan law."  Brewer Report at ¶ 118.  Therefore,

"Venezuelan law, not foreign law, must govern the conditions of validity of national public

interest contracts subject to National Assembly authorization" (*id*. at ¶ 124), and "Venezuelan

law does not permit entities such as PDVSA and PDVSA Petróleo to select the law of another

jurisdiction to govern the validity of public interest contracts such as the Indenture, the 2020

Notes issued thereunder, and the Pledge."  *Id*. at ¶ 133.

Courts routinely apply non-New York law despite a New York choice of law provision

when the transaction at issue falls within one of NYGOL 5-1401's built-in exceptions.  *SG*

*Cowen Sec. Corp. v. Messih*, 2000 U.S. Dist. LEXIS 6697, at *9 n. 2 (S.D.N.Y. May 17, 2000)

(applying California law to a contract with a New York choice-of-law provision, because the

transaction fell within NYGOL 5-1401's exception for contracts relating to labor or personal

services); *Loeser v. Gabae Dev. ULC*, 2013 U.S. Dist. LEXIS 114521, at *9 n. 2 (S.D.N.Y.

March 25, 2013) (applying statutory exception to NYGOL 5-1401 and considering potential

application of Canadian law).  Courts also routinely apply the law of the issuer's jurisdiction

when required by UCC 8-110.  *See, e.g.*, *Mackinder v. Schawk, Inc*., 2005 U.S. Dist. LEXIS

---

[11] UCC § 8-110(d) provides that "[a]n issuer organized under the law of this State may specify the law of another jurisdiction as the law governing the matters specified in subsection (a)(2) through (5)" but does not allow this option for "validity" (which is addressed in 8-110(a)(1)).

[12] UCC § 8-110, Official Comment 2.

[13] Brewer Report at § X.

15880, at *42 (S.D.N.Y. Aug. 2, 2005) (applying UCC 8-110 to conclude that the law of

Delaware, the issuer's jurisdiction, determines "the rights and duties of the issuer with respect to

the registration of a transfer"); *In re Singh*, 2007 WL 2917235 at (Bankr. D.N.J. Oct. 4, 2007)

("New Jersey has adopted the Uniform Commercial Code . . . which provides in Section 8–110

that the law of the issuer's jurisdiction governs the validity of a security.").

    None of the cases cited by Defendants involved a contract subject to one of NYGOL 5-

1401's exceptions.  *See* Defs. Mem. at 25 (citing *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,

2000 WL 223838, at *2 (S.D.N.Y. Feb. 25, 2000) (rejecting a claimed "foreign public policy"

exception to the application of NYGOL 5-1401 to a distribution agreement); *Capstone Logistics

Holdings, Inc. v. Navarrete*, 2018 WL 6786338 at *22 (S.D.N.Y. Oct. 25, 2018) (restricted stock

sale agreement); *ABB, Inc. v. Havtech, LLC*, 176 A.D.3d 580, 581  (1st Dep't 2019) (HVAC

dealership agreement); *BDC Mgmt. Servs., LLP v. Singer*, 2016 WL 75603, at *7 (Sup. Ct. N.Y.

Cty. Jan. 7, 2016) (dental practice sale agreement); *Hamilton Capital VII, LLC, I v. Khorrami*,

LLP, 2015 WL 4920281, at *6 (Sup. Ct. N.Y. Cty. Aug. 17, 2015) (litigation financing

agreement); *Sun Forest Corp. v. Shvili*, 152 F.Supp.2d 367, 388 (S.D.N.Y. 20010) (promissory

note)).  Thus, none of Defendants' cited cases had occasion to follow NYGOL 5-1401's directive

that, when the UCC provides a choice-of-law rule, that rule will govern.[14]

    Although inapplicable, New York law yields the same conclusion regarding the invalidity

of the Transaction Documents.  In their discussion of the line of cases beginning with *Lehman

Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.,* 179 F. Supp. 2d 118

---

[14] In light of the required application of Venezuelan law under UCC 8-110, no "center of gravity" or "grouping of
contacts" analysis is necessary.  Defendants appear to agree that so such analysis is necessary, albeit for the wrong
reason.  Defs. Mem. at 30.  However, it is Venezuela, not New York, that has the most significant relationship with
the transaction, given that CITGO is PDVSA's most significant foreign asset and vital to any viable plan for
restoration of Venezuela's crippled petroleum industry and economy.  *See Themis Capital*, 881 F.Supp.at 520-21
(applying DRC law, notwithstanding U.S. counterparties and an obligation to pay in the U.S.; finding that the DRC
had the most significant relationship with the transaction because of the magnitude of the potential impact of the
litigation to the DRC).

(S.D.N.Y. 2000), Defendants blithely dismiss the illegality at the heart of the 2020 Notes

Transaction, analogizing PDVSA to a boxing promoter operating without the proper licenses.

Defs. Mem at 28 (citing *Quartey v. AB Stars. Prods. S.A.*, 697 N.Y.S. 2d 280, 283 (1st Dep't

1999)).  The analogy is wholly inapt, as the execution of the 2020 Notes Transaction over the

National Assembly's objection struck directly at Venezuela's constitutional separation of

powers.  The announcement of the Exchange Offer brought to a head a constitutional crisis that

began in January 2016 with the outgoing, Maduro-controlled legislature's actions to prevent the

incoming, opposition-led legislature from exercising its constitutional powers.[15]  The crisis (at

least with respect to the Exchange Offer) was "resolved" only in the sense that the Maduro-

controlled (and now internationally condemned) Supreme Tribunal illegally quashed the

National Assembly's fledgling investigation of PDVSA and the proposed transaction.[16]

    As the Second Circuit recognized in *Schlessinger v. Valspar Corp.*, the "general rule" is

that "New York courts will not enforce illegal contracts."  686 F.3d 81, 85 (2d Cir. 2012) (citing

*Stone v. Freeman*, 298 N.Y. 268 (1948)).  However, "where the illegality concerns the violation

of a regulatory statute . . . a court may enforce an illegal contract if three requirements are

satisfied: (1) the statutory violation is *malum prohibitum*; (2) the statute that renders the contract

illegal does not specifically require that all contrary contracts be rendered null and void; and (3)

the penalty imposed by voiding the contract is wholly out of proportion to the requirements of

public policy."  *Id*. (quotation marks and citations omitted).  Even assuming this exception for

regulatory violations like the failure to obtain to license could apply to the higher order violation

of a constitutional provision, these requirements cannot be satisfied here.

    Defendants acknowledge that New York law recognizes a distinction between illegality

---

[15] Brewer Report at ¶¶ 86-87.
[16] Pls. Ex. 50; *see also* Brewer Report at ¶ 74.

that is *malum prohibitum* and illegality that is *malum in se*.  "Malum prohibitum has been variously defined as an act which is wrong only because made so by statute."  *People v. Davin*, 1 A.D.2d 811, 813 (1st Dep't 1956).  A contract is *malum in se* if the law establishing its illegality renders it unenforceable.  *See, e.g., John E. Rosasco Creameries v. Cohen*, 276 N.Y. 274, 280 (1937) (holding that the illegality was *malum prohibitum* because "[t]he statute imposes penalties for its violation by way of fine and imprisonment, but it does not expressly provide that contracts made by milk dealers shall be unenforceable").  Here, as Professor Brewer explains in his initial expert report, a contract entered into in violation of Articles 150 and 187.9 of the Venezuelan Constitution is invalid and unenforceable under Venezuelan law because no contract ever comes into valid legal existence.  *See, e.g.,* Brewer Report at ¶ 17 ("Lack of required National Assembly authorization prevents valid consent and contract formation.").  Thus, the Transaction Documents are *malum in se*, not merely *malum prohibitum*, and the *malum prohibitum* cases discussed by Defendants are inapposite.

