**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

               Plaintiffs,

            - against -

MUFG UNION BANK, N.A. and GLAS AMERICAS
LLC,

              Defendants.

Case No: 19-cv-10023-KPF

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF DEFENDANTS'**
**<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Local Civil Rule 56.1, Plaintiffs respectfully submit this response to Defendants' statement of material facts in support of their cross-motion for summary judgment. This response is solely for the purpose of Defendants' cross-motion, and nothing herein shall be deemed an admission of fact for any other purpose. Defendants' argumentative headings are not categorized as Statements of Material Facts Not in Dispute and, accordingly, no response is required.[1]

## I.     Jurisdiction

1.     The amount in controversy, exclusive of interest and costs, exceeds $75,000. Compl. ¶ 15; PDVSA & PDVSA Petróleo Answer ¶ 118; PDVH Answer ¶ 118.

**Plaintiffs' Response 1.**     Undisputed.

2.     The Trustee and PDVH are citizens of different states, and PDVSA, PDVSA Petróleo, and the Collateral Agent are citizens of foreign states. Compl. ¶ 15; PDVSA & PDVSA Petróleo Answer ¶ 118; PDVH Answer ¶ 118.

**Plaintiffs' Response 2.**     Undisputed.

## II.    The Relevant Parties and Entities

### A.     The PDVSA Parties.

3.     **PDVSA** is an oil and natural gas company. Compl. ¶¶ 2, 34.

**Plaintiffs' Response 3.**     Undisputed.

4.     PDVSA is incorporated in Venezuela as a *sociedad anónima*. Compl. ¶ 10; PDVSA & PDVSA Petróleo Answer ¶ 122; PDVH Answer ¶ 122.

**Plaintiffs' Response 4.**     Undisputed.

5.     Venezuela is the sole shareholder of PDVSA. Compl. ¶¶ 10, 34.

---

[1] Without accepting Defendants' defined terms, for sake of clarity, Plaintiffs will use them for purposes of this response.

**Plaintiffs' Response 5.**        Undisputed.

6.        Under Venezuelan law, a *sociedad anónima* is a corporation. ██████████ Ex. 2 § 33; *see also* Compl. ¶¶ 10–11.

**Plaintiffs' Response 6.**        Undisputed.

7.        Under Venezuelan law, a *sociedad anónima* has the capacity to enter into contracts. ██████████ Ex. 2 § 33.

**Plaintiffs' Response 7.**        Undisputed that a *sociedad anónima* generally has the capacity to contract, but the capacity of PDVSA and PDVSA Petróleo to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

8.        PDVSA has stated that it has "the authority to contract in its own name, and regularly exercises that authority with counterparties, including lenders, all over the world that rely on PDVSA's balance sheet and its attributes as a separate legal person."  Ex. 366 at 23; *see also* Ex. 332 ¶ 12; ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

**Plaintiffs' Response 8.**        Undisputed that PDVSA has historically made the quoted statements, but the capacity of PDVSA and PDVSA Petróleo to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

9.      Under Venezuelan law, a *sociedad anónima* is managed by its board of directors and its corporate officers.  ■■■■■■ Ex. 2 § 11.

**Plaintiffs' Response 9.**      Undisputed, except to further note that PDVSA is 100%-owned by Venezuela, as mandated by Article 303 of the Venezuelan Constitution "[f]or reasons of economic and political sovereignty and national strategy" (1999 VENEZUELAN CONSTITUTION art. 303, Pls. Ex. 4) and has its board members appointed by the Venezuelan government.

10.      "PDVSA's day-to-day operations are carried out by approximately 109,000 employees who are paid by PDVSA and do not qualify as government employees under Venezuelan law."  Ex. 366 at 23; *see also* Ex. 332 ¶ 11; ■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

**Plaintiffs' Response 10.**      Undisputed, except to further note that PDVSA is 100%-owned by Venezuela, as mandated by Article 303 of the Venezuelan Constitution, "[f]or reasons of economic and political sovereignty and national strategy."  1999 VENEZUELAN CONSTITUTION art. 303, Pls. Ex. 4.

11.      "PDVSA issues its own financial statements audited by the international accounting firm KPMG."  Ex. 366 at 23.

**Plaintiffs' Response 11.**      Undisputed, except to further note that PDVSA is 100%-owned by Venezuela, as mandated by Article 303 of the Venezuelan Constitution, "[f]or reasons of economic and political sovereignty and national strategy."  1999 VENEZUELAN CONSTITUTION art. 303, Pls. Ex. 4.

12.      "PDVSA is not part of the Republic's Centralized Administration and is a separate entity under Venezuelan law."  Ex. 366 at 23; *see also* Ex. 125 ¶¶ 4, 16–17.

**Plaintiffs' Response 12.**      Undisputed that PDVSA is not part of the Republic's

Centralized Administration, but PDVSA is a part of the Republic's Decentralized Public

Administration and, as such, part of the National Public Administration.  Brewer Report at ¶¶ 33-

38.  As a consequence, PDVSA is subject to the constraints imposed by Venezuelan public law

and the Venezuelan Constitution upon organs of the Decentralized Public Administration,

including the requirement that national public interest contracts entered with foreign non-

domiciled counterparties be approved by the National Assembly.  Brewer Report at ¶ 45.

13.      **PDVSA Petróleo** is a wholly owned subsidiary of PDVSA.  Compl. ¶ 2.

**Plaintiffs' Response 13.**      Undisputed.

14.      PDVSA Petróleo is also incorporated in Venezuela as a *sociedad anónima*.  Ex. 378

at TRU_00011240.

**Plaintiffs' Response 14.**      Undisputed.

15.      **PDVH** is a wholly owned subsidiary of PDVSA.  Compl. ¶¶ 2, 34.

**Plaintiffs' Response 15.**      Undisputed.

16.      PDVH is incorporated in Delaware and has its principal place of business in

Houston, Texas.  Compl. ¶ 12.

**Plaintiffs' Response 16.**      Undisputed.

17.      Interim President Juan Guaidó is authorized to appoint the PDVSA Ad Hoc Board,

which, in turn, is authorized to designate Ad Hoc Administrative Boards for PDVSA Petróleo,

PDVH, CITGO Holding, Inc., and CITGO Petroleum Corporation.  Compl. ¶¶ 8, 35.

**Plaintiffs' Response 17.**      Undisputed, except to the extent that this intended to suggest

that Guaidó-appointed board of PDVSA (or any board designated by it) is not the current and

actual board.  From the standpoint of U.S. courts, the Ad-Hoc Board is the only legitimate board

of directors of PDVSA.  *See Jimenez* v. *Palacios*, No. CV 2019-0490-KSJM, 2019 WL 3526479, at *13 (Del. Ch. Aug. 2, 2019).

18.     The Guaidó-appointed Ad Hoc Boards direct the PDVSA Parties in this litigation. Letter from J. Bliss to Failla, J., at 2, Nov. 6, 2019, ECF No. 15.

   **Plaintiffs' Response 18.**     Undisputed.

19.     The PDVSA Ad Hoc Board controls PDVSA's assets in the United States and litigation in the United States.  *Id.*; ██████████████████████; *Jimenez* v. *Palacios*, No. CV 2019-0490-KSJM, 2019 WL 3526479, at *13 (Del. Ch. Aug. 2, 2019), *as revised* (Aug. 12, 2019).

   **Plaintiffs' Response 19.**     PDVSA's Ad Hoc Board is not aware of any available resources in bank accounts in the U.S., and, aside from whatever funds owing to PDVSA that remain "frozen" by the U.S. government in unknown, third-party accounts, PDVSA's only U.S. asset is PDV Holding.  Complaint at ¶ 36.  Furthermore, the above-cited exhibits do not demonstrate that PDVSA's board controls all litigation in the United States.

   **B.     CITGO Holding and CITGO Petroleum.**

20.     **CITGO Holding** is a wholly owned subsidiary of PDVH.  PDVSA & PDVSA Petróleo Answer ¶ 123; PDVH Answer ¶ 123.

   **Plaintiffs' Response 20.**     Undisputed.

21.     CITGO Holding is incorporated in Delaware and has its principal place of business in Houston, Texas.  PDVSA & PDVSA Petróleo Answer ¶¶ 123, 154; PDVH Answer ¶¶ 123, 154.

   **Plaintiffs' Response 21.**     Undisputed.

22.     **CITGO Petroleum** is a wholly owned subsidiary of CITGO Holding.  Compl. ¶ 1.

   **Plaintiffs' Response 22.**     Undisputed.

23.     CITGO Petroleum is incorporated in Delaware and has its principal place of business in Houston, Texas.  PDVSA & PDVSA Petróleo Answer ¶ 124; PDVH Answer ¶ 124.

**Plaintiffs' Response 23.**     Undisputed.

24.     CITGO Petroleum refines and markets petroleum products.  Ex. 1 at 3.

**Plaintiffs' Response 24.**     Undisputed.

25.     CITGO Petroleum owns and operates "three large-scale, highly complex petroleum refineries located in Lake Charles, Louisiana, Corpus Christi, Texas, and Lemont, Illinois."  Ex. 42 at 1.

**Plaintiffs' Response 25.**     Undisputed.

26.     PDVSA acquired a 50% interest in CITGO Petroleum in 1986, and acquired the other 50% in 1990.  PDVSA & PDVSA Petróleo Answer ¶ 125; PDVH Answer ¶ 125.

**Plaintiffs' Response 26.**     Undisputed.

27.     CITGO Petroleum's corporate predecessor, the Cities Service Company, was founded in 1910.  Ex. 364 at 3.

**Plaintiffs' Response 27.**     Undisputed.

28.     PDVSA did not seek or obtain National Assembly approval for its acquisition of CITGO Petroleum.  ███████████████████

**Plaintiffs' Response 28.**     ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

29.     Prior to 1986, PDVSA had no ownership interest in CITGO Holding or CITGO Petroleum or any of their corporate predecessors.  ███████████████

**Plaintiffs' Response 29.**     Undisputed.

30.     CITGO Holding and CITGO Petroleum have assets throughout the United States and no assets in Venezuela.  ██████████████████████████████

**Plaintiffs' Response 30.**     Undisputed.

**C.     The Trustee and Collateral Agent.**

31.     **The Trustee** is a federally chartered national banking association with offices in New York, New York.  PDVSA & PDVSA Petróleo Answer ¶ 152; PDVH Answer ¶ 152.

**Plaintiffs' Response 31.**     Undisputed.

32.     **The Collateral Agent** is organized as a limited liability company under New York law and has an office in New York, New York.  PDVSA & PDVSA Petróleo Answer ¶¶ 114, 152; PDVH Answer ¶¶ 114, 152.

**Plaintiffs' Response 32.**     Undisputed.

33.     The Trustee and Collateral Agent were named in the Governing Documents.  They are the original trustee and collateral agent for the 2020 Notes and have served in their roles since the Indenture and Pledge Agreement were executed in 2016.  Ex. 1 at 17; Ex. 2 at cover page; Ex. 3 at cover page; Moreyra Decl. ¶ 5; Reed Decl. ¶ 3.

**Plaintiffs' Response 33.**     Undisputed.

**D.     The Directing Holders.**

34.     Ashmore is an investment management company incorporated in England and Wales, with its principal place of business in London, England.  Xu Decl. ¶ 1; Ex. 110 at 2, 158.

**Plaintiffs' Response 34.**     Undisputed.

35.     BlackRock is an investment management company incorporated in Delaware, with its principal place of business in New York, New, York.  Trigo Paz Decl. ¶ 1; Ex. 95 at 1.

**Plaintiffs' Response 35.**     Undisputed.

36.     Contrarian is an investment management company incorporated in Delaware, with its principal place of business in Greenwich, Connecticut.  Weisser Decl. ¶ 1; Ex. 246.

   **Plaintiffs' Response 36.**     Undisputed.

37.     The Trustee and Collateral Agent are directed in this litigation by the Directing Holders.  Funds managed by the Directing Holders together hold a majority of the outstanding 2020 Notes.  Xu Decl. ¶ 2; Weisser Decl. ¶ 3; Trigo Paz Decl. ¶ 3.

   **Plaintiffs' Response 37.**     Undisputed.

38.     The Directing Holders are not parties to the Governing Documents.  Ex. 2 at 1; Ex. 3 at at 1; Ex. 6.

   **Plaintiffs' Response 38.**     Undisputed.

III.   **Background**

   A.     **The 2017 Notes Issued by PDVSA.**

39.     On April 12, 2007, PDVSA issued $3,000,000,000 in aggregate principal amount of the April 2017 Notes.  Compl. ¶ 39.

   **Plaintiffs' Response 39.**     Undisputed.

40.     The indenture for the April 2017 Notes provided that interest on the April 2017 Notes was payable semiannually (on April 12 and October 12, commencing in October 2007), with the entire principal amount due on April 12, 2017.  PDVSA & PDVSA Petróleo Answer ¶ 127; PDVH Answer ¶ 127.

   **Plaintiffs' Response 40.**     Undisputed.

41.     On October 29, 2010, and January 18, 2011, PDVSA issued $6,150,000,000 in aggregate principal amount of the November 2017 Notes.  Compl. ¶ 39.

   **Plaintiffs' Response 41.**     Undisputed.

42.     The indenture for the November 2017 Notes provided that interest on the November 2017 Notes was payable semiannually (on May 2 and November 2), with the principal due in three equal installments of $2,050,000,000 on November 2, 2015, November 2, 2016, and November 2, 2017.  PDVSA & PDVSA Petróleo Answer ¶ 127; PDVH Answer ¶ 127.

**Plaintiffs' Response 42.**     Undisputed.

43.     The 2017 Notes were guaranteed by PDVSA Petróleo.  Compl. ¶ 39.

**Plaintiffs' Response 43.**     Undisputed.

44.     PDVSA did not seek or obtain approval from the Venezuelan National Assembly before issuing the 2017 Notes.  ▇▇▇▇▇▇▇▇▇▇▇▇

**Plaintiffs' Response 44.**  Undisputed, except that this does not provide the full factual context, as the 2017 Notes, unlike the 2020 Notes, did not involve the purported pledge of a controlling interest in CITGO as collateral.  Brewer Report at ¶¶ 63-64, 87.

45.     ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  Ex. 2 §§ 55–58, 212.

**Plaintiffs' Response 45.**  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

46.     The 2017 Notes were denominated in U.S. dollars.  Ex. 7 at § 10.1(b); Ex. 10 at § 10.1(b); *id.* Ex. 11 at § 1.02(1).

**Plaintiffs' Response 46.**     Undisputed.

47.     The 2017 Notes were governed by New York law.  Ex. 7 at § 10.3; Ex. 10 at § 10.03; Ex. 11 at § 4.04.

**Plaintiffs' Response 47.**     Undisputed that the 2017 Notes contain New York governing law clauses.

48.     The 2017 Notes were governed by New York forum-selection clauses.  Ex. 7 at § 10.10(a–b); Ex. 10 at § 10.10(a–b);  Ex. 11 at §§ 1.02(1), 4.02.

**Plaintiffs' Response 48.**     Undisputed.

49.     The Bank of New York served as the indenture trustee, registrar, and principal paying agent for the April 2017 Notes.  Ex. 7 at §§ 8.11(b–d), 10.6(a), Ex. A.

**Plaintiffs' Response 49.**     Undisputed.

50.     The Bank of New York, since merged into Bank of New York Mellon Corporation, was incorporated under the laws of New York with its principal place of business at One Wall Street, New York, New York 10286.  Ex. 92 at 8–9.

**Plaintiffs' Response 50.**     Undisputed.

51.     The Depository Trust Company, a limited purpose trust company incorporated in New York with its principal place of business in New York, New York, was the depository for the November 2017 Notes.  Ex. 10 at § 1.01; Ex. 9 at 115–16; Ex. 265.

**Plaintiffs' Response 51.**     Undisputed.

52.     Citigroup Global Markets Inc., a New York investment adviser and brokerage firm with its principal place of business in New York, New York, was the sole lead arranger and dealer manager for the November 2017 Notes.  Ex. 9 at 7; Ex. 97; Ex. 226 at Art. I.

**Plaintiffs' Response 52.**     Undisputed.

53.     Citibank, N.A., a nationally chartered bank with its principal place of business in New York, New York, was the principal paying agent, transfer agent, and registrar for the November 2017 Notes.  Ex. 10 at §§ 1.01, 10.06(a); Ex. 9 at 7; Ex. 96.

**Plaintiffs' Response 53.**     Undisputed.

**B.     PDVSA's Credit Rating Decline between 2007 and 2016.**

54.     Between the issuance of the April 2017 Notes in 2007 and 2016, Moody's, Fitch, and S&P each downgraded PDVSA's credit rating.

**Plaintiffs' Response 54.**     Undisputed.

55.     In February 2007, PDVSA had an issuer rating from Moody's of B1 and a stable outlook.  Between the issuance of the April 2017 Notes and 2016, Moody's made the following changes to PDVSA's issuer rating and outlook:

- In January 2013, Moody's downgraded PDVSA's outlook from stable to negative;

- On December 18, 2013, it downgraded PDVSA's rating from B1 to Caa1;

- On January 15, 2015, it downgraded PDVSA's rating to Caa3; and

- On March 8, 2016, it further downgraded PDVSA's outlook from stable to negative and affirmed its Caa3 issuer rating.

Ex. 65; Ex. 66; Ex. 56; Ex. 60; Ex. 126.

**Plaintiffs' Response 55.**     Undisputed.

56.     In January 2006, PDVSA had an issuer default rating from Fitch of BB- and a stable outlook.  Between the issuance of the April 2017 Notes and 2016, Fitch made the following changes to PDVSA's issuer rating and outlook:

- On October 18, 2007, Fitch downgraded PDVSA's outlook from stable to negative;

- On December 17, 2008, it downgraded PDVSA's rating from BB- to B+ and changed its outlook to stable;

- On April 4, 2012, it downgraded PDVSA's outlook to negative;

- On March  25, 2014, it downgraded PDVSA's rating to B; and

- In December 2014, it downgraded PDVSA's rating to CCC.

Ex. 63; Ex. 47; Ex. 320; Ex. 62; Ex. 120; Ex. 122.

   **Plaintiffs' Response 56.**  Undisputed.

   57.  In March 2007, PDVSA had an issuer credit rating rating from S&P of BB- and a stable outlook.  Between the issuance of the April 2017 Notes and 2016, S&P made the following changes to PDVSA's issuer rating and outlook:

- On December 10, 2008, S&P downgraded PDVSA's outlook to negative;

- On June 12, 2009, it downgraded PDVSA's rating to B+;

- On January 13, 2010, it upgraded PDVSA's outlook to stable;

- In June 2013, it downgraded PDVSA's rating to B and outlook to negative;

- In December 2013, it downgraded PDVSA's rating to B-;

- In September 2014, it downgraded PDVSA's rating to CCC+;

- In February 2015, it downgraded PDVSA's rating to CCC; and

- In September 2016, it downgraded PDVSA's rating to CC.

Ex. 21; Ex. 54; Ex. 55; Ex. 64; Ex. 119; Ex. 71; Ex. 121; Ex. 124; Ex. 128.

   **Plaintiffs' Response 57.**  Undisputed.

   58.  All three ratings agencies cited declining crude oil prices, among other factors, for the downgrades.  *See, e.g.*, Ex. 126 at 1, Ex. 320 at 1, Ex. 64 at 2.

**Plaintiffs' Response 58.**     Undisputed, except that among these "other factors" cited for the downgrades was the inextricable link between PDVSA and the Venezuelan government.  *See* ¶¶ 59-61; Hinman Report at ¶¶ 25, 70 n. 115.

59.     Moody's cited "the sharp decline in oil prices" in downgrading PDVSA's issuer rating.  Ex. 126 at 1.

**Plaintiffs' Response 59.**     "[T]he sharp decline in oil prices" was just one factor noted by Moody's, with the rating agency also noting that its prior change in outlook for the Republic of Venezuela was another factor, in light of the "inextricable relationship between PDVSA and the Government of Venezuela."  Def. Ex. 126 at 1.

60.     Fitch cited "cash generation" problems "due to lower hyrdrocarbon prices" as signaling a higher risk of default and "the sharp decline of international oil prices" in downgrading PDVSA's issuer default rating.  Ex. 320; Ex. 122 at 1.

**Plaintiffs' Response 60.**     Problems due to the decline of international oil prices were noted in the report.  However, Fitch also cited its recent "downgrade of the of the sovereign ratings of Venezuela" and PDVSA's lack of "real independence from the government."  Defs. Ex. 122 at 1; *see also* Defs. Ex. 320 at 1 (stating that a December 17, 2008 downgrade of PDVSA's rating took place "follow[ing] . . . downgrade of the country's credit rating" due to the "government's tenuous macroeconomic policy framework" and noting that PDVSA is "inextricably linked" to the government of Venezuela).

61.     S&P cited "heightened uncertainty regarding PDVSA's liquidity" "due to the decline in oil prices" in downgrading PDVSA's credit rating, and has described PDVSA's "financial performance" as "deteriorated, mostly as a result of lower oil prices."  Ex. 55 at 1; Ex. 64 at 2; Ex. 124 at 2.

**Plaintiffs' Response 61.**      S&P did note the declines in oil pricing in the reports, but the reports also noted that its "negative outlook on PDVSA mirrors that on the sovereign, reflecting our view of the company's integral link with the government" (Defs. Ex. 124 at 2) and that its opinion of PDVSA is "linked" to the government of Venezuela "reflecting [their] opinion that PDVSA is a public policy-based institution" (Defs. Ex. 55 at 1).  S&P did not actually downgrade PDVSA in the January 13, 2010 report, instead revising its outlook to stable from negative while still noting PDVSA's "'very strong' link with the government."  Defs. Ex. 64.

62.      Between the issuance of the 2017 Notes in 2007 and 2016, crude oil prices declined from above $100 per barrel (in fall 2014) to below $30 per barrel (in mid-2016).  Defs. Ex. 12 at ¶¶ 23–24, 27; Ex. 244; Porzecanski Rebuttal Decl. ¶ 89.

**Plaintiffs' Response 62.**      Undisputed that oil prices were around these prices in fall 2014 and mid-2016, but the above is misleading as—per Defendants' own chart in ¶ 63 below— oil prices fluctuated upward and downward throughout this time period.

63.   The following chart shows weekly prices of Venezuelan crude oil from April 12, 2007, to October 31, 2016:



**Weekly Venezuela Crude Oil Basket Spot Prices**
**April 12, 2007 to October 31, 2016**

**Notes and Sources:**
–Data are from Bloomberg, L.P.
–The Venezuela Crude Oil Basket Weekly Spot Price data refers to the CRVZVZBK Index on Bloomberg. The description is as follows: The Venezuelan crude basket is a reference price based on an average of all crudes handled by the state oil company, Petroleos de Venezuela. The oil basket is comprised of 70 percent crude oil and 30 percent oil products such as gasoline and distillates. FOB prices.

**Plaintiffs' Response 63.**   Undisputed.

64.   As of September 16, 2016, the day the Exchange Offer was announced, the 2017 Notes had an outstanding principal balance of $7,100,000,000.  Specifically, the April 2017 Notes had an outstanding principal balance of $3,000,000,000, and the November 2017 Notes had an outstanding principal balance of $4,100,000,000.  Ex. 1 at 10.

**Plaintiffs' Response 64.**   Undisputed.

65.   As of September 16, 2016, remaining payments were due on the 2017 Notes as follows:

a. A payment of $3,000,000,000 of principal and $157,500,000 of interest on the April 2017 Notes was due on April 12, 2017.  PDVSA & PDVSA Petróleo Answer ¶ 127; PDVH Answer ¶ 127; Ex. 7 at §§ 1.1, 2.10(a), Ex. A; Ex. 1 at 10.

b. A payment of $87,125,000 of interest on the November 2017 Notes was due on May 2, 2017.  PDVSA & PDVSA Petróleo Answer ¶ 127; PDVH Answer ¶ 127; Ex. 10 at § 2.08, Ex. A; Ex. 11 at Ex. A; Ex. 1 at 10.

c. A payment of $2,050,000,000 of principal and $174,250,000 of interest on the November 2017 Notes was due on November 2, 2016.  PDVSA & PDVSA Petróleo Answer ¶ 127; PDVH Answer ¶ 127; Ex. 10 at § 2.08, Ex. A; Ex. 11 at Ex. A; Ex. 1 at 10.

d. A payment of $2,050,000,000 of principal and $87,125,000 of interest on the November 2017 Notes was due on November 2, 2017.  PDVSA & PDVSA Petróleo Answer ¶ 127; PDVH Answer ¶ 127; Ex. 10 at § 2.08, Ex. A; Ex. 11 at Ex. A; Ex. 1 at 10.

**Plaintiffs' Response 65.**     Undisputed.

## C.     The Venezuelan Political Situation in 2016.

66.     From June 2013 to January 2019, Nicolás Maduro was recognized by the United States as the President of Venezuela.

**Plaintiffs' Response 66.**     Undisputed, except that the government of the United States has since recognized that the election of Nicolás Maduro in 2018 was illegitimate, that the National Assembly is and has been since 2016 the only legitimate legislative body of the United States, and that Juan Guaidó is the Interim President of Venezuela.  *See* State Dep't, *Mesa de la Unidad Democrática (MUD) Statement on Dialogue in Venezuela* (July 8, 2016) (calling on

16

"respect the constitutional role of the National Assembly"), Bliss Opp. Decl. Ex. 1;[2] State Dep't, *Assumption of Legislative Powers in Venezuela* (Aug. 18, 2017) ("[T]he democratically-elected National Assembly is the only legitimate legislative body . . . As long as the Maduro regime continues to conduct itself as an authoritarian dictatorship, we are prepared to bring the full weight of American economic and diplomatic power to bear in support of the Venezuelan people as they seek to restore their democracy."), Bliss Opp. Decl. Ex. 2; State Dep't, *Recognition Of Juan Guaidó As Venezuela's Interim President By Several European Countries* (Feb. 4, 2019), Bliss Opp. Decl. Ex. 3; Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela, WHITEHOUSE.GOV (Jan. 23, 2019), Bliss Opp. Decl. Ex. 4.  The U.S. President has also issued numerous executive orders imposing strict sanctions in light of Maduro's "usurpation of power" and the "illegitimate Maduro regime['s]" efforts to "prevent the Interim President and the National Assembly from exercising legitimate authority in Venezuela."  *See* Executive Orders 13857 (Jan. 25, 2019), Bliss Opp. Decl. Ex. 20 and 13884 (Aug. 5, 2019), Bliss Opp. Decl. Ex. 21.

Even prior to formal recognition, the U.S. President had issued numerous Executive Orders condemning the Maduro regime and his "illegitimate" Constituent Assembly and putting in place sanctions to prevent Maduro from overriding the democratically elected National Assembly.  On March 8, 2015, for example, the President of the United States issued an Executive Order declaring a national emergency to deal with the threat being posed by "the Government of Venezuela's erosion of human rights guarantees, persecution of political opponents, curtailment of press freedoms, use of violence and human rights violations and

---

[2] All references to "Bliss Opp. Decl. Ex. __" refer to exhibits attached to the *Declaration of James R. Bliss in Opposition to Defendants' Motion for Summary Judgment*, dated June 29, 2020

abuses in response to antigovernment protests, and arbitrary arrest and detention of

antigovernment protestors, as well as the exacerbating presence of significant public corruption."

Exec. Order No. 13692, Bliss Opp. Decl. Ex. 12.  The Executive Order (along with others acts

and proclamations of both the U.S. executive and legislative branches that followed) condemned

the Maduro regime and put in place sanctions against certain of its officials.  *Id*.; *see also*

Treasury Dep't, Treasury Sanctions the President of Venezuela (July 31, 2017) ("[T]he Maduro

government . . . aspires illegitimately to usurp the constitutional role of the democratically

elected National Assembly, rewrite the constitution, and impose an authoritarian regime on the

people of Venezuela."), Bliss Opp. Decl. Ex. 13.; U.S. White House, Statement by the Press

Secretary on New Financial Sanctions on Venezuela (Aug. 25, 2017) ("The regime's decision to

. . . usurp the powers of the democratically-elected National Assembly [] represents a

fundamental break in Venezuela's legitimate constitutional order."), Bliss Opp. Decl. Ex. 14;

State Dep't, U.S. Government Support for the Democratic Aspirations of the Venezuelan People

("United States policy supports the interim government, the National Assembly, and the

Venezuelan people in their struggle for a stable, democratic, and prosperous Venezuela. In

service of this goal, the United States has undertaken a series of strong policy actions since 2017

meant to pressure the former Maduro regime and support democratic actors."), Bliss Opp. Decl.

Ex. 15; S. Res. 537, 114th Cong. (2016) ("call[ing] on the Government of Venezuela to halt its

efforts to undermine the principle of separation of powers, its circumvention of the

democratically elected legislature, and its subjugation of judicial independence"), Bliss Opp.

Decl. Ex. 16; H. Res. 259, 115th Congress (2017) ("urg[ing] the Government of Venezuela to . . .

respect the constitutional rights of the National Assembly"), Bliss Opp. Decl. Ex. 17; S. Res. 414,

115th Cong. (2017) (referred to the S. Comm. on Foreign Relations) ("[T]he Senate . . .

condemns the steps taken by President Maduro . . . to undermine the independence of democratic institutions such as the National Assembly of Venezuela . . . .”), Bliss Opp. Decl. Ex. 18.

67.     Shortly after Maduro became President of Venezuela in 2013, U.S. Secretary of State John Kerry met with his Venezuelan counterpart, Foreign Minister Elías Jaua, at the General Assembly of the Organization of American States.  Following that meeting, Secretary Kerry said: “I want to thank President Maduro for taking the step to meet” and “for the selection and the appointment of Ambassador Ortega to come to Washington to serve as the chargé d’affaires.” Secretary Kerry also stated that he and Foreign Minister Jaua “agreed today that there will be an ongoing, continuing dialogue at a high level between the State Department and the Foreign Ministry . . . and hopefully, quickly move to the appointment of ambassadors between our nations.”  Ex. 57.

**Plaintiffs' Response 67.**     Undisputed, except that the government of the United States Government has since recognized that the election of Nicolás Maduro in 2018 was illegitimate, that the National Assembly is and has been since 2016 the only legitimate legislative body of the United States, and that Juan Guaidó is the Interim President of Venezuela.  *See* State Dep't, *Mesa de la Unidad Democrática (MUD) Statement on Dialogue in Venezuela* (July 8, 2016) (calling on "respect the constitutional role of the National Assembly"), Bliss Opp. Decl. Ex. 1; State Dep't, *Assumption of Legislative Powers in Venezuela* (Aug. 18, 2017) ("[T]he democratically-elected National Assembly is the only legitimate legislative body . . . As long as the Maduro regime continues to conduct itself as an authoritarian dictatorship, we are prepared to bring the full weight of American economic and diplomatic power to bear in support of the Venezuelan people as they seek to restore their democracy."), Bliss Opp. Decl. Ex. 2; State Dep't, *Recognition Of Juan Guaidó As Venezuela's Interim President By Several European*

*Countries* (Feb. 4, 2019), Bliss Opp. Decl. Ex. 3; Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela, WHITEHOUSE.GOV (Jan. 23, 2019), Bliss Opp. Decl. Ex. 4.  The U.S. President has also issued numerous executive orders imposing strict sanctions in light of Maduro's "usurpation of power" and the "illegitimate Maduro regime['s]" efforts to "prevent the Interim President and the National Assembly from exercising legitimate authority in Venezuela."  *See* Executive Orders 13857 (Jan. 25, 2019), Bliss Opp. Decl. Ex. 20 and 13884 (Aug. 5, 2019), Bliss Opp. Decl. Ex. 21.

Even prior to formal recognition, the U.S. President had issued numerous Executive Orders condemning the Maduro regime and his "illegitimate" Constituent Assembly and putting in place sanctions to prevent Maduro from overriding the democratically elected National Assembly.  On March 8, 2015, for example, the President of the United States issued an Executive Order declaring a national emergency to deal with the threat being posed by "the Government of Venezuela's erosion of human rights guarantees, persecution of political opponents, curtailment of press freedoms, use of violence and human rights violations and abuses in response to antigovernment protests, and arbitrary arrest and detention of antigovernment protestors, as well as the exacerbating presence of significant public corruption." Exec. Order No. 13692, Bliss Opp. Decl. Ex. 12.  The Executive Order (along with others acts and proclamations of both the U.S. executive and legislative branches that followed) condemned the Maduro regime and put in place sanctions against certain of its officials.  *Id.*; *see also* Treasury Dep't, Treasury Sanctions the President of Venezuela (July 31, 2017) ("[T]he Maduro government . . . aspires illegitimately to usurp the constitutional role of the democratically elected National Assembly, rewrite the constitution, and impose an authoritarian regime on the

people of Venezuela."), Bliss Opp. Decl. Ex. 13; U.S. White House, Statement by the Press

Secretary on New Financial Sanctions on Venezuela (Aug. 25, 2017) ("The regime's decision to

. . . usurp the powers of the democratically-elected National Assembly [] represents a

fundamental break in Venezuela's legitimate constitutional order."), Bliss Opp. Decl. Ex. 14;

State Dep't, U.S. Government Support for the Democratic Aspirations of the Venezuelan People

("United States policy supports the interim government, the National Assembly, and the

Venezuelan people in their struggle for a stable, democratic, and prosperous Venezuela. In

service of this goal, the United States has undertaken a series of strong policy actions since 2017

meant to pressure the former Maduro regime and support democratic actors."), Bliss Opp. Decl.

Ex. 15; S. Res. 537, 114th Cong. (2016) ("the [Venezuelan] Supreme Court has repeatedly issued

politically motivated judgments to overturn legislation passed by the democratically elected

National Assemby. . . ."), Bliss Opp. Decl. Ex. 16; H. Res. 259, 115th Congress (2017) ("urg[ing]

the Government of Venezuela to . . . respect the constitutional rights of the National Assembly"),

Bliss Opp. Decl. Ex. 17; S. Res. 414, 115th Cong. (2017) (referred to the S. Comm. on Foreign

Relations) ("[T]he Senate . . . condemns the steps taken by President Maduro . . . to undermine

the independence of democratic institutions such as the National Assembly of Venezuela . . . ."),

Bliss Opp. Decl. Ex. 18.

      68.     A fact sheet published on August 31, 2016, by the Bureau of Western Hemisphere

Affairs, an office within the U.S. Department of State, stated that while "[t]he U.S.-Venezuelan

bilateral relationship has been tense in recent years[,] [t]he United States and Venezuela maintain

diplomatic relations, with embassies each headed by a chargé d'affaires."  The fact sheet named

both "the late Hugo Chavez (1999-2013) and Nicolas Maduro (2013-present)" as "recent

presidents."  Ex. 58.

**Plaintiffs' Response 68.**      Undisputed, except that the U.S. government has since

explicitly recognized the Maduro regime as "illegitimate," acknowledged the National Assembly

as the "only legitimate branch of government duly elected by the Venezuelan people," and

officially recognized "the President of the Venezuelan National Assembly, Juan Guaidó, as the

Interim President of Venezuela."  Press Statement, Secretary of State Michael R. Pompeo,

*Recognition Of Juan Guaidó As Venezuela's Interim President By Several European Countries*

(Feb. 4, 2019), Bliss Opp. Decl. Ex. 3.  Further, the fact sheet itself recognizes: "the late Hugo

Chavez (1999-2013) and Nicolas Maduro (2013-present), have defined themselves in part

through their opposition to the United States."  Ex. 58 at 1.

Even prior to formal recognition, the U.S. President had issued numerous Executive

Orders condemning the Maduro regime and his "illegitimate" Constituent Assembly and putting

in place sanctions to prevent Maduro from overriding the democratically elected National

Assembly.  On March 8, 2015, for example, the President of the United States issued an

Executive Order declaring a national emergency to deal with the threat being posed by "the

Government of Venezuela's erosion of human rights guarantees, persecution of political

opponents, curtailment of press freedoms, use of violence and human rights violations and

abuses in response to antigovernment protests, and arbitrary arrest and detention of

antigovernment protestors, as well as the exacerbating presence of significant public corruption."

Exec. Order No. 13692, Bliss Opp. Decl. Ex. 12.  The Executive Order (along with others acts

and proclamations of both the U.S. executive and legislative branches that followed) condemned

the Maduro regime and put in place sanctions against certain of its officials.  *Id*.; *see also*

Treasury Dep't, Treasury Sanctions the President of Venezuela (July 31, 2017) ("[T]he Maduro

government . . . aspires illegitimately to usurp the constitutional role of the democratically

elected National Assembly, rewrite the constitution, and impose an authoritarian regime on the people of Venezuela."), Bliss Opp. Decl. Ex. 13.; U.S. White House, Statement by the Press Secretary on New Financial Sanctions on Venezuela (Aug. 25, 2017) ("The regime's decision to . . . usurp the powers of the democratically-elected National Assembly [] represents a fundamental break in Venezuela's legitimate constitutional order."), Bliss Opp. Decl. Ex. 14; State Dep't, U.S. Government Support for the Democratic Aspirations of the Venezuelan People ("United States policy supports the interim government, the National Assembly, and the Venezuelan people in their struggle for a stable, democratic, and prosperous Venezuela. In service of this goal, the United States has undertaken a series of strong policy actions since 2017 meant to pressure the former Maduro regime and support democratic actors."), Bliss Opp. Decl. Ex. 15; S. Res. 537, 114th Cong. (2016) ("the [Venezuelan] Supreme Court has repeatedly issued politically motivated judgments to overturn legislation passed by the democratically elected National Assembly. . . ."), Bliss Opp. Decl. Ex. 16; H. Res. 259, 115th Congress (2017) ("urg[ing] the Government of Venezuela to . . . respect the constitutional rights of the National Assembly"), Bliss Opp. Decl. Ex. 17; S. Res. 414, 115th Cong. (2017) (referred to the S. Comm. on Foreign Relations) ("[T]he Senate . . . condemns the steps taken by President Maduro . . . to undermine the independence of democratic institutions such as the National Assembly of Venezuela . . . ."), Bliss Opp. Decl. Ex. 18.

