**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC., | |
| Plaintiffs, | |
| - against - | Case No: 19-cv-10023-KPF |
| MUFG UNION BANK, N.A. and GLAS AMERICAS LLC, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DAVID C. HINMAN**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ........................................................................................................5

     A.     The Parties' Claims, Defenses, and Counterclaims. ................................5

     B.     Mr. Hinman's Expert Opinion. ...............................................................6

LEGAL STANDARD.................................................................................................6

ARGUMENT .............................................................................................................9

I.     MR. HINMAN'S OPINIONS CONCERNING INVALIDITY RISK ARE ADMISSIBLE.................................................................................................9

     A.     Mr. Hinman's Definition of "Invalidity Risk" is Relevant and Reliable.................9

     B.     Mr. Hinman's Market Commentary Analysis is Reliable. ....................13

     C.     Mr. Hinman's Pricing Analysis is Reliable. ..........................................17

II.     MR. HINMAN'S OPINIONS THAT PLAINTIFFS WERE NOT ENRICHED AND THAT 2020 NOTEHOLDERS RECEIVED MORE VALUE THAN THEIR COST OF INVESTMENT ARE ADMISSIBLE. ................................................................................22

     A.     Mr. Hinman's Opinion that Plaintiffs were Not Enriched by the Exchange Offer is Relevant and Reliable. ..........................................22

     B.     Mr. Hinman's Opinion that Exchanging Investors Did Not Lose Money is Relevant and Reliable. ..........................................24

CONCLUSION.........................................................................................................25

## **TABLE OF AUTHORITIES**

**Case**                                                                                                    **Page(s)**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC,*
    364 F. Supp. 3d 291  (S.D.N.Y. 2019)....................................................................8, 16, 17

*Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.,*
    222 F. Supp. 2d 423 (S.D.N.Y. 2002)...............................................................................18

*Bensen v. Am. Ultramar Ltd.,*
    No. 92 CIV. 4420 (KMW)(NRB), 1996 WL 422262 (S.D.N.Y. July 29, 1996) ..........9, 24

*Briarpatch Ltd., L.P. v. Phoenix. Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004)........................................................................................23, 24

*Campbell ex rel. Campbell v. Metro. Prop. and Cas. Ins. Co.,*
    239 F.3d 179 (2d Cir. 2001)................................................................................................8

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).......................................................7, 17

*Figueroa v. Boston Scientific Corp.,*
    254 F. Supp. 2d 361 (S.D.N.Y. 2003)....................................................................9, 18, 22

*Golod v. La Roche,* 964 F. Supp. 841 (S.D.N.Y. 1997).........................................................18, 22

*In re Gulf Oil/Cities Service Tender Offer Litig.,*
    725 F. Supp. 712 (S.D.N.Y. 1989)......................................................................................9

*Intelligent Digital Sys. v. Beazley Ins. Co.,*
    962 F.Supp.2d 451 (E.D.N.Y. 2013) ..................................................................................9

*Int'l Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC,*
    470 F. Supp. 2d 345 (S.D.N.Y. 2007)...............................................................................14

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) .................................................................8

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.,*
    179 F. Supp. 2d 118 (S.D.N.Y. 2000)................................................................................9

*Lidle ex rel. Lidle v. Cirrus Design Corp.,*
    No. 08 Cv. 1253(BSJ)(HBP), 2010 WL 2674584 (S.D.N.Y. July 6, 2010) ......................9

*McBeth v. Porges,*
    No. 15-CV-2742 (JMF), 2018 WL 5997918 (S.D.N.Y. Nov. 15, 2018)............................8

*Med. Soc'y of New York v. UnitedHealth Group Inc.,*
    No. 16-CV-5265 (JPO), 2020 WL 1489800 (S.D.N.Y. Mar. 26, 2020).............................7

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
  643 F. Supp. 2d 482 (S.D.N.Y. 2009).................................................................12

*Monterey v. City of New York*,
  No. 17-CV-4477 (VEC), 2019 WL 5884466 (S.D.N.Y. Nov. 12, 2019) ........................18

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)............................................7

*R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010).......................................12

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017).......................................16

*In re Trusts Established under the Pooling & Servicing Agreements*,
  2020 U.S. Dist. LEXIS 47847 (S.D.N.Y. Mar. 19, 2020).....................................7, 14, 16

*Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir. 1992)....................................16

*U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers' Local Union No. 3, AFL-CIO*,
  313 F. Supp. 2d 213 (S.D.N.Y. 2004).................................................................17

*In re Urethane Antitrust Litig.*, 152 F. Supp. 3d 357 (D.N.J. 2016)...............................18

*United States v. Diakhoumpa*, 171 F. Supp. 3d 148 (S.D.N.Y. 2016)............................8

*United States v. Mirilishvili*,
  S2 14 CR 810(CM), 2016 WL 751690 (S.D.N.Y. Feb. 19, 2016)....................................7

*Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC*,  No. 07 Civ.
  5804(GEL), 2009 WL 959775 (S.D.N.Y. Apr. 8, 2009)....................................7

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
  571 F.3d 206 (2d Cir. 2009).................................................................16

**Other Authorities**

Fed. R. Evid. 702 ..............................................................................................6, 7

2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence,
  § 401.04[2][c] (2013).......................................................................................8

Plaintiffs PDVSA, PDVSA Petróleo, and PDV Holding[1] respectfully submit this memorandum of law in opposition to Defendants' Motion to Exclude the Expert Testimony of David C. Hinman.

## PRELIMINARY STATEMENT

Defendants seek to preclude the testimony of David C. Hinman, an expert in emerging market debt securities. Mr. Hinman is qualified to offer expert testimony regarding (1) whether institutional investors were or should have been aware of the invalidity risk associated with the 2020 Notes at the time of the Exchange Offer; (2) whether PDVSA was enriched by the Exchange Offer; and (3) whether any such enrichment came at the expense of the 2020 Noteholders. Defendants do not dispute Mr. Hinman's qualifications. Rather, they claim that his testimony is irrelevant and unreliable. Defendants are wrong on both counts, and their objections to Mr. Hinman's testimony go to its weight (if anything), not its admissibility.

