UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETROLEOS DE VENEZUELA S.A.; PDVSA
PETROLEO S.A.; and PDV HOLDING, INC.,

                    Plaintiffs,

              -v.-

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

                    Defendants.

---

19 Civ. 10023 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

       Before the Court is a weighty question with a convoluted answer: Can
Venezuela's state oil company unburden itself of its contractual obligations,
pursuant to a transaction consummated four years ago, by dint of foreign law
or sovereign act?  The question arises from a bond swap transaction (the
"Exchange Offer") that occurred in October 2016.  Plaintiff Petróleos de
Venezuela, S.A. ("PDVSA"), with the guaranty of Plaintiff PDVSA Petróleo, S.A.
("PDVSA Petróleo"), had previously issued two sets of bonds that were
scheduled to come due in April and November of 2017 (the "2017 Notes"), with
an aggregate principal amount of $9,150,000,000.  However, in the years
following the issuance of the 2017 Notes, the Venezuelan oil market had
become volatile, and by September 2016 it seemed unlikely that PDVSA would
be able to pay the significant obligations that would be due the following year.
In an effort to forestall a potential default on the 2017 Notes, PDVSA
engineered the Exchange Offer, by which it would swap the 2017 Notes for
bonds scheduled to come due in 2020 (the "2020 Notes").  Controversially, the

2020 Notes were secured by a pledge of 50.1% of the equity in CITGO Holding ("CITGO"), which was pledged by PDV Holding, Inc. ("PDVH"), a subsidiary of PDVSA and the parent of CITGO.

The Exchange Offer was subject to much dispute in Venezuela and was condemned by the National Assembly, the legislative organ of the Bolivarian Republic of Venezuela (the "Republic" or "Venezuela").  Nevertheless, the Exchange Offer was approved by the parties to the transaction, and the 2020 Notes were issued, in October 2016.  PDVSA paid the first two installments of the principal payments in 2017 and 2018, and made interest payments in 2017, 2018, and the first half of 2019.  However, PDVSA failed to make required payments on October 27, 2019, and thus defaulted on its obligations under the 2020 Notes.  Under the terms attached to the 2020 Notes, Defendants MUFG Union Bank, N.A. ("MUFG") and GLAS Americas LLC ("GLAS") are thus entitled to seek the sale or purchase of Plaintiffs' majority stake in CITGO.

PDVSA now seeks to avoid the consequences of its default via a declaratory judgment that the 2020 Notes and the Indenture, Pledge Agreement, and Guaranty attached to them (together, the "Governing Documents") were issued and entered into illegally, and thus were null and void *ab initio.*  Specifically, Plaintiffs argue that the 2020 Notes and the Governing Documents are null and void because they were issued and entered into without the prior approval of the National Assembly, and therefore in violation of certain provisions of the Venezuelan Constitution.  Defendants, for

2

their part, ask the Court to find that the 2020 Notes and Governing Documents are valid and enforceable and that Plaintiffs are in default.  To this end, Defendants argue that New York law controls any inquiry into the validity of the 2020 Notes and Governing Documents, and that there is no assertion of invalidity or illegality under New York law.  Even if Venezuelan law were found to control the inquiry, Defendants argue that the Exchange Offer was valid and legal under Venezuelan law.

The Court must now adjudicate the parties' competing motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Additionally, the Court has before it Defendants' motion to exclude the reports and testimony of David C. Hinman, one of Plaintiffs' proposed experts.  For the reasons that follow, the Court largely grants Defendants' motion for summary judgment and denies Plaintiffs' cross-motion.  Moreover, the Court grants Defendants' motion to exclude Mr. Hinman's reports and testimony.

**BACKGROUND**[1]

**A.    Factual Background**

**1.    The Parties**

Plaintiffs are three connected corporations.  PDVSA is an oil and natural gas company incorporated in Venezuela as a *sociedad anónima*.  (Pl. Opp. 56.1

---

[1]    The facts set forth in this Opinion are drawn from Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Summary Judgment ("Pl. Opp. 56.1" (Dkt. #153)); Defendants and Counterclaim Plaintiffs' Response to Plaintiffs and Counterclaim Defendants' Rule 56.1 Statement of Undisputed Facts and Rule 56.1 Counterstatement of Additional Material Undisputed Facts ("Def. Opp. 56.1" (Dkt. #156)); exhibits attached to the Declaration of James R. Bliss in Support of Plaintiffs' Motion for Summary Judgment ("Bliss Decl., Ex. [ ]" (Dkt. #106)); exhibits attached to the Declaration of Christopher J. Clark in Support of

¶¶ 3-4).  Venezuela is the sole shareholder of PDVSA (*id.* at ¶ 5), and such

100% ownership is mandated by Article 303 of the 1999 Constitución de la

República Bolivariana de Venezuela (hereinafter, the "Venezuelan

Constitution") (Def. Opp. 56.1 ¶ 9).  As a *sociedad anónima*, PDVSA generally

---

Defendants and Counterclaim Plaintiffs' Motion for Summary Judgment ("Clark Decl., Ex. [ ]" (Dkt. #87)); and exhibits attached to the Declaration of James R. Bliss in Opposition to Defendants' Motion for Summary Judgment ("Bliss Opp. Decl., Ex. [ ]" (Dkt. #157)).

In its analysis of issues of Venezuelan law, the Court has carefully considered, pursuant to Federal Rule of Civil Procedure 44.1, the Letter from Carlos Vecchio, Ambassador of the Bolivarian Republic of Venezuela to the United States of America ("Vecchio Letter" (Dkt. #80)); the Expert Report of Allan R. Brewer-Carías ("Brewer Rep." (Dkt. #96-1)); the Expert Report of Allan R. Brewer-Carías Rebutting the Report of Defendants' Expert (Dkt. #96-2); the Declaration of Allan R. Brewer-Carías in Opposition to Defendants' Motion for Summary Judgment (Dkt. #154); the Reply Declaration of Allan R. Brewer-Carías in Support of Plaintiffs' Summary Judgment Motion (Dkt. #186); the Expert Report of Defendants' Expert ("Doe Rep." (Dkt. #84-2)); the Rebuttal Expert Report of Defendants' Expert in Response to the Expert Report of Allan Randolph Brewer-Carías ("Doe Rebuttal Rep." (Dkt. #84-3)); the Supplemental Declaration of Defendants' Expert (Dkt. #152); and the Third Declaration of Defendants' Expert (Dkt. #179.  Due to the possibility of harm to Defendants' expert should their identity be publicly disclosed, the Court will not refer to them by name in this Opinion. (*See* Dkt. #207).  In addition, the Court has carefully considered the Statement of Interest of the United States of America and its attached exhibit ("Statement of Interest" (Dkt. #213)), in relation to this Court's discussion of the act of state doctrine.

For ease of reference, Plaintiffs' opening brief is referred to as "Pl. Br." (Dkt. #95); Defendants' opening brief is referred to as "Def. Br." (Dkt. #99); Plaintiffs' opposition brief is referred to as "Pl. Opp." (Dkt. #159); Defendants' opposition brief is referred to as "Def. Opp." (Dkt. #158); Plaintiffs' reply brief is referred to as "Pl. Reply" (Dkt. #185); and Defendants' reply brief is referred to as "Def. Reply" (Dkt. #182).  Additionally, the Court refers to the transcript of the September 25, 2020 oral argument, which has not yet been filed on the docket for this action, as "Sept. 25, 2020 Tr."  Finally, the Court refers to Plaintiffs' opposition brief to Defendants' motion to exclude the expert testimony and reports of Mr. David C. Hinman as "Pl. Daubert Opp." (Dkt. #149).

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

has the capacity to enter into contracts and is managed by a board of directors and corporate officers, and its employees do not qualify as government employees.  (Pl. Opp. 56.1 ¶¶ 7-10).  PDVSA is not a part of Venezuela's Centralized Administration, although it is a part of the Decentralized Public Administration.  (*Id.* at ¶ 12).[2]

PDVSA Petróleo is a *sociedad anómia* incorporated in Venezuela, and it is a wholly owned subsidiary of PDVSA.  (Pl. Opp. 56.1 ¶¶ 13-14).  PDVH is also a wholly owned subsidiary of PDVSA, but it is incorporated in Delaware and has its principal place of business in Houston, Texas.  (*Id.* at ¶¶ 15-16).  PDVH, in turn, wholly owns CITGO, which is a Delaware corporation based in Houston. (*Id.* at ¶¶ 20-21).  CITGO's subsidiary — CITGO Petroleum — is a refiner and marketer of petroleum products, and it owns and operates three large refineries in the United States.  (*Id.* at ¶¶ 24-25).  PDVSA, through PDVH, wholly owns CITGO and has done so since 1990.  (*Id.* at ¶ 26).  Although CITGO sits at the center of the instant controversy, it is not itself a party to this action.

MUFG is a U.S. national banking association with offices in New York, New York.  (Def. Opp. 56.1 ¶ 19).  MUFG is the trustee for the 2020 Notes.  (*Id.* at ¶ 20).  GLAS is a limited liability company organized under New York law

---

[2]     "[T]he Centralized Administration consists of 'organs' or Government departments or agencies, which are described as not having their own legal personality distinct from the Republic," while "the Decentralized Administration is comprised entirely of entities known as 'Decentralized entities,' which have a legal personality of their own."  (Doe Rep. ¶¶ 36-37).  "The Centralized Administration is comprised of (i) the National Executive … as well as (ii) other departments and agencies … pertaining to the Executive branch of government."  (*Id.* at ¶ 36).  Notably, "[i]t does not include State Corporations."  (*Id.*).  Instead, state corporations, foundations, and *institutos autónomos* belong to the Decentralized Administration.  (*See id.* at ¶ 37).

and with offices in New York, New York.  (Pl. Opp. 56.1 ¶ 32).  GLAS is the

collateral agent for the 2020 Notes.  (*Id.* at ¶ 33).

### 2.    Relevant Provisions of the Venezuelan Constitution

Much like the government of the United States, the Republic of

Venezuela has legislative, executive, and judicial branches.  (Bliss Decl., Ex. 4

at 37).  Because the parties' claims for relief rely in part on the powers

delegated to those branches by the Venezuelan Constitution, the Court will

reproduce relevant provisions of that constitution here.  Article 150 of the

Venezuelan Constitution provides:

> The execution of national public interest contracts shall
> require the approval of the National Assembly in those
> cases in which such requirement is determined by law.
> No municipal, state[,] or national public interest
> contract shall be executed with foreign States or official
> entities, or with companies not domiciled in Venezuela,
> or shall be transferred to any of them without the
> approval of the National Assembly.

Venezuelan Constitution, art. 150.[3]  Section 9 of Article 187 of the Constitution

provides:

> It is the role of the National Assembly to: … Authorize
> the National Executive to enter into contracts of
> national interest, in the cases established by law.
> Authorize contracts of municipal, state[,] and national
> public interest, with States or official foreign entities or
> with companies not domiciled in Venezuela.

---

[3]    The parties vigorously dispute whether one or more of the Governing Documents qualify
as a "national public interest contract" under the constitutional provisions cited in the
text.  Both sides have devoted substantial resources, including expert witness
submissions, to the issue, and the Court acknowledges that substantial arguments can
be advanced by both sides.  The Court has determined that resolution of the national
public interest contract issue is not necessary to resolve the instant motions.
Accordingly, and cognizant of the pitfalls that can inhere in interpreting another
country's laws, the Court will not address that particular dispute in this Opinion.

*Id.*, art. 187(9).  Section 14 of Article 236 of the Constitution provides: "The following are powers and duties of the President of the Republic: ... To enter into contracts of national interest, subject to this Constitution and applicable laws."  *Id.*, art. 236(14).  Finally, Article 335 provides:

> The Supreme Court of Justice shall ensure the supremacy and effectiveness of constitutional rules and principles; it will be the ultimate and last interpreter of this Constitution and will ensure its uniform interpretation and application.  The interpretations established by the Constitutional Chamber on the content or scope of constitutional rules and principles are binding on the other Chambers of the Supreme Court of Justice and other courts of the Republic.

*Id.*, art. 335.

### 3. The Financial Backdrop to the Exchange Offer

On April 12, 2007, PDVSA issued $3 billion in aggregate principal amount of notes scheduled to come due in April 2017.  (Pl. Opp. 56.1 ¶ 39).  On October 29, 2010, and January 18, 2011, PDVSA further issued $6.15 billion in aggregate principal amount of notes scheduled to come due in November 2017.  (*Id.* at ¶ 41).  Together, these three issuances constitute the 2017 Notes, and they had an aggregate principal amount of $9.15 billion.

Between the first issuance of the 2017 Notes in April 2007 and 2016, the Moody's, Fitch, and S&P rating services all downgraded PDVSA's credit rating.  (Pl. Opp. 56.1 ¶ 54).  Specifically, Moody's downgraded its rating of PDVSA during this period from B1, with a stable outlook, to Caa3, with a negative outlook.  (*Id.* at ¶ 55).  Over the same period, Fitch downgraded its rating for PDVSA from BB-, with a stable outlook, to CCC, with a negative outlook.  (*Id.*

at ¶ 56).  And S&P downgraded its rating for PDVSA from BB-, with a stable outlook, to CC, with a negative outlook.  (*Id.* at ¶ 57).  One factor cited by the three credit rating agencies in their downward adjustments was declining crude oil prices over that period.  (*Id.* at ¶ 58).  As of September 16, 2016, the 2017 Notes had an aggregate outstanding principal balance of $7.1 billion.  (*Id.* at ¶ 64).  Moreover, there were interest payments totaling $506 million due at various times in 2017.  (*Id.* at ¶ 65).

