# Exhibit 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OI EUROPEAN GROUP B.V., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Misc. No. 19-290-LPS |
| NORTHROP GRUMMAN SHIP SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, <br><br> Defendant. | Misc. No. 20-257-LPS |
| ACL1 INVESTMENTS LTD., ACL2 INVESTMENTS LTD., and LDO (CAYMAN) XVIII LTD., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Misc. No. 21-46-LPS |
| RUSORO MINING LIMITED, <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Misc. No. 21-481-LPS |

Jody Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, DE

Jonathan M. Albano, Christopher L. Carter, P. Sabin Willett, MORGAN, LEWIS & BOCKIUS LLP, Boston, MA

Edward H. Davis, Jr., Fernando J. Menendez, Cristina Vicens Beard, SEQUOR LAW, P.A., Miami, FL

    Attorneys for OI European Group B.V.


Laura Davis Jones, Peter James Keane, PACHULSKI, STANG, ZIEHL & JONES, LLP, Wilmington, DE

Alexander A. Yanos, Carlos Ramos-Mrosovsky, Rajat Rana, Robert H. Poole, II, ALSTON & BIRD LLP, New York, NY

    Attorneys for Northrop Grumman Ship Systems, Inc.


Marie McManus Degnan, ASHBY & GEDDES, Wilmington, DE

Joshua S. Bolian, Keane A. Barger, RILEY WARNOCK & JACOBSON, PLC, Nashville, TN

    Attorneys for ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd.


R. Craig Martin, DLA PIPER LLP, Wilmington, DE

James E. Berger, Charlene C. Sun, Joshua S. Wan, Katherine A. Ibarra, Tamara Hilmi, Charlotte M. Westbrook, DLA PIPER LLP, New York, NY

    Attorneys for Rusoro Mining Ltd.

A. Thompson Bayliss and Stephen C. Childs, ABRAMS & BAYLISS LLP, Wilmington, DE

Sergio J. Galvis , Joseph E. Neuhaus, James L. Bromley, SULLIVAN & CROMWELL LLP, New York, NY

Angela N. Ellis, SULLIVAN & CROMWELL LLP, Washington, DC

     Attorneys for Bolivarian Republic of Venezuela


Samuel Taylor Hirzel, II, Jamie Lynne Brown, Aaron M. Nelson, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE

Joseph D. Pizzurro, Kevin A. Meehan, Juan O. Perla, CURTIS, MALLET-PREVOST, COLT & MOSLE LLP, New York, NY

     Attorneys for Petróleos de Venezuela, S.A.

**OPINION**

March 23, 2023
Wilmington, Delaware

**STARK, U.S. Circuit Judge:**

## INTRODUCTION

The Court has before it multiple judgment creditors of the Bolivarian Republic of

Venezuela ("Venezuela" or "Republic") who are seeking to collect on their judgments through

property Venezuela holds in this District. Specifically, Venezuela is the 100% owner of

Petróleos de Venezuela, S.A. ("PDVSA"), which in turn owns 100% of PDV Holding, Inc.

("PDVH"), which itself owns 100% of CITGO Holding, Inc., which in turn owns CITGO

Petroleum Corp. ("CITGO").

In this Opinion, the Court addresses motions for a writ of attachment *fieri facias* filed by

four judgment creditors of Venezuela. OI European Group B.V. ("OIEG") and Northrop

Grumman Ship Systems, Inc. (now known as Huntington Ingalls Inc.) ("Huntington") filed

motions that are fully briefed and opposed by one or more of Venezuela, PDVSA, PDVH, and/or

CITGO (collectively, hereinafter the "Venezuela Parties").[1] The Court conducted an evidentiary

hearing in connection with OIEG's and Huntington's motions, via remote videoconferencing

technology, on April 30, 2021. (*See* Misc. No. 19-290 ("*OIEG* Action") D.I. 92; Misc. No. 20-

---

[1] *See, e.g.*, Misc. No. 19-290 D.I. 2-6, 11-12, 14-15, 18, 20, 21, 23, 25, 27-30, 33, 36, 39-40, 44, 46, 48-52, 57, 64-70, 73-74, 77-82, 86-87, 90, 93, 95-107, 111-13, 115, 117, 119, 121-26; Misc. No. 20-257 D.I. 3-6, 12, 14, 16, 19, 22, 25-29, 31-40, 42, 45-46, 48-49, 51-54, 56, 60-61, 63-65, 67, 69, 71-74.

The Republic of Venezuela has entered an appearance only in one of the four actions under consideration in this Opinion (the *OIEG* Action, *see* Misc. No. 19-290 D.I. 32). PDVSA has intervened in all four actions and has supplied the bulk of the briefing and evidence in opposition to the creditors' motions. For simplicity, the Court refers to all of the Republic, PDVSA, PDVH, and the CITGO entities collectively as the "Venezuela Parties," although it should be understood that: (i) in reality, almost always what the Court attributes to the "Venezuela Parties" is only explicitly advocated by PDVSA; and (ii) the Court's stylistic convention has no impact on its substantive decision (i.e., that PDVSA is the alter ego of Venezuela, a decision grounded in the evidence).

257 ("*Huntington* Action") D.I. 47; *see also OIEG* Action D.I. 92 (April 30, 2021 hearing transcript))

The Court is also addressing similar motions filed by two additional judgment creditors: ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (collectively, "ACL") and Rusoro Mining Ltd. ("Rusoro"). ACL's and Rusoro's motions are opposed by PDVSA and are fully briefed.[2]

To prevail on their motions, the creditors must prove that, at the pertinent time, PDVSA was and/or is the alter ego of Venezuela. The Court granted a similar motion in August 2018. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 333 F. Supp. 3d 380, 412 (D. Del. 2018) ("*Crystallex I*"), *aff'd*, 932 F.3d 126 (3d Cir. 2019) ("*Crystallex II*"). In a (still-pending) case filed by Crystallex International, Inc. ("Crystallex"), the Court found that as of August 2018 PDVSA was the alter ego of Venezuela, and issued and served a writ of attachment on PDVSA's shares of PDVH. After that date, developments in Venezuela and the United States complicated the situation. In particular, U.S. sanctions on transactions involving Venezuelan property were expanded and the U.S. government recognized Juan Guaidó, the leader of the Republic's National Assembly, as the legitimate head of the Venezuelan government, instead of Nicolás Maduro, who holds the title of President of the Republic.

OIEG and Huntington come to this Court with overlapping but distinct theories as to how PDVSA remains Venezuela's alter ego. OIEG emphasizes the Guaidó government's ("Guaidó Government") direction and control over PDVSA's operations in the United States. As an alternative, OIEG argues that the Maduro regime's ("Maduro Regime") control on the ground in

---

[2] *See, e.g.*, Misc. No. 21-46 ("*ACL* Action") D.I. 2-8, 15-18, 20-32, 35, 37-38, 41-42, 44, 46, 49-52; Misc. No. 21-481 ("*Rusoro* Action") D.I. 2-5, 8, 10, 14, 16-19, 21-22, 24-26, 28, 30, 32-39.

Venezuela, including its control over PDVSA's operations there, is an independent and adequate basis for deeming PDVSA the Republic's alter ego. For its part, Huntington also focuses on the Guaidó government, but also addresses the situation on the ground in Venezuela. Creditors ACL and Rusoro similarly rely on both the actions of the Maduro Regime and the Guaidó Government.

Having considered the evidence and arguments, and for the reasons set out in this Opinion, the Court has decided to grant the motions. The moving parties have proven, by a preponderance of the evidence, that PDVSA has been and is the alter ego of Venezuela, at all pertinent times, including from August 2018 through at least October 13, 2022. The record before the Court establishes that the Guaidó Government exercises direction and control over PDVSA in the United States while the Maduro Regime exercises direction and control over PDVSA inside Venezuela. Accordingly, the Court will grant the motions and confer with the parties as to the next steps it should take.

This Opinion proceeds as follows. First, the Court makes findings of fact based on the extensive record created by the parties, principally at and in connection with the April 2021 hearing. These include findings about the relationship between the recognized Guaidó Government and PDVSA in the U.S. and the relationship between the non-recognized Maduro Regime and PDVSA inside Venezuela. The bulk of these findings are entered only with respect to OIEG and Huntington, the creditors who participated in the April 2021 hearing and who expressly agreed that evidence admitted in either of these actions would be part of the record in both actions. After setting out the Court's findings, the Court applies alter-ego law and concludes that the moving parties have proven that PDVSA is the alter ego of Venezuela, both in the U.S. and in Venezuela, at all pertinent times. The Court also separately addresses the

3

motions of ACL and Rusoro, based on the records made in these creditors' respective actions. Finally, the Court addresses various legal arguments the Venezuela Parties make in opposition to the Court's conclusions, determining that none has merit.

**I.    The Evidentiary Record**

1.      OIEG moved into evidence Exhibits 1-148 of the joint exhibit list submitted by OIEG (*OIEG* Action D.I. 87) and Huntington (*Huntington* Action D.I. 42). (*See, e.g.*, *Huntington* Action D.I. 47 ("April 2021 Tr.") at 152-53)

2.      Without objection (*see id.* at 42-45), the Court admitted all of this evidence. (*See* April 2021 Tr. 42-45, at 152-53)

3.      The Court recognizes that certain of the admitted evidence is hearsay and it has factored that characteristic into the probative weight it has given such evidence.

4.      The record in the *Huntington* Action and the *OIEG* Action are identical.

5.      The record in the *ACL* Action differs from the joint record created in the *OIEG* and *Huntington* Actions and differs from that created in the *Rusoro* Action.

6.      The record in the *Rusoro* Action differs from the joint record created in the *Huntington* and *OIEG* Actions and differs from that created in the *ACL* Action. Also, the Court did not address the *Rusoro* Action in its March 2, 2022 opinion (*see OIEG* Action D.I. 109) and that opinion was not docketed in the *Rusoro* Action. Because many of the issues disputed by Rusoro and the Venezuela Parties are materially identical (including the arguments made by both sides) to those addressed by the Court in its March 2, 2022 opinion – which considered the *OIEG*, *Huntington*, and *ACL* Actions – and because the Court's view on these common issues has not changed, the Court hereby adopts and incorporates by reference its March 2, 2022 Opinion (i.e., *OIEG* Action D.I. 109) and particularly its conclusions as to ripeness and the impact of U.S. sanctions on these ongoing proceedings (*see id.* at 9-18).

4

7.     Unless otherwise noted, the Court's findings of fact pertain to all four creditors' actions.

8.     The Court makes additional findings of fact in the *ACL* Action in Discussion Parts III & VI and makes additional findings of fact in the *Rusoro* Action in Discussion Parts IV & VII.

## II.    Background

### A.    Venezuela And Its State-Run Oil Company

9.     Venezuela is home to the "largest proven oil reserves in the world." *Jiménez v. Palacios*, 250 A.3d 814, 822 (Del. Ch. 2019).[3]

10.    "[T]he Venezuelan constitution . . . endows the [Republic] with significant control over PDVSA and the oil industry in the country." *Crystallex II*, 932 F.3d at 147.

11.    PDVSA was formed as the state oil concern in 1975, pursuant to Venezuela's Nationalization Law. (*OIEG* Action D.I. 50 (February 19, 2021 Declaration of Christopher L. Carter) ("Second Carter Decl.") Exs. 4, 5, 11 ¶ 12; *ACL* Action D.I. 4-7 (November 22, 2021 Declaration of Keane A. Barger) ("Barger Decl.") Ex. 48 ¶¶ 8-14; *Rusoro* Action D.I. 3 (Feb. 9, 2022 Declaration of Charlene C. Sun) ("Sun Decl.") Exs. 8, 9, 10 ¶¶ 8-14)

12.    PDVSA's incorporation in 1975 was as a sociedad anónima intended to have its own legal personality distinct from its sole shareholder, the Bolivarian Republic of Venezuela. (*OIEG* Action D.I. 66 (April 2, 2021 Declaration of Allan R. Brewer-Carías) ("Brewer-Carías Decl.") ¶¶ 20-22; Barger Decl. Ex. 55 ¶ 4; Sun Decl. Ex. 14 ¶ 4)

---

[3] In *Jiménez*, Chancellor McCormack of the Delaware Court of Chancery determined that the Ad Hoc Board of Directors of PDVSA ("Ad Hoc Board" or "Ad Hoc PDVSA") appointed by the Guaidó government constituted the legitimate board, in the view of the United States, and, therefore, our nation's courts. *See Jiménez*, 250 A.3d at 820. In this Opinion, the Court is taking judicial notice of facts found by the Chancellor; all of the facts for which *Jimenez* is cited are undisputed in the instant actions.

5

13. Until approximately 2003, PDVSA operated as an independent economically-driven company, without political interference from Venezuela. (Brewer-Carías Decl. ¶¶ 3, 23; *see also Crystallex I*, 333 F. Supp. 3d at 412 (discussing Declaration of Dr. Roberto Rigobon submitted by Crystallex))

14. "PDVSA's Articles of Incorporation require that it adhere to policies established by the National Executive." *Crystallex I*, 333 F. Supp. 3d at 408.

15. Pursuant to its bylaws, "PDVSA plans, coordinates and controls the exploration, exploitation, transportation, manufacturing, refining, storage, commercialization, and other activities of its subsidiaries regarding crude oil and other hydrocarbons both in the territory of the Republic and abroad." (Second Carter Decl. Ex. 12 ¶ 5; Barger Decl. Ex. 55 ¶ 5; Sun Decl. Ex. 14 ¶ 5)

16. PDVSA is, thus, a state-owned and state-controlled commercial enterprise directed to "comply with and implement the policy on hydrocarbons enacted by the National Executive Branch." (Second Carter Decl. Exs. 6, 7, 11 ¶ 14; Barger Decl. Ex. 48 ¶ 12; Sun Decl. Exs. 11, 10 ¶ 12)

17. PDVSA owns 100% of the shares of PDV Holding, Inc., a Delaware corporation, which in turn owns 100% of the shares of CITGO Holding, Inc., also a Delaware corporation. *See Jiménez*, 250 A.3d at 822.

