# Exhibit 16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

NORTHROP GRUMMAN
SHIP SYSTEMS, INC.,
Plaintiff.,

v.                                                   **C.A. No. 1:20-mc-00257-UNA**

THE MINISTRY OF DEFENSE OF
THE REPUBLIC OF VENEZUELA,

Defendant.

_____/

**EXPERT REPORT OF MANUEL A. GOMEZ IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR RELIEF UNDER 28 U.S.C. §160(C) AND FOR A WRIT OF**
**ATTACHMENT *FIERI FACIAS***

**I.     Qualifications and scope**

1.   As my credentials state below, I am a Professor of Law and the Associate Dean for
     Graduate Studies and Global Engagement at Florida International University with
     expertise on international and comparative law and transnational dispute resolution.
     My research, teaching and other scholarly endeavors frequently entail a comparison
     between the U.S. and Latin American jurisdictions, including Venezuela.   My
     familiarity with that country stems from the fact that I have been a Venezuelan lawyer
     for almost three decades, which has allowed me to amass significant experience both
     as practitioner and academic.   I reside in the United States, but have always remained
     engaged professionally and academically with Venezuela and routinely work on
     matters involving Venezuela.

2.   I am a lawyer duly licensed to practice law in Venezuela since 1994 and continue to be
     a good standing member of that bar.   I also hold a specialization in Civil Procedure
     from the Universidad Católica Andrés Bello.   I have extensive experience in civil,
     commercial, labor and family litigation, business transactions, insurance, contracts, and



1

torts in Venezuela. I have also been a professor and researcher affiliated to different Venezuelan law schools. As practitioner and academic, I have acquired significant experience in handling numerous legal matters both in transactional and dispute processing contexts involving Venezuelan and foreign parties. I have also been able to devote significant time and effort to conduct research and publish scholarly works on a broad variety of legal issues involving Venezuela, and other Latin American jurisdictions. I am therefore very familiar with the Venezuelan legal system, including, — but not limited to — government contracts, government regulation, private and public international law, criminal and civil liability, civil and commercial litigation, anti-corruption regulation, the recognition and enforcement of foreign judgments, and international judicial cooperation.

3. I hold two graduate degrees from Stanford University, a master's degree in Law (J.S.M) and a doctorate in juridical science (J.S.D.).

4. In the course of my professional and academic career, I have lectured at many universities, and spoken at numerous professional and academic conferences throughout the Americas, Europe, Africa, Asia and Oceania. A copy of my *curriculum vitae* listing my credentials, affiliations, and a select list of my publications is attached hereto as "Exhibit A".

5. I have been retained by counsel for Northrop Grumman Ship Systems, Inc., f/k/a Ingalls Shipbuilding, Inc., and now known as Huntington Ingalls Incorporated ("Plaintiff" or "Huntington Ingalls") to analyze certain issues regarding Venezuela in support of a writ of attachment *fieri facias* ("*fi.fa.*") as to the shares of PDV Holding, Inc. ("PDVH"), a Delaware corporation fully owned by Petróleos de Venezuela S.A. ("PDVSA"), the state oil company and alter ego of judgment debtor the Bolivarian Republic of Venezuela ("Venezuela").

6. The statements in this report are true and correct to the best of my knowledge. I was not required to conduct an independent review of the facts and circumstances of this case, but just to offer a professional opinion based on my knowledge and familiarity with Venezuela's legal system and its current political reality. My analysis and conclusions are based on (i) my familiarity with the Venezuelan legal system and the current political situation affecting that country; (ii) my analysis of the facts and



circumstances of this case based on the documents that I have reviewed, and (iii) my analysis of the laws and other regulations, government reports, judicial decisions, news articles and academic publications cited throughout this report.

7. I have been asked to address the following specific questions:

   a. Whether PDVSA remains Venezuela's alter ego —as found by this Court in August of 2018— such that PDVSA's assets in the United States are still subject to the pervasive control of Venezuela.

   b. Whether the circumstances of this Court's alter ego analysis regarding PDVSA have changed since the United States' decision in January of 2019 to transfer its recognition of Venezuela's legitimate government from that headed by Mr. Nicolás Maduro to that led by Mr. Juan Guaidó.

8. This report is the independent product of my professional assessment of the issues presented to me insofar they involve the interpretation of Venezuelan law, the work of its legal institutions and the political reality of that country. My opinion is not subject to any external influence, pressure, or interest in the outcome of any dispute —potential or present— between any and all of the parties involved in this matter. The considerations and conclusions expressed in this report embody my professional opinion on the specific matters to which they refer. I am being paid for my services in this matter, but my fees are not dependent on the nature of the opinions I state here, or on the result of the case.

9. For the reasons set forth below, it is my professional opinion that (i) PDVSA remains Venezuela's alter ego and its assets and interests in the United States are still subject to the pervasive control of Venezuela's political leaders, and (ii) the circumstances considered by this Court to regard PDVSA as Venezuela's alter ego have become more pronounced concerning the extensive control exerted by the country's political leaders since the United States' recognition of Mr. Juan Guaidó as Interim President of Venezuela in January of 2019.



## II.  Venezuela and PDVSA have become increasingly intermingled during the last two decades

10. PDVSA was originally created in 1975 as a state-owned holding to carry out the government policies regarding the distribution and commercialization of hydrocarbons in Venezuela.[1]  Despite having been established as private commercial corporation, and therefore subject to laws and regulations applicable to all commercial firms, PDVSA was also subject to the control and oversight of the Executive branch, through the Ministry of Energy and Mining.  The corporate form gave PDVSA some degree of flexibility and operational independence, while at the same time Venezuela as its sole shareholder and beneficiary, was able to maintain certain level of oversight.  Given Venezuela's key presence in the global energy market as one of the main producers of oil in the world, holder of the largest reserves, and the fact that the hydrocarbons was the main pillar of the Venezuelan economy; PDVSA's strategic importance to the government became obvious.  Nevertheless, at least until the early 2000s, the level of government intervention on PDVSA's operations was limited to what was required under the different statutes and government regulations, and political interference in the holding entities was minimal.

11. 2003 is generally seen as the breaking point in the relationship between Venezuela and PDVSA, and the beginning of a new relationship between the two whereby the former began to erode PDVSA's independence.  A nationwide oil strike that paralyzed the industry and the country's economy in February of that year was met with a dramatic decision by then-president Chávez to summarily dismiss around 18,000 PDVSA employees (40% of the company's workforce).  Chávez's dramatic announcement was broadcasted on live television and became a symbol for a new era during which PDVSA increasingly became a political instrument of the Chavista government.  The positions left vacant by the thousands of dismissed PDVSA employees were quickly filled with political supporters of Chávez's party and only trusted people with proven loyalty to the president —many of whom were former military commanders— were



---

[1] Decree No. 1123 of 30 August 1975, Official Gazzette No. 1770 (Venez.).

appointed to leadership positions in PDVSA, other key entities, and throughout most government agencies.

