IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

　　　　　　　Plaintiffs,

　　　　　-against-

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

　　　　　　　Defendants.

Case No. 19 Civ. 10023 (KPF)

**BRIEF OF THE BOLIVARIAN REPUBLIC OF VENEZUELA AS *AMICUS CURIAE***

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*................................................................................1

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT...............................................................................................................3

I.       Legal and Factual Background ........................................................................3

II.      Procedural Background....................................................................................9

SUMMARY OF ARGUMENT ..................................................................................10

ARGUMENT ..............................................................................................................11

I.       The Exchange Offer Was Unauthorized and Void *Ab Initio* Under Articles 150 and 187(9) of Venezuela's Constitution. ......................................................11

        A.      The Exchange Offer Required National Assembly Approval. .............11

        B.      Venezuelan Law Places the Burden on the Proponent of a National Public Interest Contract to Obtain National Assembly Authorization—Not on Its Opponents to Obtain National Assembly Disapproval.........................................13

        C.      The Republic's Explanation of Venezuelan Law Should Be Given Force...........15

II.      The Court Should Recognize the Republic's Acts Under the Act-of-State Doctrine.....................................................................................................................17

        A.      The National Assembly's Declaration of Its Authority to Authorize and Approve the Transaction, and Its Refusal to Do So, Are Acts of State................17

        B.      The Court Misinterpreted the May and September 2016 Resolutions and the Opinion of the Special Attorney General.........................................................20

CONCLUSION...........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Allied Bank International v. Banco Credito Agricola*,
    757 F.2d 516 (2d Cir. 1985)...................................................................................19

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
    585 U.S. 33 (2018)...............................................................................9, 14, 15, 16

*Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*,
    658 F.2d 903 (2d Cir. 1981).................................................................................17

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964)..............................................................................................17

*Braka v. Bancomer, S.N.C.*,
    762 F.2d 222 (2d Cir. 1985)...........................................................................18, 19

*Callejo v. Bancomer, S.A.*,
    764 F.2d 1101 (5th Cir. 1985) ........................................................................18, 19

*D'Augusta v. Am. Petroleum Inst.*,
    117 F.4th 1094 (9th Cir. 2024) ............................................................................18

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    313 F.3d 70 (2d Cir. 2002)...................................................................................16

*Petróleos De Venezuela S.A. v. MUFG Union Bank, N.A.*,
    106 F.4th 263 (2d Cir. 2024) ...............................................................6, 10, 17, 18

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
    495 F. Supp. 3d 257 (S.D.N.Y. 2020)............................................................ passim

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
    51 F.4th 456 (2d Cir. 2022) .................................................................................10

*Republic of Philippines v. Marcos*,
    806 F.2d 344 (2d Cir. 1986).................................................................................21

*Underhill v. Hernandez*,
    168 U.S. 250 (1897)..............................................................................................21

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*,
    493 U.S. 400 (1990)..............................................................................................18

**STATE CASES**

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
     41 N.Y.3d 462 (2024) ...................................................................................10, 11, 14

**VENEZUELAN CASES**

TSJ, Const. Chamber, No. 953 (Apr. 29, 2003) ......................................................4, 13

TSJ, Const. Chamber, No. 2241 (Sept. 24, 2002).................................................12, 13

TSJ, Pol.-Admin. Chamber, No. 416 (May 4, 2004) ......................................................4

TSJ, Pol.-Admin. Chamber, No. 847 (Jul. 16, 2013)...............................................4, 13

**VENEZUELAN CONSTITUTIONAL PROVISIONS**

Venez. Const. art. 150........................................................................................... passim

Venez. Const. art. 187...................................................................................................10

Venez. Const. art. 187(9) ....................................................................................... passim

Venez. Const. art. 233.....................................................................................................8

Venez. Const. art. 285(3) ..............................................................................................23

Venez. Const. art. 285(7) ..............................................................................................23

Venez. Const. art. 302...........................................................................................4, 6, 23

Venez. Const. art. 303...........................................................................................4, 6, 23

**OTHER VENEZUELAN SOURCES**

Decree No. 2,323, Official Gazette No. 6,227 (May 13, 2016)................................5, 20

Official Gazette No. 6,154 (Nov. 19, 2014) ....................................................................4

## INTEREST OF *AMICUS CURIAE*[1]

The Republic[2] respectfully submits this brief to address matters of vital importance to the future of the Republic, its legitimate government, and the ultimate restoration of democracy in Venezuela. In 2016, at the behest of the illegitimate regime of Nicolás Maduro, PDVSA pledged a controlling interest in the parent company of CITGO, the foreign "crown jewel" of the Venezuelan oil industry, as collateral for the 2020 Notes at issue in this case. That pledge (and the Exchange Offer that depended on the pledge) was invalid under Venezuelan law because it was never authorized by the National Assembly, as required by the Venezuelan Constitution.

The Republic has a sovereign interest in ensuring that this unconstitutional act is not given force and that the separation-of-powers principles enshrined in its Constitution are respected by other states. It also has an interest in United States courts' deference to its acts of state, including steps taken by the National Assembly to repudiate the pledge on which the proposed Exchange Offer depended. Finally, the Republic has an interest here because attempts to enforce the invalid 2020 Notes threaten to cripple the Republic's ongoing efforts to restore democracy in Venezuela and to bring humanitarian relief to the Venezuelan people.

## PRELIMINARY STATEMENT

In 2016, the illegitimate Maduro regime directed PDVSA to issue the 2020 Notes, backed by a pledge of the controlling interest in CITGO Holding as collateral, in defiance of the

---

[1] The Republic's counsel authored this brief in its entirety and no party or its counsel, or any other person or entity other than the *amicus* or its counsel, has made a monetary contribution that was intended to fund the preparation or submission of this brief. This brief is filed on behalf of the Venezuelan National Assembly that was elected in 2015, speaking for the Republic. The United States continues to recognize the 2015 National Assembly as the sole legitimate government of Venezuela. *See* U.S. Dep't of State, U.S. Relations with Venezuela (July 18, 2024), https://www.state.gov/u-s-relations-with-venezuela/.

[2] Except as otherwise stated, capitalized terms have the definitions set forth in *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257 (S.D.N.Y. 2020) ("*PDVSA I*").

National Assembly's constitutional authority.  Venezuela's Constitution unambiguously prohibits national public interest contracts with foreign entities—a category that encompasses the 2020 Notes transaction—unless the National Assembly authorizes the contract prior to execution.  That authorization never took place.  As a result, that purported pledge (and the Exchange Offer within which it appeared) was invalid, and the 2020 Notes were unauthorized and void *ab initio*.

