**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

        Plaintiffs and Counterclaim Defendants,

        - against -

MUFG UNION BANK, N.A. and GLAS AMERICAS
LLC,

        Defendants and Counterclaim Plaintiffs.

Case No: 19-cv-10023-KPF

---

## DECLARATION OF FREDDY GUEVARA

Freddy Guevara declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a Democracy Fellow with the Ash Center for Democratic Governance and Innovation at the Harvard Kennedy School.

2.      From 2016 through the present, I have been a member of the Venezuelan National Assembly. During the National Assembly's 2016 term, I served as the President of the Comptroller's Commission. The Comptroller's Commission is responsible for "monitoring the investment and use of public funds" by Venezuela's "financial and public entities."[1] Further, in 2017, I served as the Vice President of the National Assembly.

3.      Under Articles 302 and 303 of the Venezuelan Constitution, PDVSA is an entity created to fulfill a constitutional role of public interest and, therefore, given its strategic importance to the oil industry, all of its activities are matters of national interest.

---

[1] La Asamblea Nacional de la República Bolivariana de Venezuela Decreta: Reglamento de Interior y de Debates de la Asamblea Nacional, https://www.asambleanacional.gob.ve/index.php/asamblea/bases_legales.

9326099.10

4.      While Article 150 does not prevent state entities like PDVSA from negotiating or entering into ordinary contracts, state entities may not enter into contracts that implicate national interest assets without authorization from the National Assembly.

5.      In addition to my near-decade of experience with national public interest contracts during my tenure as a member of the National Assembly, I closely reviewed numerous, high-value national public interest contracts involving PDVSA as the President of the Comptroller's Commission. Thus, I am highly familiar with the constitutional provisions referenced above, as well as national public interest contracts and the authorization they require.

6.      On May 26, 2016, the National Assembly issued a resolution confirming this interpretation of the Venezuelan Constitution. This resolution was issued in response to the authoritarian measures of Nicolás Maduro, who on May 13, 2016, issued a decree to execute national public interest contracts without the prior authorization of the National Assembly.

7.      In the May Resolution, the National Assembly stated the proper legal procedures for entering into contracts that implicate Venezuelan assets and publicly warned the international community that national public interest contracts lacking National Assembly approval are illegal and null and void. The May Resolution did not expressly reject the Exchange Offer because it was not proposed until months later, in September 2016. It did, however, confirm the National Assembly's consistent understanding that it exclusively has and alone can authorize national public interest contracts—which the National Assembly expressly understood to include, but not be limited to, those involving the National Executive as a party.

8.      On September 17, 2016, the Maduro regime announced the proposed Exchange Offer, pursuant to which PDVSA would pledge a majority of its interest in CITGO Holding, Inc.

("CITGO") as collateral, to prevent default on the 2017 Notes. The Maduro regime instructed PDVSA to carry out this transaction.

9.      Oil is central to Venezuela's economy and PDVSA's corporate structure includes CITGO as an indirect U.S. subsidiary and thus a Venezuelan state company. As a result, CITGO was, and remains, an asset of national public interest; the Exchange Offer, including its pledge of CITGO as collateral, was a national public interest contract; and a majority of the National Assembly regarded the Exchange Offer as such.

10.     As soon as the Maduro regime announced the proposed Exchange Offer, a majority of the members of the National Assembly agreed to hold a session as soon as possible to discuss the clear illegality of the Exchange Offer. The session took place ten days later.

11.     The National Assembly has procedural requirements for speaking on the floor, which are specified in the "Reglamento de Interior y Debate de la Asemblea Nacional." Anyone who speaks on the floor is pre-approved by their coalition (comprised of different parties) to speak on behalf of their coalition within the larger National Assembly. That speaker is placed on a "list of speakers" that is then approved by the President of the National Assembly. During a floor meeting, the Secretary of the National Assembly calls to the floor the speakers who are on the list. A member who is speaking on the floor is speaking on behalf of all of the members of their coalition.

