**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

                Plaintiffs,

          - against -

MUFG UNION BANK, N.A. and GLAS AMERICAS
LLC,

                Defendants.

Case No: 19-cv-10023-KPF

---

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...........................................................................................................................3

I.     PURSUANT TO ARTICLE 150 OF THE VENEZUELAN CONSTITUTION, THE INDENTURE AND PLEDGE ARE VOID *AB INITIO* BECAUSE THEY WERE NOT AUTHORIZED BY THE NATIONAL ASSEMBLY. .........................................3

    A.    The Validity of Securities Issued Pursuant to National Public Interest Contracts Under Venezuelan Law Rests on National Assembly Authorization .........................4

    B.    The Indenture and Pledge Are Invalid Because They Are National Public Interest Contracts with Companies Not Domiciled in Venezuela that Did Not Receive National Assembly Authorization......................................................................6

        1.    The Indenture and Pledge Are National Public Interest Contracts Under Venezuelan Law.......................................................................................6

        2.    The Indenture and Pledge Do Not Require the Republic's Direct Participation as a Contracting Party To Qualify as National Public Interest Contracts.......................9

        3.    The Indenture and Pledge Were Entered into with Foreign Companies ..............16

        4.    The National Assembly Did Not Approve, and In Fact Categorically Rejected, the Indenture and Pledge.......................................................................17

    C.    The Indenture and Pledge Required National Assembly Approval Under Venezuela's Constitution Notwithstanding Venezuelan Statutory Law and Inapplicable Venezuelan Legal Principles................................................................17

        1.    The Organic Law of the Financial Administration of the Public Sector Does Not Override Venezuela's Constitutional Requirements..............................................18

        2.    The Venezuelan Legal Principles of Legitimate Expectations and Presumption of Legality Are Inapplicable in this Case................................................................19

II.    THE REPUBLIC'S VIEW THAT THE TRANSACTION DOCUMENTS ARE UNAUTHORIZED, UNCONSTITUTIONAL, AND VOID *AB INITIO*, AND UNENFORCEABLE UNDER VENEZUELAN LAW IS ENTITLED TO SUBSTANTIAL WEIGHT. ...............................................................................21

    A.    The Court's Earlier Concerns with Affording Comity Are Resolved. ....................22

    B.    The *Animal Science* Factors Counsel in Favor of this Court Providing Substantial Weight to the Republic's Submission ....................................................................25

III.   THIS COURT MUST ACCEPT THE VALIDITY OF AND DEFER TO THE NATIONAL ASSEMBLY'S SOVEREIGN ACTS UNDER THE ACT OF STATE DOCTRINE. .....................................................................................................27

    A.    The May 2016 Resolution Made Clear That Any Act to Usurp the National Assembly's Constitutional Prerogatives, Including Entering Into National Public Interest Contracts, Is Null and Void. ...................................................................28

B.    The September 2016 Resolution Categorically Rejected The Exchange Offer.........29

C.    The October 2019 Resolution Reaffirmed the National Assembly's Earlier Acts to Withhold Authorization of the Transaction Documents. ...........................................32

D.    The Takings Exception to the Act of State Doctrine Does Not Apply to the National Assembly's Acts Preceding the Execution of the Exchange. ...................................33

CONCLUSION....................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Abdelhamid v. Altria Group, Inc.*,
   515 F. Supp. 2d 384 (S.D.N.Y. 2007) ..................................................................10

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*,
   757 F.2d 516 (2d Cir. 1985) ..........................................................................33, 34

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharma Co. Ltd.*,
   585 U.S. 33 (2018) ............................................................................... *passim*

*Banco de Espana v. Fed. Rsrv. Bank of N.Y.*,
   114 F.2d 438 (2d Cir. 1940) .........................................................................26, 32

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ......................................................................................32

*Burgess v. United States*,
   553 U.S. 124 (2008) ......................................................................................10

*Celestin v. Caribbean Air Mail, Inc.*,
   30 F.4th 133 (2d Cir. 2022) ...........................................................................25

*City of New York v. Exxon Corp.*,
   697 F. Supp. 677 (S.D.N.Y. 1988) ...................................................................10

*Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*,
   2016 WL 7507757 (S.D.N.Y. Dec. 30 2016) .........................................................8

*Fed. Treasury Enter. Sojuzplodoimport, OAO (FTE) v. Spirits Int'l B.V.*,
   809 F.3d 737 (2d. Cir. 2016) .........................................................................31, 32

*Fin. One Pub. v. Lehman Bros. Spec. Financing*,
   414 F.3d 325 (2d Cir. 2005) ...........................................................................8

*Grayton v. United States*,
   92 Fed. Cl. 327 (2010) ...................................................................................32

*Jota v. Texaco Inc.*,
   157 F.3d 153 (2d Cir. 1998) ...........................................................................24

*Konowaloff v. Metro. Museum of Art*,
   702 F.3d 140 (2d Cir. 2012) ...........................................................................26

*Oetjen v. Cent. Leather Co.*,
   246 U.S. 297 (1918)..................................................................................32

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   106 F.4th 263 (2d Cir. 2024) ......................................................................1

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   41 N.Y.3d 462 (N.Y. 2024) ...................................................................1, 32

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   51 F.4th 456 (2d Cir. 2022) ......................................................................25

*Société Nationale Industrielle Aérospatiale v. U.S. District Court*,
   482 U.S. 522 (1987)..................................................................................23

*U.S. Olympic Comm. v. Intelicense Corp., S.A.*,
   737 F.2d 263 (2d Cir. 1984)......................................................................32

*United States v. Belmont*,
   301 U.S. 324 (1937) 43..............................................................................32

*United States v. Pink*,
   315 U.S. 203 (1942)..................................................................................24

*United States v. Sperry Corp.*,
   493 U.S. 52 (1989)....................................................................................32

*United States v, Trabelsi*,
   28 F.4th 1291 (D.C. Cir. 2022)..................................................................26

*In re Vitamin C Antitrust Litig. v. Hebei Welcome Pharm. Co.*,
   8 F.4th 136 (2d Cir. 2021) ............................................................22, 23, 24

*VR Glob. Partners, L.P. v. Petroleos de Venezuela, S.A.*,
   No. 24-1176-CV, 2024 WL 4891271 (2d Cir. Nov. 26, 2024)............................3, 21

*Whallon v. Lynn*,
   230 F.3d 450 (1st Cir. 2000)......................................................................29

**Venezuelan Cases**

Supreme Tribunal of Justice Decision No. 618 ....................................................12

Supreme Tribunal of Justice, No. [NUMBER], *Brigitte Acosta Isasis*, July 8, 2016....................12

Supreme Tribunal of Justice, No. 1460, *Attorney General of the Republic II*, July
   12, 2007 ("AG II")......................................................................11, 12, 13

Supreme Tribunal of Justice, No. 2241, *Andrés Velásquez and others, the partial annulment of Article 80 of the Organic Law of the Financial Administration of the Public Sector*, Sept. 24, 2002 ............................................................................8, 9, 10, 16

Supreme Tribunal of Justice, No. 464, *Interpretación del Decreto de la Asamblea Nacional Constituyente de fecha 30 de enero de 2000, mediante el cual se suspende por 3 días la negociación de la Convención Colectiva del Trabajo*, Mar. 18, 2002 (Venez.) ...............................................................................................5

Supreme Tribunal of Justice, No. 953, *Electrificación del Caroní S.A.*, Apr. 29, 2003 (EDELCA) .......................................................................................................10

**Other Authorities**

José Araujo-Juárez (2024). *Treatise on General and Comparative Administrative Law*, Volume 3: *Administrative Act*. Caracas, Centro para la Integración y el Derecho Público (CIDEP) .........................................................................................18

Venezuelan Constitution 1999, art. 150 .................................................................... *passim*

Venezuelan Constitution 1999, art. 187(9) .............................................................2, 3, 21, 29

Venezuelan Constitution 1999, art. 335 ...........................................................................8

Venezuelan Constitution 1999, art. 336 ...........................................................................8

Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA Petróleo, S.A., ("PDVSA Petróleo"), and PDV Holding, Inc. ("PDV Holding") (collectively, "Plaintiffs") respectfully submit this supplemental memorandum of law in support of their motion for summary judgment on all of their claims and defenses and certain counterclaims and defenses of MUFG Union Bank, N.A. ("Union Bank") and GLAS Americas LLC ("GLAS Americas") (collectively, "Defendants").

## PRELIMINARY STATEMENT

This case is before this Court on remand from the Second Circuit for a determination of whether the Transaction Documents at issue—including the Indenture and the Pledge—are valid under Venezuelan law. The Venezuelan Constitution gives an unambiguous answer to this question: Articles 150 and 187(9) of the Constitution expressly *require* a prior National Assembly authorization before an entity of the Venezuelan National Public Administration enters into a national public interest contract with a company not domiciled in Venezuela. There is no dispute that PDVSA and PDVSA Petróleo are state-owned entities within Venezuela's Decentralized Public Administration—one the country's two National Public Administration branches. And there is certainly no dispute that the National Assembly did not authorize this transaction; in fact, it categorically *rejected* it in a formal resolution.

Defendants attempt to side-step Article 150's express requirement by arguing that Article 150 applies only to national public interest contracts where the Republic of Venezuela itself is a party, and does not extend to contracts concluded by state-owned entities of the Decentralized Public Administration. This artificially narrow reading of Article 150 is antithetical to its text, and contrary to the overwhelming weight of Venezuelan constitutional and administrative law scholarship. Defendants' contrary argument relies mainly on the overreading of a single decision by the Venezuelan Constitutional Chamber—*Andrés Velazquez*. But, as numerous Venezuelan constitutional scholars—including two of Plaintiffs' experts—have explained, *Andrés Velazquez*

never held that entities within the Decentralized Public Administration are exempt from the National Assembly authorization requirement of Article 150. Nor can such (mis-)reading of *Andrés Velazquez* be reconciled with the Constitutional Chamber's subsequent decisions (or, for that matter, the *Andrés Velazquez* decision itself).

Defendants' other arguments fare no better. Articles 150 and 187(9)'s requirement that the National Assembly authorize national public interest contracts between entities of the Decentralized Public Administration and companies not domiciled in Venezuela are constitutional commands, and a statute that permits PDVSA and PDVSA Petróleo not to submit ***other*** contracts for legislative approval does not (and cannot) exempt them from that requirement.

