UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETRÓLEOS DE VENEZUELA, S.A., PDVSA
PETRÓLEO, S.A., and PDV HOLDING, INC.,

                    Plaintiffs,

              -v.-

MUFG UNION BANK, N.A. and GLAS
AMERICAS LLC,

                    Defendants.

19 Civ. 10023 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

       For more than five years, Plaintiffs have tried to escape the consequences

of defaulting on bonds that were issued in October 2016 (the "2020 Notes")

following a bond swap transaction (the "Exchange Offer").  In service of these

efforts, Plaintiffs have sought a declaratory judgment that the 2020 Notes, as

well as the Indenture, Pledge Agreement, and Guaranty attached to them

(collectively, the "Governing Documents"), were not validly issued under

Venezuelan law.  Plaintiff Petróleos de Venezuela, S.A. ("PDVSA") issued the

bonds, which were guaranteed by Plaintiff PDVSA Petróleo, S.A. ("PDVSA

Petróleo"), and which were secured by a pledge of 50.1% of the equity in CITGO

Holding by Plaintiff PDV Holding, Inc. ("PDVH").

       In October 2020, this Court determined that New York law governed the

validity of the bonds and granted summary judgment in favor of Defendants

MUFG Union Bank, N.A. ("MUFG"), the trustee for the 2020 Notes, and GLAS

Americas LLC ("GLAS"), the collateral agent for the 2020 Notes.  After several

additional years of litigation, the New York Court of Appeals determined that

Venezuelan law, rather than New York law, governed the validity of the 2020 Notes. Accordingly, the Second Circuit remanded the action to this Court to consider whether the 2020 Notes and the Governing Documents were valid under Venezuelan law.

Approximately five years after it issued its initial Opinion in this action, this Court interprets and applies Venezuelan law and concludes that the 2020 Notes and the Governing Documents were and are valid. Plaintiffs argue that the 2020 Notes and the Governing Documents are void *ab initio* because they are national public interest contracts that must be authorized by the Venezuelan National Assembly, but were not. The Bolivarian Republic of Venezuela (the "Republic"), appearing as *amicus curiae*, concurs. However, after an exhaustive review of Venezuelan law, this Court agrees with Defendants and interprets that law to require that the Republic itself, rather than a state-owned enterprise such as PDVSA, must be party to any national public interest contract. Furthermore, the Court finds that the act of state doctrine, which bars courts from invalidating the official acts of foreign sovereigns, does not apply to the official acts of the National Assembly, which is the legitimate sovereign of Venezuela in the eyes of the United States. Having so concluded, the Court denies Plaintiffs' motion for summary judgment, and grants in part Defendants' cross-motion for summary judgment.

# BACKGROUND[1]

## A.    Factual Background

The Court assumes familiarity with the factual background of this case

leading up to the issuance of its 2020 decision, and incorporates by reference

---

[1]    The facts set forth in this Opinion are drawn from Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Summary Judgment ("Pl. Opp. 56.1" (Dkt. #153)); Defendants and Counterclaim Plaintiffs' Response to Plaintiffs and Counterclaim Defendants' Rule 56.1 Statement of Undisputed Facts and Rule 56.1 Counterstatement of Additional Material Undisputed Facts ("Def. Opp. 56.1" (Dkt. #156)); Plaintiffs' Response to Defendants' Supplemental Local Rule 56.1 Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Summary Judgment ("Pl. Supp. Opp. 56.1" (Dkt. #364)); Defendants and Counterclaim Plaintiffs' Response to Plaintiffs and Counterclaim Defendants' Rule 56.1 Supplemental Statement of Undisputed Facts ("Def. Supp. Opp. 56.1" (Dkt. #360); exhibits attached to the Declaration of James R. Bliss in Support of Plaintiffs' Motion for Summary Judgment ("Bliss Decl., Ex. [ ]" (Dkt. #106)); exhibits attached to the Declaration of Christopher J. Clark in Support of Defendants and Counterclaim Plaintiffs' Motion for Summary Judgment ("First Clark Decl., Ex. [ ]" (Dkt. #87, 93)); exhibits attached to the Declaration of James R. Bliss in Opposition to Defendants' Motion for Summary Judgment ("Bliss Opp. Decl., Ex. [ ]" (Dkt. #157)); exhibits attached to the Declaration of Christopher J. Clark in Support of Defendants and Counterclaim Plaintiffs' Motion for Summary Judgment ("Second Clark Decl., Ex. [ ]" (Dkt. #334)); exhibits attached to the Declaration of Kristin Bender in Support of Plaintiffs' Motion for Summary Judgment ("Bender Decl., Ex. [ ]" (Dkt. #339)); exhibits attached to the Declaration of James. L. Ferguson dated January 22, 2025 ("First Ferguson Decl., Ex. [ ]" (Dkt. #349)); exhibits attached to the Declaration of James L. Ferguson dated March 18, 2025 ("Second Ferguson Decl., Ex. [ ]" (Dkt. #368)); and the exhibits attached to the Declaration of James L. Ferguson dated March 19, 2025 ("Third Ferguson Decl., Ex. [ ]" (Dkt. #370)).  At times, the Courts refers to documents that have been submitted multiple times by a single citation.

In its analysis of issues of Venezuelan law, the Court has considered, pursuant to Federal Rule of Civil Procedure 44.1, the Letter from Carlos Vecchio, Ambassador of the Bolivarian Republic of Venezuela to the United States of America ("Vecchio Letter" (Dkt. #80)); the Expert Report of Allan R. Brewer-Carías ("Brewer Rep." (Dkt. #96-1)); the Expert Report of Allan R. Brewer-Carías Rebutting the Report of Defendants' Expert ("Brewer Rebuttal Rep." (Dkt. #96-2)); the Declaration of Allan R. Brewer-Carías in Opposition to Defendants' Motion for Summary Judgment ("Brewer Opp. Decl." (Dkt. #154)); the Reply Declaration of Allan R. Brewer-Carías in Support of Plaintiffs' Summary Judgment Motion ("Brewer Reply Decl." (Dkt. #186)); the Opening Supplemental Declaration of Allan R. Brewer-Carías in Support of Plaintiffs' Summary Judgment Motion ("Brewer Supp. Decl." (Dkt. #340)); the Declaration of Freddy Guevara ("Guevara Decl." (Dkt. #341)); the Legal Expert Report by José Araujo-Juárez ("Araujo Rep." (Dkt. #342-1)); the Supplemental Declaration of José Araujo-Juárez ("Araujo Supp. Decl." (Dkt. #358)); the Legal Expert Report by José Araujo-Juárez Refuting Roe's First Statement of January 17, 2025 ("Araujo Rebuttal Rep." (Dkt. #365-1)); the Rebuttal Expert Declaration of Allan R. Brewer-Carías ("Brewer Supp. Rebuttal Decl." (Dkt. #366)); the Expert Report of Defendants' Expert ("Doe Rep." (Dkt. #84-2)); the Rebuttal Expert Report of Defendants' Expert in Response to the Expert Report of Allan

the factual background set forth therein. *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257, 261-67 (S.D.N.Y. 2020) ("*PDVSA I*"). Nevertheless, to provide context for its legal analysis, the Court reviews here the relevant factual background and any relevant factual developments since the Court's *PDVSA I* decision.

---

R. Brewer-Carías ("Doe Rebuttal Rep." (Dkt. #84-3)); the Supplemental Declaration of Defendants' Expert ("Doe Supp. Decl." (Dkt. #152)); the Third Declaration of Defendants' Expert ("Doe Third Decl." (Dkt. #179)); the Declaration of Defendants' Expert ("Doe Decl." (Dkt. #335)); the Declaration of Defendants' New Expert ("Roe Decl." (Dkt. #336)); and the Reply Declaration of Defendants' New Expert ("Roe Reply Decl." (Dkt. #361)). Due to the possibility of harm to Defendants' experts should their identities be publicly disclosed, the Court does not refer to them by name in this Opinion. (*See* Dkt. #207, 355. The Court has also considered the 2020 Statement of Interest of the United States of America and its attached exhibit ("2020 Statement of Interest" or "2020 SOI" (Dkt. #213)), and the 2025 Statement of Interest of the United States of America and its attached exhibit ("2025 Statement of Interest" or "2025 SOI" (Dkt. #393)), in connection with the Court's discussion of the act of state doctrine.

For ease of reference, the Court refers to Plaintiffs' opening brief as "Pl. Br." (Dkt. #95); to Defendants' opening brief as "Def. Br." (Dkt. #99); to Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #159); to Defendants' opposition brief as "Def. Opp." (Dkt. #158); to Plaintiffs' reply brief as "Pl. Reply" (Dkt. #185); to Defendants' reply brief as "Def. Reply" (Dkt. #182); to Plaintiffs' supplemental brief as "Pl. Supp. Br." (Dkt. #346); to Defendants' supplemental brief as "Def. Supp. Br." (Dkt. #337); to Plaintiffs' supplemental response brief as "Pl. Supp. Opp." (Dkt. #367); to Defendants' supplemental response brief as "Def. Supp. Opp." (Dkt. #363); and to the *amicus curiae* brief of the Bolivarian Republic of Venezuela as "Republic Br." (Dkt. #326-1). Additionally, the Court refers to the transcript of the September 25, 2020 oral argument as "Sept. 25, 2020 Tr." (Dkt. #246).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where a fact stated in the Rule 56.1 Statement is supported by evidence, the Court finds that fact to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by citation to evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c).").

4

### 1.    The Parties

Plaintiffs are three corporate entities connected to Venezuela's state-owned oil company.  Plaintiff PDVSA, of which Venezuela is the sole shareholder, is an oil and natural gas company incorporated in Venezuela that can enter into contracts and is managed by a board of directors.  (Pl. Opp. 56.1 ¶¶ 3-5, 7-10).  Plaintiff PDVSA Petróleo, another entity incorporated in Venezuela, is a wholly owned subsidiary of PDVSA.  (*Id.* ¶¶ 13-14).  Plaintiff PDVH, also a wholly owned subsidiary of PDVSA, is incorporated in Delaware and has its principal place of business in Houston, Texas.  (*Id.* ¶¶ 15-16).  PDVH owns CITGO, another Delaware corporation that is based in Houston, whose subsidiary CITGO Petroleum owns and operates three large refineries in the United States.  (*Id.* ¶¶ 20-26).

Defendant MUFG is a U.S. national banking association with offices in New York, New York, and it is the trustee for the 2020 Notes.  (Def. Opp. 56.1 ¶¶ 19-20).  Defendant GLAS is a New York limited liability company with offices in New York New York, and it is the collateral agent for the 2020 Notes.  (*Id.* ¶¶ 27-28; Pl. Opp. 56.1 ¶¶ 32-33).

### 2.    Relevant Venezuelan Constitutional Provisions

This Opinion focuses heavily on interpreting and applying several provisions of the 1999 Constitution of the Republic of Venezuela, including in particular Articles 150, 187(9), and 335.  (*See* Bliss Decl., Ex. 4 (the "Venezuelan Constitution" or "Venezuelan Const.")).  Although they are quoted

throughout the Opinion, the Court collects the three provisions here.  Article

150 of the Venezuelan Constitution provides:

> The execution of national public interest contracts shall
> require the approval of the National Assembly in those
> cases in which such requirement is determined by law.
> No municipal, state[,] or national public interest
> contract shall be executed with foreign States or official
> entities, or with companies not domiciled in Venezuela,
> or shall be transferred to any of them without the
> approval of the National Assembly.

Venezuelan Const., art. 150.  Section 9 of Article 187 of the Venezuelan

Constitution provides:

> It is the role of the National Assembly to: … Authorize
> the National Executive to enter into contracts of
> national interest, in the cases established by law.
> Authorize contracts of municipal, state[,] and national
> public interest, with States or official foreign entities or
> with companies not domiciled in Venezuela.

*Id.*, art. 187(9).  And Article 335 of the Venezuelan Constitution provides:

> The Supreme Court of Justice shall ensure the
> supremacy and effectiveness of constitutional rules and
> principles; it will be the ultimate and last interpreter of
> this Constitution and will ensure its uniform
> interpretation and application.  The interpretations
> established by the Constitutional Chamber on the
> content or scope of constitutional rules and principles
> are binding on the other Chambers of the Supreme
> Court of Justice and other courts of the Republic.

*Id.*, art. 335.  Other provisions of the Venezuelan Constitution, as well as

certain Venezuelan statutes, are discussed as appropriate throughout this

Opinion.

### 3.    The Exchange Offer

In April 2007, October 2010, and January 2011, PDVSA issued $9.15 billion in notes scheduled to come due in 2017 (the "2017 Notes").  (Pl. Opp. 56.1 ¶¶ 39, 41).  As of September 16, 2016, the 2017 Notes had an aggregate outstanding principal balance of $7.1 billion, plus $506 million in interest payments due at various times in 2016 and 2017.  (*Id.* ¶¶ 64-65).  During the relevant portion of 2016, Nicolás Maduro was the recognized President of Venezuela.  (*Id.* ¶ 66).  After a coalition of opposition parties won control of Venezuela's National Assembly in December 2015 (*id.* ¶ 72), on May 26, 2016, the National Assembly passed a resolution (the "May 2016 Resolution") (Def. Opp. 56.1 ¶ 60; Bliss Decl., Ex. 13), which states in relevant part:

(i)     "[i]n relation to contracts of national … public interest concluded by and between the National Executive and … companies not domiciled in Venezuela, the Constitution categorically mandates, without exception, the approval of the National Assembly";

(ii)    "[t]he control mechanisms of the National Assembly on the contracts of public interest concluded by the National Executive include its approval, as a condition of the validity of the contract"; and

(iii)   this "responsibility of the National Assembly … cannot be waived, transferred, [or] extended[,] and it cannot be relaxed by conventions, decrees[,] or other legal acts"

(Def. Opp. 56.1 ¶ 61).  The May 2016 Resolution also "warne[d] that any activity carried out by an organ that usurps the constitutional functions of another public authority is null and void and shall be considered non-existent," and "remind[ed] that the contracts of national … public interest concluded by and between the National Executive and … companies not domiciled in

7

Venezuela, without the approval of the National Assembly; as well as other contracts of national public interest that it signs without this approval outside of the cases excepted by law, shall be null and void in their entirety." (*Id.* ¶ 62).

On September 16, 2016, the bond swap transaction known as the Exchange Offer was announced. (*See* Pl. Opp. 56.1 ¶ 64). Under the Exchange Offer, holders of the 2017 Notes could tender their Notes in exchange for a certain amount of 2020 Notes. (*Id.* ¶¶ 116-118). The 2020 Notes were secured by PDVH's pledge of 50.1% of the equity in CITGO, as memorialized in the Pledge Agreement executed among PDVH, as pledgor; PDVSA, as issuer; PDVSA Petróleo, as guarantor; GLAS, as collateral agent; and MUFG, as trustee. (*Id.* ¶¶ 115, 168). The collateral is held as a physical stock certificate by GLAS in a vault in New York. (*Id.* ¶ 176). PDVSA (the issuer) and PDVSA Petróleo (the guarantor) are based in Venezuela, while all other parties to the Exchange Offer are based in the United States. (*Id.* ¶¶ 3-4, 13-16, 31-32; Def. Opp. 56.1 ¶ 19). The paying agent, transfer agent, and registrar for the Indenture component of the Governing Documents is based in New York, and so is the depository for the Indenture. (Pl. Opp. 56.1 ¶¶ 188-189, 191). The 2020 Notes were deposited in New York; 2017 Note holders were required to tender their Notes through New York; and the 2020 Notes were registered in the name of a New York general partnership. (*Id.* ¶¶ 188-194).

On September 27, 2016, the National Assembly passed a resolution (the "September 2016 Resolution") observing that the Exchange Offer required PDVSA to "offer 50.1% of its position in the subsidiary company [CITGO] as

collateral," and stating that "Article 187 of the Constitution empowers the National Assembly to exercise control functions … , with the power to obtain information about the financial statements and details of any transition that commits PDVSA's assets as collateral."  (Def. Opp. 56.1 ¶¶ 63-64; First Clark Decl., Ex. 44).  The Resolution also announced that the National Assembly "reject[ed] categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO … are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation," and "urge[d] the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with article[ ] 187, section 9 … of the Constitution."  (*Id.* ¶ 65).

After the Exchange Offer expired on October 21, 2016, holders representing 39.43% of the aggregate principal amount outstanding under the 2017 Notes had accepted the Offer.  (Pl. Opp. 56.1 ¶ 164).  The Governing Documents were executed on October 27, 2016, and October 28, 2016, and the 2020 Notes were issued on October 28, 2016.  (*Id.* ¶¶ 165, 167-168).

### 4.    Events Following the Exchange Offer

PDVSA made required payments on the 2020 Notes in 2017, 2018, and part of 2019.  (Pl. Opp. 56.1 ¶¶ 214, 216).  But things changed following the re-election of Nicolás Maduro in an election that the United States called neither free nor fair, and which led to the National Assembly's declaration of its president, Juan Guaidó, as Interim President of Venezuela.  (Def. Opp. 56.1 ¶¶ 116-117).  On January 23, 2019, President Trump declared the Maduro

regime illegitimate, recognized Mr. Guaidó as the Interim President of Venezuela, and recognized the National Assembly as the "only legitimate branch of government duly elected by the Venezuelan people." (*Id.* ¶ 118). On February 5, 2019, enabled by the National Assembly, Mr. Guaidó appointed a new, *ad hoc* board of directors for PDVSA, which in turn appointed new boards for PDVSA Petróleo and PDVH. (*Id.* ¶¶ 15-16, 18).