Furthermore, the "penalty" of not enforcing the Transaction Documents would not be "wholly out of proportion to the requirements of public policy."  On the "public policy" side of the proportionality equation are constitutional provisions integral to the separation of powers embodied in the Venezuelan Constitution and the related oversight powers of the National Assembly.  On the "penalty" side of the equation are noteholders that were on notice of invalidity risk and that, under almost any scenario, *have already realized a significant positive return on their investments* based on the interest and principal payments made prior to PDVSA's default on its purported obligations.  This is nothing like the *malum prohibitum* cases cited by Defendants in which a party stood to lose most or all of the expected benefits of a transaction because of a regulatory "foot fault."  *See, e.g., Korea Life Ins. Co. v. Morgan Guar. Tr. Co. of*

16

*N.Y.*, 269 F. Supp. 2d 424, 441 (S.D.N.Y. 2003) (holding that the failure to register a contract that was indisputably valid at inception with the relevant regulatory authority rendered the contract merely *malum prohibitum*).

### C.     The Analysis Is No Different for PDVSA Petróleo's Invalid Guaranty

While Defendants devote a separate section of their memorandum to PDVSA Petróleo's guaranty of the 2020 Notes, there is no basis to separate the guaranty from the rest of the Indenture or the other Transaction Documents.  The guaranty is unenforceable under the act of state doctrine for the reasons already given, and Defendants have no better argument as to the guaranty under Venezuelan or New York law.  As set forth above, Section 8-110 of the UCC provides that "[t]he local law of the issuer's jurisdiction" governs issues of validity.  Under UCC 8-201, the "issuer" of an investment security incudes, "with respect to an obligation on or defense to a security, a guarantor . . . to the extent of its guaranty, whether or not its obligation is noted on a security certificate."[17]  Accordingly, for choice-of-law purposes with respect to issues of validity, the "security" in this case includes the guaranty.

Furthermore, the guaranty is invalid and unenforceable even if New York law were to apply because the underlying obligation it purports to secure—the 2020 Notes—is invalid and void *ab initio* due to the Notes' illegal issuance.  None of the guaranty enforcement cases cited by Defendants (Defs. Mem. at 36-37) involved allegations that the underlying obligation was illegal.  Although Defendants characterize *Omega Energy* as involving "illegality under Colombian law" (Defs. Mem. at 37), the defendants in that case did "not dispute the [guaranteed] Notes' validity"; rather, the defendants merely argued that performance of the guaranty would

---

[17] This treatment of a securities guarantor as an "issuer" is consistent with the UCC's treatment of guaranties generally.  "The prevailing view is that the UCC applies to those guaranties that are ancillary to [an underlying] UCC transaction."  *Royal Palm Senior Inv'rs, LLC v. Carbon Capital II, Inc.*, 2009 U.S. Dist. LEXIS 57452, at *31 (S.D.N.Y. July 7, 2009).

violate a subsequent tax agreement between the guarantors and the Colombian government.
*Bank of N.Y. Mellon v. Omega Energy Int'l S.A.*, 2019 WL 4198676, at *3 (S.D.N.Y. Aug. 7,
2019).  The other cases cited by Defendants are similarly inapposite.[18]

 Moreover, Defendants simply ignore the principle (including the holding of a case they
cite—*In re Futterman*) that a guarantor may not waive illegality or violation of public policy as a
defense, even in a facially "unconditional" guaranty.  Under New York law, if an obligation is
invalid on account of illegality or violation of public policy, any agreement purportedly
guaranteeing that obligation is also invalid notwithstanding any waiver of defenses, as illegality
and violations of public policy cannot be waived.  *See In re Republic Airways Holdings Inc.*, 598
B.R. 118, 146 (Bankr. S.D.N.Y. 2019) ("Over the last hundred years . . . courts in New York and
elsewhere have repeatedly refused to uphold contracts that violate public policy and have held
that parties may not waive illegality as a defense.") (collecting cases); *In re Futterman*, 602 B.R.
at 480 (recognizing New York's public policy exception to the enforcement of even
"unconditional" guaranties); *In re MG Re. & Mktg Inc. Litig.*, 1997 WL 23177 at *8 (S.D.N.Y.
Jan. 22, 1997) ("[A]n agreement to waive a claim of illegality is ineffective"); *In re Dreier LLP*,
421 B.R. 60, 64 n.1 (Bankr. S.D.N.Y. 2009) (holding that a party "could not have waived the
statute of limitations defense in the Guaranty, because such a waiver would have been contrary
to public policy and unenforceable.").  As the *In re Republic* court concluded after surveying the
case law, "[g]iven the weight of authority . . . the Guarantees here are not enforceable for the
same reason as the underlying obligations: the liquidated damages clauses in the Amended
Leases violate public policy[.]"  598 B.R. at 147; *see also* 63 N.Y. Jur. 2d Guaranty and

---

[18] *See Dresser-Rand v. Petroleos de Venezuela*, 2020 WL 635523 (S.D.N.Y. Feb. 11, 2020) (underlying contract not
challenged as illegal or invalid); *Duval v. Albano*, 2017 WL 3053157, at *13 (S.D.N.Y. July 18, 2017) (Failla, J.)
(same); *In re Futterman*, 602 B.R. 465, 480 (Bankr. S.D.N.Y. 2019) (same); *Cooperatieve Centrale Raiffeisen-
Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485 (2015) (same); *UBS A.G. v. HealthSouth Corp.*, 645 F. Supp. 2d at
137, 142-43 (same); *Torin Assocs.inc. v. Perez*, 2016 WL 6662271, at *4–6 (S.D.N.Y. Nov. 10, 2016) (same).

Suretyship § 159 ("A guaranty agreement is not enforceable if the underlying obligation on which the guaranty is based is void.").  The same is true here.[19]

## III.   THE TRANSACTION DOCUMENTS ARE INVALID AND UNENFORCEABLE UNDER GOVERNING VENEZUELAN LAW

Defendants argue that the Transaction Documents are valid and enforceable under Venezuelan law because they did not require National Assembly authorization.  Defendants further argue that, even if National Assembly authorization was required, the Transaction Documents are nevertheless enforceable under Venezuelan doctrines of "presumptive legality" and "legitimate expectations."  They are wrong on both counts.

### A.   The Transaction Documents Are Invalid and Unenforceable Because Prior National Assembly Authorization Was Constitutionally Required

Defendants do not dispute that Article 150 of the Venezuelan Constitution requires prior National Assembly authorization of all national public interest contracts.  Nor do they dispute that the Transaction Documents were entered into by Venezuelan state-owned enterprises within the decentralized National Pubic Administration of the Republic (PDVSA and PDVSA Petróleo) with foreign/non-domiciled counterparties (Defendants themselves).  Defendants' only real argument is that the Transaction Documents are not "national public interest contracts" within the meaning of the Venezuelan Constitution.  This is wrong, and it is contrary to the overwhelming weight of Venezuelan legal authority and the official views of the Republic and the National Assembly.

#### 1.   National Assembly Authorization Was Required Under Articles 150 and 187.9 of the Constitution

Defendants note that neither the Venezuelan Constitution nor any Venezuelan statute

---

[19] Defendants do not devote any analysis specifically to the Pledge in their 14-page discussion of validity issues under New York law.  However, even if New York law governed the threshold validity question (which it does not), the Pledge would still be invalid for the same reason as the guaranty—the illegality of the underlying obligation it purports to secure.

specifically requires National Assembly authorization of PDVSA debt contracts, but this proves

nothing.  Articles 150 and 187.9 of the Constitution categorically require National Assembly

authorization of all national public interest contracts with foreign/non-domiciled counterparties,

without reference to *any* specific contracting entity.  *See* VENEZUELAN CONSTITUTION arts. 150

and 19, Plfs. Ex. 4.  Reading these provisions as inapplicable to contracts entered into with

foreign/non-domiciled counterparties by entities not specifically referenced therein would render

them meaningless.

Defendants next point out that, "[a]lthough Article 150 does not define the term

'contracts of national public interest, the related Article 187(9) expressly 'authorize[s] the

National Executive to sign contracts of national interest' (i.e., the Republic through its President,

Executive Vice President, and Ministers)—not state-owned companies such as PDVSA."  Defs.