69.     The U.S. Department of State fact sheet identified Lee McClenny as the Chargé d'Affaires to Venezuela.  *Id.*

**Plaintiffs' Response 69.**     Undisputed.

70.     The U.S. Department of State identified T.H. Maximilien Sanchez Arvelaiz as the Venezuela Chargé d'Affaires (ad interim) to the United States, as of October 13, 2016.  Ex. 365.

**Plaintiffs' Response 70.**     Undisputed.

71.     In September 2016, Secretary Kerry met with President Maduro in Cartagena, Colombia.  Following the meeting, State Department Spokesperson John Kirby stated that Secretary Kerry had "urged President Maduro to work constructively with opposition leaders" and noted that "[t]he Secretary and President Maduro agreed to continue the bilateral discussions begun in recent months."  Ex. 59.

**Plaintiffs' Response 71.**     Undisputed, except that, for full factual context, it should be noted that Maduro has instead jailed or forced into exile opposition members since this meeting in September 2016. *See* Andriena Aponte and Leon Wietfield, *Factbox: Venezuela's jailed, exiled or barred opposition politicians*, REUTERS (Feb. 19, 2018), Bliss Opp. Decl. Ex. 19.

Even prior to formal recognition, the U.S. President had issued numerous Executive Orders condemning the Maduro regime and his "illegitimate" Constituent Assembly and putting in place sanctions to prevent Maduro from overriding the democratically elected National Assembly.  On March 8, 2015, for example, the President of the United States issued an Executive Order declaring a national emergency to deal with the threat being posed by "the Government of Venezuela's erosion of human rights guarantees, persecution of political opponents, curtailment of press freedoms, use of violence and human rights violations and abuses in response to antigovernment protests, and arbitrary arrest and detention of antigovernment protestors, as well as the exacerbating presence of significant public corruption." Exec. Order No. 13692, Bliss Opp. Decl. Ex. 12.  The Executive Order (along with others acts and proclamations of both the U.S. executive and legislative branches that followed) condemned the Maduro regime and put in place sanctions against certain of its officials.  *Id.*; *see also* Treasury Dep't, Treasury Sanctions the President of Venezuela (July 31, 2017) ("[T]he Maduro

government . . . aspires illegitimately to usurp the constitutional role of the democratically

elected National Assembly, rewrite the constitution, and impose an authoritarian regime on the

people of Venezuela."), Bliss Opp. Decl. Ex. 13.; U.S. White House, Statement by the Press

Secretary on New Financial Sanctions on Venezuela (Aug. 25, 2017) ("The regime's decision to

. . . usurp the powers of the democratically-elected National Assembly [] represents a

fundamental break in Venezuela's legitimate constitutional order."), Bliss Opp. Decl. Ex. 14;

State Dep't, U.S. Government Support for the Democratic Aspirations of the Venezuelan People

("United States policy supports the interim government, the National Assembly, and the

Venezuelan people in their struggle for a stable, democratic, and prosperous Venezuela. In

service of this goal, the United States has undertaken a series of strong policy actions since 2017

meant to pressure the former Maduro regime and support democratic actors."), Bliss Opp. Decl.

Ex. 15; S. Res. 537, 114th Cong. (2016) ("the [Venezuelan] Supreme Court has repeatedly issued

politically motivated judgments to overturn legislation passed by the democratically elected

National Assembly. . . ."), Bliss Opp. Decl. Ex. 16; H. Res. 259, 115th Congress (2017) ("urg[ing]

the Government of Venezuela to . . . respect the constitutional rights of the National Assembly"),

Bliss Opp. Decl. Ex. 17; S. Res. 414, 115th Cong. (2017) (referred to the S. Comm. on Foreign

Relations) ("[T]he Senate . . . condemns the steps taken by President Maduro . . . to undermine

the independence of democratic institutions such as the National Assembly of Venezuela . . . ."),

Bliss Opp. Decl. Ex. 18.

     72.     In National Assembly elections held December 6, 2015, the opposition MUD

coalition won 109 seats; President Maduro's United Socialist Party of Venezuela (*Partido*

*Socialista Unido do Venezuela*) and its coalition won 55 seats; and indigenous parties that were

aligned with MUD won 3 seats.  Compl. ¶ 21; Ex. 94 at Ex. D at 18.

25

**Plaintiffs' Response 72.**     To clarify, the opposition MUD coalition won 112 seats, but in December 2015 the Maduro-dominated Supreme Tribunal attempted to prevent 3 National Assembly members from being seated.  *See* Kejal Vyas, *Venezuela Court Blocks Three Rival Lawmakers-Elect From Taking Office*, WALL ST. J. (Dec. 30, 2015), Bliss Opp. Decl. Ex. 34.

73.     In December 2015, MUD included the parties: Justice First (*Primero Justicia*), with 33 seats; Democratic Action (*Acción Democrática*), with 26 seats; A New Era (*Un Nuevo Tiempo*), with 22 seats; and Popular Will (*Voluntad Popular*), with 15 seats.  Ex. 94 at Ex. D at 18.**Plaintiffs' Response 73.**     Undisputed that the MUD included the listed parties, as well as other deputies.

**D.     Approval of the Exchange Offer.**

74.     The Exchange Offer was approved, and the Governing Documents were approved, by the board of directors of each of the PDVSA Parties in accordance with their respective certificates of incorporation and by-laws.  PDVSA & PDVSA Petróleo Answer ¶ 138; PDVH Answer ¶ 138.

**Plaintiffs' Response 74.**     Undisputed, but the capacity of PDVSA and PDVSA Petróleo (and their officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

75.     Authorized personnel of the PDVSA Parties executed the Governing Documents in accordance with their respective certificates of incorporation and bylaws.  Ex. 379 at ¶ 7; Ex. 380 at ¶ 3.

**Plaintiffs' Response 75.**     Undisputed, except to the extent that this is intended to suggest that the Governing Documents are valid, effective or enforceable.  Brewer Report at ¶¶ 22-23, 35-37, 41-42, 126-29, 139.

76.     The PDVSA Articles of Incorporation grant its board of directors the power to "[a]uthoriz[e] the conclusion of contracts, with the capacity to delegate this duty."  Ex. 53 at Title IV, Ch. 1, Cl. 27.

**Plaintiffs' Response 76.**     Undisputed that this language appears in PDVSA's Articles of Incorporation, but the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

77.     At the time of the Exchange Offer, the PDVSA Board comprised eleven directors: Eulogio del Pino, Orlando Chacín, Jesús Luongo, Ana María España, Delcy Rodriguez, Sergio Tovar, Antón Castillo, Aracelis Suez, Wills Rangel, Rodolfo Marco Torres, and Ricardo Menendez.  Ex. 1 at 123.

**Plaintiffs' Response 77.**     Undisputed.

78.     On September 7, 2016, the PDVSA Board approved the Exchange Offer and governing documents at meeting number 2016-14.  The meeting minutes were signed by PDVSA President and Director, del Pino; PDVSA Vice-President and Director, España; and PDVSA Corporate Secretary Humberto Perniciaro.  PDVSA & PDVSA Petróleo Answer ¶ 138; PDVH Answer ¶ 138; Ex. 379 at TRU_00010939–43; Moreyra Decl. Ex. 8 at TRU_0011289.

**Plaintiffs' Response 78.**     Undisputed, except to the extent this statement is intended to suggest that approval of the Exchange Offer and the governing documents by the PDVSA Board was valid, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

79.     At its September 8, 2016 meeting, the PDVSA Shareholders Assembly also instructed PDVSA Petróleo to "carry out the necessary actions" to ensure the 2020 Notes are issued pursuant to the terms of the Governing Documents and instructed PDVH to execute the Pledge Agreement and take all necessary actions to create an enforceable pledge of collateral.  Ex. 381 at TRU_00010953–54.

**Plaintiffs' Response 79.**     Undisputed, except to the extent this statement is intended to suggest that such instruction to PDVSA Petróleo was valid, as the capacity of PDVSA and PDVSA Petróleo (and their officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

80.     The PDVSA Board also directed one of its directors, España, and two of its corporate officers, PDVSA Executive Director of Treasury Waldemar Negrín and PDVSA Petróleo Financial Planning Executive Director Renny Bolívar, to sign the Indenture, Pledge Agreement, and any other document necessary to effectuate the Exchange Offer.  Moreyra Decl. Ex. 13; Ex. 379at ¶ 7; Moreyra Decl. Ex. 8 at TRU_00011290.

**Plaintiffs' Response 80.**     Undisputed, except to the extent this statement is intended to suggest that such direction from the PDVSA board was valid, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

81.     On September 14, 2016, PDVSA Legal Officer Annabella Rivas emailed a signed copy of the PDVSA Board's approval (certified by PDVSA's Corporate Secretary, Perniciaro, and signed by del Pino and España) to CITGO Petroleum, the PDVSA Parties' representatives from Credit Suisse, Hogan Lovells, and White & Case, and representatives of the Law Debenture Trust Company, the Collateral Agent, and the Trustee.  Moreyra Decl. Ex. 10; Ex. 380.

**Plaintiffs' Response 81.**     Undisputed, except to the extent this statement is intended to suggest that PDVSA Board's approval was valid, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution. Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

82.     On September 8, 2016, PDVSA convened an Extraordinary General Shareholder Assembly at which PDVSA's sole shareholder, Venezuela, approved the Exchange Offer through its agent, del Pino.  Ex. 381 at TRU_00010953–54.

**Plaintiffs' Response 82.**     Undisputed, except to the extent this statement is intended to suggest that approval by PDVSA's sole shareholder was valid, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

83.     On September 15, 2016, Rivas emailed a signed copy of the shareholder approval (certified by Perniciaro, and signed by del Pino) to CITGO Petroleum, the PDVSA Parties' representatives from Credit Suisse, Hogan Lovells, and White & Case, and representatives of the Law Debenture Trust Company, Collateral Agent, and the Trustee.  Moreyra Decl. Ex. 15; Ex. 381.

**Plaintiffs' Response 83.**     Undisputed, except to the extent this statement is intended to suggest that approval by PDVSA's sole shareholder was valid, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution, which required National Assembly approval prior to execution of the Exchange Offer.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

84.     The PDVSA Petróleo Articles of Incorporation also grant its board of directors the power to "[a]uthoriz[e] the execution of contracts."  Ex. 237 at Title IV, Ch. 1, Cl. 17.

**Plaintiffs' Response 84.**     Undisputed that the PDVSA Petróleo Articles of

Incorporation contain the quoted language, but the capacity of PDVSA Petróleo (and its officers

and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.

Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

85.     On September 7, 2016, the PDVSA Petróleo Board approved the Exchange Offer

and Governing Documents.  The board resolution was signed by del Pino, España, and Perniciaro.

PDVSA & PDVSA Petróleo Answer ¶ 138; PDVH Answer ¶ 138; Ex. 380 at TRU_00010945–47.

**Plaintiffs' Response 85.**     Undisputed, except to the extent this statement is intended to

suggest that the PDVSA Petróleo Board approval of the Exchange Offer and Governing

Documents was effective, as the capacity of PDVSA Petróleo (and its officers and directors) to

contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at

¶¶ 22-23, 35-37, 126-29, 139.

86.     PDVSA Petróleo also directed España, Negrín, and Bolívar to sign the Indenture,

Pledge Agreement, and any other document necessary to effectuate the Exchange Offer.  Moreyra

Decl. Ex. 14; Ex. 380 at TRU_00010945–47; Ex. 378 at TRU_00011240–41.

**Plaintiffs' Response 86.**     Undisputed, except to the extent this statement is intended to

suggest that the direction of PDVSA Petróleo to sign the Indenture and Pledge Agreement was

valid, as the capacity of PDVSA Petróleo (and its officers and directors) to contract is limited by

Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37,

126-29, 139.

87.     On September 14, 2016, Rivas emailed the PDVSA Petróleo Board's approval

(certified by Perniciaro, and signed by del Pino and España) to CITGO Petroleum, the PDVSA

Parties' representatives from Credit Suisse, Hogan Lovells, and White & Case, and representatives

of the Law Debenture Trust Company, the Collateral Agent, and the Trustee.  Moreyra Decl. Ex.

10; Ex. 380.

> **Plaintiffs' Response 87.**    Undisputed, except to the extent this statement is intended to
suggest that the approval of PDVSA Petróleo's Board was effective, as the capacity of PDVSA
Petróleo (and its officers and directors) to contract is limited by Venezuelan public law and the
Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

88.    España signed the 2020 Global Notes for PDVSA.  Ex. 6 at HL_019593.

> **Plaintiffs' Response 88.**    Undisputed, except to the extent this statement is intended to
suggest that this signature of the Global Notes was effective, as the capacity of PDVSA (and its
officers and directors) to contract is limited by Venezuelan public law and the Venezuelan
Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

89.    España and Negrín signed the Indenture for PDVSA.  Ex. 2 § 2.04.

> **Plaintiffs' Response 89.**    Undisputed, except to the extent this statement is intended to
suggest that these signatures were effective, as the capacity of PDVSA (and its officers and
directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.
Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

90.    España signed the Pledge Agreement for PDVSA.  Ex. 3 at ASH_00009039.

> **Plaintiffs' Response 90.**    Undisputed, except to the extent this statement is intended to
suggest that this signature was effective, as the capacity of PDVSA (and its officers and
directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.
Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

91.    Bolívar and Negrín signed the Indenture for PDVSA Petróleo.  Ex. 2 § 2.04,

HL_002794.

**Plaintiffs' Response 91.**     Undisputed, except to the extent this statement is intended to suggest that these signatures were effective, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution. Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

92.     Bolívar signed the Pledge Agreement for PDVSA Petróleo.  Ex. 3 at ASH_00009039.

**Plaintiffs' Response 92.**     Undisputed, except to the extent this statement is intended to suggest that this signature was effective, as the capacity of PDVSA Petróleo (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution. Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

93.     The PDVH Certificate of Incorporation vests its board of directors, "without the assent or vote of the stockholders," with the power to "authorize and cause to be executed mortgages and liens upon all or any part of the property of the Corporation."  Ex. 307 at PDVSA-00014234.

**Plaintiffs' Response 93.**     Undisputed, except to the extent that this is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶¶ 41-42.

94.     At the time of the Exchange Offer, the PDVH Board consisted of Castillo, Chacín, and Luongo.  Moreyra Decl. Ex. 11 at TRU_00004696.

**Plaintiffs' Response 94.**     Undisputed.

95.     The PDVH Articles of Incorporation grant its President the power to "execute bonds, mortgages and other contracts on behalf of the corporation, and shall cause the seal to be affixed to any instrument requiring it and when so affixed the seal shall be attested by the signature of the Vice President, Secretary or an Assistant Secretary."  Ex. 307 at PDVSA-00014244–45.

**Plaintiffs' Response 95.**     Undisputed, except to the extent that this is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶¶ 41-42.

96.     On September 15, 2016, the PDVH Board acted by unanimous consent to approve the proposed Pledge Agreement and authorize Luongo, Chacín, and José Pereíra (in his capacity as Treasurer of PDVH) to execute, deliver, and perform the Pledge Agreement and related agreements.  Moreyra Decl. Ex. 11 at TRU_00004695.

**Plaintiffs' Response 96.**     Undisputed, except to the extent that this is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶¶ 41-42.

97.     On September 16, 2016, Rivas emailed a signed copy of the PDVH Action by Unanimous Written Consent (signed by Castillo, Chacín, and Luongo) to CITGO Petroleum, the PDVSA Parties' representatives from Credit Suisse, Hogan Lovells, White & Case, and representatives of the Law Debenture Trust Company, the Collateral Agent, and the Trustee. Moreyra Decl. Ex. 11.

**Plaintiffs' Response 97.**     Undisputed, except to the extent that this is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶¶ 41-42.

98.     On October 25, 2016, the PDVH Board "confirm[ed] and ratifie[d] the continued validity" of its September 15 resolution and acted by unanimous consent to "enter into" the Pledge Agreement and deliver instruments of transfer.  Ex. 305 at HL_020029.

**Plaintiffs' Response 98.**     Undisputed, except to the extent that this is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶¶ 41-42.

99.     On October 27, 2016, Ciccone, based in New York, informed members of the Working Group that she would distribute executed copies of the transaction documents, PDVSA

and PDVSA Petróleo's Secretary's Certificates, the Issuer and Direction Orders, and the Hogan

Lovells LLP New York legal opinion.  Ex. 383 at TRU_00007276–77.

      **Plaintiffs' Response 99.**     Undisputed, except to the extent this statement is intended to

suggest that the referenced copies of the transaction and other documents were effective, as the

capacity of PDVSA and PDVSA Petróleo (and their officers and directors) to contract is limited

by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37,

126-29, 139.

      100.     The Trustee and Collateral Agent received copies of the executed copies of the

transaction documents, PDVSA and PDVSA Petróleo's Secretary's Certificates, the Issuer and

Direction Orders, and the Hogan Lovells US LLP New York legal opinion.  Moreyra Decl. ¶ 9;

Reed Decl. ¶ 7.

      **Plaintiffs' Response 100.**    Undisputed, except to the extent this statement is intended to

suggest that the referenced copies of the transaction and other documents were effective, as the

capacity of PDVSA and PDVSA Petróleo (and their officers and directors) to contract is limited

by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37,

126-29, 139.

      101.



- ████████████████████████████████████████████

  ███████████████████████████████████████

  ████████████████████████████

  ███████████████████

**Plaintiffs' Response 101.**   Undisputed, except to the extent that this is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶¶ 41-42.

102.    The Trustee and Collateral Agent received copies of the PDVH Officer's Certificate.  Moreyra Decl. ¶ 9; Reed Decl. ¶ 7.

**Plaintiffs' Response 102.**   Undisputed.

103.    On October 28, 2016, Luongo signed the Pledge Agreement for PDVH, as authorized by the PDVH Board.  Ex. 3 at ASH_00009039.

**Plaintiffs' Response 103.**   Undisputed, except to the extent that this is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶¶ 41-42.

104.    On the day of closing, Perniciaro, as PDVSA's "duly elected and Qualified Secretary," executed a Secretary's Certificate that "in such capacity and on behalf of [PDVSA]":

- it had provided "true, correct and complete" copies of PDVSA's Articles of Incorporation and Bylaws, the resolutions adopted by the Shareholders' Meeting and the PDVSA Board;

- the board resolutions were "duly adopted" and are "in full force and effect";

- each authorized signatory of [PDVSA] "was duly elected or appointed, qualified and acting as such officer, director or authorized signatory at the respective times of the signing and delivery thereof," and affirmed the authenticity of their signatures; and

35

- the Secretary's Certificate was approved by an officer and director of the Issuer.

Moreyra Decl. Ex. 8 at TRU_0011289–90.

**Plaintiffs' Response 104.**   Undisputed, except to the extent this statement is intended to suggest that the transaction documents were effective, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

105.    The PDVSA Secretary's Certificate was also signed by Perniciaro, España, and Bolívar.  *Id.* at TRU_0011291.

**Plaintiffs' Response 105.**   Undisputed, except to the extent this statement is intended to suggest that the transaction documents were effective, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution. Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

106.    Also on the day of closing, Perniciaro, as PDVSA Petróleo's "duly elected and Qualified Secretary," executed a Secretary's Certificate that "in such capacity and on behalf of PDVSA Petróleo" stated that:

- it had provided "true, correct and complete" copies of PDVSA Petróleo's Articles of Incorporation and Bylaws and the resolutions adopted by the PDVSA Petróleo Board of Directors;

- the board resolutions were "duly adopted" and are "in full force and effect";

- each authorized signatory of [PDVSA] "was duly elected or appointed, qualified and acting as such officer, director or authorized signatory at the respective times of the signing and delivery thereof," and affirmed the authenticity of their signatures; and

- the Secretary's Certificate was approved by an officer and director of the [Guarantor].

Ex. 378 at TRU_00011240–41.

**Plaintiffs' Response 106.**   Undisputed, except to the extent this statement is intended to suggest that the transaction documents were effective, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution. Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

107.   The PDVSA Petróleo Secretary's Certificate was also signed by PDVSA Petróleo President Luongo and Director Chacín. *Id.* at TRU_00011284.

**Plaintiffs' Response 107.**   Undisputed, except to the extent this statement is intended to suggest that the transaction documents were effective, as the capacity of PDVSA (and its officers and directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution. Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

108.   The individuals from PDVSA, PDVSA Petróleo, and PDVH who signed the Governing Documents are each directors and/or principal executives of the respective entities.

**Plaintiffs' Response 108.**    It is inaccurate to say that individuals from PDVSA, PDVSA Petróleo, and PDVH "are" each directors and/or principal executives of the respective entities.  From the standpoint of U.S. courts, the Ad-Hoc Board is the only legitimate board of directors of PDVSA.  *See Jimenez*, 2019 WL 3526479, at *13 (holding that the Guaidó Government's reconstitution of PDVSA's board was an official act of state that must be accepted by U.S. courts without further inquiry); *Impact Fluid Solutions et al v. Bariven S.A. et al*, Civ No. 4:19-cv-00654, Dkt. No. 55 (S.D. Tex. May 20, 2020) (same), Pls. Ex. 29.  In accordance with the Transition Statute, the PDVSA Ad-Hoc Board appointed new boards of PDVH, PDVSA Petróleo, and PDVSA's other wholly-owned subsidiaries.  Decree of Juan Guaidó (Apr. 10, 2019), Pls. Ex. 7.  Undisputed that, at the time, the referenced individuals had been appointed by

the Maduro regime as directors and/or executives of PDVSA, PDVSA Petróleo, and PDVH, with

authority limited by Venezuelan public law and the Venezuelan Constitution.

109.    At the time of the Exchange Offer, España was PDVSA's Vice President of Finance

in addition to serving as a member of the PDVSA Board.  Ex. 1 at 123–24; Ex. 2 at HL_002794 ;

Ex. 3 at ASH_00009039; Ex. 6 at HL_019593.

**Plaintiffs' Response 109.**    Undisputed.

110.    Prior to executing agreements related to the Exchange Offer, España had signed a

$193,959,763 6.5% Senior Guaranteed Note Agreement Among PDVSA, PDVSA Petróleo, and

GE Capital EFS Financing, Inc., on behalf of PDVSA and PDVSA Petróleo.  Ex. 220 at 154.

**Plaintiffs' Response 110.**    Undisputed.

111.    At the time of the Exchange Offer, Luongo was the President of PDVH and the

PDVSA Vice President of Refining, Trade and Supply.  Ex. 1 at 123–24; Ex. 2 at HL_002794; Ex.

3 at ASH_00009039.

**Plaintiffs' Response 111.**    Undisputed.

112.    Luongo joined the board of directors of CITGO Petroleum in 2004.  Ex. 205 at 60.

**Plaintiffs' Response 112.**    Undisputed that Mr. Luongo joined the board of CITGO

Petroleum in 2004, but, for full factual context, he no longer serves on the board of CITGO

Petroleum.  *Board of Directors*, CITGO, Bliss Opp. Decl. Ex. 5.

**E.    The Terms of the Exchange Offer.**

113.    On September 17, 2016, PDVSA announced the Exchange Offer, by which PDVSA

offered to exchange 2017 Notes for 2020 Notes, in an offering circular filed with the U.S.

Securities & Exchange Commission.  Ex. 146 at 1.

**Plaintiffs' Response 113.**    The announcement was dated September 16, 2016.  Defs.

Ex. 146 at 1.  Otherwise undisputed.

114.     As with the 2017 Notes, the 2020 Notes were to be issued by PDVSA and guaranteed by PDVSA Petróleo.  Ex. 1 at 14.

**Plaintiffs' Response 114.**    Undisputed.

115.     The 2020 Notes were secured by a pledge of 50.1% of the equity in CITGO Holding, pledged by CITGO Holding's parent and PDVSA's subsidiary, PDVH.  *Id.* at 141.

**Plaintiffs' Response 115.**    The 2020 Notes were purportedly secured by a 50.1% share of CITGO Holding, but the Pledge Agreement providing for such security is invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

116.     ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

█████████████

**Plaintiffs' Response 116.**    Undisputed

117.     Further, noteholders who tendered on or prior to the early tender deadline of September 29, 2016, received $1,000 of 2020 Notes for every $1,000 of 2017 Notes tendered, compared to noteholders who tendered 2017 Notes after the early tender deadline but before the Exchange Offer expired, who received $950 of 2020 Notes for every $1,000 of 2020 Notes tendered.  Ex. 1 at 11.

**Plaintiffs' Response 117.**     To clarify, the above reflects the initial terms of the Exchange.  Under the terms of the amended Exchange Offer, for each U.S. $1,000 in outstanding principal amount of 2017 Notes tendered, PDVSA delivered between U.S. $1,120 and U.S.

$1,170 of 2020 Notes depending on the due date of the tendered notes and the timing of the

tender.  Pls. Ex. 9 at 2.

118.    Last, under the initial terms of the Exchange Offer, holders of the 2017 Notes had

until October 14, 2016 to tender.  *Id.* at 10.  On October 12, 2016, PDVSA extended the tender

offer deadline until October 17, 2016.  Ex. 147.  And on October 17, 2016, PDVSA further

extended the tender offer deadline until October 21, 2016.  Ex. 148.

> **Plaintiffs' Response 118.**    Undisputed.

119.    PDVSA was not obligated to close the Exchange Offer unless holders of at least

50% of the 2017 Notes tendered their notes.  Ex. 1 at 13.

> **Plaintiffs' Response 119.**    Undisputed.

> **F.      The Purpose of the Exchange Offer, and Its Benefit to the PDVSA Parties.**

120.    PDVSA stated in the Offering Circular that "[t]he purpose of the Exchange Offers

[was] to extend the maturities of and refinance the Existing Notes" and "to rearrange [its] debt

profile."  Ex. 1 at 7.

> **Plaintiffs' Response 120.**    Undisputed that this purpose was stated in the Offering
>
> Circular.  However, in reality, the Exchange Offer only allowed PDVSA to avoid paying U.S.
>
> $2.982 billion in interest and principal through November 2017 on 2017 Notes but committed
>
> PDVSA to paying 40% *more* (U.S. $4.163 billion**)** in interest and principal on the 2020 Notes
>
> through October 2020.  Hinman Report at ¶ 77.  ██████████████████████████
>
> ████████████████████████████████████████████████████
>
> ████████  Defs. Ex. 17 at 168:10-11.

121.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████



Ex. 283 at HL_023889; Ex. 282 at HL_023884.

**Plaintiffs' Response 121.**

122.

Ex. 17 at 167:5–168:14.

**Plaintiffs' Response 122.**   Undisputed.

123.    Market analysts stated that the transaction would benefit PDVSA.  Ex. 102 at 1; Ex.

291 at BLA_00004826; Ex. 303 at ASH_00001323; Ex. 304 at BLA_00001571; Ex. 127 at 2.

**Plaintiffs' Response 123.**   Disputed that market analysts stated that the transaction

would benefit PDVSA.  As detailed by David Hinman, the transaction was unfavorable to

PDVSA compared to other sovereign debt exchanges, and analysts in fact opined that the

transaction did not benefit PDVSA but only increased PDVSA's risk of default in the near

future.  Hinman Report at ¶¶ 77-82.  Regarding each of the listed documents Defendants specifically cite in support of this purported statement of fact:

Disputed that Defendants' Ex. 102 states that the transaction would benefit PDVSA.  The analyst report makes no such statement.  Rather the report examines "an extreme scenario" of a 100% participation in the swap (an event that did not actually occur), and the report actually acknowledges that "the proposed transaction will not solve PDVSA's (or Venezuela's) dire financial situation," Defs. Ex. 102 at 2.  Additionally, the report notes that "beyond 2018, the net effect of the swap is negative as it increases the debt service."  *Id*. at 5.

Disputed that Defendants' Ex. 291 states that the transaction would benefit PDVSA.  The analyst report makes no such statement.  The analyst report acknowledges that "a higher exchange ratio would increase PDVSA's debt burden…" and that the transaction would not "completely push off the table the risk of a credit event in 2017."  Defs.  Ex. 291 at BLA_00004826.

Disputed that Defendants' Ex. 303 states that the transaction would benefit PDVSA.  The analyst report makes no such statement.  The analyst report actually states that the transaction would only provide PDVSA "some temporary breathing room," that would create savings for "just 3 months" and that the "swap has not solved the debt service problem."  Defs. Ex. 303 at ASH_00001323-1324.

Disputed that Defendants' Ex. 304 states that the transaction would benefit PDVSA.  The analyst report makes no such statement.  The report states that the "temporary payment relief does not address liquidity concerns for 2017," Defs. Ex. 304 at BLA_00001570, that PDVSA "will see its external bond service increasing by $1.13bn per year from 2018 to 2020," *id.* at BLA_00001571, and "at best, the bond exchange increases the company's capacity to comply

42

with its April 2017 payments, but at the cost of facing additional payments already in 4Q17.  The crucial payment period has just been postponed by a few months".  *Id.*

Disputed that Defendants' Ex. 127 states that the transaction would benefit PDVSA.  The analyst report makes no such statement.  The report, which was released prior to any terms of the transaction being public, notes that the transaction could be a "costly move for PDVSA in the longer term."  Defs. Ex. 127 at 2.

124.    On September 15, 2016, Barclays emailed an analyst report to Ashmore, which stated that "a 100% participation in the swap would generate net savings between 2016 and 2017 close to USD 6.0bn."  Ex. 102 at 1.

**Plaintiffs' Response 124.**    Undisputed that the analyst report contains the quoted language.  However, disputed to the extent Defendants seek to imply that the report's analysis of the impact of 100% participation is relevant or applies here, where it is undisputed that the exchange did not have even close to 100% participation.  Further, the report states that "the proposed transaction will not solve PDVSA's (or Venezuela's) dire financial situation," (Defs. Ex. 102 at 2), and that "beyond 2018, the net effect of the swap is negative as it increases the debt service."  Defs. Ex. 102 at 5.

125.    On September 27, 2016, J.P. Morgan emailed an analyst report to BlackRock, among other investors, that stated: "A higher exchange ratio would increase PDVSA's debt burden, but even with maximum participation of 75%, additional debt incurred would amount to $1.1bn, versus cash savings of $3.55bn from now to end-2017. We estimate that liquidity needs from now to end-2017 are reduced by roughly $470mn for every 10%-pt increase in participation." Defs. Ex. 291 at BLA_00004826.

**Plaintiffs' Response 125.**   Undisputed that the analyst report contains the quoted language regarding a higher exchange ratio increasing PDVSA's debt burden, and that the report includes estimates for financials only through the end of 2017.  However, the analyst report also notes that while the transaction may lower default risk near-term, "the PDVSA swap itself is unlikely to completely push off the table the risk of a credit event in 2017."  Defs. Ex. 291 at BLA_00004826.

126.   On September 19, 2016, Moody's published an Issuer Comment that described the Exchange Offer as a "credit positive event because it would postpone payment of debt maturing in 2016 and 2017, reducing the risk of an immediate payment default."  Moody's speculated that the Exchange Offer "could be characterized as a distressed exchange" because noteholders tendering 2017 Notes would receive "security" in exchange for a diminished return on their investment.  Ex. 375.

**Plaintiffs' Response 126.**   Undisputed that the analyst report contains the quoted language.  Disputed that Moody's speculated that the transaction would be characterized as distressed because investors would receive "security."  Rather, the report states that it could be "characterized as a distressed exchange and thus a default…because PDVSA has limited access to external financing and the exchange could help the company avoid a potential payment default."  Defs. Ex. 375 at 1.  Additionally, the report notes that despite the exchange, "PDVSA will continue to have weak liquidity going forward," and that PDVSA's "probability of default or further debt restructuring in the next twelve to eighteen months" is exacerbated.  *Id.* at 1-2.

127.   On October 24, 2016, Patrick Haller at Ashmore received an analyst report from Bank of America, which stated the Exchange Offer would give PDVSA "some breathing room"

and the "debt service savings [are] equivalent to about 3 months of Venezuela's external gap."  Ex. 303 at ASH_00001323.

      **Plaintiffs' Response 127.**   Disputed that the analyst report states "some breathing room" at ASH_00001323.  Rather the report states "some **temporary** breathing room."  Defs. Ex. 303 at ASH_00001323 (emphasis added).  Undisputed that the remaining quoted language appears in the analyst report at ASH_00001323.  However, the report later characterizes this savings as "Venezuela's external gap savings is **just** 3 months."  Defs. Ex. 303 at ASH_00001324 (emphasis added).  The report also states that the "Swap has not solved the debt service problem."  *Id.*

      128.    On October 25, 2016, Goldman Sachs circulated an analyst report to BlackRock, among other investors, that described the Exchange Offer as "mildly positive news for PDVSA credit" as it "reduce[d] short-term payment risk."  Ex. 304 at BLA_00001571.

      **Plaintiffs' Response 128.**   Undisputed that the quoted language appears in the report. However, the report more fully states that while "[the swap] reduces short term payment risk…it does not necessarily improve the profile of future payments."  Defs. Ex. 304 at BLA_00001571. The report states that the "temporary payment relief does not address liquidity concerns for 2017," *id.* at BLA_00001570, that PDVSA "will see its external bond service increasing by $1.13bn per year from 2018 to 2020," *id.* at BLA_00001571, and "at best, the bond exchange increases the company's capacity to comply with its April 2017 payments, but at the cost of facing additional payments already in 4Q17.  The crucial payment period has just been postponed by a few months."  *Id.*

      129.    Both Alejandro Grisanti—a Director of Ecoanalítica, an economic and financial consulting firm, and, subsequently, a member of the PDVSA Ad Hoc Board from April 9, 2019 to

May 15, 2020—and Luisa Palacios—the Chair of the CITGO Petroleum Board of Directors from February 13, 2019, to the present—expressed support for the Exchange without any suggestion it was illegal or invalid.  Ex. 22 at 1; Ex. 46; Ex. 101 at 2; Ex. 127 at 2; Ex. 135.

      **Plaintiffs' Response 129.**   Undisputed that the statements quoted by Defendants in ¶¶ 130 and 131 were made.  However, neither statement actually expresses being for or against the Exchange Offer either way.  Also disputed to the extent that this assertion is intended to suggest that Grisanti or Palacios should have been expected to comment on the legality of the Exchange Offer (which they did not), as any comments were made almost three years before Grisanti and Palacios became members of the boards of PDVSA and CITGO, respectively.

      130.    On September 1, 2016, Grisanti told a reporter for the Energy Economist that, "[i]f PDVSA is able to defer payments, it may have the advantage of actually reducing risk."  Ex. 22 at 1; Ex. 127 at 2.

      **Plaintiffs' Response 130.**   Undisputed, except to the extent that this statement is intended to suggest that Grisanti should have been expected to comment substantively on the Exchange, as this comment was made almost three years before Grisanti became a member of PDVSA's board, while he was an economist at an asset manager.  Defs. Ex. 22 at 1.

      131.    On September 14, 2016, Palacios told an audience at Columbia University that "Venezuela has never defaulted and neither has any NOC, but if the swap does not go through— maybe we will see the first of both."  Ex. 101 at 2; Ex. 46.

      **Plaintiffs' Response 131.**   Undisputed, except to the extent that this statement is intended to suggest that Palacios favored the Exchange Offer or should have been expected to comment substantively on the Exchange, as this comment was made almost three years before Palacios became a member of CITGO's board.

G.      The PDVSA Parties Used New York-
        Based Legal and Financial Advisors.

132.     ███████████████████████████████████████████

█████████████████████████████████████████████████████

**Plaintiffs' Response 132.**   Undisputed.

133.     Credit Suisse is a U.S.-registered brokerage firm and investment adviser firm

registered in Delaware, with its principal place of business in New York, New York.  Defs. Ex.

208 at 1–2, 5; Defs. Ex. 107 at 1.

**Plaintiffs' Response 133.**   Undisputed.

134.     ████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████

**Plaintiffs' Response 134.**   Undisputed.

135.     ████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████

**Plaintiffs' Response 135.**   Undisputed.

136.     ████████████████████████████████████████████

█████████████████████████████████████████████████████

███

**Plaintiffs' Response 136.**   Undisputed.

137.     █████████████████████████████████████████████

███████████████████████████████  Ex. 382 at HL_000004.

47

**Plaintiffs' Response 137.**   Disputed.  The issuer and guarantor of the 2020 Notes are located in Venezuela (¶¶ 4 & 14) and Venezuelan counsel was engaged to review the Governing Documents (Defs. Ex. 32), thus "all review" of the documents did not occur in New York, York.

138. ███████████████████████████████████████████

███████████████████████████████████████

**Plaintiffs' Response 138.**   ████████████████████████

████████

139. █████████████████████████████████

██████████████████████

**Plaintiffs' Response 139.**   Undisputed.

140. ████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████

**Plaintiffs' Response 140.**   ████████████████████████

██████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████



141.    Credit Suisse was represented by White & Case LLP, a law firm registered and

headquartered in New York, New York. ███████████████; Ex. 103; Ex. 382 at

HL_000007.