Mr. Hinman's opinion that sophisticated institutional investors—who make up the majority of beneficial holders of the 2020 Notes—were or should have been aware of the risk that the 2020 Notes Transaction Documents (and especially the Pledge) would be deemed invalid is directly relevant to whether the 2020 Noteholders could have reasonably relied on any statements by the Maduro-controlled board of PDVSA or its agents regarding the purported validity of the Notes. Defendants have put their purported reliance squarely at issue by raising affirmative defenses and counterclaims that require a showing of reasonable reliance to succeed. They cannot now claim that evidence that bears upon that reliance is irrelevant. Defendants also

---

[1] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (Dkt. No. 95). Defendants' opening brief in support of their Motion to Exclude the Expert Testimony of David C. Hinman, filed June 10, 2020, is hereafter referred to as "DOB." (Dkt. No. 102). Defendants' Memorandum of Law in Support of Defendants and Counterclaim Plaintiffs' Motion for Summary Judgment, filed June 10, 2020, is hereafter referred to as "DMSJ." (Dkt. No. 99).

assert a counterclaim for unjust enrichment, arguing that Plaintiffs have been enriched by the Exchange because PDVSA and PDVSA Petróleo were relieved of their contractual obligations to pay the 2017 Notes, and because PDV Holding somehow benefitted from its parent being relieved of these obligations. Defendants contend that such enrichment came at the expense of the 2020 Noteholders. Mr. Hinman's testimony goes to the heart of the unjust enrichment counterclaim, and thus is entirely relevant.

Defendants attempt to contest the reliability of Mr. Hinman's opinions regarding invalidity risk by arguing (1) that his definition of "'invalidity risk' . . . conflates several different risks," (DOB at 7); (2) that he impermissibly "cherry-pick[ed]" the market commentary upon which he relied concerning the invalidity risk, (*Id*. at 9); and (3) that he failed to rule out potential alternative causes for the depressed pricing of the 2020 Notes, Fitch's recovery rating, and investors' tepid response to the Exchange Offer. (*Id*. at 11–17). These arguments are without merit.

To begin with, Mr. Hinman's definition of "invalidity risk" refers specifically to the risk that the Pledge would be deemed invalid. Defendants quibble that this definition—and Mr. Hinman's analysis—impermissibly conflates a *legal* risk that the Pledge would be deemed invalid with a *political* risk that the Venezuelan government would repudiate its obligations under the 2020 Notes. But a legal challenge to the validity of the Pledge and the 2020 Notes Transaction could only arise if the opposition party came to power in Venezuela (as it did), since the authoritarian Maduro regime paid no regard to the National Assembly's constitutional oversight power over national public interest contracts. Thus, the political and legal risks of invalidity are inextricably intertwined. Defendants' contention that Mr. Hinman's failure to separate these risks renders his opinion inadmissible is nothing more than an illogical semantic

distinction.  Even Defendants' own economic expert, Arturo Porzecanski, recognized that "the validity of some [of Venezuela's] debts could be challenged, especially by an eventual successor government, because not all received proper authorization (e.g., from the National Assembly)." (Hinman Rebuttal Report[2] ¶ 24).

Defendants' assertion that Mr. Hinman selectively quotes public commentary and market analysis concerning the invalidity risk associated with the 2020 Notes likewise falls flat.  Mr. Hinman opines that, based on his extensive experience with emerging market debt instruments, the body of information that was available to investors—including contemporaneous resolutions from the National Assembly itself and pieces authored by reputable and closely followed analysts—was sufficient to put sophisticated investors on notice of the invalidity risk.  Mr. Hinman also considered contemporaneous emails from some of the largest holders of the 2020 Notes, including Ashmore and Blackrock, that demonstrate that the investors received (and thus were aware of) the very same public commentary and market analyses that Mr. Hinman examined.  In fact, the record demonstrates that at least one of these investors (Ashmore) considered the invalidity risk so significant that it conducted its own legal analysis of the 2020 Notes generally and the enforceability of the CITGO Collateral in particular.

Equally specious is Defendants' argument that Mr. Hinman's opinion that invalidity risk was one factor that impacted the price of the 2020 Notes or led to investors' tepid response to the Exchange Offer is inadmissible because he failed to rule out every other possible factor.  Mr. Hinman was not retained as a causation expert, and in any event, he considered (and dismissed) the potential impact of the U.S. sanctions regime on the price of the 2020 Notes and investors'

---

[2] "Hinman Rebuttal Report" means the Expert Rebuttal Report of David C. Hinman, CFA, dated April 15, 2020, attached as Exhibit 1 to the Declaration of Matthew Freimuth filed herewith.

response to the Exchange Offer.  But even in the context of causation, a failure to rule out certain alternative causes does not require exclusion of expert testimony, but rather goes to its weight.

Defendants also contend that Mr. Hinman's enrichment analysis "is based on his say-so and employs no methodology to objectively evaluate or quantify the relative benefits and costs to PDVSA under the Exchange Offer."  (DOB at 17).  This argument is unavailing.  Mr. Hinman's enrichment analysis is not, as Defendants frame it, simply *ipse dixit*.  Rather, Mr. Hinman compared the terms of the Exchange Offer to other sovereign and state-owned enterprise debt exchanges, and concluded that PDVSA was not enriched because it received only a relatively short maturity extension on its debt repayment while being required to make significantly greater payments on the 2020 Notes.  This conclusion is supported not only by Mr. Hinman's extensive experience with sovereign and state-owned debt instruments, but by contemporaneous market commentary regarding the Exchange Offer, as well as studies regarding participation rates in sovereign restructures.  In short, Mr. Hinman's methodology is reliable.  So too is Mr. Hinman's opinion that exchanging noteholders have not lost money on their investment, which is relevant to an essential element of Defendants' unjust enrichment counterclaim—that any purported enrichment came at the noteholders' expense.

For these reasons, and in light of the presumption of admissibility of expert testimony employed by the Second Circuit (especially at the summary judgment stage in a bench trial), a *Daubert* hearing is unnecessary and Defendants' motion should be denied.  If anything, Defendants' attempts to argue with Mr. Hinman's opinions only demonstrate that their motion seeking summary judgment on their affirmative defenses requires the resolution of contested fact issues and it too should be denied.

## BACKGROUND

### A.     The Parties' Claims, Defenses, and Counterclaims.

On October 29, 2019, Plaintiffs filed their complaint for declaratory and injunctive relief, alleging that the Indenture, Pledge, and 2020 Notes are invalid, illegal, null and void *ab initio*, and thus unenforceable.  (*See* Compl. ¶¶ 1, 73–94).  In response, Defendants filed an Answer which included a number of affirmative defenses and counterclaims.  As is pertinent here, Defendants allege that Plaintiffs' claims are barred under a number of legal and equitable defenses because "plaintiffs' statements, conduct, and omissions were intended to induce, and did induce, reliance" by the Defendants and 2020 Noteholders, "each of which changed its position to its detriment based on its reliance."  (Def. Ans. ¶¶ 100, 102; *see also id*. ¶¶ 231, 238 ("Counterclaim plaintiffs and . . . the exchanging holders, and the subsequent purchasers of the 2020 Notes reasonably relied" on PDVSA Petróleo's and PDV Holding's representations and warranties)).  In particular, Defendants claim that the 2020 Noteholders' reliance on Hogan Lovells' opinion letters pertaining to the 2020 Notes Transaction was "***reasonable*** under applicable professional standards governing 'closing opinions[.]'"  (DMSJ at 14 (emphasis added)).