### 4.    The Political Backdrop to the Exchange Offer

At the time of the Exchange Offer in 2016, Nicolás Maduro was recognized as the President of Venezuela.  (Pl. Opp. 56.1 ¶ 66).  However, in National Assembly elections held in December 2015, a coalition consisting of various opposition parties won control of the National Assembly.  (*Id.* at ¶ 72).  On May 26, 2016, the National Assembly passed a resolution (the "May 2016 Resolution"), entitled "Resolution on the Respect of the Inherent and Nontransferable Powers of the National Assembly on Contracts of Public Interest Signed by and between the National Executive and Foreign States or Official Entities or with Companies Not Domiciled in Venezuela."  (Def. Opp. 56.1 ¶ 60).  In relevant part, the May 2016 Resolution recited that (i) "[i]n relation to contracts of national ... public interest concluded by and between the National Executive and ... companies not domiciled in Venezuela, the Constitution categorically mandates, without exception, the approval of the National Assembly"; (ii) "[t]he control mechanisms of the National Assembly on the contracts of public interest ... include its approval, as a condition of the

validity of the contract"; and (iii) "[t]he responsibility of the National

Assembly … cannot be waived, transferred, [or] extended, and it cannot be

relaxed by conventions, decrees, or other legal acts."  (*Id.* at ¶ 61).  The May

2016 Resolution further "warne[d] that any activity carried out by an organ

that usurps the constitutional functions of another public authority is null and

void and shall be considered non-existent," and "remind[ed] that the contracts

of national … public interest concluded by and between the National Executive

and … companies not domiciled in Venezuela, without the approval of the

National Assembly …, shall be null and void in their entirety."  (*Id.* at ¶ 62).

### 5.    The Exchange Offer

The Exchange Offer was announced on September 16, 2016.  (Pl. Opp.

56.1 ¶ 64).  The Exchange Offer had previously been approved by PDVSA's

board of directors on September 7, 2016, and by PDVSA's sole

shareholder — the Republic — on September 8, 2016.  (*Id.* at ¶¶ 78, 82).  The

Exchange Offer and the Governing Documents that memorialized and executed

the Offer reflected a complex financial transaction with many interlocking

parts.  However, only a few aspects of the Exchange Offer are relevant to the

instant motions.

*First*, the basic mechanism of the Exchange Offer was that holders of

2017 Notes who tendered such Notes would receive in exchange a certain

amount of 2020 Notes.  (Pl. Opp. 56.1 ¶¶ 116-17).  *Second*, the 2020 Notes

were secured by a pledge, from PDVH, of 50.1% of the equity in CITGO.  (*Id.* at

¶ 115).  That pledge was memorialized in a pledge agreement (the "Pledge

Agreement") executed between and among PDVH, as pledgor; PDVSA Petróleo, as guarantor; GLAS, as collateral agent; and MUFG, as trustee.  (*Id.* at ¶ 168). Moreover, the collateral was, and is, held as a physical stock certificate by GLAS in a vault in New York.  (*Id.* at ¶ 176).  *Third* and finally, both the Offering Circular for the 2020 Notes and the Governing Documents contain choice of law provisions selecting New York law.  (*Id.* at ¶¶ 178, 180-82).  As an example, the Pledge Agreement provides, under a heading entitled "Governing Law":

> THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS AGREEMENT AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER TO THIS AGREEMENT (WHETHER IN CONTRACT, TORT[,] OR OTHERWISE) SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(*Id.* at ¶ 182).

It is also important to provide some details regarding the locus of the Exchange Offer and the Governing Documents.  As previously mentioned, while PDVSA — the issuer — and PDVSA Petróleo — the guarantor — are based in Venezuela, all other parties to the Exchange Offer are based in the United States.  (Pl. Opp. 56.1 ¶¶ 3-4, 13-16, 32; Def. Opp. 56.1 ¶ 19).  The parties to the Exchange Offer and the Governing Documents hired and relied upon legal and financial advisors who were primarily, if not entirely, based in New York. (Pl. Opp. 56.1 ¶¶ 132-39, 141-50, 157-63).  The Law Debenture Trust Company of New York, which served as the paying agent, transfer agent, and

registrar for the indenture component of the Governing Documents, is based in New York.  (*Id.* at ¶ 188).  Depository Trust Company ("DTC"), the depository for the indenture, is also incorporated and headquartered in New York.  (*Id.* at ¶ 191).  The 2020 Notes were deposited in New York; holders of the 2017 Notes were required to tender said Notes through DTC in New York; and the 2020 Notes were registered in the name of Cede & Co., a general partnership organized under New York law and based in New York.  (*Id.* at ¶¶ 188-89, 191-94).  Finally, many of the meetings regarding the Exchange Offer took place in New York, and the exchange of signature pages that executed the Governing Documents took place in New York.  (*Id.* at ¶¶ 138, 150).

On September 27, 2016, the National Assembly passed a resolution (the "September 2016 Resolution") in response to the announcement of the Exchange Offer.  (Def. Opp. 56.1 ¶ 63).  The September 2016 Resolution recited that the Exchange Offer required PDVSA to "offer 50.1% of its position in the subsidiary company [CITGO] as collateral," and that "Article 187 of the Constitution empowers the National Assembly to exercise control functions …[,] with the power to obtain information about the financial statements and details of any transition that commits PDVSA's assets as collateral."  (*Id.* at ¶ 64 (quoting Venezuelan Constitution, art. 187(3))).  The Resolution further resolved, in relevant part, "[t]o reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO … are offered as a guarantee with priority; or that a guarantee is constituted over any other property of the Nation," and "urge[d] the Public Ministry to open an

11

investigation to determine if the current transaction protects the National Property, in accordance with article[] 187, section 9 ... of the Constitution." (*Id.* at ¶ 65).

Despite the National Assembly's September 2016 Resolution, the Exchange Offer expired on October 21, 2016, with holders representing 39.43% of the aggregate principal amount outstanding under the 2017 Notes accepting the Offer. (Pl. Opp. 56.1 ¶ 164). The Governing Documents were executed on October 27, 2016, and the 2020 Notes were issued on October 28, 2016. (*Id.* at ¶¶ 165, 167).

### 6. Relevant Events Following the Exchange Offer and Issuance of the 2020 Notes

The 2020 Notes were structured such that principal payments would be due on October 27 of each year, from October 27, 2017, to October 27, 2020. (Pl. Opp. 56.1 ¶ 213). Similarly, interest payments were scheduled to be due on April 27 and October 27 of each year, starting April 27, 2017, and ending October 27, 2020. (*Id.* at ¶ 215). PDVSA made its payments on the 2020 Notes as required throughout both 2017 and 2018. (*Id.* at ¶¶ 214, 216).

On January 15, 2019, following the re-election of Maduro in an election that the United States has characterized as "not free, fair[,] or credible," the National Assembly declared Maduro's presidency as illegitimate and named Juan Guaidó, the president of the National Assembly, as Interim President. (Def. Opp. 56.1 ¶¶ 116-17). On January 23, 2019, President Donald J. Trump issued a statement both declaring that the Maduro regime was "illegitimate" and recognizing that Mr. Guaidó was the Interim President of Venezuela and

the National Assembly was the "only legitimate branch of government duly elected by the Venezuelan people." (*Id.* at ¶ 118). On February 5, 2019, the National Assembly enacted the "Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela," pursuant to which Mr. Guaidó appointed a new, *ad hoc* board of directors for PDVSA. (*Id.* at ¶¶ 15-16). That *ad hoc* board, in turn, appointed new boards for PDVSA Petróleo and PDVH. (*Id.* at ¶ 18).

On April 27, 2019, PDVSA made its required interest payment, although Plaintiffs assert that this payment was made under protest. (Pl. Opp. 56.1 ¶ 216). On October 15, 2019, the National Assembly passed a second resolution (the "October 2019 Resolution") specifically addressing the Exchange Offer. (Def. Opp. 56.1 ¶ 69). The October 2019 Resolution recalled that the National Assembly had, in the September 2016 Resolution, "rejected the collateral of 50.1% of the shares in [CITGO]." (*Id.* at ¶ 70). The Resolution further recited that "following the investigations conducted in coordination with the Office of the Special Prosecutor, it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution." (*Id.*). The Resolution ratified "that the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national interest public contract, executed with foreign companies, which was not authorized by the National Assembly." (*Id.* at ¶ 71).

On October 27, 2019, PDVSA failed to make its scheduled principal and interest payments.  (Pl. Opp. 56.1 ¶¶ 259, 261).  The failure to make the principal payment constituted an Event of Default, and the failure to make the interest payment for 30 days after the due date similarly constituted an Event of Default.  (*Id.* at ¶¶ 260, 262).  Thus, assuming the Governing Documents are valid and enforceable, Defendants may, with the written direction of holders of at least 25% of the outstanding 2020 Notes, exercise their right to the sale or purchase of 50.1% of equity in CITGO.  (*Id.* at ¶ 268).

## B.    Procedural Background

Plaintiffs initiated this action on October 29, 2019, with the filing of the operative Complaint.  (Dkt. #1).  The Complaint seeks both a declaratory judgment that the 2020 Notes and the Governing Documents are invalid, illegal, null and void *ab initio*, and unenforceable, and an injunction against Defendants attempting to enforce the terms of the Governing Documents.  (*See generally id.*).  On November 6, 2019, Plaintiffs filed a letter requesting the Court to hold a conference with the parties and to schedule cross-motions for summary judgment on an accelerated basis.  (Dkt. #15).  The Court ordered that the parties appear for a conference on November 8, 2019.  (Dkt. #16).  At the conference, the Court ordered the parties to meet and confer on a mutually agreeable schedule.  (Minute Entry for November 8, 2019).  On November 15, 2019, the parties reported to the Court that they had reached agreement both on a forbearance, by which Defendants would agree not to invoke default remedies, and on scheduling for discovery and summary judgment briefing.

14

(Dkt. #29).  The Court endorsed the parties' proposed schedule and set oral
argument in this action.  (Dkt. #30).

On December 18, 2019, Defendants filed their Answer and
Counterclaims.  (Dkt. #40).  As Counterclaims, Defendants similarly sought a
declaratory judgment, but also brought claims for, *inter alia*, breach of
contract, breach of warranty, unjust enrichment, and quantum meruit.  (*See
generally id.*).  On January 8, 2020, Plaintiffs filed their Answers to Defendants'
Counterclaims.  (Dkt. #43-44).  On February 6, 2020, the Court held a
conference in an effort to resolve discovery disputes between the parties and to
address how to proceed with a related case.  (Dkt. #47, 50; Minute Entry for
February 6, 2020).  At the conference, the Court authorized the parties to
depose two witnesses each, and stayed the related case pending the resolution
of the instant action.  (Minute Entry for February 6, 2020).

On June 9, 2020, the Court received a letter from Carlos Vecchio, the
Venezuelan Ambassador to the United States.  (Dkt. #80).  On June 10, 2020,
after numerous extensions to the briefing schedule (Dkt. #65, 70, 72, 77), the
parties filed the opening papers for their cross-motions for summary judgment
(Dkt. #82-100, 104, 106-10).  Additionally, Defendants filed a motion to
preclude or exclude the expert testimony of David C. Hinman, one of Plaintiffs'
proposed experts.  (Dkt. #101-03).

On June 25, 2020, upon reviewing the parties' opening papers and
seeing that Plaintiffs had raised the act of state doctrine, the Court invited the
United States Government (the "Government") to submit to the Court its views

15

as to whether recognition of the National Assembly's denunciation and invalidation of the 2020 Notes would be consistent with the law and policy of the United States.  (Dkt. #144).  On June 26, 2020, Defendants filed a motion to strike Ambassador Vecchio's letter to the Court (Dkt. #145-47), claiming that it was an unauthorized submission and not appropriate as an *amicus* submission.  On June 29, 2020, the parties filed their oppositions to one another's motions for summary judgment (Dkt. #151-59), and Plaintiffs filed their opposition to Defendants' motion to exclude the testimony of Mr. Hinman (Dkt. #149-50).

On July 7, 2020, Plaintiffs filed a letter motion requesting that the Court compel the public disclosure of the identity of Defendants' expert on Venezuelan law.  (Dkt. #172).  Defendants responded to Plaintiffs' letter motion on July 10, 2020.  (Dkt. #173).  On July 13, 2020, Plaintiffs filed their opposition to Defendants' motion to strike Ambassador Vecchio's letter, and counsel representing the Republic requested leave to file a memorandum of law in opposition to the motion to strike.  (Dkt. #175-78).  On July 15, 2020, the parties filed their reply papers in support of their motions for summary judgment (Dkt. #179, 181-86), and Defendants filed a reply memorandum in support of their motion to exclude Mr. Hinman's expert testimony (Dkt. #180). The parties' submissions on July 15, 2020, concluded the briefing on the instant motions.