18. CITGO Holding, Inc. owns 100% of the shares of CITGO Petroleum Corporation ("CITGO Petroleum"), a Delaware corporation headquartered in Texas. *See Jiménez*, 250 A.3d at 822.

19. The PDVH shares, whether controlled by the board appointed by the Maduro Regime or the Ad Hoc Board appointed by the Guaidó Government, are used for a commercial

purpose because, through them, PDVSA manages its ownership of PDVH. *See Crystallex I*, 333 F. Supp. 3d at 417-18.

**B. OI European Group B.V.[4]**

20. Judgment creditor OI European Group B.V. is a Netherlands-incorporated company and is an indirect, wholly-owned subsidiary of O-I Glass, Inc., a Delaware corporation headquartered in Perrysburg, Ohio. (*OIEG* Action D.I. 121 ¶ 1)

21. OIEG holds a judgment entered on an arbitral award against the Republic. The underlying dispute between OIEG and Venezuela arises out of the expropriation, by the regime of former President Hugo Chávez, of the assets of OIEG's Venezuelan subsidiaries, which manufactured glass containers for food companies in Venezuela. (*Id.* D.I. 67 (April 2, 2021 Declaration of Kevin A. Meehan) ("Meehan Decl.") Ex. 1 ¶¶ 86-88, 108) Those assets were transferred to Venezuela's Ministry of Science, Technology and Intermediate Industries ("Ministry of Science"). (Meehan Decl. ¶¶ 111-13) The expropriated assets were eventually transferred to Venezolana del Vidrio, C.A., a company owned by the Ministry of Science. (Meehan Decl. ¶ 90)

22. After OIEG's assets were confiscated in 2010, OIEG commenced arbitration proceedings against Venezuela with the International Centre for Settlement of Investment Disputes ("ICSID") on September 7, 2011. (Second Carter Decl. Ex. 3 at 1)

23. The ICSID tribunal issued an award (the "OIEG Award") on March 10, 2015, finding that Venezuela expropriated OIEG's interests and was required to pay OIEG $372,461,982 for the expropriation and $5,750,000 in costs and expenses, plus interest. (Second Carter Decl. Ex. 3 at 1)

---

[4] The findings of fact in this subsection only apply in the *OIEG* Action.

7

24.     Venezuela sought annulment of the OIEG Award.  On December 6, 2018, the
ICSID annulment panel reaffirmed the OIEG Award and awarded OIEG additional damages.
(Second Carter Decl. Ex. 3 at 1)

25.     On May 21, 2019, the United States District Court for the District of Columbia
(the "DC Court") granted OIEG's motion for summary judgment, confirming the OIEG Award.
The DC Court entered judgment in favor of OIEG, consisting of:

    a.      $372,461,982 in principal amount, plus interest from October 26, 2010
through May 21, 2019, calculated at a LIBOR interest rate for one-year deposits in U.S. dollars,
plus a margin of 4%, with annual compounding of accrued interest;

    b.      $5,750,000 in costs and expenses relating to the original arbitration
proceeding, plus interest from March 10, 2015 through May 21, 2019, calculated at a LIBOR
interest rate for one-year deposits in U.S. dollars, plus a margin of 4%, with annual compounding
of accrued interest;

    c.      $3,864,811.05 in costs and expenses relating to the annulment proceeding,
plus interest from December 6, 2018 through May 21, 2019, calculated at a LIBOR interest rate
for one-year deposits in U.S. dollars, plus a margin of 4%, with annual compounding of accrued
interest; and

    d.      Post-judgment interest on the total amount, calculated at the rate set forth
in 28 U.S.C. § 1961, from May 21, 2019 until full payment.  (Second Carter Decl. Exs. 1, 2)

26.     On November 1, 2019, the DC Court granted OIEG's motion for relief pursuant
to 28 U.S.C. §§ 1963 and 1610(c), authorizing OIEG to pursue formal enforcement remedies.
(Second Carter Decl. Ex. 3)

27. On November 4, 2019, OIEG registered its judgment with this Court pursuant to

28 U.S.C. § 1963. (*OIEG* Action D.I. 1)

28. On that same date, OIEG moved for a writ of attachment fieri facias against the

shares of PDVH held by judgment debtor Venezuela's purported alter ego, PDVSA. (*Id.* D.I. 2)

29. The Court denied OIEG's motion, which was based on collateral estoppel,

explaining:

> collateral estoppel does not apply, [and] any creditor seeking to
> place itself in a situation similar to Crystallex will have to prove that
> PDVSA is and/or was the Republic's alter ego on whatever pertinent
> and applicable date. In attempting to meet this burden, any creditor
> may be able to find support (perhaps strong support) in the record
> created in the Crystallex [Action] . . . and the finding reached (and
> affirmed) there.

*Crystallex Int'l Corp. v. PDV Holding Inc.*, 2019 WL 6785504, at *8 (D. Del. Dec. 12, 2019).

30. On January 15, 2021, the Court denied OIEG's motion for reconsideration.

(*OIEG* Action D.I. 27, 43) On February 19, 2021, OIEG filed its renewed motion for a writ of

attachment. (*Id.* D.I. 48)

31. As this Court has already held (*see OIEG* Action D.I. 109 at 22 n.18), the DC

Court determined that, under 28 U.S.C. § 1610(c), a reasonable period of time has elapsed

following the entry of judgment in favor of OIEG. (*See also id.* D.I. 4 (Nov. 4, 2019 Declaration

of Christopher L. Carter) ("First Carter Decl.") Ex. 4 at 3-8; *id.* D.I. 49 at 22; Second Carter

Decl. Ex. 3)

## C. Huntington[5]

32. Judgment creditor Huntington holds a judgment entered on an arbitration award

against Venezuela's Ministry of Defense, part of the Venezuelan state. (*Huntington* Action D.I.

---

[5] The findings of fact in this subsection only apply in the *Huntington* Action.

9

27 (Feb. 19, 2021 Declaration of Alexander A. Yanos) ("First Yanos Decl.") Ex. 3 at 1, 7; *see also Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of the Bolivarian Republic of Venez.*, 2003 WL 27383249, at \*1 (S.D. Miss. April 16, 2003) ("The Defendant Ministry of Defense of the Republic of Venezuela (herein, "The Ministry") is a foreign state as defined by the Foreign Sovereign Immunities Act."))

33.     Specifically, on February 19, 2018, an arbitral tribunal issued an award against the Republic and in favor of Huntington in the net amount of $128,862,457.27, not including post-award interest. (First Yanos Decl. Ex. 3 at 7)

34.     The underlying dispute leading to the arbitration award arose out of the Ministry of Defense's breach of a 1997 contract for Huntington to repair two warships. *See Northrop Grumman Ship Sys. v. Ministry of Def. of the Republic of Venez.*, 2020 WL 1584378, at \*1 (S.D. Miss. Mar. 31, 2020).

35.     A federal district court in Mississippi confirmed the award and entered judgment for Huntington on June 4, 2020. (*Huntington* Action D.I. 1 Ex. 1; *see also* April 2021 Tr. at 13) Judgment was entered against the Ministry of Defense of the Republic of Venezuela for $137,977,646.43, which included pre-award interest and costs and fees. (*See Huntington* Action D.I. 1 Ex. 1 at 2) Post-award interest accrues pursuant to 28 U.S.C. § 1961 starting from the date of the Mississippi district court's opinion, which was March 31, 2020. (*Id.* D.I. 1 Ex. 1 at 2)

36.     Huntington registered the Mississippi district court's judgment in this District on July 31, 2020. (*Id.* D.I. 1)

37.     Huntington filed a motion for a writ of attachment on September 15, 2020 and an amended motion for a writ of attachment on February 19, 2021. (*Id.* D.I. 3, 25)

10

38.    The Court has already held that, under 28 U.S.C. § 1610(c), a reasonable period of time has elapsed following the entry of judgment in favor of Huntington.  (*Id.* D.I. 59 at 2)

**D.    ACL**[6]

39.    ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. are and at all relevant times have been beneficial owners of bonds issued by the Bolivarian Republic of Venezuela.  (Barger Decl. Ex. 37 at 12)

40.    The underlying dispute arose out of the Republic's default on certain bonds issued by the Republic.  (*ACL* Action D.I. 50 (PDVSA Proposed Findings of Fact) ¶ 9)

41.    PDVSA is not an obligor on the bonds and had no involvement in the Republic's issuance and default on the bonds.  (*Id.* D.I. 50 ¶ 9)

42.    On December 7, 2020, the United States District Court for the Southern District of New York entered judgment in favor of ACL and against Venezuela in an amount totaling $118,186,251.24.  (*ACL* Action D.I. 3 at 10)

43.    ACL and the Republic stipulated that "interest on a federal judgment would run at the rate provided for in 28 U.S.C. § 1961." (*ACL1 Investments Ltd. v. Bolivarian Republic of Venez.*, No. 19-cv-09014 D.I. 51 (S.D.N.Y. Dec. 4, 2020) (Stipulation) at 2, D.I. 51 at 12 (final judgment stating that parties are "bound by the terms of" D.I. 51))

44.    On February 5, 2021, ACL registered its judgment in this District pursuant to 28 U.S.C. § 1963.  (*ACL* Action D.I. 1)

45.    ACL filed its attachment motion on November 22, 2021.  (*Id.* D.I. 2)

46.    The Court has already held that, under 28 U.S.C. § 1610(c), a reasonable period of time has elapsed following the entry of judgment in favor of ACL.  (*Id.* D.I. 34 at 2)

---

[6] The findings of fact in this subsection only apply in the *ACL* Action.

11

### E. Rusoro[7]

47. Judgment creditor Rusoro is a Canadian gold mining company listed on the Toronto Stock Exchange. *See Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, 300 F. Supp. 3d 137, 141-42 (D.D.C. 2018).

48. Rusoro holds a judgment on an arbitral award against the Republic. The underlying dispute arises out of the Chávez regime's expropriation of Rusoro's interests in mining concessions in Venezuela. (*Rusoro* Action D.I. 34 (PDVSA Proposed Findings of Fact) ¶ 7)

49. On July 17, 2012, Rusoro commenced arbitration proceedings against Venezuela pursuant to the Arbitration (Additional Facility) Rules of the ICSID and the July 1, 1996 Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments. (Sun Decl. ¶ 3)

50. On August 22, 2016, the arbitration tribunal issued a final award in favor of Rusoro, finding that Venezuela had unlawfully expropriated Rusoro's mining portfolio without compensation and ordering Venezuela to pay Rusoro $966.5 million in damages, plus interest. (Sun Decl. ¶ 4)

51. On March 2, 2018, the DC Court recognized the arbitration award and entered judgment against Venezuela in the amount of $967,777,002.00, plus (i) interest as provided by the arbitral tribunal; (ii) post-judgment interest, pursuant to 28 U.S.C. § 1961, accruing through the date of payment; and (iii) costs as provided by the arbitral tribunal, in the amount of $3,302,500.00. (Sun Decl. ¶ 5; *see also Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, 16-cv-2020 (D.D.C. Mar. 2, 2018) D.I. 22)

---

[7] The findings of fact in this subsection only apply in the *Rusoro* Action.

52.     On November 4, 2021, Rusoro registered its judgment in this District pursuant to 28 U.S.C. § 1963. (*Rusoro* Action D.I. 1)

53.     Rusoro filed its attachment motion on February 9, 2022. (*Id.* D.I. 2)

54.     The Court has already held that, under 28 U.S.C. § 1610(c), a reasonable period of time has elapsed following the entry of judgment in favor of Rusoro. (*Id.* D.I. 20 ¶ 2)

## III.     Findings Made In *Crystallex I*

55.     The Court previously found in *Crystallex I* that, as of August 9, 2018, PDVSA was the alter ego of Venezuela. *See* 333 F. Supp. 3d at 406. The Court further found that, as of that date, PDVSA's shares of PDVH were subject to attachment by Crystallex, a judgment creditor of Venezuela. *See id.* at 415.

56.     At the April 2021 hearing, Huntington, OIEG, and PDVSA recognized that the Court's findings in *Crystallex I* are relevant to the analysis the Court is now undertaking with respect to additional creditors. (*See* April 2021 Tr. at 12 (Huntington framing "main question" as "whether the U.S. government's recognition of Juan Guaidó . . . means that PDVSA is no longer Venezuela's alter ego"), 27 (OIEG suggesting August 2018 findings are "the starting point"), 229-31 (PDVSA suggesting similarly))

57.     ACL, too, has argued that the Court's *Crystallex I* factual findings are relevant to its case. (*See ACL* Action D.I. 3 at 3-5 (ACL "summariz[ing] the facts central to *Crystallex*" because of the general relevance of historical facts under *Crystallex*))

58.     Rusoro has also focused on the Court's *Crystallex I* factual findings as they relate to its case. (*See Rusoro* Action D.I. 4 Ex. 1 at 9-12; *id.* D.I. 4 Ex. 1 at 12 ("All of the factors that informed the *Crystallex I* court's 2018 decision remain true today."))

59.     The Court's conclusions in *Crystallex I* were based on, among others, the following specific findings of fact:

a. Venezuela used PDVSA's property as its own, *see Crystallex I*, 333 F.

Supp. 3d at 406;

b. Venezuela ignored PDVSA's separate status, *see id.* at 406-07;

c. Venezuela deprived PDVSA of independence from close political control, *see id.* at 407-08;

d. Venezuela required PDVSA to obtain government approvals for ordinary business decisions, *see id.* at 408-09; and

e. Venezuela issued policies causing PDVSA to act directly on behalf of Venezuela, *see id.* at 409-10.

60. The United States Court of Appeals for the Third Circuit affirmed this Court's holding, approvingly citing these same factual findings. *See Crystallex II*, 932 F.3d at 146-49. The Third Circuit added: "Indeed, if the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can." *Id.* at 152.