12. In economic terms, PDVSA became the main financier of government programs and activities —many of which were— unrelated to its main business of commercializing hydrocarbons. As it was later revealed, PDVSA became a slush fund of the Chavista government to finance political campaigns, purchase votes and attain geopolitical prominence around the world through a series of social programs called Bolivarian Missions.[2] The political interference and increasingly excessive control by the government on the operation of PDVSA and its subsidiaries, both in Venezuela and abroad, was justified by a symbolic effort to redistribute the oil wealth among all Venezuelans. This sentiment was captured by the famous slogan "Now, PDVSA belongs to the people" ("*Ahora PDVSA es del pueblo*"), which was intended to mark the difference between an old —independent— PDVSA and a new one totally controlled by the state.[3]

13. The shift toward extensive government control was not limited to PDVSA and its affiliates. It extended to every asset regardless of whether it was located at home or abroad, over which Venezuela had an interest. In many areas, the government effectively erased the distinction between formal and legal institutions and political actors. Many of these transformations required legal changes or reinterpretation of standards and principles, which were accomplished whenever the government had control over the legislative and judicial branches. In other cases, the government simply disregarded any legal limits and carried out its will even if it meant an affront to the rule of law. This situation intensified the disregard for any separation between government owned enterprises such as PDVSA and political operatives. Regular business decisions ordinarily reserved to corporate officers were made by government officials for political ends, and any property belonging to PDVSA was routinely used

---

[2] Manuel A. Gómez, "Malleable Law: The (Mis)Use of Legal Tools in the Pursuit of a Political Agenda" 19(3) ILSA Journal of International and Comparative Law (2013).

[3] Francisco J. Torres, "¡Ahora PDVSA es del Pueblo!", Aporrea, 11 March 2006 < https://www.aporrea.org/energia/a26799.html> last visited: 19 February 2021.

for purposes unrelated to the company's activities. The Maduro administration, which succeeded Chávez since 2013, has continued to openly treat PDVSA and its affiliates as an appendix of the Venezuelan government.

14. On January 23, 2019, Juan Guaidó, the head of Venezuela's legislative branch —the National Assembly— was sworn in as the country's Interim President ("IP") given the constitutional crisis generated by President Maduro's refusal to step down despite de expiration of his term.[4] Guaidó's appointment was based on an interpretation of article 233 of the Constitution, according to which the head of the National Assembly shall hold the presidency on an interim basis while new elections are held, due to a permanent vacancy (*falta absoluta*) in the presidency.[5] In Maduro's view, he was elected president for a second term in late 2018 and his new term began on January 10, 2019. In the eyes of millions of Venezuelans, many foreign governments and international organizations, the 2018 elections were illegitimate in part because opposition parties were disqualified from participating. To this day, Maduro has refused to leave his post and remains a de facto ruler in Venezuela, despite a significant level of international pressure from more than fifty countries that have recognized Guaidó as the legitimate leader of that country.[6] The U.S. was the first nation to recognize Guaidó as IP and has vowed to lend support to his efforts to put pressure on Maduro to step down, so free and fair elections can be held, and the country can regain its institutional stability.[7]

15. Despite such a heavy repudiation from many foreign governments and multilateral organizations, Maduro, and most of the public officials appointed under his mandate, have remained in office and in effective control of the government and the territory.

---

[4] Ana Vanessa Herrero, "Venezuela's Leader, Maduro Cuts Ties", The New York Times, 23 January 2019 < https://www.nytimes.com/2019/01/23/world/americas/venezuela-protests-guaido-maduro.html> last visited: 19 February 2021.

[5] Article 233, Constitution (Venez.).

[6] Congressional Research Service, "Venezuela: Background and U.S. Relations" Updated June 4, 2019 < https://crsreports.congress.gov/product/pdf/R/R44841/19> last visited: 19 February 2021.

[7] U.S. Department of State, "U.S. Relations With Venezuela", 6 July 2020 < https://www.state.gov/u-s-relations-with-venezuela/> last visited: 19 February 2021.

Guaidó, on the other hand, has managed to assemble a team of key appointees, most of whom are not in Venezuela, and have accepted to work ad honorem in critical areas such as foreign affairs, economic development, debt restructuring, asset recovery, legal representation, and the management of government interests in state-owned entities like PDVSA and its affiliates. In August 2019, Guaidó announced the creation of a Government Center (*Centro de Gobierno*, or "CdG") inside the Embassy of the Kingdom of Spain in Caracas, as an institution in charge of coordinating the activities of his interim government.[8]

16. During more than a year, the tension between Guaidó and Maduro has created an unprecedented institutional tug-of-war, with two presidencies, two legislatures[9] and two Supreme Courts.[10] The contest has spilled over to many foreign courts and arbitral tribunals throughout the world where the legal representatives of both sides have claimed the legitimate representation of Venezuela and its instrumentalities. Given the strategic significance and the economic importance of PDVSA and its affiliates to both sides, they have also fought for its control.

17. Despite the mutual challenges levied by Guaidó and Maduro's representatives against each other regarding their democratic legitimacy and right to remain in power, they have at least one thing in common. They both have used their political influence to maintain extensive control over all foreign assets held by Venezuela's owned entities, especially PDVSA and its affiliates, and have not been shy about treating those assets as the direct property of Venezuela. As I now turn to explain, the arrival of Guaidó to



---

[8] Agencia EFE, "Guaidó anuncia la creación de un 'centro de gobierno' con Leopoldo López a cargo", 28 August 2019 < https://www.efe.com/efe/america/politica/guaido-anuncia-la-creacion-de-un-centro-gobierno-con-leopoldo-lopez-a-cargo/20000035-4051908> last visited: 19 February 2021.

[9] On the one hand, the National Assembly, which is the regular legislative power, and a Constituent National Assembly, which was formed by Maduro to bypass the functioning of regular institutions.