Defendants' efforts to enforce the Maduro regime's illegal Exchange Offer pose a grave threat to the efforts of the Venezuelan people and their legitimate government to restore democracy in Venezuela.  In the July 2024 election, the Venezuelan people rejected Mr. Maduro's authoritarian rule, instead overwhelmingly electing opposition candidate Edmundo González Urrutia.  Although the United States has recognized Mr. González as president-elect of Venezuela, the Maduro regime has refused to honor the results.[3]  And while the Republic's legitimate government and the international community pressure Mr. Maduro to cede power, his regime has continued to exploit the propaganda value of this proceeding (and others in United States courts) to prop up his regime and discredit the legitimate opposition.  Indeed, as the United States has recognized, attempts to deprive the Venezuelan people and their legitimate government of control over CITGO, if successful, would be "a great political victory for the Maduro regime."  *Crystallex Int'l Corp. v. Bolivarian Rep. of Venezuela*, No. 17-mc-151, ECF

---

[3]      *See* Antony J. Blinken, *Condemning Nicolás Maduro's Illegitimate Attempt to Seize Power in Venezuela and Announcing New Actions Against Maduro and His Representatives and to Support the Venezuelan People*, U.S. Dep't of State (Jan. 10, 2025), https://www.state.gov/office-of-the-spokesperson/releases/2025/01/condemning-nicolas-maduros-illegitimate-attempt-to-seize-power-in-venezuela-and-announcing-new-actions-against-maduro-and-his-representatives-and-to-support-the-venezuelan-people; Transcript of Background Press Call on Venezuela (Nov. 27, 2024), https://www.whitehouse.gov/briefing-room/pressbriefings/2024/11/27/background-press-call-on-venezuela/.

No. 212-1, at 4 (D. Del. July 16, 2020) (letter from U.S. Special Representative for Venezuela Elliott Abrams); *see also* ECF No. 213-1, at 3 (Mr. Abrams stating that the interim government's legitimacy "would be severely eroded were creditors able to take control of CITGO").

Ensuring the recovery of the Venezuelan oil industry, and in particular CITGO, is indispensable to the ultimate restoration of democracy in Venezuela. To be sure, and as the legitimate government has long made clear, the Republic fully intends to resolve all legitimate claims of its creditors. But the Republic cannot recognize the validity of the Exchange Offer because its pledge of vital public assets as collateral violates the Venezuelan Constitution. The Second Circuit has now made clear that the validity of the Exchange Offer must be determined under the law of Venezuela. Correctly interpreted and applied, Venezuelan law mandates that this Court reject the Maduro regime's attempt to prop up its unconstitutional dictatorship by alienating a crucial part of Venezuela's national patrimony through an Exchange Offer and pledge that lacked the constitutionally-required authorization of the National Assembly.

## STATEMENT

### I.     Legal and Factual Background

Article 150 of Venezuela's Constitution provides that "[n]o . . . national public interest contract shall be executed . . . with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly." ECF No. 126-4, at 37. Article 187(9) reiterates that "[i]t is the role of the National Assembly" to "[a]uthorize contracts of . . . national public interest[] . . . with companies not domiciled in Venezuela." *Id.* at 37-38.[4] In Venezuela's civil law system, the National Assembly is the first-instance interpreter of the

---

[4]     These absolute provisions stand in contrast to provisions in the same Articles concerning public interest contracts with companies domiciled in Venezuela, as to which National Assembly approval or authorization is required only as "determined by law." ECF No. 126-4, at 37.

Constitution whenever it enacts laws, adopts Resolutions, or performs other parliamentary acts in accordance with its constitutional authority. *See, e.g.*, ECF No. 119-1, ¶ 53 (citing sources).

PDVSA is a "decentralized entity of the Public Administration" of Venezuela. ECF No. 80 ("Vecchio Letter"), ¶ 10. The close connection of such entities to the State itself subjects them to the mandatory rules of public law in Venezuela, including those governing public contracting. *See* Official Gazette No. 6,154 (Nov. 19, 2014). In addition to the Articles discussed above, the Constitution also contains Articles 302 and 303, which recognize the special importance of the petroleum industry, and of PDVSA in particular. Article 302 reserves to the Republic, "for reasons of national expediency, the control over the petroleum industry and other public interest industries, operations and goods and services of a strategic nature." ECF No. 126-4, at 38. Article 303 provides that the Republic owns PDVSA for "reasons of economic and political sovereignty and national strategy." *Id*. The Republic has long recognized that important contracts of PDVSA—particularly those that impact national public assets—can constitute national public interest contracts. For example, in 2006, the National Assembly invoked its constitutional authority under Article 150 to authorize a joint venture agreement between a PDVSA subsidiary and foreign corporations. Vecchio Letter ¶ 4.

Venezuela's Supreme Tribunal of Justice ("TSJ") has also held that PDVSA is a state-owned enterprise in charge of national public interest activities. Vecchio Letter ¶ 3 (citing TSJ, Pol.-Admin. Chamber, No. 416 (May 4, 2004)). The TSJ has repeatedly held that contracts of state-owned enterprises can be national public interest contracts. *See, e.g.*, TSJ, Const. Chamber, No. 953 (Apr. 29, 2003) (contracts of state-owned enterprise EDELCA were national public interest contracts)); TSJ, Pol.-Admin. Chamber, No. 847 (Jul. 16, 2013) (same with state-owned enterprise DIANCA). Until the pledge and issuance of the 2020 Notes that are at issue in this

litigation, PDVSA had *never* attempted to pledge strategic assets without the prior authorization of the National Assembly.  Vecchio Letter ¶¶ 7, 11.

PDVSA's ownership of CITGO Holding, the owner of the major oil refiner CITGO, is a "vital asset of Venezuela's most vital industry."  *Id.* ¶ 8 n.6.  Thus, the purported pledge of a controlling interest in CITGO "impacts *the economic and social life of the Nation*."  ECF No. 164-10 ("Special AG Report"), ¶ 123.  In the considered view of the Republic, discussed *infra*, the indenture and pledge at issue in this litigation and the 2020 Notes issued thereunder are national public interest contracts.  Vecchio Letter ¶ 8; Special AG Report ¶ 106.