12.     Additionally, under the National Assembly's procedures, at the time of any given floor discussion, the relevant resolution has already been drafted, circulated, and approved by the submitting coalition, and provided to the President of the National Assembly. Thus, floor debates are simply discussions regarding whether members do, or do not, support a resolution as it has

9326099.10

already been drafted. Floor debates reflect what the words of the ultimate resolution mean and the intent and understanding of the legislature in passing the resolution.

13.    It was pre-determined and pre-approved that I would speak at the Tuesday, September 27, 2016 floor meeting. At the time, I was a member of the Voluntad Popular Party, which was and is a member of the Unity Coalition. At the time, the Unity Coalition comprised 112 of the 167 National Assembly members. Thus, the floor statements that I made were not only on my own behalf, but on behalf of the entirety of the Unity Coalition and a clear majority of the members of the National Assembly.

14.    When speaking during the September floor meeting, I stated that the National Assembly "will not acknowledge any national interest contract that does not come before this National Assembly." I referenced "national interest contracts" with respect to the specific Exchange Offer that was the subject of the September 2016 Resolution and the floor meeting, which the majority of the National Assembly regarded as constitutionally requiring legislative approval in order to be legal and valid.

15.    In stating the National Assembly's majority position that the Exchange Offer presented to the National Assembly was a national public interest contract that was not recognized or authorized, I confirmed "that executing that swap and buying those bonds is an act that undermines national public property" and constitutes "an irregularity" (translated from the Spanish word "irregularidad"), which meant illegal in this context. And I warned, "not only will we not recognize [the Exchange Offer], but we will also investigate anyone who approves this swap, because they would be taking part in an act of embezzlement against the nation and destruction of domestic production."

9326099.10

16.    Additionally, to "make this very clear to [Venezuela's] international creditors," I stated that creditors would "not be able to ask [the Assembly] to honor the commitments of the irresponsible individuals who destroyed PDVSA."

17.    Following the floor debate, on September 27, 2016, the National Assembly passed the September 2016 Resolution, which withheld the National Assembly's requisite constitutional authorization of the Exchange Offer pursuant to its determination that the Exchange Offer implicated the national interest. Further, the September 2016 Resolution "categorically reject[ed]" the pledge of CITGO in the Exchange Offer, and, like the May 2016 Resolution, did so pursuant to Article 187.9 to reiterate the Assembly's exclusive constitutional authority to authorize national public interest contracts.

18.    The September 2016 Resolution urged the Public Ministry to initiate a criminal investigation as to whether the Exchange Offer protected the national property.

19.    Despite the National Assembly's express withholding of authorization, the Maduro-controlled PDVSA issued the 2020 Notes, alongside the pledge of a majority interest in CITGO, without the National Assembly's approval in October 2016.

20.    This ultimately led to the National Assembly's passage of yet another resolution on October 15, 2019, which "*reiterate[d]*" that the 2020 Notes were invalid. The National Assembly used the words "reiterating" because the Assembly had previously indicated the same in the September 2016 Resolution, including by withholding authorization and categorically rejecting the pledge of CITGO.

21.    The October Resolution stated that the National Assembly "ordered an investigation into the bond swap offer." This referred to the National Assembly exercising its parliamentary control function to make a finding of political liability on the part of public officials

9326099.10

in connection with the Exchange Offer, as provided for under Article 222 of Venezuela's Constitution. Further, the October Resolution stated that "following the investigations conducted in coordination with the Office of the Special Prosecutor, it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly." This referred to the fact that it was concluded by the Office of the Special Prosecutor that the 2020 Bond indenture is a national public interest contract—a conclusion that the National Assembly had reached in September 2016 when it refused to authorize the Exchange Offer.

22.     Finally, in Venezuela, the concept of "spirit of the legislators" is important and accorded substantial weight for purposes of interpreting the National Assembly's legislative intent. Thus, records of floor meetings are maintained for the purpose of later being used in support for (or opposition to) an interpretation of a legal provision. This "spirit of the legislators" concept would apply, for example, to my floor statement on September 27, 2016.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed:      Miami, Florida
               January 11, 2025

                                          Firmado por:

                                          8BE35030DF6B45B...
                                          Freddy Guevara