This understanding is reflected in the Republic's brief, which confirms that Venezuelan's Constitution ***prohibits*** national public interest contracts between state-owned decentralized entities and companies not domiciled in Venezuela unless approved by the National Assembly, and that this requisite approval ***never happened*** with respect to the Exchange Offer. The Court should afford "substantial" weight to the Republic's views as to Venezuelan law and the National Assembly's acts of state. *Animal Sci. Prods., Inc. v. Hebei Welcome Pharma Co. Ltd.*, 585 U.S. 33, 36 (2018). Whereas this Court previously held reservations regarding the Republic's submitted position, those are now resolved. *Infra* II. The Republic's views, moreover, are corroborated by the expert and contemporaneous evidence in the record.

This Court should also find that the Exchange Offer was invalid based upon the official acts of the National Assembly under the act of state doctrine. This Court must take its prior holding—that the May and September 2016 Resolutions are official acts of the National Assembly, ECF 215—to its logical and necessary conclusion by granting those sovereign acts the legal effect they purported to have, rather than questioning their validity.

2

The May 2016 Resolution's warning against the attempted usurpation of Venezuela's Constitution—which took place only four months later—applied to *all* national public interest contracts, not only those entered into by the National Executive. And both the Republic and Freddy Guevara, the President of the National Assembly Comptroller's Commission, have confirmed what is apparent from the text.

Further, the September 2016 Resolution addressed a single transaction—the Exchange Offer—and its recognition of the Exchange Offer as a contract of national public interest is evident in its reliance on Article 187(9), the constitutional provision affording the National Assembly exclusive prerogative over national public interest contracts. Although Venezuela's Constitution does not require the National Assembly to **reject** national public interest contracts, the National Assembly nevertheless made its intent unequivocal when it purported to "reject[] categorically" the pledge in the Exchange. Any doubt as to the National Assembly's intent is resolved by the Republic's submission, as well as Mr. Guevarra's confirmation that the National Assembly "withheld the National Assembly's requisite constitutional authorization of the Exchange Offer pursuant to its determination that the Exchange Offer implicated the national interest." Guevara Decl. ¶ 17. Properly understood, the September 2016 Resolution was an act of state rejecting the Exchange before it came into existence.

## ARGUMENT

**I.    PURSUANT TO ARTICLE 150 OF THE VENEZUELAN CONSTITUTION, THE INDENTURE AND PLEDGE ARE VOID *AB INITIO* BECAUSE THEY WERE NOT AUTHORIZED BY THE NATIONAL ASSEMBLY.**

As the New York Court of Appeals clarified, the validity of the Indenture and Pledge is a question of Venezuelan law. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 41 N.Y.3d 462, 481-82 (N.Y. 2024); *Petroleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 270 (2d Cir. 2024). "Because the [Venezuelan] constitutional provisions here may … render

defective the issuer's procedural authority to issue the securities in question," they must be considered in determining whether the Exchange Offer was valid under § UCC 8-110 and the Indenture and Pledge were "duly authorized." *Petróleos de Venezuela S.A.*, 41 N.Y.3d at 477, 481 (citing U.C.C. § 1-301(c)(6); U.C.C. § 8-110(a)(1)). This analysis looks to whether, under the relevant Venezuelan law, "an entity has the power or authority to issue a security, and relatedly, what ***procedures*** are required to exercise such authority." *Id.* at 478-79 (emphasis in original).  The Second Circuit accordingly remanded the case to this Court to consider the validity of the Indenture and the Pledge under Venezuelan law. *Petróleos de Venezuela S.A.*, 106 F.4th at 268-69.

The Venezuelan Constitution unambiguously requires that all national public interest contracts entered into with a foreign counterparty must be authorized by the National Assembly. The Indenture and Pledge are national public interest contracts under Venezuelan law—they were entered into by PDVSA and PDVSA Petróleo, which are part of the Venezuelan Public Administration; they have foreign counterparties; and they concern the ownership of Venezuela's strategic asset—CITGO. The Maduro regime's execution of the Indenture and Pledge without the National Assembly's authorization renders both agreements invalid.

A.    **The Validity of Securities Issued Pursuant to National Public Interest Contracts Under Venezuelan Law Rests on National Assembly Authorization**

The Venezuelan Constitution governs the authority of Venezuelan entities to enter into contracts of "national public interest." Article 150 sets forth two requirements: ***First***, it provides (in the first sentence) that "[t]he execution of national public interest contracts shall require the approval of the National Assembly in those cases in which such requirement is determined by law."[1] ***Second***, Article 150 sets forth (in the second sentence) a specific rule for national contracts with foreign entities and companies not domiciled in Venezuela: "No municipal, state or national

---

[1] 1999 VENEZUELAN CONSTITUTION art. 150, Dkt. 126-4.

4

public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly." Art. 150. The requirement that National Assembly authorization be obtained applies always and in all cases; unlike the first requirement of Article 150, it is not contingent on the existence of a prior formal law mandating such authorization.[2] Nor can a statutory enactment exempt a national public interest contract from this categorial requirement.[3]

The National Assembly's responsibility to review and authorize national public interest contracts—and, specifically, contracts with foreign entities or non-domiciliary companies—is further underscored by Article 187(9) of the Venezuelan Constitution: "It is the role of the National Assembly to . . . [a]uthorize contracts of municipal, state, and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela."[4] This power to authorize (or refuse to authorize) national public interest contracts is one of the critical ways in which the National Assembly exercises its oversight power over entities within the Venezuelan Public Administration.[5]

There is consensus in Venezuelan law that National Assembly authorization must be given **before** any national public interest contract is executed.[6] Such prior authorization is a condition of

---

[2] March 16, 2020 Expert Report of Professor Allan R. Brewer-Carías ("Brewer Report") (ECF No. 96-1) ¶¶ 24; Declaration of Professor Allan R. Brewer-Carías (June 29, 2020) ("Brewer Opp. Decl.") (ECF No. 154) ¶ 22; January 17, 2025 Legal Expert Report by José Araujo-Juárez ("Araujo Report") (filed contemporaneously herewith) ¶ 116; *see also id.* Araujo Report ¶¶ 108-120 (summarizing Venezuela's parliamentary oversight regime, and, in particular, Article 150's authorization requirement).

[3] May 1, 2020 Expert Report of Professor Allan R. Brewer-Carías Rebutting the Report of Defendants' Expert ("Brewer Rebuttal Report") (ECF No. 96-2) ¶¶ 90-91; January 17, 2025 Opening Supplemental Declaration of Allan R. Brewer-Carías ("Brewer Supp. Decl") (filed contemporaneously herewith)  ¶ 18 & n.46.

[4] 1999 Venez. Const. art. 187, Dkt. 126-4.

[5] Brewer Report ¶¶ 21-23; Araujo Report ¶¶ 108-120; Brewer Supp. Decl ¶¶ 4-5.

[6] Brewer Report at ¶¶ 20-30 (collecting authority); Brewer Supp. Decl. ¶ 6 & n.3; Araujo Report ¶ 119 ("The National Assembly authorization must be granted *a priori*—prior to the execution of the national public interest contract in question."); Defendants' Expert Report ¶ 12.

valid consent and contract formation.[7] As shown below, the National Assembly authorization requirement is not limited to national public interest contracts where the Republic of Venezuela itself is a party; the overwhelming weight of authority shows that this requirement applies to entities of the Central Public Administration and Decentralized Public Administrations alike.

### B.    The Indenture and Pledge Are Invalid Because They Are National Public Interest Contracts with Companies Not Domiciled in Venezuela that Did Not Receive National Assembly Authorization

There is no dispute that the National Assembly *did not* authorize the Indenture and Pledge. The validity of the 2020 Notes therefore turns on whether the Indenture and Pledge, pursuant to which PDVSA purported to issue the 2020 Notes, constitute national public interest contracts with foreign companies not domiciled in Venezuela that are subject to National Assembly authorization. Because these conditions are met here, the 2020 Notes are invalid.

### 1.    The Indenture and Pledge Are National Public Interest Contracts Under Venezuelan Law

Under Venezuelan Law, "public interest contracts" are those entered into by an organ or entity within Venezuela's "National Public Administration."  The National Public Administration is comprised of two branches: (1) the "Central Public Administration," which "consists of the organs of the government itself," and (2) the "Decentralized Public Administration," which "consists of entities such as public corporations and state-owned commercial enterprises like PDVSA and PDVSA Petróleo that, while not directly part of the government itself, are closely related to the government, being attached to their corresponding government Ministries and subject

---

[7] Brewer Report at ¶ 27 (citing Jesús Caballero Ortíz, Los contratos administrativos, los contratos de interés público y los contratos de interés nacional en la Constitución de 1999 [Administrative contracts, public interest contracts and contracts of national interest in the 1999 Constitution], in 1 ESTUDIOS DE DERECHO ADMINISTRATIVO 139, 147 (Fernando Parra Aranguren & Armando Rodriguez García 2001); see also Rafael Badell Madrid, Contratos de interés público nacional [Contracts of national public interest], in 19 REVISTA DE DERECHO ADMINISTRATIVO 11 (2004)); Araujo Report ¶¶ 119, 131-32.

to both public and private law."[8] The predominant opinion of Venezuelan legal scholars is that "*any* contract entered into by an organ or entity within the Public Administration is a public interest contract."[9]

State-owned commercial enterprises are considered constituent entities of the Decentralized Public Administration because "their close relation with the State subjects them to the mandatory rules of public law."[10] Additionally, Venezuelan law provides that State-owned commercial enterprises are part of the Decentralized Public Administration when "the Republic . . . ha[s] a shareholding equal to or greater than fifty per cent of the share capital," which "includes the wholly state-owned companies, whose role . . . is to coordinate the public business management of a sector of the national economy."[11]

PDVSA and PDVSA Petróleo are indisputably constituent entities of the Decentralized Public Administration.  By nature of their proximity to the organs of the Venezuelan Republic, PDVSA and PDVSA Petróleo are subject to mandatory rules of Venezuelan public law, including the Public Contracting Law and the Organic Law of the General Audit Office.[12]  The Constitutional Chamber of Venezuela's Supreme Tribunal has observed that PDVSA and PDVSA Petróleo are part of "the general structure of the National Public Administration":

> [A]lthough [PDVSA] is a company incorporated and organized in the form of a public limited company, it is beyond doubt, and reaffirmed as such by the Constitution of the Bolivarian Republic of Venezuela, that it is framed within the general structure of the National Public Administration . . . .[13]

---

[8] *Id.* ¶ 33; *see* Araujo Report ¶¶ 37-50; Brewer Supp. Decl. ¶¶ 8-9.