On October 15, 2019, the National Assembly passed another resolution (the "October 2019 Resolution"). (Def. Opp. 56.1 ¶ 69; First Clark Decl., Ex. 50). The October 2019 Resolution states that the National Assembly had, in the September 2016 Resolution, "rejected the collateral of 50.1% of the shares in [CITGO]" (Def. Opp. 56.1 ¶ 69); it further notes that, "following the investigations conducted in coordination with the Office of the Special Prosecutor, it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution" (*id.* ¶ 70), and "that the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national interest public contract, executed with foreign companies, which was not authorized by the National Assembly" (*id.* ¶ 71).

On October 27, 2019, PDVSA defaulted when it failed to make its scheduled principal and interest payments. (Pl. Opp. 56.1 ¶¶ 259-262). If the Governing Documents are valid and enforceable, Defendants may be able to

exercise their right to the sale or purchase of 50.1% of equity in CITGO.  (*Id.* ¶ 268).

### 5.    Events Since *PDVSA I*

Since January 5, 2019, the United States has in some form or another recognized the 2015 National Assembly as the government of Venezuela.  (Def. Supp. Opp. 56.1 ¶ 6; 2025 SOI 1).  In December 2020, legislative elections were held for the National Assembly, but these elections were viewed by the 2015 National Assembly as a "sham."  (Pl. Supp. Opp. 56.1 ¶¶ 568-569).  Maduro-aligned legislators claimed victory, and the United States also denounced these elections as a sham.  (*Id.* ¶¶ 570-571).  In January 2022, the United States declared its continued recognition of the 2015 National Assembly as the "last remaining democratic institution" in Venezuela.  (*Id.* ¶ 577).  It did so again in January 2023.  (*Id.* ¶ 579).  Mr. Maduro was re-elected president in July 2024 in a disputed election that international observers have said did not meet international standards.  (Def. Supp. Opp. 56.1 ¶¶ 8-10).  The United States has recognized opposition candidate Edmundo González Urrutia as the legitimate winner of the July 2024 election.  (*Id.* ¶ 12; 2025 SOI 2).

### B.    Procedural Background

### 1.    The *PDVSA I* Decision and Its Appeal

The Court incorporates by reference the procedural background set forth in its *PDVSA I* decision, which was issued on October 16, 2020.  (Dkt. #215). *See* 495 F. Supp. 3d at 267-69.  In *PDVSA I*, the Court granted in part and denied in part Defendants' motion for summary judgment; denied Plaintiffs'

cross-motion for summary judgment; and granted Defendants' motion to exclude the expert testimony and reports of David Hinman.  *Id.* at 293.  More specifically, the Court

> declare[d] that the 2020 Notes and the Governing Documents are valid and enforceable; that a default has occurred under the terms of the Indenture; that Defendants are permitted to exercise the remedies for default set forth in the Indenture and the Pledge Agreement; that MUFG, as trustee, is entitled to direct GLAS to sell the collateral securing the 2020 Notes; and that GLAS is entitled to so sell.

*Id.*  The Court also found that MUFG was entitled to a judgment in the amount of $1,683,764,500, plus interest, and that Plaintiffs PDVSA and PDVSA Petróleo were liable for fees, disbursements, and expenses, including reasonable attorneys' fees, in an amount to be determined later.  *Id.*  In so concluding, the Court determined that the act of state doctrine did not apply, *id.* at 270-83, and that New York law, rather than Venezuelan law, governed the Court's analysis of the parties' claims under Section 8-110 of New York's Uniform Commercial Code, which provides that the "local law of the issuer's jurisdiction … governs … the validity of a security," *id.* at 283-91 (quoting N.Y. U.C.C. § 8-110(a)(1)).

Plaintiffs filed a protective notice of appeal on November 12, 2020.  (Dkt. #217).  The Court entered a protective order on November 24, 2020.  (Dkt. #219).  Defendants moved for entry of judgment on November 30, 2020.  (Dkt. #222-227).  Final Judgment was entered on December 1, 2020.  (Dkt. #228, 229).  On December 8, 2020, the Court deferred consideration of any fee

petition pending the outcome of Plaintiffs' appeal.  (Dkt. #231).  Plaintiffs filed a notice of appeal from the judgment on December 11, 2020.  (Dkt. #232).

On December 11, 2020, Plaintiff PDVH moved for a partial stay of the execution of enforcement of the Court's December 1, 2020 Final Judgment during the pendency of the appeal.  (Dkt. #233-235).  The Court directed the parties to submit briefing on an expedited timeline.  (Dkt. #236).  Accordingly, Defendants filed their opposition papers on December 18, 2020 (Dkt. #237-238), and Plaintiff PDVH filed its reply brief on December 22, 2020 (Dkt. #239).  On December 29, 2020, the Court granted PDVH's motion; in so doing, the Court stayed execution through the issuance of a mandate.  (Dkt. #241).

Two and a half years later, on June 28, 2023, Defendants moved for an order modifying the partial stay of execution of enforcement.  (Dkt. #252-255).  On June 30, 2023, the Court granted Plaintiff PDVH's request for additional time to respond to Defendants' motion.  (Dkt. #256, 259).[2]  The Court granted another such request on July 18, 2023.  (Dkt. #265, 266).  On August 16, 2023, Plaintiff PDVH filed a memorandum of law and other supporting documents in opposition to Defendants' motion for an order modifying the partial stay.  (Dkt. #273-275).  After the Court granted requests for an extension of the filing deadline and for leave to file excess pages (Dkt. #276-279), Defendants filed a reply brief along with supporting documents on September 8, 2023 (Dkt. #280-281).

---

[2]    On July 5, 2023, a third party, VR Global Partners, L.P., moved to have the Court accept another matter as related.  (Dkt. #260-261).  The Court denied this request on July 6, 2023.  (Dkt. #262).

On September 19, 2023, Defendants filed a letter regarding an investor presentation in further support of their motion to modify the partial stay. (Dkt. #282). On September 21, 2023, PDVH filed a letter in response, maintaining its opposition to the motion to modify the partial stay. (Dkt. #283-284). The parties continued to discuss the relevance of this investor presentation and the motion to modify the partial stay in letters filed between September 29, 2023, and December 12, 2023, on which date the parties asked the Court to refrain from deciding the motion while they discussed a possible resolution. (Dkt. #292-300). On May 9, 2024, Defendants requested that the Court rule on the motion and modify the stay order. (Dkt. #303). On May 14, 2024, Plaintiffs filed a letter in opposition. (Dkt. #304). The parties' back-and-forth continued in subsequent letters filed over the course of several weeks. (Dkt. #305-308).

On July 3, 2024, the Second Circuit issued a decision vacating this Court's judgment and remanding for further consideration. (Dkt. #309). *Petróleos De Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 106 F.4th 263 (2d Cir. 2024) ("*PDVSA IV*"). *PDVSA IV* followed the Second Circuit's decision to certify questions of New York law to the New York Court of Appeals, the Court of Appeals' acceptance of the certification, and its responsive decision. Given the significance of these other decisions to this Court's analysis, the Court summarizes them in the next section.

### 2. The Certification to the New York Court of Appeals

On October 13, 2022, the Second Circuit decided to defer decision on Plaintiffs' appeal and certify questions of New York law to the New York Court

14

of Appeals. *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 51 F.4th 456, 474-75 (2d Cir. 2022) ("*PDVSA II*"). Specifically, the Second Circuit in *PDVSA II* certified the following three questions to the Court of Appeals:

> 1. Given PDVSA's argument that the Governing Documents are invalid and unenforceable for lack of approval by the National Assembly, does New York Uniform Commercial Code section 8-110(a)(1) require that the validity of the Governing Documents be determined under the Law of Venezuela, "the local law of the issuer's jurisdiction"?
>
> 2. Does any principle of New York common law require that a New York court apply Venezuelan substantive law rather than New York substantive law in determining the validity of the Governing Documents?
>
> 3. Are the Governing Documents valid under New York law, notwithstanding the PDV Entities' arguments regarding Venezuelan law?

*Id.* at 475-76. The Court of Appeals accepted certification on November 22, 2022. *Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 39 N.Y.3d 960 (2022).

On February 20, 2024, the Court of Appeals answered the first certified question, which obviated the need to answer the second and third questions. *See Petróleos de Venezuela S.A.* v. *MUFG Union Bank, N.A.*, 41 N.Y.3d 462, 473-74 (2024) ("*PDVSA III*"). It began by reformulating the first question to the following effect:

> Given the presence of New York choice-of-law clauses in the Governing Documents, does UCC 8-110(a)(1), which provides that the validity of securities is determined by the local law of the issuer's jurisdiction, require the application of Venezuela's law to determine whether the

> 2020 Notes are invalid due to a defect in the process by
> which the securities were issued?

*Id.* at 473.  The Court of Appeals answered in the affirmative, finding in

particular that

> [m]atters going to the "validity of [the] security" at issue
> here, that is the 2020 Notes, are governed by the law of
> Venezuela — i.e., "the local law of the issuer's
> jurisdiction" under UCC 8-110(a)(1).    Plaintiffs'
> argument that the 2020 Notes are invalid — because
> their issuance contravened constitutional provisions
> requiring National Assembly approval to issue the
> securities — falls within the scope of "validity" as that
> term is used in UCC 8-110.

*Id.* at 473-74 (second alteration in original).

The Court of Appeals emphasized that "it is important to distinguish

carefully between the validity of a security issued by a Venezuelan entity,

which is governed by Venezuelan law, and all other issues that remain

governed by New York law." *PDVSA III*, 41 N.Y.3d at 476.  In this context,

"'validity' under UCC 8-110 is a limited term that bears only on the process by

which a security is properly issued."  *Id.*  The Court concluded that

"determining whether the securities issued by these Venezuelan entities are

valid requires analysis of Article 150 and related provisions of the Venezuelan

Constitution."  *Id.* at 477.  Under UCC § 8-110, these provisions of the

Venezuelan Constitution are relevant to answering the narrow question

"whether a security issued by a foreign entity is valid when issued."  *Id.* at 482.

### 3. The Proceedings on Remand

In light of the Court of Appeals' decision that Venezuelan law governed the validity of the 2020 Notes and the Governing Documents, on July 3, 2024, the Second Circuit remanded the case back to this Court for further consideration. The Second Circuit noted that determinations of foreign law "frequently call for fact-like procedures that a district court is better situated to implement." *PDVSA IV*, 106 F.4th at 269 (quoting *Bugliotti* v. *Republic of Argentina*, 952 F.3d 410, 414 (2d Cir. 2020) ("*Bugliotti I*")). Remand was appropriate given that this Court had already received briefing on the Venezuelan law issues, solicited the views of the United States, and heard oral argument on Venezuelan law. *Id.* The Second Circuit emphasized the Court's "broad flexibility" on remand to order supplemental briefing. *Id.* at 270.

Following remand, on July 15 and 18, 2024, the parties filed competing letters regarding how the Court should proceed. (Dkt. #310, 311). On July 19, 2024, the Court denied as moot Defendants' motion for an order modifying the partial stay of execution of enforcement (*see* Dkt. #252), and ordered the parties to meet and confer and file a joint proposal regarding next steps (Dkt. #312).

After the Court granted two extension requests (Dkt. #314-315, 317-318), the parties filed a letter on August 16, 2024, containing a joint proposal, as well as the parties' respective positions (Dkt. #319). On August 20, 2024, the Court adopted the parties' joint proposal on supplemental briefing. (Dkt. #320). The parties proposed to file simultaneous supplemental briefs and

response briefs addressing (i) whether the issuance of the 2020 Notes and the associated guaranty and pledge of collateral were valid under Venezuelan law; (ii) the act of state doctrine in the Second Circuit; and (iii) any relevant factual or legal developments since September 2020.  (Dkt. #319 at 2).  The parties also agreed that all other issues, including the effect of any invalidity of the Governing Documents under New York law, and the counterclaims asserted by Defendants, would be deferred until a later stage of this proceeding.  (*Id.*).  In adopting the parties' joint proposal, the Court set a briefing schedule and directed the parties to provide expert declarations in connection with their supplemental briefing.  (Dkt. #320).

On January 15, 2025, the Republic moved for leave to file an *amicus curiae* brief.  (Dkt. #326).  The Court granted this request on January 16, 2025.  (Dkt. #327).

On January 17, 2025, Defendants filed their opening supplemental submissions, including a supplemental Local Rule 56.1 Statement (Dkt. #333); the Declaration of Christopher J. Clark and the exhibits attached thereto (Dkt. #334); the Declaration of Professor Doe (Dkt. #335); the Declaration of Dr. Roe and the exhibits attached thereto (Dkt. #336); and Defendants' supplemental memorandum of law in further support of Defendants' motion for summary judgment (Dkt. #337).  Also on January 17, 2025, Plaintiffs filed a supplemental Local Rule 56.1 Statement (Dkt. #338); the Declaration of Kristin Bender and the exhibits attached thereto (Dkt. #339); the Declaration of Professor Allan R. Brewer-Carías (Dkt. #340); the Declaration of Freddy

18

Guevara (Dkt. #341); the Declaration of Professor José Araujo-Juárez (Dkt. #342) and his report (Dkt. #342-1); and Plaintiffs' supplemental memorandum of law in support of their motion for summary judgment (Dkt. #343).  On January 22, 2025, Plaintiffs filed a corrected version of their supplemental brief (Dkt. #346) and a notice of non-substantive corrections made to it (Dkt. #345).  Also on January 22, 2025, Defendants filed a partially redacted version of their supplemental brief (Dkt. #347); a partially redacted version of Dr. Roe's Declaration (Dkt. #348); and the Declaration of James L. Ferguson and the exhibits attached thereto (Dkt. #349).

On February 28, 2025, Plaintiffs filed letter motion to compel Defendants to publicly disclose the name of their new expert.  (Dkt. #351).  Defendants opposed this request in a letter filed on March 5, 2025.  (Dkt. #354).  On March 6, 2025, the Court denied Plaintiffs' motion, finding that Defendants had shown that redacting their new expert's name served an interest in the safety of the expert and the expert's family.  (Dkt. #355).

On March 12, 2025, Plaintiffs' expert Professor Araujo filed a supplemental declaration.  (Dkt. #358).  On March 18, 2025, Defendants filed a response to Plaintiffs' supplemental Rule 56.1 statement (Dkt. #360); the Declaration of Dr. Roe in reply (Dkt. #361); a partially redacted version of the same, with exhibits attached thereto (Dkt. #362); and Defendants' memorandum of law in response to Plaintiffs' supplemental memorandum of law (Dkt. #363).  Also on March 18, 2025, Plaintiffs filed a counter-statement in response to Defendants' supplemental Rule 56.1 statement (Dkt. #364); the

Declaration of Professor Araujo in reply (Dkt. #365), as well as his rebuttal expert report (Dkt. #365-1); the Declaration of Professor Brewer in rebuttal (Dkt. #366); and Plaintiffs' memorandum of law in response to Defendants' supplemental memorandum of law (Dkt. #367). On March 19 and 20, 2025, Plaintiffs submitted two additional Declarations of James L. Ferguson, with exhibits attached thereto. (Dkt. #368, 370). On March 21, 2025, Plaintiffs filed partially redacted versions of the rebuttal submissions of Professors Araujo and Brewer, as well as a partially redacted version of their supplemental response brief. (Dkt. #371-373).

On March 31, 2025, Plaintiffs filed a letter seeking expedited consideration of and decision on the parties' cross-motions for summary judgment in light of developments in the related *Crystallex* case in the United States District Court for the District of Delaware. (Dkt. #376). On April 3, 2025, Defendants filed a letter opposing this request. (Dkt. #377). The Court denied Plaintiffs' request on April 4, 2025. (Dkt. #378). On June 24, 2025, Defendants filed a letter seeking a conference to address developments in the *Crystallex* matter and, if necessary, to set a schedule for a motion for a preliminary injunction. (Dkt. #380). The next day, Plaintiffs filed a letter opposing this request and urging instead that the Court decide the pending summary judgment motions expeditiously. (Dkt. #381). On June 30, 2025, the Court granted Defendants' request for a conference and scheduled a telephonic conference for July 10, 2025. (Dkt. #383). In advance of this conference, Defendants and Plaintiffs submitted letters detailing their

respective positions on the need for and scope of preliminary injunctive relief. (Dkt. #384, 386).

The conference on the *Crystallex* litigation was held on July 10, 2025. (July 10, 2025 Minute Entry).  Having received the parties' consent to speak with the Honorable Leonard P. Stark, the judge presiding over that litigation, the Court spoke with Judge Stark by telephone on July 12, 2025, and on July 17, 2025, the Court denied without prejudice Defendants' request to schedule briefing on a preliminary injunction motion.  (Dkt. #390).  The Court concluded that it was unnecessary to schedule briefing for such a motion because it was not clear that the decisions of this Court and Judge Stark would be issued on conflicting time frames.  (*Id.*).  In addition, the Court ordered the Government (which did not attend the July 10, 2025 conference) to file a letter stating its position on the pending cross-motions for summary judgment on or before July 31, 2025.  (*Id.*).

On July 28, 2025, the Government filed a letter seeking additional time to file either (i) a statement of interest expressing the position of the United States on the pending-cross motions or (ii) a letter advising the Court that it did not intend to file such a statement of interest.  (Dkt. #391).  The Government noted that it had previously filed a statement of interest in this matter.  (*Id.* (citing 2020 SOI)).  On July 28, 2025, the Court granted in part this request, allowing the Government until August 29, 2025, to file its statement of interest or letter indicating that it would not be filing such a statement.  (Dkt. #392).  On August 29, 2025, the Government filed a

Statement of Interest (Dkt. #393), along with a letter from Ambassador Michael G. Kozak, Senior Bureau Official in the Bureau of Western Hemisphere Affairs in the U.S. Department of State (Dkt. #393-1).

On September 5, 2025, Defendants filed a letter regarding developments in the *Crystallex* litigation and implying that a decision on the pending cross-motions for summary judgment might not be necessary. (Dkt. #394). On September 8, 2025, Plaintiffs filed a letter in response, urging the Court to issue its decision by the end of September 2025, as the Court had previously indicated it would do. (Dkt. #395). On September 9, 2025, the Court advised the parties that it intended to issue its decision by the end of September 2025 and would take no further action. (Dkt. #396).

## DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Under Fed. R. Civ. P. 56

To succeed on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23 (1986). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno* v. *Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P.* v. *Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). And a fact is "material" if it "might affect the outcome of the suit under

the governing law." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

When considering whether the movant has met its burden to "show that no genuine factual dispute exists," a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). That said, the non-movant "may not rely on unsupported assertions, conjecture[,] or surmise" to manufacture factual disputes. *Balderramo* v. *Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207, 219 (S.D.N.Y. 2023) (citing *Goenaga* v. *March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)). Rather, to defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson*, 477 U.S. at 256-57).

### 2. Determining Foreign Law Under Fed. R. Civ. P. 44.1

Courts may consider a wide array of materials when determining issues of foreign law. According to Federal Rule of Civil Procedure 44.1:

> In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1. "Adopted in 1966, the Rule 'fundamentally changed the mode of determining foreign law in federal courts' from a common-law regime that treated the meaning of foreign law as a question of fact." *Bugliotti I*, 952 F.3d at 413 (quoting *Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co. Ltd.*,

585 U.S. 33, 42 (2018)).  "At the same time, however, Rule 44.1 preserves a district court's freedom to employ fact-like procedures" that "sometimes may be required to adjudicate foreign legal questions." *Id.*  Because determining foreign law "frequently call[s] for fact-like procedures that a district court is better situated to implement, considerations of judicial economy will occasionally lead [the Second Circuit] to remand rather than review a foreign legal question with which the district court did not, or did not fully, engage." *Id.* at 414.  Indeed, that is why the Second Circuit remanded the question of Venezuelan law at issue here.  *See PDVSA IV*, 106 F.4th at 269 (remanding in part because this Court received "excellent briefing and analysis from the parties and their respective experts on the intricacies of Venezuelan law" (quoting *PDVSA I*, 495 F. Supp. 3d at 292)).

District courts are "not limited to the materials submitted by the parties" and "should 'invoke the flexible provisions of Rule 44.1' [to] avoid a determination that rests 'simply on the basis of an inadequate submission by one party.'" *Bugliotti I*, 952 F.3d at 414 (quoting *Curley* v. *AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998)).  "The district court's task, in other words, is to arrive at an independent interpretation of the governing [foreign] law, aided by the most persuasive (or, as the case may be, authoritative) materials available to it." *Id.* Courts may rely on decisions of foreign courts, which "may be preferable to any of the materials proffered." *Id.*  Indeed, when determining foreign law, courts frequently evaluate the text of foreign case law and statutes in connection with the submissions of the experts on foreign law proffered by the litigants.  *See,*

*e.g.*, *Bugliotti* v. *Republic of Argentina*, No. 17 Civ. 9934 (LAP), 2021 WL
1225971, at *8 (S.D.N.Y. Mar. 31, 2021) ("*Bugliotti II*") (evaluating proffered
experts' views on Argentine Supreme Court cases), *aff'd*, 67 F.4th 102 (2d Cir.
2023).  But, as courts are not bound by the testimony of foreign law experts,
they are free to "place[ ] little or no credence in their opinions when not
supported adequately or when the views were offered in too partisan a fashion."
9A Wright & Miller's Federal Practice and Procedure § 2444 (3d ed. 2008).  *See,*
*e.g.*, *Wamai* v. *Indus. Bank of Korea*, No. 21-1956-cv, 2023 WL 2395675, at *3
(2d Cir. Mar. 8, 2023) (summary order) (finding that the "district court made no
error of law in assessing Korea's treatment of sovereign immunity" where,
though the Korean courts were split on the relevant issue, the district court
"correctly evaluated the competing expert declarations and found" the
defendant's proffered experts more convincing), *cert. denied*, 144 S. Ct. 552
(2024).

### 3. Law of the Case

"Under the law-of-the-case doctrine, 'a decision on an issue of law
becomes binding precedent in subsequent stages of the same litigation.'"
*Absolute Resols. Invs., LLC* v. *Citibank, N.A.*, No. 22 Civ. 2079 (VM), 2024 WL
325110, at *10 (S.D.N.Y. Jan. 29, 2024) (quoting *Weslowski* v. *Zugibe*, 96 F.
Supp. 3d 308, 316-17 (S.D.N.Y. 2015)).  The doctrine effectively "forecloses re-
litigation of issues expressly or impliedly decided by the [ ] court."  *In re Shanda*
*Games Ltd. Sec. Litig.*, No. 18 Civ. 2463 (ALC), 2022 WL 992794, at *3 (S.D.N.Y.
Mar. 31, 2022) (alteration in original) (quoting *United States* v. *Quintieri*, 306

F.3d 1217, 1229 (2d Cir. 2002)), *aff'd in part, vacated in part, and remanded on other grounds*, 128 F.4th 26 (2d Cir. 2025).  The law of the case doctrine is discretionary and generally "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons." *In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (internal quotation marks omitted) (citing *Ali* v. *Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008)).

Reasons to "depart from the law of the case and reconsider [an] issue" may include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Gulino* v. *Bd. of Educ. of N.Y.C. Sch. Dist. of City of N.Y.*, 555 F. App'x 37, 40 (2d Cir. 2014) (summary order) (internal quotation marks omitted) (quoting *Quintieri*, 306 F.3d at 1230 (quoting *United States* v. *Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000))).  But, in general, "court[s] [are] 'loath[ ] to revisit an earlier decision in the absence of extraordinary circumstances.'"  *Perlman* v. *Gen. Elec.*, No. 22 Civ. 9823 (PAE), 2024 WL 664968, at *5 (S.D.N.Y. Feb. 16, 2024) (quoting *N. River Ins. Co.* v. *Phila. Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995)), *aff'd*, No. 24-514-cv, 2024 WL 4635235 (2d Cir. Oct. 31, 2024) (summary order).

## B.    The 2020 Notes and the Governing Documents Are Valid Under Venezuelan Law

Following the determination of the New York Court of Appeals that "[m]atters going to the validity of [the] security at issue here, that is the 2020 Notes, are governed by the law of Venezuela," *PDVSA III*, 41 N.Y.3d at 473 (second alteration in original) (internal quotation marks omitted), the Second

26

Circuit vacated this Court's *PDVSA I* judgment and remanded so that the Court could "in the first instance, determine whether the 2020 Notes and associated instruments were issued in violation of the Venezuelan Constitution and are thus invalid," *PDVSA IV*, 106 F.4th at 268. The parties then jointly proposed that this Court address whether the 2020 Notes and the Governing Documents were validly issued under Venezuelan law, as well as the continuing vitality of the Court's act of state doctrine analysis, while deferring until a later stage of this proceeding issues including "the effect under New York law of any alleged invalidity of the Governing Documents under Venezuelan law" and Defendants' counterclaims. (Dkt. #319 at 2). For the reasons discussed in the remainder of this section, the Court finds that the 2020 Notes and the associated Governing Documents were validly issued under Venezuelan law.[3]

---

[3]    At the outset, the Court rejects Defendants' alternative argument that Venezuelan law itself permits the application of the New York law to which the parties agreed. (*Cf.* Def. Supp. Br. 28-29). Defendants maintain that, "as defined by the U.C.C., the 'local law of the issuer's jurisdiction' is not necessarily the *substantive* law of that jurisdiction." (*Id.* at 29 (quoting N.Y. U.C.C. § 8-110(d))). "Rather, 'if permitted by the law of that jurisdiction,' the local law of the issuer's jurisdiction may be 'the law of another jurisdiction specified by the issuer.'" (*Id.* (quoting N.Y. U.C.C. § 8-110(d))). In other words, according to Defendants, "Venezuelan law itself permits the application of the New York law to which the parties agreed." (*Id.* (citing Doe Rep. ¶¶ 40-42; Roe Decl. ¶¶ 162-170)). To be sure, Defendants would benefit if the Court could find that, because the Governing Documents were valid under New York law, they were also valid under Venezuelan law, given that the Court previously held that the Governing Documents were valid and enforceable under New York law. *PDVSA I*, 495 F. Supp. 3d at 291. However, such a finding would contravene the Second Circuit's directive that this Court "determine whether the 2020 Notes and associated instruments were issued *in violation of the Venezuelan Constitution and are thus invalid.*" *PDVSA IV*, 106 F.4th at 268 (emphasis added). Moreover, in making this argument, Defendants maintain that disputes relating to contracts of national public interest may be decided by a foreign court under Article 151 of the Venezuelan Constitution, which — by Defendants' expert's own admission — is inapplicable because it only applies to national public interest contracts, which the Governing Documents are not. (Roe Decl. ¶¶ 164-167).

### 1. The Constitutional Chamber in *Andrés Velásquez* Set Forth a Binding Interpretation of the Venezuelan Constitution

Plaintiffs maintain that, because Venezuela is a civil law country, the Constitutional Chamber's decisions only have precedential weight when the Chamber expressly invokes its interpretive authority under Article 335 of the Venezuelan Constitution; otherwise, a Constitutional Chamber decision is but one of several authorities. (Pl. Supp. Br. 10-11). This position is particularly important to Plaintiffs because they further maintain that the Constitutional Chamber in the key case of *Andrés Velásquez* did not expressly invoke its Article 335 interpretive authority, and, in consequence, did not establish binding precedent. (*Id.* at 11).[4]

Before discussing what the Constitutional Chamber decided in *Andrés Velásquez,* and how the decision applies to the questions of Venezuelan law before the Court, the Court considers the antecedent issue of what level of authority it must accord a decision of the Constitutional Chamber — and, specifically, *Andrés Velásquez.* Ultimately, the Court finds that, because the Constitutional Chamber was proceeding under its Article 335 authority to establish binding interpretations of the Venezuelan Constitution in *Andrés*

---

[4]    Plaintiffs also dispute what precisely the Constitutional Chamber decided in *Andrés Velásquez,* and whether subsequent decisions and National Assembly resolutions contradict Defendants' reading of *Andrés Velásquez.* (Pl. Supp. Br. 11-16). As discussed later in this Opinion, after evaluating the text of the Venezuelan Constitution and the *Andrés Velásquez* decision, as well as the submissions of the parties' Venezuelan law experts, the Court finds that the Constitutional Chamber in *Andrés Velásquez* established a binding interpretation of Articles 150 and 187(9) of the Venezuelan Constitution that has not been modified by subsequent actions. Specifically, in *Andrés Velásquez,* the Constitutional Chamber established that, for a contract to be considered a "national public interest contract" within the meaning of these two articles, the Republic itself must be a party to the contract.

*Velásquez*, its interpretation of Articles 150 and 187(9) is authoritative under Venezuelan law.

*First*, Plaintiffs generally argue that because Venezuela is a civil law jurisdiction, judicial decisions are not binding and have only persuasive authority.  (Pl. Supp. Br. 10, 15-16).  It is true that, in civil law jurisdictions, judicial decisions are generally not considered binding authority.  *See, e.g.*, *Fin. One Pub. Co. Ltd.* v. *Lehman Bros. Spec. Fin., Inc.*, 414 F.3d 325, 343 (2d Cir. 2005) (describing Thailand as "a civil-law jurisdiction where judicial decisions in general are of only persuasive and not binding authority"); *Curley*, 153 F.3d at 14 (noting that the "primary source[s] of law" in a civil jurisdiction (specifically, Mexico) are not "precedent cases," but "the text of the constitution, civil code[,] and statutory provisions").  Indeed, Defendants' expert Dr. Roe agrees that, in civil law systems such as Venezuela's, "judicial decisions are not an authoritative, binding source of law with general (*erga omnes*) effects," and that, "in subsequent cases they are persuasive authority at most."  (Roe Decl. ¶ 29).

But Article 335 of the Venezuelan Constitution embodies an "important exception" to this general rule:  The Constitutional Chamber of the Venezuelan Supreme Tribunal of Justice can establish binding interpretations of the Venezuelan Constitution.  (Roe Decl. ¶ 30).  Article 335 provides that:

> The Supreme Court of Justice shall ensure the supremacy and effectiveness of constitutional rules and principles; it will be the ultimate and last interpreter of this Constitution and will ensure its uniform interpretation and application.  The interpretations

> established by the Constitutional Chamber on the content or scope of constitutional rules and principles are binding on the other Chambers of the Supreme Court of Justice and other courts of the Republic.

Venezuelan Const., art. 335.

Plaintiffs' experts maintain that a Constitutional Chamber decision is only binding when the Chamber formally and explicitly invokes Article 335. (*See* Brewer Rep. ¶¶ 110-111; Brewer Rebuttal Rep. ¶¶ 22-28; Brewer Opp. Decl. ¶¶ 4-17; Brewer Supp. Decl. ¶¶ 14-15; Brewer Supp. Rebuttal Decl. ¶¶ 53-60, 66-67; Araujo Rebuttal Rep. ¶ 27).  But the Court agrees with Defendants' expert, Professor Doe, who opines that "the plain text of Article 335 does not make the binding effects of [a] ruling conditional [on] any further declaration by the Constitutional Chamber."  (Doe Rebuttal Rep. ¶ 42; *see also* Roe Reply Decl. ¶ 41 ("There are no formal requirements for Constitutional Chamber decisions to be binding.  There is no requirement that they must expressly state that they are binding or contain other magic words.")). Defendants' experts' reading of Article 335 is also in line with the Sixth Circuit's conclusion that decisions of the Constitutional Chamber are "the highest and most final statements of Venezuelan law."  *DRFP L.L.C.* v. *República Bolivariana de Venezuela*, 706 F. App'x 269, 277 (6th Cir. 2017) (unpublished decision).  Accordingly, the Court finds that Constitutional Chamber decisions regarding the content or scope of constitutional rules and principles are binding, authoritative statements of Venezuelan law, regardless

of whether the Chamber formally and expressly invokes its Article 335 authority in the decision.  (*See* Roe Decl. ¶ 31).[5]

Here, as in 2020, the parties hotly contest the consistency of Professor Brewer's stance on whether the Constitutional Chamber established (or could establish) binding precedent in *Andrés Velásquez*.  Professor Brewer's consistency is potentially relevant to the Court's determination of Venezuelan law insofar as inconsistency negatively impacts his credibility, and insofar as it helps the Court distinguish what Venezuelan law is from Professor Brewer's normative views of what Venezuelan law ought to be.  The Court previously expressed skepticism of Professor Brewer's changing positions on Venezuelan law.  (Sept. 25, 2020 Tr. 98:25-99:7).  As relevant here, Professor Brewer has previously characterized *Andrés Velásquez* as establishing a binding interpretation of Venezuelan law.  He said this in numerous writings published between 2006 and 2019, while at the same time criticizing the Constitutional Chamber's reasoning (as the Court will discuss in more detail, *infra*).  (*See* Roe Decl. ¶ 97).  For example, Professor Brewer wrote in 2006 that in *Andrés Velásquez*, the Constitutional Chamber was acting as the "highest and last interpreter of the Constitution … [when it] established a binding interpretation, and reduced the category of 'public interest contracts' to those signed or concluded by the Republic."  (*Id.* ¶ 90).  Professor Brewer also described *Andrés Velásquez* (specifically and in general terms) as a binding decision in 2011,

---

[5]    That said, and as discussed *infra*, the Constitutional Chamber did invoke its authority under Article 335 when issuing the *Andrés Velásquez* decision.

2013, 2015, 2017, and 2019 publications. (*See id.* ¶¶ 91-96 & nn.108-119; *see also* Doe Rebuttal Rep. ¶¶ 23-33).

For his part, Professor Brewer, who has maintained throughout this litigation that *Andrés Velásquez* is not binding authority, explains that his initial reference to *Andrés Velásquez* as "a binding interpretation" in his 2006 article "was an error" that "was not identified upon proofreading" because he was under the stress of having to flee Venezuela to escape political persecution. (Brewer Supp. Decl. ¶¶ 47-48; *see also* Brewer Supp. Rebuttal Decl. ¶ 64). As a result, Professor Brewer "no longer had access to [his] usual support infrastructure of research assistants, who would have helped to check the accuracy of the cited sources." (Brewer Supp. Decl. ¶ 49). Of course, Professor Brewer's purportedly erroneous statement was then republished in numerous academic journals and in the 2019 first edition of his book. According to Professor Brewer, it was only in 2020 that he discovered the error "when reviewing the opinion submitted by Defendants' expert in this case" (*id.* ¶¶ 50, 53), and he "took immediate steps to correct it publicly" in new editions of three of his books published in 2021, and in a 2023 article (*id.* ¶ 54).