Mem. p. 38 (emphasis added).  But the part of Article 187.9 that addresses authorization of

public interest contracts ("national, state, and municipal") *entered into with foreign/non-*

*domiciled counterparties* does not even refer to the "National Executive."  As Professor Brewer

explains in his initial expert report, National Assembly authorization is required in two *separate*

*and independent* scenarios—(i) if authorization is required by statute, or (ii) when the contract is

entered into with a foreign/non-domiciled counterparty.  Brewer Report at ¶¶ 23-24, 27.

This basic point of law goes directly to Defendants' next argument, which is that "no

Venezuelan statute requires that the PDVSA Parties submit proposed debt issuances (whether

secured or unsecured) for National Assembly approval.  To the contrary, Venezuela's Organic

Law on the Financial Administration of the Public Sector (the "Public Sector Organic Law") has

long expressly exempted PDVSA's debt from any such requirement."  Defs. Mem. p. 38 (citing

Defs. Rule 56.1 Statement at ¶ 251; ███████ at ¶¶ 47–48, 159–65; ████████████ at

¶¶ 128–31).  Although the Public Sector Organic Law exempts PDSVA debt contracts from National Assembly authorization *otherwise required by that statute*, National Assembly authorization is *separately and independently* required under Articles 150 and 187.9 if the debt contract is with foreign/non-domiciled counterparties, which is precisely the case here.  Brewer Report at ¶ 46, n. 31.[20]

Finally, Defendants note that "the PDVSA Parties have not identified *any* decision by a Venezuelan court (and we know of none) requiring National Assembly approval for debt (secured or unsecured) issued by PDVSA or its subsidiaries."  Defs. Mem. p. 38.  This is another red herring.  The fact that no such decision exists does not mean that there is no such requirement.  It is indisputable that, if the Transaction Documents are national public interest contracts, National Assembly authorization was constitutionally required as a prerequisite of valid contract formation.

2.      **The Constitutional Chamber Has Not Established Any "Binding Interpretation" That National Public Interest Contracts Must Include the Republic Itself as a Party**

Defendants' principal argument regarding Venezuelan law is that "[t]he Constitutional Chamber has repeatedly held that only contracts entered into by the Republic—and not by state-owned companies such as PDVSA—qualify as contracts of national interest."  Defs. Mem. at 39.  Defendants further assert that, "[u]nder Article 335 of the Venezuelan Constitution, decisions of the Constitutional Chamber interpreting the Constitution [by which they mean *all* constitutional interpretations by that Chamber] "are binding on the other Chambers of the Supreme [Tribunal] of Justice and on any other courts of the Republic."  *Id.* (citing ███████████████ at ¶¶ 10, 13, 40, 101).  These assertions are demonstrably incorrect.  Indeed, Defendants' own counsel

---

[20] Moreover, while the Public Sector Organic Law exempts PDVSA debt contracts from prior National Assembly authorization as otherwise required by that statute, it does not exempt PDVSA from the prohibition on pledging national public interest assets as collateral.  Brewer Report at ¶ 46, n. 31.

argued successfully in the *PDVSA Litigation Trust* case that "contracts with state-owned enterprises (like PDVSA) . . . may qualify as national public interest contracts."  Plfs. Ex. 3.

<p style="text-align:center"><strong>a)  The Constitutional Chamber Has Not Established Any "Binding Interpretation" Regarding National Public Interest Contracts</strong></p>

In Venezuela's civil law system, there is no doctrine of *stare decisis* or binding precedent, and Supreme Tribunal decisions are not a source of law except where the Constitutional Chamber (i) annuls a legislative act of general effect, or (ii) interprets the scope or content of a constitutional rule or principle in a binding manner under Article 335 of the Venezuelan Constitution.  Brewer Rebuttal Report at ¶¶ 40-43.  Except in these circumstances, Supreme Tribunal decisions carry no more weight than the interpretations of legal scholars or other branches of government.  Brewer Report at ¶ 5(c).

Article 335 of the Constitution provides that the Supreme Tribunal, through all of its Chambers, is "ultimate and last interpreter of this Constitution and will ensure its uniform interpretation and application."  VENEZUELAN CONSTITUTION art. 335, Plfs. Ex. 4.  The article further provides that "interpretations established by the Constitutional Chamber concerning the content or scope of constitutional rules and principles are binding on the other Chambers of the Supreme Tribunal of Justice and on all of the other courts of the Republic."  *Id*.  In other words, the Constitutional Chamber has the exclusive power to establish generally applicable, binding interpretations of the content or scope of constitutional rules and principles.

It is critical to understand, however, that this exclusive power is not exercised every time the Constitutional Chamber interprets the Venezuelan Constitution.  Rather, the Constitutional Chamber engages in two distinct types of constitutional interpretation: (i) binding interpretation under Article 335 (referred to as "*jurisdatio*"), and (ii) interpretation that applies only to the particular case before the court (referred to as "*jurisdictio*").  Brewer Rebuttal Report at ¶ 22.  As

<p style="text-align:center">22</p>

the Constitutional Chamber explained in a decision "interpret[ing] the notion and scope of its

own interpretative powers," quoting its 2001 decision in the *Herman Escarra* case:

> [the Constitution] sets forth two sorts of constitutional interpretation, that is, the individualized interpretation that is contained in the ruling as individualized norm, and the general or abstract interpretation established in Article 335, which is a true *jurisdatio*, in the sense that it declares *erga omnes* and *pro futuro* (*ex nunc*), the content and scope of the constitutional principles and norms whose interpretation is requested through the corresponding extraordinary action . . . The difference between both types of interpretation is patent and produces decisive legal consequences in the exercise of the constitutional jurisdiction by this Chamber.  These consequences are refer to the different effects of the *jurisdictio* and of the *jurisdatio* (domicile), and this is because the efficacy of an individualized norm is limited to the case decided, while the general norm produced by the abstract interpretation has *erga omnes* value and constitutes a real *jurisdatio*, a quasi-authentic and para-constituent interpretation, which expresses the declared constitutional content of the fundamental text.[21]

Certain criteria have been recognized as distinguishing the Constitutional Chamber's

*jurisdatio* constitutional interpretations, *i.e.*, generally applicable, binding interpretations under

Article 335, from its *jurisdictio* constitutional interpretations, *i.e.*, interpretations that are limited

to the particular case under review.  These criteria are (i) the "rule of explicitness"—that the

binding character of the interpretation under Article 335 is explicitly announced in the text of the

decision, and (ii) the "rule of publication"—that the decision orders its own publication in the

*Official Gazette* of the Republic on account of the Chamber's binding interpretation.  Brewer

Rebuttal Report at ¶¶ 50-51.

Just as important, no constitutional interpretation is binding unless it is integral to the

main *thema decidendum*.  As Professor Hernando Diaz Candia explained in his book on the

concept of binding interpretation, the binding interpretation established by the Constitutional

Chamber can refer "only [to] to the legal principles derived from the main *thema decidemdum*"

and cannot refer to "simple assertions made by the Chamber or incidental questions, even

---

[21] Supreme Tribunal of Justice No. 276, Gerardo Sanchez Chacón, Apr. 24, 2014 (Venez.) at 7 (translated), Bliss Opp. Decl. Ex. 26.