**Plaintiffs' Response 141.**    Undisputed.

142.    Four of five lead partners from White & Case LLP worked in the firm's New York

office.  Ex. 229 at 1; Ex. 230 at 1 Ex. 231 at 1; Ex. 232 at 1; Ex. 233 at 1.

**Plaintiffs' Response 142.**    Combined, these exhibits show three partners at White &

Case that currently work in the firm's New York office.  *See* Defs. Ex. 229 at 1; Defs. Ex. 230 at

1; Defs. Ex. 231 at 1; Defs. Ex. 232 at 1; Defs. Ex. 233 at 1.

143.    PDVSA and PDVSA Petróleo engaged the law firms of Hogan Lovells US LLP and

Hogan Lovells S.C. as their legal advisors. ███████████████ Ex. 30 at 1; Ex. 31 at 1; Ex.

382 at HL_000006.

**Plaintiffs' Response 143.**    Undisputed.

144.   Hogan Lovells US LLP has an office in New York, New York.  ███████████

███   Ex. 382 at HL_000006.

**Plaintiffs' Response 144.**   Undisputed.

145.   Four of seven partners from Hogan Lovells LLP worked in the New York office.

Ex. 142 at 2; Ex. 143 at 2; Ex. 144 at 2; Ex. 145 at 2; Ex. 151 at 2; Ex. 152 at 2; Ex. 153 at 2;

Ex. 154 at 2; Ex. 234 at 1; ████████████████████ Ex. 247 at 1; Ex. 382 at HL_000006.

Hogan Lovells US LLP continues to represent PDVSA in other litigation to this day.  Ex. 250 at

PDVSA-00029517; Notice of Appearance, *Lovati* v. *Petróleos de Venezuela, S.A.*, 1:19-cv-04799

(ALC) (Oct. 23, 2019) (No. 22); Notice of Appearance, *Dresser-Rand Company* v. *Petróleos de*

*Venezuela, S.A.*, 1:19-cv-002689-LLS (May 8, 2019) (No. 16); Defs.' Reply Mem. Supp. Mot. for

Fed. R. Civ. P. 56(d) Relief, *Red Tree Investments, LLC* v. . *Petróleos de Venezuela, S.A.*, 1:19-cv-

002519 (Feb. 24, 2020) (No. 70).

**Plaintiffs' Response 145.**   Undisputed.

146.   PDVSA engaged **D.F. King**, headquartered in New York, New York, as the

exchange agent and information agent for the Exchange Offer.  Ex. 1 at 45; ██████████

██████████

**Plaintiffs' Response 146.**   Undisputed.

147.   ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

**Plaintiffs' Response 147.**   Undisputed.

148. ███████████████████████████████████████████

███

**Plaintiffs' Response 148.**   Undisputed.

149. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

**Plaintiffs' Response 149.**   Undisputed.

150. The signing and closing of the Governing Documents occurred in New York, New York. ███████████████ ¶ 15(f); Moreyra Decl. Ex. 18 at TRU_00005375–76.

**Plaintiffs' Response 150.**   Signature pages were exchanged among entities located in New York, however, as the issuer and guarantor of the transaction were located in Venezuela, it is misleading to say that the signing of the Governing Documents took place in New York.

151. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

**Plaintiffs' Response 151.** ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

152.   ███████████████████████████████

████████████████████████████████████████

███████████████████████████████

████████████

**Plaintiffs' Response 152.**   Undisputed.

153.   ███████████████████████████████

██████████████████████████████████

█████████

**Plaintiffs' Response 153.**   ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

154.   █████████████████████████████

████████████████████████████████████████

████████████████████

**Plaintiffs' Response 154.**   ████████████████████

██████████████

155.   █████████████████████████████

████████████████████████

**Plaintiffs' Response 155.**   Undisputed.

156.   ███████████████████████████████

███ These New York-based holders include:

- Allianz Investment Management LLC, Ex. 354;

52

- Alliance Investment Banking Group, Ex. 357;

- Aurelius Capital Management, LP, Ex. 352;

- Fintech Advisory, Ex. 353;

- Goldman Sachs Asset Management, Ex. 318 at 1;

- J.P. Morgan Securities LLC, Ex. 316 at 4;

- Marathon Asset Management, Ex. 356;

- Stone Harbor Investment Partners, Ex. 317 at 1;

- Van Eck Associates, Ex. 311 at 1, and

- York Capital Management Global Advisors, Ex. 314 at 1.

**Plaintiffs' Response 156.**        Undisputed**.**

> **H.    The Other Parties to the Exchange Offer Also
> Engaged New York-Based Advisors.**

157.    The Trustee was represented by Kelley Drye & Warren LLP, a law firm registered
and headquartered in New York.  Moreyra Decl. ¶ 8; Ex. 382 at HL_000008; Ex. 104 at 1.

**Plaintiffs' Response 157.**    Undisputed.

158.    Pamela Bruzzese-Szczygiel, the partner from Kelley Drye & Warren LLP, worked
out of its New York office.  Ex. 382 at HL_000008; Ex. 236 at 1, 3.

**Plaintiffs' Response 158.**    Undisputed.

159.    The Collateral Agent was represented by Seward & Kissel LLP, a law firm
registered in New York.  Its principal office is located in New York, New York.  Reed Decl. ¶¶ 3,
11; Ex. 382 at HL_000010; Ex. 106 at 1.

**Plaintiffs' Response 159.**    Undisputed.

160.    The partners from Seward & Kissel LLP worked out of its New York office.
Ex. 382 at HL_000010; Ex. 248 at 1; Ex. 249 at 1.

**Plaintiffs' Response 160.**   Undisputed.

161.    Law Debenture Trust Company of New York was represented by Dentons US LLP, a law firm registered in New York.  Dentons' principal executive office is located in New York, New York.  Ex. 382 at HL_000009; Ex. 245 at 1; Ex. 355 at 1.

**Plaintiffs' Response 161.**   Undisputed.

162.    The partners and associates from Dentons worked out of its New York office. Ex. 228 at 1; Ex. 227 at 1; Ex. 235 at 1.

**Plaintiffs' Response 162.**   Undisputed.

163.    ███████████████████████████████████████████

██████████████████████████████████████████████ Ex. 255 at HL_007889–90.

**Plaintiffs' Response 163.**   Undisputed.

**I.**      **The Results of the Exchange Offer.**

164.    The Exchange Offer expired on October 21, 2016, and PDVSA announced the results of the Exchange Offer on October 24, 2016.  The Exchange Offer was accepted by the holders of $2,799,272,267 of the 2017 Notes, representing approximately 39.43% of the aggregate principal amount outstanding under the 2017 Notes.  PDVSA waived all conditions precedent to the Exchange Offer, including the 50% participation rate.  Ex. 324 at DF-KING00003119; Ex. 149 at 1; Ex. 150 at 1.

**Plaintiffs' Response 164.**   Undisputed, except to the extent that this is intended to suggest that the 2020 Notes were effective and enforceable**.**

165.    On October 28, 2016, PDVSA issued 2020 Notes with an aggregate principal amount of approximately $3,367,529,000.  Ex. 150 at 1; Ex. 149 at 1.

**Plaintiffs' Response 165.**   Undisputed, except to the extent that this is intended to suggest that the 2020 Notes were valid, effective, and enforceable.

166.   ███████████████████████████████████████████████████████████

███ ; Xu Decl. ¶ 26.

**Plaintiffs' Response 166.**   Undisputed.

**IV.   The Terms of the 2020 Notes, the Indenture, and the Pledge Agreement.**

167.   On October 27, 2016, the Indenture was executed among (i) PDVSA, as issuer, (ii) PDVSA Petróleo, as Guarantor, (iii) MUFG Union Bank, N.A., as Trustee, (iv) GLAS Americas LLC, as Collateral Agent, (v) Law Debenture Trust Company of New York, as Registrar, Transfer Agent, and Principal Paying Agent, and (vi) Banque Internationale à Luxembourg, Société Anonyme as Luxembourg Paying Agent.  *See generally* Ex. 2.

**Plaintiffs' Response 167.**   Although there is an Indenture dated October 27, 2016, there is a later-executed Indenture dated October 28, 2016 that supersedes and controls.  Pls. Ex. 10. Otherwise undisputed, except to the extent that this is intended to suggest that the Indenture was valid, effective, and enforceable.  Brewer Report at ¶ 45.

168.   On October 28, 2016, the Pledge Agreement was executed among (i) PDVH, as Pledgor, (ii) PDVSA, as Issuer, (iii) PDVSA Petróleo, as Guarantor, (iv) GLAS Americas LLC, as Collateral Agent, and (v) MUFG Union Bank, N.A., as Trustee.  *See generally* Ex. 3.

**Plaintiffs' Response 168.**   Undisputed, except to the extent that this is intended to suggest that the Pledge Agreement was valid, effective, and enforceable.  Brewer Report at ¶ 45.

169.   On October 28, 2016, the Global Notes were executed among España, Vice President of Finance, on behalf of PDVSA, as Issuer, and Fernando Moreyra, Vice President, on behalf of MUFG Union Bank, N.A., as Trustee.  Ex. 6 at HL_019593–94.

**Plaintiffs' Response 169.**   Undisputed, except to the extent that this is intended to suggest that the Global Notes were valid, effective, and enforceable.  Brewer Report at ¶ 45.

170.   Two of the Global Notes were issued under Rule 144A, for sale to qualified institutional buyers within the United States, and six were issued under Regulation S, for sale to non-U.S. Persons outside the United States.  Ex. 6 at HL_019598.

**Plaintiffs' Response 170.**   Undisputed, except to the extent that this is intended to suggest that the Global Notes were valid, effective, and enforceable.  Brewer Report at ¶ 45.

     A.     **Payment of Principal and Interest.**

171.   The principal payment dates under the Indenture and Global Notes were October 27 of each year, from October 27, 2017, until October 27, 2020.  Ex. 6 at HL_019592; Ex. 2 § 2.08(b).

**Plaintiffs' Response 171.**   Undisputed, except to the extent that this is intended to suggest that the Indenture and Global Notes were valid, effective, and enforceable.  Brewer Report at ¶ 45.

172.   The interest payment dates under the Indenture and Global Notes were April 27 and October 27 of each year, from April 27, 2017, until October 27, 2020.  *Id.*

**Plaintiffs' Response 172.**   Undisputed, except to the extent that this is intended to suggest that the Indenture and Global Notes were valid, effective, and enforceable.  Brewer Report at ¶ 45.

173.   All principal and interest payments on the 2020 Notes were required by the Indenture to be made to the paying agent in New York, New York.  Ex. 2 § 2.08(a).

**Plaintiffs' Response 173.**   Undisputed, except to the extent that this is intended to suggest that the Indenture was valid, effective, and enforceable.  Brewer Report at ¶ 45.

     B.     **The Collateral: a Security Interest in 50.1% of CITGO Holding.**

174.    The 2020 Notes were to be secured by the Collateral.  Ex. 2 at § 1.01; Ex. 3 at § 2.01.

**Plaintiffs' Response 174.**    Undisputed that the 2020 Notes were purportedly secured by the Collateral, except to the extent that this is intended to suggest that the 2020 Notes were valid, effective, and enforceable.  Brewer Report at ¶ 45.

175.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

**Plaintiffs' Response 175.**    ████████████████████████████

████████████████████████████████████████

176.    The Collateral was and is held as a physical stock certificate by the Collateral Agent in a vault located in New York.  Reed Decl. ¶¶ 5, 10.

**Plaintiffs' Response 176.**    Undisputed.

177.    CITGO Petroleum has a New York presence, including a terminal in Albany.

████████████████; Ex. 223 at 59.

**Plaintiffs' Response 177.**    Undisputed that CITGO Petroleum has a terminal in Albany, New York, but CITGO Petroleum is incorporated in Delaware and has its principal place of business in Houston, Texas.  See ¶ 23.

**C.    The New York Choice-of-Law Clauses.**

178.    The Offering Circular for the 2020 Notes stated that the Exchange Offer "will be governed by and construed in accordance with the laws of the State of New York."  Ex. 1 at 13, 17, 42.

**Plaintiffs' Response 178.** Undisputed, except to the extent that this is intended to suggest that the 2020 Notes or their Governing Documents were valid, effective, and enforceable. Brewer Report at ¶ 45.

179. The Offering Circular further stated that "[t]he Indenture will provide that the [2020] Notes will be governed by, and construed in accordance with, the laws of the State of New York" and "[t]he Security Documents will also be governed by, and construed in accordance with, the laws of the State of New York." Ex. 1 at 156.

**Plaintiffs' Response 179.** Undisputed, except to the extent that this is intended to suggest that the Indenture or the Pledge Agreement were valid, effective, and enforceable. Brewer Report at ¶ 45.

180. Under the heading, "<u>GOVERNING LAW</u>," the Face of the Global Note states:

> THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS NOTE AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS NOTE (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

Ex. 6 at § 18 (capitalization in original).

**Plaintiffs' Response 180.** Undisputed, except to the extent that this is intended to suggest that the Global Note was valid, effective, and enforceable. Brewer Report at ¶ 45.

181. Under the heading "*Governing Law*," the Indenture states:

> THIS INDENTURE AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS INDENTURE AND THE NOTES AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS INDENTURE AND THE NOTES (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

Ex. 2 at § 10.03 (capitalization in original).

      **Plaintiffs' Response 181.**    Undisputed, except to the extent that this is intended to

suggest that the Indenture was valid, effective, and enforceable.  Brewer Report at ¶ 45.

      182.    Under the heading, "*GOVERNING LAW*," the Pledge Agreement states:

> THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS AGREEMENT AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS AGREEMENT (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

Ex. 3 at § 7.13(a) (capitalization in original).

      **Plaintiffs' Response 182.**    Undisputed, except to the extent that this is intended to

suggest that the Pledge Agreement was valid, effective, and enforceable.  Brewer Report at ¶ 45.

      **D.**    **The New York Forum-Selection Clause.**

      183.    Under the heading, "*Submission to Jurisdiction; Waivers*," the Indenture states:

> Each of the parties hereto has consented to the non-exclusive jurisdiction of any court of the State of New York or any United States federal court sitting in New York County, New York City, New York, United States, and any appellate court from any thereof, and has waived any immunity from the jurisdiction of such courts over any suit, action or proceeding that may be brought in connection with this Indenture and the Notes. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court, any claim that any such proceeding brought in such a court has been brought in an inconvenient forum and any right of objection based on place of residence or domicile.

Ex. 2 at § 10.12(a).

      **Plaintiffs' Response 183.**    Undisputed, except to the extent that this is intended to

suggest that the Indenture was valid, effective, and enforceable.  Brewer Report at ¶ 45.

184.    Under the heading, "*Submission to Jurisdiction; Waivers*," the Pledge Agreement

states:

> Each of the parties hereto has consented to the non-exclusive jurisdiction of any
> court of the State of New York or any United States federal court sitting in the
> Borough of Manhattan, New York City, New York, United States, and any
> appellate court from any thereof, and has waived any immunity from the
> jurisdiction of such courts over any suit, action or proceeding that may be brought
> in connection with this Indenture and the Notes. Each of the parties hereto hereby
> irrevocably waives, to the fullest extent permitted by Applicable Law, any
> objection that it may now or hereafter have to the laying of the venue of any such
> proceeding brought in such a court, any claim that any such proceeding brought in
> such a court has been brought in an inconvenient forum and any right of objection
> based on place of residence or domicile.

Ex. 3 at § 7.13(b)(i).

**Plaintiffs' Response 184.**    Undisputed, except to the extent that this is intended to

suggest that the Pledge Agreement was valid, effective, and enforceable.  Brewer Report at ¶ 45.

185.    The parties to the Indenture and to the Pledge Agreement further consented to the

use of a service agent, Corporation Service Company, in New York, New York and agreed that

each party must maintain a service agent in New York, New York.  Ex. 2 at § 10.12(b); Ex. 3 at

§ 7.13(b)(ii).

**Plaintiffs' Response 185.**    Undisputed, except to the extent that this is intended to

suggest that the Indenture and Pledge Agreement were valid, effective, and enforceable.  Brewer

Report at ¶ 45.

> **E.    The Location of the Parties to the 2020 Notes,
> the Indenture, and the Pledge Agreement.**

186.    The Trustee employee principally responsible for the issuance and administration of

the 2020 Notes was and is located in the Trustee's New York office.  Moreyra Decl. ¶ 3.

**Plaintiffs' Response 186.**    Undisputed, except to the extent this is intended to suggest

that the 2020 Notes were valid, effective, and enforceable.  Brewer Report at ¶ 45.

187.    The Collateral Agent personnel principally responsible for maintenance of the Collateral in accordance with, and subject to, the Indenture and Pledge Agreement, at the time of the issuance of the 2020 Notes would work out of the Collateral Agent's New York office.  Reed Decl. ¶¶ 6, 9.

**Plaintiffs' Response 187.**    Undisputed, except to the extent that this is intended to suggest that the Indenture and Pledge Agreement were valid, effective, and enforceable.  Brewer Report at ¶ 45.

188.    The **Law Debenture Trust Company of New York**, the paying agent, transfer agent, and registrar under the Indenture, is a limited purpose trust company chartered by the New York State Department of Financial Services, headquartered in New York, New York.  Ex. 382 at HL_000009; Ex. 239; Ex. 2 at cover page, § 8.10(c).

**Plaintiffs' Response 188.**    Undisputed, except to the extent that this is intended to suggest that the Indenture was valid, effective, and enforceable.  Brewer Report at ¶ 45.

189.    The 2020 Global Notes were deposited in New York with the Law Debenture Trust Company of New York, as custodian for **DTC**, the depository under the Indenture.  Moreyra Decl. ¶ 14; Ex. 1 at 167; Ex. 2 at § 2.03(a); Ex. 321 at TRU_00005371.

**Plaintiffs' Response 189.**    Undisputed, except to the extent that this is intended to suggest that the 2020 Global Notes and the Indenture were valid, effective, and enforceable.  Brewer Report at ¶ 45.

190.    On October 28, 2016, Frank Godino, Vice President of the Law Debenture Trust Company of New York, confirmed receipt of the eight 2020 Global Notes in New York.  Ex. 374 at TRU_00010549.

**Plaintiffs' Response 190.**   Undisputed, except to the extent that this is intended to suggest that the 2020 Global Notes were valid, effective, and enforceable.   Brewer Report at ¶ 45.

191.   DTC is incorporated in New York and has its principal place of business in New York, New York.   Ex. 265.

**Plaintiffs' Response 191.**   Undisputed.

192.   Beneficial holders of 2017 Notes who accepted the Exchange Offer were required to tender their 2017 Notes through DTC, located in New York (or else one of two European clearing banks).   Ex. 1 at 11–12, 36–37.

**Plaintiffs' Response 192.**   Undisputed.

193.   According to DTC, "the relevant jurisdiction" for all material aspects of DTC's activities, including "holding securities in physical form . . . or holding securities in dematerialized forms" and "transfers and pledges of securities, and the settlement of transactions for Participants by book-entry," are the United States and New York.   Ex. 241 at 15–16.

**Plaintiffs' Response 193.**   Undisputed.

194.   The 2020 Global Notes were registered in the name of **Cede & Co.**, which is a general partnership organized under New York law with a principal place of business in New York, New York.   Ex. 238 at 2; Ex. 1 at 167; Ex. 2 at § 2.03(a).

**Plaintiffs' Response 194.**   Undisputed, except to the extent that this is intended to suggest that the 2020 Global Notes were valid, effective, and enforceable.   Brewer Report at ¶ 45.

V.      **The PDVSA Parties' Representations**
        **Regarding Legality and Their Authority.**

195.    In the Indenture, PDVSA and PDVSA Petróleo each represented that the 2020

Notes and the Indenture were duly authorized.  Ex. 2 at 1.

**Plaintiffs' Response 195.**   Undisputed, but the capacity of PDVSA and PDVSA

Petróleo (and their officers and directors) to contract is limited by Venezuelan public law and the

Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

196.    PDVSA represented that it had had "duly authorized the exchange of [2017] Notes

for [2020] Notes," and "duly authorized the execution and delivery of this Indenture."  Ex. 2 at 1.

**Plaintiffs' Response 196.**   Undisputed, but the capacity of PDVSA and PDVSA

Petróleo (and their officers and directors) to contract is limited by Venezuelan public law and the

Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

197.    PDVSA Petróleo represented that it had "duly authorized the execution and delivery

of this Indenture as guarantor of the [2020] Notes."  *Id.*

**Plaintiffs' Response 197.**   Undisputed, but the capacity of PDVSA Petróleo (and its

officers and directors) to contract is limited by Venezuelan public law and the Venezuelan

Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

198.    PDVSA and PDVSA Petróleo each also represented that the 2020 Notes and the

Indenture were valid.  *Id.*

**Plaintiffs' Response 198.**   Undisputed, but the capacity of PDVSA and PDVSA

Petróleo (and their officers and directors) to contract is limited by Venezuelan public law and the

Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

199.    PDVSA represented that "all things necessary to make this Indenture a valid

agreement" of PDVSA had "been done" and that PDVSA had "done all things necessary to make

the [2020] Notes" its "valid obligations."  *Id.*

  **Plaintiffs' Response 199.**    Undisputed, but the capacity of PDVSA (and its officers and

directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.

Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

200.    PDVSA Petróleo represented that "all things necessary to make this Indenture a

valid agreement" of PDVSA Petróleo, S.A. had "been done."  *Id.*

  **Plaintiffs' Response 200.**    Undisputed, but the capacity of PDVSA Petróleo (and its

officers and directors) to contract is limited by Venezuelan public law and the Venezuelan

Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

201.    In the Pledge Agreement, PDVH represented to the Collateral Agent on behalf of

the Secured Parties that PDVH had "full power and authority, and all governmental licenses,

authorizations, consents and approvals, to execute and deliver" the Pledge Agreement "and to

perform its obligations thereunder."  Ex. 3 at §§ 1.01, 3.01(a).

  **Plaintiffs' Response 201.**    Undisputed, except to the extent that this statement is

intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report

at ¶ 45.

202.    PDVH also represented that the "execution and delivery by [PDVH] of the [Pledge

Agreement] . . . and its performance thereunder" had "been duly authorized by all necessary action

by [PDVH]"; "require[d] no additional action by or in respect of, or filing with, any governmental

authority, except such as have been taken or made on or before the date hereof and remain in full

force and effect;" and that it would "not contravene any Applicable Law," which was defined to include Venezuelan law.  Ex. 2 at § 1.01(a); Ex. 3 §§ 1.01(a), 3.01(b)(i)–(iii).

    **Plaintiffs' Response 202.**    Undisputed, except to the extent that this statement is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶ 45.

    203.    Under the heading, "REPRESENTATIONS," the Pledge Agreement states:

> The Pledgor hereby represents to the Collateral Agent, for the benefit of the Secured Parties, as of the date hereof that: . . . the choice of the laws of the State of New York as the governing law of this Agreement, the Indenture (and any Transaction Document) is a valid choice of law under the laws of Venezuela and any political subdivision thereof, and none of the Issuer, the Guarantor or the Pledgor knows of any reason why the courts of Venezuela would not give effect to such choice of law.

Ex. 3 § 3.01(d).

    **Plaintiffs' Response 203.**    Undisputed, except to the extent that this statement is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶ 45.

    204.    PDVH also represented that the Pledge Agreement had "been duly executed and delivered by it and constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms," except in applicable circumstances.  Ex. 3 at § 3.01(c).

    **Plaintiffs' Response 204.**    Undisputed, except to the extent that this statement is intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report at ¶ 45.

    205.    PDVH also represented that:

> [U]pon the delivery of any certificated securities representing the Pledged Shares and the effective filing of the UCC-1 financing statement in the appropriate filing office in the State of Delaware, United States of America, the security interest in favor of the Collateral Agent in all Collateral . . . will constitute a valid and perfected first-priority security interest and charge in the Collateral securing the

prompt and complete payment, performance and observance of the Secured
Obligations.

Ex. 3 at § 3.01(i).

**Plaintiffs' Response 205.**   Undisputed, except to the extent that this statement is

intended to suggest that the Pledge Agreement is valid, effective or enforceable.  Brewer Report

at ¶ 45.

206.   On October 28, 2016, España executed an Officer's Certificate on behalf of

PDVSA and PDVSA Petróleo certifying that:

- she "kn[e]w of no facts, circumstances or events that are contrary to or inconsistent with
  any of the statements or opinions contained in the [Hogan Lovells] Opinions";

- the "representations, warranties, certifications and statements of fact of the Transaction
  Parties contained in or made pursuant to the Transaction Documents are true and correct
  in all respects"; and,

- the "execution, delivery and performance" of the Governing Documents were "within the
  corporate powers of such Transaction Party and have been duly authorized" and did "not
  violate the Organizational Documents of such Transaction Party."

Ex. 253 at 1–2.

**Plaintiffs' Response 206.**   Undisputed, but the capacity of PDVSA and PDVSA

Petróleo (and their officers and directors) to contract is limited by Venezuelan public law and the

Venezuelan Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

207.   The Trustee and Collateral Agent received the Officer's Certificate.  Moreyra Decl.

¶ 10; Reed Decl. ¶ 7.

**Plaintiffs' Response 207.**   Undisputed, except to the extent this is intended to suggest

that such Officer's Certificates were valid and effective.  Brewer Report at ¶¶ 22-23, 35-37, 126-

29, 139.

208.   On that same date, Edoardo Orsoni, PDVSA's General Counsel, executed an

Incumbency Certificate for PDVSA, certifying that:

> [España, Bolivar, and Negrín] are the duly elected or appointed, qualified and
> acting officer, director or agent of the Company who holds the office or position
> set forth opposite such individual's name, authorized to sign (i) the Indenture,
> dated October 28, 2016 . . . (ii) the Notes, (iii) the CITGO Holding Share Pledge
> Agreement, and (iv) any other certificate or document to be delivered by the
> Company in connection" with the Exchange Offer.

Moreyra Decl. Ex. 13 at PDVSA-00007365.

**Plaintiffs' Response 208.**   Undisputed, but the capacity of PDVSA (and its officers and

directors) to contract is limited by Venezuelan public law and the Venezuelan Constitution.

Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

209.   Also on October 28, 2016, Orsoni executed an Incumbency Certificate for PDVSA

Petróleo, certifying that:  "[España, Bolivar, and Negrín] are the duly elected or appointed,

qualified and acting officer, director or agent of the Guarantor who holds the office or position set

forth opposite such individual's name, authorized to sign (i) the Indenture, dated October 27, 2016

. . . (ii) the CITGO Holding Share Pledge Agreement . . .  and (iii) any other certificate or

document to be delivered by the Guarantor in connection" with the Exchange Offer.  Moreyra

Decl. Ex. 14 at PDVSA-00007366.

**Plaintiffs' Response 209.**   Undisputed, but the capacity of PDVSA Petróleo (and its

officers and directors) to contract is limited by Venezuelan public law and the Venezuelan

Constitution.  Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

210.     The execution version of the Indenture attached as Exhibits C-1 and C-2 included

draft incumbency certificates for PDVSA and PDVSA Petróleo.  Ex. 2 at Ex. C-1, Ex. C-2.

**Plaintiffs' Response 210.**   Undisputed, except to the extent it is intended to suggest that

such Incumbency Certificates were valid and effective.  Brewer Report at ¶¶ 22-23, 35-37, 126-

29, 139.

**VI.     The PDVSA Parties Ratified the Exchange Offer.**

**A.     The PDVSA Parties Accepted the
Benefits of the Exchange Offer.**

211.     On October 28, 2016, PDVSA submitted a Mark Down Request Pursuant to

Exchange Offer to Kristen Driscoll, a vice president at Citibank, N.A., the principal paying agent

on the April 2017 Notes, advising Citibank, N.A., that $942,103,000 of the April 2017 Notes "are

to be cancelled" and requesting that Citibank, N.A. "arrange to mark down the nominal amount

outstanding on the security."  Ex. 309 at HL_011932.

**Plaintiffs' Response 211.**   Undisputed, except to the extent this statement is intended to

suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

212.     Also on October 28, 2016, Hugo Garvett, a Financing Advisor at PDVSA, emailed

Driscoll noting that $1,857,169,267 of the November 2017 Notes had been exchanged and that

only $2,242,830,733.33 of the November 2017 Notes remained outstanding.  Ex. 308 at

HL_009865–66, HL_009871.

**Plaintiffs' Response 212.**   Undisputed, except to the extent this statement is intended to

suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

### B.    PDVSA Paid the First Five Principal and
### Interest Payments Due on the 2020 Notes.

213.    Principal payment on the 2020 Notes was due on October 27 of each year, starting

October 27, 2017 and ending October 27, 2020.  Ex. 2 § 2.08(b); Ex. 6 at HL_019592.

**Plaintiffs' Response 213.**    Undisputed, except to the extent this statement is intended to

suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

214.    PDVSA paid the principal payments that were due on October 27, 2017

($841,900,000), and October 27, 2018 ($841,900,000), for a total of $1,684,000,000 paid in

principal.  PDVSA & PDVSA Petróleo Answer ¶ 158; Ex. 137 at PDVSA-00037002.

**Plaintiffs' Response 214.**    Undisputed, except to the extent this statement is intended to

suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

215.    Interest payments on the 2020 Notes were due on April 27 and October 27 of each

year, starting April 27, 2017 and ending October 27, 2020.  Ex. 2 § 2.08(b); Ex. 6 at HL_019592.

**Plaintiffs' Response 215.**    Undisputed, except to the extent this statement is intended to

suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

216.    PDVSA paid the interest payments that were due on: April 27, 2017

($143,100,000); October 27, 2017 ($143,100,000); April 27, 2018 ($107,300,000); October 27,

2018 ($107,300,000); and April 27, 2019 ($71,600,000), for a total of $573,240,000 paid in

interest.  PDVSA & PDVSA Petróleo Answer ¶ 158.

**Plaintiffs' Response 216.**    Undisputed, except to the extent this statement is intended to

suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.  This

also ignores that the April 27, 2019 interest payment was made under protest to allow time for

the validity of the 2020 Notes to be investigated.  Ex. D to Complaint.

217.     The National Assembly made no objection to any of these principal and interest

payments.  *See infra* ¶¶ 289–90; s*ee also* Ex. 50 at 6, 8 (asserting for the first time that the 2020

Notes were invalid under the Venezuelan Constitution).

     **Plaintiffs' Response 217.**     Undisputed that no National Assembly resolutions

specifically commented on PDVSA's principal and interest payments, but this statement

mischaracterizes the record, given that the National Assembly publicly withheld its authorization

from the Exchange and previously and publicly "reject[ed] categorically" the pledge of CITGO

in the September 2016 Resolution.  Ex. C. to the Complaint.  The prior September 2016

Resolution is specifically noted in the October 2019 Resolution cited by Defendants.  Ex. 50 at 1.

> **C.     The PDVSA Ad Hoc Board and the National
> Assembly Approved the April 2019 Interest Payment
> with Knowledge of Their Present Legal Theory, Which
> They Delayed Asserting for Perceived Strategic Advantage.**

218.     The payment of the interest due in April 2019 was approved by the PDVSA Ad Hoc

Board of Directors appointed by the Guaidó administration.  Ex. 156 at PDVSA-00028269.

     **Plaintiffs' Response 218.**     Undisputed, and further stated that this statement ignores that

the referenced press release (as well as the letter to the agent regarding payment (Ex. 37))

specifically stated that that the payment "should not be construed as ratification or confirmation

by the National Assembly or the Interim Government of the authorization or validity of the

underlying bonds under Venezuelan law."  Ex. 156 at PDVSA-00028270.

219.     The payment of the interest due in April 2019 was also approved by the National

Assembly's Permanent Commission of Finance and Economic Development, and then by the full

National Assembly.  Def. Ex. 49 at 1; Def. Ex. 158 at 1.

     **Plaintiffs' Response 219.**     Undisputed, and further stated that the referenced approvals

were given on the basis that the April 2019 payment be made under protest, and the Ad-Hoc-

70

Board specifically stated that "in no case" did the authorization "mean[] that [the Ad-Hoc Board] renounce[s] the legal and economic objections made by the National Assembly at the time of the issuance of the debt generated by those interests." Defs. Ex. 49. The objections are reflected, in part, in the September 2016 Resolution. Ex. C. to the Complaint.

220. ███████████████████████████████████████████

███████████████████████████████████████████████████

*See, e.g.*, Ex. 312 at PDVSA-00036393; Ex. 371 at 1–2.

**Plaintiffs' Response 220.** ███████████████████████

████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

221. For example, ███████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

71

**Plaintiffs' Response 221.** 

222.

Ex. 313 at PDVSA-00036394.

**Plaintiffs' Response 222.**

223.    On May 15, 2019, the PDVSA Ad Hoc Board published a press release announcing

that it had made the April 2019 interest payment.  The Board stated the payment was "absolutely

necessary as part of the strategy to control and protect PDVSA's assets abroad" and "an important

piece in the strategy for safeguarding the assets of CITGO."  The press release did not assert that

the April 2019 payment was made "under protest."  Ex. 371 at 1–2.

**Plaintiffs' Response 223.**    This is misleading and mischaracterizes the record, as the

press release, while not using the specific words "under protest," unequivocally reserved the

right to challenge the validity of the 2020 Notes: "The ad hoc management board reaffirms that

this payment is made leaving safe the rights that attend PDVSA related to the legality and

validity of the conditions under which the 2020 Bond was issued, as it was stated in the National

Assembly Agreement on the subject, dated September 27, 2016." Defs. Ex. 371 at 2. The

"National Assembly Agreement on the subject" is the September 2016 Resolution. Ex. C. to the

Complaint.



224.

Ex. 359 at PDVSA- 00036452.

**Plaintiffs' Response 224.**

225.    Shortly before PDVSA filed its lawsuit, Harvard Professor Ricardo Hausmann, who

formerly served on the Presidential Advisory Commission for the Renegotiation of the Venezuelan

Public Debt, published a statement on Twitter, explaining: "[w]hy did we pay the interest of the

PDVSA 2020 in April and now we argue the illegality of the bond? In April we paid under protest

to avoid having CITGO taken away from us because we were not prepared to go to trial." Ex. 163;

Ex. 20 at 2; Ex. 358.

**Plaintiffs' Response 225.**    Undisputed, but such statement only again emphasizes that

the April interest payment was made, "under protest," only to provide time to investigate the

validity of the 2020 Notes.

226.    Between the time when the April 2019 interest payment was due and the PDVSA

Parties commenced this lawsuit, the U.S. sanctions regime became temporarily more restrictive for

the holders of the 2020 Notes. In April 2019, consistent with the U.S. Treasury Department's

OFAC General License 5, the Trustee and Collateral Agent (acting at the direction of the Trustee) were authorized to foreclose on the shares of CITGO Holding.  General License 5 was issued in July 2018, following the issuance of Executive Order 13835, which imposed sanctions prohibiting U.S. Persons from being involved in the transfer by the Government of Venezuela of any equity interest in any entity owned 50 percent or more by the Government of Venezuela.  Prohibiting Certain Additional Transactions With Respect to Venezuela, 83 Fed. Reg. 24001 (May. 24, 2018). General License 5 was issued in order to remove this prohibition "as an obstacle to holders of the PdVSA 2020 8.5 percent bond gaining access to their collateral."  Ex. 260 at 31.

> **Plaintiffs' Response 226.**   Undisputed.

227.    General License 5 remained in place after President Trump's recognition of Guaidó as the Interim President of Venezuela on January 23, 2019 and OFAC's designation of PDVSA on January 28, 2019.  *See* Ex. 155 at 1; Ex. 261 at 32.  Concurrent with PDVSA's designation, OFAC issued an additional license, General License 9, authorizing transactions involving certain PDVSA debt, including the PDVSA 2020 8.5 percent bond.  *See* Ex. 315 at 1.  OFAC clarified that "[b]ecause transactions related to the PdVSA 2020 8.5 percent bond are authorized pursuant to General License 5 and General License 9, holders of this bond would not be limited from gaining access to their collateral."  *See* Ex. 261 at 32.

> **Plaintiffs' Response 227.**   Undisputed, except to the extent that this statement is intended to suggest that the 2020 Notes or the Pledge are valid, effective, and enforceable. Brewer Report at ¶ 45.

228.    Prior to April 15, 2019, the PDVSA Parties were engaged in "informal discussions" with the U.S. Treasury Department to obtain the revocation or modification of General License 5,

or obtain other action which would prohibit noteholders from selling the 2020 Notes.  *See* Ex.

6; ███████████████████

     **Plaintiffs' Response 228.**   Undisputed.

     229.   On October 24, 2019, OFAC replaced General License 5 with General License 5A,

which temporarily delayed the effective date of the authorization to foreclose until January 22,

2020.  Ex. 131 at 1; Ex. 134 at 1; Compl. ¶ 69.

     **Plaintiffs' Response 229.**   Undisputed.

     230.   On January 17, 2020, OFAC issued General License 5B, which amended General

License 5A to move its effective date to April 22, 2020.  Ex. 182 at 1.

     **Plaintiffs' Response 230.**   Undisputed.

     231.   On April 10, 2020, OFAC issued General License 5C, which amended General

License 5B to move its effective date to July 22, 2020.  Ex. 193 at 1.  OFAC's temporary

suspension of the authorization to foreclose was designed to encourage a consensual resolution

between the parties.  Ex. 292 at 63 (noting that, if an agreement was reached on "proposals to

restructure or refinance payments due to the holders of the PdVSA 2020 8.5 percent bond" . . .