Defendants also assert that Plaintiffs have been unjustly enriched by the 2020 Notes Transaction because PDVSA and PDVSA Petróleo were relieved of their obligations to pay the 2017 Notes (a benefit that purportedly also fell to PDV Holding, notwithstanding that it had nothing to do with the 2017 Notes), and that this enrichment "came at the expense of the 2020 noteholders."  (Def. Ans*.* ¶¶ 221–226).

### B.    Mr. Hinman's Expert Opinion.

Mr. Hinman is a financial services advisor with more than 25 years of asset management and finance experience.  (Hinman Report[3] ¶ 1).  In particular, Mr. Hinman has "over 20 years of experience evaluating, trading, and managing funds that invested in emerging market debt securities, including sovereign bonds and bonds issued by state-owned enterprises," including bonds issued by PDVSA.  (*Id*. ¶ 2).  As an institutional debt investor, Mr. Hinman routinely evaluated bonds' risk-return tradeoffs.  (*Id*. ¶ 3).  As he explains, "[i]nvesting in sovereign emerging market debt entails unique risks such as loss due to corruption and repudiation that other bond investments . . . typically do not entail."  (*Id*.)  Given these unique risks, institutional investors typically review a host of information to evaluate the merits of sovereign or state-owned enterprise emerging market debt investment.  (*Id*.)  Information upon which investors rely includes market pricing data, third-party credit rating agency reports, market commentary, and brokerage analyst reports related to the bond or country at issue.  (*Id*.)

Plaintiffs retained Mr. Hinman to offer three principal opinions concerning: (1) whether, from the time the Exchange Offer was announced, investors would have or should have been aware of the invalidity risk associated with the 2020 Notes; (2) whether the Exchange Offer enriched PDVSA; and (3) whether 2020 Noteholders lost money as a result of the Exchange. (*Id*. ¶ 16).

## <u>LEGAL STANDARD</u>

Federal Rule of Evidence 702 allows for expert testimony when, among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]"  Fed. R. Evid. 702.  "It is a well-

---

[3] Mr. Hinman's Expert Report is attached as Exhibit 2 to the Declaration of Matthew Freimuth filed herewith.

accepted principle that Rule 702 embodies a liberal standard of admissibility for expert

opinions[.]"  *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).  "Indeed, the Second

Circuit has instructed that '*Daubert* reinforces the idea that there should be a presumption of

admissibility'" of expert testimony.  *United States v. Mirilishvili*, S2 14 CR 810(CM), 2016 WL

751690, at *3 (S.D.N.Y. Feb. 19, 2016) (quoting *Borawick v. Shay*, 68 F.3d 597, 610 (2d. Cir.

1995)); *see also* Fed. R. Evid. 702 Advisory Committee's note ("[T]he rejection of expert

testimony is the exception rather than the rule.").  In a bench trial such as this, "the presumption

of admissibility is even stronger" because "the Court is the ultimate fact-finder," and "rather than

'gate-keep expert testimony from itself,' the Court can 'take in the evidence freely and separate

helpful conclusions from the ones that are not grounded in reliable methodology.'"  *Med. Soc'y

of New York v. UnitedHealth Grp. Inc.*, No. 16-CV-5265 (JPO), 2020 WL 1489800, at *3

(S.D.N.Y. Mar. 26, 2020) (quoting *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09–cv–

7199 (AJN), 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014)); *see also Victoria's Secret

Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*,  No. 07 Civ. 5804(GEL), 2009 WL

959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009) ("where a bench trial is in prospect, resolving *Daubert*

questions at a pretrial stage is generally less efficient than simply hearing the evidence[.]").

Indeed, as Your Honor has recognized, "'in a bench trial, the risk is with exclusion of expert

testimony rather than with its admission—it is exclusion that has the potential for an indelible

impact on the record[.]'"  *In re Trusts Established under the Pooling & Servicing Agreements*,

2020 U.S. Dist. LEXIS 47847, at *132–33 (S.D.N.Y. Mar. 19, 2020) (quoting *Joseph S. v.

Hogan*, No. 06 Civ. 1042, 2011 U.S. Dist. LEXIS 76762, at *3 (E.D.N.Y. July 15, 2011)).

　　　Rule 702 requires that expert testimony be both relevant and reliable.  *See Daubert v.

Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  In assessing relevance, courts look to the

standards of Rule 401, which provides that evidence is relevant if it "'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  *Campbell ex rel. Campbell v. Metro. Prop. and Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (citing Fed. R. Evid. 401; *Daubert*, 509 U.S. at 587).  The bar for relevance is not high.  Rule 401 "uses a lenient standard for relevance . . . .  To be admissible, evidence need only to alter the probabilities of a proposition; it need not sway the balance to any particular degree."  2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 401.04[2][c] (2013).

*Daubert*'s "reliability" test requires only "'some explanation as to how the expert came to his conclusion[.]'"  *McBeth v. Porges*, No. 15-CV-2742 (JMF), 2018 WL 5997918, at *6 (S.D.N.Y. Nov. 15, 2018) (quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006)).  Reliability "should be understood in the context of the 'liberal thrust' of the Federal Rules of Evidence, and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'"  *United States v. Diakhoumpa*, 171 F. Supp. 3d 148, 152 (S.D.N.Y. 2016) (quoting *Daubert*, 509 U.S. at 588).  In all cases, "the test of reliability is flexible," and a district court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (internal quotation marks omitted); *see also A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 323 (S.D.N.Y. 2019) (Failla, J.) ("It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]") (citation and quotation marks omitted).  When an expert's opinion does not rely strictly on traditional scientific methods, the Court's "'reliability inquiry may instead focus upon personal knowledge and experience of the expert.'"  *Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Cv.

1253(BSJ)(HBP), 2010 WL 2674584, at *6 (S.D.N.Y. July 6, 2010) (quoting *Bah v. Nordson Corp.*, 00 Civ. 9060, 2005 WL 1813023, at *7 (S.D.N.Y. Aug. 1, 2005)).  In fact, an expert may testify "on the basis of experience alone or in conjunction with other knowledge, training, skill, or education."  *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 365 (S.D.N.Y. 2003).