On July 20, 2020, the Court — in response to Plaintiffs' letter motion to compel (Dkt. #172) — ordered Defendants to submit for *in camera* review a

16

letter providing more specific detail about their concerns regarding the public disclosure of their Venezuelan law expert's identity (Dkt. #188).  On July 22, 2020, the Court also granted the Republic's motion for leave to file an opposition to Defendants' motion to strike and denied Defendants' motion to strike.  (Dkt. #199).  The Court found that it could properly consider Ambassador Vecchio's letter insofar as it offered views or interpretations of Venezuelan law, pursuant to Federal Rule of Civil Procedure 44.1.  (*Id.*).

On July 27, 2020, the Court received a letter from the Government requesting additional time to determine whether the Government would submit a Statement of Interest in response to the Court's Order of June 25, 2020. (Dkt. #204).  In response, the Court requested that the Government file a Statement of Interest or inform the Court that no such statement would be filed by September 16, 2020.  (Dkt. #205).  The Court also adjourned the scheduled oral argument to a later date, to allow the parties and the Court to have the benefit of the Government's views at the time of oral argument.  (*Id.*).

On July 30, 2020, the Court issued an order denying Plaintiffs' motion to compel the public disclosure of the identity of Defendants' Venezuelan law expert.  (Dkt. #207).  The Court found that, on the basis of Defendants' *ex parte* submissions, there was sufficient evidence of potential harm to Defendants' expert as to warrant protection of the expert's identity.  (*Id.*).  The Court's resolution of Plaintiffs' letter motion marked the resolution of all motions in this action, barring the instant cross-motions for summary judgment and the motion to exclude expert testimony.  On September 16, 2020, the Government

17

filed a response to the Court's Order of June 25, 2020. (Dkt. #213). The Government's submission includes both a formal Statement of Interest and an attached letter from Elliott Abrams, a member of the United States Department of State and the Special Representative for Venezuela. (*Id.*). After reviewing the Government's submission, the Court ordered a representative of the Government to appear at the scheduled oral argument. (Dkt. #214). Finally, the Court heard oral argument on the pending cross-motions for summary judgment on September 25, 2020. Having heard such argument, and having carefully considered the voluminous record in this action, the Court is ready to render its decision on the cross-motions for summary judgment and the motion to exclude expert testimony.

## DISCUSSION

### A.   Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[4]   A genuine

---

[4]   The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.   *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word – genuine 'issue' becomes genuine 'dispute.' 'Dispute better reflects the focus of a summary-judgment determination.").   This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refers to "genuine issues of material fact."

dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246. 252 (2d Cir. 2001).  Rather, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation

marks and citations omitted) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  "Though [the Court] must accept as true the allegations of the party defending against the summary judgment motion … conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks*, 593 F.3d at 166.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.  "If the evidence is merely colorable … or is not significantly probative … summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).  It should also be noted that "the principles governing admissibility of evidence do not change on a motion for summary judgment. …  [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)).

## B.    The Act of State Doctrine Does Not Apply

### 1.    Applicable Law

Plaintiffs argue principally that the May 2016 Resolution, the September 2016 Resolution, and the October 2019 Resolution constitute official acts by a foreign sovereign that, collectively, invalidated the 2020 Notes and the

Governing Documents *ex ante.* (*See* Pl. Br. 20). These Resolutions, when read together, contain statements to the effect that the 2020 Notes and the Governing Documents were "national public contract[s] that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution" (Def. Opp. 56.1 ¶ 70), and that "contracts of national ... public interest concluded ... without the approval of the National Assembly ... shall be null and void in their entirety" (*id.* at ¶ 62). Given these Resolutions, Plaintiffs argue, this Court must accept Venezuela's declaration of the invalidity of the 2020 Notes and the Governing Documents and resolve this action in a manner consistent with that invalidation, pursuant to the act of state doctrine. (*See id.* at ¶ 23). As detailed in the remainder of this section, Plaintiffs' arguments oversimplify the analysis and are ultimately incorrect.

The act of state doctrine provides in relevant part that courts of the United States "will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles." *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 428 (1964). The doctrine "arises out of the basic relationships between branches of government in a system of separation of power," and "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals ... in the international sphere." *Id.* at 423. As the Second Circuit has explained:

> [T]he applicability of the doctrine depends on the likely
> impact on international relations that would result from
> judicial consideration of the foreign sovereign's act.  If
> adjudication would embarrass or hinder the executive
> in the realm of foreign relations, the court should refrain
> from inquiring into the validity of the foreign state's act.

*Allied Bank Int'l* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516, 520-21 (2d

Cir. 1985).  Therefore, "[w]hen it is made to appear that the foreign government

has acted in a given way … the details of such action or the merit of the result

cannot be questioned but must be accepted by our courts as a rule for their

decision."  *Konowaloff* v. *Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir.

2012).

There are two crucial caveats to the act of state doctrine.  *First*, the

Supreme Court has cautioned against "the creation of 'an inflexible and all-

encompassing rule' to govern the application of the doctrine; 'the less

important the implications of an issue are for our foreign relations, the weaker

the justification for exclusivity in the political branches.'"  *Allied Bank*, 757

F.2d at 521 (quoting *Sabbatino*, 376 U.S. at 428).  "The doctrine demands a

case-by-case analysis of the extent to which in the context of a particular

dispute separation of powers concerns are implicated."  *Id.*  *Second,* if the act of

a foreign government purports to have extraterritorial effect — "and

consequently, by definition, fall[s] outside the scope of the act of state

doctrine" — a court may still recognize that foreign act if it is "consistent with

the law and policy of the United States."  *Id.* at 522.

In short, in order for the act of state doctrine to be applicable, it must be

shown that "the relief sought or the defense interposed would … require[] a

court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc.* v. *Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). If the official act did not take place within the territory of the foreign sovereign, the Court may still recognize the act if it is consistent with the law and policy of the United States. *See Allied Bank*, 757 F.2d at 522. The burden of establishing the applicability of the doctrine rests on the party invoking it. *See Konowaloff*, 702 F.3d at 146.

### 2. The National Assembly's Resolutions Constitute Official Acts of a Foreign Sovereign

To begin, the Court finds for purposes of the instant motions that the May 2016 Resolution, the September 2016 Resolution, and the October 2019 Resolution are all official acts of a foreign sovereign — in this case, of Venezuela. "To qualify as 'official,' an act must be imbued with some level of formality, such as authorization by the foreign sovereign through an official 'statute, decree, order, or *resolution*.'" *Kashef* v. *BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019) (emphasis added) (quoting *Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U.S. 682, 695 (1976)). There is no doubt that resolutions passed by the National Assembly are sufficiently formal to qualify as official acts of a foreign sovereign. *See also PDVSA U.S. Litig. Tr.* v. *Lukoil Pan Ams. LLC*, 372 F. Supp. 3d 1353, 1361 (S.D. Fla. 2019) (explaining that if the court held in contravention of a National Assembly resolution, "it would be ruling in direct contravention to a resolution by a foreign sovereign").

Similarly, the Executive Branch of the United State has recognized "the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim

President of Venezuela," and the National Assembly as the "only legitimate branch of government duly elected by the Venezuelan people." (Def. Opp. 56.1 ¶ 118). As the Chancery Court of Delaware has noted, the effect of the Executive Branch's action is unambiguous: "Guaidó is recognized, the National Assembly is legitimate, and neither Maduro nor the Constituent Assembly are legitimate parts of the Venezuelan government." *Jiménez* v. *Palacios*, C.A. No. 2019-0490-KSJM, 2019 WL 3526479, at *11 (Del. Ch. Aug. 2, 2019), *aff'd* No. 399, 2019, 2020 WL 4207625 (Del. July 22, 2020). Therefore, in the eyes of the United States and of this Court, the National Assembly is a foreign sovereign given its recognition as the only legitimate branch of Venezuela's government.

Defendants challenge both of these findings, arguing that (i) the National Assembly's Resolutions have no force of law and therefore are not "official" acts, and (ii) the National Assembly's actions in 2016 were not the acts of a sovereign. (*See* Def. Opp. 12-13). As to the first argument, while it may be true that "[a]dvisory recommendations that cannot bind the sovereign are not acts of state," *Von Saher* v. *Norton Simon Museum of Art at Pasadena*, 897 F.3d 1141, 1153 (9th Cir. 2018), the Resolutions at issue here are not the recommendations of some mere committee, *see id.* (declining to recognize as act of state the recommendation of a Restitution Committee); *Sharon* v. *Time, Inc.*, 599 F. Supp. 538, 545 (S.D.N.Y. 1984) (declining to recognize as act of state the findings of a commission that had no legislative authority and was "empowered only to issue its own findings and recommendations, not those of

24

the State of Israel").  Rather, these are formal Resolutions, passed by and attributable to the sovereign, and they are no less official because Defendants' Venezuelan law expert contends that they lack the status of laws.  (*See* Doe Rebuttal Rep. ¶¶ 105-08).

As to Defendants' second argument, the Second Circuit has stated unequivocally that "the act of state doctrine applies retroactively to acts that were undertaken by the foreign state prior to official United States recognition." *Konowaloff*, 702 F.3d at 146.  Indeed, the Supreme Court has explained "that recognition of a foreign sovereign conclusively binds the courts and 'is retroactive and validates all actions and conduct of the government so recognized from the commencement of its existence.'"  *United States* v. *Pink*, 315 U.S. 203, 223 (1942) (quoting *Oetjen* v. *Cent. Leather Co.*, 246 U.S. 297, 302 (1918)).  Defendants recognize this principle of retroactivity, but argue that it is limited to situations where a new government arises out of a civil war or revolution.  (*See* Def. Opp. 13).  While the Court recognizes that this is the scenario in which retroactivity typically applies, *see, e.g.*, *Konowaloff*, 702 F.3d at 146 (applying act of state doctrine retroactively to acts taken by the revolutionary Bolshevik government, even though the United States did not recognize the U.S.S.R. until 1933), there is no authority restricting retroactive application of the doctrine to such violent circumstances.  Indeed, such a restriction would nonsensically limit the effect of the Executive Branch's actions to certain factual scenarios, which runs directly counter to the separation of powers concerns animating the act of state doctrine.

A corollary to Defendants' arguments, advanced during oral argument, has more traction:  Defendants argue that the National Assembly should not be recognized as the sovereign *in 2016* when the events that led to the change in Venezuela's government did not take place until 2018 at the earliest.  (*See* Sept. 25, 2020 Tr. 60:3-12, 62:1-6, 62:23-63:19).  It is certainly true that Mr. Maduro was recognized as the legitimate president of Venezuela up until the United States' recognition of Mr. Guaidó in January 2019, and it is similarly true that the event that precipitated the switch from Mr. Maduro to Mr. Guaidó was the presidential election in May 2018.  (*See* Statement of Interest, Ex. A). Prior to that election, neither Mr. Guaidó nor the National Assembly claimed to be Venezuela's legitimate government.

However, it is equally true that the National Assembly that issued the May 2016, September 2016, and October 2019 Resolutions, and that was recognized in January 2019 as the only legitimate branch of Government by the United States, came into existence as a result of elections in 2015.  (*See* Pl. Opp. 56.1 ¶ 72).  Given that the retroactivity principle applies specifically from the commencement of the recognized government's existence, *see Pink*, 315 U.S. at 223, the Court finds that the Executive Branch's recognition of the National Assembly as the only legitimate branch of the Venezuelan government is retroactive to the commencement of the current National Assembly. Moreover, as the Delaware Chancery Court has aptly put it, "recognition of one sovereign authority must exclude others, particularly when those other bodies have taken positions contrary to the recognized sovereign."  *Jiménez*, 2019 WL

3526479, at *18.  Thus, it is of no moment that the Maduro regime was the recognized government in 2016 (*see* Def. Opp. 12), since the Executive Branch's recognition of the National Assembly and Mr. Guaidó as legitimate necessarily means that the Maduro regime is and was illegitimate.  The Court thus concludes that the May 2016, September 2016, and October 2019 Resolutions all constitute official acts of a foreign sovereign.

### 3.    The Taking At Issue Did Not Take Place Within Venezuela's Territory

Those issues resolved, the Court must still determine whether these official acts resulted in a "taking" by Venezuela under the act of state doctrine and, if so, where such taking occurred.  *See Sabbatino*, 376 U.S. at 428.  After all, if the relevant taking did not take place in Venezuela, then the Court may only apply the act of state doctrine if it can be said that recognition of the National Assembly's actions is consistent with the law and policy of the United States.  *See Allied Bank*, 757 F.2d at 522.

In this action, the situs of the taking analysis is complicated by the mismatch between the National Assembly's sovereign acts and the putative legal significance of those acts.  More pointedly, Plaintiffs have sought to transmogrify ambiguously worded 2016 Resolutions into judicially enforceable takings via the magic of 2019 hindsight.  As detailed in this section, this effort is largely unsuccessful.  However, even if the Court were to accept that the National Assembly's three Resolutions effected a taking — and, further, that the taking in question was the invalidation of Plaintiffs' debt obligations in the

Exchange Offer and the correlative reclamation of the CITGO collateral — such taking cannot be said to have occurred in Venezuela.