## IV. Venezuela: One Country With Two Governments

61. In 2013, following the death of former President Hugo Chávez, Nicolás Maduro became Venezuela's president. *See Jiménez*, 250 A.3d at 821.

62. In May 2017, when political opponents of Maduro gained control of Venezuela's legislative body (the National Assembly), the Maduro Regime formed a new legislative body, the National Constituent Assembly, granting itself the power to legislate and to put opposition leaders on trial. *See id.*

63. In August 2018, when the Court ruled in *Crystallex I*, Maduro was both de jure and de facto President of Venezuela.

14

64.     Venezuela held a presidential election in 2018, during which Maduro disqualified his opposition and claimed to win reelection. *See Jiménez*, 250 A.3d at 821.

65.     On January 10, 2019, after the disputed election, Maduro was sworn in for a second term as President of Venezuela. *See id.*

66.     On January 15, 2019, Venezuela's National Assembly rejected Maduro's claim for a second presidential term. *See id.*

67.     On January 23, 2019, the National Assembly named the opposition leader, Juan Guaidó, as "Interim President" of Venezuela. *See id.*

68.     Also on January 23, 2019, U.S. President Donald J. Trump issued a statement that provided, in part, "Today, I am officially recognizing the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim President of Venezuela." (Second Carter Decl. Ex. 9; Barger Decl. Ex. 1; Sun Decl. Ex. 1; *see also* Brewer-Carías Decl. ¶ 27 & n.19)

69.     The U.S. government, acting through its Executive Branch, has expressly declared its non-recognition of the Maduro Regime, stating: "The United States does not recognize the Maduro regime as the government of Venezuela," adding: "the United States does not consider former president Nicolas Maduro to have the legal authority" to act on behalf of the Republic. (Meehan Decl. Ex. 3) The U.S. has also "refused to recognize Maduro as Venezuela's head of state." (Meehan Decl. Ex. 2 at 2)

70.     Despite the official recognition of the Guaidó Government, and official non-recognition of the Maduro Regime, the United States has acknowledged that the Maduro Regime continues to exercise de facto power over Venezuela, stating for example: "We continue to hold the illegitimate Maduro regime directly responsible for any threats it may pose to the safety of

15

the Venezuelan people." (Second Carter Decl. Ex. 9; Barger Decl. Ex. 1; Sun Decl. Ex. 1; *see also* April 2021 Tr. at 146)

71. The United Nations recognized Venezuelan ambassadors appointed by the Maduro Regime before August 2018 and has continued to do so. (Second Carter Decl. Ex. 10 at 6; Sun Decl. Ex. 2)

72. The European Union, the Lima Group, and Canada recognized Mr. Guaidó as Venezuela's official representative in 2019, but ceased to do so in January or February 2021. (*OIEG* Action D.I. 51 (Feb. 19, 2021 Declaration of Barbara Miranda) ("First Miranda Decl.") Ex. 1); Sun Decl. Ex. 4)

## V. The Guaidó Government Controls PDVSA In The United States

73. In March 2021, in criminal proceedings against Jose Luis de Jongh Atencio, a former CITGO Petroleum Corporation ("CITGO") employee, the Executive Branch of the U.S. government told the U.S. District Court for the Southern District of Texas: "PDVSA's U.S. subsidiaries, including Citgo, are controlled by the ad hoc Administrative Board of PDVSA, appointed by President Guaidó." *United States v. Jose Luis De Jongh Atencio*, No. 20-cr-00305-S-1, D.I. 80 at 8 (U.S. Government Trial Brief) (S.D. Tex. Mar. 16, 2021).

74. The Maduro Regime does not control any property of PDVSA in the United States, including the PDVH shares. *See Jiménez*, 250 A.3d at 825-26; *OIEG* Action D.I. 68 (April 1, 2021 Declaration of Horacio Francisco Medina Herrera) ("Medina Decl.") ¶ 10; Medina Decl. Ex. A (June 17, 2020 Declaration of Luis A. Pacheco) ("Pacheco Decl.") ¶¶ 11-12.[8]

---

[8] PDVSA also filed the Medina and Pacheco Declarations in the *ACL* Action (D.I. 23-38 Exs. 1-2) but not in the *Rusoro* Action. Hence, the Court will sustain Rusoro's objection to reliance on these Declarations in the *Rusoro* Action (*see* D.I. 36 at 1-2), although this ruling has no impact on any substantive issue in dispute.

16

75.     The Maduro Regime has not appointed a single member of PDVSA's Ad Hoc

Board or any of the directors of PDVSA's U.S. subsidiaries. *See Jiménez*, 250 A.3d at 825-26.

76.     Neither the Maduro Regime nor anyone affiliated with the Maduro Regime has

access to any assets, funds, or information held by PDVSA in the U.S. or its U.S. subsidiaries.

(Medina Decl. ¶¶ 6, 10; Pacheco Decl. ¶ 11)[9]

## VI.     The Guaidó Government's Direction And Control Over PDVSA In The U.S. Is Analogous To The Direction And Control The Court Found Maduro Exercised In August 2018[10]

77.     As detailed below, the nature of the relationship between the Republic and

PDVSA has not materially changed in the time after the Court made its findings of fact in

*Crystallex I* in August 2018, notwithstanding the U.S. recognition of the Guaidó Government in

January 2019.[11]

### A.     Level of economic control by the Guaidó Government

78.     The Guaidó Government maintains significant control over PDVSA in the U.S.,

due in part to the Venezuelan constitution. *See Crystallex II*, 932 F.3d at 147 ("[T]he

---

[9] This finding of fact does not apply in the *Rusoro* Action.

[10] The findings of fact in this Part apply only in the *OIEG* and *Huntington* Actions.

[11] The Court organizes its findings based on the factors identified by the Supreme Court in its recent decision in *Rubin v. Islamic Republic of Iran*, 138 U.S. 816, 823 (2018), which is the same formulation of the alter ego factors the Third Circuit applied in *Crystallex II*, 932 F.3d at 141 n.8. This Court in *Crystallex I* had, instead, applied the slightly different formulation the Supreme Court had set out in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 624-27 (1983). Were the Court instead to apply the *Bancec* articulation of relevant considerations in this Opinion, the analysis would not materially change. Moreover, as will become evident, the factors the Court is using are not mutually exclusive but have some overlap; thus, at least some of the findings of fact could reasonably be listed under any of multiple factors. The Court's specific placement of the facts has little, if any, impact on its overall conclusion.

Venezuelan constitution . . . endows the State with significant control over PDVSA and the oil industry in the country.").

79. "Article 12 [of the Venezuela constitution] provides hydrocarbon deposits within the territory of the state are the property of the Republic." *Crystallex II*, 932 F.3d at 147; *see also* Sun Decl. Ex. 6 (Venezuela constitution's Article 12 and its certified English translation).

80. "Article 302 reiterates 'the state reserves to itself, through the pertinent organic law, and for reasons of national convenience, petroleum activity.'" *Crystallex II*, 932 F.3d at 147 (quoting Venezuelan constitution); *see also* Sun Decl. Ex. 6 (Venezuelan constitution's article 302 and its certified English translation).

81. "Article 303 addresses the state's control over PDVSA specifically: 'For reasons of economic and political sovereignty and national strategy, the State shall retain all shares in Petróleos de Venezuela, S.A.'" *Crystallex II*, 932 F.3d at 147 (quoting Venezuelan constitution); *see also* Sun Decl. Ex. 6 (Venezuelan constitution's article 303 and its certified English translation).

82. The Guaidó Government has continued to assert Venezuela's economic control over PDVSA and PDVSA's assets (and subsidiaries) in the U.S. For instance, Article 34 of the Transition Statute (more specifically identified below) provides: "[T]he business of PDV Holding, Inc. and its subsidiaries shall follow commercial efficiency principles, subject only to the control and accountability processes exercised by the National Assembly, and other applicable control mechanisms." (Second Carter Decl. Ex. 23 ¶ 12; *see also Tidewater v. Bolivarian Republic of Venez.*, No. 19-mc-0079 (D. Del. June 1, 2020) D.I. 15 (Declaration of Jose Ignacio Hernandez))

18

83.    To fund itself, the Guaidó Government has drawn directly from PDVSA commercial subsidiaries in the United States, bypassing PDVSA's corporate right to dividends. (First Miranda Decl. Exs. 37, 38 at 4 ("[T]he Trump administration gave the Venezuelan opposition access to U.S. bank accounts containing billions belonging to the state-owned oil company, PDVSA"); *Huntington* Action D.I. 48 (May 5, 2021 Declaration of Alexander A. Yanos) ("Fifth Yanos Decl.") Ex. 124 at 3; April 2021 Tr. at 22, 161)

84.    In April 2020, the Guaidó Government tapped PDVSA and CITGO funds located in the United States to fund its legal fees and also to fund the National Assembly itself. (Fifth Yanos Decl. Ex. 3; *Huntington* Action D.I. 28 (February 19, 2021 Expert Report of Manuel A. Gómez) ("Gómez Report") ¶ 22 ("PDVSA funds have also been directed to be used in the legal defense of Venezuela in foreign and international proceedings."))[12]

85.    The Guaidó Government has treated the liabilities of Venezuela and PDVSA as one, specifically indicating that it intends to treat PDVSA's bond debt interchangeably with Venezuela's bond debt in an eventual restructuring, just as President Maduro had previously declared. *Compare Crystallex II*, 932 F.3d at 147-48 (noting that in 2017 President Maduro decreed that "Venezuela would restructure the external debt of both Venezuela and PDVSA"), *with* Second Carter Decl. Ex. 8 at 2 (Mr. Guaidó promising "no different treatment shall be accorded to eligible . . . claims as a result of . . . the identity of the public sector obligor (the Republic, PDVSA or another public sector entity")).

---

[12] PDVSA cites to the Gómez Report in all four actions before the Court, although it was never filed in the *ACL* Action. ACL does not appear to object to its consideration in connection with its motion. As the Court only relies on the Gómez Report as *support* for the creditors, the Court deems it appropriate to consider this document even in connection with the *ACL* Action. That said, were the Court not to consider the Gómez Report, no finding or conclusion would differ.

86.     In late 2019, the National Assembly (which supports Mr. Guaidó) declared

PDVSA bonds to be void and illegally issued. *See Petróleos de Venez. S.A. v. MUFG Union

Bank, N.A.*, 495 F. Supp. 3d 257, 266-67 (S.D.N.Y. 2020).

87.     On October 1, 2019, the National Assembly executed the "Agreement that

Authorized the Use of Resources of Petróleos De Venezuela, S.A. (PDVSA) to Defend Its Assets

Abroad" ("Agreement on PDVSA Resources"). (*Huntington* Action D.I. 45 (April 29, 2021

Declaration of Alexander A. Yanos) ("Fourth Yanos Decl.") Ex. 14; *see also* April 2021 Tr. at

89) The Agreement on PDVSA Resources does not separate PDVSA's legal decisions from the

Republic's control.

88.     The Agreement on PDVSA Resources requires PDVSA to obtain prior

authorization for certain transactions from the Permanent Finance and Economic Development

Commission of the National Assembly, which in turn required regular updates from the

Venezuelan Special Attorney's Office. (Fourth Yanos Decl. Ex. 14 at 3-4; April 2021 Tr. at 89)

89.     Reflecting its understanding that the Republic should exercise economic control

over PDVSA's transactions, the Guaidó Government objected to the Maduro Regime's sale of

PDVSA's stake in a Swedish refinery, Nynas AB, by noting that the National Assembly's energy

committee considered the deal null "as it was not approved by congress." (First Miranda Decl.

Ex. 25 at 1; *see also* Fifth Yanos Decl. Ex. 1)

90.     On November 19, 2019, the National Assembly executed an "Agreement that

Authorized the Creation of the Special Litigation Fund" ("Litigation Fund Agreement"), which

established a "Special Litigation Fund" consisting of resources found in bank accounts abroad in

favor of, among others, the State (i.e., the Republic of Venezuela), the Central Bank of

Venezuela, and PDVSA. (Fourth Yanos Decl. Ex. 16)

91.     Pursuant to the express terms of the Litigation Fund Agreement, the Republic considers PDVSA and its assets as "Venezuelan assets held abroad" and effectively requires PDVSA to seek approval from the Republic to spend its own resources. (Fourth Yanos Decl. Ex. 16)

92.     All of the funds established by the Litigation Fund Agreement are to be overseen by a "technical commission" appointed by the National Assembly. (*Id.*)

**B.     Whether PDVSA's profits go to the Guaidó Government**

93.     "As PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government." *Crystallex II*, 932 F.3d at 148.

94.     PDVSA's Ad Hoc Board's Twitter feed refers to PDVSA's assets as assets of Venezuela. (First Miranda Decl. Exs. 29, 30, 31; *see also OIEG* Action D.I. 90 (April 29, 2021 Supplemental Declaration of Barbara Miranda) ("Fourth Miranda Decl.") Exs. 12, 13, 14 ("[CITGO's] value and potential is incalculable, we must recover it and put it at the service of Venezuelans."))

**C.     Degree to which the Guaidó Government manages PDVSA or has a hand in PDVSA's daily affairs**

95.     On February 5, 2019, the National Assembly approved and adopted a Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela (the "Transition Statute"). *Jiménez*, 250 A.3d at 824. The Transition Statute "specifically empowered Guaidó to 'appoint an ad hoc Managing Board' of PDVSA 'to exercise PDVSA's rights as a shareholder of PDV Holding.'" *Id.* at 825.