[10] The Supreme Tribunal of Justice in Exile was formed in 2017 and inaugurated in the headquarters of the Organization of American States (OAS) in Washington, D.C. https://www.clarin.com/mundo/venezuela-tribunal-supremo-justicia-exilio-instala-oea_0_rJDm2r6h-.html The Court has also been recognized by other countries in the region, including Chile https://www.lapatilla.com/2018/10/04/parlamento-chileno-aprueba-proyecto-que-reconoce-la-legitimidad-del-tsj-venezolano-en-el-exilio/ last visited: 19 February 2021.

the political scenario in early 2019 and the ensuing struggle with the Maduro regime for the control of PDVSA, not only maintained its alter ego condition vis-à-vis Venezuela, but deepened it further.

## III. The intensification of Venezuela's excessive political control of PDVSA and its affiliates since 2019

18. One of the first official acts of Venezuela's National Assembly after swearing in Guaidó as the country's IP was the issuance of an emergency act, on February 5, 2019, dubbed "Statute to Govern the Transition Toward Democracy to Reestablish the Validity of the Constitution of the Bolivarian Republic of Venezuela" ("*Estatuto de Transición*", or "TS").[11]  The TS was justified on an extraordinary and unprecedented application of article 333 of the Constitution, which imposes on all citizens the duty to restore the validity of the constitution.  Article 34 TS expressly bypassed the ordinary corporate regime of PDVSA by empowering IP Guaidó to appoint a special Board of Directors for that company so it could exercise its rights as PDV Holding's shareholder, including the selection of board members to PDV Holding, Citgo, and other affiliates. Article 34(1) expressly extended the eligibility of PDVSA board members to those living abroad, and article 34(2) further stated that the exceptional legal regime created by the TS would override any other relevant legal provisions of Venezuelan law.  It also indicated that any formalities required either by statute or by corporate bylaws, should be interpreted in a manner that favored the representation of PDVSA as sole shareholder of PDV Holding.  Soon thereafter, the Maduro-controlled Constitutional Chamber of Venezuela's Supreme Court Tribunal declared the TS null and void for considering it an act contrary to the constitutional order and public international law principles.[12]  The legal challenge continued in foreign courts with an action filed in the Court of Chancery of Delaware by six former corporate officers of PDVSA and related



---

[11] Asamblea Nacional de la República Bolivariana de Venezuela, "Estatuto que rige la transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela", 5 February 2019.

[12] Constitutional Chamber of the Supreme Justice Tribunal, Decision of 8 February 2019, File No. 17-001, published in the Official Gazette No. 41,583 of 11 February 2019.

entities against those appointed by Guaidó pursuant to the TS.[13]  Plaintiffs in that action sought a declaration that they comprised the rightful boards of PDVSA and defendants counterclaimed for a competing declaration.  Applying the act of state doctrine and based on the recognition by the U.S. government of Guaidó's investiture as IP of Venezuela, the Court took as valid the reconstitution of PDVSA's board resulting from Guaidó's decision and the TS.[14] Back in Venezuela, Maduro's regime has continued to bring legal challenges against Guaidó's interim government as reflected in a recent decision issued by the Constitutional Chamber of the Supreme Justice Tribunal on 30 December 2020, whereby it declared null and void an amendment to the TS.[15]

19. By virtue of the exceptional legal regime created by the National Assembly through the TS and other formal acts, which legitimacy has been reaffirmed by foreign courts, IP Guaidó and his appointees have been given unfettered authority to exercise considerable control over PDVSA, PDV Holding and Citgo.  Further, by subjecting the interpretation and application of this exceptional legal regime to the duty to defend and restore the Constitution under article 333, the National Assembly has effectively removed any potential obstacles that could prevent IP Guaidó from carrying out his mandate to directly control PDVSA's assets and conversely, to shield them from Maduro's reach.  Since the latter still holds control over PDVSA's assets in the Venezuelan territory, Guaidó has only been able to exercise his power and make decisions over assets located abroad.

20. On April 2, 2019, The National Assembly issued an "Accord to Expand the Powers Vested and the Number of Ad-Hoc Board Members of PDVSA" ("AtE")[16] that further

---

[13] See, Jimenez v. Palacios, C.A. 2019 Del. Ch. LEXIS 299; 2019 WL 3526479; affirmed on 22 July 2020, 2020 WL 4207625

[14] Id.

[15] Constitutional Chamber of the Supreme Justice Tribunal, Decision of 30 December 2020, Decision 0274-2020.

[16] Asamblea Nacional de la República Bolivariana de Venezuela, "Acuerdo para la ampliación de las facultades otorgadas y el número de miembros de la Junta Administradora Ad-Hoc de Petróleos de Venezuela, S.A. (PDVSA)", 9 April 2019
<https://www.asambleanacionalvenezuela.org/actos/detalle/acuerdo-para-la-ampliacion-de-las-facultades-

expanded Guaidó's control over PDVSA by allowing him to issue a special decree to broaden the authority of PDVSA's board, and by suspending all rights and authorities otherwise vested on the Shareholders' Meeting, the Board of Directors, and the Presidency of PDVSA and its affiliates. The AtE also suspended any functions given to the Minister of Hydrocarbons and any other government official, branch or agency related to PDVSA, which existed by or was given any functions after January 10, 2019, which is when the permanent vacancy of the Maduro presidency occurred.

21. As a way to further sever ties between the Maduro regime and PDVSA, and conversely to subject the company to an extensive control by Guaidó's interim government, article 34(3)(b) TS, prohibited PDV Holding and its affiliates from maintaining any relationship with "those who nowadays usurp the Presidency" (i.e. Maduro) and ordered those entities to withhold any payments or contributions to PDVSA, in order to effectively prevent the Maduro regime from accessing those resources. Until then, PDVSA's revenues were regularly channeled through different funds connected to social programs and other government initiatives.

22. The submission of PDVSA's own assets to the extraordinary control of Guaidó's interim government and their treatment as property of the Venezuelan state (*activos del Estado*) is also reflected in the limitation imposed by article 36 TS, which precludes the use of any funds belonging to PDVSA or any other state-owned entity until after the Maduro regime relinquishes power. Even to be able to carry out an otherwise ordinary business decision such as paying its own legal fees, PDVSA had to obtain express authorization from Guaidó's National Assembly in 2019.[17] Additionally, PDVSA funds have also been directed to be used in the legal defense of Venezuela in foreign and international proceedings.[18]



---

otorgadas-y-el-numero-de-miembros-de-la-junta-administradora-ad-hoc-de-petroleosde-venezuela-sa-pdvsa> last visited: 19 February 2021.

[17] Asamblea Nacional, "Acuerdo que autoriza el uso de recursos de Petróleos de Venezuela, S.A. (PDVSA) para la defensa de sus activos en el extranjero", 1 October 2019 < http://www.asambleanacional.gob.ve/actos/detalle/acuerdo-que-autoriza-el-uso-de-recursos-de-petroleos-de-venezuela-sa-pdvsa-para-la-defensa-de-sus-activos-en-el-extranjero> last visited: 19 February 2021.