Attempted usurpations of power by the Maduro regime in 2016 caused the National Assembly to assert its constitutional authority with respect to public interest contracts twice that year.  On May 13, 2016, Mr. Maduro issued a decree claiming the power to enter into contracts of national public interest without the prior authorization of the National Assembly.  Decree No. 2,323, Official Gazette No. 6,227, May 13, 2016 (cited at ECF No. 119-1, ¶ 68).  Less than two weeks later, on May 26, 2016, the National Assembly enacted a resolution that rejected this authoritarian measure.  That Resolution (a) stated that Article 150 "categorically mandates, *without exception*, the approval of the National Assembly" for contracts of national, state, or municipal public interest with companies not domiciled in Venezuela, including those executed by other than the National Executive; (b) stated that national public interest contracts include "[t]hose contracts that are linked to major procurements that could seriously compromise the assets of the Republic or expose them to serious losses or international claims that might be detrimental to the sovereignty or integrity of the country"; (c) rejected the portions of Mr. Maduro's decree that claimed the authority to enter into such contracts "without the approval of the National Assembly"; (d) "warn[ed] that any activity carried out by an organ that usurps the

constitutional functions of another public authority is null and void and shall be considered non-existent"; and (e) resolved to disseminate the Resolution so that foreign governments and companies would know "about the nullity of the contracts that are concluded in contravention of Article 150." ECF No. 126-13 ("May 2016 Resolution"), at 7-9 (emphasis added).

Mr. Maduro's second attempted usurpation that year, the Exchange Offer at issue in this litigation, was announced in September 2016. PDVSA—whose then-President, Eulogio del Pino, served simultaneously as Mr. Maduro's Minister of Petroleum—announced its offer to issue the 2020 Notes, secured by a first-priority lien on 50.1% of CITGO Holding's stock, in exchange for the unsecured 2017 Notes. ECF No. 126-5, at 17, 133-34. In response, the National Assembly again asserted its authority as first-instance interpreter of the Constitution and as the only branch of government constitutionally charged with authorizing national public interest contracts. Consistent with the understanding that the Exchange Offer, and the pledge therein, were national public interest contracts, the President of the National Assembly's Comptroller's Commission (the organ responsible for monitoring the use of public funds) announced that the Assembly "will not acknowledge any national interest contract that does not come before this National Assembly" and that creditors "will not be able to ask us to honor the commitments of the irresponsible individuals who destroyed PDVSA." ECF No. 126-14, at 41.

"Immediately after PDVSA announced that its Board had approved the Exchange Offer," *Petróleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 266 (2d Cir. 2024) ("*PDVSA IV*"), the National Assembly enacted a Resolution on September 27, 2016. The National Assembly invoked Article 187(9)—the constitutional provision that gives the National Assembly the exclusive power to "[a]uthorize contracts of . . . national public interest" with foreign companies, ECF No. 126-4, at 38—as well as Articles 302 and 303, the provisions that

emphasize the national importance of the petroleum industry and PDVSA.  ECF No. 1-3
("September 2016 Resolution"), at 8.  The September 2016 Resolution "*reject[ed] categorically*
that, within the swap transaction, 50.1% of the shares . . . of Citgo Holding . . . are offered as a
guarantee with priority, or that a guarantee is constituted over any other property of the Nation."
*Id* (emphasis added).  It summoned Mr. del Pino "to appear before this National Assembly" to
explain himself.  *Id.*  It demanded a criminal investigation "to determine if the current transaction
protects the National Property."  *Id.*  And because of CITGO's importance as a national asset, it
urged PDVSA to develop "a plan for the refinancing of its financial commitments."  *Id.*

Mr. Maduro again defied the Resolutions, refused to request authorization for the
Exchange Offer from the National Assembly as required by the Constitution, and ignored the
National Assembly's invocation of its constitutional authority to refuse to authorize the proposed
transaction as structured.  Instead, working through Mr. del Pino, Mr. Maduro proceeded with
the pledge and the Exchange Offer, issuing the 2020 Notes on October 28, 2016.

By then, it was public knowledge in the financial markets that the Exchange Offer was
unconstitutional under Venezuelan law and therefore illegal.  Both Resolutions had been widely
broadcasted to the public—including because of the National Assembly's instruction that the
Resolutions be "publicize[d]," "disseminate[d]," and sent to "all Embassies in [Venezuela] . . . to
inform the Governments of the States they represent and the corresponding companies about the
nullity of the contracts," September 2016 Resolution at 8; May 2016 Resolution at 9—and
resulted in several media and analyst reports in Venezuela and abroad.  *See* ECF No. 117, at 13-
14 (citing reports).  Investors took heed and, as expected, most holders of 2017 Notes—over
60%—recognized the illegal character of the Exchange Offer and declined to exchange their
Notes, despite the substantial economic benefits the Exchange Offer seemed to promise and the

significant risk of default for 2017 Notes.  Only 39.43% of the 2017 Notes were tendered by investors willing to take their chances that the Maduro regime would get away with its unlawful and unconstitutional usurpation of authority in issuing the Notes.

In 2019, after Interim President Juan Guaidó became the Republic's legitimate chief executive,[5] he received from Special Attorney General José Ignacio Hernández an analysis of the Exchange Offer.  In a thorough analysis filling 55 single-spaced pages, the Special Attorney General

> concluded that the indenture is a national public interest agreement that, as such, should have been previously authorized by the National Assembly pursuant to article 150 of the Constitution.  Owing to the lack of authorization, [PDVSA] did not have the legal capacity to sign that agreement, which is invalid under Venezuelan Law.

Special AG Report ¶ 2.  He reported that "the defect is the violation of article 150 of the Constitution, since PDVSA signed the issuing contract without prior authorization from the National Assembly."  *Id.* ¶ 164.  He further noted that the National Assembly "questioned . . . the Bond," a fact that bondholders "should have been aware" of.  *Id.* ¶ 161.  Therefore, "a conclu[sion] that the Bond was invalid[]" cannot "surprise those bond-holders in good faith."  *Id*.  And while he noted that the National Assembly "did not declare the unlawfulness of that Bond," *id.* ¶ 160, at the time the National Assembly considered the Exchange Offer and pledge, the 2020 Notes had not yet been issued.  There were, at that point, no Bonds to declare unlawful.  Instead, the National Assembly withheld authorization over the Exchange Offer and pledge to express its *ex ante* disapproval of the Notes' anticipated issuance.

By Resolution dated October 15, 2019 (the "October 2019 Resolution"), the National Assembly "ratif[ied] that the 2020 Bond indenture violated Article 150 of the Constitution . . . ,

---

[5]     Following illegitimate elections administered by Mr. Maduro—who, among other things, banned opposition parties from participating—the National Assembly invoked Article 233 of Constitution in January 2019 and named Mr. Guaidó as Interim President.

since it concerned a national public contract, executed with foreign companies, which was not authorized by the National Assembly."  ECF No. 1-4, at 8.