[9] Brewer Report ¶ 39; Araujo Report ¶¶ 20, 65; Brewer Supp. Decl. ¶ 11; *see also* Araujo Report ¶¶ 63-75.

[10] Constitutional Chamber, Supreme Tribunal of Justice, Decision No. 464 (Mar. 3, 2022)), *quoted in* Brewer Report ¶ 34; *see* Araujo Report ¶¶ 36-39, 41-42.

[11] Art. 5 of the Financial Management of Public Sector Organic Law, *quoted in* Brewer Report ¶ 36; *see also* Araujo Report ¶ 49.

[12] Brewer Report ¶ 35; Araujo Report ¶¶ 37-50.

[13] El Tribunal de Justicia Sala Constitucional ("Supreme Tribunal of Justice"), No. 464, *Interpretación del Decreto de la Asamblea Nacional Constituyente de fecha 30 de enero de 2000, mediante el cual se suspende por 3 días la*

Contracts entered into by "state legal persons"—*i.e.*, constituent organs and entities of the NPA, including entities of the DPA—are considered "public contracts" under Venezuelan law.[14] "Under Venezuelan law, state-owned companies such as PDVSA and PDVSA Petróleo, as state-owned enterprises that are functionally decentralized entities of the National Public Administration, can act as parties in the execution of national public interest contracts."[15] Therefore, the Indenture and Pledge—contracts entered into by PDVSA and PDVSA Petróleo as entities of the DPA—qualify as national public interest contracts under Article 150.[16]

Numerous decisions of the Venezuelan Supreme Tribunal, as well as the overwhelming majority of Venezuelan legal scholars, recognize that contracts concluded by public corporations or state-owned enterprises within the National Decentralized Public Administration (like PDVSA and PDVSA Petróleo) are national public interest contracts.[17] The Indenture and Pledge would satisfy that test.

Even if national public interest contracts had to involve the interests of the national community or positing potential implications for strategic sectors of Venezuela's economy, the Indenture and Pledge would satisfy that standard as well.[18] As the National Assembly, which has interpretive authority with respect to the Venezuelan Constitution,[19] observed in its May 26, 2016

---

*negociación de la Convención Colectiva del Trabajo)* [*Interpretation of the Decree of the National Constituent Assembly dated January 30, 2000, by which the negotiation of the Collective Labour Convention is suspended for 3 days*], Mar. 18, 2002 (Venez.). *in* 89–92 REVISTA DE DERECHO PÚBLICO 219 (Editorial Jurídica Venezolana 2002); *see also* Brewer Supp. Decl. ¶ 9.

[14] *See* Brewer Report ¶ 40; *see also* Araujo Report ¶¶ 26-28, 103 ("the former Supreme Court of Justice has held, on multiple occasions, that both autonomous entities and state companies, which are part of the functionally decentralized National Public Administration, can be parties to contracts of national public interest") (collecting cases).

[15] Araujo Report ¶ 107; *see also id.* ¶¶ 101-102. This proposition is a consensus view of Venezuelan legal scholars. *See* Brewer Supp. Decl. ¶ 11 & n. 10 (collecting sources) ; Araujo Report ¶¶ 63-87, 101-102; Brewer Rebuttal Report ¶¶ 35-39.

[16] Brewer Supp. Decl. ¶ 20; Brewer Report ¶¶ 39-41.

[17] Brewer Supp. Decl. ¶¶ 10-12 & nn.8-14 (collecting sources); Araujo Report ¶¶ 20, 63-87; Brewer Report ¶¶ 31-32, 39-40; Brewer Rebuttal Report at 7-10 (discussing cases); *id.* at 35-39 (discussing scholarly commentary).

[18] *See* Araujo Report ¶¶ 96-102; Brewer Supp. Decl. ¶ 21-22; Brewer Report ¶ 42.

[19] Brewer Supp. Decl. ¶ 23; Brewer Report at ¶ 53.

Resolution (the "May 2016 Resolution"), "public interest contracts, that require the National Assembly's approval" as a "condition of the validity of the contract," are "inextricably related to an object that affects the collective interest of all citizens," and "are linked to major procurements that could seriously compromise the assets of the Republic or expose them to serious losses or international claims that might be detrimental to the sovereignty or integrity of the country, as well as contracts that due to its subject matter deserve such a qualification."[20] The Indenture and Pledge affect the collective interest of Venezuela because they potentially expose PDVSA, Venezuela's national oil company, to significant monetary claims and place at risk Venezuela's ownership of a critical national asset, CITGO—a foreign "crown jewel" of Venezuelan oil industry.[21] The United States government similarly recognized the importance of PDVSA's continued ownership of CITGO to Venezuela's public interest.[22] And as this litigation shows, the 2020 Notes have compromised Venezuela's ownership of CITGO and exposed assets of the Republic to international claims.

### 2.    The Indenture and Pledge Do Not Require the Republic's Direct Participation as a Contracting Party To Qualify as National Public Interest Contracts

Critically, the Indenture and the Pledge are national public interest contracts notwithstanding that the Republic was not party to them. The overwhelming consensus of

---

[20] Asamblea Nacional, *Acuerdo sobre el respeto de las facultades propias e intransferibles de la Asamblea nacional sobre los contratos de interés público que suscriba el Ejecutivo Nacional con Estados o entidades oficiales extrajeras o con sociedades no domiciliadas en Venezuela* [*Resolution regarding the respect of its own and untransferable attributions regarding public interest contracts entered into by the National Executive with States or Official foreign entities or corporations not domiciled in Venezuela*], (May 26, 2016) (Venez.) (hereinafter, "May 2016 Resolution"); *see* Brewer Supp. Decl. ¶ 21.

[21] *See* Brewer Report at ¶ 42; Brewer Supp. Decl. ¶ 22; Araujo Report ¶ 107; Br. for Republic of Venez. as Amicus Curiae at 1, *Petróleos de Venezuela S.A. v. MUFG Union Bank*, No. 20-3858 (2d. Cir. Mar. 22, 2021), Dkt. 146 [hereinafter Second Circuit Amicus Brief]; Br. for Republic of Venez. as Amicus Curiae at 1, 16, 19, *PDVSA v. MUFG Union Bank*, CTQ-2022-00003 (N.Y. Nov. 22, 2023) [hereinafter NYCOA Amicus Brief]; Br. of the Republic of Venez. as Amicus Curiae at 5 (Jan. 15, 2025), Dkt. 326-1 [hereinafter Republic Br.].

[22] Statement of Interest of the U.S., Dkt. 213; Letter from Elliot Abrams, Special Representative for Venez., Jeffrey Bossert Clark, Acting Assistant Att'y Gen. (Sept. 16, 2020), Dkt. 213-1.

Venezuelan legal scholarship, as well as considered jurisprudence of the Supreme Tribunal of Justice and its predecessor, recognize that contracts concluded by entities of the Decentralized Public Administration qualify as national public interest contracts.[23] Defendants' attempt to artificially limit national public interest contracts only to those signed by the Republic itself rests on an incorrect reading of the Constitutional Chamber's decision in *Andrés Velásquez*, and a distortion of that decision's precedential force. That misreading of *Andrés Velásquez* has been squarely rejected by Venezuelan constitutional scholars, and cannot be reconciled with subsequent authority from the Constitutional Chamber.

*First*, under Venezuelan law, *Andrés Velásquez* does not have precedential value with respect to the question presented to this Court. Because Venezuela—unlike the United States—is governed by civil law, the Constitutional Chamber's decisions have precedential weight only when the Constitutional Chamber **expressly** invokes its interpretive authority under Article 335 of the Constitution to promulgate a binding interpretation of the constitutional provision at issue.[24] *Cf. Fin. One Pub. v. Lehman Bros. Spec. Financing*, 414 F.3d 325, 343 (2d Cir. 2005) ("Thailand is a civil-law jurisdiction where judicial decisions in general are of only persuasive and not binding authority"); *Abdelhamid v. Altria Group, Inc.*, 515 F. Supp. 2d 384, 396-97 (S.D.N.Y. 2007) ("Egypt is a civil law jurisdiction so . . . 'an Egyptian court has no power to exceed the scope of rules enacted by the legislature.'"); *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, 2016 WL 7507757, at *9 (S.D.N.Y. Dec. 30 2016) ("expert's overreliance on [Italian] court precedents and failure to ground his arguments in the text of the Italian Copyright Act significantly undermines the persuasiveness of his report and his testimony"). In *Andrés Velásquez*, the

---

[23] *See* Brewer Supp. Decl. ¶¶ 10-12 & nn.8-14 (collecting sources); Araujo Report ¶¶ 63-87, 101-102, 107; Brewer Report ¶¶ 39-40; Brewer Rebuttal Report at 7-10 (discussing cases); *id.* at 35-39 (discussing scholarly commentary).
[24] *See* Brewer Report ¶¶ 110-111 ; Brewer Rebuttal Report ¶¶ 4.c, 40-54; Brewer Supp. Decl. ¶ 14; *see also* Brewer Supp. Decl. ¶¶ 45, 55-58.