To be clear, Professor Brewer's explanations of his inconsistent positions remain difficult for this Court to credit. But, ultimately, the Court agrees with Professor Brewer that, "[r]egardless" of the inconsistent positions he has taken over the years, "what matters is whether the [*Andrés*] *Velásquez* decision is binding under Venezuelan constitutional law." (Brewer Supp. Rebuttal Decl. ¶ 67). And for the reasons discussed in this section, the Court agrees with

Professor Brewer's earlier positions, and considers *Andrés Velásquez* to be binding under Venezuelan law.[6]

It follows from the Court's conclusion that the Constitutional Chamber is the authoritative interpreter of the Venezuelan Constitution pursuant to Article 335 that the National Assembly, other chambers of the Supreme Tribunal of Justice, and scholarly commentators are *not* equally authoritative.  In this regard, Professor Brewer characterizes the National Assembly as the "first-instance interpreter of the Constitution whenever it enacts laws, adopts resolutions, or performs other parliamentary acts in accordance with its Constitutional authority."  (Brewer Rep. ¶ 53; *see also* Brewer Supp. Decl. ¶¶ 40-42; Pl. Supp. Br. 15-16).  But National Assembly resolutions cannot supersede the Constitutional Chamber's binding interpretations of constitutional provisions.  (*See* Doe Rebuttal Rep. ¶¶ 108, 125).  Nor can decisions issued by other chambers of the Supreme Tribunal of Justice, such as the Political-Administrative Chamber.  For example, Professor Brewer cites to Political-Administrative Chamber decisions, alongside Constitutional Chamber decisions, in support of his interpretation of the meaning of "national public interest contracts."  (Brewer Supp. Decl. ¶ 10 n.9).  But, again, it is the Constitutional Chamber, and not the Political-Administrative Chamber, whose decisions on the content or scope of constitutional rules and principles are binding.  (*See* Roe Reply Decl. ¶¶ 100-101).  Likewise, scholarly commentary

---

[6]    Later on in this Opinion, the Court considers Professor Brewer's previous writings to determine the meaning of *Andrés Velásquez*, as opposed to the precedential value of the decision.

about the meaning of the Venezuelan Constitution can have only persuasive authority, contrary to the views of Plaintiffs' proffered Venezuelan law experts. (*Cf.* Brewer Supp. Decl. ¶ 14 ("[I]n Venezuela, like in other countries that follow the [civil law] system, … [t]he reasoning in a court's ruling has the same authoritative nature as the reasoning in a legal scholar's writings."); Araujo Rep. ¶ 22 ("Because the *Andrés Velásquez* decision did not set forth a binding interpretation … , it does not automatically prevail over [the scholarly] consensus.")).

*Second*, even if the Constitutional Chamber were required to expressly invoke its Article 335 authority for its decision to be binding, it did so in *Andrés Velásquez.* Plaintiffs' experts maintain that, because only decisions expressly applying Article 335 are binding, and because the Constitutional Chamber did not state in the *Andrés Velásquez* decision that it was announcing a binding interpretation, the decision is not binding precedent. (*See* Brewer Supp. Rebuttal Decl. ¶ 57; Araujo Rebuttal Rep. ¶ 27). But, as Defendants' experts point out, the Constitutional Chamber in *Andrés Velásquez* stated that it was proceeding as the "maximum and ultimate interpreter of the Constitution," which is the same language used in Article 335. (Roe Decl. ¶ 84(a); Roe Reply Decl. ¶ 40).[7]

---

[7]    Plaintiffs appear to have abandoned the argument that *Andrés Velásquez* is not binding because a Constitutional Chamber decision is binding only if published in the Official Gazette (it was). (*See* Def. Supp. Opp. 4 n.5 (citing Pl. Opp. 23-25; Def. Reply 15)).

2.    **Only Contracts to Which the Republic Itself Is a Party Are "National Public Interest Contracts" Within the Meanings of Articles 150 and 187(9) of the Venezuelan Constitution**

a.    **The *Andrés Velásquez* Decision**

Having determined the precedential value of *Andrés Velásquez*, the Court now proceeds to consider its holding.  In *Andrés Velásquez*, the Constitutional Chamber established a binding interpretation of "national public interest contracts" under Articles 150 and 187(9) of the Venezuelan Constitution. Specifically, the Constitutional Chamber established that only contracts to which the Republic itself is a party are national public interest contracts, which require the authorization of the Venezuelan National Assembly.  The Court finds that because the Republic itself was not a party to the Governing Documents, they are not national public interest contracts, and they and the 2020 Notes were validly issued without National Assembly approval.

The Court begins with the text of the Venezuelan Constitution, then turns to the text of the *Andrés Velásquez* decision, before considering the competing views of the parties' proffered experts.  To review, Article 150 of the Venezuelan Constitution provides in relevant part that:

> The execution of national public interest contracts shall require the approval of the National Assembly in those cases in which such requirement is determined by law. No municipal, state[,] or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly.

Venezuelan Const., art. 150.  And Article 187(9) provides that:

> It is the role of the National Assembly to: ... Authorize the National Executive to enter into contracts of national interest, in the cases established by law. Authorize contracts of municipal, state[,] and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela.

*Id.*, art. 187(9).  In the case of *Andrés Velásquez*, the Constitutional Chamber determined that Article 80 of the Organic Law on Financial Administration, which permitted the Republic to enter into certain debt transactions with foreign counterparties without National Assembly authorization, was unconstitutional.  (Dkt. #84-7 ("*Andrés Velásquez*") at 1, 17, 22-23).  In so doing, the Constitutional Chamber more broadly "specified the meaning that must be given to the concept of *national public interest contracts* contained in articles 150 and 187, section 9" of the Venezuelan Constitution.  (*Id.* at 17).

The Constitutional Chamber in *Andrés Velásquez* distinguished the general term "public interest contract" from the specific term "national public interest contract" and established requirements for the latter.  The decision first provided background on interpretations of these terms prior to the adoption of the 1999 Venezuelan Constitution.  It described the "national doctrine" as having "proposed many interpretations" of the "concept of *public interest contract*," "such as that carried out by author Eloy Lares Martínez, who when referring to the expression under examination," said that it was a general expression, and that "*national interest contracts, state interest contracts[,] and municipal interest contracts*" were "*specific expressions.*"  (*Andrés Velásquez* at 15).  The decision describes another "sector of the doctrine" that "has

36

maintained … that public interest contracts constitute the genus while national, state[,] and municipal contracts constitute the species thereof."  (*Id.*). And it describes yet "another sector" that "stand[s] away from the preceding interpretations" by defining "public interest contract" according to the size of the contract, whether it jeopardizes the financial net wealth of the Republic, or exposes the Republic to serious losses or international claims.  (*Id.* at 15-16).

According to the Constitutional Chamber, this "doctrinal discussion" was "resolved" by the 1999 Constitution, as Article 150 "thereof clearly established the genus-species relationship that exists between the concept of public interest contract and the concepts of *national*, state[,] and municipal public interest contracts *in which the determining factor would be the participation of the Republic*, the States[,] or the Municipalities."  (*Andrés Velásquez* at 16 (emphases added)).  Indeed, "taking into account the interpretations previously examined, and as maximum and ultimate interpreter of the Constitution," the Constitutional Chamber found "that all of the contracts entered into by the Republic, the States[,] or the Municipalities where the national, state[,] or municipal public interest is involved are subsumed within that genus."  (*Id.*).

Focusing in on the national level, the Constitutional Chamber then found that:

> [C]ontracts concluded by the Republic through the competent organs of the National Executive to do so and whose purpose is determinant or essential to accomplishing the purposes and objectives of the Venezuelan State would be included within the species of national public interest contracts while seeking to

37

> satisfy individual and coinciding interests of the
> national community[.]

(*Andrés Velásquez* at 16-17). "Having thus specified the meaning that must be

given to the concept of *national public interest contracts* contained in articles

150 and 187, section 9" (*id.* at 17), the Chamber annulled a portion of

Article 80 of the Organic Law Governing the Financial Administration of the

Public Sector that allowed the National Executive to enter into certain public

credit transactions and subsequently "inform the National Assembly" of these

transactions (*id.* at 22-23). In sum, the Constitutional Chamber in *Andrés*

*Velásquez* defined the term "national public interest contract" as a type of

public interest contract, and it established that a necessary (but not sufficient)

requirement of a national public interest contract is that it be concluded by the

Republic through competent organs of the National Executive.

The *Andrés Velásquez* decision was not limited, as Plaintiffs suggest, to

the narrow question whether Article 80 of the Organic Law was constitutional.

On this point, Plaintiffs' experts asseverate that *Andrés Velásquez* does not

address the broader question at issue in this action, namely, the necessary

elements of national public interest contracts under Venezuelan law. (*See, e.g.*,

Brewer Supp. Decl. ¶ 17(c) ("[*Andrés Velásquez*] was about the constitutionality

of Article 80 of the Organic Law, not whether the Republic must be a party to a

national public interest contract."); *id.* ¶ 25 (arguing that *Andrés Velásquez* did

not create any additional criteria for national public interest contracts); Araujo

Rep. ¶ 79 (maintaining that the Constitutional Chamber in *Andrés Velásquez*

"did not decide that public contracts entered into by decentralized public entities such as PDVSA are not contracts of public interest")). And once again, Plaintiffs and their experts argue that the Constitutional Chamber in *Andrés Velásquez* was proceeding not under its Article 335 power to establish binding interpretations of the Venezuelan Constitution, but rather only under its Article 336 power to declare the total or partial nullity of laws conflicting with the Constitution. (*See* Pl. Supp. Br. 10-11; Brewer Rebuttal Rep. ¶¶ 22-29, 52-54; Araujo Rep. ¶¶ 21-22; Brewer Supp. Decl. ¶¶ 15, 17(c), 43-58). Setting aside for the moment whether Venezuelan law allows contracts concluded by Decentralized Public Administration entities to be considered national public interest contracts (an issue discussed *infra*), it is clear from the plain text of *Andrés Velásquez* that the decision generally defined "national public interest contracts" under Articles 150 and 187(9), and then specifically annulled part of Article 80 of the Organic Law based on this definition. And as previously discussed, the Chamber invoked its Article 335 authority to effect a binding interpretation when it defined the term "national public interest contract." (*See Andrés Velásquez* at 16 (proceeding "as maximum and ultimate interpreter of the Constitution")). Thus, it cannot be said that the only effect of *Andrés Velásquez* was to annul a portion of Article 80 of the Organic Law.

Nor is it the case, as Plaintiffs argue in the alternative, that *Andrés Velásquez* established that contracts concluded by the Republic are but one sub-species of "national public interest contracts." In *Andrés Velásquez*, the Constitutional Chamber held that "contracts concluded by the Republic

through the competent organs of the National Executive to do so … would be *included within the species of national public interest contracts*." (*Andrés Velásquez* at 16-17 (emphasis added)). Plaintiffs interpret the italicized language to mean that contracts concluded by the Republic are but one type of national public interest contract. (Pl. Supp. Br. 12 (quoting *Burgess* v. *United States*, 553 U.S. 124, 131 n.3 (2008) (finding the word "includes" to be "a term of enlargement, and not of limitation")). But, read in context, the phrase "included within the species of national public interest contracts" means to distinguish national public interest contracts from state or municipal public interest contracts, which are distinct species of public interest contracts. As Dr. Roe opines, Plaintiffs' reading "would be contrary to the express statement that that the '*determining factor would be the participation of the Republic, the States[,] or the Municipalities.*'" (Roe Reply Decl. ¶ 56 (quoting *Andrés Velásquez* at 16 (emphasis added)); *see also id.* ¶ 57 ("[*Andrés Velásquez*] stands for the proposition that the participation of a political-territorial entity (i.e., the Republic, a state[,] or a municipality) is a requirement for a contract to be of National Interest.")). Moreover, both Professor Brewer and Professor Araujo have previously characterized *Andrés Velásquez* as defining "national public interest contracts" to require that the Republic itself be party to the contract. (*See* Doe Rebuttal Rep. ¶¶ 26-31, 33, 43; Roe Decl. ¶ 99; Roe Reply Decl. ¶¶ 38, 119).[8]

---

[8]     More specifically, Professor Brewer previously wrote that, under *Andrés Velásquez*, state companies such as PDVSA can contract with foreign entities without needing to obtain National Assembly authorization. (Doe Rebuttal Rep. ¶¶ 26, 27, 33). In a 2008 book

A more nuanced question is whether the *Andrés Velásquez* decision and subsequent binding authority admits of the possibility that contracts concluded by entities of Venezuela's Decentralized Public Administration (such as PDVSA) can be counted among those "national public interest contracts" that require National Assembly approval according to Articles 150 and 187(9). If that were the case, then the Governing Documents' lack of National Assembly approval would be fatal to their validity, and to that of the 2020 Notes. But that is not the case. Put simply, Plaintiffs' experts' opinions that such contracts can be national public interest contracts express normative views of what Venezuelan law ought to be, not what Venezuelan law is. And case law following *Andrés Velásquez* confirms that only contracts concluded by the Republic, and not contracts concluded by Decentralized Public Administration entities, can be considered national public interest contracts.

---

jointly edited by Professor Brewer, Professor Araujo wrote that, according to *Andrés Velásquez*, "[I]n relation to the subjects whose presence is a necessary condition for the conclusion of contracts of national interest, it is required first of all that it be a political-territorial entity, that is, the Republic, the States, and the municipalities." (Roe Decl. ¶ 99 (quoting Dkt. #84-35); *see also* Roe Reply Decl. ¶ 38 (summarizing previous statements of both Professor Araujo and Professor Brewer to this effect)). Confronted with his prior scholarship, Professor Araujo disputes that he was recognizing a general rule in the 2008 book excerpt and asserts that he was instead merely "listing some of the entities that can be parties to the national public interest contract (such as, 'to begin with,' the Republic)." (Araujo Rep. ¶ 71). Like Dr. Roe, the Court is not persuaded by Professor Araujo's "nuanced semantic analysis" (Roe Reply Decl. ¶ 119); it is obvious that Professor Araujo was in fact describing a "necessary condition for the conclusion of contracts of national interest" (Roe Decl. ¶ 99 (quoting Dkt. #84-35)). Plaintiffs' experts' past statements are further evidence in support of the Court's reading of *Andrés Velásquez*, and against crediting the positions they are taking in this case and related litigation.

### b. Contracts Made by the Decentralized Public Administration Are Not "National Public Interest Contracts"

Plaintiffs and their experts maintain that the 2020 Notes and the Governing Documents are national public interest contracts because they were concluded by an organ of Venezuela's National Public Administration, specifically, the "Decentralized Public Administration," of which PDVSA is a part.  (*See* Pl. Supp. Br. 6-9; Pl. Supp. Opp. 4-6).[9]  But what Plaintiffs and their experts characterize as a leading theory of Venezuelan law is just that: a theory, which, though it has gained traction among scholars of Venezuelan law, expresses a normative view of what Venezuelan law ought to be.  The Court must apply Venezuelan law as it is, and, therefore, rejects this view.

According to Plaintiffs, it is the "predominant opinion of Venezuelan legal scholars" that any contract entered into by an entity in the National Public Administration is a public interest contract.  (Pl. Supp. Br. 7).  This, they maintain, is a "natural reading" of Article 150, which "encompasses contracts concluded by the Decentralized Public Administration, including state-owned companies" like PDVSA.  (Pl. Supp. Opp. 4).  Professor Brewer opines that Decentralized Public Administration entities may enter into national public interest contracts; in fact, he says it is "exceptional to find

---

[9]    The umbrella term "National Public Administration" covers two types of entities: (i) the "Central Public Administration," consisting of organs of the national government such as ministries; and (ii) the "Decentralized Public Administration," consisting of entities like public corporations and state-owned enterprises (including PDVSA), which are not directly part of the national government but are closely related to it.  (Brewer Rep. ¶¶ 33-34).

contracts directly entered into by organs of the Central Administration, such as, for example, Ministries of the National Executive." (Brewer Supp. Decl. ¶ 10). Professor Brewer touts this position as shared by "the overwhelming majority of Venezuelan legal scholars," including Professor Araujo, Professor Luis Henrique Farías Mata, and Professor Rafael Badell. (*Id.* ¶ 11 & nn.11-13). Likewise, Professor Araujo maintains that "it is well established that the entities of the Decentralized Public Administration may enter into national public interest contracts" (Araujo Rep. ¶ 20), and that this is "the consensus position in Venezuelan constitutional and administrative law scholarship" (*id.* ¶ 65).

Significantly, however, the conflicting statements of Plaintiffs' experts and those of other scholars, as well as the text of Article 187(9), together refute the notion that Decentralized Public Administration entities can enter into national public interest contracts. Although Plaintiffs' experts have consistently critiqued the Constitutional Chamber's decision to limit which entities can enter into national public interest contracts, they have done so while simultaneously recognizing the binding nature of this limitation. For example, Professor Araujo claims he has "consistently expressed the view that the entities of the Decentralized Public Administration, being intrinsic parts of the branch of the National Executive Power, can enter into contracts of national public interest." (Araujo Rep. ¶ 64). But Professor Araujo previously recognized (in a book jointly edited with Professor Brewer) that, based on the *Andrés Velásquez* decision, it is "required ... that it be a political-territorial

entity, that is, the Republic, the States, and the municipalities" "whose
presence is a necessary condition for the conclusion of contracts of national
interest." (Roe Decl. ¶ 99 (quoting Dkt. #84-35 at 228-29)). He then noted,
"[h]owever, *a sector of the literature* has considered that this category also
applies to those contracts signed by the decentralized National Public
Administration, that is, autonomous institutes and State companies when they
directly affect the national interests that correspond to the Republic." (Dkt.
#84-35 at 229 (emphasis added) (footnote omitted)). In referring to this "sector
of the literature," Professor Araujo cited works by Professor Brewer and
Professor Rafael Badell Madrid. (*Id.* at 229 n.87). Professor Araujo also cited
the Constitutional Chamber decision of *EDELCA* — which the Court discusses,
*infra* — as supporting his view. (*Id.* at 229 & n.88).

Before this Court, Professor Araujo insists that his reference to a "sector
of the literature" "should not be misconstrued to mean that [these scholars']
position is a minority view within the Venezuelan constitutional and
administrative law scholarship," but rather that it represents the "correct[ ]"
view. (Araujo Rep. ¶ 72). But the Court agrees with Dr. Roe's characterization
of Professor Araujo's comments as "purport[ing] to describe what the law
*should be* rather than what the law currently *is*; they are prescriptive
comments … meant to articulate those scholars' disagreement with the binding
decisions of the Constitutional Chamber." (Roe Decl. ¶ 100). Having so
concluded, the Court views with skepticism Professor Araujo's current claims
that binding Venezuelan law permits Decentralized Public Administration

entities to enter into national public interest contracts.  (*See, e.g.*, Araujo Rep. ¶¶ 63-87).