23

referring to the content or scope of constitutional norms and principles."[22]

In his rebuttal report, Professor Brewer cites numerous examples of decisions in which the Constitutional Chamber explicitly indicated the binding character of a constitutional interpretation under Article 335.[23]  For example, in its decision No. 2817 of November 18, 2002 (case: *Impugnación de varias disposiciones de la Ley Orgánica del Poder Electoral*), the Constitutional Chamber declared, after referring to Article 335, that it was "interpret[ing], with *binding character* the application of article 214 of the Constitution, so that order is given for the publication of this decision in the Official Gazette of the Bolivarian Republic of Venezuela."[24] As Professor Brewer notes, "[t]here is not a single case where the Constitutional Chamber is regarded as having established a binding interpretation of the content or scope of a constitutional norm or principle without expressly applying Article 335 of the Constitution and expressly announcing the establishment of a binding interpretation in accordance with this provision."[25]

None of the Constitutional Chamber decisions relied on by Defendants for their principal argument even mentions Article 335, let alone explicitly announces the establishment of a binding interpretation of the concept of national public interest contracts.  And while the *Andrés Velásquez* and *Attorney General of the Republic II* decisions were published in the *Official Gazette*, this was not on account of any binding constitutional interpretation under Article 335, as

---

[22] Brewer Rebuttal at Report at ¶ 52 n. 71 (quoting Hernando Diaz Candia, *The principal of Stare Decisis and the concept of binding precedent for the purposes of Article 335 of the Constitution of the Bolivarian Republic of Venezuela*, in 8 REVISTA DE DAERECHO CONSTITUCIONAL 220-21, 227-29 (Sherwood ed., 2003) (translated), Bliss Opp. Decl. Ex. 27).

[23] Brewer Rebuttal Report at ¶¶ 50-51, n. 69-70.

[24] *Id.* (quoting Supreme Tribunal of Justice No. 2817, Challenging of various provisions of the Organic Law of the Electorian Authority, Nov. 18, 2002  in 89-92 REVISTA DE DERECHO PUBLICO 174, 175 (Editorial Jurídica Venezolana ed., 2002) (translated), Bliss Opp. Decl. Ex. 28) (emphasis added).

[25] Brewer Opp. Decl. at ¶ 8.  "Brewer Opp. Decl." refers to the Declaration of Allan R. Brewer-Carías in Opposition to Defendants' Motion for Summary Judgment, dated June 29, 2020, and "Brewer Opp. Decl. Ex. __" refers to exhibits attached to this declaration.

the decisions contain no such interpretation.[26]  The *Andrés Velásquez* decision was published in

the *Official Gazette* because the decision annulled (in part) an article of a statute, and thus

publication was required by the Organic Law of the Supreme Court of Justice (Articles 119 and

120) then in force, which provided that any decision annulling a law must be published in the

*Official Gazette* due to its *erga omnes* effects.[27]  The *Attorney General of the Republic II*

decision was published in the *Official Gazette* at the Chamber's discretion.  Although decisions

containing binding interpretations under Article 335 are generally published in the *Official

Gazette*, not all decisions published in the *Official Gazette* contain binding interpretations.[28]

Moreover, as discussed more fully below, in none of these decisions was the

interpretation of the concept of national public interest contracts part of the main *thema

decidemdum*.  Indeed, the question presented here—whether national public interest contracts

can include contracts entered into by public corporations and state-owned enterprises within the

National Public Administration—was not a question presented in any of those cases.[29]  Thus, the

discussion of the concept of national public interest contracts in *Andrés Velásquez*, which was

literally "cut and pasted" into the *Attorney General of the Republic II* and *Brigitte Acosta Isasis*

decisions, could not have established a "binding interpretation" with respect to that question.

Plaintiffs addressed in their opening summary judgment memorandum Defendants'

contention that Professor Brewer has suddenly changed his mind on whether the *Andrés

Velásquez* decision established such a "binding interpretation."[30]  In short, the reference to a

"binding" interpretation in a single footnote to a 2006 paper that was reproduced verbatim in

numerous other publications (mostly compilations) was obviously inadvertent, as any argument

---

[26] Brewer Opp. Decl. at ¶ 7.
[27] *Id*.
[28] *Id*.
[29] Brewer Rebuttal Report at ¶ 5.
[30] Plfs. Mem. at 36-37.

that *Andrés Velásquez* contains a binding interpretation under Article 335 would be completely

at odds with Professor Brewer's own academic writings on the criteria for binding

interpretations.[31]  Consistent with his two decades of writings on this matter, Professor Brewer

does not refer to any "binding interpretation" in his discussion of the *Andrés Velásquez* decision

in his book on administrative law (first published in English in 2013) or his 2017 journal article

discussing and critiquing the decision at length.[32]  Moreover, to Plaintiffs' knowledge, *no*

*Venezuelan scholar* has ever argued that the *Andrés Velásquez* decision (or any other decision)

established a binding interpretation of the concept of national public interest contracts under

Article 335.[33]

On the contrary, in an academic article on public interest contracts just published in

Venezuela's *Journal of Public Law*, Professor Rafael Badell Madrid, a highly respected

administrative law scholar on whom ▮▮▮▮▮▮▮ purports to rely in his reports (although only

because he mischaracterizes Badell's writings), explains why the *Andrés Velásquez* decision did

not establish any such binding interpretation.  He writes:

> [T]he content of the grounds for the ruling, the nature of the appeal decided and
> the text of the provision, it may be stated that the decision concerning Andrés
> Velásquez, Elías Mata *et al.* established criteria, which have been reiterated in
> subsequent rulings by the highest court, as shall be explained below, but that
> *under no circumstances may they be understood as binding criteria to exclude*
> *functionally decentralized administration entities as possible subjects of public*
> *interest contracts, thus subject to parliamentary authorization.  **This explains***
> ***how, in subsequent rulings, even after repeating statements from the Andrés***
> ***Velásquez, Elías Mata et al. case, the highest court has admitted, expressly or***
> ***implicitly . . . that a functionally decentralized entity may enter into contracts***
> ***considered as being in the public interest, if the other aforementioned***
> ***quantitative characteristics are fulfilled, in which case application of the***
> ***constitutional regime for parliamentary authorization shall be in order.***[34]

---

[31] Brewer Opp. Decl. at ¶¶ 11-12.
[32] *Id.*
[33] *Id.*
[34] Brewer Opp. Decl. at ¶ 13 (quoting Brewer Opp. Decl. Ex. 1 at 14).


The "subsequent rulings" referenced by Professor Badell include the *Attorney General of the Republic II* decision cited by Defendants, in which, as discussed more fully below, the Constitutional Chamber recognized promissory notes issued by a public corporation known as "BANDAGRO" as national public interest contracts.  Another such subsequent ruling is decision No. 953 of April 29, 2003, in which the Constitutional Chamber recognized as a national public interest contract an agreement entered into by a state-owned enterprise known as "EDELCA" with Brazilian counterparties.  In a footnote to his initial report, ███████████ discreetly acknowledged that "a state corporation [EDELCA] entered into an agreement that the Court characterized as one of national interest."[35]

     **b)**    **The Decisions Referenced by ███████████ Contain No Interpretation That Contracts Entered Into by State-Owned Entities Within the National Public Administration Cannot Qualify as National Public Interest Contracts**

In the *Attorney General of the Republic I* case from 1937, the question presented to the former Federal Court and Court of Cassation (then the country's highest court) was whether a certain act of the Legislature approving a loan from the Republic to a Venezuelan municipality was unconstitutional on the grounds that the loan agreement, which the President of the Republic refused to implement, had been initiated and negotiated by the Legislature rather than the Federal Executive branch of government, which had no ability to modify the already-approved terms.[36]  The Court annulled the act, holding that the power to enter into the loan agreement, which naturally included the power to negotiate its terms and not just the power to execute what had already been negotiated, resided with the Federal Executive branch of government and not with

---

[35] ███████████ at ¶ 102 n. 139.
[36] Brewer Rebuttal Report at ¶¶ 17-19 (citing Political-Administrative Chamber of the Federal Court and Court of Cassation No. 62, Attorney General of the Republic I, Nov. 26, 1937 (translated), Bliss Opp. Decl. Ex. 29).

the Legislature.[37]  The question of whether national public interest contracts can be entered into

by state-owned enterprises within the decentralized National Public Administration—*a concept

that did not even exist at that time*—was nowhere in view.[38]

      Nor was that question before the court in the 1962 *Banco de Venezuela* case.  That case

involved, by ███████████ own description, "the unrelated issue of the constitutionality of a

provision of a law enacted by the Legislature to approve a contract concluded by the Federal

Executive and Banco de Venezuela, a Venezuelan banking institution, for the purpose of

authorizing the latter to act as tax collection agent."[39]  The dissenting opinion to which ████████

███ cites refers to "the legislative approval given to contracts of national interest concluded by

the President of the Republic through the respective Ministry" because the case involved such a

contract.[40]  Neither the majority nor the dissent engaged in any interpretation of the concept of

the national public interest contracts, let alone address the question presented here.[41]

      In *Andrés Velásquez* (decision No. 2241 of September 24, 2002), which is the centerpiece

of Defendants' argument, the Constitutional Chamber was asked to review the constitutionality

of Article 80 of the Organic Law on the Financial Administration of the Public Sector, which

provided, in relevant part, that "once the annual indebtedness law is passed, the National

Executive shall proceed to enter into contracts of public debt in the best financial conditions that

can be obtained and will periodically inform the National Assembly."[42]  The Chamber annulled

the challenged provision of Article 80 because, on its face, it violated Article 150 of the

---

[37] Brewer Rebuttal Report at ¶¶ 17-19.