"OFAC would encourage parties to apply for a specific license and would have a favorable

licensing policy toward such an agreement.").

     **Plaintiffs' Response 231.**   To clarify, the above-quoted language is directed to a

question about General License 5A, not General License 5C.  Defs. Ex. 292 at 63.  Additionally,

although the fact that the statement was made is undisputed, the imputation of a particular motive

to OFAC is disputed.

     232.   ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████   Ex. 39 at PDVSA-00034122; Ex. 319 at PDVSA-00030829; Ex. 310

at PDVSA-00030834; Ex. 306 at PDVSA-00031349; Ex. 40 at PDVSA-00034144.

**Plaintiffs' Response 232.**   ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

      **D.**      **Prior to October 2019, the PDVSA Parties**
                    **Acknowledged the 2020 Notes as a Valid, Secured Debt.**

    233.    In March 2017, PDVSA published an audited Consolidated Debt Balance Sheet for

2016.  The Balance Sheet was audited by Rodríguez Velázquez & Asociados.  Ex. 87 at 1, 3.

    **Plaintiffs' Response 233.**    Undisputed.

    234.    The Balance Sheet notes that

> [o]n October 28, 2016, [PDVSA] completed the exchange process of the bonds
> maturing in 2017, issued in April 2007, with an annual interest rate of 5.25% (see
> note 3 a-4), and those issued in October 2010 and January 2011, with an annual
> interest rate of 8.5% (see note 3 a-3), for a new bond of $ 3,368 million (Bs.
> 2,272,760 million), expiring in 2020; Annual capital amortizations of $842
> million (Bs. 568,190 million), with a first-grade pledge of 50.1% of the shares
> that make up the capital stock of its subsidiary CITGO Holding Inc. (CITGO
> Holding) and unconditionally and irrevocably guaranteed by the subsidiary
> PDVSA Petróleo, SA.

Ex. 87 at 12.

    **Plaintiffs' Response 234.**    Undisputed, except to the extent that the statement above

assumes the validity of the 2020 Notes and the Guarantee of PDVSA Petróleo, SA.  Brewer

Report at ¶ 45.

    235.    The Balance Sheet identified the 2020 Notes as a secured debt.  *Id.*

    **Plaintiffs' Response 235.**    Undisputed, except to the extent that the statement above

assumes the validity of the 2020 Notes.  Brewer Report at ¶ 45.

236.    The Balance Sheet makes no reference to any potential invalidity or

unenforceability of the 2020 Notes.  *Id.*

    **Plaintiffs' Response 236.**    Undisputed, except to the extent that the statement above

assumes the validity of the 2020 Notes.  Brewer Report at ¶ 45.

237.    In August 2017, PDVSA published its annual Consolidated Financial Statements

for 2016, including consolidated financials for  PDVSA Petróleo and PDVH.  The Consolidated

Financial Statements were audited by an independent auditor, Rodríguez Velázquez &

Asociados—an affiliate of KPMG.  Ex. 112 at 1, 7, 12.

    **Plaintiffs' Response 237.**    Undisputed.

238.    The 2016 Consolidated Financial Statements note that

> [o]n October 28, 2016, PDVSA completed the swap process of bonds maturing in
> 2017, issued in April 2007, and those issued in October 2010 and January 2011,
> by a new bond for $3,368 million with first-degree colateral [sic] of 50.1% of the
> shares composing the capital stock of its subsidiary CITGO Holding Inc. (CITGO
> Holding subsidiary de [sic] PDV Holding, Inc.) and with an unconditional and
> irrevocable guarantee by the subsidiary PDVSA Petróleo, S.A.

Ex. 112 at 39.

    **Plaintiffs' Response 238.**    Undisputed, except to the extent that the statement above

assumes the validity of the 2020 Notes and the Guarantee of PDVSA Petróleo, SA.  Brewer

Report at ¶ 45.

239.    In the Financial Statements, PDVSA identified the 2020 Notes as a secured

debt.  *Id.*

    **Plaintiffs' Response 239.**    Undisputed, except to the extent that the statement above

assumes the validity of the 2020 Notes.  Brewer Report at ¶ 45.

240.    The 2016 Consolidated Financial Statements make no reference to any potential

invalidity or unenforceability of the 2020 Notes.  *Id.*

**Plaintiffs' Response 240.**   Undisputed, except to the extent that the statement above assumes the validity of the 2020 Notes.  Brewer Report at ¶ 45.

241.   On August 12, 2017, Chief Commissioner of PDVSA Silvestre Latimer Molero Torres, a public accountant, released an "Annual Exercise" on PDVSA's financials for 2016.  Ex. 113 at 11.

**Plaintiffs' Response 241.**   Undisputed.

242.   The Annual Exercise notes that

100% of the share capital of CITGO Holding Inc., is conditioned by two different events: one of 50.1% (exchange of PDVSA 2020 bonds, carried out in October 2016) and another of 49.9% (advance of Rosneft, received by PDVSA in November 2017, to be canceled with crude deliveries), this to ensure the indebtedness contracted by PDVSA or its subsidiaries.  The 50.1% commitment could result in a change of control of the CITGO company in the event of non-compliance with these payments by PDVSA.

Ex. 113 at 77.

**Plaintiffs' Response 242.**   Undisputed, except to the extent that the statement above assumes the validity of the purported CITGO pledge.  Brewer Report at ¶ 45.

243.   The Annual Exercise identified the 2020 Notes as a secured debt. Ex. 113 at 12.

**Plaintiffs' Response 243.**   Undisputed, except to the extent that the statement above assumes the validity of the 2020 Notes.  Brewer Report at ¶ 45.

244.   The Annual Exercise makes no reference to any potential invalidity or unenforceability of the 2020 Notes.  *Id.*

**Plaintiffs' Response 244.**   Undisputed, except to the extent that the statement above assumes the validity of the 2020 Notes.  Brewer Report at ¶ 45.

245.   ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



Ex. 34 at 2 3 PDVSA-00030469–70; Ex. 35 at 2.

**Plaintiffs' Response 245.**

246.     On April 15, 2019, José Ignacio Hernández, the Guaidó administration's Special Attorney General, sent Interim President Guaidó a 24-page opinion recommending the payment of the interest due and payable on the 2020 Notes on April 27, 2019.  Ex. 36 at 1–2.

**Plaintiffs' Response 246.**   This mischaracterizes the record, as the referenced April 15, 2019 excerpt of the memorandum cited by Defendants (which was addressed to Luis Pacheco, chairman of the Ad-Hoc Board of PDVSA, not Interim President Guaidó) recommended that any payment only be made "under protest" because "there [were] doubts as to the legality of the indenture and the guarantee contract, which must be cleared by the National Assembly, through an investigation."  Defs. Ex. 36 at 2.

247.     In the opinion, Hernández stated that he had explored several options to avoid making the April payment.  *Id.* ¶¶ 22–29.

**Plaintiffs' Response 247.**   Undisputed that the memorandum contains the cited material in a three-page summary of the activities of the Office of the Special Attorney General since

March 2019.  Plaintiffs further note that the memorandum—which was written only several weeks after the formation of the Office of the Special Attorney General pursuant to the Transition Statute—then contains a nine-page preliminary analysis (key portions of which were entirely ommitted by Defendants in their selectively targeted excerpt of the memorandum (*see* Opinion of the Office of Special Attorney General, dated April 15, 2019, Bliss Opp. Decl. Ex. 6 at 10-11, 21-22)) focusing on "(i) the legality of issuing the bond; (ii) the legality of the guarantee on the shares of Citgo Holding, Inc. (iii) the legality of the transaction as regards the regime of public interest contracts and (iv) the consequences of the possible illegality of this transaction."  Defs Ex. 36 at ¶ 33.  The memorandum also noted that "the analysis carried out is only preliminary, aimed at determining whether there are indications that would allow inferring the illegality of this transaction."  *Id.*

248.    These strategies included "a rapprochement with holders," "considering that the failure to pay responds to a force majeure," working with the U.S. Treasury, and requesting the U.S. to issue an executive order.  *Id.* ¶¶ 22–28.

**Plaintiffs' Response 248.**    Undisputed that the memorandum contains the cited material in a three-page summary of the activities of the Office of the Special Attorney General since March 2019.  Plaintiffs further note that the memorandum—which was written only several weeks after the formation of the Office of the Special Attorney General pursuant to the Transition Statute—then contains a nine page preliminary analysis (key portions of which were entirely ommitted by Defendants in their selectively targeted excerpt of the memorandum (*see* Opinion of the Office of Special Attorney General, dated April 15, 2019, Bliss Opp. Decl. Ex. 6 at 10-11, 21-22)) focusing on analysis of "(i) the legality of issuing the bond; (ii) the legality of the guarantee on the shares of Citgo Holding, Inc. (iii) the legality of the transaction as regards

the regime of public interest contracts and (iv) the consequences of the possible illegality of this transaction." Defs Ex. 36 at ¶ 33. The memorandum also noted that "the analysis carried out is only preliminary, aimed at determining whether there are indications that would allow inferring the illegality of this transaction." *Id.*

249. Hernández's "fifth and last strategy" was arguing that the Exchange Offer may be illegal because the National Assembly was not allowed to investigate PDVSA's payment capacity, because the 50.1% of PDVH's interest in CITGO Holding was a pledge of public assets subject to "special controls," and, "finally," because the pledge was a contract of national public interest without approval of the National Assembly, in violation of Article 150 of the Venezuelan Constitution. *Id.* ¶¶ 29, 34–51.

**Plaintiffs' Response 249.** This misstates the record to the extent that it would characterize the April 2019 memorandum as "arguing" for any particular conclusion on these issues or that validity issues were viewed as less of a priority for analysis. Rather, as noted above, the focus of the memorandum was an initial, "preliminary analysis" (prepared only several weeks after the Office of the Special Attorney General was formed) of "(i) the legality of issuing the bond; (ii) the legality of the guarantee on the shares of Citgo Holding, Inc. (iii) the legality of the transaction as regards the regime of public interest contracts and (iv) the consequences of the possible illegality of this transaction." Defs Ex. 36 at ¶ 33. The Office of the Special Attorney General summarized its conclusions from that preliminary analysis as follows: "From the above, doubts arise about the legality of the indenture and the guarantee contract, which must be cleared by the National Assembly, through an investigation initiated within the framework of Article 187.3 of the Constitution." *Id.* at ¶ 51. Accordingly, the

memorandum recommended that "the payment of interest…, be made "under protest," while the legality of such contracts is determined." *Id*. at ¶ 53.

250.    Hernández also identified a number of potential flaws in arguing that the Pledge violated Article 150, including: (1) the lack of "any clarity in Venezuelan law as to when a contract is in the public interest;" (2) the fact that the transaction documents "were not declared 'contracts in the national public interest'" by the non-binding National Assembly Resolution dated September 27, 2016, or in any other non-binding resolution up until that point; and (3) the law regarding the National Assembly's power to approve contracts "is an aspect that the National Assembly should clarify." *Id.* ¶¶  48–49.

**Plaintiffs' Response 250.**   This mischaracterizes the record.  The quoted passage regarding the lack of "clarity in Venezuelan law as to when a contract is in the public interest" concludes that any lack of clarity could be resolved by the National Assembly, "which is responsible for classifying contracts entered into by the State…as contracts in the public interest." *Id*. at ¶ 48.  Far from indicating that the National Assembly's general powers with respect to national public interest contracts required clarification, the cited passages indicate that the National Assembly had (and has) the sole power to determine whether a contract constituted a national public interest contract, pursuant to "the supervisory powers assigned to it by the Constitution." *Id*. at ¶ 49.  In addition, although the memorandum observes that the September 2016 Resolution did not literally declare the Transaction Documents to be "contracts in the national public interest" (quotation marks in original, *id.*), it also observes that the National Assembly in the September 2016 Resolution (i) "categorically rejected" the swap operation, (ii) invoked its constitutional authority to supervise national public interest contracts under Article 187(9) of the Constitution, and (iii) questioned the transactions rather than authorizing them.  (*Id*.

at ¶32). Further, as noted above, the April 2019 memorandum was merely "preliminary." Finally, the April 2019 memorandum nowhere suggests that the September 2016 Resolution, or any other resolution of the National Assembly, is or was "non-binding."

251.    Hernández also recognized that the Exchange Offer did not require National Assembly debt approval under the governing Venezuela statute, writing that "[a]s to the legality of the issuance of the bond, from a formal point of view, such issuance was excluded from the controls provided for in the Organic Law of the Financial Administration of the Public Sector, since PDVSA is excluded from Title III of said Law, which establishes controls on public credit operations." *Id.* at ¶ 34.

**Plaintiffs' Response 251.**    Undisputed that the memorandum contains the quoted language, but disputed that this has any relevance to this litigation. As Plaintiffs explain in their Opposition Memorandum of Law at 20-21, although the Public Sector Organic Law exempts PDSVA debt contracts from National Assembly authorization *otherwise required by that statute*, National Assembly authorization is separately and independently required under Articles 150 and 187.9 if, like here, the debt contract is with foreign/non-domiciled counterparties.

252.    Finally, in the same memo, Hernández confirmed that "it will be necessary to determine not only if in effect those contracts actually violated the Venezuelan Law but also, if that violation is relevant to the contracts governed by foreign Law." *Id.* ¶ 52.

**Plaintiffs' Response 252.**    This mischaracterizes the record to the extent it purports to suggest that the memorandum in the quoted passage reached any conclusions regarding the choice-of-law analysis concerning the Transaction Documents. As the memorandum stated two paragraphs prior to this excerpt, choice-of-law analysis in the context of the Transaction

Documents is a "complex issue that must also be object of a thorough analysis, which is beyond the limits of this opinion." *Id*. at ¶ 50.

253.    Contemporaneously with the April 2019 payment, José Guerra, one of the National Assembly deputies who authored the non-binding September 2016 National Assembly Resolution "questioning" the decision to enter into the Exchange Offer, tweeted that "PDVSA does not require authorization from the [National Assembly] to issue debt."  Ex. 162.

   **Plaintiffs' Response 253.**    Undisputed that Mr. Guerra made such statement.  For full factual context, Mr. Guerra also noted the "unfavorable conditions" of the Exchange Offer and how "the most serious thing was to put 50% of Citgo's shares as collateral."  Defs. Ex. 162. Additionally, in an interview with CNN on September 21, 2016, Mr. Guerra stated that his party would demand that "*[Congress] will discuss whether it is legal to put the refinery up as collateral*. . . because . . . National assets are being affected there."  Pls. Ex. 55.  ███████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████  Further, as stated in Plaintiffs' response above to statement 251 and in Plaintiffs' briefing, the Public Sector Organic Law exemption of PDSVA debt contracts from National Assembly authorization is irrelevant to this litigation.  Finally, the September 2016 National Assembly Resolution was not "non-binding".  Brewer Report at ¶¶ 51, 73.

254.    On May 7, 2019, Hernández published a release in a Venezuela newspaper, *La Patilla*, about the April 2019 interest payment, stating that "[t]he payment of interest on the PDVSA 2020 Bond is, under current conditions, the only option that protects the assets of the

Venezuelan State and places the Government in a better position for the strategy for renegotiating the public debt" because "the truth is that the Bond issue contract is still valid and binding in accordance with New York Law, which is the applicable Law."  Ex. 157 at 1.

        **Plaintiffs' Response 254.**   Undisputed that such statements were made, but these statements were made before the analysis of the validity of the 2020 Notes and the Governing Documents was concluded, and prior to analysis of choice-of-law issues by the Office of the Special Attorney General.  The April 27, 2019 interest payment was ultimately made, under protest, to allow time for the validity of the 2020 Notes, including choice-of-law issues, to be investigated.  Defs. Ex. 36; Ex. D to Complaint.



255.

Ex. 132 at PDVSA-00035466.

        **Plaintiffs' Response 255.**

256.

*Id.*

        **Plaintiffs' Response 256.**

257. 

Ex.

138; *see also* Ex. 19 at 247:4 – 149:1.

**Plaintiffs' Response 257.**

## VII.    The 2020 Notes Traded in International Credit Markets

258.    The 2020 Notes have traded in the secondary bond market since the Exchange Offer

and until the imposition of sanctions by the United States.  For example, the 2020 Notes were

added to J.P. Morgan's Emerging Market Bond Index (EMBI), which is tracked by several

exchange-traded funds (ETFs) that, in turn, are held by many investors.  Trigo Paz Decl. ¶ 3; *See*

Ex. 376 ("Major banks have stopped trading the bonds of Venezuela's state-owned oil firm

PDVSA for clients after the United States imposed sweeping sanctions on the firm, according to

fund managers").

| Fund | 2016 Year-End[3] | 2017 Mid-Year | 2017 Year-End | 2018 Mid-Year | 2018 Year-End | 2019 Mid-Year | 2019 Year-End |
|---|---|---|---|---|---|---|---|
| **Rule 144A Funds** *(For Sale to Qualified Institutional Buyers)* | | | | | | | |
| Invesco Global Short Term High Yield Bond ETF[4] | 0 | 341 | 291 | 0 | 0 | 0 | 0 |
| iShares Core 1-5 Year USD Bond ETF[5] | 0 | 200 | 200 | 0 | 0 | 0 | 0 |
| iShares J.P. Morgan USD Emerging Markets Bond ETF[6] | 0 | 25,000 | 35,139 | 28,792 | 26,090 | 0 | 0 |
| iShares J.P. Morgan EM Corporate Bond ETF[7] | 0 | 300 | 0 | 0 | 0 | 0 | 0 |
| iShares Emerging Markets High Yield Bond ETF[8] | 0 | 750 | 2,700 | 2,513 | 0 | 0 | 0 |
| VanEck Vectors Emerging Markets High Yield Bond ETF[9] | 0 | 1,711 | 1,463 | 0 | 0 | 0 | 0 |
| VanEck Vectors International High Yield Bond ETF[10] | 0 | 156 | 0 | 0 | 0 | 0 | 0 |
| Vanguard Emerging Markets Government Bond Index Fund[11] | 0 | 3,000 | 3,650 | 2,250 | 0 | 0 | 0 |

87

---

[3]   Holdings are noted in USD (000s) and rounded to the nearest hundred thousand. For the purposes of this table, "mid-year" refers to January 1 to June 30, and "year-end" refers to July 1 to December 31 of each respective year. The above funds report their holdings biannually, and the numbers above represent the reported holdings of the 2020 Notes at each biannual reporting date of the holder.

[4]   Formerly the PowerShares Global Short Term High Yield Bond Portfolio. Ex. 264 at 180; Ex. 327 at 163.

[5]   Ex. 266 at 107; Ex. 328 at 76.

[6]   Ex. 266 at 484; Ex. 328 at 383; Ex. 335 at 495; Ex. 341 at 397.

[7]   Formerly the iShares Emerging Markets Corporate Bond ETF. Ex. 268 at 7.

[8]   Ex. 268 at 13; Ex. 329 at 4; Ex. 361 at 5.

[9]   Ex. 263 at 20; Ex. 322 at 21.

[10]   Ex. 263 at 39.

[11]   Ex. 273 at 76; Ex. 326 at 80; Ex. 336 at 82.

| Fund | 2016 Year-End[3] | 2017 Mid-Year | 2017 Year-End | 2018 Mid-Year | 2018 Year-End | 2019 Mid-Year | 2019 Year-End |
|---|---|---|---|---|---|---|---|
| **Regulation S Funds** *(For Sale to Non-U.S. Persons Outside the United States)* | | | | | | | |
| iShares J.P. Morgan USD EM Bond CHF Hedged UCITS ETF[12] | 0 | 350 | 350 | 350 | 0 | 0 | 0 |
| iShares J.P. Morgan USD EM Bond EUR Hedged UCITS ETF[13] | 0 | 4,800 | 6,975 | 8,200 | 792 | 0 | 0 |
| iShares J.P. Morgan USD EM Bond UCITS ETF[14] | 0 | 19,850 | 21,800 | 21,050 | 0 | 0 | 0 |
| iShares USD EM Corp Bond UCITS ETF[15] | 0 | 1,450 | 0 | 0 | 0 | 0 | 0 |
| UBS ETF – Bloomberg Barclays USD Emerging Markets Sovereign UCITS ETF[16] | 0 | 300 | 0 | 0 | 0 | 0 | 0 |
| UBS ETF – J.P. Morgan USD EM Diversified Bond 1-5 UCITS ETF[17] | 0 | 0 | 281 | 281 | 783 | 783 | 783 |
| Vanguard USD Emerging Markets Government Bond UCITS ETF[18] | 0 | 400 | 0 | 0 | 0 | 0 | 0 |
| Ashmore SICAV Emerging Markets Debt Fund[19] | 51,817 | 38,909 | 30,172 | 28,934 | 18,274 | 17,014 | 17,014 |

88

12  Ex. 272 at 289; Ex. 330 at 260; Ex. 337 at 307.
13  Ex. 272 at 305; Ex. 330 at 274; Ex. 337 at 320; Ex. 342 at 277.
14  Ex. 276 at 213; Ex. 331 at 243; Ex. 338 at 187.
15  Ex. 269 at 60.
16  Ex. 294 at 341.
17  Ex. 334 at 355; Ex. 340 at 366; Ex. 344 at 369; Ex. 346 at 381; Ex. 348 at 404.
18  Ex. 321 at 293.
19  Ex. 141 at 71; Ex. 286 at 66; Ex. 333 at 71; Ex. 339 at 61; Ex. 343 at 67; Ex. 345 at 66; Ex. 347 at 68.

| Fund | 2016 Year-End[3] | 2017 Mid-Year | 2017 Year-End | 2018 Mid-Year | 2018 Year-End | 2019 Mid-Year | 2019 Year-End |
|---|---|---|---|---|---|---|---|
| Ashmore SICAV Emerging Markets Sovereign Debt Fund[20] | 18,620 | 13,424 | 14,444 | 13,431 | 9,978 | 9,461 | 9,461 |
| Ashmore SICAV Emerging Markets Total Return Fund[21] | 80,304 | 92,917 | 81,781 | 98,446 | 71,079 | 70,560 | 70,560 |
| Ashmore SICAV Emerging Markets Multi-Asset Fund[22] | 0 | 988 | 741 | 531 | 354 | 238 | 238 |
| Ashmore SICAV Emerging Markets Corporate Debt Fund[23] | 65,570 | 51,705 | 48,647 | 44,912 | 26,250 | 23,945 | 23,945 |
| Ashmore SICAV Emerging Markets High Yield Corporate Debt Fund[24] | 3,288 | 4,643 | 3,482 | 3,366 | 2,244 | 2,054 | 2,054 |
| Ashmore SICAV Emerging Markets Short Duration Fund[25] | 85,915 | 129,375 | 178,961 | 298,718 | 216,028 | 216,028 | 216,028 |
| Ashmore SICAV Emerging Markets Local Currency Bonds (Broad) Fund[26] | 0 | 0 | 0 | 230 | 567 | 492 | 492 |

89

[20] Ex. 141 at 81; Ex. 286 at 77; Ex. 333 at 82; Ex. 339 at 71; Ex. 343 at 77; Ex. 345 at 76; Ex. 347 at 78.
[21] Ex. 141 at 113; Ex. 286 at 110; Ex. 333 at 117; Ex. 339 at 104; Ex. 343 at 111; Ex. 345 at 121; Ex. 347 at 130.
[22] Ex. 286 at 124; Ex. 333 at 131; Ex. 339 at 116; Ex. 343 at 124; Ex. 345 at 134; Ex. 347 at 142.
[23] Ex. 141 at 127; Ex. 286 at 131; Ex. 333 at 139; Ex. 339 at 123; Ex. 343 at 132; Ex. 345 at 141; Ex. 347 at 149.
[24] Ex. 141 at 136; Ex. 286 at 141; Ex. 333 at 148; Ex. 339 at 132; Ex. 343 at 141; Ex. 345 at 150; Ex. 347 at 158.
[25] Ex. 141 at 147; Ex. 286 at 151; Ex. 333 at 160; Ex. 339 at 143; Ex. 343 at 152; Ex. 345 at 162; Ex. 347 at 169.
[26] Ex. 339 at 89; Ex. 343 at 96; Ex. 345 at 100; Ex. 347 at 107.

**Plaintiffs' Response 258.**   Undisputed, except to the extent that this statement is intended to suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

**VIII.   PDVSA Has Defaulted on the 2020 Notes.**

259.    PDVSA failed to pay $841,882,250 in principal due on the 2020 Notes on October 27, 2019.  PDVSA & PDVSA Petróleo Answer ¶ 166; PDVH Answer ¶ 166.

**Plaintiffs' Response 259.**   Undisputed, except to the extent that this statement is intended to suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

260.    That non-payment constitutes an Event of Default under the Indenture. PDVSA & PDVSA Petróleo Answer ¶ 166; PDVH Answer ¶ 166; Ex. 2 at § 5.01(a)(1).

**Plaintiffs' Response 260.**   Undisputed, except to the extent that this statement is intended to suggest that the 2020 Notes or the Indenture are valid, effective, and enforceable.  Brewer Report at ¶ 45.

261.    PDVSA also failed to pay $71,559,991.25 in interest due on the 2020 Notes on October 27, 2019.  PDVSA & PDVSA Petróleo Answer ¶ 167; PDVH Answer ¶ 167.

**Plaintiffs' Response 261.**   Undisputed, except to the extent that this statement is intended to suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

262.    As it has continued for 30 days, that nonpayment constitutes another Event of Default under the Indenture.  PDVSA & PDVSA Petróleo Answer ¶ 167; PDVH Answer ¶ 167; Ex. 2 § 5.01(a)(2).

**Plaintiffs' Response 262.**   Undisputed, except to the extent that this statement is intended to suggest that the Indenture is valid, effective, and enforceable.  Brewer Report at ¶ 45.

263.    It is also an Event of Default for PDVSA to "contest the enforceability of, [and/or] deny or disaffirm its material obligations under the [2020] Notes or the Security Documents" (the latter of which are defined to include, among other things, the Pledge Agreement).  Ex. 2 at §§ 1.01, 5.01(a)(8).

**Plaintiffs' Response 263.**   Undisputed, except to the extent that this statement is intended to suggest that the Transaction Documents are valid, effective, and enforceable.  Brewer Report at ¶ 45.

264.    Thus, the filing of this action—which asserts that the 2020 Notes, Indenture, and Pledge Agreement are invalid, illegal, null, and void *ab initio*—caused an additional Event of Default.  Compl. ¶ 83; Ex. 2 at § 5.01(a)(8).

**Plaintiffs' Response 264.**   Undisputed, except to the extent that this statement is intended to suggest that the Transaction Documents are valid, effective, and enforceable.  Brewer Report at ¶ 45.

265.    Further, it is an Event of Default for PDVSA "or any Subsidiary [to] assert" that "any of the Security Documents shall for any reason cease to be in full force and effect in all material respects."  Ex. 2 at § 5.01(a)(9).

**Plaintiffs' Response 265.**   Undisputed, except to the extent that this statement is intended to suggest that the Transaction Documents are valid, effective, and enforceable.  Brewer Report at ¶ 45.

266.    Thus, the filing of this action—which asserts that the Pledge Agreement is invalid, illegal, null and void *ab initio*, and thus unenforceable—caused an additional Event of Default under the Indenture.  Compl. ¶ 94; Ex. 2 at § 5.01(a)(9).

**Plaintiffs' Response 266.**   Undisputed, except to the extent that this statement is intended to suggest that the Transaction Documents are valid, effective, and enforceable. Brewer Report at ¶ 45.

267.    Because Events of Default have occurred and are continuing, the Trustee and the Collateral Agent (acting at the written direction of the Trustee) may, in accordance with the Indenture, exercise the remedies set forth in the Pledge Agreement.  Ex. 2 at § 5.01; Ex. 3 at §§ 5.01–03.

**Plaintiffs' Response 267.**   Disputed.  The Trustee and the Collateral Agent may not exercise such remedies because both the Indenture and the Pledge Agreement are invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

268.    Because Events of Default have occurred and are continuing, the Trustee and Collateral Agent (acting at the written direction of the Trustee) may, in accordance with the Indenture and with the written direction of holders of at least 25% of the outstanding 2020 Notes, exercise their right to the sale or purchase of the collateral.  Ex. 2 § 5.01(e); Ex. 3 §§ 5.01–03.

**Plaintiffs' Response 268.**   Disputed.  The Trustee and the Collateral Agent may not exercise such remedies because the Indenture, the 2020 Notes, and the Pledge Agreement are invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

269.    In addition, because Events of Default have occurred and are continuing, "the holders of at least 25% in principal amount of Outstanding [2020] Notes may declare

the principal of, and premium, if any, accrued interest, and Additional Amount, if any, on all the [2020] Notes to be due and payable by notice in writing to the Issuer [PDVSA] and the Trustee specifying the Event of Default," (i.e., by sending an "Acceleration Notice"). Ex. 2 § 5.01(b).

> **Plaintiffs' Response 269.**   Disputed.  The Transaction Documents are invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

270.    Such an "Acceleration Notice" makes "the principal of, and premium, if any, accrued interest, and Additional Amounts, if any, on all the [2020] Notes . . . immediately due and payable." Ex. 2 § 5.01(b).

> **Plaintiffs' Response 270.**   Disputed.  Both the 2020 Notes and the underlying Indenture purporting to provide for such notice are invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

271.    On December 18, 2019, the Directing Holders sent an Acceleration Notice, as holders of more than 25% in aggregate principal amount outstanding of the 2020 Notes, to PDVSA and the Trustee.  The Acceleration Notice stated that Events of Default under Sections 5.01(a)(1), (2), (8), and (9) of the Indenture occurred and were continuing, and declared the principal of, and premium, if any, accrued interest, and Additional Amount, if any, on the 2020 Notes immediately due and payable.  *See* Ex. 360; *see also* PDVSA & PDVSA Petróleo Answer ¶¶ 110, 169; PDVH Answer ¶¶ 110, 169.

> **Plaintiffs' Response 271.**   Undisputed that such Acceleration Notice was sent, but both the 2020 Notes and the underlying Indenture purporting to provide for such notice are invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

272.     Accordingly, as a result of the Acceleration Notice, the principal of, and

premium, if any, accrued interest, and Additional Amounts, if any, on all the 2020 Notes

were immediately due and payable as of December 18, 2019.  Ex. 2 § 5.01(b); Ex. 360.

**Plaintiffs' Response 272.**   Disputed.  The 2020 Notes and the underlying

Indenture are invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

273.     The total principal amount outstanding on the 2020 Notes is

$1,683,764,500.00.  Ex. 360 at 2; PDVSA & PDVSA Petróleo Answer ¶ 108; PDVH

Answer ¶ 108.

**Plaintiffs' Response 273.**   Undisputed that this amount is purportedly

outstanding, but the 2020 Notes are invalid, illegal, null, and void *ab initio*.  Brewer

Report at ¶ 45.

274.     The interest owed under the 2020 Notes continues to accrue at the

contractual rate of 8.50% until the principal is fully paid or duly provided for, computed on

the basis of a 360 day year of twelve 30-day months.  Ex. 2 § 5.01(b).

**Plaintiffs' Response 274.**   Undisputed that the Transaction Documents purport

to provide for interest at 8.505%, but they are invalid, illegal, null, and void *ab initio*.

Brewer Report at ¶ 45.

275.     Statutory prejudgment interest at 9.00% accrues on unpaid principal and

interest amounts owed under the 2020 Notes.  N.Y. C.P.L.R. 5004 (McKinney 2020).

**Plaintiffs' Response 275.**   This purported "statement of fact" states only legal

assertions that do not require a response, but to the extent one is required, the application

of statutory prejudgment interest is denied.

276.    To date, PDVSA has not made any payments due on the 2020 Notes since May 2019.  *See* Xu Decl. ¶ 3; Trigo Paz Decl. ¶ 4; Weisser Decl. ¶ 4.

**Plaintiffs' Response 276.**   Undisputed, except to the extent that this statement is intended to suggest that the 2020 Notes are valid, effective, and enforceable.  Brewer Report at ¶ 45.

277.    PDVSA and PDVSA Petróleo must indemnify the Trustee and Collateral Agent (acting at the written direction of the Trustee) for all duly documented expenses or other losses incurred in connection with defending against the PDVSA Parties lawsuit, including reasonable attorneys' fees and costs.  Ex. 2 § 8.05(c).

**Plaintiffs' Response 277.**   Disputed, as the Indenture under which Defendants assert this purported obligation is invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

278.    PDVSA and PDVSA Petróleo must reimburse the Trustee and Collateral Agent (acting at the written direction of the Trustee) for all documented expenses, including reasonable attorneys' fees and costs, incurred in connection with enforcement of the terms of the Governing Documents in this litigation.  Ex. 2 §§ 5.01(q), 8.05(b).

**Plaintiffs' Response 278.**   Disputed, as the Indenture under which Defendants assert this purported obligation is invalid, illegal, null, and void *ab initio*.  Brewer Report at ¶ 45.

## IX.    The PDVSA Parties' Legal Theory Was Recently Invented for the Purpose of This Litigation.

279.    On January 16, 2020, the Guaidó government issued a press release stating that it would seek to protect PDVSA's ownership of CITGO Holding "at all costs and by all means."  Ex. 159.

**Plaintiffs' Response 279.**    Undisputed, except to the extent these words taken in

isolation are meant to suggest anything untoward.  As explained in the letter to the Court

on February 5, 2020, "it is obvious that the Guaidó administration [was] simply

reaffirming its commitment to protect CITGO through all legal and diplomatic means

available."  Letter of James R. Bliss to the Court, *Petróleos de Venezuela, et al. v. MUFG

Union Bank, N.A.*, et. al., Case No. 1:19-cv-10023-KPF, Dkt. No. 49 (S.D.N.Y. Feb. 5,

2020).

280.    In their Complaint, the PDVSA Parties allege that "[t]he National

Assembly's fierce opposition to the Exchange Offer was widely reported," citing to a Wall

Street Journal article.  Compl. ¶ 51.  However, the Wall Street Journal article was published

two days prior to the publication of the Exchange Offer, when the role, if any, that the

Republic would play in the Exchange Offer was still unknown.  See Ex. 367 at 1.

**Plaintiffs' Response 280.**    This misrepresents the factual record.  PDVSA

publically proposed the bond swap before the Exchange Offer was published, as reported

by news outlets at the time.  Ana Isabel Martinez and Corina Pons, *Venezuela's PDVSA

offers $7 billion bond swap to ease debt burden*, REUTERS (Sept. 13, 2016) ("[s]ome are

concerned about potential political opposition to using CITGO shares [as collateral]" and

that "***[c]ritics in the opposition, which now controls the National Assembly, argue

involving CITGO would constitute a de facto privatization of a state asset that requires

parliamentary approval***.") (emphasis added), Bliss Opp. Decl. Ex. 7.  The Wall Street

Journal cited above included the general details of the proposed PDVSA bond swap,

including the pledge of CITGO as collateral, and mentioned the potential need for

approval of the transaction by the National Assembly.   Defs. Ex. 367 ("Venezuela's

constitution requires the National Assembly to approve any new indebtedness of the

republic.").  It is illogical to say that the role of the Republic was unknown when the

Republic owns 100% of PDVSA.  1999 VENEZUELAN CONSTITUTION art. 303, Pls. Ex. 4.

Thus, even before official announcement of the Exchange Offer, opposition of the

National Assembly to the Exchange Offer was recognized, and as outlined in Plaintiffs'

response to ¶ 283 below, there was an abundance of market commentary on the National

Assembly's opposition to the Exchange Offer after it was "officially" announced.

281.    In their Complaint, the PDVSA Parties also cited four articles published

after the Exchange Offer—and all four discuss issues with Venezuela's sovereign debt, not

the 2020 Notes.  Complaint ¶¶ 52, 55; Ex. 373 at 5; Ex. 368 at 1–2; Ex. 370 at 1–2; Ex. 369

at 133.

**Plaintiffs' Response 281.**    Disputed.  As discussed below (¶ 282), one of the

cited articles is from Torino Capital and specifically discusses how "investors may be

concerned about the legal risks associated with the [2020 Notes]."  Defs. Ex. 373 at 7.

Another cited article specifically notes, in the context of discussing the Exchange Offer,

that "new debt will carry repudiation risk for investors making them wary, as the

opposition says that it will not recognise debt issued without the National Assembly's

approval (as mandated by the constitution."  Defs. Ex. 370 at 2.  The cited market report

notes the PDVSA $3.3 billion bond swap and states that the Maduro regime's lack of

cooperation with the National Assembly may result in "selective debt repudiation by

future administrations."  Defs. Ex. 369 at 133.  Finally, another cited article discussed the

"swapping . . . [of] bonds maturing in 2017 for new ones due in 2020" in the context of a

later bond issuance that did not receive National Assembly approval.  Defs. Ex. 368 at 2.

282.    The PDVSA Parties also take quotations out of context, such as a lengthy

quote from a Torino Capital article that in fact discusses sovereign debt offerings in 2017

and expresses the view that PDVSA does not need National Assembly approval to issue

debt secured by a pledge of collateral.  Complaint ¶ 52; Ex. 373 at 5.