## ARGUMENT

### I.    MR. HINMAN'S OPINIONS CONCERNING INVALIDITY RISK ARE ADMISSIBLE.

#### A.    Mr. Hinman's Definition of "Invalidity Risk" is Relevant and Reliable.

Mr. Hinman's opinion that sophisticated investors were aware (or at least should have been aware) of the invalidity risk associated with the 2020 Notes is relevant to an element of Defendants' affirmative defenses of promissory estoppel, equitable estoppel, and apparent authority—namely, that the 2020 Noteholders reasonably relied on purported statements of the Maduro-controlled PDVSA or its agents affirming the validity of the Notes.  (*See* Def. Ans. ¶¶ 100, 102, 231, 238; DMSJ at 14); *Bensen v. Am. Ultramar Ltd.,* No. 92 CIV. 4420 (KMW)(NRB), 1996 WL 422262, at *5 (S.D.N.Y. July 29, 1996) ("[I]f [an expert]'s proffered testimony is relevant to a fact of consequence in determining the action pursuant to any of [the counterclaims at issue], it is relevant."); *In re Gulf Oil/Cities Service Tender Offer Litig.*, 725 F. Supp. 712, 734 (S.D.N.Y. 1989) (the elements of promissory estoppel include "reasonable and foreseeable reliance" on a clear and unambiguous promise); *Intelligent Digital Sys. v. Beazley Ins. Co.*, 962 F.Supp.2d 451, 456 (E.D.N.Y. 2013) (elements of equitable estoppel include "[r]eliance upon . . . misrepresentations which causes the innocent party to change its position to its substantial detriment."); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 148 (S.D.N.Y. 2000) (reliance is unreasonable for apparent authority purposes where a third party knew, or even suspected, that the transaction at

issue was illegal).  Here, in moving for summary judgment and in their affirmative defenses, Defendants affirmatively assert that noteholders reasonably relied on various statements as to the legality of the 2020 Notes.  (*See* DMSJ at 10, 13–14, 16–18, 26–28, 33).  Mr. Hinman's opinions go directly to these issues.  Defendants cannot raise issues in this litigation and then handicap Plaintiffs' ability to respond to those same issues on account of purported irrelevance.

As Defendants concede, Mr. Hinman defined "invalidity risk" to mean "the risk that the purported pledge of 50.1% of CITGO Holding's equity as collateral for the 2020 Notes in the Exchange [Offer] . . . would be deemed invalid."  (Hinman Report ¶ 16(a); DOB at 6).  Defendants contend that this definition is irrelevant and unreliable because it "includes both the legal risk that a court of competent jurisdiction will declare the 2020 Notes legally invalid and thus unenforceable . . . and the political risk that a Venezuelan governmental entity would deem the pledge invalid by repudiating the debt for political reasons[.]"[4]  (DOB at 7).  As Mr. Hinman explains in his report, the risk of legal invalidity "would materialize only if (a) the 2020 Notes defaulted at maturity, or before they matured; *and* (b) there was a power transition in Venezuela from the Maduro administration to the opposition before such a default had occurred; *and* (c) the successor government refused to honor the purported pledge of the CITGO collateral."[5]  (Hinman Report ¶ 36).

---

[4] Defendants also quip that Mr. Hinman's definition of invalidity risk "does not come from finance literature [or] common usage in the bond market[.]"  (DOB at 7).  This is unsurprising, given that it is exceedingly rare that invalid bonds actually get issued into the market in the first place.  As explained herein, a suspected invalidity issue, even if only mentioned in a few analyst reports or news article, would be sufficient to put investors on notice because it represents a tail risk—a rare occurrence with a high severity of loss.

[5] Defendants puzzlingly assert that this "political risk" is "contrary to the PDVSA Parties' theory" in this case. (DOB at 7).  As the Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment makes clear, the National Assembly—the only legitimate branch of the Venezuelan government—publicly and repeatedly repudiated the Pledge and the Exchange Offer because the Transaction Documents constituted national public interest contracts that were not authorized by the National Assembly as required by the Venezuelan Constitution.  (*See* Dkt. No. 95 at 9–12).  Put differently, this "political" repudiation was inextricably tied to the *legal* invalidity of the Transaction Documents, and thus the 2020 Notes Transaction.

In other words, a legal challenge to the validity of the 2020 Notes Transaction would arise only if the opposition parties came to power in Venezuela—which is precisely what happened here—and thus the "legal" invalidity risk cannot be separated from the concomitant "political" invalidity risk.  The political risk identified by Mr. Hinman is simply not "a later political act of repudiation"[6] as Defendants' contend, (Porzecanski Rebuttal Report[7] ¶ 65), but rather a necessary precondition for any legal risk of invalidity.  Defendants' attempts to draw this arbitrary distinction are illogical and unsupported by their own expert who, before being hired by Defendants, recognized that "the validity of some [of Venezuela's] debts could be challenged, especially by an eventual successor government, because not all received proper authorization (e.g., from the National Assembly)."  (Hinman Rebuttal Report ¶ 24).  This fictional distinction between legal and political risks is also unsupported by the evidentiary record.  Mr. Xin Xu, Portfolio Manager at Ashmore (the largest institutional holder of the 2020 Notes), explained that Ashmore "regularly had to assess political risks in Venezuela," and that PDVSA and the Venezuelan state are "closely related" in terms of the political risks to which they are exposed. (Xu Dep.[8] 28:19–29:5).

Equally unavailing is Defendants' assertion that Mr. Hinman "identifies no threshold to evaluate the degree or magnitude of 'risk' of which he contends investors should have been aware."  (DOB at 2).  As an initial matter, no "threshold" is required to judge investors' awareness, and any attempt to determine investors' specific motivations or appetite for risk would be entirely speculative and an inappropriate basis for an expert opinion.  *See R.F.M.A.S.,*

---

[6] The challenge to the 2020 Notes should not be confused with other emerging debt concepts such as debt repudiation, because this challenge was both specific and publicly declared *prior* to the Exchange.
[7] "Porzecanski Rebuttal Report" means the Rebuttal Declaration of Professor Arturo C. Porzecanski in Response to Portions of the Expert Report by David C. Hinman, dated April 15, 2020, attached as Exhibit 3 to the Declaration of Matthew Freimuth filed herewith.
[8] "Xu Dep." means the transcript of the March 11, 2020 deposition of Xin Xu, attached as Exhibit 4 to the Declaration of Matthew Freimuth filed herewith.

*Inc. v. So*, 748 F. Supp. 2d 244, 268 (S.D.N.Y. 2010) ("Determining what motivated a particular person or entity is generally not an appropriate subject matter for expert testimony."); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 643 F. Supp. 2d 482, 503 (S.D.N.Y. 2009) (precluding testimony of economic advisor to the EPA concerning the EPA's motivations as impermissibly speculative). Appropriately, Mr. Hinman concluded, based on his experience and expertise, that "extensive public commentary suggests that the invalidity risk was very significant to investors because it garnered widespread coverage despite it being a 'tail risk'"— *i.e.*, "a risk with low probability of occurrence but dramatic significance if it did occur." (Hinman Report ¶ 36).