The controlling case on this issue, as noted by both Plaintiffs (*see* Pl. Br. 22) and Defendants (*see* Def. Opp. 7), is *Allied Bank*.  In that case, the defendants were three Costa Rican banks, all of which were wholly owned by the Republic of Costa Rica and subject to the direct control of the Central Bank of Costa Rica.  *See Allied Bank*, 757 F.2d at 518.  The banks had issued promissory notes, all of which were denominated in U.S. dollars and payable in New York City, and had defaulted on the notes.  *See id.* at 518-19.  Payment on the notes was made impossible by the fact that the Costa Rican government had issued an executive decree conditioning the payment of all external debt on the express approval of the Central Bank, and the Central Bank had subsequently refused to authorize any foreign debt payments in U.S. dollars. *See id.* at 519.  The Second Circuit was asked to decide whether such a taking should be recognized as an act of state, and therefore accepted as a rule of decision for the courts.  *See id.* at 520.

Critical to the Second Circuit's decision in that case was the previously mentioned extraterritorial limitation to the act of state doctrine.  *See Allied Bank*, 757 F.2d at 521, 522.  "The theory underlying the territorial limitation to the act of state doctrine is that a foreign state is less concerned about the effects of its acts on property outside of its territory than within."  *Callejo* v. *Bancomer, S.A.*, 764 F.2d 1101, 1121-22 (5th Cir. 1985).  As the Fifth Circuit has explained,

28

> The obvious inability of a foreign state to complete an expropriation beyond its borders reduces the foreign state's expectations of dominion over that property.... Consequently, the potential for offense to the foreign state is reduced, there is less danger that judicial disposition of the property will "vex the peace of nations," and there is less need for judicial deference to the foreign affairs competence of the other branches of government.

*Maltina Corp.* v. *Cawy Bottling Co.*, 462 F.2d 1021, 1028-29 (5th Cir. 1972).

Moreover, as the Second Circuit noted in *Allied Bank*, there is a whiff of *realpolitik* animating the extraterritorial limitation: namely, that "where the taking is wholly accomplished within the foreign sovereign's territory … the court's decision would almost surely be disregarded within the borders of the foreign state." 757 F.2d at 521.  Given the extraterritorial limitation to the act of state doctrine, the key issue for the *Allied Bank* Court "depend[ed] on the situs of the property at the time of the purported taking."  *Id.*[5]

In *Allied Bank*, the Second Circuit followed two different methods of determining the situs of the taking.  *See* 757 F.2d at 521.  The first focused "on whether the purported taking can be said to have 'come to complete fruition within the dominion of the foreign government.'"  *Id.* (quoting *Tabacalera Severiano Jorge, S.A.* v. *Standard Cigar Co.*, 392 F.2d 706, 715-16 (5th Cir. 1968)).  Put another way, the focus is on whether the act "is an accomplished fact" because the foreign government "has the parties and the *res* before it and

---

[5]     In *Allied Bank*, the property that was taken was "Allied's right to receive repayment from the Costa Rican banks in accordance with the agreements," 757 F.2d 516, 521 (2d Cir. 1985), otherwise known as the debt.  Similarly, the relevant property at issue here consists of Plaintiffs' debt to Defendants and the collateral in CITGO.

[has] act[ed] in such a manner as to change the relationship between the parties touching the *res*." *Tabacalera*, 392 F.2d at 715 (italicizations added). The foreign government must be "physically in a position to perform a *fait accompli*." *Id.* (italicization added). The second method was a more traditional situs of the debt analysis, focusing on the place of payment; the location of the parties; and the location of the contracting for the debt. *See Allied Bank*, 757 F.2d at 521. Using the two methods of situs analysis, the Second Circuit held that the situs of the debt in *Allied Bank* was not in Costa Rica, both because the situs of the debt under the traditional analysis was plainly in the United States and because "Costa Rica could not wholly extinguish the Costa Rican banks' obligation to timely pay United States dollars to Allied in New York." *Id.*

The same analysis controls the instant action and yields comparable results. *First*, if this Court follows the "complete fruition" situs analysis, it is clear that Venezuela was not physically in a position to perform a *fait accompli* as to invalidating the 2020 Notes and the Governing Documents. Much like in *Allied Bank*, the principal and interest payments on the 2020 Notes are obligated to be paid in U.S. dollars in New York City. (*See, e.g.*, Clark Decl., Ex. 6 at 7). Even more significantly, the collateral is sitting in a vault in New York City, well outside Venezuela's reach. (Pl. Opp. 56.1 ¶ 176). It is therefore difficult to argue that Venezuela's attempted taking is an "accomplished fact" or has come to "complete fruition." To the contrary, Plaintiffs have brought this action *because of* Venezuela's inability to complete this expropriation within its borders. Therefore, under the "complete fruition test," the takings at issue in

the instant action fall outside the act of state doctrine's extraterritorial limitation.

The result is the same, and is in fact clearer, if the Court employs a traditional situs of the debt analysis.  As in *Allied Bank*, the center of gravity for both the 2020 Notes and the collateral is in New York.  Defendants operate out of New York (Def. Opp. 56.1 ¶ 19; Pl. Opp. 56.1 ¶ 32); the paying agent, transfer agent, registrar, and depository are all based in New York (Pl. Opp. 56.1 ¶¶ 188, 191); the collateral is in New York (*id.* at ¶ 176); and PDVSA is obligated to pay the debt in New York (Clark Decl., Ex. 6 at 7).  Given such a clear center of gravity, as well as the United States' interest in, *inter alia*, "maintaining New York's status as one of the foremost commercial centers in the world" and "ensuring that creditors entitled to payment in the United States in United States dollars … may assume that … their rights will be determined in accordance with recognized principles of contract law," *Allied Bank*, 757 F.2d at 521-22, the situs of the debt is in the United States, not Venezuela.

The Court can quickly dispose of several abortive efforts by Plaintiffs to distinguish this case from *Allied Bank*.  Plaintiffs cite to *Braka* v. *Bancomer, S.N.C.* (*see* Pl. Br. 22), a case in which the Mexican government issued decrees requiring holders of certain certificates to redeem at a prescribed exchange rate, instead of the market rate.  *See* 762 F.2d 222, 223 (2d Cir. 1985).  However, their reliance on *Braka* is counterproductive.  In that case, the Second Circuit held that the situs of the debt was in Mexico because Mexico

City was named as the place of deposit and of payment of interest and principal, even though some of the certificates were dollar-denominated and deposits were occasionally accepted and transmitted to Mexico by Bancomer's New York agency.  *See id.* at 224.  Therefore, *Braka* counsels *in favor of* finding the United States as the situs of the debt, given that New York is the place of deposit and of payment of interest and principal.  (*See* Pl. Opp. ¶ 191; Clark Decl., Ex. 6 at 7).

Plaintiffs also attempt to characterize the invalidation of the 2020 Notes and the Governing Documents as mere "corollary effects," in an effort to analogize this case to several district court cases. (*See* Pl. Br. 22).  But the Resolutions' intended effect on the 2020 Notes and the Governing Documents was direct, not corollary.  In other words, the Resolutions, if Plaintiffs are to be believed, were specifically designed to invalidate the 2020 Notes and the Governing Documents.  Such invalidation was the National Assembly's prime motivation, not a mere knock-on effect.  Thus, the instant action bears no relation to cases wherein courts have recognized as acts of state a foreign government's reconstitution of corporate boards primarily based in the territory of that government.  *See Jimenez*, 2019 WL 3526479, at *18-19 (finding that Interim President Guaidó's appointment to the board of PDVSA occurred within Venezuela's sovereign territory, despite corollary effect of that board then having the ability to reconstitute the board of PDVSA's U.S.-based subsidiaries); *Republic of Panama* v. *Air Panama Internacional, S.A.*, 745 F. Supp. 669, 673 (S.D. Fla. 1988) (finding that appointments to the board of Air

Panama, a corporation wholly owned by the Republic of Panama and administered by the Panamanian economic development agency, were acts of state despite Air Panama having U.S. operations).

Plaintiffs' strongest argument is that the instant case is distinguishable from *Allied Bank* because the National Assembly's Resolutions, coupled with its omission of authorization for the Exchange Offer, precluded the 2020 Notes and Governing Documents from ever coming into valid legal existence in the first place. (*See* Pl. Br. 22).[6] Under this theory, "this is *not* a case of a government taking actions after the fact in an effort to avoid valid, preexisting obligations sited in the U.S." (*Id.*). Plaintiffs' argument does not hold up under close inspection, however, primarily because it lacks support in the plain language of the Resolutions.

The May 2016 Resolution did not effectuate an invalidation of the 2020 Notes or Governing Documents because, by its own language, it did not apply to those contracts. The May 2016 Resolution asserts that contracts of national public interest must be approved by the National Assembly, and that if such a

---

[6]  The Court finds little support for Plaintiffs' theory that the National Assembly's failure to approve the Exchange Offer qualifies as the act of a foreign sovereign. As the Court has already explained, "official" acts require some degree of formality, *see Kashef* v. *BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019), and there is no formality in a simple failure to act. Moreover, the Court does not agree that *Underhill* v. *Hernandez*, 168 U.S. 250 (1897), *United States* v. *Merit*, 962 F.2d 917 (9th Cir. 1992), and *West* v. *Multibanco Comermex, S.A.*, 807 F.2d 820 (9th Cir. 1987) — cases on which Plaintiffs rely (*see* Pl. Reply 5 n.14) — stand for the broad proposition that a government's failure to act qualifies as an act of state. In fact, in *Underhill*, the relevant sovereign took the affirmative act of refusing to give the petitioner a passport. *See* 168 U.S. at 251. This is distinguished from the absence of action that Plaintiffs urge the Court to recognize as an act of state. The Court therefore focuses its analysis on the three National Assembly Resolutions.

contract were executed without the National Assembly's approval, it would be null and void in its entirety.  (*See* Def. Opp. 56.1 ¶¶ 61-62).  However, the Resolution's language is equally clear that it pertains to "contracts of national … public interest concluded by and between the National Executive" (*id.*), and the parties cannot credibly argue on this record that PDVSA is a part of the National Executive (*see, e.g.*, Doe Rep. ¶¶ 34-37 (explaining the distinction between the National Executive and the Decentralized Administration, which includes "Autonomous Institutes (*Institutos Autónomos*) created by law, State Corporations, and foundations," and clarifying that PDVSA is part of the latter); Brewer Rep. ¶¶ 5, 22 (differentiating between "the ministries within the National Executive and the decentralized entities of the National Public Administration," and explaining that "the term 'National Executive' includes the ministries to which public corporations and state-owned commercial enterprises such as PDVSA and PDVSA Petróleo are attached"); *see also id.* at ¶ 24 (describing public corporations and state-owned enterprises such as PDVSA as "decentralized entities within the National Public Administration")).  Despite Plaintiffs' protestations to the contrary during oral argument (*see* Sept. 25, 2020 Tr. 29:18-30:9, 31:10-19, 31:24-32:17), the plain language of the May 2016 Resolution very clearly cabins the Resolution's applicability to contracts "concluded by and between the National Executive"

(Def. Opp. 56.1 ¶¶ 61-62).  It therefore, by its own terms, does not apply to contracts entered into by PDVSA.[7]

Plaintiffs similarly read too much into the September 2016 Resolution. To be sure, the Resolution includes language that the National Assembly "reject[s] categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO Holding, Inc. are offered as a guarantee with priority."  (Def. Opp. 56.1 ¶ 65).  That rejection, however, is not accompanied by any recognition of the Exchange Offer as a contract of national public interest; nor does it state that the Exchange Offer would, if executed without National Assembly approval, violate Article 150 of the Venezuelan Constitution; nor does it deem the Exchange Offer to be illegal, invalid, or void in any manner.  (See id. at ¶¶ 64-65).  The Court cannot find that the National Assembly acted to preempt the existence of the 2020 Notes and Governing Documents solely because it included within the Resolution a "rejection" of one component of the Governing Documents.[8]

This conclusion is only buttressed by the larger context of the September 2016 Resolution.  The Resolution, as Plaintiffs noted repeatedly during oral argument (see Sept. 25, 2020 Tr. 28:4-18, 29:18-30:9, 31:1-17, 33:23-34:5),

---

[7]     It is worth mentioning that Ambassador Vecchio's letter, which is discussed in greater detail infra, does not ascribe any specific power of invalidation to the May 2016 Resolution.  (See generally Vecchio Letter).