96.     Article 34 of the Transition Statue bypasses PDVSA's ordinary corporate governance by empowering Mr. Guaidó to appoint and remove an Ad Hoc Board of Directors to exercise rights as PDV Holding's shareholder, including appointing and removing board

members to PDV Holding, CITGO, and other affiliates. (*See* April 2021 Tr. at 82 (Ad Hoc Board head, Medina, acknowledging that Mr. Guaidó may remove him from his position); *OIEG* Action D.I. 18 (Nov. 18, 2019 Declaration of Joseph E. Neuhaus) Ex. A; *see also* Gómez Report ¶¶ 18, 21)

97.     Since February 2019, PDVSA's Ad Hoc Board, appointed by the Guaidó Government, has exercised PDVSA's shareholder rights to appoint PDVH's directors; PDVH's directors have, in turn, exercised PDVH's shareholder rights to appoint CITGO Holding's directors; and CITGO Holding's directors have, in turn, exercised CITGO Holding's shareholder rights to appoint CITGO Petroleum's directors. (Medina Decl. ¶ 4(d); Brewer-Carías Decl. Ex. B ¶ 16; *Jiménez*, 250 A.3d at 825-26)

98.     PDVSA's Ad Hoc Board acknowledges that it operates at the "directives" of the Guaidó Government. (Fourth Yanos Decl. Ex. 21 ("Protecting the CITGO assets is of paramount importance on the road to recovery of the Venezuela and its oil industry and is one of the primary directives given by interim President Juan Guaidó to the PDVSA ad hoc Board."))

99.     Under the Transition Statute, the National Assembly approves contracts, coordinates and approves the funding of PDVSA's legal strategies, and approves PDVSA's appointment of affiliate directors. (*Huntington* Action D.I. 38 (April 16, 2021 Declaration of Alexander A. Yanos) ("Second Yanos Decl.") Ex. 2 at 15; Fourth Yanos Decl. Ex. 12 at 3 (requiring National Assembly's "prior approval" of appointments for Ad Hoc Board and for "the directors of its affiliate"))

100.    Venezuela's legal framework requires that every PDVSA contract with a foreign national must be approved by the legislature consistent with Article 36 of the Transition Statute. (Gómez Report ¶ 22)

101.    Mr. Medina, then chairman of PDVSA's Ad Hoc Board, acknowledged that PDVSA always fulfills its obligation to permit the National Assembly to review and approve any contract signed by PDVSA with a foreign party. (*See* April 2021 Tr. at 85-86)

102.    On April 9, 2019, the National Assembly enacted the "Accord to Expand the Powers Vested and the Number of Ad-Hoc Board Members of PDVSA" ("Accord") that further expanded Mr. Guaidó's control over PDVSA by authorizing him to act by special decree and by suspending all rights and authorities otherwise vested in the Ad Hoc Board, the shareholders' meeting, and the Presidency of PDVSA and its affiliates. (Fourth Yanos Decl. Ex. 12; Gómez Report ¶ 20)

103.    The Accord also suspended any functions given to the Minister of Hydrocarbons and any other government official, branch or agency related to PDVSA, which had existed by or was given any functions after January 10, 2019, replacing the previous legal framework for PDVSA's governance with "total control" of PDVSA by the Guaidó Government. (First Yanos Decl. Ex. 17)

104.    The Accord also affirmed that PDVSA's legal strategy will be executed only in coordination with the Special Attorney appointed by Mr. Guaidó. (Fourth Yanos Decl. Ex. 12 at 4) ("[PDVSA], in coordination with the Special Attorney appointed by the President of the Republic, will carry out the legal representation of [Ad Hoc PDVSA] and its affiliate companies abroad.")

105.    Ad Hoc PDVSA's management, as appointed by Mr. Guaidó, is subservient to the State. Louis Pacheco, then-Chairman of PDVSA's Ad Hoc Board, stated in a 2020 interview that the Ad Hoc Board works toward "the main objective" of establishing the Guaidó Government's effective control over Venezuela. (Second Yanos Decl. Ex. 4 at 7)

106.     The corporate enterprise PDVSA – its actual revenue-generating assets, employees, facilities, and contracts – remains as firmly controlled by the State as it ever was. (Gómez Report ¶ 22)

107.     Venezuela has admitted that the Guaidó Government has the right to review "national interest" contracts, that is, those contracts entered into by PDVSA that implicate the national public interest. (*Huntington* Action D.I. 74 ¶ 10)  In litigation seeking to invalidate the 2020 CITGO bonds, the Ad Hoc Board argued that "any" PDVSA contract is "a public interest contract" subject to National Assembly approval. (*See Petróleos De Venez. S.A. v. MUFG Union Bank, N.A.*, No. 1:19-cv-10023 (S.D.N.Y. June 15, 2020) D.I. 117 (PDVSA Memorandum of Law in Support of Motion for Summary Judgment) at 30 n.84; April 2021 Tr. at 18, 101-103); *see also Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 266-68 (S.D.N.Y. 2020) (Guaidó Government contending that every PDVSA contract with any foreign national, including presumably every oil sale to foreign national, must be approved by legislature))

108.     PDVSA's litigation and negotiation strategy over the bonds, which is based on leveraging CITGO, were formulated at the direction of the Republic.  (Second Yanos Decl. Ex. 4 at 6) (Pacheco stated in interview that Ad Hoc Board "follow[ed] the decisions that the National Assembly . . . made")

109.     Ad Hoc PDVSA's argument in the bond litigation, as crafted by the State, was that the bonds leveraging CITGO were invalid *ab initio* because they were never approved by the National Assembly in the first place. (First Yanos Decl. Ex. 16 at 29-30; April 2021 Tr. at 101-03)

110. Venezuela and Ad Hoc PDVSA have used the same lawyers. For example, Ad Hoc PDVSA's counsel in the *Huntington* Action represented Venezuela in two proceedings before the DC Court. *See, e.g., Koch Minerals Sarl v. Bolivarian Republic of Venez.*, No. 1:17-cv-02559-ZMF (D.D.C. April 5, 2021) D.I. 53 at 4.

111. Ad Hoc PDVSA only paid its debts in May 2019 after the Guaidó Government authorized such payments. (Fourth Yanos Ex. 12 at 2 ("The ad hoc administrative board of Petróleos de Venezuela, S.A. (PDVSA) announced today that National Assembly of the Bolivarian Republic of Venezuela has authorized the interest payment on the PDVSA 2020 bond, an estimated amount of US 71.6 millions."); April 2021 Tr. at 17-18)

112. In October 2019, Ad Hoc PDVSA stopped paying its debts, on instructions from the National Assembly. (Second Yanos Decl. Ex. 2 at 12, Second Yanos Decl. Ex. 4 at 3-4; April 2021 Tr. at 18)

**D. Whether the Guaidó Government is the real beneficiary of PDVSA's conduct**

113. The National Assembly website frequently provides updates on the status of Ad Hoc PDVSA and its subsidiary, CITGO, repeatedly referring to both as assets of the Venezuelan State. (First Yanos Decl. Exs. 12, 15, 17, 20, 21, 22)

114. The National Assembly has stated that the Guaidó Government "shall continue to devise strategies and legal and diplomatic measures to continue to protect CITGO and all the Republic's assets, which have a vital role to play in the reconstruction once the usurpation of power in Venezuela has been brought to an end." (Fourth Yanos Decl. Ex. 18 at 2)

115. Mr. Guaidó and his government regularly characterize PDVSA and its related assets, such as CITGO, as assets of the State. (*See, e.g.*, First Yanos Decl. Ex. 14 at 4) (Mr.

Guaidó characterizing appointment of Ad Hoc Board as part of "taking progressive and orderly control of the assets of our Republic abroad" in order to "speed up the political transition.")

116.    PDVSA describes itself as having a "constitutionally prescribed role" in Venezuela to "manage the oil industry," including CITGO – the "'crown jewel' and most economically and strategically important foreign asset of national public interest." (First Yanos Decl. Ex. 16 at 30 n.84, 31 ("There is no dispute that PDVSA and PDVSA Petróleo, which are 'attached' to (and thus controlled by) Venezuela's Ministry of Petroleum and Mining, are part of the National Public Administration of the Venezuelan Republic."); First Yanos Decl. Ex. 21 (Venezuelan Ambassador Carlos Vecchio stating, "It is clear that we have done and will continue to do EVERYTHING to protect and preserve Citgo for Venezuelans."); First Yanos Decl. Ex. 22 (Mr. Guaidó referring to protection of CITGO as protection of "the country's assets"); April 2021 Tr. at 109 (Mr. Medina testifying: "That colloquial phrase of the crown jewels, what it tries to say is to emphasize the importance that that asset has to Venezuela, to the country and, of course, to PDVSA, who is going to administer everything that has to do with the reactivation of the industry."))

117.    PDVSA's Ad Hoc Board's website states on its "Our Mission" page: "Take back PDVSA abroad assets to . . . achieve social welfare and progress for all Venezuelans." https://pdvsa-adhoc.com/en/our-mission/ (last visited February 17, 2021).

118.    The Ad Hoc Board's Twitter feed regularly tweets messages in support of the Guaidó Government and refers to PDVSA's assets as assets of Venezuela. (First Miranda Decl. Exs. 29, 30, 31; Fourth Miranda Decl. Ex. 12 ("The ad hoc PDVSA Board continues to work actively to recover Venezuela's assets abroad . . . ."), Ex. 13 ("The new CITGO Board of Directors cooperates with North American courts to safeguard the assets of Venezuela and

determine responsibility."), Ex. 14 ("[CITGO's] value and potential is incalculable, we must

recover it and put it at the service of Venezuelans."))

119.    PetroCaribe is "an agreement pursuant to which Venezuela committed PDVSA to

supply oil to 17 Caribbean countries on favorable economic terms . . . ." *Crystallex I*, 333 F.

Supp. 3d at 413; *see also Crystallex II*, 932 F.3d at 147.

## E.    Whether adherence to separate identities would entitle Venezuela to benefits in United States courts while avoiding its obligations

120.    Adhering to the nominally separate identity between the Republic of Venezuela

and PDVSA to allow PDVSA to have its assets in the District of Delaware be immune from

attachment to satisfy the lawful judgments of the U.S. courts against its alter ego, Venezuela,

would entitle Venezuela to benefits in U.S. courts while at the same time avoiding its

obligations.

121.    The Third Circuit's statements in *Crystallex II*, 932 F.3d at 149 (internal citations

omitted), are equally applicable here:

> Venezuela owes [the judgment creditors] from . . . judgment[s] that
> ha[ve] been affirmed in our courts. Any outcome where [a creditor
> before the Court] is not paid means that Venezuela has avoided its
> obligations. It is likewise clear from the record that PDVSA, and
> by extension Venezuela, derives significant benefits from the U.S.
> judicial system. Its 2020 bonds are backed by the common stock
> and underlying assets of U.S.-based corporations, and hence
> disputes stemming from default will be subject to U.S. laws and
> presumably be resolved through the U.S. legal system. Indeed, it
> is probable the U.S. legal system is the backstop that gives
> substantial assurance to investors who buy PDVSA's debt.

## VII.    Maduro's Non-Recognized Government Continues To Control PDVSA In Venezuela

122.    While there has been U.S. recognition of corporate reorganizations at PDVSA's

U.S. subsidiaries (done at the direction of Mr. Guaidó), these actions have had no effect on

PDVSA itself. The state, through its political actors, continues to dominate and control PDVSA. (*See* April 2021 Tr. at 118, 122-23)

123. Despite its non-recognition by the U.S. government, the Maduro Regime continues to exercise de facto control over Venezuela and its territory, including over PDVSA and its assets and operations in Venezuela. (*See* Second Carter Decl. Ex. 3 at 5; Brewer-Carías Decl. ¶ 44)

124. While recognizing Guaidó as Venezuela's representative, the United States includes the "Maduro regime" in its definition of the "Government of Venezuela." (Second Carter Decl. Ex. 22 (Executive Order 13884))

125. On January 18, 2021, OFAC stated that the "illegitimate Maduro regime has continued to use [PDVSA] as its primary conduit for corruption to exploit and profit from Venezuela's natural resources." (Second Carter Decl. Ex. 18 at 1)

126. In March 2021, the United States Executive Branch advised U.S. courts that "President Maduro remains in power in Venezuela, and in control of PDVSA." (*OIEG* Action D.I. 78 (April 16, 2021 Supplemental Declaration of Barbara Miranda) ("Second Miranda Decl.") Ex. 1 at 8)

127. The Ad Hoc Board of PDVSA, appointed by Guaidó and recognized by U.S. courts, is not identified on the PDVSA website, which instead publishes the names of other individuals as its board members. (*See* First Miranda Decl. Ex. 2)

128. Members of the Ad Hoc Board of PDVSA are subject to a Venezuelan criminal prosecution launched in 2019 under the auspices of the Republic's Supreme Tribunal of Justice. (First Miranda Decl. Exs. 3, 4)

129. PDVSA's Ad Hoc Board acknowledges that the corporation's operations have not changed. (*See, e.g.*, Second Miranda Decl. Ex. 3; Fourth Miranda Decl. Ex. 20 (letter from PDVSA Ad Hoc Board stating that "PDVSA's Caracas office . . . remains under the control of PDVSA's unlawful, usurping authorities of the illegitimate Maduro regime"))

130. CITGO Petroleum acknowledges that the Maduro Regime exercises "control of PDVSA in Venezuela." (First Miranda Decl. Ex. 5 (CITGO Petroleum news release regarding Maduro Regime's seizure of vessel containing CITGO Petroleum's crude oil, stating that "The Maduro regime, including through its control of PDVSA in Venezuela, has previously attempted to obtain the cargo from the vessel"))

131. In July 2019, it was reported that PDVSA, under the direction of the Maduro Regime, was selling oil to a Turkish company known as Grupo Iveex Insaat. (First Miranda Decl. Ex. 8)

132. In March 2019, PDVSA, acting entirely through Maduro Regime officers, announced the opening of an office in Moscow. (First Miranda Decl. Ex. 6)

133. In September 2019, a Maduro-appointed oil minister completed the move of PDVSA's Lisbon office to Moscow. (Second Carter Decl. Ex. 13)

134. Maduro-appointed officers then set up a factoring arrangement between PDVSA and Rosneft (a Russian oil company headquartered in Moscow). (First Miranda Decl. Ex. 7)