[18] Asamblea Nacional, "Acuerdo que autoriza la creación del fondo especial de litigios", 19 November 2019 < http://www.asambleanacional.gob.ve/actos/detalle/acuerdo-que-autoriza-la-creacion-del-fondo-especial-de-litigios> last visited: 19 February 2021.

23. In addition to the aforementioned legal acts, the Guaidó interim government has repeatedly issued public statements declaring that the assets of PDVSA, PDV Holding and Citgo are property of Venezuela and of the Venezuelan people,[19] and that the appointment of special board members of PDVSA and related entities and other measures taken are part of the strategy to preserve the property belonging to all Venezuelans.[20]

24. Based on the aforementioned, it is clear that PDVSA remains Venezuela's alter ego such that PDVSA's assets in the United States are still subject to the pervasive control of Venezuela, and that such control has intensified since the United States' decision in January of 2019 to transfer its recognition of Venezuela's legitimate government from that headed by Mr. Nicolás Maduro to that led by Mr. Juan Guaidó.

I declare under penalty of perjury that the foregoing is true and correct.

19 February 2021

Manuel A. Gómez

---

[19] See, e.g. Centro de Comunicación Nacional, "Gobierno Legítimo: Medidas OFAC garantizan protección de CITGO pese a fallo de la Corte de Delaware", 14 January 2021.

[20] See, e.g. Centro de Comunicación Nacional, "President (e) Guaidó after court ruling on PDVSA 2020 bonds: CITGO remains protected", 17 October 2020.

Exhibit A

[v. 9/7/2020]

**MANUEL ALEJANDRO GÓMEZ**
**Professor of Law**
**Associate Dean for Graduate Studies and Global Engagement**
magomez@fiu.edu
@magom1

## EDUCATION

| Degree | Institution | Date conferred |
|---|---|---|
| Juris Science Doctor (J.S.D.) | Stanford University | 2007 |
| Juris Science Master (J.S.M.) | Stanford University | 2002 |
| Specialist in Civ. Proced. | Univ. Católica Andrés Bello | 1996 |
| LL.B. (Abogado) (*cum laude*) | Univ. Católica Andrés Bello | 1993 |

## ACADEMIC EXPERIENCE

| Title | Institution | Year(s) of appointment |
|---|---|---|
| Professor of Law | Florida Int'l. University | 2018-present |
| Associate Professor of Law | Florida Int'l. University | 2010-2014(tenure)-2018 |
| Assistant Professor of Law | Florida Int'l. University | 2007-2010 |
| Visiting Professor of Law | University of Iowa | 2012 |
| Visiting Professor of Law | INIDEM Business Law School | 2012-present |
| Teaching Fellow and Lecturer | Stanford University | 2005-2007 |
| Visiting Professor of Law | Universidad Surcolombiana | 2011, 2017 |
| Visiting Professor of Law | Universidad Sergio Arboleda | 2009-present |
| Visiting Professor of Law | Universidad Metropolitana | 2005 |
| Visiting Professor of Law | Univ. Católica del Táchira | 2001-2002 |
| Visiting Professor of Law | Univ. Católica Andrés Bello | 1996-1997 |
| Assistant Professor of Law | Universidad C. de Venezuela | 1995-2018 |

## ACADEMIC APPOINTMENTS

| Title | Institution | Year(s) of appointment |
|---|---|---|
| Associate Dean for Graduate Studies and Global Engagement | Florida Int'l. University | 2015-present |
| Director, LL.M. program | Florida Int'l University | 2015-present |
| Director, Study Abroad program | Florida Int'l. University | 2017, 2018, 2019 |
| Coordinator, Int'l Legal Projects | Florida Int'l. University | 2010-present |

## PROFESSIONAL EXPERIENCE

| Organization | Title | Dates |
|---|---|---|
| M. Gómez & Cía, LL.P. | Principal | 1997-present |
| Gómez Díaz & Asociados | Associate | 1993-1997 |

## RECENT PUBLICATIONS

**Books**

1. RECONSTRUCTING BIG LAW, D. Hensler, P. Hanlon, M. Selvin, M. Gómez, D. Hussey-Freeland (Elgar, forthcoming)

1

2. UNCITRAL MODEL LAW ON INTERNATIONAL COMMERCIAL ARBITRATION: A COMMENTARY, I. Bantekas, P. Ortolani, S. Ali, M. Gómez, and M. Polkinghorne (Cambridge U. Press, 2020)

3. MANUEL A. GÓMEZ & ROGELIO PÉREZ-PERDOMO, BIG LAW IN LATIN AMERICA AND SPAIN: GLOBALIZATION AND ADJUSTMENTS IN THE PROVISION OF HIGH END CORPORATE LEGAL SERVICE (Palgrave-MacMillan, 2017)

4. ROGELIO PÉREZ-PERDOMO & MANUEL A. GÓMEZ, LEGAL AND POLITICAL CULTURE IN REVOLUTIONARY VENEZUELA 1999-2013 (Universidad Metropolitana Press, 2015)

5. LAWRENCE M. FRIEDMAN, ROGELIO PEREZ-PERDOMO & MANUEL A. GÓMEZ, LAW IN MANY SOCIETIES: A READER (Stanford University Press, 2011)

**Articles**

1. After One Hundred Years of Solitude: The Re-Encounter of International Labor Protection and Arbitration, 13/2020 Revista Derecho Social y Empresa (peer reviewed)

2. All Bark and No Bite? Contemporary Consumer Redress in Latin America, 30(1) Stellenbosch Law Review 61 (2019) (peer reviewed)

3. *"Pran" Justice: Social Order and Dispute Processing Inside a Venezuelan Prison,* 8(2) IRVINE LAW REVIEW 183 (2018)

4. *Like South American Way: Regional integration under ALBA and UNASUR and international dispute resolution*, 58(4) Hungarian Journal of Legal Studies — Acta Jurídica Hungárica 449 (2017) (peer reviewed)

5. *More Risk, Better Regulation: A View from the World of Transnational Litigation,* 8 EUROPEAN JOURNAL OF RISK REGULATION 95 (2017)

6. *Outside but Within: The normative dimension of the underworld in the television series "Breaking Bad" and "Better Call Saul",* 1(3) JOURNAL OF THE OXFORD CENTRE FOR SOCIO-LEGAL STUDIES (2016) (peer reviewed)