## II.    Procedural Background

In June 2020, Carlos Vecchio, then the Republic's Ambassador to the United States, submitted a letter setting forth the Venezuelan constitutional, legislative, and judicial authorities and principles summarized above.[6]  The letter also explained that "the absence of the National Assembly's authorization of the CITGO pledge," as well as the enactment of the May 2016, September 2016, and October 2019 Resolutions, meant that no such authorization ever occurred. *Id.* ¶¶ 5, 24.  The Letter asked the Court to defer to those "official acts taken wholly within Venezuela by the National Assembly," which render the 2020 Notes and their underlying pledge "invalid, illegal, and null and void *ab initio*."  *Id.* ¶ 25.

Both Plaintiffs and Defendants filed for summary judgment.  ECF Nos. 81 & 91.  On October 16, 2020, this Court denied Plaintiffs' motion and substantially granted Defendants' motion.  The Court acknowledged its obligation to "accord respectful consideration" to the Ambassador's Letter as a foreign government's official statement on the interpretation and meaning of its own domestic law.  *PDVSA I*, 495 F. Supp. 3d at 279 (quoting *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 36 (2018)).  But the Court declined to analyze Venezuelan law and did not rely on any of the materials provided by the Ambassador or the parties' Venezuelan law experts.  Instead, the Court opined that Venezuelan law is "ultimately irrelevant to this action."  *Id.* at 292.

---

[6]    Though Defendants filed a motion to strike the Ambassador's Letter, *see* ECF No. 145, this Court denied that motion, noting that "insofar as the Letter offers views or interpretations of Venezuelan law—an issue that is at the heart of the instant litigation—it is proper for the Court to take into consideration under [Federal Rule of Civil Procedure] 44.1."  ECF No. 199, at 2.

On appeal, the Second Circuit certified to the New York Court of Appeals the question of whether New York law requires the validity of the 2020 Notes to be determined under Venezuelan law.  *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 475 (2d Cir. 2022) ("*PDVSA II*").[7]  The New York court answered affirmatively, holding that a court must apply Venezuelan law in determining "whether the 2020 Notes are invalid due to a defect in the process by which the securities were issued."  *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 41 N.Y.3d 462, 473 (2024) ("*PDVSA III*").  Specifically, the New York court held that "determining whether the securities . . . are valid requires analysis of Article 150 and related provisions of the Venezuelan Constitution"  *Id.* at 477 (quotation marks omitted).  Citing both Articles 150 and 187, the court found that those "provisions may address the procedural requirements and approvals necessary for—and present a discrete limitation on—the authority of certain public entities to enter into 'national public interest contracts.'"  *Id.* at 479-80.

The Second Circuit remanded this action back to this Court, instructing this Court to "determine whether the 2020 Notes and associated instruments were issued in violation of the Venezuelan Constitution and are thus invalid" and to reconsider its prior holding that the act-of-state doctrine "did not apply."  *PDVSA IV*, 106 F.4th at 268-69.[8]

## SUMMARY OF ARGUMENT

"[D]etermining whether the securities issued by the[] Venezuelan entities are valid requires analysis of Article 150 and related provisions of the Venezuelan Constitution."  *PDVSA*

---

[7]    The Republic filed *amicus* briefs before both the Second Circuit and the New York Court of Appeals explaining its considered views—consistent with those presented in this brief and Ambassador Vecchio's Letter—on the application of Venezuelan law.

[8]    On remand, this Court endorsed a proposal from the parties that they would submit supplemental briefs to discuss both issues.  ECF No. 320, at 2.  Similarly, the Republic here focuses on these issues and does not address other issues that may be relevant to this litigation. As the parties did in their joint proposal, *see id.*, the Republic reserves the ability to address other issues in a future filing.

*IV*, 106 F.4th at 268 (quoting *PDVSA III*, 41 N.Y.3d at 477).  Under Articles 150 and 187(9) of the Constitution, any national public interest contract with a foreign company must be authorized by the National Assembly.  The Exchange Offer, including the purported pledge of a controlling interest in CITGO Holding, was a national public interest contract with foreign companies.  The National Assembly did not authorize the 2020 Notes.  To the contrary, invoking its constitutional authority to authorize national public interest contracts, it categorically rejected a pledge of the CITGO interest or "any other property of the Nation."  The Exchange Offer was therefore unauthorized, unconstitutional, and void *ab initio* under Venezuelan law.

The act-of-state doctrine provides a second and independent reason to conclude that the Exchange Offer is invalid and void.  The National Assembly's May and September 2016 Resolutions asserted the Assembly's constitutional authority as the branch of government responsible for authorizing national public interest contracts, invoked that authority with respect to the proposed Exchange Offer, and categorically rejected the pledge of strategic national property on which the proposed Exchange Offer depended.  The National Assembly thus considered and declined to authorize the proposed Exchange Offer, preventing the 2020 Notes from being validly issued; these decisions should be recognized as sovereign acts of state.

## ARGUMENT

**I.    The Exchange Offer Was Unauthorized and Void *Ab Initio* Under Articles 150 and 187(9) of Venezuela's Constitution.**

### A.    The Exchange Offer Required National Assembly Approval.

Article 150 unambiguously provides that "[n]o municipal, state or national public interest contract shall be executed . . . with companies not domiciled in Venezuela, . . . without the approval of the National Assembly."  ECF No. 126-4, at 37.  Article 187(9) reiterates that it is the National Assembly's role to authorize such contracts.  *Id.* at 38.

In the September 2016 Resolution, the National Assembly concluded that the documents that created the 2020 Notes, including the purported pledge, constituted a national public interest contract. That has been the Republic's considered view throughout this litigation and remains the Republic's view today. PDVSA is "a state-owned enterprise in charge of national public interest economic activities," and CITGO is "PDVSA's greatest strategic asset abroad." Vecchio Letter ¶¶ 3, 7. The National Assembly has consistently treated important contracts of PDVSA as national public interest contracts. *Id.* ¶¶ 3-4, 8-10. The Maduro regime's attempt to pledge 50.1% of PDVSA's interest in CITGO Holding, together with its purported pledge of the remaining 49.9% to the Russian oil company Rosneft, have rightly been described by the National Assembly as an "attempt to conduct a *de facto* privatization of PDVSA." *Id.* ¶ 10.[9] As the Republic's Ambassador put it, the Indenture and Pledge for the 2020 Notes "are national public interest contracts under any possible definition." *Id.* ¶ 8.