Constitutional Chamber was proceeding under its Article 336 power to "declare the total or partial nullity" of laws conflicting with the Constitution[25]—not under its Article 335 power to establish "interpretations . . . of constitutional rules and principles [that] are binding on the other [Chambers] of the Supreme [Tribunal] of Justice and other courts of the Republic."[26] The decision nowhere invokes Article 335, and so cannot be considered as setting a precedential constitutional interpretation that would be binding on other Venezuelan courts and Venezuelan government agencies.[27] As a non-precedential decision, *Andrés Velásquez* has only persuasive authority under Venezuelan law—the same as a scholarly commentary.[28]

*Second*, *Andrés Velásquez* does not even address the question at issue here. The Constitutional Chamber in *Andrés Velásquez* was not asked to determine whether entities of the Decentralized Public Administration can enter into public interest contracts, or whether that term requires participation of the Republic itself.  Rather, the Constitutional Chamber was assessing whether Article 80 of Venezuela's Organic Law Governing the Financial Administration of the Public Sector was constitutional because it sought to permit the National Executive to enter into public debt contracts of national interest with foreign states, official foreign entities, and companies not domiciled in Venezuela without National Assembly authorization, despite Article 150's contrary requirement.[29]  The case was about the constitutionality of Article 80 of the Organic Law, not whether the Republic must be a party to a national public interest contract.  The Constitutional Chamber focused on national public interest contracts entered into by the National

---

[25] 1999 VENEZ. CONST. art. 336; s*ee* Supreme Tribunal of Justice, No. 2241, *Andrés Velásquez and others, the partial annulment of Article 80 of the Organic Law of the Financial Administration of the Public Sector*, Sept. 24, 2002, at 12 [hereinafter *Andrés Velásquez*], Dkt. 123-7.

[26] 1999 VENEZ. CONSTIT. art. 335.

[27] *See* Brewer Rebuttal Report ¶¶ 53-54; Araujo Report ¶¶ 21-22; Brewer Supp. Decl. ¶¶ 15, 17(c); *see also* Brewer Supp. Decl. ¶¶ 43-58.

[28] Araujo Report ¶ 22; *see* Brewer Supp. Decl. ¶ 14.

[29] Brewer Rebuttal Report ¶ 23; Araujo Report ¶ 21; Brewer Supp. Decl. ¶ 17.c.

Executive because those were the only contracts expressly mentioned in the challenged provision of Article 80.[30]  The Supreme Tribunal of Justice therefore had no reason to address, and did not even purport to address, contracts entered into by state-owned enterprises. The Constitutional Chamber's decision merely states that contracts entered into by the Republic qualify as national public interest contracts, not that ***only*** contracts entered into by the Republic qualify as national public interest contracts.

*Andrés Velásquez* is perfectly consistent with the notion that entities of the Decentralized National Public Administration can enter into national public interest contracts.  The Constitutional Chamber's decision expressly stated that "contracts concluded by the Republic through the competent organs of the National Executive . . . would be ***included*** within the species of national public interest contracts."[31] "'[T]he word "includes" is usually a term of enlargement, and not of limitation.'" *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) (quoting 2A N. Singer & J. Singer, *Sutherland on Statutory Construction* § 47:7, p. 305 (7th ed. 2007)); *City of N.Y. v. Exxon Corp.*, 697 F. Supp. 677, 684 (S.D.N.Y. 1988) (same). Nowhere in *Andrés Velásquez* did the Constitutional Chamber suggest that the national public interest contract category ***excludes*** contracts entered into by state entities that form the Decentralized National Public Administration.[32]

Subsequent decisions by the Constitutional Chamber confirm that *Andrés Velásquez* does

---

[30] *Andrés Velásquez* at 11; *see also* ROMÁN J. DUQUE CORREDOR, OPINIÓN SOBRE LA INCONSTITUCIONALIDAD DEL BONO PDVSA 2020 [OPINION ON THE UNCONSTITUTIONALITY OF THE 2020 PDVSA NOTES] 2, 3 (2020) ("the decision emphasizes public interest contracts of the Republic" because the decision "was in reference to the nullity of article 80 of the Financial Management of the Public Sector Organic Law"; the decision "does not establish that state-owned enterprises are excluded from article 150 of the Constitution"); Brewer Supp. Decl. ¶ 18.c; Araujo Report ¶¶ 21, 76-79; Brewer Rebuttal Report ¶¶ 25-26.

[31] *Andrés Velásquez* at 17 (emphasis added); *see also* Brewer Supp. Report ¶ 18.c; Araujo Report ¶ 67.  In fact, Defendants' own expert quoted that statement, implicitly acknowledging that the *Andrés Velazquez* decision recognized that entities other than the Republic can enter into national public interest contracts.  *See* Defendants' Expert Report at ¶ 100 (quoting *Andrés Velásquez* at 16).

[32] Araujo Report ¶ 79; Brewer Supp. Decl. ¶ 17(c), 25; Brewer Rebuttal Report ¶ 24.

not stand for the proposition that **only** contracts entered into by the Republic qualify as national public interest contracts. In *Electrificación del Caroní S.A.* ("*EDELCA*"), the Constitutional Chamber declared contracts entered into between Venezuela's eponymous state-owned utility company to be national public interest contracts.[33] Defendants previously sought to distinguish *EDELCA* on the grounds that the contract in question was part of a broader agreement between Venezuela and Brazil, but that misses the point. The Constitutional Chamber recognized that ***EDELCA's*** discrete agreement was a national public interest contract, and the Republic was not a party to that agreement.  EDELCA, as Venezuela's principal utility provider, was indisputably a constituent entity of the Decentralized Public Administration. Its status as an entity of the Decentralized Public Administration was the reason the Constitutional Chamber refers to that agreement as a national public interest contract. *EDELCA* instructs that the Republic's overarching involvement in a contract ***via the constituent organs and entities*** is sufficient for an agreement to be a national public interest contract, including contracts entered into by PDVSA, as Venezuela's national oil company.[34] In fact, Venezuelan National Executive most often enters into national public interest contracts through entities of the Decentralized Public Administration; it is rare to find contracts directly entered into by organs of the Central Administration, such as, for example, the National Executive's Ministries.[35]

Similarly, in *Attorney General of the Republic II* ("*AG II*"), the Constitutional Chamber expressly ruled that because the promissory notes purportedly issued by Venezuela's state-run agricultural development bank, Banco de Desarrollo Agropecuario S.A. ("BANDAGRO"), were

---

[33] Supreme Tribunal of Justice, No. 953, *Electrificación del Caroní S.A.*, Apr. 29, 2003, at 14–15 [hereinafter *EDELCA*]; *see* Araujo Report ¶ 77; Brewer Supp. Decl. ¶ 17(c); Brewer Rebuttal Report ¶ 26.

[34] *See* Araujo Report ¶¶ 76-77 (explaining that use of the word "subsume" in *EDELCA* decision means public interest contracts involve the participation of entities within the Republic, and not only the Republic itself).

[35] *See* Brewer Supp. Report ¶ 11.

national public interest contracts, Article 247 of the Venezuelan Constitution required BANDAGRO to consult with the Office of the Attorney General before issuing the notes.[36] Defendants' experts previously sought to side-step that decision on the basis that the Republic "allegedly . . . guaranteed" the promissory notes.[37] But there was **no discussion** of any guarantee anywhere in the Chamber's decision.  What mattered to the Chamber was BANDAGRO's status as a state-run enterprise, and thus as a constituent entity of the Decentralized Public Administration. As such, BANDAGRO was required to consult with the Attorney General before its "**issuance**" of the promissory notes.[38] Indeed, the opinion detailed the importance of the Office of the Attorney General as "the body responsible for advising the National Public Administration," and "the main consultament [*sic*] body of the National Public Administration."[39] The Chamber's deliberate reference to the **entire** National Public Administration makes clear that the provisions of the Venezuelan Constitution requiring consultation before entry into national public interest contracts applies to **both** organs of the Central Public Administration **and** entities of the Decentralized Public Administration, such as PDVSA or PDVSA Petróleo.

Likewise, another Constitutional Chamber decision, *Brigitte Acosta*, emphasizes that whether an agreement qualifies as a national public interest contract rests on whether a contracting entity is part of the National Public Administration, not on the Republic's direct involvement.  In *Brigitte Acosta*, the Chamber concluded that a loan agreement contemplated by the Central Bank of Venezuela was not a national public interest contract, and therefore not subject to the

---

[36] Constitutional Chamber, Supreme Tribunal of Justice, No. 1460, *Attorney General of the Republic II* (Jul. 12, 2007) Dkt. 128-18, at 22 (hereinafter "*AG II*") ("[T]he promissory notes are public credit operations, constitutionally [requiring] consultation to the Office of the Attorney General of the Republic '*for the corresponding <u>issuance</u> of the administrative act, in support of the formation of the will of the active administrative body*'; and so, it is declared.") (emphasis in original); *see* Brewer Supp. Decl. ¶ 25; Brewer Rebuttal Report ¶¶ 10-12, 30.
[37] *See* Decl. of Defendants' Expert ¶ 38, Dkt. No. 128.
[38] *AG II* at 22 (emphasis in original).
[39] *Id.* at 17.

authorization of the National Assembly under Article 150.[40]  The *Brigitte Acosta* decision revolved on the Central Bank's unique status and general autonomy under the Venezuelan Constitution, as well as its relations to the different powers and branches of government, to conclude that the Central Bank stood outside of both the centralized *and decentralized* Public Administration.[41]  As the Constitutional Chamber explained, the Central Bank "is neither part of the Central Administration nor the Functionally Decentralized Administration."[42]  Thus, the Chamber concluded that "it would be contrary to the logical legal order to assume that our regulatory system provides for double-level control of the Bank's operations" by requiring National Assembly approval for the Central Bank's contracts.[43]  Notably, the *Brigitte Acosta* decision cannot be reconciled with Defendants' over-reading of *Andrés Velásquez*.  If *Andrés Velásquez* had indeed limited national public interest contracts to contracts involving the Republic itself, there would have been no need for the Constitution Chamber in *Brigitte Acosta* to analyze whether a contract entered by the Central Bank of Venezuela—an autonomous government entity—was subject to National Assembly approval under Article 150.[44]

The National Assembly has enacted numerous resolutions endorsing various joint venture agreements entered into by PDVSA's subsidiaries (and not the Republic) as "national public interest contracts" pursuant to its authority under Article 150.[45]  Those resolutions, which long pre-

---

[40] Constitutional Chamber, Supreme Tribunal of Justice, No. 618, *Brigitte Acosta Isasis* (Jul. 8, 2016) Dkt. 128-8 at 33 (hereinafter "*Brigitte Acosta*").

[41] *Id.* at 29–30; *see also* Brewer Supp. Decl. ¶ 17(e); Araujo Report ¶¶ 81-86.

[42] *Brigitte Acosta* at 29–30.

[43] *Id.* at 33.