What is more, in his submissions, Professor Araujo frequently cites to his own 2024 *Treatise on General and Comparative Administration Law*.  (*See, e.g.,* Araujo Rep. ¶¶ 26 n.4; 27 n.7; 28 n.9; 29 n.11; 33 n.16; 34 nn.17-18; 35 n.19; 36 n.20; 38 nn.24-25; 39 n.26; 42 n.30; 44 n.32; 54 n.38; 56 n.40; 60 nn.44-45; 61 n.47; 63 & n.49; 64 n.51; 84 n.73; 91 n.80; 92 n.82; 95 n.87; 99 n.91; 101 & n.93; 114 n.105; 119 n.109; 131 n.113; 134 n.116; 138 n.119; 139 n.121; 141 & n.123; 149 n.134; 152 n.137; 155 n.139).  In this treatise, Professor Araujo expresses the view that "[c]ontracts concluded by entities within the Decentralized National Public Administration can impact ... state interests, and would constitute national public interest contracts." (*Id.* ¶ 101). According to Professor Araujo, this view is in line with the views he expressed in the 2008 article that Defendants' expert "incorrectly interprets." (*Id.* ¶ 102). Though he previously described *Andrés Velásquez* as establishing a "binding" interpretation in this 2008 article, Professor Araujo now maintains that — as he explains in his 2024 treatise — he "only said that the [*Andrés Velásquez*] decision seemed to espouse a 'reduced' constitutional interpretation." (Araujo Rebuttal Rep. ¶¶ 63, 65).  Moreover, Professor Araujo claims that, "[b]efore being hired as an expert in this case, [he] was unaware of the particulars of this litigation or the questions of Venezuelan law that it involves." (*Id.* ¶ 1 n.2).

Professor Araujo's efforts to harmonize his prior statements with his current litigation positions are difficult to credit.  But while the Court will not

altogether ignore the 2024 treatise (*cf.* Def. Supp. Br. 26-27), it rejects the gloss that Professor Araujo now attempts to impart to his own prior scholarship.  For example, in the 2024 treatise, Professor Araujo recounts that "constitutional case law on the notion of national interest contracts" has given rise to what Professor Brewer has called "an inconvenient process of undue restriction," by which "public contracts signed by the other state entities with legal personality, such as, e.g., … government-owned companies would be excluded."  (Roe Decl., Ex. 26 at 498).  In other words, although Professor Araujo "does not agree with that position," he still "recognize[s] that that is the current position under Venezuelan law."  (Roe Decl. ¶ 139 (citing Roe Decl., Ex. 26 at 498)).

As for Professor Brewer, he, too, has repeatedly characterized his view that Decentralized Public Administration entities can enter into national public interest contracts as one that cuts against what the Constitutional Chamber has established.  Throughout this litigation, Professor Brewer has maintained that Decentralized Public Administration entities can enter into national public interest contracts.  (*See, e.g.*, Brewer Supp. Decl. ¶¶ 10-11).  But Professor Brewer's pre-litigation scholarship was consistent in its position that *Andrés Velásquez* was binding precedent that concluded contrariwise.  Indeed, in his earlier writings, Professor Brewer described his position regarding Decentralized Public Administration entities as one that finds support in case law and other scholarly commentary, but that has not prevailed.  For example, Professor Brewer wrote that the Constitutional Chamber "*established a binding interpretation*, and reduced the category of 'contracts of public interest' (art.

150 C.) to those signed or concluded by the Republic, the States, and the Municipalities, thus, *excluding from such a classification those contracts concluded by … national public enterprises such as PDVSA.*" (Doe Rebuttal Rep. ¶ 26). In 2011, Professor Brewer described *Andrés Velásquez* as having "inconveniently restricted this notion of 'public interest contract' of article 150 of the Constitution, [to include] only those contracts signed by the Republic, States[,] and Municipalities in which a national, state[,] and municipal public interest is involved." (*Id.* ¶ 30 (first alteration in original)). He criticized this as "mak[ing] no sense at all," because it meant that "a contract concluded by [PDVSA] could not be considered a national public interest contract." (*Id.*). At the same time, Professor Brewer said the contrary view was his "opinion," and that contracts entered by state-owned companies "should" be, but were not in the eyes of the Constitutional Chamber, considered national public interest contracts. (*Id.*). Even after the 2020 Notes were issued, Professor Brewer wrote in 2017 that Articles 150 and 187(9) "*do not apply* to public contracts concluded by these decentralized national public entities, for example, … state companies." (*Id.* ¶ 27). There are more examples of similar statements by Professor Brewer. (*See, e.g.*, Roe Decl. ¶¶ 91-96; Roe Reply Decl. ¶ 117). Although Professor Brewer endeavors to explain them all away (*see* Brewer Supp. Decl. ¶¶ 47-58; Brewer Supp. Rebuttal Decl. ¶ 64), it is apparent that he, like Professor Araujo, previously critiqued *Andrés Velásquez* while recognizing it as binding law.

Both Professor Araujo and Professor Brewer cite other scholars who ostensibly share their view that Decentralized Public Administration entities can enter into national public interest contracts. Professor Brewer cites, among others, Professor Luis Henrique Farías Mata, Professor Rafael Badell, and Professor Araujo. (*See, e.g.*, Brewer Supp. Decl. ¶ 11 & nn.11-13). And Professor Araujo cites Professor Brewer, Professor Badell, and Professor Eloy Lares Martínez. (*See, e.g.*, Araujo Rep. ¶¶ 65-73). However, just like Plaintiffs' experts, these other scholars have acknowledged that the Republic itself must be party to a national public interest contract. In fact, the Constitutional Chamber cited Professor Lares Martínez in *Andrés Velásquez* and characterized his position as being that "it is necessary, but not sufficient, that one of the parties in [a national public interest] contract was the Republic." (*Andrés Velásquez* at 15). Professor Lares Martínez elsewhere has written that "[t]here is no doubt … that it is absolutely necessary for a contract to be considered of national interest, that one of the parties be the Republic of Venezuela." (Roe Reply Decl. ¶ 127). Professor Badell likewise has written that, in *Andrés Velásquez*, "it was established that the criteria that lead to the inclusion of State contracts in the category of public interest contracts … are the following: … That they are contracts concluded by the Republic, the States[,] or the Municipalities." (*Id.* ¶ 131). Dr. Roe notes that Professor Araujo cites several publications that do not address Venezuelan law. (*Id.* ¶¶ 132-133 (citing Araujo Rep. ¶¶ 28 n.9, 40 & n.28, 58 n.41, 59 & nn.42-43, 61 & n.46, 131 n.114, 134 n.116, 138 & n.120, 140 n.122, 144 & n.126, 145 n.128)).

48

And Dr. Roe points out that, although Professor Brewer favorably cites Professor Farías Mata, the article he cites refers to the 1961 Constitution, rather than the 1999 Constitution, and was written prior to the *Andrés Velásquez* decision.  (*Id.* ¶ 123).  All in all, a review of the scholars cited by Plaintiffs' experts makes clear that their position regarding the Decentralized Public Administration is a scholarly one that does not reflect what Venezuelan law actually requires.

The text of Article 187(9) similarly does not support Plaintiffs' assertion that Decentralized Public Administration entities may enter into national public interest contracts.  (*Cf.* Pl. Supp. Opp. 4-5).  Plaintiffs argue that, because the term "National Executive" is not in Article 150, national public interest contracts with foreign domiciled entities are not limited solely to contracts entered into by the National Executive.  (*Id.* at 5).  Professor Brewer maintains both that Article 150 does not restrict this requirement to contracts entered into by the Republic, and that Article 187(9) "empowers the National Assembly to approve (or disapprove) the requests brought to it by the National Executive, *including requests brought on behalf of decentralized entities.*"  (Brewer Supp. Rebuttal Decl. ¶ 24 (emphasis added)).  Relatedly, Professor Araujo claims that entities in the Decentralized Public Administration are part of the "National Executive."  (*See* Araujo Rep. ¶¶ 52-62).  However, as this Court previously found (based in part on Professor Brewer's representations), PDVSA cannot be considered part of the National Executive because it is a Decentralized Public Administration entity.  *See PDVSA I*, 495 F. Supp. 3d at 276-77 (citing Doe

Rep. ¶¶ 34-37; Brewer Rep. ¶¶ 5, 22, 24).  And Article 187(9) does not otherwise support Plaintiffs' experts' position because it provides that it is the National Assembly's role to "[a]uthorize *the National Executive* to enter into contracts of national interest," Venezuelan Const., art. 187(9) (emphasis added)); the second sentence of Article 187(9) does not contradict this because it does not specify which entities at the three levels of government are authorized to enter into contracts of national (or state or municipal) public interest with foreign entities (*see* Roe Decl. ¶¶ 44, 47).

Separately, Plaintiffs argue that the National Assembly's practice of approving contracts under a different law — Article 33 of the Hydrocarbons Organic Law — supports their view that Decentralized Public Administration entities can enter into national public interest contracts because Article 33 requires National Assembly approval of joint venture contracts.  (Pl. Supp. Opp. 13-14 & n.58 (citing Brewer Supp. Rebuttal Decl. ¶¶ 10-11, 101)).  Plaintiffs rely on Article 150's provision that "[t]he execution of national public interest contracts shall require the approval of the National Assembly *in those cases in which such requirement is determined by law.*"  Venezuelan Const., art. 150 (emphasis added).  However, the fact that Article 150 allows for statutes such as Article 33 to require National Assembly approval in certain circumstances (*i.e.*, where approval is "determined by law") does not in any way

imply that National Assembly approval is required for the debt offerings at issue here.  (*See* Roe Decl. ¶ 160).[10]

### c.     Cases and Resolutions Issued After *Andrés Velásquez* Do Not Alter Its Holding

The parties bring to the Court's attention Venezuelan case law following *Andrés Velásquez*.  In particular, they dispute the meaning of cases known to the parties and the Court as the *EDELCA*, *Attorney General II*, and *Brigitte Acosta* decisions.  As explained herein, the Court finds that these cases in fact reaffirm the requirement set forth in *Andrés Velásquez* that the Republic itself must be party to any national public interest contract.

In the *Electrificación del Caroní S.A.*, or "*EDELCA*," decision, the Constitutional Chamber found that a contract between EDELCA, a state-owned enterprise, and a Brazilian company was a national public interest contract. (Dkt. #84-16 ("*EDELCA*") at 14-15).  *EDELCA* was decided in 2003, one year after *Andrés Velásquez* was decided.  (*Id.* at 17).  Plaintiffs and their experts maintain that *EDELCA* supports their contention that state-owned enterprises such as PDVSA can enter into national public interest contracts.  (*See* Pl. Supp. Br. 13; Brewer Rebuttal Rep. ¶¶ 9, 26; Araujo Rep. ¶¶ 76-77; Brewer Supp. Decl. ¶ 17(c)).  However, this reading of *EDELCA* is far too broad.

_____

[10]     Defendants argue that Article 236(14) of the Venezuelan Constitution, which provides that the President may enter into contracts in the national public interest through the Council of Ministers, supports their view that Decentralized Public Administration entities cannot enter into national public interest contracts.  (Def. Supp. Br. 21-22; *see* Roe Decl. ¶¶ 48-49).  However, the Court views Article 236(14) as merely prescribing one means by which the Republic, through the National Executive, may enter into national public interest contracts, and therefore the provision has little analytical value to the question of Venezuelan law at issue here.  (*See* Brewer Supp. Rebuttal Decl. ¶ 25; Araujo Rebuttal Rep. ¶¶ 75-76).

The contract between EDELCA and the Brazilian enterprise stemmed from an agreement between the Republic of Venezuela and the Federal Republic of Brazil known as the "Memorandum of Understanding for the Supply of Electric Power Venezuela-Brazil," or the "MOU." (*EDELCA* at 10-12). The Constitutional Chamber in *EDELCA* wrote that:

> With respect to the legal figure concluded, which is based on the international commitments signed by the National Executive, it is noteworthy that although it is the product of the aforementioned acts of government, it turns out to be a contractual stipulation, which constitutes a *public interest contract*, since a high interest of the Republic has been committed in the margin of its international relations with the Federative Republic of Brazil for the supply of electricity. Regarding this, the agreement concluded is subject to the limits defined by this Chamber, on public interest contracts[.]

(*Id.* at 14-15). The Constitutional Chamber then quoted from the *Andrés Velásquez* decision regarding the requirements for national public interest contracts. (*Id.* at 15). Lastly, the Chamber described the MOU between the Republic of Venezuela and the Brazilian government as "a convention *generating obligations for the Republic* in the exercise of its international representation, *through a public interest contract*" between EDELCA and a Brazilian enterprise. (*Id.* (emphases added)).

In other words, *EDELCA* merely endorsed the requirement set forth in *Andrés Velásquez* that the Republic itself must be party to a national public interest contract, because the Republic was party to the MOU, and the contractual agreement between EDELCA and the Brazilian enterprise merely

52

implemented the Republic's obligations under the MOU. (*See* Roe Decl. ¶¶ 111-113; Roe Reply Decl. ¶¶ 58-68; Doe Rebuttal Rep. ¶¶ 63-66). The Court agrees with Dr. Roe's characterization of the contract as setting out obligations that "are ultimately obligations of the Republic and may directly generate liability for the Republic itself." (Roe Decl. ¶ 112; *see also* Roe Reply Decl. ¶ 64 ("[T]he Republic is a party directly (albeit of the international agreement rather than to the linked contract itself); and the Republic itself had assumed obligations under that contract (through the linked international agreement).").  This is the case regardless of whether the Constitutional Chamber considered the MOU between Venezuela and Brazil to be "binding international treaties with defined legal consequences." (Araujo Rebuttal Rep. ¶ 40; *see also* Brewer Supp. Rebuttal Decl. ¶ 80).  What matters is whether the contract between EDELCA and the Brazilian enterprise generated ultimate obligations for the Republic itself, and not precisely how it did so.

The 2007 *Attorney General II* decision similarly addressed the Republic's ultimate obligations. Plaintiffs argue that the Constitutional Chamber in *Attorney General II* ruled that certain promissory notes issued by Venezuela's state-run agricultural development bank, Banco de Desarrollo Agropecuario S.A. ("BANDAGRO"), were national public interest contracts, implying that Decentralized Public Administration entities like PDVSA can enter into such contracts, too. (Pl. Supp. Opp. 13-14).  As Article 247 of the Venezuelan Constitution requires that the Office of the Attorney General be consulted for the approval of contracts in the national public interest (Dkt. #84-18 ("*Attorney*

*General II*") at 16 (citing Venezuelan Const., art. 247)), the Constitutional

Chamber in *Attorney General II* needed to decide whether certain promissory

notes, as "public credit operations[,] may be included in the notion of '*contract*

*in the national public interest*'" that the Chamber had established in *Andrés*

*Velásquez* (*id.* at 19). The Chamber quoted at length from *Andrés Velásquez*

(*id.* at 19-21), which it described as having "specified the meaning that will be

attributed to the notion of contracts in the national public interest, contained

in Articles 150 and 187[(9)]" (*id.* at 21). The Constitutional Chamber found

that "such public credit operations … may be classified as contracts of national

public interest," and from this finding "concluded that the promissory notes

[were] public credit operations, constitutionally [requiring] consultation to the

Office of the Attorney General of the Republic." (*Id.* at 21-22).

Although Professor Brewer interprets *Attorney General II* to mean that

the promissory notes in question were national public interest contracts

because they were "issued by a public corporation *as a decentralized entity of*

*the National Public Administration (and not the Republic)*" (Brewer Rebuttal Rep.

¶ 12 (emphasis added); *see also* Brewer Supp. Decl. ¶ 25), in fact they were

considered national public interest contracts because the Republic was the

ultimate guarantor of the notes (*see* Roe Reply Decl. ¶¶ 69-83). The decision

contains "several references to the financial obligations at issue being payable

**directly** by the Republic." (*Id.* ¶ 82 & n.112 (citing *Attorney General II* at 3-4,

19, 22)). To the extent the *Attorney General II* decision is ambiguous and thus

could theoretically be interpreted as Professor Brewer would have it, the

54

Constitutional Chamber in *Attorney General II* recognized *Andrés Velásquez* as binding law regarding contracts of national public interest.  (*See Attorney General II* at 19-21; Roe Reply Decl. ¶ 83; Doe Rep. ¶ 103).  It did the same in *EDELCA*.  (*EDELCA* at 15).  Accordingly, this Court resolves any such ambiguity in favor of the requirements set forth in *Andrés Velásquez*, and the Court distinguishes *Attorney General II* on the grounds that it involved the ultimate obligations of the Republic itself.

The Constitutional Chamber's 2016 *Brigitte Acosta* decision likewise reaffirms the requirement established in *Andrés Velásquez* that the Republic itself must be a party to any national public interest contract.  In *Brigitte Acosta*, the Constitutional Chamber considered "whether the potential loan agreement to be executed by the Central Bank of Venezuela and the Latin American Reserve Fund (FLAR) could be considered as a national public interest contract, and, therefore, would be subject to the approval of The National Assembly."  (Dkt. #84-8 ("*Brigitte Acosta*") at 18).  The *Brigitte Acosta* decision quotes from *Andrés Velásquez* at length, citing it as authoritative on "the essential elements that impart to contracts a national public interest nature," including "[t]hat they be executed by the Republic, through the bodies that compose the National Executive Branch that are competent in this matter."  (*Id.* at 19-21).  The Constitutional Chamber concluded that the potential contract involving the Central Bank "should not [be] considered as a national public interest contract, not being, therefore, subject to the authorization of the National Assembly."  (*Id.* at 33).  In so doing, the Chamber

found that it would be "contrary to the logical legal order" to allow the National
Assembly to have "double-level control" of the Central Bank's operations.  (*Id.*
at 32-33).  Additionally, the Constitutional Chamber described the Central
Bank as "a legal entity under public law, … , which is neither part of the
Central Administration nor the Functionally Decentralized Administration,
but … it is part of the so-called Administration with functional autonomy,"
meaning "it requires a special regulation and organization, specific and
different from the regular regulations and organization applicable to other
public or private entities."  (*Id.* at 29-30).