[38] Brewer Rebuttal Report at ¶ 19.

[39] ████████ at ¶ 98.

[40] Bliss Opp. Decl. Ex. 30 at 11; *see* Brewer Rebuttal Report at ¶ 21 (citing Corte Suprema de Justicia No. 760, Banco de Venezuela, Mar. 22, 1962 (translated) Bliss Opp. Decl. Ex. 30).

[41] Brewer Rebuttal Report at ¶ 21.

[42] Brewer Rebuttal Report at ¶ 23 (quoting Supreme Tribunal of Justice No. 2241, Andrés Velásquez and others, the partial anullment of Article 80 of the Organic Law of the Financial Administration of the Public Sector, Sept. 24, 2002 (translated), Bliss Opp. Decl. Ex. 31).

Venezuelan Constitution insofar as it directed the execution of public credit transactions without prior National Assembly authorization, regardless of whether the transaction involved contracts with foreign/non-domiciled counterparties.[43]  Thus, the *thema decidendum* **had nothing to do with interpreting the concept of national public interest contracts**.[44]

Although not necessary to decide the question presented, the Constitutional Chamber discussed the concept of national public interest contracts, stating that "contracts concluded by the Republic through the competent organs of the National Executive to do so and whose purpose is determinant or essential to accomplishing the purposes and objectives of the Venezuelan State would be included within the species of national public interest contracts . . . ."[45]  Nowhere in the decision does the Constitutional Chamber state that the concept of national public interest contracts includes *only* contracts entered into by the National Executive and that contracts entered into by state-owned entities within the Public Administration *cannot* be national public interest contracts.[46]  The Constitutional Chamber had no need to address that question because the challenged provision of Article 80 of the Organic Law referred only to public debt contracts entered into by the "National Executive."[47]

In *Attorney General of the Republic II* (Decision No. 1460 of July 12, 2007), the Constitutional Chamber was asked to interpret Article 247 of the Venezuelan Constitution, which provides that "[t]he Office of the Attorney General of the Republic . . . will be consulted

---

[43] Brewer Rebuttal Report at ¶¶ 23, 25 (citing Supreme Tribunal of Justice No. 2241, Andrés Velásquez and others, the partial anullment of Article 80 of the Organic Law of the Financial Administration of the Public Sector, Sept. 24, 2002 (translated), Bliss Opp. Decl. Ex. 31).

[44] Brewer Rebuttal Report at ¶ 23.

[45] Supreme Tribunal of Justice No. 2241, Andrés Velásquez and others, the partial anullment of Article 80 of the Organic Law of the Financial Administration of the Public Sector, Sept. 24, 2002 (translated), Bliss Opp. Decl. Ex. 31.

[46] Brewer Rebuttal Report at ¶¶ 24-25.

[47] Brewer Rebuttal Report at ¶ 25.

for the approval of contracts in the national public interest."[48]  The question presented was whether the approval opinion issued by the Attorney General with respect to certain promissory notes issued by a public corporation known as "BANDAGRO" was binding on that entity or in the nature of a non-binding consultation.[49]  The Constitutional Chamber clarified that the Attorney General's opinion, while constitutionally required, was non-binding.[50]  Although the decision contains a "cut and pasted" excerpt of the discussion of national public interest contracts in *Andrés Velásquez*, the Chamber presumed that the BANDAGRO promissory notes were national public interest contracts subject to the requirements of Article 245.[51]  Even if the notes were separately "guaranteed" by the Republic, as ▮▮▮▮▮▮▮ claims, this does not change the nature of the notes themselves.

The final decision relied upon by ▮▮▮▮▮▮ is the Constitutional Chamber's 2016 decision in the *Brigitte Acosta Isasis* case—an illegitimate decision not worthy of recognition by a U.S. court.[52]  Indeed, it was decisions like this that led the U.S. Government to declare the Supreme Tribunal illegitimate on account of its collusion with the Maduro regime in "usurp[ing] the authority of Venezuela's democratically-elected legislature, the National Assembly."[53]

Illegitimacy aside, the *Brigitte Acosta Isasis* decision does not stand for the proposition that national public interest contracts must include the Republic itself as a party.[54]  As described by the Constitutional Chamber, "the central point of the request for constitutional interpretation (of Article 150 and various other articles)" was "none other than to clarify the question as to

---

[48] Supreme Tribunal of Justice No. 1460, Attorney General of the Republic II, Jul. 12, 2007, Bliss Opp. Decl. Ex. 32.
[49] Brewer Rebuttal Report at ¶ 11 (citing Supreme Tribunal of Justice No. 1460, Attorney General of the Republic II, Jul. 12, 2007 (translated), Bliss Opp. Decl. Ex. 32).
[50] *Id.*
[51] *Id.*
[52] Brewer Rebuttal Report at ¶¶ 31-32
[53] Brewer Report at ¶¶ 91, 95 (citing *Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice*, U.S. DEP'T OF TREASURY (May 18, 2017), Bliss Opp. Decl. Ex. 10).
[54] Brewer Rebuttal Report at ¶¶ 36-37.

whether the potential loan agreement to be executed by the Central Bank of Venezuela and the

Latin American Reserve Fund (FLAR) could be considered as a national public interest contract

and, therefore, would subject to the approval of the National Assembly and would require

consultation with the Office of  the Attorney General."[55]  The entirety of the ruling was that:

> the potential loan agreement to be executed by and between Central Bank of
> Venezuela with the Latin American Reserve Fund (FLAR), is carried out as the
> implementation of an International Covenant . . . [previously authorized by the
> National Assembly]. . . and therefore, should not [be] considered as a public
> national interest contract not being, therefore, subject to the authorization of the
> National Assembly[.][56]

The decision nowhere states that the loan contract at issue was not a national public interest

contract because it was not being entered into by the Republic itself but by the Central Bank

(which would have been a very simple basis for the ruling).[57]  Rather, the Constitutional

Chamber spent numerous pages analyzing the "unique nature" and functions of the Central Bank,

emphasizing (incorrectly and directly contrary to one of its own decisions just a few months

earlier) that the Central Bank is *not part of either the centralized or decentralized National

Public Administration*.[58]  Thus, the decision elides the question of whether contracts entered into

by entities such as PDSVA and PDVSA Petróleo, *which are indisputably part of the

decentralized National Public Administration*, can qualify as national public interest contracts.[59]

As discussed previously, ████████████ opinion that national public interest contracts

must include the Republic itself as a party finds support in the writings of only one Venezuelan

legal scholar.[60]  Every other Venezuelan legal scholar who has addressed the question, including

[55] *Id*. at ¶ 33 (citing Supreme Tribunal of Justice No. 618, Brigitte Acosta Isasis, July 20, 2016 (translated), Bliss Opp. Decl. Ex. 33).
[56] Supreme Tribunal of Justice No. 618, Brigitte Acosta Isasis, July 20, 2016 (translated), Bliss Opp. Decl. Ex. 33.
[57] Brewer Rebuttal Report at ¶ 36.
[58] Brewer Rebuttal Report at ¶ 36 (citing Supreme Tribunal of Justice No. 618, Brigitte Acosta Isasis, July 20, 2016 (translated), Bliss Opp. Decl. Ex. 33).
[59] Brewer Rebuttal Report at ¶ 37.
[60] Brewer Rebuttal Report at ¶ 5.