**Plaintiffs' Response 282.**    Disputed.  This article discusses the Exchange Offer

and states that lack of participation in the Exchange Offer could be due to the fact that

"investors may be concerned about the legal risks associated with the new bond, given

the perceived possibility of non-recognition by a future MUD government . . . [Investors]

. . . trade at an additional discount given concerns about the legality of the issuance."  Ex.

373 at 7.  Whether or not Torino Capital itself agreed with these concerns is irrelevant to

the fact that it reported them as concerns held by the market at the time.

283.    The market commentary at the time showed no concern with the

constitutionality of the Notes under Article 150, particularly after the National Assembly

Resolution of September 27, 2016.  Porzecanski Rebuttal Decl. ¶¶ 35–39.

**Plaintiffs' Response 283.**    This misrepresents the factual record, as there were

numerous examples of market commentary that noted concerns about the illegality of the

2020 Notes in the absence of National Assembly approval:

- On September 17, 2016, an article in *El Nacional*, a leading Venezuelan news outlet, quoted a Venezuelan constitutional lawyer as saying that ***the decree purportedly allowing PDVSA to use CITGO as collateral was unconstitutional*** and that "***any contract it signs is invalid.***"  *Debt Issue Under New Decree Will be Void*, EL NACIONAL (VENEZUELA) (Sept. 27, 2016) (translated), Pls. Ex. 15.

- On September 18, 2016, a Nomura analyst stated in an email to market participants that "[t]he make or break of the exchange is the assessment of the equity valuation and the ***legal risks***" and that "opinions from local lawyers suggest[ed] that ***all international transactions (such as the recent deal with Gold Reserve and this PdVSA debt exchange) would require***

98

*legislative approval or otherwise risk illegality* . . . ."  Email from Siobhan Morden to Patrick Haller, Michel Aubenas, Pablo Goldberg and 27 others, "Venezuela | PdVSA exchange," *Nomura*, September 18, 2016. (ASH_00000743 – 746 at 743) (emphasis added), Pls. Ex. 16; Email from Dan Gelfand to Michel Aubenas, Pablo Goldberg and 27 others, "FW: Venezuela | PdVSA exchange," dated September 18, 2016, forwarding an email from Siobhan Morden, "Venezuela | PdVSA exchange," *Nomura*, dated September 18, 2016. (BLA_00000556 – 558 at 557) (emphasis added), Pls. Ex. 17.

- On September 19, 2016, UBS published an analyst report ███████████ ████████████████████████████████████████████████ ███████████████████████████████████ Alejo Czerwonko, "Venezuela bonds: Of politics and swaps," *UBS*, September 19, 2016, p. 3. (UBS-PDVSA000001 – 009 at 003) (emphasis added), Pls. Ex. 18.

- Also on September 19, 2016, a Jeffries analyst sent an email to Jan Dehn, Head of Research at Ashmore, noting that the Venezuelan opposition had "*already challenged the use of Citgo equity to back this deal on legal grounds*."  Email from Javier Kulesz to Jan Dehn, Herbert Saller, and Xin Xu, "Jeffries LatAm Sovns – The PDVSA swap," dated September 19, 2016. (ASH_00004192 – 194 at 192, Pls. Ex. 51; ASH_00005982 – 984 at 982 – 983, Pls. Ex. 52; ASH_00006721 – 723 at 721 – 722, Ex. 53) (emphasis added); Email from Dan Gelfand to Pablo Goldberg, Sergio Trigo Paz and 27 others, "FW: Jeffries LatAm Sovns – The PDVSA swap," dated September 19, 2016, forwarding email from Javier Kulesz to Dan Gelfand, "Jeffries LatAm Sovns – The PDVSA swap," dated September 19, 2016. (BLA_00000643 – 645 at 643 – 644), Pls.Ex. 54 (emphasis added).

- Also on September 19, 2016, Reuters reported that "doubts about the legal underpinning of the CITGO guarantee weakened investor confidence. Venezuela's opposition, which controls parliament, has said it will oppose the use of CITGO as collateral."  Eyanir Chinea and Brian Ellsworth, *S&P says PDVSA bond swap offer 'tantamount to default'*, Reuters (Sept. 19, 2016) (emphasis added), Bliss Opp. Decl. Ex. 8.

- On September 21, 2016, in an interview with CNN, National Assembly member José Guerra stated that his party would demand that "PDVSA [] come to Congress [and] explain the swap" and that "*[Congress] will discuss whether it is legal to put the refinery up as collateral*. . . because . . . National assets are being affected there."  Congressman Jose Guerra Interview with CNN, September 21, 2016, at 3 (translated), Pls. Ex. 55.

- On September 27, 2016, a Venezuelan media outlet published a press release entitled "*Freddy Guevara on PDVSA: We will not recognize any bond sale that has not been authorized by the NA*," which quoted Mr. Guevara as saying: "We will not pay for the broken crockery of a small group of crooks that destroyed Venezuela. ***Not only do we not recognize these transactions, we will also investigate everyone involved in the sale because it would be implying an embezzlement of the Nation***." *Freddy Guevara on PDVSA: We will not recognize any bond swap that has not been authorized by the NA*, LA PATILLA (Sept. 27, 2016) (translated), Pls. Ex. 20.

- The next day, another Venezuelan media outlet published an article entitled "*Freddy Guevara: Government has proven negligent and destructive of the economy*," which quoted Mr. Guevara as saying with respect to the Exchange Offer that the National Assembly "***will not recognize any public contract that is not considered or authorized by the Legislative Branch in accordance with the Constitution***." Lysaura Fuentes, *Freddy Guevara: Government has proven negligent and destructive of the economy*, EL COOPERANTE (Sept. 28, 2016) (translated), Pls. Ex. 19.

- On October 11, 2016, a report from analyst firm Torino Capital noted that the tender deadline had been extended twice because of "concern[s] about the ***legal risks associated with the new bond***" and that noteholders "may expect that the market will not only discount the collateral on the 2020 but perhaps also force it to trade at an additional discount given ***concerns about the legality of the issuance***." Defs. Ex. 373 at 7.

- On October 13, 2016, Goldman Sachs published a research report noting that "the National Assembly has questioned the legitimacy of offering a 50% participation of CITGO as collateral." Francisco Rodríguez, *Venezuela this Week: October 11-16, 2016 Of Laws and Bonds,* Torino Capital LLC, (ASH_00006934 – 941 at 939 – 940) (emphasis added), Pls. Ex. 21.

- Also on October 13, 2016, J.P. Morgan published a report noting that "***the deal could be 'illegal' and reneged upon by a future opposition government***." Email from Dan Gelfand to Blackrock employees, "FW: PDVSA : Swap extended again and the clock is ticking," dated October 13, 2016 forwarding email from Javier Zorrilla, Ben Ramsey, and Trang Nguyen, "PDVSA Swap Extended Again and the Clock is Ticking," *J.P. Morgan*, October 13, 2016. (BLA_00001171 – 175 at 172). (emphasis added), Pls. Ex. 26.

- On October 27, 2016, a Jefferies analyst stated in an email to market participants that "even though [the] market [was] pricing it between 15 and 17 at the moment," the CITGO Shares "should not be worth much" as

collateral because the National Assembly had not "blessed" the transaction and thus the pledge of the CITGO Shares was potentially illegal. Email from John Salvesen to John Salvesen and Pablo Goldberg, "Opening Salvo - EM - METALS, VENZ/PDVSA, ARGENT, ODBR, JBSSBZ," dated October 27, 2016. (BLA_00001623 – 628 at 624), Pls. Ex. 56; Email from Zoe Piper to Xin Xu "FW: Opening Salvo - EM - METALS, VENZ/PDVSA, ARGENT, ODBR, JBSSBZ," dated October 27, 2016. (ASH_00003174 – 180 at 175), Pls. Ex. 57. *See also* Email from Javier Kulesz to Jan Dehn, Xin Xu, Herbert Saller, "Jefferies LatAm Sovns - Venezuela and Argentina commentary," dated October 26, 2016. (ASH_00004413 – 417 at 413 – 414, Pls. Ex. 58; ASH_00007140 – 144 at 140 – 141, Pls. Ex. 59; ASH_00006137 – 141 at 137 – 138, Pls. Ex. 60); Email from Dan Gelfand to Pablo Goldberg, Sergio Trigo Paz and 25 others, "FW: Jefferies LatAm Sovns - Venezuela and Argentina commentary," dated October 26, 2016, forwarding email from Javier Kulesz to Dan Gelfand, "Jefferies LatAm Sovns - Venezuela and Argentina commentary," dated October 26, 2016. (BLA_00001612 – 1616 at 612 – 614), Pls. Ex. 61.

- 

## A. The National Assembly Did Not Declare the 2020 Notes Illegal, Invalid, Void, or Unenforceable in 2016.

284.

**Plaintiffs' Response 284.**   Undisputed that opposition politicians in Venezuela expressed a range of reactions to the Exchange Offer, but a majority of the National Assembly (and therefore a large majority of the opposition) ultimately voted to adopt the September 2016 Resolution, which "categorically rejected" the proposed pledge of CITGO in the Exchange and expressly invoked Article 187.9 of the Venezuelan

Constitution, which enumerates the National Assembly's power to authorize (or refuse authorization of) national public interest contracts.  Ex. C. to Complaint.

285.    Only a few opposition-aligned National Assembly delegates expressed a belief that the Exchange Offer was a "contract of national public interest" that, under Article 150 of the Venezuelan Constitution, required the approval of the National Assembly.  Xu Decl. Ex. 3.

**Plaintiffs' Response 285.**    This mischaracterizes the record.  A majority of the National Assembly (and a large majority of the opposition) ultimately voted to adopt the September 2016 Resolution, which expressly invoked Article 187.9 of the Venezuelan Constitution, which enumerates the National Assembly's power to authorize national public interest contracts (or refuse authorization, as occurred with respect to the proposed exchange).  Ex. C. to Complaint.  Additionally, a majority of the National Assembly did not provide the constitutionally required authorization for any of the Transaction Documents,

286.



**Plaintiffs' Response 286.**



287.

**Plaintiffs' Response 287.**

a majority of the National Assembly ultimately voted to adopt the September 2016 Resolution, which "categorically rejected" the proposed pledge of CITGO in the Exchange and expressly invoked Article 187.9 of the Venezuelan Constitution, which enumerates the National Assembly's power to authorize (or refuse authorization of) national public interest contracts.  Ex. C. to Complaint.

288.    Guzmán is a principal leader of Justice First and, in 2018, served as the President of the Finance Commission of the National Assembly.  Ex. 123 at 1; Ex. 362.

**Plaintiffs' Response 288.**    Undisputed

289.    While there were some initial reports that Julio Borges, a senior member of the opposition in the National Assembly, believed the Exchange Offer required National Assembly approval, Borges was misquoted and later clarified that he did not believe the Exchange Offer involved a "Contract of National Interest" that required National Assembly approval.  Xu Decl. Ex. 4 at 3 & n. 1.

**Plaintiffs' Response 289.**   The referenced statement is inadmissible hearsay, and as previously noted, a majority of the National Assembly expressed its views by adopting the September 2016 Resolution, which "categorically rejected" the proposed pledge of CITGO in the Exchange and expressly invoked Article 187.9 of the Venezuelan Constitution, which enumerates the National Assembly's power to authorize (or refuse authorization of) national public interest contracts.  Ex. C. to Complaint.

290.    Borges is the National Coordinator of Justice First, a position equivalent to party leader, and has held that position since the founding of the party in 2000.  Previously, Borges was President of the National Assembly from January 2017 to January 2018.  Ex. 24; Ex. 76.

**Plaintiffs' Response 290.**   Undisputed.

291.    Since August 2019, Borges has served as Presidential Commissioner for Foreign Affairs of Venezuela for the Guaidó government.  Ex. 25.

**Plaintiffs' Response 291.**   Undisputed.

292.    On September 27, 2016, the National Assembly passed a non-binding resolution criticizing the Exchange Offer.  The resolution alleged years of mismangement at PDVSA; it stated that the need to offer the security interest was an "indicat[or] of the credibility problems" PDVSA was facing; it called on President Maduro to testify before the National Assembly; called for the Attorney General to investigate the transaction; called for PDVSA to develop a plan to renegotiate its debts; and "reject[ed] categorically" the Pledge Agreement.  Ex. 44 at 8.

**Plaintiffs' Response 292.**   This mischaracterizes the record, as the September 2016 Resolution (in addition to the cited statements) also expressly invoked Article 187.9

of the Venezuelan Constitution, which enumerates the National Assembly's power to

authorize (or refuse authorization of) national public interest contracts.  Ex. C. to

Complaint.  Furthermore, it is incorrect that the September 2016 Resolution was "non-

binding."  Resolutions, so long as they do not conflict with constitutional provisions,

have the same rank as statutes and are binding under Venezuelan law.  *See* Brewer Report

at ¶¶ 51, 73; Letter to the Honorable Katherine Polk Failla from Carlos Vecchio,

*Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-

10023-KPF, Dkt. 80, at ¶ 24 (June 9, 2020).

293.    The PDVSA Parties allege that the non-binding resolution "publicly

denounce[d]" (Compl. ¶ 50) and "explicitly reject[ed]" the Exchange Offer.  Ex. 12 ¶ 12.

**Plaintiffs' Response 293.**    It is incorrect that the September 2016 Resolution

was "non-binding."  Resolutions, so long as they do not conflict with constitutional

provisions, have the same rank as statutes and are binding under Venezuelan law.  See

Brewer Report at ¶¶ 51, 73; Letter to the Honorable Katherine Polk Failla from Carlos

Vecchio, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No:

19-cv-10023-KPF, Dkt. 80, at ¶ 24 (June 9, 2020).  Otherwise undisputed.

294.    In fact, the non-binding resolution did *not* state that the Exchange Offer

would be illegal, invalid, null and void *ab initio*, or unenforceable.  Ex. 44; *see also* Ex. 29

¶ 132; Ex. 136.

**Plaintiffs' Response 294.**    The September 2016 Resolution reflects that the

National Assembly never authorized the Exchange Offer, and in the absence of such

authorization the contracts purportedly arising from the Exchange Offer are illegal,

invalid, null and void *ab initio*, and unenforceable.  In addition to "reject[ing]

categorically" the pledge of CITGO as collateral, the September Resolution called for an investigation into the legality of the transaction.  Ex. C to Complaint.  This investigation was quickly quashed by the Maduro-controlled Supreme Tribunal and was ignored by PDVSA.  Ex. D to the Complaint; Brewer Report at ¶¶ 74-75.  Again, it is incorrect that the September 2016 Resolution was "non-binding."  Resolutions, so long as they do not conflict with constitutional provisions, have the same rank as statutes and are binding under Venezuelan law.  See Brewer Report at ¶¶ 51, 73; Letter to the Honorable Katherine Polk Failla from Carlos Vecchio, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF, Dkt. 80, at ¶ 24 (June 9, 2020).

295.    The day after the non-binding resolution was passed, Francisco Rodríguez, the Chief Economist at Torino Capital, sent an email to a group of investors, including Ashmore and BlackRock, explaining that the resolution "does not state that the operation is illegal nor does it criticize it on legal grounds."  Ex. 293; *see also* Xu Decl. Ex. 3.

**Plaintiffs' Response 295.**    Undisputed that Mr. Rodriguez, who is neither a lawyer nor a legislator, made such statements.  However, Mr. Rodriguez also acknowledged that "investors may be concerned about the legal risks associated with the [2020 Notes]."  Defs. Ex. 373 at 7.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  Finally, resolutions, so long as they do not conflict with constitutional provisions, have the same rank as statutes and are binding under Venezuelan law.  See Brewer Report at ¶¶ 51, 73; Letter to the Honorable Katherine Polk Failla from Carlos Vecchio, *Petróleos de Venezuela, S.A. et al.*

106

*v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF, Dkt. 80, at ¶ 24 (June 9, 2020).

296.    In the same email, Rodríguez stated:  "[Torino] spoke to several opposition leaders yesterday.  Most, including the most senior members, agreed that the [Exchange Offer] was legal and did not require National Assembly authorization.  Some claimed that it did, particularly in the case of using CITGO collateral.  But those that had looked at the legal aspect in some detail agreed with our view.  That, I believe, is the reason why the resolution in the end did not claim that Assembly approval was required."  Xu Decl. Ex. 3.

**Plaintiffs' Response 296.**    The referenced statement is inadmissible hearsay, and in any event the views of individual deputes are irrelevant to this litigation, for as previously noted a majority of the National Assembly expressed its views by adopting the September 2016 Resolution, which "categorically rejected" the proposed pledge of CITGO in the Exchange and expressly invoked Article 187.9 of the Venezuelan Constitution, which enumerates the National Assembly's power to authorize (or refuse authorization of) national public interest contracts, and the National Assembly refused to authorize any of the Transaction Documents.  Ex. C. to Complaint.

297.    Rodríguez further stated that the non-binding resolution was "non-binding and is simply a way that the Assembly has of saying 'we disagree with this operation.'  An Assembly resolution has no legal binding force."  *Id*.

**Plaintiffs' Response 297.**    Undisputed that Mr. Rodriguez, who is not an attorney or a Venezuelan legislator, made this statement.  However, Mr. Rodriguez's statement – which is inadmissible hearsay in any event – is incorrect and irrelevant to this litigation.  Resolutions, so long as they do not conflict with constitutional provisions,

have the same rank as statutes and are binding under Venezuelan law.  *See* Brewer Report at ¶¶ 51, 73; Letter to the Honorable Katherine Polk Failla from Carlos Vecchio, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF, Dkt. 80, at ¶ 24 (June 9, 2020).  Additionally, in another report following the September 2016 Resolution, Mr. Rodriguez acknowledged that "investors may be concerned about the legal risks associated with the [2020 Notes]."  Ex. 373 at 7.

298.    Rodríguez holds a Ph.D. in economics from Harvard University and headed the Venezuela National Assembly's Economic and Financial Advisory Office between 2000 and 2004.  Ex. 372.  During the 2018 Venezuela elections, Rodríguez served as economic advisor to the opposition candidate, Henri Falcón.  *Id.*

**Plaintiffs' Response 298.**    Undisputed but irrelevant (Rodriguez has not been offered as an expert witness in this case).



**Plaintiffs' Response 300.**



301.    Later that month, Hernández wrote a legal memorandum addressed to

Interim President Guaidó, in which he stated that "the National Assembly, despite having

questioned the establishment of the guarantee, did not declare the [Indenture] to be a public

interest contract," and that the non-binding resolution "did not declare the unlawfulness of

that Bond."  Ex. 29 at ¶¶ 132, 160.

**Plaintiffs' Response 301.**    This mischaracterizes the record, as the cited legal

memorandum also states that the September 2016 Resolution was issued by the National

Assembly "in exercise of the powers of oversight accorded it in article 187.3 of the

Constitution."  Opinion of the Office of Special Attorney General, dated August 28,

2019, Bliss Opp. Decl. Ex. 9 at ¶¶ 36-37.  The memorandum also observes that "Article

187.9 provides for the National Assembly's control authority over these [national public

interest] agreements."  *Id.* at n. ¶ 39, n. 34.  The statement also mischaracterizes the

record to the extent that it is intended to suggest that the memorandum concluded that the

indenture is (or ever was) valid under Venezuelan law.  To the contrary, the

memorandum concluded that "the indenture is a national public interest agreement that, as such, should have been previously authorized by the National Assembly pursuant to Article 150 of the Constitution.  Owing to the lack of authorization, Petroleos de Venezuela, S.A. (PDVSA) did not have the legal capacity to sign that agreement, which is invalid under Venezuelan Law."  *Id.* at ¶ 2.

302.    In that legal memorandum, Hernández further recognized, "the general principle is that [Venezuelan Administrative] Law only has territorial effects, in other words, that the Law governs the subjects and activities carried out within the territory of the Venezuelan State."  *Id.* ¶ 30.

**Plaintiffs' Response 302.**    This mischaracterizes the record, to the extent that it is intended to suggest that the Office of the Attorney General in the cited memorandum concluded that the validity of any aspects of the transaction are not subject to the requirements of Venezuelan public law.  To the contrary, the cited memorandum also contains, *inter alia*, the following statement shortly after the quotation cited in Statement 302:

> PDV Holding, Inc. is a company incorporated abroad and governed, therefore, by foreign law.  Nevertheless, this conclusion must be qualified.  As was explained, the guarantee contract [the Pledge] is a contract connected to the issuing contract, which contains PDVSA's promise to establish the pledge on the shares owned by PDV Holding, Inc.  Therefore, to the extent that the issuing contract is an operation of public credit governed by Venezuelan Law, the promise to establish the pledge is also subject to Venezuelan law.  Moreover, the nullity of the issuing contract – the main obligation – would entail the nullity of the guarantee contract – the accessory obligation[.]

> *Id*. at ¶ 36.

110

303.    In contrast to the non-binding resolution dated September 27, 2016, the
National Assembly passed other non-binding resolutions in 2016 and 2017 declaring that
*other transactions* were illegal on the ground that they required National Assembly
approval under Article 150 of the Venezuelan Constitution.

**Plaintiffs' Response 303.**    The September 2016 Resolution invoked the National

Assembly's powers under Article 187 of the Venezuelan Constitution, which enumerates

the National Assembly's power to authorize (or refuse authorization of) national public

interest contracts.  Ex. C. to Complaint.  As such, the September 2016 resolution

recognized that National Assembly approval of the transaction involving the 2020 Notes

was necessary, and it is immaterial whether "illegality" was expressly declared.

Furthermore, it is incorrect that the September 2016 Resolution was "non-binding."

Resolutions, so long as they do not conflict with constitutional provisions, have the same

rank as statutes and are binding under Venezuelan law.  *See* Brewer Report at ¶¶ 51, 73;

Letter to the Honorable Katherine Polk Failla from Carlos Vecchio, *Petróleos de*

*Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF,

Dkt. 80, at ¶ 24 (June 9, 2020).

304.    For example, on June 15, 2016, the National Assembly passed a non-
binding resolution concerning a contract entered into by the Republic that allowed for
mining in areas of Venezuela that were previously designated as environmentally protected
zones. Ex. 43 at 1–2.  The resolution condemned that contract for "seeking to illegally
grant concessions or contracts of national public interest" without "authorization of the
National Assembly, in accordance with the provisions of article[] 150" of the Venezuelan
Constitution.  *Id.* at 1.

**Plaintiffs' Response 304.**   Disputed that any such resolution was "non-binding." Resolutions, so long as they do not conflict with constitutional provisions, have the same rank as statutes and are binding under Venezuelan law.  *See* Brewer Report at ¶¶ 51, 73; Letter to the Honorable Katherine Polk Failla from Carlos Vecchio, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF, Dkt. 80, at ¶ 24 (June 9, 2020).  Undisputed that on some occasions, the National Assembly has specifically characterized contracts of national public interest as "illegal," and on other occasions it has simply "condemned" or "rejected" them or otherwise withheld authorization.  The relevant question is whether a contract required authorization under the Venezuelan Constitution, and whether the National Assembly granted such authorization if required.

305.    Similarly, on April 18, 2017, the National Assembly passed a non-binding resolution concerning: (i) the organization of joint ventures in the mining or hydrocarbon sectors; (ii) exchanges involving bonds possessed by the Central Bank of Venezuela; and (iii) the Central Bank of Venezuela's agreement with international banks to secure loans with gold.  The resolution declared the transactions an "absolute nullity, for contravening the provisions of article[] 150" because they were "carried out without the approval of the National Assembly," "in open violation of the Constitution and of the Law."  Ex. 45 at 2–3.

**Plaintiffs' Response 305.**   Disputed that any such resolution was "non-binding" - resolutions, so long as they do not conflict with constitutional provisions, have the same rank as statutes and are binding under Venezuelan law.  *See* Brewer Report at ¶¶ 51, 73; Letter to the Honorable Katherine Polk Failla from Carlos Vecchio, *Petróleos de*

*Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF, Dkt. 80, at ¶ 24 (June 9, 2020).  Undisputed that on some occasions, the National Assembly has specifically characterized contracts of national public interest as "illegal", and on other occasions it has simply "condemned" or "rejected" them or otherwise withheld authorization.  The relevant question is whether or not a contract required authorization under the Venezuelan Constitution, and whether or not the National Assembly granted such authorization if required.

### B.     The Administration of Interim President Juan Guaidó Gained U.S. Recognition in January 2019.

306.    On January 15, 2019, the National Assembly declared President Maduro's election illegitimate and stated that Guaidó, the President of the National Assembly, would assume the role of the Interim President of Venezuela.  Compl. ¶ 24.

**Plaintiffs' Response 306.**    Undisputed.

307.    Interim President Guaidó was sworn in as Interim President on January 23, 2019. Ex. 139 at 1.

**Plaintiffs' Response 307.**    Undisputed.

308.    That same day, U.S. President Donald Trump recognized Guaidó as the Interim President of Venezuela.  Compl. ¶ 24.

**Plaintiffs' Response 308.**    Undisputed.

309.    On February 13, 2019, the National Assembly approved the Guaidó administration's appointments to the PDVSA Ad Hoc Board, which then in turn appointed the directors of its subsidiaries, including PDVH.  Compl. ¶¶ 8, 35.

**Plaintiffs' Response 309.**    Undisputed.

> **C.**    **Over the Past Year, the Venezuelan Government and the National Assembly Have Attempted to Change Venezuelan Law to Help the PDVSA Parties Escape Their Obligations.**

310.    On May 15, 2019, José Ignacio Hernández, the Guaidó administration's Special Attorney General, gave an interview where he introduced the theory that "the capacity of PDVSA to enter into an agreement is ruled by Venezuelan law," and—under such law—PDVSA lacked capacity to enter the Exchange Offer. *See* Ex. 363.

**Plaintiffs' Response 310.**    Disputed that this constituted a "theory" or that it was "introduced" on May 15, 2019.  For the entire relevant period, commencing prior to the 2016 Exchange, PDVSA's capacity (and authority) to contract has been governed by Venezuelan public law and the Venezuelan Constitution.  Brewer Report at ¶¶ 117-133 ("VENEZUELAN LAW DOES NOT PERMIT THE LAW OF ANOTHER JURISDICTION TO GOVERN THE VALIDITY OF PUBLIC INTEREST CONTRACTS").

311.    On October 15, 2019—less than two weeks before the PDVSA Parties commenced this litigation—the National Assembly passed a non-binding resolution declaring—for the first time—that the 2020 Notes violated Article 150 of the Venezuelan Constitution.  The October 2019 resolution purported to "reiterate all the questions this National Assembly has been formulating since 2016 about the irresponsible indebtedness of PDVSA and the execution of national public contracts not previously authorized," including the non-binding resolution passed by the Assembly in September 2016.  However, the non-binding resolution passed on September 27, 2019, did not raise a question about—or even mention—the legality of the 2020 Notes or reference Article 150 of the Constitution.  Further, the non-binding resolution passed October 15, 2019, purports that the previous non-binding resolution had "ordered the initiation of investigations for

alleged crimes to the public patrimony derived from [the] transaction."  But the non-binding resolution passed September 27, 2016, does not reference alleged crimes to the patrimony.  Ex. 50 at 6, 8; Ex. 44 at 6–9.

> **Plaintiffs' Response 311.**    This mischaracterizes the record.  The September 2016 Resolution, which "categorically rejected" the proposed pledge of CITGO in the Exchange rather than providing constitutionally required authorization, expressly invoked Article 187.9 of the Venezuelan Constitution, which enumerates the National Assembly's power to authorize (or refuse authorization of) national public interest contracts.  Ex. C. to Complaint.  Furthermore, the September 2016 Resolution recited the history of both the Maduro's regime's misuse of "PDVSA as a source of financing for political-partisan purposes" and its financial mismanagement of PDVSA in the context of the National Assembly's call for an investigation of the Exchange Offer.  Finally, as stated repeatedly in these responses, it is incorrect to call the resolutions of the National Assembly "non-binding."  See Brewer Report at ¶¶ 51, 73.

312.    In the non-binding resolution passed October 15, 2019, the National Assembly opined for the first time that the 2020 Bonds were invalid under the Venezuelan Constitution—three years and one month after the announcement of the Exchange Offer. Ex. 50 at 8.

> **Plaintiffs' Response 312.**    This mischaracterizes the record, for the reasons stated in Response No. 311.

313.    ██████████████████████████████████████████
██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████    Ex. 130 at PDVSA-00035877–78.

**Plaintiffs' Response 313.**    ███████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

314.    Only during the pendency of this lawsuit, after the Trustee and Collateral Agent had listed the Rosneft transaction as a topic for the Rule 30(b)(6) deposition of PDVSA, and the day before that deposition was scheduled to occur, did the National Assembly pass a non-binding resolution—the day before that deposition was scheduled to occur—purporting to declare the Rosneft transaction invalid under Article 150 of the Venezuelan Constitution.  Ex. 14 at 8–9; Ex. 51 at 2–3; ██████████  Ex. 1 §§ 55–58.

**Plaintiffs' Response 314.**    Undisputed that the National Assembly passed a binding—not a non-binding—resolution on March 4, 2020 which, *inter alia*, (i) referred to the National Assembly's prior statements of its authority with respect to national public interest contracts, including the National Assembly's May 26, 2016 Resolution (Pls. Ex. 51 at 1), (2) declared the nullity of "the export contracts and their addenda, as well as the guarantee contract, signed between PDVSA and PDVSA Petróleo S.A., on November 30, 2016 with Rosneft Trading, S.A., through which 49.9% of Citgo Holding, Inc's shares were granted as collateral, as they are government contracts signed in breach of Article 150 of the Constitution of the Bolivarian Republic of Venezuela, and (3) "reiterate[d] all the questions that this National Assembly has been raising since 2016 regarding PDVSA's irresponsible indebtedness and the signing of government contracts without prior authorization."  *Id*. at 2-3.

116

315.    In passing the non-binding resolution dated March 4, 2020, the National

Assembly opined for the first time that the Rosneft security interest was invalid under the

Venezuelan Constitution—three years and four months after PDVH granted a lien on

49.9% of CITGO Holding to Rosneft.

**Plaintiffs' Response 315.**    This mischaracterizes the record to the extent it is

intended to suggest that the Rosneft security interest was valid prior to the National

Assembly's binding (not non-binding) March 4, 2020 Resolution.  The Rosneft security

interest is invalid because it is a contract of national public interest that was never

authorized by the National Assembly as required by the Venezuelan Constitution, and the

National Assembly has made its position clear that such contracts are invalid at least

since its May 26, 2016 Resolution asserting its constitutional powers, which was enacted

shortly after the opposition took control of the National Assembly.

316.    After defendants filed their expert report on Venezuelan constitutional law,

which cited the 2016 decision of the Constitutional Chamber in the *Brigitte Acosta* case,

the National Assembly—two days before rebuttal reports were due—issued a non-binding

resolution purporting to declare as void all cases decided by the Constitutional Chamber

after December 23, 2015, stating that "none of the decisions decreed by the Constitutional

Chamber of the Supreme Tribunal of Justice after December 23, 2015 constitute valid

judgments." Ex. 52 at 1.

**Plaintiffs' Response 316.**    Undisputed that the National Assembly on April 28,

2020 passed a binding (not a non-binding) resolution that, *inter alia*, (1) condemned an

April 22, 2020 decision of the Supreme Tribunal purporting to divest Venezuela's

Special Attorney General of his authority to represent Venezuela, and (2) "ratif[ied] that

none of the decisions decreed by the Constitutional Chamber of the Supreme Tribunal of Justice since December 23, 2015 may be considered a valid and effective judgment, much less binding, in terms of Article 335 of the Constitution, due to being the result of an illegitimate structuring of the Supreme Tribunal of Justice and, in addition, forming part of political action intended to dismantle constitutional law in Venezuela." Defs. Ex. 52. For context, as discussed at length in Professor Brewer's report and as recognized by the U.S. State Department and international humanitarian organizations, since the legislative elections that were won by the opposition in December 2015, Venezuela's Supreme Tribunal has systematically committed itself to dismantling the powers of Venezuela's National Assembly, its only democratically legitimate branch of government (including, among many other actions, by purporting to curtail the scope of the National Assembly's powers under Article 150. Brewer Report at ¶¶ 63-64, 67-68; Brewer Rebuttal Report at n. 54; *see also Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice*, U.S. DEP'T OF TREASURY (May 18, 2017), Bliss Opp. Decl. Ex. 10.

317. Despite citing as illegal all thirty-three of the December 2015 appointments to the Supreme Tribunal, the non-binding resolution selectively declares void only the decisions of the Constitutional Chamber (i.e., the Chamber that decided a key case cited by defendants' expert) since that time. *Id.*

**Plaintiffs' Response 317.** Disputed to the extent that this statement intends to suggest anything beyond the fact that it is Venezuela's Constitutional Chamber that has been at the forefront of the Supreme Tribunal's efforts since the December 2015 legislative elections to undermine the National Assembly's constitutional powers.

Further, the resolution is binding, not non-binding.  *See* Brewer Report at ¶¶ 51, 73;

Letter to the Honorable Katherine Polk Failla from Carlos Vecchio, *Petróleos de*

*Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF,

Dkt. 80, at ¶ 24 (June 9, 2020).

318.    Similarly, eleven days before the deadline for rebuttal reports, on April 19,

2020, Román J. Duque Corredor published an "opinion" in which he wrote that the 2020

Notes were void.  Ex. 118.

**Plaintiffs' Response 318.**    Undisputed that on April 19, 2020, Román J. Duque

Corredor published his opinion that the 2020 Notes are void.

319.    Duque is a "former justice of the Supreme Court and National Coordinator

of Venezuela's Constitutional Block."  Ex. 350.

**Plaintiffs' Response 319.**    Undisputed.

320.    The "opinion" mirrored reasoning in Brewer's opening expert report on

Venezuela law.  *Id.*  His opinion asserts that because the contracts "were signed by two

state-owned companies, that is, PDVSA and PDVSA Petróleos, SA," "provided a

controlling share in the most important asset of the State outside of the country (which is

Citgo) as a guarantee," and "were signed with companies located outside of the country,"

then they "meet all of the elements to be considered a contract of national public interest."

*Id.* at 1.

**Plaintiffs' Response 320.**    This is misleading to the extent that the

characterization of Dr. Duque's publication as "mirror[ing]" the Brewer Report is meant

to suggest that Mr. Duque's opinion was anything but his own, based on his experience

as a constitutional scholar and former justice of the Supreme Court and National

Coordinator of Venezuela's Constitutional Block.  Defs, Ex. 350.

321.    In support of its conclusion that the 2020 Notes violated Venezuela law, the

rebuttal report submitted by Professor Brewer-Carías relies heavily on these after-the-fact

legal sources, namely, (a) the non-binding October 2019 Resolution, (b) the non-binding

April 2020 Resolution, (c) the Duque opinion published less than a week before the rebuttal

report, and (d) the non-binding National Assembly resolutions post-dating the Exchange

Offer, dated April 24, 2018, January 8, 2019, and October 15, 2019.  *See, e.g.*, Ex. 27 ¶¶

25, 32, 37, 38, 66–69, 89.

**Plaintiffs' Response 321.**    These are legal arguments, not factual statements, but

to the extent that any response is required, disputed to the extent that this statement

intends to suggest that any of these authorities were improperly relied upon by Professor

Brewer, that the authorities are "after the fact," or that the National Assembly's

resolutions are "non-binding" (they are not – *see* Brewer Report at ¶¶ 51, 73).

322.    Most recently, on May 5, 2020, the National Assembly passed a non-

binding resolution purporting to declare that PDVSA is subject to Article 150 of the

Constitution.  This resolution came just four days after the parties exchanged rebuttal

expert reports on Venezuelan law addressing the validity of the 2020 Notes under Article

150.  In it, the National Assembly declared that "article 150 of the Constitution of the

Bolivarian Republic of Venezuela, unambiguously applied to PDVSA," and cited the

purportedly "unconstitutional collateral on Citgo Holding, Inc. resulting from the so-called

PDVSA 2020 Bonds and the contracts signed with Rosneft Trading, S.A." as examples of

the applicability of Article 150.  The National Assembly declared this notwithstanding the

National Assembly's failure to state that Article 150 applied to either transaction until more than three years after their occurrences.  Ex. 262 at 1.

**Plaintiffs' Response 322.**   Disputed to the extent that this statement is intended to suggest that the National Assembly has not repeatedly and publicly taken action since before the Exchange Offer making clear that PDVSA is subject to the National Assembly's constitutional authority with respect to national public interest contracts, including through its resolutions.  Ex. C to Complaint; Ex. D to Complaint; Pls. Ex. 13; Pls. Ex. 68; Pls. Ex. 69; Pls. Ex. 70; Pls. 71; Pls. Ex. 72.

323.   On June 2, 2020, CITGO Petroleum published a preliminary offering memorandum of $750,000,000 in senior secured notes due in 2025, governed by New York law.  The notes are guaranteed by CITGO Petroleum's wholly owned domestic restricted subsidiaries.  The notes are secured by, among other things, a first-priority lien on CITGO Petroleum's refineries in Lake Charles, Louisiana, Lemont, Illinois, and Corpus Christi, Texas; stock in each of CITGO Petroleum's wholly-owned subsidiaries; the inventory and accounts receivable of CITGO Petroleum and its subsidiaries; and all proceeds and products of the real property and assets of the other listed security.  Ex. 42 at 11–12, 15.