In forming this opinion, Mr. Hinman explained that sophisticated investors "routinely monitor various channels of information, including market commentary and analysts reports, to assess the merits of an investment," and that, based on his review of such materials, "extensive public press and analyst commentary about the invalidity risk related to the 2020 Notes . . . was available to investors from before the Exchange Offer's completion through the 2020 Notes' missed October 2019 payment." (Hinman Report ¶ 57). To support this opinion, Mr. Hinman reviewed numerous contemporaneous communications produced in this action from Ashmore and Blackrock, two of the largest institutional holders of the 2020 Notes, and found that these investors had, in fact, received much of the commentary and market analysis that Mr. Hinman reviewed. Thus, it was proper for Mr. Hinman to conclude that sophisticated investors would have (or should have) been aware of the invalidity risk associated with the 2020 Notes. (*See, e.g.*, Hinman Report ¶¶ 34 n.44, 39 n.65, 40 n.67, 42 n.69–70, 46 n.76, 48 n.78, 50 n.82, 51 n.83, 52 n.84). Indeed, at least one significant institutional investor, Ashmore, acknowledged that it was aware of the invalidity risk and considered it sufficiently important to have its legal team

perform an analysis of the 2020 Notes generally and the enforceability of the CITGO collateral in particular.  (Xu Dep. 41:19–42:5).

Defendants' argument that Mr. Hinman's opinion is irrelevant would be better aimed at their own expert's opinion, which inexplicably focuses on the distinction between bonds governed by foreign law and those governed by New York or English law.  (Porzecanski Report[9] ¶ 5).  As Mr. Hinman correctly pointed out, "[t]he distinctions between New York law and local-law bonds that are the focus of Professor Porzecanski's opinions would not have been a factor in an investor's evaluation of the overall invalidity risk . . . associated with participating in the Exchange," because "[i]t was widely understood by the relevant investor community at the time that the 2020 Notes' validity was subject to the requirements of the Venezuelan Constitution, notwithstanding the choice-of-law provisions in the 2020 Notes' governing documents."  (Hinman Rebuttal Report ¶ 4).

### B.    Mr. Hinman's Market Commentary Analysis is Reliable.

Defendants assert that Mr. Hinman's review of market commentary concerning the invalidity risk associated with the 2020 Notes "is not supported by any reliable methodology" and "amounts to impermissible cherry-picking of evidence" because he did not "systematically review any particular universe of information available to investors[.]"  (DOB at 8–9).  These arguments are meritless, and at best go to the weight to which Mr. Hinman's opinions are entitled (not to their admissibility).

Mr. Hinman was asked to opine, based on his experience, *whether investors would have (or at least should have) been aware* of the invalidity risk given the market commentary regarding that issue.  Mr. Hinman reviewed such public commentary, and concluded that it was

---

[9] "Porzecanski Report" means the Declaration of Professor Arturo C. Porzecanski, dated March 16, 2020, attached as Exhibit 5 to the Declaration of Matthew Freimuth filed herewith.

sufficient to put sophisticated investors on notice of the risk.  (Hinman Report ¶ 57).  Mr.

Hinman's opinion in this regard is not only reliable, as it based on his extensive experience in

emerging market debt securities, but it is supported by the facts.  Mr. Xu acknowledged that

Ashmore received many of the contemporaneous analyst reports identified by Mr. Hinman, and

conceded that these reports were "delivered to [Ashmore] one way or another" and that "if

[Ashmore] wanted, we would have used [them], read [them], digest[ed] [them]."  (Xu Dep.

92:13–16; 98:10–17; *see also* Hinman Report ¶¶ 36–57).

      Contrary to Defendants' assertions, Mr. Hinman need not have "systematically

review[ed]" every single piece of public commentary under the sun regarding the 2020 Notes to

reach this conclusion or for that conclusion to be relevant and reliable.[10]  *See, e.g.*, *In re Trusts*

*Established under the Pooling & Servicing Agreements*, 2020 U.S. Dist. LEXIS at *139, 147

(Failla, J.) (denying motion to exclude expert testimony where party claimed that expert

analyzed incomplete data and selectively chose to remove certain data, because these challenges

"go to the weight to be afforded to, rather than the admissibility" of the expert's methodology);

*Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 355 (S.D.N.Y.

2007) (denying motion to strike expert testimony where defendant argued that expert "did not

review pertinent record evidence" and "neglected to consider alternative explanations" for

defendant's actions).

      In any event, that other market commentary was silent on the issue of invalidity risk (or

even downplayed that risk) does nothing to counter Mr. Hinman's conclusion that, based on the

---

[10] In an effort to demonstrate that Mr. Hinman cherry-picked evidence and selectively quoted sources, Defendants themselves cherry-pick and misquote a source that he relies upon.  Specifically, Mr. Hinman cites a September 19, 206 UBS Securities analyst report which Defendants claim "says nothing to indicate that any aspect of the Exchange Offer violated Venezuelan constitutional law or was subject to invalidation on that grounds."  (DOB at 10).  Defendants ignore the first half of a key sentence cited in Mr. Hinman's report, which provides that "the collateral should not be taken at face value as . . . investors would be right to be concerned this swap is being carried out without the consent of the opposition-controlled National Assembly."  (Hinman Report ¶ 41).

commentary that *did* discuss such risk—including reports by reputable and oft-reviewed sources that were, in fact, received and reviewed by 2020 Noteholders—sophisticated investors would have or should have been aware of it.  Indeed, Defendants' expert, Professor Porzecanski, acknowledges that eight of the analyst reports examined by Mr. Hinman discuss invalidity risk (although Professor Porzecanski dismisses these reports on the grounds that they purportedly discuss political, as opposed to legal, invalidity risk—a distinction which, as mentioned, is illogical and unsupported by the record).  (Porzecanski Rebuttal Report ¶¶ 75–81).  Yet, Defendants would appear to require that Mr. Hinman "assess [the] weight . . . investors should have put" on that commentary via some scientific method for his testimony to be admissible.  (DOB at 2).  That misses the point.  Some investors, after reviewing the totality of evidence, may have decided there was little to no invalidity risk associated with the 2020 Notes.  *However, even these investors would have (or should have) been <u>aware</u> of the risk*.  It would therefore not have been reasonable for them to rely on statements by the Maduro regime or otherwise that the risk itself did not exist.  That is what Mr. Hinman's testimony is intended to show, and that is exactly what it demonstrates.