[8]     In this regard, the Court finds significant the fact that Plaintiffs are arguing for the invalidity of the entire Exchange Offer, and not just the pledging of CITGO as collateral. (See, e.g., Pl. Br. 4 (requesting that "[t]his Court … declare the entire 2020 Notes Transactions invalid and unenforceable under the act of state doctrine" (emphasis added))).

invokes Article 187(9) of the Venezuelan Constitution. Based on this invocation, Plaintiffs urge the Court to read the September 2016 Resolution as both defining the Exchange Offer as a contract of national public interest and deeming the Exchange Offer null and void *ab initio*. (*See id.*). However, the manner in which the September 2016 Resolution discusses Article 187(9) makes clear that its invocation has nothing to do with invalidation of the Exchange Offer. The Resolution invokes Article 187 twice: *first*, to explain that "Article 187[(3)] ... empowers the National Assembly to exercise control functions ..., with the power to obtain information about the financial statements and details of any transaction that commits PDVSA's assets as collateral" (Def. Opp. 56.1 ¶ 64), and *second*, in "urg[ing] the Public Ministry to open an investigation to determine if the current transaction protects the National Property" (*id.* at ¶ 65). The above language underscores that the National Assembly invoked Article 187(9) in order to substantiate its desire to investigate the Exchange Offer. It in no way demonstrates an intent to affirmatively invalidate the Exchange Offer, and the Court will not read such an intent into the Resolution.

Plaintiffs cannot escape the fact that it was not until the October 2019 Resolution — three years after the announcement of the Exchange Offer, nine months after the United States' recognition of the National Assembly as the only legitimate government in Venezuela, and the very month in which substantial interest and principal payments fell due under the Governing Documents — that the National Assembly resolved that the Exchange Offer

36

and the 2020 Notes were contracts of national public interest and had violated Article 150.  (*See* Def. Opp. 56.1 ¶¶ 70-71).  The October 2019 Resolution expressly admits that it was not until after "investigations conducted in coordination with the Office of the Special Prosecutor, [that] it was concluded that the 2020 Bond indenture [was] a national public contract that should have been authorized by the National Assembly." (*Id.* at ¶ 70).  This directly cuts against any assertion that either or both of the 2016 Resolutions were intended to or had the effect of invalidating the 2020 Notes and Governing Documents *ex ante*.  Given the plain language and clear chronology of the Resolutions, there is no basis for the Court to find that the National Assembly, through those Resolutions, prevented the 2020 Notes and Governing Documents from coming into existence.  The Court cannot stretch these earlier Resolutions to accommodate Plaintiffs' current arguments.

Perhaps recognizing the textual deficiencies, Plaintiffs ask the Court to find that the September 2016 Resolution preemptively invalidated the 2020 Notes and the Governing Documents based on contemporaneous statements by members of the National Assembly.  (*See, e.g.*, Sept. 25, 2020 Tr. 33:14-22).  Specifically, Plaintiffs point to several statements attributed to Freddy Guevara, a member of the National Assembly and president of the Comptroller's Commission.  (*See* Def. Opp. 56.1 ¶¶ 66-67, 82-83).  Mr. Guevara is purported to have stated during the debate over the September 2016 Resolution that the National Assembly would "not acknowledge any national interest contract that does not come before this National Assembly." (*Id.* at ¶ 66).  Mr. Guevara was

also quoted in a September 27, 2016 article stating, about the Exchange Offer, "[W]e [do] not recognize these transactions." (*Id.* at ¶ 82). Finally, Mr. Guevara was quoted in a different article emphasizing that the National Assembly would "not recognize any public contract that is not considered or authorized by the Legislative Branch in accordance with the Constitution." (*Id.* at ¶ 83). The Court has no doubt that Mr. Guevara is a distinguished lawmaker and respects the views he has expressed regarding the Exchange Offer and contracts of national public interest. However, as the Supreme Court has noted, "floor statements by individual legislators rank among the least illuminating forms of legislative history." *N.L.R.B.* v. *SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) (citing *Milner* v. *Dep't of Navy*, 562 U.S. 562, 572 (2011)). The floor statements of a Venezuelan lawmaker, no matter how distinguished or influential, cannot alter the plain language of the September 2016 Resolution.

As a final resort, Plaintiffs argue that the Court should consider the September 2016 Resolution as having preemptively invalidated the 2020 Notes and the Governing Documents because the Republic itself, through its ambassador to the United States, has informed the Court that it views the September 2016 Resolution as having done such. (*See* Sept. 25, 2020 Tr. 35:5-17). Specifically, the Republic has expressed the view that "the National Assembly challenged the Exchange Offer, pursuant to article 187 numeral 9 of the Venezuelan Constitution" in enacting the September 2016 Resolution; compared that Resolution to other resolutions by the National Assembly declaring other transactions as null and void; and explained that "[i]n a

38

functioning rule of law system, the September 2016 Resolution should have
prevented PDVSA from advancing the Exchange Offer and issuing the 2020
Notes." (Vecchio Letter ¶¶ 9-10, 15). The Republic has also stated that it
"recognizes the September 2016 and October 2019 Resolutions … as official
acts … that vitiate the consent necessary for the Indenture and the Pledge to
have come into valid legal existence in the first instance and therefore render
these contracts and the 2020 Notes invalid, illegal, and null and void *ab initio*."
(*Id.* at ¶ 24).

The Supreme Court has instructed that when a foreign government
"submits an official statement on the meaning and interpretation of its
domestic law, … [a] federal court should accord respectful consideration" to
that submission. *Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co. Ltd.*, 138
S. Ct. 1865, 1869 (2018). However, the court "is not bound to accord
conclusive effect to the foreign government's statements." *Id.* Indeed, while
"[i]n the spirit of 'international comity,' a federal court should carefully consider
a foreign state's views about the meaning of its own laws[,] … the appropriate
weight in each case will depend upon the circumstances." *Id.* at 1873 (internal
citations omitted). "Relevant considerations include the statement's clarity,
thoroughness, and support; its context and purpose; the transparency of the
foreign legal system; the role and authority of the entity or official offering the
statement; and the statement's consistency with the foreign government's past
positions." *Id.* at 1873-74.

39

In accordance with the Supreme Court's instruction in *Animal Science*, the Court has respectfully and carefully considered the views that the Republic has expressed regarding the effect of the September 2016 Resolution.  For several reasons, however, the Court can neither agree with nor give conclusive effect to these views.  *First*, the Republic's submission does not provide significant support for the proposition that the September 2016 Resolution either characterized the Exchange Offer as a contract of national public interest or declared the Exchange Offer as null and void.  Indeed, the Republic notes that the September 2016 Resolution "categorically reject[e]d the pledge of CITGO" and "called for an investigation of the transaction" (Vecchio Letter ¶ 16), while it was the October 2019 Resolution that "declared the Indenture and Pledge null and void" (*id.* at ¶ 23).  The Republic states that such declaration was "based on the September 2016 Resolution" (*id.*), but offers no explanation for how the September 2016 Resolution supports such a finding.  This reticence is thrown into even starker relief by the Republic's admission that other National Assembly resolutions have expressly declared certain transactions to be null and void.  (*See id.* at ¶ 10).  The Republic's submission therefore provides little to no explanation, in the absence of clear language expressing such a goal or intent, why the September 2016 Resolution effected a preemptive invalidation of the 2020 Notes and Governing Documents.

*Second*, and perhaps more importantly, any suggestion by the Republic that the September 2016 Resolution declared the Exchange Offer or the 2020 Notes illegal is fatally undermined by the Opinion on the Legality of the PDVSA

2020 Bond Indenture as a National Public Interest Agreement that was produced by Special Attorney General Juan Ignacio Hernández on behalf of the Republic in August 2019.  In that Opinion, it is expressly stated that, through the September 2016 Resolution, "the National Assembly did *not* declare the unlawfulness" of the 2020 Notes.  (Bliss Opp. Decl., Ex. 9 at ¶ 160 (emphasis added)).[9]  This earlier governmental statement is consistent with the text of the Resolution, and entirely inconsistent with the views currently advanced by the Republic and Plaintiffs; in consequence, it substantially decreases the weight that the Court assigns to the Republic's current views.

*Third* and finally, the Court cannot ignore that the Republic's submission has been offered specifically for the purposes of this litigation, and seemingly in coordination with Plaintiffs.  (*Compare* Dkt. #80 (showing that Republic's letter was filed on June 9, 2020, the day before opening briefs were due), *with* Pl. Br. 20, 28 (citing to and relying on the Republic's letter, despite it having been submitted just one day prior)).  As the Supreme Court has noted, "[w]hen a foreign government … offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission." *Animal Sci. Prods.*, 138 S. Ct. at 1873.  Given the circumstances surrounding the Republic's submission, the Court is duly cautious of the views it has expressed and is not persuaded, based on said submission and views, that the

---

[9]   To quote more fully from Special Attorney General Hernández's Opinion, the September 2016 Resolution "questioned the issuance of the 2020 Bond and[,] in particular, the establishment of the pledge guarantee.  Certainly the National Assembly did not declare the unlawfulness of that Bond, but it did announce the start of an investigation based on the questioning of the operation."  (Bliss Opp. Decl., Ex. 9 at ¶ 160).

September 2016 Resolution preemptively invalidated the 2020 Notes and Governing Documents.

Putting aside the many serious issues with Plaintiffs' invalidation theory, even if the Court were to assume *arguendo* that this invalidation did take place, and that it took place prior to the consummation of the Exchange Offer, the Court would still be compelled to find that the taking took place outside of Venezuela. As the Court has already mentioned, the situs component of the act of state doctrine is, at its core, an eminently practical analysis. *See Bandes* v. *Harlow & Jones, Inc.*, 852 F.2d 661, 666 (2d Cir. 1988) ("The [act of state] doctrine also recognizes the practical limits of enforcing judicial mandates overseas."). The reason why courts will not question the validity of a foreign sovereign's act occurring within that sovereign's territory is that "it would be a waste of judicial resources … to condemn the result; there is little our courts can do to right a wrong committed in a foreign land." *Id.* "The rationale, however, does not extend to property located within the United States. When another state attempts to seize property held here, our jurisdiction is paramount." *Id.* Moreover, in the context of taking of debt, the Second Circuit has held that "[f]or purposes of the act of state doctrine, a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it." *Menendez* v. *Saks & Co.*, 485 F.2d 1355, 1364 (2d Cir. 1973), *rev'd on other grounds sub nom. Alfred Dunhill of London*, 425 U.S. 682 (1976).

Plaintiffs understandably wish that the September 2016 Resolution had preemptively invalidated the 2020 Notes and Governing Documents in

Venezuela.  The fact remains that papers were signed, contracts were executed, payments are due in New York, and the collateral sits waiting in a vault in New York.  Venezuela has no power, save by the actions of this Court or intervention by the United States, to stop Defendants from enforcing their contractual remedies.  And it is that impotence to complete the expropriation that makes clear that no taking has taken place in Venezuela.  Moreover, it is irrelevant that the Resolutions were issued in Venezuela, "since the act of state doctrine looks to actual dominion over property rather than to the mere execution of official documents."  *Drexel Burnham Lambert Grp. Inc.* v. *Galadari*, 610 F. Supp. 114, 118 (S.D.N.Y. 1985), *aff'd in relevant part*, 777 F.2d 877 (2d Cir. 1985).  In the end, all that Plaintiffs have is a legal theory, entirely uncoupled from the facts on the ground.  The Court cannot contort the act of state doctrine to accommodate Plaintiffs' theory.  The relevant taking — if any taking can be said to have occurred — could not have taken place in Venezuela, and therefore there is no basis for mandatory application of the act of state doctrine.[10]

---

[10]    Plaintiffs may argue that, given the Court's formulation of the "complete fruition" test, there is no theory that would allow a court to recognize a governmental repudiation of debt.  Not so.  If Plaintiffs had structured the 2020 Notes and Governing Documents such that the debt was to be paid in Venezuela, or such that the collateral was to be held in a vault in Caracas, it would be well within the National Assembly's power to expropriate that property.  By designating New York as the situs of the debt, however, Plaintiffs placed the property within the jurisdiction of the United States.  And "[w]hen another state attempts to seize property held here, our jurisdiction is paramount."  *Bandes* v. *Harlow & Jones, Inc.*, 852 F.2d 661, 666 (2d Cir. 1988).

### 4.  Permissive Application of the Act of State Doctrine Is Not Warranted Here

As the Court has already noted, a finding that the foreign government's taking did not take place within its own territory does not necessarily preclude this Court from applying the act of state doctrine.  As indicated in *Allied Bank*, a court may nevertheless recognize an extraterritorial taking by a foreign sovereign if such recognition would be consistent with the law and policy of the United States.  *See* 757 F.2d at 522.  Such recognition occurs not as a matter of any constitutionally derived doctrine, such as the act of state doctrine, but more as a matter of comity.  *See Films by Jove, Inc.* v. *Berov*, 341 F. Supp. 2d 199, 212-13 (S.D.N.Y. 2004) (explaining that while "the act of state doctrine applies only to acts of a foreign state committed within its own territory, comity … can generally relate to extraterritorial effects of a foreign legal system" (citing *Allied Bank*, 757 F.2d at 522)).