135. In November 2019, PDVSA signed a commercial contract with an Indian concern – with Maduro Regime officers providing the signatures. (First Miranda Decl. Ex. 9)

136. In May 2020, PDVSA, acting through its European subsidiary PDVSA Europa, sold a significant and valuable stake in Nynas, a Swedish oil refinery. (First Miranda Decl. Ex. 25) After the fact, the Ad Hoc Board criticized the sale as "harm[ful] to the nation's wealth,"

adding that the Ad Hoc Board "was not informed of the company's sale of a 35% stake in Swedish refiner Nynas." (First Miranda Decl. Ex. 26; Fifth Yanos Decl. Ex. 1)

137.    In March 2021, when a pipeline explosion damaged a PDVSA facility in Venezuela, the Ad Hoc Board blamed the incident on the Maduro Regime's incompetent "manage[ment] of assets and facilities that belong to the Republic and the Venezuelan people," revealing the Ad Hoc Board's understanding that PDVSA, owned by Venezuela, is dominated by the Maduro Regime that currently controls the state. (Second Miranda Decl. Ex. 3; Fourth Miranda Decl. Ex. 20)

## VIII.   The Maduro Regime's Direction And Control Over PDVSA In Venezuela Is Analogous To The Direction And Control The Court Found In August 2018

### A.    Level of economic control by the Maduro Regime

138.    In May 2020, Maduro announced on national television that PDVSA would increase consumer prices. (First Miranda Decl. Ex. 23; Fourth Miranda Decl. Ex. 10) A subsequent press release published on PDVSA's website advised that the price of gasoline would increase pursuant to the announcement. (First Miranda Decl. Ex. 10; Fourth Miranda Decl. Ex. 1)

139.    In approximately May 2020, acting pursuant Mr. Maduro's Executive Order 4.090, PDVSA announced to owners of licensed service stations in Venezuela that PDVSA was authorized to rescind such licenses. (First Miranda Decl. Ex. 18; Fourth Miranda Decl. Ex. 5)

140.    On June 27, 2020, as directed by Maduro Regime appointees as corporate officers, PDVSA rescinded agreements with various Venezuelans who licensed service stations, seizing them for the State. (First Miranda Decl. Ex. 18; Fourth Miranda Decl. Ex. 5)

30

**B.     Whether PDVSA's profits go to the Maduro Regime**

141.    The Maduro Regime profits from PDVSA's operations, as the Republic is the sole shareholder of PDVSA. *See Crystallex II*, 932 F.3d at 148.

**C.     Degree to which the Maduro Regime manages PDVSA or otherwise has a hand in PDVSA's daily affairs**

142.    As it had in and before 2018, PDVSA regularly tweets that "PDVSA is Venezuela." *Crystallex I*, 333 F. Supp. 3d at 407. More recently, the message continues with "In PDVSA we think as a Nation" or "as a Country." (First Miranda Decl. Exs. 44, 45)

143.    In late 2018, Maduro named General Manuel Salvador Quevedo Fernández, a career military officer and then-Minister of Oil, as president of the board of PDVSA, and Tareck El Aissami, the then-Minister of Industry and National Production, as External Director of PDVSA. *See Jiménez*, 250 A.3d at 822 n.7; First Yanos Decl. Ex. 6 (article showing Mr. Quevedo as both minister and president of PDVSA); First Yanos Decl. Ex. 7 ("Venezuela names El Aissami to PDVSA board of directors"))

144.    Also in 2018, Mr. Quevedo imposed a military regime on PDVSA, arresting workers for operational mistakes and deploying active military personnel aboard tankers. (First Yanos Decl. Ex. 5 ("Oil output goes AWOL in Venezuela as soldiers run PDVSA"))

145.    On February 19, 2020, it was reported that Maduro ordered PDVSA employees to attack Interim President Guaidó. (First Miranda Decl. Ex. 39; Fourth Miranda Decl. Ex. 18 ("Nicolás Maduro lashed out against Juan Guaidó, interim president of Venezuela, and called upon PDVSA workers to attack him and call him a traitor to the nation due to the recent United States sanctions on Rosneft Trading."))

146.    On April 27, 2020, Maduro installed Asdrubal Chávez, a cousin of the deceased former President Chavez, as president of PDVSA. (First Miranda Decl. Exs. 12, 13; Fourth

31

Miranda Decl. Ex. 3, 4)  Maduro had previously appointed Asdrubal Chávez as president of CITGO. (Second Miranda Decl. Ex. 13; Fourth Miranda Decl. Ex. 4)

147.    Also on April 27, 2020, Maduro appointed Tareck El Aissami, a long-time lieutenant and former close ally of Hugo Chavez, as Minister of Petroleum, and directed him to restructure PDVSA. (First Miranda Decl. Exs. 12, 14; Fourth Miranda Decl. Ex. 3)

148.    Mr. Maduro makes announcements in PDVSA's offices, and PDVSA's own press releases issue the Maduro regime's policy. (*See* First Miranda Decl. Ex. 14)

149.    In February 2020, CITGO Petroleum released a statement that the Maduro Regime utilized "its control of PDVSA in Venezuela" and Venezuela's military to take possession of CITGO's crude oil that was meant for delivery overseas. (First Miranda Decl. Ex. 5)

150.    On May 27, 2020, El Aissami attended virtual OPEC meetings on behalf of Venezuela and PDVSA, and posted a photo of the event to his official Twitter account. (First Miranda Decl. Ex. 20; Fourth Miranda Decl. Ex. 7)

**D.      Whether the Maduro Regime is the real beneficiary of PDVSA's conduct**

151.    The version of PDVSA's website controlled by the Maduro Regime lists three "Strategic Objectives," one of which is to "[s]upport the geopolitical positioning of Venezuela internationally." Strategic Objectives, PDVSA, http://www.pdvsa.com/index.php?option=com_content&view=article&id=6551&Itemid=890&lang=en (last accessed Feb. 3, 2021).

152.    In furtherance of this strategy, Venezuela causes PDVSA to use its property and revenues for the benefit of the State.

153.     For example, in March 2019, Venezuela's Minister of Foreign Affairs, Jorge Arreaza, traveled abroad on board a PDVSA plane. (*See* First Miranda Decl. Ex. 27; Fourth Miranda Decl. Ex. 11)

154.     In 2019, Mr. Maduro sent an aircraft registered to PDVSA to Guinea-Bissau. (First Miranda Decl. Ex. 32; Fourth Miranda Decl. Ex. 15)

155.     In November 2019, Maduro pledged Venezuelan state funds to pay PDVSA's direct contract obligations for the completion of construction of PDVSA tankers. (Second Carter Decl. Ex. 16)

156.     On January 21, 2020, OFAC stated that "[PDVSA] Falcon 200EX (YV3360) . . . was used throughout 2019 to transport senior members of the former Maduro regime in a continuation of the former Maduro regime's misappropriation of PdVSA assets." (Second Carter Decl. Ex. 17 at 1)

157.     In early 2020, in identifying numerous PDVSA aircraft as blocked property, OFAC stated that "[i]n late Summer 2019, Venezuelan Oil Minister Manuel Salvador Quevedo Fernandez . . . attended an OPEC meeting in the United Arab Emirates and utilized the PdVSA aircraft Falcon 200EX (YV3360)." (Second Carter Decl. Ex. 17 at 1)

158.     In 2020, Venezuelan officials (appointed by Maduro) traveled to Trinidad & Tobago aboard a PDVSA aircraft. (First Miranda Decl. Ex. 28)

159.     On March 3, 2020, it was reported that Venezuela (via Maduro) was gifting "PDVSA" petroleum to Cuba. (First Miranda Decl. Ex. 35; Third Miranda Decl. Ex. 16)

160.     In July 2020, it was reported that PDVSA gasoline was being loaded onto oil tankers destined for Cuba. (First Miranda Decl. Ex. 36; Fourth Miranda Decl. Ex. 17)

161.    Since December 11, 2020, PDVSA's official Twitter account has retweeted at least 460 of Mr. Maduro's tweets.  (First Miranda Decl. ¶ 4)

162.    PDVSA's official Twitter account regularly retweets the Ministry of Petroleum's tweets about the government's fuel distribution schedule, implemented through PDVSA locations.  (*See, e.g.*, First Miranda Decl. Ex. 43)

### E.    Whether adherence to separate identities would entitle Venezuela to benefits in United States courts while avoiding its obligations

163.    Adhering to the nominally separate identity between the Republic of Venezuela and PDVSA to allow PDVSA to have its assets in the District of Delaware be immune from attachment to satisfy the lawful judgments of the U.S. courts against its alter ego, Venezuela, would entitle Venezuela to benefits in U.S. courts while at the same time avoiding its obligations.

164.    The Third Circuit's statements in *Crystallex II*, 932 F.3d at 149, are equally applicable here:

> Venezuela owes [the judgment creditors] from . . . judgment[s] that ha[ve] been affirmed in our courts.  Any outcome where [a creditor before the Court] is not paid means that Venezuela has avoided its obligations.  It is likewise clear from the record that PDVSA, and by extension Venezuela, derives significant benefits from the U.S. judicial system.  Its 2020 bonds are backed by the common stock and underlying assets of U.S.-based corporations, and hence disputes stemming from default will be subject to U.S. laws and presumably be resolved through the U.S. legal system.  Indeed, it is probable the U.S. legal system is the backstop that gives substantial assurance to investors who buy PDVSA's debt.

## IX.    PDVSA Continues To Use Its PDVH Shares For A Commercial Activity

165.    As part of their effort to show that the particular property at issue in their motions is not immune from attachment under the FSIA, the judgment creditors involved in the actions being addressed in this Opinion have shown that PDVSA uses its shares of PDVH stock for a

commercial activity in the United States. *See* 28 U.S.C. § 1610(a)(6).[13] In *Crystallex I*, 333 F.

Supp. 3d at 417-18, this Court held that the PDVH shares are "used for a commercial purpose"

because "PDVSA manages its ownership of PDVH and, consequently, CITGO, in the United

States." "Specifically, Venezuela – through PDVSA – uses the shares to appoint directors,

approve contracts, and pledge assets as security for PDVSA's debt." *Id.* at 418.

166.    All of the commercial activities for which PDVSA's shares of PDVH had been

used in the past, combined with the continued use of these shares for the same activities, render

those shares not immune from attachment. *See Crystallex II*, 932 F.3d at 151 ("[T]he shares can

still be used by PDVSA to run its business as an owner, to appoint directors, approve contracts,

and to pledge PDVH's debts for its own short-term debt.").

167.    In February 2019, Mr. Guaidó "appointed an ad hoc administrative board to

represent PDVSA in its capacity as sole shareholder of PDVH for appointing a new board of

directors of that entity." *Crystallex II*, 932 F.3d at 151. Since February 2019, PDVSA's Ad Hoc

Board has exercised PDVSA's shareholder rights to appoint PDVH's directors; PDVH's

directors have, in turn, exercised PDVH's shareholder rights to appoint CITGO Holding's

directors; and CITGO Holding's directors have, in turn, exercised CITGO Holding's shareholder

---

[13] As the Third Circuit explained in *Crystallex II*, 932 F.3d at 150:

> [T]he phrase commercial activity captures the distinction
> between state sovereign acts, on the one hand, and state
> commercial and private acts, on the other. [W]hen a foreign
> government acts, not as a regulator of a market, but in the manner
> of a private player within it, the foreign sovereign's actions are
> commercial within the meaning of the [FSIA].

(Internal citations and quotation marks omitted) To determine whether property to be attached
has been used for a "commercial activity" within the meaning of the FSIA, the Court applies a
totality of the circumstances test, which includes "an examination of the uses of the property in
the past." *Id.*

rights to appoint CITGO Petroleum's directors. (Medina Decl. ¶ 4(d); Brewer-Carías Decl. Ex. B ¶ 16; *see also Jiménez*, 250 A.3d at 825-26)

168.   Mr. Guaidó appointed additional directors to both PDVSA's and CITGO's board in summer 2020. (First Yanos Decl. Exs. 18, 24)

169.   In the 2020 Bond proceedings, Mr. Guaidó's Ad Hoc Board confirmed that it continues to manage subsidiaries through PDVH. (First Yanos Decl. Ex. 16 at 31) (discussing "pledge of CITGO Shares to secure the 2020 Notes")

## X.   All Parties Agree There Has Been No Material Factual Change Since April 2021

170.   On October 13, 2022, PDVSA made a binding representation that, since April 2021, "there has [not] been any material change to any fact relevant to the factual determination(s) the Court must make" in connection with the alter ego controversy. (*E.g., ACL* Action D.I. 46 at 4)

171.   Also on October 13, 2022, all of the judgment creditors whose motions are addressed in this Opinion – OIEG, Huntington, ACL, and Rusoro – made the same representation. (*See, e.g., OIEG* Action D.I. 119 at 2-5)

172.   It follows that the Court's findings and conclusions – that the Guaidó Government directs and controls PDVSA and its assets in the United States in a manner materially identical to that which the Court found to exist in August 2018, and that the Maduro Regime directs and controls PDVSA and its assets inside Venezuela in a manner materially identical to that which the Court found to exist in August 2018 – are equally true and applicable on all pertinent dates, including through at least October 13, 2022.

36

173.    No record is before the Court indicating any material change in fact since October

13, 2022, nor does the Court have any basis to find any such material change.[14]

## DISCUSSION

### I.    Legal Standards

The Court adheres to, adopts, and hereby incorporates by reference its analysis of the

legal standards governing the issuance of writs of attachment (including its discussion of Federal

Rule of Civil Procedure 69(a)(1) and 10 Del. C. § 5031) with respect to property of an agency or

instrumentality of a foreign sovereign as set out in *Crystallex I*, 333 F. Supp. 3d at 388-89, 394-

95, 399-401, 404-05, including to the extent modified on appeal by the Third Circuit in

*Crystallex II*, 932 F.3d at 134, 136, 144-46.  The Court further adheres to, adopts, and hereby

incorporates by reference its analysis of the Foreign Sovereign Immunity Act ("FSIA" or "Act"),

28 U.S.C. § 1602 et seq., including the immunities (and exceptions to immunity) for a foreign

sovereign and its property in the United States *see Crystallex I*, 333 F. Supp. 3d at 394-99, 401,

406, again including to the extent modified on appeal by the Third Circuit in *Crystallex II*, 932

F.3d at 140-47, 149-51.