7. *No Limite: A Representaçao do Direito e da Ordem Social Não-oficiais na Série de Televisão Breaking Bad,* in LAW AND POPULAR CULTURE (Pedro Fortes, ed.) (Fundação Getulio Vargas: São Paulo, 2015) volume 12 of FGV Law School Series (Cadernos FGV Direito Rio) (peer reviewed)

8. Katia Fach Gómez & Manuel A. Gómez, *How can the battle be averted? An Introduction,* Conflict Resolution Quarterly (2016) (Also, Special Co-Editor) (peer reviewed)

9. Manuel A. Gómez & J.C. Gómez, *A view from the sky: A general overview about civil litigation in the United States of America with reference to the relief in small and simple matters,* 4 ERASMUS LAW REVIEW 225 (2015) (peer reviewed)

10. Manuel A. Gómez, *A sour battle in Lago Agrio and beyond: The metamorphosis of transnational litigation and the protection of collective rights in Ecuador,* 46 UNIVERSITY OF MIAMI INTER-AMERICAN LAW REVIEW 153 (2015)

11. Manuel A. Gómez, *The Tower of David: Social Order in the Vertical Slum,* 10 FLORIDA INTERNATIONAL UNIVERSITY LAW REVIEW 215 (2014)

12. Marc Galanter & Manuel A. Gómez, *Waiting for Mendeleev: The Tangle of Indigenous Law,* 10 FLORIDA INTERNATIONAL UNIVERSITY LAW REVIEW 1 (2014)

13. Manuel A. Gómez, *Crowd funded justice: On the potential benefits and challenges of crowd funding as a litigation financing tool,* 49 UNIVERSITY OF SAN FRANCISCO LAW REVIEW 307 (2014)

14. Manuel A. Gómez, *Precious Resolution: The Use of Intra-Community Arbitration by Jain Diamond Merchants,* 2 BELGIAN REVIEW OF ARBITRATION, B-ARBITRA (2013) (Peer reviewed)

15. Manuel A. Gómez, *The Global Chase: Seeking the Recognition and Enforcement of the Lago Agrio Judgment Outside of Ecuador,* 1 STAN. J. COMPLEX LIT. 101 (2013) (Peer Reviewed)

16. Manuel A. Gómez, *Order in the Desert: Law Abiding Behavior at Burning Man,* J. DISP. RES. (2013)

17. Manuel A. Gómez, *Malleable Law: The (mis)use of legal tools in the pursuit of a political agenda,* 19 ILSA J. Int'l & Comp. L. (2013)

18. Manuel A. Gómez, *Will the Birds Stay South? The Rise of Class Actions and Other Forms of Group Litigation Across Latin America,* 43 Univ. Miami Inter- American L. Rev. 3 (2012)

19. Manuel A. Gómez, *Knowledge and social networks in the construction of elite lawyers in Venezuela,* XXXVI/2009/3 SOCIOLOGIA DEL DIRITTO (2010) Reprinted as *Greasing the Squeaky Wheel of Justice: Lawyers, Social Networks and Dispute Processing* in THE ROLE OF LAWYERS IN THE CONSTRUCTION OF STATES (Yves Dezalay & Bryant Garth, Routledge, 2011)

20. Marta Vides, Manuel A. Gómez & Luis F. Pérez-Hurtado, *The American Way: Los abogados latinoamericanos como estudiantes de maestría en los Estados Unidos de América,* 130 Boletín Mexicano de Derecho Comparado (2011) (Peer Reviewed)

21. Manuel A. Gomez, *Recent developments in Collective Litigation in Latin America: A regional report.* (December 2008) http://globalclassactions.stanford.edu/taxonomy/term/59

22. Manuel A. Gómez & Rogelio Pérez-Perdomo, *Innovaciones en la Educación Jurídica de América Latina,* Derecho y Democracia II, 15 Cuadernos Unimetanos (2008) (symposium editor, proceedings from conference on Innovations in Legal Education in Latin America)

23. Manuel A. Gómez, *All In The Family: The Influence of Social Networks on Dispute Processing,* 36 GA. J. INT'L. & COMP. L. 291 (2008)

24. Manuel A. Gomez, *Class Actions, Group Litigation and other Aggregate Procedures in Latin America: A general overview* (December 2007), available at http://globalclassactions.stanford.edu/taxonomy/term/59

25. Manuel A. Gómez, *Latin American Laws and the Status of Women, in* THE OXFORD ENCYCLOPEDIA OF WOMEN HISTORY (Oxford U. Press 2007)

26. Manuel A. Gómez & Rogelio Pérez-Perdomo, *Alternative Justices in Venezuela*, 7 REFORMA JUDICIAL 161-190 (UNAM, México 2006)

27. Manuel A. Gómez, *Like Migratory Birds: Latin American Claimants in U.S. Courts and the Ford-Firestone Rollover Litigation*, 11 SW. J. L. & TRADE AM. 281 (2005)

28. Manuel A. Gómez, *The Venezuelan Legal Regime of Crimes Commited Under Voluntary Intoxication* (*Algunas Notas sobre la Responsabilidad Penal por la Comisión de Delitos en Estado de Intoxicación Voluntaria en Venezuela*), 15 DERECHO PENAL CONTEMPORÁNEO 83-107 (Legislec: Bogotá 2005)

29. Manuel A. Gómez & Rogelio Pérez-Perdomo, *Alternative Dispute Processing Mechanisms in Venezuela* (*Los Mecanismos Alternativos para el Manejo de Conflictos en Venezuela*) (Jornadas Domínguez Escobar: Barquisimeto, Venezuela, 2005)

30. Manuel A. Gómez, *The Venezuelan Business Lawyers* (*Los Abogados de Negocios en Venezuela*). 125 REVISTA DE LA FACULTAD DE DERECHO DE LA U.C.V. (2003) (Peer Reviewed)

31. Manuel A. Gómez, The Legal Regime of the Conciliatory Power of Venezuelan Judges from 1836 to the present (*La función conciliatoria de los Jueces y su regulación en la Legislación Venezolana, desde 1836 hasta el presente*), ÁMBITO JURÍDICO (Legislec: Caracas 2001)

32. Manuel A. Gómez & Marisol Santana, The formula for the calculation of labor and Social Security contribution. (*Factor de cálculo para determinar las contribuciones laborales y de Seguridad Social.*) *in* 36 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

33. Manuel A. Gómez & Marisol Santana, The legal regime of mandatory lay-offs (*El subsistema de Paro Forzoso*). 38 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