The contracts at issue were also with companies not domiciled in Venezuela. The parties to the Indenture were PDVSA; its subsidiary PDVSA Petróleo; MUFG, a U.S. national banking association; GLAS, a New York limited liability company; and other entities formed under New York and Luxembourg law. ECF No. 126-10, at 1. The Pledge and Security Agreement was entered among PDVSA, PDV Holding, Inc., MUFG, and GLAS. ECF No. 126-11, at 5.

Because the Indenture and Pledge were national public interest contracts with companies domiciled outside Venezuela, under Article 150 and Article 187(9), those contracts are void *ab initio* without the authorization of the National Assembly. Defendants have previously argued that the TSJ's decision in *Andrés Velásquez*, TSJ, Const. Chamber, No. 2241 (Sept. 24, 2002),

---

[9]     Unlike the September 2016 Resolution—which disapproved of the Exchange Offer and the associated pledge *before* the relevant Bonds were issued—the National Assembly expressed its *ex post* disapproval of the purported pledge to Rosneft. *See id.*; *infra*, p. 22.

supports the view that *only* contracts to which the Republic is a party can be national public interest contracts. *See* ECF No. 135, at 39-41. It is the Republic's considered view that this interpretation of *Andrés Velásquez* is incorrect. In that decision, the TSJ stated that "contracts concluded by the Republic through the competent organs of the National Executive . . . whose purpose is determinant or essential to accomplishing the purposes and objectives of the Venezuelan State would be included within the species of national public interest contracts." ECF No. 128-7, at 17. But that decision states that such contracts "concluded by the Republic" are "*included*" within the category of national public interest contracts, not that national public interest contracts are *exclusively limited* to those entered into by the Republic. Not only is that later interpretation unsupported by the text of *Andrés Velásquez*, it is also inconsistent with later decisions involving contracts entered into by state-owned enterprises like EDELCA or DIANCA. *See, e.g.*, TSJ, Const. Chamber, No. 953 (Apr. 29, 2003); TSJ, Pol.-Admin. Chamber, No. 847 (Jul. 16, 2013). And, of course, such an interpretation would be inconsistent with the Resolutions of the National Assembly—the first-instance interpreter of the Constitution— regarding PDVSA.

### B. Venezuelan Law Places the Burden on the Proponent of a National Public Interest Contract to Obtain National Assembly Authorization—Not on Its Opponents to Obtain National Assembly Disapproval.

Venezuelan law—which the Second Circuit has held must be applied in analyzing whether the 2020 Notes and pledge are invalid—requires that the proponents of the Exchange Offer obtain National Assembly approval in order for the notes and pledge to be considered valid. Article 150 of the Constitution provides that "[n]o . . . contract shall be executed . . . without the approval of the National Assembly." ECF No. 126-4, at 37. That language is unambiguous. It requires the *proponent* of a national public interest contract to obtain the National Assembly's approval prior to execution of the contract—not the *opponent* of such a

13

contract to have the National Assembly affirmatively invalidate it.  In other words, any national public interest contract executed without the approval of the National Assembly is unlawful and without force.  This is why the New York Court of Appeals correctly described the question presented here as whether the Maduro regime's "failure to *receive authorization* from the National Assembly *prior to* issuing the 2020 notes"—and not any purported failure of the National Assembly to overtly disapprove of the transaction after it was announced—"means that the notes were invalid under the law of Venezuela at the time of their issuance."  *PDVSA III*, 41 N.Y.3d at 482 (emphasis added).

The National Assembly has repeatedly reaffirmed this understanding of Articles 150 and 187(9).  The Assembly's May 2016 Resolution, enacted in direct response to Mr. Maduro's announced intention to enter national public interest contracts without National Assembly authorization, expressly invoked the Assembly's authority under Article 187(9), "rejected" Mr. Maduro's claim to the authority to do so, "remind[ed]" the world of the need for National Assembly approval, and "inform[ed]" foreign governments and companies "about the nullity of the contracts that are concluded in contravention of Article 150."  May 2016 Resolution at 8-9.  Still, Mr. Maduro purported to go forward with the Exchange Offer, never requesting authorization from the National Assembly as required by Articles 150 and 187(9).  In response, the National Assembly issued the September 2016 Resolution, again invoking Article 187(9)— the provision that assigns to the National Assembly the sole authority to authorize national public interest contracts—and "reject[ing] categorically" PDVSA's attempted pledge of the CITGO Holding shares.  September 2016 Resolution at 8.  The National Assembly reiterated the same understanding in its October 2019 Resolution.  ECF No. 1-4, at 6-9.

### C.      The Republic's Explanation of Venezuelan Law Should Be Given Force.

As this Court has previously recognized, *PDVSA I*, 495 F. Supp. 3d at 279, when a

foreign government submits a statement interpreting its own laws, a federal court must accord

that interpretation "careful[]" and "respectful" (even if not "conclusive") consideration. *Animal

Sci. Prods.*, 585 U.S. at 36, 43.  That deferential approach honors "the spirit of 'international

comity.'"  *Id.* at 43 (citation omitted).

Here, the Republic confirms that the "2020 Notes were issued as a result of an illegal and

unconstitutional transaction aimed to circumvent the political control of the National Assembly

over the public national interest contract."  Vecchio Letter ¶ 18.  The Republic also confirms that

the "2020 Notes, including the Pledge and Indenture, were therefore void *ab initio*."  *Id.*  Those

conclusions follow directly from a plain reading of Venezuela's Constitution as discussed above.

The Republic's official interpretation of Venezuelan law, as expressed in the present brief,

further supports this reading.  Indeed, each of the considerations the Supreme Court identified in

*Animal Science Products*, 585 U.S. at 43, supports accepting the Republic's considered views:

- ***The "statement's clarity, thoroughness, and support."***  Like the Vecchio Letter previously submitted to this Court, this brief clearly sets forth Venezuela's interpretation of its applicable law and discusses the reasoning underlying its interpretation thoroughly. The Republic's interpretation of the relevant issues of Venezuelan law presented here was not manufactured for purposes of this litigation.  Rather, as the Republic's submissions demonstrate, its views are thoroughly supported by provisions of Venezuela's Constitution (including Articles 150 and 187(9)), Resolutions of the National Assembly (including the May and September 2016 Resolutions and others that predate those two), and other authoritative sources.

- ***The "transparency of the foreign legal system."***  The authorities cited by the Republic are readily available for review, as the extensive discussions by the parties' expert witnesses in the original summary judgment briefing demonstrate.  Moreover, the 2015 National Assembly, on whose behalf this brief is being submitted, was democratically elected and is committed to the rule of law.  Its enactments (including the Resolutions in question here) were passed through orderly and transparent legislative processes, including public debate.  And unlike in *Animal Science Products*—where the Chinese government "had not identified any written law or regulation" supporting its views on

what Chinese law required, 585 U.S. at 38—here, the relevant constitutional and legislative provisions are fully available in the record.