[44] Regardless, the Brigitte Acosta decision should be ignored, as it was issued by the Supreme Tribunal of Justice when the Supreme Tribunal was a puppet of Maduro and issuing decisions to underline the oversight of the opposition-controlled National Assembly over the Maduro regime.  See Brewer Supp. Decl. ¶ 17(d); Araujo Report ¶ 85.

[45] Reply Decl. of Allan R. Brewer-Carías in Support of Pls.' Mot. for Summ. J., Dkt. 195 ("Brewer Reply Decl.") ¶ 11; Brewer Supp. Decl. ¶¶ 38-40.

date the dispute at hand, are particularly compelling under Venezuela's civil law regime.[46] This understanding is also reflected in the National Assembly's September 27, 2016 Resolution (the "September 2016 Resolution"), which invoked Article 187(9) in rejecting the transaction.[47] Article 187(9) **only** concerns the National Assembly's approval of national public interest contracts.[48] Thus, the only reason for the National Assembly—the primary interpreter of the Venezuelan Constitution—to invoke Article 187(9) was pursuant to its approval authority with respect to the Indenture and Pledge as national public interest contracts.[49]

### 3.  The Indenture and Pledge Were Entered into with Foreign Companies

Article 150 requires National Assembly approval of any national public interest contract to be "executed with foreign States or official entities, or with companies not domiciled in Venezuela."[50] It is undisputed that the Indenture and Pledge were entered into with one or more of Union Bank, GLAS Americas, Law Debenture Trust Company of New York, and Banque Internationale à Luxembourg, Société Anonyme.[51] None of these companies are domiciled in Venezuela.[52]

---

[46] Brewer Report at ¶ 53; Brewer Supp. Decl. ¶ 40. Even the Maduro-controlled National Executive and the illegitimate Maduro-controlled National Assembly have adhered to this constitutional requirement. In the period from December 2023 to July 2024, the Maduro-controlled National Assembly enacted six separate resolutions authorizing national public interest contracts entered into by national state-owned enterprises, which are part of the Decentralized National Public Administration, regarding the incorporation and functioning of joint venture/mixed enterprises within the Oil sector. All of these resolutions expressly reference Articles 150 and 187(9) of the Constitutions that refer to national public interest contracts and the requirement of obtaining National Assembly authorization. *See* Brewer Supp. Decl. ¶¶ 41-42.

[47] Asamblea Nacional, *Acuerdo sobre la situación financiera actual de Petróleos de Venezuela S.A.* [*National Assembly Resolution on the current Financial Situation of Petróleos de Venezuela S.A.*]*,* (Sept. 27, 2016) (Venez.), Dkt. 1-3 [hereinafter September 2016 Resolution].

[48] 1999 VENEZ. CONST. art. 187, Dkt. 126-4; Brewer Report ¶¶ 21-23, 72; Brewer Supp. Decl. ¶ 23.

[49] Brewer Report at ¶ 72.

[50] 1999 VENEZ. CONST. art. 150, Dkt. 126-4.

[51] Defs.' Resp. to Plfs.' Local Rule 56.1 Statement of Fact and Counterstatement of Fact, Dkt. 163, at ¶¶ 41-42.

[52] *See id.* at ¶ 29.

4. **The National Assembly Did Not Approve, and In Fact Categorically Rejected, the Indenture and Pledge**

Because the Indenture and Pledge are national public interest contracts entered into with foreign companies, the National Assembly's approval was required for PDVSA to duly authorize the agreements. As discussed in further detail below (Part III), the National Assembly never approved the Indenture or the Pledge.[53]

In fact, the National Assembly went a step further, passing a resolution "rejecting[ing] [it] categorically" under its Article 187(9) authority.[54] There can be no dispute that the National Assembly, which acts as the *first-instance interpreter* of the Venezuelan Constitution, deemed the Indenture and Pledge to be national public interest contracts falling under Article 150 and refused to authorize PDVSA to enter into such transactions.[55] As the National Assembly did not authorize either PDVSA or PDVSA Petróleo to enter into the agreement, the Indenture and the Pledge are void *ab initio* under Venezuelan law.[56]

C. **The Indenture and Pledge Required National Assembly Approval Under Venezuela's Constitution Notwithstanding Venezuelan Statutory Law and Inapplicable Venezuelan Legal Principles**

Defendants have argued that Article 150 should be ignored because of a statutory provision (the Organic Law of the Financial Administration of the Public Sector) and general legal doctrines (principles of legitimate expectations and presumption of legality). This argument fails.

---

[53] Araujo Report ¶ 16; Brewer Supp. Decl. ¶¶ 30-31.
[54] September 2016 Resolution.
[55] Brewer Report ¶ 53; Brewer Supp. Decl. ¶ 23.
[56] Araujo Report ¶¶ 131-34 ("an authorization by the National Legislative Branch must be requested and granted prior to the conclusion of the contract of national, state or municipal public interest with companies not domiciled in Venezuela in order for the contract to be 'recognized as valid, in accordance with the Constitution.' Without such constitutionally mandated authorization, the resulting unconstitutional act is null and void, of absolute nullity.") (emphasis in original) (quoting *Andrés Velásquez* at 14–15); Brewer Supp. Decl. ¶¶ 31-32.¶

1.    **<u>The Organic Law of the Financial Administration of the Public Sector</u>**
**<u>Does Not Override Venezuela's Constitutional Requirements</u>**

First, Article 150 applies to all national public interest contracts entered into with companies not domiciled in Venezuela.  As the Constitutional Chamber expressly noted in *Andrés Velásquez*:

> [T]he Organic Law Governing the Financial Administration of the Public Sector can only authorize the National Executive to enter into public credit transactions . . . without the need for the control set forth in articles 150 and 187, section 9 of the Constitution of the Bolivarian Republic of Venezuela, when such transactions consist in, for example, . . . entering into national public interest contracts with companies domiciled in Venezuela, ***but not when such transactions imply entering into national public interest contracts with States or foreign official entities or companies not domiciled in Venezuela, since in those cases the application of the prior control or authorization by the National Assembly is inescapable.***[57]

This mandatory requirement exists because "international contracts which, not being subject to close control by the representative body in every democratic state of the national will of the people, might be entered into in a light or negligent manner with serious effects and consequences for the life of the inhabitants of Venezuela."[58] That is, the constitutional requirement was designed to safeguard against the very same risks presented by the Exchange.

Defendants have contended that the Organic Law of the Financial Administration of the Public Sector exempts PDVSA from Article 150, but the Venezuelan Constitution, like its U.S. counterpart, is the highest authority.[59]  It is not subject to exceptions or modifications by statute, only by a constitutional amendment.[60]

---

[57] *Andrés Velásquez*, Dkt. 128-7, at 19 (emphasis added).
[58] *Id.* at 20; *see also* Araujo ¶¶ 124-25; Republic Br. at 6, 9-10.
[59] Brewer Supp. Decl ¶ 18; Araujo Report ¶¶ 127, 130, 131 ("the principle of constitutional supremacy means that, being the Constitution the fundamental and supreme norm of Venezuelan Law, 'the law and other state norms and acts must be in accordance with the Constitution.'") (quoting JOSÉ ARAUJO-JUÁREZ TREATISE ON GENERAL AND COMPARATIVE ADMINISTRATIVE LAW. VOLUME 1: FUNDAMENTALS. SOURCES OF LAW 419-420 (2024)).
[60] Brewer Supp. Decl. ¶ 18.

For this reason, Article 101.4 of the ***statutory*** Organic Law, which exempts public debt contracts of PDVSA and other state-owned enterprises in the hydrocarbon sector from national assembly approval, cannot override Article 150 of the ***Constitution***. Rather, Article 101.4 excepts such public debt contracts from ***the Organic Law's*** own requirement—which may extend to debt contracts of PDVSA with Venezuelan entities (and which are not subjected to Article 150)—from National Assembly's annual budget approval.[61] But Article 101.4 says nothing (nor could it) about overriding an independent constitutional requirement of Article 150 with respect to national public interest contracts with companies not domiciled in Venezuela.[62] Any such exemption from Article 150 would directly contravene the Constitutional Chamber's guidance, including in *Andrés Velásquez*.[63]

### 2.    The Venezuelan Legal Principles of Legitimate Expectations and Presumption of Legality Are Inapplicable in this Case

Defendants have previously argued that Venezuelan legal principles of legitimate expectations and presumption of legality would effectively waive the Constitutional requirement of Article 150, yet neither doctrine applies to acts that are an "absolute nullity," *i.e.* void *ab initio*.[64] It is universally understood that the doctrine of legitimate expectations cannot apply to "a promise that does not comply with the rules, or even, is contrary to the rules."[65] Similarly, the presumption

---

[61] *Ley Orgánica de la Administración Financiera del Sector Público* [Organic Law of Financial Administration of the Public Sector], Gaceta Oficial No. 6.210 (Nov. 19, 2014), art 101.4, Dkt. 171-118; Araujo Report ¶¶ 122-24.

[62] *See id.*; Araujo Report ¶¶ 125–30; *Ley Orgánica de la Administración Financiera del Sector Público* [Organic Law of Financial Administration of the Public Sector], Gaceta Oficial No. 6.210 (Nov. 19, 2014), art 101.4, Dkt. 171-118 (produced as Tab 4 to the First Report); Brewer Supp. Decl. ¶ 18.

[63] Araujo Report ¶¶ 102-103; Brewer Supp. Decl. ¶ 18.

[64] Brewer Rebuttal Report ¶¶ 6, 103-114; Araujo Report ¶¶ 142-143, 148-153; Brewer Supp. Decl. ¶¶ 34-35.

[65] Hildegard Rondón de Sansó, *El Principio de Confianza Legítima en el Derecho Venezolano* [The Principle of Legitimate Expectation in Venezuelan Law], *in* IV Jornadas Internacionales De Derecho Administrativo 295, 230 (1998), Dkt. 128-43; Allan Randolph Brewer-Carías, *El Derecho Administrativo y la Ley Orgánica de Procedimientos Administrativos*, *in* 16 Colección Estudios Jurídicos 203 (8th ed. 2008) (produced as Exhibit JM-103 to the Defendants' Expert's Report); Brewer Rebuttal Report ¶¶ 109–11.

of legality "has an exception for when the act is affected of absolute nullity,"[66] because an act of absolute nullity "*cannot produce an effect in any way whatsoever*,"[67] otherwise the presumption would "prevail against logic," which it "cannot" do.[68] As failure to obtain prior approval from the National Assembly under Article 150 renders contracts void *ab initio*, the doctrine of legitimate expectations and presumption of legality do not apply to either the Indenture or the Pledge.[69]

Even if the Indenture and Pledge were not acts of absolute nullity, neither principle of presumption of legality nor legitimate expectations is satisfied here.