Plaintiffs' experts consider the *Brigitte Acosta* decision to be a function of
the Central Bank of Venezuela's unique legal status.  (*See* Araujo Rep. ¶¶ 80-
86; Brewer Supp. Decl. ¶ 17(e); Brewer Supp. Rebuttal Decl. ¶ 74; Araujo
Rebuttal Rep. ¶¶ 41-44).  However, a more straightforward interpretation is
that, because the Central Bank, and not the Republic itself, was party to the
contract, it was not a national public interest contract requiring National
Assembly approval, as *Andrés Velásquez* established the Constitution requires.
(*See* Doe Rep. ¶¶ 104-106; Roe Decl. ¶ 106; Roe Reply Decl. ¶¶ 84-90).  That is
why *Brigitte Acosta* quotes at length from *Andrés Velásquez*.  (*See Brigitte
Acosta* at 19-21; Roe Reply Decl. ¶¶ 85-86, 88, 90).  And, although Professor
Araujo also characterized *Brigitte Acosta* as "reflect[ing] the political pressure
that the illegitimate Maduro regime placed on the Supreme Tribunal of Justice"
(Araujo Rep. ¶ 85), that decision, like *EDELCA* and *Attorney General II*, merely
upheld requirements established in *Andrés Velásquez* in 2002, long before the

56

Maduro regime came to power.  Accordingly, *Brigitte Acosta*, like *EDELCA* and *Attorney General II*, reaffirms the requirement established in *Andrés Velásquez* that the Republic itself must be party to a national public interest contract.

The Court has focused, appropriately, on decisions of the Constitutional Chamber.  Conversely, the Court finds that neither decisions of the Political-Administrative Chamber, nor decisions predating *Andrés Velásquez*, impact the requirements established in the Constitutional Chamber's binding decision. For example, Professor Brewer cites to decisions of the Political-Administrative Chamber in support of his contention that Decentralized Public Administration entities can enter into national public interest contracts.  (*See* Brewer Supp. Decl. ¶ 11 n.9).  However, as the Court discussed *supra*, only decisions of the Constitutional Chamber, and not any other chamber of the Supreme Tribunal of Justice, establish binding interpretations of the scope of rules and principles of the Venezuelan Constitution when so expounding.  (*See also* Roe Reply Decl. ¶¶ 100-101).  As such, these decisions cannot supersede *Andrés Velásquez*.

Plaintiffs also argue that, in a case known alternately as *Simón Muñoz Armas* and *Apertura Petrolera*, "the Supreme Court of Justice ruled that joint venture agreements between subsidiaries of PDVSA (decentralized entities) and foreign oil companies were national public interest contracts and therefore subject to Article 126 of the 1961 Constitution (the predecessor provision of current Article 150)."  (Pl. Supp. Opp. 11 & n.45; *see* Brewer Supp. Rebuttal Decl. ¶¶ 86-91).  But the Court agrees with Dr. Roe that the case is "completely inapposite" because it "was decided under the previous Venezuelan

Constitution of 1961" and "did not even purport to interpret any of the provisions of the Venezuelan Constitution that are at issue here or consider the scope of Contracts of National Interest." (Roe Decl. ¶ 144; *see also id.* ¶¶ 148-149). And although Professor Brewer analogizes provisions of the 1961 Constitution discussed in *Simón Muñoz Armas* to 1999 Constitution provisions (Brewer Supp. Rebuttal Decl. ¶ 91), the Constitutional Chamber was aware of the "doctrinal discussion" regarding public interest contracts prior to the 1999 Constitution's adoption, which "resolved" that discussion in the manner described in *Andrés Velásquez* (*Andrés Velásquez* at 16).

Finally, and using a similar analysis, the Court finds that National Assembly resolutions do not impact its reading of *Andrés Velásquez* and subsequent cases because these resolutions do not establish binding interpretations of the Venezuelan Constitution in the same manner as Constitutional Chamber decisions. (*Cf.* Pl. Supp. Br. 15-16). As previously discussed, the National Assembly is not the "first-instance interpreter of the Constitution whenever it ... adopts resolutions" if the Constitutional Chamber has defined the same constitutional provisions. (*Cf.* Brewer Rep. ¶ 53; Brewer Supp. Decl. ¶¶ 40-42). And although the National Assembly has adopted several resolutions endorsing agreements concluded by PDVSA as national public interest contracts (*see* Brewer Supp. Decl. ¶¶ 40-42), such resolutions cannot supersede the Constitutional Chamber's binding interpretations of constitutional rules and principles. As made plain by the preceding discussion, Venezuelan law narrows the aperture of the Court's analysis to

Constitutional Chamber decisions such as *Andrés Velásquez* and subsequent case law.

### 3. The Views of the Republic Are Not Conclusive

To be clear, resolutions passed by the National Assembly are relevant to the Court's analysis, insofar as they represent the official views of a foreign government to which the Court must give due weight and consideration. The Republic has submitted a brief as *amicus curiae* indicating that it considers the 2020 Notes and the Governing Documents to be national public interest contracts and, because they were not approved by the National Assembly, to be void *ab initio* and unenforceable under Venezuelan law. (*See generally* Republic Br.).[11] While the Court accords substantial weight and respectful consideration to the Republic's views, these views are not conclusive and do not persuade the Court to deviate from its analysis of Venezuelan law.

Broadly speaking, it is the "considered view of the Republic" that "the indenture and pledge at issue in this litigation and the 2020 Notes issued thereunder are national public interest contracts." (Republic Br. 5 (citing Vecchio Letter ¶ 8; Dkt. #164-10 (the "Special AG Report") ¶ 106)). The Republic relies on a letter previously submitted by Carlos Vecchio, the Venezuelan Ambassador to the United States, which letter the Court previously found it could properly consider under Federal Rule of Civil Procedure 44.1

---

[11] By the "Republic," the Court means "the Venezuelan National Assembly that was elected in 2015" (Republic Br. 1 n.1), which remains the recognized government of Venezuela in the eyes of the United States Government (*see* (Dkt. #393-1 (the "Kozak Letter") at 2 ("[T]he United States recognizes the 2015 National Assembly as the government of Venezuela.")).

(Dkt. #199), and on a report produced in August 2019 by Special Attorney General José Ignacio Hernández on behalf of the Republic (Special AG Report).

According to the Republic, the 2020 Notes and the Governing Documents are national public interest contracts because PDVSA is a state-owned enterprise in charge of national public interest economic activities, including CITGO, a strategic foreign asset of PDVSA. (Republic Br. 11-13). The Republic emphasizes the importance of PDVSA to the country's economy and international political strategy. (*See* Vecchio Letter ¶¶ 3, 7-8). It notes that Articles 302 and 303 of the Venezuelan Constitutional also stress the national importance of the petroleum industry and PDVSA. (Republic Br. 6-7). It highlights the National Assembly's September 2016 Resolution, which it claims "concluded that the documents that created the 2020 Notes … constituted a national public interest contract." (*Id.* at 12). And it decries "[t]he Maduro regime's attempt to pledge 50.1% of PDVSA's interest in CITGO Holding" as "an 'attempt to conduct a *de facto* privatization of PDVSA.'" (*Id.* (quoting Vecchio Letter ¶ 10)).

Moving from the factual to the legal, the Republic argues that Defendants' interpretation of *Andrés Velásquez* is incorrect. (Republic Br. 12-13). Like Plaintiffs and their proffered experts, the Republic's view is that contracts concluded by the Republic itself through the National Executive are included within a broader category of national public interest contracts, rather than that national public interest contracts are exclusively limited to those concluded by the Republic itself. (*Id.* at 13). The Republic points to the

60

*EDELCA* decision, as well as a decision of the Political-Administrative Chamber. (*Id.*). And the Republic believes its interpretation to be consistent with the relevant Resolutions of the National Assembly, which it argues to be the first-instance interpreter of the Constitution. (*Id.*).[12] The Republic urges the Court to defer to its views and deem the 2020 Notes and the Governing Documents void *ab initio* and unenforceable under Venezuelan law. (*Id.* at 15-17).

After carefully considering the Republic's submission, the Court declines to do so. The Supreme Court has held that, "[w]hen foreign law is relevant to a case instituted in a federal court, and the foreign government whose law is in contention submits an official statement on the meaning and interpretation of its domestic law," a federal court "should accord respectful consideration to a foreign government's submission, but is not bound to accord conclusive effect to the foreign government's statements." *Animal Sci. Prods., Inc.*, 585 U.S. at 36. The Supreme Court in *Animal Science Products* further instructed that:

> [T]he appropriate weight in each case will depend upon the circumstances; a federal court is neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials. When a foreign government makes conflicting statements, or, as here, offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission. … Relevant considerations include the statement's clarity, thoroughness, and support; its context and purpose; the transparency of

---

[12]    The Republic also maintains that Venezuelan law requires the proponent of a national public interest contract to obtain the National Assembly's approval prior to the execution of the contract, and not the opponent to have the National Assembly affirmatively invalidate it. (Republic Br. 13-14). This is of little relevance given that the Court and the parties agree that the National Assembly must approve national public interest contracts prior to their execution; the disagreement is over whether the 2020 Notes and the Governing Documents amount to national public interest contracts.

> the foreign legal system; the role and authority of the
> entity or official offering the statement; and the
> statement's consistency with the foreign government's
> past positions.

*Id.* at 43 (internal citation omitted).  In *PDVSA I*, this Court stated that, "[g]iven

the circumstances surrounding the Republic's submission" — in particular, the

fact that the Vecchio Letter was submitted one day prior to Plaintiffs' brief,

which then cited to the Vecchio Letter — "the Court [was] duly cautious of the

views [the Republic] [had] expressed and [was] not persuaded, based on said

submission and views."  495 F. Supp. 3d at 280.

The Court remains duly cautious of the views the Republic expresses in

its *amicus* brief, and ultimately does not defer to these views.  As Defendants

note, the Republic's brief was submitted two days before the parties' opening

briefs (*see* Def. Supp. Opp. 13), and the Republic's interpretation of *Andrés*

*Velásquez* and the principles embedded therein largely aligns that of Plaintiffs

and their proffered experts.  (*See* Pl. Supp. Br. 22 (citing Republic Br. 11-17)).

This obvious synergy sheds light on the "context and purpose" of the Republic's

statement, which is to supplement Plaintiffs' submissions in this litigation, in

addition to vindicating the Republic's own interests.  As for the other relevant

considerations, the Court finds that they cut in favor of the Republic, or are at

the very least neutral: (i) the Republic has clearly articulated its position; (ii)

the parties have thoroughly briefed the Court on the relevant points of

authority in Venezuela's legal system; (iii) the Republic is the government of

Venezuela in the eyes of the United States; and (iv) the Republic has taken

similar positions in this litigation, including in *amicus* submissions to the Second Circuit and the New York Court of Appeals.  (Republic Br. 15-16).

The Court has carefully considered the Republic's position regarding national public interest contracts and the significance of *Andrés Velásquez*, especially insofar as Plaintiffs have raised the very same issues.  But the Court, having reviewed the Republic's submissions and the parties' expert submissions, and having tempered due deference with the submission's context and purpose, finds that it simply cannot square the Republic's views with what Venezuelan law requires.  Certainly, contracts involving PDVSA are economically and politically important to the Republic.  But the Court reads Venezuelan law, through the binding decisions of the Constitutional Chamber of the Supreme Tribunal of Justice, to necessitate that the Republic itself, through the National Executive, conclude national public interest contracts. The Republic's contrary views do not persuade the Court to reach a different conclusion.

### 4. The Court Need Not Address Certain Other Issues of Venezuelan Law Presented by the Parties

The parties raise and debate other statutes and doctrines of Venezuelan law that might exempt PDVSA from the requirements of Article 150.  For example, Defendants have argued that "Venezuela's Organic Law of the Financial Administration of the Public Sector has long expressly exempted PDVSA's debt from any … requirement" that PDVSA submit proposed debt issuances for National Assembly approval.  (Def. Br. 38; *see also* Pl. Supp. Br. 18-19).  Such statutory exceptions from the Constitution's requirement do not

factor into the Court's analysis because the Court's conclusion that the 2020 Notes and the Governing Documents are not national public interest contracts means that Article 150's requirement of National Assembly authorization does not apply.  In other words, because the rule does not apply, the exception to the rule is analytically insignificant.

Defendants also argue that, even if the 2020 Notes and the Governing Documents were required to be approved by the National Assembly, they would nevertheless be enforceable because they are entitled to a presumption of legality, and because enforcement is required to protect the "legitimate expectations" of the 2020 Noteholders and Defendants.  (Def. Supp. Br. 28; *cf.* Pl. Supp. Br. 19-21).  The Court need not address these alternative arguments because, once again, the Court has determined that the 2020 Notes and the Governing Documents did not require National Assembly approval.[13]

---

[13]    The parties have raised a number of other issues that have little or no bearing on the narrow issue of Venezuelan law that the Court has determined.  To begin, Defendants note that Plaintiffs and their counsel at Hogan Lovells represented to the 2020 Noteholders that they had no reason to believe the Exchange Offer was invalid, and that a Hogan Lovells memorandum characterizes *Andrés Velásquez* as binding authority on the scope of national public interest contracts.  (Def. Supp. Br. 28 n.7; Def. Supp. Opp. 6; Pl. Opp. 56.1 ¶¶ 334-337, 344-345, 351-352).  Furthermore, Defendants note that PDVSA has repeatedly issued secured debt without National Assembly approval, and that Plaintiffs have identified no cases invalidating transactions such as the Exchange Offer for lack of National Assembly authorization.  (Def. Supp. Br. 22-23).  Plaintiffs counter that Defendants' characterization is misleading because most of these transactions were entered into by a foreign subsidiary; under the prior constitution; did not involve a foreign domiciled counterparty; or took place when the Chávez and Maduro regimes were usurping the Constitution.  (Pl. Supp. Opp. 15-16).  Defendants also note that Plaintiffs have taken shifting positions on the meaning of "national public interest contracts" throughout this litigation, such as that a national public interest contract is one inextricably related to the collective interests of Venezuelan citizens or could seriously compromise the Republic's assets; that a national public interest contract is one related to PDVSA's oil industry activities in Venezuela, which are of great national interest; and that contracts entered into by the Decentralized Public Administration are national public interest contracts.  (Def. Supp. Opp. 10-12).

5.    **The 2020 Notes and the Governing Documents Are Valid Under Venezuelan Law**

According to Article 150, National Assembly approval is required for national public interest contracts where the contract is executed with foreign states or official entities, or with companies not domiciled in Venezuela. Venezuelan Const., art. 150. The parties do not contest that the contracts at issue here were with companies not domiciled in Venezuela. The parties to the Indenture were PDVSA; its subsidiary PDVSA Petróleo; MUFG, a U.S. national banking association; GLAS, a New York limited liability company; and other entities formed under New York and Luxembourg law. (*See* Bliss Decl., Ex. 10 at 1). And, to the extent *Andrés Velásquez* established other necessary requirements for national public interest contracts, such as that their purpose is "determinant or essential to accomplishing the purposes and objectives of the Venezuelan State … while seeking to satisfy individual and coinciding interests of the national community and not just of a specific sector thereof"

---

To the extent the Court has not already addressed these issues (*e.g.*, the Court has rejected the argument that Decentralized Public Administration entities can enter into national public interest contracts), it concludes that they stray too far from the question of Venezuelan law at the heart of the matter. The Court has zeroed in on whether Venezuelan constitutional law requires National Assembly approval for contracts that were not entered into by the Republic itself. It does not.

Additionally, developments in Venezuela following *PDVSA I* do not lead the Court to alter its conclusions about what Venezuelan law requires. Plaintiffs maintain that resolutions passed by the 2020 National Assembly — which they concede is "illegitimate" — saying that contracts entered into by PDVSA require National Assembly approval demonstrate an "unbroken practice and constitutional understanding" that Decentralized Public Administration entities can enter into national public interest contracts. (Pl. Supp. Opp. 14 n.64; Dkt. #319 at 5). Not so. Once again, the Court defers to the Constitutional Chamber's binding interpretation of constitutional provisions, and not to National Assembly resolutions. The Court also need not give respectful consideration or substantial weight to the statements of a concededly unrecognized government entity such as the 2020 National Assembly. *Cf. Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co. Ltd.*, 585 U.S. 33, 36 (2018).

(*Andrés Velásquez* at 16-17), these requirements are not at issue. Their presence or absence is of little significance given that the Court has determined that a necessary ingredient (the participation of the Republic itself) is missing. Having determined that the 2020 Notes and the Governing Documents are not national public interest contracts due to this missing ingredient, and therefore did not require National Assembly approval, the Court finds that the 2020 Notes and the Governing Documents were validly issued without National Assembly approval under Venezuelan law.

## C.    The Act of State Doctrine Does Not Apply

The Court previously ruled that the act of state doctrine did not apply here. *PDVSA I*, 495 F. Supp. 3d at 270-83. On appeal, in *PDVSA II*, the Second Circuit ruled that the act of state doctrine would not be implicated if Venezuelan law were irrelevant and New York law in fact governed the validity of the 2020 Notes and the Governing Documents. 51 F.4th at 466-67. The Second Circuit considered the choice of law analysis to be a "necessary antecedent to the act-of-state analysis in this case." *Id.* at 467. After the New York Court of Appeals held that Venezuelan law governs the validity of the 2020 Notes and the Governing Documents in *PDVSA III*, 41 N.Y.3d at 473, 477, the Second Circuit in *PDVSA IV* considered two possible roles the act of state doctrine could play on remand. The Second Circuit instructed that, if the Court were to determine that the 2020 Notes and the Governing Documents were invalid under Venezuelan law, then there would be "no role for the act-of-state doctrine to play because antecedent questions [would] render the doctrine

irrelevant, or at least superfluous." *PDVSA IV*, 106 F.4th at 270.  If the Court instead were to conclude "that the Exchange Offer was valid under Venezuelan law, then the question of whether any or all of the legislature's resolutions constitute acts of state that invalidate the Exchange Offer takes center stage." *Id.*  The Second Circuit "express[ed] no view as to the applicability and effect of the act-of-state doctrine," while noting that its "decision not to conduct a plenary review of the district court's act-of-state doctrine analysis should not be construed as implicitly endorsing or rejecting it."  *Id.*

Because the Court has found that the 2020 Notes were validly issued under Venezuelan law, the act of state doctrine now takes center stage. Although the Second Circuit neither endorsed nor rejected the Court's act of state analysis, the Court is not writing on a blank slate.  Taking into account the supplemental briefing, the position of the Republic in its *amicus* brief, and the Government's 2025 Statement of Interest, the Court determines not to deviate from its prior conclusion that the act of state doctrine does not apply.