Professor Brewer in his academic writings, has recognized that contracts entered into by state-owned entities within the Public Administration can qualify as national public interest contracts.[61]  For the Court's convenience, and to eliminate any possibility of doubt on this point, attached as Appendix I to this memorandum is a chart with quotations from each of these scholars, *most of which post-date the Andrés Velásquez decision and some of which address the question specifically in the context of the 2020 Notes Transaction*, which is a matter of significant public and scholarly interest in Venezuela.  For example, Professor Roman J. Duque-Corredor, an eminent Venezuelan scholar, former justice of the Venezuelan Supreme Court, and former president of the National Academy of Social and Political Sciences, published an "Opinion on the Unconstitutionality of the PDVSA 2020 Notes," which ████████ tries to dismiss as merely "repeat[ing]" Professor Brewer's opinions.[62]

Most recently, in his above-referenced article in the *Journal of Public Law*, Professor Badell also specifically addresses the 2020 Notes Transaction, writing that:

> Certainly, that contract for issuance of the PDVSA 2020 Bond, as well as the contract guaranteeing that bond backed by 50.1% of the shares of Citgo Holding, Inc., have the nature of public interest contract insofar as they were entered into by two state-owned enterprises, which PDVSA and PDVSA Petróleos S.A. are; an asset of particular importance to the country, Citgo, was offered as guarantee; these are in no way whatsoever routine or ordinary contracts entered into during the normal course of business of PDVSA, but rather, on the contrary, they constitute truly extraordinary transactions; and they were entered into with companies domiciled abroad. . . . *Hence, in our view, the issuance of the PDVSA 2020 Bond, as well as its respective guarantee, is a national public interest contract that should have been subjected to the procedure of review and authorization by the National Assembly, pursuant to Article 150 of the Constitution . . . [as it is] a clear example of this type of national public interest contract.*[63]

In short, the weight of authority on this issue is not even close.

---

[61] *See* Plfs Memo. of Law at 37-38.
[62] ████████ at ¶ 61.
[63] Brewer Opp. Decl. Ex. 1 at 14.

32

### 3.    The Transaction Documents Satisfy the "Other Criteria" for National Public Interest Contracts Discussed in *Andrés Velásquez*

Defendants argue that the Transaction Documents also fail to satisfy the second and third of three "additional criteria" for national public interest contracts set forth by the Constitutional Chamber in the *Andrés Velásquez* decision.  According to Defendants' inaccurate recitation, these criteria are that "(ii) the contract must satisfy the general interests of the national community; and (iii) the contract must imply the assumption of obligations payable by the Republic 'against the National Treasury' during multiple fiscal years after the one in which the contract was concluded."[64]

Leaving aside that the Constitutional Chamber has not established any such binding criteria under Article 335 of the Venezuelan Constitution, the *Andrés Velásquez* decision says nothing about the assumption of obligations over multiple fiscal years "by the Republic" payable "against the National Treasury."[65]  Those words are from ███████████ initial report, not from the decision itself, which simply refers to contracts that "imply the assumption of obligations whose total or partial payment is stipulated over the course of several fiscal years subsequent to the one in which the object of the contract was caused."[66]  The 2020 Notes, which were issued in 2016 with a maturity date in 2020, certainly implied the assumption of obligations over the course of several fiscal years.

Moreover, the relation of the 2020 Notes Transaction to the "general interests of the national community" could hardly be more evident.  Venezuela's economy depends vitally on its oil industry, which was nationalized in 1975 as an industry "in the public interest and of a

---

[64] Defs. Mem. at 41(citing ████████ at ¶¶ 88–89; ███████████ at ¶ 144).
[65] *See generally* Supreme Tribunal of Justice No. 2241, Andrés Velásquez and others, the partial anullment of Article 80 of the Organic Law of the Financial Administration of the Public Sector, Sept. 24, 2002 (translated), Bliss Opp. Decl. Ex. 31.
[66] *Id.*

strategic nature."[67]  No other industry comes close in terms of economic or strategic importance.

Article 303 of the Venezuelan Constitution provides that "[f]or reasons of economic and political

sovereignty and national strategy, the State shall retain all shares of [PDVSA]," which was

"created to manage the petroleum industry."[68]  Thus, the Venezuelan "national community"

indisputably has a "general interest" in the financial condition of PDVSA, the national oil

industry it manages, and its foreign "crown jewel" asset.

### 4.    The Historical Issuance of PDVSA Debt Without National Assembly Authorization Is Not Contrary to Professor Brewer's Opinion and Certainly Does Not Support the Opinion Offered by ███████

Defendants argue that "█████████ opinion is . . . supported by the PDVSA Parties'

multi-decade practice of issuing debt, including secured debt, without National Assembly

approval, including long before Chávez and Maduro came to power."[69]  This is nothing but a

"smoke and mirrors" argument.  As an initial matter, the 2020 Notes Transaction was

unprecedented, as no prior PDVSA debt transaction was purportedly secured by a controlling

interest in CITGO or any other such asset of national public interest.[70]  Soon after the execution

of the 2020 Notes Transaction, the remaining interest in CITGO was pledged (without the

knowledge of the National Assembly, let alone its authorization) as part of a transaction with

Russian oil company Rosneft, which the National Assembly has also declared invalid on account

of the pledge.[71]

To the extent the historical transactions cited by Defendants even required National

Assembly authorization (*i.e.*, authorization was required by statute or the contracts were with

foreign/non-domiciled counterparties), no meaningful inference can be made from the fact that

---

[67] Pls. Ex 4, Art. 302.
[68] Pls. Ex 4, Art. 303.
[69] Defs. Mem. at 42.
[70] Plfs. Mem. at 11-12.
[71] Pls. Ex 72.

National Assembly approval was not sought or obtained.  As explained in Professor Brewer's expert reports, since the beginning of Chávez regime in 1999, the National Executive has devoted itself to neutralizing the National Assembly, primarily by ignoring its constitutional powers.[72]  Thus, numerous contracts of obvious national public interest have been executed without being submitted to the National Assembly for required authorization.[73]

It was not until the opposition parties won control in the December 2015 parliamentary elections that the National Assembly could begin asserting its constitutional powers as an independent branch of government, overseeing the government and the Public Administration.[74]  Since beginning to independently exercise its control functions in 2016, the National Assembly has passed numerous resolutions declaring contracts to be national public interest contracts or rejecting contracts entered into without legislative authorization, including other PDVSA contracts.[75]

Defendants' reference to unauthorized transactions "long before Chávez and Maduro came to power" appears principally to refer to the acquisitions of CITGO and a German oil company in the 1980s and 90s (which, like the other historical transactions cited by Defendants, are not at issue here).[76]  And while there is evidence that the initial acquisition of CITGO in 1986 was approved by the National Assembly,[77] these foreign acquisitions have no bearing on whether

---

[72] Brewer Report at ¶¶ 54-64; Brewer Rebuttal Report at ¶¶ 99-101.

[73] Brewer Rebuttal Report at ¶ 102.

[74] Brewer Report at ¶¶ 63, 65.

[75] *Id*. at ¶ 65 (collecting examples of resolutions).  It is also bears noting that, before 2016, even the Chávez-dominated National Assembly passed numerous resolutions authorizing as national public interest contracts under Article 150 joint venture ("mixed enterprise") agreements entered into by PDVSA or certain of its subsidiaries relating to oil industry activities in Venezuela.  These agreements were submitted to the National Assembly because their authorization as national public interest contracts was expressly required by statute, and thus the counterparties insisted on National Assembly authorization (which, given the National Assembly's lack of independence, was sure to be granted).  Brewer Opp. Decl. at ¶ 17.