**Plaintiffs' Response 323.**   Undisputed.

324.   CITGO Petroleum did not seek or obtain National Assembly approval before offering these notes.  Ex. 277.

**Plaintiffs' Response 324.**   Undisputed.

325.   The day after the debt offering was announced, the Guaidó administration's Special Attorney General tweeted a press release, stating: "[t]he debt refining of Citgo Petroleum Corporation is not subject to prior authorization by the National Assembly based

on article 187 of the Constitution, unlike the financial operations of [PDVSA]," because "[t]he powers of control of the National Assembly . . . cannot be exercised extraterritorially concerning PDVSA subsidiaries incorporated abroad, nor concerning contracts executed abroad not related to the transfer or traffic of PDVSA."  Ex. 277.

**Plaintiffs' Response 325.**   Undisputed.

326.    This standard differs from the position the PDVSA Parties have advanced previously in this case.  In prior academic writing, Professor Brewer has never asserted that foreign subsidiaries are exempt from the purported requirement to obtain National Assembly approval, nor that it mattered where a contract was executed.  Professor Brewer also never referred to "transfer or traffic of PDVSA" in his reports.  Ex. 13.

**Plaintiffs' Response 326.**   This is legal argument to which no factual response is required, but to the extent that a response is necessary, disputed that the comments in Statement 325 "differ from the position the PDVSA Parties have advanced previously in this case."

327.    This differs from the theory contained in the Guaidó Special Attorney General's prior memoranda.  Those memoranda never argued that foreign subsidiaries were exempt or that the National Assembly approval requirement did not apply to "contracts executed abroad not related to the transfer or traffic of PDVSA."  Ex. 36 at ¶¶ 40–50; Ex. 29 at  ¶¶ 38–68.

**Plaintiffs' Response 327.**   This also is legal argument to which no factual response is required, but to the extent a response is necessary, this mischaracterizes the prior memoranda of the Special Attorney General.  For example, as the Office of the

Attorney General wrote in its August 2019 memorandum (Opinion of the Office of

Special Attorney General, dated August 28, 2019, Bliss Opp. Decl. Ex. 9):

> PDV Holding, Inc. is a company incorporated abroad and governed,
> therefore, by foreign law.  Nevertheless, this conclusion must be qualified.
> As was explained, the guarantee contract [the Pledge] is a contract
> connected to the issuing contract, which contains PDVSA's promise to
> establish the pledge on the shares owned by PDV Holding, Inc.
> Therefore, to the extent that the issuing contract is an operation of public
> credit governed by Venezuelan Law, the promise to establish the pledge is
> also subject to Venezuelan law.  Moreover, the nullity of the issuing
> contract – the main obligation – would entail the nullity of the guarantee
> contract – the accessory obligation[.]

> *Id*. at ¶ 35-36.* * *

> PDV Holding, Inc. had no plausible financial reasons to establish the
> pledge in order to guarantee an obligation of its shareholder, unrelated to
> its line of business.

> *Id*. at ¶ 123.* * *

> [I]t is important to remember that despite the fact that PDV Holding, Inc.
> signed the guarantee contract [the Pledge], in truth, it was PDVSA who
> undertook the obligation to establish that guarantee, for the benefit of its
> own public credit operation – which in no way benefitted PDV Holding,
> Inc.  The fact that it was PDVSA – and not PDV Holding, Inc. – who
> made the decision to establish this guarantee, corroborates the idea that it
> affects 'the economic and social life of the Nation", having an impact
> beyond the scope of PDV Holding, Inc.

> *Id*. at ¶ 128.

328.    This new standard is also incompatible with the historical practices of

PDVSA and its subsidiaries.  During the last three decades alone, PDVSA and its

Venezuela-based subsidiaries have issued at least $60,000,000,000 in secured and

unsecured debt, guaranteed the debt of its foreign-based subsidiaries, and entered multiple

contracts with foreign corporations for the development of oil projects, all without seeking

National Assembly approval.

**Plaintiffs' Response 328.**    At this level of generality, this statement of "fact" is

impossible to meaningfully respond to.  Plaintiffs will respond below to the specific

assertions of fact made by defendants with respect to specific debt offerings, but
Plaintiffs note that the PDVSA 2020 transaction was the first transaction to which
PDVSA itself was a party in which a controlling security interest in its most important
asset abroad, CITGO, was offered as collateral.

329.    PDVSA alone has issued or guaranteed at least 34 note offerings or
exchanges, entered into agreements for multiple credit facilities and loans, entered into at
least four joint ventures, and at least three investment certificates.  *See* ¶¶ 386, 390–93,
395, 414–15, 421, 453, 460–64, 466, 470, 486–95.

**Plaintiffs' Response 329**    Plaintiffs refer to their response to ¶ 328.

330.    PDVSA Petróleo has guaranteed nine note offerings or exchanges.  *See*
¶¶ 451, 459–62, 464, 468, 484, 494.

**Plaintiffs' Response 330.**    Based upon the excerpted exhibit provided by
Defendants, PDVSA Petróleo did not guarantee the bond offering described in ¶ 451 (and
they do not describe PDVSA Petróleo as a guarantor in that paragraph).  The transaction
described in ¶ 459 is a sale of a company, not a bond offering or exchange, and does not
involve PDVSA Petróleo as a guarantor.  The transaction described in ¶ 484 is a credit
facility agreement, not a bond offering or exchange, and likewise does not involve
PDVSA Petróleo as a guarantor.  All of the transactions actually involving PDVSA
Petróleo as guarantor are dissimilar from the transaction at issue because they did not
involve the pledge of the majority share of CITGO as collateral.  Plaintiffs otherwise
refer to their response to ¶ 328.

331.    PDVSA's subsidiaries based in Venezuela (PDV Marina, Bariven, S.A.,
Sociedad de Fomento de Inversion Petrolera CA, Petrozuata Finance Inc., Cerro Negro

Finance Ltd., PDVSA Sincor, S.A., CA Electricidad de Caracas) have issued or guaranteed approximately $5,880,000,000 in debt over the last three decades. *See* ¶¶ 386–89, 391–93, 406–07, 414–15, 421, 426–27, 454.

**Plaintiffs' Response 331.**   Plaintiffs refer to their response to ¶ 328.

**X.      The Trustee, Collateral Agent, and the
         Exchanging Holders Reasonably Believed That
         the Exchange Offer Was Legal and Authorized.**

**A.      The Trustee and Collateral Agent Did
         Not Intend to Violate Venezuelan Law.**

332.    The Trustee's principal officer responsible for the issuance of the 2020 Notes was not alerted that the issuance of the 2020 Notes or the execution and delivery of the Indenture and Pledge Agreement violated Venezuelan law, or that there was any question whether the 2020 Notes, the Indenture, or the Pledge Agreement were enforceable.  Moreyra Decl. ¶ 11.

**Plaintiffs' Response 332.**   PDVSA lacks information with which to confirm or deny this purported "fact", but denies it to the extent that this statement is intended to suggest that the Transaction Documents are valid, or that the National Assembly's public opposition to the transaction and market concerns about its validity were not widely and publicly reported at the time.  Brewer Report at ¶ 45.

333.    The Collateral Agent was not alerted that the issuance of the 2020 Notes or the execution and delivery of the Indenture and Pledge Agreement violated Venezuelan law, or that there was any question whether the 2020 Notes, the Indenture, or the Pledge Agreement were enforceable.  Reed Decl. ¶ 8.

**Plaintiffs' Response 333.**   PDVSA lacks information with which to confirm or deny this purported "fact", but denies it to the extent that this statement is intended to

suggest that the Transaction Documents are valid, or that the National Assembly's public opposition to the transaction and market concerns its validity were not widely and publicly reported at the time.  Brewer Report at ¶ 45.

**B.    The Exchanging Holders Also Relied Upon the PDVSA Parties' Representations and Did Not Intend to Violate Venezuelan Law.**

334.    Beneficial noteholders Ashmore, BlackRock, and Contrarian also had no reason to believe the Exchange Offer was invalid and had no intent to violate Venezuelan law.  Weisser Decl. ¶¶ 9–11; Trigo Paz Decl. ¶¶ 7–9; Xu Decl. ¶¶ 9–11.

**Plaintiffs' Response 334.**    Disputed.  ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████    *See* Hinman Report at ¶¶ 36–57, n. 139; ████████████████████

335.    The Offering Circular assured investors that "[c]ertain legal matters with respect to Venezuelan law will be passed upon for us by Despacho de Abogados Hogan Lovells, S.C. as our Venezuelan counsel" and that "[c]ertain legal aspects of U.S. law and New York law and the issuance of the New Notes offered hereby will be passed upon for us by Hogan Lovells US LLP as our U.S. legal counsel."  Ex. 1 at 176.

**Plaintiffs' Response 335.**    Undisputed that the aforementioned quotes are contained in the Offering Circular, but denied to the extent that this statement is intended to suggest that reliance upon such statements was or would have been reasonable under the circumstances at the time in light of the National Assembly's public opposition to the transaction.

336.    Exchanging holders likewise relied upon the identification of Hogan Lovells in the Offering Circular and believed that Hogan Lovells would not have allowed

its role to be disclosed if the Offering Circular omitted a material legal risk.  *Id.*; Xu Decl. ¶ 22; Trigo Paz Decl. ¶ 8; Weisser Decl. ¶ 10.

**Plaintiffs' Response 336.**    PDVSA lacks information with which to confirm or deny this purported "fact", but denies it to the extent that this statement is intended to suggest that any such reliance by exchanging holders was or would have been reasonable under the circumstances in light of the National Assembly's public opposition ot the transaction.

337.    Xin Xu of Ashmore based his conclusions that the Exchange Offer was not in violation of Venezuelan law in part on a trip he took to Venezuela from September 7 through 9, 2016.  Xu Decl. ¶¶ 5–10.  The Non-binding resolution dated September 27, 2016, "reaffirmed Ashmore's previous assessment that the Exchange Offer was not subject to legitimate challenge under Venezuelan law."  *Id.* at ¶ 18.  Xu believed that the view that the Exchange Offer was not in violation of Venezuelan law "was a widely held view in the investment community."  *Id.*

**Plaintiffs' Response 337.**    Undisputed that Mr. Xu made the cited statements, but disputed to the extent that this statement is intended to suggest that any such beliefs could have been reasonably held at the time, or that the investment community was not on notice of the National Assembly's public oppositoin to the transaction and the consequent risk that it was invalid under Venezuelan law.  Hinman Report at ¶¶ 13, 22, 36-57; Xu Decl. ¶¶ 9, 14, 19; Xu Dep. 41:19–42:5.

## C.    The Lack of a Risk Disclosure in the Offering Circular.

338.    The Offering Circular contained 14 pages of risk disclosures, but identified no risk that the Governing Documents could be invalid or subject to challenge under Venezuelan law.  Ex. 1 at 18–32.

**Plaintiffs' Response 338.**    Disputed.  The last risk factor refers to Appendix A of the Offering Circular "for certain risk factors in connection with CITGO Holding" and added that noteholders "should consider the information contained under the section "Risk Factors" set forth therein before making a decision to tender your Existing Notes." Defs. Ex. 1 at 32.  Appendix A contains a section on "Risks Related to Our Relationship with PDVSA" which explains, "[m]ajor corporate actions of PDVSA may be subject to the approval of the Venezuelan government, as its sole shareholder." *Id*. at A-28. Furthermore, "[n]o assurance can be given that the Bolivarian Republic of Venezuela, as PDVSA's sharehodler, will not adopt policies or exercsie its control of PDVSA in a manner that might adversely affect your interests." *Id*. at A-28–29.

The Offering Circular also explained that the listed risk disclosures were not an exhaustive list of consderations so note holders "should consider carefully . . . all of the information set forth in this offering circular and, in particular, certain matters relating to the Issuer and other matters associated with investments in securities of issuers in countries that do not have highly developed capital markets, including, without limitation, the risk factors set forth below." *Id*. at 18.

### D.    The Hogan Lovells Opinion Letters

339.    Hogan Lovells US LLP and Hogan Lovells S.C. provided four opinion letters in connection with the Exchange Offer.  Two opinion letters dated September 16, 2016, were addressed to Credit Suisse, and two opinion letters dated October 28, 2016, were addressed to PDVSA, PDVSA Petróleo, S.A., Credit Suisse, the Law Debenture Trust Company of New York, the Trustee, and the Collateral Agent. These opinion letters opined without relevant qualification that the Governing Documents were legal, valid, and binding.  Exs. 30–33.

**Plaintiffs' Response 339.**   While it is undisputed that Hogan Lovells US LLP and Hogan Lovells S.C. provided opinion letters in connection with the Exchange Offer, this statement of fact is misleading because these opinions provided no reasoning for their legal opinions and offered only conclusory statements regarding the legality of the Exchange Offer.  Both entities issued letters on September 16, 2016 and then again on October 28, 2016, without modifying their analysis or even acknowledging the September 27, 2016 resolution passed by the National Assembly condemning the transaction and invoking its constitutional authority to regulate national public interest contracts under Article 187 of the Constitution.  Furthermore, Plaintiffs dispute Defendants' characterization here that the letters were provided "without relevant qualification" and note that the letters clearly qualify their opinions by noting that Hogan Lovells "assumed the genuineness of all signatures, the legal capacity of all natural persons, the accuracy and completeness of all the Documents" and their authenciticy. In relevant part, they also assumed that each party to the agreements has all requisite power and authority under all applicable laws, regulations and governing documents to execute, deliver and perform its obligations under the agreements.  Between these and other assumptions, it is clear Hogan Lovells US LLP and Hogan Lovells S.C. provided relevant qualifications to their opinions.  Ex. 30 at 1–3; Ex. 31 at 2; Ex. 32 at 2–3; Ex. 33 at 2.

340.   Neither opinion letter on New York law concluded that the Governing Documents, the choice-of-law clauses, the 2020 Notes, or the Pledge were unenforceable or invalid.

**Plaintiffs' Response 340.**   It is undisputed that neither letter concluded the choice-of-law clauses were unenforceable or invalid; however, Hogan Lovells US LLP's opinions assumed that the Indenture and Pledge Agreement had "been duly executed and delivered by the Company and the Guarantor under Venezuelan law."  Ex. 30 at 3; Ex. 33 at 5.  Additionally, both letters indicated the clauses might be unenforceable or invalid when noting that such choices "may be subject to certain constitutional limitations where the parties and the transaction have little or no contact with New York."  Ex. 30 at 4; Ex. 33 at 7.

341.   In its opinion letter on New York law, dated October 28, 2016, Hogan Lovells US LLP opined that the 2020 Notes, the Indenture, and the Pledge Agreement constituted a "legal, valid and binding obligation . . . as applicable, under New York State Law" of the PDVSA Parties.  Ex. 33 at 5.[27]

**Plaintiffs' Response 341.**   Undisputed, however, Hogan Lovells US LLP's opinions assumed that the 2020 Notes, Indenture, and the Pledge Agreement had "been duly executed and delivered by the Company and the Guarantor under Venezuelan law." Ex. 30 at 3; Ex. 33 at 5.

342.   In its opinion letter dated October 28, 2016, Hogan Lovells US LLP further opined that PDVH, as Pledgor, "ha[d] the corporate power to execute, deliver and perform the Pledge Agreement" and that "[t]he execution, delivery and performance by the Pledgor of the Pledge Agreement ha[d] been duly authorized by all necessary corporate action of the Company."  *Id.* at 6.

---

[27]   Hogan Lovells LLP's opinion letter dated September 16, 2016, similarly concluded that "[a]ssuming that it has been duly executed and delivered by the Relevant Parties under Venezuelan law, the Agreement has been duly executed and delivered and is the legal, valid and binding obligation of the Relevant Parties, under New York State Law, enforceable against the Relevant Parties."  Ex. 30 at 3.

**Plaintiffs' Response 342.**   Undisputed.

343.   Similarly, neither opinion letter on Venezuela law concluded that approval by Venezuela's National Assembly was required for the Governing Documents to be legal, valid, or enforceable, or that any of the PDVSA Parties lacked the capacity to enter into the 2020 Notes, the Indenture, or the Pledge Agreement.

**Plaintiffs' Response 343.**   It is undisputed that neither opinion letter concluded that approval was required by the National Assembly; however, this fact is misleading because these opinions provided no reasoning for their legal opinions and offered only conclusory statements regarding the legality of the Exchange Offer.  Both entities issued letters on September 16, 2016 and then again on October 28, 2016, without modifying their analysis or even acknowledging the September 27, 2016 resolution passed by the National Assembly condemning the transaction and invoking its constitutional authority to regulate national public interest contracts under Article 187 of the Constitution.

344.   To the contrary, Hogan Lovells S.C. represented that the Exchange Offer, the issuance of the 2020 Notes, the execution, delivery, and performance of the 2020 Notes, Indenture, and Pledge Agreement "do[] not: (i) violate Venezuelan Law or the Articles of Incorporation and By-Laws of [PDVSA and PDVSA Petróleo], respectively, [or] (ii) conflict with or violate any Venezuelan law, rule, regulation, order, judgment or decree applicable to [PDVSA and PDVSA Petróleo] by which any property or asset of [PDVSA, PDVSA Petróleo] or any of their subsidiaries is or may be bound."  Ex. 32 at 4.[28]

---

[28]   The Hogan Lovells S.C. opinion letter dated September 16, 2016, reached the same conclusion.  Ex. 31 at 4.

**Plaintiffs' Response 344.**   It is undisputed that neither opinion letter contained these statements; however, this fact is misleading because these opinions provided no reasoning for their legal opinions and offered only conclusory statements regarding the legality of the Exchange Offer.  Both entities issued letters on September 16, 2016 and then again on October 28, 2016, without modifying their analysis or even acknowledging the September 27, 2016 resolution passed by the National Assembly condemning the transaction and invoking its constitutional authority to regulate national public interest contracts under Article 187 of the Constitution.  In fact, the conclusions in each letter were substantially flawed and ultimately incorrect.  *See* Brewer Report at ¶¶ 102–16.

345.    In the same opinion letter, Hogan Lovells S.C. further opined that: "[n]o approval, authorization or consent of . . . any governmental agency or governmental authority in Venezuela is required to be obtained or made by [PDVSA and PDVSA Petróleo] under Venezuelan Law in connection with, the execution, delivery and consummation by [PDVSA and PDVSA Petróleo] of the Transaction Documents."  *Id.*

**Plaintiffs' Response 345.**   It is undisputed that the opinion letters contained these statements; however, this fact is misleading because these opinions provided no reasoning for their legal opinions and offered only conclusory statements regarding the legality of the Exchange Offer.  Both entities issued letters on September 16, 2016 and then again on October 28, 2016, without modifying their analysis or even acknowledging the September 27, 2016 resolution passed by the National Assembly condemning the transaction and invoking its constitutional authority to regulate national public interest contracts under Article 187 of the Constitution.  In fact, the conclusions in each letter were substantially flawed and ultimately incorrect.  *See* Brewer Report at ¶¶ 102–16.

346.    Hogan Lovells S.C. further opined that the execution, delivery, and performance of the Transaction Documents by PDVSA and PDVSA Petróleo are private and commercial acts rather than governmental or public acts under Venezuelan law. *Id.* at 5.[29]

**Plaintiffs' Response 346.**    It is undisputed that the opinion letters contained these statements; however, this fact is misleading because these opinions provided no reasoning for their legal opinions and offered only conclusory statements regarding the legality of the Exchange Offer.  Both entities issued letters on September 16, 2016 and then again on October 28, 2016, without modifying their analysis or even acknowledging the September 27, 2016 resolution passed by the National Assembly condemning the transaction and invoking its constitutional authority to regulate national public interest contracts under Article 187 of the Constitution.  In fact, the conclusions in each letter were substantially flawed and ultimately incorrect. *See* Brewer Report at ¶¶ 102–16.

347.    Hogan Lovells S.C. further opined that PDVSA and PDVSA Petróleo had "the corporate power and authority to take all necessary corporate action to authorize the Exchange [Offer], the issuance of the [2020] Notes and to execute, deliver and perform [the 2020 Notes, Indenture, and Pledge Agreement]." *Id.* at 4.[30]

**Plaintiffs' Response 347.**    It is undisputed that the opinion letters contained these statements; however, this fact is misleading because these opinions provided no reasoning for their legal opinions and offered only conclusory statements regarding the

---

[29]    The Hogan Lovells S.C. opinion letter dated September 16, 2016, reached the same conclusion.  Ex. 31 at 4.

[30]    The Hogan Lovells S.C. opinion letter dated September 16, 2016, similarly concluded that PDVSA and PDVSA Petróleo had "the corporate power and authority to take all necessary corporate action to authorize the Exchange, the issuance of the Notes and to execute, deliver and perform the Transaction Documents."  Ex. 31 at 3.

legality of the Exchange Offer.  Both entities issued letters on September 16, 2016 and then again on October 28, 2016, without modifying their analysis or even acknowledging the September 27, 2016 resolution passed by the National Assembly condemning the transaction and invoking its constitutional authority to regulate national public interest contracts under Article 187 of the Constitution.  In fact, the conclusions in each letter were substantially flawed and ultimately incorrect.  *See* Brewer Report at ¶¶ 102–16.

348.    Hogan Lovells S.C. also represented that "their execution, delivery and performance have been duly authorized by [PDVSA and PDVSA Petróleo]."  *Id.*[31]

**Plaintiffs' Response 348.**   It is undisputed that the opinion letters contained these statements; however, this fact is misleading because these opinions provided no reasoning for their legal opinions and offered only conclusory statements regarding the legality of the Exchange Offer.  Both entities issued letters on September 16, 2016 and then again on October 28, 2016, without modifying their analysis or even acknowledging the September 27, 2016 resolution passed by the National Assembly condemning the transaction and invoking its constitutional authority to regulate national public interest contracts under Article 187 of the Constitution.  In fact, the conclusions in each letter were substantially flawed and ultimately incorrect.  *See* Brewer Report at ¶¶ 102–16.

E.    **The Hogan Lovells Legal Memorandum**

349.    On September 21, 2016, Hogan Lovells S.C. sent a legal memorandum to PDVSA entitled "The Exchange Offer and the requisite approval set forth in article 150 of the Venezuelan Constitution."  Ex. 28 at 1.

---

[31]    The Hogan Lovells S.C. opinion letter dated September 16, 2016 reached the same conclusion.  Ex. 31 at 3.

**Plaintiffs' Response 349.**   Undisputed that Hogan Lovells prepared the cited memorandum prior to the National Assembly's passage on September 27, 2016 of its resolution condemning the transaction and invoking its constitutional authority to regulate national public interest contracts under Article 187 of the Constitution .

350.   Therein, Hogan Lovells opined that "[c]onclusively, the Exchange Offer, including the Pledge [of 50.1% of the capital stock of CITGO Holding Inc.], is not subject to the approval of the National Assembly as provided by article 150 of the Venezuelan Constitution." *Id.* at 4.

**Plaintiffs' Response 350.**   Undisputed that the memorandum contains the cited quotation, and also noted that the memorandum (i) was written prior to the National Assembly's invocation of its constitutional authority to regulate national public interest contracts in the September 27, 2016 Resolution, (ii) was apparently never revised in light of the passage of the September 27, 2016 Resolution, and (iii) was incorrect in its analysis and its conclusions.  Brewer Report at ¶¶ 102–16.

351.   Hogan Lovells's conclusion was based on: (a) the fact that PDVSA is "fully enabled to enter operations of public credit without the approval of the National Legislative or Executive branches of government," as the Organic Law on the Financial Administration of Public Sector excludes PDVSA from parliamentary approval requirements; (b) the conclusion that the Exchange and the Pledge do not qualify as contracts of public interest under Venezuelan case law; and (c) even if the contract were a contract of public interest, National Assembly approval would be necessary only if a law specifically required PDVSA to seek such approval, and no such law exists.  *Id.* at 2–3.

**Plaintiffs' Response 351.**   Undisputed that the memorandum contains the cited quotation, and also noted that the memorandum (i) was written prior to the National Assembly's invocation of its constitutional authority to regulate national public interest contracts in the September 27, 2016 Resolution, (ii) was apparently never revised in light of the passage of the September 27, 2016 Resolution, and (iii) was incorrect in its analysis and its conclusions, including with respect to the significance of the Organic Law on the Financial Adminstration of the Public Sector (which is – or should be – irrelevant to the analysis (Opposition at 20-21).  Brewer Report at ¶¶ 102–16. .

352.   Hogan Lovells argued that "Decision No. 2,241 issued by the Constitutional Chamber of the Supreme Tribunal of Justice in September 24, 2002 [*Andres Velasquez et al.*] provides the definitive scope and content of [the concept of a national public interest contract]" and that, "[i]n accordance with Decision No. 2,241, contracts of public interest are those 'entered into by the Republic, through the competent organs of the National Executive, whose object is determinative or essential for the accomplishment of the ends and purposes of the Venezuelan state.'"  *Id.* at 3.

**Plaintiffs' Response 352.**   Undisputed that the memorandum contains the cited quotation, and also noted that the memorandum (i) was written prior to the National Assembly's invocation of its constitutional authority to regulate national public interest contracts in the September 27, 2016 Resolution, (ii) was apparently never revised in light of the passage of the September 27, 2016 Resolution, and (iii) was incorrect in its analysis and its conclusions, including in its analysis of the meaning and effect of the *Andres Velasquez et al.* decision  Brewer Report at ¶¶ 102-16.

353.    Hogan Lovells reasoned that *Andres Velasquez* was "binding by all other Chambers that make up the Supreme Tribunal, as well as the rest of the judiciary within the country." *Id*.

**Plaintiffs' Response 353.**    Undisputed that the memorandum contains the cited quotation, and also noted that the memorandum (i) was written prior to the National Assembly's invocation of its constiutional authority to regulate national public interest contracts in the September 27, 2016 Resolution, (ii) was apparently never revised in light of the passage of the September 27, 2016 Resolution, and (iii) was incorrect in its analysis and its conclusions, ncluding in its analysis of the meaning and effect of the *Andres Velasquez et al.* decision.  Brewer Report at ¶¶ 102-16; Brewer Rebuttal Report at ¶¶ 22–29.

354.    Hogan Lovells further reasoned that "[t]he Exchange Offer and the Pledge do not meet any of the criteria set out in [*Andres Velasquez*] to qualify as contracts of public interest." *Id.*  Hogan Lovells explained that "[t]he Exchange Offer and the Pledge do not directly involve the Republic as a contracting party.  To this end, the criterion set out by the Constitutional Chamber would require the direct involvement of the Republic through one of its organs, such as, mainly, ministries." *Id.*  Hogan Lovells also explained that "the Exchange Offer and the Pledge do not compromise in any way assets or funds owned by the Republic.  On the contrary, it compromises assets owned by PDVSA and/or its affiliates." *Id*.

**Plaintiffs' Response 354.**    Undisputed that the memorandum contains the cited quotation, and also noted that the memorandum (i) was written prior to the National Assembly's invocation of its constiutional authority to regulate national public interest

137

contracts in the September 27, 2016 Resolution, (ii) was apparently never revised in light of the passage of the September 27, 2016 Resolution, and (iii) was incorrect in its analysis and its conclusions, ncluding in its analysis of the meaning and effect of the *Andres Velasquez et al.* decision.  Brewer Report at ¶¶ 102–16.

355.    Finally, Hogan Lovells argued that "PDVSA is fully enabled to enter into operations of public credit without the approval of the National Legislative or Executive branches of government" and that "the Organic Law on the Financial Administration of the Public Sector (Ley Organica de la Administración Financiera del Sector Pùblico), which sets forth the Venezuelan public spending regime, expressly excludes PDVSA from seeking parliamentary approval when entering into public credit agreements, such as the issuance of bonds."  *Id.* at 2.

**Plaintiffs' Response 355.**    Undisputed that the memorandum contains the cited quotation, and also noted that the memorandum (i) was written prior to the National Assembly's invocation of its constitutional authority to regulate national public interest contracts in the September 27, 2016 Resolution, (ii) was apparently never revised in light of the passage of the September 27, 2016 Resolution, and (iii) was incorrect in its analysis and its conclusions, including with respect to the significance of the Organic Law on the Financial Adminstration of the Public Sector (which is – or should be – irrelevant to the analysis (Opposition at 20-21).  Brewer Report at ¶¶ 102-16.

356.    

Ex. 17 at 201:20–202:3.



*Id.* at 200:19–201:20.

*Id.* at 130:13–131:7; 143:3–144:18.

**Plaintiffs' Response 356.**

#### F.     Statements by PDVSA and Its Advisors to 2017 Noteholders Assuring Them that the Exchange Offer Was Lawful.

357.    Prior to and throughout the Exchange Offer, the PDVSA Parties and their advisors assured holders of the 2017 Notes of the legality of the Exchange Offer.

**Plaintiffs' Response 357.**    It is undisputed that the PDVSA Parties purported that the Exchange Offer was legal, however, the PDVSA Parties lacked the authority to sanction the Exchange Offer without approval from the National Assembly.  *See* Brewer Report at ¶ 17.

358.

**Plaintiffs' Response 358.** ████████████████████████████

████████████████████████████████████████

359. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

**Plaintiffs' Response 359.** ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

360. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

**Plaintiffs' Response 360.**   Undisputed.

361. ████████████████████████████████

██████████████████████



████████████████████████████

**Plaintiffs' Response 361.** ███████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

███

362. █████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Ex. 282.

**Plaintiffs' Response 362.** ████████████████████████

█████████████████████████████████████

███████████████████████████████████

363. ████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████   ████████████████████



*Id.*

**Plaintiffs' Response 363.** ████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████

364.   ████████████████████████████████

████████████████████████████████

███████████████████

**Plaintiffs' Response 364.** ████████████████████████████

████████████████████████████████

██████████████████████████

███████████████████████████

██████████████████████████████████████

█████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

█████████████████████████████████

███████████████████████████████

██████████████████████████████████████



365. 

Ex. 298 at HL_021748.

**Plaintiffs' Response 365.**

### G.      Statements by Analysts that the Exchange Offer Was Lawful.

366.     The majority of analyst reports published during the time period when the Exchange Offer was open did not mention any risk the 2020 Notes were invalid or illegal. Porzecanski Rebuttal Decl. ¶¶ 37–39.

**Plaintiffs' Response 366.**    This fact is disputed because Porzecanski merely reviewed "all analyst reports produced in this litigation that mention 'PDVSA' or 'CITGO,'" and additional reports cited by Hinman.  This inexhaustive review does not reflect the sum of analyst reports during the time period described.  Porzecanski Rebuttal Decl. ¶ 35.  Furthermore, this fact is misleading because during this period, "a plethora of market and analyst commentary about the invalidity risk associated with the 2020 Notes was publically available."  Hinman Report at 10.

367.    Analysts from Torino Capital and J.P. Morgan explicitly rejected the argument that the Exchange Offer required National Assembly approval.  Xu Decl. Ex. 2 at 6; Xu Decl. Ex. 4 at 3: Ex. 290 at ASH_00006835; Xu Decl. Ex. 3 at 1; Ex. 299 at BLA_00004841.

**Plaintiffs' Response 367.**    Disputed.  Analysts at both Torino Capital and J.P. Morgan acknowledged the concerns regarding the invalidity risk due to the National Assembly's disapproval of the Exchange Offer.  On October 11, 2016 a Torino Capital analyst noted that the market's negative response to the bonds could illustrate "concerns about the legality of the issuance."  Hinman Report at 27.  On October 13, 2016 a J.P. Morgan analyst reported that markets were warned the "deal could be 'illegal.'"  Defs. Ex. 299 at BLA_00004841.

368.    On September 12, 2016, Rodríguez of Torino Capital wrote an analyst report distributed to a group of investors, including BlackRock: "Opposition representatives also reassured us that they would not question the legality of the PDVSA bond swap, as they agreed with the interpretation of the law according to which a new PDVSA issuance (even if it was backed by CITGO) does not require National Assembly authorization."  Xu Decl. Ex. 2 at 7.

**Plaintiffs' Response 368.**    It is undisputed that the aforementioned quote was included in Rodriguez's September 12, 2016 analyst report, however, this fact is misleading because the report was written prior to the National Assembly's resolution dated September 27, 2016, in which a large majority of the Opposition "reject[ed] categorically" the Exchange Offer.  *See* Defs. Ex. 44.

369. 

**Plaintiffs' Response 369.**

370.     On September 28, 2016, Rodríguez wrote another analyst report distributed to a group of investors, including Ashmore.  Ex. 293 at BLA_00004830.  Rodríguez wrote: "The operation is clearly legal in terms of Venezuelan law.  Public credit operations are normed by the Organic Law of Financial Administration of the Public Sector.  Although the law requires National Assembly approval for bond issuances

and forbids the use of state assets as collateral (Article 105), it also expressly exempts PDVSA from those requirements (Article 101).  We discussed this with several Venezuelan lawyers and they all agreed that the operation was clearly within the bounds of Venezuelan law." *Id.*

**Plaintiffs' Response 370.**   It is undisputed that the September 28, 2016 analyst report contained the aforementioned quote – which contains inadmissable hearsay – but this fact is misleading as it omits that the report also stated that some senior members of the National Assembly believed the operation required National Assembly authorization, "particularly in the case of using CITGO collateral." *Id.*

371.    On October 3, 2016, Rodríguez of Torino Capital wrote in an analyst report, addressing the National Assembly's non-binding resolution of September 27, 2016, that "the National Assembly's resolution does not contain any allegation that the operation is illegal or contravened constitutional rules.  This is in stark contrast with the way in which the National Assembly has handled other cases, such as that of the Mining Arc concessions, where it explicitly denied approval for the concessions and approved a law to restrict the government's authority to give them. In the case of the bond swap, the Assembly simply criticized the operation, but did not label it illegal.  Furthermore, the legislative did not take the additional step of approving a law to restrict the operation, but rather decided to restrict itself to issuing a non-binding resolution."  Xu Decl. Ex. 4 at 3.

**Plaintiffs' Response 371.**   It is undisputed that the October 3, 2016 analyst report contains the aforementioned quote, however, this fact is misleading because it omits that the report also includes that the National Assembly "rejects the use of CITGO Holding stock as collateral in the bond swap operation, requests the Attorney General's

office to investigate whether the operation generated economic damages to the nation that involve responsibility of the public officials involved, and requests PDVSA to present a plan to reprofile its debt and increase oil production [].”  *Id.*

372.   On October 4, 2016, Grisanti of consulting firm Ecoanalitica, stated that the 2020 Notes were “a very safe bond and that's why we're recommending it.”  Ex. 111 at 2.

**Plaintiffs' Response 372.**   Undisputed.

373.   Grisanti is a member of a party, Justice First (Primero Justicia), that opposes President Maduro and is part of MUD.  Ex. 94; Ex. 323 (listing support for Justice First).

**Plaintiffs' Response 373.**   Undisputed.

374.   Grisanti was a member of the PDVSA Ad Hoc Board from April 9, 2019, to May 15, 2020.  Ex. 48 at 4; Ex. 135.

**Plaintiffs' Response 374.**   Undisputed.

375.   On October 13, 2016, analysts from J.P. Morgan stated in an analyst report distributed to a group of investors, including BlackRock, that they did “not believe the National Assembly has explicit purview of PDVSA's finance operations.”  Ex. 299 at BLA_00004841.

**Plaintiffs' Response 375.**   It is undisputed that the October 13, 2016 analyst report contains the aforementioned quote, however, this fact is misleading because it omits that the report also states: “but the Assembly has gone on the record with resolution rejecting the use of Citgo as collateral and calling del Pino to testify (which he has not). Moreover, from a more political perspective, jailed leader Leopoldo Lopez has warned

markets that the deal could be 'illegal' and reneged upon by a future opposition government  In our view, any future opposition government is likely to try to leverage market confidence rather than immediately fight a battle over onerous debt, but the warning shot has been fired nonetheless." *Id.*

### H. PDVSA's Long History of Issuing Debt Without National Assembly Approval.

376. In the decades prior to the Exchange Offer, PDVSA and its subsidiaries engaged in at least 95 financing transactions.  Ex. 1 at 70–83; ████████ Ex. 2 §§ 55–58.

**Plaintiffs' Response 376.**  Undisputed.

377. National Assembly approval was neither sought nor received for any of these many transactions. ████████████████████████

████████████████████████████████ Ex. 2 §§ 17, 24, 58, 210–222;

████████ Ex. 3 §§ 90–91, 148–151; Hr'g Tr. 13:21–14:4, Nov. 8, 2019, ECF No. 31.

**Plaintiffs' Response 377.**  Undisputed; however, this is misleading as many of these transactions involved a different array of parties and couterpaties, different transaction structures, and differing levels of risk to the Bolivarian Republic of Venezuela.

378. These transactions were performed openly and, in many cases, with prospectuses or similar documents filed with the U.S. Securities and Exchange Commission.  *See, e.g.,* Ex. 78; Ex. 173; Ex. 177; Ex. 190.

**Plaintiffs' Response 378.**  Undisputed.

379. These prospectuses often contained representations that the transactions were lawful and that all necessary consents, approvals, and authorizations had been obtained.  *See, e.g.,* Ex. 8 at i, 100; Ex. 167 at 13; Ex. 198 at B-1–B-3.

**Plaintiffs' Response 379.**    Undisputed.

380.    There is no evidence that, prior to this lawsuit, the National Assembly had ever asserted, with respect to *any* of these transactions, that National Assembly approval was required, under Article 150 of the Venezuelan Constitution or otherwise, or that the absence of its approval caused the transaction to be null and void *ab initio* or unenforceable.  Nor is there any evidence that the National Assembly has ever taken any concrete steps to block the consummation of any of these transactions on such ground.