Furthermore, Mr. Hinman does more than simply "marshal[] evidence that the Court can review without the assistance of an expert."  (DOB at 9).  Mr. Hinman explains, based on his experience, that sophisticated investors—like the majority of the beneficial holders of the 2020 Notes—"routinely monitor" information such as the market commentary and analyst reports cited in his report, and that given the "extensive public press and analyst commentary about the invalidity risk related to the 2020 Notes," it is "reasonable to conclude that investors knew (or at a minimum should have known) of the invalidity risk associated with the CITGO Collateral." (Hinman Report ¶ 57).  He further opines that "[i]n light of the known invalidity risk, it would

not have been reasonable for sophisticated investors to assume that the purported pledge of

CITGO Collateral was valid or to rely upon any Representations to that effect."  (Hinman Report

¶ 22).  These are conclusions that the Court would not be able to reach by simply reviewing the

market commentary discussed in Mr. Hinman's Report, and his testimony is thus helpful to the

Court.  *See In re Trusts Established under the Pooling & Servicing Agreements*, 2020 U.S. Dist.

LEXIS at *159 (Failla, J.) (admitting testimony and explaining that "in the context of summary

judgment motions preparatory to a bench trial," the issue of helpfulness is "a largely academic

exercise.").  Additionally, as discussed in detail below, Mr. Hinman supports his conclusions that

the market was aware of and took account of the invalidity risk (and therefore did not rely on the

Maduro regime's assertions that the 2020 Notes Transaction did not violate the Venezuelan

Constitution) by analyzing numerous other factors, such as the 2020 Notes' pricing history, the

terms of the Exchange compared to other sovereign debt exchanges, and credit agency ratings.

At most, Defendants' contentions regarding Mr. Hinman's methodology address the

appropriate *weight* his opinions ought to be given, not its *admissibility*.  The Second Circuit has

long held that the Court should "exclude expert testimony if it is speculative or conjectural or

based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in

essence an apples and oranges comparison."  *Zerega Ave. Realty Corp. v. Hornbeck Offshore

Transp.*, LLC, 571 F.3d 206, 214 (2d Cir. 2009) (citations and internal quotation marks omitted).

"By contrast, 'other contentions that the assumptions are unfounded go to the weight, not the

admissibility, of the testimony.'"  *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017)

(quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *see also

A.V.E.L.A.,* 364 F. Supp. 3d at 324 (Failla, J.) (same); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d

1176, 1188 (2d Cir. 1992) (defendants' arguments that expert's opinion relied on unfounded

assumptions "go to the weight, not the admissibility, of the testimony.").  In this context, the

appropriate mechanism by which to challenge Mr. Hinman's conclusions is rigorous cross-

examination or presentation of contrary evidence, not wholesale preclusion of his testimony.  *See*

*Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof  are the traditional and appropriate means of attacking

shaky but admissible evidence."); *A.V.E.L.A., Inc.*, 364 F. Supp. 3d at 324 (Failla, J.) (same).

>       **C.      Mr. Hinman's Pricing Analysis is Reliable.**

Defendants claim that Mr. Hinman's opinion that the invalidity risk associated with the

2020 Notes, in part, accounts for the depressed pricing of the 2020 Notes after PDVSA's default

is unreliable because he does not rule out alternative explanations, such as (1) uncertainty

regarding the value of the CITGO collateral, (2) uncertainty concerning how to foreclose on the

Collateral, (3) political risks related to CITGO, and (4) volatility in CITGO's value due to oil

price fluctuations.  (DOB at 11–14).  Defendants again miss the mark.

Mr. Hinman was not asked to opine, and his testimony is not being offered to prove, that

the invalidity risk *caused* (or was the *only* factor in) the depressed pricing of the 2020 Notes

post-default.[11]  Rather, Mr. Hinman was asked to consider whether the pricing of the 2020 Notes

was *consistent* with market awareness of the invalidity risk.  Such testimony is plainly

admissible.  *See U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers' Local Union No. 3,

AFL-CIO*, 313 F. Supp. 2d 213, 241 (S.D.N.Y. 2004) (explaining that "[e]conomists often

explain whether conduct is indicative of collusion.  For example, courts have held that an expert

is permitted to testify that the 'climate' of a specific market was consistent with a conspiracy,"

---

[11] Defendants suggest that Mr. Hinman should have conducted an "event study" to assess the impact of the invalidity risk on the pricing of the 2020 Notes.  (DOB at 15).  But an event study—which seeks to prove causation—is not feasible in this case given the lack of trading data (*i.e.*, the infrequency of trading the 2020 Notes due in part to U.S. sanctions prohibiting trading in the U.S.).

and that an expert could "hypothesize that if certain conduct did occur, economists would expect the market to react in a particular way[.]"); *Monterey v. City of New York*, No. 17-CV-4477 (VEC), 2019 WL 5884466, at *2 (S.D.N.Y. Nov. 12, 2019) (denying motion to preclude expert testimony that plaintiff's injury "is consistent with having his arms forcefully pulled behind him during his arrest."); *In re Urethane Antitrust Litig*., 152 F. Supp. 3d 357, 360–61 (D.N.J. 2016) (admitting expert testimony over objections to methodology where the expert "sought to determine whether the economic evidence was consistent with the existence of a cartel" by analyzing the composition of the market, the economic behavior of suppliers, and trends in prices).

But even in the context of causation, "[i]t is not required . . . that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002). Rather, "a failure to rule out alternative causes is not determinative of admissibility of evidence but goes to weight[.]" *Figueroa*, 254 F. Supp. 2d at 368; *see also Golod v. La Roche*, 964 F. Supp. 841, 859 (S.D.N.Y. 1997) ("[T]o the extent that these physicians did not fully consider and rule out all possible causes, such deficiencies in the application of the method generally go to the weight of the evidence."). Furthermore, as Defendants concede, Mr. Hinman *did* consider (and dismiss) an alternative factor that could have negatively impacted the pricing of the 2020 Notes: the U.S. sanctions regime. (*See* Hinman Report ¶¶ 61–62 (explaining that because the 2020 Notes' price remained stable after GL5 was issued, "[t]his suggests that the deep discount in the post-default 2020 Notes' Value . . . is consistent with the invalidity risk associated with the CITGO Collateral rather than the imposition (or removal) of U.S. sanctions[.]"); DOB at 12–13).