In line with this possible extension to the act of state doctrine, the Court has solicited — and the Government has provided — the views of the United States.  (*See generally* Statement of Interest).[11]  However, the Government has declined to give a clear answer on whether recognition of the National

---

[11]    The Court highlights that this is a "possible" extension to the act of state doctrine for two reasons.  *First*, the Court can find vanishingly few examples of courts utilizing this extension to the doctrine.  *See Hausler* v. *JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 57 (S.D.N.Y. 2015) (recognizing an extraterritorial expropriation as consistent with U.S. policy in unique circumstance where there was no *bona fide* owner protesting the expropriation or claiming to have been uncompensated, the court's recognition of the expropriation would allow a wronged party to seek compensation for her loss, and declining recognition would result in escheatment of the funds at issue).  *Second*, the Government's *amicus* brief in *Allied Bank*, to which the Government has referred this Court (*see* Statement of Interest 8), has characterized the extension as not an extension at all, but instead as a "limiting doctrine" (*see* Dkt. #151, Ex. 385 at 29).

Assembly's purported extraterritorial taking would be consistent with the law and policy of the United States.  (*See generally id.*).  The Government has noted that "United States foreign policy generally favors ensuring that the Maduro government cannot squander Venezuela's key assets," and that "[t]he United States supports the efforts of the interim government in Venezuela to restore democracy and to reconstruct the Venezuelan economy after Maduro steps aside."  (*Id.* at 7).  However, the Government has been equally strong in emphasizing that "the United States also has a substantial interest in avoiding the adverse effects that uncertainty in contract enforcement could have on international financial markets and on efforts to restructure sovereign debt."  (*Id.* at 8).  Moreover, "[t]he United States is 'a major source of private international credit,' and 'has an interest in maintaining New York's status as one of the foremost commercial centers in the world.'"  (*Id.* (quoting *Allied Bank*, 757 F.2d at 521-22)).  At base, "the United States [has] respectfully take[n] no position on the question of whether the act of state doctrine applies in this case in light of unresolved questions of fact and of Venezuelan law antecedent to the possible applicability of the doctrine."  (*Id.* at 9).

In addition to the Government's Statement of Interest, the Court has also received a letter from Elliott Abrams, the United States Special Representative for Venezuela.  (*See generally* Statement of Interest, Ex. A).  Although his letter makes far clearer the stakes at issue in this litigation — he writes that "[a]ny … loss of PdVSA's U.S.-based assets … would be detrimental to U.S. policy and the interim government's priorities," and even that "the impact of a loss of

these assets … would be greatly damaging and perhaps beyond recuperation" — Mr. Abrams acknowledges nonetheless that "U.S. government policy has generally favored the negotiated and consensual resolution of sovereign debt disputes." (*Id.* at 3-4). Mr. Abrams's letter, then, gets the Court no closer to determining whether recognition of the National Assembly's purported invalidation is consistent with the law and policy of the United States.

Given the non-committal nature of its written submissions, the Court ordered the Government to appear at oral argument so that the Court could attempt to gain further clarity on the Government's views. There, the Government reiterated that, given the disputed issues of law and fact, it was not in a position at the time to offer a definitive view as to whether recognition would be consistent with the law and policy of the United States. (*See* Sept. 25, 2020 Tr. 7:22-8:7). The Government did, however, make many references to its *amicus* brief in *Allied Bank*, and specifically to the Government's articulation of its interest in protecting creditors and negotiating resolutions to debt disputes. (*See id.* at 13:9-11, 14:12-14).

The Court is therefore left to determine for itself whether it should extend comity to the National Assembly's actions. The Court is cognizant of the United States' well-documented support both for Interim President Guaidó and for his efforts to restore democracy and financial health to Venezuela. (*See* Statement of Interest 3). Even more importantly, the Court is profoundly aware of, and deeply troubled by, the deprivations that the Maduro regime has

46

visited upon the Venezuelan people.  (*See id.*).  This Court has no wish to exacerbate the many hardships that Venezuelans are already suffering.

However, given the substantial interests that the United States has in stabilizing financial markets, protecting the expectations of creditors, and maintaining New York's status as a preeminent global commercial center, and given the absence of any affirmative statement by the United States in favor of granting comity to the National Assembly's actions, the Court does not believe that such a grant is warranted under the present circumstances.  The Court is appropriately concerned that recognizing the National Assembly's actions, and accepting them as a rule of decision here, would invite less honest foreign governments to invalidate and repudiate legitimate debts and leave innocent creditors in the lurch.  Such a reality, in the Court's carefully considered view, presents just as great a risk of embarrassing the United States as opening the door to Defendants' sale or purchase of CITGO.  Therefore, the Court does not believe that it would be consistent with the law and policy of the United States to recognize the National Assembly's efforts at invalidation of the 2020 Notes and Governing Documents.  The Court will not grant summary judgment in Plaintiffs' favor on that basis, or on the basis that the act of state doctrine is applicable.

## C.   New York Law Governs This Action

Having resolved the parties' disputes concerning the act of state doctrine, the Court now turns to the remainder of the parties' arguments.  A core dispute in this action is whether Venezuelan law or New York law governs the Court's

47

analysis of the parties' claims.  While choice of law is typically a threshold question that must be decided prior to any investigation of the merits of the parties' claims, here the issue is dispositive.  Plaintiffs' entire case rests on whether the 2020 Notes and the Governing Documents are invalid under Venezuelan law (*see* Pl. Br. 2-3); if New York law controls, there can be no declaration in Plaintiffs' favor.  As it happens, under any analysis, it is clear that it is New York's law — not Venezuela's — that governs this action.

This action has been brought pursuant to the Court's diversity jurisdiction, *see* 28 U.S.C. § 1332(a), and therefore the Court is bound to follow the choice of law rules of the state in which it sits — in this case, New York, *see Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).[12]  In order

---

[12]     The Court is aware that there are choice of law provisions in each of the Governing Documents selecting New York law as the relevant law for any dispute regarding the Governing Documents and 2020 Notes.  (*See* Pl. Opp. 56.1 ¶¶ 180-82).  The Court is also aware of a legion of New York State court decisions concluding that "New York substantive law applies when parties include an ordinary choice-of-law provision ... in their contracts."  *IRB-Brasil Resseguros, S.A.* v. *Inepar Invs., S.A.*, 20 N.Y.3d 310, 315 (2012); *see also Ministers & Missionaries Benefit Bd.* v. *Snow*, 26 N.Y.3d 466, 474 (2015); N.Y. Gen. Oblig. Law § 5-1401(1) (allowing parties to a contract to select New York law even if the contract bears no reasonable relation to New York).  The parties dispute whether these choice of law provisions control, given that the very validity of the underlying contracts are at issue.  (*See* Pl. Br. 24).  And this Court has previously noted, in reliance on the Second Circuit's decision in *Schnabel* v. *Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012), that "there is a logical flaw inherent in following a contractual choice-of-law provision before determining whether the parties have actually formed the contract in which the choice-of-law clause appears."  *Worthington* v. *JetSmarter, Inc.*, No. 18 Civ. 12113 (KPF), 2019 WL 4933635, at *4 (S.D.N.Y. Oct. 7, 2019) (citing *Schnabel*, 697 F.3d at 119).  It is unclear, given the language in *Schnabel* and its inconsistent interpretation by other courts, whether this Court should ignore the choice of law provisions.  *Compare Edminster, Hinshaw, Russ & Assocs., Inc.* v. *Downe Twp.*, 953 F.3d 348, 351-52 (5th Cir. 2020) (citing to *Schnabel* for its decision that a choice of law provision could not control when a party's capacity to contract was at issue), *with Berkley Assurance Co.* v. *MacDonald-Miller Facility Sols., Inc.*, No. 19 Civ. 7627 (JPO), 2020 WL 1643866, at *2 (S.D.N.Y. Apr. 1, 2020) (citing to *Schnabel* in a way that indicates the case is limited to circumstances where notice and assent are at issue).  Given the imprecision regarding the limits of *Schnabel*'s language, the Court believes it best to proceed as if the choice of law provisions were not effective.  This approach makes sense because (i) even if the choice of law provisions did control, the Court would

for Plaintiffs to overcome the dispositive choice of law hurdle, they must be able to point to a New York choice of law rule that requires this Court to apply Venezuelan law to the question of whether the 2020 Notes and Governing Documents are valid and enforceable.  Plaintiffs attempt to overcome this hurdle by pointing to two different rules.  However, as will be explained, neither rule applies in this action.

### 1. Section 8-110 of the Uniform Commercial Code Does Not Apply Here

Plaintiffs argue that Section 8-110 of the Uniform Commercial Code (the "U.C.C."), which has been adopted into New York law, *see* N.Y. U.C.C. § 8-110, mandates that Venezuelan law govern the issue of validity.  (*See* Pl. Br. 25; Pl. Opp. 12-13).  At first blush, the argument makes sense.  Section 8-110 provides that "[t]he local law of the issuer's jurisdiction … governs … the validity of a security."  N.Y. U.C.C. § 8-110(a)(1).[13]  Therefore, it would seem, based on a plain reading of the provision, that Venezuelan law would govern the validity of the 2020 Notes and the Governing Documents.  However, several sources make clear that the term "validity," as used in Section 8-110, has a far narrower meaning than the common understanding of the word.

---

still need to assess the applicability of Section 8-110 of the New York Uniform Commercial Code, *see* N.Y. Gen. Oblig. Law § 5-1401(1) (providing that the statute does not apply "to the extent provided to the contrary in subsection (c) of section 1-301 of the uniform commercial code"), and (ii) as the Court will explain, either analytical path results in the application of New York law.

[13]   For the purposes of this Opinion, the Court assumes, without deciding, that Section 8-110 applies to all the constituent parts of the Governing Documents.

As an initial source, the official prefatory note to Article 8 of the U.C.C.

emphasizes:

> Article 8 is in no sense a comprehensive codification of the law governing securities or transactions in securities. Although Article 8 deals with some aspects of the rights of securities holders against issuers, most of that relationship is governed not by Article 8, but by corporation, securities, and contract law.

Prefatory Note to Article 8 at III.B (1994). Instead, Article 8

> deals with the mechanisms by which interests in securities are transferred, and the rights and duties of those who are involved in the transfer process. It does not deal with the process of entering into contracts for the transfer of securities or regulate the rights and duties of those involved in the contracting process.

*Id.* Put somewhat differently, Article 8 governs issues involving securities

intermediaries, such as brokers. *Id.* (noting that "Article 8 deals with the

settlement phase of securities transactions, and that "[t]he principal goal of the

Article 8 revision project is to provide a satisfactory framework for analysis of

the indirect holding system"). Further establishing the narrow scope of Article

8, the prefatory note makes clear that "[r]evised Article 8 is not, and should not

be, a comprehensive body of private law governing the relationship between

brokers and their customers, nor a body of regulatory law to police against

improper conduct." *Id.* Even more on point, "Article 8 does not regulate the

conduct of parties to securities transactions." *Id.* Although the prefatory note

is a general overview of Article 8 as it currently stands, it is apparent even from

comments above that Article 8 is not meant to be a substitution in any way for

general contract law. This cuts directly against any argument that "validity,"

50

within the Article 8 context, shares the broad meaning that term holds in contract law (or that Plaintiffs espouse here).  If it did, Article 8 would swallow whole any choice of law analysis involving the formation of a contract for securities.  This was plainly not the intent of the drafters of the revised U.C.C.

The New York legislators who codified the revised Article 8 into law shared the U.C.C. drafters' narrow view of the Article's scope.  They reiterated that Article 8 was intended to "govern how interests in securities are evidenced and how they are transferred in the current securities market," and that it was "not intended to constitute a comprehensive body of law governing the relationship between brokers and their customers[,] nor to be a body of regulatory law to police against improper conduct by brokers or other intermediaries."  N.Y. Bill Jacket, 1997 A.B. 6619, Ch. 566.  To the contrary, "[m]any, if not most, aspects of the relationship between brokers and customers are governed by the common law of contract and agency."  *Id.*  New York's legislators also clarified that in using the term "validity," they understood it to mean whether a security "ha[d] been issued pursuant to appropriate corporate or similar action."  *Id.*  The Bill Jacket thus also supports the argument that Article 8 has a narrow scope, and that the concept of "validity" has a concomitantly narrow scope.

Finally, this narrow scope is brought into sharp focus in the Hawkland & Rogers treatise on Section 8-110.  As the authors note, "'[v]alid' … is one of those delightful or horrendous words of which imprecise lawyers are so fond that means virtually everything and therefore virtually nothing."  7 William D.

Hawkland, *et al.*, UNIFORM COMMERCIAL CODE SERIES § 8-110:2 (2020) (hereinafter, "Hawkland").  In the Article 8 context, the term "validity" should be interpreted in accordance with U.C.C. § 8-202.  *See id.* ("[S]ection 8-202 is the principal Article 8 substantive rule to look to for guidance in applying the choice of law rule in subsection 8-110(a).").  And in discussing Section 8-202, the authors explain that "[o]bviously the concept of 'invalidity' as used in this section must have a narrower scope than one might encounter in other legal contexts, e.g., in a dispute about whether the obligation represented by the security is 'enforceable' or 'legal, valid, and binding.'"  *Id.* at § 8:202-6.