Moreover, as the Third Circuit explained in *Crystallex II*, 932 F.3d at 137, "a district

court has jurisdiction to enforce a federal judgment against a foreign sovereign when it is

registered" in the District pursuant to 28 U.S.C. § 1963, which is indisputably the case here with

---

[14] In another judgment creditor action against the Republic of Venezuela, *Gold Reserve Inc. v. Bolivarian Republic of Venez.*, Misc. No. 22-453 (D.I. 15 at 1 & n.1), intervenor PDVSA advised the Court of the Venezuelan National Assembly's revised Transition Statute, adopted in December 2022, which in relevant part removed Mr. Guaidó from his position as Interim President of Venezuela.  The issue of whether this is a post-April 2021 (or post October 13, 2022) material factual change has not been addressed by the parties or the Court in the *Gold Reserve* Action.  More importantly for today's purposes, no party in any of the four actions addressed by this Opinion has provided notice of the same to the Court.  The Court infers from the concerted, collective silence of these (generally highly-litigious) parties that they continue to agree there has been no material factual change since April 30, 2021.

respect to all four creditors. Therefore, the Court has jurisdiction over the Republic of
Venezuela in all four actions being considered in this Opinion. The Court also has jurisdiction
over PDVSA in these actions because, as the Third Circuit held in the analogous circumstances
of *Crystallex II*, 932 F.3d at 139, "so long as PDVSA is Venezuela's alter ego under *Bancec*, the
District Court ha[s] the power to issue a writ of attachment on that entity's non-immune assets to
satisfy the judgment against the country."

The FSIA does not address the circumstances under which an agency or instrumentality
of a foreign state may be treated effectively as the sovereign state itself for purposes of the
former's property being used to pay the debts of the latter. Thus, to determine whether the
creditors have rebutted the strong presumption of separateness between PDVSA and Venezuela,
the Court applies standards developed pursuant to federal common law, particularly in two
Supreme Court cases: *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462
U.S. 611, 627 (1983) ("*Bancec*"), and *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823
(2018) ("*Rubin*"). The *Bancec/Rubin* doctrine "exists specifically to enable federal courts, in
certain circumstances, to disregard the corporate separateness of foreign sovereigns to avoid the
unfair results from a rote application of the immunity provisions provided by the Sovereign
Immunities Act." *Crystallex II*, 932 F.3d at 139.

In *Bancec*, the Supreme Court explained that the "presumption [of separateness] may be
overcome in certain circumstances," including: (1) "where a corporate entity is so extensively
controlled by its owner that a relationship of principal and agent is created, we have held that one
may be held liable for the actions of the other," and "[i]n addition" (2) where adhering to "the
broader equitable principle" of corporate separateness "would work fraud or injustice." 462 U.S.
at 628-29 (internal quotation marks omitted). This is "a disjunctive test for when the separate

identities of sovereign and instrumentality should be disregarded," *Crystallex II*, 932 F.3d at 140, and a finding of "'extensive[] control'" by the former over the latter can be sufficient, *id.* (quoting *Rubin*, 138 S. Ct. at 823).

The Supreme Court recently clarified the five factors most prominently used to conduct an extensive control (or alter ego) analysis, articulating them as follows:

> (1) the level of economic control by the government;
>
> (2) whether the entity's profits go to the government;
>
> (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs;
>
> (4) whether the government is the real beneficiary of the entity's conduct; and
>
> (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*Rubin*, 138 S. Ct. at 823; *see also Crystallex II*, 932 F.3d at 141. There is no "mechanical formula," *Crystallex II*, 932 F.3d at 141 (quoting *Bancec*, 462 U.S. at 633); these tests "are meant to aid case-by-case analysis" of specific records in order to identify situations involving extensive control, *id.* In this Opinion, the Court will apply the *Rubin* formulation (which will sometimes be referred to as the "*Bancec/Rubin*" factors, test, or standard), as the Third Circuit did in *Crystallex II*. As was true in *Crystallex II*, 932 F.3d at 141 n.8, "[e]ither inquiry [i.e., *Bancec* or *Rubin*] compels the same result." 932 F.3d at 141 n.8.

Importantly, the *Bancec/Rubin* factors are not exhaustive of all the considerations that go into an alter ego analysis. Nor is it necessary, in order to prove an alter ego relationship, that the moving party be able to demonstrate that all of the *Bancec/Rubin* factors favor such a conclusion. *See generally Rubin*, 138 S. Ct. at 823.

The burden of making the appropriate showing rests on the party seeking to rebut the presumption of separateness, which here are the judgment creditors. *See also Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 179 (5th Cir. 1989); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 447 (D.C. Cir. 1990) ("It is further clear that the plaintiff bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship"). As the Third Circuit has confirmed, "preponderance of the evidence is the appropriate burden of proof" by which the creditors must prove their case, considering the *Bancec/Rubin* factors. *Crystallex II*, 932 F.3d at 144-46.

## II. OIEG And Huntington Have Proven That PDVSA Remains The Alter Ego of Venezuela Under The Guaidó Government

The Venezuela Parties (and, to a large extent, the creditors) contend that the appropriate analysis of whether PDVSA is the Republic's alter ego must focus on the relationship between the Guaidó Government and PDVSA in the United States. The Court agrees.

The Guaidó Government's acts are the pertinent acts for the alter ego analysis because the Guaidó Government is recognized by the United States as the legitimate government of Venezuela. The recognition of a foreign government is a power reserved exclusively to the Executive Branch of the United States government. *See Zivotofsky v. Kerry*, 576 U.S. 1, 18-19, 30 (2015) (discussing the Executive Branch's "exclusive" formal recognition power). Federal courts have no authority to question a decision by the Executive Branch on this issue. *See United States v. Belmont*, 301 U.S. 324, 330 (1937) (addressing Executive Branch's "authority to speak as the sole organ" of government on external affairs). Thus, the fact that, in the litigation before this Court, the Republic is represented by the Guaidó Government, and the further fact that the Guaidó Government exclusively holds all rights and interests to the Republic's property in the United States, are facts that cannot be disputed by any parties in these actions or second-

40

guessed by this Court. *See Zivotofsky*, 576 U.S. at 18-19; *Pfizer v. Government of India*, 434 U.S. 308, 319-20 (1978); *United States v. Pink*, 315 U.S. 203, 229 (1942); *Guaranty Tr. Co. v. United States*, 304 U.S. 126, 137-38 (1938); *Belmont*, 301 U.S. at 327-30 (1937); *see also Nat'l Union Fire Ins. Co. v. Republic of China*, 254 F.2d 177, 186 (4th Cir. 1958); *The Maret*, 145 F.2d 431, 442 (3d Cir. 1944).

An additional reason for the Court's conclusion is that the property the creditors are seeking to attach is located in the United States. This, too, suggests that the focus of the alter ego analysis should be on the United States.

Although the Court disagrees with the arguments some creditors make that the focus must be on the relationship between the Maduro Regime and PDVSA in Venezuela, even under this view (which is an alternate ground asserted by at least some creditors) the creditors have met their burden, as explained later in this Opinion. Additionally, although the Court agrees with the Venezuela Parties that the focus must be on the relationship between the Guaidó Government and PDVSA in the U.S., it does not agree that this holding renders the "facts on the ground" in Venezuela entirely irrelevant to the proper alter ego analysis. Given that this analysis is meant to consider the totality of the circumstances, and is to have some flexibility to be applied to vastly divergent factual realities, there may be some relevance (though certainly not predominance) to the relationship between the Maduro Regime and PDVSA in Venezuela. (The Court's conclusions would not be any different if it treated the Maduro-related facts as utterly irrelevant.)

Considering the record created in the *OIEG* and *Huntington* Actions and applying that record to the *Bancec/Rubin* factors, the Court concludes that OIEG and Huntington have proven, by a preponderance of the evidence, that PDVSA is the alter ego of Venezuela. In particular, the Guaidó Government exercises such extensive direction and control over PDVSA in the U.S. as to

41

render PDVSA the alter ego of Venezuela. Each of the *Rubin* factors is supported by extensive evidence (*see supra* Parts IV, V, & VI), some of which is summarized below.[15]

The Guaidó Government maintains extensive economic control over PDVSA. Venezuela treats PDVSA's assets as its own. The Guaidó Government has accessed PDVSA's U.S. subsidiaries' assets in the United States and used them to fund itself, bypassing any right PDVSA may have had to corporate dividends. The Guaidó Government has also used PDVSA assets to fund Venezuela's legal defense. On occasion, PDVSA has started, only later to stop, paying its debts at the direction of Venezuela. President Guaidó announced that he intends to treat Venezuela's debts and PDVSA's debts the same in an eventual debt restructuring. Economic control of PDVSA remains as engrafted in Venezuela's Constitution now as it was in August 2018. In *Crystallex II*, 932 F.3d at 147, the Third Circuit emphasized that these constitutional provisions result in substantial control over PDVSA and the Venezuelan oil industry, and this is no less true today.

Under the Guaidó Government, PDVSA's profits go to Venezuela, which remains the sole shareholder in PDVSA. *See id.* at 148.

The Guaidó Government, acting through PDVSA's Ad Hoc Board, which the government appointed, exercises control over PDVSA's daily activities. PDVSA's Ad Hoc Board has acknowledged that it operates under "directives" from the Guaidó Government. In litigation in U.S. courts, the Ad Hoc Board has noted that Venezuelan law gives the National

---

[15] The Court's decision to highlight only certain of the many findings of fact contained in this Opinion does not mean that the other findings of fact have no impact on the Court's analysis. The Court's conclusion that the creditors have proven PDVSA is Venezuela's alter ego is based, as it must be, on the totality of the evidence. In part because the evidence of Venezuela's extensive direction and control over PDVSA is so overwhelming, and in part for simplicity (since the detailed findings of fact are set out earlier in this Opinion), the Court's Discussion is abbreviated.

Assembly the authority to approve any "public interest contract" PDVSA enters into and that, in its view, "any" PDVSA contract is a public interest contract.

The Guaidó Government is the real beneficiary of PDVSA's conduct. Among other things, the Guaidó Government has used PDVSA funds to conduct its legal defense. Mr. Guaidó and his government regularly characterize PDVSA and its related assets as assets of the Republic itself.

Finally, adherence to separate identities would entitle Venezuela to benefits in U.S. courts while allowing Venezuela to avoid its obligations. The Third Circuit's holding on this point in *Crystallex II* is equally applicable in the *OIEG* and *Huntington* Actions (and also in the *ACL* and *Rusoro* Actions):

> Venezuela owes [the judgment creditors] from . . . judgment[s] that ha[ve] been affirmed in our courts. Any outcome where [a creditor before the Court] is not paid means that Venezuela has avoided its obligations. It is likewise clear from the record that PDVSA, and by extension Venezuela, derives significant benefits from the U.S. judicial system. Its 2020 bonds are backed by the common stock and underlying assets of U.S.-based corporations, and hence disputes stemming from default will be subject to U.S. laws and presumably be resolved through the U.S. legal system. Indeed, it is probable the U.S. legal system is the backstop that gives substantial assurance to investors who buy PDVSA's debt.

932 F.3d at 149.

In sum, then, considering the totality of the joint record made out in the *OIEG* and *Huntington* Actions, and carefully evaluating that record in light of the *Bancec/Rubin* factors – while recognizing that these factors are neither exhaustive nor mandatory – the Court concludes that PDVSA in the United States is the alter ego of Venezuela under the Guaidó Government.

## III.  ACL Has Proven That PDVSA Remains The Alter Ego of Venezuela Under The Guaidó Government

ACL did not participate in the April 2021 hearing and did not otherwise expressly agree

to adopt the evidentiary record from OIEG's and Huntington's cases. Nevertheless, ACL

supplied its own evidence which in all material respects matches the record in the other two

actions already discussed. (*See ACL* Action D.I. 49, 51)[16]  Therefore, and for the same reasons,

the Court also concludes that ACL has established, by a preponderance of the evidence, that the

Guaidó Government extensively controls PDVSA such that PDVSA is Venezuela's alter ego.

A brief summary of the evidence ACL presented in support of this conclusion is as

follows:

- The Guaidó Government maintains extensive economic control over PDVSA through provisions in the Venezuela Constitution (*ACL* Action D.I. 49 ¶ 21), by controlling PDVSA's ability to make payments on its bonds and to the Maduro Regime (*id.* D.I. 49 ¶¶ 24, 31-32), requiring National Assembly approval for PDVSA to pay its legal fees (*id.* D.I. 49 ¶ 30), having access to PDVSA income (*id.* D.I. 51 ¶ 29), and by not distinguishing between Venezuela's and PDVSA's assets (*id.* D.I. 49 ¶ 33).

- The Guaidó Government receives PDVSA's profits, as PDVSA is wholly owned by Venezuela. (*ACL* Action D.I. 49 ¶¶ 4-5; *see also id.* D.I. 51 ¶ 29)

- The Guaidó Government manages PDVSA, including by exercising its powers under the Transition Statute, which enable the National Assembly to exercise veto power over PDVSA's business contracts (*ACL* Action D.I. 49 ¶¶ 23-25) and allow Guaidó to appoint the Ad Hoc Board (*id.* D.I. 49 ¶¶ 26-27), and also by closely monitoring the day-to-day workings of PDVSA (*id.* D.I. 49 ¶¶ 34-35, 38).

- The Guaidó Government is the real beneficiary of PDVSA's conduct (*see, e.g.*, *ACL* Action D.I. 49 ¶ 35).