34. Manuel A. Gómez & Marisol Santana, Minimum Wages and Decision 892 (*Fijación del salario mínimo y el Decreto 892*) 36 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

35. Manuel A. Gómez, Notes on Preferential Acquisition Rights (*Notas sobre los derechos de adquisición preferente*), 33-34-35 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

36. Manuel A. Gómez, Some Notes about the Legal Regime of Accidental Death Presumptions (*Notas en torno a la presunción de muerte por accidente.*) 29 ÁMBITO JURÍDICO (Legislec: Caracas 2000)

37. Manuel A. Gómez, Merger by Takeover: The Most Relevant Aspects (*La fusión por absorción: Sus aspectos más relevantes.*) 26 ÁMBITO JURÍDICO (Legislec: Caracas 1999)

38. Manuel A. Gómez, Audiovisuals as Evidentiary Material (*Consideraciones sobre el Audiovisual como Medio de Prueba.*) 24 ÁMBITO JURÍDICO (Legislec: Caracas 1999)

39. Manuel A. Gómez, Can videogames and other graphic projections be used as audiovisual evidence? (*¿Son Pruebas Audiovisuales los juegos de video y otras proyecciones graficas?*) 9 REVISTA DE DERECHO PROBATORIO (Editorial Alva, Caracas, 1997)

**Book chapters**

3

1. Marc Galanter & Manuel A. Gómez, *Large Law Firms,* in LAWYERS IN SOCIETY, VOLUME 2 (Hilary Sommerlad, Richard Abel, Ole Hammerslev & Ulrike Schultz, eds.) (Hart Publishing, forthcoming)

2. Manuel A. Gómez, *The Chimera of Smart Contracts,* in ELGAR HANDBOOK ON INTERNATIONAL COMMERCIAL CONTRACTS (A. Hutchison & F. Myburgh, eds.) (Edward Elgar, forthcoming)

3. Manuel A. Gómez, *(In)fallible Smart Legal Contracts*, in LEGAL CHALLENGES IN THE NEW DIGITAL AGE (Ana Mercedes López Rodríguez, Michael D. Green, and María Lubomira Kubica, eds.) (Brill, forthcoming)

4. Manuel A. Gómez, *Latin American Lawyers: Between Democratization and Globalization*, in LAWYERS IN SOCIETY, VOLUME 2 (Hilary Sommerlad, Richard Abel, Ole Hammerslev & Ulrike Schultz, eds.) (Hart Publishing, forthcoming)

5. Manuel A. Gómez, *Stare Decisis y Jurisprudencia Vinculante ¿Dos Caras de Una Misma Moneda?*, in REVISTA DOS TRIBUNAIS: PRECEDENTES NO PROCESSO DO TRABALHO (Ney Maranhão, Cesar Zucatti Pritsch, Fernanda Antunes Marque Junqueira e Flávio da Costa Higa, eds.) (Thomson Reuters, 2020)

6. VOLUME Manuel A. Gómez & Rogelio Pérez-Perdomo, *Venezuela: A Dispatch from the Abyss,* in LAWYERS IN SOCIETY, 1 (Hilary Sommerlad, Richard Abel, Ole Hammerslev & Ulrike Schultz, eds.) (Hart Publishing, 2020)

7. Manuel A. Gómez, *Legal professionals in Latin America at the dawn of the 21st century,* in HANDBOOK OF LAW AND SOCIETY IN LATIN AMERICA (Routledge, 2019)

8. Manuel A. Gómez, *Lawyering in a Transnational Context: Latin America,* in OXFORD HANDBOOK OF TRANSNATIONAL LAW (Oxford U. Press, forthcoming)

9. Manuel A. Gómez, *Innovaciones en la educación jurídica latinoamericana y políticas públicas en tiempos de globalización*, in LA EDUCACIÓN LEGAL COMO POLÍTICA PÚBLICA EN AMÉRICA LATINA, Gorki Gonzales Mantilla (Ed.) 99-118 (Palestra Editores, 2018)

10. Manuel A. Gómez & R. Pérez-Perdomo, *A New Global Landscape,* in Reconstructing Big Law (Palgrave MacMillan, 2017)

11. Manuel A. Gómez, *Smoking Signals from the South: Tobacco Litigation in Brazil*, in CLASS ACTIONS IN CONTEXT: HOW ECONOMICS, POLITICS AND CULTURE SHAPE COLLECTIVE LITIGATION, Deborah R. Hensler, Christopher Hodges, and Ianika Tzankova, eds. (Edward Elgar Publishing Ltd., 2016)

12. MANUEL A. GÓMEZ, *The manipulation of law through the social agenda: The case of two Bolivarian misiones, in* LEGAL AND POLITICAL CULTURE IN REVOLUTIONARY VENEZUELA 1999-2013 (co-edited with Rogelio Pérez-Perdomo) (2015)

13. MANUEL A. GÓMEZ, *Developments of Latin American Legal Education in the Age of Globalization, in* INNOVATIONS IN LEGAL EDUCATION IN LATIN AMERICA, 2nd Ed. (co-edited with Rogelio Pérez-Perdomo)

14. Manuel A. Gómez, *La difícil relación entre la anulación y el reconocimiento y ejecución del laudo arbitral internacional* ("*The difficult relationship between the annulment, and the recognition and enforcement of the international arbitral award*"), in ARBITRAJE COMERCIAL INTERNACIONAL, Organization of American States (OAS, 2014)

15. Manuel A. Gómez, *Collective Redress in Latin America: The regulation of class actions and other forms of aggregate and group litigation for the protection of consumer rights, IN* L'ART. 140 BIS DEL CODICE DEL CONSUMO L'AZIONE DI CLASSE, a cura di Lorenzo Mezzasoma e Francesco Rizzo, Roma: Edizioni Scientifiche Italiane, 2011

16. Manuel A. Gómez, *Latin America: A Regional Report, in* FUNDING AND COSTS OF CIVIL LITIGATION (Christopher Hodges, Stefan Vogenauer and Magdalena Tulibacka, eds, Oxford: Hart 2011)

17. Manuel A. Gómez, *Political Activism and the Practice of Law in Venezuela, in* CULTURES OF LEGALITY: JUDICIALIZATION AND POLITICAL ACTIVISM IN LATIN AMERICA (J. Couso, A. Huneeus, and R. Sieder, eds) (Cambridge University Press, 2010)