- ***The "context and purpose" of the statement.***  The Republic has been transparent about its context and purpose: to vindicate the National Assembly's constitutional role in authorizing contracts in the national public interest, and to explain why the Maduro regime's pledge of a controlling interest in a strategic national asset—in defiance of the Venezuelan Constitution and the Resolutions of the National Assembly—was void under Venezuelan law.  It is difficult to imagine an interest more deserving of comity than a sovereign's desire to enforce its Constitution and to ensure respect for the separation of powers that the Constitution reflects.

    Although this Court has previously opined that the Republic's earlier submission was "offered specifically for the purposes of this litigation," *PDVSA I*, 495 F. Supp. 3d at 280, the relevant question is not whether the Republic's submissions were offered to influence this litigation—that will *always* be the case when a foreign sovereign makes such a submission.  *See, e.g.*, *Animal Sci. Prods.*, 585 U.S. at 37 (noting that the views of the foreign sovereign were submitted to the district court in the form of an *amicus* brief). What matters is whether the position expressed in such a submission was newly invented in order to influence the litigation.  That is not the case here.  The legal principles set forth in this brief are long-standing.  They are unambiguously enshrined in Venezuela's Constitution; they were articulated and applied in the May and September 2016 Resolutions; and they were ratified in the October 2019 Resolution.  Moreover, the National Assembly has applied the same principles to condemn other usurpations by the Maduro regime, such as the attempt to pledge 49.9% of CITGO to Rosneft and the purported creation of a PDVSA "litigation trust."  Vecchio Letter ¶ 10.  That the Republic and its citizens have an important economic and political interest in this litigation hardly makes the Republic's interpretation of its own laws less worthy of respectful consideration.  *See, e.g.*, *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002) (that Indonesia was "a party to the case does not blunt this comity concern").

- ***The "role and authority of the entity or official offering the statement."***  This brief is being offered on behalf of the 2015 National Assembly, which is the legitimate, U.S.-recognized government of the Bolivarian Republic of Venezuela.

- ***The "statement's consistency with the foreign government's past positions."***  The Republic's position stated herein is entirely consistent with the position it has taken previously in this litigation and elsewhere.[10]  In arriving at that position, the Republic relies on long-standing provisions of Venezuela's Constitution, a decision of the TSJ dating from 2003, and numerous Resolutions of the Venezuelan National Assembly from 2006 to 2019.  These include the May 2016 Resolution and the September 2016 Resolution, both of which were issued before the Exchange Offer was consummated and

---

[10]    In addition to the Vecchio Letter submitted to this Court, the Republic has submitted *amicus* briefs to both the Second Circuit and the New York Court of Appeals, and presented oral argument to the Second Circuit as well.

had sharply in focus Mr. Maduro's attempted usurpations of the National Assembly's constitutional authority.  Indeed, the Exchange Offer's unlawful character was public knowledge when investors made their decision on whether or not to take up the offer.

II.    **The Court Should Recognize the Republic's Acts Under the Act-of-State Doctrine.**

For the reasons stated *supra* in Section I, it is indisputable that the Exchange Offer was unauthorized and void *ab initio* under Venezuelan law.  But in all events, under the act-of-state doctrine, this Court is required to give respect to the definitive action of the National Assembly in refusing to approve the Exchange Offer and therefore rendering it void.  *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964).  The Court previously declined to give effect to the Assembly's refusal to authorize the transaction, which thereby rendered the Exchange Offer void *ab initio*.  As this Court has recognized, those actions, memorialized in the May and September 2016 Resolutions, are sovereign acts of state taken by Venezuela's U.S.-recognized government.  The Court's prior reading of the Resolutions, however, nullified those acts of state.

A.    **The National Assembly's Declaration of Its Authority to Authorize and Approve the Transaction, and Its Refusal to Do So, Are Acts of State.**

Under the act-of-state doctrine, U.S. courts must give effect to, and must refrain from declaring invalid, the public acts of a foreign sovereign.  *Sabbatino*, 376 U.S. 401.  The doctrine reflects "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs."  *PDVSA IV*, 106 F.4th at 269 (citation omitted).  The act-of-state doctrine thus requires U.S. courts to give effect to a foreign sovereign's official acts if they occurred within its territory.  *See, e.g.*, *Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 658 F.2d 903, 908 (2d Cir. 1981).

The National Assembly's determination that the Exchange Offer was a national public interest contract requiring authorization, its refusal to authorize that contract, and its rejection of the Exchange Offer, including the pledge therein, as void *ab initio* (all of which were effectuated

by the May and September 2016 Resolutions, and confirmed by the October 2019 Resolution)
were all official acts of a foreign sovereign within its territory.  *See PDVSA I*, 495 F. Supp. 3d at
271-73 (concluding that the "May 2016, September 2016, and October 2019 Resolutions all
constitute official acts of a foreign sovereign").  By seeking to invalidate each of these sovereign
decisions, Defendants here "seek to litigate the . . . policy of [a] foreign nation[]," which is
precisely what the act-of-state doctrine prohibits.  *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th
1094, 1103 (9th Cir. 2024).  By contrast, if those acts of state are given effect here as they should
be, the 2020 Notes are void and the purported pledge of PDVSA's shares is invalid.

If the Court declines to conclude that "the Exchange Offer is invalid under the
Venezuelan Constitution for lack of legislative approval" *PDVSA IV*, 106 F.4th at 270—which,
for the reasons stated in Section I, would be incorrect—"the outcome of the case" will then
"turn[] upon . . . the effect of official action by a foreign sovereign"; this is precisely the
circumstance in which the act-of-state doctrine applies.  *W.S. Kirkpatrick & Co. v. Env't
Tectonics Corp., Int'l,* 493 U.S. 400, 406 (1990).  The entire purpose and effect of the May and
September 2016 Resolutions was to assert the National Assembly's constitutional authority to
ensure that the Exchange Offer, including the pledge, could not validly be made without the
Assembly's prior authorization.  To refuse to give effect to those Resolutions is to "render
nugatory the attempts by [Venezuela] to protect" its important national assets.  *Callejo v.
Bancomer, S.A.*, 764 F.2d 1101, 1116 (5th Cir. 1985).