*First*, the presumption of legality only applies to "administrative acts."[70] Public contracts, however, are not "administrative acts."[71] As such, "the presumption of legality does not apply to public contracts.[72]

*Second*, legitimate expectations do not apply if the "wronged" party knew, or should have known under ordinary diligence, of the illegality.[73] Under Venezuelan law, all parties, including foreign counterparties, are assumed to know the applicable Venezuelan laws.[74] What is more, here, the Bondholders clearly knew or should have known of the illegality of the Indenture and Pledge[75]

---

[66] Allan Randolph Brewer-Carías, *El Derecho Administrativo y la Ley Orgánica de Procedimientos Administrativos*, *in* 16 COLECCIÓN ESTUDIOS JURÍDICOS 203 (8th ed. 2008 (produced as Exhibit JM-103 to the Defendants' Expert's Report).

[67] La Corte Suprema de Justicia Sala Político Administrativa ("Political-Administrative Chamber, Supreme Court of Justice"), *Eduardo Contramaestre vs. Repúbica (Ministerio de Sanidad y Asistencia Social)* (Apr. 6, 1993) *in* 55-56 REVISTA DE DERECHO PÚBLICO 198 (1993), Ex. 2.

[68] La Corte Suprema de Justicia Sala Político Administrativa [Supreme Court of Justice Political-Administrative Chamber] [CSJ] No. 411 Banco del Caribe vs. República (Ministerio de Hacienda), Aug. 13, 1991 *in* 47 REVISTA DE DERECHO PÚBLICO 111 (Editorial Jurídica Venezolana ed., 1991), Ex. 3; Araujo Report ¶ 118 (citing Ex. 4("flawed acts of absolute nullity . . . are excluded from the principle of presumption of legitimacy.")).

[69] Brewer Rebuttal Report at ¶¶ 109-114; Araujo Report ¶¶ 131-34; Brewer Supp. Decl. ¶ 31.

[70] Araujo Report ¶ 136.

[71] Araujo Report ¶¶ 26, 138–41; Ex. 4 p. 122 ("[The presumption of legality] always applies to administrative acts and the administrative regulations, but not to other legal forms such as simple acts—e.g., internal administration acts—or public contracts nor to administrative acts.").

[72] Araujo Report ¶ 137.

[73] Araujo Report ¶ 146.

[74] *Id.*

[75] *Id.* ¶ 147.

because the National Assembly publicly passed both the May and September Resolutions,[76] made public statements disclaiming the validity of the 2020 Notes as unconstitutional,[77] and the National Assembly's opposition to the Indenture and Pledge, the Constitutional requirement of National Assembly authorization, and the Constitutional risks associated with the 2020 Notes were all publicly reported in major publications.[78]

That the Bondholders knew or should have known of the illegality of the Exchange is further underscored by the Second Circuit's recent decision in *VR Global*, in which the Second Circuit found that the PDVSA legal opinion letters, the National Assembly resolutions, and statements by National Assembly members "show that, in 2016, the Maduro-controlled PDVSA offered the 2020 Notes despite the opposition-led National Assembly's categorical rejection of the exchange offer," and that the statements reflect "a risky investment due to a public fight for control of PDVSA." *VR Glob. Partners, L.P. v. Petroleos de Venezuela, S.A.*, No. 24-1176-CV, 2024 WL 4891271, at *3 (2d Cir. Nov. 26, 2024).[79] Because the Bondholders were aware, or should have been aware, of this "risky investment' and "the opposition-led National Assembly's categorical rejection of the exchange offer," the doctrine of legitimate expectations does not apply.[80]

## II.    THE REPUBLIC'S VIEW THAT THE TRANSACTION DOCUMENTS ARE UNAUTHORIZED, UNCONSTITUTIONAL, AND VOID *AB INITIO*, AND UNENFORCEABLE UNDER VENEZUELAN LAW IS ENTITLED TO SUBSTANTIAL WEIGHT.

The doctrine of international comity supports Plaintiffs' construction of Venezuelan law because it is the same view that has been consistently articulated by the Venezuelan Republic. Under established comity principles, courts *must* grant respectful consideration to a recognized

---

[76] May 2016 Resolution; September 2016 Resolution; Araujo Report ¶ 147.
[77] Araujo Report ¶ 147; *see also* Guevara Decl. ¶¶ 14–15.
[78] Araujo Report ¶ 147.
[79] Counsel for VR Global also represents the Trustee and Agent in this litigation.
[80] Araujo Report ¶ 147.

foreign government's interpretation of its own laws when adjudicating questions of foreign law. The Supreme Court has made clear that such views are entitled to "respectful consideration" and to "**substantial** but not conclusive **weight**." *Animal Sci.*, 585 U.S. at 36 (emphasis added).

### A. The Court's Earlier Concerns with Affording Comity Are Resolved.

This Court acknowledged comity principles when it last considered the Republic's views on the questions of Venezuelan law in this case, put forth in a letter submitted by then ambassador of Venezuela, Carlos Vecchio. Order at 39-40. Ambassador Vecchio's letter primarily addressed why, as a matter of Venezuelan law, the Indenture and Pledge are "national public interest contracts" that required prior National Assembly authorization as a condition precedent to their formation and validity under Articles 150 and 187(9). Vecchio Letter ¶¶ 1–12, 18–19. This Court ultimately did not weigh those portions of the letter because it held that New York, not Venezuelan law, governed the validity of the relevant agreements. *See* Order at 6 n.3.

Instead, the Court focused its analysis on the three remaining paragraphs in Ambassador Vecchio's letter, concluding it could "neither agree with nor give conclusive effect to" the Republic's views as to the meaning and import of the National Assembly's acts with respect to the Transaction Documents. *Id.* at 40 (citing Vecchio Letter ¶¶ 10, 16, 23). Each of the concerns raised in this Court's prior analysis, which proceeded with the assumption that U.S. rather than Venezuelan law was at issue, have been addressed by the Republic's subsequent submissions to the Second Circuit, the New York Court of Appeals, and this Court.

*First*, the Republic has explained that the Exchange Offer is a national public interest contract that is invalid under Articles 150 and 187(9), and that the Assembly's withholding of approval—including as clearly reflected in the September 2016 Resolution—rendered the 2020 Notes and Governing Documents invalid and void *ab initio*. Republic Br. at 11-17 (Jan. 15, 2025), Dkt. No. 326-1; Guevara Decl. ¶ 17. Further, the Republic and a member of the National Assembly

who was authorized to speak on behalf of the majority of legislatures at the time have explained that the September 2016 Resolution had the legal effect of deciding that the Exchange Offer was a contract of national public interest by reference to Article 187(9). *See* NYCOA Amicus Brief at 9; Second Circuit Amicus Brief at 18. And the Republic has explained that the September 2016 Resolution was not required to declare the Exchange Offer null and void in order to nullify it as a matter of Venezuelan law, because such legal effect was the only possible result of the National Assembly's withholding of approval even if the Assembly had *not* issued its "categorical[] reject[ion]" of the Pledge.  NYCOA Amicus Brief at 2, Second Circuit Amicus Brief at 18.

*Second*, the Republic's explanation is consistent with José Ignacio Hernández's legal opinion. Both the Republic and Mr. Hernández have consistently taken the position that National Assembly authorization for the Transaction Documents was required (but withheld) prior to their issuance, and that the 2020 Notes and Pledge therefore never came into legal existence. Order at 33. Moreover, the Republic and Mr. Hernández both explained that its September Resolution, did not seek to investigate whether the Transaction Documents were public interest contracts, but demanded that the Maduro regime officials involved in attempting to carry out the Exchange without National Assembly approval be criminally investigated.

This Court previously singled out Mr. Hernández's statement that "the National Assembly did not declare the unlawfulness of that Bond," but Mr. Hernandez has subsequently explained that his statement was never intended to suggest that the National Assembly regarded the Exchange Offer as valid, and simply reflected the reality that the Assembly's deliberations occurred before the Bond came into legal existence:

> [T]he National Assembly could hardly declare that invalid because, as of September 27, *no agreement could have been declared null.* The indenture and pledge agreement were executed *after* the Resolution on October 28. What was significant is that *before* issuing the Notes, based on the Constitutional Law in force at that time,

the National Assembly denied the authorization that PDVSA needed to pledge Citgo's shares, invoking article 187.9 of the Constitution.[81]

Mr. Hernández's opinion simply confirms the same position articulated by the Republic. *See* Dkt. No. 164-10, ¶ 106; ¶ 170(a), (c) (referencing "[t]he invalidity of the issuing contract under Venezuela law"); Second Circuit Amicus Brief at 34 ("A fair reading of the Special Attorney General's opinion leaves no doubt about his conclusion that the 2020 Notes were void *ab initio* because the indenture and pledge were never authorized by the National Assembly.").

Even if that single sentence in Mr. Hernández's opinion could be interpreted as contradicting the Republic's position, that would not warrant disregarding the official position of the Republic as to the September 2016 Resolution.[82]   And even if it did, that supposed contradiction does *nothing* to undermine the Republic's position (clearly supported by Mr. Hernández) as to the status of the Exchange as a national public interest contract, or the transaction's invalidity under the Venezuelan Constitution because the National Assembly did not authorize it.  *See In re Vitamin C*, *Antitrust Litigation*, 8 F.4th 136, 157 (2d Cir. 2021)

*Third*, the Republic's briefing throughout this case and in third-party submissions elsewhere provide additional details as to its view of Venezuelan law. *See, e.g.*, Vecchio Letter at ¶ 10. The Republic's interpretation of Venezuelan law—as it has made clear in its five articulations of its position in this matter alone—rests on legal principles long preceding this litigation and that do not depend on its outcome. It has long been the Republic's position that PDVSA contracts involving or affecting national assets are national public interest contracts, and require the National

---

[81] José Ignacio Hernandez*, The Global South Constitutional Law and the Choice-of-Law Provisions in Public Debt Notes: The Venezuela Case* (Feb. 23, 2024), https://ssrn.com/abstract=4736817.