### 1. Applicable Law

The Court incorporates by reference its discussion of the act of state doctrine in *PDVSA I.*  495 F. Supp. 3d at 270-83.  For purposes of this Opinion, the Court reviews relevant principles of the doctrine.

"The act of state doctrine bars federal and state courts from 'declar[ing] invalid, and thus ineffective as a rule of decision for the courts of this country, the official act of a foreign sovereign.'"  *Celestin* v. *Caribbean Air Mail, Inc.*, 30 F.4th 133, 137 (2d Cir. 2022) (alteration in original) (quoting *W.S. Kirkpatrick &*

*Co.* v. *Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990) ("*Kirkpatrick*")).  "To qualify as 'official,' an act must be imbued with some level of formality, such as authorization by the foreign sovereign through an official 'statute, decree, order, or resolution.'"  *Kashef* v. *BNP Paribas S.A.* 925 F.3d 53, 60 (2d Cir. 2019) (quoting *Alfred Dunhill of Lond., Inc.* v. *Republic of Cuba*, 425 U.S. 682, 695 (1976)).

The act of state doctrine functions as "a 'rule of decision' for the merits: It compels federal and state courts to treat foreign official acts as 'valid' in the sense that a court may not declare them 'null and void.'"  *Celestin*, 30 F.4th at 138 (quoting *Kirkpatrick*, 493 U.S. at 406).  The doctrine "flows from a broad avoidance principle" and "is built around separation of powers concerns relating to foreign affairs."  *PDVSA IV*, 106 F.4th at 269 (citing *Kirkpatrick*, 493 U.S. at 404 (quoting *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 423 (1964))).  "Act-of-state issues arise only 'when the outcome of the case turns upon … the effect of official action by a foreign sovereign.'"  *Id.* (omission in original) (quoting *Kirkpatrick*, 493 U.S. at 406).

The Court previously described "two crucial caveats to the act of state doctrine."  *PDVSA I*, 495 F. Supp. 3d at 271.  The first is that the Supreme Court has cautioned against applying the doctrine in an inflexible and all-encompassing manner.  Accordingly, "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."  *Allied Bank Int'l* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516, 521 (2d Cir. 1985) (quoting *Sabbatino*, 376 U.S. at 428).  Thus,

separation of powers concerns must be evaluated on a "case-by-case" basis.

*Id.* (citing *Tex. Trading & Milling Corp.* v. *Federal Republic of Nigeria*, 647 F.2d 300, 316 n.38 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148 (1982)).

The second caveat is known as the "extraterritorial limitation." *Id.* The Supreme Court has held that:

> [T]he [Judicial Branch] will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

*Sabbatino*, 376 U.S. at 428; *accord Allied Bank*, 757 F.2d at 520. "[W]here a taking is wholly accomplished within the foreign sovereign's territory, 'it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity.'" *Allied Bank*, 757 F.2d at 521 (quoting *Tabacalera Severiano Jorge, S.A.* v. *Std. Cigar Co.*, 392 F.2d 706, 715 (5th Cir.), *cert. denied*, 393 U.S. 924 (1968)). That is partly because, "under such circumstances, the court's decision would almost surely be disregarded within the borders of the foreign state." *Id.* The Court previously characterized the extraterritorial limitation as being animated by "a whiff of *realpolitik*." *PDVSA I*, 495 F. Supp. 3d at 274.

The Second Circuit in *Allied Bank* instructed that the act of state doctrine is not applicable when the situs of debt at the time it was promulgated was the United States, rather than a foreign country. 757 F.2d at 521. *Allied Bank* then distinguished two ways of determining the situs of debt. The first

69

"depends in large part on whether the purported taking can be said to have 'come to complete fruition within the dominion of the [foreign] government.'" *Id.* (alteration in original) (quoting *Tabacalera*, 392 F.2d at 715-16). "Put another way, the focus is on whether the act 'is an accomplished fact' because the foreign government 'has the parties and the *res* before it and [has] act[ed] in such a manner as to change the relationship between the parties touching the *res.*'" *PDVSA I*, 495 F. Supp. 3d at 274 (alterations in original) (quoting *Tabacalera*, 392 F.2d at 715 (italicizations added)). "The foreign government must be 'physically in a position to perform a *fait accompli.*'" *Id.* (quoting *Tabacalera*, 392 F.2d at 715 (italicizations added)). The second, or traditional situs analysis, "focuse[s] on the place of payment; the location of the parties; and the location of the contracting for the debt." *Id.* at 274-75 (citing *Allied Bank*, 757 F.2d at 521).

Lastly, "[a]cts of foreign governments purporting to have extraterritorial effect — and consequently, by definition, falling outside the scope of the act of state doctrine — should be recognized by the courts only if they are consistent with the law and policy of the United States." *Allied Bank*, 757 F.2d at 522 (citing *United States* v. *Belmont*, 301 U.S. 324, 332-33 (1937); *Banco Nacional de Cuba* v. *Chem. Bank N.Y. Tr. Co.*, 658 F.2d 903, 908-09 (2d Cir. 1981); *Republic of Iraq* v. *First Nat'l City Bank*, 353 F.2d 47, 51 (2d Cir. 1965)). The Court in *PDVSA I* called this the "[p]ermissive [a]pplication" of the act of state doctrine and described it as a "possible extension to the act of state doctrine." 495 F. Supp. 3d at 281; *see also id.* at 281 n.11 (noting that the permissive

application is but a "possible" extension to the act of state doctrine in part

because there are few examples of courts using the permissive application

(citing *Hausler* v. *JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 57

(S.D.N.Y. 2015))).

### 2.    The Act of State Doctrine Still Does Not Apply

#### a.    The *PDVSA I* Decision

In *PDVSA I*, the Court determined that the act of state doctrine was

inapplicable despite finding that the May 2016 Resolution, the September 2016

Resolution, and the October 2019 Resolution were all official acts of a foreign

sovereign.  495 F. Supp. 3d at 271-73.  The Court reasoned that the act of

state doctrine was inapplicable because (i) these official acts resulted in

extraterritorial takings and (ii) the Resolutions did not invalidate the 2020

Notes and the Governing Documents *ex ante*.  *Id.* at 273-81.  The Court also

found that the permissive application of the act of state doctrine was not

warranted based on the proffered interests of the United States Government.

*Id.* at 281-83.  Without restating its analysis *verbatim*, in this section the Court

reviews in more detail its findings regarding the act of state doctrine in *PDVSA

I*, especially as relevant to the issues raised by the parties, the Republic, and

the United States Government in their supplemental submissions.

The Court first found that the three Resolutions were sufficiently formal,

"passed by and attributable to the [foreign] sovereign, and ... no less official

because Defendants' Venezuelan law expert contends that they lack the status

of laws."  *PDVSA I*, 495 F. Supp. 3d at 271-72.  The Court then found that

recognition of a foreign sovereign — in this case, the 2015 National Assembly as the Venezuelan sovereign — had retroactive effect. *Id.* at 272 (citing *United States* v. *Pink*, 315 U.S. 203, 223 (1942)). In so finding, the Court rejected Defendants' argument that retroactivity is limited to situations where a new government arises out of a civil war or revolution. *Id.* at 272-73. The Court also determined that the 2015 National Assembly was the sovereign of Venezuela retroactive to its commencement, even though Mr. Maduro was recognized as the legitimate president of Venezuela up until January 2019. *Id.* at 273.

The Court nonetheless concluded that the act of state doctrine did not apply because, although the Resolutions were official acts of a foreign sovereign that purported to effect a taking by invalidating Plaintiffs' debt obligations and the correlative reclamation of the CITGO collateral, any such taking was extraterritorial. *PDVSA I*, 495 F. Supp. 3d at 273. Applying *Allied Bank*, the controlling case on the issue, the Court analyzed the situs of the taking under the two methods described therein. *Id.* at 274-75. Under the "complete fruition" situs analysis, the Court reasoned that Venezuela was not in a position to invalidate the 2020 Notes and the Governing Documents because principal and interest payments were obligated to be paid in U.S. dollars in New York City, and because the collateral was located in New York City. *Id.* at 275. Likewise, under the traditional "situs of the debt" analysis, the Court reasoned that the "center of gravity," and therefore the situs of the debt, for both the 2020 Notes and the collateral was New York, not Venezuela. *Id.*

72

The Court considered Plaintiffs' "strongest argument" to be that *Allied Bank* was distinguishable because the National Assembly's Resolutions, coupled with its omission of authorization for the Exchange Offer, precluded the 2020 Notes and the Governing Documents from ever coming into valid legal existence. *PDVSA I*, 495 F. Supp. 3d at 276. The Court nevertheless rejected this argument because it lacked support in the plain language of the Resolutions. *Id.* By its own terms, the May 2016 Resolution does not apply to contracts entered into by PDVSA, rather than the National Executive. *Id.* at 276-77. Likewise, the September 2016 Resolution evinces no intent to affirmatively invalidate the Exchange Offer when it only rejects the pledging of CITGO as collateral and does not define the Exchange Offer as a national public interest contract. *Id.* at 277-78. And the October 2019 Resolution, which resolves that the Exchange Offer and the 2020 Notes were contracts of national public interest and violated Article 150, only did so after investigations conducted in coordination with the Office of the Special Prosecutor (cutting against a finding that the earlier Resolutions had nullified the Exchange Offer *ex ante*), and conveniently during "the very month in which substantial interest and principal payments fell due under the Governing Documents." *Id.* at 278. Even assuming *arguendo* that these Resolutions did invalidate the Exchange Offer and the 2020 Notes, the Court could not "contort the act of state doctrine to accommodate Plaintiffs' theory" because it "would still be compelled to find that the taking took place outside of Venezuela." *Id.* at 280-81.

The Court also declined to defer to the statements of Freddy Guevara, a 2015 National Assembly member, who purportedly stated in connection with the September 2016 Resolution that the National Assembly should not recognize a national interest contract that did not come before the Assembly. *PDVSA I*, 495 F. Supp. 3d at 278. The Court focused on the "plain language of the September 2016 Resolution," which the floor statements of a Venezuelan lawmaker such as Mr. Guevara could not alter. *Id.* And the Court likewise declined to defer to the views of the Republic, expressed by Ambassador Vecchio, that the September 2016 Resolution and October 2019 Resolution invalidated the Exchange Offer and rendered the 2020 Notes void *ab initio*. *Id.* at 278-79. Applying *Animal Science Products*, the Court determined not to give conclusive effect to the Republic's views in light of the clear language of both Resolutions; the Special AG Report, which stated that the National Assembly did not declare the 2020 Notes unlawful in the September 2016 Resolution; and the fact that the Republic's submissions were offered specifically for the purposes of this litigation, and seemingly in coordination with Plaintiffs. *Id.* at 279-80.

Lastly, the Court determined that permissive application of the act of state doctrine, consistent with the law and policy of the United States, was not warranted. Having solicited the views of the United States, the Court evaluated the Government's 2020 Statement of Interest, as well as a letter from United States Special Representative for Venezuela Elliott Abrams, and the Government's statements at the September 25, 2020 oral argument. *PDVSA I*,

495 F. Supp. 3d at 281-82. The Government emphasized its support for the efforts of the 2015 National Assembly to restore democracy to Venezuela, as well as its interest in avoiding uncertainty in contract enforcement due to potential adverse effects on international financial markets and efforts to restructure sovereign debt. *Id.* at 282 (citing 2020 SOI 7-8). Still, the Government took no position on whether the act of state doctrine applied in this case in light of unresolved questions of fact and Venezuelan law. *Id.* at 282 (citing 2020 SOI 9). Neither the Abrams letter, nor the Government's non-committal statements at oral argument, brought the Court any closer to determining whether recognition of the 2015 National Assembly's purported invalidation was consistent with the law and policy of the United States. *See id.* Accordingly, "cognizant of the United States' well-documented support both for Interim President Guaidó and for his efforts to restore democracy and financial health to Venezuela," and aware of the "deprivations that the Maduro regime has visited upon the Venezuelan people," the Court declined to permissively apply the act of state doctrine; instead, the Court gave effect to the United States' "substantial interests" in stable financial markets, protecting creditors' expectations, and maintaining New York's status as a global commercial center — especially absent an affirmative statement by the United States in favor of granting comity to the National Assembly's actions. *Id.* at 282-83.

### b.    There Is No Reason to Depart from the Law of the Case

As noted, the Court in its discretion may depart from the law of the case and reconsider an issue if, for example, there has been an intervening change of controlling law, new evidence is available, or there is a need to correct a clear error or prevent manifest injustice.  *See Gulino*, 555 F. App'x at 40; *Quintieri*, 306 F.3d at 1230; *Tenzer*, 213 F.3d at 39.  In general, however, courts are loath to revisit earlier decisions absent extraordinary circumstances, *see Perlman*, 2024 WL 664968, at *5, and that is especially so where the issues the parties seek to revisit were so thoroughly briefed and considered, as here. Nevertheless, the Court will revisit its decision to the extent that the parties' supplemental briefing and expert submissions, the *amicus* brief submitted by the Republic, the Guevara Declaration, the Government's 2025 Statement of Interest, and the letter from Ambassador Kozak may have raised issues the Court did not consider, or else insofar as the parties persuade the Court that its decision not to apply the act of state doctrine was wrong.

After spending considerable time evaluating these new submissions, the Court is not persuaded to reach a different conclusion regarding the act of state doctrine.  The parties do not cite any developments in the law since *PDVSA I* was decided that would cast doubt on the Court's prior analysis. Instead, Plaintiffs would like the Court to redo its analysis of the May 2016, September 2016, and October 2019 Resolutions.  (Pl. Supp. Br. 28-32).  This time around, they would like the Court to give substantial weight to the Declaration of Freddy Guevara, the National Assembly member whose floor

76

statements the Court considered in *PDVSA I*, 495 F. Supp. 3d at 278, and to the Republic's *amicus* submission.  (*See* Pl. Supp. Br. 28-32).  Additionally, Plaintiffs maintain that the Court misapplied *Allied Bank*, which "involved a *retroactive* repudiation of debt that was indisputably valid when issued, [whereas] this case involves a foreign sovereign's *prospective* refusal to authorize newly issued debt."  (*Id.* at 33).  For their part, Defendants urge the Court to reaffirm its finding that the act of state doctrine does not apply.  (Def. Supp. Br. 30-35).  However, Defendants want the Court to reconsider its finding that the September 2016 Resolution was an official act of a foreign sovereign because, they argue, the 2015 National Assembly was not Venezuela's sovereign at the time.  (*Id.* at 32-35).

At the outset, the Court reaffirms its conclusion that the September 2016 Resolution was an official act of a foreign sovereign.  Previously, the Court rejected Defendants' argument that the National Assembly was not the Venezuelan sovereign in 2016 because it determined that the United States' recognition of the National Assembly as the only legitimate branch of the Venezuelan government was retroactive to the National Assembly's commencement in 2015.  *PDVSA I*, 495 F. Supp. 3d at 272-73.  At the same time, the Court acknowledged that a corollary to Defendants' argument had "more traction," namely, that the National Assembly should not be recognized as the Venezuelan sovereign in 2016 because the event that precipitated the United States' recognition of Mr. Guaidó in January 2019 was the presidential election in May 2018.  *Id.* at 273.  Perhaps the Court's comment that this

argument had "more traction" has led Defendants to renew their challenge to the National Assembly's status as a foreign sovereign with respect to the September 2016 Resolution.  In *PDVSA I*, the Court decided that "it is *of no moment* that the Maduro regime was the recognized government in 2016, since the Executive Branch's [2019] recognition of the National Assembly and Mr. Guaidó as legitimate *necessarily means that the Maduro regime* is and *was illegitimate.*"  *Id.* (internal citation omitted) (emphases added).