[76] *See* Defs. Mem. at 42 (citing Defs. 56.1 ¶¶ 473–99; ███████ at ¶¶ 30, 57, 215–19; ███████ at ¶¶ 146–51).

[77] Defs. Ex. 19 at 63:21-25.

the 2020 Notes Transaction required National Assembly authorization, as Professor Brewer explains.[78]

Defendants further argue that the supposed "practice of issuing debt without National Assembly approval has continued with the approval of the PDVSA Parties' ad hoc boards" and that the Guaidó Administration has "invented yet another gerrymandered theory" to explain why these transactions did not require National Assembly approval.[79]  This argument is just another demonstration of how Defendants fail to grasp basic principles of Venezuelan law.  By definition, a national public interest contract is a contract that, at a minimum, has as a party an entity within the National Public Administration (the dispute in this case being whether that entity must be the Republic itself).[80]  No one has ever argued that a contract entered into only by a non-Venezuelan entity such as CITGO, which is not part of the centralized or decentralized National Public Administration, could qualify as a national public interest contract.[81]

Thus, as explained in the Guaidó Administration press release cited by Defendants:

The powers of control of the National Assembly extend to contracts signed by organs and entities of the National Public Administration based on the law governing the subject.  This includes state-owned entities incorporated in Venezuela, as is the case of PDVSA.  However, these control powers cannot be exercised extraterritorially concerning PDVSA subsidiaries incorporated abroad, nor concerning contracts executed abroad not related to the transfer or traffic [course of business] of PDVSA.[82]

### 5.    The Transaction Documents Are National Public Interest Contracts Under Any Potentially Applicable Qualitative Criteria

Defendants' argue that "Professor Brewer-Carías's sweeping opinion that National Assembly approval is required for any contract by PDVSA with a foreign corporation would

---

[78] Brewer Opp. Decl. at ¶¶ 25-30.
[79] *See* Defs. Mem. at 42.
[80] Brewer Report ¶ 13; Brewer Opp. Decl. at ¶ 28.
[81] Brewer Opp. Decl. at ¶ 28.
[82] Defs. Mem. at 42-43 (citing Defs. Ex. 277).

have the absurd result that all of PDVSA's contracts with non-Venezuelan entities would be deemed void and unenforceable."[83]  That is wrong.  Due to the purported pledge of a controlling interest in the foreign "crown jewel" of Venezuela's crucial national oil industry, the Transaction Documents qualify as national public contracts under any potentially applicable qualitative criteria.  Thus, what PDVSA's undersigned counsel told the Court at the initial conference remains true.  Plaintiffs' illegality theory does not challenge all of PDVSA's debt, which is not at issue in this case, but is based instead on the purported pledge of CITGO Shares to secure the 2020 Notes.  It is ██████████ outlier opinion that would lead to absurd results, as nearly all public contracts affecting vital national interests are entered into by public corporations and state-owned enterprises within the National Public Administration that, like PDVSA, are "attached" to and controlled by one of the ministries of the Republic but are technically not part of the Republic itself.

**B.     The Transaction Documents Are Not Enforceable Under Venezuela's "Presumption of Legality" or "Principle of Legitimate Expectations" Because These Doctrines Do Not Apply to Illegal Acts**

Defendants argue that, even if a Venezuelan court were to find that the Transaction Documents were executed in violation of the Venezuelan Constitution, the court would enforce them anyway under Venezuela's "presumption of legality" and "principle of legitimate expectations."[84]  As an initial matter, as discussed above and in Plaintiffs' opening summary judgment memorandum, enforcement of the Transaction Documents would squarely conflict with the act of state doctrine.  Furthermore, as explained in Professor Brewer's rebuttal report, the "presumption of legality" and "principle of legitimate expectations" do not apply to acts of

---

[83] Defs. Mem. at 43 (citing ██████████ at ¶¶ 89–91).
[84] *See* Defs. Mem. at 44 (citing ██████████ at ¶¶ 179-92 and ██████████ at ¶¶ 161-63).

the Public Administration that are contrary to law.[85]  In addition to his own works, Professor Brewer cites the works of numerous other Venezuelan scholars, as well as decisions of the Supreme Tribunal, as authority for this well-settled proposition.[86]

The 2007 Supreme Tribunal decision cited by ▮▮▮▮▮▮▮ for the first time in his summary judgment declaration does not support his opinion that a Venezuelan court would enforce the Transaction Documents notwithstanding a finding that they were illegally executed without required National Assembly authorization.  In that decision, the Political-Administrative Chamber of the Supreme Tribunal (not the Constitutional Chamber, as ▮▮▮▮▮▮▮ erroneously states) invoked the "principal of legitimate expectations" as a basis for granting the plaintiff company a limited *unjust enrichment-type remedy* against the University of Central Venezuela after finding that an alleged contract to manufacture sports team uniforms, which had already been delivered and used, had not been duly authorized by the University Council and thus was invalid and unenforceable because of "the non-existence of the manifestation of the will of the University in order to be liable [on the contract]."[87]  Accordingly, the Chamber did not *enforce the alleged contract* on the basis of the plaintiff's expectations and expressly rejected the plaintiff's claims for a contract-based remedy (payment of the agreed-upon price plus interest) because, as with the Transaction Documents, no valid contract was ever formed.[88]

Here, if there were any basis to invoke the principle of legitimate expectations, it would not be to enforce the Transactions Documents, which are void *ab initio* like the contract in the

---

[85] Brewer Rebuttal Report at ¶ 104.

[86] Brewer Rebuttal Report at ¶¶ 105-10.

[87] ▮▮▮▮▮ Ex. 42 at 20.

[88] In other decisions, the Political-Administrative Chamber has made absolutely clear that a contract infected by illegality cannot be the enforced based on the principle of legitimate expectations.  *See* Brewer Opp. Decl. at ¶ 34. Most recently, in its decision of November 20, 2019 in the *Propatrimonio* case, the Chamber ruled that "legitimate expectations or plausible expectations are not principles or values that can be invoked or predicated in a situation of illegality or outside the law, since this would imply reinforcing and perpetuating conducts contrary to law instead of contributing to the consolidation of legal security and stability of the legal system . . . ."  *Id.* (quoting Brewer Opp. Decl. Ex. 10).

UCV case, but to grant some kind of unjust enrichment remedy.  However, in the case of the

Transaction Documents, no "legitimate expectations" of enforceability could possibly have

arisen in the face of (i) the opposition-led National Assembly's May 2016 Resolution explicitly

and publicly declaring that any national public interest contract entered into without its prior

authorization would be null and void, (ii) its September 2016 Resolution explicitly and publicly

rejecting the pledge of CITGO Shares, initiating an investigation of PDVSA and the Exchange

Offer, and invoking its oversight powers under Article 187.9 of the Venezuelan Constitution, and

(iii) the public statements of National Assembly members explicitly warning investors that any

transaction not authorized by the National Assembly would be considered invalid by a new

administration—all of which were the subject of extensive public reporting at the time.[89]

 Finally, Professor Brewer's opinion that these doctrines are inapplicable because the

Transaction Documents are void *ab initio* is not "contrary to the opinion of the Guaidó

administration's Special Attorney General.[90]  Defendants state that "[a]s the Special Attorney

General has acknowledged, a lack of National Assembly approval 'renders a contract merely

voidable, not void,'" seeming to quote from an opinion of the Special Attorney General.[91]  The

quoted language, however, is not from any opinion of the Special Attorney General but rather

from ███████████ misleading discussion of the Special Attorney General's opinion of

August 28, 2019, known as "PER-189."[92]  In that opinion, the Special Attorney General wrote

that the 2020 Notes Transaction could be "renegotiated" and its invalidity "rectified,"[93] which

████████████ construes as an implicit acknowledgment that the Transaction Documents are

"merely voidable, not void."  However, as discussed in PER-189, any such "correction" would

---

[89] Hinman Report at § III.B.
[90] Defs. Mem. at 44 (citing ███████████ at ¶¶ 168–72).
[91] *Id.*
[92] *See* ███████████ at ¶ 169.
[93] Bliss Opp. Decl. Ex. 9 at ¶ 167.

involve the issuance of *new notes* pursuant to new contracts authorized by National Assembly in accordance with Article 150.[94]  Defendants and ████████ simply ignore, and did not put before the Court, the part of PER-189 that reads: "This authorization can be issued at the time when the 2020 Bond is renegotiated . . . [I]n order to re-establish the principle of budgetary legality, it is necessary for the National Assembly to authorize in advance the renegotiation of the 2020 Bond – and if that is the case, the issuing of new debt.  This authorization would thus make it possible to obtain the authorization of the National Assembly within the framework of article 150 of the Constitution."[95]  Thus, what ████████ mischaracterizes as an "acknowledgment" that the Transaction Documents were "merely voidable, not void" was, in the end, really just a recognition that the invalidity of the 2020 Notes Transaction did not prelude a negotiated resolution with the noteholders, as "new debt" could be issued with prior National Assembly authorization.  ████████ also ignores the ultimate conclusion of PER-189 that the Indenture and the Pledge are integrated contracts of national public interest that are invalid and unenforceable because National Assembly authorization was constitutionally required.[96]

## IV.  DEFENDANTS' ACTUAL AUTHORITY, APPARENT AUTHORITY, AND RATIFICATION DEFENSES FAIL OR, AT A MINIMUM, RAISE GENUINE FACT ISSUES

The only affirmative defenses addressed in Defendants' summary judgment memorandum are actual authority, apparent authority, and ratification.  Leaving aside the act of state doctrine and the inapplicability of New York law as discussed above, these defenses fail at the outset even under New York law because the Transaction Documents' illegal execution in violation of the Venezuelan Constitution render them void *ab initio*.  *See Sardanis v. Sumitomo Corp.*, 282 A.D.2d 322, 324 (1st Dep't 2001) ("[E]quitable defenses are unavailable when the

---

[94] *Id.*
[95] *Id.* at ¶ 167.
[96] *Id.* at ¶ 170.

rights being pressed by a party are based upon a void document."); *Draper v. Georgia Props., Inc.*, 230 A.D.2d 455, 460 (1st Dep't 1997), *aff'd*, 94 N.Y.2d 809 (1999) (where contract provisions are void and unenforceable, the "contention that [the defendant's] affirmative defenses and counterclaims should be reinstated is without merit[.]"); *Strauss Linotyping Co. v. Schwalbe*, 159 A.D. 347, 350 (1st Dep't 1913) ("But an illegal contract of this character cannot be given validity by ratification.  The agreement is void in its inception and thereafter continues to be void.").  The reasoning of these cases applies with particular force here, as enforcing the Transaction Documents would effectively condone and reward the Maduro regime's illegal quashing of the National Assembly's public opposition to the Exchange Offer.

These defenses also fail because essential elements cannot be satisfied.  For apparent authority to exist under New York law, "[first,] the principal's actions [must] create[] the appearance of authority and, second . . . the plaintiff [must have] reasonably relied on this appearance."  *Adler v. Solar Power, Inc.*, 2018 WL 1626162, at *7 (S.D.N.Y. Mar. 30, 2018).  The National Assembly—the only "principal" empowered by the Venezuelan Constitution to grant PDVSA authority to execute the Transaction Documents—publicly *withheld* that authority.  And no defense of actual authority can be based on Defendants' or any noteholders' perception of the National Assembly's actions, as "[t]he existence of actual authority depends upon the actual interaction between the putative principal and agent, *not on any perception a third party may have of the relationship*."  *Themis Capital*, 881 F.Supp.2d at 520 (emphasis added).

Furthermore, Defendants have not and cannot establish *reasonable* reliance on any alleged appearance of authority created by the National Assembly.[97]  A party "cannot claim

---

[97] Under New York law, "[r]epresentations by the purported agent may not contribute to create the reasonable appearance of authority." *Id.* (citing *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F.Supp.2d 155, 163 (S.D.N.Y. 2007)); *see also* 4C N.Y. Prac. § 85:14 ("Apparent authority may *only* be created by conduct of the principal.  The

apparent authority if he knows or should know of a relevant limitation on the agent's authority. . . ." *See* 4C N.Y. Prac. § 85:14; *see also Highland Capital Mgmt. LP v. Schneider,* 607 F.3d 322, 328 (2d Cir. 2010) ("A party cannot claim that an agent acted with apparent authority when it knew, or should have known, that [the agent] was exceeding the scope of its authority.") (citation and quotation marks omitted).  Here, the relevant limitation on PDVSA's authority is (and was) contained in a public law (a constitutional provision) that was publicly invoked in the National Assembly's September 2016 Resolution prior to the execution of the Transaction Documents. *See Parsa v. New York*, 64 N.Y.2d 143, 147 (1984) ("A party contracting with the State is chargeable with knowledge of the statutes which regulate its contracting powers and is bound by them.").  Under well-established New York law, a party contracting with a public entity assumes the risk that its counterparty has exceeded its authority.  *See, e.g.*, *Michael R. Gianatasio, PE, P.C. v. City of N.Y.*, 53 Misc.3d 757, 771 (N.Y. Sup. Ct. 2016) ("[T]hose dealing with municipal agents must ascertain the extent of the agents' authority, or else proceed at their own risk."); *Walentas v. N.Y.C. Dep't of Ports*, 167 A.D.2d 211, 212 (1st Dept. 1990) ("[I]t is solely at his peril that such a party presume s that the persons with whom he is dealing are acting within the scope of their authority and, since the extent of that authority is a matter of public record, there is a conclusive presumption that he is aware of it.").

Nor can Defendants establish the essential element of a law ratification defense that the allegedly ratifying party had "knowledge of a defect in the act to be confirmed and the right to reject or ratify it."  *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp.3d 393, 468 (S.D.N.Y. 2018) (citations and quotation marks omitted).  Here, PDVSA had (and has) no right to "reject or ratify" contracts entered into without constitutionally required National Assembly

---

agent cannot by his own acts imbue himself with apparent authority.") (citations and quotation marks omitted). Thus, any purported actions by PDVSA (the agent) to create the appearance of authority is irrelevant to this defense.

authorization.  Indeed, not even the National Assembly has that power, as such contracts are void

*ab initio*.[98]

## **CONCLUSION**

For the forgoing reasons, Plaintiffs respectfully request that Defendants' motion for

summary judgment be denied in its entirety.

[*Remainder of page intentionally left blank*]

---

[98] *See* Brewer Report at § 5.

Dated:  June 29, 2020                    Respectfully submitted,

                                        */s/ Kurt Hansson*
                                        Kurt W. Hansson
                                        James R. Bliss
                                        James B. Worthington

                                        PAUL HASTINGS LLP
                                        200 Park Avenue
                                        New York, New York 10166
                                        Telephone: (212) 318-6000
                                        Facsimile: (212) 319-4090
                                        kurthansson@paulhastings.com
                                        jamesbliss@paulhastings.com
                                        jamesworthington@paulhastings.com

                                        *Attorneys for Plaintiffs and Counterclaim*
                                        *Defendants Petróleos de Venezuela, S.A. and*
                                        *PDVSA Petróleo, S.A.*

                                        */s/ Jeffrey B. Korn*
                                        Jeffrey B. Korn
                                        Michael Gottlieb
                                        Nicholas Reddick
                                        WILLKIE FARR & GALLAGHER LLP
                                        787 Seventh Avenue
                                        New York, NY 10019
                                        Telephone: (212) 728-8000
                                        Facsimile: (212) 728-8111
                                        jkorn@willkie.com
                                        1875 K Street NW
                                        Washington, DC  20006-1238
                                        Telephone: (202) 303-1442
                                        Facsimile: (202) 303 2442
                                        mgottlieb@willkie.com
                                        nreddick@willkie.com

                                        *Attorneys for Plaintiff and Counterclaim Defendant*
                                        *PDV Holding, Inc.*