████████████████████████

**Plaintiffs' Response 380.**    ██████████████████████████

████████████████████████████████████████████████

████████████

381.    This history includes both unsecured and secured debt, *see below* ¶¶ 385–427, 431–72, 474–75, 484–98, including debt that was secured by equity in CITGO Holding or CITGO Petroleum or by significant assets of those companies, *see below* ¶¶ 443, 449, 458, 465, 468–69, 471–72, 475, 497.

**Plaintiffs' Response 381.**    The existence of prior transactions is undisputed; however, this fact is misleading because these transactions involved different sets of parties and counterparties, different transaction structures, and different levels of risk to the Bolivarian Republic of Venezuela.  Each transaction is unique.

382.    This history begins long before the administrations of Presidents Maduro (2013 to 2019) and Hugo Chavez (1999 to 2013) and continues under the current administration of Interim President Guaidó (2019 to present).  *See, e.g.*, Ex. 164 at 3; Ex. 140 at 1; Ex. 94 at 14–15.

**Plaintiffs' Response 382.**   Undisputed.

383.   The following chart summarizes the organizational structure of the

PDVSA Parties and the financing transactions described in this section:



**Plaintiffs' Response 383.**   Undisputed.

### 1.   Transactions Through 1999

384.   As a foreign, privately-held company, not all of the PDVSA Parties' past

debt financing transactions were registered with the SEC.  The PDVSA Parties also have

not provided discovery into their records prior to 2019, citing an asserted inability to

access any such records located in Venezuela.  Accordingly, the information herein may

not include all relevant transactions.

**Plaintiffs' Response 384.**   It is undisputed that some debt financing transactions

were not registered with the SEC and that the PDVSA Parties lack access to records

located in Venezuela.

385.    Prior to February 2, 1999 (when President Chavez took office), PDVSA
and its subsidiaries entered into at least 40 debt transactions, totaling at least
$10,000,000,000, many of which were secured debt transactions.  In none of these
transactions, described in paragraphs 384–420 below, was National Assembly approval
sought or received.  ██████████████ ; *id.* ████████████████████████
██████████████████████████████████ ; ████████  Ex. 2 §§ 17, 24, 55–58, 210–
222; *id.* Ex. 3 §§ 148–151; Hr'g Tr. 14:14–22, Nov. 8, 2019, ECF No. 31; Ex. 72 at A8.

**Plaintiffs' Response 385.**    The existence of prior transactions is undisputed;
however, this fact is misleading because these transactions involved different sets of
parties and counterparties, different transaction structures, and different levels of risk to
the Bolivarian Republic of Venezuela.  Each transaction is distinguishable from the
transaction at issue in this litigation.

386.    On approximately October 5, 1990, Baproven Ltd., a Bahamian subsidiary
of PDVSA, issued DM 200,000,000 in unsecured notes with an 11.125% coupon and due
in 1995, guaranteed by PDVSA and governed by the law of the Federal Republic of
Germany.  Ex. 164 at 3; Ex. 67 at 167.

**Plaintiffs' Response 386.**    The existence of this transaction is undisputed;
however, this fact is misleading because this transaction did not involve PDVSA or
CITGO, but did involve different parties, a different transaction structure, and a different
level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the
National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge
[of CITGO shares] was being offered as guaranty for a corporate bond issuance of

PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016,

Discussions on the effects of PDVSA Bond Redemption, at 5).

387.    In 1991, PDV Marina, S.A., a subsidiary of PDVSA, entered into a

secured credit facility agreement with Fairplay Shipfinance to finance the purchase of

eight tankers, pledging the tankers as collateral.  Ex. 83 at 30, F-31.

**Plaintiffs' Response 387.**    The existence of this transaction is undisputed;

however, this fact is misleading because this transaction did not involve PDVSA or

CITGO, but did involve different parties, a different transaction structure, and a different

level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the

National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge

[of CITGO shares] was being offered as guaranty for a corporate bond issuance of

PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Discussions on the

effects of PDVSA Bond Redemption, at 5).

388.    On approximately November 1, 1991, CITGO Petroleum issued

$75,000,000 in guaranteed Series A Senior Notes with a 8.75% coupon and due in 1998,

$200,000,000 in guaranteed Series B Senior Notes with a 9.03% coupon and due in 2001,

and $125,000,000 in guaranteed Series C Senior Notes with a 9.30% coupon and due in

2006.  The issuances were governed by New York law.  Ex. 67 at 251, 256, 334–36.

**Plaintiffs' Response 388.**    The existence of this transaction is undisputed;

however, this fact is misleading because this transaction did not involve PDVSA, but did

involve different parties, a different transaction structure, and a different level of risk to

the Bolivarian Republic of Venezuela.  As noted in the debate before the National

Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of

CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."
Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Discussions on the effects of
PDVSA Bond Redemption, at 5).

389.    On approximately December 4, 1991, Bariven, S.A. a wholly-owned
subsidiary of PDVSA, issued $230,000,000 in unsecured notes with a 9.5% coupon and
due in 1996, and governed by New York law.  Ex. 165 at 13, 113.

**Plaintiffs' Response 389.**    The existence of this transaction is undisputed;
however, this fact is misleading because this transaction did not involve CITGO, but did
involve different parties, a different transaction structure, and a different level of risk to
the Bolivarian Republic of Venezuela.  As noted in the debate before the National
Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of
CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."
Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on
the effects of PDVSA Bond Redemption, at 5).

390.    On approximately February 14, 1992, PDVSA entered a Euro Medium-
Term Note Programme with up to $1,000,000,000 in notes issued with various interest
rates and maturities, governed by English law.  Ex. 166 at A-32.

**Plaintiffs' Response 390.**    The existence of this transaction is undisputed;
however, this fact is misleading because this transaction did not involve CITGO, but did
involve different parties, a different transaction structure, and a different level of risk to
the Bolivarian Republic of Venezuela.  As noted in the debate before the National
Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of
CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."

Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

391.    On approximately February 18, 1992, Bariven, S.A. offered $200,000,000 in unsecured notes with a 9% coupon and due in 1997, guaranteed by PDVSA, and governed by New York law.  Ex. 167 at 4, 13.

**Plaintiffs' Response 391.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

392.    On approximately March 10, 1992, Bariven, S.A. issued $200,000,000 in unsecured notes with a 8.25% coupon and due in 1995, and $200,000,000 in unsecured notes with a 10.625% coupon and due in 2002.  PDVSA guaranteed both notes.  Ex. 168; Ex. 271.

**Plaintiffs' Response 392.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA or CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of

PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

393.    On approximately July 8, 1992, Bariven, S.A. issued DM 250,000,000 in unsecured notes with a 10.75% coupon and due in 1997, guaranteed by PDVSA and governed by the law of the Federal Republic of Germany.  Ex. 169 at 3–4, 89.

**Plaintiffs' Response 393.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA or CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

394.    On approximately July 31, 1992, CITGO Petroleum entered into an unsecured $675,000,000 revolving credit facility with various borrowing maturities through December 1999.  Ex. 278 at 17; Ex. 75 at 26, 74.  The credit facility was governed by Illinois law.  Ex. 278 at 115.

**Plaintiffs' Response 394.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."

Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

395.    On approximately July 22, 1993, PDV America, Inc., a wholly-owned subsidiary of PDVH and PDVSA that refines, markets and transports petroleum products within the United States, issued a total of $1,000,000,000 in 7.25% Senior Notes due 1998, 7.75% Senior Notes due 2000, and 7.875% Senior Notes due 2003, guaranteed, jointly and severally, by PDVSA and Propernyn, and governed by New York law. Ex. 170 at 1, 4–5, 117.

**Plaintiffs' Response 395.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

396.    On December 9, 1993, CITGO Petroleum received $50,000,000 from environmental revenue bonds due 2023 issued by the Parish of Calcasieu on CITGO Petroleum's behalf.  CITGO Petroleum secured the bonds by a pledge and assignment of revenues derived from an installment sale agreement between the Parish and CITGO Petroleum.  The bonds were guaranteed by CITGO Refining and CITGO Venezuela. Ex. 171 at 1–2, 5.

**Plaintiffs' Response 396.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

397.   On March 4, 1994, CITGO Petroleum entered into a master shelf agreement with Prudential Insurance Company of America to issue $100,000,000 in senior promissory notes with fixed interest rates between 7.17% and 8.94%, guaranteed by CITGO Refining and CITGO Venezuela and governed by New York law.  Ex. 74 at 461, 531, 558, 564; Ex. 105 at 46, F-16, F-17.

**Plaintiffs' Response 397.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

398.    On October 21, 1994, CITGO Petroleum received an amended unsecured $125,000,000 term loan from various banks with various interest rate options.  Ex. 75 at 59, 74; Ex. 74 at 71.

**Plaintiffs' Response 398.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

399.    Also on October 21, 1994, CITGO Petroleum received an amended unsecured $675,000,000 revolving credit facility agreement from various banks with various borrowing maturities and interest rate options.  Ex. 75 at 59, 74; Ex. 74 at 71.

**Plaintiffs' Response 399.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

400.    On approximately April 20, 1995, CITGO Petroleum received
$40,700,000 from environmental revenue refunding bonds due 2025 issued by the Parish
of Calcasieu on CITGO Petroleum's behalf.  CITGO Petroleum secured the bonds by
amounts owed to the Parish and a letter of credit issued by the Houston Agency of
Banque Nationale de Paris.  CITGO Petroleum secured the letter of credit with its funds
deposited with the bank. Ex. 172 at 1, 4, 19, 21.  The bonds were issued to refund
$46,980,000 of the Parish's environmental revenue bonds due 2023.  *Id*. at 1.

**Plaintiffs' Response 400.**    The existence of this transaction is undisputed;
however, this fact is misleading because this transaction did not involve PDVSA, but did
involve different parties, a different transaction structure, and a different level of risk to
the Bolivarian Republic of Venezuela.  As noted in the debate before the National
Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of
CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."
Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on
the effects of PDVSA Bond Redemption, at 5).

401.    On approximately April 27, 1995, CITGO Petroleum received
$50,000,000 from solid waste disposal revenue bonds due 2025 issued by the Gulf Coast
on CITGO Petroleum's behalf.  CITGO Petroleum secured the bonds by amounts owed
to Gulf Coast and a letter of credit issued by NationsBank of Texas, N.A.  CITGO
Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 240 at
1, B-1, B-2; Ex. 79 at 55–56.

**Plaintiffs' Response 401.**    The existence of this transaction is undisputed;
however, this fact is misleading because this transaction did not involve PDVSA, but did

involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

402.    From 1993 through 1996, PDVSA established at least three special-purpose Guaranteed Export Trusts, through which it issued oil-backed securities.  Ex. 70 at 2; Ex. 68 at 2; Ex. 78 at 2.

**Plaintiffs' Response 402.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

403.    In March 1996, CITGO Petroleum received $25,000,000 from sewage and solid waste disposal revenue bonds due 2026 issued by Corpus Christi on CITGO Petroleum's behalf.  CITGO Petroleum secured the bonds by amounts owed to Corpus Christi and a letter of credit issued by Banque Nationale de Paris.  CITGO Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 225 at 1, 20, 22, 26; Ex. 79 at 55–56; Ex. 77 at 8.

**Plaintiffs' Response 403.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

404.    On approximately May 17, 1996, CITGO Petroleum issued $200,000,000 in senior unsecured notes with a 7.875% coupon, governed by New York law.  Ex. 173 at 1, S-39.

**Plaintiffs' Response 404.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

405.    On approximately July 25, 1996, CITGO Petroleum received $120,000,000 from taxable environmental revenue bonds due in 2026 issued by the Parish of Calcasieu on CITGO Petroleum's behalf.  CITGO Petroleum secured the bonds by amounts owed to the Parish and a letter of credit issued by the Houston Agency of

ABN AMRO Bank N.V.  CITGO Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 174 at 1, 20, 22; Ex. 79 at 55–56.

**Plaintiffs' Response 405.**   The existence of this transaction is undisputed; however, this fact is misleading this transaction did not involve PDVSA but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

406.    In February 1997, Sociedad de Fomento de Inversion Petrolera, C.A.—a subsidiary of PDVSA established to develop investment vehicles, funds, and other instruments to allow investors to invest in the Venezuelan oil industry—issued a Bs. 20,000,000,000 bond with a 12.75% coupon.  Ex. 80 at 4, 38.

**Plaintiffs' Response 406.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

407.    On approximately June 17, 1997, Petrozuata Finance Inc., a joint venture between PDVSA and Conoco, Inc., an American oil company, issued $300,000,000 Series A Bonds with a 7.63% coupon and due in 2009, $625,000,000 Series B Bonds with a 8.22% coupon and due in 2017, and $75,000,000 Series C Bonds with a 8.37% coupon and due in 2022, guaranteed by Petrolera Zuata, Petrozuata C.A., an oil development project in Venezuela.  Ex. 175 at 17–18.  The Agreement was governed by New York law, "except for security interests granted or to be granted on certain Venezuelan assets, which will be governed by Venezuelan law" and certain agreements between Maraven, S.A., a PDVSA subsidiary, Petrozuata Finance Inc., and an affiliate of Conoco, Inc.  *Id.* at 25, 116.  Maraven S.A., a wholly-owned subsidiary of PDVSA, owned 49.9% of Petrozuata Finance Inc., and Conoco Orinco, a wholly-owned subsidiary of an Conoco Inc., owned the remaining 50.1% interest in Petrozuata Finance Inc.  As part of the offering, Petrozuata Finance Inc. pledged collateral consisting of, among other things: the loan proceeds, projects funds, and Class B Shares and dividends of certain subsidiaries.  *Id.* at 1, 10, 19.

**Plaintiffs' Response 407.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA or CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

408.    On approximately October 28, 1997 CITGO Petroleum issued $235,000,000 in senior unsecured notes with a nine-month maturity, governed by New York law.  Ex. 177 at 1, S-2, S-6.

**Plaintiffs' Response 408.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

409.    On approximately December 3, 1997, CITGO Petroleum received $10,000,000 from environmental revenue bonds due in 2026 issued by the Parish of Calcasieu on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to the Parish and a letter of credit issued by the Houston Agency of ABN AMRO Bank N.V. CITGO Petroleum secured the letter of credit with its funds deposited with the bank. Ex. 178 at 1, 4; Ex. 174 at 1, 20, 22.

**Plaintiffs' Response 409.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."

Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

410.    In 1998, PDV Midwest Refining, LLC, a wholly-owned subsidiary of PDV America, Inc., entered into a secured revolving credit facility with a consortium of banks that allowed for borrowings of up to $125,000,000 at average weighted interest rates of 6.6% and 6.72%.  Ex. 83 at 3, F-28.  PDV Midwest Refining, LLC, pledged its inventories and accounts receivable as collateral.  *Id.* at F-28.

**Plaintiffs' Response 410.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA or CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

411.    On approximately April 23, 1998, CITGO Petroleum received $25,000,000 from solid waste disposal revenue bonds due in 2028 issued by Gulf Coast on CITGO Petroleum's behalf.  CITGO Petroleum secured the bonds by amounts owed to Gulf Coast and a letter of credit issued by Bank Austria AG through its New York branch.  CITGO Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 179 at 1, 4, 19, 23; Ex. 81 at 9.

**Plaintiffs' Response 411.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did

involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

412.    On approximately May 13, 1998, CITGO Petroleum received a $150,000,000 364-day unsecured revolving bank loan with various interest options, governed by New York law.  Ex. 180 at 40, 84; Ex. 274 at 22–23; Ex. 85 at F-29, F-30.

**Plaintiffs' Response 412.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

413.    On approximately May 13, 1998, CITGO Petroleum received a $400,000,000 unsecured five-year revolving bank loan maturing in 2003 with various interest options, governed by New York law.  Ex. 73 at 91–92; Ex. 274 at 20; Ex. 85 at F-29, F-30.

**Plaintiffs' Response 413.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did

involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

414.     In June 1998, Cerro Negro Finance, Ltd., a company 50% owned by PDVSA Cerro Negro, S.A., an indirect wholly-owned subsidiary of PDVSA, and 50% owned by Mobil Cerro Negro, Ltd, an indirect wholly-owned subsidiary of ExxonMobil, issued $600,000,000 in secured bonds.  Ex. 1 at TRU-00009212.  PDVSA agreed to severally guarantee repayment of the debt of PDVSA Cerro Negro, S.A.  Ex. 85 at 54.

**Plaintiffs' Response 414.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

415.     In August 1998, PDVSA Sincor, S.A., a wholly-owned subsidiary of PDVSA, entered into a $1,200,000,000 loan agreement with TOTAL Venezuela, S.A. and Statoil Venezuela AS, wholly-owned subsidiaries of TOTAL and Statoil,

respectively.  Ex. 83 at 62–63; Ex. 85 at 55.  The loan agreement was severally guaranteed by parent companies PDVSA, TOTAL, and Statoil.  Ex. 83 at 62–63.

**Plaintiffs' Response 415.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

416.   On approximately August 1, 1998, CITGO Petroleum received $22,200,000 from pollution control revenue bonds due in 2028 issued by Corpus Christi on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to Corpus Christi and a letter of credit issued by Bank One, Oklahoma, N.A.  CITGO Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 183 at 1, 4; Ex. 281 at 8–9.

**Plaintiffs' Response 416.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."

Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

417.    On approximately August 1, 1998, CITGO Petroleum received $100,000,000 from environmental facilities revenue bonds due in 2028 issued by Gulf Coast on CITGO's behalf.  CITGO secured the bonds  by amounts owed to Gulf Coast and a letter of credit issued by Royal Bank of Canada.  CITGO Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 100 at 1, 4, 20, 22; Ex. 281 at 8–9.

**Plaintiffs' Response 417.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

418.    On approximately November 16, 1998, PDVSA Finance Ltd. issued $400,000,000 in unsecured notes with a 6.45% coupon and due in 2004, $300,000,000 in unsecured notes with a 6.65% coupon and due in 2006, $300,000,000 unsecured notes with a 6.8% coupon and due in 2008, $400,000,000 in unsecured notes with a 7.4% coupon and due in 2016, and $400,000,000 in unsecured notes with a 7.5% coupon and due in 2028, governed by New York law.  Ex. 184 at 1, 20.

**Plaintiffs' Response 418.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

419.    On approximately November 10, 1998, PDVSA Finance Ltd. issued $260,000,000 in notes with a 8.558% coupon and due in 2013.  Ex. 91 at F-12.

**Plaintiffs' Response 419.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve PDVSA, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

420.    In December 1998, PDVH received a $50,000,000 five-year term loan from Deutsche Bank, guaranteed by CITGO Petroleum.  Ex. 83 at 63.

**Plaintiffs' Response 420.**   The existence of this transaction is undisputed; however, this fact is misleading because this transaction involved different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of

Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering

Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as

guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing

Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond

Redemption, at 5).

421.    In 1999, PDVSA Sincor, S.A., TOTAL Venezuela, S.A., and Statoil

Venezuela AS secured lines of credit totaling $1,500,000,000 from "syndicates of

international banks."  Ex. 85 at 55.  PDVSA, TOTAL, and Statoil guaranteed, on an

individual basis, the amounts withdrawn by each of their subsidiaries.  *Id.*

**Plaintiffs' Response 421.**    The existence of this transaction is undisputed;

however, this fact is misleading because this transaction involved different parties, a

different transaction structure, and a different level of risk to the Bolivarian Republic of

Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering

Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as

guaranty for a corporate bond issuance of PDVSA."  Brewer Report at ¶ 46, n. 31 (citing

Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond

Redemption, at 5).

422.    In January 1999, PDVSA received a $50,000,000 loan from Chase

Manhattan Bank.  Ex. 84 at 10.

**Plaintiffs' Response 422.**    The existence of this transaction is undisputed;

however, this fact is misleading because this transaction did not involve CITGO, but did

involve different parties, a different transaction structure, and a different level of risk to

the Bolivarian Republic of Venezuela.  As noted in the debate before the National

Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

423.    In March 1999, Barclays Bank PLC advanced to PDVSA a $25,000,000 loan, maturing in March 2000.  *Id.* at 10.

**Plaintiffs' Response 423.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela.  As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

424.    On approximately March 31, 1999, PDVSA Finance Ltd. issued $400,000,000 notes with a 8.75% coupon and due in 2004, $250,000,000 notes with a 9.375% coupon and due in 2007; $250,000,000 notes with a 9.75% coupon and due in 2010, $100,000,000 notes with a 9.95% coupon and due in 2020, and €200,000,000 ($244,778,000) notes with a 6.25% coupon and due in 2006, governed by New York law. Ex. 185 at 9, 17; Ex. 84 at 10.

**Plaintiffs' Response 424.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to

172

the Bolivarian Republic of Venezuela.  As noted in the debate before the National

Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of

CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."

Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on

the effects of PDVSA Bond Redemption, at 5).

425.    On approximately April 1, 1999, CITGO Petroleum received  $25,000,000

from tax exempt environmental facilities revenue bonds due in 2029 issued by Gulf Coast

on CITGO Petroleum's behalf.  CITGO Petroleum secured the bonds by amounts owed

to Gulf Coast and a letter of credit issued by Banque Nationale de Paris.  CITGO

Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 186 at

1, 23.

**Plaintiffs' Response 425.**    The existence of this transaction is undisputed;

however, this fact is misleading because this transaction did not involve PDVSA, but did

involve different parties, a different transaction structure, and a different level of risk to

the Bolivarian Republic of Venezuela.  As noted in the debate before the National

Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of

CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA."

Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on

the effects of PDVSA Bond Redemption, at 5).

426.    In May 1999, Bariven, S. A., and Chase Manhattan Bank entered into an

export financing credit facility agreement guaranteed by PDVSA and the Export-Import

Bank for "loans to be made . . . in an aggregate principal amount not to exceed

$150,000,000."  Ex. 84 at 10.

**Plaintiffs' Response 426.** The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela. As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

427. In June 1999, PDVSA Cerro Negro obtained loans from an unspecified financial institution for $150,000,000 at an annual interest rate between 5.99% and 6.79%, maturing from 2002 through 2012. Ex. 85 at 54.

**Plaintiffs' Response 427.** The existence of this transaction is undisputed; however, this fact is misleading because this transaction did not involve CITGO, but did involve different parties, a different transaction structure, and a different level of risk to the Bolivarian Republic of Venezuela. As noted in the debate before the National Assembly in 2016, the Offering Exchange created "'for the first time,' a pledge [of CITGO shares] was being offered as guaranty for a corporate bond issuance of PDVSA." Brewer Report at ¶ 46, n. 31 (citing Asamblea Nacional, Sept. 27, 2016, Discussions on the effects of PDVSA Bond Redemption, at 5).

## 2. Transactions from 1999 to December 2015

428. Between 1999 and December 2015, PDVSA and its subsidiaries continued to issue debt, including secured debt, in at least 84 debt transactions. In none of these transactions, described in paragraphs 386–472, was National Assembly approval sought or received.

**Plaintiffs' Response 428.**   The existence of prior transactions is undisputed; however, this fact is misleading because these transactions involved different sets of parties and counterparties, different transaction structures, and different levels of risk to the Bolivarian Republic of Venezuela.  Each transaction is distinguishable from the transaction at issue in this litigation.

429.    At least 21 of these debt transactions were secured by collateral (*see below* ¶¶ 431, 435–39, 443–44, 446, 449, 451–52, 455–58, 465, 468–69, 471–72), including seven in which stock equity in CITGO Holding, CITGO Petroleum, or the subsidiaries or refineries owned by those companies were pledged as collateral (*see below* ¶¶ 449, 457, 458, 468–69, 471–72).

**Plaintiffs' Response 429.**   The existence of prior transactions is undisputed; however, the transaction at issue in this litigation is either distinguishable from these transactions or these transactions suffer from similar legal defects that reflect the unconstitutional actions of the regimes of President Chavez and President Maduro.  *See, e.g.*, Brewer Report at ¶¶ 55–56.

430.    ███████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████  During this time, President Chavez (1999–2013) and then President Maduro (2013–2019) were recognized by the United States as the Presidents of Venezuela.  *See above* ¶¶ 66–71; Compl. ¶¶ 19–20, 24.

**Plaintiffs' Response 430.**   Undisputed.

431.   On approximately April 1, 2001, CITGO Petroleum received $25,000,000 from environmental facilities revenue bonds due in 2031 issued by Gulf Coast on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to Gulf Coast and a letter of credit issued by the Royal Bank of Canada through its New York branch. CITGO Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 188 at 1, 22.

**Plaintiffs' Response 431.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

432.   On May 11, 2001, CITGO Petroleum renewed a $15,000,000 364-day revolving bank loan facility for another term.  Ex. 86 at 7.

**Plaintiffs' Response 432.**   The existence of this transaction is undisputed; however, the revolving bank loan facility was $150,000,000 not $15,000,000.  Ex. 86 at 7.  Furthermore, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting  the instant transaction was  the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

433.   On May 28, 2001, CITGO Petroleum established a $25,000,000 364-day revolving bank loan facility.  Ex. 86 at 7.

**Plaintiffs' Response 433.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

176

434.    On November 8, 2001, PDVSA Finance Ltd. issued $500,000,000 in unsecured notes with a 8.5% coupon, due in 2012, and governed by New York law. Ex. 190 at 1, 3, 13.

**Plaintiffs' Response 434.**    The existence of this transaction is undisputed; however, this fact is misleading because it involves PDVSA Finance Ltd., a Cayman Islands-based subsidiary of PDVSA, but not a pledge of CITGO shares as collateral.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

435.    On approximately March 12, 2002, CITGO Petroleum received $25,000,000 from environmental facilities revenue bonds due in 2032 issued by Gulf Coast on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to Gulf Coast and a letter of credit issued by the Royal Bank of Canada.  CITGO Petroleum secured the letter of credit with its funds deposited with the bank.  The bonds were issued to refund an equal principal amount of prior Gulf Coast environmental revenue bonds. Ex. 191 at 1, 4, 22.

**Plaintiffs' Response 435.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

436.    On May 3, 2002, CITGO Petroleum received $7,650,000 from tax-exempt environmental facilities revenue bonds due in 2032 issued by the Village of Lemont, Illinois on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to the Village of Lemont and a letter of credit issued by Bank One, N.A.  Ex. 192 at 1, 4.

**Plaintiffs' Response 436.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

437.   On approximately June 26, 2002, CITGO Petroleum received $30,000,000 from environmental facilities revenue bonds issued by the Illinois Development Finance Authority on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to the Illinois Development Finance Authority.  The bonds were guaranteed by CITGO Petroleum.  Ex. 267 at 1, 4.

**Plaintiffs' Response 437.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

438.   On approximately June 26, 2002, CITGO Petroleum received $25,000,000 from solid waste disposal revenue bonds due in 2028 issued by Gulf Coast on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to Gulf Coast.  The bonds were guaranteed by CITGO Petroleum.  Ex. 194 at 1, 3–4.

**Plaintiffs' Response 438.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

439.   On approximately September 30, 2002, CITGO Petroleum received $50,000,000 from solid waste disposal revenue bonds issued by Gulf Coast on CITGO's

behalf.  CITGO Petroleum secured the bonds by amounts owed to Gulf Coast.  The bonds were guaranteed by CITGO Petroleum.  Ex. 195 at 1, 3–4.

**Plaintiffs' Response 439.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

440.    On December 11, 2002, CITGO Petroleum entered a $250,000,000 three-year unsecured revolving credit agreement with Bank of America, JPMorgan Chase Bank, Societe Generale, Banc of America Securities LLC, and JPMorgan Securities Inc., maturing in December 2005, which was governed by New York law.  Ex. 196 at 2, 14, 90; Ex. 270 at 19.

**Plaintiffs' Response 440.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

441.    On December 11, 2002, CITGO Petroleum entered a $250,000,000 364-day credit agreement due in 2003 with Bank of America, JPMorgan Chase Bank, Societe Generale, Banc of America Securities LLC, and JPMorgan Securities Inc., which was governed by New York law.  Ex. 270 at 14, 75; Ex. 196 at 2.

**Plaintiffs' Response 441.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

179

442.    On approximately February 27, 2003, CITGO Petroleum issued $550,000,000 in unsecured senior notes with a 11.375% coupon and due in 2011, which were governed by New York law.  Ex. 197 at 1, 110.

**Plaintiffs' Response 442.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

443.    On February 27, 2003, CITGO Petroleum entered into a $200,000,000 senior secured term loan agreement with Credit Suisse First Boston and other lending parties due on February 27, 2006, which was governed by New York law.  CITGO Petroleum pledged as collateral its interest in Colonial Ventures, LLC, Colonial Pipeline Company, and Explorer Pipeline Company.  Ex. 98 at 1, 7, 12 68; Ex. 205 at 26.

**Plaintiffs' Response 443.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

444.    On approximately May 12, 2003,  CITGO Petroleum received $39,200,000 from environmental facilities revenue bonds due in 2031 issued by Corpus Christi on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to Corpus Christi.  Ex. 198 at 1–3.

**Plaintiffs' Response 444.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

445.    On November 11, 2003, CITGO Petroleum exchanged its $550,000,000 in unsecured and unregistered senior notes issued on February 27, 2003 for substantially identical notes registered under the federal securities laws, which were governed by New York law.  Ex. 69 at 1, 4, 89.

**Plaintiffs' Response 445.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

446.    On approximately May 1, 2004, CITGO Petroleum received $25,000,000 from environmental facilities revenue bonds due in 2032 issued by Gulf Coast on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to Gulf Coast and a letter of credit issued by WestLB AG.  Ex. 200 at 1–4.

**Plaintiffs' Response 446.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

447.    On approximately October 22, 2004, CITGO Petroleum issued $250,000,000 of senior unsecured notes with a 6% coupon and due in 2011, which were governed by New York law.  Ex. 203 at 1, 13, 15, 72.

**Plaintiffs' Response 447.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

448.    On approximately January 18, 2005, CITGO Petroleum exchanged $250,000,000 in unregistered senior notes due in 2011 for substantially identical notes registered under the federal securities laws, which were governed by New York law. Ex. 205 at 93.

**Plaintiffs' Response 448.**    The existence of this transaction is undisputed and, in the absence of further clarity about the term's definition and scope, Plaintiffs dispute Defendants' characterization of these notes as "substantially identical."  However, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

449.    On November 15, 2005, CITGO Petroleum entered into a five year $1,850,000,000 senior secured credit agreement with a syndicate of lenders led by BNP Paribas and J.P. Morgan Securities Inc.  The credit agreement consisted of a five-year $1,150,000,000 revolving credit facility and a seven-year $700,000,000 term loan facility.  Borrowings under the "New Credit Agreement" were guaranteed by "certain of CITGO's subsidiaries" and secured by "certain accounts receivable and inventory of CITGO and the guarantors," and CITGO Petroleum's interest in its Lake Charles, Louisiana refinery and the entity that holds its Corpus Christi, Texas refinery.  Ex. 140 at 1.

**Plaintiffs' Response 449.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

450.    On July 31, 2006, CITGO Petroleum sold its 41.25% share in the

Lyondell-CITGO refinery to Lyondell Chemical Co. for $2,100,000,000.  The agreement

was governed by Texas law.  Ex. 90 at 1, 26; Ex. 115 at 1.

**Plaintiffs' Response 450.**    The existence of this transaction is undisputed;

however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

451.    On approximately October 1, 2006, CITGO Petroleum received

$50,000,000 from environmental facilities revenue bonds due in 2036 issued by Corpus

Christi on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to

Corpus Christi and a letter of credit from JPMorgan Chase Bank, N.A.  CITGO

Petroleum secured the letter of credit with its funds deposited with the bank.  Ex. 221 at

1, 12, 18.

**Plaintiffs' Response 451.**    The existence of this transaction is undisputed;

however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

452.    On approximately May 1, 2007, CITGO Petroleum received  $45,000,000

from environmental facilities revenue bonds due in 2037 issued by Corpus Christi on

CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to Corpus

Christi and a letter of credit issued by BNP Paribas.  Ex. 207 at 1, 4.

**Plaintiffs' Response 452.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

453.   In November 2007, PDVSA issued $3,000,000,000 in notes with a 5.25% coupon and due in 2017; $3,000,000,000 in notes with a 5.375% coupon and due in 2027; and $1,500,000,000 notes with a 5.50% coupon and due in 2037, guaranteed by PDVSA Petróleo and governed by New York law.  Ex. 8 at 1, 6.

**Plaintiffs' Response 453.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

454.   On approximately March 31, 2008, C.A. La Electricidad de Caracas, an electricity utility of which PDVSA is the majority shareholder, issued $650,000,000 in senior unsecured notes with a 8.5% coupon and due in 2018, which were governed by New York law.  Ex. 209 at 1, 6–7.

**Plaintiffs' Response 454.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

455.   On approximately April 1, 2008, CITGO Petroleum received $50,000,000 from environmental facilities revenue bonds due in 2043 issued by Corpus Christi on CITGO's behalf.  CITGO Petroleum secured the bonds by amounts owed to Corpus

Christi and a letter of credit issued by Sumitomo Mitsui Banking Corporation.  Ex. 210 at

1, 21.

      **Plaintiffs' Response 455.**   The existence of this transaction is undisputed;

however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

      456.   Moreover, in September 2008, CITGO Petroleum entered into a

$450,000,000 revolving credit facility with a group of banks led by BNP Paribas, secured

by certain trade accounts receivable.  Ex. 1 at F-44.

      **Plaintiffs' Response 456.**   The existence of this transaction is undisputed;

however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

      457.   On June 13, 2008, CITGO Petroleum issued a $515,000,000 term loan A

side letter due 2012 with BNP Paribas as the paying agent and Sumitomo Mitsui Banking

Corporation as the administrative agent/lender.  The term loan side letter was guaranteed

by CITGO Pipeline Company, CITGO Refining and Chemicals Company, LP; PDV

Midwest Refining, LLC; VPHI Midwest, Inc.; Gulf Coast Refining; and CITGO Refining

Investment Company were the guarantors, each of whom pledged "their receivables, their

inventory, 100 percent of their stock and equity interests," and their "principal property

equipment." ██████████████████████

      **Plaintiffs' Response 457.**   The existence of this transaction is undisputed;

however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

458.    On approximately June 18, 2010, CITGO Petroleum issued $300,000,000

in secured notes with a 11.5% coupon and due in 2017, governed by New York law and

guaranteed by "each of our existing and future wholly owned domestic restricted

subsidiaries (other than immaterial subsidiaries and certain other excluded subsidiaries)

and each of our other restricted subsidiaries that guarantee our new senior secure

revolving credit facility term loans."  Ex. 211 at 1, 7, 131.  These notes were secured by a

first-priority lien on CITGO Petroleum's refineries in Lake Charles, Louisiana, Lemont,

Illinois, and, beginning in 2011, CITGO Petroleum's refinery in Corpus Christi, Texas, as

well as all of CITGO Petroleum and the guarantors' inventory and equity interests, the

guarantors' present and future capital stock, and CITGO Petroleum's accounts

receiveable.  *Id* at 6–8; ▮▮▮▮▮▮▮▮▮▮

**Plaintiffs' Response 458.**    The existence of this transaction is undisputed;

however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

459.    On October 15, 2010, PDVSA sold its 50% stake in German refinery

RuhR Oel to Rosneft for $1,600,000,000.  Ex. 1 at 50.

**Plaintiffs' Response 459.**    The existence of this transaction is undisputed;

however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

460.    On approximately November 17, 2010, PDVSA issued to exchange its unsecured notes due in 2011 for new $618,681,375 8% notes due in 2013, and governed by New York law.  Ex. 187 at 1, 5, 7.

**Plaintiffs' Response 460.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

461.    On approximately October 15, 2010, PDVSA issued $3,000,000,000 in senior notes with a 8.5% coupon and due in 2017, guaranteed by PDVSA Petróleo for cash.  Ex. 187 at 1, 5, 7.

**Plaintiffs' Response 461.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

462.    On approximately April 5, 2011, PDVSA issued $3,000,000,000 in senior unsecured notes with a 12.75% coupon and due in 2022, guaranteed by PDVSA Petróleo, and governed by New York law.  Ex. 212 at 1, 5–6.

**Plaintiffs' Response 462.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

463.    On approximately November 11, 2011, PDVSA issued $2,394,239,600 in senior unsecured notes with a 9% coupon and due in 2021, guaranteed by PDVSA Petróleo, and governed by New York law.  Ex. 213 at 1, 6–7.

**Plaintiffs' Response 463.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

464.    On approximately May 17, 2012, PDVSA issued $3,000,000,000 in senior notes with a 9.75% coupon and due in 2035, guaranteed by PDVSA Petróleo.  Ex. 1 at 71.

**Plaintiffs' Response 464.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

465.    On approximately September 25, 2012, CITGO Petroleum received $50,000,000 from solid waste disposal revenue bonds due in 2025 issued by Gulf Coast on CITGO's behalf.  CITGO Petroleum secured the bonds by a pledge of CITGO Petroleum's real property, inventory, capital stock of subsidiaries, and accounts receivable pursuant to a loan agreement with Gulf Coast.  Ex. 214 at 1, 29, 31.

**Plaintiffs' Response 465.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

466.    On approximately November 15, 2013, PDVSA issued $4,500,000,000 in senior unsecured notes with a 6% coupon and due in 2026, guaranteed by PDVSA Petróleo, and governed by New York law.  Ex. 215 at 6–7.

**Plaintiffs' Response 466.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

467.    On approximately June 26, 2014, Nynas Petroleum (*see* ¶ 504 below) issued SEK 1,100,000,000 (approximately $140,569,000) in unsecured floating rate notes governed by the law of Sweden.  Ex. 216 at 1, 5, 40.

**Plaintiffs' Response 467.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA or CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

468.    On approximately July 29, 2014, CITGO Petroleum replaced its former senior secured credit facility due in 2017 with a new $1,600,000,000 senior secured credit facility, consisting of a five-year $900,000,000 revolving credit facility and a seven-year $650,000,000 term loan B, with both loans due in 2019 and 2021 respectively.  Ex. 1 at 79–80.  The new credit facility was secured by CITGO Petroleum's interests in its Lake Charles, Louisiana, Corpus Christi, Texas, and Lemont, Illinois refineries, its trade accounts receivable, and its inventories, and was further guaranteed by CITGO's "material subsidiaries."  *Id*.

**Plaintiffs' Response 468.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

469.    On approximately July 29, 2014, CITGO Petroleum issued $650,000,000 in secured notes at 6.25% due August 15, 2022, governed by New York law and guaranteed by "all of our existing and future wholly owned domestic restricted subsidiaries (other than immaterial subsidiaries and certain other excluded subsidiaries) and each of our other restricted subsidiaries that guarantee our New Senior Credit Facility."  Ex. 217 at 1, 149; ████████████████████████████.  CITGO Petroleum pledged its refineries in Lake Charles, Louisiana, Lemont, Illinois, and Corpus Christi, Texas as security for the notes.  Ex. 217 at 1, 149; ████████████.

**Plaintiffs' Response 469.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

470.    On approximately October 16, 2014, PDVSA issued $3,000,000,000 in senior unsecured notes with a 6% coupon and due in 2022, guaranteed by PDVSA Petróleo, and governed by New York law.  Ex. 218 at 3–4.

**Plaintiffs' Response 470.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

471.    On approximately February 9, 2015, CITGO Holding issued

$1,500,000,000 of senior secured notes with a 10.75% coupon and due in 2020, secured

by "100% of the capital stock of CITGO Petroleum Corporation, 100% of the equity

interests in subsidiaries held directly by the issuer or any of the guarantors," as well as

"five terminals to be owned by one of the guarantors, minority shareholder interests in

four pipeline companies owned by two of the guarantors," and "substantially all other

assets of the issuer and the guarantors, in each case to the extent that such assets secure

the Issuer Term Loan Facility."  The notes were to be governed by New York law.

Ex. 219 at 1, 47, 194.  CITGO Holding subsidiaries, including the holding companies that

owned CITGO Petroleum's refineries, guaranteed the notes.  *Id*.

**Plaintiffs' Response 471.**    The existence of this transaction is undisputed;

however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report

at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO

shares were pledged in support of a debt issuance by PDVSA).

472.    On approximately February 12, 2015, CITGO Holding issued a senior

secured term loan B in the amount of $1,300,000,000 due in 2018.  Ex. 1 at 81–82;

███████████████████████████████████████ Ex. 1 §§ 57–58.  This loan was secured

by 100% of CITGO Petroleum's capital stock and 100% of the limited liability company

interests in CITGO Holding's direct subsidiaries—CITGO Holding Terminals, Southwest

Pipeline Holding, and Midwest Pipeline Holding—as well as by "minority pipeline

interests and terminals owned by these other subsidiaries."  Ex. 1 at 81.  The loan was

further guaranteed by "CITGO Holding's direct subsidiaries other than CITGO."  *Id*.

**Plaintiffs' Response 472.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

### 3.    Debt Incurred Since December 2015

473.    Consistent with the prior historical practice, PDVSA and its subsidiaries continued to participate in debt transactions after December 2015 (when the opposition parties won control of the National Assembly).  In none of the transactions identified in paragraphs 473–499 was National Assembly approval sought or received.

**Plaintiffs' Response 473.**    It is undisputed that PDVSA and its subsidiaries continued to participate in debt transactions and that National Assembly approval was not received.  In the absence of further clarity about their definition and scope, Plaintiffs dispute Defendants' characterization of these actions as "consistent with the prior historical practice" and their statement that National Assembly approval was not sought.

474.    In November 2016, one month after the Exchange Offer, PDVH granted a lien on 49.9% of CITGO Holding to Rosneft to secure pre-payments by Rosneft for oil exports, guaranteed by PDVSA, and governed by New York law.  ███████████████ ██████████ ; Ex. 38 at 5, 11.

**Plaintiffs' Response 474.**    The existence of this transaction is undisputed; however, this fact is misleading because this transaction was a contract of national public interest that should have been submitted to the National Assembly for authorization but instead was "simply enacted by the Executive in complete disregard of the proper consittutional role of the National Assembly."  *See* Brewer Report at ¶¶ 55–56.

475.    On August 1, 2019, *after* a Guaidó-appointed Ad Hoc Board took control of CITGO Holding, CITGO Holding issued $1,370,000,000 of notes was a 9.25% coupon and due in 2024 secured by a pledge of its entire ownership interest in CITGO Petroleum, guaranteed by existing and future wholly owned domestic restricted subsidiaries (other than CITGO Petroleum and certain other subsidiaries), and governed by New York law. Ex. 223 at 1, 18; ████████████████. Under the terms of the documents governing that debt issuance, if CITGO Holding defaults on its obligations, it risks losing control of CITGO Petroleum.  Ex. 223 at cover page, 58; ████████████████████ ██████

**Plaintiffs' Response 475.**    It is undisputed the transaction occurred on August 1, 2019 with the terms stated above; however, this fact is misleading because it does not involve a debt issuance by PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

476.    This transaction occurred at a time when the PDVSA Parties were already preparing to file this lawsuit and had already begun developing their novel legal theory that the 2020 Notes required the approval of the National Assembly.  Ex. 36 ¶ 47; Ex. 312; Ex. 313; Ex. 37; Ex. 156; Ex. 29 ¶ 2.

**Plaintiffs' Response 476.**    It is undisputed the transaction occurred on August 1, 2019; however, this fact is misleading because it does not involve a debt issuance by PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).  Further, the requirement of National Assembly authorization of the 2020

Notes is not a "novel legal theory" – it is established by the Venezuelan Constitution.

Brewer Report at ¶¶ 12-15.

477.    As of today, the National Assembly has never condemned the CITGO

Holding 2024 notes as invalid for lack of National Assembly approval, whether under

Article 150 of the Venezuelan Constitution or otherwise. ███████████████

███████████████████████████

**Plaintiffs' Response 477.**    Undisputed.

478.    ████████████████████████████

█████████████████████████████████

███████████ Ex. 223 at 1.

**Plaintiffs' Response 478.**    Undisputed.

479.    CITGO Holding has not disclaimed its obligations under the 2024 notes.

████████████

**Plaintiffs' Response 479.**    Undisputed.

480.    None of the PDVSA Parties has contended that the 2024 notes or the

pledge supporting them are invalid or unenforceable. ████████████████

████

**Plaintiffs' Response 480.**    Undisputed.

481.    ████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████

Ex. 19 at 174:25–175:12, 178:10–16, 179:14–180:19; 235:14–236:3, 237:24–238:11.

**Plaintiffs' Response 481.**    Undisputed; however, this fact is misleading because the CITGO Holding 2024 notes do not involve a debt issuance by PDVSA.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

482.    PDVSA agreed to "adopt CITGO's corporate testimony with respect to" the "CITGO transactions identified on both the PDVSA and CITGO [Rule] 30(b)(6) notices," which included the CITGO Holding 2024 notes.  Ex. 16; ███████████; Ex. 15 at 4–5; Ex. 14 at 8–9.

**Plaintiffs' Response 482.**    Undisputed.

483.    PDVSA engaged in 18 unsecured debt financing transactions from February 2016 through December 2016.  Ex. 1 at 47, 77–79; Ex. 222 at 1.

**Plaintiffs' Response 483.**    Undisputed.

484.    In February 2016, PDVSA entered a Bs. 20,000,000,000 revolving credit facility with Banco de Venezuela with an annual interest rate of 14%, maturing in 2017. Ex. 1 at 47.

**Plaintiffs' Response 484.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

485.    On March 23, 2016, PDVSA entered a $300,000,000 credit facility with Banco San Juan Internacional, Inc., comprised of a $70,000,000 revolving loan facility

with a 6.25% annual interest rate, maturing in 18 months, and a $230,000,000 term loan facility with a 7.5% annual interest rate, maturing in 24 months.  *Id.* at 47, 79.

**Plaintiffs' Response 485.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

486.   On May 13, 2016, PDVSA issued a $193,959,763.03 senior note to GE Capital Financing, Inc., with a 6.5% coupon and due in 2019, guaranteed by PDVSA Petróleo, and governed by New York law.  Ex. 220 at 6, 17, 39.

**Plaintiffs' Response 486.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

487.   In June of 2016, PDVSA issued a $100,000,000 note to Cementaciones Petroleras Venezolanas, S.A., with a 6.5% coupon and due in 2019.  Ex. 1 at 77.

**Plaintiffs' Response 487.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

488.   Also in June of 2016, PDVSA issued a $100,000,000 note to Petroalianza C.A., with a 6.5% coupon and due in 2019.  *Id.*

**Plaintiffs' Response 488.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares.

*See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

489.    Also in June of 2016, PDVSA issued a $117,571,234.31 note to Maritime Contractors de Venezuela, S.A., with a 6.5% coupon and due in 2019.  *Id.* at 77–78.

**Plaintiffs' Response 489.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

490.    Also in June of 2016, PDVSA issued a $120,000,009 note to Weatherford Latin America, S.C.A., with a 6.5% coupon and due in 2019.  *Id.* at 78.

**Plaintiffs' Response 490.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

491.    Also in June of 2016, PDVSA issued a $200,000,123.50 note to Servicios Halliburton de Venezuela, S.A., with a 6.5% coupon and due in 2019.  *Id.*

**Plaintiffs' Response 491.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

492.    Also in June of 2016, PDVSA issued $30,000,000,000 and $36,082,436 notes to Environmental Solutions de Venezuela, C.A., with a 6.5% coupon and due in 2019.  *Id.*

**Plaintiffs' Response 492.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

493.   Also in June of 2016, PDVSA issued two $13,518,837.80 notes to Proambiente, S.A., with a 6.5% coupon and due in 2019.  *Id.*

**Plaintiffs' Response 493.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

494.   In July of 2016, PDVSA issued two $50,000,000 notes and two $45,000,000 notes to Elecnor, S.A., with a 6.5% coupon and due in 2019.  *Id.*

**Plaintiffs' Response 494.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

495.   In September 2016, PDVSA issued a $36,753,463.54 note to Servicios Picardi, C.A., with a 6.5% coupon and due in 2019.  *Id.* at 78.

**Plaintiffs' Response 495.**   The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

496.     On December 27, 2016, PDVSA borrowed $96,942,347.9 from GE Capital EFS, Financing Inc., with a 7.5% annual interest rate, guaranteed by PDVSA Petróleo, and governed by New York law.  Ex. 222 at 1, 8, 66.

**Plaintiffs' Response 496.**     The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a pledge of CITGO shares. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

497.     On June 2, 2020, CITGO Petroleum announced that it had commenced a private issuance of $750,000,000 in Senior Secured Notes with a 7% coupon and due in 2025, guranteed by CITGO Petroleum's existing and future wholly-owned domestic restricted subsidiaries. Ex. 42 at 11; Ex. 351 at 1.  The notes are to be secured by a "first-priority lien" on CITGO Petroleum's three refineries, inventory and accounts receivables, the inventory and accounts receivable of each of the guarantors, equity interests in its guarantors, and equity interests in CITGO Petroleum's accounts receivable subsidiary, and related assets, and all proceeds and products of the pledged property and assets.  *Id.* at 11–12.  The preliminary offering memorandum states that the "indenture and the notes will be governed by, and will be construed in accordance with, the laws of the State of New York." *Id.* at 15.

**Plaintiffs' Response 497.**     The existence of this transaction is undisputed; however, this fact is misleading because it does not involve a debt issuance by PDVSA. *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

498.    Later on June 2, 2020, CITGO Petroleum announced that it would

increase the amount of its private issuance of its Senior Secured Notes to $1.125 billion.

Ex. 351.

**Plaintiffs' Response 498.**    Undisputed.

499.    CITGO Petroleum did not seek or obtain National Assembly approval for

the $750,000,000 Senior Secured Notes due in 2025.  According to Hernández, the

CITGO debt refinancing is not subject to National Assembly "pre-authorization."

Ex. 277.

**Plaintiffs' Response 499.**    Attorney General Hernández's statement is

undisputed; however, this fact is misleading because, as the statement notes, the "powers

of control of the National Assembly . . . cannot be exercised extraterritorially concerning

PDVSA subsidiaries incorporated abroad, nor oncerning contracts executed abroad not

related to the transfer or traffic of PDVSA."  Defs. Ex. 277.  *See also* Responses 325 –

327.

I.    **PDVSA's Long History of Entering
into Other Important Contracts
Without National Assembly Approval.**

500.    In the decades prior to the Exchange Offer, PDVSA and its subsidiaries

engaged in several joint ventures, and purchases and dispositions of significant assets, in

addition to the acquisition of CITGO Petroleum described in paragraphs 26–28 above.  In

none of these transactions was approval by National Assembly sought or received.  *See*

*below* ¶¶ 500–07.

**Plaintiffs' Response 500.**    It is undisputed that PDVSA and its subsidiaires

engaged in the financial transactions listed above; however, in the absence of further

clarity about the definition of the terms used, Plaintiffs dispute Defendants' statement that approval by the National Assembly was not sought.

501.    In 1983, PDVSA entered into an approximately $80,000,000 contract with Veba Oel A.G. for the purpose of acquiring 50% of the capital shares of RuhR Oel, a refining company in West Germany.  Ex. 114 at D6.

**Plaintiffs' Response 501.**    The existence of this transaction is undisputed; however, this fact is misleading because it does not involve CITGO.  *See* Brewer Report at ¶ 46, n. 31 (noting the transaction at issue in this litigation was the first time CITGO shares were pledged in support of a debt issuance by PDVSA).

502.    The National Assembly decided that no legislative approval was required for PDVSA to acquire 50% of the capital shares of RuhR Oel.  ▋▋▋▋  Ex. 3 §§ 148–49.

**Plaintiffs' Response 502.**    This fact is disputed because it is a conclusion and characterization written by Defendants' expert.  ▋▋▋▋  Ex. 3 § 149 ("In other words, according to Congress, no legislative approval was required for PDVSA's entry into this contract.").  ▋▋▋ characterization was based on the consideration and rejection of one proposal addressing the transaction; however, ▋▋▋ does not cite or discuss any affirmative decision or declaration made by the National Assembly stating that no legislative approval was required for the transaction.

503.    In 1986, PDVSA invested $20,000,000 to acquire a 50% interest in Nynas Petroleum, a subsidiary of Sweden's Axel-Johnson Group.  Ex. 114 at D6.

**Plaintiffs' Response 503.**    Undisputed.

504.    In 1986, PDVSA invested $290,000,000 to acquire a 50% interest in CITGO Petroleum for $290,000,000.  PDVSA did not seek or otherwise obtain National Assembly approval for its acquisition of CITGO Petroleum.  Ex. 114 at D6; ███████ Ex. 3 § 150.

**Plaintiffs' Response 504.**    It is undisputed that PDVSA acquired an interest in CITGO Petroleum in 1986; however, in the absence of further clarity about the definition of the terms used, Plaintiffs dispute Defendants' statement that approval by the National Assembly was not sought.  As Defendants' own expert recognized and acknowledged, "CITGO Holdings' corporate representative stated he had a conversation with someone who believed National Assembly appoval was sought for the first acquisition of 50% of CITGO in 1986." ███████ Ex. 3 n. 164; *see also* ██████████████. Defendants have shown no other facts indicating that National Assembly approval was not sought for the acquisition of CITGO Petroleum.

505.    In 1987, PDVSA entered a joint venture with Union Pacific Corporation to form Champlin Refining Co., a refinery in Corpus Christi, Texas.  *Id.*

**Plaintiffs' Response 505.**    Undisputed.

506.    On October 30, 1998, PDVSA and Amerada Hess Corporation entered into a joint venture, pursuant to which PDVSA, V.I., Inc., a wholly-owned subsidiary of PDVSA, purchased a 50% interest in the Virgin Islands refinery fixed assets for a $62,500,000 in cash, a $562,500,000, note from PDVSA V.I., Inc., with a 8.46% coupon and due in 2008, and a $125,000,000, contingent note with a 8.46% coupon and due in 2008 from PDVSA V.I., Inc., governed by New York law.  Ex. 82 at 1, 52; Ex. 93 at 55.

Both the note and the contingent note were secured by a pledge of PDVSA V.I., Inc.'s membership interest in the joint venture and guaranteed by PDVSA.  Ex. 82 at 1.

**Plaintiffs' Response 506.**   Undisputed.

507.    On October 31, 2015, PDVSA sold its 50% interest in the Chalmette Refinery, located in Chalmette, Louisiana, a joint venture with ExxonMobil.  Ex. 1 at 87.

**Plaintiffs' Response 507.**   Undisputed.

**J.      Governing Law Clauses in Sovereign Law Bonds**

508.    The documents governing certain of the Bolivarian Republic of Venezuela's sovereign debt include a governing law provision with an express carve-out for issues of execution and authority, which are governed by Venezuelan law.  *See, e.g.*, Ex. 206 at S-7 ("The laws of the State of New York will be the governing law except with respect to the authorization and execution of the global bonds, which will be governed by the laws of the Republic."); Ex. 199 at S-5 (same); Ex. 201 at 20 (same); Ex. 202 at § 6 (same); Ex. 204 at S-6 (same); Ex. 189 at 26 (same); Ex. 181 at 25 (same); Ex. 176 at 85 (same).

**Plaintiffs' Response 508.**   Undisputed, but the capacity of PDVSA and PDVSA Petróleo to contract is limited by Venezuelan public law and the Venezuelan Constitution.  *See* Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

509.    The governing law provisions in the Governing Documents do not contain a carve-out for issues of execution and authority.  *See above* ¶¶ 178–182.

**Plaintiffs' Response 509.**   Undisputed, but the capacity of PDVSA and PDVSA Petróleo to contract is limited by Venezuelan public law and the Venezuelan Constitution.  *See* Brewer Report at ¶¶ 22-23, 35-37, 126-29, 139.

XI.     **The PDVSA Parties Failed to Provide**
        **Discovery Regarding Their Intent in 2016.**

510.    Defendants have requested documents from the PDVSA Parties concerning, among other things, the purpose of the Exchange and the PDVSA Parties' knowledge of any purported illegality around the time of the Exchange Offer, and the PDVSA Parties' prior debt transactions.  The PDVSA Parties have not produced documents on these topics, expect for a limited production of documents on prior transactions they obtained from third parties, such as U.S. counsel.  Ex. 252 at ¶¶ 7, 16, 32–33; Hr'g Tr. 7:12–19, 31:11–13, Nov. 8, 2019, ECF No. 31; ███████████████

████████; Ex. 259 at 3, 8 (objecting to document request on ground that PDVSA and PDVSA Petróleo "do not have access to or control over the documents [and] communications" that are "located in Venezeula or under the control of the Maduro regime").

**Plaintiffs' Response 510.**    Undisputed that Defendants have made document requests concerning the purpose of the Exchange and the PDVSA Parties' knowledge of any purported illegality around the time of the Exchange Offer, and the PDVSA Parties' prior debt transactions; however, the scope of discovery produced by Plaintiffs reflects mutually agreed upon limitations negotiated in light of the PDVSA Plaintiffs' lack of access to materials located in Venezuela.

511.    Defendants also noticed a 30(b)(6) deposition for the PDVSA Parties concerning the PDVSA Parties' "knowledge or belief, from January 1, 2016, to October 29, 2019, as to the validity, legality, or enforceability of the" Exchange Offer and the PDVSA Parties' prior debt transactions. ████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 14 at 8; Ex. 17

at ¶¶ 80:8–24, 82:6–16, 112:14–21, 138:13–139:4, 183:13–18; 187:19–22, 250:17–252:3.

**Plaintiffs' Response 511.** ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

### A.    PDVSA and PDVSA Petróleo Fail to Produce Documents Regarding Their Intent at the Time of the Exchange Offer or Prior Transactions.

512.    On November 25, 2019, the Trustee and Collateral Agent served

Defendants' First Request for the Production of Documents on PDVSA and PDVSA

Petróleo.  Ex. 252.

**Plaintiffs' Response 512.**    Undisputed.

513.    The Trustee and Collateral Agent requested, among other things,

documents relevant to the PDVSA Parties' intent at the time of the Exchange Offer:

> All Documents Concerning the approval of the 2017 Notes, 2020 Notes,
> or the Governing Documents by the Board of Directors of Plaintiffs;
> Plaintiffs' shareholders; the Venezuelan Government; the National
> Assembly; the Supreme Tribunal of Justice of the Bolivarian Republic of
> Venezuela; or any other person with actual or purported approval
> authority. . . .

> All minutes or records of meetings of the Board of Directors of each of
> Plaintiffs (including any presentations) Concerning the 2017 Notes, the
> 2020 Notes or the Governing Documents. . . .

The resolution of the Board of Directors of PDVSA dated September 21, 2016, and the Shareholders Meeting Minutes of PDVSA dated September 21, 2016, approving the modification of certain terms and conditions of the Exchange.

Documents sufficient to identify all Persons involved in the negotiation, drafting, execution or performance of the 2020 Notes or the Governing Documents, including, but not limited to, any legal, financial, or other advisors to Plaintiffs, and any Persons involved in the sale or market of the Exchange or the 2020 Notes

All Documents Concerning communications between Plaintiffs and Credit Suisse Securities (USA) LLC or any of its affiliates Concerning the 2017 Notes, the 2020 Notes, the Governing Documents, or any other actual or potential refinancing, repurchase, or exchange of the 2017 Notes.

All Documents Concerning the use of proceeds of the 2017 Notes.

All Documents Concerning the legality or validity under the laws of any jurisdiction of the 2017 Notes, the 2020 Notes or the Governing documents.

Ex. 252 at ¶¶ 8–9, 11–14, 16.

**Plaintiffs' Response 513.**   Undisputed, except to add that the PDVSA Parties objected on various grounds, including, "their lack of access to or control over documents and communications located in Venezuela or under the control of the Maduro regime." *Responses and Objections of Petróleos de Venezuela, S.A. & PDVSA Petróleo, S.A., to Defendants' First Request for Documents*, dated January 3, 2020, Bliss Opp. Decl. Ex. 11.

514.   The Trustee and Collateral Agent also requested documents relevant to the PDVSA Parties' prior transactions not approved by the National Assembly:

Documents, whether or not created during or Concerning the Relevant Time Period, sufficient to identify (a) any issuances of debt by Plaintiffs, including, but not limited to, those identified in Appendix B, (b) any sale or pledge of stock of PDVH, CITGO Holding, or CITGO, or (c) any sale or pledge of assets of PDVH, CITGO Holding, or CITGO sold or pledged for, or with a value of, more than $100 million.

For each transaction described in the preceding paragraph: (a) any
governing indenture or other governing agreements; (b) any offering
Document or prospectus; (c) any legal opinions Concerning any
requirements for approval of such transaction (including, but not limited
to, approval by the National Assembly); (d) any documents indicating the
applicable interest rate or rate of return on these transactions; (e) any
documents indicating any collateral or pledge associated with the
transactions; (f) all Documents Concerning any approval or disapproval,
or effort to obtain approval, by the National Assembly or the Venezuelan
Government; and (g) all Documents Concerning the adequacy,
sufficiency, or legality of the transaction, including any legal opinions and
any representations Concerning such adequacy, sufficiency, or legality.

*Id.* ¶¶ 32–33.

**Plaintiffs' Response 514.**   Undisputed, except to add that the PDVSA Parties

objected on various grounds, including, "their lack of access to or control over documents

and communications located in Venezuela or under the control of the Maduro regime."

*Responses and Objections of Petróleos de Venezuela, S.A. & PDVSA Petróleo, S.A., to*

*Defendants' First Request for Documents*, dated January 3, 2020, Bliss Opp. Decl. Ex.

11.

516.   The Trustee and Collateral Agent's First Request also instructed the

PDVSA Parties, to the extent they "contend [they] are unable to produce any responsive

Documents because [they] do not have de facto control of assets of Plaintiffs in

Venezuela or elsewhere, specify the nature and contents of all such responsive

Documents and their location, and any other information explaining why [they] contend

that [they] are unable to produce them."  *Id.* ¶ K.

**Plaintiffs' Response 515.**   Undisputed.

516.   On January 3, 2020, PDVSA and PDVSA Petróleo served on the Trustee

and Collateral Agent their response and objections to Defendants' First Request for the

Production of Documents.  Ex. 259.

**Plaintiffs' Response 516.**   Undisputed.

517.   PDVSA and PDVSA Petróleo objected to producing "documents or communications located in Venezuela or under the control of the Maduro regime" on the ground that the PDVSA Parties "do not have access to or control over the documents [and] communications."  *Id.* ¶ 6.

**Plaintiffs' Response 517.**   Undisputed.

518.   PDVSA and PDVSA Petróleo also stated that they "will provide defendants with a statement attesting to their lack of access to or control over documents and communications located in Venezuela or under the control of the Maduro regime." *Id.* ¶ 8.

**Plaintiffs' Response 518.**   Undisputed.

519.   Ultimately, PDVSA and PDVSA Petróleo have not produced any documents in this case from prior to 2019, except a limited production of documents from third parties located in the United States or documents publicly available, ███

███████████████████████████████████████████████████

███   Ex. 17 at 88:16–25, 92:21–25, 118:23–19:25, 137:20–140:9, 161:3–16, 168:16–169:10, 181:20–23, 181:5–17, 194:2–8, 201:20–202:3.

**Plaintiffs' Response 519.**   Undisputed that Plaintiffs have produced documents within the mutually agreed upon timeframe and scope of discovery subjects, which were agreed at least in part based on the PDVSA Parties' lack of access to materials located in Venezuela.

**B.    The PDVSA Parties' Corporate Designees under Fed. R. Civ. P. 30(b)(6)** █████████
████████████████████████████████████

520.    PDVSA designated as its Rule 30(b)(6) corporate representative Luis

Pacheco, President of the PDVSA Ad Hoc Board.  Ex. 17 at 21:8–11.

**Plaintiffs' Response 520.**    Undisputed.

521.    

*Id.* 168:16–170:10, 192:19–193:11, 194:2–8, 196:21–

197:10, 197:22–25, 201:2–202:3; Ex. 14 at 8.

**Plaintiffs' Response 521.**

522.

Ex. 17 at 168:16–21.

**Plaintiffs' Response 522.**    Undisputed.

Case 1:19-cv-10023-KPF   Document 166   Filed 07/06/20   Page 211 of 223

523. ████████████████████████████████████

████████████████████████████████████████ *Id.* at

169:5–170:7.

**Plaintiffs' Response 523.**   Undisputed.

524. ████████████████████████████████████████

███████████████████████ *Id.* at 176:4–7, 178:24–179:2.

**Plaintiffs' Response 524.**   Undisputed.

525. ███████████████████████████████

████████████████████████████████████████

████████████ *Id.* at 181:24–182:17.

**Plaintiffs' Response 525.**   Undisputed.

526. ████████████████████████████████████

██████████████████████████ *Id.* at 114:15–115:3, 133:13–

134:4, 151:2–25; Ex. 14 at 8–9.

**Plaintiffs' Response 526.** ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

527. ████████████████████████████████████

████████████████████████████████████████

████████████ Ex. 17 at 114:15–115:3.

**Plaintiffs' Response 527.**   Undisputed.

210

528. ████████████████████████████

████████████████████████████████ *Id.* at

133:13–134:4.

**Plaintiffs' Response 528.** ████████████████

████████████████████████████████

███████████████████████

529. ████████████████████████████

████████████████████████████

███████ *Id.* at 137:9–140:12.

**Plaintiffs' Response 529.** ████████████████

████████████████████████████████

████████████████████████████████

██████████████████

530. ██████████████████████

████████████████████████████████ *Id.*

at 151:2–4.

**Plaintiffs' Response 530.**   Undisputed.

531. ██████████████████████

██████████████████████████

████████████ *Id.* at 151:14–25.

**Plaintiffs' Response 531.** ████████████████

██████████████████████████



532. ██████████████████████████████

██████████████████████████████ *Id.* at 243:25–

244:8

**Plaintiffs' Response 532.**   Undisputed.

533. ██████████████████████████████

████████████████████ *Id.* at 91:4–15, 92:21–25.

**Plaintiffs' Response 533.**   ██████████████

534. ██████████████████████████████

██████ *Id.* at 74:20–25; Ex. 16.

**Plaintiffs' Response 534.**   Undisputed.

535.   CITGO Holding designated as its Rule 30(b)(6) corporate representative

Rick Esser, the Executive Vice President at CITGO Holding.  Ex. 19 at 36:20–23.

**Plaintiffs' Response 535.**   Undisputed.

536. ██████████████████████████████

███████        *Id.* at 58:3–11, 59:7–11, 60:6–61:21, 62:8-11, 112:10–114:2, 114:19–115:17,

116:17–117:8, 118:7–21; 122:12–23, 128:10–24, 130:13–131:10, 133:3–135:21, 144:13–

18; 172:18–22; 173:11–174:1, 179:5–22, 184:8–24, 186:15–187:5.

**Plaintiffs' Response 536.**  ████████████████████

████████████████████████████████████

██████████████████████████████

████████████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████████████████

█████████████████

537.    ██████████████████████

████████████████████████████

████████████████████████████████████

███████        *Id.* at 55:16–22.

**Plaintiffs' Response 537.**  ██████████████████████

██████████████████████████

██████████████████████████

████████████████████████████████████

██████████████████████████

███████████████████████████

████████████████████████████████████

██████████████████

538. ████████████████████████████████

████████████████████████████████

████████████████████████████ *Id.* at

62:12–15.

**Plaintiffs' Response 538.** ███████████████████

████████████████████████████████

█████████████████████████████████

██████

539. ██████████████████████████

████████████████████████████████

██████████ *Id.* at 62:16–20.

**Plaintiffs' Response 539.** Undisputed.

540. █████████████████████████████

████████████████ *Id.* at 229:19–232:16.

**Plaintiffs' Response 540.** ███████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████

541. ███████████████████████████

███████████████████████████

███████████ *Id.* at 114:15–115:6, 116:17–117:8, 172:18–174:1; Ex. 15 at 4–5.

**Plaintiffs' Response 541.** ████████████████

███████████████████████████

█████████████████████████

█████████████████████████

█████████████████████████

███████████████████████████

███████████████████████████.

542. ██████████████████████

███████████████████████

███████████ Ex. 19 at 116:17–117:8, 179:5–22.

**Plaintiffs' Response 542.** ████████████████

███████████████████████████

█████████████████████████

█████████████████████████

█████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████



543.

*Id.* at 116:17–117:8, 184:8–24, 186:15–187:5, 215:23–25.

**Plaintiffs' Response 543.**

544.

*Id.* at 116:17–117:8, 193:6–15, 196:11–14, 198:5–17, 203:12–15, 205:3–10, 213:22–214:1, 220:20–221:3, 221:24–222:7, 225:18–226:10.

**Plaintiffs' Response 544.**

545. ████████████████████████████

████████████████████████████

██████████████ *Id.* at 193:6–15.

**Plaintiffs' Response 545.** ████████████████

████████████████████████████

██████████████████████████

██████████████████████████

██████████████████████████

████████████████████████████

████████████████████████████

546. ████████████████████

████████████████████████████

██████████████████████ *Id.* at 213:22–214:1.

**Plaintiffs' Response 546.** ████████████████

████████████████████████████

██████████████████████████

██████████████████████████

██████████████████████████

████████████████████████████

████████████████████████████

547. ████████████████████

████████████████████████████

██████████████ *Id.* at 196:11–14.

**Plaintiffs' Response 547.** ████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

  548.  ██████████████████████████████

██████████████████████████████████████████

██████████████████████████  *Id.* at 239:9–20.

**Plaintiffs' Response 548.** ███████████████████

██████████████████████████████████████

██████████████████████████████████████

███

  549.  ██████████████████████████

██████████████████████████████████████████

██████████████████  *Id.* at 60:2–61:21, 62:8–11.

**Plaintiffs' Response 549.** ██████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████



550.

**Plaintiffs' Response 550.**

551.

Ex. 19 at 249:2–18, 254:14–21.

**Plaintiffs' Response 551.**

552.

Ex. 19 at 241:12–243:4.

**Plaintiffs' Response 552.**   Undisputed.

C.     The PDVSA Parties' Statements in This Action and
       Other U.S. Litigation Asserting Inability to Obtain
       Access to Documents or Witnesses in Venezuela.

553.     PDVSA and PDVSA Petróleo have explained their failure to produce

documents located in Venezuela by asserting that "[t]he Maduro regime maintains

control, practical control of [PDVSA and PDVSA Petróleo's] assets and operations in

Venezuela" and that plaintiffs "don't control any documents in Venezuela."  Hr'g Tr.

6:7–9, 31:11–12, Nov. 8, 2019, ECF No. 31.

**Plaintiffs' Response 553.**   Undisputed.

554.     ███████████████████████████████████

██████████████████████████████████████████████

███████████████ Ex. 17 at 250:17–251:14.

**Plaintiffs' Response 554.**   ███████████████████

██████████████████████████████████████████████

███████████

555.     The PDVSA Parties have consistently represented in this litigation that

they do not have access to documents and witnesses in Venezuela.  Letter from J. Bliss to

Failla, J., at 2, Nov. 6, 2019, ECF No. 15; ████████████████████████████

**Plaintiffs' Response 555.**   Undisputed.

556.     The PDVSA Parties have also consistently represented in other pending

U.S. litigations and, as defendants, have sought stays in other pending U.S. litigations as

a result.  In a declaration in support of the PDVSA Parties in one such litigation,

Hernández asserted that the PDVSA Parties "are not in a position to provide counsel with

sufficient information to respond to the allegations of the plaintiff in this action, access to

records, or obtain the necessary documents and testimony required to defend the merits"

of these cases.  *See* Ex. 23 ¶¶ 12–13; *see also* Joint Status Report, *Helmerich & Payne Intern'l Drilling Co.* v. *Bolivarian Republic of Venezuela*, No. 1:11-cv-01735-CRC, at 1 (May 12, 2020); Defs.' Mem. Supp. Fed. R. Civ. P. 56(d), *Red Tree Investments, LLC* v. *PDVSA*, No. 1:19-cv-002519, at 10–11 (Feb. 7, 2020) (No. 65); Ex. 242 at ¶¶ 10–12; Ex. 243 at ¶¶ 13–15; Def.'s Mem. Supp. of Def.'s Mot. to Dismiss Compl., *Lovati* v. *PDVSA*, No. 1:19-cv-04799-ALC, at 12 (Oct. 30, 2019) (No. 25); Defs.' Mem. Supp. Additional Stay, *Red Tree Investments, LLC* v. *PDVSA*, No. 1:19-cv-02519, at 1 (Sept. 26, 2019) (No. 50); Defs.' Mem. Supp. Additional Stay, *Red Tree Investments, LLC* v. *PDVSA*, No. 1:19-cv-02519, at 1 (Sept. 26, 2019) (No. 50); Ex. 41 at 1–2; Defs.' Mem. Supp. Mot. Fed. R. Civ. P. 56(d), *Dresser-Rand Company* v. *PDVSA*, No. 1:19-cv-02689-LLS, at 10–11 (June 3, 2019) (No. 18).

**Plaintiffs' Response 556.**    Undisputed that the PDVSA Parties have consistently represented that they have no ability to access records, obtain documents and testiomny, or confer with certain individuals involved with specific transactions and actions because of the unlawful acts of the Maduro regime and its decision to preclude such access to the Ad Hoc Boards and their representatives.  *See, e.g.*, Defs. Ex. 23 at ¶¶ 12–13.

Dated:  June 29, 2020                              Respectfully submitted,

                                                  */s/ Kurt W. Hansson*
                                                  Kurt W. Hansson
                                                  James R. Bliss
                                                  James B. Worthington

                                                  PAUL HASTINGS LLP
                                                  200 Park Avenue
                                                  New York, New York 10166
                                                  Telephone: (212) 318-6000
                                                  Facsimile: (212) 319-4090
                                                  kurthansson@paulhastings.com
                                                  jamesbliss@paulhastings.com
                                                  jamesworthington@paulhastings.com

                                                  *Attorneys for Plaintiffs and Counterclaim
                                                  Defendants Petróleos de Venezuela, S.A.
                                                  and PDVSA Petróleo, S.A.*

                                                  */s/ Jeffrey B. Korn*
                                                  Jeffrey B. Korn
                                                  Michael Gottlieb
                                                  Nicholas Reddick
                                                  WILLKIE FARR & GALLAGHER LLP
                                                  787 Seventh Avenue
                                                  New York, NY 10019
                                                  Telephone: (212) 728-8000
                                                  Facsimile: (212) 728-8111
                                                  jkorn@willkie.com
                                                  1875 K Street NW
                                                  Washington, DC  20006-1238
                                                  Telephone: (202) 303-1442
                                                  Facsimile: (202) 303 2442
                                                  mgottlieb@willkie.com
                                                  nreddick@willkie.com

                                                  *Attorneys for Plaintiff and Counterclaim
                                                  Defendant PDV Holding, Inc.*