18

Defendants and their expert Timothy McKenna contend that Mr. Hinman's rejection of the sanctions regime as an alternative cause for the deflated price of the 2020 Notes is unreliable because he did not employ a proper event study and considered too short of a window around the event in question (*i.e.*, the issuance of GL5).  (DOB at 15; McKenna Rebuttal Report[12] ¶¶ 68, 73).  However, the premise of an event study is that the security in question trades in an efficient market in which price reacts quickly to news.  As a study by Mr. McKenna's colleagues at his own firm, NERA, regarding the use of event studies in the courtroom highlights, the period over which the price reaction to an event is studied (the "event window") is typically a short one:

> Generally, these windows begin immediately before an announcement and conclude shortly thereafter . . . .  In securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement.  The most recent academic pronouncement expresses support for the shorter, one-day or two-day window, though it recognizes that in practice longer windows are often used.[13]

Thus, while Defendants and Mr. McKenna criticize Mr. Hinman for considering an event window of seven days, this window is perfectly appropriate and consistent with academic literature concerning event studies.  In fact, Mr. McKenna's extension of that event window (to a period of over a month) would be considered unreliable by his own colleagues because "[t]he longer the event window is . . . the more likely it is to pick up other effects unrelated to the event under consideration."[14]  Put differently, interpreting the reaction of the price of a security to a specific news item over a longer period of time is more difficult because of the need to account for intervening confounding news.  Mr. McKenna's GL5 analysis fails to consider the price

---

[12] "McKenna Rebuttal Report" means the Rebuttal Expert Report of Timothy McKenna, dated April 15, 2020, attached as Exhibit 6 to the Declaration of Matthew Freimuth filed herewith.
[13] David Tabak and Frederick Dunbar, *Materiality And Magnitude: Event Studies In The Courtroom*, NERA Working Paper No. 34, 1999, at 7–8 (attached as Exhibit 7 to the Declaration of Matthew Freimuth filed herewith).
[14] *Id*. at 8.

impact of confounding news, such as oil price changes or even market noise. (*See* McKenna Rebuttal Report ¶ 73, Ex. 2). A reliable approach, such as that used by Mr. Hinman, would have been to consider a much shorter window.

Defendants next quibble with Mr. Hinman's conclusion that Fitch's downgraded debt recovery rating for the 2020 Notes is consistent with the credit agency factoring the invalidity risk into its assessment. (Hinman Report ¶ 67; DOB at 15). Defendants claim that this conclusion ignores Fitch's own explanation for its rating, which "makes no mention of 'invalidity risk.'" (DOB at 15–16). This claim is misleading because the Fitch ratings reports are related to companies as a whole, not to specific bonds issued by a company such as the 2020 Notes (which are one of many bonds issued by PDVSA, and which Mr. Hinman was asked to examine in particular). Therefore it is unsurprising that the October 2016 Fitch Report does not *specifically* discuss the invalidity risk associated with the 2020 Notes in detail. In any event, the Fitch Report explicitly considers risk associated with the political uncertainty in Venezuela, stating that "PDVSA's credit quality continues to be linked to that of the Venezuelan government," and that Venezuela's ratings reflect, in part, "continued policy and political uncertainty."[15] What is more, Defendants ignore the fact that Fitch *does* provide a separate bond-specific recovery rating for bonds rated B+ or below, like the 2020 Notes.[16] (*See* Hinman Report ¶ 63). Fitch's methodology for assignment ratings for such bonds considers the "likely recovery in the event of default" as well as "the quality and amount of collateral."[17] Therefore, it follows that Fitch's recovery rating for the 2020 Notes would have considered the invalidity risk

---

[15] *Fitch Downgrades PDVSA's IDRs to 'CC'*, Fitch Ratings, Oct. 25, 2016 at 2 (attached as Exhibit 8 to the Declaration of Matthew Freimuth filed herewith).
[16] *Corporates Notching and Recovery Ratings Criteria Effective from 23 March 2018 to 14 October 2019*, Fitch Ratings, Mar. 23, 2018 (attached as Exhibit 9 to the Declaration of Matthew Freimuth filed herewith).
[17] *Corporate Rating Criteria - Effective from 19 February 2019 to 27 March 2020*, Fitch Ratings, Feb. 19, 2019 (attached as Exhibit 10 to the Declaration of Matthew Freimuth filed herewith).

of collateral associated with the Notes, which would have negatively impacted the quality and amount of collateral likely to be recoverable, as Mr. Hinman opines.

Finally, Defendants dispute Mr. Hinman's opinion that the invalidity risk accounts for investors' tepid response to the Exchange Offer, claiming that this opinion is speculative and unreliable. (DOB at 16). Mr. Hinman opines that the fact that only 39% of the 2017 Notes' outstanding principal was tendered in the Exchange Offer "is consistent with the finding that investors had factored in invalidity risk associated with the CITGO Collateral." (Hinman Report ¶ 83). This conclusion is not speculative, but rather, is based upon his extensive experience with emerging market debt instruments (of which Defendants' expert, Professor Porzecanski, appears to have none) as well as academic studies that demonstrate that "participation rates in sovereign restructurings typically range from 72% to 100%." (Hinman Report ¶ 83). Defendants' claim that "there are numerous reasons why investors might decline to participate" in the Exchange "which the Hinman Report ignores" is misleading. (DOB at 16). The reasons other than invalidity risk that cause some investors not to participate in a bond exchange are well known and not unique to the Exchange Offer, and thus would have been included in the academic studies analyzed by Mr. Hinman. Therefore, Mr. Hinman's comparison of the participation rate in the Exchange with the typical participation rate reported in these academic studies already accounts for these alternative reasons that investors might not participate. Indeed, while Mr. Hinman's opinion is based on rigorous academic studies and numerous analyst reports, (*see* Hinman Report ¶¶ 49, 83 n. 137–138), Professor Porzecanski's claim that "the low participation rate should be interpreted as evidence that many investors concluded that the terms of the exchange were not as attractive as the alternative of keeping their 2017 Notes," (Porzecanski Rebuttal Report ¶ 87), is simply *ipse dixit*. He offers no support for this statement, nor could he.

Mr. Hinman's opinion is admissible, notwithstanding that Defendants point to other factors that may (or may not) have impacted investors' decision not to participate in the Exchange Offer, because "a failure to rule out alternative causes is not determinative of admissibility of evidence but goes to weight[.]" *Figueroa*, 254 F. Supp. 2d at 368; *see also Golod*, 964 F. Supp. at 859; *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 354.

## II.    MR. HINMAN'S OPINIONS THAT PLAINTIFFS WERE NOT ENRICHED AND THAT 2020 NOTEHOLDERS RECEIVED MORE VALUE THAN THEIR COST OF INVESTMENT ARE ADMISSIBLE.

### A.    Mr. Hinman's Opinion that Plaintiffs were Not Enriched by the Exchange Offer is Relevant and Reliable.

Defendants contend that Mr. Hinman's opinion that the Exchange Offer did not enrich PDVSA because the terms of the Exchange gave PDVSA only "modest, short-term debt relief" in exchange for "significantly greater principal and interest payments through 2020," (Hinman Report ¶¶ 77–78), is inadmissible because it is "based entirely on his say-so and employs no methodology to objectively evaluate or quantify the relative benefits and costs to PDVSA under the Exchange Offer." (DOB at 17). Defendants are mistaken. Mr. Hinman's opinion is based on a comparison of the Exchange Offer's terms to those of other debt restructurings analyzed in academic studies. (Hinman Report ¶¶ 70–77). These studies support Mr. Hinman's conclusion that the combination of a face value premium, increase in coupon rate, and short term maturity extension was unusually favorable to investors in a sovereign (or state-owned enterprise) debt restructuring. This conclusion is also supported by the factual record, as Mr. Xin Xu, someone who is "very experienced in investigating emerging markets," conceded that he has "not dealt with any sovereign or [state-owned enterprise] restructuring" in which "an issuer agreed to an increased face amount for a restructured debt, a higher cash coupon on the restructured debt, and an average life extension of less than two years." (Xu Dep. 158:5–8; 157:13–17).

Defendants next contend that Mr. Hinman's enrichment analysis fails *Daubert*'s "fit" requirement because "[o]nly if the Court finds that the 2020 Notes are unenforceable will the Trustee and Collateral Agent seek disgorgement, restitution, and other quasi-contract remedies through unjust enrichment and quantum meruit counterclaims," and that in that scenario "PDVSA will avoid its final payments of principal and interest, and it will certainly have been 'enriched,' yet the Hinman Report does not address this circumstance." (DOB at 18). As an initial matter, Defendants cite no authority, legal or factual, for the proposition that PDVSA will "certainly have been 'enriched'" if the 2020 Notes are deemed invalid. More importantly, Mr. Hinman's analysis demonstrates that, even assuming Plaintiffs were somehow enriched, such enrichment did not come at the expense of exchanging investors—a necessary element of any unjust enrichment claim. *See Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) ("The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.").

Specifically, Mr. Hinman's analysis demonstrates that, counting only interest and principal payments received by exchanging noteholders at the date of his report (and not counting the market value of the 2020 Notes), the value received for 2017 Notes purchased at issuance equals 153% and 192% of investors' purchase cost of the April 2017 Notes and the November 2017 Notes, respectively. (*See* Hinman Report ¶¶ 87(b), 89(b), Figure 1A). Put differently, these exchanging investors have *already* received substantial positive returns on their investment*, even if the present-day value of the 2020 Notes were zero*. Similarly, for 2017 Notes purchased during the Exchange Offer window, the value received equals no less than 96% of investors' purchase cost. (*See* Hinman Report ¶¶ 92(b), 94(b), Figure 1B).

Finally, Defendants' contention that Mr. Hinman's enrichment analysis is inadmissible because "if the 2020 Notes are enforced, the question of enrichment is irrelevant, because remedies will be dictated by the relevant contracts," (DOB at 18), obviously puts the cart well before the horse. Regardless, expert testimony is admissible if it bears upon a party's counterclaims, as Mr. Hinman's testimony does here. *See Bensen*, 1996 WL 422262, at *6 (admitting expert testimony where it was "relevant to the counterclaims," including a counterclaim for unjust enrichment).

### B.   Mr. Hinman's Opinion that Exchanging Investors Did Not Lose Money is Relevant and Reliable.

Defendants assert that Mr. Hinman's opinion that exchanging investors have not lost money by virtue of the Exchange Offer should be excluded because it is "irrelevant to any legal theory of damages at issue in this case." (DOB at 19). Again, Defendants are wrong. Mr. Hinman is not offered as an expert on damages, and he does not opine on the appropriate amount of damages (if any) available to Defendants. Rather, as discussed above, Mr. Hinman's analysis is directly relevant to whether any purported enrichment on the part of Plaintiffs came at the expense of exchanging noteholders. *See Briarpatch*, 373 F.3d at 306.

Defendants also claim that Mr. Hinman's opinion on this point is irrelevant if the 2020 Notes are deemed invalid because "he includes in his arithmetic the market value of the 2020 Notes as of the date of his report." (DOB at 19). Defendants misleadingly omit half of Mr. Hinman's analysis. Although Mr. Hinman does include the market value of the 2020 Notes in some of his calculations, he also separately calculates the value received by exchanging noteholders solely in the form of cash flows (principal plus interest payments) through the date of his report (*i.e.*, not counting the market value of the 2020 Notes). (*See* Hinman Report ¶¶ 87(b), 89(b), 92(b), 94(b)). As explained above, these calculations show that holders who

purchased their 2017 Notes at issuance and tendered into the Exchange received cash flows equaling 153% and 192% of their investment cost (for the April 2017 and November 2017 Notes, respectively).  (*Id*. ¶¶ 87(b), 89(b)).  Investors who purchased and tendered 2017 Notes during the Exchange Offer Window received cash flows equaling 96% and 98% of their investment cost (for the April 2017 and November 2017 Notes, respectively).  (*Id*. ¶¶ 92(b), 94(b)).  Similarly, Mr. Hinman's additional analysis of the noteholders' return which factors in the market value of the 2020 Notes post-default is relevant to one possible scenario where the Pledge is found to be invalid, yet the 2020 Notes themselves are found to be valid.  It would be incorrect to assume that the 2020 Notes would be worthless in such a scenario, because even unsecured PDVSA notes traded at positive prices even after they had defaulted.

If anything, Defendants' attempts to contest Mr. Hinman's conclusions by proffering their own expert to put forward conflicting opinions only serve to demonstrate that their motion for summary judgment should be denied.

## CONCLUSION

Accordingly, this Court should deny Defendants' Motion to Exclude the Expert Testimony of David C. Hinman.

Dated: New York, New York
       June 29, 2020                    Respectfully submitted,

                                        */s/ Kurt W. Hansson*
                                        Kurt W. Hansson
                                        James R. Bliss
                                        James B. Worthington

                                        PAUL HASTINGS LLP
                                        200 Park Avenue
                                        New York, New York 10166
                                        Telephone: (212) 318-6000
                                        Facsimile: (212) 319-4090
                                        kurthansson@paulhastings.com
                                        jamesbliss@paulhastings.com
                                        jamesworthington@paulhastings.com

                                        *Attorneys for Plaintiffs and Counterclaim*
                                        *Defendants Petróleos de Venezuela, S.A. and*
                                        *PDVSA Petróleo, S.A.*

                                        */s/ Jeffrey B. Korn*
                                        Jeffrey B. Korn
                                        Michael Gottlieb
                                        Matthew Freimuth
                                        Nicholas Reddick
                                        Cole S. Mathews

                                        WILLKIE FARR & GALLAGHER LLP
                                        787 Seventh Avenue
                                        New York, NY 10019
                                        Telephone: (212) 728-8000
                                        Facsimile: (212) 728-8111
                                        jkorn@willkie.com
                                        mfreimuth@willkie.com
                                        cmathews@willkie.com

                                        1875 K Street NW
                                        Washington, DC  20006-1238
                                        Telephone: (202) 303-1442
                                        Facsimile: (202) 303 2442
                                        mgottlieb@willkie.com
                                        nreddick@willkie.com

                                        *Attorneys for Plaintiff and Counterclaim Defendant*
                                        *PDV Holding, Inc.*

26