Instead, "'valid' as used in these rather elderly Article 8 substantive provisions refers to the issue that lawyers today would probably describe as whether issuance of the securities had been 'duly authorized.'"  Hawkland, *supra*, at § 8-110:2.  And although it is true that Section 8-202 contemplates a scenario where an issuer seeks to avoid payment because "the requirements of some constitutional or statutory provision concerning authorization for issuance of municipal bonds has not been satisfied," *id.*, Defendants argued persuasively at oral argument that Article 150 of the Venezuelan Constitution is *not* such a provision.  (*See* Sept. 25, 2020 Tr. 126:8-127:1, 128:20-129:7, 129:25-131:7).  That is, the types of constitutional provisions contemplated by Section 8-202 are those that specifically address the requirements for the issuance of securities, as opposed to provisions that might more generally govern contracts.  *See Am. Sec. Transfer, Inc.* v. *Pantheon Indus., Inc.*, 871 F. Supp. 400, 405 (D. Colo. 1994) (citing to Article XV, § 9 of the Colorado

Constitution, which provides that "[n]o corporation shall issue stocks or bonds, except for labor done, services performed, or money or property actually received, and all fictitious increase of stock or indebtedness shall be void"); *see also* Hawkland, *supra*, at § 8-202:6 n.4 (explaining, in reliance on an earlier draft of Article 8, that "'[v]alid' means within the issuer's power, authorized, free of fraud and duress, and in compliance with any applicable constitutional, statutory, charter[,] and other regulatory provisions governing the authorization or issue of the security").

The narrow scope of the term "validity" is best explained through a hypothetical presented in the Hawkland & Rogers treatise, which the Court will reproduce in full here:

> Suppose that Issuer, organized under the laws of State A, is issuing debt securities pursuant to an indenture under which the indenture trustee will be a bank located in State B. The indenture provides that it, and the terms of the debt obligation itself, are to be governed by the laws of State B. Suppose further that the general contract or other civil obligation law of State A includes a somewhat unusual statute or law (Law X) that renders unenforceable a certain category of promises to pay money. Law X does not deal with the procedural or other requirements for issuance of securities by municipalities or corporations organized under the laws of State A. Rather, Law X is a provision of general applicability that could apply to any promise to pay money. Suppose that the terms of the promise to pay money that is represented by the securities issued by Issuer are such that some question might be raised about its enforceability if State A's Law X applies. Suppose that State B has no statute or law equivalent to State A's Law X, so that the promise to pay money that is represented by the debt security would be fully enforceable as a matter of the contract or other civil obligation law of State B. *Section 8-110 would have no bearing on the question whether a court in State A would*

> *give effect to the provision in the indenture stating that*
> *the security was to be governed by the law of State B.*
> Although it would be possible to describe the question
> of the enforceability of the promise to pay as an issue
> about the "validity" of the issuer's obligation, this is not
> the type of issue to which subsection 8-110(a) refers
> in using the world "validity." … Accordingly, a court in
> State A should decide the choice of law issue in
> accordance with the general choice of law rules of State
> A.

Hawkland, *supra*, at § 8-110:2 (emphasis added).

The above hypothetical maps almost perfectly onto the facts of the
instant action.  The Issuer is PDVSA; State A is Venezuela; State B is New
York; and Law X is Article 150 of the Venezuelan Constitution.  Article 150
"does not deal with the procedural or other requirements for issuance of
securities by municipalities or corporations" organized under Venezuelan law.
Hawkland, *supra*, at § 8-110:2.  Instead, Article 150 requires National
Assembly approval for a broad category of contracts, and has nothing
specifically to do with the issuance of securities.  (*See* Bliss Decl., Ex. 4 at 37).
It is far more similar to a "provision of general applicability" that "renders
unenforceable a certain category of promises to pay money."  Hawkland, *supra*,
at § 8-110:2.  Thus, Section 8-110(a) should, and does, have no bearing
whatsoever on the choice of law analysis that this Court must undertake, since
Plaintiffs' claim of invalidity due to Article 150 does not fall within Article 8's
concept of "validity."  In short, Section 8-110(a) has a far narrower
understanding of "validity" than Plaintiffs' varied assertions of invalidity due to

54

illegality, or incapacity, or lack of authority, and thus it is not a relevant choice of law rule for this action.[14]

### 2.   *Themis Capital* **and Similar Cases Are Irrelevant to This Action**

As an alternative line of attack, Plaintiffs point to a line of district court cases that, they argue, stands for the proposition that New York law, in scenarios similar to the instant action, requires the application of a foreign state's law.  (*See* Pl. Br. 27; Pl. Opp. 10-11).  *Themis Capital, LLC* v. *Democratic Republic of Congo*, 881 F. Supp. 2d 508 (S.D.N.Y. 2012), provides the clearest explanation of the choice of law rule that Plaintiffs urge this Court to apply here.  In that case, the plaintiffs had brought suit against the Democratic Republic of Congo (the "DRC") and the Central Bank of the DRC for the latter's failure to make payments on a credit agreement.  *See Themis Capital,* 881 F. Supp. 2d at 513-14.  One question at issue was whether certain DRC government officials had actual authority to sign a letter that revived the defendants' obligations under the credit agreement.  *See id.* at 519.  The

---

[14]    This finding is further reinforced by the absence of any case law supporting this broad interpretation of "validity" in the Section 8-110 context.  *See In re Singh*, Bankr. No. 02 41704 (DHS), 2007 WL 2917235, at *6 (Bankr. D.N.J. Oct. 4, 2007) (relying on New Jersey's version of U.C.C. § 8-110 to determine applicable law regarding the validity of a stock certificate, where the issue was whether there was valid corporate action or authority for the certificate issuance); *Mackinder* v. *Schawk, Inc.*, No. 00 Civ. 6098 (DAB), 2005 WL 1832385, at *15 (S.D.N.Y. Aug. 2, 2005) (relying on N.Y. U.C.C. § 8-110 for the determination that Delaware law governed the issue of whether the defendant was required to issue clean stock certificates).  Neither of the above cases, which Plaintiffs rely on (*see* Pl. Opp. 13-14), has anything to do with the more general idea of "validity."

defendants argued that the court had to apply the law of the DRC in determining the issue of actual authority.  *See id.* at 520.

In response, the *Themis Capital* court explained that "[w]here a commercial transaction is with a foreign state and that state is found to have the most significant relationship to the transaction, 'New York law must look to the law of the foreign state to determine the actual authority of an agent of the state's government.'"  881 F. Supp. 2d at 521 (internal brackets omitted) (quoting *Republic of Benin* v. *Mezei*, No. 06 Civ. 870 (JGK), 2010 WL 3564270, at *6 (S.D.N.Y. Sept. 9, 2010)).  The court further stated that "[a]pplying this principle, courts in this district have consistently applied the laws of foreign states to evaluate claims of actual authority."  *Id.* (collecting similar cases). The court then found that the DRC had "the most significant relationship with the transaction at issue" because the "plaintiffs' claims, if successful, [would] expose the DRC and its instrumentalities to up to $80 million in liabilities."  *Id.*

*Themis Capital* is not an isolated case.  Beyond the analogous cases on which *Themis Capital* itself relies, sister courts in this District have similarly found that New York law points to the application of a foreign state's law when the actual authority of that foreign state's agent is in question.  *See Exp.-Im. Bank of China* v. *Cent. Bank of Liberia*, No. 15 Civ. 9565 (ALC), 2017 WL 1378271, at *3 (S.D.N.Y. Apr. 12, 2017) (explaining, in reliance on *Themis Capital*, that where there is a commercial transaction with a foreign state and that state has the most significant relationship to the transaction, New York law turns to the law of the foreign state for the question of actual authority),

*vacated on other grounds*, 2018 WL 1871436 (S.D.N.Y. Feb. 6, 2018); *1964 Realty LLC* v. *Consulate of Qatar*, No. 14 Civ. 6429 (ER), 2015 WL 5197327, at *6 (S.D.N.Y. Sept. 4, 2015) (same).  *But see Wasserstein Perella Emerging Mkts. Fin., L.P.* v. *Province of Formosa*, No. 97 Civ. 793 (BSJ), 2002 WL 1453831, at *12 (S.D.N.Y. July 2, 2002) (forgoing complete choice of law analysis for issue of actual authority of foreign state's agent, but explaining in the alternative that such an analysis would require a "center of gravity" or "grouping of contacts" analysis under New York law).

There are three things that link *Themis Capital*, the cases on which *Themis Capital* relies, and the three cases cited in the preceding paragraph. *First*, almost all of the cases arise in the context of, and involve in some way, the Foreign Sovereign Immunities Act (the "FSIA").  *See Exp.-Imp. Bank of China*, 2017 WL 1378271, at *2 (noting that the FSIA is at issue); *1964 Realty LLC*, 2015 WL 5197327, at *5 (same); *Themis Capital*, 881 F. Supp. 2d at 515-16 (same); *Skanga Energy & Marine Ltd.* v. *Arevenca S.A.*, 875 F. Supp. 2d 264, 268 (S.D.N.Y. 2012) (same); *Wasserstein Perella*, 2002 WL 1453831, at *7 (same); *Anglo-Iberia Underwriting Mgmt. Co.* v. *PT Jamostek*, No. 97 Civ. 5116 (HB), 1998 WL 289711, at *2 (S.D.N.Y. June 4, 1998) (same); *Storr* v. *Nat'l Defence Sec. Council of Indon.-Jakarta*, No. 95 Civ. 9663 (AGS), 1997 WL 633405, at *2 (S.D.N.Y. Oct. 14, 1997) (same).

*Second*, and related to the first point, the foreign party in all of the cases is either a foreign state itself or an entity that has been found to be an instrumentality, for FSIA purposes, of the foreign state.  *See Exp.-Imp. Bank of*

*China*, 2017 WL 1378271, at *1 (noting that defendant is the Central Bank of Liberia); *1964 Realty LLC*, 2015 WL 5197327, at *5 (noting that defendant is the state of Qatar); *Themis Capital*, 881 F. Supp. 2d at 512 (noting that defendants are the DRC and the Central Bank of the DRC); *Skanga Energy*, 875 F. Supp. 2d at 269 (noting that defendant "PDVSA is a foreign sovereign for FSIA purposes"); *Wasserstein Perella*, 2002 WL 1453831, at *7 (noting that defendant, as a political subdivision of Argentina, was a foreign state for FSIA purposes); *Anglo-Iberia Underwriting*, 1998 WL 289711, at *2, 4 (noting that defendants are Indonesia and a corporation wholly owned by Indonesia and found to be a foreign sovereign for FSIA purposes); *Storr*, 1997 WL 633405, at *1 (noting that defendant was an agency or instrumentality of Indonesia).

 *Third*, all of the cases dealt with the issue of whether a government agent had actual authority in regards to a particular transaction. *See Exp.-Imp. Bank of China*, 2017 WL 1378271, at *3 (addressing whether National Bank of Liberia or its agent had actual authority to enter into agreement); *1964 Realty LLC*, 2015 WL 5197327, at *6 (addressing whether Qatari consul general had actual authority to enter into contract); *Themis Capital*, 881 F. Supp. 2d at 520 (addressing whether government agents had actual authority to sign letter); *Skanga Energy*, 875 F. Supp. 2d at 269 (addressing issue of whether one defendant was the agent of the other); *Wasserstein Perella*, 2002 WL 1453831, at *12 (discussing potential lack of actual authority as issue); *Anglo-Iberia Underwriting*, 1998 WL 289711, at *3, 4 (addressing whether there was actual

authority); *Storr*, 1997 WL 633405, at *2 (addressing whether signatories to notes had actual authority).[15]

What links these cases together is what distinguishes them from the instant action. *First*, the FSIA is decidedly not at issue in this action. This immediately puts the instant action in a different framework from *Themis Capital* and its related cases. *Second*, although it may be that PDVSA in other contexts has been found to be an instrumentality of Venezuela, *see Skanga Energy*, 875 F. Supp. 2d at 269, here the parties have not argued that PDVSA is a foreign sovereign or an instrumentality of a foreign sovereign.

*Third*, and most importantly, actual authority is not at issue in this action. Although Plaintiffs have characterized their theory of the case in multifarious ways throughout the course of this litigation (*see* Pl. Br. 26-27 (characterizing PDVSA's prior acts as having been done without authority); Pl. Opp. 14-17 (characterizing PDVSA's prior acts as illegal); Sept. 25, 2020 Tr. 23:12-16 (arguing that the 2020 Notes and Governing Documents are void because PDVSA lacked capacity to contract)), it is obvious that authority is an inappropriate framework for this action. Actual authority deals with the relationship between a principal and its agent, *see Dinaco, Inc.* v. *Time Warner,*

---

[15]    Notably, of the above cases that ended up applying a foreign state's law, none of them engaged in a traditional multifactor "grouping of contacts" analysis. *Compare, e.g., Themis Capital, LLC* v. *Democratic Republic of Congo*, 881 F. Supp. 2d 508, 521 (S.D.N.Y. 2012) (finding that the DRC had the most significant relationship merely because "plaintiffs' claims, if successful, [would] expose the DRC and its instrumentalities to up to $80 million in liabilities"), *with Wasserstein Perella Emerging Mkts. Fin., L.P.* v. *Province of Formosa*, No. 97 Civ. 793 (BSJ), 2002 WL 1453831, at *12 (S.D.N.Y. July 2, 2002) (engaging, in the alternative, in a "grouping of contacts" analysis and finding that the multifactor test pointed to the application of New York law).

*Inc.*, 364 F.3d 64, 68 (2d Cir. 2003) ("Actual authority 'is the power of the agent to do an act or to conduct a transaction on account of the principal.'" (quoting *Minskoff* v. *Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996))), and the National Assembly is not the principal of any of the Plaintiffs in this action.  Although it is not a direct fit to the instant action, the Second Circuit has noted, in the context of federal government contractors, that there is evidence of an agency relationship "if the Government enjoys the power to control the detailed physical performance of the contractor, or if the Government in fact supervises the day-to-day operations." *B & A Marine Co., Inc.* v. *Am. Foreign Shipping Co., Inc.*, 23 F.3d 709, 713 (2d Cir. 1994) (internal citations and quotation marks omitted).  There is no evidence in the record before this Court that the National Assembly has such a relationship with PDVSA and its subsidiaries.  And given that actual authority is not at issue in this action, it is irrelevant that New York law looks to a foreign state's law to determine the actual authority of that foreign state's agent.  *See Themis Capital*, 881 F. Supp. 2d at 521.  As with U.C.C. § 8-110, the choice of law rule provided in *Themis Capital* has no bearing on this Court's analysis.

### 3. No Other New York Choice of Law Rule Points to Venezuelan Law

Although the Court has now addressed, and cast aside, the two choice of law rules that Plaintiffs asserted required the application of Venezuelan law, there is one other potentially relevant choice of law rule that the Court addresses for the sake of completeness.  As sister courts in this District have noted, New York law will not simply ignore a violation of foreign law.  "In cases

alleging a violation of foreign law, the existence of illegality is to be determined by the local law of the jurisdiction where the illegal act is done, while the effect of illegality upon the contractual relationship is to be determined by the law of the jurisdiction which is selected under conflicts analysis." *Korea Life Ins. Co., Ltd.* v. *Morgan Guar. Tr. Co. of N.Y.*, 269 F. Supp. 2d 424, 438 (S.D.N.Y. 2003); *see also Lehman Bros. Commercial Corp.* v. *Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 138 (S.D.N.Y. 2000) ("A contract that is illegal in its place of performance is unenforceable in New York if the parties entered into the contract with a view to violate the laws of that other jurisdiction.").

Under this choice of law rule, if the place of performance for the 2020 Notes and Governing Documents is Venezuela, then Venezuelan law would at least be relevant for determining whether there was illegality in the execution of those contracts. But since it is New York, and not Venezuela, that is the place of performance, this rule is of no use to Plaintiffs. Under the 2020 Notes and Governing Documents, all principal and interest payments are required to be made in U.S. dollars in New York, New York. (*See* Bliss Decl., Ex. 10 at 32). Moreover, multiple principal and interest payments were so made. (*See* Pl. Opp. 56.1 ¶¶ 214, 216). This is enough to indicate that New York, not Venezuela, is the place of performance for the 2020 Notes and the Governing Documents. *See Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 619 (1992) (determining that "New York was the place of performance for Argentina's ultimate contractual obligations" because New York was designated

61

as the place of payment and Argentina made some interest payments there); *MMA Consultants 1, Inc.* v. *Republic of Peru*, 719 F. App'x 47, 54 (2d Cir. 2017) (summary order) (finding that intended place of performance was United States because bonds indicated that "both principal and interest [are] to be paid in United States Gold Coin … in New York").  Given that New York is the relevant place of performance, the above referenced choice of law rule points, if anywhere, to New York law controlling this dispute in its entirety.

### 4.    A "Grouping of Contacts" Analysis Results in the Application of New York Law

In lieu of any more specific choice of law rule, the Court applies New York's "'center of gravity' or 'grouping of contacts' analysis to determine which State has the most substantial relationship to the transaction and to the parties." *Tayyib Bosque, Corp.* v. *Emily Realty, LLC*, 813 F. App'x 628, 629 (2d Cir. 2020) (summary order) (citing *Zurich Ins. Co.* v. *Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994)).  That analysis requires the Court to consider (i) the places of contracting, negotiation, and performance; (ii) the location of the subject matter of the contract; and (iii) the domicile or place of business of the contracting parties.  *See Zurich Ins. Co.*, 84 N.Y.2d at 317; *Integon Ins. Co.* v. *Garcia*, 721 N.Y.S.2d 660, 661 (2d Dep't 2001); *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 227 (1993).  "The places of contracting and performance are given the heaviest weight in the analysis."  *U.S. Fidelity & Guar. Co.* v. *Petroleo Brasileiro S.A. – Petrobras*, No. 98 Civ. 3099 (THK), 2005 WL 289575, at *16 (S.D.N.Y. Feb. 4, 2005).  "Additionally, with regard to the law governing financial transactions arranged in New York, New York has

emphasized the state's role as an international financial center." *Fieger* v. *Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (citing *Intercontinental Planning, Ltd.* v. *Daystrom, Inc.*, 24 N.Y.2d 372, 383-84 (1969)).

Based on the above factors and the Court's examination of the record before it, it is clear that New York is the center of gravity for the 2020 Notes and the Governing Documents. The contracting and negotiation of the Exchange Offer and Notes issuance took place almost entirely in New York. (*See* Pl. Opp. 56.1 ¶¶ 132, 134, 136, 138-39, 141-46, 150, 157-63 (showing that PDVSA and PDVSA Petróleo engaged Credit Suisse in New York as PDVSA's financial advisor on the Exchange Offer; that Credit Suisse's Latin America team is based entirely in New York; that all of Michael Cummings's — the head of Credit Suisse's Latin America team — in-person meetings with PDVSA regarding the Exchange Offer and the Governing Documents occurred in New York; that Credit Suisse, PDVSA, and PDVSA Petróleo all engaged law firms that worked primarily out of New York; that D.F. King, the exchange agent and information agent for the Exchange Offer, was based in New York; that Defendants engaged law firms that were based in New York; that PDVSA representatives met with representatives of Law Debenture Trust Company of New York in New York to discuss details of the Exchange Offer; and that the signature pages for the Governing Documents were exchanged in New York)). The place of performance, as already discussed, was also in New York. *See supra* at 61. Additionally, the location of the subject matter of the Governing Documents — whether it be the 2020 Notes, the debt,

or the collateral — is New York.  (*See* Pl. Opp. 56.1 ¶¶ 176, 189 (showing that the 2020 Notes were deposited in New York and the collateral is in a vault in New York); Bliss Decl., Ex. 10 at 32 (showing that the principal and interest payments are to be paid in New York)).

The only connection the 2020 Notes and Governing Documents have to Venezuela is that two of the Plaintiffs — PDVSA and PDVSA Petróleo — are domiciled in Venezuela.  (*See* Pl. Opp. 56.1 ¶¶ 3-4, 13-14).  This fact, however, exists in equipoise with the fact that Defendants are either located in New York or do business in New York.  (*See id.* at ¶ 32; Def. Opp. 56.1 ¶ 19).  The choice of law analysis therefore overwhelmingly favors the application of New York law to this dispute.  And while it is true that "[t]heoretically, in a proper case, a foreign State's sufficiently compelling public policy could preclude an application of New York law otherwise indicated by the grouping of contacts analysis, particularly where New York's policy is weak or uncertain," *Zurich Ins. Co.*, 84 N.Y.2d at 319, New York's policy here is far from weak or uncertain. New York "is a financial capital of the world, serving as an international clearinghouse and market place for a plethora of international transactions." *J. Zeevi & Sons, Ltd.* v. *Grindlays Bank (Uganda) Ltd.*, 37 N.Y.2d 220, 227 (1975).  "In order to maintain [New York's] preeminent financial position," the New York Court of Appeals has held that when parties to a financial transaction have made New York the locus of the transaction, "it is important that the justified expectations of the parties to the contract be protected."  *Id.* Thus, while it may be that Venezuela has an interest in the 2020 Notes and

Governing Documents as a matter of public policy, that interest is not strong enough to displace both the center of gravity of the transactions at issue and New York's strong public policy.  New York law is the applicable law for this action.

## D.    **Final Thoughts**

The Court acknowledges that its finding that New York law governs this action has several significant consequences.  *First*, given that Plaintiffs' claim for declaratory relief rises and falls on whether the 2020 Notes and Governing Documents were issued and formed in contravention of the Venezuelan Constitution, the application of New York law to the exclusion of Venezuelan law vitiates their claim.  Plaintiffs have not asserted, and the Court has not identified, any infirmity grounded in New York law in the 2020 Notes and Governing Documents.  Given the lack of any such infirmity, Defendants are entitled to summary judgment on most of their Counterclaims.

*Second,* despite the excellent briefing and analysis from the parties and their respective experts on the intricacies of Venezuelan law, the Court has determined not to address these intricacies in this Opinion.  As found above, Venezuelan law is ultimately irrelevant to this action, and while there is no jurisdictional bar to the Court proceeding to a discussion of Venezuelan law, the Court is reluctant to interpret another nation's law when such interpretation is not necessary.  This is especially so given that the foreign law at issue is a constitution, as opposed to a mere statute.

*Third*, because Defendants are entitled to summary judgment on their breach of contract counterclaims — there is indisputably a contract, adequate performance of that contract, breach, and damages, *see RNC Telecom Servs., Inc.* v. *202 Centre Street Realty LLC*, 156 F. App'x 349, 350-51 (2d Cir. 2005) (summary order) — the Court cannot grant Defendants summary judgment on their unjust enrichment and *quantum meruit* counterclaims, *see Palatkevich* v. *Choupak*, 152 F. Supp. 3d 201, 222 (S.D.N.Y. 2016) ("A plaintiff 'cannot ultimately recover on both his quasi-contract claim and his breach of contract claim.'" (quoting *Antares Mgmt. LLC* v. *Galt Glob. Capital, Inc.*, No. 12 Civ. 6075 (TPG), 2013 WL 1209799, at *12 (S.D.N.Y. Mar. 22, 2013))).

*Fourth*, and related to the above, because the Court will grant those Counterclaims referenced in Defendants' motion for summary judgment,[16] deny any claim by Defendants to relief based on unjust enrichment or *quantum meruit*, and deny Plaintiff's cross-motion for summary judgment, there are no claims at issue that require the Court to determine whether Defendants could have reasonably relied on Plaintiffs' past statements regarding the Exchange Offer and 2020 Notes.  Since such reasonable reliance is the sole basis for the relevance of Mr. Hinman's expert testimony (*see* Pl. Daubert Opp. 1-2 (explaining that Mr. Hinman's testimony is relevant because "Defendants have

---

[16]    Specifically, the Court grants Defendants summary judgment on Counterclaims 1-5, which seek declaratory judgments on the enforceability of the Governing Documents and the fact that events of default have occurred; on Counterclaims 6-7, which sound in breach of contract; on Counterclaim 11, which similarly is for breach of contract, as well as indemnification of fees, costs, and expenses; and denies summary judgment on Counterclaim 12, which is for *quantum meruit*.  (*See* Dkt. #40, 81)

put their purported reliance squarely at issue by raising affirmative defenses and counterclaims that require a showing of reasonable reliance to succeed," and because his testimony "goes to the heart of the unjust enrichment counterclaim")), Mr. Hinman's opinions now have no relevance to this action. Therefore, the Court will grant Defendants' motion to exclude Mr. Hinman's testimony. *See Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (explaining that Federal Rule of Evidence 702 requires that expert testimony be relevant to the issues in the case).

In summary, Defendants' motion for summary judgment is granted as stated herein due to the indisputable validity of the 2020 Notes and Governing Documents under New York law, which is the governing law for this action. Plaintiffs' motion for summary judgment, in turn, is denied in full, since both the act of state doctrine and Venezuelan law are inapplicable to this action. Finally, Defendants' motion to exclude the testimony of Mr. Hinman is granted due to that testimony's irrelevance to the dispositive issues in this action.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART as set forth herein, and Plaintiffs' cross-motion for summary judgment is DENIED. Defendants' motion to exclude the expert testimony and reports of Mr. David Hinman is GRANTED. The Court declares that the 2020 Notes and the Governing Documents are valid and enforceable; that a default has occurred under the terms of the Indenture; that Defendants are permitted to exercise the remedies for default

set forth in the Indenture and the Pledge Agreement; that MUFG, as trustee, is entitled to direct GLAS to sell the collateral securing the 2020 Notes; and that GLAS is entitled to so sell.  In regard to Defendants' breach of contract claims, the Court ORDERS that MUFG is entitled to judgment in the amount of $1,683,764,500, as well as all accrued and unpaid interest, including pre-judgment interest.  Moreover, the Court finds that PDVSA and PDVSA Petróleo are liable for fees, disbursements, and expenses, including reasonable attorneys' fees, in an amount to be determined.

The Court ORDERS that Plaintiffs' claims are hereby dismissed with prejudice.

The Court ORDERS that Defendants submit to the Court within 45 days of this Opinion a motion for fees and expenses, along with supporting documentation for said motion.  At or before that time, Defendants shall also submit a proposed judgment providing an accurate calculation of accrued and unpaid interest, including any prejudgment interest.

The Clerk of Court is directed to terminate the motions at docket entries 81, 91, and 101.

SO ORDERED.

Dated:   October 16, 2020
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

68