- Adherence to separate identities would entitle Venezuela to benefits in U.S. courts while avoiding its obligations, for the same reasons already given above on this very same point with respect to OIEG's and Huntington's motions. (*See supra* Discussion Part II)

---

[16] Any paragraph containing an ACL proposed finding of fact that the Court refers to by number is a finding of fact the Court is adopting as its own.

## IV.     Rusoro Has Proven That PDVSA Remains The Alter Ego of Venezuela Under The Guaidó Government

Rusoro did not participate in the April 2021 Hearing and did not otherwise expressly agree to adopt the evidentiary record in OIEG's and Huntington's cases. Nevertheless, Rusoro supplied its own evidence which in all material respects matches the record in the other actions already discussed. (*See Rusoro* Action D.I. 35, 38)[17] Therefore, and for the same reasons, the Court also concludes that Rusoro has established, by a preponderance of the evidence, that the Guaidó Government extensively controls PDVSA such that PDVSA is Venezuela's alter ego.

A brief summary of the evidence Rusoro presented in support of this conclusion is as follows:

- The Guaidó Government maintains extensive economic control over PDVSA. (*See Rusoro* Action D.I. 35 ¶ 55; *id.* D.I. 38 ¶¶ 5-8)

- The Guaidó Government receives PDVSA's profits, as PDVSA is wholly owned by Venezuela. (*Rusoro* Action D.I. 34 ¶ 16)[18]

- The Guaidó Government manages PDVSA. (*Rusoro* Action D.I. 35 ¶¶ 56, 61; *id.* D.I. 38 ¶¶ 11-17)

- The Guaidó Government is the real beneficiary of PDVSA's conduct. (*Rusoro* Action D.I. 35 ¶ 57; *id.* D.I. 38 ¶¶ 18-19)

- Adherence to separate identities would entitle Venezuela to benefits in U.S. courts while avoiding its obligations, for the same reasons already given above on this very same point with respect to OIEG's and Huntington's motions. (*See supra* Discussion Part II)

---

[17] Any paragraph containing a Rusoro proposed finding of fact that the Court refers to by number is a finding of fact the Court is adopting as its own.

[18] The Court adopts this finding of fact, proposed by PDVSA, as its own finding.

## V.  OIEG And Huntington Have Proven That PDVSA Remains The Alter Ego of Venezuela Under The Maduro Regime

The Court has held that the proper focus for the alter ego analysis is on the relationship between the recognized Guaidó Government and PDVSA in the United States. However, the Court has before it, additionally, a record of the relationship between the Maduro Regime and PDVSA in Venezuela. The four creditors the Court is considering in this Opinion argue, to varying degrees (i.e., as either their principal argument or as an alternative basis for the relief they seek), that the alter ego analysis can meaningfully be undertaken with respect to the Maduro Regime and PDVSA in Venezuela. The Court agrees that this alternate approach leads to the same conclusion: PDVSA is the alter ego of Venezuela.[19]

---

[19] "[R]ecognition or nonrecognition of the decrees of an unrecognized government which actually governs [is] a political matter for the sole determination of the Executive." *The Maret*, 145 F.2d at 440. Nevertheless, while the Executive Branch's determination of which of Venezuela's governments is recognized as legitimate "is conclusive on all domestic courts," courts still "are free to draw for themselves its legal consequences in litigations pending before them." *Guar. Tr. Co. of N.Y.*, 304 U.S. at 138; *see also Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 541 (S.D.N.Y. 2013), *aff'd* 768 F.3d 145 (2d Cir. 2014) ("The legitimacy or illegitimacy of the Hussein Regime's rule does not affect whether the Regime's acts may be attributed to the Republic of Iraq. Indeed, Courts have attributed conduct of allegedly unlawful regimes to the states they purported to represent. . . . [A]ttribution operates independently of diplomatic recognition. . . . What matters is control."); *Salimoff & Co. v. Standard Oil Co.*, 262 N.Y. 220, 227 (1933) ("The courts may not recognize the Soviet government as the de jure government until the State Department gives the word. They may, however, say that it is a government, maintaining internal peace and order, providing for national defense and the general welfare, carrying on relations with our own government and others. To refuse to recognize that Soviet Russia is a government regulating the internal affairs of the country, is to give to fictions an air of reality which they do not deserve."). Thus, for example, in cases like *The Denny*, 127 F.2d 404, 410 (3d Cir. 1942), courts have explained that they "may not ignore the fact that the [non-recognized] government did actually exercise governmental authority in [a country] at the time the decrees in question were made and the powers of attorney were given." *See also Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (stating that courts must look to "reality and not form" in making alter ego determination). Based on these and similar authorities, the Court does not believe that the Maduro Regime's conduct in Venezuela is entirely irrelevant to the required alter ego analysis.

Applying the *Bancec/Rubin* factors to the record jointly admitted in the *OIEG* and

*Huntington* Actions, the Court concludes that these creditors have proven, by a preponderance of

the evidence, that PDVSA in Venezuela is the alter ego of Venezuela under the Maduro Regime.

A selection of the evidence (all of which is set out in detail in the Court's findings of fact, *see*

*supra*) leading the Court to this conclusion follows:

- The Maduro Regime exercises extensive economic control over PDVSA in
  Venezuela, as evidenced by, among other things, Mr. Maduro's announcement of
  gasoline price increases PDVSA subsequently enacted, the government's
  announcement of a corporate transaction executed by a PDVSA subsidiary, and
  Executive Order 4.090 (by which Mr. Maduro authorized PDVSA to take actions
  with respect to owners of licensed service stations).

- The Maduro Regime profits from PDVSA's operations, as the Republic is the sole
  shareholder of PDVSA.

- The Maduro Regime manages PDVSA, as evidenced by, among other things, Mr.
  Maduro's appointment of members of PDVSA's Board (including appointments of
  government officials, including a Minister of Oil) and his appointment of high-level
  officers at PDVSA, at one of its subsidiaries, and at a CITGO entity.

- The Maduro Regime is the real beneficiary of PDVSA's conduct, as evidenced by,
  among other things, the government's use of PDVSA property (including airplanes)
  for government activities, Mr. Maduro's use of PDVSA petroleum to support
  Venezuela's foreign policy (including with respect to Cuba and China), and
  PDVSA's website's declaration that one of its strategic objectives is to "[s]upport the
  geopolitical positioning of Venezuela internationally."

- Adherence to separate identities would entitle Venezuela to benefits in U.S. courts
  while avoiding its obligations, for the same reasons already given above on this very
  same point. (*See supra* Discussion Part II)

## VI. ACL Has Proven That PDVSA Remains The Alter Ego of Venezuela Under The Maduro Regime

ACL did not participate in the April 2021 Hearing and did not otherwise expressly agree

to adopt the evidentiary record in OIEG's and Huntington's cases. Nevertheless, ACL supplied

its own evidence which in all material respects matches the record in the other two actions

already discussed. (*See ACL* Action D.I. 49, 51)[20] Therefore, and for the same reasons, the

Court also concludes that ACL has established, by a preponderance of the evidence, that the

Maduro Regime extensively controls PDVSA such that PDVSA is Venezuela's alter ego.

A brief summary of the evidence ACL presented in support of this conclusion is as

follows:

- The Maduro Regime maintains extensive economic control over PDVSA in numerous ways, including by exercising its powers under the Venezuelan Constitution, by Mr. Maduro ordering PDVSA's office in Lisbon to be relocated to Moscow, causing PDVSA to sell oil products at below-market prices for political ends, and causing PDVSA to deliver oil to China to service Venezuela's sovereign debt and to Cuba to support Venezuela's political ally. (*ACL* Action D.I. 49 ¶¶ 16, 19, 21; *see also* Barger Decl. Ex. 2)

- The Maduro Regime receives PDVSA's profits, as PDVSA is wholly owned by Venezuela. (*ACL* Action D.I. 49 ¶¶ 4-5; *see also id.* D.I. 51 ¶ 29)

- The Maduro Regime manages PDVSA, including by exercising appointment power, requiring PDVSA employees to avoid publicly opposing governmental aims, and using PDVSA aircraft for travel by government officials. (*ACL* Action D.I. 49 ¶¶ 15, 17-18)

- The Maduro Regime is the real beneficiary of PDVSA's conduct, as evidenced by the execution by Venezuela of a deal under which PDVSA was required to deliver approximately $260 million of crude oil to supply food for a government program. (*ACL* Action D.I. 49 ¶ 20)

- Adherence to separate identities would entitle Venezuela to benefits in U.S. courts while avoiding its obligations, for the same reasons already given above on this very same point. (*See supra* Discussion Part II)

## VII. Rusoro Has Proven That PDVSA Remains The Alter Ego of Venezuela Under The Maduro Regime

Rusoro did not participate in the April 2021 Hearing, and did not otherwise expressly

agree to adopt the evidentiary record in OIEG's and Huntington's cases. Nevertheless, Rusoro

---

[20] Again, any paragraph containing an ACL proposed finding of fact that the Court refers to by number is a finding of fact the Court is adopting as its own.

supplied its own evidence which in all material respects matches the record in the other actions already discussed. (*See Rusoro* Action D.I. 35, 38)[21] Therefore, and for the same reasons, the Court also concludes that Rusoro has established, by a preponderance of the evidence, that the Maduro Regime extensively controls PDVSA such that PDVSA is Venezuela's alter ego.

A brief summary of the evidence Rusoro presented in support of this conclusion is as follows:

- The Maduro Regime maintains extensive economic control over PDVSA. (*See Rusoro* Action D.I. 35 ¶¶ 12-16, 20, 31-33, 36-38, 40-41)

- The Maduro Regime receives PDVSA's profits, as PDVSA is wholly owned by Venezuela. (*Rusoro* Action D.I. 34 ¶ 16)[22]

- The Maduro Regime manages PDVSA. (*Rusoro* Action D.I. 35 ¶¶ 21-24)

- The Maduro Regime is the real beneficiary of PDVSA's conduct. (*Rusoro* Action D.I. 35 ¶¶ 26-30, 45-53)

- Adherence to separate identities would entitle Venezuela to benefits in U.S. courts while avoiding its obligations, for the same reasons already given above on this very same point. (*See supra* Discussion Part II)

## VIII. The Creditors Have Proven That PDVSA Is The Alter Ego Of Venezuela As Of All Potentially Pertinent Dates

In *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, Misc. No. 17-151-LPS, 2021 WL 129803, at \*6 (D. Del. Jan. 14, 2021), this Court held that "the pertinent time" for purposes of an alter ego analysis is "the period between the filing of the motion seeking a writ of attachment and the subsequent issuance and service of that writ." The Court continues to adhere

---

[21] Again, any paragraph containing a Rusoro proposed finding of fact that the Court refers to by number is a finding of fact the Court is adopting as its own.

[22] Once again, the Court adopts this proposed finding of fact of PDVSA's as its own finding of fact.

to this view.[23] It reflects the reality that the judgment creditors' actions are brought against the *property* of the Bolivarian Republic of Venezuela (i.e., the property of its alter ego, PDVSA, found in this District) and not against PDVSA itself. It follows that this Court is only able to grant the relief sought by the judgment creditors so long as Venezuela has property in this District. Since the focus is on the property, and not the party, what matters is the location and ownership status of the property, characteristics that can change at any time. This strongly suggests to the Court that the pertinent time has to be related to the time that the judgment creditor seeks to attach the property of the judgment debtor and not, by contrast, some (potentially distant) time in the past (e.g., the time of the injury that gave rise to the creditor's judgment).

Because the Court continues to conclude that the pertinent time is the period between the filing of the motion seeking a writ of attachment and the subsequent issuance and service of that writ, in evaluating the motions of the four creditors the Court is considering in this Opinion the pertinent times for the Court's alter-ego determination are as follows: (i) for OIEG, from the date of filing of its renewed attachment motion on February 19, 2021 through the date of issuance and/or service of the writ; (ii) for Huntington, from the date of filing of its amended motion on February 19, 2021 through the date of issuance and/or service of the writ; (iii) for ACL, from the date of filing of its motion on November 22, 2021 through the date of issuance and/or service of

---

[23] In May 2022, Court certified the pertinent-time question for interlocutory appeal, in this formulation: "Whether the pertinent time for conducting an alter ego analysis with respect to the Bolivarian Republic of Venezuela and Petróleos de Venezuela, S.A. is: (i) the period between a judgment creditor filing a motion seeking a writ of attachment and the subsequent issuance and service of the writ, (ii) the time of the injury that gave rise to the judgment creditor's judgment, or (iii) some other time." (*E.g.*, *OIEG* Action D.I. 114) The Third Circuit denied the petitions for leave to appeal that followed. *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, No. 22-8024 D.I. 28 (3d Cir. July 26, 2022).

the writ; and (iv) for Rusoro, from the date of filing of its motion on February 9, 2022 through the date of issuance and/or service of the writ.

The Court recognizes that the judgment creditors disagree with the Court's pertinent time analysis. OIEG, Huntington, ACL, and Rusoro all argue that the pertinent time is the time they were injured via the expropriation of their assets: OIEG in 2010 when the Chávez regime expropriated two of OIEG's glass factories (*OIEG* Action D.I. 49 at 2); Huntington in February 2018 (*Huntington* Action D.I. 64 Ex. 1 at 17; *id.* D.I. 64 at 2 ("facts pertinent to the moment the debt arose are the only pertinent facts"); ACL in January 2018, when Venezuela failed to make timely payments on its bonds, or in December 2018, when the full principal became due (*ACL* Action D.I. 3 at 10, 14); and Rusoro in 2011, when its property and gold-mining rights were seized by Venezuela (*Rusoro* Action D.I. 4 Ex. 1 at 3, 27). Alternatively, the creditors contend that the pertinent date is August 2018, because as of that date the Venezuela Parties have been barred by collateral estoppel from arguing against an alter-ego finding, due to the Court's ruling in *Crystallex I.* (*See, e.g.*, *OIEG* Action D.I. 49 at 23-25; *Huntington* Action D.I. 64 Ex. 1 at 6-8; *see ACL* Action D.I. 3 at 14-15; *Rusoro* Action D.I. 4 Ex. 1 at 26-28) The Court has already rejected this position and continues to do so.

The record before the Court, and the Court's findings with respect to that record, is sufficient such that the Court finds, in the alternative, that if the pertinent dates begin on the date of injury, as identified just above, each of the four judgment creditors has proven, by a preponderance of the evidence, that PDVSA was the alter ego on all such pertinent dates, continuing at least through October 13, 2022. The Court reaches these conclusions based on the same findings of fact given above and throughout this Opinion, based on its consideration of the *Bancec/Rubin* factors.

51

## IX.    Venezuela Parties' Counter-Arguments

In addition to the arguments and objections that have already been addressed in connection with the analysis above, the Court here discusses certain additional contentions made by the Venezuela Parties. raised by the Venezuela Parties.

First, throughout these proceedings, the Venezuela Parties have maintained that the OFAC regulations "broadly prohibit any conceivable steps toward enforcing a judgment against blocked property, such as the PDVH shares, without a license."[24]  (*E.g.*, *Huntington* Action D.I. 32 at 27)  More specifically, the Venezuela Parties have argued that "resolution of the alter ego issue in favor of [the judgment creditors] . . . would alter or affect PDVSA's interests in the PDVH shares and create an interest in the PDVH shares," which is prohibited by the sanctions regime in the absence of a specific license from OFAC. (*E.g.*, *OIEG* Action D.I. 101 at 1;[25] *see also id.* D.I. 65 at 29-30 (creditor cannot obtain "contingent priority interest in the PDVH shares in the absence of a specific license from OFAC"); *id.* D.I. 95 at 2-5 ("any order or judicial process that purports to create a future or contingent interest, or otherwise alters or affects directly or indirectly any right or interest in the PDVH shares, in the absence of a license would be a nullity"); *ACL* Action D.I. 22 at 4, 30-32; *Rusoro* Action D.I. 33 at 2 n.2, 18-19)  The Venezuela Parties relatedly argue that OFAC sanctions disallow the Court from "making findings of fact tending to establish that PDVSA is the alter ego of Venezuela," regardless of whether the Court orders issuance and service of any writ. (*See, e.g.*, *OIEG* Action D.I. 95 at 7-9; *see also id.* D.I. 101 at 8-10)  If the Court were to issue findings of fact or were to conditionally grant a motion

---

[24] The Republic submitted filings in the *OIEG* Action, but not in the *Huntington*, *ACL*, or *Rusoro* Actions. (*See, e.g.*, *OIEG* Action D.I. 11-13, 18-19, 30, 39, 44, 69, 75, 98, 123, 126)

[25] PDVSA filed identical post-hearing briefs in the *OIEG* and *Huntington* Actions. (*See OIEG* Action D.I. 95, 101; *Huntington* Action D.I. 51, 53)  For convenience, in this section the Court cites only to the version of the briefs filed in the *OIEG* Action.

for writ of attachment, the Venezuela Parties continue, the Court would be acting inconsistently with the Article III doctrines of standing, ripeness, and mootness, or otherwise rendering an advisory opinion. (*See, e.g.*, *OIEG* Action D.I. 95 at 9-13; *id.* D.I. 101 at 10-13); *Huntington* Action D.I. 32 at 28; *ACL* Action D.I. 22 at 30-33; *id.* D.I. 32 at 7-10); *Rusoro* Action D.I. 33 at 20)

The Court rejected each of these contentions in its March 2, 2022 Opinion, holding that "the OFAC sanctions regime does not require a specific license before the Court may enter an order authorizing the eventual issuance of a writ of attachment." (*E.g.*, *OIEG* Action D.I. 109 at 18)[26] The Court also held that "no OFAC license is required before it may issue findings of fact regarding whether PDVSA is the Republic's alter ego." (*Id.* at 17 n.13) The Court further rejected PDVSA's ripeness challenge and other "vague" Article III challenges, concluding it has jurisdiction under Article III. (*See, e.g.*, March 2022 Op. at 8-11, 12 & n.9) The Court adheres to and hereby incorporates by reference the analysis and conclusions it reached in the March 2022 Opinion.

Rusoro is the only judgment creditor whose case is addressed in the instant Opinion and was not a party to the March 2022 Opinion. With respect to Rusoro, the Venezuela Parties incorporate their prior arguments by reference. (*See, e.g.*, *Rusoro* Action D.I. 33 at 2 n.2, 18-20) Accordingly, the Court rejects these arguments for the same reasons provided in the March 2022 Opinion.

Second, PDVSA has moved to dismiss these judgment creditor actions for lack of subject-matter jurisdiction and lack of personal jurisdiction under the FSIA. (*See OIEG* Action

---

[26] The March 2022 Opinion was also docketed in the *Huntington* Action (D.I. 58) and the *ACL* Action (D.I. 33).

53

D.I. 64; *Huntington* Action D.I. 31; *ACL* Action D.I. 21; *see also Rusoro* Action D.I. 32 (also

seeking dismissal for lack of subject matter jurisdiction under Article III and to vacate Rusoro's

registered judgment pursuant to Federal Rule of Civil Procedure 60(b)(4)) The Court concludes

it has subject-matter jurisdiction over all the actions against Venezuela it is addressing in this

Opinion.[27]

In *Crystallex I*, 333 F. Supp. 3d at 399, "the Court ha[d] subject matter jurisdiction over

Venezuela under § 1605(a)(6)(A) due to Crystallex's \$1.2 billion arbitral award against

Venezuela, which was confirmed by the United States District Court for the District of Columbia

and is now registered in the District of Delaware." Similarly, here, (a) OIEG has an arbitral

award against Venezuela, which was confirmed by the DC Court and is now registered in this

District (*see OIEG* Action D.I. 1; *id.* D.I. 3 at 1-3); (b) *Huntington* has an arbitral award against

Venezuela, which was confirmed by the Southern District of Mississippi and subsequently

registered in this District (*Huntington* Action D.I. 1; *id.* D.I. 4 at 1-2 & n.1); (c) ACL registered

its judgment against Venezuela from the Southern District of New York in this District and

Venezuela "irrevocably waive[d]" "immunity from suit" (*ACL* Action D.I. 1; *id.* D.I. 3 at 15-16);

and (d) Rusoro has an arbitral award against Venezuela, confirmed by the DC Court and

registered in this District (*Rusoro* Action D.I. 1; *id.* D.I. 4 Ex. 1 at 3-4).

Because the Court has concluded that PDVSA is the alter-ego of Venezuela in all of these

actions, and because the Court has subject-matter jurisdiction over Venezuela in all of these

---

[27] To the extent that PDVSA is challenging the justiciability of Rusoro's pending attachment
motion under Article III (*see Rusoro* Action D.I. 33 at 1 n.1), the Court already rejected
PDVSA's position in the March 2022 Opinion at 12 n.9. PDVSA also moves to vacate Rusoro's
registered judgment, alleging that even registration of a judgment violates the OFAC sanctions
regime. (*See id.* D.I. 33 at 5, 19-20) As PDVSA acknowledges (*see, e.g.*, *id.* D.I. 33 at 2 n.2),
the Court has already rejected these positions, and does so again here. (*See, e.g.*, March 2022
Opinion at 19-20)

actions under 38 U.S.C. § 1605(a), "the Court may exercise subject matter jurisdiction with respect to PDVSA as well." *Crystallex I*, 333 F.3d at 394. PDVSA's personal-jurisdiction argument is entirely premised on the Court agreeing with PDVSA that the Court lacks subject-matter jurisdiction and that PDVSA was never properly served. (*See, e.g.*, *OIEG* Action D.I. 65 at 9 n.2; *Huntington* Action D.I. 32 at 1 n.1; *ACL* Action D.I. 22 1 n.1; *Rusoro* Action D.I. 33 1 n.1) The Court does not agree with PDVSA on these points. Moreover, PDVSA intervened in these actions (*see OIEG* Action D.I. 57; *Huntington* Action D.I. 19; *ACL* Action D.I. 13; *Rusoro* Action D.I. 14), did not object to personal jurisdiction at the time, and is (as the Court has found) the alter ego of Venezuela. For this combination of reasons, the Court may exercise personal jurisdiction over PDVSA in all of the above-captioned actions. Accordingly, PDVSA's cross-motions to dismiss (*OIEG* Action D.I. 64; *Huntington* Action D.I. 31; *ACL* Action D.I. 21; *Rusoro* Action D.I. 32) will be denied.

Third, the Venezuela Parties argue that Delaware law applies to this proceeding, that it precludes attachment of the PDVH shares absent a showing of fraud, and that the judgment creditors have not made a showing of fraud. (*See, e.g.*, *OIEG* Action D.I. 65 at 31-35; *id.* D.I. 69 at ¶ 4; *id.* D.I. 98 at 4-6; *Huntington* Action D.I. 32 at 29-30; *ACL* Action D.I. 22 at 33-35; *Rusoro* Action D.I. 33 at 17-18) This Court and the Third Circuit have previously rejected these contentions. *See Crystallex II*, 932 F.3d at 145 ("*Bancec* is binding federal common law for disputes under the [FSIA]."); *Crystallex I*, 333 F. Supp. 3d at 397 (explaining fraud is not required under governing federal common law). No new or persuasive arguments have been provided in the actions addressed in this Opinion (even assuming, for the sake of argument, the Court were free to revisit this issue). Thus, the Court adheres to and hereby adopts and incorporates by reference its holding and analysis in its earlier rejections of these positions.

55

Fourth, the Venezuela Parties emphasize that the Republic of Venezuela is PDVSA's sole shareholder, giving the Republic all the same extensive rights any controlling shareholder would have, and suggesting that the evidence shows nothing more than the kinds of actions any controlling shareholder might take with respect to a corporate entity it controls. *See generally Gater Assets Ltd. v. Moldovagaz*, 2 F.4th 42, 55-56 (2d Cir. 2021) ("To qualify as sufficiently extensive under *Bancec*, the sovereign's control over an entity must rise above the level that corporations would normally tolerate from significant shareholders or expect from government regulators."). For instance, a controlling shareholder may have the right to appoint directors and to be provided with information about a company's operations. *See generally Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 203 (2d Cir. 2016) ("[C]ourts have consistently rejected the argument that the appointment or removal of an instrumentality's officers or directors, standing alone, overcomes the *Bancec* presumption") (internal quotation marks omitted). The Court recognizes these realities. However, for all the reasons set out in detail throughout this Opinion, the Court finds that the Republic is regularly exercising powers far beyond those accorded to it through its role as sole and controlling shareholder of PDVSA. (*See, e.g.*, April 2021 Tr. at 251-54 (Huntington counsel describing evidence of commingling of Venezuela and PDVSA funds, use of government funds to pay corporation's lawyers, and arguing, persuasively, that no "normal shareholder would . . . be able to get at and make direct orders of second – third, and fourth-order subsidiaries without going through the company it actually owns")) Moreover, actions taken by the Republic that happen to correspond to actions any controlling shareholder may be empowered to take do not, thereby, lose all probative value in an alter ego analysis. Fundamentally, after according all of the facts found here their appropriate weight, including the fact that Venezuela is PDVSA's sole shareholder, the Court

has found, by a preponderance of the evidence, that Venezuela directs and controls PDVSA to an extent and in a manner rendering PDVSA the alter ego of Venezuela.

Finally, as already noted, the Venezuela Parties insist that the Court's consideration of the Maduro Regime's actions is inconsistent with caselaw in this area. (*See, e.g.*, *OIEG* Action D.I. 11 at 11-12 & n.12; *id.* D.I. 65 at 11-12, 14-20; *id.* D.I. 69 at 3-4; *id.* D.I. 101 at 15-20; *Huntington* Action D.I. 53 at 15-20; *ACL* Action D.I. 22 at 12-16; *id.* D.I. 32 at 3-4; *Rusoro* Action D.I. 33 at 15-16) As the Court has stated (*see supra* Discussion Part II), the Court largely agrees and, thus, has held that the relevant analysis is of the recognized Guaidó Government's relationship with PDVSA in the United States. The Court has considered the numerous cases relied on by the Venezuela Parties and finds in them no basis not to have also considered, as an alternative ground for its ruling, that the relationship between the Maduro Regime and PDVSA in Venezuela is also an alter-ego relationship.[28]

---

[28] *See, e.g.*, *Zivotofsky*, 576 U.S. at 14, 18-19, 22; *Pink*, 315 U.S. at 229-33; *Guaranty Tr. Co.*, 304 U.S. at 137-38; *Belmont*, 301 U.S. at 328-30; *PDVSA U.S. Litig. Trust v. Lukoil Pan Ams. LLC*, -- F. 4th --, 2023 U.S. App. LEXIS 5950 (11th Cir. 2023); *Nat'l Union Fire Ins. Co.*, 254 F.2d at 186-87; *Latvian State Cargo & Passenger S.S. Line v. McGrath*, 188 F.2d 1000, 1002-04 (D.C. Cir. 1951); *The Maret*, 145 F.2d at 433, 439-42.

## CONCLUSION

For the reasons given above, the Court will grant OIEG's, Huntington's, ACL's, and Rusoro's motions for writs of attachment of PDVSA's shares of PDVH, as these creditors have rebutted the presumption that Venezuela and PDVSA are separate, as the creditors have proven, by a preponderance of the evidence, that in fact PDVSA is the alter ego of the judgment debtor, the Republic of Venezuela. The Court has found that this alter ego relationship existed at all possibly pertinent dates and regardless of whether the analysis is properly focused on the relationship between the Guaidó Government and PDVSA in the United States (as the Court holds is the correct analysis) or, alternatively, centers on the relationship between the Maduro Regime and PDVSA in Venezuela. The Court will order the parties to meet and confer and provide their positions on how the Court should now proceed. An appropriate order follows.