18. Manuel A. Gómez, *Greasing the Squeaky Wheel of Justice: Lawyers, Social Networks and Dispute Processing, in* LAWYERS AND THE RULE OF LAW IN AN ERA OF GLOBALIZATION (Yves Dezalay & Bryant Garth, eds. Routledge, 2011) (Also published as *Knowledge and social networks in the construction of elite lawyers in Venezuela*, XXXVI/2009/3 SOCIOLOGIA DEL DIRITTO)

**Reports and monographs**

1. The Globalization of Mass Civil Litigation: Lessons from the Volkswagen "Clean Diesel" Case, with Deborah Hensler, Jasminka Kalajdzic, Peter Cashman, Axel Halfmeier, and Ianika Tzankova (2020)
2. Manuel A. Gomez & Gilberto Guerrero-Rocca, 'National Report for the Venezuela (2020)', in Lise Bosman (ed), ICCA International Handbook on Commercial Arbitration, (© Kluwer Law International; ICCA & Kluwer Law International 2020, Supplement No. 111, July 2020) pp. 1—54
3. Manuel A. Gómez, *Legal and Strategic Culture in Venezuela*, in STRATEGIC CULTURE: A MULTIFACETED CULTURAL APPROACH TO THE STUDY OF LATIN AMERICA, Florida International University Applied Research Center (2009)

**Book Reviews**

1. Manuel A. Gómez, *Seeing the Forest and the Trees: A Review of Peter Binder's Analytical Commentary to the UNCITRAL Arbitration Rules of 2010*, 2 BELGIAN REVIEW OF ARBITRATION, B-ARBITRA (2013)

### PROFESSIONAL HONORS, PRIZES, FELLOWSHIPS

1. FIU Center for International Business Education and Research CIBER, 2013 Faculty Award (shared with Professor Carlos M. Parra, FIU College of Business)

2. Fellow, Stanford Center for the Legal Profession, Stanford Law School (2012-present)

3. Investigador Libre Asociado, Universidad Metropolitana (2012-present)

4. Florida International University Bhagwan Mahavir Junior Faculty Fellowship (2011)

5. Research Excellence Diploma and appointment as Honorary Member of Grupo Nuevas Visiones del Derecho, Universidad Surcolombiana, Colombia (2011)

6. Law and Society Association, Dissertation Award for outstanding scholarship in a dissertation (2008)

7. Latin American Studies Association, Venezuelan Studies Section, Best Article (2007)

8. Richard S. Goldsmith Award for Best Paper in Dispute Resolution at Stanford University (2007)

9. Colegio de Abogados del Distrito Federal, Mención Honorífica

10. Ayacucho Graduate Fellow, Center for Latin American Studies (2002-2005).

11. Fellow, Stanford Center for Conflict and Negotiation (2004).

12. Fellow, Stanford Law School Class of 2002 Fellowship in Conflict Resolution (2003).

### OFFICES HELD IN PROFESSIONAL SOCIETIES & KEY APPOINTMENTS

1. Editor-In-Chief, World Arbitration and Mediation Review (2017-present)

2. Editorial Board Member, European Journal of Risk Regulation (2017-present)

3. Editorial Board Member, Latin American Law Review (2017-present)

4. Editorial Board Member, Revista Derecho y Democracia (2006-present)

5. Member of the Program Committee, RCSL/IISL Meeting (2019)

6. Chair of the International Activities Committee, Law and Society Association (2018-2019), Member (2019-present)

7. Member of the Scientific Committee, RCSL-SDJ 2018 Meeting (2018)

8. Co-Chair, International Meeting of the Law and Society Association and the Research Committee of the Sociology of Law (2016-2017)

9. Member of the Planning Committee, International Council for Commercial Arbitration Miami (2012-2014)

10. Board Member, Miami International Arbitration Society (2014-present)

11. Investigador Libre Asociado, Universidad Metropolitana (2013-present)

12. Founding member, Venezuelan American National Bar Association (2013-present)

13. Member of the Executive Council, International Section of the Florida bar (2013-present)

14. Chair, Law School Liaision Committee, International Law Section of the Florida Bar (2018-present)

15. Academic Council Member, Instituto for Transnational Arbitration (2012-2018)

16. Founding Member, Miami International Arbitration Society (2009)

17. Law and Society Association, member (2002-present)

18. Colegio de Abogados del Distrito Capital (1993-present)

## SELECTED SPEAKING ENGAGEMENTS (Since 2018)

1. June 25, 2020, Presenter, Garcia Armas v. Venezuela, at the conference "Revisión de Laudos Arbitrales de Inversión 2019: 1er Encuentro Anual", Universidad Autónoma de Chile, Chile.

2. May 11, 2020, Presenter, New Technologies and Dispute Resolution, Western Sydney School of Law, Sydney, Australia.

3. February 7, 2020, Presenter, Magic Realism in the World of Torts, at Law Review Symposium New Frontiers in Torts: The Challenges of Science, Technology and Innovation, Southwestern Law School, Los Angeles.

4. January 21, 2020, Presenter, The Chimera of Smart Contracts, at the First International Conference on Law and Criminology in the New Digital Era, Universidad Loyola Campus Sevilla, Seville.

5. November 15, 2019, Presenter, Small But Meanigful: Exploring the Potential of Crowd-Litigation-Funding (CLF) for Disputes Involving Small States, at the conference on Small States, International Law and the Realisation of Rights, London.

6. November 13, 2019, Moderator and Speaker, Arbitratiing Technology and Intellectual Property Cases: Latin American and European Approaches, Miami Tech/IP Arbitration Seminar, Florida International University College of Law, Miami.

7. November 12, 2019, Presenter, Intelligence about Arbitrators & the Future of International Arbitration, Shutts & Bowen LLP, Miami.

8. October 17, 2019, Comentator, International Junior Faculty Forum, Stanford Law School, Stanford.

9. September 26, 2019, Presenter, Recent Challenges in Enforcing Commercial and Investor-State Awards Involving Sovereigns, and Related Issues, Juris, Boston.

10. July 10, 2019, Presenter, The international law path, Florida International University College of Law.

11. June 26, 2019, Presenter, Estrategia y efectiva gestion de conflictos en Latinoamérica, Cuatrecasas Gonçalves Pereira, Seville.

12. June 24, 2019, Co-organizer and moderator, "Global Lawyering Across the Atlantic", University of Seville Law School, Seville.

13. June 21, 2019, Panelist, "A world of possibilities? The professional life of socio-legal scholars, Plenary session, International Congress for the Sociology of Law, Oñati.

14. June 20, 2019, Presenter, "Venezuela: A dispatch from the abyss", International Congress for the Sociology of Law, Oñati.

15. June 18, 2019, Presenter, "El derecho frente a las nuevas tecnologías", University of Loyola-Andalusia Law School, Seville.

16. June 3, 2019, Presenter, "Educación Jurídica Contemporánea en Ambos Lados del Atlántico: Globalización e Interdisciplinariedad", University of Seville Law School, Seville.

17. May 30-June 2, 2019, Moderator, "Mini-Plenary: Corruption and Dignity", Law and Society Association Annual Meeting, Washington, D.C.

18. May 30-June 2, 2019, Presenter, "IN THE SHADOW OF NAFTA: Evolution and change of corporate lawyers in Mexico City and Miami (1994-2018)", Law and Society Association Annual Meeting, Washington, D.C.

19. May 3, 2019, Presenter, "A Belt, a Road, and a Canal: Current Developments in the World of International Arbitration from China to the Americas.", Atlanta International Arbitration Society, Atlanta.

20. April 25-26, 2019, Co-chair and moderator, Fourth International Conference on the Fight Against Corruption, Florida International University College of Law.

21. April 24, 2919, Co-organizer, Fundamentals of Risk Management and Future Trends in Compliance for 2019 and Beyond, Florida International University College of Law.

22. April 19, 2019, Speaker, "The Landscape of CSR-related Litigation in United States Courts", HEC Paris.

23. March 13, 2019, Speaker, "Recent Developments in International Arbitration in Latin America and the Caribbean", New York International Arbitration Club.

24. March 9, 2019, Speaker, "Talk to Me: The Upsurge of International Arbitration Conferences", in Advances in Comparative and Transnational ADR: Research into Practice, Hong Kong University.

25. March 1, 2019, Co-chair and moderator, The World of Arbitration and Mediation in Latin America and the Caribbean Today, Inaugural Conference, Miami.

26. February 28, 2019, Speaker, The Venezuela Crisis, Steven J. Green School of International and Public Affairs, Florida International University.

27. February 26, 2019, Moderator, Venezuela's Constitutional Crisis and International Law, Florida International University College of Law.

28. February 22nd, 2019, Speaker. Opening Plenary: Our Global Future: Artificial Intelligence, Blockchain, other Innovations and The Outlook for New Technologies in International Law and the Legal Profession, iLaw 2019, Annual Conference of the International Law Section of the Florida Bar, Miami.

29. December 8th, 2018, Speaker, From the Corner Office to the Street Corner: Venezuelan Lawyers and their Struggle for Social Justice and Democracy, International Legal Ethics Conference, University of Melbourne School of Law, Melbourne, Australia

30. November 26, 2018, Moderator, Commercial Disputes, Indian National Bar Association's 7th Annual International Conference titled "69th Constitution Day", New Delhi, India

31. November 26, 2018, Presenter, Legal and Moral Debates around Artificial Intelligence, Indian National Bar Association's 7th Annual International Conference titled "69th Constitution Day", New Delhi, India.

32. November 14, 2018, Moderator and organizer, The changing landscape of trade agreements and regional development strategies and international arbitration: USMCA, CAFTA-DR, CPEC and BRI, Florida International University, Miami, FL.

33. October 26, 2018, Presenter, Taking stock of international arbitration in the age of technology, 10th Annual Arbitration Conference, AIJA, Singapore

34. October 18-20, 2018, Discussant, International Junior Faculty Forum, Stanford Law School, Stanford, CA.

35. October 9th, 2018, Moderator and co-chair, The Death Penalty: European Union and International Perspectives, Ruth K. Shepard Broad Distinguished Lecture Series, FIU College of Law and School of International and Public Affairs, Miami, FL.

36. September 10-13, 2018, Presenter (and member of the Conference Scientific Committee), Venezuelan Expatriate Lawyers: A Study on the Globalization of the Legal Profession, RCSL-SDJ 2018 Meeting, Lisbon, Portugal.

37. July 4, 2018, Speaker, Smart Contracts, Blockchain and Arbitration: Old Challenges, New Realities ("Contratos Inteligentes, Blockchain y Arbitraje: Viejos Retos, Nuevas Realidades"), Cuatrecasas, Seville, Spain.

38. June 15, 2018, Speaker and co-chair, Roundtrip: Litigation and Arbitration Across the Atlantic ("De Ida y Vuelta: Litigios y Arbitraje a Través del Atlántico"), Hogan Lovells, Madrid, Spain.

39. June 13, 2018, Speaker, Arbitration and Transnational Litigation and the New Technologies: Criptocurrencies and Blockchain ("Arbitraje y Litigios Transnacionales en las Nuevas Tecnologías: Criptomoneda y Blockchain"), Pontifical University of Comillas-ICADE, Jones Day, Madrid, Spain.

40. May 24, 2018, Presenter, The Chimera of Smart Contracts, Legal Problems with the Application of Smart Contracts and the Way Forward, City University of Hong Kong Law Review Symposium, City University of Hong Kong, Hong Kong.

41. May 11-12, 2018, Moderator, 5th Conference for Junior Researchers in Law and Society, Stanford Law School, Stanford, CA.

42. May 7, 2018, Keynote speaker, Mediation, Conciliation and Arbitration in Times of Globalization (""Mediação, conciliação e arbitragem em tempos de globalização"), XII Semana do Direito da Universidade Federal de Ceará, Federal University of Ceará School of Law, Fortaleza, Brazil.

43. April 18, 2018, Presenter and conference co-chair, 3rd Annual Conference on the Fight Against Corruption and Impunity, FIU College of Law, Miami, FL.

44. April 13, 2018, Presenter, Smart Justice: Resolving Disputes Involving Smart Contracts on the Blockchain, Cape Town University Faculty of Law, Cape Town, South Africa.

45. April 10, 2018, Presenter, All Bark and No Bite? Contemporary Consumer Redress in Latin America, International Conference on Consumer Redress, Stellenbosch University School of Law, Stellenbosch, South Africa.

46. March 15, 2018, Presenter, Borderless Dispute Resolution in the Era of Smart Contracts, City University of Hong Kong School of Law, Hong Kong.

47. March 13, 2018, Presenter, The Most Intelligent Way? Finding Common Ground Between Technological Innovations and the Development of an International Dispute Profession, Hong Kong University School of Law, Hong Kong.

48. February 26, 2018, Presenter, Gun Violence in America: A Conversation on the Epidemic of Mass Shootings in our Schools and Other Public Spaces, FIU School of International and Public Affairs, Miami, FL.

49. February 16, 2018, Moderator, Roundtable "The ICSID Report and State Parties and State Related Entities in International Arbitration, iLaw 2018: The ILS Global Forum on International Law, Miami, FL.