The National Assembly's exercise of its constitutional power to review and refuse to
authorize the Exchange Offer under Articles 150 and 187(9), like the exchange control
regulations at issue in *Braka* and *Callejo*, governs the conduct and obligations of a state-owned
entity subject to foreign law, which cannot give its contractual counterparties what they seek

without running afoul of that law. *See Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985); *Callejo*, 764 F.2d at 1116. Defendants here, like the counterparties in those cases, argue that they seek only an order honoring contractual commitments; but the very point is that honoring those commitments would violate Venezuelan law because the contract at issue is void *ab initio*, a conclusion effectuated by the May and September 2016 Resolutions.

The act-of-state doctrine therefore dictates that the Court find the Exchange Offer to be invalid and void. "Only by disregarding" the Resolutions could the Court enforce the Exchange Offer; the act-of-state doctrine therefore prohibits that relief. *See Callejo*, 764 F.2d at 1116.

This case is unlike *Allied Bank International v. Banco Credito Agricola*, 757 F.2d 516, 521 (2d Cir. 1985), because at the time of the National Assembly's acts of state, the 2020 Notes did not yet exist; the National Assembly's refusal to authorize the Exchange Offer, therefore, took place entirely in Venezuela, and not in the United States.[11] "The test . . . adopted in *Allied* was whether the [act of state] was 'able to come to complete fruition within the dominion of the [foreign] government.'" *Braka*, 762 F.2d at 224 (citation omitted). The May and September 2016 Resolutions established, all within Venezuela, that without prior National Assembly authorization, the pledge could not be made and the 2020 Notes could not be issued. The bondholders who chose to accept the unauthorized Exchange Offer never acquired valid property rights. In other words, to respect the Resolutions as acts of state does not bless an after-the-fact

---

[11]     As the Court previously acknowledged, this distinction is critical. *See PDVSA I*, 495 F. Supp. 3d at 276 ("Plaintiffs' strongest argument is that the instant case is distinguishable from *Allied Bank* because the National Assembly's Resolutions, coupled with its omission of authorization for the Exchange Offer, precluded the 2020 Notes and Governing Documents from ever coming into valid legal existence in the first place."). The Court ultimately found this unpersuasive, but only because in its reading, the "language of the Resolutions" did not support the view that the National Assembly invalidated the Exchange Offer in 2016. *Id.* As discussed in Section II.B *infra*, respectfully, the Court's conclusions about the Resolutions are neither supported by their text nor by the context in which they were issued.

expropriation of foreign assets.  To the contrary, it gives effect to the National Assembly's *ex ante* assertion of its constitutional authority to prevent the Maduro regime's usurpation.

### B.     The Court Misinterpreted the May and September 2016 Resolutions and the Opinion of the Special Attorney General.

Respectfully, it is the Republic's considered view that the Court's prior analysis misinterpreted the May and September 2016 Resolutions and gave insufficient weight to the context in which those Resolutions were enacted.

The Court viewed the May 2016 Resolution as "cabin[ed]" to contracts entered into by "the National Executive," and therefore inapplicable to "contracts entered into by PDVSA." *PDVSA I*, 495 F. Supp. 3d at 277.  But this reading does not consider the Resolution's context, responding directly to a Maduro decree issued less than two weeks earlier claiming unilateral authority to enter into national public interest contracts.  *See* Decree No. 2,323, Official Gazette No. 6,227, May 13, 2016 (cited at ECF No. 119-1, ¶ 68).  The Resolution declares that Article 150 "categorically mandates, *without exception*," the Assembly's approval of such contracts with foreign companies, and warns that this constitutional requirement "cannot be relaxed by conventions, decrees or other legal acts."  May 2016 Resolution at 7-8 (emphasis added).

In addition, other provisions of the May 2016 Resolution were not limited to contracts entered by the National Executive.  Provision Two "warn[ed] that *any* activity carried out by *an organ* that usurps the constitutional functions of another public authority is null and void," and Provision Four informed foreign governments and companies "about the nullity of the contracts that are concluded in contravention of Article 150."  *Id.* at 9 (emphasis added).  Neither provision limited itself to contracts signed by the National Executive.  Rather, the Resolution "reiterate[ed] that any national interest contract entered with foreign companies must be previously authorized by the National Assembly."  Vecchio Letter ¶ 5.

20

Similarly, the Court's prior treatment of the September 2016 Resolution was unduly narrow. The Court previously dismissed the National Assembly's decision to withhold authorization of the Exchange Offer as irrelevant to the act-of-state analysis on the ground that a "simple failure to act" was unworthy of treatment "as the act of a foreign sovereign." *PDVSA I*, 495 F. Supp. 3d at 276 n.6. But the decision to withhold an authorization that the Venezuelan Constitution requires is not a "simple failure to act," especially since it was Mr. Maduro that failed to request authorization as required by the Constitution. Even without having been asked to consider the issue by Mr. Maduro, the Assembly's September 2016 Resolution "reject[ed] categorically" the pledge of CITGO Holding shares or "any other property of the nation," demanded a criminal investigation be opened about possible abuse of government property, summoned Mr. del Pino to appear before the National Assembly to explain himself, and urged PDVSA to come up with a new plan for refinancing its debt. September 2016 Resolution at 8. In other words, in enacting the September 2016 Resolution, the National Assembly confirmed and memorialized its refusal to authorize the Exchange Offer. *Id*. That was certainly *not* a failure to act on part of the National Assembly. *See, e.g.*, *Underhill v. Hernandez*, 168 U.S. 250, 251 (1897); *Republic of Philippines v. Marcos*, 806 F.2d 344, 358 (2d Cir. 1986).

Equally to the point, the Court's prior conclusions misinterpreted Venezuelan law by declining to treat the Resolutions as acts of state on the ground that they did not expressly reject the Exchange Offer. *See PDVSA I*, 495 F. Supp. 3d at 276-78. As an initial matter, that characterization is incorrect: the National Assembly "reject[ed] categorically" the pledge of CITGO Holding shares, as well as a "guarantee . . . over any other property of the Nation." September 2016 Resolution at 8. Instead, the National Assembly called upon PDVSA to come

up with a new plan for "the refinancing of its financial commitments." *Id.* Thus, even if the National Assembly were required to affirmatively express disapproval, it unmistakably did so.

This Court similarly erred in concluding that the September 2016 Resolution failed to "declare[] the Exchange Offer as null and void." *PDVSA I*, 495 F. Supp. 3d at 279 (noting that "other National Assembly resolutions have expressly declared certain transactions to be null and void" and citing Vecchio Letter ¶ 10). Under Venezuelan law, no talismanic phrases are required for the Assembly's expressed disapproval to have legal force, and certainly the Resolution's declaration that the Assembly "reject[ed] categorically" the Exchange Offer's pledge should satisfy any reasonable standard in that regard. Indeed, in one of the "other National Assembly resolutions" cited at Vecchio Letter ¶ 10 that the Court attempted to distinguish from the September 2016 Resolution, *PDVSA I*, 495 F. Supp. 3d at 279, the National Assembly exercised its constitutional authority to disapprove of the PDVSA "litigation trust agreement" without explicitly declaring the contract "null and void."[12] Moreover, each of the examples cited at Vecchio Letter ¶ 10 involved the Assembly's *ex post* disapproval of a transaction—unlike here, where at the time of the Resolution, the 2020 Notes had not yet issued and there were thus no Bonds to declare "null and void."

More fundamentally, the Court's analysis rested on the assumption that the Exchange Offer should be presumed valid unless the National Assembly expressly repudiated it. *See, e.g.*, *PDVSA I*, 495 F. Supp. 3d. at 278 (concluding that the September 2016 Resolution did not "demonstrate[] an intent to affirmatively invalidate the Exchange Offer"). As discussed above, *see supra*, pp. 13-14, that gets Venezuelan law backwards. Moreover, at the time the National Assembly passed the Resolutions, the transaction itself was not final, but rather a proposal that

---

[12]    *See* ECF No. 126-69, at 9 (declaring the trust to be "unconstitutional").

could be withdrawn or modified.  The National Assembly could scarcely have done more to make clear that the proposed transaction as structured, including the pledge, was unconstitutional, unauthorized, and void as a matter of Venezuelan law.

The Court's analysis also relied on a misreading of the September 2016 Resolution's instruction that an "investigation" be opened by the Venezuelan Public Ministry.[13]  The Resolution "urge[d] the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with articles 187, section 9, 302, and 303 of the Constitution."  September 2016 Resolution at 8.  In doing so, the National Assembly "demanded the opening of a *criminal* investigation" to determine whether Maduro regime officials violated their obligations to protect National Property.  Special AG Report ¶ 103 (emphasis added).  Indeed, the Resolution's invocation of Articles 302 and 303 of the Constitution—which recognize the special importance of the petroleum industry and PDVSA— demonstrate that the National Assembly was concerned that officials were abusing National Property by purporting to execute the pledge.  The Court previously read the Resolution's instruction to "open an investigation" as demonstrating the National Assembly's "desire to *investigate the Exchange Offer*," and that the accordingly, the Resolution failed to definitively "invalidate the Exchange Offer."  *PDVSA I*, 495 F. Supp. 3d. at 277-78 (emphasis added).  But the Resolution was clear that the National Assembly "reject[ed] categorically" the pledge; the investigation it sought to open was whether Maduro officials would be subject to liability for the illegal proposed transaction.  *See also* Venez. Const. art. 285(7) (ECF No. 128-5, at 47) (authorizing the Public Ministry to "file any appropriate actions to hold liable public officials

---

[13]    The Public Ministry is a government agency responsible for investigating and prosecuting criminal conduct.  *See* Venez. Const. art. 285(3) (ECF No. 128-5, at 47) (the Public Ministry will "order and direct criminal investigation of the perpetration of punishable acts").

who have incurred civil, labor, military, criminal, administrative or disciplinary liability [in] the course of their official duties.").

Moreover, the National Assembly's explicit invocation in both Resolutions of Article 187(9)—the provision that allocates to the Assembly the role of authorizing national public interest contracts—made clear the determination that the Exchange Offer could not be consummated without prior authorization, a determination plainly qualifies as an act of state.

The financial markets' reaction to the National Assembly's actions further underscores their import as unambiguous acts of state. At the National Assembly's direction, the Resolutions were widely publicized both as a sovereign-to-sovereign matter and in the financial markets more broadly. *See* May 2016 Resolution at 9 (instructing that the Resolution be sent to all embassies in Venezuela to inform foreign governments and companies "about the nullity of the contracts"); September 2016 Resolution at 8 (instructing that the resolution be "publicize[d]"). Investors took heed. Not even 40% of the 2017 Notes were tendered—despite the substantial economic benefits the Exchange Offer seemed to promise and the significant risk of default for the 2017 Notes—doubtless because the noteholders understood that the 2020 Notes had been offered in defiance of law and the National Assembly's sovereign acts. Only opportunistic investors, representing the 39.43% of 2017 Noteholders that are now at issue in this litigation, decided to gamble that a future court would give effect to the illegal scheme in contravention of the sovereign decision by the National Assembly.

Finally, this Court overlooked key portions of the 55-page report issued by the Special Attorney General. The Court previously found that the Republic's views were "undermined" by a single comment in that report stating that "through the September 2016 Resolution, 'the National Assembly did *not* declare the unlawfulness' of the 2020 Notes." *PDVSA I*, 495 F.

Supp. 3d at 279-80 (quoting Special AG Report ¶ 160).  But at the time the National Assembly considered the Exchange Offer and pledge, the 2020 Notes had not yet been issued—there were no Bonds to declare unlawful.  That sentence appeared near the end of the report, in a section addressing whether investors were on notice of the invalidity of the 2020 Notes.  The Special Attorney General concluded in that section that investors "*should have been aware that the Bond was questioned by the National Assembly before being issued*."  *Id.* ¶ 161.  Moreover, earlier in his report, the Special Attorney General analyzed at length the validity of the Exchange Offer and concluded that the absence of National Assembly authorization rendered the indenture and pledge invalid *ab initio*.  *See id.* ¶ 2 ("*conclud[ing] that the indenture is a national public interest agreement that, as such, should have been previously authorized by the National Assembly pursuant to article 150 of the Constitution*" and that because of the "lack of authorization, [PDVSA] did not have the legal capacity to sign that agreement, which is invalid under Venezuelan Law"); *see also id.* ¶ 164 ("[T]he defect is the violation of article 150 of the Constitution, since PDVSA signed the issuing contract without prior authorization from the National Assembly."); *id.* ¶ 170(b) (concluding that the "issuing contract" was a national public interest contract because it entailed the pledge of the CITGO shares and was invalid because it was not authorized by the National Assembly).  A fair reading of the Special Attorney General's report leaves no doubt that his conclusion is consistent with the Republic's understanding: that the National Assembly considered the Exchange Offer, and pledge therein, to be a national public interest contract, and that the September 2016 Resolution rendered the 2020 Notes void *ab initio* because the Offer and pledge were never authorized by the Assembly.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

Dated:   January 15, 2025

Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

George M. Garvey
Adeel Mohammadi
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
George.Garvey@mto.com
Adeel.Mohmmadi@mto.com

*Attorneys for Bolivarian Republic of Venezuela*