[82] Regardless, Mr. Hernández's statements cannot override the Republic's official position and instead must yield to the formal submissions of the sovereign whose prerogative it is to interpret and explain the meaning of the Venezuelan Constitution. *See Vitamin C*, 8 F.4th at 157-58 (deferring to Ministry's account because "consistent" with past positions, even where prior announcements could be read as contradictory).

Assembly's authorization. *See* Vecchio Letter at ¶¶ 2–4, Second Circuit Amicus Brief at 15–16, NYCOA Amicus Brief at 5–6. This position is corroborated by contemporaneous reporting, statements from National Assembly members, and the criminal investigation into the Exchange. *See* Guevara Decl. ¶¶ 4, 9, 17–18; Republic's Brief at 23-24. Further, the Republic's position aligns with the majority view of the National Assembly held at the time. Guevara Decl. ¶¶ 7, 9, 15, 17, 20–21.

The fact that the Republic has an interest in the outcome of this litigation is not a legally permissible basis on which to discredit its views—as the Supreme Court and Second Circuit have both held, affording comity to a foreign sovereign is appropriate even when that sovereign is keenly interested in the litigation in which it is participating.  *See Vitamin C*, 8 F.4th at 156–57 (giving the Ministry's submission "some weight" even where it was uncorroborated, offered in the context of litigation, and the Ministry had "unambiguously stalked out a common interest with defendants"); *Animal Sci.*, 585 U.S. at 42–43 (referencing careful consideration of foreign sovereign views provided "through [an] *amicus* brief"); *see also Société Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987).

### B.  The *Animal Science* Factors Counsel in Favor of this Court Providing Substantial Weight to the Republic's Submission

With the Court's prior concerns resolved, this Court must assess comity principles starting from the baseline that the Republic's position is ordinarily entitled substantial weight. 585 U.S. at 46. The Republic's brief addressed each of the relevant "considerations" under *Animal Science* in detail, Republic's Br. at 15-16, which weigh incontrovertibly in favor of providing substantial weight to the Republic's views here.

Here, the sovereign has articulated a consistent legal interpretation of the Venezuelan Constitution through more than 113 pages of briefing. Each time, it has provided significant and

meaningful support for its position with legitimate factual and legal sources, including with reference to over 26 Venezuelan authorities. The Republic's position has aligned with multiple experts' discussions of the integral issues pertaining to the history of the Venezuelan Constitution, the meaning of its provisions, the categorization of the Exchange as a national public interest contract under Articles 150 and 187(9), the National Assembly's prerogative to approve (or not) national public interest contracts, and the National Assembly's multiple resolutions with respect to the factual circumstances here. *See, e.g.,* Brewer Report at ¶¶ 12-17; Araujo Report at ¶ 116.

The Republic has transparently relied on the Venezuelan Constitution, the National Assembly's resolutions, and other authoritative sources to explain why the Exchange qualifies as a contract of national public interest and is invalid under applicable law. *See* Republic's Br. at 11–13; *cf. Animal Sci.*, 8 F.4th at 157.

Further, each of the Republic's submissions was submitted by those with official authority to convey the Republic's binding legal positions to American courts. Indeed, as this Court has acknowledged, the National Assembly is the only "legitimate branch of Venezuela's government," Order at 13, and it is the "first-instance interpreter of the [Venezuelan] Constitution," Brewer Report at ¶ 53 Dkt. No. 119-1; Defendants' Expert Report Rebutting the Report of Allan R. Brewer-Carías at § 99, Dkt. No. 128–3. *See, e.g.*, *Vitamin C*, 8 F.4th at 157 (deferring to the views of the Chinese Ministry, "the highest administrative authority" on the at-issue topic); *Jota v. Texaco Inc.*, 157 F.3d 153, 162-63 (2d Cir. 1998) (the Ecuadoran Ambassador has the power to "bind the state that he represents"); *see also Banco de Espana v. Fed. Rsrv. Bank of New York*, 114 F.2d 438, 443, 445 (2d Cir. 1940) (ambassador's statements admissible as proof).

As in *United States v. Pink*, 315 U.S. 203 (1942), there is "no indication that the declaration" made by the sovereign "was inconsistent with the [sovereign's] past statements," and

moreover, "the declaration was consistent with [the] expert evidence on point." *Animal Sci.*, 585 U.S. at 45 (recounting *Pink*).  Here too, the Venezuelan Government's position is consistent with its past statements on Articles 150 and 187(9), and is consistent with the opinions of Professor Brewer-Carias, Professor Araujo-Juarez, and the overwhelming majority of Venezuelan legal scholars. This Court should give the Republic's position on Venezuelan law substantial weight and find, consistent with the Republic's submissions, the Exchange invalid and void *ab initio*.

## III.    THIS COURT MUST ACCEPT THE VALIDITY OF AND DEFER TO THE NATIONAL ASSEMBLY'S SOVEREIGN ACTS UNDER THE ACT OF STATE DOCTRINE.

The invalidity of the Exchange Offer is separately and independently established by the act of state doctrine.  Under that doctrine, "a foreign state's official acts executed within that state's territory are valid in that they have the legal effects … that they purport to have." *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 140 (2d Cir. 2022). Such official sovereign acts "'cannot be questioned but must be accepted by our courts as a rule for their decision'" and "'deemed valid'" when taken. *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) (citation omitted); *see also Petróleos de Venezuela S.A.*, 106 F.4th at 269.

As this Court correctly recognized, the National Assembly is a sovereign for purposes of the act of state doctrine, and its resolutions constitute "official acts of a foreign sovereign." Order at 27.  This Court also observed that, prior to taking place, the Exchange Offer "was subject to much dispute in Venezuela and was *condemned* by the National Assembly." Order at 2 (emphasis added). The National Assembly's 2016 resolutions "*purported to assert its constitutional authority over national public interest contracts*—including explicitly rejecting the plan to pledge control of CITGO," 51 F.4th at 459, and that the Assembly's October 2019 Resolution "*purport[ed] to ratify that the 2020 Notes violated the Venezuelan Constitution*." *Petróleos de Venezuela S.A.*, 106 F.4th at 266 (emphasis added).

27

The act of state doctrine requires this Court to presume that the National Assembly's official acts—*i.e.*, its withholding of authorization *and* categorical rejection of the Exchange through its Resolutions—had legal effect under Venezuelan law. Here, the Assembly was *purporting* to deny the legal authority required by the Constitution for the Exchange Offer to come into legal existence. Those sovereign acts cannot be questioned or rejected on procedural objections. *See Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012); *see also Trabelsi*, 28 F.4th at 1299–1300).

### A. The May 2016 Resolution Made Clear That Any Act to Usurp the National Assembly's Constitutional Prerogatives, Including Entering Into National Public Interest Contracts, Is Null and Void.

The September 2016 Resolution is a continuation of the May 2016 Resolution, and must be read in conjunction with the May Resolution. The May Resolution was issued in direct response to an "emergency" decree by Maduro that purported to empower the "National Executive" to execute national public interest contracts without prior authorization of the National Assembly; in direct response to that proposal, the May 2016 Resolution explains that *only* the Assembly has constitutional power to authorize national public interest contracts. May Res. at 2–3; *see also* Guevara Decl. ¶ 6. Further, it expressly declared that without the National Assembly's authorization *any* issued national public interest contract "is null and void and shall be considered non-existent." May Res., Dkt. 126-13, at 1, 3.

While issued in the response to the "National Executive's" attempt to unilaterally execute national public interest contracts, the May 2016 Resolution described constitutional principles that apply with equal force to *all* national public interest contracts. Republic's Br. __; Guevara Decl. ¶¶ 6–7. This is clear not only from the text of the relevant Constitutional provisions, which do not limit the National Assembly's authority to contracts involving the National Executive, but from the text of the Resolution itself. Guevara Decl. ¶ 7 (resolution not limited to contracts "involving

the National Executive as a party"). Indeed, the Resolution covers *any* contract "linked to major procurements that could seriously compromise the assets of the Republic or expose them to serious losses" and declares such contracts ones of "national public interest." May 2016 Resolution at 2. Further, it resolved that "*any activity* carried out by an organ that usurps the constitutional functions of another public authority is *null and void* and shall be considered *non-existent*" (emphases added), and urged foreign embassies in Venezuela to "inform the[ir] Governments … *and the corresponding companies* about the nullity of the contracts that are concluded in contravention of Article 150 of the Constitution." May 2016 Resolution at 3 (emphases added).

### B.  The September 2016 Resolution Categorically Rejected The Exchange Offer.

The Maduro regime announced the Exchange Offer less than four months after the May 2016 Resolution. Guevara Decl. ¶ 9. Recognizing the Exchange Offer as a national public interest contract, the Assembly held floor debates and ultimately issued the September 2016 Resolution, prior to the execution of the Exchange. *Id.* ¶¶ 10–17.

The September 2016 Resolution was aimed at blocking a single transaction—the Exchange Offer—and invoked Article 187(9), which exclusively pertains to the National Assembly's constitutional prerogative to authorize national public interest contracts. The Assembly's categorical rejection of the Pledge must be understood in that context. *See* Sept. Res., Dkt. 1-3, at 2; *see also* Guevara Decl. ¶¶ 9–10, 17. Giving effect to the explicit words in these two resolutions requires this Court to find that the National Assembly was *purporting* to declare that the Exchange was "null and void and shall be considered non-existent."  May Res. at 3; *see also* Brief of the Republic of Venezuela as Amicus Curiae ("Republic's Brief") at 13–14.

The Assembly did not have to express disapproval in any specific way, or even at all. *See* Republic's Br. at 28–29. Rather, consistent with Articles 150 and 187(9), all it needed to do was withhold authorization. *Id.* at 28–29. But *inaction* is not a fair description of the legislative conduct

at issue—instead, the National Assembly held a hearing, deliberated, expressed its views via floor statements by designated representatives, and enacted an official Resolution that "reject[ed] categorically" the pledge of CITGO in the Exchange Offer, called upon PDVSA to come up with a new plan for "the refinancing of its financial commitments," and called for a criminal investigation of those who were involved. This renders the Exchange Offer null and void under the act of state doctrine.

This Court previously considered the floor statement of Mr. Guevarra, who at the time served as the President of the National Assembly's Comptroller's Commission, without the benefit of context that explains the relevance of such statements under Venezuelan law. As described in Mr. Guevarra's attached declaration, the National Assembly passed the September Resolution to "with[o]ld the National Assembly's requisite constitutional authorization of the Exchange Offer pursuant to its determination that the Exchange Offer implicated the national interest," and "'categorically reject[]' the pledge of CITGO in the Exchange Offer . . . pursuant to Article 187.9[.]" Guevara Decl. ¶ 17. When Mr. Guevarra spoke on the floor of the National Assembly to explain the intended effect of the September Resolution—which took place after the resolution had been drafted, circulated, and approved by the submission coalition—he did so on behalf of "a clear majority of the members of the National Assembly."[83] *Id.* ¶¶ 11–15. Thus, when he stated the legislature "will not acknowledge any national interest contract that does not come before this National Assembly" and "that executing that swap . . . is an act that constitutes an irregularity," he represented the National Assembly's majority position. This meant a majority of the Assembly viewed the Exchange as illegal and called to criminally "investigate anyone who approve[d] this swap, because they would be taking part in an act of embezzlement against the nation and

---

[83] At the time, the Unity Coalition he was a member of comprised 112 of the 167 National Assembly members.

destruction of domestic production."[84]

That the National Assembly invoked Article 187(9) in the September 2016 Resolution when calling for "the Public Ministry to open an investigation to determine if the current transaction protects the National Property" further confirms the above conclusion.  The National Assembly's express invocation of Article 187(9) demonstrates its view that the Exchange was a national public interest contract.[85] And by categorically rejecting the Exchange Offer, the Assembly affirmative acted to invalidate it. This Court should not second-guess the Resolution's language. *Whallon v. Lynn*, 230 F.3d 450, 456 (1st Cir. 2000) ("Care must be taken to avoid imposing American legal concepts onto another legal culture.").

Further, as the Republic, members of the National Assembly serving at the time, and Plaintiffs' experts explain, the investigation being called for was criminal in nature—*i.e.*, to determine whether members of the Maduro regime were criminal liable precisely because the regime was pushing through a national public interest contract without seeking the National Assembly's approval.  Republic Br. at 8, 24–25; 27–28; Guevara Declaration at ¶ 18. As the Republic explains, the Public Ministry is charged by the Constitution with "order[ing] and direct[ing] criminal investigation[s] of the perpetration of punishable acts." *See* Republic Br. at 29 n.20 (citing Venez. Const. Art. 185). This is in accord with the May 2016 Resolution's admonition to the Maduro regime that "those who issue or sign the respective acts" that "usurps the constitutional functions of another public authority . . . shall be liable under the law." Thus,

---

[84] *See also* Guevara Decl. at ¶ 12 (Under Venezuelan law, "[f]loor debates reflect what the words of the ultimate resolution mean and the intent and understanding of the legislature in passing the resolution.")

[85] The Resolution's reference to whether the "current transaction protects the National Property, in accordance with articles 187, section 9, 302 and 303 of the Constitution" does not suggest that the National Assembly doubted Article 187.9's applicability to the Exchange. Whether the Exchange "protects the National Property" does not determine the transaction's status as a national public interest contract under Articles 150 or 187.9 (neither of which references that concept), but is relevant to whether the proponents of the Exchange had failed to comply with the constitutional requirement (established by Articles 302 and 303) to safeguard PDVSA and the Republic's related strategic assets.

when the National Assembly called for an investigation *by the Public Ministry*, it was doing nothing more than expressing its belief that the Maduro regime officials involved may have committed crimes by pushing through the national public interest contract without its prior authorization. *See id.* at 20, 28.

### C. The October 2019 Resolution Reaffirmed the National Assembly's Earlier Acts to Withhold Authorization of the Transaction Documents.

The National Assembly's October 2019 Resolution—entitled "Resolution that Reiterates the Invalidity of PDVSA's 2020 Bonds"—reiterated the National Assembly's earlier conclusion that the Exchange Offer constituted a public interest contract and was invalid for lack of authorization. As the Second Circuit put it, the October 2019 Resolution purported "to ratify that the 2020 Notes violated the Venezuelan Constitution." *Petróleos de Venezuela S.A.*, 106 F.4th at 266.

Although the October 2019 Resolution also references the investigation requested by the Assembly on April 24, 2019, regarding its decision to make an interest payment under protest—that language refers to the Public Ministry's investigation. Guevara Decl. This language does not suggest that the Assembly regarded the Exchange valid until that point; that the Assembly's first "conclusion" regarding the unconstitutional status of the transaction took place only after the April 2019 investigation; nor that the National Assembly provided implicit constitutional authorization in the meantime. The October 2019 Resolution could not be read to suggest any of this because the National Assembly had already rejected the Exchange in the September 2016 Resolution and did not authorize it at any time thereafter. *See supra* II.B. The import of the October 2019 Resolution is straightforward. By "reiterating" the Notes' invalidity, the resolution corroborates that the Exchange was invalid before inception. *See* Republic's Brief at 17, 21.

### D.  The Takings Exception to the Act of State Doctrine Does Not Apply to the National Assembly's Acts Preceding the Execution of the Exchange.

When this Court last evaluated the legal effect of the National Assembly's sovereign acts, it assessed whether the "takings" exception to the act of state doctrine applies. *See* Order at 31-38; *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985). It does not, especially since the validity of the Transaction Documents is determined under Venezuelan, as opposed to New York, law. *Allied Bank* applied the territoriality requirement to a purported taking of property and held that, under the "situs rule," the act of state doctrine applies only when the taken property's "situs" (evaluated at the time of the purported taking) is in the sovereign's territory. 757 F.2d at 521. Whereas *Allied Bank* involved a *retroactive* repudiation of debt that was indisputably valid when issued, this case involves a foreign sovereign's *prospective* refusal to authorize newly issued debt.

This Court has limited the "situs test" to "takings" of *existing* property or debt, and made clear that this test does not control where the relevant act of state is an intra-government regulation of rights or authorities rather than a "taking." *See FTE*, 809 F.3d at 742-45. Here, unlike in *Allied Bank*, the relevant sovereign acts predated the issuance of the debt, at which time there was no property interest to take and, hence, no taking. *See U.S. Olympic Comm.*, 737 F.2d at 267 (governmental action does not effect a taking where the property owner "had no interest in the [property] at the time the [relevant] Act became law"); *United States v. Sperry Corp.*, 493 U.S. 52, 59 (1989); *Grayton v. United States*, 92 Fed. Cl. 327, 337 (2010).

But if property could be said to have existed, the act of state doctrine asks where the property was located at the time of the foreign sovereign's acts, *not* where the property is located at the time of suit. *See Allied Bank*, 757 F.2d at 521. The Supreme Court has repeatedly applied this principle in a long line of unbroken cases. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303–

04 (1918) (applying the doctrine where the sovereign acted to transfer title of certain property later "brought within the custody of a [U.S.] court"); *see also Sabbatino*, 376 U.S. at 428-37 (applying the doctrine to a Cuban act that caused an American commodity broker to forfeit proceeds located in New York); *United States v. Belmont*, 301 U.S. 324, 332 (1937) 43 (applying the doctrine to an act that forced a New York banker to return a sum of money deposited in New York by a nationalized Russian corporation). This case concerns *Venezuelan* decrees, issued under *Venezuelan* law in *Venezuela*, directed at *Venezuelan* state-owned entities *prior* to the existence of the purported debt obligation. With every component of the relevant acts of the sovereign having taken place in Venezuela, the situs test provides no basis to decline to apply the act of state doctrine. *See FTE*, 809 F.3d at 742-45 (situs analysis inapplicable where sovereign act was "done" in Russia and effect was transfer rather than confiscation); *Banco de Espana*, 114 F. 2d at 444 (act of state doctrine applied where "[i]f these acts took place, they took place within Spain"). Indeed, it "would be an affront to such foreign government for courts of the United States to hold that such act was a nullity." *Allied Bank*, 757 F.2d at 521 (quoting *Tabacalera Severiano Jorge v. Standard Cigar*, 392 F.2d 706, 715 (5th Cir. 1968)).

## CONCLUSION

Plaintiffs respectfully request that the Court conclude that the Transaction Documents and Pledge are invalid, illegal, null, and void *ab initio*, and unenforceable under Venezuelan law or, alternatively, pursuant to the act of state doctrine.

Dated:  January 17, 2025                    Respectfully submitted,


                                            /s/ Michael Gottlieb
                                            Michael Gottlieb

                                            Michael Gottlieb
                                            Kristin Bender
                                            WILLKIE FARR & GALLAGHER LLP
                                            1875 K Street NW
                                            Washington, DC  20006-1238
                                            Telephone: (202) 303-1442
                                            Facsimile: (202) 303 2442
                                            mgottlieb@willkie.com
                                            kbender@willkie.com

                                            Nicholas Reddick (*admission application pending*)
                                            WILLKIE FARR & GALLAGHER LLP
                                            333 Bush Street
                                            San Francisco, CA 94104
                                            Telephone: (415) 858-7400
                                            Facsimile: (415) 858-7599
                                            nreddick@willkie.com


                                            *Attorneys for Plaintiff PDV Holding, Inc.*



                                            /s/ Kurt W. Hansson
                                            Kurt W. Hansson

                                            Kurt W. Hansson
                                            James Ferguson
                                            PAUL HASTINGS LLP
                                            200 Park Avenue
                                            New York, New York 10166
                                            Telephone: (212) 318-6000
                                            Facsimile: (212) 319-4090
                                            kurthansson@paulhastings.com
                                            jamesferguson@paulhastings.com

                                            Igor Timofeyev
                                            PAUL HASTINGS LLP
                                            2050 M Street, N.W.

Washington, D.C. 20036
Telephone: (202) 551-1700
Facsimile: (202) 551-1705
igortimofeyev@paulhastings.com

*Attorneys for Plaintiffs Petróleos de Venezuela, S.A.
and PDVSA Petróleos, S.A.*