Because the United States' January 2019 recognition of the National Assembly was retroactive to the Assembly's commencement, the September 2016 Resolution was an official act of a foreign sovereign.  Defendants incorrectly maintain that retroactive recognition of a foreign government applies only in circumstances where there are competing claims to sovereignty that are later resolved, such as in cases of revolution or civil war, and that the lack of such competing claims in 2016 means recognition of the National Assembly is not retroactive to that year.  (Def. Supp. Br. 33).  In fact, the retroactivity principle applies from the commencement of the recognized government's existence, as the Court affirmed in *PDVSA I*, 495 F. Supp. 3d at 273.  *See Pink*, 315 U.S. at 223 ("[R]ecognition of a foreign sovereign conclusively binds the courts and is retroactive and validates all actions and conduct of the government so recognized *from the commencement of its existence.*" (emphasis added) (internal quotation marks omitted)).  The Court vindicated this principle in *PDVSA I* while recognizing that situations where a new government arises out of a civil war or revolution "is the scenario in which

78

retroactivity typically applies." *PDVSA I*, 495 F. Supp. 3d at 272 (citing

*Konowaloff* v. *Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) (finding

that recognition of revolutionary government had retroactive effect)).  This

Court still believes that limiting the retroactive effect of recognition to "such

violent circumstances" would "nonsensically limit the effect of the Executive

Branch's actions to certain factual scenarios, which runs directly counter to

the separation of powers concerns animating the act of state doctrine."  *Id.* at

272-73.[14]

Just as the Court reaffirms its conclusion that the September 2016

Resolution was an official act of a foreign sovereign, so too does the Court

reaffirm its conclusion that the May 2016, September 2016, and October 2019

Resolutions did not preemptively invalidate the Exchange Offer and the 2020

Notes.  Plaintiffs previously argued that there was no "taking" for purposes of

---

[14]    Defendants also maintain that their limited view of retroactivity is vital to protecting the "reliance interests" of parties who transact with previously legitimate governments. (Def. Supp. Br. 34-35 (citing *Banco de Espana* v. *Fed. Rsrv. Bank of N.Y.*, 114 F.2d 438, 440, 444 (2d Cir. 1940); *Guar. Tr. Co. of N.Y.* v. *United States*, 304 U.S. 126, 140-41 (1938))).  The Court rejects this argument for two reasons.  First and foremost, without downplaying the importance of reliance interests, the Court finds that separation of powers concerns require it to give retroactive effect to the Executive Branch's recognition of the National Assembly as the Venezuelan sovereign.  Moreover, Defendants' reliance interests are insignificant in context.  The Second Circuit in *Banco de Espana* cited *Guaranty Trust Co.* for the proposition that persons who dealt with a former government are entitled to rely upon the finality and legality of that government's acts.  114 F.2d at 444 (citing *Guar. Tr. Co.*, 304 U.S. at 140).  The Supreme Court in *Guaranty Trust Co.* noted in particular that, if transactions that were "valid when entered into[ ] were to be disregarded after the later recognition of a successor government, recognition would … yield[ ] none of the advantages of established diplomatic relations in enabling business transactions to proceed, and afford[ ] no protection to our own nationals in carrying them on."  304 U.S. at 140-41. But here, the Court has found that the 2020 Notes and the Governing Documents are valid, and again given the separation of powers interests at stake, it will not give effect to the generalized reliance interests of other parties, when Defendants' own reliance interests have been vindicated.

the extraterritorial limitation because the National Assembly's Resolutions and lack of authorization of the Exchange Offer precluded the 2020 Notes from ever coming into valid legal existence.  (Pl. Br. 22).  The Court rejected this argument in *PDVSA I*.  495 F. Supp. 3d at 276.  Now, in light of the new submissions — and even assuming that the Resolutions were affirmative, official acts of a foreign sovereign (*cf. id.* at 276 n.6) — the Court reconsiders whether the National Assembly through these Resolutions preemptively invalidated the Exchange Offer and the 2020 Notes, and finds again that it did not.

Previously the Court found that, because the text of the May 2016 Resolution is directed only at contracts of national public interest concluded by the National Executive, it is not directed at contracts entered into by PDVSA. *PDVSA I*, 495 F. Supp. 3d at 276-77.  Mr. Guevara, the National Assembly member, acknowledges that the "May Resolution did not expressly reject the Exchange Offer because it was not proposed until months later, in September 2016." (Guevara Decl. ¶ 7).  Mr. Guevara further explains that the May 2016 Resolution confirmed that only the National Assembly could authorize national public interest contracts, "which the National Assembly expressly understood to include, but not be limited to, those involving the National Executive as a party." (*Id.*).  The Republic likewise maintains that the Court misinterpreted the May 2016 Resolution, which it claims is not limited to contracts entered into by the National Executive because it purports to invalidate activities in contravention of Article 150.  (Republic Br. 20).  But neither Mr. Guevara nor

the Republic has controverted the plain language of the May 2016 Resolution, which refers to contracts concluded by "the National Executive" and only obliquely refers to conduct that "usurps the constitutional functions" as being "null and void." (Bliss Decl., Ex. 13 at 8-9). As before, the Court reads the May 2016 Resolution as not directly addressing the Exchange Offer.

With respect to the September 2016 Resolution, the Court previously concluded that it did not invalidate the Exchange Offer or the 2020 Notes because the Resolution only rejected the pledge of CITGO as collateral, and only invoked Article 187(9) of the Constitution to obtain information about the Exchange Offer, including by urging the Public Ministry to open an investigation. *PDVSA I*, 495 F. Supp. 3d at 277-78. On top of the floor statements the Court already considered, Mr. Guevara now explains that, in the September 2016 Resolution, the National Assembly "withheld [its] requisite constitutional authorization of the Exchange Offer pursuant to its determination that the Exchange Offer implicated the national interest." (Guevara Decl. ¶ 17). Along these lines, the Republic believes that the Court's reading of the September 2016 Resolution was unduly narrow because the September 2016 Resolution was an affirmative, categorical rejection of the Exchange Offer. (Republic Br. 21-22). According to the Republic, "[u]nder Venezuelan law, no talismanic phrases are required for the Assembly's expressed disapproval to have legal force." (*Id.* at 22). As such, the Republic argues that the National Assembly did not merely want to investigate the Exchange Offer, but categorically rejected it. (*Id.* at 23-24). The problem for

Plaintiffs and the Republic is that their views contradict the plain language of the September 2016 Resolution. As with its discussion of Article 335 *supra*, the Court is not looking for talismanic phrases. Rather, the Court analyzes the plain text of the September 2016 Resolution, which purports to summon the President of PDVSA to appear before the National Assembly, to reject the pledge of 50.1% of shares of CITGO as collateral, to urge the Public Ministry to open an investigation,[15] and to urge PDVSA to present a refinancing plan. (First Clark Decl., Ex. 44 at 3). It does not purport to invalidate the Exchange Offer. (*Cf. id.*). The Court thus reaffirms its prior conclusion.

As for the October 2019 Resolution, the Resolution "ratif[ies]" and "reiterates" that the 2020 Notes and the Governing Documents violated the Constitution, while referencing both the May 2016 Resolution and the September 2016 Resolution. (First Clark Decl., Ex. 50 at 1). By its own terms, then, the October 2019 Resolution did not *preemptively* invalidate the 2020 Notes and the Governing Documents. Indeed, Mr. Guevara describes the October 2019 Resolution as "reiterating" that the 2020 Notes were invalid because "the Assembly had *previously indicated the same* in the September 2016 Resolution, including by withholding authorization and categorically rejecting the pledge of CITGO." (Guevara Decl. ¶ 20 (emphasis added)). In any

---

[15]    It is of no moment that the investigation being called for was "criminal in nature — *i.e.*, to determine whether members of the Maduro regime were criminal[ly] liable precisely because the regime was pushing through a national public interest contract without seeking the National Assembly's approval." (Pl. Supp. Br. 31 (citing Republic Br. 8, 24-25, 27-28; Guevara Decl. ¶ 18)). According to the plain text of the September 2016 Resolution, the National Assembly was still calling for an investigation, criminal or not, rather than invalidating the Exchange Offer. (First Clark Decl., Ex. 44 at 3).

event, while reserving judgment on the applicability of the act of state doctrine pending resolution of the choice of law issues, the Second Circuit in *PDVSA II* agreed with this Court's ruling that "*Allied Bank* forecloses any argument that the [National Assembly's] October 2019 Resolution could operate on its own to retroactively void the 2020 Notes, Indenture, and Pledge Agreement." 51 F.4th at 466 n.6. Thus, the Court reaffirms its prior ruling regarding the October 2019 Resolution.

Regardless of whether the National Assembly through the Resolutions preemptively invalidated or retroactively repudiated the Exchange Offer and the 2020 Notes, the Court again concludes that the extraterritorial limitation described in *Allied Bank* precludes application of the act of state doctrine. On this point, Plaintiffs argue that, because the relevant official acts of the Venezuelan sovereign "predated the issuance of the debt, ... there was no property interest to take and, hence, no taking." (Pl. Supp. Br. 33 (citing *U.S. Olympic Comm.* v. *Intelicense Corp., S.A.*, 737 F.2d 263, 267 (2d Cir. 1984); *United States* v. *Sperry Corp.*, 493 U.S. 52, 59 (1989); *Grayton* v. *United States*, 92 Fed. Cl. 327, 337 (2010))). However, Plaintiffs' views of the extraterritorial limitation, and of the act of state doctrine more generally, are too formalistic. Previously the Court concluded that, even assuming *arguendo* that the National Assembly preemptively invalidated the Exchange Offer and the 2020 Notes, the extraterritorial limitation still precluded application of the act of state doctrine. *PDVSA I*, 495 F. Supp. 3d at 280-81. That is because "the situs component of the act of state doctrine is, at its core, an eminently practical

analysis." *Id.* at 280 (citing *Bandes* v. *Harlow & Jones, Inc.*, 852 F.2d 661, 666 (2d Cir. 1988)).  The Second Circuit has held that the rationale animating the act of state doctrine "does not extend to property located within the United States," where federal courts' "jurisdiction is paramount."  *Bandes*, 852 F.2d at 666; *see also id.* ("Conversely, the foreign sovereign is acting beyond *its* enforcement capacity when it involves itself within our nation's jurisdiction."). And "[f]or purposes of the act of state doctrine, a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it."  *Menendez* v. *Saks & Co.*, 485 F.2d 1355, 1364 (2d Cir. 1973), *rev'd on other grounds sub nom. Alfred Dunhill of Lond., Inc.*, 425 U.S. 682.

Plaintiffs now argue that, because "[t]his case concerns *Venezuelan* decrees, issued under *Venezuelan* law in *Venezuela*, directed at *Venezuelan* state-owned entities *prior* to the existence of the purported debt obligation … the situs test provides no basis to decline to apply the act of state doctrine." (Pl. Supp. Br. 34 (citing *Fed. Treasury Enter. Sojuzplodoimport, OAO (FTE)* v. *Spirits Int'l B.V.*, 809 F.3d 737, 742-45 (2d Cir. 2016) ("*FTE*"); *Banco de Espana* v. *Fed. Rsrv. Bank of N.Y.*, 114 F.2d 438, 444 (2d Cir. 1940)); *see also* Republic Br. 19-20 (advancing similar argument)).  But, as the Court found in *PDVSA I*,

> [t]he fact remains that papers were signed, contracts were executed, [and] payments are due in New York, and the collateral sits waiting in a vault in New York. Venezuela has no power, save by the actions of this Court or intervention by the United States, to stop Defendants from enforcing their contractual remedies. And it is that impotence to complete the expropriation that makes clear that no taking has taken place in Venezuela.  Moreover, it is irrelevant that the

> Resolutions were issued in Venezuela, "since the act of
> state doctrine looks to actual dominion over property
> rather than to the mere execution of official
> documents."

495 F. Supp. 3d at 280-81 (quoting *Drexel Burnham Lambert Grp. Inc.* v.

*Galadari*, 610 F. Supp. 114, 118 (S.D.N.Y.), *aff'd in relevant part*, 777 F.2d 877

(2d Cir. 1985)).  That distinguishes this case from *FTE*, where the Second

Circuit reversed the district court's refusal to apply the act of state doctrine

because the district court had found that the foreign sovereign's act concerned

a property interest in the United States.  *FTE*, 809 F.3d at 744.  The Second

Circuit instead concluded that the Russian government's assignment of

trademark rights and interests did not "impair[ ] anyone's property rights or

affect[ ] the jurisdiction of the United States courts to decide the competing

claims to ownership of the" trademarks at issue.  *Id.*  Rather than confiscating

property, the Russian government had merely "*transfer[red]* whatever rights the

Russian Federation may already have in the Marks to FTE."  *Id.*  Put another

way, "the sovereign act was a wholly intragovernmental transfer of rights,

executed by the sovereign acting as a government"; it was "an internal act

that … impair[ed] no commercial interest of anyone else."  *Id.* at 744-45.  By

contrast, the National Assembly's official acts — even if they preemptively

invalidated the Exchange Offer and the 2020 Notes, which they did not — did

impair property rights of U.S. creditors concerning debt sited in the United

States, and would affect the jurisdiction of the courts of the United States.

These official acts did not come to complete fruition within the dominion of

Venezuela.  *Cf. Bandes*, 852 F.2d at 666; *Allied Bank*, 757 F.2d at 521.

Accordingly, the Court reaffirms its conclusion that the act of state doctrine

does not apply in light of the doctrine's extraterritorial limitation.  *See PDVSA I*,

495 F. Supp. 3d at 273-81.[16]

### 3.    The Permissive Application of the Act of State Doctrine Remains Unwarranted

Finally, Plaintiffs maintain that, "[e]ven if the National Assembly's

sovereign acts purported to have extraterritorial effect, such acts would

warrant deference under the 'permissive' application of the act of state doctrine

as 'consistent with the law and policy of the United States.'"  (Pl. Supp. Opp. 18

n.80 (quoting *Allied Bank*, 757 F.2d at 522)).  As potential support for this

argument, Plaintiffs urged the Court to seek a statement of interest from the

United States, as it did during the first round of briefing.  (*Id.*; *see* 2020 SOI).

The Court did so on July 17, 2025.  (Dkt. #390).  On August 29, 2025, the

Government submitted its statement of interest (*see* 2025 SOI), along with a

letter from Ambassador Michael G. Kozak, Senior Bureau Official in the Bureau

of Western Hemisphere Affairs in the U.S. Department of State, to Brenna

Jenny, Deputy Assistant Attorney General, Civil Division, U.S. Department of

---

[16]    The Republic contends that the "financial markets' reaction to the National Assembly's actions further underscores their import as unambiguous acts of state."  (Republic Br. 24).  But the Republic cites no case law for this proposition, and it has no significance to the Court's act of state doctrine analysis.  Nor does the Republic's explanation of the Special Attorney General's Report factor significantly into the Court's interpretation of the plain text of the September 2016 Resolution.  (*Cf. id.* at 24-25 (citing Special AG Report ¶¶ 2, 160-161, 164, 170(b))).  The Special AG's Report may be "consistent with the Republic's understanding" that the September 2016 Resolution rendered the 2020 Notes void *ab initio*, but the Court has already explained why the Republic's understanding contradicts the plain text of the September 2016 Resolution.  (*Id.* at 25).

Justice (Kozak Letter).  Having considered the 2025 Statement of Interest and the Kozak Letter, the Court reaffirms its prior conclusion that the permissive application of the act of state doctrine is not warranted.

In the 2025 Statement of Interest, the Government "affirm[s] its recognition of, and firm support for, the 2015 National Assembly of Venezuela as the government of Venezuela," because it is "the only government of Venezuela duly elected by the Venezuelan people."  (2025 SOI 1).  In his letter submitted in connection with the 2025 Statement of Interest, Ambassador Kozak favorably cites the 2020 letter from Elliott Abrams, the United States Special Representative for Venezuela (Dkt. #213-1 (the "Abrams Letter")), which Kozak characterizes as having "comprehensively articulated several policy considerations."  (Kozak Letter 1).  Ambassador Kozak echoes Special Representative Abrams's view that "Nicolás Maduro and his coterie of corrupt associates have ravaged Venezuela's economy, inflicted serious human rights abuses upon innocent citizens, and have exploited and squandered the Venezuelan people's assets, including [PDVSA]."  (*Id.*).  According to Ambassador Kozak, in the interim, the situation has "only worsened due to Maduro's cruelty, corruption, and inhuman indifference to the misery of tens of millions of his countrymen."  (*Id.*).  The Ambassador further states that, in July 2024, the Venezuelan people "overwhelmingly cast their ballots for opposition candidate Edmundo González Urrutia," though Mr. Maduro declared himself the winner.  (*Id.* at 1-2).  As a result, "Maduro does not speak for the Venezuelan people," and the "2015 National Assembly was and remains the

87

only democratically elected public institution in Venezuela," — indeed, it is "the government of Venezuela" despite changes in leadership since the United States last submitted its views to this Court.  (*Id.* at 2).  In the eyes of the United States, "the views of the 2015 National Assembly on questions of Venezuelan law are entitled to the same respectful consideration owed to any foreign government's statements regarding its own domestic law."  (*Id.*).

More specifically, the Government maintains that the views expressed by the Republic in its *amicus* brief regarding Venezuelan law "constitute the views of a foreign government that deserve the same 'respectful consideration' from the Court that would be due to any foreign sovereign under [*Animal Science Products*]."  (2025 SOI 2 (quoting *Animal Science Prods., Inc.*, 585 U.S. at 36)).  At the same time, the Government stresses that, per *Animal Science Products*, the Court is not bound to give conclusive effect to the views of a foreign government such as the 2015 National Assembly.  (*Id.* at 2-3 (citing *Animal Science Prods., Inc.*, 585 U.S. at 36, 43)).

With respect to the merits of the case, the Government refers the Court to the views set forth in the 2020 Statement of Interest and the accompanying Abrams Letter.  (2025 SOI 3).  The United States continues to "take[ ] no position on the operation of Venezuelan law in this case or the application of the act of state doctrine."  (*Id.* at 3 (citing 2020 SOI 4-7)).  The United States also "reiterates its substantial interest in avoiding uncertainty in lawful contractual relations and an orderly process for restructuring sovereign debts for which creditors can legitimately expect payment."  (*Id.* (citing 2020 SOI 8-

9)).  In other words, the 2025 Statement of Interest and Kozak letter leave the Court right back where it started.  The permissive application of the act of state doctrine is thus unwarranted for the reasons given in *PDVSA I*, 495 F. Supp. 3d at 281-83.

In sum, the Court reaffirms its prior conclusion that the act of state doctrine does not apply.

## CONCLUSION

For all of the above reasons, Defendants' motion for summary judgment is GRANTED IN PART.  As the parties agreed, the Court reserves decision on Defendants' counterclaims and the effect of the validity of the 2020 Notes and the Governing Documents under New York law.  Plaintiffs' cross-motion for summary judgment is DENIED.  The parties are hereby ORDERED to submit a joint letter on or before **October 16, 2025**, proposing next steps in this action.

SO ORDERED.

Dated:    September 18, 2025
          New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge